**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **JOHN COREY FRASER, et al,** | ) | |
| **on behalf of themselves and all** | ) | |
| **others similarly situated as a Class;** | ) | ) |
| *Plaintiffs*, | ) | **Case No. 3:22-cv-00410** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BUREAU OF ALCOHOL,** | ) | |
| **TOBACCO, FIREARMS** | ) | **CLASS ACTION** |
| **AND EXPLOSIVES, et al.** | ) | |
| *Defendants* | | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS

**COME NOW** the Plaintiffs, Mr. John "Corey" Fraser, Mr. Joshua McCoy, Mr. Tyler McGrath, and Mr. Ian Shackley, (collectively, "Plaintiffs"), by and through counsel, and on behalf of themselves and a pending Class of those similarly situated, provide their Response in Opposition to the Defendants' Motion to Dismiss.

### Argument

### I.    The Plaintiffs Have Standing.

The Government argues that the Plaintiffs lack standing to bring this suit. To establish Article III standing to bring a suit before this Court, a plaintiff (1) "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) "it must be likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The Plaintiffs suffer from an

injury that is both actual and inevitable, it does not come as the result of third-party action, and such injury is capable of redress by this Court.

Mr. Fraser was denied his purchase of a previously unowned handgun from an FFL due to the laws at issue. Aware of his mandated denial, the other Plaintiffs are not required to attempt a frivolous, inevitable denial or the potentially unlawful act of aiding, abetting, or conspiring with an FFL to violate the laws at issue by enticing the sale. The Government argues FFLs may sell handguns to the parents or guardians of those under twenty-one, and such parents or guardians may then gift these firearms to their children if they are not otherwise prohibited from receiving or possessing a firearm. *See* Opinion of ATF Chief Counsel, No. 23362 (Dec. 5, 1983). Nevertheless, these parents may not buy firearms for their children with money provided by their children if they are under the age of twenty-one. *See Hirschfeld v. Bureau of Alcohol, Tobacco & Explosives*, 5 F.4th 407, 413 n.4 (4th Cir. 2021) (vacated for mootness); *see also* 18 U.S.C. §§ 922(a)(6), 924(a)(1)(A); *see also Abramski v. United States*, 573 U.S. 169, 193 (2014) (finding a violation of §§ 922(a)(6) and 924(a)(1)(A) when an individual prohibited from purchasing gun used straw man to acquire it). This eliminates their ability to engage in the protected activity of commercial procurement of handguns—the "quintessential self-defense weapon." *Heller*, at 629.

The Plaintiffs remain subject to injury capable of redress, therefore they maintain standing for these claims to be ruled upon on the merits. The Government argues that adults of able body and mind could theoretically use their parents to purchase the desired firearms and ammunition from an FFL, therefore they have not made the necessary showing that the laws at issue interfere with their Second Amendment rights. Not only is this unnecessary, as the Government agreed there is no issue of material fact left to be established and has not shown that these parents would purchase such firearms, but the argument is irrelevant. Free citizens do not maintain "legal

guardians" or other State-sanctioned intermediaries for the purpose of exercising fundamental liberties, for they are fully emancipated adults and the rights are natural. There is no example in the history of Constitutional jurisprudence of law-abiding, adult citizens of able mind and body having to subject their fundamental liberties to the approval or participation of his or her parent for exercise. Moreover, parental-oversight restrictions on other fundamental liberties have been routinely invalidated, even where minors are involved. *See, e.g., Planned Parenthood v. Danforth*, 428 U.S. 52, 74–75 (1976). The "parent as a third-party intermediary" doctrine does not exist. The Government's argument is most appropriately considered as a defense on the merits to the regulatory scheme generally, not an argument against Article III standing. The Constitution's Article III standing requirement does not demand the Plaintiffs to subject fundamental liberties to the discretion of parents and no such requirement has ever been upheld. These individuals are independent. The Fourth Circuit considered the exact challenge before this Court and never held the plaintiffs lacked standing based on a failure to plead that their parents actually refused to purchase the relevant handguns. *See Hirschfeld*, 5 F.4th 407 (ruling on the merits); *see also National Rifle Ass'n v. BATFE*, 700 F.3d 185, 196 (5th Cir. 2012) (ruling on the merits). Should this Court adopt the Government's position, it would be unprecedented and run afoul of every basic tenant concerning justiciability and constitutional protections.

## II.   The Laws At Issue Violate The Fundamental Right To Bear Arms In Self-Defense As Protected By The Second Amendment.

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Our Nation's historical tradition teaches that there are certain "longstanding," "presumptively lawful regulatory measures" that the Second Amendment did not abrogate. *Heller*, 554 U.S. at 626–27, n.26. In *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court

reiterated the standard for applying the Second Amendment. In doing so, the Supreme Court rejected the two-step framework adopted by the courts of appeal, including the Fourth Circuit, calling such standard "inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." __ U.S. __, 142 S. Ct. 2111, 2129 (2022). Rather than means-end scrutiny, this Court must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2132. Courts must first interpret the Second Amendment's text, as informed by history. *Firearms Policy Coal., Inc. v. McCraw*, 2022 U.S. Dist. LEXIS 152834 at *7 (N.D. Tex. Aug. 25, 2022) (holding Texas' restrictions on right to carry handguns outside of the home by those under twenty-one runs afoul of the Second Amendment). When the plain text covers an individual's conduct, the Constitution presumptively protects such conduct. *Bruen*, 142 S. Ct. at 2129–30. The "Government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

A. **The Conduct At Issue Falls Within The Scope of The Second Amendment Because It Involves Law-Abiding Citizens Purchasing Firearms And Ammunition Typically Possessed For Lawful Purposes.**

