IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| JOHN COREY FRASER, et al., on behalf of themselves and all others similarly situated as a Class, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22CV00410 |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, et al., | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.    Plaintiffs Fail to Demonstrate that They Cannot Legally Acquire a Handgun Under the Current Regulations. ......................................................................... 3

II.    Plaintiffs Ignore the Specific Restrictions of Firearm Ownership Expressly Recognized in *Heller*. ...................................................................................... 4

III.   Plaintiffs' Reliance upon Founding-Era Militia Statutes Is Misplaced and Proves Too Much. ......................................................................................................... 5

       a.    At the Time of the Framing of the Second Amendment, the Minimum Age for Militia Service Fluctuated from 16 Years Old to 21 Years Old. ...................... 6

       b.    During the Founding Era, Congress and the States Recognized that Militia Service Did Not Emancipate Minors from the Care and Authority of Their Parents or Legal Guardians. .................................................................................. 8

IV.   Post-Ratification History Confirms that the Regulations on the Sale of Handguns to 18- to 20-Year-Olds Falls Outside the Scope of the Second Amendment. .................. 10

V.    Even Fundamental Rights Are Subject to Reasonable Age Restrictions Set by the Legislature. ........................................................................................................ 11

VI.   Youth Is Not a Suspect Class with Immutable Characteristics. ......................... 13

CONCLUSION ......................................................................................................... 14

i

# TABLE OF AUTHORITIES

**Cases**

*Allam v. State,*
   830 P.2d 435 (Alaska Ct. App. 1992) .............................................................. 11, 12

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) .................................................................................... 4, 10

*General Dynamics Land Sys., Inc. v. Cline,*
   540 U.S. 581 (2004) ........................................................................................ 14

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ........................................................................................ 13

*Jones v. Jones,*
   72 F.2d 829 (D.C. Cir. 1934) ............................................................................ 11

*Kimel v. Fla. Bd. of Regents,*
   528 U.S. 62 (2000) .......................................................................................... 13

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .......................................................................................... 4

*Mass. Bd. of Ret. v. Murgia,*
   427 U.S. 307 (1976) .................................................................................. 13, 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) .............................................................................. 10, 11

*Oregon v. Mitchell,*
   400 U.S. 112 (1970) ........................................................................................ 12

*Ramos v. Louisiana*
   140 S. Ct. 1390 ................................................................................................ 10

*Reese v. ATF, No. 6:20cv01438,*
   2022 WL 17859138, at *10 (W.D. La. Dec. 21, 2022) ......................................... 2

*Rourke v. U.S. Fid. & Guar. Co.,*
   1 S.E. 2d 728 (Ga. 1939) .................................................................................. 12

*Tashjian v. Republican Party of Conn.,*
   479 U.S. 208 (1986) ........................................................................................ 12

*United States v. Alvarez,*
   567 U.S. 709 (2012) ........................................................................................ 10

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ............................................................. 11

*Vance v. Bradley*,
  440 U.S. 93 (1979) ............................................................................. 13

**Constitutional Provisions**

U.S. Const. amend. XIV, § 2 ............................................................... 12

U.S. Const. amend. XXVI, § 1 ............................................................ 11

U.S. Const. art. I, § 2, cl. 2 .................................................................. 11

U.S. Const. art. I, §3, cl. 3 ................................................................... 11

U.S. Const. art. II, § 1, cl. 5 ................................................................ 11

**Statutes**

10 U.S.C. § 246 (2016) .......................................................................... 7

2019 Virginia Laws Ch. 90 (H.B. 2748) ............................................. 11

Va. Code Ann. § 4.1-304(West 2019) ................................................. 11

Va. Code Ann. § 44-1 (West 2015) ....................................................... 7

Va. Code § 18.2-371.2 ......................................................................... 11

**Rules**

E.D. Va. Civ. R. 56 ................................................................................ 4

Federal Rule of Civil Procedure 4 ......................................................... 1

Federal Rule of Civil Procedure 12 ....................................................... 1

**Other Authorities**

2 The Debates and Proceedings in The Congress of The United States (1834) .............................. 9

42 Am. Jur. 2d *Infants* § 6 (2019) ...................................................... 11

90 Cong. Rec. 12279 (1968) .................................................................. 3

An Act for the Better Ordering and Regulating Such as Are Willing and Desirous to Be United for

