# Calendar No. 1080

| 90TH CONGRESS 2d Session | SENATE | REPORT No. 1097 |
|---|---|---|

## OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1967

---

APRIL 29, 1968.—Ordered to be printed

---

Mr. McClellan, from the Committee on the Judiciary,

# REPORT

Submitted the following

together with

## MINORITY, INDIVIDUAL, AND ADDITIONAL VIEWS

[To accompany S. 917]

The Committee on the Judiciary, to which was referred the bill (S. 917) to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes, having considered the same, reports favorably thereon, with an amendment in the nature of a substitute, and recommends that the bill, as amended, do pass.

## AMENDMENT

Strike out all after the enacting clause and insert in lieu thereof the following:

That this Act may be cited as the "Omnibus Crime Control and Safe Streets Act of 1967".

### TITLE I—LAW ENFORCEMENT ASSISTANCE

#### DECLARATIONS AND PURPOSE

Congress finds that the high incidence of crime in the United States threatens the peace, security, and general welfare of the Nation and its citizens. To prevent crime and to insure the greater safety of the people, law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government.

Congress finds further that crime is essentially a local problem that must be dealt with by State and local governments if it is to be controlled effectively.

It is therefore the declared policy of the Congress to assist State and local governments in strengthening and improving law enforcement at every level by national assistance. It is the purpose of this title to (1) encourage States and units of general local government to prepare and adopt comprehensive plans based upon their evaluation of State and local problems of law enforcement; (2) authorize grants to States and units of local government in order to improve and strengthen law enforcement; and (3) encourage research and development directed toward the improvement of law enforcement and the development of new methods for the prevention and reduction of crime and the detection and apprehension of criminals.

### PART A—LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

SEC. 101. (a) There is hereby established within the Department of Justice, under the general authority of the Attorney General, a Law Enforcement Assistance Administration (hereafter referred to in this title as "Administration").

(b) The Administration shall be composed of an Administrator of Law Enforcement Assistance and two Associate Administrators of Law Enforcement Assistance, who shall be appointed by the President, by and with the advice and consent of the Senate. No more than two members of the Administration shall be of the same political party, and members shall be appointed with due regard to their fitness, knowledge, and experience to perform the functions, powers, and duties vested in the Administration by this title.

(c) It shall be the duty of the Administration to exercise all of the functions, powers, and duties created and established by this title, except as otherwise provided.

### PART B—PLANNING GRANTS

SEC. 201. It is the purpose of this part to encourage States and units of general local government to prepare and adopt comprehensive law enforcement plans based on their evaluation of State and local problems of law enforcement.

SEC. 202. The Administration is authorized to make grants to States, units of general local government, or combinations of such States or units of local government for preparing, developing, or revising law enforcement plans to carry out the purpose set forth in section 302: *Provided, however,* That no unit of general local government or combination of such units shall be eligible for a grant under this part unless such unit or combination has a population of not less than fifty thousand persons.

SEC. 203. A grant authorized under section 202 shall not exceed 80 per centum of the total cost of the preparation, development, or revision of a plan.

SEC. 204. The Administration may advance such grants authorized under section 202 upon application for the purposes described. Such application shall:

(1) Set forth programs and activities designed to carry out the purposes of section 302.

(2) Contain such information as the Administration may prescribe in accordance with section 501.

### PART C—GRANTS FOR LAW ENFORCEMENT PURPOSES

SEC. 301. It is the purpose of this part to encourage States and units of general local government to carry out programs and projects to improve and strengthen law enforcement.

SEC. 302. (a) The Administration is authorized to make grants to States, units of general local government, and combinations of such States or units of general local government to improve and strengthen law enforcement: *Provided however,* That no unit of general local government or combination of such units shall be eligible for a grant under this part unless such unit or combination has a population of not less than fifty thousand persons.

(b) Under this part grants may be made pursuant to an application which is approved under section 303 for—

(1) Public protection, including the development, demonstration, evaluation, implementation, and purchase of methods, devices, facilities, and equipment designed to improve and strengthen law enforcement and reduce crime in public and private places.

(2) The recruiting of law enforcement personnel and the training of personnel in law enforcement.

(3) Public education relating to crime prevention and encouraging respect for law and order, including education programs in schools and programs to

improve public understanding of and cooperation with law enforcement agencies.

(4) Construction of buildings or other physical facilities which would fulfill or implement the purposes of this section.

(5) The organization, education, and training of special law enforcement units to combat organized crime, including the establishment and development of State organized crime prevention councils, the recruiting and training of special investigative and prosecuting personnel, and the development of systems for collecting, storing, and disseminating information relating to the control of organized crime.

(6) The organization, education, and training of regular law enforcement officers, special law enforcement units, and law enforcement reserve units for the prevention, detection, and control of riots and other violent civil disorders, including the acquisition of riot control equipment.

(c) The amount of any grant made under paragraph (5) or (6) of subsection (b) of this section may be up to 75 per centum of the cost of the program or project specified in the application for such grant. The amount of any grant made under paragraph (4) of subsection (b) of this section may be up to 50 per centum of the cost of the program or project specified in the application for such grant: The amount of any other grant made under this part may be up to 60 per centum of the cost of the program or project specified in the application for such grant: *Provided,* That no part of any grant for the purpose of construction of buildings or other physical facilities shall be used for land acquisition.

(d) Not more than one-third of any grant made under this part may be expended for the compensation of personnel. The amount of any such grant expended for the compensation of personnel shall not exceed the amount of State or local funds made available to increase such compensation. The limitations contained in this subsection shall not apply to the compensation of personnel for time engaged in conducting or undergoing training programs.

SEC. 303. (a) A grant under this part may be made only upon application to the Administration, at such time or times, in such manner, and containing or accompanied by such information as the Administration may prescribe in accordance with section 501. Each such application shall set forth a program for carrying out the purposes set forth in section 302 which is consistent with a law enforcement plan developed by the applicant and approved for the purposes of this part.

(b) The Administration is authorized to make grants to an applicant under this part only if such applicant has on file with the Administration an approved law enforcement plan which conforms with the purposes and requirements of this title. Each such plan shall—

(1) unless it is not practicable to do so, encompass a State, unit of general local government, or combination of such States or units; and

(2) contain adequate assurances that Federal funds made available under the application, will be so used as to supplement and, to the extent practical, increase the amount of funds that the applicant would, in the absence of such Federal funds, make available for law enforcement.

(c) The Administration may approve applications for grants under this part or any modifications thereof, only if each such application meets the requirements set forth in subsections (a) and (b) of this section. In implementing this section, the Administration shall—

(1) encourage plans which encompass entire metropolitan areas;

(2) encourage plans which are related to and coordinate with other relevant State or local law enforcement plans and systems; and

(3) encourage plans which deal with the problems and provide for the improvement of all law enforcement agencies in the area encompassed by the plans.

SEC. 304. (a) In making grants under this part, the Administration shall give special emphasis, where appropriate or feasible, to programs and projects dealing with the prevention, detection, and control of organized crime and of riots and other violent civil disorders.

(b) Notwithstanding the provisions of section 303 of this part, until August 31, 1968, the Administration is authorized to make grants for programs and projects dealing with the prevention, detection, and control of riots and other violent civil disorders on the basis of applications describing in detail the programs, projects, and costs of the items for which the grants will be used, and the relationship of the programs and projects to the applicant's general program for the improvement of law enforcement.

Part D—Training, Education, Research, Demonstration, and Special Grants

Sec. 401. It is the purpose of this part to provide for and encourage training, education, research, and development for the purpose of improving law enforcement and developing new methods for the prevention and reduction of crime, and the detection and apprehension of criminals.

Sec. 402. (a) There is established within the Department of Justice a National Institute of Law Enforcement and Criminal Justice (hereafter referred to in this part as "Institute"). The Institute shall be under the general authority of the Administration. It shall be the purpose of the Institute to encourage research and development to improve and strengthen law enforcement.

(b) The Institute is authorized—

(1) to make grants to, or enter into contracts with, public agencies, institutions of higher education, or private organizations to conduct research, demonstrations, or special projects pertaining to the purposes described in this title, including the development of new or improved approaches, techniques, systems, equipment, and devices to improve and strengthen law enforcement;

(2) to make continuing studies and undertake programs of research to develop new or improved approaches, techniques, systems, equipment, and devices to improve and strengthen law enforcement, including, but not limited to, the effectiveness of projects or programs carried out under this title;

(3) to carry out programs of behavioral research designed to provide more accurate information on the causes of crime and the effectiveness of various means of preventing crime, and to evaluate the success of correctional procedures;

(4) to make recommendations for action which can be taken by Federal, State, and local governments and by private persons and organizations to improve and strengthen law enforcement;

(5) to carry out programs of instructional assistance consisting of research fellowships for the programs provided under this section, and special workshops for the presentation and dissemination of information resulting from research, demonstrations, and special projects authorized by this title;

(6) to carry out a program of collection and dissemination of information obtained by the Institute or other Federal agencies, public agencies, institutions of higher education, or private organizations engaged in projects under this title, including information relating to new or improved approaches, techniques, systems, equipment, and devices to improve and strengthen law enforcement; and

(7) to establish a research center to carry out the programs described in this section.

Sec. 403. A grant authorized under this part may be up to 100 per centum of the total cost of each project for which such grant is made. The Administration shall require, whenever feasible, as a condition of approval of a grant under this part, that the recipient contribute money, facilities, or services to carry out the purpose for which the grant is sought.

Sec. 404. (a) The Director of the Federal Bureau of Investigation is authorized to—

(1) establish and conduct training programs at the Federal Bureau of Investigation National Academy at Quantico, Virginia, to provide, at the request of a State or unit of local government, training for State and local law enforcement personnel;

(2) develop new or improved approaches, techniques, systems, equipment, and devices to improve and strengthen law enforcement; and

(3) assist in conducting, at the request of a State or unit of local government, local and regional training programs for the training of State and local law enforcement personnel, Such training shall be provided only for persons actually employed as State police or highway patrol, police of a unit of local government, sheriffs and their deputies, and such other persons as the State or unit may nominate for police training while such persons are actually employed as officers of such State or unit.

(b) In the exercise of the functions, powers, and duties established under this section the Director of the Federal Bureau of Investigation shall be under the general authority of the Attorney General.

Sec. 405. (a) Subject to the provisions of this section, the Law Enforcement Assistance Act of 1965 (79 Stat. 828) is repealed: Provided, That—

(1) The Administration, or the Attorney General until such time as the members of the Administration are appointed, is authorized to obligate funds

for the continuation of projects approved under the Law Enforcement Assistance Act of 1965 prior to the date of enactment of this Act to the extent that such approval provided for continuation.

(2) Any funds obligated under subsection (1) of this section and all activities necessary or appropriate for the review under subsection (3) of this section may be carried out with funds previously appropriated and funds appropriated pursuant to this title.

(3) Immediately upon establishment of the Administration, it shall be its duty to study, review, and evaluate projects and programs funded under the Law Enforcement Assistance Act of 1965. Continuation of projects and programs under subsections (1) and (2) of this section shall be in the discretion of the Administration.

Sec. 406. (a) Pursuant to the provisions of subsections (b) and (c) of this section, the Administration is authorized, after appropriate consultation with the Commissioner of Education, to carry out programs of academic educational assistance to improve and strengthen law enforcement.

(b) The Administration is authorized to enter into contracts to make, and make, payments to institutions of higher education for loans, not exceeding $1,800 per academic year to any person, to persons enrolled on a full-time basis in undergraduate or graduate programs approved by the Administration and leading to degrees or certificates in areas directly related to law enforcement, with special consideration to police or correctional personnel of States or units of general local government on academic leave to earn such degrees or certificates. Loans to persons assisted under this subsection shall be made on such terms and conditions as the Administration and the institution offering such programs may determine, except that the total amount of any such loan, plus interest, shall be canceled for service as a full-time officer or employee of a law enforcement agency at the rate of 25 per centum of the total amount of such loan plus interest for each complete year of such service or its equivalent of such service, as determined under regulations of the Administration.

(c) The Administration is authorized to enter into contracts to make, and make, payments to institutions of higher education for tuition and fees, not exceeding $200 per academic quarter or $300 per semester for any person, for officers of any publicly funded law enforcement agency enrolled on a full-time or part-time basis in courses included in an undergraduate or graduate program which is approved by the Administration and which leads to a degree or certificate in an area related to law enforcement or an area suitable for persons employed in law enforcement. Assistance under this subsection may be granted only on behalf of an applicant who enters into an agreement to remain in the service of the law enforcement agency employing such applicant for a period of two years following completion of any course for which payments are provided under this subsection, and in the event such service is not completed, to repay the full amount of such payments on such terms and in such manner as the Administration may prescribe.

## Part E—Administrative Provisions

Sec. 501. The Administration is authorized, after appropriate consultation with representatives of States and units of general local government, to establish such rules, regulations and procedures as are necessary to the exercise of its functions, and are consistent with the stated purpose of this title.

Sec. 502. The Administration may delegate to any officer or official of the Administration, or, with the approval of the Attorney General, to any officer of the Department of Justice such functions as it deems appropriate.

Sec. 503. The functions, powers, and duties specified in this title to be carried out by the Administration shall not be transferred elsewhere in the Department of Justice unless specifically hereafter authorized by the Congress.

Sec. 504. In carrying out its functions, the Administration, or upon authorization of the Administration, any member thereof or any hearing examiner assigned to or employed by the Administration, shall have the power to hold hearings, sign and issue subpenas, administer oaths, examine witnesses, and receive evidence at any place in the United States it may designate.

Sec. 505. Section 5315 of title 5, United States Code, is amended by adding at the end thereof—

"(90) Administrator of Law Enforcement Assistance."

Sec. 506. Section 5316 of title 5, United States Code, is amended by adding at the end thereof—

"(126) Associate Administrator of Law Enforcement Assistance."

Sec. 507. Subject to the civil service and classification laws, the Administration is authorized to select, appoint, employ, and fix compensation of such officers and

employees, including hearing examiners, as shall be necessary to carry out its powers and duties under this title.

SEC. 508. The Administration is authorized, on a reimbursable basis when appropriate, to use the available services, equipment, personnel, and facilities of the Department of Justice and of other civilian or military agencies and instrumentalities of the Federal Government, and to cooperate with the Department of Justice and such other agencies and instrumentalities in the establishment and use of services, equipment, personnel, and facilities of the Administration. The Administration is further authorized to confer with and avail itself of the cooperation, services, records, and facilities of State, municipal, or other local agencies.

SEC. 509. Whenever the Administration, after reasonable notice and opportunity for hearing to an applicant or a grantee under this title, finds that, with respect to any payments made or to be made under this title, there is a substantial failure to comply with—

(a) the provisions of this title;

(b) regulations promulgated by the Administration under this title; or

(c) a plan or application submitted in accordance with the provisions of this title;

the Administration shall notify such applicant or grantee that further payments shall not be made (or in its discretion that further payments shall not be made for activities in which there is such failure), until there is no longer such failure.

SEC. 510. (a) In carrying out the functions vested by this title in the Administration, the determination, findings, and conclusions of the Administration shall be final and conclusive upon all applicants, except as hereafter provided.

(b) If the application has been rejected or an applicant has been denied a grant or has had a grant, or any portion of a grant, discontinued, or has been given a grant in a lesser amount than such applicant believes appropriate under the provisions of this title, the Administration shall notify the applicant or grantee of its action and set forth the reason for the action taken. Whenever an applicant or grantee requests a hearing on action taken by the Administration on an application or a grant the Administration, or any authorized officer thereof, is authorized and directed to hold such hearings or investigations at such times and places as the Administration deems necessary, following appropriate and adequate notice to such applicant; and the findings of fact and determinations made by the Administration with respect thereto shall be final and conclusive, except as otherwise provided herein.

(c) If such applicant is still dissatisfied with the findings and determinations of the Administration, following the notice and hearing provided for in subsection (b) of this section, a request may be made for rehearing, under such regulations and procedures as the Administration may establish, and such applicant shall be afforded an opportunity to present such additional information as may be deemed appropriate and pertinent to the matter involved. The findings and determinations of the Administration following such rehearing, shall be final and conclusive upon all parties concerned, except as hereafter provided.

SEC. 511. (a) If any applicant or grantee is dissatisfied with the Administration's final action with respect to the approval of its application or plan submitted under this title, or any applicant or grantee is dissatisfied with the Administration's final action under section 509 or section 510, such applicant or grantee may, within sixty days after notice of such action, file with the United States court of appeals for the circuit in which such applicant or grantee is located a petition for review of that action. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Administration. The Administration shall thereupon file in the court the record of the proceedings on which the action of the Administration was based, as provided in section 2112 of title 28, United States Code.

(b) The determinations and the findings of fact by the Administration, if supported by substantial evidence, shall be conclusive; but the court, for good cause shown, may remand the case to the Administration to take further evidence. The Administration may thereupon make new or modified findings of fact and may modify its previous action, and shall file in the court the record of the further proceedings. Such new or modified findings of fact or determinations shall likewise be conclusive if supported by substantial evidence.

(c) Upon the filing of such petition, the court shall have jurisdiction to affirm the action of the Administration or to set it aside, in whole or in part. The judgment of the court shall be subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28, United States Code.

SEC. 512. Unless otherwise specified in this title, the Administration shall carry out the programs provided for in this title during the fiscal year ending June 30, 1968, and the five succeeding fiscal years.

SEC. 513. To insure that all Federal assistance to State and local programs under this title is carried out in a coordinated manner, the Administration is authorized to request any Federal department or agency to supply such statistics, data, program reports, and other material as the Administration deems necessary to carry out its functions under this title. Each such department or agency is authorized to cooperate with the Administration and, to the extent permitted by law, to furnish such materials to the Administration. Any Federal department or agency engaged in administering programs related to this title shall, to the maximum extent practicable, consult with and seek advice from the Administration to insure fully coordinated efforts, and the Administration shall undertake to coordinate such efforts.

SEC. 514. The Administration may arrange with and reimburse the heads of other Federal departments and agencies for the performance of any of its functions under this title.

SEC. 515. The Administration is authorized—

(a) to conduct evaluation studies of the programs and activities assisted under this title;

(b) to collect, evaluate, publish, and disseminate statistics and other information on the condition and progress of law enforcement in the several States; and

(c) to cooperate with and render technical assistance to States, units of general local government, combinations of such States or units, or other public or private ¬gencies, organizations, or institutions in matters relating to law enforcement.

SEC. 516. (a) Payments under this title may be made in installments, and in advance or by way of reimbursement, as may be determined by the Administration.

(b) Not more than 12 per centum of the sums appropriated for any fiscal year to carry out the provisions of this title may be used within any one State except that this limitation shall not apply to grants made pursuant to part D.

SEC. 517. The Administration is authorized to appoint such technical or other advisory committees to advise the Administration with respect to the administration of this title as it deems necessary. Members of such committees not otherwise in the employ of the United States, while attending meetings of the committees, shall be entitled to receive compensation at a rate to be fixed by the Administration but not exceeding $75 per diem, and while away from home or regular place of business they may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of title 5, United States Code, for persons in the Government service employed intermittently.

SEC. 518. (a) Nothing contained in this title or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof.

(b) Notwithstanding any other provision of law nothing contained in this title shall be construed to authorize the Administration (1) to require, or condition the availability or amount of a grant upon, the adoption by an applicant or grantee under this title of a percentage ratio, quota system, or other program to achieve racial balance or to eliminate racial imbalance in any law enforcement agency, or (2) to deny or discontinue a grant because of the refusal of an applicant or grantee under this title to adopt such a ratio, system, or other program.

SEC. 519. On or before August 31, 1968, and each year thereafter, the Administration shall report to the President and to the Congress on activities pursuant to the provisions of this title during the preceding fiscal year.

SEC. 520. For the purpose of carrying out this title, there is authorized to be appropriated the sums of $100,111,000 for the fiscal years ending June 30, 1968, and June 30, 1969, $300,000,000 for the fiscal year ending June 30, 1970 and for succeeding fiscal years such sums as the Congress might authorize: *Provided, however,* That of the amount appropriated for the fiscal years ending June 30, 1968, and June 30, 1969—

(a) the sum of $25,000,000 shall be for the purposes of part B;

(b) the sum of $50,000,000 shall be for the purposes of part C, of which amount—

(1) not more than $2,500,000 shall be for the purposes of section 302(b)(3);

(2) not more than $15,000,000 shall be for the purposes of section 302(b)(5), of which not more than $1,000,000 may be used within any one State;

(3) not more than $15,000,000 shall be for the purposes of section 302(b)(6); and

(4) not more than $10,000,000 shall be for the purposes of correction, probation, and parole; and

(c) the sum of $25,111,000 shall be for the purposes of part D, of which $5,111,000 shall be for the purposes of section 404, and not more than $10,000,000 shall be for the purposes of section 406.

SEC. 521. The Administration is authorized to make grants under this title to a unit of general local government or combination of such units only if—

(a) the applicant certifies that it has submitted a copy of its application to the chief executive of the State, and, where appropriate, the State law enforcement agency in which such unit or combination of such units is located; and

(b) such chief executive and, where appropriate, the State law enforcement agency have been afforded a reasonable opportunity not exceeding sixty days from the date of receipt of the application to submit to the Administration in writing an evaluation of the project set forth in the application. Such evaluation shall include comments on the relationship of the application to other applications then pending, and to existing or proposed plans in the State for the development of new approaches to and improvements in law enforcement. If an application is submitted by a combination of units of general local government which is located in more than one State, such application must be submitted to the chief executive, and where appropriate, the State law enforcement agency, of each State in which the combination of such units is located.

SEC. 522. (a) Each recipient of assistance under this Act shall keep such records as the Administration shall prescribe, including records which fully disclose the amount and disposition by such recipient of the proceeds of such assistance, the total cost of the project or undertaking in connection with which such assistance is given or used, and the amount of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit.

(b) The Administration and the Comptroller General of the United States, or any of their duly authorized representatives, shall have access for purpose of audit and examinations to any books, documents, papers, and records of the recipients that are pertinent to the grants received under this title.

SEC. 523. Section 3334 of title 42, United States Code, is amended by inserting "law enforcement facilities," immediately after "transportation facilities."

## PART F—DEFINITIONS

SEC. 601. As used in this title—

(a) "Law enforcement" means all activities pertaining to crime prevention or reduction and enforcement of the criminal law.

(b) "Organized crime" means the unlawful activities of the members of a highly organized, disciplined association engaged in supplying illegal goods and services, including but not limited to gambling, prostitution, loan sharking, narcotics, labor racketeering, and other unlawful activities of members of such organizations.

(c) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(d) "Unit of general local government" means any city, county, township, town, borough, parish, village, or other general purpose political subdivision of a State.

(e) "Combination" as applied to States or units of general local government means any grouping or joining together of such States or units for the purpose of preparing, developing, or implementing a law enforcement plan.

(f) "Construction" means the erection, acquisition, expansion, or repair (but not including minor remodeling or minor repairs) of new or existing buildings or other physical facilities, and the acquisition or installation of initial equipment therefor.

(g) "State law enforcement agency" means an agency established pursuant to State law or established by the chief executive for the purpose of this title, or an existing agency so designated, which agency shall be broadly representative of law enforcement officials within such State.

(h) "State organized crime prevention council" means a council composed of not more than seven persons established pursuant to State law or established by the chief executive of the state for the purpose of this title, or an existing agency so designated, which council shall be broadly representative of law enforcement officials within such State and whose members by virtue of their training or experience shall be knowledgeable in the prevention and control of organized crime.

(i) "Metropolitan area" means a standard metropolitan statistical area as established by the Bureau of the Budget, subject, however, to such modifications and extensions as the Administration may determine to be appropriate.

(j) "Public agency" means any State, unit of local government, combination of such States or units, or any department, agency, or instrumentality of any of the foregoing.

(k) "Institution of higher education" means any such institution as defined by section 801(a) of the Higher Education Act of 1965 (79 Stat. 1269; 20 U.S.C. 1141(a)), subject, however, to such modifications and extensions as the Administration may determine to be appropriate.

## TITLE II—ADMISSIBILITY OF CONFESSIONS, REVIEWABILITY OF ADMISSION IN EVIDENCE OF CONFESSIONS IN STATE CASES, ADMISSIBILITY IN EVIDENCE OF EYE WITNESS TESTIMONY, AND PROCEDURES IN OBTAINING WRITS OF HABEAS CORPUS

SEC. 701. (a) Chapter 223, title 18, United States Code (relating to witnesses and evidence), is amended by adding at the end thereof the following new sections:

**"§ 3501. Admissibility of confessions**

"(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

"(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

"(c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a commissioner or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury.

"(d) Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention.

"(e) As used in this section, the term 'confession' means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing."

**"§ 3502. Reviewability of admission in evidence of confessions in State cases**

"Neither the Supreme Court nor any inferior court ordained and established by Congress under article III of the Constitution of the United States shall have jurisdiction to review or to reverse, vacate, modify, or disturb in any way, a ruling of any tri:l court of any State in any criminal prosecution admitting in evidence as voluntarily made an admission or confession of an accused if such ruling has be affirmed or otherwise upheld by the highest court of the State having appellate jurisdiction of the cause.

**"§ 3503. Admissibility in evidence of eye witness testimony**

"The testimony of a witness that he saw the accused commit or participate in the commission of the crime for which the accused is being tried shall be admissible into evidence in a criminal prosecution in any trial court ordained and established under article III of the Constitution of the United States; and neither the Supreme Court nor any inferior appellate court ordained and established by the Congress under article III of the Constitution of the United States shall have jurisdiction to review, reverse, vacate, modify, or disturb in any way a ruling of such a trial court or any trial court in any State, territory, district, commonwealth, or other possession of the United States admitting in evidence in any criminal prosecution the testimony of a witness that he saw the accused commit or participate in the commission of the crime for which the accused is tried."

(b) The section analysis of that chapter is amended by adding at the end thereof the following new items:

"3501. Admissibility of admission in evidence of confessions.
"3502. Reviewability of admission in evidence of confessions in State cases.
"3503. Admissibility in evidence of eye witness testimony."

SEC. 702. (a) Chapter 153, title 28, United States Code (relating to habeas corpus), is amended by adding at the end thereof the following new section:

**"§ 2256. Procedures in obtaining writs of habeas corpus**

"The judgment of a court of a State upon a plea or verdict of guilty in a criminal action shall be conclusive with respect to all questions of law or fact which were determined, or which could have been determined, in that action until such judgment is reversed, vacated, or modified by a court having jurisdiction to review by appeal or certiorari such judgment; and neither the Supreme Court nor any inferior court ordained and established by Congress under article III of the Constitution of the United States shall have jurisdiction to reverse, vacate, or modify any such judgment of a State court except upon appeal from, or writ of certiorari granted to review, a determination made with respect to such judgment upon review thereof by the highest court of that State having jurisdiction to review such judgment."

(b) The section analysis of that chapter is amended by adding at the end thereof the following new item:

"§ 2256. Procedures in obtaining writs of habeas corpus."

## TITLE III—WIRETAPPING AND ELECTRONIC SURVEILLANCE

### FINDINGS

SEC. 801. On the basis of its own investigations and of published studies, the Congress makes the following findings:

(a) Wire communications are normally conducted through the use of facilities which form part of an interstate network. The same facilities are used for interstate and intrastate communications. There has been extensive wiretapping carried on without legal sanctions, and without the consent of any of the parties to the conversation. Electronic, mechanical, and other intercepting devices are being used to overhear oral conversations made in private, without the consent of any of the parties to such communications. The contents of these communications and evidence derived therefrom are being used by public and private parties as evidence in court and administrative proceedings, and by persons whose activities affect interstate commerce. The possession, manufacture, distribution, advertising, and use of these devices are facilitated by interstate commerce.

(b) In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings, and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized, to prohibit any unauthorized

interception of such communications, and the use of the contents thereof in evidence in courts and administrative proceedings.

(c) Organized criminals make extensive use of wire and oral communications in their criminal activities. The interception of such communications to obtain evidence of the commission of crimes or to prevent their commission is an indispensable aid to law enforcement and the administration of justice.

(d) To safeguard the privacy of innocent persons, the interception of wire or oral communications where none of the parties to the communication has consented to the interception should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court. Interception of wire and oral communications should further be limited to certain major types of offenses and specific categories of crime with assurances that the interception is justified and that the information obtained thereby will not be misused.

SEC. 802. Part I of title 18, United States Code, is amended by adding at the end the following new chapter:

## Chapter 119. WIRE INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

"Sec

"2510. Definitions.
"2511. Interception and disclosure of wire or oral communications prohibited.
"2512. Manufacture distribution, possession, and advertising of wire or oral communication intercepting devices prohibited.
"2513. Confiscation of wire or oral communication intercepting devices.
"2514. Immunity of witnesses.
"2515. Prohibition of use as evidence of intercepted wire or oral communications.
"2516. Authorization for interception of wire or oral communications.
"2517. Authorization for disclosure and use of intercepted wire or oral communications.
"2518. Procedure for interception of wire or oral communications.
"2519. Reports concerning intercepted wire or oral communications.
"2520. Recovery of civil damages authorized.

### "§ 2510. Definitions

"As used in this chapter—

"(1) 'wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point or origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

"(2) 'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;

"(3) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

"(4) 'intercept' means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

"(5) 'electronic, mechanical, or other device' means any device or apparatus which can be used to intercept a wire or oral communication other than—

"(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

"(b) a hearing aid or similar device being used to correct subnormal hearing to not better than normal;

"(6) 'person' means any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation;

"(7) 'investigative or law enforcement officer' means any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses;

"(8) 'contents,' when used with respect to any wire or oral communication, includes any information concerning the identity of the parties to such com-

munication or the existence, substance, purport, or meaning of that communication;

"(9) 'judge of competent jurisdiction' means—

"(a) a judge of a United States district court or a United States court of appeals; and

"(b) a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders aurhorizing interceptions of wire or oral communications;

"(10) 'communication common carrier' shall have the same meaning which is given the term 'common carrier' by section 153(h) of title 47 of the United States Code; and

"(11) 'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed.

"**§ 2511. Interception and disclosure of wire or oral communications prohibited**

"(1) Except as otherwise specifically provided in this chapter any person who—

"(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;

"(b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

"(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

"(ii) such device transmits communications by radio, or interferes with the transmission of such communications; or

"(iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or

"(iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or

"(v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;"

"(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or

"(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"(2) (a) It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication. *Provided:* that said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

"(b) It shall not be unlawful under this chapter for an officer, employee, or agent of the Federal Communications Commission, in the normal course of his employment and in discharge of the monitoring responsibilities exercised by the Commission in the enforcement of chapter 5 of title 47 of the United States Code, to intercept a wire communication, or oral communication transmitted by radio, or to disclose or use the information thereby obtained.

"(c) It shall not be unlawful under this chapter for a party to any wire or oral communication, or a person given prior authority by a party to the communication to intercept such communication.

"(3) Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United

States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power.

### "§ 2512. Manufacture, distribution, possession, and advertising of wire or oral communication intercepting devices prohibited

"(1) Except as otherwise specifically provided in this chapter, any person who willfully—

"(a) sends through the mail, or sends or carries in interstate or foreign commerce, any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications;

"(b) manufactures, assembles, possesses or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce; or

"(c) places in any newspaper, magazine, handbill, or other publication any advertisement of—

"(i) any electronic, mechanical, or other device knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications; or

"(ii) any other electronic, mechanical, or other device, where such advertisement promotes the use of such device for the purpose of the surreptitious interception of wire or oral communications,

knowing or having reason to know that such advertisement will be sent through the mail or transported in interstate or foreign commerce,

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"(2) It shall not be unlawful under this section for—

"(a) a communications common carrier or an officer, agent, or employee of, or a person under contract with, a communications common carrier, in the normal course of the communications common carrier's business, or

"b) an officer, agent, or employee of, or a person under contract with, the United States, a State, or a political subdivision thereof, in the normal course of the activities of the United States, a State, or a political subdivision thereof, to send through the mail, send or carry in interstate or foreign commerce, or manufacture, assemble, possess, or sell any electronic, mechanical, or other device knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications.

### "§ 2513. Confiscation of wire or oral communication intercepting devices

"Any electronic, mechanical, or other device used, sent, carried, manufactured, assembled, possessed, sold, or advertised in violation of section 2511 or section 2512 of this chapter may be seized and forfeited to the United States. All provisions of law relating to (1) the seizure, summary and judicial forfeiture, and condemnation of vessels, vehicles, merchandise, and baggage for violations of the customs laws contained in title 19 of the United States Code, (2) the disposition of such vessels, vehicles, merchandise and baggage or the proceeds from the sale thereof, (3) the remission or mitigation of such forfeiture, (4) the compromise of claims, and (5) the award of compensation to informers in respect of such forfeitures, shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this section, insofar as applicable and not inconsistent with the provisions of this section; except that such duties as are imposed upon the collector of customs or any other person with respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the provisions of the customs laws contained in title 19 of the United States Code shall be performed with respect to seizure and forfeiture of electronic, mechanical, or other

intercepting devices under this section by such officers, agents, or other persons as may be authorized or designated for that purpose by the Attorney General.

## "§ 2514. Immunity of witnesses

"Whenever in the judgment of a United States attorney the testimony of any witness, or the production of books, papers, or other evidence by any witness, in any case or proceeding before any grand jury or court of the United States involving any violation of this chapter or any of the offenses enumerated in section 2516, or any conspiracy to violate this chapter or any of the offenses enumerated in section 2516 is necessary to the public interest, such United States attorney, upon the approval of the Attorney General, shall make application to the court that the witness shall be instructed to testify or produce evidence subject to the provisions of this section, and upon order of the court such witness shall not be excused from testifying or from producing books, papers, or other evidence on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture. No such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding (except in a proceeding described in the next sentence) against him in any court. No witness shall be exempt under this section from prosecution for perjury or contempt committed while giving testimony or producing evidence under compulsion as provided in this section.

## "§ 2515. Prohibition of use as evidence of intercepted wire or oral communications

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof, if the disclosure of that information would be in violation of this chapter.

## "§ 2516. Authorization for interception of wire or oral communications

"(1) The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of—

"(a) any offense punishable by death or by imprisonment for more than one year under sections 2274 through 2277 of title 42 of the United States Code (relating to the enforcement of the Atomic Energy Act of 1954), or under the following chapters of this title: chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason);

"(b) a violation of section 186 or section 501(c) of title 29, United States Code (dealing with restrictions on payments and loans to labor organizations), or any offense which involves murder, kidnapping, robbery, or extortion, and which is punishable under this title;

"(c) any offense which is punishable under the following sections of this title: section 201 (bribery of public officials and witnesses), section 224 (bribery in sporting contests), section 1084 (transmission of wagering information), section 1503 (influencing or injuring an officer, juror, or witness generally), section 1510 (obstruction of criminal investigations), section 1751 (Presidential assassinations, kidnapping, and assault), section 1951 (interference with commerce by threats or violence), section 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises), section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan), or sections 2313 and 2314 (interstate transportation of stolen property);

"(d) any offense involving counterfeiting punishable under sections 471, 472, or 473 of this title;

"(e) any offense involving bankruptcy fraud or the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States; or

"(f) any conspiracy to commit any of the foregoing offenses.

"(2) The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdicition for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statue an order authorizing, or approving the interception of wire or oral communcations by investigate or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.

## "§ 2517. Authorization for disclosure and use of intercepted wire or oral communications

"(1) Any investigative or law enforcement officer, who by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

"(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

"(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any criminal proceeding in any court of the United States or of any State or in any Federal or State grand jury proceeding.

"(4) No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character.

"(5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

## "§ 2518. Procedure for interception of wire or oral communications

"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

"(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

"(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

"(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

"(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authori-

zation for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter; and

"(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application.

"(2) The judge may require the applicant to furnish additional testimony or documentary evidence in support of the application.

"(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

"(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

"(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

"(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

"(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

"(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

"(a) the identity of the person, if known, whose communications are to be intercepted;

"(b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

"(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

"(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

"(e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

"(5) No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

"(6) Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require.

"(7) Notwithstanding any other provision of this chapter, any investigative or law enforcement officer, specially designated by the Attorney General or by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State, who reasonably determines that—

"(a) an emergency situation exists that requires a wire or oral communication to be intercepted before an order authorizing such interception can with due diligence be obtained, and

"(b) there are grounds upon which an order could be entered under this chapter to authorize such interception,

may intercept such wire or oral communication if an application for an order approving the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur. In the absence of an order, such interception shall immediately terminate when the communication sought is obtained or when the application for the order is denied, whichever is earlier. In the event such application for approval is denied, or in any other case where the interception is terminated without an order having been issued, the contents of any wire or oral communication intercepted shall be treated as having been obtained in violation of this chapter, and an inventory shall be served as provided for in subsection (d) of this section on the person named in the application.

"(8)(a) The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.

"(b) Applications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

"(c) Any violation of the provisions of this subsection may be punished as contempt of the issuing or denying judge.

"(d) Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518 (7) (b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, an inventory which shall include notice of—

"(1) the fact of the entry of the order or the application;

"(2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and

"(3) the fact that during the period wire or oral communications were or were not intercepted.

On an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed.

"(9) The contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing or proceeding, has been furnished with a copy of the court order under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing or proceeding and that the party will not be prejudiced by the delay in receiving such information.

"(10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

"(i) the communication was unlawfully intercepted;

"(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

"(iii) the interception was not made in conformity with the order of authorization or approval.

Such motion shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds

of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice.

"(b) In addition to any other right to appeal, the United States shall have the right to appeal from an order granting a motion to suppress made under paragraph (a) of this subsection, or the denial of an application for an order of approval, if the United States attorney shall certify to the judge or other official granting such motion or denying such application that the appeal is not taken for purposes of delay. Such appeal shall be taken within thirty days after the date the order was entered and shall be diligently prosecuted.

## "§ 2519. Reports concerning intercepted wire or oral communications

"(1) Within thirty days after the expiration of an order (or each extension thereof) entered under section 2518, or the denial of an order approving an interception, the issuing or denying judge shall report to the Administrative Office of the United States Courts—

"(a) the fact that an order or extension was applied for;

"(b) the kind of order or extension applied for;

"(c) the fact that the order or extension was granted as applied for, as modified, or was denied;

"(d) the period of interceptions authorized by the order, and the number and duration of any extensions of the order;

"(e) the offense specified in the order or application, or extension of an order;

"(f) the identity of the applying investigative or law enforcement officer and agency making the application and the person authorizing the application; and

"(g) the nature of the facilities from which or the place where communications were to be intercepted.

"(2) In January of each year the Attorney General, an Assistant Attorney General specially designated by the Attorney General, or the principal prosecuting attorney of a State, or the principal prosecuting attorney for any political subdivision of a State, shall report to the Administrative Office of the United States Courts—

"(a) the information required by paragraphs (a) through (g) of subsection (1) of this section with respect to each application for an order or extension made during the preceding calendar year;

"(b) a general description of the interceptions made under such order or extension, including (i) the approximate nature and frequency of incriminating communications intercepted, (ii) the approximate nature and frequency of other communications intercepted, (iii) the aproximate number of persons whose communications were intercepted, and (iv) the approximate nature, amount and cost of the manpower and other resources used in the interceptions;

"(c) the number of arrests resulting from interceptions made under such order or extension, and the offenses from which arrests were made;

"(d) the number of trials resulting from such interceptions;

"(e) the number of motions to suppress made with respect to such interceptions, and the number granted or denied;

"(f) the number of convictions resulting from such interceptions and the offenses for which the convictions were obtained and a general assessment of the importance of the interceptions; and

"(g) the information required by paragraphs (b) through (f) of this subsection with respect to orders or extensions obtained in a preceding calendar year.

"(3) In April of each year the Director of the Administrative Office of the United States Courts shall transmit to the Congress a full and complete report concerning the number of applications for orders authorizing or approving the interception of wire or oral communications and the number of orders and extensions granted or denied during the preceding calendar year. Such report shall include a summary and analysis of the data required to be filed with the Administrative Office by subsections (1) and (2) of this section. The Director of the Administrative Office of the United States Courts is authorized to issue binding regulations dealing with the content and form of the reports required to be filed by subsections (1) and (2) of this section.

"§ 2520. **Recovery of civil damages authorized**

"Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

"(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

"(b) punitive damages; and

"(c) a reasonable attorney's fee and other litigation costs reasonably incurred:

A good faith reliance on a court order or on the provisions of section 2518 (7) of this chapter shall constitute a complete defense to any civil or criminal action brought under this chapter."

SEC. 803. Section 605 of the Communications Act of 1934 (48 Stat. 1103; 47 U.S.C. 605) is amended to read as follows:

### "UNAUTHORIZED PUBLICATION OF COMMUNICATIONS

"SEC. 605. Except as authorized by chapter 119, title 18, United States Code, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress."

## TITLE IV—STATE FIREARMS CONTROL ASSISTANCE FINDINGS AND DECLARATION

SEC. 901. (a) The Congress hereby finds and declares—

(1) that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power;

(2) that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States;

(3) that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible;

(4) that the acquisition on a mail-order basis of firearms other than a rifle or shotgun by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances;

(5) that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms;

(6) that there is a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior, and that such firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior;

(7) that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years, has contributed greatly to lawlessness and to the Nation's law enforcement problems;

(8) that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, and so forth, and destructive devices such as explosive or incendiary grenades, bombs, missiles, and so forth) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern;

(9) that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the granting or denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.

(b) The Congress further hereby declares that the purpose of this Title is to cope with the conditions referred to in the foregoing subsection, and that it is not the purpose of this Title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that this Title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this Title.

"Sec. 902. Title 18, United States Code, is amended by inserting after section 917 thereof the following new chapter:

## "Chapter 44.—FIREARMS

"Sec.
"921. Definitions.
"922. Unlawful acts.
"923. Licensing.
"924. Penalties.
"925. Exceptions: Relief from disabilities.
"926. Rules and regulations.
"927. Effect on State law.
"928. Separability clause.

## "§ 921. Definitions

"(a) As used in this chapter—

"(1) The term 'person' and the term 'whoever' includes any individual, corporation, company, association, firm, partnership, society, or joint stock company.

"(2) The term 'interstate or foreign commerce' includes commerce between any State or possession (not including the Canal Zone) and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), but through any place outside thereof; or within any possession or the District of Columbia. The term 'State' shall include the Commonwealth of Puerto Rico, the Virgin Islands, and the District of Columbia.

"(3) The term 'firearm' means any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device.

"(4) The term 'destructive device' means any explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type

of weapon which will or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter.

"(5) The term 'shotgun' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

"(6) The term 'short-barreled shotgun' means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(7) The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

"(8) The term 'short-barreled rifle' means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(9) The term 'importer' means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term 'licensed importer' means any such person licensed under the provisions of this chapter.

"(10) The term 'manufacturer' means any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this chapter.

"(11) The term 'dealer' means (A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing such firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms or (C) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this chapter.

"(12) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.

"(13) The term 'indictment' includes an indictment or an information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

"(14) The term 'fugitive from justice' means any person who has fled from any State or possession to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year or to avoid giving testimony in any criminal proceeding.

"(15) The term 'antique firearm' means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ingnition system) or replica thereof, whether actually manufactured before or after the year 1870; but not including any weapon designed for use with smokeless powder or using rimfire or conventional center-fire ignition with fixed ammunition.

"(16) The term 'ammunition' means ammunition for a destructive device; it shall not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.

"(17) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(b) As used in this chapter—

"(1) The term 'firearm' shall not include an antique firearm.

"(2) The term 'destructive device' shall not include—

"(A) a device which is not designed or redesigned or used or intended for use as a weapon; or

"(B) any device, although originally designed as a weapon, which is redesigned so that it may be used solely as a signaling, linethrowing, safety or similar device; or

"(C) any shotgun other than a short-barreled shotgun; or

"(D) any nonautomatic rifle (other than a short-barreled rifle) generally recognized or particularly suitable for use for the hunting of big game; or

"(E) surplus obsolete ordinance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of sections 4684(2), 4685, or 4686 of title 10, United States Code; or

"(F) any other device which the Secretary finds is not likely to be used as a weapon.

"(3) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate.

"**§ 922. Unlawful acts**

"(a) It shall be unlawful—

"(1) for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or ammunition, or in the course of such business to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce.

"(2) for any importer, manufacturer, or dealer licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce, any firearm other than a rifle or shotgun or ammunition to any person other than a licensed importer, licensed manufacturer, or licensed dealer, except that—

"(A) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received;

"(B) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of title 18 of the United States Code, is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duty;

"(C) nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were in fact a State of the United States.

"(3) for any person other than a licensed importer, licensed manufacturer, or licensed dealer to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, in which he maintains a place of business)—

"(A) any firearm, other than a shotgun or rifle, purchased or otherwise obtained by him outside that State;

"(B) any firearm, purchased or otherwise obtained by him outside that State, which it would be unlawful for him to purchase or possess in the State or political subdivision thereof wherein he resides (or if the person is a corporation or other business entity, in which he maintains a place of business.)

"(4) for any person, other than a licensed importer, licensed manufacturer, or licensed dealer, to transport in interstate or foreign commerce any destructive device, machine gun (as defined in section 5848 of the Internal Revenue Code of 1954), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Secretary.

"(5) for any person to transfer, sell, trade, give, transport, or deliver to any person (other than a licensed importer, licensed manufacturer, or licensed dealer) who resides in any State other than that in which the transferor resides (or in which his place of business is located if the transferor is a corporation or other business entity)—

"(A) any firearm, other than a shotgun or rifle;

"(B) any firearm which the transferee could not lawfully purchase or possess in accord with applicable laws, regulations or ordinances of the State or political subdivision thereof in which the transferee resides (or

23

in which his place of business is located if the transferee is a corporation or other business entity).

"This paragraph shall not apply to transactions between licensed importers, licensed manufacturers, and licensed dealers.

"(6) for any person in connection with the acquisition or attempted acquisition of any firearm from a licensed importer, licensed manufacturer, or licensed dealer, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false or fictitious or misrepresented identification, intended or likely to deceive such importer, manufacturer, or dealer with respect to any fact material to the lawfulness of the sale or other disposition of such firearm under the provisions of this chapter.

"(b) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or deliver—

"(1) any firearm to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age, if the firearm is other than a shotgun or rifle.

"(2) any firearm to any person who the licensee knows or has reasonable cause to believe is not lawfully entitled to receive or possess such firearm by reason of any State or local law, regulation, or ordinance applicable at the place of sale, delivery, or other disposition of the firearm.

"(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located; except that this paragraph shall not apply in the case of a shotgun or rifle.

"(4) to any person any destructive device, machine gun (as defined in section 5848 of the Internal Revenue Code of 1954), short-barreled shotgun, or short-barreled rifle, unless he has in his possession a sworn statement executed by the principal law enforcement officer of the locality wherein the purchaser or person to whom it is otherwise disposed of resides, attesting that there is no provision of law, regulation, or ordnance which would be violated by such person's receipt or possession thereof, and that he is satisfied that it is intended by such person for lawful purposes; and such sworn statement shall be retained by the licensee as a part of the records required to be kept under the provisions of this chapter.

"(5) any firearm to any person unless the licensee notes in his records required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

Paragraphs (1), (2), (3) and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, and licensed dealers.

"(c) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person, knowing or having reasonable cause to believe that such person is a fugitive from justice or is under indictment or has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year. This subsection shall not apply with respect to sale or disposition of a firearm to a licensed importer, licensed manufacturer, or licensed dealer who pursuant to subsection (b) of section 925 of this chapter is not precluded from dealing in firearms, or to a person who has been granted relief from disabilities pursuant to subsection (c) of section 925 of this chapter.

"(d) It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

"(e) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to ship or transport any firearm or ammunition in interstate or foreign commerce.

"(f) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or is a fugitive from justice, to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

"(g) It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe the same to have been stolen.

"(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, moving as or which is a part of or which constitutes interstate or foreign commerce, knowing or having reasonable cause to believe the same to have been stolen.

"(i) It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm the importer's or manufacturer's serial number of which has been removed, obliterated, or altered.

"(j) It shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition, except as provided in subsection (d) of section 925 of this chapter; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

"(k) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer knowingly to make any false entry in, or to fail to make appropriate entry in or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

## "§ 923. Licensing

"(a) No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulation prescribe. Each applicant shall be required to pay a fee for obtaining such a license, a separate fee being required for each place in which the applicant is to do business, as follows:

"(1) If a manufacturer—
"(A) of a destructive devices and/or ammunition a fee of $1,000 per year.
"(B) of firearms other than destructive devices a fee of $500 per year.

"(2) If an importer—
"(A) of destructive devices and/or ammunition a fee of $1,000 per year;
"(B) of firearms other than destructive devices a fee of $500 per year.

"(3) If a dealer—
"(A) in destructive devices and/or ammunition a fee of $1,000 per year;
"(B) who is a pawnbroker dealing in firearms other than destructive devices a fee of $250 per year;
"(C) who is not a dealer in destructive devices or a pawnbroker, a fee of $10 per year; except that for the first renewal following the effective date of this chapter or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25.

"(b) Upon the filing of a proper application and payment of the prescribed fee, the Secretary may issue to the applicant the appropriate license which, subject to the provisions of this chapter and other applicable provisions of law, shall entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.

"(c) Any application submitted under subsections (a) and (b) of this section shall be disapproved and the license denied and the fee returned to the applicant if the Secretary, after notice and opportunity for hearing, finds that—

"(1) the applicant is under twenty-one years of age; or
"(2) the applicant (including, in the case of a corporation, partnership, or association, any individual possessing directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of this chapter; or is, by reason of his business experience, financial standing, or trade connections, not likely to commence business operations during the term of the annual license applied for or to maintain operations in compliance with this chapter; or
"(3) the applicant has willfully violated any of the provisions of this chapter or regulations issued thereunder; or
"(4) the applicant has willfully failed to disclose any material information required, or has made any false statement as to any material fact, in connection with his application; or
"(5) the applicant does not have, or does not intend to have or to maintain, in a State or possession, business premises for the conduct of the business.

2cv-00410-REP   Document 41-3   Filed 02/22/23   Page 25 of 284 Pag

"(d) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, and sale or other disposition, of firearms and ammunition at such place, for such period and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary or his delegate may enter during business hours the premises (including places of storage) of any firearms or ammunition importer, manufacturer, or dealer for the purpose of inspecting or examining any records or documents required to be kept by such importer or manufacturer or dealer under the provisions of this chapter or regulations issued pursuant thereto, and any firearms or ammunition kept or stored by such importer, manufacturer, or dealer at such premises. Upon the request of any State, or possession, or any political subdivision thereof, the Secretary of the Treasury may make available to such State, or possession, or any political subdivision thereof, any information which he may obtain by reason of the provisions of this chapter with respect to the identification of persons within such State, or possession, or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of such firearms or ammunition.

"(e) Licenses issued under the provisions of subsection (b) of this section shall be kept posted and kept available for inspection on the business premises covered by the license.

"(f) Licensed importers and licensed manufacturers shall identify, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer.

## "§ 924. Penalties

"(a) Whoever violates any provision of this chapter or any rule or regulation promulgated thereunder, or knowingly makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or in applying for any license or exemption or relief from disability under the provisions of this chapter, shall be fined not more than $5,000 or imprisoned not more then five years, or both.

"(b) Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports, or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

"(c) Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of this chapter, or a rule or regulation promulgated thereunder, or violation of any other criminal law of the United States, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5848(1) of said Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter.

## "§ 925. Exceptions: relief from disabilities

"(a) The provisions of this chapter shall not apply with respect to the transportation, shipment, receipt, or importation of any firearm or ammunition imported for, or sold or shipped to, or issued for the use of the United States or any department, or agency thereof; or any State or possession, or any department, agency, or political subdivision thereof.

"(b) A licensed importer, licensed manufacturer, or licensed dealer who is indicted for a crime punishable by imprisonment for a term exceeding one year, may, notwithstanding any other provisions of this chapter, continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license) during the term of such indictment and until any conviction pursuant to the indictment becomes final.

"(c) A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this chapter or of the National Firearms Act) may make application to the Secretary for relief from the disabilities under this chapter incurred by reason of such conviction, and the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant

will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest. A licensee conducting operations under this chapter, who makes application for relief from the disabilities incurred under this chapter by reason of such a conviction, shall not be barred by such conviction from further operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary grants relief to any person pursuant to this section, he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.

"(d) The Secretary may authorize a firearm to be imported or brought into the United States or any possession thereof if the person importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—

"(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or

"(2) is an unserviceable firearm, other than a machine gun as defined by 5848(2) of the Internal Revenue Code of 1954 (not readily restorable to firing condition), imported or brought in as a curio or museum piece; or

"(3) is of a type that does not fall within the definition of a firearm as defined in section 5848(1) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, and in the case of surplus military firearms is a rifle or shotgun; or

"(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm.

*Provided,* That the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm will be allowed under this subsection.

## "§ 926   Rules and regulations

"The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this chapter. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.

## "§ 927.   Effect on State law

"No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State or possession on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State or possession so that the two cannot be reconciled or consistently stand together.

## "§ 928.   Separability

"If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby.''

SEC. 903. The administration and enforcement of the amendment made by this Title shall be vested in the Secretary of the Treasury.

SEC. 904. Nothing in this Title or amendment made thereby shall be construed as modifying or affecting any provision of—

(a) the National Firearms Act (chapter 53 of the Internal Revenue Code of 1954); or

(b) section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), as amended, relating to munitions control; or

(c) section 1715 of title 18, United States Code, relating to nonmailable firearms.

SEC. 905. The table of contents to "PART I.—CRIMES" of title 18, United States Code, is amended by inserting after

"43. False personation_____ 911''

a new chapter reference as follows:

"44. Firearms_____ 921''

SEC. 906. The Federal Firearms Act (52 Stat. 1250; 15 U.S.C. 901–910), as amended, is repealed.

SEC. 907. The amendments made by this Title shall become effective one hundred and eighty days after the date of its enactment; except that repeal of the Federal Firearms Act shall not in itself terminate any valid license issued pursuant to that Act and any such license shall be deemed valid until it shall expire

according to its terms unless it be sooner revoked or terminated pursuant to applicable provisions of law.

### TITLE V—GENERAL PROVISIONS

SEC. 1001. If the provisions of any part of this Act or any amendments made thereby or the application thereof to any person or circumstances be held invalid, the provisions of the other parts and their application to other persons or circumstances shall not be affected thereby.

Amend the title so as to read:

A bill to assist State and local governments in reducing the incidence of crime to increase the effectiveness, fairness, and coordination of law enforcement at all levels of government, and for other purposes.

## PURPOSE OF AMENDMENT

The bill, as amended, is divided into five titles: Title I, Law Enforcement Assistance; Title II, Admissibility of Confessions, Reviewability of Admission in Evidence of Confessions in State Cases, Admissibility in Evidence of Eyewitness Testimony, and Procedures in Obtaining Writs of Habeas Corpus; Title III, Wiretapping and Electronic Surveillance; Title IV, State Firearms Control Assistance; and Title V, General Provisions.

Title I, Law Enforcement Assistance, authorizes the establishment of a three-member Law Enforcement Assistance Administration within the Department of Justice under the general authority of the Attorney General to administer grant programs to States and units of local government to strengthen and improve law enforcement. These programs will consist of planning grants of up to 80 percent and action grants of up to 60 percent, with grants of up to 75 percent to combat organized crime and to prevent and control riots and other civil disorders. In addition, grants of up to 100 percent are authorized for research, education, training, and demonstration projects. The Federal Bureau of Investigation is authorized to establish and conduct training programs at the Federal Bureau of Investigation National Academy at Quantico, Va., and, at the request of any State or local government, provide training assistance for law enforcement personnel. This provision is directed toward the expansion and upgrading of the law enforcement training program that is already in progress under the auspices of the Federal Bureau of Investigation.

Title II adds three new sections to chapter 223, title 18, United States Code, which relate to (a) the admissibility into evidence of voluntary confessions in criminal prosecutions in Federal courts, (b) reviewability by Federal courts of State court rulings admitting confessions found to be voluntary, and (c) the admissibility into evidence of eyewitness testimony. This title also adds a new section to chapter 153, title 28, United States Code, designed to relieve our overburdened Federal courts from the growing practice of convicted persons using the habeas corpus procedures as a substitute for direct appeal.

Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in the investigation of specified types of major crimes after obtaining a court order, with exceptions provided for interceptions by employees of communications facilities whose normal course of employment would make necessary such interception, personnel of the Federal Communications Commission in the normal course of employment, and Government agents to secure information under the powers of the

President to protect the Nation against actual or potential attack, or to otherwise protect the national security. This proposed legislation conforms to the constitutional standards set out in *Berger* v. *New York* (388 U.S. 41 (1967)), and *Katz* v. *United States* (389 U.S. 347 (1967)).

The principal purposes of title IV are to aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States.

The ready availability; that is, ease with which any person can anonymously acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern.

The existing Federal controls over interstate and foreign commerce in firearms are not sufficient to enable the States to effectively cope with the firearms traffic within their own borders through the exercise of their police power. Only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business of importing, manufacturing, or dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible.

It is not the purpose of the title to place any undue or unnecessary restrictions or burdens on responsible, law-abiding citizens with respect to the acquisition, possession, transportation, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity. The title is not intended to discourage or eliminate the private ownership of such firearms by law-abiding citizens for lawful purposes, or to provide for the imposition, by regulations, of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of the title.

Title V contains the customary legislative separability clause.

The title of the act has been changed to read: "A bill to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement at all levels of government, and for other purposes," and the citation of the act has been changed from the "Safe Streets and Crime Control Act of 1967," to the "Omnibus Crime Control and Safe Streets Act of 1967," to more nearly reflect the purpose of the bill as amended by the committee.

A total of $100,111,000 is authorized to be appropriated to fund the grant program of title I, Law Enforcement Assistance, for the fiscal years ending June 30, 1968, and June 30, 1969, $300 million for the fiscal year ending June 30, 1970, and for succeeding fiscal years such sums as the Congress might authorize.

## MAJOR CHANGES MADE BY THE AMENDMENT TO THE BILL AS INTRODUCED

The major changes made by the amendment to the bill as introduced include the creation of a three-member, nonpartisan, Law Enforcement Assistance Administration to supervise and administer, under the general authority of the Attorney General, the grant provisions of the bill; provision for grants to combat organized crime; provision for grants to prevent and control riots; authorization for the FBI to establish and conduct training programs at the FBI National Academy at Quantico, Va., and, at the request of State and local governments, to assist in training law enforcement personnel; establishment of a National Institute of Law Enforcement and Criminal Justice under the general authority of the three-member Administration for the purpose of encouraging research and development to improve and strengthen law enforcement; an academic educational assistance program for police or correctional personnel comprised of loan and tuition assistance to improve and strengthen law enforcement; an increase of $50,111,000 in the authorization over the original bill for a total authorization of $100,111,000 for fiscal 1968 and 1969, to provide for the above-mentioned additions, and $300 million for fiscal 1970; the addition of title II relating to voluntary confessions, eyewitness testimony and habeas corpus proceedings; the addition of title III relating to the prohibiting, with the exceptions noted, of all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in the investigation of specific types of major crimes after obtaining a court order; the addition of title IV relating to State firearms control assistance; and the citation of the bill changed from the "Safe Streets and Crime Control Act of 1967" to the "Omnibus Crime Control and Safe Streets Act of 1967".

The "Findings and Declarations of Purpose" have been restated so as to emphasize the Congress' concern over the startling increase in the crime rate and the threat which this poses to the peace, security and general welfare of the Nation and its citizens.

## STATEMENT

### TITLE I—LAW ENFORCEMENT ASSISTANCE

In his special message on the Crime Commission report, on February 6, 1967, the President called for enactment of legislation in the area of Federal assistance for the control of crime. On February 8, 1967, Senator McClellan, by request, and others, introduced S. 917, which represented the administration's proposals. In his special message, the President said:

> Substantially greater resources must be devoted to improving the entire criminal justice system. The Federal Government must not and will not try to dominate the system. It could not if it tried. Our system of law enforcement is essentially local; based upon local initiative, generated by local energies, and controlled by local officials. But the Federal Government must help to strengthen the system, and to encourage the kind of innovations needed to respond to the prob-

lem of crime in America. I recommended that the Congress enact the Safe Streets and Crime Control Act of 1967.

Title I of S. 917, as amended, declares it to be the policy of the Congress to assist State and local governments in strengthening and improving law enforcement at every level by national assistance. It is the purpose of this legislation to (1) encourage States and units of general local government to prepare and adopt comprehensive plans to increase their effectiveness in dealing with local problems of law enforcement; (2) authorize grants to States and units of local government in order to improve and strengthen law enforcement; (3) encourage research and development directed toward the improvement and strengthening of law enforcement and the development of new methods for the prevention and reduction of crime and the detection and apprehension of criminals; (4) the control and eradication of organized crime; and (5) the prevention and control of riots.

Title I was in response to the recommendations resulting from the study made by the President's Commission on Law Enforcement and the Administration of Justice. This was the most comprehensive study of crime in the history of our country. The President's Crime Commission's report represents a landmark in crime research and the study of law enforcement needs. The work of the Commission covered a period of some 18 months. The chairman of the 19-member Commission was Undersecretary of State Nicholas deB. Katzenbach. The Commission published a comprehensive report entitled "The Challenge of Crime in a Free Society" (1967), and nine task force reports dealing with such subjects as police, organized crime, and corrections. The major report emphasized the critical need for the Federal Government to begin immediately a financial and technological assistance prorgam to assist State and local governments in combating the rising incidence of crime. The Commission's report states:

* * * although day-by-day criminal administration is primarily a State and local responsibility, the Federal Government's contribution to the national effort against crime is crucial.

The President said, in his 1966 message on national strategy against crime:

Crime—the fact of crime and the fear of crime—marks the life of every American. We know its unrelenting pace: A forcible rape every 26 minutes; a robbery every 5 minutes; an aggravated assault every 3 minutes; a car theft every minute; a burglary every 28 seconds. We know its cost in dollars—some $27 billion annually. We know the still more widespread cost it exacts from millions in fear; fear that can turn us into a nation of captives imprisoned nightly behind chained doors, double locks, barred windows; fear that can make us afraid to walk city streets by night or public parks by day.

In 1967, in a special message to the Congress on the National Crime Commission report, the President stated:

Lawlessness is like a plague. Its costs, whether economic, physical, or psychological, are spread through every alley and every street in every neighborhood. It creates a climate in

which people makes choices, not out of confidence, but out of fear.

Recently, a survey made in high-crime areas of two of our our largest cities found that—

Forty-three percent of those interviewed stayed off the streets at night.

Thirty-five percent did not speak to strangers.

Twenty-one percent used only cabs and cars at night.

Twenty percent would like to move to another neighborhood.

All because of their crime.

* * * For them, and for all of us, crime—and the fear of crime—has become a public malady. Its extent may be subject for debate but its existence is certain. So is our duty to seek its cure with every means at our command.

The President's Commission on Law Enforcement and Administration of Justice stated in its report, "The Challenge of Crime in a Free Society," of February 1967:

One-third of a representative sample of all Americans say it is unsafe to walk alone at night in their neighborhoods. Slightly more than one-third say they keep firearms in the house for protection against criminals. Twenty-eight percent say they keep watchdogs for the same reason.

According to the FBI's uniform crime report of June 1967, the country experienced, during the first 3 months of 1967, an increase in crime of 20 percent over the same period in 1966. The Director of the Federal Bureau of Investigation, Mr. J. Edgar Hoover, cautioned that the 20-percent rise in serious crime in the United States for this 3-month period was the sharpest recorded since 1958. Moreover, since 1960, there has been an increase in crime of 62 percent while the population of the Nation has increased by only 9 percent. Each crime category had a substantial rise with murder up 23 percent, forcible rape up 8 percent, robbery up 32 percent, aggravated assault up 15 percent, burglary up 21 percent, and auto theft up 20 percent.

Attorney General Ramsey Clark testified before the subcommittee on March 7, 1967, that—

* * * crime will not wait while we seek to eliminate its underlying causes. These are immense and stubborn forces pervading our environment, measuring our character and determining the quality of our lives. Through long-range effort we can conquer poverty, ignorance, disease, discrimination, social tensions and despair, family breakdown, the dehumanization of mass culture, injustice. To do these things is our firm commitment. But while we strive to uproot the causes of crime, we must secure the public safety (hearings, p. 147).[1]

Crime is a national catastrophe. Its elimination and control must be directed from the local level as law enforcement in the United States has traditionally been a local responsibility. The present threat of

[1] Parenthetical page references to hearings are the hearings before the Special Subcommittee on Criminal Laws and Procedures, of the Committee on the Judiciary, U.S. Senate. "Controlling Crime Through More Effective Law Enforcement," 90th Cong., first sess., 1967.

lawlessness dictates, however, that national assistance is needed to strengthen and improve the law enforcement effort by the States and units of local government.

Under the bill, planning grants and action grants may be made directly to States and units of local government, or combinations thereof, having populations of not less than 50,000 persons.

Although the 50,000 population cutoff will avoid any possibility that the bill will stimulate further decentralization of law enforcement, the cutoff is not intended to be a bar to participation in the new grant program by smaller jurisdictions. The bill encourages a city, town, or county that does not by itself have the requisite population to formulate a joint plan or implement an action program with one or more nearby jurisdictions. The bill specifically authorizes the administration to make planning grants and action grants to combinations of local jurisdictions, and the bill's definition of combination makes clear that a combination may exist solely for the purpose of preparing or implementing a law enforcement plan.

In addition, a local jurisdiction with a population of less than 50,000 persons will be eligible for Federal assistance through grants made to the State in which the jurisdiction is located by way of a comprehensive statewide plan. In effect, therefore, S. 917 as reported reflects a broad grant approach with sufficient flexibility to meet the law enforcement needs of the States and individual units of general local government and combinations thereof.

Equally important, S. 917 provides an express opportunity for the chief executive of the State or the appropriate State law enforcement agency to review and comment upon any application for a planning grant or an action grant made by a unit of local government in the State. Thus, no grant can be made by the administration to a local government until the chief executive has been given the opportunity to comment upon the grant application plan.

In addition, S. 917 specifically directs the administration to encourage plans which encompass entire metropolitan areas and which take into account all other relevant law enforcement plans and systems. In this manner, S. 917 should promote the adoption and implementation of law enforcement plans that cut across artificial geographic and political boundaries.

The Crime Commission concluded in its studies that an obligation rests upon the Federal Government to assist local governments in improving their programs of law enforcement. Federal assistance directed toward this objective is encompassed in title I of the amended bill. In testimony before the subcommittee, the Attorney General described the objectives of this legislation and noted that this can triple the rate of increase in resources devoted to law enforcement purposes.

The authorization for the planning, law enforcement purposes, training, education, demonstration, and research purposes is $100,-111,000 for the fiscal years ending June 30, 1968, and June 30, 1969, including $15 million each for grants to combat organized crime and to prevent and control riots and other violent civil disorders—up to $10 million for police and correctional personnel academic education and $5,111,000 for expanding the Federal Bureau of Investigation's training assistance to State and local police officers. There is authorized to be appropriated for the fiscal year ending June 30, 1970, $300 million for the strengthening and improving of law enforcement.

The Attorney General testified that the Federal contribution to law enforcement needs will experience a substantial increase in future years. He stated that by the second year this grant program is in operation $300 million will be needed. If enacted, this legislation, the Attorney General thought, probably would require that the Federal Government's annual contribution be increased eventually to around $1 billion.

The main objectives of this title have been endorsed by—

    The American Civil Liberties Union
    The Americans for Democratic Action.
    The International Association of Chiefs of Police.
    The National Association of Attorneys General.
    The National Association of Counties.
    The National Council on Crime.
    The National Council on Crime and Delinquency.
    The National Governors Conference.
    The National League of Cities.
    The National Sheriffs Association.
    The U.S. Conference of Mayors.

The grant programs authorized by this title have grown out of a long and arduous study and analysis of the crime conditions in the Nation. Under the Law Enforcement Assistance Act of 1965, pilot projects related to crime control were launched for a 3-year period beginning in 1966. To date, some $19 million in direct financial assistance for the support of some 330 projects involving police, courts, corrections, and the overall administration of law enforcement has been made. These projects have encompassed training, education, research, and demonstration.

Legislation to strengthen and improve law enforcement throughout the Nation must come to grips with the problems of organized crime. Part C, Law Enforcement Assistance, carries provisions which embrace the amendment to S. 917, introduced by Senator Hruska on June 29, 1967, which relates to the prevention and control of organized crime.

The President's Crime Commission report succinctly states:

Organized crime is a society that seeks to operate outside the control of the American people and their Government. It involves thousands of criminals, working within structures as complex as those of any large corporation, subject to laws more rigidly enforce than those of legitimate governments. Its actions are not impulsive but rather the result of intricate conspiracies, carried on over many years and aimed at gaining control over whole fields of activity in order to amass huge profits.

The core of organized crime activity is the supplying of illegal goods and services—gambling, loan sharking, narcotics, and other forms of vice—to countless numbers of citizen customers. But organized crime is also extensively and deeply involved in legitimate business and in labor unions. Here it employs illegitimate methods—monopolization, terrorism, extortion, tax evasion—to drive out or control lawful ownership and leadership and to exact illegal profits from the public. And to carry on its many activities secure from

governmental interference, organized crime corrupts public officials.

The impact of organized crimes' activities is said, in the Crime Commission report, to be in its—

> * * * accumulation of money, not the individual transactions by which the money is accumulated. Millions of quarters in thousands of jukeboxes can provide both a strong motive for murder and the means to commit murder with impunity. Organized crime exists by virtue of the power it purchases with its money. The millions of dollars it can invest in narcotics or use for payoff money gives it power over the lives of thousands of people and over the quality of life in whole neighborhoods. The millions of dollars it can throw into the legitimate economic system gives it power to manipulate the price of shares on the stock market, to raise or lower the price of retail merchandise, to determine whether entire industries are union or nonunion, to make it easier or harder for businessmen to continue in business. The purpose of organized crime is not competition with visible legal government but nullification of it.

The Crime Commission recommends, among other things:

> (1) Every attorney general in States where organized crime exists should form in his office a unit of attorneys and investigators to gather information and assist in prosecution regarding this criminal activity.
>
> (2) Police departments in every major city should have a special intelligence unit solely to ferret out organized criminal activity and to collect information regarding the possible entry of criminal cartels into the area's criminal operations.
>
> (3) The prosecutor's office in every major city should have sufficient manpower assigned full time to organized crime cases.
>
> (4) The Department of Justice should give financial assistance to encourage the development of efficient systems for regional intelligence gathering, collection, and dissemination. By financial assistance and provisions of security clearance the Department should also sponsor and encourage research by the many relevant disciplines regarding the nature, development, activities, and organization of these special criminal groups.

It is to these ends that an authorization of up to $15 million for control of organized crime is directed by providing grants of up to 75 percent of the cost of the establishment of State organized crime prevention councils, the recruiting and training of special personnel, and the development and dissemination of information relating to the control of organized crime. According to the sponsor of this provision, some 15 States are directly involved with the threat of organized crime.

Law enforcement encompasses the prevention and control of riots. Legislation to strengthen and improve law enforcement at every level of our national life would be incomplete without specific provisions to prevent and control riots. Grants to assist in the prevention and control of riots embrace the provisions of an amendment to S. 917 introduced by Senator Hart on August 27, 1967.

The President's Crime Commission report, in referring to this subject, stated:

> The size of the threat to the community that riots offer cannot be reckoned as merely the sum of the individual acts of murder, assault, arson, theft, and vandalism that occur during them. * * * Riots are a mass repudiation of the standards of conduct citizens must adhere to if society is to remain not only safe, but civilized and free.

The ghetto riots of 1964, 1965, 1966, 1967, and 1968 represent crime in its most aggravated form. In the 1965 riot in the Watts section of Los Angeles alone, 34 persons were killed, 930 injured, and 3,332 arrested. An estimated $40 million in property was destroyed and some 600 buildings were damaged. In Newark, N.J., riots last year, two policemen and 23 civilians were killed and 725 persons were injured. Through 250 cases of arson, coupled with numerous instances of looting and vandalism, there was an estimated $10,251,000 loss in property damages; 1,462 persons were arrested.

Detroit, Mich., also experienced a catastrophic riot last year in which four policemen and 39 civilians were killed and 324 persons were injured. Some estimated $144 million loss in property damage was incurred and 7,231 persons were arrested. In 1967, there were some 80 instances of criminal disorders and riots, of which the above-cited examples are illustrative of the devastation resulting therefrom.

An early estimate of the damage, destruction, injuries, and deaths resulting from the April 1968 riots in the District of Columbia shows: In excess of $13.3 million in property loss. Deaths, 7 to 10. Arrests, 6,826. Total injured, 1,120—52 policemen, 19 firemen, 10 military personnel, and 1,049 civilians. Approximately 14,000 troops were deployed in the city. The total number of fires, 919.

Riots, regardless of the underlying causes, are war—to which the special Army troops sent into Detroit, can testify. Local law enforcement officers are not equipped nor trained to meet this new criminal crisis.

There is authorized $15 million to States and units of local government to meet this new threat to the peace and internal security of our Nation by providing grants of up to 75 percent of the cost of projects or programs designed to prevent or control riots.

Part D of title I makes provisions for training, education, research, and development for the purpose of strengthening and improving law enforcement.

There is established, within the Department of Justice, a National Institute of Law Enforcement and Criminal Justice under the general authority of the three-member Administration for the purpose of encouraging research and development to improve and strengthen law enforcement.

Since 1965, the Department of Justice has been engaged in a modest grant program, geared to improve and upgrade our law enforcement system. Under the Law Enforcement Assistance Act of 1965, the Department has made grants totaling approximately $19 million to support more than 330 research and pilot projects in law enforcement. These projects have laid a foundation for the research programs to be sponsored by the National Institute of Law Enforcement and Criminal Justice.

The Institute, which is authorized to establish a central research facility to create and develop comprehensive programs to carry out the programs described in this section, would be modeled along the lines of the National Institutes of Health and the National Academy of Sciences.

Grants of up to 100 percent may be authorized for the purposes of research, demonstration, or special projects. Part D also authorizes the Director of the Federal Bureau of Investigation to establish and conduct training programs at the National FBI Academy, and, at the request of State or local governmental units, to assist in the training of State or local law enforcement personnel. For the purposes of part D the sum of $20,111,000 is authorized, with $5,111,000 authorized to be appropriated to the FBI for the exercise of its functions under this part. During the 1967 fiscal year, the FBI, at the request of State, county, and local law enforcement authorities assisted in a total of 6,045 police training schools throughout the Nation. Approximately 178,000 law enforcement officers attended these schools.

Training instructors and personnel are a crucial factor in strengthening and improving law enforcement capability. Often the local agencies are incapable of meeting this need. The FBI has traditionally supplied assistance to State and local police efforts in training. Through this legislation, the FBI will be able to expand their instructional facilities and thus be prepared to render broader assistance to State and local government.

As a first step toward raising the status of the police, and improving the quality of law enforcement, higher educational standards for police should be established. Today most police do not have a college education. A 1961 study of 300 police departments showed that less than 1 percent required any college training; and a 1964 survey of 6,200 officers across the Nation revealed that only 30 percent had taken one or more college courses, and just 7 percent had a college degree.

The President's Commission on Law Enforcement recognized that the education and training needed for effective police work can best be acquired through college work. For this reason, it recommended that our goal be 2 years of college for officers and that a bachelor's degree be set as the standard for all major administrative and supervisory personnel.

The amended bill takes a long stride toward that goal. Authorization is made of up to $10 million for educational assistance to police and correctional personnel. This will provide an opportunity for policemen and correctional personnel throughout the Nation to improve their knowledge and skills, and should lead to greater public awareness of the policeman's task and increased respect for him and his job.

The bill authorizes the Administration to establish a major program of educational assistance to institutions of higher education in subjects related to law enforcement. The National Crime Commission recommended that police departments should take immediate steps to establish minimum degree requirements for supervisory and executive positions, and that the ultimate aim of police departments should be a baccalaureate degree for personnel with general law enforcement powers.

The committee bill authorizes two types of financial assistance:

Forgivable loans, not to exceed $1,800 per academic year, to students in areas related to law enforcement in undergraduate or graduate degree programs; and

Tuition fees, not exceeding $200 per academic quarter or $300 per semester, for inservice law enforcement officers enrolled in courses in such programs.

Coupled with the President's National Crime Commission studies, the work of the Law Enforcement Assistance Act program has provided valuable experience in formulating the provisions of title I. Speaking for the objectives of this title, the Attorney General said that they are—

* * * supported by the most comprehensive study of crime ever undertaken in this country. The National Crime Commission has amassed an invaluable reservoir of fact, experience and judgment. The theory of the act is buttressed by 18 months grant experience involving the expenditure of $10 million for research, demonstration, training, and education in law enforcement under the Law Enforcement Assistance Act of 1965.

Planned, studied, and tested, the Crime Control Act is ready (hearings, p. 149).

TITLE II.—ADMISSIBILITY OF CONFESSIONS, REVIEWABILITY OF ADMISSION IN EVIDENCE OF CONFESSIONS IN STATE CASES, ADMISSIBILITY IN EVIDENCE OF EYEWITNESS TESTIMONY, AND PROCEDURES FOR OBTAINING WRITS OF HABEAS CORPUS

Federal aid to the States is not enough to successfully combat the menace of crime. Much more is necessary. No matter how much money is spent for upgrading police departments, for modern equipment, for research and other purposes encompassed in title I, crime will not be effectively abated so long as criminals who have voluntarily confessed their crimes are released on mere technicalities. The traditional right of the people to have their prosecuting attorneys place in evidence before juries the voluntary confessions and incriminating statements made by defendants simply must be restored. It is the purpose of title II to accomplish this and other related objectives.

Section 701, which includes S. 674, introduced by Senator McClellan and others, provides that a voluntary confession is admissible in evidence in any Federal criminal prosecution. The section lists the factors and circumstances the trial judge is to consider in deciding whether the confession is voluntary. The trial judge is required to instruct the jury to give the confession such weight as it feels it is entitled under all the circumstances. The section also assures that confessions made while the suspect is under arrest shall not be inadmissible solely because of delay in bring the defendant before a magistrate or commissioner, and provides that nothing therein will bar from evidence a voluntary, spontaneous, and unsolicited confession. The term "confession" is defined and includes self-incriminating statements.

The section also includes a portion of S. 1194, introduced by Senator Ervin and others, which denies jurisdiction to Federal courts to reverse State cases involving admissions and confessions admitted as voluntarily given where the highest court of the State has affirmed.

It also contains an amendment offered by Senator Ervin which provides that eyewitness testimony is admissible in evidence in Federal criminal prosecutions and limits the appellate jurisdiction of Federal courts in State and Federal cases admitting this testimony into evidence.

Section 702, an amendment offered by Senator Ervin, provides that State court judgments regarding questions of law or fact shall be conclusive unless reversed by a court with jurisdiction to review by direct appeal or certiorari, and defines the extent to which the Federal courts can review certain State court decisions.

### ADMISSIBILITY OF, AND REVIEWABILITY OF, ADMISSION IN EVIDENCE OF CONFESSIONS

Voluntary confessions have been admissible in evidence since the early days of our Republic. These inculpatory statements have long been recognized as strong and convincing evidence—often called the best evidence of guilt. In *Mallory* v. *United States*, 354 U.S. 449 (1957), the U.S. Supreme Court declared inadmissible voluntary confessions made during a period of unnecessary delay between the time of arrest and the time the suspect is taken before a committing magistrate. The case of *Alston* v. *United States*, 348 F. 2d 72 (D.C. Cir. 1965), is indicative of the illogical and unrealistic court decisions resulting from the application of the *Mallory* rule. The Honorable Alexander Holtzoff, U.S. district judge for the District of Columbia, testified before the subcommittee as follows:

> On the other hand, the District of Columbia circuit takes an extreme position and practically holds that an arrested person must be taken to a magistrate immediately, even in the dead of night, subject to necessary time to make a record of the arrest, fingerprinting the defendant, and similar mechanical processes. This is illustrated by the case of *Alston v. United States*, 121 U.S. App. D.C. 66, 348 F. 2d 72, in which the conviction of a self-confessed murderer whose guilt was not in dispute, was reversed. The facts are startling. The defendant was brought to police headquarters at 5:30 a.m. He was questioned by the police for about 5 minutes and then immediately confessed on the advice of his wife who had accompanied him with the police. It was held by the court of appeals that the arresting officers should have taken the defendant before a committing magistrate immediately and that the questioning, even for 5 minutes, was not permissible—the conviction was reversed. It is my understanding that the indictment thereafter was dismissed on the motion of the U.S. attorney in view of the fact that he felt that without the confession he did not have sufficient evidence to convict (hearings, pp. 260–261).

The rigid, mechanical exclusion of an otherwise voluntary and competent confession is a very high price to pay for a "constable's blunder."

Enactment of subsections 3501 and 3502 of section 701 is needed to offset the harmful effects of the *Mallory* case, Senator Alan Bible, chairman of the Senate Committee on the District of Columbia, was especially critical and dismayed by the effect of that case on the crime rate in Washington, D.C. Senator Bible explained that the

decision in *Mallory* v. *United States*, 354 U.S. 449 (1957), was one of several factors influencing the increased crime rate in Washington, D.C. Studies and statistics in the District of Columbia indicate that serious crimes in the District have increased 72 percent in 16 years. Since 1950, police clearance rates for the proportion of cases solved in the serious crime area declined from 48½ to 26.3 percent. Despite the tremendous increase in crime in the District, the number of felony convictions has decreased markedly. The 72 percent increase in crime was accompanied by a 39 percent decrease in felony convictions. The decline in felony convictions has been accompanied by an increase in the number of guilty pleas to lesser offenses. From 1950 to 1960, these "compromise" pleas increased from 21 percent of the defendants to 38 percent of the defendants. It is his view that the *Mallory* decision contributed to these disturbing statistics. He continued:

> These statistics clearly point out, it seems to me, that something is drastically wrong with our system of criminal justice. What is causing the drastic decline in felony prosecutions as well as the growing increase in pleas of guilty to lesser offenses may be, again repeating, conjectural, and depending upon the person to whom you are talking, but in my opinion, the *Mallory* decision and other rights granted to defendants by the courts have contributed to it.
>
> It seems to me we have become obsessed with uncovering new rights and safeguards for the criminal to such a degree that we have unbalanced the scales of justice, and find ourselves in the unenviable position of losing control of the crime and violence that are running rampant in our cities, * * * I think it is significant to note that the President's Commission on Crime in the District of Columbia, in its report dated December 15, 1966, also supported a change in postarrest procedures, in order to afford the police officers the opportunity to question suspects. I am indeed gratified that the Commission, in its long and conscientious study of crime in the District, concluded that such a change is considered necessary (hearings, pp. 132–133).

Judge Holtzoff was equally critical of *Mallory* and its harmful effects. He testified:

> In my humble judgment, * * * (the *Mallory* rule) was one of the contributing causes to the difficulty in enforcing the criminal law and in the increasing rate of crime. Washington has become a crime-ridden city. The grapevine of the underworld travels fast, and members of the underworld, while not familiar with the intricacies of the law, know the general tendencies, and the result is that they become bolder, feeling that there will be some technicality or other which will save them from punishment.
>
> We get fewer pleas of guilty than we ever did before, because experienced and sophisticated criminals feel that, well, they will take a chance. The chances are very great that eventually, if they are found guilty, the conviction may be reversed.

Not only have we had a diminution in the percentage of pleas of guilty, but trials take longer, because instead of concentrating on the real issue of the case—namely, did the defendant commit the crime, that is what we should be trying—we have to try a great many tangential issues, such as did the policeman take his prisoner promptly enough to a magistrate. Should he have questioned him? Should he have searched him? And more time is devoted to these tangential issues than to the real issue that has to be tried.

The question of guilt or innocence becomes relegated to the background, because in many of these instances guilt isn't seriously in dispute. The only matters that are tried nowadays are these side issues. And I must say that sometimes I feel, when I am trying a criminal case, as though I am in a topsy-turvy world—I am not trying the accused, I am trying the policeman—did he break any rule?

In view of these considerations and in the interest of public safety and law enforcement, legislation such as is embodied in S. 674 is highly desirable and I hope that it will be enacted (hearings, p. 261).

Judge Holtzoff sees no constitutional bar to congressional abrogation of the *Mallory* rule. He told the subcommittee:

\* \* \* This doctrine was predicated not on any constitutional principle, but merely is a procedural matter as a sanction or a means of enforcing rule 5 of the Federal Rules of Criminal Procedure, which requires an arrested person to be brought before a committing magistrate without unnecessary delay. Since this rule is not based on any constitutional principle, it can be changed by legislation (hearings, p. 260).

Attorney General Lynch of the State of California affirms the above by stating:

One portion of the bill would eliminate the rule of *McNabb* v. *United States*, 318 U.S. 332 (1943), and *Mallory* v. *United States*, 354 U.S. 449 (1957). These cases held that failure of the police to observe the Federal statutes and rules requiring that an arrested person be brought before a committing magistrate without unnecessary delay bars the admission in Federal prosecutions of any confession made after arrest and before arraignment. Eradication of this rule seems to me long overdue and badly needed. While perhaps some incentive should be given Federal officers to obey the prompt-arraignment statutes, the exclusion of confessions obtained in violation thereof is too high a price for society to pay for this type of "constable's blunder." Since the *McNabb-Mallory* rule was formulated in the exercise of the Supreme Court's supervisory powers over lower Federal courts, and has never been considered a constitutional requisite, no constitutional obstacle is imposed in the way of its legislative repeal (hearings, p. 925).

Enactment of the provisions of subsections 3501 and 3502 would assign proper weight to the *Mallory* rule. Delay in bringing a suspect before a committing magistrate would be a factor to consider in deter-

mining the issue of voluntariness, but it would not be the sole criterion to be considered—operating to automatically exclude an otherwise competent confession.

The case of *Escobedo* v. *Illinois*, 378 U.S. 478 (1964), set the stage for another most disastrous blow to the cause of law enforcement in this country.[2] This case, along with others, formed the basis for the decision in *Miranda* v. *Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that an otherwise voluntary confession made after the suspect was taken into police custody could not be used in evidence unless a fourfold warning had been given prior to any questioning. The majority opinion in this respect reads:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned (384 U.S. at 444).

After considering the testimony of many witnesses, and statements and letters of many other interested parties, the committee found that there is a need for legislation to offset the harmful effects of the Court decisions mentioned above. These decisions have resulted in the release of criminals whose guilt is virtually beyond question. This has had a demoralizing effect on law-enforcement officials whose efforts to investigate crimes and interrogate suspects have been stymied by the technical roadblocks thrown up by the Court. The general public is becoming frightened and angered by the many reports of depraved criminals being released to roam the streets in search of other victims. For example, the infamous Mallory was convicted on another rape charge shortly after his first rape conviction was reversed by the Supreme Court.

The Honorable John Stennis, a U.S. Senator from the State of Mississippi, stated in subcommittee hearings that recent Supreme Court decisions dealing with interrogation procedures have demoralized policemen and threatened to lessen their effectiveness in combating crime. He feels that a change from the approach of the *Miranda* case is essential and significant in the fight against crime. The *Miranda*

---

[2] *Escobedo* held that where "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the assistance of counsel' in violation of the sixth amendment to the Constitution as 'made obligatory upon the States by the 14th amendment ; (cit. omitted) and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

rule goes to the very heart of the investigative process—custodial interrogation. If *Miranda* is not challenged, its harmful effect will gain momentum when the lower Federal courts begin expanding its doctrine and result in many extended interpretations of the case.

The Honorable Alexander Holtzoff, U.S. district judge for the District of Columbia, also discussed the harmful effects of *Miranda*. He said the case would result in reducing the use of voluntary confessions in a very large percentage of cases. This hinders the quick and efficient enforcement of the criminal law.

Quinn Tamm, executive director of the International Association of Chiefs of Police, agreed that the *Miranda* case will materially reduce the number of confessions from defendants.

Statistical evidence further indicates the harmful effects of the *Miranda* decision. During the subcommittee hearings, Arlen Specter, district attorney of the city of Philadelphia, revealed a study on the effects of *Miranda* conducted by his office. The results indicated that prior to the *Escobedo* case, 90 percent of the suspects would make a statement, often not incriminating on their face, but valuable in investigating the crime. After *Escobedo*, only 80 percent would give statements. After the second circuit *Russo* case, only 68 percent of suspects would give statements. Then came the *Miranda* case in June 1966. For a period after *Miranda*, out of 5,220 suspects arrested for serious crimes, 3,095 refused to give a statement. This is a percentage of only 41 percent who would give statements, a decrease of 49 percent since *Escobedo*. These statistics are inclined to become more alarming as more criminals become more familiar with *Miranda*.

Aaron Koota, district attorney for Kings County, N.Y., conducted a similar survey, indicating that prior to *Miranda*, approximately 10 percent of the suspects involved in serious crimes refused to make statements or confessions to police. After *Miranda*, 41 percent refused to make statements or confessions. Specifically, between June and September of 1966, Mr. Koota revealed that 130 of 316 suspects refused to make any statement at all. In only 30 of these 130 cases did Mr. Koota have sufficient evidence to prosecute apart from the confession. Mr. Koota was unequivocal in stating that confessions are helpful in securing convictions.

Charles E. Moylan, Jr., State's attorney for the city of Baltimore, Md., reports more disturbing statistics. Mr. Moylan said:

> * * * [W]e used to get * * * (confessions) in 20 to 25 percent of our cases, and now we are getting * * * (them) in 2 percent of our cases. The confession as a law-enforcement instrument has been virtually eliminated (hearings, p. 622).

Mr. Moylan noted that the *Miranda* case has encouraged criminals, discouraged the police, and disappointed the public that depends on the courts for protection.

Frank S. Hogan, New York County district attorney, reported similar findings. In the 6 months prior to the *Miranda* case, 49 percent of the nonhomicide felony defendants in New York County made incriminating statements. In the 6 months after this decision, only 15 percent of the defendants gave incriminating statements. Mr. Hogan characterized it as being most harmful to efforts to convict criminals who roam our streets and assault our citizens.

Some who defend the *Miranda* rule rely on a survey conducted by New York Judge Nathan Sobel[3] to buttress their position. Judge Sobel concluded that confessions are not really vital to prosecution, since his survey indicates that confessions constitute part of the evidence in less than 10 percent of all indictments. The following portion from a letter by Miles F. McDonald, Justice of the Supreme Court of the State of New York, lays the Sobel survey to rest. After stating that confessions are by far the most reliable evidence in criminal cases, Justice McDonald writes:

After the decision in *Escobedo* and *Miranda*, any objections to the confession, based upon either of these decisions, were similarly to be determined in the course of * * * (pretrial hearing). The district attorney of this county adopted the practice of serving the required notice upon the defendant at the time the case was assigned to a trial part—usually 2 weeks to a month in advance of the trial. All that was required of the defendant was that he serve a notice on the district attorney that he desired a hearing with respect to the issue of voluntariness of the alleged confession.

Judge Sobel, in the computation, used as the basis for his estimates only the cases in which the district attorney served a notice that he intended to use the confession at the time of the trial. He failed to realize that prior to this time all of these cases had at least two preliminary conferences before the court for the purpose of disposing of the case by a plea to a lesser degree of the crime. My experience during these pretrial discussions (I sit in a pretrial part a great percentage of the time) has been that approximately 40 percent of all indictments filed result in a disposition in the pretrial part. From my experience in these parts, I have ascertained that at least 75 to 80 percent of the cases disposed of in the pretrial parts were cases in which there was a confession by the defendant; and by far in the greatest percentage of the confession cases, the defendant was willing to plead to a lesser degree. The greatest majority of the cases, in which confessions had been obtained, were disposed of by a plea of guilty before the case reached the stage of being noticed for trial, and for that reason Judge Sobel's figures have no validity regarding the importance of the confessions, and he has eliminated a large number of cases in which the defendants had confessed and already pleaded guilty before the necessity for the service of the notice upon the defendant ever arose.

I pointed this out to Judge Sobel but as far as I have been able to ascertain he has never rechecked his figures or conducted any further survey, either to validate the existing figures or to disprove my assertion with respect thereto.

In like manner, Mr. Tamm discounted another survey indicating that *Miranda* would have no significant effect on law enforcement.

[3] Sobel, "The Exclusionary Rules in the Law of Confessions: A Legal Perspective—A Practical Perspective," N.Y.L.J., November 1965, p. 1. *See also,* "The Confession Debate Continues," Irving R. Kaufman, the New York Times Magazine, Oct. 2, 1966.

Mr. Tamm had this to say about the survey (hearings, pp. 341–352) prepared by E. J. Younger, district attorney of Los Angeles:

> * * * If I recall it correctly, in trying to recall it to my mind, I think that the district attorney stated that it was not necessary for law-enforcement agencies to have confessions, that their survey indicated that confessions were not necessary in the prosecution of the cases, and my reaction to this is very simple. This was made 3 weeks after the *Miranda* decision. It is based on an extremely limited number of cases, and I think it is premature.
>
> I might mention that my association at the same time did a survey of the major cities to find out just exactly what effect the *Miranda* decision was having upon law enforcement in this country, and our findings were so one-sided in favor of the police that we decided not to publish it, because we felt it was premature, and I don't think this is an objective approach to the whole problem.
>
> We are now doing a survey somewhat nationwide in conjunction with a university, as we are getting some amazing answers again as to the effect that the *Miranda* decision has had on law enforcement. But until we have finished, we are not going to say. But we did do a survey that we completed at the same time as the district attorney in Los Angeles, and and I just think this was premature. I don't think the results would have been conclusive, although as I say, there was a great deal of discussion on cases being lost (hearings, pp. 340–341).

Mr. Younger himself recognizes certain limitations in his report and qualifies his findings with these forthright reservations:

> However, I must state, as I did before, that we are not prepared to say that these decisions have not impaired the efficiency of law enforcement in areas which are at this moment not subject to accurate measurement (hearings, p. 341).
>
> * * *
>
> These decisions have not made it impossible for law enforcement to successfully protect lives and property, but, presumably, have made it more difficult for the police to ascertain the truth by curtailing their use of the important investigative device of proper and reasonable interrogation of suspects. These decisions can be harmful to law enforcement in a way that cannot be measured—by preventing a confession at the first confrontation between suspect and policeman and depriving the officer of information necessary to make an arrest. However, arrests in Los Angeles County continue to increase at a consistent and predictable rate (hearings, pp. 343–344).
>
> * * *
>
> It should be noted that since neither of these two surveys attempted a correlation with pre-*Escobedo* cases wherein confessions or admissions were obtained, it cannot be determined what effect these decisions are having upon the police departments' efforts in solving crimes. We only

obtain those requests for complaints wherein the police officers are satisfied that they have sufficient evidence to establish the corpus and sufficient connecting evidence regarding the particular suspect. We cannot tell from this present survey how many cases we are not ever seeing from the police agencies (hearings, p. 345).

A letter from H. R. Morton, chief of police of the city of Fresno, Calif., is typical of those letters received by the subcommittee explaining the plight of law enforcement officials. Chief Morton writes:

It appears to be well established that the *Escobedo* and *Miranda* decisions have had a decidedly adverse effect upon law enforcement. Examining the fact that law enforcement officers are not thoroughly schooled in constitutional law, may shed some light on the situation. Contributing to the overall problem, however, is the difficulty with which lower courts apply the *Escobedo* and *Miranda* principles. In many instances they are arriving at decisions which are poles apart under very similar circumstances.

The number of convictions and guilty pleas have declined drastically since the pre-*Escobedo* days of 1963. This is in spite of the fact that felony arrests have increased 75 percent since 1963. The following table is included for reference:

CITY OF FRESNO, CALIF.

|  | Felony arrests | Convictions or pleas | Percent |
|---|---|---|---|
| 1963 | 1,475 | 546 | 37 |
| 1964 | 1,635 | 539 | 32 |
| 1965 | 1,539 | 379 | 24 |
| 1966 (+72 percent) | 2,042 | 461 | 22 |

Figures such as those shown make a travesty of the efforts of dedicated law enforcement officers. In previous years and through 1963, there had been a gradual increase in the number of felony arrests and the percentage of those arrests which terminated in a conviction or plea of guilty. This trend, which I attributed to better police methods, was drastically reversed after *Escobedo* and the California decision in *Dorado*.

Fresno county court records show that the fiscal year 1965–66 experienced a new high in the number of felony cases in which criminal informations were filed. In spite of this new high, the percentage of guilty pleas as compared to complaints filed, dropped to a new low. The percentage drop in guilty pleas amounts to 24 percent since the pre-*Escobedo* and pre-*Miranda* era. *One of the most disturbing facts, however, is that for the first 6 months after the 1966 Miranda decision, dismissals before trial are already higher than for the entire preceding year.*

It may appear rather trite to reiterate that the Supreme Court has contributed immeasurably to the above facts, but I am compelled to do so. *Advancements in training police personnel and the utilization of more science in crime detection methods are no doubt partial solutions to the mounting crime toll, but they certainly are not the complete answer. There are*

> *too many crimes in which no physical evidence of value may be*
> *found and well-trained investigators are definitely thwarted*
> *when they must tell a suspect that he has a right to say nothing*
> *to them.*

I hope that the above comments may be of value to you and wish you success in your attempt to remedy this situation. Certainly, as the dissenting opinion in *Miranda* expressed, no other country in the world has ever had such restrictions nor are such restrictions founded on a constitutional basis (hearings, pp. 695–696).

The committee is convinced from the mass of evidence heard by the subcommittee, much of which is printed in the transcript of hearings, that the rigid and inflexible requirements of the majority opinion in the *Miranda* case are unreasonable, unrealistic, and extremely harmful to law enforcement. Instance after instance are documented in the transcript where the most vicious criminals have gone unpunished, even though they had voluntarily confessed their guilt. The transcript and subcommittee files contain testimony and statements from district attorneys, police chiefs, and other law enforcement officers in cities and towns all over the country, demonstrating beyond doubt the devastating effect upon the rights of society of the *Miranda* decision. The unsoundness of the majority opinion was forcefully shown by the four dissenting justices, who also predicted the dire consequences of overruling what theretofore had been the law of the land, confirmed in 1896 in *Wilson* v. *U.S.*, 162 U.S. 613, and in 1912 in *Powers* v. *U.S.*, 223 U.S. 303, and in other more recent Supreme Court decisions.

The Supreme Court itself suggests that Congress is free to enact legislation in this field. The Court's invitation for Congress to act could stem from a widespread notion that Congress is better able to cope with the problem of confessions than is the Court. Senator Bible, in testifying before the subcommittee, observed that experience has taught that Court decisions are too inexact to deal with postarrest problems. The Honorable J. Edward Lumbard, Chief Judge of the U.S. Court of Appeals for the Second Circuit agrees. He states:

> In my opinion, it is most important that the Congress should take some action in the important areas I have discussed. The legislative process permits a wide variety of views to be screened and testimony can be taken from those who know the facts and those who bear the responsibility for law enforcement.
>
> The legislative process is far better calculated to set standards and rules by statute than is the process of announcing principles through court decision in particular cases where the facts are limited. The legislative process is better adapted to seeing the situation in all its aspects and establishing a system and rules which can govern a multitude of different cases.
>
> Judges seldom have before them all those who are the best informed regarding practical problems and the difficulties in living with any proposed change in the law. Judges usually are advised only by the parties in the case; the parties want to win the case and do not always care about general principles of wider application.

As I said before, it is because the Congress and the legislatures of the States have taken so little action in the field of criminal justice that the courts have more and more chosen to lay down rules which have the force of law until changed, and which all too frequently come to us in the form of new constitutional principles which then can be modified only by constitutional amendment (hearings, p. 184).

Mr. Specter expresses a similar view. He pointed out that the subcommittee hearings make it possible for Congress to examine all the facets of human experience that must be taken into account in solving the problem of confessions. The courts, in considering only the limited facts and issues of each particular case do not have the opportunity to evaluate all these factors. Passage of this bill with all of its legislative history—the record of the subcommittee hearings and all of the underlying social policies bearing on this issue and taken into account by Congress—will furnish an excellent record that will hopefully make an impression on some of the Supreme Court Justices.

In commenting upon the Court's encouragement to the Congress to legislate in this area, Attorney General Thomas C. Lynch, of the State of California, wrote:

> It seems to me that the Court has implicitly acknowledged that Congress, with its vastly superior fact-gathering powers, is in a much better position than the Court to formulate standards most likely to result in a correct determination, in a given case, of the issue of voluntariness of a confession. The bill under consideration sets out factors bearing on the voluntariness of confessions. If findings of fact are made by Congress that demonstrate the relevance and importance of these factors, and their superiority over the rules laid down in *Miranda*, it would seem that the Court would have little choice but to defer to the expert judgment of Congress. Accordingly, I consider the bill constitutional and am happy to give it my full support (hearings, p. 925).

More than one of the witnesses expressed the opinion that subsections 3501 and 3502 represent a sensible and workable approach to the problem of confessions. Senator Stennis commented that the approach taken in the bill is fair and reasonable, as the admissibility of a confession should depend on its voluntariness. The judge and jury are in a much better position to determine the truthfulness of testimony regarding the confession than is an appellate court from a cold record. Senator Frank J. Lausche points out that subsections 3501 and 3502 reflect the historical rule governing admissibility of a confession.

One of the most damaging aspects of the *Miranda* decision is its apparent holding that, absent waiver, no suspect can be interrogated at all without the benefit of counsel. It is widely known that counsel will advise the suspect to make no statement at all. The police are virtually hamstrung. This is much more serious than the barring from evidence of a confession—the suspect may refuse to make *any statement whatever*.

Hearings before the subcommittee revealed further defects in the *Miranda* reasoning. Mr. Specter pointed out that the so-called third-degree methods deplored by the Supreme Court and cited as a basis for their opinion in *Miranda* is not a correct portrayal of what actually

goes on in police stations across the country. While there are isolated cases of police using coersive tactics, this is the exception rather than the rule. Mr. Tamm agrees, stating that while these coersive practices might have been approved 30 years ago, they have no place in modern police techniques. The committee is convinced that the Court over-reacted to defense claims that police brutality is widespread.

The severest and perhaps the most eloquent critics of the majority opinion in *Miranda* were the four dissenting Justices, Justices Clark, Harlan, Stewart, and White.

Justice Clark pointed out that under the majority opinion not only the incriminating statement but the fruits thereof also would be excluded from the jury trying the issue of the guilt or innocence of the accused. For instance, if the statement led the police officers to the weapon which injured or killed the victim of the crime, the weapon, too, although demonstrating the truth of the statement, would have to be excluded. Justice Clark states:

> The Court further holds that failure to follow the new procedures requires inexorably the exclusion of any statement of the accused, as well as the fruits thereof. Such a strict constitutional specific inserted at the nerve center of crime detection may well kill the patient.

This decision was an abrupt departure from precedent extending back at least to the earliest days of the Republic. Up to the time of the rendition of this 5-to-4 opinion, the "totality of circumstances" had been the test in our State and Federal courts in determining the admissability of incriminating statements and evidence derived by leads therefrom. Custodial interrogation had always been recognized as "undoubtedly an essential tool in effective law enforcement" (*Haynes* v. *Washington*, 373 U.S. 503, 515 (1963)).

Mr. Justice Clark said the majority was "in one full sweep changing the traditional rules of custodial interrogation which this Court has for so long recognized as a justifiable and proper tool in balancing individual rights against the rights of society."

Justice Harlan, joined by Justices Stewart and White, said:

> I believed the decision of the Court represents poor constitutional law and entails harmful consequences for the country at large. How serious these consequences may prove to be only time can tell. * * * To incorporate this notion into the Constitution requires a strained reading of history and precedent.

Mr. Justice Harlan pointed out that the limitations imposed by the majority "were rejected by necessary implication in case after case, the right to warnings having been explicitly rebuffed in this Court many years ago (*Powers* v. *United States*, 223 U.S. 303; *Wilson* v. *United States*, 162 U.S. 613)."

Moreover, the dire effects upon law enforcement, which were developed by the subcommittee hearings, as hereinbefore shown, were prophesied by the dissenting Justices. Justice Harlan said:

> There can be little doubt that the Court's new code would markedly decrease the number of convictions. To warn the suspect that he may remain silent and remind him that his confession may be used in court are minor obstructions. To require also an express waiver by the suspect and an end to

questioning whenever he demurs must heavily handicap questioning. And to suggest or provide counsel for the suspect simply invites the end of interrogation. How much harm this decision will inflict on law enforcement cannot fairly be predicted with accuracy. * * * We do know that some crimes cannot be solved without confessions, that ample expert testimony attests to their importance in crime control, and that the Court is taking a real risk with society's welfare in imposing its new regime on the country. The social costs of crime are too great to call the new rules anything but a hazardous experimentation.

Citing the oft-quoted language of Mr. Justice Cardozo—"Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained until it is narrowed to a filament. We are to keep the balance true"—Mr. Justice Harlan severely criticized the majority ruling and pointed out "it would probably be shared by few." Specifically, he said:

One is entitled to feel astonished that the Constitution can be read to produce this result. * * * The resulting confession, and the responsible course of police practice they represent, are to be sacrificed to the Court's own fine-spun conception of fairness which I seriously doubt is shared by many thinking citizens in this country. In this case new restrictions on police questioning have been opposed by the United States and in an amicus brief signed by 27 States and Commonwealths, not including the three other States who are parties. No State in the country has urged this Court to impose the newly announced rules, nor has any State chosen to go nearly so far on its own. (The reference to "the three other States" arises out of the fact that the decision disposed of three State court cases and one Federal court case. Justice Thurgood Marshall, who was the Solicitor General of the United States, urged affirmance of the Federal court conviction.)

The Committee feels that it should be borne in mind that the *Miranda* majority opinion upset what had been the law in practically every State and in all Federal circuits. It nullified four trials by jury (one of five cases heard together was later disposed of by a holding that the newly announced restrictions should not be applied retroactively).

Mr. Justice White's dissent, concurred in by Justice's Harlan and Stewart, going back to the earliest cases in the Supreme Court, demonstrates beyond question that the law prior to the *Miranda* decision was that warnings as to constitutional rights were not required by the Constitution, and that the sole test of admissibility should be "totality of circumstances" as bearing on voluntariness.

Mr. Justice White, as had Justice Harlan, in dissenting, predicted the majority opinion's extremely harmful effects on society's rights which is so convincingly shown by evidence adduced by the subcommittee hearings, Justice White said:

Until today, "the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence." *Brown* v. *Walker*, 161

U.S. 591; see also *Hopt* v. *Utah*, 110 U.S. 574, 584–585. Particularly when corroborated, as where the police have confirmed the accused's disclosure of the hiding place of implements or fruits of the crime, such confessions have the highest reliabiltiy and significantly contribute to the certitude with which we may believe the accused is guilty. * * * There is, in my view, every reason to believe that a good many criminal defendants, who otherwise would have been convicted on what this Court has previously thought to be the most satisfactory kind of evidence, will now, under this new version of the fifth amendment, either not be tried at all or acquitted if the State's evidence, minus the confession, is put to the test of litigation. I have no desire whatsoever to share the responsibility for any such impact on the present criminal process. In some unknown number of cases the Court's rule will return a killer, a rapist or other criminal to the streets and to the environment which produced him, to repeat his crime whenever it pleases him. As a consequence, there will not be a gain, but a loss, in human dignity.

The Committee is of the view that it simply makes no sense to exclude from a jury what has traditionally been considered the very highest type of evidence, and the most convincing evidence of guilt, that is, a voluntary confession or incriminating statement by the accused. This view is borne out by common experience and general acceptation, and by almost 200 years of precedent in the courts of this country.

The Committee also feels that the majoriy opinion not only runs counter to practically all the precedent in the State and Federal courts, but that it misconstrues the Constitution. The Committee alines itself wholeheartedly with the view expressed by the dissenting Justices and with what it feels are the views of the vast majority of judges, lawyers and plain citizens of our country who are so obviously aroused at the unrealistic opinions such as the *Miranda* decision which are having the effect of daily releasing upon the public vicious criminals who have voluntarily confessed their guilt.

Consequently, the committee feels that Congress, through its power to prescribe rules of evidence in Federal courts, should respond to the majority opinion's invitation to Congress, wherein the Court says:

> It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws (*Miranda* v. *Arizona*, 384 U.S. at 467).

The committee is of the view that the legislation proposed in section 701 of title II would be an effective way of protecting the rights of the individual and would promote efficient enforcement of our criminal laws. By the express provisions of the proposed legislation the trail judge must take into consideration all the surrounding circumstances in determining the issue of voluntariness, including specifically enumerated factors which historically enter into such a determination. Whether or not the arrested person was informed of or knew his rights before questioning is but one of the factors. There is the added safeguard that the jury must be instructed to give the confession or statement the weight that they feel its warrants under all the circumstances. The committee feels that society is entitled to the use of confessions and incriminating statements which are admitted only after passing the tests of both court and jury under the above-described safeguards. The committee also feels that a civilized society could not be more fair to persons accused of crime, as the constitutional rights of defendants in criminal cases would be fully protected and respected by the safeguards in this proposed legislation.

The committee is aware that a few have expressed the view that legislation by Congress restoring the voluntariness test to the admissibility of confessions and incriminating statements would be declared unconstitutional, on the ground that the provisions do not measure up to the rigid standards set forth in the majority opinion in *Miranda*. The committee, however, is aware also that the overwhelming weight of the testimony adduced by the subcommittee supported the passage of these provisions of the bill, and that the vast majority of the witnesses expressed no doubt as to the constitutionality of the legislation. The committee is also aware that the opinions of the four dissenting Justices clearly indicate that neither of them would consider these provisions unconstitutional. Justice Harlan, it will be recalled, said the majority opinion "represents poor constitutional law," and that "it would be shared by few."

The committee feels that it is obvious from the opinion of Justice Harlan and other dissenting Justices (excerpts from which are heretofore quoted in this report) that the overwhelming weight of judicial opinion in this country is that the voluntariness test does not offend the Constitution or deprive a defendant of any constitutional right. No one can predict with any assurance what the Supreme Court might at some future date decide if these provisions are enacted. The committee has concluded that this approach to the balancing of the rights of society and the rights of the individual served us well over the years, that it is constitutional and that Congress should adopt it. After all, the *Miranda* decision itself was by a bare majority of one, and with increasing frequency the Supreme Court has reversed itself. The committee feels that by the time the issue of constitutionality would reach the Supreme Court, the probability rather is that this legislation would be upheld.

FEDERAL APPELLATE REVIEW OF FINAL STATE COURT DECISIONS ADMITTING VOLUNTARY CONFESSIONS

The need for a revision of the *Miranda* decision has been well documented in the preceeding section of this report. The committee feels that passage of subsection 3502 is necessary to bring about a

complete judicial restoration of the sound rule which allows the admissability of a confession of an accused into evidence if it is voluntarily made.

That portion of title II which adds section 3502 to chapter 223 of title 18 of the United States Code, limits the power of the Federal courts to review a State court's admission into evidence of a voluntary confession and is designed to foster State and Federal cooperation in the orderly and efficient enforcement of criminal laws of the several States.

In recent years, the Federal judiciary, following the leadership of the U.S. Supreme Court, has usurped and infringed upon the sovereign powers of the States in the administration of their criminal laws. The Federal judiciary has practically rewritten the criminal procedures of the States basing their interference upon the Bill of Rights, which was intended to be applicable only to the Federal Government. While recognizing that some issues raised in State cases do present Federal questions, the committee feels that there are other legal questions heretofore deemed reviewable as a Federal question that should be finally decided on the State level, free from Federal interference. One of these questions is whether, as a factual matter, a confession was voluntarily given. This is a question of fact—not one of law—and should be decided on the trial level. The decision of the trial judge on the question of voluntariness is reviewable by the respective State appellate courts and is generally affirmed if it is supported by substantial evidence. At this stage of the proceeding, exercise of jurisdiction by Federal courts is disruptive and tends to dilute the State's enforcement of its criminal laws. To counteract this disruptive practice, title II limits Federal jurisdiction to review a State court's final decision as to voluntariness of a confession as follows:

> Neither the Supreme Court nor any inferior court ordained and established by Congress under article III of the Constitution of the United States shall have jurisdiction to review or to reverse, vacate, modify, or disturb in any way, a ruling of any trial court of any State in any criminal prosecution admitting in evidence as voluntarily made an admission or confession of an accused if such ruling has been affirmed or otherwise upheld by the highest court of the State having appellate jurisdiction of the cause.

Section 2 of article III of the Constitution of the United States provides in part, as follows:

> * * * The judicial power of the United States, shall be in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. * * * [T]he Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make.

This provision vests in the Congress the authority to deny Federal appellate jurisdiction regarding the question of voluntariness of confessions in criminal cases brought by the various States. (*Ex parte McCardle*, 73 U.S. (6 Wall.) 318 (1868); 74 U.S. (7 Wall.) 508 (1869).)

### ADMISSIBILITY OF EYE-WITNESS TESTIMONY

The use of eyewitness testimony in the trial of criminal cases is an essential prosecutorial tool. The recent case of *United States* v. *Wade*, 388 U.S. 318 (1967), struck a harmful blow at the nationwide effort to control crime. The Court held that an in-court identification of the suspect by an eyewitness is inadmissible unless the prosecution can show that the identification is independent of any prior identification by the witness while the suspect was in custody, and while his court appointed lawyer was neither notified nor present. It is incredible that a victim is not permitted to identify his assailant in court. The same is true of eyewitnesses who saw the victim assailed or murdered. The fact that eyewitness might on some occasion prior to trial have identified the accused, without a lawyer for the accused being present, cannot in reason, law, or commonsense justify such a disastrous rule of evidence. Nothing in the Constitution warrants it. To counter this harmful effect, the committee adopted that portion of title II providing that eyewitness testimony is admissible in criminal prosecutions brought in the Federal courts and that portion of title II that denies the Federal courts the power to review the final State court and Federal trial court decisions declaring eyewitness testimony to be admissible.

### CONSTITUTIONALITY OF LEGISLATION TO LIMIT THE JURISDICTION OF THE FEDERAL COURTS

At the beginning of the 90th Congress, Senator Ervin introduced S. 1194, to reverse the *Miranda* decision by regulating the appellate jurisdiction of the Federal courts. At that time he requested the American Law Division, Legislative Reference Service, to prepare a memorandum setting out the possible theories on which the constitutionality of the bill could be sustained. The memorandum, set out below, considers the matter in the context of S. 1194, but its argument and discussion apply equally well to provisions contained in title II, incorporating as it does much of S. 1194. It is the committee's view that the argument presented and the principles set out concerning the regulation of the appellate jurisdiction of the Federal courts apply to section 901 in its entirety, including subsection 3503 dealing with the eyewitness testimony.

The committee was acquainted with this memorandum and its premises informed our consideration of and final treatment of title II.

#### BRIEF IN SUPPORT OF CONSTITUTIONALITY OF BILL LIMITING JURISDICTION OF FEDERAL COURTS IN CONFESSION CASES

This report will undertake to develop and present a theory under which the constitutionality of a proposed Senate bill which would reinstate the voluntariness test as the standard for the the admissibility of confessions or other incriminating statements in criminal trials in both the Federal and State courts would be sustained. It is argued that, under the plain language of the Constitution, Congress has almost plenary power over the appellate jurisdiction of the Supreme Court and of the jurisdiction of the inferior Federal courts. Further, it is contended that, whatever may be the limitations existing on congressional power over the jurisdiction of the Federal

courts, the proposed bill does not approach that area of limitation. And, finally, it is argued that the purpose and effect of this proposed bill, aside from the argument about control over jurisdiction, is an appropriate matter to be reached by statutory processes.

The bill would provide as follows:

"Sec. 1. That the sole test of the admissibility of an admission or confession of an accused in a criminal prosecution in any trial court ordained and established by the Congress under Article III of the Constitution of the United States shall be its voluntary character and neither the Supreme Court nor any inferior appellate court ordained and established by the Congress under Article III of the Constitution of the United States shall have jurisdiction to reverse, vacate, modify, or disturb in any way a ruling of such a trial court in any criminal prosecution admitting in evidence as voluntarily made any admission or confession of an accused if such ruling is supported by any competent evidence admitted at the trial.

"Sec. 2. Neither the Supreme Court nor any inferior court ordained and established by the Congress under Article III of the Constitution of the United States shall have jurisdiction to review or to reverse, vacate, modify, or disturb in any way, a ruling of any trial court of any State in any criminal prosecution admitting in evidence as voluntarily made an admission or confession of an accused if such ruling has been affirmed or otherwise upheld by the highest court of the State having appellate jurisdiction of the cause."

The intent of the bill is to reverse the holding of *Miranda* v. *Arizona*, 384 U.S. 436 (1966), applying in both Federal and State courts an exclusionary rule in regard to confession and inculpatory statements of an accused unless the prosecution demonstrates that the accused had the benefit of procedural safeguards effective to secure to him the privilege against self-incrimination guaranteed by the fifth amendment to the Constitution.

The bill would also set aside the holdings of such cases as *McNabb* v. *United States*, 318 U.S. 332 (1943), and *Mallory* v. *United States*, 354 U.S. 449 (1957), which made inadmissible statements given while the accused were held allegedly in violation of a statute requiring prompt arraignment. This line of cases is founded on the Supreme Court's asserted supervisory power over the lower Federal courts, rather than upon any constitutional provision. These holdings have not been applied to the States and after *Miranda* are probably not too important.

*Miranda*, however, is the case to which the bill is directly addressed. What was its holding? What range of legislation does it place beyond the constitutional pale?

I

First, it is important to note that *Miranda* does not do away with the voluntariness test as a standard of admissi-

bility. *Miranda* v. *Arizona, supra,* 457, 478; and see, *supra* 505 (Harlan, J., dissenting). Thus, voluntariness is still a test of admissibility, and, in a sense, it might be said that *Miranda* simply adds on certain procedural safeguards that a majority of the Court sees as necessary before a confession may be deemed truly voluntary.

Second, and very important in terms of what the bill seeks to do, the Court did not purport to lay down its standards because these standards were compelled by the fifth amendment; the standards were called for because without "adequate protective devices [being] employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice" (*supra,* 458).

In other words, the Court made a finding of fact that every custodial interrogation was inherently coercive and intimidating. And upon what basis is this conclusion drawn? It is upon impartial surveys, not by examination of the records of any police interrogation, not by drawing upon a developing consensus among the authorities in this area (*supra,* 532–33 (White, J., dissenting)).

Rather, the Court notes that since "[i]nterrogation still takes place in privacy", there is a secrecy which "results in a gap in our knowledge as to what *in fact* goes on in the interrogation rooms" (*supra,* 448). [Emphasis supplied.]

Examples of presumed police practice and data supporting the conclusion of inherent coercion in custodial interrogation were drawn solely from police manuals and texts which may or may not have been followed (*supra,* 448–55).

This, then, is the case with which the proposed bill would attempt to deal. Any analysis of its validity must proceed first upon a consideration of the congressional power over the jurisdiction of the Federal courts and second upon a consideration of the exercise of that power in this instance.

## II

It is provided in article III, section 2, clause 2 of the Constitution, that the Supreme Court "shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make." Article I, section 8, clause 9, provides that Congress has power to establish an inferior system of courts.

The Supreme Court has repeatedly asserted that absent enactments of Congress expressly sanctioning the exercise of all or specific portions of the measure of jurisdiction enumerated in article III, none of the provisions of that constitutional source may be invoked by Federal district courts established as tribunals vested with original jurisdiction or by the Supreme Court in its capacity solely as an agency endowed with powers of appellate review.

For example, in *Chisholm* v. *Georgia,* 2 Dall. (2 U.S.) 419, 423 (1793), Mr. Justice Iredell wrote:

"I conceive that all the courts of the United States must receive, not merely their organization as to the number of

judges of which they are to consist; but all their authority, as to the manner of their proceeding, from the legislature only."

And in *Derousseau* v. *United States*, 6 Cranch (10 U.S.) 307, 313 (1810), Chief Justice Marshall stated of the recently enacted Judiciary Act:

"The appellate powers of this Court are not given by the Judicial Act, they are given by the Constitution. But they are limited and regulated by the Judicial Act and by such other acts as have been passed on the subject."

Reiteration of the conclusion respecting the broad extent of congressional authority under article III and article I, section 8, clause 9, is found in many cases; see e.g., *Sheldon* v. *Sill* 8. How. (49 U.S.) 440 (1850); *Kentucky* v. *Powers*, 201 U.S. 1, 24, 35 (1908); *Kline* v. *Burke Construction Co.*, 260 U.S. 226, 233, 234 (1922); *Lauf* v. *E. G. Skinner Co.*, 303 U.S. 323 (1938); *Stephen* v. *United States*, 319 U.S. 423, 426 (1943).

The leading case in this area is *Ex parte McCardle*, 7 Wall. (74 U.S.) 506 (1868), in which the Court accepted a withdrawal by Congress of its appellate jurisdiction immediately affecting a case already on its docket. The Court dismissed the case, saying that "without jurisdiction the Court cannot proceed at all in any cause. Jurisdiction is power to declare the law and when it ceases to exist, the only function remaining to the Court is that of announcing the fact and dismissing the case" (*supra*, 514).

There are dicta in some cases which suggest that the congressional power might not be unlimited, without specificity as to the nature of the limitation. See, e.g., *United States* v. *Bitty*, 208 U.S. 393, 399–400 (1908); *Lockerty* v. *Phillips*, 319 U.S. 182, 187 (1943); *Yakus* v. *United States*, 321 U.S. 414, 444 (1944). It has been suggested by some authorities that, at the least, a limitation exists in the sense that it would be a violation of due process to deny someone any means of judicial review, of appellate review, at all. See, Hart, "The power of Congress to limit the jurisdiction of Federal Courts: An Exercise in Dialectic," 66 Harvard Law Review 1362 (1953).

The only limitation of which we may be sure is found in *United States* v. *Klein*, 80 U.S. 128 (1871). During the Civil War, Congress had passed a number of acts providing for the confiscation of property belonging to those persons in rebellion or otherwise disloyal. It had also passed an act authorizing the President to offer pardons on such conditions as he deemed advisable, an unnecessary act because of the constitutional grant of the power to pardon to the President. One element of all pardons under presidential proclamation was the restoration of all property, except slaves, on condition that the formerly disloyal person take an oath of loyalty to the United States.

A faction of President Johnson's administration was opposed to his pardoning policy and fought in the Court of Claims suits to recover confiscated property with the pardon

as the basis for recovery. On the first case appealed, the Supreme Court held that the effect of the pardon was as if the person had never been in rebellion and that he was therefore entitled to his property. *United States* v. *Padelford*, 9 Wall. (76 U.S. 531 (1869).

Whereupon, Congress repealed its pardoning statue and adopted a rider to an appropriation bill designed to frustrate the effect of the presidential pardons, including that in *Klein's* case which had already been decided by the Court of Claims and was being appealed to the Supreme Court. The rider declared that no pardon, acceptance, oath, or other act performed in pursuance, or as a condition, of pardon, should be admissible in evidence in support of any claim against the United States in the Court of Claims, or to establish the right of any claimant to bring suit in that court, nor, if already put in evidence, should be used or considered on behalf of the claimant by the court or by the Supreme Court on appeal. Proof of loyalty was required to be made according to provisions of certain congressional enactments, irrespective of any executive pardon, and when judgment had already been rendered on other proof of loyalty, the Supreme Court, on appeal, should have no further jurisdiction and should dismiss it for want of jurisdiction.

The rider further provided that whenever any pardon, granted to any suitor in the Court of Claims for the proceeds of seized property should recite in substance that the person pardoned took part in the late rebellion, or was guilty of any act of rebellion or disloyalty, and was accepted in writing without express disclaimer against the fact so recited, such pardon was to be taken as conclusive evidence in the Court of Claims and on appeal that the claimant did give aid to the rebellion. On proof of such pardon, the jurisdiction of the court was to cease and the suit be dismissed.

Said the court:

"Undoubtedly, the legislature had complete control over the organization and existence of that court and may confer or withhold the right of appeal from its decisions. And if this act did nothing more, it would be our duty to give it effect. * * *

"But the language of the proviso shows plainly that it does not intend to withhold appellate jurisdiction except as a means to an end. Its great and controlling purpose is to deny to pardons granted by the President the effect which this court had adjudged them to have" (*supra*, 145).

There were two grounds on which to hold the act unconstitutional, said the court. First, it was invalid because it "infring[ed] the constitutional power of the executive" (*supra*, 147). Second, it was invalid because it "prescrib[ed] a rule for the decision of a cause in a particular way" (*supra*, 146). In other words, it told the court what facts to consider and what decision to make upon the narrow range of facts which could be considered. As the court asked:

"Can [Congress] prescribe a rule in conformity with which the court must deny to itself the jurisdiction thus conferred,

*because and only because its decision*, in accordance with
with settled law, *must be adverse to the government and fa-*
*vorable to the suitor?* This question seems to us to answer it-
self" (*supra*, 147). [Emphasis supplied.]

The statute was invalid then, because in both instances, it
contravened the separation of powers, infringing upon both a
presidential and a judicial power.

### III

The question, then, is how the proposed bill comports with
the range and limitations of the congressional power over
the jurisdiction of the Federal courts.

First, it will be noted that neither section of the bill pro-
poses a simple denial of jurisdiction in a class of cases in terms
of either original or appellate jurisdiction. What it does, in
terms of jurisdictional limitations, is to deny appellate juris-
diction to reverse or otherwise modify a finding of a trial
court, State or Federal, admitting a confession on the grounds
that it is voluntary if such ruling is supported by any compe-
tent evidence.

The effect of this limitation is not to deny to anyone the
privilege of judicial review or appellate review which might
be thought to be commanded by due process. A defendant
still has the right to appeal, all the way to the Supreme
Court if he can get there, on all issues involved in his trial
but on the question of the determination of an essential
*fact* issues, whether *in fact* a confession has been voluntarily
made, the decision of the trial court, at the Federal level, or
the trial court and the highest State appellate court, at the
State level, must be left undisturbed if supported by any
competent evidence. This denial of review, limited as it is,
is much less than the absolute denial of review of adminis-
trative determination of fact sanctioned in *South Carolina*
v. *Katzenbach*, 383 U.S. 301, 332–33 (1966) ; cf. *United States*
v. *California Eastern Line*. 348 U.S. 351 (1952) ; *Switch-
men's Union* v. *National Mediation Board*, 320 U.S. 297
(1943). The Court has upheld a statute limiting its review
of Court of Claims decisions to questions of law, making
the fact determination below final. *Luckenbach S. S. Co.* v.
*United States*, 272 U.S. 523 (1926).

Thus, no issue of law is being disturbed here. The lower
courts must determine a question of fact, of voluntariness,
and the standards, the legal standards for determining what
constitutes voluntariness, are left undisturbed. The standards
have been grouped by the court in the past under the general
heading of "the totality of circumstances," an examination of
which is necessary to see if the defendant was deprived of "a
free choice to admit, to deny, or to refuse to answer," *Lisenba*
v. *California*. 314 U.S. 219, 241 (1941), and whether physical
of psychological coercion was of such a degree that "the de-
fendant's will was overborne at the time he confessed." *Haynes*
v. *Washington*. 373 U.S. 503, 513 (1963) ; *Lynymn* v. *Illinois*,
372 U.S. 528, 534 (1963). Under the supremacy clause, article

6, clause 2, all judges, Federal and State, are required to apply these standards.

So, it may not be said that the proposed legislation would deprive anyone of all judicial review. It merely says that, on a particular issue of fact, under stated circumstances, there is no further appellate review. Even there, a defendant may obtain appellate review to the extent of determining whether any competent evidence supports the finding of fact.

If one has no constitutionally protected right to be able to carry any case to the Supreme Court, and no one of whom we are aware contends otherwise, then the limitation of that privilege to the extent proposed by this bill could in no way be deemed impermissible.

Our second area of consideration relates to the teaching of *Klein*. On a superficial level, it could be said that the proposed legislation dictates a result to the appellate courts. If any competent evidence exists to support the trial court's finding of voluntariness, the holding of the trial court must be left undisturbed. But this can hardly be what the Court had in mind in *Klein* when the act there found unconstitutional was condemned for prescribing "a rule for the decision of a cause in a particular way." The act there prescribed the result at the trial and appellate level; it not only prescribed a result, it set out and limited the standards for getting to that result. By its standards and prescription, the claimant against the Government could not win because the pardon which he had could not be used in evidence for him but was irrebutable evidence against him.

Here, on the other hand, the proposed bill prescribes a test, voluntariness, which all courts have used heretofore and in respect to which there are established judicial standards. Each case will turn upon its own facts and how they are proved. If a defendant can prove his confession was coerced, it will be excluded; if he cannot so prove, it will be admitted.

If one should argue that this prescription of a test is unconstitutional on the basis of *Klein*, because it sets out a rule of decision, one would have to draw the same conclusion about a statute which prescribes negligence as the test whether a claimant may or may not recover in a court case for damages.

This, then, would seem to dispose of one basis of the *Klein* holding, the violation of the separation-of-powers concept between legislative and judicial powers. Here, a result is not imposed on the courts; rather a standard, a test is set out, and this process is usual in practically all legislation concerning the courts, whether it deals with, for instance, the monetary amount in issue before one may assert Federal jurisdiction, or with what acts one must have done before he may be found guilty of manslaughter.

And, of course, the other holding in *Klein*, the infringement on the powers of the President, is not at all involved.

## IV

At this point, it may well be conceded that the limitation on jurisdiction constitute proper, appropriate, and valid legis-

lation. There still remains, however, the one question of whether Congress may establish voluntariness as the test of admissibility when the Court held in *Miranda* that other standards were also constitutionally required.

It will be remembered from the discussion of *Miranda* earlier in the memorandum that the Court did not hold that the fifth amendment compelled the result; it held rather than in effectuating and protecting the privilege against self-incrimination, the majority Justices, in the absence of contrary evidence and in reliance on police manuals and tests, had decided that custodial interrogation was inherently coercive and therefore violative of the fifth amendment, without the safeguards there promulgated.

But if, *in fact*, custodial interrogation is not inherently coercive, how does the constitutional basis of the decision fare? With its underpinning removed, it would seem that the Court would be compelled to retreat to its past standard—the standard of voluntariness.

How may the Court be acquainted of the error of its factual assumption? It would seem that congressional legislation with a finding of fact and a reassertion of the traditional test would be appropriate means to that end.

There would be nothing unusual in this approach. In fact, the Voting Rights Act of 1965 (79 Stat. 437, 42 U.S.C. 1973 et seq.) and the judicial response afford at least two examples of the process at work and point importantly to the constitutionality of the approach of the proposed bill.

In section 4 (e) of the 1965 act (42 U.S.C. 1973b(e)), it was provided that no person who has successfully completed the sixth primary grade in a public school in, or a private school accredited by, the Commonwealth of Puerto Rico, or any State or territory, in which the language of instruction was other than English should be denied the right to vote in any election because of his inability to read or write English. The effect of the section, if it were valid, was to enfranchise all those Puerto Ricans in New York, who met the conditions set forth, who could not meet the English literacy requirement for voting, in effect, in New York.

Earlier, an English literacy requirement had been held constitutional by the Court. *Lassiter* v. *Northampton Election Board*, 360 U.S. 45 (1960). The franchise is essentially a matter of State concern. *Minor* v. *Happersett*, 21 Wall. (88 U.S.) 162 (1874); *Lassiter* v. *Northampton Election Board, supra*. It is a matter then of Federal concern only if in administering its laws relating to the franchise a State engages in unlawful discrimination. See, e.g., *Carrington* v. *Rash*, 380 U.S. 89 (1964). It would seem, therefore, and the attorney general of New York so argued, that section 4(e) could not be sustained as appropriate legislation unless Congress had decided and the judiciary independently, with or without the guidance of Congress, reached the same conclusion, that the English literacy requirement was discriminatory in violation of the equal protection clause.

The Court disagreed and upheld section 4(e). *Katzenbach v. Morgan*, 384 U.S. 641 (1966). Congress, said Mr. Justice Brennan, may not have considered the New York requirement of literacy in English as itself a violation of the 14th amendment. Rather Congress may have been concerned with evidence of discriminatory treatment of the Puerto Rican community at the hands of New York public agencies, although no evidence was adduced to support this assumption. Thus, Congress sought to secure the vote for the Puerto Rican community in the belief that its political power would then enable that community to insure nondiscriminatory treatment for itself.

The nature of the evidence and the considerations of all the factors that went to make up the conclusion was up to Congress to determine.

"It is not for us to review the congressional resolution of these factors. It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did" (*supra*, 653).

To the argument that the New York requirement constituted an incentive for non-English speaking people to learn English and better to assure the intelligent exercise of the franchise, the Court thought that Congress might have concluded otherwise.

"Congress might well have concluded that as a means of furthering the intelligent exercise of the franchise, an ability to read or understand Spanish is as effective as ability to read English for those to whom Spanish-language newspapers and Spanish-language radio and television programs are available to inform them of election issues and governmental affairs. Since Congress undertook to legislate so as to preclude the enforcement of the State law, and did so in the context of a general appraisal of literacy requirements for voting * * * it was Congress' prerogative to weigh these competing considerations" (*supra*, 655–56).

Stated simply, the Court had previously made a constitutional decision, the validity of English literacy as a requirement for voting, on the basis both of constitutional theory and of *its* appraisal of the facts surrounding the application of that requirement and the results, appraisal which led the Court to conclude that no invidious discrimination existed. With section 4(e), Congress did not change the constitutional theory; rather, it made *its* appraisal of the facts and reached a different factual conclusion than the Court had.

On the basis of that different factual conclusion, the Court would now hold that, to the extent of section 4(e), the English literacy requirement was invalid and would do so without an independent verification of the basis of the congressional conclusion. It was enough that the Justices could "perceive a basis upon which Congress might predicate [its] judgment" (*supra*, 656).

The effect of this ruling, and of the ones discussed below, was perceived by Mr. Justic Harlan in dissent. *Supra*, 667–68. His formulation of the inevitable conclusion to be drawn from

the Court's ruling has a direct bearing upon the validity of the proposed bill. As he saw it, the question was whether there has "in fact" been an infringement of a constitutional guarantee so as to underpin the congressional action.

"That question is one for the judicial branch ultimately to determine. Were the rule otherwise, Congress would be able to qualify this Court's constitutional decision under the 14th and 15th amendments, let alone those under other provisions of the Constitution, by resorting to congressional power under the necessary and proper clause."

The teaching of the majority opinion, however, is that "the rule [is] otherwise," that a congressional determination of fact making the difference in constitutional adjudication, so long as basis may be perceived for that determination, will be accepted by the Court.

In much less detail, the other two examples may be considered here.

Twice, the Supreme Court upheld the constitutionality of the poll tax as a requirement for voting. *Breedlove* v. *Suttles*, 302 U.S. 277 (1937); *Butler* v. *Thompson*, 341 U.S. 937 (1951). But Congress in section 10 of the Voting Rights Act, 42 U.S.C. 1973(h), found that the poll tax inhibits voting by the poor, is not reasonably related to "any legitimate State interest in the conduct of elections," and in some cases has the effect of discriminating by race.

"Upon the basis of these findings, Congress declares that the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting."

The section then directed the Attorney General to bring suit for a declaratory judgment or injunctive relief against enforcement of the poll tax. On two suits brought thereunder, two Federal district courts declared the poll tax as a precondition to voting unconstitutional. *United States* v. *Texas*, 252 F. Supp. 234 (D.C.W.D. Tex., 1966), affirmed, 384 U.S. 155 (1966); *United States* v. *Alabama*, 252 F. Supp. 95 (D.C.M.D. Ala., 1966). Subsequently, the Supreme Court, in a suit not brought under section 10, invalidated the poll tax on grounds conspicuously in reliance on the section though without mentioning it. *Harper* v. *Virginia Board of Education*, 383 U.S. 663 (1966).

Finally, we might turn to the principal point of the Voting Rights Act, that is, the automatic triggering device for putting the act into effect. When the Attorney General determines that a State or political subdivision maintained as of November 1, 1964, "any test or device," and the Director of the Census certifies that fewer than 50 percent of persons of voting age residing there were registered on November 1, 1964, or voted in the presidential election of that year, the otherwise valid "test or device" may be suspended because there is created the presumption that it is discriminatory. This, too, the Court upheld, *South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966). Once more, Congress on the basis of its

determination of a factual issue has been allowed to mold constitutional policy.

Certainly the proposed bill does much less than that.

## V

It is submitted, therefore, that, first, because *Miranda* as a constitutional decision was based upon a factual conclusion by the Justices, and, second, since under the Voting Rights Act cases it appears that Congress may undertake to mold constitutional policy by itself making factual determination, it is proper and appropriate for Congress, by simple legislation, not to override *Miranda*, but to present to the Court a factual determination and conclusion different from that underpinning *Miranda*. The proposed bill does not, at this point at least, contain such a statement of factual determination. It was not required in *Katzenbach* v. *Morgan, supra,* although in the case of the poll tax a statement of finding was set out. Any deficiency in this area could be remedied by the legislative history or by an inclusion of a statement of findings.

In conclusion, then, it appears that the power of Congress over the jurisdiction of the Federal courts is broad enough to provide a basis for the action sought here; it further appears that it is constitutionally permissible for Congress to formulate a test of admissibility different from that adopted by the Court, inasmuch as the adoption does not follow upon any attempt to change constitutional theory but rather upon a qualifying of the factual basis of the effectuation of that policy.

RESTRICTION ON THE USE OF FEDERAL HABEAS CORPUS AS A SUBSTITUTE FOR
DIRECT APPEAL

In the case of *Fay* v. *Noia*, 372 U.S. 391 (1963), *Townsend* v. *Sain*, 372 U.S. 293 (1963), and others, the Supreme Court liberalized the use of the Federal habeas corpus procedure to such an extent that it is now being used as a substitute for direct appeal. This has increased the caseload on the various courts and has disrupted the orderly process of final disposition of State criminal cases. The following portion of an address by Hon. W. Walter Braham, submitted to the committee by the Honorable Homer Kreider, aptly expresses the need for congressional enactment of that portion of title II that adds section 2256 to chapter 153 of title 28 of the United States Code:

The *Noia* case discloses the determination of the Supreme Court to assert its authority over all cases of Federal civil rights tried in State courts. The prisoner's petition for habeas corpus was filed in the Federal courts 14 years after the date of his sentence. The Supreme Court voided the sentence and directed the prisoner's release unless he was granted an immediate new trial. *Townsend* v. *Sain* rules that the district court had had to accord the prisoner a full trial of his case de novo, although more than five petitions for habeas corpus had been filed in the case, and it had been three times before the Supreme Court on certiorari. *Sanders* v. *United States*

involved a Federal prisoner; after losing in one hearing, he was allowed to allege other grounds and get another hearing.

    \*        \*        \*        \*        \*

No sooner were the decisions of the Supreme Court which we have cited released than word about them flashed through the dim, occult reaches of the penitentiaries, and the courts have been flooded with habeas corpus cases ever since.

The extent to which this process has increased the business of the Federal courts is appalling. The reports of the Standing Committee on the American Bar Association on Jurisprudence and Law Reform affirm that the applications by State prisoners for writs of habeas corpus in the Federal courts grew from 127 in 1941 to 981 in 1961, and 4,664 in 1965. The proportion of increase was 675 percent from 1941 to 1961, and 3,750 percent from 1941 to 1965. The growth in the number of these cases has continued unabated in 1966. It is estimated that about 30 percent of the business of the Federal courts derives from habeas corpus. From an opinion of the District Court for the District of Columbia, I cite the following: "In 5 years the most extreme example is that of a person who, between July 1939 and April 1944, presented in the district court 50 petitions for writs of habeas corpus; another person has presented 27 petitions, a third 24, a fourth 22, a fifth 20. One hundred nineteen persons have presented 597 petitions—an average of five."

The Standing Committee on Jurisprudence and Law Reform of the American Bar Association in its report in August 1966, has this to say:

"The delay in the enforcement of the judgments of conviction in the State courts is perhaps the worst feature of the habeas corpus proceedings in the Federal courts by State prisoners. It is a serious factor in bringing about the unfortunate delay of criminal justice in the United States that contributes to disrespect for the laws.

" \* \* \* In the *Chessman* case in California, the elapsed period was 12 years." [Citations given.]

"In the *Townsend* case in Illinois, 11 years have elapsed, and it is not yet clear whether the proceedings have terminated. Eight of those 11 years have been consumed in habeas corpus proceedings in the Federal court \* \* \*." [Citations given.]

"In the *Labat* case in Louisiana, over 12 years have intervened, and the case is not over yet. Eight of the 12 years of delay have been in connection with habeas corpus proceedings in the Federal courts, and the case is now in the Court of Appeals for the Fifth Circuit." [Citations given.]

In these opinions, little or nothing is said about whether the defendant is guilty. Up to 12 years have been spent to determine preliminarily the civil rights of these defendants, to determine whether he is guilty of crime, has had to wait. If the defendant is ever to come to trial for his alleged crime, the witnesses will be scattered and the prosecution will probably fail.

All are agreed that most of the applications for habeas
corpus are frivolous and without merit. Before the change
in interpretation of the 14th amendment, about 2 percent of
the applications were successful. After the change, the per-
centage of successful applications went to 2.25 in 1963, and
to 3.84 percent in 1965. The only figure I have for 1966 is
about 2 percent (hearings, p. 280).

The committee recognized the problems created by the disruptive
use of the habeas corpus procedure to relitigate questions that should
have been raised at trial or on appeal. To alleviate this problem, the
committee recommends that the Congress exercise its powers under
Article III of the Constitution by enacting legislation providing that
certain State court decisions can be reviewed by the Federal courts
only by the process of appeal or by writ of certiorari.

### CONSTITUTIONALITY OF RESTRICTIONS ON FEDERAL HABEAS CORPUS

No constitutional problems are raised by this section since *Noia,
Townsend, Brown* v. *Allen,* and others were all cases of statutory
interpretation by the Court. The Court purported to interpret the act
of February 5, 1867, 14 Stat. 385, now title 28, United States Code, sec-
tion 2241, to support its decision that under habeas corpus it could ex-
amine whether the constitutional rights of convicted prisoners tried by
State courts had been violated somehow. Competent scholarly inquiry
has demonstrated irrefutably, the committee believes, that these hold-
ings were a total distortion of the 1867 statute.[4]

The only possible constitutional objection that could arise would
have to be premised on article I, section 9, clause 2, of the Constitu-
tion which forbids Congress to suspend the privilege of habeas corpus
except in cases of rebellion or invasion. But two considerations mili-
tate against reliance on this clause in regard to the bill's provisions.

First, the writ of habeas corpus protected in the Constitution is not
the writ of habeas corpus that the Supreme Court has fashioned. It
is clear from history that the office of the writ from the time of its
development before Magna Carta down through the time of the Found-
ing Fathers and until the present activist Court was to allow a court
to examine the reason for the detention of one bringing or for whom
was brought a petition for the writ. If the person holding custody of
the detainer presented to the inquiring court a lawful reason for the
detention the matter was closed. Except in those cases in which a sen-
tencing court had had no jurisdiction, the fact that a person was being
detained upon sentence after conviction of a crime always foreclosed
further inquiry.[5] The writ did not authorize a writ to inquire behind
the fact of conviction. That was the invention of the Supreme Court
in *Brown* v. *Allen,* 344 U.S. 433 (1953). The effect of section 702(a)
is to restore the classic concept of habeas corpus and require State
prisoners to seek to uphold their constitutional rights through the reg-
ular appellate process.

Second, the constitutional provisions quoted above related to the
power of Federal courts to issue writs of habeas corpus to inquire into

---

[4] Oaks, "Legal History in the High Court—Habeas Corpus," 64 Mich. Law Review
451 (1966); Mayers, "The Habeas Corpus Act of 1867: The Supreme Court as Legal
Historian," 33 Univ. of Chicago Law Review 31 (1965).
[5] Oaks, *op cit;* Mayers, *op cit;* Daniel Meador, Habeas Corpus and Magna Carta—
Dualism of Power and Liberty (Charlottesville (1966).

the detention of persons by Federal authority. The first Congress so understood this and included a provision to this effect in the Judiciary Act of 1789, section 14, 1 Stat. 81. The power did not extent to Federal court inquiry into detention by State authority. As the legislative history, developed in the sources cited in note 1, makes clear, Congress in 1867 did not intend to grant the Federal courts plenary authority to inquire into State detention but only detention designed to frustrate the involuntary servitude prohibition of the 13th amendment. By this bill, therefore, Congress would only reassert that intent and restrict the exercise of Federal court power to the manner in which it was suggested to be exercised.

In other words, the Constitution does not compel Congress to allow the Federal courts power to inquire into State court convictions of criminals. Article I, section 9, closure 2, does not provide for this and even if it did require Congress to allow Federal courts to issue writs to inquire into State detention of prisons it most assuredly does not look to inquiry into detention after conviction.

It is therefore submitted that section 702(a) is well within the legislative powers of Congress.

### TITLE III—WIRETAPPING AND ELECTRONIC SURVEILLANCE

Title III is essentially a combination of S. 675, the Federal Wire Interception Act, introduced by Senator McClellan on January 25, 1967, and S. 2050, the Electronic Surveillance Control Act of 1967, introduced by Senator Hruska on June 29, 1967. Subsequent to the introduction of S. 675, the U.S. Supreme Court, on June 12, 1967, handed down the decision in *Berger* v. *New York*, 388 U.S. 41, which declared unconstitutional the New York State statute authorizing electronic eavesdropping (bugging) by law-enforcement officers in investigating certain types of crimes. The Court held that the New York statute, on its face, failed to meet certain constitutional standards. In the course of the opinion, the Court delineated the constitutional criteria that electronic surveillance legislation should contain. Title III was drafted to meet these standards and to conform with *Katz* v. *United States*, 389 U.S. 347 (1967).

Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause. The only exceptions to the above prohibition are: (1) the power of the President to obtain information by such means as he may deem necessary to protect the Nation from attack or hostile acts of a foreign power, to obtain intelligence information essential to the Nation's security, and to protect the internal security of the United States from those who advocate its overthrow by force or other unlawful means; (2) employees of the Federal Communications Commission may, in the normal course of employment, intercept and disclose wire communications in the discharge of the monitoring responsibilities discharged by the Commission in the enforcement of chapter

5 of title 47 of the United States Code; and (3) employees of a communication common carrier may intercept and disclose wire communications in the normal course of their employment while engaged in any activity necessary to the rendition of service, or protection of the rights or property of the carrier of such communication.

PROBLEM

The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage.

The Report of the President's Commission on Law Enforcement and Administration of Justice, "The Challenge of Crime in a Free Society" (1967), concluded that "the present status of the law (relating to wiretapping and electronic surveilliance) is intolerable." "It serves," the Report observed, "neither the interests of privacy nor of law enforcement."

Both proponents and opponents of wiretapping and electronic surveillance agree that the present state of the law in this area is extremely unsatisfactory and that the Congress should act to clarify the resulting confusion.

The first case in which the Supreme Court considered the status of wiretapping was *Olmstead* v. *United States*, decided in 1928, 277 U.S. 438. It held that the tapping of telephone wires and the use of the intercepted messages did not constitute an unreasonable search and seizure under the Fourth Amendment, there being no trespass into constitutionally protected areas and no seizure of anything tangible.

At the time the *Olmstead* case was decided there was no Federal statute governing wiretapping. Section 605 of the Federal Communications was enacted in 1934 and provides that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person * * *" (47 U.S.C. 605).

Soon after the enactment of the Federal Communications Act, the Supreme Court held in *Nardone* v. *United States*, 302 U.S. 379 (1937), that evidence obtained by wiretapping in violation of section 605 was inadmissible in Federal courts. The decision was based not on constitutional grounds, but rather on the Court's supervisory powers over Federal courts and officers.

Later, in the second *Nardone* case, 308 U.S. 388 (1939), the Supreme Court went further and held that section 605 bars not only evidence obtained directly by wiretapping but also evidence obtained by use of

leads secured by wiretapping (the "fruit of the poisonous tree" doctrine).

Then, in 1939, the Supreme Court held that section 605 prohibited the interception and divulgence of intrastate as well as interstate calls (*Weiss* v. *United States*, 308 U.S. 321).

The Court then held in *Goldstein* v. *United States*, 316 U.S. 114 (1942), that only a party to a tapped conversation has standing to object to the use of evidence so obtained and in *Rathburn* v. *United States*, 355 U.S. 107 (1957), that the statute was not violated when police officers listened in on a telephone from an extension with the permission of one party to the conversation, since there was no forbidden "interception."

In 1952, in the case of *Schwartz* v. *Texas*, 344 U.S. 199, the Supreme Court held that, although it was a Federal crime for State officers to divulge wiretapping evidence, section 605 did not render such evidence inadmissible in State Court. Wiretap evidence, however, obtained by State officers under sanction of State law, could not be admitted in Federal courts (*Benanti* v. *United States*, 355 U.S. 96 (1957)).

In the area of "bugging," as distinguished from wiretapping, the Supreme Court has held that evidence procured by electronic eavesdropping devices becomes inadmissible only where there has been an unauthorized physical invasion of the defendant's premises. Evidence procured by the use of a detectophone attached to the wall of a room, in order to allow Federal agents in the room to pick up conversations on the other side of the wall, was admissible *Goldstein* v. *United States*, 316 U.S. 114 (1942) citing *Goldman* v. *United States*, 316 U.S. 129 (1942) at page 120).

Where a "spike mike" was inserted into a heating duct to pick up conversations in other parts of the building, however, the evidence was held inadmissible as violating the Fourth Amendment (*Silverman* v. *United States*, 365 U.S. 505 (1961)). In 1953 the Supreme Court held an informer could be "wired for sound" to transmit a suspect's statements to officers waiting with a receiver outside the building (*On Lee* v. *United States*, 343 U.S. 747 (1953)). Moreover, the Supreme Court decided in 1963 that no constitutional rights would be violated if a Federal agent concealed a small tape recorder on his person and thus recorded the statements of a suspect who knew the interrogator was an agent but did not know he was "bugger" (*Lopez* v. *United States*, 373 U.S. 427 (1963)).

Thus the Supreme Court has effectively prevented the use in both Federal and State courts of intercepted communications by wiretapping, as well as the fruits thereof. State officers would be subject to Federal prosecution and, therefore, most State prosecutors do not use such evidence, although it is authorized by their State statutes.

Supreme Court cases, to some extent, prior to the *Berger* decision, which is hereinafter more fully discussed, had clarified a few complexing problems in the area of "bugging." That case, by a divided Court, held unconstitutional the New York statute authorizing electronic surveillance, but in doing so has laid out guidelines for the Congress and State legislatures to follow in enacting wiretapping and electronic eavesdropping statutes which would meet constitutional requirements.

On the State level, there is little uniformity. Most States have "malicious mischief" statutes passed in the latter part of the last century to protect the property of telephone companies. Not all of them, however, are broad enough to cover illegal wiretapping that does not involve physical damage to the lines of communication. See, e.g., *Washington* v. *Nordskeg*, 76 Wash. 472, 136 p. 694 (1913). Only a few States have enacted statutes dealing with other forms of electronic surveillance. Few States, too, have set up needed court order systems for law enforcement officers. Even those existing statutes, however, must now be reformed in light of the standards for constitutional electronic surveillance laid down by the Supreme Court in *Berger* v. *New York*, 388 U.S. 41 (1967), and *Katz* v. *United States*, 389 U.S. 347 (1967).

It would be, in short, difficult to devise a body of law from the point of view of privacy or justice more totally unsatisfactory in its consequences. The need for comprehensive, fair and effective reform setting uniform standards is obvious. New protections for privacy must be enacted. Guidance and supervision must be given to State and Federal law enforcement officers. This can only be accomplished through national legislation. This the subcommittee proposes.

PROHIBITION

Virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification where communications are intercepted without the consent of one of the participants. No one quarrels with the proposition that the unauthorized use of these techniques by law enforcement agents should be prohibited. It is not enough, however, just to prohibit the unjustifiable interception, disclosure, or use of any wire or oral communications. An attack must also be made on the possession, distribution, manufacture, and advertising of intercepting devices. All too often the invasion of privacy itself will go unknown. Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages. The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings. Each of these objectives is sought by the proposed legislation.

NATIONAL SECURITY

It is obvious that whatever means are necessary should and must be taken to protect the national security interest. Wiretapping and electronic surveillance techniques are proper means for the acquisition of counterintelligence against the hostile action of foreign powers. Nothing in the proposed legislation seeks to disturb the power of the President to act in this area. Limitations that may be deemed proper in the field of domestic affairs of a nation become artificial when international relations and internal security are at stake.

70

LAW ENFORCEMENT

The major purpose of title III is to combat organized crime. To consider the question of the need for wiretapping and electronic surveillance techniques in the administration of justice, it is necessary first to consider the historical development of our system of criminal law and procedure and the challenge put to it today by modern organized crime. We inherited from England a medieval system, devised originally for a stable, homogeneous, primarily agrarian community. In our formative years, we had no professional police force. Today, however, we are a mobile, modern, heterogeneous, urban industrial community. Our Nation, moreover, is no longer small. Our traditional methods in the administration of justice, too, were fashioned in response to the problems of our Nation as they were in its formative years. In years past it was not possible to investigate crime aided by science. Today it is not only possible but necessary, in the development of evidence, to subject it to analysis by the hands of those trained in the scientific disciplines. Even so, scientific "crime detection, popular fiction to the contrary notwithstanding, at present is a limited tool" ("The Challenge of Crime in a Free Society" (1967)). In our formative years, offenses usually occurred between neighbors No specialized law enforcement force was thought necessary to bring such crimes into the system of justice. Ignored entirely in the development of our system of justice, therefore, was the possibility of the growth of a phenomenon such as modern organized crime with its attendant corruption or our political and law enforcement processes.

We have always had forms of organized crime and corruption. But there has grown up in our society today highly organized, structured and formalized groups of criminal cartels, whose existence transcends the crime known yesterday, for which our criminal laws and procedures were primarily designed. The "American system was not designed with (organized crime) * * * in mind," the President's Crime Commission noted in its report "The Challenge of Crime in a Free Society" (1967), "and it has been notably unsuccessful to date in preventing such organizations from preying on society." These hard-core groups have become more than just loose associations of criminals. They have developed into corporations of corruption, indeed, quasi-governments within our society, presenting a unique challenge to the administration of justice. Organized crime has never limited itself to one illegal endeavor. Today, it is active in, and largely controls, professional gambling, which can only be described as exploitive, corruptive and parasitic, draining income away from food, clothing, shelter, health, and education in our urban ghettos. The net take is estimated at $7 billion a year.

Organized crime also has an almost monopolistic control over the illegal importation, distribution and sale of narcotics, which is estimated to be a $350 million a year business. The destruction of human personality, the violation of human dignity, even death, associated with addiction need not be belabored here nor ought it be necessary to point out again who the victims are, the poor, the uneducated, the unskilled, the young. The cost of narcotics varies, but it is seldom low enough to permit the typical addict to obtain money for drugs by lawful means. Theft and prostitution are necessary byproducts of many addicts.

Loan sharking, finally, is everywhere dominated by organized crime. Its estimated take is $350 million a year. Its victims, in contrast, come from all segments of our society. Only a pressing need for cash and no access to regular channels of credit separate the victim from each of us. Repayment is everywhere compelled by force. Since debtors are often pressed into criminal acts to find repayment, loan sharking also has wide social impact.

Organized crime has not limited itself to criminal endeavors. It has large spheres of legitimate business and union activity undermining our basic economic mores and institutions. In many cities, it dominates the fields of jukebox and vending machine distribution. Laundry services, liquor and beer distribution, night clubs, food wholesaling, record manufacturing, the garment industry, and a host of other lines have been invaded. Our free control of businesses has been acquired by the sub rosa investment of profits acquired from illegal ventures, accepting business interests in payment of gambling or loan sharks debts, or using various forms of extortion. After takeover, the defaulted loan has sometimes been liquidated by professional arsonists burning the business and collecting the insurance or by various bankruptcy fraud techniques. All of us consequently pay higher insurance premiums and higher prices to cover the losses. Many times the group, using force and fear, will attempt to secure a monopoly in the service or product of the business. When the campaign is successful, the organization begins to extract a premium price from customers. Either way, each of us suffers individually and our traditional economic way of life is damaged.

### CORRUPTION OF DEMOCRATIC PROCESSES

Organized crime flourishes best only in a climate of corruption. Today's corruption is less visible, more subtle, and therefore, more difficult to detect and assess than the corruption of earlier times. With the expansion of governmental regulation of private and business activity, the power to corrupt has given organized crime greater control over matters affecting the everyday life of each of us. At various times, it has been the dominant political force in such metropolitan centers as New York, Chicago, Miami, and New Orleans. Political leaders, legislators, police officers, prosecutors, and judges have been tainted by organized crime, and the public is the victim because there can be no true liberty or justice under a corrupt government.

The President's Crime Commission, in their report "The Challenge of Crime in a Free Society" (1967), put it this way: Organized crime's success preaches "a sermon that all too many Americans heed: The Government is for sale: lawlessness is the road to wealth; honesty is a pitfall and morality a trap for suckers."

In discussing the use of electronic surveillance as a weapon against organized crime, the President's Crime Commission states:

> * * * communication is essential to the operation of any business enterprise. In legitimate business this is accomplished with written and oral exchanges. In organized crime enterprises, however, the possibility of loss or seizure of an incriminating document demands a minimum of written communication. Because of the varied character of organized crime enterprises, the large numbers of persons employed in them, and frequently the distances separating elements

of the organization, the telephone remains an essential vehicle for communication.

Victims, complainants, or witnesses are unwilling to testify because of apathy, fear, or self-interest, and the top figures in the rackets are protected by layers of insulation and direct participation in criminal acts. Information received from paid informants is often unreliable, and a stern code of discipline inhibits the development of informants against organized criminals. In short, intercepting the communications of organized criminals is the only effective method of learning about their activities.

District Attorney Frank Hogan, a recognized national authority, who has served in the New York District Attorney's office for 32 years, states that wiretapping is an indispensable weapon in the fight against organized crime. The President's Commission on Law Enforcement and Administration of Justice had this to say about the organized crime problem in New York:

> Over the years New York has faced one of the Nation's most aggravated organized crime problems. Only in New York have law enforcement officials achieved some level of continuous success in bringing prosecutions against organized crime. For over 20 years, New York has authorized wiretapping on court order. Since 1957 "bugging" has been similarly authorized. Wiretapping was the mainstay of the New York attack against organized crime until Federal court decisions intervened.

The principal argument of those who oppose wiretapping and electronic surveillance by law enforcement officers on court order is that it will destroy our right of privacy. Wiretapping and electronic surveillance as practiced by law enforcement officers has been subject to much confusion and misunderstanding. As District Attorney Frank Hogan so aptly put it when testifying before the subcommittee:

> This is a field that produces the most extravagant accusations of abusive practices, as ill-founded and unsupported as they are shocking, and as irresponsible as they are inaccurate (hearings, p. 1100).

When the facts are brought to light, statistics show that extremely few telephones are tapped by law enforcement officers—and that even fewer electronic surveillance devices are installed. Testimony at the subcommittee hearings revealed the following statistics: In Kings County, N.Y., with over 3,000,000 people, 47 wiretap orders were obtained the first 11 months of 1966. In Nassau County, N.Y., which has a population of approximately 1,500,000 persons, 78 wiretap orders were obtained in 1966. In New York County, N.Y., with a population of nearly 3,200,000 persons, 73 wiretap orders were obtained in 1966. In 1966 in New York County, 23 orders granting installations of electronic surveillance devices were entered. Since 1958, when the law permitting this type of eavesdropping by law enforcement authorities under court order was enacted, the average in New York County has been less than 19 orders a year.

In his testimony before the subcommittee, District Attorney Frank Hogan referred to a study conducted by the New York Legislature which reinforces the above figures and shows that the danger that law enforcement officials may listen in on conversations that do not con-

cern some criminal enterprise is exceedingly remote. According to Mr. Hogan, starting in 1955 a joint legislative committee conducted a 5-year study in the State of New York inquiring particularly into possible abuses by law enforcement officers. In its report the committee explicitly declared that no abuses whatever by any district attorney had been found in the use of the wiretapping privilege. Quite the contrary is true. The committee concluded that the system of legalized telephonic interception had worked well in New York for over 20 years, that it had popular approval, and that it enjoyed the overwhelming support of New York's highest State officers, executive, legislative, and judicial. There was unanimous agreement that law enforcement in New York had used this investigative weapon fairly, sparingly, and with the most selective discrimination. Law enforcement officers simply have too much to do to be listening in on conversations of law-abiding citizens. Available manpower just does not permit such abuse. It is idle to contend otherwise.

"From a legal standpoint, organized crime," the President's Crime Commission noted in its report "The Challenge of Crime in a Free Society" (1967), "continues to grow because of defects in the evidence gathering process." The prohibitions of the criminal law are, in short, not self-executing. To bring criminal sanction into play, it is necessary to develop legally admissible evidence. Due process requires no less (*Thompson* v. *City of Louisville*, 362 U.S. 199 (1960)). Absent that evidence, criminal sanctions can have no role to play in dealing with this social problem. That means witnesses, since organized crime groups do not keep books and records available for law enforcement inspection. Yet, the President's Crime Commission found in their report "The Challenge of Crime in a Free Society" (1967), that under "present procedures too few witnesses have been produced to prove the link between criminal group members and the illicit activities that they sponsor." Victims do not normally testify for they are already in bodily fear or they are compliant, that is, the narcotic addict in desperate need of a "fix" does not usually turn in his "pusher." What victim of extortion will unsolicitedly risk his body by cooperation with law enforcement? Insiders are kept quiet by an ideology of silence underwritten by a fear, quite realistic, that death comes to him who talks.

All of this is not to say that significant cases have not been developed by law enforcement agents using conventional techniques and based upon the testimony of brave martyr-witnesses. The most successful drive ever launched against organized crime begun by the U.S. Department of Justice in 1961 had by 1966 raised the number of federally secured convictions in the area of organized crime from 73 to 477. Yet against the hard-core little real progress was made. The estimated number of members of the leading groups today is put at 5,000. During the 1961–66 period, only 185 of these individuals were indicted and 102 convicted. Six gained acquittals and dismissals and four secured reversals. A conviction rate of 5 percent per 5-year period hardly constitutes more than a harassing action. The effect is negligible.

Organized criminals must hold meetings to lay plans. Where the geographical area over which they operate is large, they must use telephones. Wiretapping and electronic surveillance techniques can intercept these wire and oral communications. This is not, however,

the whole situation. More than the securing of an evidentiary substitute for live testimony, which is not subject to being eliminated or tampered with by fear or favor, is necessary. To realize the potential possible from the use of criminal sanctions, it will be necessary to comit to the system more than legal tools. Time, talent, and personnel are required. Nevertheless, no amount of time, talent, or personnel—without the necesary legal tools—will work, and authorized wiretapping and electronic surveillance techniques by law enforcement officials are indispensable legal tools.

Debate over the constitutionality of wiretapping and electronic surveillance techniques has raged insistently since the Court decided in 1928 in *Olmstead* v. *United States,* 277 U.S. 438 (1928), that wiretapping accomplished without a physical trespass into a constitutionally protected area did not violate any provision of the Constitution. That debate has taken many forms. It has posited many hypotheses. All of them need not now be considered, for the Court itself now has authoritatively set down the constitutional standards in this area on the use of these techniques in *Berger* v. *New York*, 388 U.S. 41 (1967), and *Katz* v. *United States*, 389 U.S. 347 (1967).

The *Berger* decision reversed by a vote of 6 to 3 the conviction, secured through a court-ordered eavesdrop, of a New York public relations man for conspiracy to bribe the chairman of the New York State Liquor Authority. In declaring the New York State eavesdropping statute unconstitutional, the Court held that (1) a conversation is within the fourth amendment's right to privacy protections, and the use of electronic devices to seize conversations is a search within the meaning of that amendment; (2) the language of the New York statute was so broad that it resulted in a treapassory instrusion into a constitutionally protected area and is violative of the fourth and 14th amendments; and (3) evidence obtained by an eavesdrop which violates the fourth amendment must be excluded in State courts.

During the course of the majority opinion the Court delineated the following constitutional standards the New York statute failed to meet:

    (1) Particularity in describing the place to be searched and the person or thing to be seized.

    (2) Particularity in describing the crime that has been, is being, or is about to be committed.

    (3) Particularly in describing the type of conversation sought.

    (4) Limitations on the officer executing the eavesdrop order which would (a) prevent his searching unauthorized areas, and (b) prevent further searching once the property sought is found.

    (5) Probable cause in seeking to renew the eavesdrop order.

    (6) Dispatch in executing the eavesdrop order.

    (7) Requirement that the executing officer make a return on the eavesdrop order showing what was seized.

    (8) A showing of exigent circumstances in order to overcome the defect of not giving prior notice.

The *Katz* decision, handed down 6 months after *Berger*, reaffirmed the principles and constitutional guidelines set out in *Berger*. In *Katz* petitioner was convicted of interstate transmission of wagering information via telephone in violation of a Federal statute (18 U.S.C. 1084). At trial the Government introduced, over petitioner's objection, evidence of his end of telephone conversations, overheard by

FBI agents who had attached an electronic listening and recording device to the outside of the public telephone booth from which he had placed his calls.

On certiorari the Supreme Court held that the Government's activities in electronically listening to and recording petitioner's words constituted an unlawful search and seizure within the fourth amendment and reversed the conviction.

The Court noted that the Government handled the surveillance in the following manner: (1) The agents did not begin their electronic surveillance until investigation of the petitioner's activities had established a strong probability that he was using the telephone in question to transmit gambling information interstate, in violation of Federal law; (2) the surveillance was limited, both in scope and duration, to the specific purpose of establishing the contents of petitioner's unlawful telephonic communications; (3) the agents confined their surveillance to the brief periods during which petitioner used the telephone booth and took great care to overhear only the conversations of the petitioner himself.

Commenting on the manner in which the surveillance was carried out, the Court stated, "It is clear that this surveillance was so narrowly circumscribed that a duly authorized magistrate, properly notified of the need for such investigation, specifically informed of the basis on which it was to proceed, and clearly apprised of the precise intrusion it would entail, could constitutionally have authorized, with appropriate safeguards, the very limited search the Government asserts took place."

The Court noted that the agents had acted with restraint, but that the restraint was imposed by the agents themselves, not by a judicial officer. The agents were not required, before starting the search, to do the following things: (1) present their estimate of probable cause for detached scrutiny by a neutral magistrate; (2) conduct the search within precise limits established by a specific court order; (3) to notify the authorizing magistrate, after the search, of all that had been seized.

In concluding, the Court held that the Government agents ignored the procedure of antecedent justification that is central to the fourth amendment, and a procedure the Court held to be a constitutional precondition of the kind of electronic surveillance involved in this case.

Working from the hypothesis that any wiretapping and electronic surveillance legislation should include the above constitutional standards, the subcommittee has used the *Berger* and *Katz* decisions as a guide in drafting title III. Each section of title III is discussed in detail in the analysis section of this title, including those provisions which are intended to conform to the *Berger* and *Katz* decisions.

Legislation meeting the constitutional standards set out in the decisions, and granting law enforcement officers the authority to tap telephone wires and install electronic surveillance devices in the investigation of major crimes and upon obtaining a court order, which is the purpose of title III of S. 917, has been endorsed by the following groups and organizations:

(1) The President's Commission on Law Enforcement and Administration of Justice.

(2) The Judicial Conference of the United States.

(3) National Association of Attorneys General.

(4) National District Attorneys Association.
(5) Association of Federal Investigators.
(6) All living former U.S. attorneys for the southern district of New York.
(7) The National Council on Crime and Delinquency.

In addition to the above endorsements, the subcommittee received comments on wiretapping and electronic surveillance legislation from many State and Federal judges and law enforcement officials, officials of State and local crime commissions, the attorneys general of the States, local prosecuting attorneys, and other interested and qualified persons. These statements favored almost without exception legislation granting carefully circumscribed authority to law enforcement officials to engage in wiretapping and electronic surveillance in the investigation of certain serious crimes after obtaining a court order. These statements are available for reference in the subcommittee's offices.

It also should be pointed out that every U.S. Attorney General since 1931, excepting the present Attorney General, has endorsed some sort of legislation granting law enforcement officers the right to utilize wiretapping and/or electronic surveillance devices in the investigation of major crimes upon the securing of a court order.

## Title IV—State Firearms Control Assistance

According to FBI figures, in 1966 firearms were used in 60 percent of the murders committed in the United States. Thus, 6,500 persons were killed in 1966 by persons armed with guns, a 16-percent increase over 1965.

In the category of aggravated assault by gun and robbery by gun, the percentages of increase were 25 and 14, respectively, with 43,500 citizens assaulted with firearms and 59,000 Americans robbed at gunpoint in 1966.

In 1967, there were further increases in these two categories of violent crime; armed robbery increased 30 percent and aggrevated assault by gun increased 22 percent.

President Johnson, the American Bar Association, the International Association of Chiefs of Police, the National Association of Citizens Crime Commissions, and civic, religious, and fraternal affiliations have urged the enactment of meaningful and effective Federal legislation to regulate the interstate traffic in, and access to, firearms.

Passage of this legislation would not interfere with the lawful use of firearms by the vast majority of responsible gun owners in the United States.

We also believe that enactment of this measure would aid in curbing the problem of gun abuse that exists in the United States. The preponderance of evidence substantiates that firearms controls are effective in curtailing gun abuse and there is every reason to believe that the enactment of this title would effect similar results.

A careful study of this issue for the last 6 years has led us to conclude that the enactment of this title is necessary and prudent.

### EXTENT OF THE PROBLEM

The problem of firearms misuse in crimes of violence in the United States has been adequately documented by the Judiciary Subcommittee to Investigate Juvenile Delinquency, commencing with the subcom-

mittee's hearings record of 1963 and including the hearing records of 1964, 1965, and 1967.

There is no further need to detail the committee's findings in this report, in view of the fact that they are included in the above-referenced hearing records and in Judiciary Committee Report 1866, 89th Congress, second session.

However, a summary of the major problem areas documented by the committee is appropriate to outline the extent and the scope of the firearms abuse problem.

Two prime sources of firearms to criminals, juveniles, mental defectives, and crime-bent individuals which involve access to guns through interstate routes are the mail-order common carrier source and the out-of-State, nonresident source. In both cases, the committee's record is replete with evidence substantiating that these sources of firearms for illicit purposes are major problem areas with which only the Federal Government can deal effectively.

Because of interstate, nonresident purchases of firearms for criminal purposes, the laws of our States and their political subdivisions are circumvented, contravened, and rendered ineffective.

As an example of this, the Massachusetts authorities have testified that 87 percent of 4,506 crime guns misused in that State were purchased outside of Massachusetts in neighboring States. The result is that their stringent controls which are applicable to the sale of firearms and primarily handguns, are considerably reduced in effectiveness.

The prosecuting attorney of Wayne County, Mich., which includes the city of Detroit, testified that 90 out of every 100 crime guns confiscated in Detroit are not purchased and registered in Michigan and that the prime source of these crime guns is by purchases is neighboring Ohio, where controls on firearms are minimal. This was also true of the firearms used in the Detroit riot of July 23–29, 1967.

A second major source of crime guns, the mail-order, common carrier route, has been substantiated by the committee's investigations and by the testimony of a host of witnesses who have appeared before it.

One-quarter of the mail-order gun recipients investigated had criminal records before ordering and receiving their firearms. In addition, juveniles and minors have utilized the anonymity of the mails to order and then receive firearms by common carrier in circumvention and contravention of State and local laws. In contributing to our ever-increasing crime rates, juveniles account for some 49 percent of the arrests for serious crimes in the United States and minors account for 64 percent of the total arrests in this category.

Additional major problem areas concern (1) the question of imported firearms; (2) the ease with which anyone can become licensed as a federally licensed dealer in firearms; and (3) the ease with which anyone may acquire a destructive device, such as an antitank gun, a bazooka, or a mortar for unlawful purposes.

Substantial numbers of firearms that are sold via the mail-order route in the United States are foreign imported firearms, either of the military surplus category or the category of inexpensive, small-caliber firearms, which have been termed as "unsafe" and as "Saturday night specials."

Our law enforcement officials have testified that from 50 to 80 percent of the crime guns that are confiscated each year are foreign imports of either of the above categories of weapons. Many of these imports are shipped into the United States as parts or disassembled. Many are rebored and rechambered upon reentry into the United States and the barrels are cut down for concealment purposes.

The majority of the countries whose surplus arms are dumped in the United States stringently control access to firearms within their own borders and preclude such dumping in those countries. Furthermore, the United States no longer sells domestic military surplus to the public. Only through affiliation with the National Rifle Association may an individual secure a domestic military surplus firearm from the Federal Government.

The importation of military surplus arms is a contributing factor to the misuse of the destructive devices, such as the Finnish Lahti antitank gun that was used in the robbery of a Brinks Co. installation in Syracuse, N.Y.

The majority of the destructive devices that have been used unlawfully in recent years in the United States have been imported military surplus. Such implements of war have no sporting use and their continued importation and domestic availability to virtually anyone cannot be justified.

The last major area covered by the committee in its investigations and hearings concerns the licensing standards and the issuing of licenses to persons as federally licensed dealers, manufacturers, and importers in firearms.

A recent Treasury Department survey of licensed firearms dealers reflects that fully one-quarter of them are not bona fide dealers in firearms, but rather are individuals who have purchased a Federal license for $1 in order to trade in firearms at substantial discounts or for whatever other purpose they desire.

The $1 license fee is not realistic and the licensing standards are not adequate to insure that only bona fide persons are to be licensed as Federal firearms dealers. In addition, the licensing fee for manufacturers and importers is not realistic nor are the standards in order to obtain such licenses adequate under existing law.

The problem of gun abuse as documented by the committee is real, it is urgent and it is increasing each year and there should be no further delay in meeting it squarely with remedial Federal legislation.

PRESIDENT'S STATEMENT ON FIREARMS CONTROL

In President Johnson's message on crime to the Congress of February 6, 1967, he indicated that "Any effective crime control program requires the enactment of firearms legislation." He went on to underscore the need for firearms legislation and said "I urge the 90th Congress to place it high on its agenda in this session."

He went on to indicate that the legislation that he was proposing to the Congress was "closely comparable in substance to that which was under consideration in the last Congress."

In concluding his remarks on this issue, the President said: "To pass strict firearms control laws at every level of government is an act of simple prudence and a measure of civilized society. Further delay is unconscionable."

SCOPE OF COVERAGE

*The interstate traffic in mail-order firearms, other than rifles and shotguns*

The title would have the effect of channeling interstate and foreign commerce in firearms other than rifles and shotguns through federally licensed importers, manufacturers, and dealers, thereby prohibiting the commercial mail-order traffic in firearms other than rifles and shotguns to unlicensed persons. This will enable the States to more effectively control this traffic within their own jurisdictions under the police power granted to them by the Constitution.

The record reflects the concern of law enforcement officials throughout the country over the vast proliferation of mail-order firearms in interstate commerce.

This traffic is a means which affords circumvention and contravention of State and local laws governing the acquisition of firearms. It is characterized by ready availability, minimal cost and anonymity of purchase. The result has been an ever-increasing abuse of this source of firearms by juveniles, minors, and adult criminals. We believe that the controls on the mail-order traffic as contained in this title are justified.

*Acquisition of firearms by juveniles and minors*

The title would bar federally licensed importers, manufacturers, and dealers from selling or otherwise disposing of any firearms to any person who (in the case of an individual) he knows, or has reasonable cause to believe, is under 21 years of age (except for a shotgun or rifle). The title would place similar restrictions on interstate carriers regarding delivery of firearms to such persons. Thus, the title would provide a uniform and effective means through the United States for preventing the acquisition of the specified firearms by persons under such ages. However, under the title, a minor or juvenile would not be restricted from owning, or learning the proper usage of the firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.

The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country. The controls proposed in the title are designed to meet this problem and to substantially curtail it.

*Out-of-State purchase of concealable firearms*

The title would prohibit a federally licensed importer, manufacturer, or dealer from selling or otherwise disposing of a firearm (other than a shotgun or rifle) to any person whom he knows, or has reasonable cause to believe, does not reside in (or in the case of a corporation or other business entity, who does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located.

The title would also make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased outside that State in those cases where it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

The provisions of the title which prohibit a licensee from disposing of firearms (other than rifles and shotguns) to persons who are not residents of the State in which he conducts his business is justified by the record, which is replete with testimony documenting the fact that the purchase of such firearms by persons in other than their residence State is a serious contributing factor to crime. Testimony further indicates that large numbers of criminals and juveniles have availed themselves of this source of firearms in order to circumvent the laws of their respective jurisdictions.

*Importation of nonsporting and military surplus firearms*

The title would curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting.

The provisions concerning the importation of firearms would not interfere with the bringing in of currently produced firearms, such as rifles, shotguns, pistols, or revolvers of recognized quality which are used for hunting and for recreational purposes, or for personal protection.

The importation of certain foreign-made and military surplus nonsporting firearms has an important bearing on the problem which this title is designed to alleviate. Thus the import provisions of this title seem entirely justified.

*Highly destructive weapons*

The title would extend the coverage of Federal law specifically to include highly destructive devices, such as explosive or incendiary bombs, grenades, mines, and so forth, and would establish strict controls for interstate and foreign commerce in such devices, and large-caliber military-type weapons, such as bazookas, mortars, and antitank guns.

The record reflects a consensus that these highly destructive devices should be subjected to strict Federal regulations.

*Licensing of importers, manufacturers, and dealers*

The title would prescribe meaningful licensing standards and denial hearing procedures designed to assure that licenses would be issued only to responsible, law-abiding persons actually engaged in or intending to engage in business as importers, manufacturers, or dealers in firearms. License fees, to be increased by the title, would provide sufficient funds to partially defray investigation of applicants and would tend the discourage license applications by persons who do not intend to engage in the business for which the license is sought.

The record is abundantly clear on the need for the provisions of this title which set forth specific standards and increased license fees in order to obtain Federal licenses to engage in business as a manufacturer, dealer, or importer in firearms.

The absence of specific standards from the present Federal law and the minimal fees in the law have resulted in abuse which violates the intent of present Federal firearms controls.

*Recordkeeping provisions*

The title would place more emphasis on the recordkeeping responsibilities of licensees by requiring that the licensee record identifying information submitted to him by the purchaser, and by specifically providing for the inspection of records by the Treasury Department.

The title would also authorize the release of pertinent information obtained from the licensee's records, to State and local authorities, to assist them in law-enforcement activities. In addition, the title would make it possible to require, by regulations, the submission of reports concerning the operations of licensees.

*Transfer of Federal Firearms Act*

This Title transfers the provisions of the Federal Firearms Act, as modified by this Title, from Title 15 of the United States Code to Title 18 of the United States Code, which Title contains the Federal criminal laws.

### CONSTITUTIONALITY OF FEDERAL FIREARMS LEGISLATION

A number of witnesses at the hearings have raised the question of the constitutionality of Federal firearms legislation, because it would interfere with individual rights guaranteed by the second amendment to the Constitution. The amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

It is noteworthy that enactment of the National Firearms Act of 1934, as well as of the Federal Firearms Act, was opposed on the same grounds and that these statutes were attacked in the courts as being violative of the second amendment. The courts have uniformly ruled to the contrary, and their decisions make it plain that the amendment presents no obstacle to the enactment and enforcement of this title.

The decisions hold that the second amendment, unlike the first, was not adopted with the individual rights in mind, but is a prohibition upon Federal action which would interfere with the organization of militia by the States of the Union.

Obviously, Federal firearms legislation does not hamper the present-day militia, that is, the National Guard, and the courts have held accordingly (see *United States* v. *Miller*, 307 U.S. 174 (1939); *Cases* v. *United States*, 131 F. 2d 916 (1st Cir., 1942), cert. den., sub nom *Velasquez* v. *United States*, 319 U.S. 770 (1943); *United States* v. *Tot*, 131 F. 2d 261 (3d Cir., 1942), rev'd on other grounds, 319 U.S. 463 (1943); *United States* v. *Adams*, 11 F. Supp. 216 (S.D. Fla., 1935)).

It is sometimes contended that, aside from the second amendment, there is a natural right to bear arms, or a right stemming from a State constitution. However, it is well settled that there is nothing inherent in any such right that renders it absolute. The overwhelming majority of State cases hold that the legislature may prescribe regulations and limitations with regard to the carrying of weapons. It is clear, for example, that a State law prohibiting the carrying of revolvers without a license, or forbidding possession of concealed weapons, does not violate either the Federal or that States's constitution. And it is clear also that no body of citizens other than the organized State militia, or other military organization provided for by law, may be said to have a constitutional right to bear arms.

In summary, the decided cases, both at the Federal and State levels, reveal no constitutional barrier to the passage of this title. To the contrary, they afford ample precedent for its validity.

## SECTION-BY-SECTION ANALYSIS

### Title I

*Section 101.*—Section 101 of part A establishes within the Department of Justice, under the general authority of the Attorney General, a three-member Law Enforcement Administration (referred to in this title as "Administration") appointed by the President, by and with the consent of the Senate. No more than two members of the Administration shall be of the same political party. The members of the Administration shall have special qualifications and expertise in the field of law enforcement.

#### PART B—PLANNING GRANTS

*Sections 201 and 202* establish and authorize a grant program to be carried out by the Administration for the purpose of encouraging and assisting States and local governments to prepare and adopt comprehensive law-enforcement plans, with the proviso that no unit or combination of units of local government shall be eligible for a planning grant unless it has a population of 50,000 or more persons.

*Section 203.*—Section 203 provides that a grant authorized under section 202 shall not exceed 80 percent of the total cost of the preparation, development, or revision of a plan.

*Section 204.*—Section 204 states that the Administration may advance grants authorized under section 202 upon application. Such application shall (1) set forth programs and activities designed to carry out the purposes of section 302, (2) contain information as may be prescribed in accordance with section 501, and (3) contain a certification that a copy of the application has been submitted to the chief executive of the State and, where appropriate, the State law-enforcement agency, of the State or States in which the applicant is located, in acordance with section 521.

#### PART C—GRANTS FOR LAW ENFORCEMENT PURPOSES

*Section 301.*—States the purpose of this part to be to encourage States and units of general local government to carry out programs and projects to improve and strengthen law enforcement.

*Section 302(a).*—Authorize the Administration to make grants to States and units of general local government, and combinations of such States or units, to improve and strengthen law enforcement. To be eligibile for a grant, such State, unit or combination of units of local government must have a population of not less than 50,000 persons.

*Subsection (b)* of section 302 set forth the purposes for which grants may be made under this part to be: (1) Public protection, including the development, demonstration, evaluation, implementation, and purchase of methods, devices, facilities, and equipment designed to improve and strengthen law enforcement and reduce crime in public and private places. (2) The recruitment and training of law enforcement

personnel. (3) Public education relating to crime prevention and encouraging respect for law and order. (4) Construction of buildings or other facilities which would fulfill or implement the purpose of this section. (5) Organization, education, and training of special law enforcement units to combat organized crime. (6) Organization, education, and training of regular law enforcement officers, special law enforcement units, and law enforcement reserve units for the prevention, detection, and control of riots.

*Subsection (c)* of section 302 limits the amount of any grant under this part to not more than 60 percent of the cost of the program or project, except that up to 75 percent of the cost may be allowed for grants for organized crime and riot control purposes, and not more than 50 percent of the cost may be allowed for construction of buildings or other facilities, with no part of the funds to be used for land acquisition.

*Subsection (d)* provides that not more than one-third of any grant may be expended for the compensation of personnel except that this limitation shall not apply to personnel engaged in training programs.

*Section 303(a).*—Requires an application be made to the Administration containing: (1) information which may be prescribed in accordance with section 501; and (2) a program which carries out the purposes set forth in section 302 which is consistent with a law enforcement plan developed by the applicant and approved for the purposes of this part.

*Subsection (b)* of section 303 authorizes the Administration to make grants under this part only if the applicant has on file with the Administration an approved law enforcement plan which conforms to the purposes and requirements of this title. Each plan shall (1) encompass a State, unit or general local government, or combination, unless it is not practicable to do so, and (2) contain adequate assurances that Federal funds to be made available under the application will be used to supplement, or, to the extent practicable, increase the amount of funds that the applicant would otherwise make available for law enforcement purposes.

*Subsection (c)* of section 303 states that the Administration may approve applications for grants under this part only if the requirements of subsections (a) and (b) are met. The Administration is directed to encourage plans which encompass entire metropolitan areas, encourage plans which are coordinated with other State or local plans and systems, and encourage plans which provide for the improvement of all law enforcement agencies in the area encompassed by the plans.

*Section 304(a).*—In making grants under this part, the Administration is to give special emphasis, where appropriate or feasible, to programs and projects dealing with the prevention, detection, and control of organized crime and of riots.

*Subsection (b)* of section 304 suspends the requirements of section 303 until August 31, 1968, and authorizes the Administration to make grants for programs and projects dealing with the prevention, detection and control of riots and other civil disorders on the basis of detailed applications, including the relationship of the programs and projects to the general program for the improvement of law enforcement.

84

PART D—TRAINING, EDUCATION, RESEARCH, DEMONSTRATION, AND SPECIAL GRANTS

*Section 401.*—States the purpose of this part.

*Section 402(a).*—Establishes within the Department of Justice, under the general authority of the Administration, a National Institute of Law Enforcement and Criminal Justice to encourage research and development to improve and strengthen law enforcement.

*Subsection 402(b)* authorizes the Institute to (1) make grants or enter into contracts with public agencies, institutions of higher education, or private organizations to conduct research, demonstrations, or special projects pertaining to the purposes described in this title; (2) make continuing studies to develop new or improved approaches, techniques, systems, etc., to improve and strengthen law enforcement— not limited to projects or programs carried out under this title; (3) carry out behavioral research projects on the causes and preventions of crime and the evaluation of correctional procedures; (4) make recommendations for the improvement and strengthening of law enforcement by Federal, State, and local governments; (5) carry out programs of instructional assistance, such as research fellowships; (6) collect and disseminate information to improve and strengthen law enforcement; and (7) establish a research center to carry out the programs described in this section.

*Section 403.*—Provides that grants for this part may be up to 100 percent of the total cost of each project for which a grant is made.

*Section 404(a).*—The Director of the Federal Bureau of Investigation is authorized to (1) establish and conduct training programs for State or local law enforcement personnel at the Federal Bureau of Investigation National Academy at Quantico, Va., when such training is requested by the State or local unit of government; (2) develop new or improved approaches, techniques, systems, equipment, and devices to improve and strengthen law enforcement; and (3) at the request of a State or local unit of government, assist in conducting regional training programs for the training of State and local law enforcement personnel.

*Subsection (b)* of section 404 provides that in carrying out the duties of this section the Director of the Federal Bureau of Investigation shall be under the general authority of the Attorney General.

*Section 405.*—Repeals the Law Enforcement Assistance Act of 1965, with the provision that the Administration is to study, review, and evaluate projects and programs funded under that act. The Administration (or the Attorney General until the members of the Administration are appointed) is authorized to obligate funds for the continuation of LEEA projects approved prior to the date of enactment of this act, to the extent that such approval provided for continuation.

*Section 406(a).*—Authorizes the Administration, after consultation with the Commissioner of Education, to carry out programs of academic educational assistance provided for in subsections (b) and (c) of this section.

*Subsection (b)* of section 406 authorizes the Administration to make payments to institutions of higher education for loans to students enrolled on a full-time basis in college-level programs approved by the Administration and leading to degrees or certificates in areas directly related to law enforcement. Special consideration will be

given to police or correctional personnel of States or local government on academic leave to earn such degrees or certificates. The maximum loan authorized for any person is $1,800 per academic year. The total amount of any such loan shall be canceled at the rate of 25 percent of the total amount of the loan plus interest for each year of service as a full-time law enforcement officer. The Administration is to issue regulations stating terms and conditions under which loans are to be made.

*Subsection* (*c*) of section 406 authorizes the Administration to make payments to institutions of higher education for tuition and fees of law enforcement officers enrolled in college-level courses. The maximum payment is $200 per academic quarter or $300 per semester. The academic program must be approved by the Administration and lead to a degree or certificate in an area related to law enforcement or an area suitable for persons employed in law enforcement. An officer receiving assistance under this subsection must agree to repay the full amount of the assistance if he does not remain in the employment of his law enforcement agency for 2 years following completion of the courses for which assistance was granted.

### PART E—ADMINISTRATIVE PROVISIONS

*Section 501.*—Authorizes the Administration, after consultation with representatives of States and units of general local government, to establish rules and regulations necessary to the exercise of its functions under, and are consistent with the stated purpose of this title.

*Section 502.*—Section 502 permits the Administration to delegate to any officer or official of the Administration, or, with the approval of the Attorney General, any officer of the Department of Justice, such functions as it deems appropriate.

*Section 503.*—Section 503 provides that the powers, functions, and duties specified in this title to be carried out by the Administration shall not be transferred elsewhere in the Department unless specifically hereafter authorized by the Congress.

*Section 504.*—Section 504 gives the Administration the power to hold hearings, sign and issue subpenas, administer oaths, examine witnesses, and receive evidence at any place in the United States it may designate.

*Sections 505 and 506.*—Sections 505 and 506 amend sections 5315 and 5316 of title 5, United States Code, to provide for the schedule of compensation of the Administrator at a level IV position ($27,000) and the Associate Administrators at level V positions ($26,000).

*Section 507.*—Section 507 authorizes the Administration, subject to the civil service and classification laws, to select, appoint, employ, and fix the compensation of officers and employees necessary to carry out the functions of this title.

*Section 508.*—Section 508 authorizes the Administration, on a reimbursable basis, to use the available services, equipment, personnel, and facilities of the Department of Justice and of other agencies of the Government.

*Section 509.*—Section 509 provides that the Administration shall have the power and authority to discontinue payments under this title, after reasonable notice and opportunity for hearing, whenever

it finds that the applicant or grantee substantially fails to comply with the provisions of this title, regulations promulgated by the Administration, or a plan or application submitted in accordance with the provisions of this title.

*Section 510.*—Subsection (a) of section 510 states that the findings and conclusions of the Administration shall be final, except as hereinafter provided.

Subsection (b) of section 510 provides that whenever the Administration takes action to reject an application, deny a grant, make a grant in a lesser amount than applied for, or discontinues a grant or a portion thereof, it shall so notify the applicant or grantee of its action setting forth the reasons for the action taken, and further provides that an applicant or grantee, under this title, upon request, may obtain a hearing before the Administration upon the action taken, and the Administration is authorized and directed to hold such hearings. The findings of the Administration shall be conclusive except as otherwise provided in this part.

Subsection (c) of section 510 provides for a rehearing if an applicant is dissatisfied with the findings of the Administration under subsection (b) of section 510.

*Section 511.*—Subsection (a) of section 511 provides for appeal by an applicant or grantee dissatisfied with the final action under section 509 or section 510. It grants such applicant or grantee 60 days after notice of action to file with the appropriate U.S. circuit court of appeals a petition for review of the final action of the Administration. The Administration is directed to file in the court the record of the proceedings on which the action was based.

Subsection (b) of section 511 provides that the court, for good cause shown, may remand the case to the Administration to take further evidence and the Administration may make new modified findings of fact and modify its previous action.

Subsection (c) of section 511 gives the court jurisdiction to affirm the action of the Administration or to set it aside, in whole or in part. The judgment of the court shall be subject to review by the Supreme Court of the United States.

*Section 512.*—Section 512 provides a 5-year period for the programs provided for by this title.

*Section 513.*—Section 513 authorizes the Administration to request from other Federal agencies statistics, data, program reports, and other material in order that the programs under this title can be carried out in a coordinated manner.

*Section 514.*—Section 514 provides for the reimbursement of the heads of other Federal departments for the performance of any functions under this title.

*Section 515.*—Subsections (a) and (b) of section 515 provide that the Administration shall collect and disseminate information on the condition and progress of law enforcement in the several States, and to cooperate and lend technical assistance to States or local governmental units.

*Section 516.*—Subsection (a) of section 516 permits the Administration to determine the method of payments under this title.

Subsection (b) of section 516 provides that not more than 12 percent of the funds appropriated for any 1 fiscal year shall be used in any

one State. This limitation does not apply to grants made under part D.

*Section 517.*—Section 517 authorizes the Administration to appoint advisory committees and makes provisions for compensation and travel allowances.

*Section 518.*—Subsection (a) of section 518 provides that nothing contained in this title or any other act shall be construed to authorize any Federal control over any law enforcement agency of any State or political subdivision thereof.

*Subsection (b)* of section 518 states that notwithstanding any other provision of law the Administration shall not construe anything in this title as authorization to require an applicant or grantee to adopt a percentage ratio or other program to achieve racial balance or to eliminate racial balance in any law enforcement agency, or to deny or discontinue a grant because of the refusal of an applicant or a grantee to adopt such a ratio, system, or program.

*Section 519.*—Section 519 directs the Administration to report to the President and to the Congress by August 31 of each year on the activities under this title.

*Section 520.*—Section 520 authorizes $100,111,000 to be appropriated for the fiscal years ending June 30, 1968, and June 30, 1969; and $300 million for the fiscal year ending June 30, 1970. Authorization of sums for succeeding fiscal years is left to the discretion of the Congress.

Of the amount appropriated for the fiscal years ending June 30, 1968, and June 30, 1969, $25 million shall be for part B, planning grants; $50 million shall be for part C, law enforcement grants (action grants), with not more than $2,500,000 of action grant funds for programs or projects in the area of public education relating to crime prevention and improving public understanding in relation to law enforcement, not more than $15 million for projects and programs relating to the prevention and control of organized crime, with not more than $1 million to be used in any one State; not more than $15 million for projects and programs relating to the prevention and control of riots, not more than $10 million shall be for purposes relating to correction, probation, and parole; and $25,111,000 shall be for the purposes of part D, training, education, research, demonstration, and special grants, of which amount $5,111,000 shall be for the Federal Bureau of Investigation to carry out its functions under section 404, and not more than $10 million shall be for programs of academic educational assistance authorized by section 406.

*Section 521.*—Section 521 sets as a prerequisite for a grant under this title a certification that the applicant has submitted a copy of the application to the chief executive of the State or States, and, where appropriate, to the State law enforcement agency or agencies, in which the unit is located. It provides a period of 60 days in which the chief executive and, where appropriate, law enforcement agency can evaluate the application in relationship to other applications and submit such evaluation in writing to the Administration.

*Section 522.*—Subsection (a) of section 522 provides for the keeping of such records by each recipient as the Administration shall prescribe.

*Subsection (b)* of section 522 provides that the Administration and the Comptroller General shall have access to pertinent material relating to grants received under this title.

PART F—DEFINITIONS

*Section 601.*—Section 601 defines, as used in this title, the following terms: "law enforcement," "organized crime," "State," "unit of general local government," "combination" as applied to States or units of general local government, "combination" as applied to States or units of general local government, "construction," "State law enforcement agency," "State organized crime prevention council," "metropolitan area," "public agency," and "institution of higher education."

## TITLE II

Section 701 of title II adds new sections 3501–3503 to chapter 223, title 18, United States Code. The section analysis by Code citation follows:

*Section 3501, United States Code.*—Subsection (a) of section 3501 provides that a voluntary confession is admissible in evidence in any criminal prosecution brought by the United States or the District of Columbia.

Subsection (b) lists the factors and circumstances that the trial judge is to consider in deciding whether the confession is voluntary.

Subsection (c) provides that a confession made while under detention shall not be inadmissible solely because of delay in bringing the defendant before a magistrate or commissioner.

Subsection (d) provides that nothing in that section will bar from evidence a voluntary spontaneous confession, given to anyone without interrogation or when the defendant was not under arrest or other detention.

Subsection (e) defines the term "confession" to include incriminating statements.

*Section 3502, United States Code.*—Section 3502 denies jurisdiction to Federal courts to reverse State cases involving admissions and confessions admitted as voluntarily given where the highest court of the State has affirmed.

*Section 3503, United States Code.*—Section 3503 provides that eyewitness testimony is admissible in evidence and limits the appellate jurisdction of Federal courts in both Federal and State cases admitting this testimony into evidence.

Section 702 of title II adds a new scetion 2256 to chapter 153, title 28, United States Code. The analysis of the new section to the Code is as follows:

*Section 2256, United States Code.*—Section 2256 provides that State courts' judgments in criminal cases regarding questions of law or fact shall be conclusive unless reversed by a court with jurisdiction to review by direct appeal or certiorari, and denies Federal court jurisdiction to review State court criminal judgments, except upon appeal or certiorari after review of such judgments by the highest court of the State.

## TITLE III

Because of the complexity in the area of wiretapping and electronic surveillance, the committee believes that a comprehensive and in-depth analysis of title III would be appropriate in order to make explicit congressional intent in this area.

*Section 801.*—Section 801 contains the findings relating to the conditions with which the proposed legislation is designed to deal, and of the actions necessary to cope with those conditions.

Paragraphs (a) notes that intrastate and interstate wire communications in our Nation are inextricably interwoven. Because the same facilities are alternatively used by each class of communiaction, it is not practicable to draw a distinction between them. (*Wiess* v. *United States*, 308 U.S. 321 (1939).) It then finds that there has been extensive wiretapping carried on without legal sanction or the consent of any of the participants to the communications. Next it recognizes that intercepting devices are being used by certain segments of our society to overhear private oral conversations. It then notes that the contents of these communications are used in court and administrative proceedings and by persons whose activities affect interstate commerce and that the possession, manufacture, distribution, advertising, and use of these devices are facilitated by interstate commerce. Compare *Wickard* v. *Filburn*, 317 U.S. 111 (1942). The findings also recognize again that it is not practicable to draw distinctions between different classes of oral communications.

Paragraph (b) recognizes that to protect the privacy of wire and oral communications, to protect the integrity of court and administrative proceeding and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire or oral communications may be authorized. It also finds that all unauthorized interception of such communications should be prohibited, as well as the use of the contents of unauthorized interceptions as evidence in courts and administrative hearings.

Paragraph (c) recognizes the extensive use made by organized crime of wire and oral communications. It then finds that the ability to intercept such communications is indispensable in the evidence gathering process in the administration of justice in the area of organized crime.

Paragraph (d) recognizes the responsible part that the judiciary must play in supervising the interception of wire or oral communications in order that the privacy of innocent persons may be protected: Except in emergency situations (2518(7)) and where the national security is involved, the interception or use of wire or oral communications should only be on court order. Because of the importance of privacy, such interceptions should further be limited to major offenses and care must be taken to insure that no misuse is made of any information obtained.

*Section 802.*—This section amends title 18, United States Code, by adding a new chatper, entitled "Chapter 119—Wire Interception and Interception of Oral Communications."

Section 2510 of the new chapter contains the definitions of certain words employed in the proposed new chapter.

Paragraph (1) defines "wire communication" to include all communications carried by a common carrier, in whole or in part, through our Nation's communications network. The coverage is intended to be comprehensive.

Paragraph (2) defines "oral communication" to include any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation. The definition is intended to reflect ex-

isting law. See *Katz* v. *United States*, 389 U.S. 347 (1967). Compare *United States* v. *South Eastern Underwriters Assn.*, 322 U.S. 533 (1944) with *Lee* v. *Florida*, 191 So. 2d 84 (1966), *cert. granted*, Jan. 15, 1968, No. 174, 1967 Term. The person's subjective intent or the place where the communication is uttered is not necessarily the controlling factor. Compare *Linnell* v. *Linnell*, 143 N.E. 813 (Mass. 1924), with *Freeman* v. *Freeman*, 130 N.E. 220 (Mass. 1921). Nevertheless, such an expectation would clearly be unjustified in certain areas; for example, a jail cell (*Lanza* v. *New York*, 370 U.S. 139 (1962)) or an open field (*Hester* v. *United States*, 265 U.S. 57 (1924)). Ordinarily, however, a person would be justified in relying on such expectation when he was in his home (*Silverman* v. *United States*, 365 U.S. 505 (1961)) or office (*Berger* v. *New York*, 388 U.S. 41 (1967)), but even there, his expectation under certain circumstances could be unwarranted, for example, when he speaks too loudly. See *State* v. *Cartwright*, 418 P. 2d 822 (Ore. 1966), *cert denied*, 386 U.S. 937 (1967). The person's expectation that his communication is or is not subject to "interception," defined in paragraph (4), discussed below, is thus to be gathered and evaluated from and in terms of all the facts and circumstances.

Paragraph (3) defines "State" to include the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

Paragraph (4) defines "intercept" to include the aural acquisition of the contents of any wire or oral communication by any electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation. See *Lee* v. *United States*, 274 U.S. 559 (1927); *Corngold* v. *United States*, 367 F. 2d (9th 1966). An examination of telephone company records by law enforcement agents in the regular course of their duties would be lawful because it would not be an "interception." (*United States* v. *Russo*, 250 F. Supp. 55 (E.D. Pa. 1966)). The proposed legislation is not designed to prevent the tracing of phone calls. The use of a "pen register," for example, would be permissible. But see *United States* v. *Dote*, 371 F. 2d 176 (7th 1966). The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication.

Paragraph (5) defines "electronic, mechanical, or other device" to include any device which can be used to intercept wire or oral communications. Only equipment furnished to a subscriber by a communications common carrier in the ordinary course of its business, and being used by the subscriber in the ordinary course of its business, equipment being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties, or hearing aids would be excluded. Otherwise the phrase intends to be comprehensive.

Paragraph (6) defines "person" to include any individual, partnership, association, corporation, agent, or other natural or legal entity. Through the various provisions of the proposed legislation, including the section imposing civil and criminal liability, this definition defines the scope of the proposed chapter. The definition explicitly includes any officer or employee of the United States or any State or political subdivision of a State. But see *Pierson* v. *Ray*, 386 U.S. 547 (1967). Only the governmental units themselves are excluded. Compare *Mon-*

*roe* v. *Pape*, 365 U.S. (1961); *Wilford* v. *California*, 352 F. 2d 474 (9th 1965). Otherwise the definition is intended to be comprehensive.

Paragraph (7) defines "investigative or law enforcement officer" to include any Federal, State, or local law enforcement officer empowered to make investigations of or to make arrests for any of the offenses enumerated in the proposed legislation. It would include law enforcement personnel carrying out law enforcement purposes. It includes within the phrase any attorney authorized by law to prosecute or participate in the prosecution of such offenses. The definition gives recognition to the affirmative responsibility which the prosecuting officer has for the investigation of offenses and envisions close cooperation between law enforcement and prosecuting officers.

Paragraph (8) defines "contents" in reference to wire and oral communication to include all aspects of the communication itself. No aspect, including the identity of the parties, the substance of the communication between them, or the fact of the communication itself, is excluded. The privacy of the communication to be protected is intended to be comprehensive.

Paragraph (9) defines "judge of competent jurisdiction." This definition designates the judicial officers whose responsibility it will be to supervise authorized interceptions. Existing Federal search warrant practice permits U.S. Commissioners and city mayors to issue warrants (18 U.S.C. 3041 (1964)). This practice is too permissive for the interception of wire or oral communications. Only judges of Federal district courts or courts of appeal should issue Federal warrants. On the State level only the judges designated under legislation meeting the standards under section 2516(2) discussed below, would be permitted to issue warrants. This is intended to guarantee responsible judicial participation in the decision to use these techniques.

Paragraph (10) defines "communication common carrier" to have the same meaning the "common carrier" has in 47 U.S.C. 153(1) (1958). It is intended to reflect existing law.

Paragraph (11) defines "aggrieved person" to mean any person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed. This definition defines the class of those who are entitled to invoke the suppression sanction of section 2515 discussed below, through the motion to suppress provided for by section 2518(10)(a), also discussed below. It is intended to reflect existing law (*Jones* v. *United States*, 362 U.S. 257 (1960); *Goldstein* v. *United States*, 316 U.S. 114 (1942); *Wong Sun* v. *United States*, 371 U.S. 741 (1963); see *United States ex rel De forte* v. *Mancusi*, 379 Fed. 897 (2d 1967), cert. granted, Jan. 22, 1968, No. 844, 1967 Term).

Section 2511 of the new chapter prohibits, except as otherwise specifically provided in the chapter itself, the interception and disclosure of all wire or oral communications. Paragraph (1) sets out several prohibitions. Subparagraph (*a*) prohibits the interception itself. This eliminates the requirement under existing law that an "interception" and a "divulgence" must take place. See *Massocot* v. *United States*, 254 F. 2d 58 (5th), cert. denied, 358 U.S. 816 (1958); *Benanti* v. *United States*, 355 U.S. 96, 102 n. 10 (1957).

Subparagraph (a) establishes a blanket prohibition against the interception of any wire communication. Since the facilities used to

transmit wire communications form part of the interstate or foreign communications network, Congress has plenary power under the commerce clause to prohibit all interception of such communications, whether by wiretapping or otherwise. (*Weiss* v. *United States*, 308 U.S. 321 (1939)).

The broad prohibition of subparagraph (a) is also applicable to the interception of oral communications. The interception of such communications, however, does not necessarily interfere with the interstate or foreign communications network, and the extent of the constitutional power of Congress to prohibit such interception is less clear than in the case of interception of wire communications. The Supreme Court has indicated that Congress has broad power to protect certain rights under the Equal Protection Clause of the 14th amendment against private interference. (*United States* v. *Guest*, 383 U.S. 745 (1966) (concurring and dissenting opinions).) The right here at stake—the right of privacy—is a right arising under certain provisions of the Bill of Rights and the due process clause of the 14th amendment. Although the broad prohibitions of subparagraph (a) could, for example, be constitutionally applied to the unlawful interception of oral communications by persons acting under color of State or Federal law, see *Katzenbach* v. *Morgan*, 384 U.S. 641 (1966), the application of the paragraph to other circumstances could in some cases lead to a constitutional challenge that can be avoided by a clear statutory specification of an alternative constitutional basis for the prohibition.

Therefore, in addition to the broad prohibitions of subparagraph (a), the committee has included subparagraph (b), which relies on accepted jurisdictional bases under the commerce clause and other provisions of the Constitution to prohibit the interception of oral communications.

Subparagraph (i) prohibits any interception through the use of a device linked in any way to the interstate or foreign network of wire communications. Under this provision, for example, the use of leased or other telephone lines to transmit signals intercepted by eavesdropping devices is prohibited. The use of such lines in the past has greatly extended the range of eavesdropping devices, since the devices can be made useful in circumstances where intercepted conversations cannot be conveniently monitored from adjacent premises, but must be transmitted to a more distant location.

Subparagraph (ii) prohibits any interception through the use of a device which transmits communications by radio or which interferes with the transmission of radio communications. As in the case of wire communications, Congress has plenary power under the commerce clause to regulate not only the use of radio devices, but also the use of devices that interfere with radio communications. Subparagraph (ii) is intended to be a complete prohibition against the use of such devices for the interception of oral communications. The provisions will be applicable even though only one component in a series of devices used in combination by an eavesdropper is a radio device.

Subparagraph (iii) prohibits any interception through the use of a device, if the device itself or any of its components has been sent through the mail or transmitted in interstate or foreign commerce.

Subparagraph (iv) prohibits any interception that takes place on the premises of a business whose operations affect interstate or foreign commerce. The subparagraph also prohibits any interception,

wherever it takes place, which obtains or is for the purpose of obtaining information about such a business. The broad provisions of the subparagraph are intended to eliminate one of the most insidious contemporary practices of industrial espionage.

Subparagraph (v) prohibits any interception that takes place in the District of Columbia, Puerto Rico, or the territories or possessions of the United States. Since Congress has plenary power over these geographic areas, the prohibitions are complete.

Taken together, subparagraphs (i) to (v) of subparagraph (b) create an essentially comprehensive ban on the interception of oral communications. The provisions will be applicable to the overwhelming majority of cases involving the unlawful interception of such communications, and it will be unnecessary to rely on the broader prohibition of subparagraph (a). In many cases, use of a particular device will violate more than one, or even all, of the provisions of subparagraph (b). The committee intends in such cases that a person may be convicted of only one offense under the section.

Subparagraphs (c) and (d) prohibit, in turn, the disclosure or the use of the contents of any intercepted communication by any person knowing or having reason to know the information was obtained through an interception in violation of this subsection. The disclosure of the contents of an intercepted communication that had already become "public information" or "common knowledge" would not be prohibited. The scope of this knowledge required to violate either subparagraph reflects existing law (*Pereira* v. *United States*, 347 U.S. 1 (1954)). A violation of each must be willful to be criminal (*United States* v. *Murdock*, 290 U.S. 389 (1933)). Each prohibition strikes not only at the prohibited action but also at endeavors (*Osborn* v. *United States*, 385 U.S. 323 (1966)) and procurements (*Nye & Nissen* v. *United States*, 336 U.S. 613 (1949)). There is no intent to preempt State law. Each violation is punishable by a fine of $10,000 or imprisonment of not more than 5 years, or both.

Paragraph (2) (a) provides that it shall not be unlawful for an operator of a switchboard or employees of a common carrier to intercept, diclose, or use wire communications in the normal course of their employment while engaged in any activity which is a necessary incident to the rendition of his service or the protection of the rights or property of the carrier. It is intended to reflect existing law (*United States* v. *Beckley*, 259 F. Supp. 567 (D.C. Ga. 1965)). Paragraph (2) (a) further provides that communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks. Service observing is the principal quality control procedure used by these carriers for maintaining and improving the quality of telephone service. Such observing is done by employees known as service observers, and this provision was inserted to insure that service observing will not be used for any purpose other than mechanical and service quality control.

Paragraph (2) (b) provides a similar exception for an employee of the Federal Communications Commission in the normal course of his employment in the discharge of the monitoring responsibility of the Commission.

Paragraph (2) (c) provides that it shall not be unlawful for a party to any wire or oral communication or a person given prior authority by a party to a communication to intercept such communication. It

largely reflects existing law. Where one of the parties consents, it is not unlawful. (*Lopez* v. *United States*, 373 U.S. 427 (1963); *Rathbun* v. *United States*, 355 U.S. 107 (1957); *On Lee* v. *United States*, 343 U.S. 747 (1952)). Consent may be expressed or implied. Surveillance devices in banks or apartment houses for institutional or personal protection would be impliedly consented to. Retroactive authorization, however, would not be possible. (*Weiss* v. *United States*, 308 U.S. 321 (1939)) and "party" would mean the person actually participating in the communication. (*United States* v. *Pasha*, 332 Fed. 193 (7th), *cert. denied*, 379 U.S. 839 (1964)).

Paragraph (3) is intended to reflect a distinction between the administration of domestic criminal legislation not constituting a danger to the structure or existence of the Government and the conduct of foreign affairs. It makes it clear that nothing in the proposed chapter or other act amended by the proposed legislation is intended to limit the power of the President to obtain information by whatever means to protect the United States from the acts of a foreign power including actual or potential attack or foreign intelligence activities, or any other danger to the structure or existence of the Government. Where foreign affairs and internal security are involved, the proposed system of court ordered electronic surveillance envisioned for the administration of domestic criminal legislation is not intended necessarily to be applicable. The two areas may, however, overlap. Even though their activities take place within the United States, the domestic Communist party and its front groups remain instruments of the foreign policy of a foreign power (*Communist Party, U.S.A.* v. *Subversive Activities Control Board*, 367 U.S. 1 (1961)). Consequently, they fall within the field of foreign affairs and outside the scope of the proposed chapter. Yet, their activities may involve violations of domestic criminal legislation. See *Abel* v. *United States*, 362 U.S. 217 (1960). These provisions of the proposed chapter regarding national and internal security thus provide that the contents of any wire or oral communication intercepted by the authority of the President may be received into evidence in any judicial trial or administrative hearing. Otherwise, individuals seeking the overthrow of the Government, including agents of foreign powers and those who cooperate with them, could not be held legally accountable when evidence of their unlawful activity was uncovered incident to the exercise of this power by the President. The only limitations recognized on this use is that the interceptions be deemed reasonable based on an ad hoc judgment taking into consideration all of the facts and circumstances of the individual case, which is but the test of the Constitution itself (*Carroll* v. *United States*, 267 U.S. 132 (1925)). The possibility that a judicial authorization for the interception could or could not have been obtained under the proposed chapter would be only one factor in such a judgment. No preference should be given to either alternative, since this would tend to limit the very power that this provision recognizes is not to be deemed disturbed.

The provisions of section 2512 banning the manufacture, distribution, sale, possession, and advertising of wiretapping and eavesdropping devices will significantly curtail the supply of a variety of devices. There is no intent to preempt State law. The prohibitions are applicable to devices whose design renders them primarily useful for the surreptitious interception of private wire or oral communications. The

statutory phrase is intended to establish a relatively narrow category of devices whose principal use is likely to be for wiretapping or eavesdropping. A device will not escape the prohibition merely because it may have innocent uses. The crucial test is whether the design of the device renders it *primarily* useful for *surreptitious* listening. Obviously, the sort of judgment called for here in close cases would warrant the use of expert testimony.

See *United States* v. *One Device*, 160 Fed. 194 (10th 1947). The prohibition will thus be applicable to, among others, such objectionable devices as the martini olive transmitter, the spike mike, the infinity transmitter, and the microphone disguised as a wristwatch, picture frame, cuff link, tie clip, fountain pen, stapler, or cigarette pack. Such devices are widely advertised and distributed at the present time and are readily available on the market. By banning these devices, a significant source of equipment highly useful for illegal electronic surveillance will be eliminated.

At the same time, the prohibitions of section 2512 will cause no substantial interference with the production, distribution, or use of legitimate electronics equipment, whether by the electronics industry or others. Size alone is not the criterion under the section. A device does not fall under the prohibitions merely because it is small, or because it may be adapted to wiretapping or eavesdropping. Nor will the prohibition be applicable, for example, to devices such as the parabolic microphone or other directional microphones ordinarily used by broadcasters at sports events. Such devices cannot be said to be primarily useful for surreptitious listening. To be prohibited, the device would also have to possess attributes that give predominance to the surreptitious character of its use, such as the spike in the case of the spike mike or the disguised shape in the case of the martini olive transmitter and the other devices mentioned in the preceding paragraph.

Excepted from the above prohibitions are (1) the actions of a communications common carrier and its employees or persons under contract with a communications common carrier in the normal course of its business; (2) any officer, agent, or employee of, or person under contract with, the United States, a State or a political subdivision of a State in the normal course of its activities.

Section 2513 of the new chapter provides that any electronic, mechanical or other intercepting device possessed, used, sent, carried, manufactured or assembled in violation of section 2511 or 2512, discussed above, may be seized and forfeited to the United States. This provision adds a significant sanction to the prohibitions of sections 2511 and 2512. The equipment employed in electronic surveillance is usually expensive. The equipment itself often makes the interception possible. Its confiscation will impose an additional penalty on the individual who violates the provisions of sections 2511 and 2512 and prevent further violations using the same equipment. The provision should be particularly effective in stripping a professional eavesdropper of the tools of his trade and in taking off the market the inventory of those who manufacture or assemble prohibited devices. The provision is keyed to the postal, interstate, and foreign commerce powers. It will not be coextensive with section 2511. Even so, its scope should be sufficient to be effective. The provision makes applicable to the process of confiscation under the direction of the Attorney General all of the existing provisions relating to violations of the customs

law. With suitable modifications, the provision is intended to reflect existing law.

Section 2514 of the new chapter provides for the granting of immunity from prosecution in the investigation of violations of the chapter and the offenses enumerated in section 2516. Since unlawful electronic surveillance is typically a clandestine crime, often committed by an individual at the instigation of another person, the usual techniques of criminal investigation will not, as in organized crime investigations, be adequate to enforce the prohibitions of the statute. The privilege against selfincrimination would work in most cases to prevent the principals behind the overt acts of others from being held legally accountable. Consequently, an immunity grant will be necessary to enforce effectively the prohibitions of the statute and safeguard privacy. Under the proposed section, the grant of immunity would have to be approved by the Attorney General and would be effective only upon an order of the court. The provision is patterned after provisions in other laws which have been upheld and found effective. It is intended to reflect existing law (*Ullman* v. *United States*, 350 U.S. 422 (1956), upholding 18 U.S.C. 3486 (1964), as amended, 18 U.S.C. 3486(c) (Supp. 1, 1965); *Reina* v. *United States*, 364 U.S. 507 (1960), upholding 18 U.S.C. 1406 (1964)).

Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. It provides that intercepted wire or oral communications or evidence derived therefrom may not be received in evidence in any proceeding before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision of a State, where the disclosure of that information would be in violation of this chapter. The provision must, of course, be read in light of section 2518(10)(a) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects existing law. It applies to suppress evidence directly (*Nardone* v. *United States*, 302 U.S. 379 (1937)) or indirectly obtained in violation of the chapter. (*Nardone* v. *United States*, 308 U.S. 338 (1939).) There is, however, no intention to change the attenuation rule. See *Nardone* v. *United States*, 127 F. 2d 521 (2d), cert. denied, 316 U.S. 698 (1942); *Wong Sun* v. *United States*, 371 U.S. 471 (1963). Nor generally to press the scope of the suppression role beyond present search and seizure law. See *Walder* v. *United States*, 347 U.S. 62 (1954). But it does apply across the board in both Federal and State proceeding. Compare *Schwartz* v. *Texas*, 344 U.S. 199 (1952). And it is not limited to criminal proceedings. Such a suppression rule is necessary and proper to protect privacy. Compare *Adams* v. *Maryland*, 347 U.S. 179 (1954); *Mapp* v. *Ohio*, 367 U.S. 643 (1969). The provision thus forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications.

Section 2516 of the new chapter authorizes the interception of particular wire or oral communication under court order pursuant to the authorization of the appropriate Federal, State, or local prosecuting officer.

97

Paragraph (1) provides that the Attorney General, or any Assistant Attorney General of the Department of Justice specifically designated by him, may authorize an application for an order authorizing the interception of wire or oral communications. This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen.

The application must be made to a Federal judge of competent jurisdiction, as defined in section 2510(9), discussed above. The application must conform to section 2518, discussed below. The judicial officer's decision is also circumscribed by section 2518. This provision is in accord with the practical and constitutional demand that a neutral and detached authority be interposed between the law enforcement officers and the citizen (*Berger* v. *New York*, 388 U.S. 41, 54 (1967); *Katz* v. *United States*, 389 U.S. 347 (1967)). Judicial review of the decision to intercept wire or oral communications will not only tend to insure that the decision is proper, but it will also tend to assure the community that the decision is fair.

The order of authorization may permit the Federal Bureau of Investigation or the Federal agency having responsibility for the investigation of the offense involved to intercept the wire or oral communication. The Department of Justice under the leadership of the Attorney General must be the central focal point of any drive against organized crime, particularly in the collection, analysis, and dissemination of information. It is appropriate that no limitation be placed on the investigations in which the investigative arm of the Department may participate. Organized crime has not limited itself to the commission of any particular offense. No limitation should be placed on the Department of Justice.

Applications for orders authorizing the interception of wire or oral communications may be made only in the investigation of certain major offenses, which are designated in subparagraphs (a) through (f). Each offense has been chosen either because it is intrinsically serious or because it is characteristic of the operations of organized crime. Subparagraph (a) includes those offenses that fall within the national security category. It includes offenses involving espionage, sabotage, treason, and the enforcement of the Atomic Energy Act of 1954 (68 Stat. 921, 42 U.S.C. secs. 224–227 (1958)). Subparagraph (b) includes any offense under title 18, United States Code, which involves murder, kidnapping, robbery or extortion. It is aimed, among other things, primarily at organized crime, bank robbery and hijacking activity. It would include, for example, 18 U.S.C. 1951 (1964), which prohibits affecting interstate commerce by extortion. (Cf. *Carbo* v. *United States*, 314 F. 2d 718(9th), cert. denied, 377 U.S. 953 (1964)). Under appropriate circumstances, loan sharking would also be included. It also strikes at labor racketeering by the inclusion of 29 U.S.C. 186 and 501(c). Subparagraph (c) specifically enumerates the following sections of title 18, United States Code: Section 1084 (transmission of wagering information); section 1503 (influencing or injuring an officer, juror, or witness generally); (Cf. *United States.* v. *Buffalino*,

285 F. 2d 408 (2d 1960) ; *Ferina* v. *United States*, 340 F. 2d 837 (8th),
cert. denied, 381 U.S.C. 902 (1965) ) ; section 1510 (obstruction of
criminal investigations) ; section 1751 (Presidential assassinations,
kidnapping, and assault) ; section 1951 (interference with commerce
by threats of violence) ; section 1952 (interstate and foreign travel or
transportation in aid of racketeering enterprises) ; section 1954 (offer,
acceptance, or solicitation to influence operations of an employee benefit
plan) ; or sections 2313 and 2314 (interstate transportation of stolen
property). This last provision is included to make it possible to strike
at organized crime fencing. Subparagraph (d) includes any offense
involving bankruptcy fraud or the manufacture, importation, receiv-
ing, concealment, buying, selling, or otherwise dealing in narcotic
drugs, marijuana, or other dangerous drugs, punishable by any law
of the United States. (Cf. *United States* v. *Castellana*, 349 F. 2d 264
(2d 1965), cert. denied, 383 U.S. 928 (1966) ; *United States* v. *Ariles*,
274 F. 2d 179 (2d 1960) ; cert. denied sub nom., *Evola* v. *United States*,
362 U.S. 974 (1960).) Finally, subparagraph (f) includes any con-
spiracy to commit any of the foregoing offenses.

Paragraph (2) provides that the principal prosecuting attorney of
any State or the principal prosecuting attorney of any political sub-
division of a State may authorize an application to a State judge of
competent jurisdiction, as defined in section 2510(9), for an order
authorizing the interception of wire or oral communications. The issue
of delegation by that officer would be a question of State law. In most
States, the principal prosecuting attorney of the State would be the
attorney general. The important question, however, is not name but
function. The intent of the proposed provision is to provide for the
centralization of policy relating to statewide law enforcement in the
area of the use of electronic surveillance in the chief proseuting officer
of the State. Who that officer would be would be a question of State
law. Where no such office exists, policymaking would not be pos-
sible on a statewide basis ; it would have to move down to the next level
of government. In most States, the principal prosecuting attorney at
the next political level of a State, usually the county, would be the
district attorney, State's attorney, or county solicitor. The intent of
the proposed provision is to centralize areawide law enforcement policy
in him. Who he is would also be a question of State law. Where there
are both an attorney general and a district attorney, either could
authorize applications, the attorney general anywhere in the State and
the district attorney anywhere in his county. The proposed provision
does not envision a further breakdown. Although city attorneys may
have in some places limited criminal prosecuting jurisdiction, the pro-
posed provision is not intended to include them.

No applications may be authorized unless a specific State statute
permits it. The State statute must meet the minimum standards re-
flected as a whole in the proposed chapter. The proposed provision
envisions that States would be free to adopt more restrictive legisla-
tion, or no legislation at all, but not less restrictive legislation. State
legislation enacted in conformity with this chapter should specifically
designate the principal prosecuting attorneys empowered to authorize
interceptions. The State judge of competent jurisdiction, as defined in
section 2510(9), empowered by the State legislation to grant orders for
interceptions would have to make the findings which would be the
substantial equivalent to those required by section 2518(3), discussed

99

below, and the authorization itself would have to be made in substantial conformity with the standards set out in section 2518, discussed below. The interception of wire or oral communications by State law-enforcement officers could only be authorized when it might provide, or has provided evidence of designated offenses. (See *McNally* v. *Hill*, 293 U.S. 131, 136 (1934).) Specifically designated offenses include murder, kidnaping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana, or other dangerous drugs. All other crimes designated in the State statute would have to be "dangerous to life, limb, or property, and punishable by imprisonment for more than 1 year." This limitation is intended to exclude such offenses as fornication and adultery, which do not involve danger to life, limb, or property. The term "property," however, is not to be read restrictively. For example, the activities of organized crime in "cigarette bootlegging," which pose a substantial threat to the revenue of some cities and States, could be made a designated offense if the penalty were made high enough. Finally, any conspiracy to commit any of the designated offenses would warrant the issuance of an order.

Section 2517 of the new chapter authorizes the use and disclosure of intercepted wire or oral communications in specified circumstances. Section 2517 must, of course, be read in light of section 2518.

Paragraph (1) authorizes any investigative or law-enforcement officer as defined in section 2510(7), who, by any means authorized in this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom to disclose the contents to other investigative or law-enforcement officers. The proposed provision envisions close Federal, State, and local cooperation in the administration of justice. The utilization of an information-sharing system within the law-enforcement community circumscribed by suitable safeguards for privacy is within the intent of the proposed legislation. Examples of existing systems include the law-enforcement intelligence unit established in California in 1956, the New England State Police compact (see *R. I. Gen Laws Ann* §42 37–1 to 3 (Supp. 1965)), the New York State identification and intelligence system, and the National Crime Information Center. Only disclosure that is appropriate to the proper performance of the official duties of the officers making and receiving the disclosure may be made.

Paragraph (2) authorizes any investigative or law-enforcement officer who, by any means authorized in this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom to use it. Only use that is appropriate to the proper performance of official duties may be made. The proposed provision envisions use of the contents of intercepted communications, for example, to establish probable cause for arrest (*Ginsberg* v. *United States*, 96 F. 2d 433 (5th 1938)), to establish probable cause to search (*Foley* v. *United States*, 64 F. 2d 1 (5th), *cert. denied*, 289 U.S. 762 (1933)), or to develop witnesses. (*In re Saperstein*, 30 N.J. Super 373, 104 A. 2d 842 (1954), *cert. denied*, 348 U.S. 874 (1954); *New York* v. *Saperstein*, 2 N.Y. 2d 210, 140 N.E. 2d 252 (1957)). Neither paragraphs (1) nor (2) are limited to evidence intercepted in accordance with the provisions of the proposed chapter, since in certain limited situations disclosure and use of illegally intercepted communications would be appropriate to the proper performance of the officers' duties. For example, such use and disclosure would be necessary in the in-

vestigation and prosecution of an illegal wiretapper himself. (See *United States* v. *Gris*, 146 F. Supp. 293 (S.D.N.Y. 1956), *aff'd*, 247 Fed. 860 (2d 1957)).

Paragraph (3) authorizes any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication or evidence derived therefrom intercepted in accordance with the provisions of the proposed chapter to disclose the contents of that communication or evidence derived therefrom while giving testimony. It envisions, of course, the use and disclosure of such evidence at trial to establish guilt directly (*New York* v. *Saperstein*, 2 N.Y. 2d 210, 140 N.E. 2d 252 (1957)), or to corroborate (*United States* v. *Walker*, 320 F. 2d 472 (6th 1963)), or to impeach (*People* v. *Hughes*, 203 Cal. App. 2d 598, 21 Cal. Retr. 668 (1962)), a witness' testimony or to refresh his recollection (*Monroe* v. *United States*, 234 F. 2d 49 (D.C. 1956), *cert. denied*, 355 U.S. 875 (1957)).

Paragraph (4) provides that no otherwise privileged wire or oral communication intercepted in accordance with or in violation of the new chapter shall lose its privileged characted. Traditionally, the interest of truth in the administration of justice has been subordinated in the law to the interest of preserving privileged communications where four relationships have been involved: physician-patient, lawyer-client, clergyman-confidant, and husband-wife. The scope and existence of these privileges varies from jurisdiction to jurisdiction. The proposed provision is intended to vary the existing law only to the extent it provides that an otherwise privileged communication does not lose its privileged character because it is intercepted by a stranger. But see *State* v. *Wallace*, 162 N.C. 622, 78 S.E. 1 (1913); *Commonwealth* v. *Wakelin*, 230 Mass. 567, 120 N.E. 209 (1918). Otherwise, it is intended to reflect existing law. See *Fed. R. Crim. Proc.* 26; *Wolfle* v. *United States*, 291 U.S. 7 (1934).

Paragraph (5) provides that if an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized in the chapter, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section, discussed above. Such contents and any evidence derived therefrom may be introduced in evidence under subsection (3) of this section only when authorized or approved by a judge of competent jurisdiction as defined in section 2510(9) where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. They need not be designated "offenses." Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order. Compare, *Marron* v. *United States*, 275 U.S. 192, 196 (1927), with *United States* v. *Eisner*, 297 Fed. 595 (6th 1962), and *State* v. *Hunter*, 235 Wis. 188, 292 N.W. 609 (1940).

Section 2518 of the new chapter sets out in detail the procedure to be followed in the interception of wire or oral communications.

Paragraph (1) requires a written application for an authorization to intercept wire or oral communications. This reflects existing law.

See *Fed. R. Crim. Proc.* 41. The information each application should contain is specified in subparagraphs (a) through (c).

Subparagraph (a) requires the identity of the person who makes, and the person who authorized the application to be set out. This fixes responsibility.

Subparagraph (b) requires that a full and complete statement of the facts and circumstances relied upon by the applicant be set out, including (i) the details as to what type of offense has been, is being, or is about to be committed, (ii) the place where, or the facilities or phone from which the communication is to be intercepted, (iii) a particular description of the type of the communication which it is expected will be intercepted, and (iv) the identity of the person, if known, who is committing the offense and whose communications are to be intercepted. Each of these requirements reflects the constitutional command of particularization (*Berger* v. *New York*, 388 U.S. 41, 58–60 (1967); *Katz* v. *United States*, 389 U.S. 347, 354–56 (1967)).

Subparagraph (c) requires a full and complete statement as to whether or not normal investigative procedures have been tried and have failed or why these are unlikely to succeed if tried, or to be too dangerous. This requirement is patterned after traditional search warrant practice and present English procedure in the issuance of warrants to wiretap by the Home Secretary. Compare *Report of the Committee of Councillors Appointed to Inquire into the Interception of Communication*, par. 64 (1957); *Read* v. *Case*, 4 Conn. 166 (1822). The judgment would involve a consideration of all the facts and circumstances. Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. See *Giancana* v. *United States*, 352 F. 2d 921 (7th) *cert. denied*, 382 U.S. 959 (1965); *New York* v. *Saperstein*, 2 N.Y. 2d 210, 140 N.E. 2d 252 (1957). What the provision envisions is that the showing be tested in a practical and commonsense fashion. Compare *United States* v. *Ventresca*, 380 U.S. 102 (1965).

Subparagraph (d) requires a statement of the period of time during which the interceptions are to be made. This provision must be read in light of paragraphs (4) (e), (5), and (6), discussed below. Together they require that the duration of an interception not be longer than is necessary under the facts of the particular case. This is a command of the Constitution according to *Berger* v. *New York*, 388 U.S. 41, 59 (1967) and *Katz* v. *United States*, 389 U.S. 347, 355–56 (1967). Where it is necessary to obtain coverage to only one meeting, the order should not authorize additional surveillance. Compare *Osborn* v. *United States*, 385 U.S. 323 (1966). Where a course of conduct embracing multiple parties and extending over a period of time is involved, the order may properly authorize proportionately longer surveillance, but in no event for longer than 30 days, unless extensions are granted. Compare *People* v. *Sica*, 112 Cal. App. 2d 574, 247 P. 2d 72 (1952); *People* v. *Tarinto*, 45 Cal. 2d 590, 290 P. 505 (1955). What is important is that the facts in the application on a case-by-case basis justify the period of time of the surveillance.

Subparagraph (e) requires a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each such application.

Paragraph (2) provides that the judge may require the applicant to furnish additional testimony or documentary evidence in support of the application. The additional testimony need not be in writing, but it should be under oath or affirmation and a suitable record should be made of it. The use of a court reporter would be the best practice.

Paragraph (3) authorizes the judge to enter an ex parte order authorizing or approving the interception of wire or oral communications within the territorial jurisdiction of the court. Authorization would be based on an application made pursuant to paragraph (1). Approval would be based on an application made in conformity with paragraph (1) but made pursuant to paragraph (7), discussed below, or section 2517(5), discussed below. The proposed provision recognizes that the judge may properly deny the application altogether, or grant it as suitably modified.

What the judge must determine before he can issue an order based on the facts submitted to him is specified in subparagraphs (a) through (d). Subparagraph (a) requires that the judge determine that there is probable cause for belief that a particular type of offense enumerated in section 2516, discussed above, is being, has been, or is about to be committed by a particular person. This is intended to reflect the test of the Constitution (*Berger* v. *New York*, 388 U.S. 41, 58–60 (1967)). Subparagraph (b) requires him to determine that there is probable cause for belief that facts concerning that offense may be obtained through such interception. Compare *Warden* v. *Hayden*, 387 U.S. 294 (1967). Subparagraph (c) requires a finding that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. This finding is discussed above in the analysis of paragraph (1) (c). Subparagraph (d) requires a finding of probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or are commonly used by, the person who has committed, is committing, or is about to commit such offense. With the findings required by subparagraphs (a) and (b), the order will link up specific person, specific offense, and specific place. Together they are intended to meet the test of the Constitution that electronic surveillance techniques be used only under the most precise and discriminate circumstances, which fully comply with the requirement of particularity (*Berger* v. *New York*, 388 U.S. 41, 58–60 (1967), *Katz* v. *United States*, 389 U.S. 347, 355–56 (1967)).

Subparagraph (4) sets out in subparagraphs (a) through (e) the requirements that each order authorizing or approving the interception of wire or oral communications must meet. Subparagraph (a) requires the order to specify the identity, if known, of the individual whose communications are to be intercepted. See *West* v. *Cabell*, 153 U.S. 78 (1894). Subparagraph (b) requires the order to specify the phone

or other communication facilities from which or the place where the authority to intercept is granted. See *Steele* v. *United States*, 267 U.S. 498 (1925). Subparagraph (c) requires a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates. (*Berger* v. *New York*, 388 U.S. 41 (1967).) Subparagraph (d) requires that the order note the agency authorized to make the interception and the person who authorized the application so that responsibility will be fixed. Finally, subparagraph (e) requires that the order specify the period of time during which the interception is authorized including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

Paragraph (5) provides that no order may authorize or approve the interception of wire or oral communications for a period of time longer than necessary to achieve the approved objective of the law enforcement officers and in no event longer than 30 days. The provision must be read in light of section 2518(1)(d), discussed above. It is intended to prevent the issuance of blank warrants, condemned in *Berger* v. *New York*, 388 U.S. 41 (1967). It requires the time of the warrant to be carefully tailored to the showing of probable cause. The period of authorized interception is intended to begin when the interception—in fact—begins and terminates when the interception—in fact—terminates. This will be a question of fact in each case. When it is necessary to conduct surveillance for a period of time longer than that specified, the provision provides for extensions. No arbitrary limit is placed on the number of extensions which can be obtained. The application for an extension must be made in accordance with paragraph (1), discussed above, and the judge must make the findings required by paragraph (3), discussed above. This meets the test of the Constitution (*Berger* v. *New York*, 388 U.S. 41 (1967)). As with initial orders, extensions must be related in time to the showing of probable cause and in no event shall be granted for longer than 30 days. All orders and extensions must be executed as soon as practicable and shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter. A wiretap can take up to several days or longer to install. Other forms or devices may take even longer. The provision is intended to recognize that each case must rest on its own facts. But the execution must be prompt (*Berger* v. *New York*, 388 U.S. 41 (1967)). Otherwise there is a danger that the showing of probable cause and the additional information in the application will become stale. Compare *Sgro* v. *United States*, 287 U.S. 206 (1932). This will be a question of fact in each case. The provision finally requires each order or extension to specify that interception must terminate when the objective for which the order was issued is achieved even though the period of authorized interception has not been exhausted or in any event within 30 days. Again, this meets the test of the Constitution (*Berger* v. *New York*, 388 U.S. 41 (1967)).

Paragraph (b) sets out a procedure for periodic judicial supervision during a period of surveillance. It must be read in light of paragraph (1)(d) and paragraph (5), both of which are discussed above. It provides that when an order to intercept is entered the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized

objective and the need for continued interception. The reports are intended as a check on the continuing need to conduct the surveillance. At any time the judge is convinced the need is no longer established, he may order the surveillance discontinued. Section 2518(1)(d), discussed above, will serve to insure that extended surveillance is not undertaken lightly. This provision will serve to insure that it is not unthinkingly or automatically continued without due consideration.

Paragraph (7) provides for an emergency procedure for the interception of wire or oral communications. Where any investigative or law enforcement officer determines: (a) that an emergency situation exists that requires a wire or oral communication to be intercepted before an order authorizing an interception can with due diligence be obtained, and (b) that there are grounds upon which an order could be entered under this chapter to authorize such an interception, this provision authorizes the interception of the communication. Often in criminal investigations a meeting will be set up and the place finally chosen almost simultaneously. Requiring a court order in these situations would be tantamount to failing to authorize the surveillance. The provision reflects existing search warrant law in which the principle of emergency search is well established (*Carroll* v. *United States*, 267 U.S. 132 (1925); *Schmerber* v. *California*, 384 U.S. 757 (1966)). Where an interception is made, an application for an order of approval must be made under paragraph (1) of this section within 48 hours after the interception has occurred or begun to occur. In the absence of an order, such interception shall immediately terminate when the communication sought is obtained, or when the application for the order is denied, whichever is earlier. If the application is denied or terminated without an order having been issued, the intercepted communication must be treated as provided for in section 2515, discussed above. An inventory under paragraph (8)(d), discussed below, must be filed. A denial of an application for an order of approval would be appealable under paragraph (10)(b). See *Gottne* v. *United States*, 345 F. 2d 165 (10th), certiorari denied, 382 U.S 901 (1965).

Paragraph (8) sets out safeguards designed to insure that accurate records will be kept of intercepted communications.

Subparagraph (a) requires, if practicable, that the communication be recorded on tape, wire, or other comparable device. The recording must be made in such a way as will protect it insofar as possible from editing or alteration. Appropriate procedures should be developed to safeguard the identity, physical integrity, and contents of the recordings to assure their admissibility in evidence. Immediately upon the termination of the interception, the records must be made available to the judge who issued the order and sealed. Custody of the records shall be wherever the judge orders. Most law enforcement agency's facilities for safekeeping will be superior to the court's, and the agency normally should be ordered to retain custody, but the intent of the provision is that the records should be considered confidential court records. They must not be destroyed except upon court order and must be kept for at least 10 years. Duplicate recordings may be made for authorized disclosure or use under section 2517 (1) and (2), discussed above. Finally, the presence of the seal, noted above, is intended to be a prerequisite for use or disclosure under section 2817 (3) or (5) unless a satisfactory explanation can be made to the judge before whom the

evidence is to be disclosed or before whom permission is sought for other use or disclosure.

Subparagraph (b) provides that applications and orders for authorization shall be treated confidentially. Particularly in renewal suitations, they may be expected to contain sensitive information. The provision requires them to be sealed and kept wherever the judge directs, which would normally be with the records themselves. Applications and orders may not be disclosed except incidental to the disclosure or use of the records themselves after a showing of good cause, for example, under (10) (a), discussed below. Applications and orders may not be destroyed except on a court order and must be kept for at least 10 years.

Subparagraph (c) mades explicit the power of the judge to enforce the provisions of subparagraphs (a) and (b) through the contempt power of the court.

Subparagraph (d) places on the judge the duty of causing an inventory to be served by the law enforcement agency on the person named in an order authorizing or approving an interception. This reflects existing search warrant practice. See Federal Rules of Criminal Procedures, 41(c) ; *Berger* v. *New York*, 388 U.S. 41 (1967) ; *Katz* v. *United States*, 389 U.S. 347 (1967). The inventory must be filed within a reasonable period of time, but not later than 90 days after the interception is terminated. It must include notice of the entry of the order, the date of its entry, the period of authorized or approved interception, and whether or not wire or oral communications were intercepted. On an ex parte showing of good cause, the serving of the inventory may be, not dispensed with, but postponed. For example, where interception is discontinued at one location, when the subject moves, but is reestablished at the subject's new location, or the investigation itself is still in progress, even though interception is terminated at any one place, the inventory due at the first location could be postponed until the investigation is complete. In other situations, where the interception relates, for example, to a matter involving or touching on the national security interest, it might be expected that the period of postponement could be extended almost indefinitely. Yet the intent of the provision is that the principle of postuse notice will be retained. This provision alone should insure the community that the techniques are reasonably employed. Through its operation all irrohtauniettieoe are reasonably employed. Through its operation all authorized interceptions must eventually become known at least to the subject. He can then seek appropriate civil redress, for example, under section 2520, discussed below, if he feels that his privacy has been unlawfully invaded.

Paragraph (9) provides that the contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any Federal or State trial, hearing, or other proceeding unless each party not less than 10 days before the trial has been furnished with a copy of the court order under which the interception was authorized or approved. "Proceeding" is intended to include all adversary type hearings. It would include a trial itself, a probation revocation proceeding, or a hearing on a motion for reduction of sentence. It would not include a grand jury hearing. Compare *Blue* v. *United States*, 384 U.S. 251 (1966). The 10-day period is designed to give the party an opportunity to make a

pretrial motion to suppress under paragraph (10)(a), discussed below. Compare *Segurola* v. *United States*, 275 U.S. 106 (1927). Where it is not possible to furnish the party the information 10 days before trial, and he would not be prejudiced, the judge may waive the requirement. Such a situation might arise, for example, when an intercepted communication became relevant only as a result of the character of a defense presented by the defendant. Ordinarily, prejudice would be shown only where it was established that the trial could not be reasonably recessed in order that the motion to suppress could be fully heard or that the granting of a mistrial rather than excluding the evidence would be grossly unfair.

Paragraph (10)(a) provides that any aggrieved persons, as defined in section 2510(11), discussed above, in any trial hearing or other proceeding in or before any court department, officer, agency, regulating body or other authority of the United States, a State, or a political subdivision of a State may make a motion to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom. This provision must be read in connection with sections 2515 and 2517, discussed above, which it limits. It provides the remedy for the right created by section 2515. Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. (*Blue* v. *United States*, 384 U.S. 251 (1965).) There is no intent to change this general rule. It is the intent of the provision only that when a motion to suppress is granted in another context, its scope may include use in a future grand jury proceeding. Nor is there any intent to grant jurisdiction to Federal courts over the Congress itself. (See *Hearst* v. *Black*, 66 App. D.C. 313, 87 F. 2d 68 1936).) Otherwise, the scope of the provision is intended to be comprehensive. The motion may be made on the ground that: (i) the communication was unlawfully intercepted, (ii) the order of authorization or approval is insufficient on its face, or (iii) the interception was not made in conformity with the order. The motion must be made before the trial, hearing, or proceeding unless there was no opportunity to make the motion or the person was not aware of the grounds of the motion, for example, when no notice was given under paragraph (9), discussed above. Care must be exercised to avoid having a defendant defeat the right of appeal under paragraph (b), discussed below, by waiting until trial. (*Giacona* v. *United States*, 257 F. 1d 450 (5th), *cert. denied*, 358 U.S. 873 (1958).) Upon the filing of such a motion to suppress, the court may make available to the person or his counsel such portions of the intercepted communications or evidence derived therefrom as the court determines to be in the interest of justice. This provision explicitly recognizes the propriety of limiting access to intercepted communications or evidence derived therefrom according to the exigencies of the situation. The motion to suppress envisioned by this paragraph should not be turned into a bill of discovery by the defendant in order that he may learn everything in the confidential files of the law enforcement agency. Nor should the privacy of other people be unduly invaded in the process of litigating the propriety of the interception of an aggrieved person's communications.

Subparagraph (b) provides that the United States shall have a right of appeal from an order granting a motion to suppress under paragraph (a), above, or the denial of an application for an order of approval. This right is necessary in order that the proposed chapter will receive a uniform interpretation. This provision is intended to reflect existing law in the area of narcotics. Compare 18 U.S.C. 1404 (1966). The United States Attorney must certify to the judge or other official granting the motion that the appeal is not taken for purposes of delay. The appeal must be taken within 30 days after the date the order was entered and prosecuted diligently.

Section 2519 of the new chapter provides for a series of reports on the administration of the court order system. They are intended to form the basis for a public evaluation of its operation. The reports are not intended to include confidential material. They should be statistical in character. It is intended that the contents of the reports should be governed by 18 U.S.C. 1001 (1958). It will assure the community that the system of court-order electronic surveillance envisioned by the proposed chapter is properly administered and will provide a basis for evaluating its operation.

Section 2520 of the new chapter authorizes the recovery of civil damages. It provides that any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall have a civil cause of action against any person, as defined in section 2510(6), discussed above, who intercepts, discloses or uses or procures any other person to intercept, disclose or use such communication. The scope of the remedy is intended to be both comprehensive and exclusive, but there is no intent to preempt parallel State law.

Recovery shall include: (a) actual damages, but not less than liquidated damages at the rate of $100 a day for each day of violation or $1,000, whichever is higher, (b) punitive damages, where malice is shown, and (c) a reasonable attorney's fee and other litigation costs reasonable incurred. Injunctive relief, with its attendant discovery proceedings, is not intended to be available (*Pugach* v. *Dollinger*, 365 U.S. 458 (1961)). It is expected that civil suits, if any, will instead grow out of the filing of inventories under section 2518(8) (d). A good faith reliance on a court order would constitute a complete defense to an action for damages. (Compare *Pierson* v. *Ray*, 386 U.S. 547 (1967)).

*Section 803.*—This section amends section 605 of the Communications Act of 1934 (48 Stat. 1103, 47 U.S.C. sec. 605 (1958)). This section is not intended merely to be a reenactment of section 605. The new provision is intended as a substitute. The regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code.

As redrafted, the new section 605 would provide that, except as authorized or permitted by chapter 119, title 18, United States Code, no person receiving, assisting in receiving, transmitting, assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or transmission or reception, (1) to any person other than the addressee, his agents, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officer of the various communica-

tion centers over which the communications may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction or (6) on demand of other lawful authority. The new section is designed to regulate the conduct of communications personnel. It also provides that no person not authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. "Person" does not include a law enforcement officer acting in the normal course of his duties. But see *United States* v. *Sugden* (226 F. 2d 281 (9th 1955), *aff'd per curiam*, 351 U.S. 916 (1956)). Under the new section, no person not so entitled will be permitted to receive or assist in receiving any interstate or foreign radio communication for his own benefit or for the benefit of another not entitled to it. Finally, no person who has received any intercepted radio communication or become acquainted with its contents, substance, purport, effect, or meaning, knowing that the communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning, of it or use it for his own benefit or for the benefit of another not entitled to it. The section is not intended to apply to radio broadcasts or transmission by amateurs or others for the use of the general public or which relates to ships in distress.

## Title IV

*Section 901.*—This section of the title contains a statement of findings and declaration. The purpose of setting forth such a statement is to clarify misconceptions which have arisen concerning the nature and purpose of the provisions of the title and to include a definite declaration of the purpose of the title and of the findings which justified its enactment.

*Subsection* (a) of section 501 contains findings and declarations as to the existence of the conditions with which the title is designed to deal and of the action necessary to cope with those conditions. Each of these findings is fully supported by the evidence of record before the committee.

Paragraph (1) is the basic finding and declaration that the existing Federal controls over the traffic in firearms moving in (or otherwise affecting) interstate or foreign commerce do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power.

Paragraph (2) is the basic finding and declaration that the ease with which any person can acquire firearms other than a rifle and shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States.

The committee, through its own investigations and by the evidence presented to the committee by the Nation's leading law enforcement officers, has established this fact beyond reasonable doubt.

Paragraph (3) is the basic finding and declaration that only through adequate Federal control over interstate and foreign commerce in firearms, other than rifles and shotguns, and over all persons engaging

in the businesses of importing, manufacturing, or dealing in firearms, can the grave problem of firearms getting into the wrong hands be properly dealt with, and effective State and local regulation of the firearms traffic be made possible.

Paragraph (4) is a specific finding that the acquisition on a mail-order basis of firearms, other than rifles and shotguns, by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances.

This specific finding is documented by the evidence summarized in the August 7, 1964, Interim Report on Interstate Traffic in Mail Order Firearms (S. Rept. 1340, 88th Cong., 2d sess.), and in S. Rept. 1866, 89th Congress, 2d session.

Paragraph (5) is a specific finding and declaration that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms.

The evidence of record before the committee fully supports this finding and declaration. (See summary in the general discussion of the scope of coverage of the bill under the subheading "Out of State Purchase of Concealable Firearms, " p. 12, S. Rept. 1866, 89th Cong., 2d sess.)

Paragraph (6) is a specific finding and declaration that there is a causal relationship between the easy availability of firearms other than rifles and shotguns, and juvenile and youthful criminal behavior, and that such firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior.

The committee in the course of its investigation and hearings has fully established the basis for this finding and declaration. The committee expressed its concern with regard to the casual relationship between the availability of firearms and juvenile and youthful criminal behavior in the interim report on August 7, 1964 (S. Rept. 1340, 88th Cong., 2d sess.), relating to the "Interstate Traffic in Mail Order Firearms."

This finding and declaration has been fully supported by the evidence presented at the several hearings before the Senate on firearms legislation.

Paragraph (7) is a specific finding and declaration that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years have contributed greatly to lawlessness and to the Nation's law enforcement problems.

This finding and declaration is fully supported by the evidence developed by the investigations of the committee and by testimony before it by the Attorney General of the United States, the attorneys general of California, New Jersey, and South Carolina, and by the police officials of Atlanta, Chicago, Los Angeles, New York City, Philadelphia, St. Louis, and the District of Columbia.

Paragraph (8) is a specific declaration and finding that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, and so forth, and destructive devices such as explosive or incendiary grenades, bombs, missiles, and so forth) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority and those participating in civil disorders, thus creating a problem of national concern.

This finding and declaration is fully supported by the investigations of the committee and by the evidence presented at the hearings before the committee.

The concern of Federal, State, and city law enforcement officers over this problem was made clear at the hearings before the committee.

Paragraph (9) is a specific finding and declaration that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.

This finding and declaration is fully supported by investigations of the committee and by the evidence presented by Federal, State, and city law enforcement officials at the hearings before the committee.

*Subsection (b)* of section 501 is designed and intended to remove certain public misconceptions as to the nature of the title and is a general declaration that the purpose of the title is to cope with the conditions referred to in the findings in subsection (a), and that it is not the purpose of the title to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that the title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by regulations of any procedures or requirements other than those reasonably necessary to implement, and effectuate the provisions of the title.

*Section 902.*—This section would incorporate in title 18, United States Code, a new chapter (ch. 44) consisting of sections 921 through 928. For clarity, references in this section of the title will be to sections as they would appear in chapter 44 of title 18.

*Section 921 provides definitions*

*Section 921(a)(1).*—The definition of the term "person" in this paragraph is substantially the same as existing law (15 U.S.C. 901 (1)). However, the term "whoever" is added and "any company, firm, society, or joint-stock company" is included in the definition.

*Section 921(a)(2).*—The definition of the term "interstate or foreign commerce" is a restatement of existing law (15 U.S.C. 901(2)). "Territory" is omitted since there is no territory at this time. The last sentence of this definition is added to clarify the status of the title in Puerto Rico, the Virgin Islands, and the District of Columbia through providing that these areas shall be included within the term "State."

*Section 921(a)(3).*—This definition of the term "firearm" is a revision of the definition in the present law (15 U.S.C. 901(3)). The definition has been extended to include any weapon (including a starter gun) which will, or may be readily converted to, expel a projectile or

projectiles by the action of an explosive. This provision makes it clear that so-called unserviceable firearms come within the definition. Under the present definition of "firearm," any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words "any part or parts." The revised definition continues to cover mufflers and silencers and is extended to include destructive devices which term is subsequently defined. Section 921(b)(1) of the title excludes an antique firearms from this definition. It should be noted that powder actuated industrial tools used for their intended purpose are not considered weapons and, therefore, are not included in this definition.

*Section 921(a)(4).*—The term "destructive device" is a new provision defined to mean dangerous bomb and incendiary-type weapons and weapons having a large bore such as antitank guns. Section 921(b)(2) of the title excludes certain devices from the definition.

*Section 921(a)(5).*—The term "shotgun" is defined in the same manner as in section 5848(4) of title 26 which is a part of the National Firearms Act—that is, a weapon intended to be fired from the shoulder designed to fire a number of ball shot through a smooth bore. The present Federal Firearms Act does not contain such a definition.

*Section 921(a)(6).*—The term "short barreled shotgun" is defined as a shotgun which comes within the purview of the National Firearms Act (26 U.S.C. 5801 et seq.)—that is, a shotgun having a barrel less than 18 inches in length or a modified shotgun having an overall length less than 26 inches. The term is not defined in the present Federal Firearms Act.

*Section 921(a)(7).*—The term "rifle" is defined in the same manner as the term is defined in section 5848(3) of title 26 which is a part of the National Firearms Act—that is, a weapon intended to be fired from the shoulder and designed to fire a single projectile through a rifled bore. This term is not defined in the present Federal Firearms Act.

*Section 921(a)(8).*—The term "short barreled rifle" is defined as being a rifle coming within the purview of the National Firearms Act (26 U.S.C. 5801 et seq.)—i.e., a rifle having a barrel less than 16 inches in length or a modified rifle having an overall length of less than 26 inches. This definition is not included in the present Federal Firearms Act.

*Section 921(a)(9).*—The term "importer" is defined as one engaged in the business of importing or bringing firearms and ammunition into the United States for sale or distribution. Under the present Federal Firearms Act, the term "manufacturer" is defined in such a way that an importer is included within the meaning of the term (15 U.S.C. 901(4)).

*Section 921(a)(10).*—The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 904(4)), except that reference to importation has been deleted. Importation activities would come within the definition of the term "importer" in paragraph (9) of this subsection.

*Section 921(a)(11).*—The term "dealer" is defined in somewhat the same manner as that definition appears in present law (15 U.S.C. 901(5)). The definition would make one engaged in the business of selling ammunition for destructive devices a dealer and specifically

provides that a pawnbroker dealing in firearms shall be considered a dealer.

*Section 921 (a) (12).*—The term "pawnbroker" is a new definition and is designed to make it clear what category of person is required to obtain a dealer license as a pawnbroker under section 923(a) as contained in the title.

*Section 921 (a) (13).*—The definition of the term "indictment" is a new provision. Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license will not be issued to such a person, the definition makes it clear that either an indictment or an information in any court for a felony comes within the meaning of the term.

*Section 921 (a) (14).*—The definition of the term "fugitive from justice" is a restatement of the present definition (15 U.S.C. 901(6)) with "Territory" and the "District of Columbia" being omitted. These omissions were made in that there are no more territories and under the provision of section 921(a) (2) as contained in the title, the District of Columbia is treated as a State.

*Section 921 (a) (15).*—The definition of the term "antique firearm" is a new provision. Section 921(b) (1) as contained in the title excludes an antique firearm from the definition of a firearm in section 921(a) (3) as contained in the title. Thus, the definition makes it clear that the term includes only firearms of a design used before the year 1870, or a replica thereof, which were not designed to use smokeless powder.

*Section 921 (a) (16).*—The term "ammunition" is defined in the present law (15 U.S.C. 901(7)), as pistol and revolver ammunition. This title does not include controls over pistol or revolver ammunition but it does incorporate controls over ammunition for desrtuctive devices. Thus, this term is defined as meaning ammunition for destructive devices and ammunition for use in any other type of firearm is excluded from its meaning.

*Section 921 (a) (17).*—This definition of the term "Secretary" or "Secretary of the Treasury" is a new provision. The term is defined to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several provisions of the title.

*Section 921 (b) (1).*—As noted in section 921(a) (3) as contained in the title, this paragraph excludes an "antique firearm," which is defined in section 921(a) (15) as contained in the title, from the definition of "firearm." Thus, an antique firearm is not controlled under the title.

*Section 921 (b) (2).*—As noted under section 921(a) (4) as contained in the title, this paragraph excludes certain devices from the definition of "destructive device." The devices excluded are those not designed or redesigned or used or intended for use as a weapon—e.g., construction tools using explosives when used for such purposes; those used solely for such purposes as signaling; shotguns other than those coming within the purview of the National Firearms Act; nonautomatic rifles suitable for big game hunting; surplus military weapons distributed under 10 U.S.C. 4684(2), 4685, and 4686, e.g., a piece of obsolete field artillery given to an Amercan Legon post; or those devces which the Secretary finds will not likely be used as a weapno, e.g., a rocket used in a research project.

*Section 921 (b) (3).*—This paragraph provides that certain commercial-type crimes shall not be included in the term "crime punishable

by imprisonment for a term exceeding one year." Thus, one convicted, for example, of unfair trade practices, would not be restricted under those provisions of the title related to purchase or transportation of firearms by convicted felons. While the paragraph enumerates certain types of crimes which are excluded from the felony criteria, it also gives the Secretary authority to add similar types of crimes to the list. The present Federal Firearms Act contains no comparable provision.

*Section 922(a) contains prohibitions applicable to all persons as well as prohibitions applicable only to licensees*

*Section 922(a)(1).*—This paragraph proscribes any person from engaging in the business of importing, manufacturing, or dealing in firearms or ammunition (destructive device) without a license. The prohibition goes to both an unlicensed person engaging in a firearms business and such a person who, in the course of that business, ships, transports, or receives, a firearm or ammunition in interstate or foreign commerce. Thus, the paragraph makes it clear that a license is required for an intrastate business as well as an interstate business. The present Federal Firearms Act (15 U.S.C. 902(a)) merely prohibits the interstate or foreign shipment or receipt of firearms by a manufacturer or dealer unless he has a license.

*Section 922(a)(2).*—This paragraph contains one of the major measures of the title—the interstate shipment of any firearm (other than a rifle or shotgun) or ammunition by a licensee to anyone other than another licensee is prohibited unless such shipment comes within one of the three exceptions stated. In effect, the interstate mail-order shipments of firearms (other than rifles and shotguns) and ammunition would be banned so that State and local authorities may better exercise the controls they deem desirable over the acquisition and possession of such firearms. There is no similar provision in the present Federal Firearms Act. Exceptions to the overall prohibition are: (1) licensees returning a repaired firearm or replacement firearm of the same kind to the person from whom received; (2) shipment of a firearm by mail to one entitled to receive it under 18 U.S.C. 1715; and (3) delivery by a licensee in the District of Columbia to a resident of the District of Columbia (this exception also goes to transactions in Puerto Rico and the possessions).

*Section 922(a)(3).*—This paragraph implements the prohibition in section 922(a)(2) of the title, as well as State and local controls over firearms. Any person other than a licensee, would be prohibited from transporting or receiving in his State of residence any firearm, except a rifle or shotgun, purchased or otherwise obtained by him outside that State and the prohibition is extended to a rifle and shotgun if the purchase or possession of such weapon would be unlawful in the State, or political subdivision thereof, where he resides. There is no comparable requirement in the present Federal Firearms Act.

*Section 922(a)(4).*—This paragraph prohibits transportation of destructive devices and National Firearms Act weapons (gangster-type) in interstate or foreign commerce, except as authorized by the Secretary. There is no comparable provision in the present Federal Firearms Act.

*Section 922(a)(5).*—This paragraph is also designed to implement section 922(a)(2) of the title, as well as State and local firearms control provisions, by prohibiting any unlicensed person from transferring in any way a firearm, other than a rifle or shotgun, to another unlicensed person who resides in another State. The prohibition is extended to a rifle or shotgun if the State or local law of the place of residence of the transferee would be violated by the purchase or possession of the weapon. The present Federal Firearms Act contains no comparable provision.

*Section 922(a)(6).*—This paragraph prohibits the making of false statements or the use of any deceitful practice (both knowingly) by a person in connection with the acquisition or attempted acquisition of a firearm from a licensee. To invoke the prohibition, the false statement or deceitful practice must be material to the lawfulness of the sale of the firearm under the provisions of the title. The requirement that one who obtains a firearm from a licensee must properly identify himself is inherent in this prohibition. This is strengthened by the recordkeeping provisions of sections 922(b)(5) and 923(d) as contained in the title. There is no specific prohibition in the present Federal Firearms Act covering the type of falsification involved in this paragraph.

*Section 922(b) contains prohibitions applicable only to licensees— These prohibitions go to intrastate, as well as interstate, transactions by licensees*

*Section 922(b)(1).*—The sale by a licensee of any firearm, other than a shotgun or rifle, to anyone less than 21 years old is prohibited. The prohibition would usually be concerned with over-the-counter sales but would also be involved in intrastate mail-order sales. There is no comparable restriction in the present Federal Firearms Act.

*Section 922(b)(2).*—This paragraph was designed to implement State and local firearms controls by making it unlawful for a licensee to deliver any firearm to an unlicensed person with reasonable cause to believe the receipt or possession of the weapon would be in violation of State or local law. Again, this control measure is directed primarily toward over-the-counter sales but would also be applicable to all sales. There is no comparable provision in the present Federal Firearms Act.

*Section 922(b)(3).*—Under this paragraph, it would be unlawful for a licensee to sell a firearm, other than a rifle or shotgun, to an out-of-State unlicensed resident. Shotguns or rifles could be sold over-the-counter or mail-order to out-of-State residents. This prohibition implements the strict controls over the interstate movements of pistols and revolvers in section 922(a)(2) as contained in the title. It also is designed to prevent the avoidance of State and local laws controlling firearms other than rifles and shotguns by the simple expediency of crossing a State line to purchase one. There is no comparable provision in the present Federal Firearms Act.

*Section 922(b)(4).*—A licensee is prohibited from disposing of a destructive device or a national act weapon (gangster-type) to any unlicensed person unless that person has a statement executed by the principal law enforcement officer of the locality where the unlicensed person resides. The statement is required to be maintained as part of the records of the licensee. This prohibition is directed to over-the-counter sales and may be applied to intrastate mail-order sales. The present Federal Firearms Act has no similar provision.

*Section 922(b)(5)*.—This paragraph makes it unlawful for a licensee to dispose of a firearm without making a record showing the name, age, and residence of the purchaser. Of course, this prohibition implements each of the controls imposed by the title. There is a somewhat similar provision in the present Federal Firearms Act (15 U.S.C. 903(d)).

*Section 922(c)*.—This subsection prohibits a licensee from disposing of a firearm or ammunition to a fugitive, a felon, or one under indictment. A person who has been granted relief under section 925(c) is excluded from the class of persons covered by this restriction. The prohibition here goes to all types of sales or dispositions—over-the-counter as well as mail order. The provisions of this subsection are similar to 15 U.S.C. 902(d) of the present Federal Firearms Act but go further than that subsection in that over-the-counter sales are covered. Also ammunition for destructive devices is included in the prohibition.

*Section 922(d)*.—This subsection makes it unlawful for a common or contract carrier to transport or deliver any firearm in interstate or foreign commerce with knowledge that its transportation or receipt would be in violation of any provision of the title. Present law has no specific restrictions on common or contract carriers. However, 15 U.S.C. 902(d) through (i) of the present Federal Firearms Act could be applied to carriers in proper factual situations.

*Section 922(e)*.—This subsection prohibits a felon, fugitive, or one under indictment from shipping a firearm or ammunition in interstate or foreign commerce. The same prohibition is contained in 15 U.S.C. 902(e) of the present Federal Firearms Act except that ammunition for a destructive device is not covered.

*Section 922(f)*.—This subsection makes it unlawful for a felon, fugitive, or one under indictment to receive a firearm or ammunition which has been shipped or transported in interstate or foreign commerce. The present Federal Firearms Act (15 U.S.C. 902(f)) contains a similar prohibition. However, a person under indictment is added by this subsection to the class of persons restricted from receiving firearms, the presumption in 15 U.S.C. 902(f) is not carried over into this subsection, and the restriction in the present Federal Firearms Act does not go to ammunition for destructive devices.

*Section 922(g)*.—This subsection makes it a crime to transport a stolen firearm or ammunition in interstate or foreign commerce knowing either was stolen. This subsection follows 15 U.S.C. 902(g) of the present Federal Firearms Act except that it covers ammunition for destructive devices rather than pistol and revolver ammunition.

*Section 922(h)*.—This subsection prohibits any person from receiving, etc., any stolen firearm or ammunition "moving as", etc., in interstate or foreign commerce. This prohibition is a modified form of the restriction in 15 U.S.C. 902(h) of the present Federal Firearms Act but the restriction would go to ammunition for destructive devices rather than pistol and revolver ammunition.

*Section 922(i)*.—This subsection makes it unlawful for any person knowingly to ship or receive in interstate or foreign commerce any firearm having the serial number removed or altered. This prohibition is found in 15 U.S.C. 902(i) of the present Federal Firearms Act except that the presumption would not be carried over.

*Section 922(j)*.—This subsection is related to section 925(d) as contained in the title which authorizes the importation of firearms upon meeting state conditions precedent. The subsection makes it un-

lawful to import a firearm in violation of section 925 (d) as contained in the title or knowingly receive any firearm unlawfully imported under that section. The present Federal Firearms Act contains no comparable prohibition.

*Section 922 (k)*.—This subsection makes it unlawful for a licensee to falsify records, to fail to make record entries or to fail to maintain records required. The present Federal Firearms Act requires records in 15 U.S.C. 903 (d). However, this prohibition, coupled with the more detailed record requirements in section 923 (d) as contained in the title, goes further than requirements in the present Federal Firearms Act.

*Section 923 contains licensing provisions*

*Section 923 (a)*.—This subsection requires all persons engaging in business as a firearms manufacturer, importer, or dealer to have a license for each place of business. The Secretary is given authority to prescribe the form of the application and the information it will contain. The fees are prescribed and range from $1,000 per year, in the case of a manufacturer or importer of destructive devices, to $10 per year (after the first renewal, which would be $25), in the case of a dealer in firearms other than destructive devices. The licensing requirements of the present Federal Firearms Act, 15 U.S.C. 903 (a), are based upon dealers and manufacturers (includes importers) shipping or receiving firearms in interstate or foreign commerce. Here, the requirement is on engaging in business and would include one engaging in such a business in intrastate commerce. Also, the fees for licenses are substantially increased by this subsection and types of licenses are increased—manufacturers and importers of destructive devices are added and a new type of dealer—pawnbroker—is included.

*Section 923 (b)*.—This subsection authorizes the Secretary to issue a license to one who has filed a proper application and paid the prescribed fee and provides that such license shall, subject to the provisions of the title and other applicable law, entitle the licensee to transport or receive the firearms and ammunition covered by the license in interstate or foreign commerce for the period stated. The subsection is comparable to 15 U.S.C. 903 (b) of the present Federal Firearms Act except that no specific provision is made for revocation. However, it should be noted that the provisions of the proposed subsection specifically restrict the licensee to interstate shipments and receipts in accordance with the provisions of the title. Thus, for example, a licensee finally convicted of a felony could not continue to engage in business under the title.

*Section 923 (c)*.—The standards for issuing a license would be greatly strengthened by the provisions of this subsection. This subsection provides for denial of a license applied for under subsections (a) and (b) of this section if the Secretary finds the applicant (1) is under 21 years of age; (2) is prohibited by the title from transporting or receiving firearms in interstate or foreign commerce or is not likely to maintain operations in compliance with title; (3) has violated any provision of the chapter; (4) has failed to disclose material information, or made a false statement, in his application; or (5) does not have or intend to have, business premises. Notice and opportunity for a hearing on the disapproval of an application are specifically provided. Under the present Federal Firearms Act, there is no specific authorization to deny an application for a license. However, licenses are not

issued to persons who may not lawfully ship or receive fire arms or ammunition in interstate commerce. Of course, 5 U.S.C., 556–558, and related sections of Title 5 of the United States Code are applicable in actions with respect to licensing under this title.

*Section 923 (d).*—Requires *all* licensees to maintain records of "importation, production, shipment, receipt, and sale or other disposition" of firearms and ammunition as the Secretary may by regulations prescribe and that such records be made available for inspection at reasonable times. The subsection also provides that the Secretary may enter the business premises of a licensee for inspection and authorizes the Secretary to disclose information acquired through provisions of the title to State and local authorities. The requirement for records under the present Federal Firearms Act is vague. (15 U.S.C. 903 (d).)

*Section 923 (e).*—This subsection requires the license be kept posted and available for inspection. There is no similar provision in the present Federal Firearms Act.

*Section 923 (f).*—Licensed importers and licensed manufacturers are required to identify firearms imported or manufactured. The present Federal Firearms Act does not contain a specific requirement for identification of firearms. However, there is an implied requirement in the recordkeeping provisions (15 U.S.C. 903 (d)) and in 15 U.S.C. 902 (i).

*Section 924 contains the penalty and forfeiture provisions*

*Section 924 (a).*—Provides penalties for violation, including false statements, of any provision of the title, or regulations issued thereunder—a fine of not more than $5,000 or imprisonment for not more than 5 years or both. Under 15 U.S.C. 905 (a) of the present Federal Firearms Act, the penalty for a violation is a $2,000 fine or imprisonment for 5 years or both.

*Section 924 (b).*—This subsection provides that a person who ships, transports, or receives a firearm in interstate or foreign commerce with intent to commit a felony, or with knowledge or reason to believe that such crime will be committed, with the weapon shall be fined both more than $10,000 or imprisoned not more than 10 years, or both. There is no comparable provision in the present Federal Firearms Act.

*Section 924 (c).*—This subsection provides that any firearm involved in a violation of the title, or regulations thereunder, and any firearm involved in a violation of any criminal law of the United States shall be subject to forfeiture. The forfeiture provisions of the National Firearms Act (26 U.S.C. 5801, *et seq.*) are, insofar as applicable, extended to forfeiture under this subsection. Under 15 U.S.C. 905 (b) of the present Federal Firearms Act, a firearm involved in a violation of that act is subject to forfeiture. However, there is no comparable provision in the present Federal Firearms Act as to forfeiting firearms used in a violation of other Federal laws.

*Section 925 concerns exceptions to the title and relief from disabilities under the title*

*Section 925 (a).*—This subsection excepts from the title transactions in which a firearm or ammunition is imported for, sold or shipped to, or issued for the use of the United States (including any department or agency thereof), or any State or possession (including any department, agency or political subdivision thereof). Those exemptions are carried over from the present Federal Firearms Act (15 U.S.C. 904)

but this subsection does not carry over other exemptions in that act, *e.g.*, shipments of firearms to a "research laboratory designated by the Secretary."

*Section 925(b).*—This subsection authorizes a licensee indicted for a felony to continue operations under his existing license until a conviction under the indictment becomes final. The present Federal Firearms Act contains no specific provision to this effect but has been interpreted to authorize this procedure. (See 26 CFR 177. 31(b)).

*Section 925(c).*—This subsection is 15 U.S.C. 910 in the present Federal Firearms Act. It would grant relief to certain individuals from the restrictions that would be imposed on them under the title by reason of having been convicted of certain felonies.

*Section 925(d).*—This subsection gives the Secretary authority to permit the importation of certain types of firearms—(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machine gun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, *et seq.*) and suitable for sporting purposes (in the case of surplus military weapons, this type is limited to shotguns and rifles), and those previously taken out of the United States. The subsection contains a proviso permitting the Secretary to authorize the importation of a firearm for classification purposes. There is no comparable provision in the present Federal Firearms Act.

*Section 926. Rules and regulations*

This section provides the rulemaking authority now granted to the Secretary by 15 U.S.C. 907. It also specifically provides that interested parties will be given opportunity for a public hearing on proposed rules and regulations after notice. The present Federal Firearms Act does not contain a comparable provision. However, other Federal statutes require notice of the issuance of regulations.

*Section 927. Effect on State law*

This section sets out the intent of Congress with respect to the title as it would relate to the law of any State on the subject matter.

*Section 928. Separability*

This section provides that if any provision of the title is held invalid, the remainder of the title shall not be affected thereby.

*Section 903*

Here, the Secretary of the Treasury is given specific authority to administer and enforce the provisions of the title.

*Section 904*

This section provides that nothing in the title would modify or affect any provision of the National Firearms Act (26 U.S.C. 5801, et seq.), section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), or section 1715 of title 18, United States Code.

*Section 905*

This section would conform the table of contents in "Part I—Crimes" of title 18, United States Code, to reflect a new chapter 44 of that title.

*Section 906*

The Federal Firearms Act (15 U.S.C. 901, *et seq.*) would be repealed by this section.

*Section 907*

This section contains the effective date provisions of the title. The provisions of the title would become effective 180 days after enactment, except as to a license issued under the present Federal Firearms Act which would be deemed valid until it expired according to its terms, *i.e.*, usually 1 year after date of issuance.

### TITLE V

This title provides that if any provision of the act is held invalid, the remainder of the act shall not be affected thereby.

## CHANGES IN EXISTING LAW

In compliance with subsection (4) of rule XXIX of the Standing Rules of the Senate, changes in exising law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic and existing law in which no change is proposed is shown in roman): [4]

## OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1967

## TITLE 5.—UNITED STATES CODE—GOVERNMENT ORGANIZATION AND EMPLOYEES

SUBCHAPTER II.—EXECUTIVE SCHEDULE PAY RATES

### § 5315. Positions at level IV

Level IV of the Executive Schedule applies to the following positions, for which the annual rate of basic pay is $27,000:

\*         \*         \*         \*         \*         \*         \*

*(84) Administrator of Law Enforcement Assistance.*

### § 5316. Positions at level V

Level V of the Executive Schedule applies to the following positions, for which the annual rate of basic pay is $26,000:

\*         \*         \*         \*         \*         \*         \*

*(119) Associate Administrator of Law Enforcement Assistance.*

---

[4] In the interest of economy, the committee felt it unnecessary to reprint here title I of the Omnibus Crime Control and Safe Streets Act of 1967 in its entirety. Likewise omitted is the Law Enforcement Assistance Act of 1965 (79 Stat. 828), which is repealed by the new act. Furthermore, the committee felt it necessary to print only the sections to be added to chs. 223, title 18, United States Code, and 153 of title 28, United States Code; the new ch. 119 to be added to title 18, United States Code; sec. 605, subch. VI, of title 47, United States Code; and the new ch. 44 to be added to title 18, United States Code.

# TITLE 18.—UNITED STATES CODE—CRIMES AND CRIMINAL PROCEDURE

## Chapter 223.—WITNESSES AND EVIDENCE

＊  ＊  ＊  ＊  ＊  ＊  ＊

3501. *Admissibility of confessions.*
3502. *Reviewability of admission in evidence of confessions in State cases.*
3503. *Admissibility in evidence of eye witness testimony.*

## § 3501. *Admissibility of confessions*

(a) *In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.*

(b) *The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.*

*The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.*

(c) *In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a commissioner or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury.*

(d) *Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention.*

(e) *As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.*

## § 3502. *Reviewability of admission in evidence of confessions in State cases*

Neither the Supreme Court nor any inferior court ordained and established by Congress under article III of the Constitution of the United States shall have jurisdiction to review or to reverse, vacate, modify, or disturb in any way, a ruling of any trial court of any State in any criminal prosecution admitting in evidence as voluntarily made an admission or confession of an accused if such ruling has been affirmed or otherwise upheld by the highest court of the State having appellate jurisdiction of the cause.

## § 3503. *Admissibility in evidence of eye witness testimony*

The testimony of a witness that he saw the accused commit or participate in the commission of the crime for which the accused is being tried shall be admissible into evidence in a criminal prosecution in any trial court ordained and established under article II of the Constitution of the United States; and neither the Supreme Court nor any inferior appellate court ordained and established by the Congress under article III of the Constitution of the United States shall have jurisdiction to review, reverse, vacate, modify, or disturb in any way a ruling of such a trial court or any trial court in any State, territory, district, commonwealth, or other possession of the United States admitting in evidence in any criminal prosecution the testimony of a witness that he saw the accused commit or participate in the commission of the crime for which the accused is tried.

## Chapter 153.—HABEAS CORPUS

Sec.
2256. *Procedures in obtaining writs of habeas corpus.*

\*        \*        \*        \*        \*        \*        \*

## § 2256. *Procedure in obtaining writs of habeas corpus*

The judgment of a court of a State upon a plea or verdict of guilty in a criminal action shall be conclusive with respect to all questions of law or fact which were determined, or which could have been determined, in that action until such judgment is reversed, vacated, or modified by a court having jurisdiction to review by appeal or certiorari such judgment; and neither the Supreme Court nor any inferior court ordained and established by Congress under article III of the Constitution of the United States shall have jurisdiction to reverse, vacate, or modify any such judgment of a State court except upon appeal from, or writ of certiorari granted to review, a determination made with respect to such judgment upon review thereof by the highest court of that State having jurisdiction to review such judgment.

## TITLE 18.—UNITED STATES CODE, PART I

### Chapter 119.—INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS

Sec.
2510. Definitions.
2511. Interception and disclosure of wire or oral communications prohibited.
2512. Manufacture, distribution, possession, and advertising of wire or oval communication intercepting devices prohibited.
2513. Confiscation of wire or oral communication intercepting devices.
2514. Immunity of witnesses.
2515. Prohibition of use as evidence of intercepted wire or oral communications.
2516. Authorization for interception of wire or oral communications.
2517. Authorization for disclosure and use of intercepted wire or oral communications.
2518. Procedure for interception of wire or oral communications.
2519. Reports concerning intercepted wire or oral communications.
2520. Recovery of civil damages authorized.

### § 2510. Definitions

As used in this chapter—

(1) "wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

(2) "oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

(4) "intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

(5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire or oral communication other than—

(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

(b) a hearing aid or similar device being used to correct subnormal hearing to not better than normal;

(6) "person" means any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation;

(7) "investigative or law enforcement officer" means any officer of the United States or of a State or political subdivision thereof,

*who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses;*

*(8) "contents", when used with respect to any wire or oral communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication;*

*(9) "judge of competent jurisdiction" means—*

*(a) a judge of a United States district court or a United States court of appeals; and*

*(b) a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of wire or oral communications;*

*(10) "communication common carrier" shall have the same meaning which is given the term "common carrier" by section 153 (h) of title 47 of the United States Code; and*

*(11) "aggrieved person" means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed.*

## § 2511. Interception and disclosure of wire or oral communications prohibited

*(1) Except as otherwise specifically provided in this chapter any person who—*

*(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;*

*(b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—*

*(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or*

*(ii) such device transmits communications by radio, or interferes with the transmission of such communications; or*

*(iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in terstate or foreign commerce; or*

*(iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or*

*(v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;*

*(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained*

through the interception of a wire or oral communication in violation of this subsection; or

(d) *willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;*

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(2) (a) *It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication. Provided: That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.*

(b) *It shall not be unlawful under this chapter for an officer, employee, or agent of the Federal Communications Commission, in the normal course of his employment and in discharge of the monitoring responsibilities exercised by the Commission in the enforcement of chapter 5 of title 47 of the United States Code, to intercept a wire communication, or oral communication transmitted by radio, or to disclose or use the information thereby obtained.*

(c) *It shall not be unlawful under this chapter for a party to any wire or oral communication, or a person given prior authority by a party to the communication to intercept such communication.*

(3) *Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power.*

## § 2512. *Manufacture, distribution, possession, and advertising of wire or oral communication intercepting devices prohibited*

(1) *Except as otherwise specifically provided in this chapter, any person who willfully—*

(a) *sends through the mail, or sends or carries in interstate or foreign commerce, any electronic, mechanical, or other device*

*knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications;*

*(b) manufactures, assemblies, possesses or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce; or*

*(c) places in any newspaper, magazine, handbill, or other publication any advertisement of—*

*(i) any electronic, mechanical, or other device knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications; or*

*(ii) any other electronic, mechanical, or other device, where such advertisement promotes the use of such device for the purpose of the surreptitious interception of wire or oral communications,*

*knowing or having reason to know that such advertisement will be sent through the mail or transported in interstate or foreign commerce,*

*shall be fined not more than $10,000 or imprisoned not more than five years, or both.*

*(2) It shall not be unlawful under this section for—*

*(a) a communications common carrier or an officer, agent, or employee of, or a person under contract with, a communications common carrier, in the normal course of the communications common carrier's business, or*

*(b) an officer, agent, or employee of, or a person under contract with, the United States, a State, or a political subdivision thereof, in the normal course of the activities of the United States, a State, or a political subdivision thereof, to send through the mail, send or carry in interstate or foreign commerce, or manufacture, assemble, possess, or sell any electronic, mechanical, or other device device knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications.*

## § 2513.  Confiscation of wire or oral communication intercepting devices

*Any electronic, mechanical, or other device used, sent, carried, manufactured, assembled, possessed, sold, or advertised in violation of section 2511 or section 2512 of this chapter may be seized and forfeited to the United States. All provisions of law relating to (1) the seizure, summary and judicial forfeiture, and condemnation of vessels, vehicles, merchandise, and baggage for violations of the customs laws contained in title 19 of the United States Code, (2) the disposition of such vessels, vehicles, merchandise and baggage or the proceeds from the sale thereof, (3) the remission or mitigation of such forfeiture, (4) the compromise of claims, and (5) the award of compensation to informers in respect of such forfeitures, shall apply to seizures and forfeitures incurred, or alleged to have been incurred,*

under the provisions of this section, insofar as applicable and not inconsistent with the provisions of this section; except that such duties as are imposed upon the collector of customs or any other person with respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the provisions of the customs laws contained in title 19 of the United States Code shall be performed with respect to seizure and forfeiture of electronic, mechanical, or other intercepting devices under this section by such officers, agents, or other persons as may be authorized or designated for that purpose by the Attorney General.

### § 2514. *Immunity of witnesses*

Whenever in the judgment of a United States attorney the testimony of any witness, or the production of books, papers, or other evidence by any witness, in any case or proceeding before any grand jury or court of the United States involving any violation of this chapter or any of the offenses enumerated in section 2516, or any conspiracy to violate this chapter or any of the offenses enumerated in section 2516 is necessary to the public interest, such United States attorney, upon the approval of the Attorney General, shall make application to the court that the witness shall be instructed to testify or produce evidence subject to the provisions of this section, and upon order of the court such witness shall not be excused from testifying or from producing books, papers, or other evidence on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture. No such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding (except in a proceeding described in the next sentence) against him in any court. No witness shall be exempt under this section from prosecution for perjury or contempt committed while giving testimony or producing evidence under compulsion as provided in this section.

### § 2515. *Prohibition of use as evidence of intercepted wire or oral communications*

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof, if the disclosure of that information would be in violation of this chapter.

### § 2516. *Authorization for interception of wire or oral communications*

(1) The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which

the application is made, when such interception may provide or has provided evidence of—

(a) any offense punishable by death or by imprisonment for for than one year under sections 2274 through 2277 of title 42 of the United States Code (relating to the enforcement of the Atomic Energy Act of 1954), or under the following chapters of this title: chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason);

(b) a violation of section 186 or section 501(c) of title 29, United States Code (dealing with restrictions on payments and loans to labor organizations), or any offense which involves murder, kidnapping, robbery, or extortion, and which is punishable under this title;

(c) any offense which is punishable under the following sections of this title: section 201 (bribery of public officials and witnesses), section 224 (bribery in sporting contests), section 1084 (transmission of wagering information), section 1503 (influencing or injuring an officer, juror, or witness generally), section 1510 (obstruction of criminal investigations), section 1751 (Presidential assassinations, kidnapping, and assault), section 1951 (interference with commerce by threats or violence), section 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises), section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan), or sections 2313 and 2314 (interstate transportation of stolen property);

(d) any offense involving counterfeiting punishable under sections 471, 472, or 473 of this title;

(e) any offense involving bankruptcy, fraud or the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States; or

(f) any conspiracy to commit any of the foregoing offenses.

(2) The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.

## § 2517. Authorization for disclosure and use of intercepted wire or oral communications

(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents

of any wire or oral communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath of affirmation in any criminal proceeding in any court of the United States or of any State or in any Federal or State grand jury proceeding.

(4) No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character.

(5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

## § 2518. Procedure for interception of wire or oral communications

(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepter, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they

reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter; and

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application.

(2) The judge may require the applicant to furnish additional testimony or documentary evidence in support of the application.

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

(a) the identity of the person, if known, whose communications are to be intercepted;

(b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

(e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

(5) *No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.*

(6) *Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require.*

(7) *Notwithstanding any other provision of this chapter, any investigative or law enforcement officer, specially designated by the Attorney General or by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State, who reasonably determines that—*

(a) *an emergency situation exists that requires a wire or oral communication to be intercepted before an order authorizing such interception can with due diligence be obtained, and*

(b) *there are grounds upon which an order could be entered under this chapter to authorize such interception,*

*may intercept such wire or oval communication if an application for an order approving the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur. In the absence of an order, such interception shall immediately terminate when the communication sought is obtained or when the application for the order is denied, whichever is earlier. In the event such application for approval is denied, or in any other case where the interception is terminated without an order having been issued, the contents of any wire or oral communication intercepted shall be treated as having been obtained in vioation of this chapter, and an inventory shall be served as provided for in subsection (d) of this section on the person named in the application.*

(8) (a) *The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings*

may be made for use or disclosure pursuant to the provisions of sub-sections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satis-factory explanation for the absence thereof, shall be a prerequisite for the use or discolsure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.

(b) Applications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge of compe-tent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

(c) Any violation of the provisions of this subsection may be pun-ished as contempt of the issuing or denying judge.

(d) Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518(7)(b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, an inventory which shall include notice of—

(1) the fact of the entry of the order or the application;
(2) the date of the entry and the period of authorized, ap-proved or disapproved interception, or the denial of the applica-tion; and
(3) the fact that during the period wire or oral communications were or were not intercepted.

On an ex parte showing of good cause to a judge of competent juris-diction the serving of the inventory required by this subsection may be postponed.

(9) The contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or other-wise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing or proceeding, has been furnished with a copy of the court order under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing or proceeding and that the party will not be prejudiced by the delay in receiving such information.

(10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;
(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
(iii) the interception was not made in conformity with the order of authorization or approval.

Such motion shall be made before the trial, hearing, or proceeding un-less there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence

derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice.

(b) In addition to any other right to appeal, the United States shall have the right to appeal from an order granting a motion to suppress made under paragrph (a) of this subsection, or the denial of an application for an order of approval, if the United States attorney shall certify to the judge or other official granting such motion or denying such application that the appeal is not taken for purposes of delay. Such appeal shall be taken within thirty days after the date the order was entered and shall be diligently prosecuted.

## § 2519. *Reports concerning intercepted wire or oral communications*

(1) Within thirty days after the expiration of an order (or each extension thereof) entered under section 2518, or the denial of an order approving an interception, the issuing or denying judge shall report to the Administrative Office of the United States Courts—

(a) the fact that an order or extension was applied for;

(b) the kind of order or extension applied for;

(c) the fact that the order or extension was granted as applied for, as modified, or was denied;

(d) the period of interceptions authorized by the order, and the number and duration of any extensions of the order;

(e) the offense specified in the order or application, or extension of an order;

(f) the identity of the applying investigative or law enforcement officer and agency making the application and the person authorizing the application; and

(g) the nature of facilities from which or the place where communications were to be intercepted.

(2) In January of each year the Attorney General, an Assistant Attorney General specially designated by the Attorney General, or the principal prosecuting attorney of a State, or the principal prosecuting attorney for any political subdivision of a State, shall report to the Administrative Office of the United States Courts—

(a) the information required by paragraphs (a) through (g) of subsection (1) of this section with respect to each application for an order or extension made during the preceding calendar year;

(b) a general description of the interceptions made under such order or extension, including (i) the approximate nature and frequency of incriminating communications intercepted, (ii) the approximate nature and frequency of other communications intercepted, (iii) the approximate number of persons whose communications were intercepted, and (iv) the approximate nature, amount and cost of the manpowr and other resources used in the interceptions;

(c) the number of arrests resulting from interceptions made under such order or extension, and th offenses for which arrests were made;

(d) the number of trials resulting from such interceptions;

*(e) the number of motions to suppress made with respect to such interceptions, and the number granted or denied;*

*(f) the number of convictions resulting from such interceptions and the offenses for which the convictions were obtained and a general assessment of the importance of the interceptions; and*

*(g) the information required by paragraphs (b) through (f) of this subsection with respect to orders or extensions obtained in a preceding calendar year.*

*(3) In April of each year the Director of the Administrative Office of the United States Courts shall transmit to the Congress a full and complete report concerning the number of applications for orders authorizing or approving the interception of wire or oral communications and the number of orders and extensions granted or denied during the preceding calendar year. Such report shall include a summary and analysis of the data required to be filed with the Administrative Office by subsections (1) and (2) of this section. The Director of the Administrative Office of the United States Courts is authorized to issue binding regulations dealing with the content and form of the reports required to be filed by subsections (1) and (2) of this section.*

## § 2520. *Recovery of civil damages authorized*

*Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause af action against any person who intercept, disclose, or uses, or procures any other person to intercept, discloses, or use such communications, and (2) be entitled to recover from any such person—*

*(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;*

*(b) punitive damages; and*

*(c) a reasonable attorney's fee and other litigation costs reasonably incurred:*

*A good faith reliance on a court order or on the provisions of section 2518(7) of this chapter shall constitute a complete defense to any civil or criminal action brought under this chapter.*

## TITLE 47.—UNITED STATES CODE—TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS

### SUBCHAPTER VI.—MISCELLANEOUS PROVISIONS

### § 605. Unauthorized publication or use of communications

*Except as authorized by chapter 119, title 18, United States Code,* no [No] person receiving, *assisting in receiving,* [or] transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, *(1)* to any person other than the addressee, his agent, or attorney, [or] *(2)* to a person employed or authorized to forward such communication to its destination, [or] *(3)* to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, [or] *(4)* to the master of a ship under whom he is serving, [or] *(5)* in response to a subpena issued by a court of competent jurisdiction, or

(*6*) on demand of other lawful *authority*. 【authority; and no】 *No* person not being authorized by the sender shall intercept 【any communication】 *any radio communication* and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any *person*. 【person; and no】 *No* person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by 【wire or】 radio and use 【the same or any information therein contained】 *such communication* (*or any information therein contained*) for his own benefit or for the benefit of another not entitled thereto. 【; and no】 No person having received 【such intercepted communication】 *any intercepted radio communication* or having become acquainted with the contents, substance, purport, effect, or meaning of 【such communication (or any part thereof,)】 *of such communication* (*or any part thereof*) knowing that 【such information was so obtained】 *such communication was intercepted*, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of 【the same or any part thereof,】 *of such communication* (*or any part thereof*) or use 【the same or any information therein contained】 *such communication* (*or any information therein contained*) for his own benefit or for the benefit of another not entitled *thereto*. 【thereto: Provided, That this】 *This* section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication *which is* brodacast 【,】 or transmitted by amateurs or others for the use of the general public, or 【relating】 *which relates* to ships in distress.

## 【52 STAT. 1250; TITLE 15, UNITED STATES CODE—COMMERCE AND TRADE—CHAP. 18, TRANSPORTATION OF FIREARMS

### 【AN ACT

#### 【To regulate commerce in firearms

　【(a) As used in this Act——
　【(1) The term "person" includes an individual, partnership, association, or corporation.
　【(2) The term "interstate or foreign commerce" means commerce between any State, Territory or possession (not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession (not including the Canal Zone), or the District of Columbia, but through any place outside thereof; or within any Territory or possession or the District of Columbia.
　【(3) The term "firearm" means any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part of parts of such weapon.
　【(4) The term "manufacturer" means any person engaged in the manufacture or importation of firearms, or ammunition or cartridge cases, primers, bullets, or propellent powder for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter.
　【(5) The term "dealer" means any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellant powder, at wholesale or retail, or any person engaged

in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, trigger mechanisms, or breech mechanisms to firearms, and the term "licensed dealer" means any such person licensed under the provisions of this chapter.

〚(6) The term "fugitive from justice" means any person who has fled from any State, Territory, the District of Columbia, or possession of the United States to avoid prosecution of a crime punishable by imprisonment for a term exceeding one year or to avoid giving testimony in any criminal proceeding.

〚(7) The term "ammunition" shall include only pistol or revolver ammunition. It shall not include shotgun shells, metallic ammunition suitable for use only in rifles, or any .22 caliber rimfire ammunition.

〚Sec. 2. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this act, to transport, ship, or receive any firearm or ammunition in interstate or foreign commerce.

〚(b) It shall be unlawful for any person to receive any firearm or ammunition transported or shipped in interstate or foreign commerce in violation of subdivision (a) of this section, knowing or having reasonable cause to believe such firearms or ammunition to have been transported or shipped in violation of subdivision (a) of this section.

〚(c) It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearm in interstate or foreign commerce to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer by the prospective purchaser.

〚(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States, the several States, Territories, possessions, or the District of Columbia of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice.

〚(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime punishable by imprisonment for a term exceeding one year or who is a fugitive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition.

〚(f) It shall be unlawful for any person who has been convicted of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this act.

〚(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm or ammunition, knowing, or having reasonable cause to believe, same to have been stolen.

[(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or ammunition or to pledge or accept as security for a loan any firearm or ammunition moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe the same to have been stolen.

[(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this act.

[SEC. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce shall make application to the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum.

[(b) Upon payment of the prescribed fee, the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of this chapter: *Provided*, That no license shall be issued to any applicant within two years after the revocation of a previous license.

[(c) Whenever any licensee is convicted of a violation of any of the provisions of this chapter, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided*, That in the case of appeal from such conviction the licensee may furnish a bond in the amount of $1,000 and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secretary of the Treasury shall suspend such license until he is notified by the clerk of the court of last appeal as to the final disposition of the case.

[(d) Licensed dealers shall maintain such permanent records of importation, shipment, and other disposal of firearms and ammunition as the Secretary of the Treasury shall prescribe.

[SEC. 4. The provisions of this act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearm, or ammunition, sold or shipped to, or issued for the use of, (1) the United States or any department, independent establishment, or agency thereof; (2) any State, Territory, or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof; (3) any duly commissioned officer or agent of the United States, a State, Territory, or possession, or the District of Columbia, or any political subdivision thereof; (4) or to any bank, public carrier, express, or armored-truck company organized and operating in good faith for the transportation of money and valuables; (5) or to any research laboratory designated by the Secretary of the Treasury: *Provided*, That such bank, public carriers, express, and armored-truck companies are granted exemption by the

Secretary of the Treasury; nor to the transportation, shipment, or receipt of any antique or unserviceable firearms, or ammunition, possessed and held as curios or museum pieces: *Provided*, That nothing contained in this section shall be construed to prevent shipments of firearms and ammunition to institutions, organizations, or persons to whom such firearms and ammunition may be lawfully delivered by the Secretary of War nor to prevent the transportation of such firearms and ammunition so delivered by their lawful possessors while they are engaged in military training or in competitions.

[Sec. 5. (a) Any person violating any of the provisions of this act or any rules and regulations promulgated hereunder, or who makes any statement in applying for the license or exemption provided for in this act, knowing such statement to be false, shall, upon conviction thereof, be fined not more than $2,000, or imprisoned for not more than five years, or both.

[(b) Any firearm or ammunition involved in any violation of the provisions of this chapter or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture, and all provisions of Title 26 relating to the seizure, forfeiture, and disposition of firearms as defined in section 2733 (Sec. 5848, Internal Revenue Code of 1954) of Title 26 shall, so far as applicable, extend to seizures and forfeitures incurred under the provisions of this act.

[Sec. 6. This act shall take effect thirty days after June 30, 1938.

[Sec. 7. The Secretary of the Treasury may prescribe such rules and regulations as he deems necessary to carry out the provisions of this act.

[Sec. 8. Should any section or subsection of this act be declared unconstitutional, the remaining portion of the act shall remain in full force and effect.

[Sec. 9. This act may be cited as the Federal Firearms Act.

[Sec. 10. A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this act or the National Firearms Act) may make application to the Secretary of the Treasury for relief from the disabilities under this act incurred by reason of such conviction, and the Secretary of the Treasury may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest. A licensee conducting operations under this act, who makes application for relief from the disabilities incurred under this act by reason of such a conviction from further operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary of the Treasury grants relief to any person pursuant to this section, he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.]

138

## TITLE 18—UNITED STATES CODE

\*      \*      \*      \*      \*      \*      \*

### Part 1—Crimes

\*      \*      \*      \*      \*      \*      \*

44. Firearms_____ 921

\*      \*      \*      \*      \*      \*      \*

### Chapter 44—FIREARMS

Sec.
921. Definitions.
922. Unlawful acts.
923. Licensing.
924. Penalties.
925. Exceptions: Relief from disabilities.
926. Rules and regulations.
927. Effect on State law.
928. Separability clause.

## § 921. Definitions

(a) As used in this chapter—

(1) The term "person" and the term "whoever" includes any individual, corporation, company, association, firm, partnership, society, or joint stock company.

(2) The term "interstate or foreign commerce" includes commerce between any State or possession (not including the Canal Zone) and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), but through any place outside thereof; or within any possession or the District of Columbia. The term "State" shall include the Commonwealth of Puerto Rico, the Virgin Islands, and the District of Columbia.

(3) The term "firearms" means any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; or any firearms muffler or firearm silencer; or any destructive device.

(4) The term "destructive device" means any explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type of weapon which will or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter.

(5) The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(6) The term "short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

(7) The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(8) *The term "short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.*

(9) *The term "importer" means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term "licensed importer" means any such person licensed under the provisions of this chapter.*

(10) *The term "manufacturer" means any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter.*

(11) *The term "dealer" means (A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing such firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.*

(12) *The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.*

(13) *The term "indictment" includes an indictment or an information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.*

(14) *The term "fugitive from justice" means any person who has fled from any State or possession to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year or to avoid giving testimony in any criminal proceeding.*

(15) *The term "antique firearm" means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870; but not including any weapon designed for use with smokeless powder or using rim-fire or conventional center-fire ignition with fixed ammunition.*

(16) *The term "ammunition" means ammunition for a destructive device; it shall not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.*

(17) *The term "Secretary" or "Secretary of the Treasury" means the Secretary of the Treasury or his delegate.*

(b) *As used in this chapter—*

    (1) *The term "firearm" shall not include an antique firearm.*

    (2) *The term "destructive device" shall not include—*

        (A) *a device which is not designed or redesigned or used or intended for use as a weapon; or*

        (B) *any device, although originally designed as a weapon, which is redesigned so that it may be used solely as a signaling, linethrowing, safety or similar device; or*

        (C) *any shotgun other than a short-barreled shotgun; or*

        (D) *any nonautomatic rifle (other than a short-barreled*

*rifle*) *generally recognized or particularly suitable for use for the hunting of big game; or*

(E) *surplus obsolete ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of sections 4684(2), 4685, or 4686 of title 10, United States Code; or*

(F) *any other device which the Secretary finds is not likely to be used as a weapon.*

(3) *The term "crime punishable by imprisonment for a term exceeding one year" shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate.*

## § 922. *Unlawful acts*

(a) *It shall be unlawful—*

(1) *for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or ammunition, or in the course of such business to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce.*

(2) *for any importer, manufacturer, or dealer licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce, any firearm other than a rifle or shotgun, or ammunition to any person other than a licensed importer, licensed manufacturer, or licensed dealer, except that—*

(A) *this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received;*

(B) *this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of title 18 of the United States Code, is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duty;*

(C) *nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were in fact a State of the United States.*

(3) *for any person other than a licensed importer, licensed manufacturer, or licensed dealer to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, in which he maintains a place of business)—*

(A) *any firearm, other than a shotgun or rifle, purchased or otherwise obtained by him outside that State;*

(B) *any firearm, purchased or otherwise obtained by him outside that State, which it would be unlawful for him to purchase or possess in the State or political subdivision thereof wherein he resides (or if the person is a corporation*

or other business entity, in which he maintains a place of business).

(4) for any person, other than a licensed importer, licensed manufacturer, or licensed dealer, to transport in interstate or foreign commerce any destructive device, machine gun (as defined in section 5848 of the Internal Revenue Code of 1954), a short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Secretary.

(5) for any person to transfer, sell, trade, give, transport, or deliver to any person (other than a licensed importer, licensed manufacturer, or licensed dealer) who resides in any State other than that in which the transferor resides (or in which his place of business is located if the transferor is a corporation or other business entity)—

(A) any firearm, other than a shotgun or rifle;
(B) any firearm which the transferee could not lawfully purchase or possess in accord with applicable laws, regulations or ordinances of the State or political subdivision thereof in which the transferee resides (or in which his place of business is located if the transferee is a corporation or other business entity).

This paragraph shall not apply to transactions between licensed importers, licensed manufacturers, and licensed dealers.

(6) for any person in connection with the acquisition or attempted acquisition of any firearm from a licensed importer, licensed manufacturer, or licensed dealer, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false or fictitious or misrepresented identification, intended or likely to deceive such importer, manufacturer, or dealer with respect to any fact material to the lawfulness of the sale or other disposition of such firearm under the provisions of this chapter.

(b) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or deliver—

(1) any firearm to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age, if the firearm is other than a shotgun or rifle.

(2) any firearm to any person who the licensee knows or has reasonable cause to believe is not lawfully entitled to receive or possess such firearm by reason of any State or local law, regulation, or ordinance applicable at the place of sale, delivery, or other disposition of the firearm.

(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located; except that this paragraph shall not apply in the case of a shotgun or rifle.

(4) to any person any destructive device, machine gun (as defined in section 5818 of the Internal Revenue Code of 1954), short-barreled shotgun, or short-barreled rifle, unless he has in his possession a sworn statement executed by the principal law enforcement officer of the locality wherein the purchaser or person to whom it is otherwise disposed of resides, attesting that there is no provision of law, regulation, or ordinance which would be

violated by such person's receipt or possession thereof, and that he is satisfied that it is intended by such person for lawful purposes; and such sworn statement shall be retained by the licensee as a part of the records required to be kept under the provisions of this chapter.

(5) any firearm to any person unless the licensee notes in his records required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

Paragraphs (1), (2), (3) and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, and licensed dealers.

(c) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person, knowing or having reasonable cause to believe that such person is a fugitive from justice or is under indictment or has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year. This subsection shall not apply with respect to sale or disposition of a firearm to a licensed importer, licensed manufacturer, or licensed dealer who pursuant to subsection (b) of section 925 of this chapter is not precluded from dealing in firearms, or to a person who has been granted relief from disabilities pursuant to subsection (c) of section 925 of this chapter.

(d) It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

(e) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to ship or transport any firearm or ammunition in interstate or foreign commerce.

(f) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or is a fugitive from justice, to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

(g) It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe the same to have been stolen.

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, moving as or which is a part of or which constitutes interstate or foreign commerce, knowing or having reasonable cause to believe the same to have been stolen.

(i) It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearms the importer's or manufacturer's serial number of which has been removed, obliterated, or altered.

(j) It shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition, except as provided in subsection (d) of section 925 of this chapter; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

(k) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer knowingly to make any false entry in, or to fail to make appropriate entry in or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

## § 923. *Licensing*

(a) No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulation prescribe. Each applicant shall be required to pay a fee for obtaining such a license, a separate fee being required for each place in which the applicant is to do business, as follows:

(1) If a manufacturer—

(A) of destructive devices and/or ammunition a fee of $1,000 per year;

(B) of firearms other than destructive devices a fee of $500 per year.

(2) If an importer—

(A) of destructive devices and/or ammunition a fee of $1,000 per year;

(B) of firearms other than destructive devices a fee of $500 per year.

(3) If a dealer—

(A) in destructive devices and/or ammunition a fee of $1,000 per year;

(B) who is a pawnbroker dealing in firearms other than destructive devices a fee of $250 per year;

(C) who is not a dealer in destructive devces or a pawnbroker, a fee of $10 per year; except that for the first renewal following the effective date of this chapter, or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25.

(b) Upon the filing of a proper application and payment of the prescribed fee, the Secretary may issue to the applicant the appropriate license which, subject to the provisions of this chapter and other applicable provisions of law, shall entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.

(c) Any application submitted under subsections (a) and (b) of this section shall be disapproved and the license denied and the fee returned to the applicant if the Secretary, after notice and opportunity for hearing, finds that—

(1) the applicant is under twenty-one years of age; or

(2) the applicant (including in the case of a corporation, partnership, or association, any individual possessing directly or in-

directly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of this chapter; or is, by reason of his business experience, financial standing, or trade connections, not likely to commence business operations during the term of the annual license applied for or to maintain operations in compliance with this chapter; or

(3) the applicant has willfully violated any of the provisions of this chapter or regulations issued thereunder; or

(4) the applicant has willfully failed to disclose any material information required, or has made any false statement as to any material fact, in connection with his application; or

(5) the applicant does not have, or does not intend to have or to maintain, in a State or possession, business premises for the conduct of the business.

(d) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, and sale or other disposition, of firearms and ammunition at such place, for such period and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary or his delegate may enter during business hours the premises (including places of storage) of any firearms or ammunition importer, manufacturer, or dealer for the purpose of inspecting or examining any records or documents required to be kept by such importer or manufacturer or dealer under the provisions of this chapter or regulations issued pursuant thereto, and any firearms or ammunition kept or stored by such importer, manufacturer, or dealer at such premises. Upon the request of any State, or possession, or any political subdivision thereof, the Secretary of the Treasury may make available to such State, or possession, or any political subdivision thereof, any information which he may obtain by reason of the provisions of this chapter with respect to the identification of persons within such State, or possession, or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of such firearms or ammunition.

(e) Licenses issued under the provisions of subsection (b) of this section shall be kept posted and kept available for inspection on the business premises covered by the license.

(f) Licensed importers and licensed manufacturers shall identify, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer.

## § 924. Penalties

(a) Whoever violates any provision of this chapter or any rule or regulation promulgated thereunder, or knowingly makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or in applying for any license or exemption or relief from disability under the provisions of this chapter,

shall be fined not more than $5,000 or imprisoned not more than five years, or both.

(b) Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports, or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

(c) Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of this chapter, or a rule or regulation promulgated thereunder, or violation of any other criminal law of the United States, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5848(1) of said Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter.

## § 925. Exceptions: relief from disabilities

(a) The provisions of this chapter shall not apply with respect to the transportation, shipment, receipt, or importation of any firearm or ammunition imported for, or sold or shipped to, or issued for the use of the United States or any department, or agency thereof; or any State or possession, or any department, agency, or political subdivision thereof.

(b) A licensed imported, licensed manufacturer, or licensed dealer who is indicted for a crime punishable by imprisonment for a term exceeding one year, may, nothwithstanding any other provisions of this chapter, continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license) during the term of such indictment and until any conviction pursuant to the indictment becomes final.

(c) A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this chapter or of the National Fireams Act) may make application to the Secretary for relief from the disabilities under this chapter incured by reason of such conviction, and the Secretary may grant such relief if it is established to his satisfaction that the cicumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest. A licensee conducting operations under this chapter, who makes application for relief from the disabilities incurred under this chapter by reason of such a conviction, shall not be barred by such conviction from further operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary grants relief to any person pursuant to this section, he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.

(d) The Secretary may authorize a firearm to be imported or brought into the United States or any possession thereof if the person

*importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—*

> *(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or*
>
> *(2) is an unserviceable firearm, other than a machinegun as defined by 5848(2) of the Internal Revenue Code of 1954 (not readily restorable to firing condition), imported or brought in as a curio or museum piece; or*
>
> *(3) is of a type that does not fall within the definition of a firearm as defined in section 5848(1) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, and in the case of surplus military firearms is a rifle or shotgun; or*
>
> *(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm.*

*Provided, That the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm will be allowed under this subsection.*

## § 926. *Rules and regulations*

*The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this chapter. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.*

## § 927. *Effect on State law*

*No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State or possession on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State or possession so that the two cannot be reconciled or consistently stand together.*

## § 928. *Separability*

*If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby.*

MINORITY VIEWS OF MESSRS. TYDINGS, DODD, HART,
LONG OF MISSOURI, KENNEDY OF MASSACHUSETTS,
BURDICK, AND FONG ON TITLE II OF S. 917

As we make clear in the following paragraphs, each of the five major
provisions of title II of S. 917 is subject to extremely serious objections
on both constitutional and policy grounds. Title II, which was origi-
nally added to S. 917 in the subcommittee, was retained in the bill by
the narrowest possible margin in the committee—an evenly divided
vote of the full committee. We strongly opposed the committee action,
and we urge our colleagues in the Senate to delete title II from the
bill when it is offered on the floor of the Senate.

The constitutional objections to title II are manifold. The provisions
on police interrogation and eyewitness testimony are so squarely in
conflict with the recent decisions of the Supreme Court in the *Miranda*
and *Wade* cases that they will almost certainly be declared unconsti-
tutional as soon as they are tested in the courts.

The provisions limiting the appellate jurisdiction of the Supreme
Court and abolishing the habeas corpus jurisdiction of the Federal
courts will fare little better. Since no Congress in the history of this
country has ever before enacted this sort of extreme curtailment of
the authority of the Federal judiciary, no occassion has yet arisen
for the courts to pass upon such issues. But, it is highly likely that
these provisions too will be held unconstitutional as soon as they are
tested in the courts.

The Constitution itself sets out clear procedures for amending its
provisions. If Congress determines that the Constitution itself or
the decisions of the Supreme Court interpreting the Constitution are
in need of change, Congress cannot act by statute, but must act through
the only method established by our system of law, the method of
constitutional amendment.

Equally serious, title II promise nothing but frustration, con-
fusion, and uncertainty as the product of any effort by law enforce-
ment officers and agencies to implement its provisions. Grave doubts
will inevitably surround the validity of confessions obtained by law
enforcement officers in reliance on title II instead of the clear command
of *Miranda*. The use of such confessions in evidence will inevitably
be challenged at every stage of the judicial process. Convictions ob-
tained on the basis of such confessions will inevitably be reversed,
sometimes years after trial, when witnesses and other sources of evi-
dence have long since disappeared. For all of these reasons, title II
offers only the dismal prospect of yet another self-defeating round
of police frustration and public dissatisfaction with the courts.

But the constitutional arguments against title II, however strong
they are, tell only part of the story. As we indicate below, all of the
provisions of title II are highly objectionable on grounds of policy
alone, even without consideration of questions of constitutionality.

Title II nourishes the wholly inaccurate attitude that Congress has done its part in the war against crime by deciding whether it is for or against police interrogation, or for or against the Supreme Court. Simplistic answers do us no service in the struggle to find solutions for the complicated problems we face in the war against crime.

We submit that the cost paid by law enforcement for enactment of title II far exceeds any possible benefit that may be obtained. As the comprehensive studies carried out by the National Crime Commission demonstrate, there are literally scores of noncontroversial improvements in law enforcement that can be initiated by State and local governments across the Nation as soon as the necessary resources are made available. Title I is a wise and useful method of providing Federal assistance to these governments. We urge our colleagues to take the high road of title I as the appropriate route toward achieving our goal of improving and strengthening law enforcement and bringing law and order to the Nation, and to reject the low road of title II, a road that invites disrespect for our Government of laws and undermines the Constitution itself, the fundamental law of the land.

### DETAILED ANALYSIS

Title II of the committee print would add three new sections of title 18, United States Code (3501–3503), and one new section (2256) to title 28, United States Code. These sections would modify present law in five principal respects. As described in the following paragraphs, they are vulnerable to serious constitutional and policy objection.

#### A. CONFESSIONS—THE REPEAL OF MIRANDA

Section 3501(a) of the committee print makes voluntariness the sole criterion of the admissibility of a confession in a Federal court.

According to the provisions of subsections (a) and (b) of section 3501, the procedure in Federal courts will be as follows:

A preliminary determination of the voluntariness of a confession will be made by the trial judge, outside the presence of the jury (sec. 3501(a)).

In making his preliminary determination, the trial judge will be required to consider all the circumstances surrounding the confession, including the following specified factors, none of which is to be conclusive on the issue of voluntariness (sec. 3501(b)):

Delay between arrest and arraignment of the defendant.

Whether the defendant knew the nature of his offense.

Whether the defendant was aware or advised of his right to silence or that anything he said might be used against him.

Whether the defendant was advised of his right to counsel.

Whether the defendant had the assistance of counsel during his interrogation and confession.

If the trial judge makes a preliminary determination that a confession was voluntary, he must admit the confession in evidence (sec. 3501(a)). The jury must then hear the relevant evidence on the issue of voluntariness and determine the weight to be accorded the confession (sec. 3501(a)).

Section 3501 (a) and (b) are squarely in conflict with the Supreme Court's decision in *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and will

almost certainly be held unconstitutional. In *Miranda*, the Supreme Court held unequivocally that a confession obtained from a defendant during custodial police interrogation could not constitutionally be used in evidence against the defendant unless the following specific procedural safeguards were followed, based on the defendant's privilege against self-incrimination under the fifth amendment:

The defendant must be advised that he has a right to remain silent and that anything he says may be used against him.

The defendant must be advised that he has the right to consult with a lawyer and to have the lawyer with him during the interrogation.

The defendant must be advised that if he cannot afford a lawyer, a lawyer will be appointed for him.

Although the case also held that a suspect could waive these rights, the Court stated that a heavy burden of proof rests on the prosecution to demonstrate that the waiver was knowing and intelligent.

The Court emphasized in *Miranda* that the procedural safeguards established in the case are in addition to the traditional voluntariness test. Since section 3501 specifically dispenses with these safeguards and in lieu thereof establishes voluntariness as the sole test of the admissibility of a confession, the section is obviously contrary to the Constitution.

The Supreme Court made clear in the *Miranda* opinion that its holding was firmly grounded on a constitutional basis that no legislature could overrule. In both the briefs and oral arguments in the case, the Court was specifically requested to withhold decision until legislative bodies had a chance to act upon the issue. The Court replied:

Congress and the States are free to develop their own safeguards for the privilege, so long as they are fully as effective as those described [in the Court's holding] in informing accused persons of their right of silence and in affording a continuous opportunity to exercise it. In any event, however, the issues presented are of constitutional dimensions and must be determined by the courts. The admissibility of a statement in the face of a claim that it was obtained in violation of the defendant's constitutional rights is an issue the resolution of which has long since been undertaken by this Court. * * * Judicial solutions to problems of constitutional dimension have evolved decade by decade. As courts have been presented with the need to enforce constitutional rights, they have found means of doing so. That was our responsibility when *Escobedo* was before us and it is our responsibility today. *Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them* (384 U.S. at 490–491). [Emphasis added.]

The Court's invitation in *Miranda* for legislatures to adopt "other fully effective means" to protect suspects in the free exercise of their constitutional rights offers no solace to the proponents of section 3501. The provisions of that section can hardly be characterized as "other fully effective means," since the means chosen by the section are manifestly less effective than the safeguards announced in *Miranda*.

Moreover, even though Congress has broad general power under the Constitution to enact procedural rules governing the admissibility of evidence in Federal courts, nothing in the Constitution gives Congress the power to adopt procedural rules that override specific decisions of the Supreme Court interpreting the fundamental requirements of the Constitution. Simply put, Congress has the power only to expand, not to contract or abrogate these basic guarantees.

The fault in the *Miranda* decision, if any, lies not with the Supreme Court, but with the fifth amendment itself. Long ago, our Founding Fathers enshrined in the Bill of Rights the ancient maxim, nemo tenetur seipsum accusare. In the words of the fifth amendment, no person "shall be compelled in any criminal case to be a witness against himself." At the very heart of the privilege against self-incrimination lies one of the fundamental principles of our system of criminal justice, that the Government must produce evidence against an individual by its own independent labors, rather than by the cruel simple expedient of compelling it from his own mouth. *Chambers* v. *Florida* (309 U.S. 227, 235–238 (1940)). As Sir James Fitzjames Stephen commented almost a century ago on the use of interrogation by law enforcement officers:

> There is a great deal of laziness in it. It is far pleasanter to sit comfortably in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun hunting up evidence (1 Stephen, "A History of the Criminal Law in England," 442 (1883)).

In *Miranda*, the Supreme Court breathed life into the privilege as applied to police interrogation. The basic thrust of the Court's decision was to place the poor and inexperienced suspect on an equal footing with the wealthy and most sophisticated suspect by informing all suspects of their constitutional right to silence and assuring them of a continuous opportunity to exercise it.

As Justice Walter Schaefer, of the Supreme Court of Illinois, one of our most distinguished jurists, has eloquently stated, the quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law. See *Schaefer* "Federalism and State Criminal Procedure" (70 Harv. L. Rev. 1, 26 (1956)). To allow the Government in the administration of justice to take advantage of the ignorance or indigence of an accused would violate the most elementary principles of our constitutional jurisprudence.

Forty years ago, Justice Brandeis forcefully answered the recurrent argument that the needs of law enforcement outweigh the rights of the individual. In *Olmstead* v. *United States*, he said:

> Decency, security, and liberty alike demand that Government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the Government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal

law the end justifies the means * * * would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face (277 U.S. 438, 485 (1928) (dissenting opinion)).

Contrary to the suggestion of the proponents of title II, it can hardly be said with authority that the *Miranda* decision has seriously hampered law enforcement. Essentially the same warnings required by the Supreme Court in *Miranda* were being used by the FBI 14 years before the decision in that case. As Chief Justice Warren stated in delivering the opinion of the Court in *Miranda*:

> Over the years the Federal Bureau of Investigation has compiled an exemplary record of effective law enforcement while advising any suspect or arrested person, at the outset of an interview, that he is not required to make a statement, that any statement may be used against him in court, that the individual may obtain the services of an attorney of his own choice and, more recently, that he has a right to free counsel if he is unable to pay * * *. [T]he present pattern of warnings and respect for the rights of the individual followed as a practice by the FBI is consistent with the procedure which we delineate today (384 U.S. at 483–484).

Equally important, each of the two major field studies published to date on the impact of *Miranda* on law enforcement has concluded that the impact has been small and that the decision has had little effect on police practices or the clearance of crime. What is by far the most comprehensive of these studies was conducted by the student editors of the Yale Law Journal and faculty members of the Yale Law School. See "Interrogations in New Haven: The Impact of Miranda" (76 Yale L.J. 1519 (1967)). Over a period of 3 months, the Yale investigators observed every stationhouse interrogation undertaken by the New Haven police force. One of the basic conclusions reached by the study was that interrogation of suspects by police was unnecessary in the overwhelming majority—87 percent—of the cases observed, since the police had already obtained enough evidence against a suspect at the time of his arrest to assure his conviction. In the typical case, either the police already had enough evidence to convict a suspect without interrogation, or they did not even have enough evidence to arrest him in the first place.

The second major study of the impact of *Miranda* was a statistical survey by two law professors at the University of Pittsburgh Law School. See Seeburger and Wettick, "Miranda in Pittsburgh—A Statistical Study" (29 U. Pittsburgh L.R. 1 (1967)). Using files made available by the Pittsburgh Detective Bureau, the authors found that the incidence of confessions declined by almost 20 percent in the period following the *Miranda* decision. But—and this is the crucial finding of the study—the decline in the incidence of confessions was accompanied by no substantial decline in the arrest rate, the conviction rate, the rate of crime clearance, or the court backlog.

The Yale and Pittsburgh studies point up the crucial defect in many of the studies relied upon by the proponents of title II to support the provisions of section 3501. It is not enough to study the impact of *Miranda* on law enforcement by the crude measure of the incidence of confessions. The real impact can be determined only by measuring

152

the effect on convictions and crime clearance. By this scale, the only true scale, the much-ballyhooed deleterious impact of *Miranda* on law enforcement has been extremely small, if not illusory.

Indeed, *Miranda* itself and its three companion cases [1] present graphic examples of the overstatement of the "need" for confessions in law enforcement. In each case, law-enforcement officers had developed substantial other evidence against the defendants before conducting the interrogations held invalid by the Supreme Court. Thus, Miranda, Vignera, and Westover had been identified by eyewitnesses. Marked bills from the robbed bank had been found in Westover's car. Articles stolen from several robbery victims had been found in Stewart's home.

The overstatement of the "need" for confessions becomes even more obvious when the subsequent history of the four *Miranda* defendants is considered. Miranda himself was convicted in Arizona in February 1967 on the same two counts of kidnapping and rape with which he was originally charged, and received the same sentence of concurrent prison terms of 20 to 30 years on each count. Vigner pleaded guilty in New York to an indictment charging a lesser robbery offense, and was sentenced to a prison term of 7½ to 10 years. Westover was convicted in February 1967 on the same two counts of bank robbery, and received the same sentence of consecutive 15-year prison terms on each count. Stewart has not yet been retried on the original charges of robbery and murder, for which he was convicted and sentenced to death. However, a motion to suppress evidence in the case was denied in November 1967; after several continuances, the trail has been set for May 1968.

One specter raised by the proponents of title II that is easily put to rest is the suggestion that *Miranda* and like decisions are daily releasing vicious, and confessed criminals upon the public streets. This suggestion stems from the brief and unfortunate period immediately following the *Miranda* decision. In *Johnson* v. *New Jersey*, 384 U.S. 719 (1966), decided 1 week after *Miranda*, the Supreme Court held that the rules approved in *Miranda*, would apply to all defendants tried after June 13, 1966, the date of the *Miranda* decision. Thus, in a number of cases awaiting trail at that time, seemingly voluntary confessions obtained prior to the date of *Miranda* were inadmissible in evidence, and some cases involving heinous crimes were dismissed, amid great publicity. That situation was temporary, however, and is no longer a serious problem. So long as the procedures of *Miranda* are followed, any truly voluntary confession can still be made and will still be admissible in evidence. As the studies of the impact of *Miranda* suggest, most of the confessions lost in the wake of *Miranda* could today be saved.

Yet another specter raised by the committee majority must also be laid to rest. The suggestion is made that the harmful effect of *Miranda* will be compounded as the lower Federal courts expand its doctrine and extend its interpretation. Nearly 2 years of judicial experience under *Miranda* in the Federal courts of appeals have proved this suggestion false. The trend of cases to date shows a strong reluctance by the Federal courts to apply the requirements of *Miranda* except in obvious instances of formal custodial interrogation. If anything, the

---

[1] In the *Miranda* opinion, the Supreme Court actually decided four separate cases—*Miranda* v. *Ariona*, *Vignera* v. *New York*, *Westover* v. *United States*, and *California* v. *Stewart*. See 384 U.S. 436 (1966).

defintion of custodial interrogation in *Miranda as* "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way" is receiving a highly restrictive interpretation. See, for example, *O'Toole* v. *Scarfati*, 386 F. 2d 168 (1st Cir. 1967) (statement to prosecutor by city official given chance to explain deficiencies held admissible) ; *United States* v. *Adler*, 380 F. 2d 917 (2nd Cir. 1967) (volunteered statements to FBI agent examining books of suspect's corporation held admissible) ; *United States* v. *Gibson*, 4th Cir. (March 1, 1968) (discussion of stolen car by defendant after State police officer asked him to step outside held admissible) ; *Yates* v. *United States*, 384 F. 2d 586 (5th Cir. 1968) (statements made to hotel manager holding suspect in conversation pending arrival of FBI held admissible) ; *United States* v. *Agy*, 374 F. 2d 94 (6th Cir. 1967) (incriminating reply to question asked by alcohol tax agent held admissible) ; *United States* v. *Holmes*, 387 F. 2d 781 (7th Cir 1968) (statement to selective service clerk held admissible) ; *Frohmann* v. *United States*, 380 F. 2d 832 (8th Cir. 1967) (statement to internal revenue agent making criminal investigation held admissible) ; *Williams* v. *United States*, 381 F. 2d 20 (9th Cir. 1967) (false statements to border-crossing guards held admissible; *Mares* v. *United States*, 383 F. 2d 811 (10th Cir. 1967) (statement to FBI by suspect free to leave held admissible) ; *Allen* v. *United States*, D.C. Cir. (January 25, 1968) (statement made during detention after failure to produce auto registration held admissible).

### B. CONFESSIONS—THE REPEAL OF "MALLORY"

Section 3501 (c) of the committee print specifies that a confession shall not be inadmissible in evidence in a Federal court solely because of delay between the arrest and arraignment of the defendant.

Subsection (c) is obviously intended to repeal the decision of the Supreme Court in *Mallory* v. *United States*, 354 U. S. 449 (1957). In *Mallory*, the Court held that if an arrested person is not taken before a magistrate or other judicial officer "without unnecessary delay," as required by rule 5(a) of the Federal Rules of Criminal Procedure, any confession obtained during the period of delay is inadmissible in evidence in a Federal court.

Section 3501(c) will inevitably encourage prolonged and indefinite incarceration and interrogation of suspects, without opportunity to consult with friends, family, or counsel. Unlike the recently enacted District of Columbia Crime Act, section 3501(c) fails to provide any time limit whatsoever on the period during which interrogation may take place. The District of Columbia Crime Act provides a maximum 3-hour period for interrogation after which a person may be released without charge and without an arrest record.

Rules prohibiting unnecessary delay between arrest and arraignment are based on sound law enforcement policy. Prompt arraignment of arrested persons is necessary in a free society which values the fair administration of criminal justice. Prolonged incarceration and interrogation of suspects, without giving them the opportunity to consult with friends, family, or counsel, must be condemned. Yet, it is precisely such incarceration and interrogation that are countenanced by the committee print. In effect, section 3501(c) would leave

154

the "without unnecessary delay" provision of rule 5(a) of the Federal Rules of Criminal Procedure as a rule without a remedy.

## C. EYEWITNESS TESTIMONY—THE REPEAL OF "WADE"

Section 3503 of the committee print makes eyewitness testimony that a defendant participated in a crime admissible in evidence in any Federal court.

Section 3503 is squarely in conflict with the Supreme Court's decisions in *United States* v. *Wade*, 388 U.S. 218 (1967), *Gilbert* v. *California*, 388 U.S. 263 (1967), and *Stovall* v. *Denno*, 388 U.S. 293 (1967). In *Wade* and *Gilbert*, the Supreme Court held that a pretrial lineup at which a defendant is exhibited to identifying witnesses is a critical stage of a criminal prosecution, and that the defendant is constitutionally entitled to the assistance of counsel at the lineup. In *Stovall*, the Court held that, even though the *Wade* decision was not to be applied retroactively,[2] lineups in pending cases must still satisfy the requirements of the due process clause.

For essentially the same reasons stated in part A, supra, section 3503 will almost certainly be held unconstitutional. The section dispenses with the procedural safeguards established in *Wade* for police lineups and is therefore in clear conflict with the requirements of the Constitution announced by the Supreme Court. In addition, section 3503 does not even attempt to establish effective alternative safeguards for lineups in lieu of the requirements of *Wade*. Instead, the section is a blanket provision making eyewitness testimony admissible in all circumstances, whether or not even the most fundamental and time-honored requirements of due process have been met in the identification, let alone the requirements of the right to counsel under the sixth amendment.

In the *Wade* decision itself, the Supreme Court discussed at length the grave potential for prejudice and miscarriage of justice inherent in lineup procedures. Eyewitnesses to crimes are notoriously subject to mistaken identification. Frequently, their opportunity for observation at the time of the crime was insubstantial. At the lineup, they are highly susceptible to suggestion, whether intentional or not, based on the manner in which the prosecutors or police present the suspect for identification. Where the victim himself is the witness, the hazard to objective identification is even further increased, because of the turbulent and possibly vengeful emotional attitude of the witness.

One expert authority quoted by the Supreme Court has given graphic examples of cases in which grossly unfair lineups were conducted.

> In a Canadian case * * * the defendant had been picked out of a lineup of six men, of which he was the only Oriental. In other cases, a black-haired suspect was placed in a group of light-haired persons, tall suspects have been made to stand

[2] Decisions like *Stovall* indicate that, contrary to the suggestions of the proponents of title II, the Supreme Court is in fact highly sensitive to the problems and needs of law enforcement. In a series of recent constitutional decisions, the Court has moved gradually to a position of almost completely prospective application of new constitutional principles. The Court has explicitly stated that it attaches "overriding significance" to such factors as the reliance by law enforcement officers on the prior law, and the severe burden on law enforcement and administration of justice if the new principles are to be applied retroactively to grant new trials to defendants already convicted under the prior law. See *Linkletter* v. *Walker*, 381 U.S. 618 (1965); *Tehan* v. *Shott*, 382 U.S. 406 (1966); *Johnson* v. *New Jersey*, 384 U.S. 719 (1966) and *Stovall* v. *Denno*, 388 U.S. 293 (1967).

with short nonsuspects, and in a case where the perpetrator of a crime was known to be a youth, a suspect under 20 was placed in a lineup with five other persons, all of whom were over 40 (Wall, "Eyewitness Identification in Criminal Cases," 53).

Once an eyewitness has picked out a suspect from a lineup, the witness easily becomes committed to the identification and is unlikely to go back on his word at trial. The requirement of *Wade* that a suspect is entitled to the presence of counsel at a lineup is well-calculated to eliminate the possibility that unfair procedures will lead to mistaken eyewitnesses identifications or the conviction of innocent persons.

At the same time, the requirement of *Wade* is unlikely to cause an undue burden on law enforcement. The Supreme Court suggested that a variety of procedures could conveniently be used by law-enforcement officers to assure fair and impartial lineups. It also suggested appropriate alternative procedures that could be used in circumstances where the presence of a suspect's counsel at a lineup was likely to cause prejudicial delay or obstruction of the confrontation.

The *Wade* opinion thus offers workable guidelines for achieving a reasonable accommodation between the needs of law enforcement and the rights of persons accused of crime. So far as we are aware, no study has yet been made of the impact of *Wade* on law enforcement. Moreover, as is demonstrated by the recent decision of the Supreme Court in *Simmons* v. *United States* (decided March 18, 1968), the Court has granted broad leeway for the needs of law enforcement in areas related to lineups. In *Simmons*, the Court refused to apply the requirement of *Wade* to circumstances in which eyewitnesses are shown photographs of suspects by the police. The Court recognized that photograph identification procedures are widely and effectively used in law enforcement and held only that such procedures must meet the elementary requirements of due process of law—that is, that the procedures are invalid only if they are "so impermissibly suggestive as to give use to a very substantial likelihood of irreparable misidentification" (slip opinion, pp. 5–6).

In these circumstances, therefore, we believe that precipitous legislative action overruling *Wade* would be not only unconstitutional, but unwise and highly premature as well.

### D. FEDERAL COURT JURISDICTION

Section 3502 of the committee print abolishes the jurisdiction of the Supreme Court and other Federal courts to review a State trial court's determination that a confession was voluntary, provided that the State court's determination has been upheld by the highest State court having appellate jurisdiction over the case.

Section 3503 of the committee print goes even further. Not only does it abolish the jurisdiction of the Supreme Court and other Federal courts to review a State trial court's determination that eyewitness testimony was admissible in evidence. It also abolishes the appellate jurisdiction of both the Supreme Court and the Federal courts of appeals to review a Federal trial court's determination that such testimony was admissible.

Under present law, the Supreme Court has appellate jurisdiction over all cases in the lower Federal courts. The Supreme Court also

has appellate jurisdiction over cases in the State courts raising a Federal question (28 U.S.C. 1251 et. seq.).

Sections 3502 and 3503 drastically curtail the appellate jurisdiction of the Federal courts over determinations involving the voluntariness of a confession or eyewitness testimony. Any attempt by Congress to accomplish this result by statute, rather than by constitutional amendment, is open to serious constitutional challenge. The sections raise especially grave questions with respect to State court determinations in these areas, since no Federal review whatsoever would be available, even though a Federal claim has obviously been raised.

The supremacy clause, in article VI of the Constitution, states that the Constitution and laws of the United States "shall be the Supreme Law of the Land." At least since the time of *Marbury* v. *Madison*, 1 Cranch 137 (1803), and *Martin* v. *Hunter's Lessee*, 1 Wheat. 304 (1816), the Supreme Court has been the sole tribunal under the Constitution with ultimate authority to resolve inconsistent or conflicting interpretations of Federal constitutional law by State and Federal courts and to maintain the supremacy of Federal law against conflicting State law.

Although article III, section 2 of the Constitution provides that the appellate jurisdiction of the Supreme Court is created "with such Exceptions, and under such Regulations as the Congress shall make," the exercise by Congress of such power must be consistent with the fundamental role of the Supreme Court in our Federal system. The exceptions and regulations clause does not give Congress the power to abolish Supreme Court review in all cases involving a particular issue, whether confessions, eyewitness testimony, or any other. To interpret the clause otherwise would deny the long-accepted power of ultimate resolution of constitutional questions by the Supreme Court. It would radically alter our established legal system by nullifying the supremacy clause and destroying the essential role of the Supreme Court as the principal instrument for implementing that clause in our constitutional system.

The unconstitutionality of sections 3502 and 3503 is forcefully and concisely urged in Hart and Wechsler, "The Federal Courts and the Federal System" (312 (1953)), and Ratner, "Congressional Power Over the Appellate Jurisdiction of the Supreme Court." (109 U. Pa. L. Rev. 157 (1960)). Although the Supreme Court itself has never been specifically called upon to determine the validity of a blanket exclusion of appellate jurisdiction over particular issues, we have little doubt as to the unconstitutionality of these provisions. In every case raising the issue, the Court has either found no limitation on its jurisdiction or upheld a limitation which did not seriously impair its jurisdiction. The leading case is *Ex parte McArdle*, 7 Wall. 586 (1969), in which the Court upheld an act of Congress removing Supreme Court jurisdiction over appeals from lower court decisions denying habeas corpus relief. The Court made clear, however, that the statute did not affect its power to review such decisions by issuing a writ of habeas corpus in its original jurisdiction. Thus, for example, in *Ex parte Yerger*, 8 Wall. 85 (1869), decided a few months after the *McArdle* case, the Court reviewed, on a petition for an original writ of habeas corpus, a lower court decision denying habeas corpus relief. In the *Yerger* case, the Court specifically indicated that Congress could not

constitutionally abolish all appellate jurisdiction of the Supreme Court.

Moreover, even though Congress may have some general power under the exceptions and regulations clause to withdraw Federal appellate jurisdiction to review constitutional questions in certain areas of the law, Congress surely cannot dilute or abrogate existing constitutional guarantees in the guise of exercising such power. See *United States* v. *Klein*, 13 Wall. 128 (1872). It is obvious that sections 3502 and 3503 dealing with Federal appellate jurisdiction are intended by the committee majority as part of a single inseparable plan to accomplish the legislative overruling of the *Miranda* and *Wade* decisions. As such, the sections will almost certainly be declared unconstitutional along with the substantive provisions of sections 3501 and 3503 discussed in part A and part C, supra.

Apart from the issue of the constitutional validity of legislation by Congress to eliminate the appellate jurisdiction of the Supreme Court over particular issues, enactment of such legislation would be extremely unwise, as a matter of policy, for several reasons.

1. Abolition of Supreme Court jurisdiction by Congress would seriously distort the delicate balance that is maintained between the three branches of Government in our federal system. The exercise by Congress of an ultimate power such as abolition of Supreme Court jurisdiction would cause the sort of basic confrontation between court and legislature that should be avoided at all costs if possible. Sections 3502 and 3503 are attacks on the Supreme Court even more drastic and extensive than the infamous Court-packing plan of the 1930's.

3. Experience has shown that the Federal courts, and especially the Supreme Court, perform an important and useful function in reviewing State criminal convictions in the area of confessions. A long line of confessions cases in the Supreme Court, extending back many years before the present controversy over *Miranda*, points up the fact that there have been numerous occasions in the past when State courts have not effectively protected the constitutional rights of accused persons.

4. By abolishing the appellate jurisdiction of the Supreme Court, Congress will reduce the Constitution and laws of the United States to a hodgepodge of inconsistent decisions. The 50 State courts and 94 Federal district courts will become the final arbiters of the meaning of the Constitution and laws of the United States. As Hamilton eloquently stated in The Federalist, No. 80, "The mere necessity of uniformity in the interpretation of the national laws decides the question. Thirteen independent courts of final jurisdiction over the same causes, arising upon the same laws, is a hydra in government, from which nothing but contradiction and confusion can proceed."

### E. HABEAS CORPUS

Section 2256 of the committee print abolishes the habeas corpus jurisdiction of the Federal courts with respect to State criminal convictions. Under this section, the sole Federal review of Federal claims by State prisoners will be limited to appeal or certiorari to the Supreme Court from the highest State court having appellate jurisdiction over the case.

As in the case of sections 3502 and 3503 described in part D, supra, section 2256 is open to serious constitutional attack.

The Constitution specifically provides that "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Since 1867, as we discuss in greater detail below, Congress has made the Federal writ of habeas corpus available to all persons, including State prisoners, restrained of their liberty in violation of the Constitution or laws of the United States. Although the constitutional provision prohibiting suspension of the writ of habeas corpus does not of itself confer jurisdiction on any court to issue the writ, decisions of the Supreme Court make clear that once Congress has granted jurisdiction to the Federal courts to issue the writ, the jurisdiction cannot be withdrawn except in cases of rebellion or invasion. Thus, in *United States* v. *Hayman*, 342 U.S. 205 (1952), in which the Court upheld the validity of the alternative method of collateral attack required under 28 U.S.C. 2255 for Federal prisoners, the Court emphasized that nothing in the legislative history of section 2255 disclosed any purpose to infringe upon a prisoner's right of collateral attack upon his conviction. The Court specifically held that the sole purpose of the section was to minimize difficulties encountered in habeas corpus hearings by providing the same rights through an alternative and more convenient procedure, and that the section did not operate to suspend the writ of habeas corpus.

Even apart from considerations of constitutionality, however, the elimination of Federal habeas corpus jurisdiction is open to grave objection on the grounds of both history and policy.

The writ of habeas corpus, the great writ, is one of the ancient pillars of Anglo-American law. Blackstone called it "the most celebrated writ in English law" (3 Blackstone's Commentaries 129). (See also 9 Holdsworth, "History of English Law" (108–125 (1926)), and *United States* v. *Hayman, supra.*) Power to issue the writ was first granted to the Federal courts as early as the Judiciary Act of 1789 (1 Sta. 73, 81–82). At that time, however, the common law rule governing issuance of the writ held that a judgment of conviction rendered by a court of general criminal jurisdiction was conclusive proof that confinement was legal. In addition, even where the writ was available, the common law rule permitted an inquiry only into the law, not the facts, of a detention.

In 1867, Congress modified the common law rule by making the Federal writ of habeas corpus available to all persons, including State prisoners, restrained of their liberty in violation of the Constitution or laws of the United States, and by permitting inquiry into both the facts and the law of the detention (14 Stat. 385, now incorporated in 28 U.S.C. 2241 et seq.). Thus, in all cases in which a full and fair disposition of a Federal claim has not been reached in a State court, the Federal courts are available as an alternative forum through their habeas corpus jurisdiction to test the legality of the prisoner's confinement.

For a hundred years, the Federal courts have vindicated the basic constitutional rights of American citizens through habeas corpus proceedings, frequently after blatant denials of such rights have gone

uncorrected in the State courts. Many of the great principles of American constitutional law have been established in such proceedings. (See, for example, *Moore* v. *Dempsey*, 261 U.S. 86 (1923) (mob domination of a trial); *Mooney* v. *Holohan*, 294 U.S. 103 (1935) (knowing use of perjured testimony by the prosecution); and *Gideon* v. *Wainwright*, 372 U.S. 355 (1961) (right to appoint counsel in criminal trials).)

Equally important, the provisions in section 2256 for Federal review of State criminal convictions by appeal or certiorari to the Supreme Court are grossly inadequate. As is well known, both of these appeal procedures are largely and necessarily discretionary in the Supreme Court. The Supreme Court simply does not have the time to consider thoroughly all the appeals and petitions for certiorari that are filed. To make these procedures the sole avenue for Federal review will, at best, cause the Supreme Court to accept for review many questionable cases on poor factual records, since this would be the Court's sole opportunity to review the Federal questions in the case. At worst, section 2256 will deny many State prisoners even one full and fair review in a Federal court of their constitutional claims. In addition, section 2256, taken in conjunction with the provisions of sections 3502 and 3503 abolishing the appellate jurisdiction of the Supreme Court with respect to issues involving the voluntariness of confessions or the conduct of lineups, means that no Federal review whatsoever will be available to State defendants raising such issues, no matter how meritorious their Federal constitutional claims.

Because of their number and their ability as trial courts to hold hearings and make findings, the Federal district courts are uniquely suited to review the disposition of Federal claims in State courts. See, e.g., Wright and Sofaer, "Federal Habeas Corpus Jurisdiction for State Prisoners: The Allocation of Fact-Finding Responsibility" (75 Yale L. J. 894–985 (1966).

It is regrettable that the highly charged emotional atmosphere in which the current debate over Federal habeas corpus for State prisoners is taking place obscures the single most salient fact of the procedure applicable under present law. In *Townsend* v. *Sain*, 372 U.S. 293 (1963), the Supreme Court held unequivocally that State court findings of fact, arrived at after full and fair hearings, must be accepted by Federal courts. A Federal habeas corpus hearing is not available merely because a State prisoner has been convicted of a serious offense. It is not available merely to reevaluate the evidence obtained at a full and fair State proceeding, or because a Federal district judge may disagree with the State court's evaluation of such evidence. Under the specific doctrine of *Townsend* v. *Sain*, Federal habeas corpus is available only when the State trier of fact has not afforded the habeas applicant a full and fair hearing. The *Townsend* doctrine recognizes the basic importance in our Federal system of allocating the primary factfinding responsibility to the State courts in cases involving State criminal proceedings. At the same time, it preserves the important role of the Federal courts in providing a meaningful Federal review of Federal claims raised in State courts.

A hundred years of experience under the Federal habeas corpus provisions forcefully demonstrate that absolute reliance on State courts

to protect Federal rights does not adequately protect these rights. To abolish this jurisdiction would roll back a century of progress in American constitutional law and restore American criminal procedure to the dark ages of the early 1900's.

JOSEPH D. TYDINGS.
THOMAS J. DODD.
PHILIP A. HART.
EDWARD V. LONG.
EDWARD M. KENNEDY.
QUENTIN N. BURDICK.
HIRAM L. FONG.

## INDIVIDUAL VIEWS OF MR. LONG OF MISSOURI AND MR. HART IN OPPOSITION TO TITLE III OF S. 917

We object most strenuously to title III of S. 917, dealing with wiretapping and other forms of electronic eavesdropping (popularly known as "bugging").

In our view, title III of S. 917, as reported, is unconstitutional, as it provides for unreasonable searches and seizures. However, even if the constitutional defects could and would be corrected, we would oppose it equally as much on purely policy grounds.

The Congress has debated similar bills to legalize wiretapping and bugging for 40 years and, until the present, rejected each and every one as providing for serious and unwarranted invasions of personal privacy. Now, through the mistaken idea that limited wiretapping and bugging will (1) help stamp out organized crime and (2) help eliminate crime in the streets, Congress is asked to sell its soul for a mess of porridge.

The hard truth of the matter is that limited eavesdropping is neither sought nor particularly helpful in the fight against organized crime. What would help is unlimited surveillance. As proof. look at New York which has had limited wiretap and eavesdrop for decades, and which has as much organized crime as almost any city in the country. The vast majority of the fish in the New York wiretap net are petty gamblers, and relatively few of them go to jail.

As to crime in the streets, the talk of electronic eavesdropping being helpful to the police is ludicrous. Who ever heard of a purse-snatcher or rapist planning his crime so as to be caught by wiretap or bugging. The proponents are using crime in the streets as nothing more than a red herring. If we are to really do something about crime in the streets, we must get at its roots—poverty and ignorance—not legalize wiretapping.

George Orwell's "Big Brother" is well on his way technologically. Do we want to speed his arrival legally by sanctioning use of his tools, especially when their application will have little or no effect in lessening crime?

### RIGHT OF PRIVACY ACT OF 1967

### (S. 928)

The administration's Right of Privacy Act of 1967 (S. 928), which outlaws electronic eavesdropping except in national security cases, was introduced on February 8, 1967, sponsored by 21 Senators. The bill was referred to the Subcommittee on Administrative Practice and Procedure and hearings were held on 10 different days between March 20 and May 19, 1967, during which 41 witnesses were heard. Thirty-five days of hearings, involving over 200 witnesses, had previously been held relating to invasions of privacy by Federal and other agencies, particularly through the use of wiretapping and eavesdropping.

Our conclusions, as a result of these extensive hearings, are as follows: wiretapping and bugging, with rare exception, are currently illegal as well as unconstitutional; both are repugnant to our historical concepts of privacy; both are repugnant to our concepts of justice and fairplay for all, guilty and innocent alike. It is this repugnance that has caused these activities to be cloaked in secrecy.

The subcommittee has encountered instance after instance where otherwise honest and decent law enforcement officials have dishonestly denied or withheld the fact that their investigations involved the use of wiretapping or bugging. In the last 2 years, we have been treated to the spectacle of the Solicitor General of the United States going before the Supreme Court to disclose that a number of convicted defendants had been the subject of electronic eavesdropping—a fact not disclosed to the Department of Justice until after that Department had obtained convictions.

Two hundred and forty-three witnesses have appeared before the subcommittee and several times that number have been interviewed. Some were engaged in wiretapping and bugging; others were its victims. From their testimony, several conclusions are inescapable:

> (1) Whether wiretapping and bugging are legal or illegal, constitutional or unconstitutional, they are essentially a form of "peeping tomism" and repugnant to men of good conscience;
>
> (2) Notwithstanding the personal reluctance to admit such activity, the activity itself, in order to be effective, must remain secret and covert just as all spying activities must be and must remain surreptitious;
>
> (3) Either by reason of personal embarrassment or for reasons of deception, evidence or leads to evidence are disguised so as to conceal the fact that such were obtained by "peeping" upon the conversations of the suspect or his associates;
>
> (4) No matter how circumscribed the "peeping," conversations of innocent parties are invariably listened to and recorded.

The above observations explain why all legislation offered by the proponents of legalized eavesdropping draft such legislation to provide ex parte proceedings in obtaining court sanction and thereafter the withholding from the suspect the fact that he was the victim of such techniques.

The administration's bill (S. 928) would prohibit all forms of electronic eavesdropping, private and law enforcement alike, except when authorized by the President in cases involving the national security and in such cases no evidence thus obtained could be used in any civil or criminal proceeding. In our view, this is a good bill and should be passed; it would preserve the modicum of privacy that progress has left to us, while at the same time permitting the President to use whatever tools he needs in the interest of national security.

## Safe Streets and Crime Control Act of 1967

### (S. 917)

Title III of the Safe Streets and Crime Control Act of 1967 (S. 917), as amended and adopted by the Committee on the Judiciary, sanctions electronic eavesdropping in instances where any court has approved their use. Thus, title III would for the first time legalize the use of

wiretapping and bugging as a legitimate law enforcement technique incorporating, of necessity, the proposition that what the courts have heretofore abhorred is not so abhorrent if there is legislative sanction.

Let us examine what appears to be a "little bit" of an invasion of privacy. Federal and State law enforcement agencies are to be provided with a procedure under which they may obtain court authorized approval to wiretap or eavesdrop where "a crime has been, is being, or is about to be committed." The Subcommittee on Administrative Practice and Procedure is yet to hear a single witness testify to the effect that wiretapping or eavesdropping would contribute one iota to the prevention or prosecution of those crimes of violence against persons or property which constitute the major percentage of "crime in the streets." As to such crimes as are about to be committed, we lack the speculative ability to make practical use of the proposed statute—except possibly for invading individual privacy in the random collection of criminal intelligence.

Section 2518(10)(a) of the proposed statute would permit an "aggrieved person" in any trial the right to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on certain specified grounds, while section 2510(11) defines an "aggrieved person" as one who "was a party to any intercepted wire or oral communication or a person against whom the interception was directed." There is no pretense of affording protection by way of suppression or otherwise for the person "who was the subject of the conversation." Hence, the proposed legislation legitimizes a practice of law enforcement now banned by the courts.

In order to understand the import of this "loop hole," let us consider A and B who are alleged to be bookmakers. A's and B's premises are bugged and their telephones are tapped under the authority of the proposed statute on the grounds that there is probable cause for belief that A and B are committing a crime. In the course of the surveillance, numerous leads are obtained which, in turn, provide independent evidence connecting X and Y with a different crime. It subsequently develops that neither A nor B were involved in any criminal activity—in fact, that there never was probable cause for such a belief in the first instance. However, X and Y are brought to trial. Neither have any relief under the proposed statute, either by way of suppression or civil damages. Assume, further, that X and Y were engaged purely in political activities, that such political activities had as its objective the removal of the corrupt chief of police who sought and obtained the spurious tap and bug on A and B. The suspected public official has in his possession evidence relative to X and Y that he may use in such a manner as he chooses, all lawfully acquired through wiretapping and eavesdropping.

"Law enforcement" includes a number of functions, but principally it includes the investigation of crimes committed and thereafter the prosecution of the suspect, when apprehended. The investigation of crimes normally presupposes that a crime has been or is being committed. That is the historical proposition. In any event, prosecution essentially requires the "crime complete" although it may encompass a conspiracy where only a single act in pursuit of the conspiracy may have been committed while the final objective of the conspiracy is still remote in time. The modern concern of many law enforcement agencies

has been to concentrate upon crimes which are in a continuous process of commission or are about to be committed. The latter is of gravest concern to those who challenge "organized crime," a term which they apply to that nationwide criminal conspiracy which transcends State boundaries, which touches every citizen, and which deals chiefly in gambling, narcotics, prostitution, and loan sharking.

Traditional military intelligence has furnished this group of law enforcement officials with both the vocabulary and the tools by which it wages constant war upon the sophisticated but sinister barbarians of our times.

Essentially the attack involves the collection of "criminal intelligence" through the use of informants, undercover agents, and electronic surveillance. The product of this effort is thousands of bits of information, all theoretically capable of being woven into the clearly identifiable fabric of criminal activity. Yet there is no ascertainable relationship or ratio between the thousands of man-hours and dollars involved in this activity and the convictions which it produces.

In the terms of convenience, electronic surveillance has no peer. Hundreds of homes and offices, and thousands of telephone conversations can be monitored from the comfort of the agency's offices miles away. It is small wonder that it is so tenaciously fought for by its adherents. One is often reminded of the story about the poor unfortunate who lost his dime one night on a darkened street but searched for it at the next corner where the street lamp furnished better light. We are inclined to adopt the Attorney General's public view that there is no substitute for good old-fashioned police work and that his restrictions on the use of electronic devices has not hampered the Department of Justice's drive on organized crime.

The subcommittee's investigations of criminal intelligence-gathering activities disclosed that almost every metropolitan police department and almost every major State has a bureau engaged exclusively in the collection of criminal—and political—intelligence. It was particularly interesting to find that these bureaus had no direct responsibility to investigate any specific crimes. Such responsibilities were assigned to and ably performed by the detective, homicide, vice, and other bureaus, while crimes in the street were directly handled by the patrolman on the beat or in the police cruiser. The number of files and the quantity of information gathered by these intelligence bureaus is appalling. A computerized consolidation of all such information could certainly make available some sort of information on almost 9 out of every 10 citizens in the country. Much of this information has been obtained through illegal, unconstitutional, and unconscionable electronic eavesdropping. Since the improper use of the proposed legislation will never be discovered unless the evidence is produced in a criminal proceeding, there is no reason to believe that these agencies will not, in time, achieve the perfection of 10 out of 10.

CONCLUSION

Most of the countries of the world have a "Big Brother" to watch over them.

So far, America has been fortunate enough to avoid such a form of government. But, as Sinclair Lewis said, "It Can Happen Here."

Technology is Big Brother's right hand, especially electronic technology. Nowhere has such technology outrun the United States. In being and on the drawing board, we have marvels of electronic eavesdropping.

There is no good reason why Congress should join technology in speeding the arrival of Big Brother.

To the contrary, we should continue our historic course of resisting invasions of privacy.

Constant surveillance of citizens by the State may be inevitable, but we need not lend a hand to the process. Little enough privacy remains today. Therefore, we are implacably opposed to passage of title III of S. 917.

EDWARD V. LONG.
PHILIP A. HART.

ADDITIONAL VIEWS OF MR. HART ON TITLE III OF S. 917

As do Senators Burdick, Fong, and Long, I strongly oppose passage of title III, which authorizes Federal and State law enforcement wiretapping and eavesdropping for a wide range of crimes.

## A. Constitutional Issue

First, I have serious doubts about the constitutionality of title III. Proponents of title III cite the recent Supreme Court eavesdropping decisions in *Katz* v. *United States*, 389 U.S. 347 (1967) and *Berger* v. *New York*, 388 U.S. 41 (1967) for the proposition that Congress now has the constitutional green light to pass a court-ordered eavesdropping statute such as title III.

While mindful of the quote attributed to Chief Justice Hughes that "the Constitution is what the judges say it is," I believe a close reading of the Supreme Court's recent eavesdropping decisions in these two cases casts considerable doubt on the constitutionality of title III of S. 917.

### 1. BERGER *v.* NEW YORK, 388 U.S. 41 (1967)

The Supreme Court by a 6-to-3 decision reversed the conviction of Ralph Berger who had been convicted of conspiracy to bribe the chairman of the New York Liquor Authority. Evidence for conviction was obtained by eavesdropping authorized by a New York statute (N.Y. Code Criminal Procedure 813–a) permitting law enforcement eavesdropping for up to a 2-month period.

The Supreme Court held that the language of the New York law was too broad, resulting in a trespassory intrusion into a constitutionally protected area in violation of the fourth and 14th amendments. The Court specifically held that the provision in the New York statute authorizing eavesdropping for a 2-month period was unconstitutional. According to the Court, such eavesdropping is the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause. During such a long and continuous (24 hours a day) period, the conversations of any and all persons coming into the area covered by the eavesdropping device are seized indiscriminately and without regard to their connection with the crime under investigation (388 U.S. at 59).

### 2. KATZ *v.* U.S. 389 U.S. 347 (1967)

Six months after *Berger* v. *New York*, the Supreme Court set aside a conviction based on evidence obtained from a bug placed by FBI agents on two public telephones that Katz habitually used.

In many ways the *Katz* decision represented a major victory for privacy. First, the Supreme Court finally overruled *Olmstead* v. *U.S.*, 277 U.S. 438 (1928), which had denied fourth amendment protection to eavesdropping which did not physically penetrate one's premises. *Katz* thus brought wiretapping clearly within the fourth

amendment's prohibition against "unreasonable searches and seizures"—thus impliedly requiring the exclusion from State courts of wiretapping evidence obtained in an unconstitutional manner.

Further, in *Katz* the Supreme Court discarded the "constitutionally protected areas" doctrine under which unlimited eavesdropping had been permitted in such places as prison visiting rooms because such rooms had been deemed unprotected areas. Instead the Court held that the correct rule is "what (a person) seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."

It is true that the Court in *Katz* stated that had the eavesdropping been conducted pursuant to a court order, it would have been sustained (389 U.S. 347, 359). Nothing in *Katz*, however, supports the broad provisions of title III.

*Katz* involved that rare situation where electronic eavesdropping could be limited, not only with respect to time and place, but also to a specific person or persons and specific conversations. In *Katz*, FBI agents had established that Katz was in the habit of using certain public telephones at a certain location at a certain time to transmit wagering information. The FBI agents, therefore, installed a bug on the phone booth which was activated only when Katz entered the booth. The bug caught only Katz's end of the conversation and was turned off when he left.

In approving this kind of eavesdropping, the Court emphasized that no conversations of innocent persons were overheard. It noted that "on the single occasion where the statements of another person were inadvertently intercepted, the (FBI) agents refrained from listening to them" (389 U.S. 347, 354). The Supreme Court placed particular emphasis on the extremely narrow circumstances under which the surveillance in *Katz* was conducted:

> Accepting this account of the Government's actions as accurate, it is clear that *this surveillance was so narrowly circumscribed* that a duly authorized magistrate * * * clearly apprised of the precise intrusion could constitutionally have authorized, with appropriate safeguards, *the very limited search and seizure* that the Government asserts in fact took place (at 354). [Emphasis added.]

*Katz* thus permits eavesdropping in one of the rare situations where it can be carefully circumscribed—a bug activated only when the suspect uses the "bugged" premises and recording only particular conversations of the suspect. Supreme Court approval of such a narrowly circumscribed eavesdropping situation as *Katz* does not imply approval of a 30-day bug on a house or office (as is provided by title III), where many innocent people congregate to talk about many innocent things.

*Katz* is thus consistent with the language and tone of *Berger*, which disapproved the indiscriminate seizure of the conversations of innocent people when a bug is in continuous operation in an area during any lengthy period of time (388 U.S. at 59). Indeed, in both *Berger* and *Katz* the Court cited examples of narrowly circumscribed electronic

eavesdropping which it had approved in prior decisions. As stated in *Berger*:

> This Court has in the past, under specific conditions and circumstances, sustained the use of eavesdropping devices. See *Goldman* v. *U.S.*, supra; *On Lee* v. *U.S.*, supra; *Lopez* v. *U.S.*, supra; and *Osborn* v. *U.S.*, supra (388 U.S. at 63).

These four eavesdropping cases cited approvingly by the Court in *Berger* involved, as did *Katz*, very circumscribed eavesdropping. In *Goldman*, an FBI detectaphone was installed to overhear four conversations to which an FBI informer was a party. In *On Lee* an informer wore a radio transmitter for his conversation with a specific suspect. In both *Lopez* and *Osborn* the Supreme Court upheld the use of an eavesdropping device wired to an informer and used to record the informer's conversations with a suspect. In each of these four cases, as in *Katz*, the eavesdropping the Supreme Court approved was carefully circumscribed and limited to specific conversations which the eavesdropper knew would take place.

The eavesdropping and wiretapping authorized by title III of S. 917, however, is essentially an indiscriminate dragnet. Section 2518 (5) of title III authorizes wiretapping and eavesdropping orders for 30-day periods. During such 30-day authorizations, a title III bug or tap will normally be in continuous operation. Such a bug or tap will inevitably pick up all the conversations on the wire tapped or room bugged. Nothing can be done to capture only the conversations authorized in the tapping order. Thus, under title III, not only is the privacy of the telephone user invaded with respect to those calls relating to the offense for which the tap is installed, but all his other calls are overheard, no matter how irrelevant, intimate (husband-wife, doctor-patient, priest-penitent), or constitutionally privileged (attorney-client). Further, under title III all persons who respond to the telephone user's calls also have their conversations overheard. Likewise, under a tile III tap, all other persons who use a tapped telephone are overheard, whether they be family, business associates, or visitors; and all persons who call a tapped phone are also overheard.

To illustrate the indiscriminate nature of a title III tap, one need only consider the experience of a New York police agent who in the course of tapping a single telephone recorded conversations involving, at the other end, the Julliard School of Music, Brooklyn Law School, Western Union, Mercantile National Bank, several restaurants, a drugstore, Prudential Insurance Co., the Medical Bureau To Aid Spanish Democracy, dentists, brokers, engineers, and a New York police station.

Wiretapping and eavesdropping as authorized by title III thus represent a sweeping intrusion into private and often constitutionally protected conversations of many, and often innocent, persons. The effect of *Berger* and *Katz* is now to measure wiretapping and eavesdropping authorizations against the fourth amendment's requirements for a search warrant. Title III, as I see it, permits "general searches" by electronic devices, the offensive character of which was first condemned in *Entick* v. *Carrington*, 19 How. St. Tr. 1029 (1765) and which were then known as "general warrants."

The use of such "general warrants" was a motivating factor behind the Declaration of Independence. "Under these 'general warrants,'

customs officials were given blanket authority to conduct general searches for goods imported to the colonies in violation of the tax laws of the Crown. The fourth amendment's requirement that a warrant 'particularly describe the place to be searched, and the persons or things to be seized' repudiated these general warrants" (*Berger* at 58).

### 3. CONSTITUTIONAL REQUIREMENT OF PARTICULARITY

There is yet another fundamental inconsistency between title III and the requirements of the Constitution applicable to electronic surveillance, as interpreted by the Supreme Court in the *Berger* and *Katz* decisions. I believe that title III violates the requirement of these decisions that a warrant for electronic surveillance must particularly describe the conversations to be overheard.

As the Court emphasized time and again in *Berger* and *Katz*, the requirements of the fourth amendment applicable to wiretapping and eavesdropping are the same requirements applicable to conventional search warrants. Thus, it is clear that the overall purpose of *Berger* and *Katz* is to assimilate electronic surveillance to the strict requirements applicable to searches and seizures for tangible physical objects.

It has long been established that a conventional search warrant must describe with particularity the object to be seized, and that a judge authorizing the issuance of a warrant for the object must have probable cause to believe that the described object will be found on the premises to be searched.

Under rule 41(c) of the Federal Rules of Criminal Procedure, of course, the requirements applicable to nighttime searches are more stringent than for searches to be executed in daytime. Thus, a warrant for a daytime search may be issued on the basis merely of a showing of probable cause for belief that the object named in the warrant will be found on the premises to be searched. A warrant may not be issued for a nighttime search, however, unless the issuing judge finds as a fact that the object will be found on the premises. Title III draws no distinction between daytime and nighttime searches, but authorizes round-the-clock surveillance for the entire 30-day period of the warrant.

It is true that section 2518(3)(b) of title III requires a finding of probable cause for belief that particular communications concerning the offense named in the warrant will be intercepted. That provision, however, pays only lipservice to the constitutional mandate. The lengthy period of surveillance authorized in title III—up to 30 days, with unlimited renewals for fresh periods of 30 days each—belies the apparent adherence of title III to the requirement of particularity.

No one would suggest that a conventional search warrant may validly be issued to authorize a law enforcement officer to enter a private home or office and embark on a search lasting even a few days, let alone authorize the officer to move into the premises for a month.

Conventional searches lasting even a few hours have been roundly condemned in the courts as general, or "ransacking," searches. Yet it is precisely such a ransacking search that title III authorizes. A search lasting for a period of days or months can hardly be a search for a particularly described object. Unless we are to define "particularity" in novel terms, completely divorced from the requirements long held applicable to traditional search warrants, title III cannot stand.

Fortunately, the circumstances of the *Katz* case offer a clear example of what the Supreme Court intended as a valid application of the particularity requirement in existing search-and-seizure law to electronic surveillance. In *Katz*, the Federal investigating agents obviously had probable cause to believe that the particular communications made by the suspect from the public telephone booth were themselves part of the suspect's ongoing criminal activities. An application by the agents for a warrant authorizing the surveillance could clearly have described the communications to be intercepted with precisely the sort of particularity that is required in warrants authorizing searches for tangible physical objects.

The surveillance authorized by title III, however, is vastly different. It ranges far beyond the circumstances of *Katz*. Instead of requiring a meaningful description of particular communications to be intercepted, it authorizes all conversations of the person named in the warrant to be intercepted over the entire period of the surveillance, with law enforcement officers authorized to sift through the many varied conversations, innocent and otherwise, that take place during the period.

No search warrant could constitutionally authorize all of a person's future written statements to be seized for a 30-day period, in the hope that one or another of the statements would contain certain incriminating information. The constitutional protection for oral statements can be no less. I suggest that no warrant should be able to authorize all of a person's conversations to be seized for a 30-day period, in the hope that an incriminating conversation will be intercepted. Yet, this is precisely the sort of unlimited search contemplated by title III. It was not contemplated, nor is it permitted by the Constitution.

## B. POLICY CONSIDERATIONS

Usually, one who opposes legislation in the belief it is unconstitutional opposes it also as unwise and undesirable. There is a chicken-egg question here, admittedly, and my opposition to legalizing wiretapping and eavesdropping goes beyond the constitutional doubts I have about title III.

Wiretapping and other forms of eavesdropping are recognized by even their most zealous advocates as encroachments on a man's right to privacy, characterized by Justice Brandeis as "the most comprehensive of rights and the right most valued by civilized men."

In yesteryear, a man could retire into his home or office free from the prying eye or ear. That time is no long past. Transmitting microphones the size of a sugar cube can be bought for less than $10. Other gadgets now enable a would-be snooper in New York to eavesdrop in Los Angeles merely by dialing a telephone number. This is done by attaching to the telephone in Los Angeles a beeper which converts the telephone into a transmitter without its ever leaving its cradle.

Directional microphones of the "shotgun" and parabolic mike type make it possible, by aiming the mike at a subject, to overhear conversations several hundred feet away. Laser beams permit an eavesdropper to monitor conversations in rooms up to half a mile away by aiming the beam at a thin wall or window. And the experts now tell us that in the years to come, as the methods of eavesdropping tech-

nology surges forward, the problems of protecting personal privacy will even further intensify.

Against this backdrop of diminishing individual privacy, proponents of title III now want to legitimate law enforcement wiretapping and eavesdropping. Clearly, if such an effort is successful, today's narrowing enclave of individual privacy will shrink to the vanishing point.

Personal privacy is not the only basic right wiretapping and eavesdropping circumscribe.

Private property is a basic institution in our democratic country. Without it, individualism and freedom wither and die, no matter how democratic a government purports to be. One of the major purposes of our Constitution and Bill of Rights was to safeguard private property.

One of the most important characteristics of private property is the right to possess it exclusively—to keep all strangers out. The householder may shut his door against the world.

This right of a citizen to shut the door against anyone, even the king himself, is part of our ancient heritage. One of the great ends for which men entered into society was to protect their property. Under common law, every invasion of private property, no matter how minute, was a trespass, even if no damage was done. And the king's man, entering without sanction of law, was as much a trespasser as the ordinary citizen.

Make no mistake about it: Eavesdropping and wiretapping are trespasses against the home. They are more serious trespasses than an unlawful search of the premises because they continue over long periods of time unknown to the householder. Thus to those who value the institution of private property, eavesdropping and wiretapping have always been regarded as unacceptable. That property shall not be immune from all control and entry, however, long has been accepted. Overriding claims of public health and safety needs, for example, have justified carefully defined limitations on freedom and use of private property.

Is there such an overriding claim here? Is there so great a need for wiretapping as to allow it as title III proposes, assuming it is constitutionally permitted?

Despite the clear-cut invasion of privacy, there is a great clamor for wiretapping and bugging from certain of the law enforcement community. Yet there is in fact serious doubt and disagreement as to the need for such authority in dealing with crime. According to this Nation's highest ranking law enforcement officer, U.S. Attorney General Ramsey Clark:

> Public safety will not be found in wiretapping. Security is to be found in excellence in law enforcement, in courts and in corrections * * *. Nothing so mocks privacy as the wiretap and electronic surveillance. They are incompatible with a free society. *Only the most urgent need can justify wiretapping and other electronic surveillance. Proponents of authorization have failed to make a case—much less meet the heavy burden of proof our values require. Where is the evidence that this is an efficient police technique? Might not more crime be prevented and detected by other uses of the same*

> *manpower without the large scale, unfocused intrusions on
> personal privacy that electronic surveillance involves?*
> [Emphasis added.]

Ray Girardin, speaking as police commissioner of Detroit, said:

> * * * from the evidence at hand as to wiretapping, I feel
> that it is an outrageous tactic and that it is not necessary and
> has no place in law enforcement.

Nor are the Attorney General and Commissioner Girardin alone in their views. Back in the twenties, thirties, and forties, when we also had a serious crime problem, Attorneys General Harlan F. Stone and Robert H. Jackson condemned wiretapping as inefficient and unnecessary.

As Attorney General Robert H. Jackson said before World War II:

> The discredit and suspicion of the law-enforcing branch
> which arises from the occasional use of wiretaping *more than
> offsets the good* which is likely to come of it. [Emphasis
> added.]

It is far from clear that crime cannot be fought without wiretapping and eavesdropping. Rifling the mails and reading private correspondence, suspension of the fifth amendment's privilege against self-incrimination and judicious use of the thumbscrew and rack would probably help the police secure more convictions. This country, however, has wisely seen fit to forbid the police from using such techniques; for the past 34 years Congress also wisely classified wiretapping as a forbidden police method because the dangers inherent in it to innocent persons far outweigh any benefit it may yield to law enforcement. As Justice Holmes said in the first eavesdropping case to confront the Supreme Court:

> For my part I think it is a less evil that some criminals
> should escape than that a government should play an ignoble
> part (dissent, *Olmstead* v. *U.S.*, 277 U.S. 438).

When the Government overhears clients talking to their attorneys, husbands to their wives, ministers to their penitents, patients to their doctors, or just innocent people talking to other innocent people, it is clearly playing an "ignoble part."

## C. The Johnson Administration Position on Eavesdropping

President Johnson and Attorney General Clark have recognized the clear threat to privacy wiretapping and eavesdropping pose.

In his state of the Union address in 1967, the President stated:

> We should protect what Justice Brandeis called the "right
> most valued by civilized men"—the right to privacy. We
> should outlaw all wiretapping—public and private—wherever
> and whenever it occurs, except when the security of the Nation
> itself is at stake—and only then with the strictest safeguards.
> We should exercise the full reach of our constitutional powers
> to outlaw electronic "bugging" and "snooping." [Emphasis
> added.]

On February 8, 1967, the President sent to Congress his Right of Privacy Act (S. 928) which outlaws electronic eavesdroping except

173

in national security cases. Twenty-two Senators cosponsored S. 928. Although I feel S. 928's national security provisions could be tighter, I commend the President, because S. 928 represents a tremendous step forward for privacy. Under S. 928, neither the Government nor private citizens could legally use today's frightening panoply of eavesdropping devices to snoop on our citizens. Under S. 928, individual privacy and the institution of private property would once again be meaningful terms.

On February 7, 1968, in his special message on crime to Congress, the President again called for passage of the administration's Right to Privacy Act (S. 928).

Title III rejects the approach recommended by the President and supported by the Attorney General.

## D. Technical Aspects of Title III

Even for those who favor legalizing wiretapping, title III could present certain problems.

### 1. Aggrieved Person (Sec. 2510(11))

Section 2510(11) of title III gives standing to challenge a surveillance order only to a person who was either a party to an intercepted communication or against whom the interception was directed.

Section 2510(11) is thus likely to encourage illegal surveillance in cases where the parties to a communication are not the real objects of the surveillance. For example, section 2510(11) may encourage illegal surveillance of petty hoodlums to gain intelligence against their bosses. As section 2510(11) now stands, it is an open invitation to law enforcement officers to engage in illegal electronic surveillance. So long as the illegally obtained evidence is not used against the parties to the intercepted communications, no person will have standing to challenge its introduction in evidence. Although section 2510(11) gives standing to the person against whom an interception is directed, whether or not he was a party to the communication, it will be difficult in many cases to determine that the surveillance was directed against anyone other than the parties to the communication.

### 2. Range of Federal Crimes for which Wiretapping and Eavesdropping Authorized (Sec. 2516 a–f)

In their report, proponents of title III state:

Applications for orders authorizing the interception of wire or oral communications may be made only in the investigation of *certain major offenses* * * *. Each offense has been chosen *because it is intrinsically serious* or because *it is characteristic of the operations of organized crime.* [Emphasis added.]

Section 2516 of title III then goes on to authorize Federal wiretapping for such crimes as bribery of union officials (sec. 186, title 29), embezzlement of union assets (sec. 501(c), title 29), bribery of public officials and witnesses (sec. 201, title 18), offering or soliciting kickbacks to influence the operation of employee benefit plans (sec. 1954 of title 18), and "any offense involving the manufacture, importation,

receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs."

Even the most zealous advocate of wiretapping might be hard-pressed to establish some of the preceding crimes as "major offenses."

Under the list of offenses spelled out in section 2516, every high school or college student who takes a puff of marihuana could be tapped or bugged; every union activity, too.

One should be able to be against union corruption and illegal drug usage without inaugurating the big brother state which could result if the present list of Federal crimes for which tapping and bugging are authorized is allowed to stand.

### 3. RANGE OF STATE CRIMES FOR WHICH EAVESDROPPING WARRANTS MAY BE ISSUED (SEC. 2516(2))

It is hard to conceive how the range of State offenses for which such a serious invasion of privacy as wiretapping is authorized could be broader than the Federal offenses, but such is the case.

Section 2516(2) permits wiretapping and eavesdropping for *any state crime* punishable by more than *one year* in prison *and* dangerous to "life, limb or property." Nothing in Section 2516(2) thus prohibits the use of bugging or tapping in such sensitive areas as state income tax violations.

Likewise in many states numerous petty offenses will qualify under Section 2516(2) as crimes for which wiretapping and bugging orders may be issued.

### 4. NATIONAL SECURITY TAPPING—SECTION 2511(3)

Section 2511(3) of Title III permits the President to authorize, without first seeking a court order, wiretapping and eavesdropping in "national security cases". In Section 2511(3), however, it states:

Nor should anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States . . . *against any other clear and present danger to the structure of existence of the Government.* [Emphasis added.]

This language leaves too much discretion in the hands of a President. Under 2511(3) a President on his own motion could declare a militant right wing political group (i.e., the Minutemen) or left wing group (i.e., Black Nationalists), a national labor dispute, a concerted tax avoidance campaign, draft protesters, the Mafia, civil rights demonstrations, a "clear and present danger to the structure of the Government." Such a declaration would allow unlimited unsupervised bugging and tapping. Section 2516 limits federal tapping and bugging to certain crimes and places such eavesdropping under judicial supervision. As drafted, however, Section 2511(3) gives the President a blank check to tap or bug without judicial supervision, whenever he finds, on his motion, that an activity poses a "clear and present danger to the Government." Further, section 2511(3) permits the introduction into evidence any bug or tap the President authorizes.

Section 2511(3) vests power in a President to utilize bugging and taping in many areas totally unconnected with our traditional concept of "national security."

5. CONSENSUAL WIRETAPPING AND EAVESDROPPING (SEC. 2511(2)(C))

Section 2511(2)(c) of title III completely exempts all consensual wiretapping and eavesdropping from the provisions of the title. So long as at least one of the parties to a conversation has consented to its interception, title III is inapplicable.

Thus, although the title contains blanket prohibitions on all "third-party" ("nonconsensual") interception—that is, interceptions without the consent of at least one of the parties to a conversation—by private persons, and places strict controls on the use of such interception by law-enforcement officers, it is totally permissive with respect to surreptitious monitoring of a conversation by a party to the conversation, even though the monitoring may be for insidious purposes such as blackmail, stealing business secrets, or other criminal or tortious acts in violation of Federal or State laws.

The use of such outrageous practices is widespread today, and I believe they constitute a serious invasion of privacy. See Greenawalt, "The Consent Problem in Wiretapping and Eavesdropping: Surreptitious Monitoring with the Consent of a Participant in a Conversation" (68 Col. L. Rev. 189 (1968)). Consensual wiretapping and eavesdropping may be accomplished in several different ways:

A party to a conversation may himself record the conversation;

A party to a conversation may use or even wear a concealed electronic device to transmit the conversation to a nonparty; or

A party to a conversation may consent to the use of an electronic device by a nonparty to overhear the conversation.

Occasionally, it is said that the parties to a conversation rely on their trust of one another not to reveal confidences that are disclosed in the conversation, and that the risk that the confidences will later be repeated to other persons is essentially the same, whether the repetition is by memory or by electronic recording.

I believe, however, that the risk created by electronic recording is of an entirely different order from the risk of repetition involved in normal conversations, and that consensual electronic surveillance presents grave dangers to free and open expression in our society. None of us is so circumspect in our speech that we can countenance the later use of our most private utterances, played with the shattering impact of a broadcast in our own words. Therefore, if the provisions of title III prohibiting the use of electronic surveillance by private persons are to become meaningful protections of the right of privacy, I believe that the abusive practice of consensual wiretapping and eavesdropping by private persons cannot be completely exempted from the title.

There are, of course, certain situations in which consensual electronic surveillance may be used for legitimate purposes by public officials and private persons. Law-enforcement officers use it to record incriminating statements in their confrontations with a suspect, in order to obtain convincing evidence that will not be subject to attack on grounds of credibility when it is later introduced at the trial of the suspect. Law-enforcement officers also use it defensively to protect the integrity of government officials from attempts by private persons to distort their conversations or to engage them in criminal or compromising activities. Private persons may use it to preserve accurate records of their conversations in order to refresh their memory, or to prevent future distortions of their remarks by other parties, without intending

in any way to harm the nonconsenting party. In addition, private persons placed in compromising circumstances may desire to record incriminating conversations by the other party in order to be able to take an accurate record of such conversations to law-enforcement officers. Such legitimate uses of consensual electronic surveillance should not be prohibited.

Title III contains strong prohibitions against wiretapping and eavesdropping by private persons where none of the parties to the conversation has consented to the interception. I believe that these provisions should be broadened to prohibit the flagrant abuses that now exist in circumstances where some, but not all, of the parties have consented to the interception. Such nefarious practices can readily be curbed without hindering in any way the legitimate needs of law enforcement or private citizens. I urge the Senate to amend title III to accomplish this goal.

### 6. DISCLOSURE OF EAVESDROPPING ORDER (SEC. 2518 (8) (d))

Section 2518(8)(d) places on the judge the duty of causing an inventory to be served by the law-enforcement agency on the person named in an order authorizing or approving a bug or a wiretap. Such "inventory" must be filed not later than 90 days after the eavesdropping order is terminated, and shall include notice of the entry of the eavesdropping order, the period of authorized or approved interception, and whether or not wire or oral communications were intercepted. According to the majority report on title III, the preceding "inventory procedure" reflects existing search warrant practice under rule 41 of the Federal Rules of Criminal Procedure.

It should be noted, however, that under rule 41 of the Federal Rules of Criminal Procedure, the police must, after seizing any property, give the defendant a written inventory of such "seized property." To fully comply with rule 41 under title III eavesdropping order, the police, therefore, should have to give the person named in the order either a copy of the conversations intercepted or a copy of the complete logs of the intercepted conversations or permit the person named in the order to hear the tapes of the intercepted conversations.

Since proponents of title III attempt to have section 2518(8)d reflect "existing search warrant practice," I urge they fully meet the inventory disclosure requirements of rule 41.

### E. CONCLUSION

For nearly four decades Congress wisely has rejected numerous bills similar to title III.

In 1948, Orwell wrote a book, "1984," in which he painted a bleak prophecy of what life would be like 16 years from now:

> The telescreen received and transmitted simultaneously. Any sound that Winston made, above the level of a very low whisper, would be picked up by it; moreover, so long as he remained within the field of vision which the metal plaque commanded, he could be seen as well as heard. There was of course no way of knowing whether you were being watched at any given moment. . . . You had to live—did live, from

habit that became instinct—in the assumption that every sound you made was overheard and, except in darkness, every movement scrutinized.

In terms of the technological advances in the field of electronic eavesdropping, 1984 is clearly upon us. I, for one, however, do not want to see the Government given the right to use, especially when their use will have little or no effect in lessening crime, 1984's tools against its citizens.

Therefore, I oppose Senate adoption of title III.

PHILIP A. HART.

## INDIVIDUAL VIEWS OF MR. BURDICK ON S. 917

I believe that title III should be stricken from the bill. It is fraught with grave doubts of constitutionality. In my opinion neither *Katz* v. *United States*, 88 S. Ct. 509 (1967) or *Berger* v. *New York* 388 U.S. 41 (1967), nor any other Supreme Court decision, sustains the broad intrusion into the private lives of our citizens which is authorized under title III. Under this title, the right of privacy of innocent third parties is ignored and violated. Therefore I will oppose the inclusion of title III in the bill.

I have read the individual views expressed by my colleagues, Senator Long of Missouri and Senator Hart of Michigan, and I concur generally therewith.

QUENTIN N. BURDICK.

## INDIVIDUAL VIEWS OF MR. FONG

According to the FBI Uniform Crime Report for 1967, the incidence of violent crimes in the United States showed a sharp increase by more than 16 percent. Murder increased by 12 percent, armed robbery by more than 33 percent, property crimes by 16 percent, and the use of firearms in aggravated assault by 22 percent; 53,000 Americans were assaulted with guns in 1967, a sharp rise of 22 percent over the 1966 figure. In not a single category of crime did the FBI's crime index show a decline or any change from the previous period surveyed.

During 1966 the police in our country were able to solve only 25 percent of the serious crimes reported—a slight decrease from the national police solution rate in 1965.

America's high crime rates are tremendously costly to the American economy. In 1965 the crimes against property—robbery, burglary, larceny (more than $50) and auto theft—cost the nation $600 million; crimes against the person—homicide and assault, for example—cost $815 million. These figures represent a staggering total of $1,145 million.

All of these statistics underscore the need for action by the Federal Government to maintain an orderly society through the effective enforcement of our laws. Federal assistance is urgently required to achieve these ends.

### TITLE I—LAW ENFORCEMENT ASSISTANCE

I wholeheartedly endorse the objectives of title I of this bill. This title represents the heart of this legislation.

There are certain national objectives which are vital to every citizen of this country, and the elimination of crimes is one of the foremost among these objectives. We cannot sit back and expect the existing law enforcement agencies to solve the problem without aid from Congress and from all the citizens of the United States.

Title I clearly recognizes, as it must, that law enforcement in the United States is primarily a task for our State and local governments. The Constitution of the United States confers no general police power on the Federal Government. The denial of such power is soundly predicated on the fear that a too-powerful central government will become despotic. Our citizens have always insisted and continue to insist that police power must be dispersed among the State and local governments of the Nation, as a guarantee that no single government can begin to accumulate enough power to submerge the democratic foundations of the Republic.

This basic principle of the responsibility of State and local governments for law enforcement in the United States is firmly maintained in title I of the bill. The law enforcement assistance programs authorized by the title will remain under the direction and control of State and local law enforcement agencies. Title I strengthens the capacity

of State and local governments to solve their problems of law enforcement, and thereby eliminates any tendency toward Federal domination.

At the same time, title I recognizes that there are many problems in law enforcement and crime prevention which State and local grovernments cannot solve on their own.

In accord with the recommendations of the President's Commission on Law Enforcement and Administration of Justice, title I provides substantial Federal financial assistance to these governments to improve and strengthen all aspects of their systems of law enforcement and criminal justice. It will speed funds to the areas of law enforcement where the need is greatest and most immediate. It will encourage the planning, coordination, and research in law enforcement that has been so seriously lacking in the past.

The additional resources which would be available under title I to both Federal and local authorities will facilitate better training for law enforcement personnel, acquisition of modern equipment and facilities, incorporation of innovative techniques for apprehension of the lawless, and improvements in rehabilitation processes and procedures.

This legislation will not solve all of the problems. No simple or easy solution is available.

It will, however, firmly commit the Federal Government to a role of leadership and support. Within the framework of our established and traditional separation of responsibilities, it will let all levels of Government work together to fight the common enemy—crime and lawlessness.

I believe this proposal to be a sound, imaginative approach which will make a substantial contribution to the life of our society.

I am happy to endorse the comments of the majority report pertaining to title I.

TITLE II—CONFESSIONS, EYEWITNESS TESTIMONY, AND HABEAS CORPUS

However bright the promise of title I, I deplore the action of the committee in accepting title II of the bill. Title II is a dangerous affront to the Constitution of the United States. It presents a grave threat to the fundamenal principles of the Nation—to our basic concepts of separation of powers, to Federal supremacy, to Judicial independence—in short, to our most cherished notions of justice and the rule of law.

Title II. if enacted, would:

Require Federal courts to admit confessions and eyewitness identifications into evidence even if such evidence were obtained in violation of the specific safeguards required under the Constitution by the Supreme Court in *Miranda* v. *United States* (1966) and *United States* v. *Wade* (1967) ;

Abolish Supreme Court jurisdiction to review State criminal cases in which confessions or eyewitness identifications have been admitted in evidence ;

Abolish Federal habeas corpus jurisdiction over State criminal convictions, in disregard of article I, section 9, of the Constitution, which provides that "the privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it" ;

Overrule the Supreme Court's decision in *Mallory* v. *United States* (1957) and permit Federal criminal suspects to be questioned indefinitely before they are presented to a committing magistrate. Unlike the District of Columbia Crime Act, enacted in the first session of this Congress, no time limit or other safeguards on interrogations are provided.

Each of the provisions of title II is vulnerable to serious constitutional objections. Several of the provisions are almost certainly unconstitutional on their face, because they attempt to overrule by statute clear commands of the Constitution—particularly those limiting the appellate jurisdiction of the Federal high courts and abolishing the habeas corpus jurisdiction of all Federal courts. I had thought it settled within our federal system that what is mandated by the Constitution may not be dismissed by legislative fiat.

Moreover, the provisions of existing law that title II seeks to overturn can hardly be declared unreasonable. Under present law, prior to any questioning, a putative defendant must be warned that—

(*a*) He has the right to remain silent;

(*b*) Anything he says could be used against him in a court of law;

(*c*) He has the right to the presence of an attorney;

(*d*) If he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires;

(*e*) Opportunity to exercise these rights must be given him throughout the interrogation;

(*f*) After these warnings have been given and he has been afforded these opportunities, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.

These points were spelled out in the landmark decision *Miranda* v. *Arizona*, 384 U.S. 436 (1966), where the Supreme Court held that a confession made after the suspect was taken into police custody could not be used in evidence unless the above sixfold warning had been given before questioning.

Another landmark case in this area was *Mallory* v. *United States*, 345 U.S. 444 (1957). There, the Supreme Court held that if the arresting officer fails to comply with rule 5(a) of the Federal Rules of Criminal Procedure—requiring imprisonment of an arrested person "without unnecessary delay"—any confession obtained during the period of unnecessary delay shall be excluded.

Section 3501 of title II would overrule all of the presently existing standards and render them merely as guidelines to determine admissibility.

In short, existing law is designed to assure that confessions are voluntary, that lineups are fair, that arraignments are prompt, and that defendants receive a full and fair hearing of their Federal claims in a Federal court. Unless we are to reject these principles, title II cannot stand.

I am, therefore, in accord with the views expressed in the minority report on title II.

TITLE III—WIRETAPPING AND ELECTRONICS SURVEILLANCE

I must also respectfully interpose serious constitutional and policy objections to title III of the bill. Title III, in the form proposed by the administration as S. 928, was properly described as the Right to Privacy Act. As accepted by the committee, title III is more appropriately described as the End to Privacy Act.

To be sure, title III has incorporated, substantially verbatim, many of the provisions of S. 928. I strongly endorse the portions of title III concerned with protecting the individual from electronic invasions of his privacy by private persons. I also approve the excellent prohibitions on the manufacture, shipment, or advertising of electronic surveillance devices. If we are to make substantial progress toward protecting individual privacy, we must sharply curtail the supply of the nefarious devices that are so easily obtained in the marketplace today.

But these protections are scant compensation for the grave threat to privacy engendered by the permissive provisions in the remainder of title III. Police-conducted invasions of privacy are authorized to investigate a vast range of Federal or States crimes. Section 2516(1) offers a shopping list of crimes for which Federal warrants may be issued that is far too broad to be reconciled with any legitimate law enforcement purpose. And the provisions of section 2516(2) give carte blanche to State and local police to engage in wiretapping and eavesdropping for any felony whatsoever.

So long as a willing judge is found to issue a surveillance warrant, there is no bar to massive electronic surveillance by the police at every level—Federal, State, or local. The statutory requirement of a judicial warrant is simply inadequate to protect the precious right of the individual to privacy. The ease with which some judges now rubber-stamp conventional search warrants is notorious. No doubt, the vast majority of judges will take care to make proper findings before issuing surveillance warrants. We shall inevitably find, however, that law enforcement officers in search of surveillance warrants will seek out the judges who are less exacting or less cautious in their dispensation.

I oppose the enactment of any permissive electronic surveillance legislation at the present time. I especially regret the action of the committee in tying such legislation to the crucially important provisions of the law enforcement assistance program in title I of the bill.

At the same time, however, I recognize that there may be areas of law enforcement in which some police eavesdropping and wiretapping may eventually be shown to be necessary. In matters of national security, for example, electronic surveillance may be essential because the stakes involved are so high.

In matters involving organized crime, electronic surveillance may be essential because of the shroud of secrecy that organized crime can and does command to the death.

I cannot believe, however, that such surveillance is needed in the investigation of the myriad other Federal and State crimes for which warrants are authorized under the bill. If title III is to be enacted in some form, I urge the Congress to limit the use of surveillance to the narrow areas of national security and hard-core organized crime, and

even then to allow such surveillance to be conducted only by the Federal Bureau of Investigation.

The truth is, however, that wiretapping and eavesdropping are law enforcement weapons whose value and impact is as yet dimly perceived. At the present time, we can only speculate on the burdens and benefits involved. In our present state of knowledge, we simply ought not to create a blanket authorization for the wholesale use of such an ultimate weapon.

I am fearful that if these wiretapping and eavesdropping practices are allowed to continue on a widespread scale, we will soon become a nation in fear—a police state.

Further, if title III is to be enacted, I urge that its permissive provisions be limited to a life of 5 years. If wiretapping and eavesdropping prove in actual experience to be useful, and their cost is not too great, then Congress, I am sure, will not hesitate to make the legislation permanent. In light of the tremendously advanced state of technology today, with its vast potential for invasion of privacy, we owe it to each individual American citizen to require this second look at title III before it passes with finality into the statute books.

I also respectfully suggest that title III be amended to include a requirement that a National Commission be appointed to study the results of electronic surveillance carried out under the bill, and to report to Congress on whether the legislation has been effective. In this manner, the judgment of Congress on this basic issue will be as fully informed as possible. The right to privacy is deeply valued by our society. It deserves no less.

## TITLE IV—HANDGUN CONTROL

All citizens of the United States are aware of the danger presented by the possession of firearms by irresponsible and criminal members of our society. We have nothing to fear from the possession of firearms by responsible citizens in the pursuit of the legitimate goals of recreation or self-protection.

However, as I have repeatedly pointed out in the past, we must prevent indiscriminate purchase of weapons and control their use, so that our citizens are protected from their unlawful and destructive use.

As approved by the committee, title IV contains the following provisions:

(1) Prohibits the interstate mail order sale of handguns except between federally licensed dealers.

(2) Prohibits the over-the-counter sale of handguns to persons not residing in the State in which the dealer's place of business is located.

(3) Prohibits a Federal dealer from selling a handgun to a person under 21 years of age.

(4) Prohibits a Federal dealer from selling a firearm to a person who the licensee believes is prohibited by State or local law from receiving or possessing a firearm. (Rifles and shotguns are included in the definition of "firearm.")

(5) Provides higher standards for obtaining Federal firearms dealer licenses and increases the licensing fees for dealers, importers and manufacturers.

(6) Regulates the importation of firearms into the United States by excluding surplus military handguns and rifles and shotguns not suitable for sporting purposes.

(7) Prohibits the sale of destructive devices (antitank guns, bombs, grenades), machineguns and sawed-off rifles and shotguns unless the dealer has a sworn statement from the purchaser's local law enforcement officer stating that no law would be violated by such person's possession.

(8) Prohibits the interstate transportation of destructive devices, machineguns, and sawed-off rifles and shotguns in interstate commerce except between licensed dealers or as authorized by the Treasury Secretary.

(9) Prohibits the transportation or receipt in interstate commerce of a firearm (including rifles and shotguns) knowing a felony is to be committed with it.

Although this title represents the first step to effective Federal gun control legislation and has my support, I strongly believe that it is entirely inadequate. By limiting its coverage to only handguns and excluding rifles and long guns, title IV falls far short of the strong and effective firearms control legislation so urgently required to control crime.

As one who has, since 1963, urged the adoption of a strong, comprehensive gun control law, I consider the provisions contained in S. 1, to control the indiscriminate sale of all firearms—rifles as well as handguns—as being the first effective step in that direction.

S. 1 would limit the number of firearms in the possession of minors and persons with serious criminal records. It would limit the mail-order sale of all firearms in interstate commerce, unless the purchaser is positively identified.

In short, title IV should be amended so as to cover not only handguns but all types of firearms.

The Congress has a clear mandate from the people to pass such a comprehensive law.

According to the Gallup poll, nearly 75 percent of the American people want some kind of strong and effective gun control legislation. The Harris poll of April 22, 1968, indicated that Americans favor strict control over the sale of firearms by 71 to 23 percent. Significantly, the Harris poll also showed that people who own guns favor such a law by a better than 2-to-1 margin, 65 to 31 percent.

The International Association of Chiefs of Police, representing law-enforcement officers from across the Nation, have voted overwhelmingly to endorse S. 1; so have the American Bar Association, the National Association of Citizens Crime Commissions, and the President's Commission on Law Enforcement and Administration of Justice.

Facts and figures overwhelmingly support the urgent need for a comprehensive law. According to surveys taken in 1966, 59 percent of all murders were committed with guns—the highest percentage ever recorded; aggravated assaults with a gun rose by 22 percent; and armed robbery, which comprises 58 percent of all robberies, rose 10 percent.

Even more compelling is the fact that in States which have strong gun control laws, homicides committed with guns are less common than in States with no law or which have ineffective controls. For ex-

ample: In four States having strong gun control laws, the proportion of murders committed with firearms to the total number of homicides committed in the last 4 years, according to the FBI report, was well below the national average of 57 percent. In Pennsylvania, firearm murders were 43 percent of the total; in New Jersey, 39 percent; in Massachusetts, 35 percent; in New York, 32 percent. On the other hand, States with minimal controls or no such law had much higher rates: Colorado, 59 percent; Louisiana, 62 percent; Arizona, 66 percent; Montana, 68 percent; Texas, 69 percent, and Nebraska, 70 percent.

A good, strong Federal firearms law is long overdue.

HIRAM L. FONG.

# INDIVIDUAL VIEWS OF MR. BAYH

An examination of crime incident statistics, from whatever source, leaves little doubt that all agencies at all levels of government must invest new resources in crime preventative measures if efforts at deterence are to be meaningful. Title I of the "Safe Streets" bill represents an effort on the part of the federal government to assist local law enforcement agencies in meeting some of their growing responsibilities. Although we need not expect that this measure will eliminate all criminal activity, it does represent a significant recognition and awareness that a total marshalling of local-state-federal resources is necessary if a successful assault on criminal activity is to result. Because the thrust of Title I of this measure does provide assistance to local law enforcement agencies in the areas of street crime, riot control and prevention, and organized crime, I enthusiastically support this portion of the bill.

Title III of the bill provides for the limited use of electronic listening devices by law enforcement agencies. The uncontrolled use of electronic listening devices has long concerned me as a violation of the right to privacy of each individual citizen. I frankly look with great concern at many efforts to legitimatize this type of "snooping". The need to use electronic devices in the area of national security has general acceptance, but their extension to other fields should only come after closest examination demonstrates the most compelling need. The area of organized crime increasingly appears to meet this criteria.

"Organized crime," according to the report of the Task Force on Organized Crime, "is the society that seeks to operate outside the control of the people of America and its government, which involves thousands of criminals working within its structures as complex as those of any large corporation, subject to laws more rigidly enforced than those of legitimate governments. Its actions are not impulsive, rather the result of intricate conspiracies carried on over many years and aimed at gaining control over whole fields of activity in order to amass huge profits." Because of its operation in complete and total contravention of the mores and tenets of society as we know it, little can be achieved without the ability to pierce the organization veil. Since the essence of organized crime is secrecy and conspiracy, particular emphasis is placed on the "internal security" of this organization which makes the usual and common means of information and intelligence gathering by police insufficient to thwart their expanding activities.

It is clear that those who traffic in terrorism, murder, extortion, loan-sharking, prostitution, narcotics and tax evasion have a twisted sense of society which prevents their acceptance of our traditional notions of justice, humaneness and morality.

Acknowledging, as we must, that the trail of organized crime has led into an ever enlarging circle to high public and private offices, I have come to the unavoidable conclusion that organized crime and its

capacities for extortion, blackmail, duress, and murder threatens not only the very moral fiber of our country, but as importantly, our national security.

It is with this thought in mind that I reluctantly support Title III as a means to provide an effective tool to combat the continued conspiracies of organized crime which are eating at the very foundation of America. The requirement of continued judicial supervision and the limited duration during which the electronic devices may be used must be closely adhered to so that organized crime and not the individual citizen will become the target of this section.

Title II of the proposed bill is one with which I must take issue. Those views filed by the minority as they pertain to Sections B, C, D, and E of Title II so adequately express the agreements regarding these particular points that there is no need for me to list them here. I do not feel compelled to express different thoughts than those of the Minority concerning Section A of Title II.

Section A deals with the application of certain legal criteria in the determination of the admissibility of confessions as evidence in a criminal court. This provision of the bill exists as a result of the Supreme Court decision in *Miranda* v. *Arizona.* In my capacity as Chairman of the Subcommittee on Constitutional Amendments, I have conducted a number of hearings following the *Miranda* decision regarding the wisdom of suggesting Constitutional changes that might abrogate the effect of that decision on law enforcement agencies.

This entire area is an extremely difficult and complicated one. Law enforcement officials almost unanimously agree that *Miranda* did in varying degrees cause them considerable difficulty. On the other hand, there was strong evidence expressing reluctance to support an effort to rearrange, restrict or repeal the Fifth Amendment guarantees.

For over 35 years, since the decision in *Brown* v. *Mississippi*, we have accepted the view that physical beatings that result in a confession of a crime are not conducive to the ahievement of perfect truth or justice. Since that time there has been a growing awareness that beatings administered mentally were also subject to question on the same grounds. This aspect, difficult for us to understand, received sharp attention as examples of the techniques of brainwashing came to us from the Korean conflict. And so the Courts eventually recognized the invalidity of the mentally coerced confession when they stated in *Blackburn* v. *Alabama* that "the blood of the accused is not the only hallmark of an unconstitutional inquisition."

Although there is little empirical evidence that law enforcement agencies engage in concerted and deliberate efforts, either physical or mental, which are not in keeping with our traditional notions of fair play and justice, there are isolated instances where duress and trickery were employed by the State against the individual. The question inevitably is this: were those actions sufficient in number and degree to warrant what some believe to be the devastating criteria of *Miranda?* Notwithstanding, the Court has now assured the criminally accused a right to be clinically processed in the "cold light of day."

It is my judgment that from a practical standpoint if this Court rendered criteria is to be changed, it cannot be done by legislation which the Court would, in all probability, subsequently render unconstitutional.

I doubt that the provisions of this bill which relate to the admissibility of confessions meets the requirements expressed by the Court in the following language:

> "* * * unless we are shown other procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, the following safeguards must be observed.";

However, I do believe that it could serve, as Senator McClellan has suggested, as an admonition to the Court that strong sentiment and cause exists against the further extension of the doctrine pronounced in *Miranda*. In addition, it is hoped that the consideration of this matter by the Congress will cause all law enforcement agencies to re-examine the actual holding of the Court in *Miranda*. Much evidence was presented in the hearings of the Subcommittee on Constitutional Amendments to the effect that some well-meaning jurisdictions had extended the holding of *Miranda* to be more restrictive on the police than was actually the intention of the Court. It is this narrow line which the Congress and the country must walk which, on the one hand, guarantees each individual against oppressive police tactics while, on the other, guarantees to each individual law-abiding citizen adequate protection of a police force which is increasingly hard put to maintain vigilance against the upsurge in criminal activity.

BIRCH BAYH.

## ADDITIONAL VIEWS OF MR. TYDINGS ON TITLE IV, THE CONCEALED WEAPONS AMENDMENT

Three years ago President Johnson first asked Congress to enact the "State Firearms Control Assistance Act." That bill provided modest federal controls on the interstate commerce in firearms. Its purpose was to assist the states in enforcing whatever gun laws they wish to enact. Three years and 2040 pages of congressional hearings later, the Judiciary Committee is now favorably reporting a limited portion of that legislation as Title IV of the Safe Streets and Crime Control Act.

### WHAT TITLE IV PROVIDES

Title IV, the Concealed Weapons Amendment, is a very limited, stripped down, bare minimum gun traffic control bill, primarily designed to reduce access to *handguns* for criminals, juveniles, and fugitives.

This Concealed Weapons Amendment does *not* provide for registration of any firearm or require any permit for purchase of firearms.

This Concealed Weapons Amendment does *not* affect domestic sale of rifles or shotguns in any fashion. Mail order and over-the-counter sales of rifles and shotguns are totally exempt from the bill.

Regarding handguns, Title IV provides only that handguns must be bought in the purchaser's home state. Mail order sales of handguns, except between licensed dealers, are prohibited. Likewise, dealers cannot sell handguns to out-of-state purchasers, or minors, fugitives or felons.

Title IV affects long guns in only two ways. First, it authorizes the Treasury Department to control imports of weapons not suitable for sporting purposes. Second, Title IV prohibits sale of any handgun or long gun in violation of the law of the state where the sale is made, or which the seller knows will be used in a felony.

As an avid hunter, who first learned to shoot at his father's knee in the duck blinds at the age of nine, I can fairly say that this Concealed Weapons Amendment does *not* significantly inconvenience hunters and sportsmen in any way. The people it does frustrate are the juveniles, felons, and fugitives who today can, with total anonymity and impunity, obtain guns by mail or by crossing into neighboring states with lax or no gun laws at all, regardless of the law of their own state.

This Concealed Weapons Amendment does *not* violate any state's rights to make its own gun laws. Quite the **contrary, Title IV provides** the controls on interstate gun traffic which **only the federal** government can apply, and without which no state gun law is worth the paper it is written on.

The purpose of this Concealed Weapons Amendment is simply to help the states enforce whatever gun laws each wishes to enact. Without such federal assistance, any state gun law can be subverted by any

child, fugitive, or felon who orders a gun by mail or buys one in a neighboring state which has lax gun laws. As William L. Cahalan, Prosecuting Attorney, Wayne County (Detroit) Michigan, told the Senate Juvenile Delinquency Committee last summer, in the wake of the Detroit riots:

> Effective law enforcement in Michigan, particularly in the County of Wayne, has been seriously hampered by the unlawful possession and illegal use of firearms brought into the State of Michigan by residents who are able to purchase these firearms with scarcely any restrictions in the State of Ohio, principally in the City of Toledo and its environs which is only a one hour drive on the Expressway from Detroit.
>
> Michigan has enacted adequate legislation for regulating the *purchase* and *possession* of handguns within the state.
>
> However, law enforcement in this area has been largely circumvented by those who can leave the City of Detroit and drive to Toledo, Ohio, where handguns may be purchased in various kinds of business establishments merely by making the purchase and giving the seller a name and address. No other requirement is imposed upon the purchaser.
>
> . . .
>
> Handguns confiscated by the City of Detroit police from defendants in connection with the commission of crimes, and held for use as evidence in those criminal cases, have increased substantially in recent years. In the year 1965, there were 2,910 such firearms seized, followed by 3,970 in the year 1966, and 2,435 seized during the first 6 months (to June 30, 1967) of the current year.
>
> Of the 100 handguns seized each week, 90 of these firearms are found to be unregistered within the State of Michigan and most of these 90 firearms have been used in the commission of crimes.
>
> . . .
>
> Based on information which has been gathered from surveillances, statements obtained from defendants, and data supplied by Federal and local law enforcement agencies, most of these firearms are purchased by Michigan residents outside of the State of Michigan either by direct purchase or by mail order.
>
> . . .
>
> I think the situation that occurs in Wayne County in which Detroit is the major city, demonstrates probably better than any other locality in the country the very need for some sort of Federal regulation, particularly as it has to do with handguns. (Hearings before Senate Juvenile Delinquency Subcommittee on the Federal Firearms Act, July 1967, pages 368–401.)

The Concealed Weapons Amendment provides this desperately needed federal safeguard to make state gun laws effective. Title IV

represents the least Congress can do to meet the urgent public demand for protection against the currently unrestricted gun traffic to criminals and juveniles in this country.

### Who Wants Firearms Control?

The President, the Attorney General, the Director of the FBI, the President's Commission on Law Enforcement and the Administration of Justice, the International Association of Chiefs of Police, the American Bar Association, and state and local law enforcement officials all across the country have recommended federal firearms control legislation much more stringent than Title IV, the Concealed Weapons Amendment, provides. (See Appendix ——, to these views.)

The overwhelming majority of Americans, including gun owners, wants strong gun controls. A nation-wide Harris poll of public opinion released on April 22, 1968, reports that three out of every four Americans, and two out of every three gun owners, want far more stringent gun controls than Title IV provides.

Gun owners and non-gun owners alike recognize that today's virtually unlimited gun traffic threatens every law-abiding American. In September 1966, Gallup reported that *56% of all gun owners* favored registration. By September 1967, a Harris poll reported that this support has risen to *66% of all gun owners.* The April 22, 1968 Harris poll shows gun owner support of Federal laws compelling registration remains at the same high level, with *more than 2 out of every 3 gun owners in favor of federally required registration of all gun sales.* These findings have been confirmed again and again by an entire series of public opinion polls by the Harris and Gallup organizations during the past two years. (See Appendix I, hereto.)

Yet to judge from the mail manufactured and inspired by the firearms lobby, one might conclude that some members of the National Rifle Association speak for the 200,000,000 other Americans who are more concerned with personal and public safety than with the hysteria generated by the NRA's *American Rifleman* magazine. The fact is, however, that the NRA does not speak for the U.S.A. The American people want action to deny guns to criminals, juveniles and fugitives. The American people want protection, not bogus legal arguments and sophistries about punishing criminals after they have killed, maimed and wounded innocent persons.

I believe the great majority of NRA members would also favor the Concealed Weapons Amendment, if only they could get the *facts* rather than deceitful half-truths from their national headquarters. The sad fact is that a handful of professional gun control fighters, who make a living opposing gun sales control legislation, have so distorted and misrepresented the provisions and purpose of federal firearms legislation that hunters and sportsmen all over America have grave misconceptions of what such legislation provides. Whether hunting in one of our great Western States last summer, or shooting duck on Maryland's famous Eastern Shore last fall, I have found that readers of the *American Rifleman* hold wildly inaccurate views of proposed federal firearms proposals. Many sportsmen actually seem to believe the President's modest firearms bill would require surrender of their weapons.

The reason for these misconceptions is painfully clear. The NRA propagandists and a few other irresponsible "journalists" have, either through incredible carelessness or calculated deceit, grossly mislead their audience about the purposes and provisions of recent federal firearms control proposals. For example, the April 12, 1968 Congressional Quarterly reported on the NRA's gun control lobbying activities. Citing a letter the NRA had sent to its entire 700,000 membership about the President's gun control bill, CQ stated:

> The letter said the bill could lead to elimination of "the private ownership of all guns" and would give the Secretary of the Treasury "unlimited power to surround all sales of guns by dealers with arbitrary and burdensome regulations." The letter warned NRA members that "if the battle is lost, it will be your loss, and that of all who follow."

> By any accounting, the letter was replete with distortions of the fact. NRA members were told that "anyone engaged in the manufacture of ammunition would be required to have a $1,000 manufacturer's license." In fact, the license fee was set at $500. Furthermore, the letter stated, "Apparently this (license fee) would apply to a club engaged in reloading for its members." It was not clear how the NRA determined that reloading constituted manufacturing of ammunition.

> Another paragraph stated: "If you transported your rifle or shotgun to another state, for a lawful purpose, such as hunting, you would have to comply with such burdensome restrictions and red tape as might be required by the regulations." In fact, there were no restrictions in the bill against carrying guns in interstate commerce for a lawful purpose (except for a felon or a fugitive from justice), and there would have been no reason for the Secretary of the Treasury to impose regulations which had nothing to do with administering the legislation.

> The letter also stated: "A dealer could not sell a nonresident of his state." In fact, the bill only prohibited selling handguns to out-of-state residents. Shotguns and rifles could be purchased freely anywhere.

> During Senate hearings, Dodd went through the NRA letter paragraph by paragraph and pointed out items he called patently untrue." Dodd asked NRA officials to correct the record with a new mailing. NRA President Harlon B. Carter told Dodd he felt "a keen sense of responsibility" and would consider sending another letter.

> No new letter was sent. In the December 1965 issue of *The American Rifleman*, Orth, the NRA executive vice president, thanked members for the "response to my April letter. Probably no issue before the 1st Session of the 89th Congress drew the volume of mail that poured into the nation's lawmakers in opposition to S. 1592.... That these letters were effective in preventing the passage of S. 1592 is beyond question."
> **(Congressional Quarterly, April 12, pp. 811–812).**

Unfortunately, such fast and loose treatment of the truth by the gun lobby continues to this day to plague rational discussion of firearms legislation.

While congressional action on the gun traffic has been stalled by this vocal, but relatively small, band of gun lobbyists, the American people have become increasingly critical of congressional inaction on effective firearms sales regulation. A Harris poll in January of this year indicated that the major cause of a 5-year low in public confidence in Congress is congressional failure to pass gun sales regulation legislation. Almost half of all citizens interviewed put congressional inaction on guns as the major cause for their loss of confidence in Congress.

The American people are fed up with the unlimited gun traffic in this country. They are grievously disappointed in Congressional failure to take any action to keep concealed weapons out of the hands of criminals, juveniles, and fugitives.

The American people want action now to control the gun traffic in this country. Americans want an end to the incredible condition we face in this country when any fugitive, 10-year-old, or escaped convict can order a gun by mail in any State in the Union with total anonymity and impunity.

As one distinguished American put it:

> Each year, thousands of businessmen look up from their work into the menacing muzzle of a gun wielded by a trigger-happy robber. In recent months, murderous snipers have waged guerilla warfare against law enforcement officers in our city streets. In 1963, our President was slain with a mail order rifle. During the calendar year of 1966 alone, more citizens were killed or assaulted with guns in American streets and homes than were killed in battle during the entire Korean conflict.
>
> The use of firearms in crime is indeed a serious and major problem in our country today.
>
> A firearm continues to be the instrument of death in virtually every murder of a law enforcement officer. Last year, 55 of the 57 law enforcement victims killed in the line of duty died of gunshot wounds. These figures are in keeping with the trend since 1960 which reflects that firearms have been the murder weapons in 96 per cent of the 335 police killings.
>
> · · · ·
>
> I think mail-order firearm purchases should be banned, interstate transportation of firearms controlled, and local registration of weapons required and enforced.
>
> · · ·
>
> There is no doubt in my mind that the easy accessibility of firearms is responsible for many killings, both impulse and premeditated. The statistics are grim and realistic. Strong measures must be taken, and promptly, to protect the public.

Those are not my words. Nor are they the words of any Senator or Congressman. They are the words of Mr. J. Edgar Hoover, Director of the Federal Bureau of Investigation, writing in the September 1967 issue of the FBI Law Enforcement Bulletin.

Mr. Hoover's words reflect the views of scores of law enforcement officials and concerned citizens all across the country. For example, Mr. Quinn Tamm, Executive Director of the prestigious International Association of Chiefs of Police says:

> Law-abiding citizens and the police are tired of living in a country which is becoming a veritable armed camp, erupting too frequently into violence, bringing death and destruction by firearms to innocent citizens.
>
> In October 1965, our members adopted a resolution supporting proposed federal legislation . . . to restrict the widespread traffic in firearms . . . The framers of our resolution . . . pointed out that the case with which any person can acquire firearms (including criminals, juveniles without knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, [and] armed groups) . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States. (Quinn Tamm, editorial in *Police Chief*, magazine of the International Association of Chiefs of Police, July, 1967.)

Governor Hughes of New Jersey, testifying before the Senate Judiciary Committee after last year's Newark riots, testified forcefully in favor of federal legislation to control the gun traffic. He said:

> It is tragic . . . and it seems to me to contain the beginning elements of a national scandal at this important and dangerous posture of our Nation's affairs, that Congress should even be considering the denial of the protection of an interstate gun control law to Americans threatened not only by criminals and narcotics addicts and mentally unstable persons, but by extremists who openly and criminally call for armed revolt in the cities of America . . .
>
> And I think, Mr. Chairman, it is time that all of us . . . gave more thought to the safety of the people of America, and the policemen on the street, whose job is already dangerous enough . . .
>
> These policemen, at least in my State, are of one unanimous view, that guns must be controlled if the safety of American citizens is to be protected. (Hearings Before Juvenile Delinquency Subcommittee on Federal Firearms Act, July 31, 1967, pp. 997–1030.)

Title IV, the Concealed Firearms Amendment, a limited, moderate measure to protect the safety of the American people by making state handgun sales law enforceable. In fact, it is so limited that if apologies for it need be made to anyone, they should be made to the American public, since this bill falls short of the comprehensive gun control legislation their safety requires.

Yet, the provisions of even this limited bill has been vigorously opposed both within Congress and elsewhere.

Some opponents of Title IV assert the President's bill is a part of a campaign to disarm law-abiding citizens. In fact, the bill only places reasonable restraints on the interstate shipment and sale of handguns, to reduce the chance they will fall into the hands of criminals, fugitives and juveniles.

The bill does not require or contemplate registration or surrender of any firearms by their owners, and would not prevent any law-abiding adult from walking into his local store and buying or ordering a handgun. Furthermore, rifles and shotguns will continue to be freely available both over-the-counter and by mail in any state in the Union.

Opponents of Title IV argue that it imposes unfair restrictions on sportsmen. The only restriction this bill imposes on sportsmen is that they must purchase their handguns in their own state. This provision will help states enforce their own effective gun laws by preventing their residents from evading those laws by purchasing handguns by mail or in a neighboring state with lax gun laws.

(One study by the Massachusetts State Police showed that 87% of concealable firearms used during the commission of crimes there are obtained from sources outside the state, thus undermining Massachusett's own strong gun laws. Hearings before Senate Juvenile Delinquency Subcommittee, Federal Firearms Act, pp. 343–373, June 3, 1965.) Similarly, as I have already noted, after the Detroit riots last summer, the Michigan State's Attorney for the Detroit area told the Senate Juvenile Delinquency Subcommittee that, despite Michigan's strong gun law, 90 of every 100 handguns seized from criminals in Michigan are illegally possessed and most of them were purchased by Michigan residents outside the state either by direct purchase in neighboring Ohio or by mail order.

The third argument that opponents of the gun control bill make is that criminals will still get guns, despite any gun control measure. Therefore, to reduce gun crimes, stronger penalties for gun crimes, not reasonable controls on gun sales, are the answer. The record shows, however, that stringent penalties for gun crimes do not control gun crimes. The death penalty for murder did not prevent the 5,090 gun-caused murders in 1963, the 5,634 in 1965, or the 6,552 gun murders committed in 1966. The prospect for long terms in jail did not prevent the 27,700 gun-committed aggravated assaults in 1964, the 34,700 in 1965 or the 43,500 committed in 1966. Nor did the strong penalties in existing law deter the 40% increase in armed robbery by guns between 1964 and 1966 alone.

On the other hand, state which have enacted strong gun control laws have experienced significantly lower gun crime rates than states which have lax laws or no laws at all. Fifty-seven per cent of all murders in the United States between 1962 and 1965 were committed by gun. In four states which have effective gun laws, however, gun murders made up only 43% of the total murders in Pennsylvania, 39% in New Jersey, 35% in Massachusetts, and 32% in New York. In stark contrast, states with minimal or no gun laws experienced sharply higher gun murder rates. The percentage of all murders committed with guns was 59% in Colorado, 62% in Louisiana, 66% in Arizona, 29% in Texas, 70% in Nebraska, and 72% in Montana. In Vermont, a state frequently cited by the NRA as having weak gun laws but low gun crime rates, there were only seven murders between 1962 and 1965, *but all seven were by guns, for a 100% gun murder rate!* (See FBI Law Enforcement Bulletin, Appendix II, hereto.)

The reason effective state gun laws do not work even better is that existing federal law undercuts them by allowing guns to be purchased by mail-order or purchased under looser laws in nearby states and then smuggled in.

## THE AFFIDAVIT APPROACH

Many who recognize the dire need for federal legislation to regulate the gun traffic nonetheless do not wish to go very far in any such law. They suggest not only that rifles and shotguns be exempt from any regulation, but also that mail order and over-the-counter handgun sales be regulated only by an affidavit procedure.

To the extent rifles and handguns are exempted, Title IV and the affidavit approach are identical. With regard to handguns, however, the affidavit approach fails to provide either effective regulation or adequate coverage of the handgun traffic.

Title IV would make state handgun laws enforceable by prohibiting over-the-counter sales of handguns except in the buyer's home state. Title IV would also outlaw mail order sales. The affidavit approach would permit mail order sales and over-the-counter sales to non-residents, regardless of the law of any state, but would require the purchaser to affirm under oath such things as that he is over 21, not violating any law in buying the gun, not a drug addict, or convicted drug pusher, and not insane. Also, the affidavit would include the name and address of the principal law enforcement officer of the buyer's residence or the locality to which the handgun would be shipped. The seller would have to send a copy of the affidavit to the police official named therein and wait a brief period before delivering the handgun to the mail order purchaser.

It is not clear how the affidavit approach would work, if the would-be purchaser lies about his identity or the identity or address of the local police official. In fact, the affidavit procedure appears to be a burden and harassment for the honest, but no barrier to the juvenile, fugitive, or criminal intent on getting a gun by mail, regardless of the law of his state.

Aside from its ineffectiveness, the affidavit approach will impose a new administrative burden on already badly overworked state and local police. In contrast, Title IV is self-executing and *actually* keeps weapons out of the hands of criminals, rather than counting on their honesty in executing mail orders.

## PROTECTING THE AMERICAN PEOPLE

The almost limitless gun traffic must be brought under control. More than 100,000,000 guns are already in private hands in our country. More than 1,000,000 more a year are being dumped in this country through imports alone. Americans tolerate a rate of gun murder unthinkable in other countries. In 1962, for example, the 4,954 gun murders in this country compared to 29 in Great Britain, 9 in Belgium, 6 in Denmark, 5 in Sweden and none in Holland. The soaring gun crime rate endangers every American and is killing and maiming many new thousands of citizens every year.

Effective federal legislation to protect the American people from the gun traffic is long overdue. The time for action is now.

APPENDIX 1

THE HARRIS SURVEY—CONFIDENCE IN CONGRESS AT LOW EBB, PRESIDENT NOW HAS HIGHER RATING

(By Louis Harris)

Public confidence in Congress has reached its lowest ebb in five years, with the American people giving the recently reconvened 90th Congress at 41 to 59 per cent negative job rating.

In fact, President Johnson, with a positive rating of 43 per cent, now is more favorably received by the public than is Congress.

Specific criticisms of last year's session are directed at failure to pass a gun control bill, cutting back aid to cities, not passing an open-housing law and cutting funds for the poverty program.

The House and Senate are credited for refusing to pass the income tax increase requested by the President, for increasing Social Security benefits, for extension of the draft and for cutting back funds for foreign aid.

Basically, the public's unhappiness with Congress stems from a feeling that in a time of crisis in Vietnam, racial turmoil at home and a rising cost of living, Congress has bogged down in cantankerous debate over peripheral issues and has not come up with a legislative program to meet urgent problems.

Here is the trend of confidence in Congress as measured in the last part of 1967, compared with similar readings over the past five years. A cross section of 1620 households selected on a careful probability basis across the country was asked:

*"How would you rate the job this session of Congress (90th Congress) has done—excellent, pretty good, only fair or poor?"*

TREND OF CONFIDENCE IN CONGRESS

[Percentage]

|  | Positive | Negative |
|---|---|---|
| 1967 | 41 | 59 |
| 1966 | 54 | 46 |
| 1965 | 71 | 29 |
| 1964 | 64 | 36 |
| 1963 | 35 | 65 |

Those with no opinion, 1 per cent, have been eliminated from this table in order to compare trends with other years.

The drop in esteem for Congress since the flood of Great Society legislation in 1964 and 1965 has been precipitous.

Significantly, people who voted for Barry Goldwater in 1964 are far more critical of Congress (2 to 1 negative) than those who voted for President Johnson four years ago (51–49) per cent favorable. This would indicate that the criticism of Congress is likely to work more against Mr. Johnson than his Republican opponent in this year's presidential election.

Among key groups in the electorate, independent voters, the better educated and younger people are most critical. Negroes and enrolled Democrats tend most to defend the record of Congress.

Specific assessment of legislative action by the 90th Congress showed these reactions by the cross section:

### SPECIFIC RATINGS OF CONGRESS

[In percent]

|  | Positive | Negative | Not sure |
|---|---|---|---|
| Increasing social security benefits | 55 | 30 | 15 |
| Refusing to pass a tax increase | 54 | 26 | 20 |
| Cutting back foreign aid bill | 43 | 34 | 23 |
| Passing an extension of draft law | 41 | 25 | 34 |
| Cutting back the antipoverty program funds | 34 | 45 | 21 |
| Not passing an open housing law | 33 | 38 | 29 |
| Cutting back aid to the cities | 29 | 41 | 30 |
| Not passing gun control legislation | 28 | 48 | 24 |

[From the Washington (D.C.) Post, Apr. 22, 1968]

## TIGHT GUN RULES FAVORED 71 TO 23

### (By Louis Harris)

By 71 to 23 per cent, the American people favor that passage of Federal laws that would place tight controls over the sale of guns in this country. These latest results mark a five-point rise in support of a gun control legislation from last August.

Such legislation has been before Congress for over a year, but the measure has encountered strong opposition from the National Rifle Association.

Significantly, people who own guns favor gun control laws by 65 to 31 per cent, better than a 2-to-1 margin.

The number of homes in which occupants say they have guns has now reached a majority, with 51 per cent reporting gun ownership. The largest incidence of acknowledged gun ownership is found in rural areas, where 78 per cent possess a gun; in the South, with 64 per cent, and small towns where 58 per cent own a gun in the household, compared with 32 per cent among Negroes.

Despite the heavy sentiment in favor of gun control legislation, the number of gun owners who say that they would use their weapon to shoot other people in case of a riot has risen from 29 to 51 per cent since last August. The reasons can be found in additional questioning which found that 48 per cent of all adult Americans now say they are personally more uneasy on the streets as a result of fear of racial violence.

Many added that in the absence of gun control and other measures, they felt they had no alternative but to resort to measures of self-protection.

A cross-section of 1634 homes was asked this question on gun control legislation:

*"Do you favor or oppose Federal laws which would control the sales of guns, such as making all persons register all gun purchases no matter where they buy them?"*

[In percent]

|  | Favor | Oppose | Not sure |
|---|---|---|---|
| Nationwide | 71 | 23 | 6 |
| East | 70 | 20 | 10 |
| Midwest | 69 | 27 | 4 |
| South | 71 | 22 | 7 |
| West | 77 | 22 | 1 |
| Own gun | 65 | 31 | 4 |
| Don't own gun | 79 | 13 | 8 |
| Whites | 71 | 23 | 6 |
| Negroes | 69 | 23 | 8 |

The patterns of gun ownership shows wide variation by region, size of place, and by race:

*"Do you or does anyone in your house own a gun?"*

[In percent]

|  | Own gun | Don't own gun |
|---|---|---|
| Nationwide | 51 | 49 |
| East | 34 | 66 |
| Midwest | 55 | 45 |
| South | 64 | 36 |
| West | 53 | 47 |
| Cities | 27 | 73 |
| Suburbs | 47 | 53 |
| Towns | 58 | 42 |
| Rural | 78 | 22 |
| All whites | 55 | 45 |
| Whites under $15,000 income | 47 | 53 |
| All Negroes | 32 | 68 |
| Negroes under $15,000 income | 36 | 64 |

Last August and again in this latest survey, all gun owners were asked:

*"Would you or a member of your family use your gun to shoot other people in case of a riot or not?"*

[In percent]

|  | March | August |
|---|---|---|
| Would use gun | 51 | 29 |
| Would not use gun | 32 | 62 |
| Not sure | 17 | 9 |

Students of gun usage under combat and other conditions of stress emphasize that there might be a wide divergence between a person's expressed willingness to use a weapon and his actual behavior when confronted with an actual shooting. So it is undoubtedly an overstatement to conclude that better than half of all gun owners today would actually use their weapons against other human beings.

But, the willingness to say they would shoot other people in case of a riot is symptomatic of the tension that exists in this country today. Another question illustrated this apprehension:

*"Does the fear of racial violence make you feel personally more uneasy on the streets or not?"*

[In percent]

|  | Uneasy | Not uneasy | Not sure |
|---|---|---|---|
| Nationwide | 48 | 47 | 5 |
| Cities | 56 | 39 | 5 |
| Suburbs | 52 | 43 | 5 |
| Towns | 34 | 62 | 4 |
| Rural | 46 | 48 | 6 |
| All whites | 46 | 50 | 4 |
| Whites under $15,000 | 48 | 49 | 13 |
| All Negroes | 58 | 30 | 12 |
| Negroes under $15,000 | 60 | 31 | 0 |

Fear of physical safety due to possible outbreaks of racial violence runs higher among Negroes than whites, and highest among lower income Negroes.

In the absence of other measures, some Americans clearly have taken to arming themselves with guns. Unquestionably, however, the vast majority of people in this country would much prefer to see steps taken to curb violence. And one key step, nearly three out of every four feel, would be to have Congress pass gun control laws now.

———

## THE HARRIS SURVEY

### (By Louis Harris, September 16, 1967)

A national survey indicates that 27 million white Americans, representing 54% of the nation's homes, own guns. A majority of gun owners say they would use their weapons to "shoot other people in case of a riot." Large numbers of white people in this country have apparently given serious thought to self-protection, and one person in every three believes that his own home or neighborhood might be affected by a riot.

It would be a mistake, however, to conclude from this evidence that most whites welcome the idea of unrestricted arms. To the contrary, by a decisive 66-to-28% margin, white gun owners favor passage of a law in Congress which would require that all persons "register all gun purchases no matter where they buy them."

Gun ownership shows wide variants by regions of the country:

### GUN OWNERSHIP AMONG WHITES

|  | Percent | |
|---|---|---|
|  | Own | Don't own |
| Nationwide | 54 | 46 |
| By region: | | |
| East | 33 | 67 |
| Midwest | 63 | 37 |
| South | 67 | 33 |
| West | 59 | 41 |

Gun ownership is concentrated more in the South and the Midwest than in other parts of the country. The East, where the fewest own guns is also the area where gun owners would be least willing (46%) to use their firearms against fellow citizens.

The cross section of white gun owners was asked:
"Would you use your gun to shoot other people in case of a riot?"

USE GUN TO SHOOT PEOPLE IN RIOT

| | Gun owners | |
| --- | --- | --- |
| | Would use, percent | Not use, percent |
| Nationwide | 55 | 45 |
| By region: | | |
| East | 46 | 54 |
| Midwest | 54 | 46 |
| South | 58 | 42 |
| West | 59 | 41 |

The willingness to use guns against other people seems to be related to white gun owners' attitudes toward a national firearms control law. Although a majority in the South and West favor such legislation, the percentages in favor are less than in the East and Midwest.

The cross section of white gun owners was asked:
"Do you favor or oppose federal laws which would control the sale of guns, such as making all persons register all gun purchases no matter where they buy them?"

REGISTRATION OF ALL GUNS

[In percent]

| | Favor | Opposed | Not sure |
| --- | --- | --- | --- |
| All white gun owners | 66 | 28 | 6 |
| By region: | | | |
| East | 70 | 21 | 9 |
| Midwest | 70 | 25 | 5 |
| South | 62 | 27 | 11 |
| West | 56 | 40 | 4 |

Clearly, the spate of civil disorders over the past summer has raised people's fears for their safety. This was evident in the replies of the special cross section of whites to this question:

"Do you fear that in a riot your own home or neighborhood might be affected?"

MIGHT BE AFFECTED BY RIOT

[In percent]

| | Might be | Not be | Not sure |
| --- | --- | --- | --- |
| Total whites | 34 | 58 | 8 |
| By income: | | | |
| Under $5,000 | 41 | 49 | 10 |
| $5,000 to $9,999 | 33 | 60 | 7 |
| $10,000 and over | 32 | 62 | 6 |

Low-income whites, many of whom live in fringe neighborhoods alongside Negroes, are most apprehensive.

It should be pointed out, however, that earlier Harris Surveys reported that when both Negroes and whites were asked how they feel

about their personal safety on the streets, Negroes were far more anxious than whites. Fear of violence does not seem to show any color line.

———

[From the Washington Post, Sept. 14, 1966]

THE GALLUP POLL: GUN OWNERS THEMSELVES FAVOR CURBS

PRINCETON, N.J., September 13.—Few issues spark such heated reactions as gun controls, and few issues are so widely misunderstood.

Some of the opposition to the registration of guns comes from those who think that this would mean banning all guns. Actually, the law proposed would not prohibit a person from owning a gun—either for sport or protection—but would require that a record be made of the name of the gun purchaser. The purpose of such a law would be to keep guns out of the hands of persons with criminal record, the mentally disturbed and others unqualified to handle weapons.

The mood of the public for nearly three decades has been to impose controls on the sale and possession of weapons.

The survey questions and findings:

*"Would you favor or oppose a law which would require a person to obtain a police permit before he or she could buy a gun?"*

[Percentage]

|  | All persons | Gun owners |
|---|---|---|
| Yes | 68 | 56 |
| No | 29 | 41 |
| No opinion | 3 | 3 |

Those who favor such a law:

1. Too many people get guns who are irresponsible, mentally ill, retarded, trigger happy, criminals.
2. It would save lives.
3. It's too easy to get guns.
4. It would be a help to the police.
5. It would keep guns out of the hands of teenagers.

Reasons of those who oppose such a law:

1. Such a law would take away the individual's rights.
2. Such a law wouldn't work—people would still get guns if they wanted to.
3. People need guns for protection.

*"Which of those three plans would you prefer for the use of guns by persons under the age of 18—forbid their use completely, put restrictions on their use, or continue as at present with few regulations?"*

[Percentage]

|  | All persons | Gun owners |
|---|---|---|
| Forbid use | 27 | 17 |
| Restrictions on use | 55 | 59 |
| Continue as at present | 15 | 22 |
| No opinion | 3 | 2 |

## Appendix 2

[From the FBI Law Enforcement Bulletin, October 1966]

### Firearms in Crime

In recent months there have been increasing interest and concern over the use and involvement of firearms in crime. As a public service, the FBI began compiling data on this subject several years ago based on information relating to the use of firearms in violent crimes. Law enforcement agencies contributing statistics through the Uniform Crime Reporting Program have made this information possible. Reports on pertinent aspects of this problem have appeared regularly in Uniform Crime Reports and from time to time in other publications.

Current highlights of this collection of data show that during the past 4 years, 1962–65, a firearm was used as the weapon in 56 percent of the 36,000 willful killings in the United States. The basic problem is the handgun which was used in 70 percent of these murders. A shotgun was used in 20 percent, and a rifle in 10 percent. Of the 278 police officers killed by criminals in 1960–65, 96 percent of these deaths resulted from the use of guns, 78 percent of which were handguns.

During the 4-year period 1962–65, the Northeastern States, where gun controls generally exist, reported 36 percent of their murders were caused by guns. On the other hand, the North Central States reported 57 percent of their murders were by guns, the Southern States reported 64 percent, and the Western States 55 percent. In these regions minimum gun controls exist.

Uniform Crime Reports in the past have pointed out that about 70 percent of the murders in the United States happen within the family or among acquaintances, for the most part the result of insane or emotional rage. Almost 60 percent of this type of murder is committed by the use of firearms. In this type of murder the availability and easy accessibility of a firearm appear to be major factors in the problem. And, of course, because of its lethal nature, a gun makes murder easy.

While a hardened criminal will obtain a gun regardless of controls applied, most authorities agree controls would make acquisition more difficult. In addition, controls at the local level provide the possibility of an investigative lead in tracing a weapon. This is not possible in most instances now. The ability to trace and locate lost and stolen weapons nationwide is becoming a significant possibility with the opening of the FBI National Crime Information Center (NCIC) in January 1967. Information on lost and stolen weapons will be stored in the FBI computer network and will be available to participating agencies throughout the country within seconds.

In addition to murder, in 1965 there were 34,700 aggravated assaults with guns and over 68,400 armed robberies, two-thirds of which involved the use of guns.

Following is a list of murder percentages by guns, by State, for the 4-year period 1962–65:

| | | | |
|---|---|---|---|
| Alabama | 59. 6 | Nebraska | 70. 3 |
| Alaska | 71. 4 | Nevada | 66. 9 |
| Arizona | 66. 4 | New Hampshire | 66. 7 |
| Arkansas | 65. 0 | New Jersey | 38. 6 |
| California | 50. 1 | New Mexico | 63. 7 |
| Colorado | 58. 7 | New York | 31. 8 |
| Connecticut | 48. 3 | North Carolina | 68. 5 |
| Delaware | 58. 0 | North Dakota | 17. 4 |
| Florida | 66. 0 | Ohio | 60. 3 |
| Georgia | 66. 6 | Oklahoma | 61. 9 |
| Hawaii | 52. 9 | Oregon | 62. 5 |
| Idaho | 60. 0 | Pennsylvania | 43. 2 |
| Illinois | 54. 8 | Rhode Island | 24. 0 |
| Indiana | 61. 6 | South Carolina | 73. 6 |
| Iowa | 61. 9 | South Dakota | 66. 7 |
| Kansas | 64. 2 | Tennessee | 66. 4 |
| Kentucky | 73. 0 | Texas | 68. 7 |
| Louisiana | 61. 6 | Utah | 72. 3 |
| Maine | 52. 3 | Vermont* | 100. 0 |
| Maryland | 48. 6 | Virginia | 60. 9 |
| Massachusetts | 35. 3 | Washington | 54. 9 |
| Michigan | 45. 9 | West Virginia | 63. 9 |
| Minnesota | 56. 7 | Wisconsin | 55. 9 |
| Mississippi | 70. 9 | Wyoming | 54. 8 |
| Missouri | 65. 5 | Washington, D.C. | 41. 5 |
| Montana | 72. 0 | | |

*Only seven willful killings involved.

JOSEPH D. TYDINGS

## ADDITIONAL VIEWS OF MR. KENNEDY OF MASSACHU-
## SETTS, MR. TYDINGS, MR. SMATHERS, AND MR. FONG

Although I am pleased that some legislation regulating the sale of firearms finally has been reported from the Judiciary Committee, I intend to support an amendment on the Senate floor to substitute the Administration's bill, S. 1, Amendment 90, for Title IV. Title IV is a measure supported by some members as the only way to get any kind of gun control legislation out of the committee. But it is not an adequate substitute for S. 1, Amendment 90, and in my judgment there is no justification for passing legislation weaker in impact or narrower in scope than Amendment 90.

Indeed, it amazes me that we continue to tolerate a system of laws which makes it so outrageously easy for any criminal, insane person, drug addict or child to obtain lethal firearms which can be used to rain violence and death on innocent people.

In 1967 serious assaults where a gun was used as the weapon rose 22 percent, and one out of every five assaults was committed with a gun. The vicious crime of armed robbery had a sharp upswing of 30 percent, and firearms were used in 58 percent of all robbery offenses. 60 percent of all murders involved the use of a gun.

I recognize that Amendment 90 is not a panacea, that effective gun regulation will require state action and that gun controls by themselves will not eliminate violence. But I think we have a responsibility to do what we can to minimize bloodshed and death resulting from firearms abuse. Amendment 90 represents a responsive and responsible effort to build a framework within which state and local regulation of firearms can be made effective. For without Federal regulation of interstate traffic in deadly weapons, it is impossible for state and local governments to prevent evasion of the gun controls which they choose to pass.

Amendment 90 will increase safety and strengthen local regulation by:

Requiring that interstate mail-order sales of handguns and long guns be ordered through a local dealer;

Restricting over-the-counter purchases of handguns by non-residents;

Establishing minimum ages of 18 for the purchase of long guns and 21 for the purchase of handguns;

Prohibiting the sale of firearms to criminals;

Curbing the flow of cheap non-sporting and military surplus firearms which have poured into this country from abroad in recent years and been dumped on the market at low prices attractive to juveniles and to those amassing weapons for criminal purposes.

Amendment 90 is a constructive attempt to deal with the serious problems uncovered by testimony taken at the many hearings held by the Senate Juvenile Delinquency Subcommittee. It is supported

by the American Bar Association, the International Association of Chiefs of Police, the National Sheriffs Association, the National Council on Crime and Delinquency, the National Council for a Responsible Firearms Policy, the National Crime Commission, the National Riot Commission, the Federal Bureau of Investigation, and attorneys general, police chiefs and prosecutors across the country.

In contrast to Amendment 90, however, Title IV as it now reads, permits almost anyone, no matter how young or dangerous, to buy a rifle or shotgun only over-the-counter but also in total anonymity through the mail.

This is the major flaw as well of S. 1853, another alternative which has been proposed to Amendment 90 by Senator Roman L. Hruska. And S. 1853 is even weaker than Title IV because it would permit the impersonal interstate purchase of handguns by anyone willing to fill out an affidavit and wait a few days for delivery. It has no requirement that the seller obtain or receive any clearance from the authorities in the purchaser's home state.

Ironically, the affidavit procedure constitutes a true administrative burden of the type which gun control opponents constantly complain about.

In addition, S. 1853 would do nothing to stop the torrent of cheap imports flooding our country with unsafe and untested military surplus weapons. Under Amendment 90, on the other hand, imported military surplus handguns are banned and imported military surplus rifles are permitted only if they meet recognized safety standards and are suitable for lawful sporting purposes. The aim of this restriction is to stop the United States from being the dumping ground for weapons of death from abroad.

The simple fact is that S. 1853 would not and could not provide effective control even as to pistols and revolvers. But even more important, S. 1853 provides no controls whatsoever over rifles and shotguns.

Considering the evidence of the frequency with which long guns are involved in crimes, accidents and other gun abuses—particularly in areas where handguns are regulated—I can see no justification for leaving mail-order rifle and shotgun sales totally unregulated.

Of all murders by firearm in 1966, in 27 percent of the cases the murder weapon was a rifle or shotgun. One quarter of the law enforcement officers killed that year met their death by long gun. Close to 2,000 people a year—five persons a day—are murdered with a rifle or shotgun.

In major riots in 1967, nine policemen and 75 civilians were killed—many of them victims of snipers, lurking in windows and rooftops where they could shoot rifles with deadly accuracy.

Indeed, the riots we have had over the last few years—and which still threaten us in the future—point up dramatically the danger from long guns as well as handguns. For not only does the practice of sniping directly lead to death and serious injury, the threat and fear of sniping increases tensions and the level of violence.

In assessing the factors contributing to riots, the President's Commission on Civil Disorders cited the problem of sniper fire and guns, and recommends the enactment of strong federal, state and local gun legislation as a step towards preventing their reoccurrence. The Commission says in its report:

The fact that firearms can readily be acquired is an obviously dangerous factor in dealing with civil disorders. It makes it easier for a serious incident to spark a riot and may increase the level of violence during disorders. It increases the dangers faced by police and others seeking to control riots.

We recommend that all state and local governments should enact gun control legislation of the type recommended by the Crime Commission.

We also believe that Federal legislation is essential in order to make state and local laws fully effective, and to regulate areas beyond the reach of state government. We therefore support the President's call for gun control legislation and urge its prompt enactment.

The President's Commission on Law Enforcement and Administration of Justice also stresses the seriousness of gun misuse and recommends legislative change:

Since laws, as they now stand, do not accomplish the purposes of firearms control, the Commission believes that all States and the Federal Government should act to strengthen them.

In fact the legislation urged by the Crime Commission—calling for a comprehensive system for actual registration of all guns by all owners—is far stronger than the modest provisions of Amendment 90.

Opponents of Amendment 90 base their opposition on what they claim to be the unnecessary burdens which it will cause the average gun buyer. But in fact Amendment 90 will not in any significant way inconvenience the legitimate and honest sportsman, hunter or hobbyist from obtaining a firearm. He still can purchase a rifle or shotgun while away from his home state, and he still can carry a gun across state lines for hunting or other lawful purposes as long as he complies with state and local regulations.

Indeed, Amendment 90 asks the gun buyer only to cooperate in two simple ways; first, that he identify himself so that it can be determined that he is not a minor or criminal; and second, that if he wants a gun from an out-of-state mail-order supplier he places the order through his local gun shop or hardware store, so that any requirement of local law can be complied with upon delivery.

I do not believe that these very minor and speculative inconveniences of Amendment 90 can in any way justify further delay in enactment of this very limited gun control legislation.

I believe that most honest gun users would be willing to incur an even greater burden to help this nation achieve a reduction, however slight, in the 17,000 firearms deaths which occur in the country each year—a rate of one death every half hour.

Many times over the last several years I have posed the question of why we have not succeeded in passing legislation like Amendment 90 which is so obviously vital to the safety and security of our citizens.

It is increasingly clear that the answer lies in the opposition of a small group of self-interested people who have promoted misunderstanding and misinformation about the various effective gun control proposals which many of us in the Senate have supported.

Frankly, I have always doubted that the position of these few leaders accurately reflects the sentiments of the sportsmen and hunters and hobbyists they purport to represent. And this opinion was confirmed just recently by a poll which indicates not only that 71 per cent of all Americans favor Federal gun control legislation, but also that 65 per cent of persons *who themselves own guns* favor Federal control.

Nevertheless, there are reports that the gun lobbyists are prepared to commit unlimited efforts and resources to defeat even the mild bill reported by the Judiciary Committee. Already floods of mail have started to pour in to Senate offices, stimulated through a well-coordinated national campaign.

I am hopeful and confident that the United States Senate will not be swayed by appeals to emotion through exaggeration and misinformation.

We have an opportunity to exercise our leadership responsibilities in the interests of all citizens, and we should not let the unsupported and unsupportable outcry of a vociferous few steer us from our course.

## INDIVIDUAL VIEWS OF MR. SCOTT

As a member of the original U.S. Crime Commission headed by Governor Franklin D. Roosevelt, as a former Assistant District Attorney, and presently as a member of the Senate Judiciary Subcommittee on Criminal Laws and Procedures, I have had the opportunity both to witness crime and its manifold effects and to hear and study the enlightened views of this Nation's specialists on this most urgent problem.

But while expertise and sophistication are necessary to mount a successful anti-crime attack, one need be no specialist to sense the growing and understandable concern of America. It should be clear to all that this country has failed in the first order of business—the maintenance of law and order. And this failure threatens to rend the very fabric of American life as we know it.

Recent surveys of high crime areas discussed in the President's Commission on Law Enforcement and Administration of Justice found that due to the fear of crime:

Forty-three percent of those interviewed stayed off the streets at night

Thirty-five percent did not speak to strangers

Twenty-one percent used only taxicabs and cars at night

Over 33% kept firearms in their houses

Twenty-eight percent kept watchdogs.

Surely we can take no pride when our citizens restrict and alter their daily way of living because law and order have broken down. Moreover, these are not idle fears. They represent a toll of the increased incidence of crime which must be considered along with the personal tragedy that accompanies every additional murder, rape, robbery, and other such senseless acts. Nor can we ignore the growing feeling that crime is the easy way out, with the rewards high and the chances for conviction low. The long-range prospects of such a philosophy, unless its errors are clearly demonstrated, are truly alarming.

How extensive is crime? Read the Uniform Crime Reports of the Federal Bureau of Investigation and learn that serious crime is increasing at a sharper rate now than at any time during almost the past 10 years. Read the well-documented Reports of the President's Crime Commission on Law Enforcement and Administration of Justice. Regretfully, in fact, you need not read further than your local newspaper.

The need is clear as is the urgency. We cannot wait until the bolted door and suspicious glance totally replace the warmth of America. Our resolve to act must be articulated and transformed into coordinated, planned and reasoned programs which strike out at every facet and level of the law enforcement and criminal justice systems. New approaches must be sought, proven methods continued and expanded

and ineffective approaches discarded. Greater efforts to bring the benefits of modern technology to bear on the problem are necessary to provide the latest techniques and equipment to local law enforcement officials throughout the Nation. Law enforcement training and education must be encouraged along with advanced research into the causes and prevention of crime. In short, the best talent and most progressive thinking must be focused on—and a part of—the entire law enforcement and criminal justice systems. The public interest and safety must continually be measured against the rights of the individual—new balances being struck within Constitutional limits where old ones prove unworkable or unwise. America must commit herself to a truly national effort to combat the internal threat confronting us and to create a setting in which crime is neither a permanent fixture, a predominant fear, nor a promising alternative to those that feel that all other approaches are closed off or too difficult. Moreover, those who out of desperation move into a life of crime must be assured the opportunity for access to the benefits of society through normal and lawful channels.

We must address ourselves to the anarchy which has erupted the past several years in ghettos throughout the Nation. Such mass repudiations of law and order strike at the very core of a free and civilized society. We must plan and take the necessary steps now so that personnel adequately trained and equipped for riot prevention and control can deter underlying and sometimes understandable frustrations from erupting into blind mob violence once again. We must not, however, delude ourselves into believing that improved prevention and control is an adequate or just alternative to dealing with the underlying problems which beset many of our major cities.

The Omnibus Crime Control and Safe Streets Act of 1967 (S. 917), the major and most comprehensive legislative proposal in the field of law enforcement and criminal justice, substantially meets the needs I have discussed and has my strongest support. After extensive hearings before the Senate Judiciary Subcommittee on Criminal Laws and Procedures, an impressive hearing record and blueprint for action were developed. As a result, the Subcommittee and full Committee made several additions and changes in the bill as introduced and has reported legislation which truly represents an effective overall anticrime program.

Several sections of this legislation deserve individual attention because they concern areas that can be of extreme importance in improving our law enforcement and criminal justice systems. I will briefly refer to these sections and then discuss them in detail.

I strongly favor the section in Title II of this legislation which will permit voluntary statements made by the accused to be admitted into evidence at trial where the trial judge determines that such statements were truly voluntary under all the circumstances and facts in the specific case. Such a procedure is a marked improvement over the recent Supreme Court decision in the *Miranda* case which while aimed at preventing abuses of the accused's Constitutional rights—and rightly so—seemed to overlook the right of the public to be free of abusive activities committed by criminals. The provisions in Title III authorizing the use of electronic surveillance by specified law enforcement officials under strict Court supervision will prove invaluable in

this Nation's fight against the increasing threat posed by organized criminal syndicates.

There are, however, two sections of the Omnibus Crime Control and Safe Streets Act which should be altered to make this an even more effective anti-crime measure. I do not support the system of direct Federal grants to individual units of local government with the opinion of the "State crime agency" being given merely advisory status as to the benefits of the program in question. On the contrary, I believe the bloc grant approach would enable the States to plan and to coordinate law enforcement activities more effectively. I also oppose setting any statutory limit on the resources which should be allocated for the purposes of our criminal justice system.

### Confessions

Title II of this legislation makes the test of admissibility of a confession in a Federal Court the "totality of circumstances" and the voluntariness with which it was given. This would restore the test which had been in use and considered constitutional until recent Supreme Court decisions, most notably *Minda* v. *Arizona*.

In *Miranda* the Court held that an otherwise voluntary confession made after a suspect was taken into custody could not be admitted into evidence unless the suspect was given four warnings prior to questioning:

(1) He has the right to remain silent.

(2) Any statement he makes may be used as evidence against him.

(3) He has the right to the presence of an attorney.

(4) If he cannot afford an attorney one will be appointed for him.

The Court further stated that only a voluntary knowing and intelligent waiver of these rights by the defendant will make the confession admissible.

I express my views not to find fault with Court decisions, but to observe that recent decisions of great importance to the protection of the individual accused of crime have in themselves raised new questions of criminal law enforcement. In *Miranda* the Court sets up a new standard not supported by law, not supported by valid precedent, but very tortuously worked out in order to staple in what it is justly concerned about, the prevention of abuses.

As a citizen, it is my duty to respect the law of the land. As a Senator and legislator, it is my duty to uphold the Court whenever I conscientiously can; where I cannot, I seek to explore possible alternatives within the orderly framework of our governmental system. I think one thing that shakes public and Congressional confidence in the Court is the Court's seeming determination to make broad Constitutional findings which establish entirely new directions for the law on these narrow 5-to-4 decisions. As lawyers, many of us are seriously concerned that our higher Courts seem so rarely to be impressed by the need for some disciplines or some restraint on Courts as Courts until a true test case can be found, that Courts can do more than to make their decisions depend upon the narrow shading of a single man's opinion, knowing as the Court has to know, that the very next ap-

pointee to the Court may, in the very next test case, reverse the whole
procedure under that particular constitutional decision. We need some-
thing better than the "last guess" doctrine.

If the Court will not exert self-discipline, then it is the role of the
legislative branch to express its concern as to that very unfortunate
aspect of the Court's attitude toward vast and fundamental changes in
constitutional viewpoints. This responsibility is aptly stated by the
late Chief Justice Harlan F. Stone:

> Where the courts deal, as ours do, with great public ques-
> tions, the only protection against unwise decisions, and even
> judicial usurpation, is careful scrutiny of their action, and
> fearless comment upon it.

The Court itself in the *Miranda* decision urges Congress to examine
this whole problem and encourages it to come up with a solution,
which, I can only read into the Supreme Court's language, is a better
proposed solution. The Court couples its encouragement to Congress
with a judicial warning that the solution must be in consonance with
the Constitution, the Bill of Rights, and presumably with the Court's
disposition and composition at that time. But the latest decision, the
*Miranda* case, is far from an ultimately satisfactory conclusion of a
matter which affects not only the life and liberty of the accused, but
also affects the life and security of all American citizens in this process.

The Senate Judiciary Subcommittee on Criminal Laws and Pro-
cedures has responded positively to this "urging" and has developed
an impressive body of opinion from judges, lawyers, sociologists,
academicians and private citizens. Title II represents a fair and effec-
tive solution more in keeping with the "genius of the people." As a
general principle it should be noted that Congressional Committees
and Subcommittees are better situated to explore human experience,
to analyze the impact of judicial decisions, to conduct detailed hear-
ings, and to make extensive findings on the total situation than is a
Court considering a single factual situation and a specific legal issue.
When fundamental changes in constitutional law on criminal proce-
dure are contemplated, there can be do doubt that such extensive
considerations as just outlined are most desirable.

Regrettably, the President's Crime Commission—another excellent
forum—did not examine the question of recent confession and inter-
rogation decisions. The additional views of seven members of the
Commission appear at the end of the Report and declare that these
decisions have tilted the balance of justice too far in favor of defend-
ants. While these members state, and rightly so, that these decisions
are the law of the land, they go on to make the point that a body such
as the Commission should have studied this important area. I agree
wholeheartedly.

As stated earlier, my purpose is not an attack on the Court, but
rather a reasoned discussion of its action and its impact. In this, I do
not speak alone—there were four dissenters in *Miranda*. The words of
one of these, Justice John Harlan, bear repeating at this juncture:

> There is, in my view, every reason to believe that a good
> many criminal defendants, who otherwise would have been
> convicted on what this Court has previously thought to be the
> most satisfactory kind of evidence, will now, under this new

version of the Fifth Amendment, either not be tried at all or acquitted if the State's evidence, minus the confession, is put to the test of litigation. I have no desire whatsoever to share the responsibility for any such impact on the present criminal process. In some unknown number of cases the Court's rule will return a killer, a rapist or other criminal to the streets and to the environment which produced him, to repeat his crime whenever it pleases him. As a consequence, there will not be a gain, but a loss, in human dignity.

To those who say that a Court decision cannot "cause" crime, I would remind them of the excellent communications system of the underworld, the so-called "grapevine" of the prison "sea lawyers." One need not be a legal scholar to sense the tendency of the law, and where it is felt that a "technicality" will prevent prosecution, the result is bolder action. There has been a sharp decrease in confessions and concomitant decline in convictions and these developments cannot be ignored.

How should we approach this most vexing and important problem? For one, our criminal laws must seek to create and maintain an equitable balance between the rights of the individual and society. Laws must be drafted with as full purpose to protect the innocent as to preserve the rights of those charged with offenses. Of course, the innocent can either be a victim of the crime or a person wrongly accused of committing it.

An appropriate consideration in attempting to strike this balance are the words of Judge Learned Hand:

> Our dangers do not lie in too little tenderness to the accused. Our procedure has always been haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime.

As was so aptly stated by Justice Cardozo:

> Justice, though due to the accused, is due the accuser also. The concept of fairness must not be strained until it is narrowed to a filament if we are to keep the balance true.

Title II keeps the balance true. The trial judge is required to take into account all the surrounding circumstances in determining whether the statement under consideration was voluntary. He is specifically required to examine certain enumerated factors which historically have been considered relevant in this area. If the judge finds the statement involuntary, he does not even allow it in evidence before the jury. Should he find the statement voluntary, he will permit the jury to consider it with the instruction that it should be given no more weight than the circumstances warrant. I believe these safeguards will enable the judge and the jury to search for the truth within the bounds of constitutional guarantees. This, in my way of thinking, is the purpose of our criminal law.

I hope that the President, in his search for a better system of law enforcement in this country, may provide a little encouragement to the legislative branch as he is perhaps called upon to fill vacancies on the High Court. By the action of the President in his selection of

the candidates to make these judgments, the Court perhaps may some-day be able to formulate some fundamental rules of law or, as some would think, changes in the law, by something more than the assumption of rather seismic risks when judgment depends upon the hairline decision of a single Justice.

### WIRETAPPING

Title III of the bill would authorize carefully circumscribed and strictly controlled electronic surveillance (eavesdropping and wiretapping) by duly authorized law enforcement officials under a Court order procedure for the purpose of investigating specified crimes involving national security and serious offenses. This Title also prohibits the utilization of wiretapping and bugging by all private persons and by all public officials where there is no compelling law enforcement need as discussed above. In those circumstances, there can be no justification for the use of such techniques.

This legislation is vitally important if we are successfully to encounter the most insidious threat to the continued existence of American society as we know it—the threat of organized crime.

While I have a natural reluctance to authorize the overhearing of private conversations, even where there is the possibility that evidence concerning criminal activity may be uncovered, I must admit some doubt as to whether any wiretapping legislation should prevent the use of this weapon in society's struggle against organized crime—especially in view of the unique evidence-gathering problems in this area.

The impact of the Crime Commission Reports, revealing testimony before the Senate Judiciary Subcommittee on Criminal Laws and Procedures, on which I serve, and discussions with many persons expert in the criminal justice system lead me to believe that if such organized criminal activity is permitted continued immunity from surveillance while it infests all of our lives, it may well destroy our society. As stated in the report of the *President's Commission on Law Enforcement and Administration of Justice* and in the *Task Force report on Organized Crime*:

> Organized crime is a society that seeks to operate outside the control of the American people and their governments. It involves thousands of criminals, working within structures as complex as those of any large corporation, subject to laws more rigidly enforced than those of legitimate governments. Its actions are not impulsive but rather the result of intricate conspiracies, carried on over many years and aimed at gaining control over whole fields of activity in order to amass huge profits.

> The core of organized crime activity is the supplying of illegal goods and services—gambling, loan sharking, narcotics, and other forms of vice—to countless numbers of citizen customers. But organized crime is also extensively and deeply involved in legitimate business and in labor unions. Here it employs illegitimate methods—monopolization, terrorism, extortion, tax evasion—to drive out or control lawful ownership and leadership and to exact illegal profits

from the public. And to carry on its many activities secure from governmental interference, organized crime corrupts public officials.

It should be patently clear that organized crime does not operate in a vacuum. We can ill afford to stand aside and shake our collective heads at the effects of such criminal activity, for in one way or another, every individual is affected when such activities are permitted to exist in our society. Indeed, some are affected more harshly than others, with the primary victims of organized crime being the disadvantaged persons in our urban areas. For the most part, it is not the upper or middle class who are lured into the web of narcotics addiction, victimization by loan sharks, and the numbers racket, to name a few—it is the urban poor. And when illegal profits are extracted from the public, as described in the above-quoted passage, it stands to reason that the burden falls heaviest on those who can least shoulder it and have the least share in the advantages of our society.

I firmly believe that any so-called War on Crime that falls short of a total attack on the roots and infrastructure of organized crime is a limited war, being fought for an unrealistically limited objective, with no chance of success in its declared purpose. There is no sound basis for giving organized crime immunity from pursuit and prosecution. Moreover, no matter how well-intentioned and thoughtfully conceived and administered are our efforts to assist those caught-up in a cycle of poverty, no program will be successful unless the effects of organized crime on these very persons are neutralized. It has been estimated that the revenue of nationwide crime syndicates reaches nine billion dollars a year. The chief brunt of this tribute is paid by the poor in the big cities and far outweighs the benefits of the anti-poverty programs.

However, the mere conviction and intent to mount an effective assault on organized crime will not suffice. The very nature of the criminal syndicate increases the difficulty of dismantling it. Due to the complex structures and intricate overlays of authority described above, law enforcement officials have a difficult time in ever really reaching the high command of organized crime. Underlings "on errands" for the boss often come within the ready grasp of alert law enforcement officials, but they are the "expendables." When they neither know exactly who their real boss is or are fearful of discussing such matters, law enforcement work is stymied. The reluctance and fear of victims and witnesses do not ease the task.

How then do you break into this core and get to the center of this cancer? How do you obtain the necessary evidence when an organization is dedicated to protecting its masters through a Code of Silence? What do you look for when almost all communication is by word of mouth, and there are no telltale records or memoranda of illicit enterprises? There can be no doubt as to the extent of the problem, the question is how successfully to combat it.

It is against this unique background that I turn to probably the most controversial means of obtaining evidence—the techniques referred to as bugging and wiretapping. There are those who say that these techniques are the only effective tools to fight such criminal activity. Others condemn these methods as a dangerous invasion of privacy. There are valid arguments on both sides. But there should

be no doubt that the final decision on how to proceed in this area must be based on both the rights of individuals and the need to protect society, not an emotional harangue which too often accompanies these electronic surveillance debates. It should also be noted that the present United States law on wiretapping and bugging is totally unsatisfactory. Neither the right of privacy nor enforcement of the law is adequately served.

Anyone who has ever attempted an intelligent discussion of wiretapping and bugging will undoubtedly find himself confronted with a major problem at the outset: the sinister connotation and fear of Big Brother and 1984 which has become attached to the very terms themselves due to the amazing scientific developments in the field of electronic surveillance in the past fifty years. If we only devise a word to mean "scientific techniques to combat crime," I believe the issue would be placed in much clearer perspective and discussion could proceed unhampered by the distorted images which are conjured up by the very terms themselves.

One should realize that the need to balance the competing interests of privacy and law enforcement occurs at a number of points in our criminal justice system and the decision as to where to strike the balance must depend on the specific circumstances involved. But the concept of balance is not new and can in fact be traced by a reading of the United States Constitution. The framers of the Bill of Rights did not establish the privacy of the individual in his person and effects as an absolute right nor his home as an impenetrable sanctuary. Safety was only guaranteed against unreasonable—not every—search and seizure and institutions of law enforcement were afforded the privilege of such search and seizure under carefully circumscribed criteria. This is the recognition of a basic precept of civilized society: there is a *point* at which individual privacy and rights yield to the public safety. The difficulty of striking this balance should not deter us from our responsibility as legislators.

There is overwhelming evidence that we have reached the "crisis point." Modern surveillance techniques are urgently needed if law enforcement institutions are successfully to perform their sworn duty of protecting the public. New York County District Attorney Frank Hogan—whose office has made the most sophisticated use of the techniques under consideration—believes that telephonic interception pursuant to Court order and under proper safeguards is the single most valuable and effective weapon in the arsenal of law enforcement particularly in the battle against organized crime." A distinguished array of witnesses before the Senate Judiciary Subcommittee on Criminal Laws and Procedures also urged the need and propriety of such techniques. All members of the President's highly respected Commission on Law Enforcement and Administration of Justice agree both on the difficulty of striking the balance between the benefits to law enforcement versus the threat to privacy, and the belief that if authority to employ electronic surveillance techniques is granted it must be done with stringent limitations. But a majority of the members favored enacting legislation "granting carefully circumscribed authority for electornic surveillance to law enforcement officers to the extent it may be consistent with the decision of the Supreme Court in *People* v. *Berger*. . . ."

A telling point is made by District Attorney Hogan when he points out that no responsible critic of wiretapping—not even the Attorney General of the United States—urges that it should be abandoned in national security situations. District Attorney Hogan views this as a concession that wiretapping and electronic surveillance are vital weapons of detection against elaborate criminal conspiracies.

In response to those who believe such surveillance activity would lead to excessive invasions of privacy and a Big Brother Society, I would point out the practical considerations which rule out the arbitrary use of wiretapping and electronic surveillance devices and which therefore reduce possible invasions of privacy to a minimum: difficulty of installation, "maintenance" of the equipment once installed, properly monitoring conversations and adequately covering "rendezvous," overhead through surveillance. Thus, in view of the effort, time, and manpower required for the proper use of such modern surveillance techniques, these methods—far from being a substitute for good police legwork—are frequently a preliminary to a great deal of it.

Moreover, Title III contains an elaborate system of checks and safeguards whereby criminal and civil remedies would be available to prevent abuses and unauthorized surveillance by public officials and private persons.

Congressional concern and activity in the organized crime-surveillance area are somewhat recent. Following World War II, the Congress attempted to pass a wiretap bill on several occasions. However, the primary concern in the 1950s was subversive activities, and it was not until the 1960s that such legislation was envisioned as a means to combat crime. In 1961, the Kennedy Administration endorsed proposals for a wiretapping law authorizing federal agencies to tap in cases of national security, organized crime, and other serious crimes, placing no limits on State wiretapping.

In 1962, the Kennedy Administration sent a somewhat more restricted bill the Congress. It authorized federal wiretapping in cases of national security, organized crime, and other serious crime, i.e., narcotics violations, murder, kidnaping, extortion, bribery, interstate transportation in aid of racketeering, interstate communication of gambling information, and a conspiracy to commit any of the foregoing. It limited State wiretapping to certain serious crimes and outlawed all other wiretapping. Congress took no action on the proposal. The Kennedy Administration recommended passage of similar legislation in 1963, but again Congress took no action.

In 1965, 1966 and 1967, several bills on wiretapping and eavesdropping were introduced in both the House and the Senate, but the Administration of President Johnson has not endorsed any that would extend electronic surveillance to organized criminal activities. In fact, by Executive Order promulgated in July 1965. President Johnson ordered all federal agencies except the Justice Department to cease wiretapping. The Presidential order permitted the Justice Department to continue to tap wires only in cases of national security, but prior approval of the Attorney General was necessary.

In the recent *Berger* v. *New York* decision, the Supreme Court reversed a State conviction for conspiracy to bribe based on a Court-approved eavesdrop.

The Court found the statute failed to meet the constitutional standard because it did not require sufficient particularity in the orders concerning the place to be searched, the person's conversations to be overheard, and the expected nature of the conversations and the times at which they will be heard. Significantly, the Court indicated that a statute meeting these standards would meet constitutional requirements. Therefore, I read this case as an invitation to the Congress to work its legislative will on the difficult problem of drafting a just, effective and comprehensive wiretapping and electronic surveillance statute.

The legislation under consideration has responsibly answered that invitation and deserves our support. This Title was drafted with the *Berger* decision specifically in mind and every effort was made to conform to the criteria set forth by the Court and to develop a proposal which would fully comply. This Title is also in accord with the Court's more recent decision in *Katz* v. *U.S.* which dealt with the issue of electronic eavesdropping. I believe this Title can provide our law enforcement authorities a useful tool in their investigations of organized crime while not unduly disturbing the privacy of the ordinary, law-abiding citizen.

In short, the advantages to society of this legislation outweigh its disadvantages. If flaws appear in its administration, they can—and must—be corrected.

BLOC GRANTS

Parts B and C of Title I provide for direct Federal planning and law enforcement grants to individual units of local government, largely bypassing the Governors of the States. The creation of this nationwide competition for funding will lead the way to Federal control and restrictions while encouraging fragmentation and confusion among existing State law enforcement agencies and services. Moreover, units of local government hurriedly attempting to submit their applications for funds will have little time for the thoughtful analysis necessary to formulate innovative programs of law enforcement and criminal justice.

The President's Commission on Law Enforcement and Administration of Justice pointed out that one of the major problems of effective law enforcement is in the fragmentation of police efforts. As an example, in my own State of Pennsylvania, one county—a metropolitan area needing highly-coordinated law enforcement services—has approximately 129 police departments. Imagine the results if each local political subdivision could apply individually for Federal assistance without any overall coordination. I am sure similar instances can be found across the Nation.

I therefore urge that we stimulate intrastate activity and interstate cooperation by adopting the bloc grant approach (so-called Cahill Amendment) incorporated into the House-passed crime bill, the Law Enforcement and Criminal Justice Assistance Act of 1967 (H.R. 5037), and proposed during Committee consideration by Senator Roman Hruska. Under this approach, Federal financial assistance to State and local law enforcement would be channeled through "State planning agencies" created or designated by the Governors of the several States. These funds would be allocated by the State agencies to State and local

219-REP   Document 41-3   Filed 02/22/23   Page 219 of 284 Pag
law enforcement activities pursuant to current comprehensive plans which must be approved annually by the Federal Law Enforcement Administration. Each State agency would determine its own priorities for expenditures consistent with its comprehensive plan.

To participate in the bloc grant system, a State must indicate its commitment to a statewide program of law enforcement and criminal justice as well as its willingness to contribute to such a program. Moreover, where a State is unable or refuses to meet the necessary conditions, the bloc grant approach provides for a bypass of the State by direct Federal grants to units of local government. By thus giving those States that are willing to meet their responsibilities the opportunity to formulate and implement comprehensive plans of action, this method of providing crime-fighting funds would encourage the pooling of services, effective regionalization and increased coordination in law enforcement activities. Moreover, it would enable the States, who are more familiar than the Federal Government with local needs and are directly responsible to their constituents, to apply funds to the specific projects most urgently needed in their areas rather than permitting the National Government to set priorities. My views on this matter are in line with the able recommendations of Attorney General William C. Sennett of by Commonwealth of Pennsylvania.

### CRIMINAL JUSTICE SYSTEM

Section 520 in Part E of Title I limits to 20% of the authorized funds the amount of money which can be spent on grants for purposes of "correction, probation, and parole"—what I call the criminal justice system. This limitation is unfortunate because our law enforcement and criminal justice systems must represent a unified assault on crime based on a meaningful distribution of resources to be effective.

Today, there is imbalance between criminal justice and law enforcement. To increase the effectiveness of law enforcement while limiting the funds for criminal justice will reinforce this imbalance and prevent the very type of planing and action that this legislation envisions. By establishing this standard of imbalance by statute, we may run the risk of forcing a judge to select a sentence—be it prison, probation or rehabilitation—on the basis of what is available as opposed to what is best suited for society and the criminal in each particular case.

It should be remembered that the President's Commission on Law Enforcement and Administration of Justice found that "the most striking fact" about persons convicted of serious crimes is that they continue to break the law. It is imperative that when these people are within the criminal justice system, we devote all necessary resources and do all under our control to break this cycle of recidivism. Rather than setting any limit, I believe the decision on the allocation of resources in an anti-crime program should be left as a matter of judgment to those persons directly dealing with the problem.

I believe my record is clear. When I argue for a balanced system of criminal justice and law enforcement, I do not argue for a "soft" or "hard" policy on criminals. I argue for a rational approach that will enable us to meet and overcome the major crime problem facing this Nation.

HUGH SCOTT.

## INDIVIDUAL VIEWS OF MR. EASTLAND

I strongly favor the general purpose and object of S. 917, which is to provide Federal financial assistance for local law enforcement agencies to aid them in preventing and combatting crime.

In my judgment, the sharp and steady increase in violent crimes against persons and property, which results in a constantly spiralling rate of crime, constitutes our most serious domestic crisis.

In 1967, the United States experienced an increase of 16 percent in the number of serious crimes committed compared to the number of serious crimes committed the preceding year. Yet, the population of the Nation is reliably estimated to have increased by only 1 percent in 1967. Crime is increasing at a rate of 16 times that of population.

It is of the first order of business for this Congress to enact effective legislation to combat crime. I will wholeheartedly support such legislation.

However, I believe that Title I of the bill, if enacted in its present form, would undermine a basic premise of our Federal Republic; that is, that there should be local control and supervision over law enforcement. In my judgment, this undermining of local control of law enforcement could lead to a national police force, and perhaps to a national police state.

I wholeheartedly support the provisions of Title II, which deal with the admissibility of confessions in criminal cases, the admissibility of eye-witness testimony when there has been a viewing by the witness of the defendant in a police line-up, and post-conviction remedies available in the Federal courts. I believe that all of these provisions of Title II will measurably strengthen law enforcement and respect for the law by helping to assure that the guilty will be convicted and punished. The hyper-technical decisions of the Supreme Court of the United States in the field of criminal law have encouraged the criminal elements to feel that no matter what they do they will escape conviction and punishment. Of course, this creates a general disrespect for the law.

I concur in the views of the Committee Report on Title II.

Likewise, I support the provisions of and concur with the Report of Title III, which sets up procedures for law enforcement officers to obtain court orders in certain cases to engage in wiretapping or electronic surveillance. It is absolutely necessary that our law enforcement officers have this right, especially in order to combat the sinister activities of organized crime. This will result in more effective law enforcement without violating any of the constitutional rights of our citizens. This wiretapping or electronic surveillance would always be under strict court supervision.

I oppose the provisions of Title IV, the gun control amendment, and concur in the individual views of Senator Hruska as to that title.

I will now briefly detail my objections to the language of Title I, and will undertake to document my statement that its anactment could lead to a Federal take-over of local law enforcement.

Section 101 establishes within the Department of Justice under the general authority of the Attorney General of Law Enforcement Assistance Administration, to be composed of an Administrator and two Associate Administrators, who shall be appointed by the President by and with the consent of the Senate. The Administration is given the power to administer the entire program of Federal financial assistance to local law enforcement agencies.

Section 501 gives the Administration the authority, after consultation with State and local officials, to establish rules, regulations, and procedures necessary to the exercise of its functions. This would give this Administration, at a Federal level, a general rule-making power to establish "guidelines", compliance with which would be a condition for the granting of Federal funds. Our local schools, hospitals, and other institutions have had painful experiences in attempting to comply with guidelines laid down by other Federal agencies in the disbursement of Federal funds. In my judgment, it would be most unwise to have these experiences repeated in the delicate area of local law enforcement.

It is significant that although the Administration is directed to "consult" with State and local authorities in establishing rules, regulations, and procedures, Section 501 does *not* mandate the Administration to give this advice any weight in formulating its "guidelines".

Section 502 exhibits a further disregard for State and local law enforcement authorities by giving the Administration the right to delegate any of its functions to any of its officers or officials, or, with the consent of the Attorney General, to any officer of the Department of Justice. Thus, any staff member of the Administration or any Assistant Attorney General of the United States can be delegated the awesome authority of formulating "guidelines", compliance with which would be a condition for the granting of vast sums of Federal money. Such functionaries could also be delegated the power to enforce these "guidelines".

It has been a hallmark of the movement to exalt Federal power and debase the power of the States and local communities to place high State and local officials in an inferior position to lower-ranking members of the Federal Establishment. I strongly condemn this practice. It is destructive of healthy Federal-State relationships.

Section 509(b) is the "chopping block" provision. It states, in essence, that whenever the Administration, after reasonable notice and opportunity for hearing to an applicant or a grantee, finds that there is a substantial failure to comply with regulations promulgated by the Administration, the Administration shall notify such applicant or grantee that further payments shall not be made until there is no longer such failure. This is the "stick" of the "carrot-stick" approach to enforcing compliance with the "guidelines".

Section 515 authorizes the Administration to collect, *evaluate,* *publish,* and disseminate statistics and other information on the condition and progress of law enforcement in the several States. It does not require much imagination to envision the effect of the publication by the Administration of critical comments about the condition of law enforcement in a particular State or locality while applications for funds with the Administration were pending from such State or locality, or while the Administration was in the process of determining whether the payment of Federal funds should be terminated to such State or locality. Predictably, there would be a great local pressure

for the citicized State or locality to "fall in line" with the recommenda-tions contained in the "evaluation" of the Administration. There is no guarantee that any evaluation made by the Administration of the condition and progress of law enforcement in the several States would be an objective one, and if recent experience teaches us anything, it is that such an evaluation is likely to be a highly subjective one.

The Attorney General candidly admitted in testimony before the Subcommittee on Criminal Laws and Procedures on this bill that the "rule-making" power would vest almost unlimited discretion in the Federal authorities administering the program. At that time, the pro-gram was to be administered directly by the Attorney General, rather than by a three-man Administration under his supervision. The Attorney General acknowledged that he would have the power under the "rule-making" authority to prescribe the type of shoes and uniforms to be worn by local law enforcement officers, the type or brand of ammunition to be purchased and used by police departments, and many other vital matters pertaining to the day-to-day operation of local law enforcement. He disavowed any intent to use the "rule-making power" in any such far-reaching and arbitrary manner. I am certain that the Attorney General was completely sincere in making these disavowals.

However, there is no assurance that the present Attorney General will be succeeded in office by persons of equal sincerity. This great power may be used in the future by a man who is lacking in judgment, virtue, or self-restraint. We should not take that chance.

In his last writings, the late Justice Robert H. Jackson cogently warned of the danger of a Federal take-over of local law enforcement. In preparing his notes for the Godkin Lectures at Harvard, which were never given because of his untimely death, Justice Jackson drew on his experiences as a prosecutor at the Nuremberg Trials to issue this timely warning:

> The Court has been drawing into the federal system more and more control by federal agencies over local police agencies. I have no doubt that the latter are often guilty of serious invasions of individual rights. But there are more fundamental questions involved in the interpretation of the antiquated, cumbersome, and vague civil rights statutes which give the Department of Justice the right to prosecute state officials. If the Department of Justice must prosecute local officials, the FBI must investigate them, and no local agency which is subject to federal investigation, inspection and discipline is a free agency. I cannot say that our country could have no central police without becoming totalitarian, but I can say with great conviction that it cannot become totalitarian without a centralized national police. At his trial Hermann Goering, with great candor, related the steps by which the Nazi Party obtained complete domination of Germany, and one of the first was the establishment of the supremacy of the national over the local police authorities. So it was in Russia, and so it has been in every totalitarian state. All that is neces-sary is to have a national police competent to investigate all manner of offenses, and then, in the parlance of the street, it will have enough on enough people, even if it does not elect to prosecute them, so that it will find no opposition to its

policies. Even those who are supposed to supervise it are likely to fear it. I believe that the safeguard of our liberty lies in limiting any national policing or investigative organization, first of all to a small number of strictly federal offenses, and secondly to nonpolitical ones. The fact that we may have confidence in the administration of a federal investigative agency under its existing heads does not mean that it may not revert again to the days when the Department of Justice was headed by men to whom the investigatory power was a weapon to be used for their own purposes. (*The Supreme Court in the American System of Government*, Robert H. Jackson, 1955, pages 70–71).

For these reasons, I will support on the Floor the so-called "Block Grant" amendment, which would provide for Federal grants to State law enforcement planning agencies, which, in turn, would disburse these funds to local law enforcement agencies. In my judgement, the "Block Grant" approach is superior, in that it would place control at the State level rather than at the Federal level of government.

JAMES O. EASTLAND.

## INDIVIDUAL VIEWS MESSRS. DIRKSEN, HRUSKA, SCOTT, AND THURMOND ON TITLES I, II, AND III

Since 1960, serious crime in the United States has increased an alarming 88 percent. This fact is cause for the gravest national concern.

This is not a partisan issue. It is an American tragedy.

In consideration of the omnibus crime bill, we have sought to strengthen and improve the proposal sent to Congress. To a limited extent, these efforts have been successful. The committee bill, however, still needs further upgrading and refinement.

### MINORITY CONTRIBUTIONS

The Omnibus Crime Control Act reported by the Senate Judiciary Committee bears an unmistakable imprint of constructive Republican contributions. These contributions range from new substantive provisions to perfecting technical changes.

### ORGANIZED CRIME

The most significant Republican contributions to the bill are those which increase significantly the tools and financial resources to combat the scourge of organized crime. In this regard, two major provisions were added at our insistence.

First, the substance of Amendment 223, introduced on June 29, 1967, by Senators Dirksen, Hruska, Scott, Thurmond and several others, has been approved. The amendment creates a category of special financial assistance to state and local governments. Such assistance has two purposes:

(1) To assist in the establishment or expansion of special prosecuting groups on a local level to ferret out and prosecute the multifarious illegal activities of organized crime.

(2) To provide special federal assistance in establishing a coordinated intelligence network among states including computerized data banks of syndicate operations and activities. These efforts would be under the direction and control of State Organized Crime Councils. A special authorization up to $15 million for fiscal year 1969 would be available for this purpose.

### ELECTRONIC SURVEILLANCE

Another major contribution to efforts to combat organized crime is found in Title III of the committee bill. To a great degree, this title reflects the provisions of S. 2050, the proposed Electronic Surveillance Act of 1967, which was introduced by Senators Dirksen, Hruska, Scott, Thurmond, Percy, Hansen and others in June of 1967. Included in the committee bill is the formula for strict impartial court authorization and supervision of surveillance and a broad prohibition on private snooping. S. 2050 was introduced in the wake of the Supreme Court's decision of *Berger v. New York*. It was tailored to meet the constitutional requirements imposed by that decision.

(224)

Specifically, the sponsors of S. 2050 drew heavily upon the recommendations of the President's Crime Commission. Also, the services of the Commission's expert consultants on organized crime were secured in preparing the bill. Since S. 2050 was incorporated into the subcommittee bill, it has been further refined and changed to reflect the clear guidance of the Supreme Court decision in *Katz v. U.S.* and constructive comments from interested parties.

The original bill which provided the foundation for Title III was S. 675, a bill introduced by Senator McClellan in January of 1967 for himself and Senator Hruska.

The electronic surveillance title will provide an essential tool to law enforcement officials in waging all-out war against organized crime. Yet, the right of privacy of our citizens will be carefully safeguarded by a scrupulous system of impartial court authorized supervision. Such court supervision will monitor and control use of these techniques by law enforcement officials. A broad prohibition is imposed on private use of electronic surveillance, particularly in domestic relations and industrial espionage situations.

Special emphasis on organized crime was essential because of the tragic lack of progress made in recent years in bringing the kingpins of organized crime before the bar of justice. Testimony by Professor Robert G. Blakey before the Criminal Laws Subcommittee last summer indicated:

> If you examine the work that was done a number of years ago, I think you can say the existing program is a success. But if you examine the existing program in reference to what could be done, I think you are going to have to say it is a colossal failure. Let me give you a measuring stick to test this judgment.
>
> The Department (of Justice) has indentified an estimated 5,000 members of La Cosa Nostra. Between 1961 and 1966, the Department has succeeded in indicting approximately 200 of them and convicting approximately 100. That gives them against the hard core in organized crime about a 2-percent batting average. With the best we have to offer, that is, the FBI, the Internal Revenue, the top lawyers of of the Department of Justice, with an expenditure of $20 million a year over a 5-year period, we have not secured the conviction of more than 2 percent of the hard core of identified people. I think there is an indication of failure. And the reason we haven't been able to get beyond that point is simply because we haven't given the best men the necessary legal tool.

As evidence of the Administration's superficial and indifferent understanding of the threat of organized crime, the Attorney General recently described the mass of organized crime as a "tiny part" of the entire crime problem. It is earnestly hoped, however, that the new arsenal of tools which this bill provides will be effectively used; Senator Scott does not necessarily support this amendment.

We associate ourselves fully with the comments on organized crime which are contained in the committee report in Titles I and III. In doing so, we pay tribute to the long dedication and hard work of the

chairman of the Criminal Laws Subcommittee, Senator John L. McClellan.

Further, we urge early hearing on S. 2048, S. 2049, and S. 2051. These bills were introduced by Senator Hruska and others to provide additional legal tools to combat organized crime.

### STATE AND LOCAL CORRECTIONAL INSTITUTIONS

In the original drafts of the omnibus bill circulated to members of the Criminal Laws Subcommittee, state and local correctional systems were either prohibited from participating in the various assistance programs made available for this purpose or such participation was severely limited. At our insistence, this vital but tragically neglected area of law enforcement was restored to an appropriate place within the statutory framework.

Our nation's prisons must become something more than mere way stations in criminal careers.

### CONTINUATION OF THE LAW ENFORCEMENT ASSISTANCE PROGRAM

On Senator Hruska's motion, language was added to the crime control bill in committee to insure that the activities and functions of the Office of Law Enforcement Assistance would be continued until the appropriations become available to establish and operate the new program.

The Office of Law Enforcement Assistance was established pursuant to the Law Enforcement Assistance Act of 1965. This act, which received substantial minority support in both houses of the Congress, provided for federal support of research and development into the problems associated with the law enforcement and criminal justice systems. Even though the existing program has been grossly underfunded at a third of its present $20 million authorization and is substantially undermanned, we feel that it is essential that it be continued until the new program gets underway. Otherwise, there would be a significant break in continuity. The staff of 25 would have to be discharged, transferred to other positions or similar objectionable readjustments made.

The amendment approved by the committee will insure an orderly transition.

### DEFICIENCIES OF TITLE I

Although we are in substantial agreement with many of the provisions of Title I which authorize federal assistance to state and local law enforcement agencies, we are not satisfied with the title as reported from the committee. We offered three major amendments to the measure in full committee which were narrowly defeated. The first amendment included the so-called block grants provisions similar to those of the House-passed bill. The second amendment would reinstate the provisions of the Senate subcommittee-approved bill in which the Law Enforcement Assistance Administration would be independent of the control of the Attorney General. Finally, we attempted to remove the provisions of the committee bill which provide for federal supplements to policemen's salaries.

We will offer these amendments for consideration by the Senate.

## BLOCK GRANTS

The overriding deficiency of the committee bill is the failure to retain the so-called block grant provisions of the House-passed bill. We offered amendments to reinstate the block grant features in the full committee, but they were defeated by a one vote margin. We will offer them again on the floor of the Senate.

It is the purpose of these amendments to insure that federal assistance to state and local law enforcement does not bring with it federal domination and control nor provide the machinery or potential for the establishment of a federal police force. Frankly, we fear that S. 917, without such provisions, could well become the vehicle for the imposition of federal guidelines, restrictions and eventual domination.

Our block grant amendments would revise Parts B and C of Title I, to adopt, with some changes, the provisions of Titles II and III of the bill as it was passed by the House of Representatives. The amendments provide that federal financial assistance to state and local law enforcement be channeled through "state planning agencies" created or designated by the several states. These moneys would be allocated by the state authority to state and local enforcement activities pursuant to comprehensive plans which must be approved annually by the federal Law Enforcement Administration. Each state agency would determine its own priorities for expenditures consistent with its comprehensive plan.

Local activities could apply directly to the Law Enforcement Assistance Administration if a state planning agency is not designated or created within six months after the effective date of the Federal Act. Specific criteria for comprehensive state plans are set forth in the amendment to Part C. Funds appropriated for Part C grants would be available to the states according to their respective populations, except that 15 percent of the funds would be reserved for allocation as the Administration may determine.

Of the funds made available to the states 75 percent must be spent at the local level unless there is no local demand.

We offer this amendment for many reasons, reasons which the House of Representatives has recognized and overwhelmingly approved.

The House very wisely did not pass a local police forces bill, but a law enforcement and criminal justice bill. Criminal justice is a system covering law enforcement, court judgments, and corrections. Better protection and security for every individual American necessitates coordinated and simultaneous improvement in the system, and not just a single-shot effort to improve some local police forces. The House chose to require that states give written evidence of their intentions to improve their criminal justice systems, in cooperation with local governments, before federal funds could be spent. This is a call for state responsibility.

The administrative complexities and long delays associated with too many federal grants made directly to local governments are well documented. Every member of the Senate has spent long hours trying to beg, bludgeon or cajole some bureaucrat to pry loose from voluminous dusty files grant applications which have been pending for months or years.

The federal government should concern itself with the coordination of 50 state programs rather than trying to evaluate, judge, and fund the projects of thousands of local governments.

The states are ready to assume their responsibilities for action. In 1966 when limited federal funds were offered to the states to establish planning commissions to combat crime, 16 states established these commissions, and eight others have had applications pending with the Justice Department for varying lengths of time. During the same 18 month period, the Justice Department with the active cooperation of national organizations representing cities and counties, only managed to approve a total of 11 grants to both cities and counties, plus eight grants for the District of Columbia, out of a potential of over 18,000 cities and 3,000 counties. The published Justice Department facts show that the states more than other jurisdictions are assuming their responsibilities. In all, more than one-half of the states have already received state planning grants. Several more have applications pending.

Within the last month, 47 Governors meeting in Washington unanimously recommended that Congress push forward with these bills, but with due regard for required statewide planning and project coordination, including provisions for local officials to participate with the state officials in the development of these programs. The National Association of Attorneys General recently passed a resolution in support of the Law Enforcement and Criminal Justice Act as amended and passed by the House. The unanimous judgment of these state officials plus a substantial majority of the members of the House of Representatives is that if creative federalism is to become workable federalism, then it must move away from direct project grants to local governments that would bypass state financial and technical assistance related to the solution of the same problem. Seldom does the solution of a problem involve only one functional area; in most cases other functional elements are directly related.

New York City may have 29,000 policemen, but New York City's problems of law enforcement, courts and corrections, and juvenile delinquency extend into the jurisdiction of three states and over 14,400 separate taxing authorities in the New York metropolitan area. Direct federal aid for police functions in New York City without proper requirements for concerted action on the part of New York State would be a simple distribution of more federal money with no regard for the multiplication of benefits that would result from a requirement that the state approve the grant while at the same time relating the grant to all existing and proposed state programs.

Most direct grants that bypass the states are project-oriented stop-gap measures, which never approach the level of comprehensive program orientation and fail to provide measurable evidence that problems are actually being solved. With $100 million in federal funds for law enforcement and criminal justice programs, about 350 project grants are proposed. The House very wisely foresaw the fruitlessness of scattering these funds among such a minute number of uncoordinated separate projects. Consequently, the House required that a coordinated action plan be submitted by each state before the funds are released.

Administratively, most cities and counties have a greater chance of getting some of the $20 billion of federal aid funds when they are processed through a state agency. When they must deal directly with Washington, the premium is on the new art of "Grantsmanship."

Certainly, large cities with several fulltime Grantsmanship Officers would prefer direct relations with Washington. However, our national concern should be problem solving, with workable programs to meet local needs. The state will always be the primary administrative unit that can see that funds are going where they are needed, not where the Grantsmen are operating.

The prestigious National Council on Crime and Delinquency, in a recent policy statement on block grants observed:

> A serious program of law enforcement assistance will promote at least pooling of police departments in the major metropolitan areas. The President's Commission recommended this, and there really cannot be a question of doing it. Regionalization, sharing of facilities and services, and realistic planning are going to occur. The real question is who will decide how and which combinations will take place. Cities, even those with a population of 50,000, cannot do it. Metropolitan areas are beyond the jurisdiction of cities. It must be done either by the state or Federal governments.

> The Administration's new bill would leave this decision to the Attorney General and the 331 cities with populations over 50,000. For the law enforcement agencies serving the other 58 percent of the population, state governments would make the decisions. The bill passed by the House would leave to the state planning body the decision in all jurisdictions. To choose between these it is necessary to look beyond law enforcement, narrowly construed, to see it as what it is—part of a larger system.

It is inconsistent to expand direct federal-local relationships at a time when the crucial need is for more and better state-local relations. Direct federal-local actions generate unnecessary misunderstandings, confusions, and endless debate at a time when local governments are in need of home rule powers, model court systems, greater state financial and technical assistance, and modernization of a wide variety of laws for every functional activity.

The days are long overdue when the unmanageable and unworkable proportion of 495 separate authorizations for federal aid programs should be revamped, repackaged, and consolidated where feasible, in the form of block grants to the states in broad program categories. At the very least, when it comes to adding new grant programs to the total such as Law Enforcement, Criminal Justice, and Juvenile Delinquency, state responsibility in urban affairs should be required, and not optional as encouraged by all bypassing proposals.

But the most persuasive argument in support of increasing state responsibility for law enforcement was well stated by the distinguished director of the Federal Bureau of Investigation when he said:

> America has no place for, nor does it need, a national police force. It should be abundantly clear by now that in a democracy such as ours effective law enforcement is basically a local responsibility. In the great area of self-government reserved for States, counties and cities, the enforcement of the laws is not only their duty but also their right.

We agree.

INDEPENDENT LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

In pursuit of one of the same objectives of the block grant provisions, namely the prevention of federal domination and control of state and local law enforcement, the Criminal Laws Subcommittee, upon the initiative of Chairman McClellan, added a provision to its bill for the establishment of an independent Law Enforcement Assistance Administration to administer the federal aid program. The administering agency was to be headed by a three-man board appointed by the President with the advice and consent of the Senate. Minority party representation was assured by the requirement that one of the three men would be a representative of the party out of power.

The subcommittee bill provided:

> In the exercise of its functions, powers, and duties, the Administration shall be independent of the Attorney General and other offices and officers of the Department of Justice.

This was deemed essential to insure that, as much as possible, the law enforcement assistance program would be administered impartially and free from political pressures. Also, it was considered to be important to refrain from placing in the hands of one man the potential power of granting or denying federal financial assistance in very large amounts to state and city law enforcement agencies.

It is regrettable that the provision for the independent status of the Administration was dropped from the bill. We attempted unsuccessfully to reinstate the provision in the full committee, and will urge its adoption on the floor of the Senate.

In short, we don't want the Attorney General, the so-called "Mr. Big" of federal law enforcement to become the director of state and local law enforcement as well. It is true that the Attorney General is chief law enforcement officer of the federal government. But he is not chief law enforcement officer of states or cities. We believe America does not want him to serve in this latter capacity.

Organization and management experts may object to a dilution of executive authority, but we want no part of a national police force. Such dilution, if a price at all, is a small price to pay to preserve a fundamental balance of police power.

We don't want this bill to become the vehicle for the imposition of federal guidelines, controls, and domination.

### POLICE SALARY SUPPORT

The Administration's original proposal to Congress in early 1967 contained a feature allowing up to one-third of each federal grant to be utilized for compensation of law enforcement personnel. In the hearing record of both the House and Senate Judiciary Committees, this provision proved to be quite controversial. When the House Committee reported the bill, the provision for salary support was deleted. Commenting on this action, the committee report on page 6 stated:

> The committee deleted all authority to use grant funds authorized by the bill for the purpose of direct compensation to police and other law enforcement personnel other than for training programs or for the performance of innovative

> functions. Deletion of authority to use Federal funds for
> local law enforcement personnel compensation underscores
> the committee's concern that responsibility for law enforce-
> ment not be shifted from State and local government level.
> It is anticipated that local governments, as the cost for
> research, innovative services, training, and new equipment
> developments are shared by the Federal Government in the
> programs authorized in the bill will be able to devote more
> of their local resources to the solution of personnel com-
> pensation problems. The committee recognizes that adequate
> compensation for law enforcement personnel is one of the
> most vexing problems in the fight against crime.

We wholeheartedly subscribe to the House committee's view. There is indeed a grave concern that responsibility for law enforcement not be shifted from the state and local levels.

The Senate Criminal Laws Subcommittee also deleted a similar provision by an overwhelming vote, but subsequently a somewhat modified salary provision was reinstated. In modified form, up to one-third of each grant could be made available to pay one-half the cost of salary *increases* for law enforcement personnel. Even with this modification, we must strongly oppose the provision. This is not because we are indifferent to the low pay of the nation's law enforce-ment officers. It is because we fear that "he who pays the piper calls the tune" and that dependence upon the federal government for sal-aries could be an easy street to federal domination and control.

In addition, this provision would not have equal application or provide equal benefits to all law enforcement officials. In fact, most of the nation's 400,000 police officers would not be eligible because under the committee bill only local jurisdictions or groups of local jurisdic-tions with populations of more than 50,000 would be eligible to apply for grant aid. Thus, those smaller jurisdictions, some 80 percent of the nation's total with 58 percent of the population, would not be eligible for grant assistance. Who is to say that the officers of City A which meets the population standard could receive federal salary supple-ments whereas the officers of City B, perhaps an adjoining community whose population requirements do not meet the test, could not qualify.

The unfairness of the Administration proposal becomes crystal clear when it is considered that not all large cities and policemen will be beneficiaries of federal law enforcement grants. This is so because there is simply not enough federal money to go around. Thus, City C which perhaps got its application in early or whose political leadership was in favor with the Department of Justice received a grant and salary support, while City D with the same needs, the same crime problems and same low pay scales was left out because its application was tardy or not in compliance with contemporary federal notions on what a good application should contain. What could be more manifestly unfair?

Finally, it should be noted that once salary support is granted, it would be difficult if not impossible for the federal government to abandon its assistance, thus leaving a permanent dependence on the federal treasury.

### TITLE II

The spectre of American society—the greatest in the history of the world—plunging into chaos as the national fabric unravels into law-

lessness is alarming. It is that spectre that urges us to support this omnibus measure in hopes to reverse that ever-quickening trend. No honest and conscientious effort to restore effective law enforcement and fair criminal justice—no matter how many dollars are spent or wires tapped or guns controlled—can hope for success without dealing with the technical problems of admissibility of evidence and appellate review of criminal cases.

To control criminal conduct, our American system requires some means of getting control of the criminal—the person breaking the law. Society has no more effective means of controlling a criminal than laws and penalties for violations of those laws. To impose the penalties requires conviction of the criminal. To convict criminals, relevant, competent and material proof, rising to the degree of beyond a reasonable doubt, must be admitted into evidence for the trier of the facts—judge or jury—to weigh and determine. Without such evidence, no intelligent, competent, and above all, fair decision can be made. In an increasing number of cases, such evidence is unavailable, not because it does not exist or cannot be discovered, but because it is inadmissible for certain court created reasons.

The exclusion of voluntary confessions, including admissions against interest, is perhaps the most significant problem in obtaining criminal convictions. Members of the Subcommittee on Criminal Law and Procedure have heard scores of respected and competent witnesses testify that such exclusion has seriously crippled law enforcement. Not only is the actual confession rendered useless but any "lead" or "clue" to other independent evidence provided by the confession is so "tainted" that it is inadmissible and therefore useless. District attorneys and State Attorneys General from cities and states that are in serious trouble in the war on rising lawlessness, shocked the sensibilities of many of us on the Committee with reports of the ever-increasing numbers of criminals who are patently guilty and who walk out of courtrooms because the principal evidence against them was ruled inadmissible. This result was attributed to the rigid and technical application of exclusionary rules laid down by appellate courts. Distinguished judges, appellate and trial, voiced similar concern in urging Congressional action. Our hearing record is replete with such pleas for help. In our own self-defense, this destructive trend must be reversed. Are we to sit idly by while, through the operation of a legal technicality, innocent people are ravaged by self-confessed marauders? Is society to render itself incapable of self-protection? Should it be as the famed jurist, Benjamin Cardozo, once asked, that "the criminal is to go free because the constable has blundered?"

The provisions of Title II attempt to right the imbalance in the scales of justice. We have agonizingly weighed the rights and equities of the individual against those of society. We have tried to the best of our consciences to strike the balance true.

This title would restore the test for the admissibility of confessions in criminal cases to that time-tested and well-founded standard of voluntariness. It would avoid the inflexible rule of excluding such statements *solely* on technical grounds such as delay or failure to warn the accused as to his rights to silence or to counsel. We have not nullified, however, the rights of defendants to the safeguards of federal law or the Constitution. On the contrary, we have provided a

more reasonable rule in that the judge shall consider all the defendant's rights (speedy arraignment, silence, counsel, knowledge of offense charged) and their possible violation in deciding as to the voluntariness of the confession and thus its admissibility.

We also have attempted to deal with the imbalance in our delicate federal system caused by the ever-growing tendency of federal courts to disrupt the finality of state court adjudications, particularly with respect to the admissibility of confessions.

Never-ending proceedings are continuously sought in federal courts to overturn the final adjudications of state courts in criminal cases. This dilution and disruption of state criminal law enforcement is part of the serious deficiency in dealing with criminal conduct. In this respect, Title II provides for the Congress to exercise its very clear authority under the Constitution to create the appellate jurisdiction of the federal courts. Such jurisdiction would be limited by excluding the issue of admissibility of confessions that have been adjudicated in the highest court of the state.*

Another area in which we have reached a ridiculous stage in the criminal process is where eye-witnesses and victims of crime are not permitted to identify the criminal in court. Such a situation arises when a witness happens to see the defendant subsequent to the commission of the crime at a time when the defendant is in police custody and when he does not have a lawyer present. This rule finds no direct or indirect support in the Constitution. Justice Black pointed out such lack of precedent in dissenting from the decision that established the rule. The majority of the court strained the Sixth Amendment's right to counsel concept in order to find the power to exclude such testimony. The result offends the conscience and erodes the law of evidence. The justice also pointed out that the court has no power to establish such a constitutional rule of evidence for a state court.

Title II would permit the admission of eye-witness testimony in federal courts without regard to intermediate observations by the witness of the defendant. It also would limit the federal appellate jurisdiction in state cases where that issue is sought to be reviewed.*

The disruptive influence that federal courts have had in state criminal prosecutions is reflected in the area of federal habeas corpus. Our Subcommittee hearings revealed extensive abuse of the federal habeas corpus proceeding, since it results in the continuous litigation and relitigation of issues settled in the state courts. The appalling figures that demonstrate the explosive growth of such petitions in the federal courts are set out in the hearings and in this report. The statistics are staggering to us and to the courts. Orderly administration of criminal justice is impeded by the proliferation of such a device to escape the final adjudication of state courts. All are agreed that *most* applications are frivolous and without merit. To allow indiscriminate use of this device to frustrate other legitimate functions of the courts thwarts our efforts to obtain justice. Again, the federal courts will not discipline themselves with self-restraint. To return balance to the administration of justice it is necessary for the Congress to use its power under the Constitution and clearly regulate the jurisdiction of the federal courts. Thus, we would limit federal court jurisdiction to direct appeal and certiorari in certain state criminal cases. The

---

* Senator Scott does not associate himself with those views in support of limiting the appellate jurisdiction of federal courts and curtailing habeas corpus proceedings. For an extended statement of his position on this legislation, see his Individual Views at p. 209 of this Report.

practice of abusing federal habeas corpus procedures as a substitute for direct appeal must cease to overburden our system of criminal justice.*

## TITLE III

While we strongly agree with the report of the Committee on Title III, we feel that it is necessary to add certain additional comments.

### HISTORY OF THE LEGISLATION

Title III, as the report notes, is essentially a combination of S. 675 introduced by Senator McClellan and S. 2050 introduced by Senator Hruska. S. 675 was, of course, modeled on the wiretapping bill first introduced under the Kennedy Administration. It had the strong support of Nicholas deB. Katzenbach, when he was attorney general. Indeed, it was not until the present Attorney General assumed his position that the position of the Department of Justice changed.

S. 2050, on the other hand, finds its origin in the proposal which the President's Commission on Law Enforcement and Administration of Justice had before it when it made its recommendation that "legislation should be enacted granting carefully circumscribed authority for electronic surveillance to law enforcement officers . . . ."

This proposal was put into legislative form, prior to the Supreme Court's decision in *Berger* v. *New York*, 388 U.S. 41 (1967), and it was introduced in the House of Representatives as the Ford-McCulloch bill, H.R. 13275. Because of the opposition of the Administration, no action has been taken on this proposal in the House. Following the Supreme Court's decision in *Berger*, which laid down the Constitutional criterion for electronic surveillance legislation. H.R. 13275 was reworked and introduced as S. 2050. The Republican and thus bipartisan character of Title III thus is clear.

### THE NEED FOR THE LEGISLATION

The report itself admirably documents the pressing need for the proposed legislation. Certain additional comments are, however, necessary.

The question of need divides itself into two broad areas: national security and organized crime.

The need to use these techniques in the national security area seems all but obvious. The reasons were noted by Herbert Brownell, when he was attorney general during the Eisenhower Administration. He said:

> It is almost impossible to 'spot' [communists and spies] since they no longer use membership cards or other written documents which will identify them for what they are. As a matter of necessity they turn to the telephone to carry on their intrigue. The success of their plans frequently rests upon piecing together shreds of information received from many sources . . . The participants in the conspiracy are often dispersed and stationed in various strategic positions . . .

---

* Senator Scott does not associate himself with those views in support of limiting the appellate jurisdiction of federal courts and curtailing habeas corpus proceedings. For an extended statement of his position on this legislation, see his Individual Views at p. 209 of this Report.

Attorney General Brownell also commented on the need to deal with these individuals in the traditional American way. He observed:

> [I]t is not enough merely to uproot [them] from government or out of other sensitive positions in industry or commerce. They should be tried fairly with all the constitutional safeguards to an accused that our law provides. But if the evidence establishes their guilt, be it from their overt acts or from the lips of the confederates, or from intercepted evidence obtained by federal officers, . . . these wrongdoers, too, should be put away where they will no longer continue to prey on the liberty and freedom of [the] nation. The mere fact that they have cleverly resorted to the telephone . . . to carry out their treachery should no longer serve as a shield to punishment.

Indeed, every Attorney General since 1931 has thus recognized this need. Former Attorney General Tom C. Clark, for example, put it this way. "It seems to me imperative to use [wiretapping] in cases vitally affecting domestic security or where human life is in jeopardy. . . ." He also observed: "It seems incongruous that existing law should protect our enemies and hamper our protectors." With the case for need in this area, we take it, theefore, no one seriously doubts it any longer.

Organized crime cases stand on a similar footing. The President's Crime Commission, aptly summed it up in these terms:

> In many ways organized crime is the most sadistic kind of crime in America. The men who control it have become rich and powerful by encouraging the needy to gamble, by luring the troubled to destroy themselves with drugs and extorting the profits of honest and hardworking businessmen, by collecting usury from those in financial plight, by maiming or murdering those who oppose them, by bribing those who are sworn to destroy them. Organized crime is not merely a few preying upon a few. In a very real sense it is dedicated to subverting not only American institutions, but the very decency and integrity that are the most cherished attributes of a free society. As the leaders of Cosa Nostra pursue the conspiracy unmolested in open and continuous defiance of the law, they preach a sermon that all too many Americans heed: the government is for sale; lawlessness is the road to wealth; honesty is a pitfall and morality a trap for suckers.

That electronic surveillance techniques are necessary to meet this challenge also seems clear. This was the conclusion of the President's own Crime Commission.

When the President called together his Commission on Law Enforcement and the Administration of Justice, he asked it "to determine why organized crime has been expanding despite the Nation's best efforts to prevent it." The Commission identified a number of factors. The major problem, however, related to matters of proof. "From a legal standpoint, organized crime," the Commission concluded, "continues to grow because of defects in the evidence gathering

process." The Commission reviewed the difficulties experienced in developing evidence in this area in these terms:

> Usually, when a crime is committed, the public calls the police, but the police have to ferret out even the existence of organized crime. The many Americans who are compliant "victims" have no incentive to report the illicit operations. The millions of people who gamble illegally are willing customers, who do not wish to see their supplier destroyed. Even the true victim of organized crime, such as those succumbing to extortion, are too afraid to inform law enforcement officials. Some misguided citizens think there is social stigma in the role of "informer," and this tends to prevent reporting and cooperating with police.
>
> Law enforcement may be able to develop informants but organized crime uses torture and murder to destroy the particular prosecution at hand and to deter others from cooperating with police agencies. Informants who do furnish intelligence to the police often wish to remain anonymous and are unwilling to testify publically. Other informants are valuable on a long-range basis and cannot be used in public trials. Even when a prosecution witness testifies against family members, the criminal organization often tries, sometimes successfully, to bribe or threaten jury members or judges.
>
> Documentary evidence is equally difficult to obtain. Bookmakers at the street level keep no detailed records. Main offices of gambling enterprises can be moved often enough to keep anyone from getting sufficient evidence for a search warrant for a particular location. Mechanical devices are used that prevent even the telephone company from knowing about telephone calls. And even if an enforcement agent has a search warrant, there are easy ways to destroy written material while the agent fulfills the legal requirements of knocking on the door, announcing his identify and purpose, and waiting a reasonable time for a response before breaking into the room.

The Commission then concluded, simply enough, that under "present procedures, too few witnesses have been produced to prove the link between criminal group members and the illicit activities that they sponsor." It was in this context, therefore, that the Commission examined the testimony of law enforcement officilas that electronic surveillance techniques were indispensable to develop adequate strategic intelligence concerning organized crime, to set up specific investigations, to develop witnesses, to corroborate their testimony, and to serve as substitutes for them. The Commission then reviewed the arguments for and against the use of these techniques, examining in particular the New York experience, and concluded:

> All members of the Commission agree on the difficulty of striking the balance between law enforcement benefits from the use of electronic surveillance and the threat to privacy its use may entail . . .
>
> All members of the Commission believe that if authority to employ these techniques is granted it must be granted

only with stringent limitations . . . All private use of
electronic surveillance should be placed under rigid control,
or it should be outlawed.

A majority of the members of the Commission believe
that legislation should be enacted granting carefully cir-
cumscribed authority for electronic surveillance to law
enforcement officers to the extent it may be consistent with
the decision of the Supreme Court in *People* v. *Berger*. . . .

The conclusion of the President's Crime commission echoes the
similar findings of the English Privy Councillors.

In June of 1957, three Privy Councillors were appointed to in-
quire into the interception of communications in Great Britain.
Their Report dealt only with wiretapping, but its conclusions are
equally applicable to all forms of electronic surveillance. The practice
over a twenty year period was examined. After reviewing the British
experience in great depth, they concluded:

If it should be said that at least the citizen would have
the assurance that his own telephone would not be tapped,
this would be of little comfort to him, because if the powers
of the Police are allowed to be exercised in the future, as
they have been in the past under the safeguards we have
set out, the telephone of the ordinary law-abiding citizen
would be quite immune . . . [I]f it is said that when the
telephone wires of a suspected criminal are tapped all
messages to him, innocent or otherwise, are necessarily
intercepted too, it should be remembered that this is really
no hardship at all to the innocent citizen. This cannot
properly be described as an interference with liberty; it is
an inevitable consequence of tapping the telephone of the
criminal; but it has no harmful results . . . The citizen must
endure this inevitable consequence in order that the main
purpose of detecting and preventing crime should be
achieved. We cannot think, in any event, that the fact
that innocent messages may be intercepted is any ground
for depriving the Police of a very powerful weapon in their
fight against crime and criminals. . . . To abandon the
power now would be a concession to those who are desirous
of breaking the law in one form or another, without any
advantage to the community whatever.

It is in this context that we find so wholly without support the
position of the present Attorney General, Ramsey Clark. Mr. Clark
has publicly taken the position that electronic surveillance is "neither
effective nor highly productive." He has testified that "there are
only a small proportion of all crimes where it could be utilized at all
and as to these it would not be a significant investigative device."
Finally, he has suggested that his position is somehow based on a
review of "hundreds and hundreds of bug and wiretap" records.

We find this conclusion incredible. Indeed, it is not even supported
by others within the Department of Justice itself. J. Edgar Hoover,
the Director of the Federal Bureau of Investigation, has publicly
stated that "we would never know what we do (know) about the Cosa
Nostra without electronic surveillance." William O. Bittman, who

successfully prosecuted James Hoffa and Bobby Baker, described the effectiveness of electronic surveillance in these terms:

> In Las Vegas, the Government learned from bugging the amount of money that was being skimmed, who was doing the skimming, how the skimming was done, who the couriers were that were delivering the money around the country, when they were leaving and who was going to receive the money.

He then observed:

> How can you say this was no help to law enforcement?

Finally, the Committee received conclusive evidence stemming from the files of the Department itself which rebuts the Attorney General's position. Professor G. Robert Blakey during the hearings presented to the Committee the comprehensive analysis of ten documents made public during an organized crime prosecution which represents the product of approximately three weeks of electronic surveillance of only one organized crime boss.

### SCOPE OF THE LEGISLATION

While we agree in broad outline with Title III as it is presently drafted, two aspects of it seem to us on further reflection to be unwise.

First, as now drafted, Title III will limit ou the federal level the use of electronic surveillance techniques to certain designated offenses. As an isolated issue this approach has much to say for it. The use of these techniques should be carefully limited. Placing a category limitation on the kinds of investigations in which they may be employed is one obvious way of limiting their use. Yet when this limitation is placed in the context of the other limitations in the bill, it seems to us to be both unnecessary and unwise. First, there is, of course, no Constitutional reason why these techniques may not be used in the investigation of any offense. Nothing the Supreme Court said in either *Berger* or *Katz* indicates that such a limitation is necessary or desirable. Second, if all of the other standards set out in the Title can be met, we fail to see why the use of these techniques should be further restricted. We note particularly the requirement that other investigative procedures have been tried or reasonably appear to be unlikely to succeed if tried or to be too dangerous. Can we seriously suggest to the American people that all constitutional methods of law unforcement should not be used to attack our mounting crime problem? How can we justify enacting legislation which recognizes safe havens for certain kinds of criminal behavior? organized crime has not seen fit to limit itself to any set of fixed list of offenses. Why should we so tie the hands of law enforcement? Third, present search and seizure law does not draw a distinction in the kinds of cases in which search warrants may be issued. Why should electronic surveillance, which is but another form of search and seizure, be so limited? Should we have one standard for the routine case and another, more strict standard for the organized crime or national security case? This kind of double standard cannot be justified. Finally, New York has had a court order electronic surveillance system for an number of years now which has not been so limited and it has not been shown that its absence has caused any difficulty. For these reasons, we intend to propose to offer

on the Senate floor an amendment to Title III which would eliminate the distinction in the kinds of cases in which electronic surveillance may be used.*

Second, as now drafted, Title III will set federal standards for the use of these techniques by State law enforcement officers. At the time S. 2050 was drafted and introduced there was little or no state activity in this area. Concern was expressed that if the Congress acted some States might be encouraged to act and they might not act responsibly. Loose or inadequate legislation might be enacted. Recent activity on the State level, however, has proven that fear unfounded. Legislation is now pending in California, Rhode Island, Pennsylvania and New Jersey which would set up court order systems. Legislation, too, has passed at least one house of the State legislatures in New York and Michigan. This legislation appears to have been carefully drawn. This Body has no superior wisdom in this area. Indeed, as Mr. Justice Brandeis rightly observed in *New State Ice Co.* v. *Liebmann*, 285 U.S. 262, 280–311 (1932) that:

> It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory, and try . . . experiments without risk to the rest of the country.

This is not, of course, to say that the States should have a free hand. But it is to say that it is not necessary for us to intervene, for the States are already subject to the same basis constitutional limitations that we are. The teaching of the Supreme Court in *Berger* v. *New York* makes that unquestionably clear. Any State legislation in this area must pass muster in the Supreme Court. We see no good reason why it should pass review here too. A healthy federalism demands that the States be left unfettered within the same constitutional limitations that we ourselves are free to act. No one has established a need for the Congress to set federal standards in this area any different than those already set by the Supreme Court. Apart from wiretapping, where the experience with Congressional action in the past has not been happy anyway, the States are now free to act. It is not necessary for us to authorize them to act. We see no good reason why we should now step in and prevent them from following their own judgments. Consequently, we intend to offer on the Senate floor an amendment which will eliminate from Title III those aspects of the bill which now set federal standards for state law enforcement.*

EVERETT MCKINLEY DIRKSEN.
ROMAN L. HRUSKA.
HUGH SCOTT.
STROM THURMOND.

---

*Senator Scott does not necessarily support this amendment.

## INDIVIDUAL VIEWS OF MESSRS. DIRKSEN, HRUSKA,. THURMOND, AND BURDICK ON TITLE IV

The need for up-dating federal legislation regulating firearms is. generally recognized. The issue is not whether a bill on this subject be enacted, but rather what kind of measure should be adopted.

The National Firearms Act dealing with destructive devices and popularly known as the "Machine Gun" Act, was enacted in 1934. The Federal Firearms Act dealing with firearms for sporting purposes. was enacted in 1938.

No general revision or comprehensive amendments have been made since original enactment. The passage of time as well as the vast and alarming increase in crime combine to make it necessary that an up-dating be made of both Acts.

Purposes of such legislation should be directed to—

(1) Regulate more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them.

(2) Assist the States and their subdivisions to enforce their firearms control laws and ordinances.

(3) Help combat the spiralling increase in serious crime in the United States.

(4) Strictly regulate the manufacture, sale, transfer and possession of destructive devices by federal registration and heavy transfer taxes.

In the process, care should be exercised not to interfere with the legitimate uses of firearms by the millions of law-abiding citizens who acquire, transport, and possess them for hunting and other recreational pursuits, self-protection, and other lawful uses.

It is submitted that Title IV of the pending bill is fundamentally objectionable in its approach and in its provisions. It would be ineffective to achieve the declared objectives. It would be harmful to a greater degree than helpful.

The undersigned intend to propose a substitute which will more effectively achieve the declared goals and which will resu lt in better enforcement.

### OBJECTIONS TO TITLE IV AS REPORTED

1. The Title embraces and joins in one measure the subject matter of both destructive devices and firearms for sporting purposes. This is faulty from a legislating technique since it departs from the logical division of subject matter which has prevailed for a third of a century. Separate Amendment of the two Statutes would be preferred procedure. The subject matter is different in each Act. Its treatment is different. Our substitute would preserve the differentiation between destructive devices and sporting firearms.

2. In resorting to a prohibition concept by outlawing mail order sales. of firearms, difficult enforcement problems are created for the federal

authority. Federal jurisdiction is made to invade an area which should be reserved to state and local authorities. The federal law should undertake to deal with interstate shipment and movement of firearms in such a way as to enable and assist state enforcement officials to enforce their laws in this field, and without needless and undue prejudice and hardship to the millions of lawful owners and users. This Title IV fails to do.

3. The Title prohibits some presently legitimate methods and avenues of commerce in firearms. This is an objectionable and harmful approach for several basic reasons. It would be a precedent for leading to further elimination of additional legitimate sales channels. It confers a monopoly power in remaining avenues of commerce. It would substantially prejudice the lawful owner and uses because of increased cost incurred in buying new arms; and because in parts of America it would make purchase of guns difficult, and in some instances would prevent acquisition. This latter situation would result from the Title's imposition on dealers of severe burdens of assuring that sales are made only to persons who would not mis-use their purchasers, but does not confer upon the dealer the means by which he can get reliable, informed information upon which to make a decision. In many ways there is less assurance that a sale over the counter would be to an ineligible purchaser than if the sale were by mail order under procedures set out in the proposed substitute to Title IV.

4. Another basic defect of the regulatory scheme in Title IV and in the Administration proposal is the fact that the remaining commercial firearms dealers would be subjected to severe federal criminal sanctions without the ability to safeguard or protect themselves against liability. Under the proposed Section 922(b) of Section 901, it would be a federal crime for any licensed dealer to sell any firearm to any purchaser (over-the-counter or through the mails) who the licensee knows or has reasonable cause to believe is not lawfully entitled to receive or possess a firearm because of the operation of any state or local law applicable at the place of sale or delivery, or to non-residents and persons under 21 in the case of handguns. At his peril, the dealer is charged with the responsibility for establishing the bona fides of the transaction. There is no provision for the requirement of a sworn statement from the purchaser. There is no provision to send a copy of the statement to the purchaser's local police for verification of the information contained in the application. The dealer is on his own. Many jurisdictions impose stringent or vague restrictions on the sale of firearms. The District of Columbia forbids sales of handguns to felons, narcotics addicts, vagrants or prostitutes. Texas law forbids sales to "undesirable" persons. In many instances these laws are not rigidly enforced or dealers are given relief if reasonable precautions were taken to establish the identity and qualifications of the purchaser. But in Title IV, the dealer is not even given the benefit of a sworn statement from the purchaser or a police check.

Under Title IV all sales in technical violation of state law or city ordinance would become federal offenses. This means imposition of duties and burdens on dealers far beyond reasonable commercial practice. The caution that would be forthcoming from dealers would certainly lead to inability of many lawful users of guns to purchase new ones.

## LICENSE FEE SCHEDULES

The license fee schedule proposed in Title IV is unreasonable and discriminatory against small business. First, it must be noted that there is common agreement on the fee schedule for dealers. Both Title IV and our amendment provide that there should be an initial license fee of $25 and a $10 renewal charge annually thereafter. This point is not an issue. This represents an increase over the existing Federal Firearms Act which requires a $1 dealer fee.

There is strong disagreement, however, as to license fees for manufacturers and importers. Existing law specifies a $25 fee. Our amendment raises this charge to $50. In Title IV, the fee would be elevated to $500 for manufacturers and importers of firearms, and $1,000 for manufacturers and importers of destructive devices and ammunition for destructive devices.

No justification was ever submitted in the hearings for this drastic increase. Undoubtedly, the large New England manufacturers would not be adversely affected by the increases. However, it would grossly discriminate against small business, particularly those who engage in special order and customizing work.

Federal gun control legislation is not a revenue measure; it seeks to regulate legitimate firearms commerce. License fees should be set at reasonable and non-discriminatory levels.

## STANDARDS FOR OBTAINING FEDERAL FIREARMS LICENSES

In the existing Federal Firearms Act of 1938, there are minimal requirements for obtaining a federal manufacturer's or dealer's license. As a result, many persons who are not genuinely engaged in the business of manufacturing and selling firearms have obtained licenses by payment of the nominal fees. There is general agreement that these requirements should be strengthened. Section 3 of our amendment imposes three new requirements:

1. An applicant must be 21 years of age.

2. The applicant must not be prohibited from transporting, shipping, selling or receiving firearms in interstate commerce by the provisions of the act.

3. The applicant must not have willfully failed to disclose any material information required or made any false statement in connection with this application.

These requirements are also contained in the amendment offered by Senator Dodd. In addition, three other requirements are imposed by Dodd.

The Secretary of the Treasury shall deny the issuance of a manufacturer's, importer's, or dealer's license if he finds that—

1. The applicant has willfully violated any of the provisions of the act or regulations issued thereunder.

2. The applicant does not have or does not intend to have and maintain business premises for the conduct of his business.

3. The applicant, by reason of his business experience, financial standing or trade connections, is not likely to commence business operations or to maintain operations in compliance with the act.

We do not strongly object to the provision pertaining to wilful violation of the act. However, it is felt that this was covered in the standard denying a license to a person who is prohibited from trans-

porting, shipping, or receiving firearms under the provisions of the act. As for the requirement of maintaining or intending to maintain business premises, it is noted that under existing regulations implementing the Federal Firearms Act, a similar requirement is already in existence. This requirement apparently is only selectively enforced. A memorandum submitted to the House and Senate committees by the Treasury Department last year during the firearms hearings indicated that in one survey conducted by the Treasury in the Middle Atlantic Region, of approximately 5,000 licensees checked, approximately 1,500 licenses were either revoked or not renewed because of failure to maintain business premises or to be engaged in the firearms business.

There is a real problem of definition as to just what constitutes a business premise. This could be the basis for arbitrary or capricious action on the part of those charged with enforcement of the act.

Most objectionable and strongly objected to is the requirement that the applicant, by reason of his business experience, financial standing or trade connections, will be likely to commence operations or maintain operations in compliance with the act. This provision was strongly opposed to by several witnesses during the 1967 hearings. There seems to be little question but that it does arm the Secretary of Treasury or his delegate with very broad authority to issue or deny licenses. Although there is opportunity for appeal and a hearing procedure, this remedy would be of little consolation to the small businessman such as a rural general store or crossroads gas station which conducted a very small business for the convenience of his customers. Such persons would lack financial resources to take advantage of whatever remedies the appeal procedure might offer.

The colloquy between Senator Hruska and the Attorney General at pages 930 and 931 of the 1967 Senate firearms hearings is pertinent. When asked by Senator Hruska to comment on the "not likely to comply" standard, the Attorney General replied:

> This points up another respect in which this bill in my judgment is superior to yours, because yours does not require the licensee have any place of business or any regular establishment. We think that is important. We think the licenses should be issued to dealers, to dealers with a regular place of business. We believe that the Government can enforce this and can enforce it effectively, and the Secretary can proceed through inquiries and regulations.

When asked again to comment by Senator Hruska, the Attorney General replied:

> "He has recourse through the Administrative Procedure Act."

In the proposed substitute, the three requirements of S. 1853 have been retained. Furthermore, we have added the "willful violation" requirement, while rejecting the other proposed requirements for the reasons stated above.

### CONTROL OF DESTRUCTIVE DEVICES

Universal agreement exists that the so-called destructive devices such as rockets, mortars, bazookas, crew-served artillery should be the subject of strict federal regulation. A few collectors of firearms

find these articles interesting. They are also found in museums, but there are no legitimate sporting purposes for these devices.

But there is a fundamental disagreement as to the most appropriate and effective method of regulation. In the 89th Congress, Senator Dodd introduced S. 1591 on behalf of the Administration. This bill would place destructive devices within the framework of the National Firearms Act of 1934. This act presently regulates machine guns, other fully automatic weapons, and sawed-off rifles and shotguns by providing a system of federal registration and heavy transfer taxes ($200) on each sale or transfer. Subsequently, Senator Hruska also introduced amendments to the National Act in the 89th Congress; S. 3878. This bill was similar to S. 1591, but it was somewhat stronger in several provisions. For example, the penalty provisions were substantially increased to provide maximum penalties of up to 10 years imprisonment and $10,000 fine.

In the 90th Congress Senator Hruska introduced S. 1854, a measure identical to his previous National Act bill. All three measures, S. 1591, S. 3787, and S. 1854 have received strong public endorsement and support from interested sporting groups, including the National Rifle Association, the National Shooting Sports Foundation, the National Wildlife Federation, the Wildlife Management Institute, and others.

For unexplained reasons, S. 1591 was not reintroduced in the 90th Congress. Instead, Senator Dodd introduced, on behalf of the Administration, a highly controversial and strongly objectionable feature of S. 1, Amendment 90 (which is incorporated into Title IV) which would control destructive devices by requiring prior approval of local police in the form of a sworn statement before a person could purchase one of these weapons. First, it must be questioned whether or not the federal government can constitutionally impose a duty on a state or local official to perform an affirmative act, such as the execution of a sworn statement. Yet this is what the provision apparently requires. In response, it may be argued that there is no burden to act imposed on the law enforcement official, but that the burden is placed only on dealers and purchasers who must obtain the statements. This may be technically correct, but the practical effect is to place a burden on the local police.

However, the provision is strongly objectionable, since there is no requirement that an officer act upon the request for the required statement, nor is there any appeal procedure even if he does respond.

Even more objectionable is the imposition of the requirement of prior approval by a law enforcement officer before a firearm of any kind could be obtained. Although this provision applies only to destructive devices, it could be a precedent for further legislation in the future which would have more general application.

The affidavit procedure of our amendment has been criticized by supporters of President Johnson's bill as being too burdensome on local police. Apparently they overlook the burdens which the Title IV means of regulation places on police. Explosives are included in the definition of "destructive device". Thus, every sale of dynamite, gunpowder for reloading use and even fireworks could need police clearance.

All kinds of "rockets" are included in this scheme, from ICBMs if manufactured for use by foreign governments to model rockets

built under the sanction of the National Association of Rocketry. Talk about burdens on police!

## IMPORTS

In the new Section 925(d) of Title IV, severe restrictions are placed on the importation of firearms. In the case of destructive devices, National Act weapons, and military surplus handguns, there are total prohibitions. In the case of military surplus longguns and other commercially manufactured firearms, they are importable only if they are generally recognized as "particularly suitable for or readily adaptable to sporting purposes."

Under existing law (Section 414 of the Mutual Security Act of 1954) the Department of State presently grants import licenses for all firearms and other implements of war. Since 1965, the Department has not issued import licenses for destructive devices. Under the provisions of the Hruska amendments, imports are treated the same as any other firearms.

For more than a decade, the New England firearms manufacturers have been engaged in various attempts to restrict or eliminate competition from foreign sources. In the past several years, however, with imports of military surplus on the decline and many of the manufacturers obtaining firearms from foreign subsidiaries, interest by the industry in banning imports or restricting them has somewhat waned. However, since President Kennedy was assassinated with a military surplus weapon, repeated attempts have been made to justify embargoes because this particular type of weapon was used in the commission of the heinous crime.

Domestic gun control legislation is no place to attempt to impose protectionist views on foreign trade policy. More importantly, the standard imposed for allowing imports would arm the Secretary of the Treasury with broad discretionary powers, but would be virtually meaningless.

One of the most important law enforcement problems is the so-called starter pistol or "Saturday night special." These are small caliber handguns, usually of foreign commercial manufacture, that sell for a few dollars on the retail market. They are generally made of pot metal or other inferior materials. Their legitimate use is for firing blank cartridges to "start" races at track meets and other athletic contests. They are widely used by juveniles and others in the commission of crimes according to the testimony presented to the committee. It is also noted that there are domestic manufacturers of similar items which sell at competitive prices to the foreign imports.

Assuming that it could somehow be found that the starter pistols were not being brought into this country for lawful sporting purposes (track meets and other contests), still the market would be supplied by domestic sources. The proper way to deal with this problem is the imposition of the affidavit requirement for mail-order sales and over-the-counter sales to out-of-state residents. It is probable that the "red tape," inherent delay, and notification of local police would be sufficient restraints to minimize and control the problem.

## REPEAL OF THE FEDERAL FIREARMS ACT

One of the more objectionable features of Title IV is the fact that the Federal Firearms Act of 1938 is repealed and replaced by

a new chapter in the Federal Criminal Code, Title 18. This provision of Title IV is in keeping with the approach of S. 1—Amendment 90 and its companion House bill, H.R. 5384. Prior bills dealing with the Federal Firearms Act introduced by Senator Dodd for himself and on behalf of the Administration amended the Federal Firearms Act rather than repealed it. (S. 1975 of the 88th Congress, S. 14 and S.1592 of the 89th Congress, and S. 1 of the 90th Congress as introduced.) Also, Senator Hruska's bills of the 89th and 90th Congresses took a similar approach.

The statutory transposition has met with very stiff opposition. Strong objections were raised to placement of the regulation of legitimate firearms commerce in the Criminal Code. Second, since the new act would continue to be administered by the Secretary of the Treasury rather than the Attorney General, no advantage could be gained from the shift from Title 15 to Title 18. Most important, however, is the fact that there are sound legal reasons why the shift should not be made. Title IV contains provisions which replace many provisions of the Federal Act, some of which have been previously subjected to court scrutiny and have been upheld. Why risk the abandonment of decisional precedents that have been built up through the years under existing law?

Even more crucial, however, is the fact that the measure as reported from committee apparently would leave a six-months transition period in which existing federal law would be repealed but the new law would not be in effect. Section 406 provides:

> The Federal Firearms Act (52 Stat. 1250; 15 U.S.C. 901–910), as amended, is repealed.

Yet Section 407 provides:

> The amendments made by this Title shall become effective one hundred and eighty days after the date of its enactment; except that repeal of the Federal Firearms Act shall not in itself terminate any valid license issued pursuant to that Act and any such license shall be deemed valid until it shall expire according to its terms unless it be sooner revoked or terminated pursuant to applicable provisions of law.

In short, the new law would not become effective for six months, even though the existing law would be repealed immediately. However, licenses issued under the old law would continue to be valid despite the fact that the there was no longer any law imposing duties upon the licencees. If interpreted literally, a ludicrous situation would obtain.

### FINDINGS AND DECLARATION

If there were no other aspects of title IV that are objectionable to legitimate gun owners—and there are many—Section 901(a) alone would ensure their violent opposition to this bill.

The "Findings and Declaration," was added to S. 1592 in the 89th Congress and carried forward into the present bill.

There appears to be no legislative need or justification for such a section. The nature of this tirade—no other word does it justice—can be inferred from the repetition three times in the first paragraph of the word "traffic," with all of its noxious connotations.

The 9 paragraphs of subsection (a) are replete with highly colored expressions of opinion and one-sided half-truths.

Paragraph (2) asserts as fact that accessibility of firearms "is a significant factor in the prevalence of lawlessness." Paragraph (6) avers that "there is a causal relationship between the easy availability of firearms and . . . criminal behavior." Primitive peoples and children have been known to ascribe their misdeeds to inanimate objects. The FBI Uniform Crime Reports lists many factors that promote crime; availability of firearms is not on the list. The 1966 list includes:

### Crime Factors

Uniform Crime Reports give a nationwide view of crime based on police statistics made possible by the voluntary cooperation of local law enforcement agencies. Since the factors which cause crime are many and vary from place to place, readers are cautioned against drawing conclusions from direct comparisons of crime figures between individual communities without first considering the factors involved. The national material summarized in this publication should be used, however, as a starting point to determine deviations of individual cities from the national averages.

Crime is a social problem and the concern of the entire community. The law enforcement effort is limited to factors within its control. Some of the conditions which will affect the amount and type of crime that occurs from place to place are briefly outlined below:

Density and size of the community population and the metropolitan area of which it is a part.

Composition of the population with reference particularly to age, sex and race.

Economic status and mores of the population.

Relative stability of population, including commuters, seasonal, and other transient types.

Climate, including seasonal weather conditions.

Educational, recreational, and religious characteristics.

Effective strength of the police force.

Standards governing appointments to the police force.

Policies of the prosecuting officials and the courts.

Attitude of the public toward law enforcement problems.

The administrative and investigative efficiency of the local law enforcement agency, including the degree of adherence to crime reporting standards.

Paragraph (3), ironically enough in a measure titled the "State Firearms Control *Assistance*," proposes "Federal control * * * over all persons engaging in the business of * * * dealing in firearms." In other words, assist the States by taking firearms control out of their hands.

Paragraphs (4) and (5) appear to advocate the complete Balkanization, as far as firearms are concerned, of the United States into 50 principalities. It ignores the possibility of regulating interstate sales in favor of their outright prohibition.

Paragraph (7) lumps together surplus military weapons and "inexpensive pistols and revolvers" as "contributing greatly to lawlessness."

There is no statistical evidence of this regarding surplus rifles and, while cheap handguns (including those of domestic and foreign sources of manufacture) are involved in a major portion of the unlawful uses of firearms, they can hardly be said to *cause* lawlessness, for the reasons noted above.

Paragraph (8) perpetuates the fiction that there is a connection between destructive devices (such as bazookas, mortars, antitank guns, etc.) and firearms normally used by sportsmen. Strict control of "destructive devices" is long overdue, but this has been properly accomplished for imports under the Mutual Security Act of 1954. This action should be complimented by amendment to the National Firearms Act.

Paragraph (9) constitutes an admission that the present Federal Firearms Act is not being enforced adequately. While the need for higher license fees is not questioned, it certainly is no excuse for non-enforcement of existing law.

Subsection (b) is evidently intended as a sop to legitimate gun owners. It recognizes the possession of firearms for "personal protection, or any other lawful activity" even though this premise is denied in the provisions of the bill that regulate importation of firearms.

Taken as a whole, the "Findings and Declaration" is an unnecessary irritant that makes an objectionable bill even more unpalatable to legitimate gun owners.

## Major Provisions of Amendment 708

### Part A—Federal Firearms Act Amendments

1. The act of a manufacturer or dealer shipping any firearm (including rifles and shotguns) in interstate commerce to any person in any State or locality where the receipt of the firearm by such person would violate any statute or published ordinance of that State is prohibited.

2. No manufacturer or dealer may ship any handgun in interstate or foreign commerce to any person, except a licensed manufacturer or dealer, unless that person submits to the shipper a sworn statement that he

   (a) is at least 21 years of age;

   (b) is not prohibited by Federal or State law or local ordinance from receiving or possessing the handgun;

   (c) discloses the title, true name and address of the principal law enforcement officer of the locality to which the handgun will be shipped.

If a purchase permit or license is required, a true copy must be attached to the sworn statement. Prior to the shipment of a handgun under provisions of the act, the manufacturer or dealer must forward a copy of the customer's sworn statement by registered or certified mail (return receipt requested) to the law enforcement officer named in the statement containing a full description (excluding serial number) of the handgun to be shipped, and must receive a return receipt evidencing delivery of the letter, or notice that the law enforcement officer has refused to accept the letter. A dealer then must delay delivery to the purchaser for 7 days after he has received the return receipt or notice of refusal.

3. The act of transporting into or receiving a firearm by a resident of any State from outside the State if it were unlawful for him to purchase or possess a firearm in his own State or locality is prohibited.

4. The act of knowingly making a false statement, furnishing false or deceiving identification to any licensed dealer or manufacturer for the purpose of obtaining a firearm in prohibited.

5. No carrier in interstate or foreign commerce may deliver any handgun to any person under 21 years of age or a long gun to any person under 18.

6. No manufacturer or dealer may sell a handgun over-the-counter to out-of-state residents unless a sworn statement is submitted by the prospective recipient containing the same information required of the mail-order purchaser.

7. A person must be at least 21 years of age to obtain a Federal firearms license as dealer, manufacturer, or pawnbroker. The applicant must not be prohibited from receiving a firearm by the provisions of the act. The applicant must not have failed to disclose any material fact or made false statements in connection with the application. He must not have willfully violated any provisions of the act.

8. The fee for a manufacturer's or pawnbroker's license shall be $50 a year; for a dealer's license $25 for the first year and $10 for each renewal year.

9. The existing penalty provisions of the Federal Firearms Act (a maximum fine of $5,000 and a maximum term of imprisonment of 2 years) are increased to maximums of $10,000 and 10 years, but all sentenced offenders are made eligible for parole as the U.S. Board of Parole may determine.

### PART B—NATIONAL FIREARMS ACT AMENDMENTS

1. The Act is amended to include "destructive devices" within the scope of those weapons which must be registered and upon which a $200.00 transfer tax is imposed.

2. "Destructive devices" are defined to include bombs, grenades, rockets and weapons having a bore of more than 0.78 inches in diameter.

    a. Specifically excluded are rifles, shotguns, signaling and line-throwing devices, black powder firearms, firearms provided by the National Board for the promotion of Rifle Practice, and other weapons not likely to be used as destructive devices.

3. The definition of "machinegun" is amended to include frames, receivers, and sets of parts which will convert a weapon into a machine-gun, as well as weapons which can be readily restored to shoot as machineguns.

4. The definitions of rifle and shotgun are amended to include any such weapons that can be restored to firing condition.

5. Firearms without serial numbers may be required to be identified as prescribed by the Secretary.

6. The second sentence of the registration provision (§ 5841) is stricken and new language added to overcome that section's unconstitutionality as recently proscribed by the Supreme Court.

7. Persons under 21 may not possess "National Act" weapons.

8. A copy of the transfer application for a "National Act" weapon must be sent to the purchaser's local chief of police.

9. The penalty provision is increased from a maximum of $2,000 and 5 years to $10,000 and 10 years.

*Statistics on firearms used in crimes*

Federal Bureau of Investigation statistics delineate the handgun as the firearms problem.

The 1965 FBI Uniform Crime Reports state that 59 percent of the willful killings during that year were committed with firearms. Thus, out of a total of 10,920 such killings, firearms were used in 6,476 cases. Writing to Senator Roman L. Hruska on July 27, 1966, FBI Director J. Edgar Hoover supplemented the Reports. Indicating that handguns were used in 70 percent of the murders committed with firearms, the Director stated:

> Based on the submission of police reports under the uniform crime reporting program, 70 percent of the murder by gun in this country is committed with a handgun, 20 percent by the use of a shotgun, and 10 percent with a rifle or other firearm. This will supplement the data available to you in Uniform Crime Reports—1965.

In regard to aggravated assaults, approximately 19 percent of the total (231,800) were committed with firearms. However, Mr. Hoover advised that,

> There is no available breakdown of the type of firearms used in these attacks.

In 1966, there were 153,420 robberies. Of this figure, 39 percent, or about 59,680, were armed robberies committed with firearms. In regard to this category, Mr. Hoover stated in the above-mentioned letter:

> Although we do not make a regular collection of the type of weapon used in armed robbery, from special surveys in the past we have determined about two-thirds are firearms and most of these the handgun.

From these statistics, as well as the treatment accorded handguns by State and city statutes and ordinances, it is quite clear that the principal offender in the unlawful use of firearms is the handgun.

The Federal Bureau of Investigation Uniform Crime Reports show that the number of serious crimes reported in the United States for 1966 came to a total of approximately 3,243,370.

In crimes of violence, statistics showing use of firearms in their commission are available in only three classes; willful killings, aggravated assaults, and robbery. The total of crimes of these 3 classes in 1966 was 396,140.

It becomes very pertinent to inquire how many of those 396,140 crimes of violence were committed with firearms. The answer for the uninitiated is rather spectacular—only one in every four. Firearms were used in about 109,000 of this number. This means about a 27-percent use of firearms in these crimes of violence.

TABLE 1.—RELATIONSHIP OF FIREARMS [1] TO OTHER WEAPONS USED IN THE COMMISSION OF SERIOUS CRIMES, 1966

| | Percent of weapons used | Total crimes committed | Crimes in which firearms were used |
|---|---|---|---|
| Homicide (willful killings) | | 10,920 | |
| Firearms | 59.3 | | 6,476 |
| Knives or cutting instruments | 22.3 | | |
| Personal weapon (hands, feet, etc.) | 9.4 | | |
| Blunt objects | 5.4 | | |
| Miscellaneous | 3.6 | | |
| Aggravated assault | | 231,800 | |
| Knives or cutting instruments | 33.6 | | |
| Blunt objects | 22.3 | | |
| Personal weapons (hands, feet, etc.) | 25.3 | | |
| Firearms | 18.8 | | 43,578 |
| Robbery | | 153,420 | |
| Armed with— | | | |
| Firearms | 38.9 | 59,680 | |
| Other weapons | 19.4 | | |
| Strong arm (muggings) | 41.7 | | |
| Forcible rape | | 25,330 | |
| Burglary | | 1,370,300 | |
| Larceny ($50 and over) | | 894,600 | |
| Auto theft | | 557,000 | |
| Total | [1] 3.4 | 3,243,370 | 109,734 |

[1] Firearms including the so-called gangster weapons as so classified under the National Firearms Act of 1934, "zip" guns, toy guns, alleged guns, pistols and revolvers, and rifles and shotguns.

Source: FBI Uniform Crime Report, 1966, pp. 4, 9, 15, and 107 and supplemental letters from the Director of the FBI.

### THE PRINCIPAL PROBLEM: HANDGUNS

The handgun as the most formidable and most frequently used tool of the criminal is well recognized and established by first, the existence in many States of laws controlling it; and, second, by statistics showing its dominance as the weapon used in unlawful activities.

*State control of handguns*

While 2 States require an identification card for the purchase of a rifle or shotgun and 22 States prohibit the carrying of a loaded rifle or shotgun in a moving vehicle, compare the much greater extent of control over handguns by the States. These controls are of two classes—the positive and the negative. In those States with positive handgun controls:

Twenty-three States require a license to sell at retail.

Twenty-nine States require a license to carry a handgun on or about the person.

Eight States require a permit or its equivalent to purchase a handgun.

Ten States prescribe a waiting period between purchase and delivery of a handgun.

Eighteen States require a license to carry a handgun in a vehicle.
As to States with negative controls:

Twenty-one States prohibit the carrying of a handgun concealed on the person.

Four States require registration of handguns.

Twenty-two States prohibit carrying a loaded handgun—and in some instances other firearms—in a vehicle.

In addition, many municipalities have similar ordinances.
The lawmakers of each State are best able to determine the conditions and needs within their own borders and to pass appropriate legislation in regard to the use of handguns. Thus, we have drafted

legislation which would give State and local officials notice of the flow of handguns into their jurisdictions to enable them to enforce applicable local laws.

### ENFORCEMENT OF EXISTING FEDERAL LAW

Experience and testimony indicate that the operation of the Federal Firearms Act over the years has demonstrated certain weaknesses which call for correction. The object is to remove these weaknesses in the interest of more effective and efficient law enforcement.

Many of the problems which some persons ascribe to the present Federal firearms statutes are, in reality, not the fault of the law itself but a result of the yet unsolved problem of uniform and effective administration of the criminal law. This problem has several factors, not the least of which are overworked and understaffed enforcement agencies and similarly overworked, but frequently too lenient, prosecutors and courts. The record shows that indictments and convictions under the existing Federal firearms statutes have been relatively few, and the comparative rarity of successful action in the courts by the Federal Government have contributed to a compounding of the problems of reasonable and effective firearms regulation.

An indictment handed down by a Federal grand jury in the Southern District of New York against a firearms dealer is demonstrative of the rarity of prosecutions under the Federal Firearms Act of 1938. Section 2(c) of the Act declares it unlawful for a dealer to ship a firearm in interstate commerce to any person in any state where the laws require that a license be obtained for the purchase of such firearms, unless such license is exhibited to the dealer. As testified to by police officials before the Committee, mail-order shipments of firearms made by a few unscrupulous dealers constitute a real problem for local law enforcement officials. Despite evidence of long-term continued violations of the Act, the New York grand jury indictment is held to be the first Federal prosecution, in the 34-year history of the Act, of a dealer for unlawful interstate shipment of firearms. This is an encouraging, yet woefully tardy, utilization of existing firearms controls.

Similarly, in a number of instances, the public authorities are not fully utilizing the other tools, available to them at present under Federal law. Testimony has been presented that a State conservation agency, in the course of apprehending individuals in violation of game laws or in routine checking, has had occasion to turn over to Federal enforcement personnel weapons in violation of the National Firearms Act. To its knowledge, this conservation agency has never heard of a Federal prosecution resulting from those seizures. Further, testimony before the committee has brought out that in a number of instances Federal agents have apprehended individuals in serious violation of various provisions of the Federal firearms laws but that no action has resulted from the arrest of these individuals. This is a matter of concern to us and ought to be considered in evaluating the desirability and necessity for additional firearms controls.

A police official of a large American city testified before the committee that in the first 6 months of 1965, police officers "stopped and searched and found 256 persons carrying, in most instances, handguns. The arrested persons were charged with carrying a concealed weapon and warrants were applied for in all these cases. However, due to frailties in the law, only 81 warrants were issued."

We are fully aware that the foregoing examples could be amplified many times. If this be the case, and the evidence points in that direction, then we believe that the solution to the problem of firearms in crime lies not in highly restrictive legislative controls but in the understanding and proper handling of all operative factors in the field of crime and criminal administration.

As detailed earlier in this report, specific needs for amendment of the Federal Firearms Act have been demonstrated in the hearings before the committee. S. 1853 addresses itself to these problems which must be resolved. Yet, it avoids any undue restrictions upon the legitimate, proper, and beneficial use of firearms, for when taken in the entire context and on balance, the place and role of privately owned and used firearms are necessary and wholesome; a position they have always held in the history of this Nation. Their legitimate role should be maintained.

Any legislation intended to deal with those who unlawfully use firearms must be made to concentrate on them as effectively as possible without unnecessarily encroaching upon the vast preponderance of the public who use firearms in a lawful and beneficial manner.

In seeking to protect the constitutionally guaranteed right of our citizenry to keep and bear arms for lawful purposes, we have considered a factor in our society of no mean proportion. Best estimates indicate that there are, within the United States, over 100 million privately owned firearms in the possession of over 20 million citizens.

We must consider the hundreds of thousands of shooters who enter into formal rifle, pistol, and shotgun competitive shooting, and the millions who use these same types of firearms for informal skeet, trap, and target shooting. Not only does this use of firearms provide a healthy recreational activity, but it provides, as a valuable national asset, a great number of young men who are, prior to their entering our Armed Forces, familiar with firearms and skilled in their use. In Vietnam, as in every armed conflict, it is evident that, in spite of spectacular advances in weaponry systems, we are still faced with a need for skilled riflemen capable of aimed fire. The plain fact that preinduction firearms training produces more capable and effective soldiers was made clear by a 1965 Department of Defense study.

The study, which was conducted for the Department of the Army by the Arthur D. Little, Inc., a private industrial and management research firm, undertook to review completely the Army's civilian marksmanship program conducted by the National Board for the promotion of Rifle Practice.

A brief summary of the findings of that evaluation follows:

> The results of our study indicate that the civilian marksmanship program * * * contributes significantly to the development of rifle marksmanship proficiency and confidence in the ability to use a rifle effectively in combat on the part of those who participate in the program or benefit indirectly from it.

> We believe that those aspects of the DCM program which relate to the broader interest and participation in rifle shooting among the youth of our country (primarily club activities)

should be emphasized more and pursued even more effectively to reach a greater percentage of those young men likely to enter military service.

This study indicates clearly that a continuation and implementation of the program is necessary for the defense of our country.

We are cognizant of the many collectors of legitimate firearms of all types; the students of firearms history and development who are just as serious about their respectable hobby as those who collect stamps, automobiles, or works of art.

While in no way advocating that individuals take the law into their own hands, we are aware that there are millions of homes where firearms have a proper place for self-protection.

Finally, we seek legislation which would not unnecessarily restrict the activities of the more than 15 million hunters in this country. Hunting provides a healthy outdoor recreation which can be enjoyed throughout the lifetime of an active adult. This activity is an effective instrument of wildlife management utilized by Federal and State wildlife managers. In addition, these sportsmen fund, in large part, Government programs of wildlife management through the purchase of hunting licenses, and through the allocated Federal excise taxes paid upon the sales of sporting arms and ammunition.

Furthermore, the recent report by the U.S. Department of the Interior, Bureau of Sport Fisheries and Wildlife, is noteworthy. Its 1965 National Survey of Fishing and Hunting revealed that during this period, 13,583,000 hunters spent a total of $1,121,135,000 in pursuit of their sports. They took 169,377,000 trips in spending 185,819,000 recreation days afield. They traveled 8,659,034,000 passenger miles, principally by auto, to reach and return from hunting areas. Collectively and individually, hunting supports a significant portion of the economy.

The lawful and legitimate use of firearms by our citizenry is a widespread and worthwhile activity which must not be unnecessarily impaired. We believe that S. 1853 preserves the freedom of activity for these more than 40 million lawful firearms users while effectively confronting the infinitesimal fraction of this number which represents those who use firearms in an antisocial manner.

### DESTRUCTIVE DEVICES

During the 1965 Senate firearms hearings, much attention was devoted to the so-called destructive devices—rockets, mortars, bazookas, grenades, mines, bombs, missiles, field artillery and the like. Imports of such military hardware were featured at the hearings as a major reason for authorizing an embargo on military surplus of all kinds and other categories of firearms.

While these devices do not appear to be used significantly in the commission of serious crime, it was not contended by any of the sportsmen's groups whose representatives testified in opposition to S. 1592 that there were legitimate sporting uses for them.

One of the larger importers of firearms recommended that import licenses be denied such military ordnance under section 414 of the Mutual Security Act, as amended. The Munitions Control Office of the State Department advised that it has not allowed permits imports of this type since 1965.

Serious objections were raised to the inclusion in the Federal Firearms Act of prohibitions designed to take this or any other category of firearms out of commerce. This law was enacted primarily for the regulation of commerce in firearms generally used for sporting purposes—rifles, shotguns, and handguns. The National Firearms Act of 1934 (ch. 53 of the Internal Revenue Code of 1954) has long been the vehicle for removing from commerce weapons which are peculiarly susceptible to criminal use and not generally used for recreation.

This act provides for the registration and prohibitory taxes on the transfer of automatic weapons such as machineguns and sawed-off rifles and shotguns. Also included are firearms mufflers and silencers. The National Firearms Act appears to have regulated effectively so-called gangster-type weapons in the years since its enactment. Persuasive testimony at the hearings brought out the advantages of preserving the essential difference between the two acts. Obviously, it would be more effective to restruct commerce in all destructive devices, not merely imports, and to subject all prohibited weapons to the same enforcement and regulatory machinery.

### IMPORTS

We have given a good deal of consideration to the question of whether the Federal Firearms Act should be amended to authorize the Secretary of the Treasury to place embargoes on certain categories of imported firearms and special restrictions on others. We have concluded that needed firearms regulation will be adequately accomplished through regulation of domestic commerce in firearms and that no clear basis has been established to defined types of firearms which particularly aggravated the crime problem and which are not also readily available from domestic sources. We feel strongly that discriminatory treatment of commerce and interference with consumer preference without a clear showing of overriding necessity should be avoided.

The idea of an embargo on imports, which has recurred in most of the firearms bills sponsored by Senator Dodd, has been largely publicized and justified by the commerce in heavy military surplus ordnance; that is, "destructive devices."

For example considerable attention was attracted at the hearings to the rather shocking idea that anyone can buy a bazooka, antitank gun, or other high-caliber military ordnance. Taking destructive devices out of commerce is no justification whatsoever for an embargo on imports because (a) imports of these devices have already been cut off by the State Department under existing law, and (b) the need is for restrictions which reach destructive devices already in the United States. Amendments to the National Firearms Act to include destructive devices will far more effectively accomplish the desired objective.

The proposed import restrictions of title IV would give the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes. If this authority means anything, it permits Federal officials to differ with the judgment of sportsmen expressed through consumer preference in the marketplace. Substantial imports would not exist in the absence

of important consumer preference. We are not prepared to make the unlikely assumption without evidence that substantial markets for imported products are composed of irresponsible or criminal citizens. No justifiable criteria have been proposed for the Secretary of the Treasury to discriminate between various categories of imported firearms; on the contrary, the statements of the proponents of embargoes would encourage the Secretary to use this broad discretion to curtail the availability of firearms in general within the practical limitations of domestic politics. The fact that Treasury witnesses expressed no sensitivity to this problem further suggests the need for caution.

The hearings failed to establish inherent differences, which might bear on criminal use, between military and sporting small arms or between firearms manufactured abroad or in the United States. Despite a general tendency toward lower prices for imports and military surplus, the hearings revealed a considerable overlap with the retail prices of equally lethal domestic sporting firearms.

The conclusion is inescapable that the purpose of proposing any embargo would be twofold: (a) remove lower cost firearms from the market, and (b) discriminate against imports because they are politically vulnerable and might enlist the support of competing domestic manufacturers. We reject the discriminatory implications of both justifications in a bill designed to meet the problem of crime in the United States. It is both impractical and unfair to legislate against low prices. Where should the line be drawn? Why should low-income sportsmen, frequently farmers and other country people to whom hunting is most important, bear the burden of Federal intervention in the marketplace?

The device of an embargo on international trade raises complex questions with regard to U.S. treaty obligations. It could prejudice the future bargaining positions of our country if we oppose the misuse by other countries of public safety justifications for otherwise unacceptable protectionist moves. Import restrictions considered by the committee would require the Treasury Department to overlap a State Department import licensing system authorized by section 414 of the Mutual Security Act, as amended, which is working well and makes full use of the overseas investigatory facilities of the State Department. Such duplication would waste Government man-hours and unduly burden those affected by the overlapping regulation; no necessity for this inherently undesirable approach has been demonstrated.

For these reasons, it seemed plain to us that the foreign source of a firearm is no basis to outlaw it because, like a similar domestic firearm, it might be used in a crime. If nondiscriminatory restrictions on mail-order distribution and firearms dealers are adequate methods of firearms control for domestic products, they are adequate for imports. To declare an import somehow more evil than its comparable domestic product is not only illogical, but it would be misunderstood by many as inspired by the collateral purpose of protecting American industry from foreign competition. Any such misunderstanding must be avoided.

## THE SECOND AMENDMENT

One of the great pillars upon which the constitutional framework of this Nation rests is the second amendment to the Constitution. This amendment reads:

A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed.

There are two highly significant aspects about this provision of our Bill of Rights. The first is a specific command of the language: "* * * right of the people to keep and bear arms shall not be infringed." The second is the place the amendment occupies: it comes immediately after the amendment respecting religion, free speech, free press, peaceable assembly and petition for redress of grievances. The position of the second amendment certainly indicates its preferred status in the constitutional scheme.

The Attorney General presented no testimony on the second amendment in the 1967 Senate hearings on S. 1 and S. 1853. However, he did submit a memorandum on this amendment in the House hearings. This memorandum was similar to that submitted by the Department of Justice in the 1965 hearings on the various firearms bills.

In essence, the position of the Department of Justice with respect to the second amendment may be stated as follows: (1) that the amendment applies only to the organized militia; (2) that individual rights were not contemplated at the time of adoption of the amendment; and (3) that a ban on interstate sale of firearms to individuals is not objectionable as an infringement on the right of the people to keep and bear arms because there would still be intrastate commerce in these items.

The following paragraphs will treat of the individual and collective aspects of the right affirmed by the second amendment. As to the question of regulation within the area of a right, we do not dispute the proper exercise of the regulatory power; but we do contend that any law which regulates to the point of practical negation of a right is fundamentally wrong and cannot be justified either in the theoretical or operative realms.

There have been only four Supreme Court decisions involving the second amendment. These decisions do not give a view of the application of the Bill of Rights presently in favor. Three of the four cases—*United States* v. *Cruikshank*, 92 U.S. 542 (1875), *Presser* v. *Illinois*, 116 U.S. 252 (1886) and *Miller* v. *Texas*, 153 U.S. 535—hold that the second amendment operates as a limitation on the Federal Government and not on the States. It hardly need be said that this view does not prevail today. In recent years, the trend of Supreme Courts decisions has been toward making specific provisions of the Bill of Rights applicable to the States through the 14th amendment. In point of fact, the rights of the first eight amendments have been applied to the State in a series of cases, such as the *Mapp* case in 1961 on search and seizure, the *Gideon* case in 1963 on the right to counsel in all criminal cases, and the *Malloy* case in 1964 on the right against compulsory self-incrimination. The Supreme Court has carried the applicablity principal even further. In 1965, the Court held in the *Griswald* case that a State statute which conflicted with the right of privacy, a right not specifically mentioned in the Bill of Rights, was

258

unconstitutional. To be sure, if the right of privacy can be made applicable to the States, the mandate of the second amendment could—and should—also apply.

Some historical arguments can be offered for the thesis that the second amendment guarantee is both an individual and collective right. The constitutions of several States prior to the adoption of the Federal Constitution contain provisions declaring that every citizen has a right to bear arms in defense of himself and the State. If the State constitutions were so explicit in this respect, those States surely would not have accepted the wording of the second amendment had it at the time been intended to be more limited than their own. Therefore, it would appear that the second amendment guaranteed an already existing right in the people to possess and use firearms individually and collectively for defense of person, property, and the Commonwealth. Moreoever, it is common knowledge that ratification of the U.S. Constitution depended upon the basic assurance of the safeguarding of individual rights.

In his commentaries. Blackstone has this to say on the absolute rights of individuals:

> * * * to vindicate these rights (i.e., "the liberties of English-men"), when actually violated or attacked, the subjects of England are entitled, in the first place, to the regular administration and free course of justice in the courts of law; next to the right of petitioning the King and Parliament for redress of grievances; and lastly to the right of having and using arms for self-preservation and defense.

Justice Story wrote in 1833 in his commentaries on the Constitution of the United States:

> The right of the citizen to keep and bear arms has justly been considered, as the palladium of the liberties of the Republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.

Justice William O. Douglas in speaking of the erosion of the Constitution by the courts said in a lecture on the Bill of Rights at New York University in 1963 that "the courts have diluted the specific demands of the Constitution." He commented further that "the closest the framers came to the affirmative side of liberty was in 'the right of the people to bear arms'. Yet this too has been greatly modified by judicial construction."

Justice Hugo Black in his discussion of the 1939 case of *United States* v. *Miller* (307 U.S. 174) in the New York University Law Review (1960) said: "Although the Supreme Court has held this amendment (i.e., the second amendment) to include only arms necessary to a well-regulated militia, as so construed, 'its prohibition is absolute'."

One of our great Presidents, Woodrow Wilson, is reported to have said: "We must depend in every time of national peril, in the future as in the past, not upon a standing army, nor yet upon a reserve army, but upon a citzenry trained and accustomed to arms . . . and this, also not because the time or occasion specially call for such measure,

but because it should be a constant policy to make these provisions for our national peace and safety.''

Justice William J. Brennan, Jr., stated in a lecture on ''The Bill of Rights and the States'' at the New York University School of Law in 1962: ''The constitutions of the original States anticipated the National Constitution in declaring the doctrine that there are human liberties which are inalienable. This doctrine has ever since been the center and core of the American idea of limited government. The government of each State was a creation of the people of the States; the source of power was the people of that State. The only end and aim of government was to secure the people in their natural and civil rights.'' We know and recognize, of course, that natural rights are concomitant with man's existence while civil rights derive from a person's membership in society. Hence, natural rights exist whether or not guaranteed by written or unwritten constitutions.

The Chief Justice of the United States, writing in a 1962 issue of the New York University Law Review, discussed the formulation and adoption of the Constitution. He drew attention to the safeguards to the people contained in it in these words:

> Despite these safeguards, the people were still troubled by the recollection of the conditions that prompted the charge of the Declaration of Independence that the King had ''effected to render the military independent and superior to the civil power.'' They were reluctant to ratify the Constitution without further assurances, and thus we find in the Bill of Rights amendments No. 2 and 3, specifically authorizing a decentralized militia, guaranteeing the right of the people to keep and bear arms, and prohibiting the quartering of troops in any house in time of peace without the consent of the owner.

Hence, at least two Supreme Court Justices would seem to take a somewhat differing view from that of the Attorney General.

In our view, the interpretation of the second amendment as applying only to the National Government and as encompassing only a collective right is not so well established as many would have us believe. There is substantial evidence to the contrary, and the foregoing touches upon certain points of this evidence.

Thomas Jefferson admonished his compatriots thus: ''Our peculiar security is in the possession of a written Constitution. Let us not make it a blank paper by construction.''

––––––

### Amendment 708

Intended to be proposed by Mr. HRUSKA to S. 917, a bill to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes, viz: On page 80, beginning with line 15, strike out through line 4 on page 107 and insert in lieu thereof the following:

260

## TITLE IV—FIREARMS AMENDMENTS

### Part A—Federal Firearms Act Amendments

Sec. 901. The first section of the Federal Firearms Act is amended to read:

"That as used in this Act—

"(1) The term 'person' includes an individual, partnership, association, or corporation.

"(2) The term 'State' includes each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, the Canal Zone, and American Samoa.

"(3) The term 'interstate or foreign commerce' means commerce between any State and any place outside thereof; or between points within the same State, but through any place outside thereof; or within any possession or the District of Columbia.

"(4) The term 'firearm', except when the context otherwise requires, means any weapon, manufactured after the year 1898, by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive or the frame or receiver of any such weapon.

"(5) The term 'handgun' means any pistol or revolver originally designed to be fired by the use of a single hand and which is designed to fire or capable of firing fixed cartridge ammunition, or any other firearm originally designed to be fired by the use of a single hand.

"(6) The term 'manufacturer' means any person engaged in the business of manufacturing or importing firearms for purposes of sale or distribution. The term 'licensed manufacturer' means any such person licensed under the provisions of this Act.

"(7) the term 'dealer' means any person engaged in the business of selling firearms at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting barrels, stocks, or trigger mechanisms to firearms, or any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.

"(8) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the repayment of money loaned thereon.

"(9) The term 'Secretary' means the Secretary of the Treasury or his designee.

"(10) The term 'indictment' includes an indictment or any information in any court of the United States or in any court of any State under which a crime of violence may be prosecuted.

"(11) The term 'fugitive from justice' means any person who has fled from any State to avoid prosecution for a crime of violence or to avoid giving testimony in any criminal proceeding.

"(12) The term 'published ordinance' means a published law of any political subdivision of a State which the Secretary of the Treasury determines to be relevant to the enforcement of this Act and which is contained on a list compiled by the Secretary of

the Treasury which list shall be published in the Federal Register, revised annually, and furnished to each licensee under this Act."

Sec. 902. Section 2 of the Federal Firearms Act is amended to read:

"(a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm in interstate or foreign commerce.

"(b) It shall be unlawful for any person to receive any firearm transported or shipped in interstate or foreign commerce in violation of subsection (a) of this section, knowing or having reasonable cause to believe such firearm to have been transported or shipped in violation of said subsection.

"(c) It shall be unlawful for any licensed manufacturer or licensed dealer to ship or transport, or cause to be shipped or transported, any firearm in interstate or foreign commerce, to any person in any State where the receipt or possession by such person of such firearm would be in violation of any statute of such State or of any published ordinance applicable in the locality in which such person resides unless the licensed manufacturer or licensed dealer establishes that he was unable to ascertain with reasonable effort that such receipt or possession would be in violation of such State law or such ordinance.

"(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm to any person knowing or having reasonable cause to believe that such person is under indictment for or has been convicted in any court of the United States or in any court of any State of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice.

"(e) It shall be unlawful for any person who is under indictment for or who has been convicted of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm.

"(f) It shall be unlawful for any person who is under indictment for or who has been convicted of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to receive any firearm which has been shipped or transported in interstate or foreign commerce.

"(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm, knowing, or having reasonable cause to believe, such firearm to have been stolen.

"(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or to pledge or accept as security for a loan any firearm moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe, such firearm to have been stolen.

"(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered.

"(j) It shall be unlawful for any manufacturer or dealer knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to

persons other than licensed manufacturers or licensed dealers, any package or other container in which there is any handgun without written notice to the carrier than such handgun is being transported or shipped.

"(k) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce any handgun to any person with knowledge or with reasonable cause to believe that such person is under twenty-one years of age or any firearm to any person with knowledge or with reasonable cause to believe that such person is under eighteen years of age.

"(i) It shall be unlawful for any licensed manufacturer or licensed dealer to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or licensed dealer unless:

"(1) such person has submitted to such manufacturer or dealer a sworn statement in the following form: 'Subject to penalties provided by law, I swear that I am 21 years or more of age; that I am not prohibited by the Federal Firearms Act from receiving a handgun in interstate or foreign commerce; and that my receipt of this handgun will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside. Further, the true title, name, and address of the principal law enforcement officer of the locality to which the handgun will be shipped are _____
Signature _____ Date _____,
and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance.

"(2) such manufacturer or dealer has, prior to the shipment of such handgun, forwarded by registered or certified mail (return receipt requested) to (A) the local law enforcement officer named in the sworn statement, or (B) the official designated by the Governor of the State concerned under this subsection, a description of the handgun to be shipped (including the manufacturer, the caliber, the model, and type of such handgun, but not including serial number identification), and one copy of the sworn statement, and has received a return receipt evidencing delivery of such letter, or such letter has been returned to such manufacturer or dealer due to the refusal of the named law enforcement officer or designated official to accept such letter in accordance with United States Post Office Department regulations; and

"(3) such manufacturer or dealer has delayed shipment for a period of at least seven days following receipt of the notification of the local law enforcement officer's or designated official's acceptance or refusal of such letter.

A copy of the sworn statement and a copy of the notification to the local law enforcement officer or designated official along with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 3(d). For purposes of paragraph (2)(B), the Governor of any State may designate any official in his State to receive such notification for such State or any part thereof in lieu of the notification required by paragraph 2(A) and shall notify the Secretary of the name, title, and

business address of such official and the Secretary shall publish in the Federal Register the name, title, and address of such official. Upon such publication, notification to the local law enforcement officers required under paragraph (2)(A) of this subsection will not be required for a period of five years from the date of such publication unless the request is withdrawn by the Governor of such State and such withdrawal is published in the Federal Register.

"(m) It shall be unlawful for any licensed manufacturer or licensed dealer to sell or deliver for sale any handgun to any person other than another licensed manufacturer or licensed dealer who is not a resident of the State in which such manufacturer's or dealer's place of business is located and in which the sale or delivery for sale is made, unless such manufacturer or dealer has, prior to sale, or delivery for sale of the handgun, complied with the provisions of subsection (1) of this section.

"(n) It shall be unlawful for any person in connection with the acquisition or attempted acquisition of a firearm from a licensed manufacturer or licensed dealer to—

"(1) knowingly make any false or fictitious statement, written or oral; or

"(2) knowingly furnish or exhibit any false, fictitious, or misrepresented identification with the intention to deceive such manufacturer or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed manufacturer or licensed dealer under the provisions of this section.

"(o) It shall be unlawful for any person to transport or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides."

Sec. 903. Section 3 of the Federal Firearms Act is amended to read:

"Sec. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms in interstate or foreign commerce shall file an application for such license with the Secretary, in such form and containing such information as the Secretary shall by regulation prescribe. Each such applicant shall be required to pay a fee for obtaining such license as follows:

"(1) If a manufacturer of firearms, a fee of $50 per annum;

"(2) If a dealer (other than a pawnbroker) in firearms, a fee of $10 per annum, except that for the first renewal following the effective date of the Federal Firearms Amendments of 1968 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25;

"(3) If a pawnbroker, a fee of $50 per annum.

"(b) Upon filing by a qualified applicant of a proper application and the payment of the prescribed fee, the Secretary shall issue to such applicant the license applied for, which shall, subject to the provisions of this Act, entitle the licensee to transport, ship, sell, and receive firearms in interstate or foreign commerce during the period stated in the license. No license shall be issued pursuant to this Act—

"(1) to any applicant who is under twenty-one years of age;

"(2) to any applicant, if the applicant (including, in the case of a corporation, partnership, or association, any individual who,

directly or indirectly, has the power to direct or cause the direction of the management and policies of the corporation partnership, or association) is prohibited by the provisions of this Act from transporting, shipping, selling, or receiving firearms in interstate or foreign commerce;

"(3) to any applicant who has willfully violated any of the provisions of this Act or regulations issued thereunder; or

"(4) to any applicant who has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application.

"(c) The provisions of section 2 (d), (e), and (f) of this Act shall not apply in the case of a licensed manufacturer or licensed dealer who is under indictment for a crime punishable by imprisonment for a term exceeding one year: *Provided,* That such manufacturer or dealer gives notice to the Secretary by registered or certified mail of his indictment within thirty days of the date of the indictment. A licensed manufacturer or licensed dealer who has given notice of his indictment to the Secretary, as provided in this subsection, may continue operation pursuant to his existing license during the term of such indictment, and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act, and operations pursuant to such license shall be discontinued.

"(d) Each licensed manufacturer and licensed dealer shall maintain such records of production, importation, notification, shipment, sale, and other disposal of firearms as the Secretary may by regulation prescribe."

Sec. 904. Section 4 of the Federal Firearms Act is amended to read:

"Sec. 4. (a) The provisions of this Act shall not apply with respect—

"(1) to the transportation, shipment, receipt, or importation of any firearms sold or shipped to, or issued for the use of (A) the United States or any department, independent establishment, or agency thereof; (B) any State or any department, independent establishment, agency, or any political subdivision thereof; (C) any duly commissioned officer or agent of the United States, a State or any political subdivision thereof; (D) any bank, common or contract carrier, express company, or armored-truck company organized and operating in good faith for the transportation of money and valuables, which is granted an exemption by the Secretary; or (E) any research laboratory designated as such by the Secretary; or

"(2) to the transportation, shipment, or receipt of antique or unserviceable firearms possessed and held as a curio or museum piece.

"(b) Nothing contained in this Act shall be construed to prevent shipments of firearms to institutions, organizations, or persons to whom firearms may be lawfully delivered by the Secretary of Defense or his designee, nor to prevent the receipt or transportation of such firearms by their lawful possessors while they are engaged in military training or in competitions."

Sec. 905. Section 5 of the Federal Firearms Act is amended to read:

"Sec. 5. (a) Any person violating any of the provisions of this Act or any rules and regulations promulgated hereunder, or who makes any statement in applying for the license or exemption provided for in this Act, knowing or having reasonable cause to know such state-

ment to be false, shall, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine.

"(b) Any firearm involved in any violation of the provisions of this Act or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 154 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5848(1) of said Code shall, so far as applicable, extend to seizures and forfeitures incurred under the provisions of this Act."

SEC. 906. The Federal Firearms Act is amended by adding at the end thereof the following new section:

"SEC. 11. Nothing in this Act shall be construed as modifying or affecting any provision of—

"(1) the National Firearms Act (chapter 53 of Internal Revenue Code of 1954); or

"(2) section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control)); or

"(3) section 1715 of title 18 of the United States Code (relating to nonmailable firearms)."

SEC. 907. The amendments made by this part shall become effective on the first day of the sixth month beginning after the date of enactment of this part.

SEC. 908. This part may be cited as the "Federal Firearms Amendments of 1968".

## PART B—NATIONAL FIREARMS ACT AMENDMENTS

SEC. 911. (a) Paragraph (1) of section 5848 of the Internal Revenue Code of 1954 is amended by inserting after "or a machinegun," the words "or a destructive device,".

(b) Paragraph (2) of section 5848 of the Intrnal Revenue Code of 1954 is amended by inserting after the words "or is designed to shoot," the words "or which can readily be restored to shoot," and by striking out the period at the end thereof and inserting after the word "trigger" the words ", and shall include (A) the frame or receiver of any such weapon, and (B) any combination of parts designed and intended for use in converting a weapon, other than a machinegun, into a machinegun".

(c) Section 5848 of the Internal Revenue Code of 1954 is amended by renumbering paragraphs (3), (4), (5), (6), (7), (8), (9), (10), and (11), as paragraphs (4), (5,) (6), (7), (8), (9), (10), (11), and (12), respectively, and by inserting after paragraph (2) a new paragraph (3) as follows:

"(3) The term 'destructive device' means (A) any explosive or incendiary (i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile, (v) mine, or (vi) similar device; (B) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive, the barrel or barrels of which have a bore of more than 0.78 inches in diameter; or (C) any combination of aprts designed and intended for use in converting any device into a destructive device. The term 'destructive device' shall not inlcude (i) any device which

is not designed or redesigned or used or intended for use as a weapon, (ii) any device, although originally designed as a weapon, which is redesigned for use or is used as a signaling, pyrotechnic, line throwing, safety, or similar device, (iii) any shotgun or rifle, (iv) any firearm designed for use with black powder, regardless of when manufactured, (v) surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10 of the United States Code, (vi) any device which the Secretary finds is used exclusively by the United States or any department or agency thereof, or (vii) any other device which the Secretary finds is not likely to be used as a weapon."

(d) Paragraph (4) of section 5848 of the Internal Revenue Code of 1954 (as renumbered) is amended by striking out the period at the end thereof and inserting the words ", and any such weapon which can readily be restored to firing condition."

(e) Paragraph (5) of section 5848 of the Internal Revenue Code of 1954 (as renumbered) is amended by striking out the period at the end thereof and inserting the words ", and any such weapon which can readily be restored to firing condition."

SEC. 912. Section 5803 of the Internal Revenue Code of 1954 is amended to read as follows:

## "SEC. 5803. EXEMPTIONS

"The tax imposed by section 5801 shall not apply to any importer, manufacturer, or dealer all of whose business as an importer, manufacturer, or dealer is conducted with, or on behalf of, the United States or any department, independent establishment, or agency thereof. The Secretary or his delegate may relieve any such importer, manufacturer, or dealer from compliance with any provision of this chapter with respect to the conducting of such business."

SEC. 913. (a) Section 5814 of the Internal Revenue Code of 1954 is amended by—

(1) striking out the word "duplicate" in the first sentence of subsection (a) and inserting in lieu thereof "triplicate";

(2) inserting before the period in the second sentence of subsection (a) thereof the following: "and the age of such applicant"; and

(3) striking out "a copy" in the first sentence of subsection (b), inserting in lieu thereof "one copy", and adding before the period in such sentence the following: "and one copy to the principal law enforcement officer of the locality wherein he resides".

(b) Subsection (e) of section 5821 of the Internal Revenue Code of 1954 is amended by—

(1) inserting before the period in the last sentence thereof the following: "and the age of such applicant"; and

(2) adding at the end thereof the following new sentence: "At the same time that the person making the declaration forwards the declaration to the Secretary or his delegate, he shall forward a copy thereof to the principal law enforcement officer of the locality wherein he resides."

(b) Section 5841 of the Internal Revenue Code of 1954 is further amended by adding at the end thereof the following: "No person required to register under the provisions of this chapter shall be prose-

cuted or subjected to any penalty for or on account of any matter or information contained in any declaration or other statement required pursuant to the provisions of this chapter, nor shall such information or matter be used as evidence in any criminal proceeding against him in any court, provided that no person shall be exempt under the provisions of this section from prosecution for any violation of the provisions of section 1001 of title 18 of the United States Code.''

(c) Section 5843 of the Internal Revenue Code of 1954 is amended by inserting at the end thereof the following sentence: "If a firearm (possessed by a person other than an importer or manufacturer) does not bear the identification required under this section, the possessor thereof shall identify the firearm with such number and other identificatiou marks as may be designated by the Secretary or his delegate, in a manner approved by the Secretary or his delegate.''

Sec. 914. (a) The second sentence of section 5841 of the Internal Revenue Code of 1954 is hereby repealed.

Sec. 915. (a) Subchapter B of chapter 53 of the Internal Revenue Code of 1954 is amended by adding at the end thereof a new section 5850 as follows:

## "SEC. 5850. APPLICABILTY OF OTHER LAWS.

"Nothing in this chapter shall be construed as modifying or affecting any provision of—

"(1) the Federal Firearms Act, as amended (15 U.S.C. 901–909); or

"(2) section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control)); or

"(3) section 1715 of title 18 of the United States Code (relating to nonmailable firearms).

(b) The table of sections in subchapter B of chapter 53 of the Internal Revenue Code of 1954 is amended by adding at the end thereof:

"Sec. 5850. Applicability of other laws.''

Sec. 916. (a) Subchapter C of chapter 53 of the Internal Revenue Code of 1954 is amended by adding at the end thereof the following new sections:

## "SEC. 5856. UNLAWFUL RECEIPT IN VIOLATION OF STATE LAW

"It shall be unlawful for any person to transport or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

## "SEC. 5857. UNLAWFUL SALE TO A PERSON UNDER 21 YEARS OF AGE

"It shall be unlawful for any importer, manufacturer, or dealer, subject to the special tax imposed under section 5801 to sell any firearm to any person with knowledge or with reasonable cause to believe that such person is under 21 years of age.''

(b) The table of sections in subchapter C of chapter 53 of the Internal Revenue Code of 1954 is amended by adding at the end thereof:

"Sec. 5856. Unlawful receipt in violation of State law.
"Sec. 5857. Unlawful sale to a person under 21 years of age."

Sec. 917. Section 5861 of the Internal Revenue Code is amended to read as follows:

## "SEC. 5861. PENALTIES

"Any person who violates or fails to comply with any of the requirements of this chapter shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine."

Sec. 918. (a) The proviso in paragraph (3) of subsection (a) of section 5801 of the Internal Revenue Code of 1954 is amended by striking out the words "under section 5848(5)" and inserting in lieu thereof the words "under section 5848(6)".

(b) The proviso in subsection (a) of section 5811 of the Internal Revenue Code of 1954 is amended by striking out the words "under section 5848(5)" and inserting in lieu thereof the words "under section 5848(6)".

(c) Subsection (d) of section 5685 of the Internal Revenue Code is amended to read as follows:

"(d) DEFINITION OF MACHINE GUN.—As used in this section the term 'machine gun' has the same meaning assigned to it in section 5848(2)."

Sec. 919. (a) This part shall take effect on the first day of the sixth month following the month in which it is enacted.

(b) Notwithstanding the provisions of subsection (a), any person required to register a firearm under the provisions of section 5841 of the Internal Revenue Code of 1954 by reason of the amendments to section 5848 of such Code contained in the section 911 of this part, shall have ninety days from the effective date of this Act to register such firearm, and no liability (criminal or otherwise) shall be incurred in respect to failure to so register under such section prior to the expiration of such ninety days.

SECTIONAL ANALYSIS OF THE PROVISIONS OF AMENDMENT 708

PART A—FEDERAL FIREARMS ACT AMENDMENTS

SECTION 901

Section 901 of amendment 708 amends section 1 of the Federal Firearms Act (52 Stat. 1250) by restating and clarifying existing definitions contained in the act and adding several new definitions.

The definition of "person" is unchanged. The terms "interstate or foreign commerce," "firearm," "manufacturer," "dealer," and "fugitive from justice," have been restated and clarified. The term "ammunition" has been deleted. The terms "State," "pawnbroker," "Secretary," "indictment," and "published ordinance" are new.

*Paragraph (1)*

The definition of the term "person" in paragraph (1) of amendment 708 is unchanged from the existing law (15 U.S.C. 901(1)).

*Paragraph (2)*

Paragraph (2) of section 901 of amendment 708 adds a new definition "State" to simplify and clarify later provisions of the bill and the existing law. The Canal Zone is included in the definition. Previously it was excluded. Also included are the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa, the principal Commonwealth and possessions of the United States.

*Paragraph (3)*

Paragraph (3) restates the existing definition of "interstate or foreign commerce" (15 U.S.C. 901(2)). However, language has been removed that has been defined in paragraph (2) above.

*Paragraph (4)*

Paragraph (4) restates the definition of "firearm" and revises it to exclude from the act antique firearms made in 1898 or earlier. Also mufflers and silencers for firearms are removed from the definition.

The year 1898 was selected as the "cutoff" date on the basis of testimony presented to Congress by several gun collectors organizations and to be consistent with the regulations on importation of firearms issued by the Department of State pursuant to section 414 of the Mutual Security Act of 1954.

Mufflers and silencers for firearms are excluded from coverage since these items are included presently in the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). This act provides for heavy transfer taxes and registration of all such items.

Also excluded from the present definition of the term "firearm" is "any part or parts" of a firearm. Experience in the administration of the Federal Firearms Act has indicated that it is impractical to treat each small part as if it were a firearm. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

Added to the term "firearm" are weapons which "may be readily converted to" a firearm. The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive. Starter pistols have been found to be a matter of serious concern to law enforcement officers.

*Paragraph (5)*

The definition of the term "handgun" in paragraph (5) is a new provision. This definition is necessary because of later provisions of the bill which have application solely to these firearms. There is no intention that handguns be exempted from any of the other provisions of amendment 708 since a handgun is a firearm within the meaning of paragraph (4) above.

The term includes "pistols," "revolvers," and "any other weapons originally designed to be fired by the use of a single hand" which are made to be fired by the use of a single hand and which are designed to fire or are capable of firing fixed cartridge ammunition.

*Paragraph (6)*

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 901(4)) except that references to ammunition, cartridge cases, primers, bullets, or propellant powder" have been stricken.

This deletion was made because experience in the administration of the Federal Firearms Act has showed that it is extremely difficult to control interstate and foreign commerce in ammunition.

The requirement that the manufacturer be "in the business of" manufacturing or importing firearms has been added to the definition to conform with a similar provision in the definition of "dealer."

*Paragraph (7)*

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) except that references to "ammunition, cartridge cases, primers, bullets, or propellant powder" have been stricken as in the definition of "manufacturer" above.

The word "special" has been stricken from the definition since a gunsmith or other person in the business of repairing firearms should be required to comply with the provisions of the Federal Firearms Act if he fits only barrels which do not fall into "special" category.

The words "or breech mechanism" have been stricken because they are unnecessary to a complete description of the functions performed by a person in the business of repairing firearms.

Other minor rephrasing of the language in the definition has been made to clarify the existing language.

*Paragraph (8)*

The definition of the term "pawnbroker" is a new provision. Pawnbroker dealers are covered under the provisions of the existing law in the same manner as other dealers. The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers.

Under this bill pawnbrokers would be subject to a higher license fee than other dealers.

*Paragraph (9)*

The definition of the term "Secretary" contained in paragraph (14) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

*Paragraph (10)*

The definition of the term "indictment" is a new provision. Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime. This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

*Paragraph (11)*

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to Territory, the District of Columbia, or possession of the United States" omitted in accordance with the definition of "State" in paragraph (2) above.

*Paragraph (12)*

The definition of the term "published ordinance" is new to amendment 708. It was not defined in S. 1853 although the term was used in the sworn statement required in section 2 of the bill in the provisions of the new section 2(l). The term means an ordinance or regulation of

any political subdivision of a State which has been lawfully promulgated under the laws of the State, published in written form and in full force and effect. Any such jurisdiction desiring to have such an ordinance made applicable to interstate sales of firearms which are destined for that jurisdiction would be required to notify the Secretary of the Treasury of the existance and validity of the ordinance or regulation and submit a true copy of the document to the Secretary for review. If, after review, the Secretary finds that the ordinance imposes conditions on the sale or receipt of firearms within the jurisdiction which could reasonably be applied to interstate transactions, and relevant to the enforcement of the Federal Firearms Act, as amended by this amendment, then the Secretary shall include the name of the jurisdiction in a list to be compiled annually by the Secretary, published in the Federal Register and sent to each licensee.

*"Ammunition"*

The definition of the term "ammunition" has been stricken from the existing law (15 U.S.C. 901(7)), to exclude all ammunition from the coverage of the Federal Firearms Act.

Under existing law, the term included pistol and revolver ammunition. However, an evaluation of the evidence developed in the hearings before the committee showed that it is difficult to control effectively interstate and foreign commerce in conventional firearms ammunition used for sporting, recreational, and other lawful purposes and that the act was not enforced in this regard.

SECTION 902

Section 2 of the Federal Firearms Act (15 U.S.C. 902) would be restated, revised and six new subsections added. References to ammunition have been eliminated in subsections (a), (b), (d), (e), and (g). Subsection (c) has been substantially revised and broadened. Subsections (f) and (i) have been restated and language stricken which has been declared unconstitutional. Subsections (j) through (o) are new.

*Subsection (a)*

Subsection (a) of section 2 of existing law (15 U.S.C. 902(a)) has been restated except that the words "or ammunition" have been stricken.

*Subsection (b)*

Subsection (b) of section 2 of existing law (15 U.S.C. 902(b)) has been restated except that the words "or ammunition" have been stricken and minor changes have been made for clarity.

*Subsection (c)*

Subsection (c) of section 2 of existing law (15 U.S.C. 902(c)) has been revised and its scope broadened so that it is an unlawful act within the meaning of the act for any Federal licensee to knowingly ship or transport directly or indirectly in interstate or foreign commerce any firearm (including rifles and shotguns as well as handguns) to any person in any State in violation of any State law or published ordinance which has application to the shipment.

The existing provision has application only to State firearms control laws which require purchase permits. Fewer than 10 States have such laws whereas most States and many local jurisdictions have firearms

laws and ordinances which impose controls and restrictions on the receipt, transportation or possession of firearms in a variety of ways.

This provision has been broadened to assist the States and localities in the control of firearms commerce within their respective borders by insuring that channels of interstate and foreign commerce will not be used to circumvent applicable State laws.

It is not the intention of the subsection to impose absolute criminal liability on Federal licensees. It is contemplated that an affirmative defense would be allowed so that any person charged with a violation of this section may establish that he took reasonable efforts to ascertain that the shipment would not be in violation of the applicable State laws.

*Subsection (d)*

Subsection (d) of section 2 of the existing law (15 U.S.C. 902(d)) has been restated and modified. The words "or ammunition" have been stricken.

The words "territories, possessions, or the District of Columbia" have been stricken as they fall within the meaning of the term "State" as defined in section 1(2) of the bill.

*Subsection (e)*

Subsection (e) of section 2 of the existing law (15 U.S.C. 902(e)) has been restated and modified by substituting crime "of violence" for the words "punishable by imprisonment for a term exceeding 1 year" and by striking the words "or ammunition."

*Subsection (f)*

Subsection (f) as changed by section 902 of the amendment is a restatement of existing law (15 U.S.C. 902(f)). The restatement eliminates the words "and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this act," since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States,* 319 U.S. 463.

*Subsection (g)*

Subsection (g) as changed by section 902 of the amendment is a restatement of existing law (15 U.S.C. 902(g)) and has been revised by striking the words "or ammunition" and making minor changes for clarity.

*Subsection (h)*

Subsection (h) as changed by section 902 of the amendment is a restatement of existing law (15 U.S.C. 902(h)) and the words "or ammunition" stricken wherever they appear. Also, minor changes have been made for clarity.

*Subsection (i)*

Subsection (i) as changed by section 902 of the amendment is a restatement of existing law (15 U.S.C. 902(i)). The restatement also deletes the words "and the possession of any such firearm shall be presumptive evidence that such firearm was being transported, shipped, or received, as the case may be, by the possessor in violation of this act" since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States,* 319 U.S. 463.

*Subsection (j)*

Subsection (j) as changed by section 902 of the amendment is a new provision which would make it unlawful for any licensee under the act knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package containing a firearm, without written notice to the carrier that a firearm is being transported or shipped. This provision is correlated to the provisions of section 2(c). Testi mony before the committee disclosed the existence of a practice of surreptitiously shipping firearms, without notice or disclosure, to circumvent requirements of Federal or State law.

*Subsection (k)*

Subsection (k) prohibits a common or contract carrier from delivering in interstate or foreign commerce any handgun to any person knowing or having reasonable cause to believe that such person is under 21 years of age or any firearm (including rifles and shotguns) to any person under 18.

*Subsection (l)*

Subsection (l) as added by section 902 of the amendment is a new provision that would establish a procedure whereby the channels of interstate and foreign commerce could not be used to circumvent applicable State laws and local ordinances. It would make it a violation of the Federal Firearms Act for any licensee to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or dealer unless the prospective recipient has submitted a sworn statement to the manufacturer or dealer containing material information pertaining to the sale.

The dealer must then forward a copy of the statement to the appropriate local law enforcement officer or designated State official by registered or certified mail, receive a return receipt evidencing delivery of the letter or notice of refusal to accept the letter, and wait at least 7 days after return of the receipt or refusal before making delivery of the handgun to the recipient.

While there is no express requirement for this procedure to be followed by dealers with respect to mail order sales of rifles and shotguns, no provision of the amendment would bar a licensee from requiring a sworn statement from the purchaser if he so desires.

*Paragraph (1)*

Paragraph (1) of such subsection (l) provides that the sworn statement to be submitted to the dealer or manufacturer by the prospective recipient shall be in such form as prescribed by the Secretary of the Treasury and shall contain the following information: (1) That the recipient is at least 21 years or more of age; (2) that he is not prohibited by the Federal Firearms Act from receiving a handgun in interstate or foreign commerce; (3) that there are no provisions of applicable State law or local ordinance which would be violated by the purchaser's receipt or possession of the handgun; and (4) the title, name, and official address of the principal law enforcement officer where the handgun is to be shipped.

*Paragraph (2)*

Paragraph (2) of such subsection (l) provides that prior to shipment of the handgun to the purchaser, the dealer, or manufacturer shall

274

forward to the appropriate local law enforcement or State official a description of the handgun (not including serial number) and a copy of the sworn statement by registered or certified mail. Also, the dealer must receive a return receipt evidencing delivery of the letter containing the description of the handgun and the copy of the sworn statement or a notice of refusal to accept the letter in accordance with the applicable regulations of the Post Office Department.

*Paragraph (3)*

Paragraph (3) of such subsection (l) would impose a 7-day waiting period following receipt of the notification of the local law enforcement officer's acceptance or refusal before the manufacturer or dealer could make delivery to the consignee.

In addition, subsection (l) provides (1) that the Governor of any State may designate any official in his State to receive the notification to local law enforcement officials required by this subsection and that the Secretary shall publish such designation in the Federal Register; and (2) that the Governor of any State may request that the Secretary discontinue the required notification to local law enforcement officials in his State or any part thereof and upon publication in the Federal Register, the request shall be in effect for 5 years, unless withdrawn by the Governor and so published in the Federal Register.

*Subsection (m)*

Subsection (m) as added by section 902 of amendment 708 is a new provision prohibiting licensees under the act from selling a handgun to an unlicensed individual who is a resident of a State, other than that in which the manufacturer's or dealer's place of business is located without compliance with the provisions of subsection (l) above. The subsection is intended to deal with the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities. The hearings before the committee have demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms. The hearings have also shown that this is a means by which criminal and lawless elements obtain firearms.

This provision allows such handgun purchases to be made, but only after compliance with the detailed procedures set forth in subsection (l) above.

*Subsection (n)*

Subsection (n) of section 902 of amendment 708 is a new provision that would make it unlawful for any person, in purchasing or otherwise obtaining or attempting to purchase or otherwise obtain a firearm from a licensed manufacturer or licensed dealer under this act, knowingly to make any written or oral false statement or to knowingly supply any false or spurious information or identification intended or calculated to deceive such licensee with respect to such person's identity, age, address, or criminal record (if any), or with respect to any other material fact pertinent to the lawfulness of a sale or other deposition of a firearm by a licensed manufacturer or licensed dealer.

*Subsection (o)*

Subsection (o) of section 902 as contained in amendment 708 is a new provision that would make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased or otherwise obtained outside that State if it is unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

The intent of this provision is to assist the States and their political subdivisions in the enforcement of applicable firearms control laws and ordinances by imposing Federal felony sanctions upon those who utilize channels of interstate or foreign commerce to circumvent or evade these laws and ordinances.

SECTION 903

Section 903 of amendment 708 would restate and revise section 3 of the Federal Firearms Act (15 U.S.C. 903). All references to ammunition would be stricken along with references to territories and possessions.

Subsection (a) of the existing law would be revised and the fee schedules for manufacturers, dealers, and pawnbrokers set forth in separate paragraphs. The fees for manufacturers and dealers would be increased. The fee for pawnbroker dealers is new. Subsection (b) of the existing law would be revised and four new requirements for obtaining a Federal license established. The applicant must be at least 21 years of age, must not be prohibited from transporting firearms under the provisions of the act, and must not have made false statements or misrepresented material facts in connection with his application. The applicant must not have willfully violated any provisions of the act. Subsection (c) of amendment 708 is a new provision intended to substitute for section 3(c) of the existing law. Subsection (d) is a restatement of the recordkeeping requirement of existing law with minor changes.

*Subsection (a)*

Subsection (a) of amendment 708 is intended to make it clear that no person shall engage in business as a manufacturer of firearms, or as a dealer in firearms until he has filed an application with, and received a license to do so from the Secretary. In order to regulate effectively interstate and foreign commerce in firearms it is necessary that all persons engaging in these businesses be licensed. Similar provisions were upheld in *Hanf* v. *United States* (235 F. 2d 710, cert. den. 352 U.S. 880), as reasonably necessary to effective control of interstate and foreign commerce under comparable conditions.

Subsection (a) also provides that the application for a license shall be in such form and contain such information as the Secretary of the Treasury shall by regulation prescribe. It is the intent of this provision to authorize the Secretary to require the submission of information reasonably relevant to the determination as to whether the applicant is entitled to a license under the standards prescribed in subsection (b). Since the Secretary has the responsibility for determining whether the license should be issued, he must necessarily have the authority to require the submission by the applicant of information relevant to his determination as to the applicant's eligibility. Authority to prescribe

the form of the license application has been exercised by the Secretary since the Federal Firearms Act was enacted in 1938.

Subsection (a) also increases license fees presently contained in section 3(a) of the Federal Firearms Act and adds a new fee for pawnbrokers. The annual fee for manufacturers (including importers) would be doubled from $25 to $50. Fees for dealers (including gunsmiths) would be increased from $1 to $10, except that a one-time fee of $25 would be levied for the first renewal date following the effective date of the bill or for the first year the dealer is engaged in business. This additional charge would help to defray the costs of the investigation necessary to determine if the applicant has met the licensing requirements contained in section 3(b) of the amendment.

A separate license with a higher license fee is also provided for pawnbroker dealers. A "pawnbroker" is defined in paragraph (8) of section 1 of the amendment. It is noted that under the National Firearms Act (26 U.S.C. ch. 53) pawnbroker dealers are charged a higher rate of occupational tax than other dealers.

Since all references to ammunition would be removed from the act by the amendment, the substantial number of persons who deal only in ammunition will not be required to obtain a license under the act. Thus, ammunition reloaders and ammunition dealers will not be affected by the amendment.

*Subsection (b)*

Subsection (b) establishes four conditions under which no licenses shall be issued by the Secretary of the Treasury or his disignee. An application for a license shall be denied if the applicant is "under 21 years of age," if he is "prohibited by the provisions of the act from transporting, shipping, selling, or receiving firearms in interstate or foreign commerce," or if he has willfully violated any provisions of the act or regulations issued thereunder. This requirement would include failure of a licensee to keep proper records as might reasonably be required by the Secretary. Also, an application could be disapproved if the applicant has "willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application."

*Subsection (c)*

Subsection (c) as contained in the amendment replaces the provisions of existing law contained in section 3(c) of the act (15 U.S.C. 903(c)) and reflects the construction of existing law as contained in current regulations (26 CFR, pt. 177).

The requirement of existing law, concerning the posting of a bond by a licensee convicted of a violation of the act in order to continue operations pending final disposition of the case on appeal, serves no useful purpose, and has been omitted. Further, the provisions of this subsection have been revised to simplify administration. Since the licensee is required to reapply each year for a license, the information on the application relating to his indictment and/or conviction will be adequate. Also, the license itself can, as at present, contain a warning that the licensee cannot continue operations once his conviction has become final (other than as provided in section 10 of the existing law).

As under existing law and regulations, a new license will not be issued to a person under indictment for, or who has been convicted

of, an offense punishable by imprisonment for a term exceeding 1 year. However, a licensed manufacturer or licensed dealer may continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be subject to all provisions of this act, and operations pursuant to such license shall be discontinued. If a bona fide application for relief is filed under section 10 of the act, operations may continue until such application is acted upon.

*Subsection (d)*

Subsection (d) would restate and revise section 3(d) of the Federal Firearms Act (15 U.S.C. 903(d)). References to ammunition would be removed from the existing law. The word "permanent" would be stricken from the recordkeeping requirement of the subsection, since the Secretary of Treasury is given specific authority to prescribe regulations for the implementation of this requirement. The length of time for which the records should be kept and maintained by licensees under the provisions of the act and other administrative details would be left to the discretion of the Secretary. Thus, the word "permanent" becomes meaningless. It is anticipated that any regulations issued under that authority granted by this subsection would be reasonable and in accordance with good commercial practice and custom.

SECTION 904

Section 904 of amendment 708 would restate section 4 of the Federal Firearms Act (15 U.S.C. 904), strike the references to ammunition and to territories, possessions and the District of Columbia, and renumber and revise several provisions of the section for clarity.

*Subsection(a)*

Subsection 904(a) of amendment 708 would restate portions of section 4 of the Federal Firearms Act (15 U.S.C. 904) and make several modifications thereof. Ammunition would be removed as elsewhere in the bill. The words "territory, or possession, or the District of Columbia," would be stricken consistent with their deletion in other sections of the bill. Other revisions would be made by renumbering and rephrasing provisions of the section for clarity without changing the meaning of existing law.

*Subsection (b)*

Subsection 904(b) of amendment 708 would restate the remainder of section 4 of the Federal Firearms Act (15 U.S.C. 904) and would make certain modifications. All references to ammunition would be deleted. The Secretary of "Defense or his designee" would be substituted for the Secretary of "War". The words "receipt or" would be added to the last sentence of the section to clarify the provision contained therein and other technical revisions made for the same purpose without altering the meaning of existing law.

278

### SECTION 905

Section 905 of the amendment would restate section 5 of the Federal Firearms Act, add an element of reasonable cause to the provision which makes it unlawful for an applicant for a license or exemption to make a false statement in connection with the application, increase the maximum penalties provided for in the act from $2,000 to $10,000 and from 2 years to 10 years, provide for parole of sentenced offenders as the board of parole shall determine, removed the reference to ammunition contained in subsection (b), and update the reference to the Internal Revenue Code.

*Subsection (a)*

Subsection (a) of section 905 of the amendment would restate the existing law (15 U.S.C. 905(a)) and make several changes. The words "or having reasonable cause to know" would be added to the provision which sets forth the unlawful act of making a false statement in connection with an application for a license or an exemption under the provisions of the Federal Firearms Act.

The maximum penalty provisions for violation of the Federal Firearms Act would be increased from $5,000 to $10,000 and 2 years to 10 years to serve as a further deterrence to potential violators of the act. It is anticipated that this change will have the effect of increasing compliance with the act's provisions.

All sentenced violators are made eligible for parole "as the board of parole shall determine." Thus, the opportunity will be available to keep hardened criminals away from the law-abiding community for a substantial period of time, but at the same time provide flexibility to correctional officials so that they may work with those who show significant potential for rehabilitation.

*Subsection (b)*

Subsection (b) of section 905 of the amendment would restate subsection (b) of section 5 of the existing law (15 U.S.C. 905(b)) and make minor changes. The reference to ammunition would be deleted. The reference to the Internal Revenue Code would be changed to reflect the recodification of the code which was accomplished in 1954.

### SECTION 906

Section 906 of the amendment would amend the Federal Firearms Act by adding a new section 11 which would provide that nothing contained in the act shall be construed as "modifying or affecting the requirements" of the provisions of the Mutual Security Act of 1954 which deal with "the manufacture, exportation, and importation of arms, ammunition, and implements of war."

Section 414 of that act gives authority to the President to control the export and import of arms, ammunition, implements of war, and technical data related thereto. It also requires all persons engaging in these transactions to register with the U.S. Government, pay registration fees, and secure import licenses for all such materials imported into this country.

### SECTION 907

Section 907 of the amendment would establish the date at which time the amendments and changes made by the amendment become

effective. The effective date would be "the first day of the sixth month beginning after the date of enactment" of the amendments. It is felt that this period of time will be sufficient for the promulgation and dissemination of any regulations necessary to implement the amendmets to the act and would afford ample opportunity for comment of persons who would be affected by the regulations.

SECTION 908

Section 908 of the amendment would set forth a short title for the amendment, "Federal Firearms Amendments of 1968."

PART B—NATIONAL ACT AMENDMENTS

Part B of Amendment incorporates the provisions of S. 1854, a bill introduced by Senator Hruska and others to add the so-called destructive devices to the regulatory framework of the National Firearms Act of 1934.

Under part B, the scope of the National Firearms Act (which now covers gangster-type weapons such as machineguns, sawed-off shotguns, and deceptive weapons such as flashlight guns, fountain pen guns, etc.) would be broadened to include destructive devices such as explosive or incendiary (1) bombs, (2) grenades, (3) rockets, (4) missiles, or (5) similar weapons, as well as large caliber weapons such as mortars, cannons, bazookas, etc. This would mean that such weapons would be subject to all provisions of the act and that persons engaging in business as importers, manufacturers, and dealers in such weapons would be required to register and pay special (occupational) tax. Also, the taxes applicable in respect of the making and transfer of weapons such as machineguns would be applicable with respect to the making and transfer of such destructive devices. Also, it would be unlawful for a person to possess a destructive device of this character unless such device was registered with the Secretary of the Treasury.

In addition, the bill contains certain additional strengthening and clarifying amendments to the National Firearms Act.

SECTION 911

This section would amend section 5848 of the Internal Revenue Code of 1954 which is the section of the National Firearms Act containing the definition of the weapons subject to the act (chapter 53 of the Internal Revenue Code is cited as the National Firearms Act).

*Paragraph (a)*

Paragraph (a) of section 911 would amend paragraph (1) of section 5848 of the Internal Revenue Code of 1954 to include destructive devices within the term "firearms," as used in the National Firearms Act. The effect of this is to make the provisions of the act applicable to a "destructive device" as that term is defined in paragraph (c) of section 1 of the amendment.

*Paragraph (b)*

Paragraph (b) of section 1 would amend paragraph (2) of section 5848 of the Internal Revenue Code of 1954 (which is the definition of "machinegun" contained in the National Firearms Act) to include

any weapons "which can readily be restored to shoot" automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

"Readily restored to shoot" is intended to mean that only a simple mechanical operation is required to restore a weapon to a capacity of fully automatic fire. It is not intended to cover deactivated weapons that have had chambers closed and barrels securely welded.

The definition of machinegun would be further amended to include "the frame or receiver" of a machinegun.

The definition of machinegun is further amended to include "any combination of parts designed and intended for use in converting a weapon, other than a machinegun, into a machinegun." For example, so-called conversion kits are now made and sold for the purpose of converting certain rifles so that they will fire automatically or semiautomatically more than one shot, without manual reloading, by a single function of the trigger (i.e., converting such rifles into machineguns. However, under existing law, there is no effective way to control the manufacture and transfer of such kits. This change is designed to correct this situation, by bringing such kits which will convert a weapon, other than a machinegun, into a machinegun.

*Paragraph (c)*

Paragraph (c) of section 911 provides for the renumbering of paragraphs (3) through (11) as paragraphs (4) through (12), respectively, of section 5848 of the Internal Revenue Code of 1954, and for the insertion after paragraph (2) of such section of the code of 1954, and for the insertion after paragraph (2) of such section of the code of a new paragraph (3). The new paragraph (3) would insert a definition of the term "destructive device."

The definition of the term "destructive device" contained in paragraph (3) of section 5848 of the Internal Revenue Code of 1954, as contained in the bill is a new provision. It would bring under the coverage of the National Firearms Act any explosive or incendiary bomb, grenade, rockets having a propellant charge of more than four ounces, missiles, mines or similar devices.

The qualification on rockets is intended to exclude from coverage of the act model rockets designed, built and launched under the auspices of the National Association of Rocketry.

Devices which are not designed or redesigned or used or intended for use as a weapon would not be included, but coverage would be extended to large-caliber weapons such as bazookas, mortars, cannons and the like.

The parenthetical exception contained in this definition is drafted in the same manner as the exceptions contained in title 26 U.S.C. section 5179)a) (relating to registration of stills) and section 5205(a)(2) (relating to stamps on containers of distilled spirits). Therefore, the decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780; cert. den. 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove the matter contained in an exception would be applicable. Establishment by a person that he came within the exception would be a matter of affirmative defense. Thus, an explosive device shown to be designed and intended for lawful use in construction or for other industrial purposes would be excepted. However, if the device were designed or

used or intended for use as a weapon, it would be subject to the provisions of the act.

A provision has been made in this definition that the Secretary may exclude from the definition any device which he finds is not likely to be used as a weapon. Examples of devices which may be excluded from this definition are devices such as Very pistols and other signaling devices and line-throwing appliances (required for commercial vessels by U.S. Coast Guard regulations) which may have been made from converted firearms. This provision also makes it possible to deal with any other comparable situation which may arise, such as old cannon or field pieces which are primarily of historical significance and with respect to which there is no reasonable likelihood that they will be used as weapons.

*Paragraph (d)*

Paragraph (d) of section 911 would amend paragraph (4) (as renumbered) of section 5848 of the Internal Revenue Code of 1954 by striking out the period at the end thereof and inserting the words ", and any such weapon which can readily be restored to firing condition." This represents a clarification of law and is consistent with the administrative construction of existing law.

*Paragraph (e)*

Paragraph (e) of section 1 would amend paragraph (5) (as renumbered) of section 5848 of the Internal Revenue Code of 1954. This paragraph contains the definition of the term "shotgun" and the change is identical with the change made with respect to the definition of "rifle" referred to in paragraph (d) above.

### SECTION 912

The exemptions from payment of the "occupational" taxes provided in section 5801 of the Internal Revenue Code of 1954 are extended to include importers, manufacturers, and dealers, all of whose business is conducted with, or on behalf of, the United States, or any of its departments, establishments, or agencies.

### SECTION 913

Paragraph (a) of section 913 would amend subsection (a) of section 5821 of the Internal Revenue Code of 1954 by increasing the number of application forms that must be completed to transfer a firearm under the act from two to three. In additon, the revised paragraph (a) would require that the identification in an application to purchase a firearm under the act be expanded to include the applicant's age. These are technical and conforming changes brought about by the changes in subsections (b) and (c) of section 913 below.

Paragraph (a) of section 913 would also amend subsection (b) of section 5814 of the Internal Revenue Code of 1954 by striking out "a copy" in the first sentence and inserting in lieu thereof "one copy", and by adding before the period language which would provide that at the same time a person forwards a copy of the order form regarding transfer of a firearm to the Secretary or his delegate, as required by subsection (b) of section 5814, he shall forward a copy of the order form to the principal law-enforcement officer of the locality wherein he resides. This is intended as an additional requirement and not as a

substitute for existing procedures regarding verification of the identity of the applicant.

Paragraph (b) of section 913 would amend subsection (e) of section 5821 of the Internal Revenue Code of 1954 by adding at the end thereof a new sentence providing that at the same time a person making the declaration in respect of making a firearm forwards the declaration to the Secretary or his delegate, he shall forward a copy thereof to the principal law-enforcement officer of the locality wherein he resides. This provision is intended to be in addition to any other existing procedures, and not as a substitute for the procedures requiring verification of the identity of the person making the declaration.

Paragraph (c) of section 913 would amend section 5843 of the Internal Revenue Code of 1954 (which relates to the identification of firearms) by inserting at the end thereof a new sentence. This provision is intended to provide for the identification of a firearm (possessed by a person other than a manufacturer or importer) which does not bear the proper identification.

### SECTION 914

Subsection (a) of section 914 of the amendment would repeal the second sentence of section 5841 of the Internal Revenue Code. The first sentence of section 5841 imposes a registration requirement on all persons possessing firearms subject to the National Firearms Act. The second sentence is interpretative and by exempting from the registration requirement of that section persons possessing firearms held pursuant to lawful transfer, importation, or making, recognizes that such possession has been effectively registered by virtue of the approved transaction involved. It is felt that the striking of this qualifying sentence would eliminate a constitutional challenge of self-incrimination raised in certain criminal cases where an offense under this section was charged.

Although it is felt that the second sentence of section 5841 does not void the universality of the registration requirement, its elimination should make it more apparent that the provision contemplates registration by every person possessing a firearm coming within the purview of the act.

The regulations, could provide that the documents filed for a lawful transfer, making, or importation include the information required by the first sentence of section 5841. Thus, such a transferee, maker, or importer could comply with section 5841 at the time of the transaction by which he lawfully obtained the firearm. Subsection (b) of section 914 would amend section 5841 of the Internal Revenue Code of 1954 by adding at the end a new provision that no person required to register under the provisions of the chapter shall be prosecuted or subjected to any penalty on account of any information contained or disclosed in compliance with the chapter. The information required or disclosed shall not be used in evidence in any criminal proceeding in any court.

This provision was added to conform with the decision of the Supreme Court in the *Haynes* case.

Should any information disclosed or given pursuant to chapter 53 of the Internal Revenue Code of 1954 be false or a material misrepresentation of fact, no exemption from prosecution would be granted by subsection (b) of section 914 for any violation of the provisions of

section 1001 of title 18 of the United States Code. Section 1001 deals
with the making of false, fictitious or fraudulent statements or repre-
sentations and contains maximum penalty provisions of not more than
$10,000 and 5 years, or both.

### SECTION 915

Section 915 of the bill would add a new section 5850 to the Internal
Revenue Code providing that nothing in the Code should be construed
as modifying or affecting any provision of the Federal Firearms Act,
section 414 of the Mutual Security Act or section 1715 of title 18 of
the United States Code.

This provision would not exclude from coverage any firearms within
the definitions of chapter 53 of the Internal Revenue Code of 1954
which would also be included within the definition of "firearm" in
section 1 of the Federal Firearms Act (52 Stat. 1250).

### SECTION 916

Section 916 of the amendment would add two new sections to
chapter 53 of the Internal Revenue Code of 1954 respecting receipt
and sale of National Firearms Act firearms.

New section 5856 would make it unlawful for any person to transport
or receive in his State of residence a firearm purchased or otherwise
obtained by him outside of his State of residence if it would be unlawful
for him to purchase or possess such firearm in the State or political
subdivision where he resides. It is intended that no person would be
able to circumvent applicable State law or local ordinance by utilizing
the channels of interstate commerce.

New section 5857 would prohibit any importer, manufacturer, or
dealer subject to the National Firearms Act from selling any National
Act firearm to persons under 21 with knowledge or reasonable cause
to believe that such person is under 21.

There is no reason why persons of immature years should be allowed
to purchase automatic weapons, heavy field artillery, and other
National Firearms Act weapons.

S. 1854 as introduced by Senator Hruska prohibits possession of
National Act weapons in the situations described in the two new
sections, but these provisions were modified to reflect the comments
of the Department of the Treasury in a letter to the chairman of the
Senate Judiciary Committee dated July 6, 1967.

### SECTION 917

Section 917 of the amendment would restate existing law (section
5861 of the Internal Revenue Code of 1954) and make two changes.
First, the maximum penalty provisions for violation of chapter 53 of
the Internal Revenue Code would be increased from the present
maximums of $2,000 fine and imprisonment for not more than 5
years, or both to a fine of $10,000 or more and imprisonment of not
more than 10 years, or both.

All sentenced violators are made eligible for parole "as the board of
parole shall determine." Thus, the opportunity will be available to
keep hardened criminals away from the law-abiding community for a

substantial period of time, but at the same time provide flexibility to correctional officials so that they may work with those who show significant potential for rehabilitation.

SECTION 918

Section 918 is a miscellany of conforming and technical changes.

SECTION 919

Section 919 of the amendment provides for an effective date 6 months after the date of enactment. In addition any person required to register a firearm under the provisions of section 5841 by reason of the amendments to section 5848 contained in section 911 of this part shall have an additional 90 days from the effective date of this part to register such firearm.