When determining whether a particular regulation violates the Second Amendment, the first inquiry is whether the conduct falls within the scope of the Second Amendment's guarantee. *Id.*; s*ee also Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017). This historical inquiry seeks to determine whether the conduct was understood to be within the scope of the right at the time of ratification and courts look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee. *Id.*; *Heller*, 554 U.S. at 577–628; *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("[H]istorical meaning enjoys a privileged

interpretive role in the Second Amendment context."). The Court may rely on a wide array of materials to conduct a historical analysis. *Heller*, 554 U.S. at 600–26 (relying on courts, legislators, and scholars from before ratification through the late Nineteenth century to interpret Second Amendment). Because the plain text of the Second Amendment covers ordinary, law-abiding 18-to-20-year-olds purchasing a handgun for self-defense, that conduct is presumptively protected by the Constitution. *Cf. McCraw*, 2022 U.S. Dist. LEXIS 152834 at *20. It is the Government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127. The Government cannot carry this burden and the Motion to Dismiss must be denied. The Government argues that the commercial purchase of handguns and ammunition by those younger than twenty-one falls outside of the Second Amendment 'sprotection because of their age. This relies on specific traits of the Class rather than any particular risk associated with protected conduct (purchasing) or the uniquely heightened dangerousness of the firearms themselves (handguns). The Court must start "with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 580.

The "first salient feature" of the Second Amendment's "operative clause" is that it codifies a "right of the people." *Id*. at 579. The Bill of Rights uses the phrase "right of the people" two other times—in the First Amendment's Assembly-and-Petition Clause and in the Fourth Amendment's Search-and-Seizure Clause. *Id*. ("The Ninth Amendment uses very similar terminology, 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'"). All three instances "unambiguously refer to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body." *Id*. In all six other provisions of the Constitution that mention "the

people," the term clearly refers to all members of the recognized political community, not an unspecified subset. *Id*. at 580 ("This contrasts markedly with the phrase 'the militia' in the prefatory clause."). Those eighteen and older fall within the "the people" due to their unqualified presence as law-abiding adults within the body-politic and political community.

1. **The Government's Reliance On The Founding-Era's Age of Majority Supports The Plaintiffs' Claim Because The Prevailing Age of Majority Throughout The United States Is Eighteen Years Old.**

The Government posits that the Second Amendment allows the United States to use the age of twenty-one as a threshold for discrimination because the age of majority at common law was twenty-one at the time of our nation's Founding. *See* Motion to Dismiss at p.12 (citing William Blackstone, 1 Commentaries on the Laws of England 463 (1st ed. 1765); Black's Law Dictionary 847 (9th ed. 2009)). The position that the Second Amendment does not apply to those younger than the Founding-era's age of majority is not only extreme, it goes beyond the issue. The laws do not prohibit possession by those under twenty-one altogether and the Plaintiffs maintain their right to purchase firearms in private, unregulated transactions. The Government recognizes as much, but asks this Court to adopt an interpretation of *Heller*, *Bruen*, and the Second Amendment that would authorize a ban of all firearms from everyone younger than twenty-one because they suggest these young adults do not fall within the scope of Constitutional protection altogether.

Second, the Government presupposes that a legal declaration of adulthood via age is the determinative factor for whether the Second Amendment applies. Assuming this is true, *arguendo*, the determination must rely on the generally-recognized age of majority as established by the States rather than be forever-fixed at the age of twenty-one from the Founding-era. <u>*Bruen*</u> stressed that modern firearms regulations need not be a "dead ringer for historical precursors" and a law will pass constitutional muster if it is "analogous enough" to historical firearms restrictions." *Id.* at

2133. Courts must be able to conclude modern and historical regulations impose a "comparable burden" that is "comparably justified." *Id.* The Government cites Congressional intent underlying the restrictions at issue, stating that the statutory provisions were designed to address "[t]he clandestine acquisition of firearms by juveniles and minors," S. Rep. No. 90-1097, at 79. When Congress enacted these laws in 1968, majority was twenty-one in most states. It is now eighteen in at least forty-seven states, with Alabama (19), Mississippi (21), and Nebraska (19) being the only three with higher limits per statute. Additionally, the federal government defines a minor as one younger than eighteen in every context which includes a specified age. Three years after the passage of the Omnibus Crime Control and Safe Streets Act of 1968, eighteen-year-olds received the universal right to vote via the Twenty-Sixth Amendment. *See also Horsley v. Trame*, 808 F.3d 1126, 1130 (7th Cir. 2015) ("The age of majority was 21 until the 1970s."). Eighteen-year-old males have been required to register for Selective Service for over a century and eighteen-year-olds are treated as adults for criminal trials, jury service, and independence from parents. At eighteen, one can enter a binding contract, work without restriction, vote, and they are held responsible for their own taxes. For these and other reasons, the age of majority must be recognized as eighteen for the purpose of the Second Amendment. If the Government's argument is correct— that the Founders considered age of majority to govern the Second Amendment—th protection applies to those who are eighteen.

The Government seeks to sever Constitutional guarantees from law-abiding adults because they would have been minors in 1791. A fundamental liberty has never been deemed inapplicable to a class of law-abiding adult citizens in such a fashion and the Supreme Court consistently rules that the Constitution's protections generally apply to minors and adults alike. *See, e.g.*, *McCraw*, 2022 U.S. Dist. LEXIS 152834 at *10–12; *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S.

503 (1969) (recognizing First Amendment protections for minors in high school); *Goss v. Lopez*, 419 U.S. 565 (1975) (due process in civil proceedings); *Roper v. Simmons*, 543 U.S. 551 (2005) (Eighth Amendment applies to minors); *Brown v. Bd. of Educ.*, 347 U.S. 483 (recognizing Fourteenth Amendment protections for minors); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (Fourth Amendment right to privacy for purposes of search and seizure). If the Government's position were tenable, nearly every liberty could be subject to the age threshold established in the Founding-era rather than those ages determined by the States and prevailing common-law. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of maturity." *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74 (1976). The age of majority at the time of this Court's inquiry must serve as the delineation between whether civil liberties are fully guaranteed and whether those liberties can remain subject to age-related interference.