Military Purposes Within this Province, Nov. 25, 1755,
3 Jared Sparks, ed., *The Works of Benjamin Franklin* (1836) .................................................. 9

*Immutable*, Merriam-Webster's Collegiate Dictionary (10th ed. 1998)....................................... 14

*Infants*, Black's Law Dictionary 847 (9th ed. 2009) ................................................................... 6

I. Thomas & E.T. Andrews, The Perpetual Laws of The Commonwealth of Massachusetts from
the Establishment of Its Constitution in the Year 1780 to the End of the Year 1800 (1801).....7

William Blackstone, 1 *Commentaries On The Laws Of England* (1st ed. 1765) .......................... 6

## INTRODUCTION

Defendants the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); Steven Dettelbach, in his official capacity as the Director of ATF; and Merrick Garland, in his official capacity as Attorney General of the United States (hereinafter Defendants)[1] submit this reply to Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss (*see* ECF No. 27). The Court should grant Defendants' motion to dismiss and deny Plaintiffs' motion for summary judgment for the reasons stated in the Memorandum in Support of Defendants' Motion to Dismiss (*see* ECF No. 22), and for the reasons given below.

Plaintiffs would have this Court make new law by recognizing an unrestricted right by 18- to 20-year-olds to purchase handguns without parental knowledge from federal firearms licencees (FFLs).  To support this alleged right, Plaintiffs primarily rely upon the 1792 Militia Act and historical research that shows that, during the founding era, 18-year-olds were sometimes permitted to serve in some state militias.  According to Plaintiffs, this is enough to demonstrate that all rights secured by the Second Amendment necessarily reach 18-year-olds.

---

[1] The First Amended Complaint also appears to raise claims against Director Dettelbach and Attorney General Garland in their individual capacities. The undersigned counsel represents only the agencies of the United States and federal officers sued in their official capacities. The undersigned counsel does not represent officers sued in their individual capacities, and this brief is submitted only on behalf of ATF and federal officers sued in their official capacities. For simplicity, this brief uses the term "Defendants" to refer to this group of defendants, excluding Defendants Dettelbach and Garland in their individual capacities. To undersigned counsel's knowledge, Plaintiffs have not served Director Dettelbach and Attorney General Garland in their individual capacities in accordance with Federal Rule of Civil Procedure 4(i)(3); those individuals would have sixty days after the completion of service in which to file a response to the First Amended Complaint under Federal Rule of Civil Procedure 12(a)(3). In any event, Plaintiffs' opposition to the motion to dismiss does not address the purported individual-capacity claims against Defendants Dettelbach and Garland.

1

There are multiple, fatal problems with Plaintiffs' argument.[2]  First and foremost, at the time the Second Amendment was adopted, it was well understood that the age of majority was 21, not 18.  This original understanding of the Second Amendment prevails today.  Second, Plaintiffs' historical research is flawed, as the minimum age of militia service fluctuated dramatically, ranging from 21 years old down to 16 years old.  History thus suggests that Congress has some discretion to set age requirements for the commercial sale of handguns from FFLs, not that the Constitution itself fixes the age limit at 18.  Third, Plaintiffs' historical research ignores the fact that, while those under 21 years old were frequently allowed to serve in colonial militias, such minors were still unemancipated children, subject to the care and control of their parents or legal guardians.  Thus, mere service in the militia by minors did not yield the rights that traditionally attached upon the age of majority.

Plaintiffs' remaining arguments fare no better.  Plaintiffs fail to demonstrate that the current statutory and regulatory regime prevents them from lawfully acquiring a handgun, most readily through their parents or legal guardians.  Additionally, Plaintiffs' attempt to create more new law—by arguing that youth is a suspect or quasi-suspect class for Equal Protection analysis—runs headlong into contradictory Supreme Court precedent.

The current regulatory framework is designed to discourage the *clandestine* acquisition of handguns by 18- to 20-year-olds outside of the knowledge and supervision of their parents or legal guardians.  Significantly, the regulatory framework does not prohibit the *possession* of handguns by 18- to 20-year-olds.  Parents are still able to act as gatekeepers, purchasing and providing

---

[2] A district court in the Fifth Circuit recently upheld the federal laws challenged here against a similar Second Amendment challenge. *See Reese v. ATF*, No. 6:20-cv-01438, 2022 WL 17859138, at *10 (W.D. La. Dec. 21, 2022).