2. **The Government's Reliance On A Founding-Era Age of Majority Is Misguided Because Those Who Were Eighteen Routinely Purchased, Possessed, And Used Analogous Firearms And There Were No Founding-Era Age Restrictions.**

Rather than applying an analysis according to the levels of scrutiny, this court must apply the "text, history, and tradition analysis" used by the Supreme Court in *Bruen*. 142 S. Ct. at 2126; *Heller*, 554 U.S. at 576 (stating that the Court is "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning" and that "[n]ormal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation"). Considering the unique role that eighteen-year-olds played at the time of our Founding, together with the text, history, and tradition of the Second Amendment already mentioned, the court should find that the laws at issue are

invalid. This case presents the Court with an important question: What history should a court consider? To this point, *Bruen* recognized an "ongoing scholarly debate" on whether the Fourteenth Amendment" ratification in 1868 imbued the Second Amendment with a new and different meaning to the States than it had to the Federal Government in 1791. *Bruen*, 142 S. Ct. at 2138. The Supreme Court clarified that "post-Civil war discussion of the right to bear arms, [which] 'took place 75 years after the ratification of the Second Amendment [and] do[es] not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2137–38 (quoting *Heller*, 554 U.S. at 614). *Bruen* "should not be understood to endorse freewheeling reliance on historical practice form the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring). An exhaustive list of historical firearm regulations shows that there were no state laws governing the possession or purchase of firearms by minors prior to 1791 and only two states adopted them between the Constitution's ratification and 1867. *See* Robert J. Spitzer, *The Second Generation of Second Amendment Law & Policy: Gun Law History In The United States And Second Amendment Rights*, 80 LAW & CONTEMP. PROB. 55, 58–59 (2017). As for licensure, regulation, or prohibition on the commercial sale of firearms, it was not until the early Twentieth-century that similar laws were enacted in certain states and there were effectively no federal requirements until the National Firearms Act in 1934. *Id.* at 75 (Georgia (1902), North Carolina (1905), New York (1911), New Hampshire (1917), West Virginia (1925), New Jersey (1927), and Florida (1927)).

Historical materials "couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history." *NRA v. BATFE*, 714 F.3d 334, 339 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). Armed militias in the colonies were comprised of boys as young as sixteen, with thousands entering service while

younger. *See id.* George Washington's Continental Army consisted of thousands of young men under twenty-one and they regularly used firearms. *See id.* Young males were commonly required to possess firearms as part of their militia service. *Id.*, *see also* James Lindgren, *Counting Guns In Early America*, 43 WM. & MARY L. REV. 1777, 1782 (2002). Eighteen-year-olds regularly used, possessed, and traded pistols, ammunition, and other firearms. These firearms continue to serve as the "most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *See Heller*, 554 U.S. at 628. Eighteen-year-olds were required by the 1792 Militia Act to be available for service, and militia members were required to furnish their own weapons; therefore, eighteen-year-olds must have been allowed to "keep" firearms for personal use. *NRA*, 714 F.3d at 339 (Jones, J., dissenting from denial of rehearing en banc). Because they were within the "core" rights-holders at the founding, their rights cannot be infringed today. *Id.* Following *Heller* and *Bruen*'s methodology, the laws prior to and immediately surrounding passage of the Second Amendment illuminate contemporary understanding. Sixteen was the minimum age for colonial militias almost exclusively for 150 years before the Constitution. *Id.* at 340. In 1650, it was not just the right but the duty of all persons aged sixteen and above in Connecticut, for example, to bear arms. *See* Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON FIREARMS & PUB. POL'Y 1, 3 (2004). Other colonies had similar laws, *id.* at 8, with Delaware's minimum age of seventeen as the exception. *Id.* At the time of the Second Amendment's passage and shortly thereafter, the minimum age for militia service in every state[1] became eighteen.

---

[1] Alphabetically by state, these are the available minimum militia ages set around the time of ratification of the Second Amendment and the federal Militia Act of 1792: **Connecticut**: 18 /Acts and Laws, 308 (1792); **Delaware**: 18/ Ch. XXXVI, An Act for Establishing the Militia In This State, 1134 (1793); **Georgia**: 18/ An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of the Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled "An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States," as

Nearly every state adopted the Militia Act of 1792 by reference and began using its age structure. *Id*. Historical data confirms that those eighteen and above had the right to keep and bear arms and the right to keep and bear arms was not coextensive with militia service, but it was intimately related. *Id*. Gun ownership was necessary for militia service, but militia service was not necessary for gun ownership. *Id*. Not only had the colonies employed sixteen-year-olds in the militia for more than a century prior to the Second Amendment's ratification, other gun laws in place at the time serve as indicia of the Founders' mindset. *Id.* The Government is correct that the age of majority was twenty-one during the Founding era but the point remains, minors were in the militia and were expected, if not required, to own their own weapons.

Referring to permissible historic limitations on gun ownership, *Heller* never mentioned a minimum age for exercise of the right. On the contrary, to explain the "militia clause," the Court

---

contained in Digest of the Laws of Georgia, 460 (1792); **Maryland**: 18 / Ch. LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793); **Massachusetts**: 18 / Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, "An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service," 172 (1793); **New Hampshire**: 18 / An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, 251 (1792); **New Jersey**: 18 / Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey, 825 (1792); **New York**: 18 / Ch. 45, An Act to Organize the Militia of This State. Laws of New York 440 (1793); **North Carolina**: 18 / Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina—1786, 813 (amended by An Act to Carry Into Effect an Act of Congress, Entitled, "An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States," Also to Amend an Act, Passed at Fayetteville, in he Year One Thousand Seven Hundred and Eighty Six, Entitled, "An Act for Establishing the Militia in This State," (1793)); **Pennsylvania**: 18/ Ch. MDCXCVI, An Act for Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 455 (1793); **South Carolina**: 18/ An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, 21 (1794) (enrolling citizens turning eighteen and evidencing a shift from the former militia age of sixteen as seen in: No. 1154, An Act for the Regulation of the Militia of This State, 682 (1782-91)); **Virginia**: 18/ Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, 182 & 184 (1792).

quoted the first federal Militia Act, which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years . . . shall . . . be enrolled in the militia." *Heller*, 554 U.S. at 596 (quoting Act of May 8, 1792, 1 Stat. 271). The Court explained that the right of able-bodied citizens to keep and bear arms for self-defense was constitutionally codified "to prevent elimination of the militia," which some feared the newly created Federal Government, like past tyrants, might do by taking away the citizens' arms. *Id*. at 599. Those subject to militia duty are therefore a subset of citizens entitled to be armed and the right was considered to be essential.