2

handguns to their 18- to 20-year-old children as they deem appropriate, which is a traditional role with historical roots running back to the founding era.  Thus, minors between the ages of 18 and 20 do not enjoy an unvarnished right to acquire handguns from FFLs, and the challenge restrictions do not infringe on the Second Amendment as historically understood.

## ARGUMENT

### I.   Plaintiffs Fail to Demonstrate that They Cannot Legally Acquire a Handgun Under the Current Regulations.

While Plaintiffs present a thicket of constitutional arguments, this Court need not – and should not – venture into that thicket.  Rather, this case should be dismissed because Plaintiffs are in fact able to acquire and possess a handgun under the current regulations.

As the Government described previously, the current regulations do not bar Plaintiffs' *possession* of handguns.  *See* Defendants' Memorandum in Support of Their Motion to Dismiss, ECF No. 22 (Defs.' Mem.), at 5-6, 8-10.  Nor do the current regulations bar Plaintiffs' parents or legal guardians from purchasing handguns for their children from FFLs.  *See id.*  Rather, the current regulations are intended to stop the *clandestine* acquisition of handguns by 18- to 20-years-olds, outside of the oversight of their parents or legal guardians.  *See id.*  Parents or legal guardians may purchase a handgun from an FFL for their 18- to 20-year-old minor children.  *See* Defs.' Mem., Ex. A (ATF Opinion Letter), ECF No. 22-1.  This permits parents and legal guardians to serve an important gatekeeping role, consistent with the history and tradition of the Second Amendment.  *See* 90 Cong. Rec. 12279, 12309 (1968) (Sen. Dodd)  ("At the most [the challenged regulations] could cause minor inconveniences to certain youngsters who are mature, law abiding, and responsible, by requiring that a parent or guardian over 21 years of age make a handgun purchase for any person under 21.").

3

Nowhere in the Amended Complaint or in their opposition to the motion to dismiss do Plaintiffs allege that their parents or legal guardians have refused to purchase handguns for them from FFLs or that they have otherwise exhausted legal means to obtain a handgun, let alone that obtaining a handgun through such legal channels impinges their Second Amendment rights.[3] Plaintiffs therefore lack standing. *See* Defs.' Mem. 8-10.  The Court should dispose of this case on that ground alone.

## II.     Plaintiffs Ignore the Specific Restrictions of Firearm Ownership Expressly Recognized in *Heller*.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that the Second Amendment broadly protects the rights of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.  But Plaintiffs gloss over the specific historical conditions and restrictions that the *Heller* Court also expressly approved.  The Supreme Court recognized as constitutionally permissible the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.  After all, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

---

[3] Plaintiffs have failed to establish that they have exhausted legal options for obtaining a handgun. No Plaintiff has alleged that they have attempted to have their parents or guardians assist in the purchase and the parents or guardians have refused; indeed, Plaintiffs have not even alleged that they do not already possess a handgun. Since Plaintiffs have the burden of proving standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), their failure to plead these facts is fatal to their claims, *see also* Defendants' Opp'n to Plaintiffs' Mot. for Summary Judgment (Defs' Opp'n), at 4 n.3 (citing E.D. Va. Civ. R. 56(B)).

Thus, *Heller* did not create a new right that reached all citizens at all times. The general language of *Heller* is subject to the specific, long-standing conditions, restrictions, or exceptions recognized in *Heller* itself. And nowhere in the *Heller* opinion does the Supreme Court suggest that minor children now have an unrestricted right to purchase a handgun. Just as felons or the mentally ill can be categorically denied the ability to purchase or possess handguns, so too the ability of minor children to purchase handguns can be restricted without infringing on rights protected by the Second Amendment.

### III. Plaintiffs' Reliance upon Founding-Era Militia Statutes Is Misplaced and Proves Too Much.

Plaintiffs put great stock in the fact that 18-year-olds could serve in the militia at the time of the framing of the Second Amendment and rely principally on the Militia Act of 1792. *See* Plaintiffs' Response in Opp'n to the Mot. to Dismiss, ECF No. 27 (Pls.' Opp'n), at 8-13. While it is undoubtedly true that 18-year-olds could serve in some militias at some times, that does not provide a complete historical account. The minimum age for militia service fluctuated dramatically, ranging from 21 years old, the common law age of majority at the time, to 16 years old in some states at some points. That history alone suggests that Congress and state legislatures have some discretion to set age requirements for purchasing guns—not, as Plaintiffs suggest, that the Constitution itself fixes the minimum age at 18.