The Founders expressly resisted the notion of a standing army in the United States and preferred a strong, decentralized system of militias which consisted of thousands of young men younger than twenty-one. "[T]he conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Id*. at 627. In Federalist No. 46, James Madison discussed the interplay between state militias and a federal army. While defending the notion of keeping a federal military small, he posited that state militias and an armed citizenry could outweigh threats of a standing military force. *See* The Federalist No. 46, p. 247–48 (Gideon, J. ed. 1818) (J. Madison). Militias consisted and relied on young people, not just adults. Militias were decentralized bands of able-bodied males comprised of adults and minors. James Lindgren, *Counting Guns In Early America*, 43 WM. & MARY L. REV. 1777, 1782 (2002). Militias were the first and last line of domestic defense, before and after the American Revolution, and their presence was a vital consideration when the Founders formulated America's system of federalism. *See, e.g.*, The Federalist No. 46, pp. 247–48 (Gideon, J. ed. 1818) (J. Madison). To think the Founders would

have permitted a federal limitation on the purchase of new, commonly used firearms by the same body that constituted the militia is fundamentally at odds with the Second Amendment.

Nothing in the Second Amendment or in debates underlying our Founding limited Constitutional protections to adults at the time. Not only does the conduct proscribed in this case fall squarely within the scope of what our Founders meant to protect, but a reading of early-American documents show that the Founders would have rejected such bans altogether. *See, e.g.*, Richard Henry Lee, Walter Bennett, ed., *Letters from the Federal Farmer to the Republican,* at 21, 22, 24 (Univ. of Alabama Press 1975) ("[T]o preserve liberty, it is essential that the whole body of the people always possess arms and be taught alike, especially when young, how to use them." (emphasis added)); *see also* Tench Coxe, "A Pennsylvanian, No. 3," Pennsylvania Gazette, Feb. 20, 1788 ("[T]he powers of the sword are in the hands of the yeomanry of America from 16 to 60 . . . . Their swords . . . are the birthright of an American.").

### 3. The Government's Reliance on The Founding Era's Age of Majority is Misguided Because There Is No Age Limit In The Second Amendments And The Founders Knew How To Include Such Limits If They Wanted To.

If the Founders wanted to attach an age restriction on the Second Amendment, they knew how to do so. *See, e.g.*, U.S. Const. Art. I, § 2 (minimum age of 25 for holding office in House of Representatives), § 3 (minimum age of thirty for holding office in Senate), Art. II, § 1 (minimum age of thirty-five for holding office as President). Further, if the People want to apply an age threshold, they know how to do so. *See, e.g.*, U.S. Const. amend. XXVI (providing eighteen-year-olds with universal suffrage). The maxim *expressio unius est exclusio alterius* is applicable. *See, e.g., United States Term Limits v. Thornton*, 515 U.S. 779, 868 (1995) (Thomas, J., dissenting). "When the Framers decided which qualifications to include in the Constitution, they also decided not to include any other qualifications in the Constitution." *Id*.

### 4. Commercial Sales And Purchase of Firearms That Are Not Unusually Dangerous Constitute Conduct Within The Scope of The Second Amendment.

The Government does not argue that the conduct falls outside the scope of the Second Amendment because "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). To uphold the constitutionality of a law imposing conditions on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. *Id.* If there were categorical exceptions from the Second Amendment for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms altogether, *id.*, but such a result would be untenable under. *Id.* As Thomas Jefferson said: "Our citizens have always been free to make, vend, and ex-port arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 6 Writings 252–53 (P. Ford ed. 1895).

### B. Prohibiting The Sale of Handguns To Law-Abiding Adult Citizens Is Not A Presumptively Lawful, Longstanding Restriction.

The *Heller* Court stated that, "like most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). The Court noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id. Heller*'s exception for "longstanding," "presumptively lawful regulatory measures" has proven to be a challenge to apply. *National Rifle Ass'n v. BATFE*, 700 F.3d 185, 196 (5th Cir. 2012). Courts have found it "difficult to discern"

whether *Heller*'s reference to "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27, by "virtue of their presumptive validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or (ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny." *National Rifle Ass'n,* 700 F.3d at 196; *Marzzarella*, 614 F.3d at 91 (recognizing that the designation—longstanding, presumptively lawful measure—is ambiguous). The Fifth Circuit determined "that a longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment . . . ." *National Rifle Ass'n*, 700 F.3d at 196. The Fourth Circuit has not provided similar guidance as to whether courts should consider "longstanding prohibitions" to be presumptively lawful because the conduct "presumptively" falls outside of the Second Amendment's scope or because the laws presumptively withstand heightened scrutiny. Nevertheless, it has considered this issue and ruled in favor of the Plaintiffs exact legal argument in *Hirschfeld* and did so before *Bruen* was decided. 5 F.4th 407 (vacated as moot). This Court should reject the Fifth Circuit's approach and recognize that *Heller*'s examples of "longstanding prohibitions" are only "presumptively lawful" because they presumably satisfy the review of the text, history, and tradition of the Second Amendment even though they encompass conduct within the Second Amendment's scope of protection.