Contrary to Plaintiffs' arguments, the states and Congress recognized that those under 21 years old were unemancipated minors, subject to special regulations and the oversight of parents or legal guardians, even while serving in the militia. During the founding, both Congress and various states recognized the role that parents or legal guardians would play in overseeing their minor children enrolled in militia service, going as far as to require that parents or guardians

provide firearms for their children's militia service.  Thus, the mere possibility of service by 18-to 20-year-olds in the militia does not alter the contemporary background legal principle that rights under the Second Amendment attach at the age of 21.  *See, e.g.*, William Blackstone, 1 *Commentaries On The Laws Of England* 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years, which age is completed on the day preceding the anniversary of a person's birth; who till that time is an infant, and so styled in law."); Black's Law Dictionary 847 (9th ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority.").

### a.  At the Time of the Framing of the Second Amendment, the Minimum Age for Militia Service Fluctuated from 16 Years Old to 21 Years Old.

The minimum age to serve in militias varied dramatically.  A number of States — Delaware, Georgia, Kansas, New Jersey, North Carolina, Ohio, Pennsylvania — chose at certain points to enroll only individuals over 21 in their respective militias. *See* Ex. C[4] (chart reproducing statutory provisions setting 21 as the minimum age for militia service).

In other states, the minimum age to serve varied between 16 and 21.  In 1705, during Queen Anne's War (1702-1713), Virginia set the age restriction on militia duty at 16.  *See* Ex. E (chart reproducing early New Jersey and Virginia militia laws). In 1723, it raised the minimum age for militia duty to 21.  *See id*. The minimum age remained at 21 when Virginia passed a later militia law in 1738, and when it sought recruits for a 1754 expedition against the French.  *See id.*  In 1755, at the beginning of the Seven Years War, the legislature lowered the minimum age for service to

---

[4] All exhibits are attached to Defendants' opposition to Plaintiffs' motion for summary judgment. For clarity, Defendants continue the sequence of exhibit lettering from their previous memorandum. Exhibits A and B are the same exhibits previously filed in support of Defendants' motion to dismiss, *see* ECF Nos. 22-1, 22-2, and are reattached to Defendants' opposition to Plaintiffs' motion for summary judgment.

18.  *See id.* At the beginning of the Revolutionary War, the legislature lowered the minimum age to 16.  *See id.*

In 1784, the legislature raised the minimum age back up to 18.  *See id.* Multiple other states set the minimum age for militia service at 16.  At the time Massachusetts ratified the Constitution on February 6, 1788, its militia laws allowed service "from sixteen to forty years of age."  I. Thomas & E.T. Andrews, The Perpetual Laws of The Commonwealth of Massachusetts from the Establishment of Its Constitution in the Year 1780 to the End of the Year 1800, at 339 (1801). Similarly, in 1777, the New Jersey legislature set 16 as its minimum age for required militia service.  *See* Ex. G (chart of early state militia laws allowing 16-year-olds to serve).  In 1778, it raised the minimum age for required service to 21, while expressly reserving the right to accept volunteers "between the Age of sixteen and twenty-one years."  *See* Ex. E.  Indeed, at various points, at least nine states allowed those as young as 16 to serve in the militia:  Connecticut (1786), Georgia (1786), Maryland (1777), Massachusetts (1785), New Hampshire (1786), New Jersey (1777), New York (1786), North Carolina (1777), and Vermont (1787).  *See* Ex. G.

Today, both federal law and Virginia state law continue to recognize the role that militias might play in the common defense.  These modern statutes set the minimum age for service at 17 (for the federal militia) and 16 (for the Commonwealth's militia).  Under federal law, the "militia of the United States consists of all able-bodied males at least 17 years of age and . . . under 45 years of age . . . and of female citizens of the United States who are members of the National Guard." 10 U.S.C. § 246(a) (2016).  And under Virginia law, "[t]he militia of the Commonwealth of Virginia shall consist of all able-bodied residents of the Commonwealth . . . who are at least 16 years of age and . . . not more than 55 years of age."  Va. Code Ann. § 44-1 (West 2015).