 *Heller* listed the firearm-possession bans for felons and the mentally ill to be "longstanding" and presumptively lawful, but the conduct—possession of firearms generally—fell within the "core" of the Second Amendment. 554 U.S. at 630. This reference to laws "that targeted particular groups for public safety reasons" are insufficient historical analogs to support the statutory and regulatory scheme at issue in this case. This recognition "of specific 'longstanding

prohibitions' does not support a general prohibition on almost all 18-to-20-year-olds—just because of their age." *McCraw*, 2022 U.S. Dist. LEXIS 152834 at *25. The defining characteristics of felons or the mentally ill as a class are what materially distinguish them from those who remain free to engage in the same conduct. It is their *classification*, rather than the *conduct*, that allows for Second Amendment restrictions. *Heller* referred to class-based restrictions on firearm possession by felons and the mentally ill as "longstanding" though those bans were of mid-Twentieth century vintage. *See United States v. Booker*, 644 F.3d 12, 23–24 (1st Cir. 2011) (explaining that the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), "bears little resemblance to laws in effect at the time the Second Amendment was ratified," as it was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968); *United States v. Skoien*, 614 F.3d 638, 640–41 (7th Cir. 2010) (explaining that 18 U.S.C. § 922(g)(4), which forbids firearm possession by a person who has been adjudicated to be mentally ill, was enacted in 1968); Carlton F. W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L. J. 1371, 1376–80 (2009) (showing that a strictly originalist argument for *Heller*'s examples—including bans on firearm possession by felons and the mentally ill, and laws imposing conditions on commercial arms sales—is difficult to make). *Heller* suggests that regulation can be "longstanding" even if it cannot boast a Founding-era analogue. *See Skoien*, 614 F.3d at 640–41 ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791."). Nevertheless, *Heller* did not go so far as to say that a restriction is presumably lawful merely because it has gone unchallenged. *Heller*'s examples of class-based restrictions on felons and the mentally ill are listed among several others in 18 U.S.C. § 922(g) that are materially different from the age-related restrictions at issue in 18 U.S.C. §§ 922(b)(1) and (c). The ban on

being a felon in possession of a firearm comes only after a verdict is rendered via our justice system that must comport with due process and a series of other constitutional safeguards. The ban on the mentally ill being in possession of a firearm must generally comport with due process as well. Even if, *arguendo*, those restrictions are constitutional, they maintain a quality of individualized assessment and due process while the restrictions in this case apply universally to all adults under a particular age. *Compare* 18 U.S.C. § 922(g), *with* 18 U.S.C. §§ 922(b)(1) and (c).

A similar class-based prohibition exists in this case, in that the law attempts to rely on the distinguishing characteristics of a group rather than the inherent risk of the conduct (commercial transactions) or any uniquely dangerous quality of the firearms and ammunition (handguns and ammunition). At the time of the Founding, class-based restrictions targeted Native Americans, African-Americans, and Catholics. *See* Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON. FIREARMS & PUB. POL'Y at 16–20 (2004). None of those would be permitted today. The only Founding-era regulations that could compare to the laws at issue were those for "Loyalists to the Crown," in that they applied to law-abiding, able-bodied adult citizens absent consideration of race, ethnicity, national origin, or religion, but even the "Loyalty Test" regulations contradict the Government's position in this case. *NRA*, 714 F.3d at 343 (Jones, J., dissenting).

"Loyalty Tests" were applicable to persons "above eighteen and stated that those who did not swear allegiance would be disarmed"—eighteen-year-olds were considered to have rights, even if they were equally subject to being restricted with other suspect class members. *Id.* (citing Massachusetts' age cut-off of sixteen in 1775 and Pennsylvania's at eighteen). Additionally, "Loyalty Tests" were applied to individuals on a case-by-case basis and were therefore most similar to contemporary restrictions on felons and the mentally ill. In theory, restrictions on the sale of firearms and ammunition to contemporary minors is presumptively valid, *see, e.g.*, Thomas

17

M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883)); *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009), but that is not at issue. There are no Founding-era analogues or longstanding prohibitions against the sale of items commonly used in self-defense to law-abiding, able-bodied adult citizens and the restrictions here lack the material features of those illustrated in *Heller*. The "longstanding prohibition" exception is inapplicable.

### III. Classification Based On Youth Constitutes A Suspect or Quasi-Suspect Class, Therefore Laws Which Burden A Law-Abiding Adult Citizen's Liberties Based On Youth Must Be Subject To Heightened Scrutiny.

The Fifth Amendment states that "[n]o person shall be… be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Though it does not contain the Fourteenth Amendment's equal protection clause, the concepts of equal protection and due process are not mutually exclusive. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Fifth Amendment equal protection claims are "precisely the same" as equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."). Not only does equal protection analysis require "strict scrutiny of a legislative classification" when the classification "impermissibly interferes with the exercise of a fundamental right," it also requires strict scrutiny when it "operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Ret. v. Murgi*a, 427 U.S. 307, 312 (1976). If this Court does not find that the laws at issue impermissibly interfere with the Plaintiffs' rights to defend themselves, it should apply heightened scrutiny because the age classification at issue impacts a suspect or quasi-suspect class—young adults who are legally discriminated according to their youth.

The Government argues that Supreme Court jurisprudence forecloses this argument because it once held that "[a]ge is not a suspect classification under the Equal Protection Clause." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). *Kimel* referenced a dispositive and materially different form of age-based classification, the use of a maximum age for older adults. Notably, age-based challenges have only been directly considered in that context before the Supreme Court of the United States. *Id*. (citing *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) (upholding maximum age for state judges); *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (mandatory retirement for foreign service personnel); *Murgia*, 427 U.S. 307 (mandatory retirement of police officers at fifty years old). The Supreme Court has never considered whether minimum age-based classifications, particularly those for young adults, create a suspect classification.

The most notable challenge on behalf of the youth in America came in *Oregon v. Mitchell*, 400 U.S. 112 (1970), just prior to the passage of the Twenty-Sixth Amendment, when the Court simultaneously upheld and struck portions of federal law attempting to universally lower the voting age from twenty-one-year-old adults to eighteen-year-old minors. *Id*. (finding that Congress could lower the age for federal but not state elections due to federalism concerns, prompting the passage of the Twenty-Sixth Amendment). A material factor that distinguishes the issue from that in *Mitchell* was that eighteen-year-olds were minors at the time. Now that they are adults, Justice Douglas's partial dissent in *Mitchell* carries even more weight in this equal protection challenge:

> Congress might well conclude that a reduction in the voting age from 21 to 18 was needed in the interest of equal protection. The Act itself brands the denial of the franchise to 18-year-olds as "a particularly unfair treatment of such citizens in view of the national defense responsibilities imposed" on them. § 301 (a)(1), Voting Rights Act, 84 Stat. 318. The fact that only males are drafted while the vote extends to females as well is not relevant, for the female component of these families or prospective families is also caught up in war and hit hard by it. Congress might well believe that men and women alike should share the fateful decision. It is said, why draw the line at 18? Why not 17? Congress can draw lines and I see no reason why it cannot conclude that 18-year-olds have that degree of maturity which entitles

them to the franchise. They are "generally considered by American law to be mature enough to contract, to marry, to drive an automobile, to own a gun, and to be responsible for criminal behavior as an adult." Moreover, we are advised that under state laws, mandatory school attendance does not, as a matter of practice, extend beyond the age of 18. On any of these items the States, of course, have leeway to raise or lower the age requirements. But voting is a fundamental matter in a free and democratic society, [w]here "fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."