Plaintiffs ignore these historical facts.  In their rush to rely upon the fluctuating minimum

7

age for militia service, they run into the problem that their argument proves too much:  under their theory, 16-year-olds should have an unrestricted right to purchase a handgun because they were allowed to serve in militias at points during the founding-era.  Yet Plaintiffs offer no coherent principle explaining why 18-year-olds—but not 16-year-olds—should have unrestricted rights to purchase handguns from FFLs.  The reality is that the mere service by minor children in the militia (either in 1791 or today) does not reverse the long-standing historical understanding that legislatures may regulate firearm ownership by people under 21, which has long been understood to be the age of majority.

> **b. During the Founding Era, Congress and the States Recognized that Militia Service Did Not Emancipate Minors from the Care and Authority of Their Parents or Legal Guardians.**

Plaintiffs also fail to recognize that the ability to bear arms in the highly regulated context of military service is not inconsistent with conditions on the commercial acquisition of handguns from FFLs, including age qualifications, as a matter of historical practice and common sense. Longstanding conditions on the acquisition and/or possession of handguns and other firearms by those under the age of 21 include—and presuppose—the active oversight by parents or legal guardians.  In the 1968 Gun Control Act, Congress expected that parents could serve as the initial gatekeepers to determine whether their minor children were mature enough to handle a handgun. *See* Defs.' Mem. 5.  And this is similar to the oversight that parents and legal guardians played over their minor children at the time of the drafting of the Second Amendment.

During the founding era, Congress and the states expressly recognized that those under 21 years old were generally unemancipated and subject to parental authority.  For example, Michigan, Missouri, and New York required parental consent for individuals under 21  to serve in their militias. *See* Ex. D (chart summarizing state laws that required parental consent for those under 21

to serve in the militia).  Colonial Pennsylvania in 1755 passed a militia Act, drafted by Benjamin Franklin, that permitted persons under 21 to enroll in the militia but provided "that *no youth under the age of twenty-one years*, . . . shall be admitted to enroll himself, or be capable of being enrolled, in the said companies or regiments *without the consent of his or their parents or guardians*, masters or mistresses, in writing under their hands first had and obtained." An Act for the Better Ordering and Regulating Such as Are Willing and Desirous to Be United for Military Purposes Within this Province, Nov. 25, 1755, in 3 Jared Sparks, ed., *The Works of Benjamin Franklin* 78, 82-83 (1836) (emphasis added). Other States required parents to furnish the firearms for their minor child's militia duty. *See* Ex. F (chart summarizing states that required parents to furnish firearms to their minor children enrolled in militia service).

The role of parents in overseeing their minor children's involvement in militia service was also recognized by Congress.  In the course of Congressional debate over the 1792 Militia Act, while Congress was considering whether the United States should furnish firearms to persons who were unable to equip themselves, Representative John Vining "asked by what means minors were to provide themselves with the requisite articles?" *See* 2 The Debates and Proceedings in The Congress of The United States 1854-55 (1834) (relevant portions attached as Exhibit H). The remedy, according to Representative Jeremiah Wadsworth, was that "as to minors, their parents or guardians would prefer furnishing them with arms themselves." *Id.* at 1855-56.

Thus, when it comes to the use of firearms by minors, it is a long-standing tradition for parents and legal guardians to provide oversight.  The regime established by the 1968 Gun Control Act allows 18- to 20-year-olds to possess handguns but prohibits such persons from directly purchasing handguns from FFLs.  The idea behind this provision is to defeat the *clandestine*

acquiring of handguns by minors, and instead, to encourage parental supervision of minors when possessing or using handguns.  Such a regime does not offend the Second Amendment.

IV.     **Post-Ratification History Confirms that the Regulations on the Sale of Handguns to 18- to 20-Year-Olds Falls Outside the Scope of the Second Amendment.**

Regulations on the commercial sale of handguns to 18- to 20-years olds are longstanding and constitutional. As Defendants have demonstrated in their motion to dismiss, the overwhelming majority of states have adopted some restriction on the possession and/or purchase of firearms to individuals under the age of 21 at some point in the nineteenth and twentieth centuries. *See* Defs.' Mem. 13-15; *id.* Ex. B (chart of state restrictions on use or purchase of firearms), ECF No. 22-2.