*Id*. at 142 (Douglas, J., dissenting in part) (internal citations omitted).

In *Gregory v. Ashcroft*, the Court considered discrimination against judges based on olde age. 501 U.S. at 472. It asserted that "a State may rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interest . . . . That age proves to be an inaccurate proxy in any individual case is irrelevant." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000). The Court suggested that a rational basis might exist even if no judges affected by the mandatory retirement requirement were incompetent when removed as a result of the provision: "The Missouri mandatory retirement provision, like all legal classifications, is founded on a generalization. It is far from true that all judges suffer significant deterioration in performance at age 70. It is probably not true that most do. It may not be true at all." *Id*. This dicta suggested the Court believed that very little scrutiny was necessary but *Gregory* was consistent with intermediate scrutiny in that it considered the government's interest as "compelling" and declared the provision not merely rational but "reasonable." *Id*. For a classification to be "suspect" or "quasi-suspect" for heightened scrutiny, there must have been: a history of legally imposed discrimination based on that classification; the individuals must exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and they must constitute an insular minority or be politically powerless. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (citing *Murgia*, 427 U.S. at 313–14). A suspect or quasi-suspect class "is saddled with such disabilities, or subjected to such a

history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection youth and deem them unconstitutional in this case. from the majoritarian political process." *Murgia*, 427 U.S. at 313. All three of these factors exist for young adults who are discriminated according to their youth. First, young adults are politically insular minorities relegated to a position of relative powerlessness due to the overwhelming number of the population who are older and have had years, if not decades, of additional time and influence within the political system by the time these young citizens participate. Second, young adults suffer from an inherently immutable characteristic, their age. Finally, and most importantly, young adults have suffered from a lengthy and detailed history of purposeful and unequal treatment, oppression, and exploitation based on youth. For the following reasons heightened scrutiny must apply to laws that discriminate against adults based on their youth and deem them unconstitutional in this case.

### A. Those Classified Based on Their Youth Have Suffered From a History of Purposeful, Unequal, And Oppressive Treatment.

A fundamental component of age-related jurisprudence is *Murgia*'s finding that:

> While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a "history of purposeful unequal treatment" or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities.

427 U.S. at 313.

The same cannot be said for young adults in America, as they have not only suffered from discrimination, but centuries of exploitation.

### 1. Pre-Colonial America And Youth Exploitation In The Founding-Era.

Just before the ratification of the Fourteenth Amendment and its Equal Protection Clause, the Thirteenth Amendment explicitly outlawed the practices of slavery and involuntary servitude:

> Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

U.S. Const. amend. XIII, § 1.

Based on the pervasive history and abuses associated with the African slave trade, as well as the oppressive, exploitative legal system necessary for such race-based slavery to exist, it was clear why race-based classifications became subject to strict scrutiny after the ratification of the Thirteenth and Fourteenth Amendments. For involuntary servitude to be included with slavery in the Thirteenth Amendment, the drafters must have believed the practice lent itself to at least some materially similar forms of oppression and exploitation. If the use of race as an underlying factor in the slave trade and Slave Codes warranted its designation as a suspect classification and racial discrimination to strict scrutiny, then what historical factor, if any, formed the legal foundation for involuntary servitude? The answer is youth.

A critical problem facing early-America was the Virginia Company's inability to recruit an adequate labor force. After series of experiments, the Company focused resources on the development of indentured servitude as an institutional practice. Mary Ann Mason, *Masters and Servants: The American Colonial Model of Child Custody and Control*, 2 INT'L J. CHILD RTS. 317, 325 (1994). Because the young provided the majority of all labor in preindustrial England, with most falling between thirteen and twenty-five, the Virginia Company sought to replicate this model but transportation costs proved too high for workers to pay their own freight. David Galenson, *The Rise and Fall of Indentured Servitude in the Americas: An Economic Analysis*, 44:1 THE JOURNAL OF ECONOMIC HISTORY, 1–26 (1984).  The Company instituted the "indentured servant" program to cover transport costs as an advance. *Id*. Young workers were forced to work under exploitative conditions for a term of years to alleviate the debt.  In 1617 the Company solicited the Lord Mayor

of London to send poor children to settle the American colony. Mary Ann Mason, *Masters and Servants: The American Colonial Model of Child Custody and Control*, 2 Int'l J. Child Rts. at 325. In 1620, the Company complained to the principal secretary of King James I that London's street children were unwilling to be sent to Virginia as apprentices. *Id*. The Mayor complied:

> The City of London have . . . appointed one hundred children out of their superfluous multitude to be transported to Virginia: there to be bound apprentices for certain years and afterward with very beneficial conditions for the children . . . Now it falleth out that among those children, sundry being ill disposed, and fitter for any more remote place than for this city, declare their unwillingness to go to Virginia, of whom the City is especially desirous to be disburdened, and in Virginia under severe masters they may be brought to goodness.

> *See* A.E. Smith, *Colonists in Bondage: White Servitude and Convict Labor in America*, 1607-1776 149 (1947).

> In response, the Privy Council granted the Virginia Company permission to do whatever necessary to force children into the ships:

> And if any of them shall be found obstinate to resist or otherwise to disobey such directions as shall be given in this behalf, we do likewise hereby authorize such as shall have the charge of this service to imprison, punish, and dispose any of those children…and, so to ship them out for Virginia with as much expedition as may stand with conveniency.