The Supreme Court has explained that, while nineteenth century materials may "not provide as much insight" as Founding Era sources, they nonetheless constitute a "critical tool of constitutional interpretation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2136-37 (2022) (quoting *Heller*, 554 U.S. at 605, 614). The Court's extensive review of nineteenth century evidence in both *Heller* and *Bruen* confirms that such evidence plays an important role in Second Amendment analysis. *See Heller*, 554 U.S. at 605-619 (reviewing post-ratification evidence "through the end of the 19th century"); *Bruen*, 142 S. Ct. at 2145-56 (same). The Supreme Court has similarly looked to practices from the nineteenth century onward in interpreting the historical scope of other rights. In First Amendment cases, for example, the Court has recognized "historic and traditional" exceptions "long familiar to the bar" without tracing those exceptions back to the founding. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (citation and quotation marks omitted). In Sixth Amendment cases, likewise, the Court has consulted nineteenth century evidence in identifying the scope of the right to a jury trial. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020). There is no basis for adopting a more circumscribed view of the relevant

historical evidence in Second Amendment cases. As one court has stated, "we do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010); *see also Bruen*, 142 S. Ct. at 2118 ("[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.").

## V.   Even Fundamental Rights Are Subject to Reasonable Age Restrictions Set by the Legislature.

It is well established in our history that the legislature may draw categorical minimum age limits for certain activity. *See, e.g.*, U.S. Const. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years"); *id.*, art. I, §3, cl. 3 ("No Person shall be a Senator who shall not have attained to the Age of thirty Years"); *id.*, art. II, § 1, cl. 5 (no person shall be eligible for the office of President "who shall not have attained to the Age of thirty five Years"); *id.* amend. XXVI, § 1 ("The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.").  And the legislature has the power to set different minimum ages for different activities.[5]  "[S]tatutes setting different ages at which a person may engage in an activity or be treated as an adult are within the province of the legislature." 42 Am. Jur. 2d Infants § 6 (2019); *see also Jones v. Jones*, 72 F.2d 829, 830 (D.C. Cir. 1934) (observing that at common law, individuals were deemed infants until age 21, but noting that "the Legislature may regulate the age of majority for infants in all cases, or  for specified purposes only."); *Allam v. State*, 830

---

[5] For example, in Virginia, a person must be 21-years-old to buy beer.  Va. Code Ann. § 4.1-304(A) (West 2019).  And as of July 2019, a person must be 21-years-old to buy cigarettes.  *See* 2019 Virginia Laws Ch. 90 (H.B. 2748) (amending Va. Code § 18.2-371.2 to raise the minimum age from 18 to 21).

P.2d 435, 438 (Alaska Ct. App. 1992) ("There is no legal requirement that the same age of majority apply to all activities and circumstances."); *Rourke v. U.S. Fid. & Guar. Co.*, 1 S.E. 2d 728, 731 (Ga. 1939) ("The legislature has ample power to regulate the age of minority or majority, and it may prescribe a longer period of minority for some purposes than for others.").

This same principle applies equally to fundamental rights such as the right to keep and bear arms. The right to vote is a fundamental right, *see Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986), but prior to the Twenty-Sixth Amendment, nothing *constitutionally* prevented legislatures from setting the minimum age to vote at 21.  *See Oregon v. Mitchell*, 400 U.S. 112, 118 (1970) (striking down a portion of federal law lowering the voting age in state, county, and municipal elections from 21 to 18); *id*. at 294-95 ("Obviously, the power to establish an age qualification must carry with it the power to choose 21 as a reasonable voting age, as the vast majority of the States have done.") (Stewart, J., joined by Burger, C.J. and Blackmun, J., concurring in relevant part).  Indeed, prior to 1971, the Constitution itself expressly recognized that voting rights attached at 21 years of age, not 18.  *See* U.S. Const. amend. XIV, § 2. This was so because of the well-understood principle that rights—even fundamental rights—generally attach at age 21, the common law age of majority.

The Second Amendment was adopted against this same background principle.  Unlike the right to vote, however, there has been no formal constitutional amendment to alter this original understanding.  Therefore, the age at which Second Amendment rights attach remains as originally understood in 1791: 21 years old.  Thus, Congress is well within its authority to set a minimum age of 21 to purchase handguns from an FFL.