> Mary Ann Mason, Masters and Servants: *The American Colonial Model of Child Custody and Control*, 2 Int'l J. Child Rts. at 325.

Children arrived involuntarily with irregular terms of indenture or worse, no term at all. *Id*. The law required masters to bring imported young people before the court to determine the terms of indenture. Virginia's legislature set the most common terms: "Such persons as shall be imported, having no indenture or covenant, either men or women, if they be above sixteen years old shall serve four years, if under fifteen to serve till he or she shall be one and twenty years of age, and the courts to be judges of their ages." *Id*. Indentured youth were the foundation of settlement in American colonies and pre-dated the use of the African slave trade. More than half

of all personnel in colonies south of New England were indentured and seventy-five percent of the 450,000 were under twenty-five. *See* Christopher Tomlins, *Reconsidering Indentured Servitude: European Migration and the Early American Labor Force, 1600–1775*, 42 Labor History 5–43 (2001). A myriad of developments led to the replacement of indentured servitude with slavery, but even after both institutions were eliminated via the Thirteenth Amendment, similar forms of conscripted youth labor remained.

2. **Youth Exploitation, Oppression, and Government-Forced Labor Before and After Ratification of the Thirteenth and Fourteenth Amendments.**

In 1916, the Supreme Court decided *Butler v. Perry* and upheld Florida's requirement that every able-bodied young adult male engage in physical labor for public works without pay for fear of criminal punishment. 240 U.S. 328 (1916). The statute at issue read:

> Every able-bodied male person over the age of twenty-one years and under the age of forty-five years . . . shall be subject, liable and required to work on the roads and bridges of the several counties for six days of not less than ten hours each in each year when summoned so to do, as herein provided; that such persons so subject to road duty may perform such services by an able-bodied substitute over the age of eighteen years, or in lieu thereof may pay to the road overseer on or before the day he is called upon to render such service the sum of three dollars, and such overseer shall turn into the county treasury of his county any and all moneys so paid to him . . . .

> *Id*. at 329.

In *Butler*, Justice McReynolds provided a detailed history of how our nation routinely conscripted young men for physical labor on behalf of the State. He explained how, in the Court's view, forced labor was not akin to the slave labor proscribed by the Thirteenth Amendment:

> From Colonial days to the present time conscripted labor has been much relied on for the construction and maintenance of roads. The system was introduced from England, and, while it has produced no Appian Way, appropriateness to the circumstances existing in rural communities gave it general favor. In 1889 the statutes of twenty-seven States provided for such labor on public roads.

The Ordinance of 1787 for the government of the Northwest Territory declares: "There shall be neither slavery nor involuntary servitude in the said territory, otherwise than in punishment of crimes, whereof the party shall have been duly convicted."

In 1792 the territorial legislative body passed an act providing: "That every male inhabitant of sixteen years of age and upwards on being duly warned to work on the highways by the supervisor in the township to which such inhabitant may belong shall repair to the place and at the time by the said supervisor appointed with such utensils and tools as may be ordered him wherewith he is to labour and there abide and obey the direction of such supervisor during the day in opening and repairing the highway." An act of the General Assembly of the Territory passed in 1799, declared: "That all male persons of the age of twenty-one years, and not exceeding fifty, who have resided thirty days in any township of any county within this territory, who are not a township charge, shall over and above the rate of assessment hereinafter mentioned, be liable, yearly and every year, to do and perform two days work on the public roads, under the direction of the supervisor within whose limits they shall be respectively residents."

By their several constitutions the States within the limits of the Northwest Territory prohibited involuntary servitude substantially in the language of the 1787 Ordinance, and with the possible exception of Wisconsin, all of them early enacted and long enforced laws requiring labor upon public roads.

Utilizing the language of the Ordinance of 1787, the Thirteenth Amendment declares that neither slavery nor involuntary servitude shall exist. This amendment was adopted with reference to conditions existing since the foundation of our Government, and the term involuntary servitude was intended to cover those forms of compulsory labor akin to African slavery, which in practical operation would tend to produce like undesirable results. It introduced no novel doctrine with respect of services always treated as exceptional, and certainly was not intended to interdict enforcement of those duties which individuals owe to the State, such as services in the army, militia, on the jury, etc. The great purpose in view was liberty under the protection of effective government, not the destruction of the latter by depriving it of essential powers.

There is no merit in the claim that a man's labor is property, the taking of which without compensation by the State for building and maintenance of public roads, violates the due process clause of the Fourteenth Amendment. That Amendment was intended to preserve and protect fundamental rights long recognized under the common law system. Conceding for some purposes labor must be considered as property, it is evident from what already has been said that to require work on the public roads has never been regarded as a deprivation of either liberty or property.

*Id*. at 331–33 (internal citations omitted).

One year after *Butler*, Congress passed the Selective Service Act of 1917 following the declaration of World War I and the Supreme Court cited similar logic in upholding the involuntary conscription of young men to die on behalf the United States.

### 3. American Military Conscription And The Youth's Sacrifice In The Twentieth Century.

President Wilson signed the Selective Service Act after the Army failed to meet targets of expanding to one million men within the first six weeks of World War I. *See* Will Creighton, *How the draft has evolved in the 100 years since Selective Service Act*, United Press International (May 13, 2017) (available at https://www.upi.com/How-the-draft-has-evolved-in-the-100-years-since-Selective-Service-Act/4031494780649/). He was given power to conscript young men for military service and all men aged twenty-one to thirty were required to register for service for a period of twelve months. "The Draft" was immediately subject to litigious scrutiny and Thirteenth Amendment challenges. The Supreme Court held that the United States could seize young adults against their will for military sacrifice. The Supreme Court upheld Selective Service in *Arver v. United States*, 245 U.S. 366 (1918) (known as "the *Selective Draft Law Cases*"). Chief Justice White detailed our history of conscripting the young. In closing, the Court wrote:

> Finally, as we are unable to conceive upon what theory the exaction by government from the citizen of the performance of his supreme and noble duty of contributing to the defense of the rights and honor of the nation, as the result of a war declared by the great representative body of the people, can be said to be the imposition of involuntary servitude in violation of the prohibitions of the Thirteenth Amendment, we are constrained to the conclusion that the contention to that effect is refuted by its mere statement.