**VI.      Youth Is Not a Suspect Class with Immutable Characteristics.**

Plaintiffs spend a significant portion of their brief arguing that this Court should make new law and hold that youth is a suspect or quasi-suspect class.  *See* Pls.' Opp'n 18-29.  This flies in the face of the Supreme Court's statement in *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000), that "[a]ge is not a suspect classification under the Equal Protection Clause."  That should be the end of the matter.  *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) ("This Court has said repeatedly that age is not a suspect classification under the Equal Protection Clause.").

Yet, Plaintiffs persist by arguing that *Kimel* and related cases are distinguishable because they referenced "a materially different form of age-based classification, the use of a maximum age for older adults."  Pls.' Mem. 19.  While this is true, this fact weakens, rather than strengthens Plaintiffs' argument.  In *Kimel*, the plaintiffs faced mandatory retirement ages.  In other words, (relative) youth vanished, never to be regained.  Yet, the Supreme Court approved this regime, holding that it did not violate the Equal Protection Clause.

In the current case, Plaintiffs do not even face the degree of disability that the *Kimel* plaintiffs faced.  The current Plaintiffs still have their (relative) youth.  In three years (or less), they will "age out" of their supposed disability, enjoying the full panoply of rights under the Second Amendment.  This is an age-based classification that imposes a far lower cost than the *Kimel* plaintiffs suffered.  Moreover, "[e]ven if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required."  *Vance v. Bradley*, 440 U.S. 93, 108 (1979) (citation and internal quotation marks omitted); *see also Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976) (upholding mandatory retirement age for state police officers and recognizing that such "drawing of lines that create distinctions is peculiarly a legislative task

13

and an unavoidable one" and that "[p]erfection in making the necessary classifications is neither possible nor necessary").

Plaintiffs also argue that youth presents "immutable" characteristics that trigger suspect classification, "[s]imilar to those limitations once placed on women." Pls.' Opp'n 21, 27. The problem with this analogy is apparent:  youth is not "immutable."  *See* Merriam-Webster's Collegiate Dictionary (10th ed. 1998) (defining "immutable" as "not capable of or susceptible to change").  Unlike biological sex, which is generally constant and unchanging, "youth" as a classification eventually disappears—all too quickly.

The bottom-line is that youth is not a suspect or quasi-suspect classification that triggers Equal Protection analysis.  The Plaintiffs will soon "age out" of this classification.  As such, their Equal Protection claims must be denied.[6]

## CONCLUSION

Because the challenged regulations do not violate the Second Amendment or the Fifth Amendment, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint with prejudice.

---

[6] In a glancing fashion, Plaintiffs argue that "young adults are politically insular minorities relegated to a position of relative powerlessness" due to the fact that older people have had additional time and influence within the political system. *See* Pls.' Opp'n 21. This questionable "us-versus-them" characterization ignores the fact that every single person in young adults' supposed political opposition was, at some point, young themselves. *Cf. General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 591 (2004) "[T]he record is devoid of any evidence that younger [people] [a]re suffering at the expense of their elders . . . . Common experience is to the contrary").

Dated:  January 3, 2023

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:      /s/ *Jonathan H. Hambrick*
Jonathan H. Hambrick
VSB No. 37590
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5400 (phone)
(804) 819-7417 (fax)
jay.h.hambrick@usdoj.gov


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

MICHAEL P. CLENDENEN
(D.C. Bar No. 1660091)
Trial Attorney
DANIEL RIESS
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-0693
Fax: (202) 616-8460
michael.p.clendenen@usdoj.gov

*Attorneys for Defendants*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of January, 2023, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following:

> Elliott Harding, Esquire
> Harding Counsel, PLLC
> 608 Elizabeth Avenue
> Charlottesville, VA 22901

> /s/ *Jonathan H. Hambrick*
> Jonathan H. Hambrick
> VSB No. 37590
> Attorney for the Defendants
> Office of the United States Attorney
> 919 East Main Street, Suite 1900
> Richmond, Virginia 23219
> Telephone:  (804) 819-5400
> Facsimile:  (804) 771-2316
> Email:  jay.h.hambrick@usdoj.gov

16