*Id*. at 390.

Following the end of the draft in 1920, the Selective Training and Service Act of 1940 passed the first peacetime conscription in history. One year later, the service period was extended5 to eighteen months and the age bracket was lowered to also include men aged eighteen. Since the

Supreme Court's 1918 decision in the Selective Draft Law Cases, over sixteen million young men have been conscripted into the military via the Selective Service. See Induction Statistics, Selective Service System, https://www.sss.gov/About/History-And-Records/Induction-Statistics (last visited May 10, 2019). Virtually every male citizen and immigrant non-citizen between the ages of eighteen and twenty-five must continue registering within thirty days of turning eighteen.

Though it may seem as though the majoritarian boot has come off the neck of our Nation's young adults, this is due in part to shifts in societal norms or a simple lack of necessity rather than legal change. The exploitation of the young has merely taken a new form—the financial collateralization and securitization of their future. The State once conscripted young adults to construct domestic infrastructure, *Butler*, 240 U.S. 328, and into military service, *Arver v. United States*, 245 U.S. 366. Now our foreign conflicts and public works are merely financed by public deficit spending—something paid by the labor of future generations. Young adults, by virtue of their age, have had a unique history of legal exploitation and disenfranchisement pre-dating our Founding. Similar to those limitations once placed on women, our statute books "gradually became laden with gross, stereotyped distinctions" between young adults based on improper notions. *Cf. Frontiero v. Richardson*, 411 U.S. 677, 684 (1973). In *Frontiero v. Richardson*, the Supreme Court took special notice that at one time, "blacks were guaranteed the right to vote in 1870" but "women were denied even that right—which is itself 'preservative of other basic civil and political rights'— until adoption of the Nineteenth Amendment half a century later." *Id*. at 685. Similarly, young adults were not guaranteed franchise until the Twenty-Sixth Amendment, half-a-century after women's suffrage. When considering the protections of heightened scrutiny, it is necessary to recognize centuries of American exploitation of young adults and their forced sacrifice to the State by those in power. Even after achieving the universal right to vote at eighteen, young adults are

subjected to discriminatory legislation. Admittedly, the Plaintiffs do not argue that all forms of youth-based regulation against adults are unconstitutional. Nevertheless, it is worth noting the various forms of discrimination that exist. The fundamental right to self-defense limited in this case, as well as the right to become an adoptive parent is limited to those who are twenty-one or twenty-five in many states. Young adults are not free to consume alcohol or tobacco as they wish. They are barred from recreational gaming. The Constitution itself discriminates against young adults from serving in elected office. Similar age restrictions for public office exist in nearly every state. In *Frontiero*, the Court famously stated that our nation's history of sex "discrimination was rationalized by an attitude of '*romantic paternalism*,' which, in practical effect, put women, not on a pedestal, *but in a cage*." *Id*. at 684 (emphasis added). Paternalism underlies the legal distinctions separating rights and responsibilities of young adults versus those of older age. By virtue of age, those in this Class have a history of falling victim to legal exploitation and disenfranchisement pre-dating our Nation's founding and it continues here today.

### B. Young Adults Are Insular Minorities Suffering From Immutable Characteristics.

Youth-based age classification—like race, alienage, national origin, and sex—is an obvious and immutable characteristic determined solely by time. The imposition of special disabilities upon adults because of their youth violates "the basic concept of our system that legal burdens should bear some relationship to individual responsibility . . . ." *Frontiero*, 411 U.S. at 686–87. What differentiates the classification of young adults from otherwise unprotected classes is that an adult's youth, rather than a minor's youth, bears little-to-no relation to his or her ability or inability to perform or contribute to political society. The justification for distinguishing minors and young adults via age is legitimately predicated on developmental, biological, and educational grounds akin to the Court's disability jurisprudence and the State has drawn the definitive line for

alternative legal treatment at eighteen. Plaintiffs do not go so far as to suggest minors should be treated any differently than the status quo. But once the definitive age threshold is crossed, and the accompanying risks and responsibilities of adulthood are fully bestowed, only the rare and heightened circumstance should deny any of the rights or benefits of full citizenship based on youth alone. Statutory distinctions between ages have the effect of invidiously relegating millions of young adults to inferior legal status without regard to capabilities of individual members. *Cf. id*. Youth-based classification for adults must receive heightened scrutiny, whether that is "strict" or "intermediate," and for reasons cited, neither justify the discrimination that comes as a result of the laws at issue.  If the Plaintiffs and their Class fall outside of the scope of the Second Amendment and do not warrant heightened due process protections, the laws at issue violate rational basis for the reasons cited. It is irrational to discriminate against young adults by relegating them to a market devoid of regulatory oversight, background checks, or licensure requirements in the name of deterring clandestine firearm possession.

## Conclusion

WHEREFORE, the Plaintiffs, on behalf of themselves and a Class respectfully request for this honorable Court to DENY the Defendants' Motion to Dismiss.

Respectfully submitted,

_____/s_____
Elliott M. Harding, Esq.
*Counsel for the Plaintiffs & Class*
Harding Counsel, PLLC
608 Elizabeth Ave.,
Charlottesville, VA 22901
P: 434-962-8465
E: Elliott@HardingCounsel.com

## CERTIFICATE OF SERVICE

On December 15, 2022, I electronically submitted the foregoing document with the clerk of court for the United States District Court for the Eastern District of Virginia using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically as well.

Respectfully submitted,

_____/s_____
Elliott M. Harding, Esq.
*Counsel for the Plaintiffs & Prospective Class*
Harding Counsel, PLLC
608 Elizabeth Ave.,
Charlottesville, VA 22901
P: 434-962-8465
E: Elliott@HardingCounsel.com