# Calendar No. 1835

| 89TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 1866 |
|---|---|---|

## FEDERAL FIREARMS AMENDMENTS OF 1966

OCTOBER 19, 1966.—Ordered to be printed

Mr. HRUSKA, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## INDIVIDUAL VIEWS

[To accompany S. 3767]

The Committee on the Judiciary, to which was referred the bill (S. 3767) to amend the Federal Firearms Act, having considered the same, reports favorably thereon, without amendment, and recommends that the bill do pass.

### PURPOSE

The purpose of the proposed legislation is to amend existing Federal firearms control law to—

(1) regulate more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them;

(2) assist the States and their political subdivisions to enforce their firearms control laws and ordinances;

(3) help combat the skyrocketing increase in the incidence of serious crime in the United States.

It is not the purpose of this bill to interfere with the legitimate uses of firearms by the millions of law-abiding citizens who acquire, transport and possess them for hunting and other recreational pursuits, self-protection, and other lawful purposes.

### MAJOR PROVISIONS OF S. 3767

1. No carrier in interstate or foreign commerce may deliver any handgun to any person under 21 years of age.

2. No manufacturer or dealer may ship any handgun in interstate or foreign commerce to any person, except a licensed manufacturer or dealer, unless that person submits to the shipper a sworn statement that he

(*a*) is at least 21 years of age;

(*b*) is not prohibited by Federal or State law or local ordinance from receiving or possessing the handgun;

(*c*) discloses the title, true name and address of the principal law enforcement officer of the locality to which the handgun will be shipped.

In addition, no manufacturer or dealer may sell a handgun over-the-counter to out-of-state residents unless a sworn statement is submitted by the prospective recipient containing the same information required of the mail-order purchaser.

3. Prior to the shipment of a handgun under provisions of the act, the manufacturer or dealer must forward a copy of the customer's sworn statement by registered or certified mail (return receipt requested) to the law enforcement officer named in the statement containing a full description (excluding serial number) of the handgun to be shipped, and must receive a return receipt evidencing delivery of the letter, or notice that the law enforcement officer has refused to accept the letter. A dealer then must delay delivery to the purchaser for 7 days after he has received the return receipt or notice of refusal.

The Governor of any State may designate any official in his State to receive notification of handgun purchases for his State or any part thereof in lieu of notification to local law enforcement officers.

4. The act of a manufacturer or dealer shipping any firearm (including rifles and shotguns) in interstate commerce to any person in any State where the receipt of the firearm by such person would violate any statute of that State is prohibited.

5. The act of knowingly making a false statement, furnishing false or deceiving identification to any licensed dealer or manufacturer for the purpose of obtaining a firearm is prohibited.

6. The act of transporting into or receiving a firearm by a resident of any State from outside the State if it were unlawful for him to purchase or possess a firearm in his own State is prohibited.

7. No manufacturer or dealer may deliver any package containing a firearm to any carrier for shipment in interstate commerce without prior written notice to the carrier.

8. A person must be at least 21 years of age to obtain a Federal firearms license as dealer, manufacturer, or pawnbroker. The applicant must not be prohibited from receiving a firearm by the provisions of the act. The applicant must not have failed to disclose any material fact or made false statements in connection with the application.

9. The fee for a manufacturer's or pawnbroker's license shall be $50 a year; for a dealer's license $25 for the first year and $10 for each renewal year.

10. Ammunition, ammunition components, and minor parts of a firearm (such as springs, sights, and accessories) are removed from the application of the Federal Firearms Act.

11. Firearms manufactured prior to 1899 are considered as antique firearms and, as such, are exempted from the provisions of the act.

12. The existing penalty provisions of the Federal Firearms Act (a maximum fine of $5,000 and a maximum term of imprisonment of 2 years) are increased to maximums of $10,000 and 10 years, but all sentenced offenders are made eligible for parole as the U.S. Board of Parole may determine.

On September 22 of this year, the committee by a vote of 10 to 5, reported this bill to the Senate favorably.

## STATEMENT

Over the past 4 years the Committee on the Judiciary has become increasingly concerned over the rise in lawlessness and violent crime in the United States and the relationship between the apparent easy availability of firearms and criminal behavior.   Initial investigative hearings were conducted by a subcommittee in 1963 and 1964 into the adequacy of existing Federal firearms control laws.   Further hearings followed in 1965.

The public hearings demonstrated that the interstate mail-order sale of firearms to criminal elements posed a significant problem to law enforcement officials throughout the United States and necessitated legislation to strengthen existing Federal control statutes.

The earlier hearings produced evidence that criminals and other undesirable elements have seized upon the inadequacies of existing Federal law by availing themselves of mail-order firearms.   The availability through this source thus circumvents State and local laws, giving rise to serious law enforcement problems at the State and local level.

The 1965 hearings brought out further deficiencies in the present firearms statutes.

Not only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention.   This problem is most prevalent in, but not limited to, those States where stringent firearms regulations are in effect and the purchaser is not able to purchase a firearm in accord with the laws of his State.   As a result, a would-be purchaser travels to a neighboring State with less stringent controls and purchases the firearm which is then misused in his residence State.   This problem was outlined by law-enforcement officers throughout the country.

Firearms purchased in the above manner have been utilized in the commission of crime in substantial numbers.   For example, the Massachusetts State Police have traced 87 percent of the concealable firearms used in crimes in Massachusetts to out-of-State purchases.

The lack of adequate Federal controls over this aspect of the commerce in firearms affords circumvention and violation of the laws of several of the States similar to the mail-order methods of purchase.

It is difficult for the States to cope with this aspect of the problem without additional help by the Federal Government.

## THE NEED FOR LEGISLATION

There has been a great nationwide concern over the steadily increasing rate of crime in this country.   Much attention, perhaps too much attention, has been directed at the role of firearms in crime, with too little attention given to the many sociological aspects which are the basic causes of our crime problem.   It would appear, however, from testimony presented to this committee, that there are some respects in which the existing Federal Firearms Act should be strengthened.

4        FEDERAL FIREARMS AMENDMENTS OF 1966

After reviewing all of the evidence adduced during the hearings, it is the opinion of the committee that the enactment of legislation that would indiscriminately place further restrictions on the acquisition of all types of firearms would be unwarranted. Rather, in seeking to reduce the criminal use of firearms, the legislation should especially concern itself with the particular type of weapon that is predominantly used by the criminal.

Despite the fact that the vast majority of all handguns are used for legitimate sporting purposes, the committee concluded that this firearm was the most troublesome and difficult factor in the unlawful use of firearms. Its size, weight, and compactness make it easy to carry, to conceal, to dispose of, or to transport. All these factors make it the weapon most susceptible to criminal use.

In particular, it was learned upon investigation that the most serious firearms problem facing most enforcement agencies has been the widespread availability of handguns through mail-order channels. The record shows that the sale of mail-order handguns in the large urban complexes may have stimulated crime and juvenile delinquency and that State, county, and municipal laws and ordinances have been unable to cope with the problem because of their jurisdictional limits. The extension of the Federal law proposed in S. 3767 is in keeping with the long-accepted role of the Federal Government in restricting interstate commerce in weapons, drugs, and other commodities dangerous to life.

THE PROBLEM: HANDGUNS

The handgun as the most formidable and most frequently used tool of the criminal is well recognized and established by first, the existence in many States of laws controlling it; and, second, by statistics showing its dominance as the weapon used in unlawful activities.

*State control of handguns*

While there is 1 State that requires an identification card for the purchase of a rifle or shotgun and 22 States that prohibit the carrying of a loaded rifle or shotgun in a moving vehicle, compare the much greater extent of control over handguns by the States. These controls are of two classes—the positive and the negative. In those States with positive handgun controls:

Twenty-three States require a license to sell at retail.

Twenty-nine States require a license to carry a handgun on or about the person.

Eight States require a permit or its equivalent to purchase a handgun.

Ten States prescribe a waiting period between purchase and delivery of a handgun.

Eighteen States require a license to carry a handgun in a vehicle.

As to States with negative controls:

Twenty-one States prohibit the carrying of a handgun concealed on the person.

Four States require registration of handguns.

Twenty-two States prohibit carrying a loaded handgun—and in some instances other firearms—in a vehicle.

In addition, many municipalities have similar ordinances.

The committee is of the opinion that the lawmakers of each State are best able to determine the conditions and needs within their own borders and to pass appropriate legislation in regard to the use of handguns. Thus, the committee endeavored to draft legislation which would give State and local officials notice of the flow of handguns into their jurisdiction so as to enable them to regulate their use as dictated by applicable local laws.

*Statistics on firearms used in crimes*

Federal Bureau of Investigation statistics delineate the handgun as the firearms problem.

The 1965 FBI Uniform Crime Reports state that 57 percent of the willful killings during that year were committed with firearms. Thus, out of a total of 9,850 such killings, firearms were used in 5,634 cases. Writing to Senator Roman L. Hruska on July 27, 1966, FBI Director J. Edgar Hoover supplemented the Reports. Indicating that handguns were used in 70 percent of the murders committed with firearms, the Director stated:

> "Based on the submission of police reports under the uniform crime reporting program, 70 percent of the murder by gun in this country is committed with a handgun, 20 percent by the use of a shotgun, and 10 percent with a rifle or other firearm. This will supplement the data available to you in Uniform Crime Reports—1965."

In regard to aggravated assaults, approximately 17 percent of the total (206,600) were committed with firearms. However, Mr. Hoover advised that,

> "There is no available breakdown of the type of firearms used in these attacks."

In 1965, there were 118,900 robberies. Of this figure, 38 percent, or about 45,000, were armed robberies committed with firearms. In regard to this category, Mr. Hoover stated in the above-mentioned letter:

> Although we do not make a regular collection of the type of weapon used in armed robbery, from special surveys in the past we have determined about two-thirds are firearms and most of these the handgun.

From these statistics, as well as the treatment accorded handguns by State and city statutes and ordinances, it is quite clear that the principal offender in the unlawful use of firearms is the handgun.

*Inadequacy of existing Federal law*

It was the intent of the Congress in enacting the Federal Firearms Act of 1938 (as amended) to control the movement of all firearms in interstate commerce. This law;

(*a*) Requires the licensing of manufacturers and importers of, and dealers in, firearms, ammunition and components thereof;

(*b*) Provides restrictions on the movement of all firearms and pistol ammunition in interstate or foreign commerce;

(*c*) Prohibits convicted felons, persons under indictment and fugitives from justice from shipping, transporting or receiving firearms or ammunition in interstate or foreign commerce;

**6**        FEDERAL FIREARMS AMENDMENTS OF 1966

(*d*) Prohibits the shipment, transportation, or receipt of stolen firearms or ammunition, or firearms from which the serial number has been removed, obliterated, or altered;

(*e*) Requires all licensed manufacturers, importers, and dealers to maintain complete records of the production, receipt, and disposition of all firearms.

A provision of this Federal firearms law makes it mandatory for any federally licensed firearms manufacturer or dealer to observe the purchase-permit requirement of any State which has such a requirement for the purchase of a firearm. Here, however, it is important to note that only 8 of the 50 States enacted a purchase-permit requirement, and in all cases with respect to the purchase of a pistol or revolver. At the same time, virtually all States do have statutes regulating the acquisition of firearms by minor children. It is these State and local statutes which are being circumvented by mail order and are creating the pressing problem before us.

The committee has drafted legislation to effectively plug this loophole by providing that a federally licensed manufacturer or dealer, in shipping a pistol or revolver by common carrier, must notify the carrier that the package being transported contains a pistol or revolver. The law then places the responsibility on the common carrier to knowingly make no delivery of such a package to a person who is a minor or otherwise prohibited from receiving or possessing a handgun.

It is believed that this, in addition to the sworn affidavit requirement provided in S. 3767 and the notification to local law enforcement authorities, will provide the necessary and timely information to State and local enforcement officials to enable them to enforce the applicable laws in their respective jurisdictions.

These provisions will serve to give greatest assurance that State and local laws can be effectively enforced, without the necessity of encroaching unduly upon the longstanding rights and privileges of the millions of firearms owners, collectors, and users who put them to legal, wholesome, and beneficial use.

*What S. 3767 does not do*

The subject bill does not have special provisions which apply to imported firearms, destructive devices, or rifles and shotguns.

Imported firearms have been singled out by proponents of highly restrictive firearms control legislation for embargoes in some cases and unusual requirements such as meeting recognized safety standards in others. However, the testimony before the committee indicated clearly that imported firearms are not inherently evil because of their origin. They are brought into this country in as wide a range of price and variety as are their domestically manufactured counterparts. To be sure, they should be subject to the same controls and restrictions which apply to all firearms, but no reason could be ascertained to apply embargoes and unusual restrictions against them. In any event, any such restrictions fall beyond the jurisdiction or competency of this committee since questions of foreign trade and relations policy are involved. Properly these matters should be considered by the Senate Committees on Finance and Foreign Relations. Detailed comments on imported firearms follow later in this report.

The subject bill does not deal with the so-called destructive devices such as bazookas, rockets, mines, heavy field artillery and the like.

S. 3767 is intended to amend the Federal Firearms Act of 1938, which primarily governs interstate and foreign commerce in firearms used for sporting purposes. The National Firearms Act of 1934, the so-called Machinegun Act, has effectively controlled interstate commerce in machineguns, other automatic weapons, and sawed-off rifles and shotguns by imposing heavy ($200) transfer taxes on each sale and a national registration system of all such weapons.

While the destructive devices are not a substantial factor in the commission of serious crimes (only a handful of cases were made known to the committee in which these weapons were actually used in the commission of the 86,000 firearms crimes committed in 1965), neither are there any significant sporting purposes for which they are suited.

Both Senators Dodd and Hruska have introduced bills to bring destructive devices within the scope of the National Firearms Act. These bills are pending in the Senate Committee on Finance. These bills should be given early consideration.

The subject bill does not impose special procedures or restrictions on the long gun, although many of the bill's provisions apply to all firearms. The evidence before the committee has overwhelmingly demonstrated that the handgun is the type of firearm that is principally used in the commission of serious crime. Thus, it is the subject of special provisions which require the submission of a sworn statement by the purchaser and waiting periods before delivery can be effected by the dealer or manufacturer. Also, persons under the age of 21 cannot obtain handguns by interstate mail-order shipment. Rifles and shotguns are exempted from these additional requirements, since they are used substantially less frequently by the lawless and because of their preponderant use in a lawful and beneficial manner.

## ENFORCEMENT OF EXISTING FEDERAL LAW

Experience and testimony before this committee indicate that the operation of the Federal Firearms Act over the years has demonstrated certain weaknesses which call for correction. The object of S. 3767 is to remove these weaknesses in the interest of more effective and efficient law enforcement.

Many of the problems which some persons ascribe to the present Federal firearms statutes are, in reality, not the fault of the law itself but a result of the yet unsolved problem of uniform and effective administration of the criminal law. This problem has several factors, not the least of which are overworked and understaffed enforcement agencies and similarly overworked but frequently too lenient prosecutors and courts. The record shows that indictments and convictions under the existing Federal firearms statutes have been relatively few, and the comparative rarity of successful action in the courts by the Federal Government have contributed to a compounding of the problems of reasonable and effective firearms regulation.

Apparently, in a number of instances, the public authorities are not fully utilizing the tools available to them at present under Federal law. Testimony has been presented to this committee that a State conservation agency, in the course of apprehending individuals in violation of game laws or in routine checking, has had occasion to turn over to Federal enforcement personnel weapons in violation of the

National Firearms Act. To its knowledge, this conservation agency has never heard of a Federal prosecution resulting from those seizures. Further, testimony before this committee has brought out that in a number of instances Federal agents have apprehended individuals in serious violation of the Federal firearms laws but that no action has resulted from the arrest of these individuals. This is a matter of concern to this committee and ought to be considered in evaluating the desirability and necessity for additional firearms controls.

A police official of a large American city testified before this committee that in the first 6 months of 1965, police officers "stopped and searched and found 256 persons carrying, in most instances, handguns. The arrested persons were charged with carrying a concealed weapon and warrants were applied for in all these cases. However, due to frailties in the law, only 81 warrants were issued."

Another police official testified that even though his State has a law requiring permits for the purchase of handguns, serious difficulty was encountered with persons obtaining handguns by mail order from out-of-State dealers. These sales apparently are in violation of section 2(c) of the Federal Firearms Act (15 U.S.C. 902(c)). Yet, no evidence was presented to the committee that these violations were prosecuted.

This committee is fully aware that the foregoing examples could be amplified many times. If this be the case, and the evidence points in that direction, then this committee believes that the solution to the problem of firearms in crime lies not in highly restrictive legislative controls but in the understanding and proper handling of all operative factors in the field of crime and criminal administration.

### LAWFUL USE OF FIREARMS

As detailed earlier in this report, specific needs for amendment of the Federal Firearms Act have been demonstrated in the hearings before the committee. The subject bill, S. 3767, has effectively addressed itself to these problems which must be resolved. Yet, in the drafting of the reported bill, the committee has been scrupulously careful to avoid any undue restrictions upon the legitimate, proper, and beneficial use of firearms, for when taken in the entire context and on balance, the place and role of privately owned and used firearms are necessary and wholesome as they have always been in the history of this Nation. Their legitimate role should be maintained.

Any legislation intended to deal with those who unlawfully use firearms must be made to concentrate on them as effectively as possible without encroaching upon the vast preponderance of the public who use firearms in a lawful and beneficial manner.

In seeking to protect the constitutionally guaranteed right of our citizenry to keep and bear arms for lawful purposes, the committee was considering a factor in our society of no mean proportion. Best estimates indicate that there are, within the United States, over 100 million privately owned firearms in the possession of over 20 million citizens.

The committee considered the hundreds of thousands of shooters who enter into formal rifle, pistol, and shotgun competitive shooting, and the millions who use these same types of firearms for informal skeet, trap, and target shooting. Not only does this use of firearms provide a healthy recreational activity, but it provides, as a valuable

national asset, a great number of young men who are, prior to their entering our Armed Forces, familiar with firearms and skilled in their use. In Vietnam, as in every armed conflict, it is evident that, in spite of spectacular advances in weaponry systems, we are still faced with a need for skilled riflemen. The plain fact that preinduction firearms training produces more capable and effective soldiers was recently made clear by a Department of Defense study.

The study, which was conducted for the Department of the Army by the Arthur D. Little, Inc., a private industrial and management research firm, undertook to review completely the Army's civilian marksmanship program conducted by the National Board for the Promotion of Rifle Practice.

A brief summary of the findings of that evaluation follows:

> The results of our study indicate that the civilian marksmanship program * * * contributes significantly to the development of rifle marksmanship proficiency and confidence in the ability to use a rifle effectively in combat on the part of those who participate in the program or benefit indirectly from it.
>
> We believe that those aspects of the DCM program which relate to the broader interest and participation in rifle shooting among the youth of our country (primarily club activities) should be emphasized more and pursued even more effectively to reach a greater percentage of those young men likely to enter military service.

This study indicates clearly that a continuation and implementation of the program is necessary for the defense of our country.

The committee was cognizant of the many collectors of legitimate firearms of all types; the students of firearms history and development who are just as serious about their respectable hobby as those who collect stamps, automobiles, or works of art.

While in no way advocating that individuals take the law into their own hands, the committee is aware that there are millions of homes where firearms have a proper place for self-protection.

Finally, the committee endeavored to draft legislation which would not unnecessarily restrict the activities of the more than 15 million hunters in this country. Hunting provides a healthy outdoor recreation which can be enjoyed throughout the lifetime of an active adult. This activity is an effective instrument of wildlife management utilized by Federal and State wildlife managers. In addition, these sportsmen fund, in large part, Government programs of wildlife management through the purchase of hunting licenses, and through the allocated Federal excise taxes paid upon the sales of sporting arms and ammunition.

Furthermore, the recent report by the U.S. Department of the Interior, Bureau of Sport Fisheries and Wildlife, is noteworthy. Its 1965 National Survey of Fishing and Hunting revealed that during this period, 13,583,000 hunters spent a total of $1,121,135,000 in pursuit of their sports. They took 169,377,000 trips in spending 185,819,000 recreation days afield. They traveled 8,659,034,000 passenger miles, principally by auto, to reach and return from hunting areas. Collectively and individually, hunting supports a significant portion of the economy.

The lawful and legitimate use of firearms by our citizenry is a widespread and worthwhile activity which must not be unnecessarily impaired. The committee believes that this bill preserves the freedom of activity for these more than 20 million lawful firearms users while effectively confronting the infinitesimal fraction of this number which represents those who use firearms in an antisocial manner.

## DESTRUCTIVE DEVICES

During last year's firearms hearings, much attention was devoted to the so-called destructive devices—rockets, mortars, bazookas, grenades, mines, bombs, missiles, field artillery, and the like. Imports of such military hardware were featured at the hearings as a major reason for authorizing an embargo on military surplus of all kinds and other categories of firearms.

While these devices do not appear to be used significantly in the commission of serious crime, it was not contended by any of the sportsmen's groups whose representatives testified in opposition to S. 1592 that there were legitimate sporting uses for them. One of the larger importers of firearms recommended that import licenses be denied such military ordnance under section 414 of the Mutual Security Act, as amended. The Munitions Control Office of the State Department advises that it no longer permits imports of this type.

Serious objections were raised to the inclusion in the Federal Firearms Act of prohibitions designed to take this or any other category of firearms out of commerce. This law was enacted primarily for the regulation of commerce in firearms generally used for sporting purposes—rifles, shotguns, and handguns. The National Firearms Act of 1934 (ch. 53 of the Internal Revenue Code of 1954) has long been the vehicle for removing from commerce weapons which are peculiarly susceptible to criminal use and not generally used for recreation. This act provides for the registration and prohibitory taxes on the transfer of automatic weapons such as machineguns and sawed-off rifles and shotguns. Also included are firearms mufflers and silencers. The National Firearms Act appears to have regulated effectively so-called gangster-type weapons in the years since its enactment. Persuasive testimony at the hearings brought out the advantages of preserving the essential difference between the two acts. Obviously, it would be more effective to restrict commerce in all destructive devices, not merely imports, and to subject all prohibited weapons to the same enforcement and regulatory machinery.

*Imports*

The committee gave a good deal of consideration to the question of whether the Federal Firearms Act should be amended to authorize the Secretary of the Treasury to place embargoes on certain categories of imported firearms and special restrictions on others. The conclusion reached by a majority of the committee was that the purposes of the bill could be adequately accomplished through regulation of domestic commerce in firearms and that no clear basis had been established at the hearings to define types of firearms which particularly aggravated the crime problem and which were not also readily available from domestic sources. The committee felt strongly that discriminatory treatment of commerce and interference with consumer preference without a clear showing of overriding necessity should be

avoided.  Proposals to cut off certain imports and to ban mail-order sales of rifles made to military specifications were among the provisions which the committee rejected as unnecessary and discriminatory. This prevailing view is well expressed in a letter dated April 20, 1966, circulated to the full committee from one of its members who thus gave notice of his reservations while nonetheless voting to submit the subcommittee bill to the full committee.

As pointed out in the above section on so-called destructive devices, considerable attention was attracted at the hearings to the rather shocking idea that anyone can buy a bazooka, antitank gun, or other high-caliber military ordnance.  Taking destructive devices out of commerce is no justification whatsoever for an embargo on imports because (a) imports of these devices have already been cut off by the State Department under existing law, and (b) the need is for restrictions which reach destructive devices already in the United States. Pending bills to amend the National Firearms Act to include destructive devices will far more effectively accomplish the desired objective.

The proposed import restrictions would have given the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes.  If this authority means anything, it permits Federal officials to differ with the judgment of sportsmen expressed in the more familiar manner through consumer preference in the marketplace.  It is plain that the proponents of an embargo anticipated cutting off large quantities of imported firearms.  Quite obviously such large-scale imports would not exist in the absence of important consumer preference.  This committee is not prepared to make the unlikely assumption without evidence that substantial markets for imported products are composed of irresponsible or criminal citizens.  No justifiable criteria have been proposed for the Secretary of the Treasury to discriminate between various categories of imported firearms; on the contrary, the statements of the proponents of embargoes would encourage the Secretary to use this broad discretion to curtail the availability of firearms in general within the practical limitations of domestic politics. The fact that Treasury witnesses expressed no sensitivity to this problem further suggests the need for caution.

The hearings failed to establish inherent differences, which might bear on criminal use, between military and sporting small arms or between firearms manufactured abroad or in the United States. Despite a general tendency toward lower prices for imports and military surplus, the hearings revealed a considerable overlap with the retail prices of equally lethal domestic sporting firearms.  Furthermore, the hearings brought out the important role over the last 10 years of imported military surplus, largely bolt action rifles, in making inexpensive hunting and shooting equipment more widely available as a stimulant to outdoor sports and also to thousands of small businesses (gunsmiths, manufacturers of accessories and parts, sporterizers of surplus rifles, makers of ammunition and ammunition loading equipment and retailers).

The conclusion is inescapable that the purpose of proposing any embargo would be twofold: (a) remove lower cost firearms from the market, and (b) discriminate against imports because they are politically vulnerable and might enlist the support of competing domestic manufacturers.  The majority of the committee rejects on principle

the discriminatory implications of both justifications in a bill designed to meet the problem of crime in the United States. It is both impractical and unfair to legislate against low prices. Where should the line be drawn? Why should low-income sportsmen, frequently farmers and other country people to whom hunting is most important, bear the burden of Federal intervention in the marketplace?

The committee considered a proposal which originated quite recently on a subject not covered at the hearings. It would give the Secretary of the Treasury broad discretion to embargo imports on the grounds that they might be unsafe to the user. The injection of this issue may reflect the difficulty in finding plausible grounds for curbing imports. To establish Federal safety regulations in firearms is a complex step which should be carefully studied. It could require elaborate regulatory machinery. Why should safety standards be applied to imported firearms and not to the much larger commerce in new and used domestic firearms?

The device of an embargo on international trade raises complex questions with regard to U.S. treaty obligations. It could prejudice the future bargaining positions of our country if we oppose the misuse by other countries of public safety justifications for otherwise unacceptable protectionist moves. Import restrictions considered by the committee would require the Treasury Department to overlap a State Department import licensing system authorized by section 414 of the Mutual Security Act, as amended, which is working well and makes full use of the overseas investigatory facilities of the State Department. Such duplication would waste Government man-hours and unduly burden those affected by the overlapping regulation; no necessity for this inherently undesirable approach has been demonstrated.

For these reasons, it seemed plain to the majority of the committee that the foreign source of a firearm is no basis to outlaw it because, like a similar domestic firearm, it might be used in a crime. If nondiscriminatory restrictions on mail-order distribution and firearms dealers are adequate methods of firearms control for domestic products, they are adequate for imports. To declare imports somehow more evil than its comparable domestic product is not only illogical; it would be misunderstood by many as inspired by the collateral purpose of protecting American industry from foreign competition. Any such misunderstanding would jeopardize passage of the bill and the credibility and standing of any law which might finally be enacted.

## EXISTING FEDERAL LAWS RELATING TO FIREARMS

### A. NATIONAL FIREARMS ACT OF 1934, AS AMENDED

(a) Imposes a tax and registration on the making or transfer, among other weapons, of all fully automatic firearms and all short-barrel rifles and shotguns.

(b) Provides that all manufacturers and importers of, and dealers and pawnbrokers in, the foregoing kinds of firearms must pay an annual occupational tax.

### B. FEDERAL FIREARMS ACT OF 1938, AS AMENDED

(*a*) Requires the licensing of manufacturers and importers of, and dealers in, firearms, ammunition and components thereof;

(*b*) Provides certain restrictions on the movement of firearms and ammunition in interstate or foreign commerce;

(*c*) Prohibits convicted felons, persons under indictment, and fugitives from justice from shipping, transporting, or receiving firearms or ammunition in interstate or foreign commerce;

(*d*) Prohibits the shipment, transportation, or receipt of stolen firearms or ammunition, or firearms from which the serial number has been removed, obliterated or altered.

### C. MAILING OF CONCEALABLE FIREARMS (18 U.S.C. 1715)

(*a*) Prohibits the mailing of concealable firearms (i.e., handguns) except to officers of the Active or Reserve Forces; to law-enforcement officers whose duty is to serve warrants of arrest or commitment, to employees of the postal service; and to watchmen engaged in guarding any Government property;

(*b*) Permits the mailing of concealable firearms to or between firearms manufacturers and dealers.

### D. WEAPONS ABOARD AIRCRAFT (49 U.S.C. 1472(1))

(*a*) Prohibits the carrying on or about the person while aboard an aircraft engaged in air transportation of a concealed deadly or dangerous weapon;

(*b*) Permits the carrying of such weapon aboard such aircraft by any law-enforcement officer authorized to carry arms, or by any person authorized by regulations issued by the Administrator of the Federal Aviation Agency.

### E. MUTUAL SECURITY ACT OF 1954 (22 U.S.C. 1934)

(*a*) Gives authority to the President to control the export and import of arms, ammunition, implements of war, and technical data related thereto.

(*b*) Requires all persons engaging in these transactions to register with the U.S. Government, pay registration fees, and secure import licenses for all such materials imported into this country.

## SECTIONAL ANALYSIS OF THE PROVISIONS OF S. 3767

### SECTION 1

Section 1 of S. 3767 amends section 1 of the Federal Firearms Act (52 Stat. 1250) by restating and clarifying existing definitions contained in the act and adding several new definitions.

The definition of "person" is unchanged. The terms "interstate or foreign commerce," "firearm," "manufacturer," "dealer," and "fugitive from justice," have been restated and clarified. The term "ammunition" has been deleted. The terms "State," "pawnbroker," "Secretary," "crime of violence," and "indictment" are new.

14      FEDERAL FIREARMS AMENDMENTS OF 1966

*Paragraph (1)*

The definition of the term "person" in paragraph (1) of the bill is unchanged from the existing law (15 U.S.C. 901(1)).

*Paragraph (2)*

Paragraph (2) of section 1 of the bill adds a new definition "State" to simplify and clarify later provisions of the bill and the existing law. The Canal Zone is included in the definition. Previously it was excluded. Also included are the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa, the principal Commonwealth and possessions of the United States.

*Paragraph (3)*

Paragraph (3) restates the existing definition of "interstate or foreign commerce" (15 U.S.C. 901(2)). However, language has been removed that has been defined in paragraph (2) above.

*Paragraph (4)*

Paragraph (4) restates the definition of "firearm" and revises it to exclude from the act antique firearms made in 1898 or earlier. Also mufflers and silencers for firearms are removed from the definition.

The year 1898 was selected as the "cutoff" date on the basis of testimony presented to Congress by several gun collectors organizations and to be consistent with the regulations on importation of firearms issued by the Department of State pursuant to section 414 of the Mutual Security Act of 1954.

Mufflers and silencers for firearms are excluded from coverage since these items are included presently in the National Firearms Act (Ch. 53 of the Internal Revenue Code of 1954). This act provides for heavy transfer taxes and registration of all such items.

Also excluded from the present definition of the term "firearm" is "any part or parts" of a firearm. Experience in the administration of the Federal Firearms Act has indicated that it is impractical to treat each small part as if it were a firearm. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

Added to the term "firearm" are weapons which "may be readily converted to" a firearm. The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive. Such so-called starter pistols have been found to be a matter of serious concern to law enforcement officers.

*Paragraph (5)*

The definition of the term "handgun" in paragraph (5) is a new provision. This definition is necessary because of later provisions of the bill which have application solely to these firearms. There is no intention that handguns be exempted from any of the other provision of the bill since a handgun is a firearm within the meaning of paragraph (4) above.

The term includes "pistols," "revolvers" and "any other weapons originally designed to be fired by the use of a single hand" which are made to be fired by the use of a single hand and which are designed to fire or are capable of firing fixed cartridge ammunition.

*Paragraph (6)*

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 901(4)) except that references to ammunition, cartridge cases, primers, bullets, or propellant powder" have been stricken.

This deletion was made because experience in the administration of the Federal Firearms Act has showed that it is extremely difficult to control interstate and foreign commerce in ammunition.

The requirement that the manufacturer be "in the business of" manufacturing or importing firearms has been added to the definition to conform with a similar provision in the definition of "dealer."

*Paragraph (7)*

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) except that references to "ammunition, cartridge cases, primers, bullets, or propellant powder" have been stricken as in the definition of "manufacturer" above.

The word "special" has been stricken from the definition since a gunsmith or other person in the business of repairing firearms should be required to comply with the provisions of the Federal Firearms Act if he fits only barrels which do not fall into "special" category.

The words "or breech mechanism" have been stricken because they are unnecessary to a complete description of the functions performed by a person in the business of repairing firearms.

Other minor rephrasing of the language in the definition has been made to clarify the existing language.

*Paragraph (8)*

The definition of the term "pawnbroker" is a new provision. Pawnbroker dealers are covered under the provisions of the existing law in the same manner as other dealers. The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers.

Under this bill pawnbrokers would be subject to a higher license fee than other dealers.

*Paragraph (9)*

The definition of the term "Secretary" contained in paragraph (14) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

*Paragraph (10)*

The definition of the term "crime of violence" is new. The term includes "voluntary manslaughter, murder, rape, mayhem, kidnaping, robbery, burglary, housebreaking, extortion accompanied by threats of violence, assault with a dangerous weapon, assault with intent to commit any offense punishable by imprisonment for more than 1 year, arson punishable as a felony, or an attempt to commit any of the foregoing offenses."

Prior to an amendment of October 3, 1961 (75 Stat. 757), the term "crime of violence" was included in the act. However, the 1961 amendment substituted the term "crime punishable by imprisonment for a term exceeding 1 year" for the term formerly used.

On September 15, 1965, another amendment (79 Stat. 788) was enacted which gave persons convicted of "a crime punishable by imprisonment for a term exceeding 1 year (other than a crime involving

the use of a firearm or other weapon or a violation of the act or the National Firearms Act)" the privilege of applying to the Secretary of the Treasury for "relief from the disabilities under this act incurred by reason of such conviction" and the Secretary was authorized to grant relief. However, this privilege was not extended to persons who were indicted for felony crimes.

The effect of the 1965 amendment was to place certain convicted persons in a position to obtain relief from the prohibitions of the act, whereas certain persons under indictment could not.

Under these circumstances it was determined that a return to the previous concept of a crime of violence should be effected to remove the obvious disparity of treatment.

*Paragraph (11)*

The definition of the term "indictment" is a new provision. Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime. This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

*Paragraph (12)*

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to "Territory, the District of Columbia, or possession of the United States" omitted in accordance with the definition of "State" in paragraph (2) above.

*"Ammunition"*

The definition of the term "ammunition" has been stricken from the existing law (15 U.S.C. 901(7)), to exclude all ammunition from the coverage of the Federal Firearms Act.

Under existing law, the term included pistol and revolver ammunition. However, an evaluation of the evidence developed in the hearings before the committee showed that it is difficult to control effectively interstate and foreign commerce in conventional firearms ammunition used for sporting, recreational, and other lawful purposes and that the act was not enforced in this regard.

### SECTION 2

Section 2 of the Federal Firearms Act (15 U.S.C. 902) would be restated, revised and six new subsections added. References to ammunition have been eliminated in subsections (a), (b), (d), (e), and (g). Subsection (c) has been substantially revised and broadened. Subsections (f) and (i) have been restated and language stricken which has been declared unconstitutional. Subsections (j) through (o) are new.

*Subsection (a)*

Subsection (a) of section 2 of existing law (15 U.S.C. 902(a)) has been restated except that the words "or ammunition" have been stricken.

*Subsection (b)*

Subsection (b) of section 2 of existing law (15 U.S.C. 902(b)) has been restated except that the words "or ammunition" have been stricken and minor changes have been made for clarity.

*Subsection (c)*

Subsection (c) of section 2 of existing law (15 U.S.C. 902(c)) has been revised and its scope broadened so that it is an unlawful act within the meaning of the act for any Federal licensee to knowingly ship or transport directly or indirectly in interstate or foreign commerce any firearm (including rifles and shotguns as well as handguns) to any person in any State in violation of any State law which has application to the shipment.

The existing provision has application only to State firearms control laws which require purchase permits. Fewer than 10 States have such laws, whereas most States have firearms laws which impose controls and restrictions on the receipt, transportation or possession of firearms in a variety of ways.

This provision has been broadened to assist the States in the control of firearms commerce within their respective borders by insuring that channels of interstate and foreign commerce will not be used to circumvent applicable State laws.

It is not the intention of the subsection to impose absolute criminal liability on Federal licensees. It is contemplated that an affirmative defense would be allowed so that any person charged with a violation of this section may establish that he took reasonable efforts to ascertain that the shipment would not be in violation of the applicable State laws.

*Subsection (d)*

Subsection (d) of section 2 of the existing law (15 U.S.C. 902(d)) has been restated and modified. The words "or ammunition" have been stricken.

The term "crime of violence" has been inserted in lieu of a "crime punishable by imprisonment exceeding 1 year." This change substitutes language similar to that in section 2(d) of the Federal Firearms Act which was eliminated by the amendment of October 3, 1961 (75 Stat. 757). The 1961 amendment substituted the words "crime punishable by imprisonment for a term exceeding 1 year." The reason for the return to the previous language was stated in discussion of the definition of "crime of violence" in section 1(10).

The words "territories, possessions, or the District of Columbia" have been stricken as they fall within the meaning of the term "State" as defined in section 1(2) of the bill.

*Subsection (e)*

Subsection (e) of section 2 of the existing law (15 U.S.C. 902(e)) has been restated and modified by substituting crime "of violence" for the words "punishable by imprisonment for a term exceeding one year" and by striking the words "or ammunition."

*Subsection (f)*

Subsection (f) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(f)). The restatement eliminates the words "and the possession of a firearm or ammunition by any such person

shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this act," since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

*Subsection (g)*

Subsection (g) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(g)) and has been revised by striking the words "or ammunition" and making minor changes for clarity.

*Subsection (h)*

Subsection (h) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(h)) and the words "or ammunition" stricken wherever they appear. Also, minor changes have been made for clarity.

*Subsection (i)*

Subsection (i) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(i)). The restatement also deletes the words "and the possession of any such firearm shall be presumptive evidence that such firearm was being transported, shipped, or received, as the case may be, by the possessor in violation of this act" since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

*Subsection (j)*

Subsection (j) as changed by section 2 of the bill is a new provision which would make it unlawful for any licensee under the act knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package containing a firearm, without written notice to the carrier that a firearm is being transported or shipped. This provision is correlated to the provisions of section 2(c). Testimony before the committee disclosed the existence of a practice of surreptitiously shipping firearms, without notice or disclosure, to circumvent requirements of Federal or State law.

*Subsection (k)*

Subsection (k) prohibits a common or contract carrier from delivering in interstate or foreign commerce any firearm to any person knowing or having reasonable cause to believe that such person is under 21 years of age.

*Subsection (l)*

Subsection (l) as added by section 2 of the bill is a new provision that would establish a procedure whereby the channels of interstate and foreign commerce could not be used to circumvent applicable State laws and local ordinances. It would make it a violation of the Federal Firearms Act for any licensee to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or dealer unless the prospective recipient has submitted a sworn statement to the manufacturer or dealer containing material information pertaining to the sale. The dealer must then forward a copy of the statement to the appropriate local law enforcement officer or designated State official by registered or certified mail, receive a return receipt evidencing delivery of the letter or notice of refusal to accept the

letter, and wait at least 7 days after return of the receipt or refusal before making delivery of the handgun to the recipient.

*Paragraph (1)*

Paragraph (1) of such subsection (l) provides that the sworn statement to be submitted to the dealer or manufacturer by the prospective recipient shall be in such form as prescribed by the Secretary of the Treasury and shall contain the following information: (1) That the recipient is at least 21 years or more of age; (2) that he is not prohibited by the Federal Firearms Act from receiving a handgun in interstate or foreign commerce; (3) that there are no provisions of applicable State law or local ordinance which would be violated by the purchaser's receipt or possession of the handgun; and (4) the title, name, and official address of the principal law enforcement officer where the handgun is to be shipped.

*Paragraph (2)*

Paragraph (2) of such subsection (l) provides that prior to shipment of the handgun to the purchaser, the dealer, or manufacturer shall forward to the appropriate local law enforcement or State official a description of the handgun (not including serial number) and a copy of the sworn statement by registered or certified mail. Also, the dealer must receive a return receipt evidencing delivery of the letter containing the description of the handgun and the copy of the sworn statement or a notice of refusal to accept the letter in accordance with the applicable regulations of the Post Office Department.

*Paragraph (3)*

Paragraph (3) of such subsection (l) would impose a 7-day waiting period following receipt of the notification of the local law enforcement officer's acceptance or refusal before the manufacturer or dealer could make delivery to the consignee.

In addition, subsection (l) provides (1) that the Governor of any State may designate any official in his State to receive the notification to local law enforcement officials required by this subsection and that the Secretary shall publish such designation in the Federal Register; and (2) that the Governor of any State may request that the Secretary discontinue the required notification to local law enforcement officials in his State or any part thereof and upon publication in the Federal Register, the request shall be in effect for 5 years, unless withdrawn by the Governor and so published in the Federal Register.

*Subsection (m)*

Subsection (m) as added by section 2 of the bill is a new provision prohibiting licensees under the act from selling a handgun to an unlicensed individual who is a resident of a State, other than that in which the manufacturer's or dealer's place of business is located without compliance with the provisions of subsection (l) above.   The subsection is intended to deal with the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities.   The hearings before the committee have demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms.   The hearings have also shown

that this is a means by which criminal and lawless elements obtain firearms.

This provision allows such handgun purchases to be made, but only after compliance with the detailed procedures set forth in subsection (l) above.

*Subsection (n)*

Subsection (n) of section 2 of the bill is a new provision that would make it unlawful for any person, in purchasing or otherwise obtaining or attempting to purchase or otherwise obtain a firearm from a licensed manufacturer or licensed dealer under this act, knowingly to make any written or oral false statement or to knowingly supply any false or spurious information or identification intended or calculated to deceive such licensee with respect to such person's identity, age, address, or criminal record (if any), or with respect to any other material fact pertinent to the lawfulness of a sale or other disposition of a firearm by a licensed manufacturer or licensed dealer.

*Subsection (o)*

Subsection (o) of section 2 as contained in the bill is a new provision that would make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased or otherwise obtained outside that State if it is unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

The intent of this provision is to assist the States and their political subdivisions in the enforcement of applicable firearms control laws and ordinances by imposing Federal felony sanctions upon those who utilize channels of interstate or foreign commerce to circumvent or evade these laws and ordinances.

### SECTION 3

Section 3 of the bill would restate and revise section 3 of the Federal Firearms Act (15 U.S.C. 903).   All references to ammunition would be stricken along with references to territories and possessions.

Subsection (a) of the existing law would be revised and the fee schedules for manufacturers, dealers, and pawnbrokers set forth in separate paragraphs.   The fees for manufacturers and dealers would be increased.   The fee for pawnbroker dealers is new.   Subsection (b) of the existing law would be revised and three new requirements for obtaining a Federal license established.   The applicant must be at least 21 years of age, must not be prohibited from transporting firearms under the provisions of the act, and must not have made false statements or misrepresented material facts in connection with his application.   Subsection (c) of the bill is a new provision intended to substitute for section 3(c) of the existing law.   Subsection (d) is a restatement of the recordkeeping requirement of existing law with minor changes.

*Subsection (a)*

Subsection (a) of the bill is intended to make it clear that no person shall engage in business as a manufacturer of firearms, or as a dealer in firearms until he has filed an application with, and received a license to do so from the Secretary.   In order to regulate effectively interstate and foreign commerce in firearms it is necessary that all persons en-

gaging in these businesses be licensed. Similar provisions were upheld in *Hanf* v. *United States* (235 F. 2d 710, cert. den. 352 U.S. 880), as reasonably necessary to effective control of interstate and foreign commerce under comparable conditions.

Subsection (a) also provides that the application for a license shall be in such form and contain such information as the Secretary of the Treasury shall by regulation prescribe. It is the intent of this provision to authorize the Secretary to require the submission of information reasonably relevant to the determination as to whether the applicant is entitled to a license under the standards prescribed in subsection (b). Since the Secretary has the responsibility for determining whether the license should be issued, he must necessarily have the authority to require the submission by the applicant of information relevant to his determination as to the applicant's eligibility. Authority to prescribe the form of the license application has been exercised by the Secretary since the Federal Firearms Act was enacted in 1938.

Subsection (a) also increases license fees presently contained in section 3(a) of the Federal Firearms Act and adds a new fee for pawnbrokers. The annual fee for manufacturers (including importers) would be doubled from $25 to $50. Fees for dealers (including gunsmiths) would be increased from $1 to $10, except that a one-time fee of $25 would be levied for the first renewal date following the effective date of the bill or for the first year the dealer is engaged in business. This additional charge would help to defray the costs of the investigation necessary to determine if the applicant has met the licensing requirements contained in section 3(b) of the bill.

A separate license with a higher license fee is also provided for pawnbroker dealers. A "pawnbroker" is defined in paragraph (8) of section 1 of the bill. It is noted that under the National Firearms Act (26 U.S.C. ch. 53) pawnbroker dealers are charged a higher rate of occupational tax than other dealers.

Since all references to ammunition would be removed from the act by the bill, the substantial number of persons who deal only in ammunition will not be required to obtain a license under the act. Thus, ammunition reloaders and ammunition dealers will not be affected by the bill.

*Subsection (b)*

Subsection (b) establishes three conditions under which no licenses shall be issued by the Secretary of the Treasury or his designee. An application for a license shall be denied if the applicant is "under 21 years of age," if he is "prohibited by the provisions of the act from transporting, shipping, selling, or receiving firearms in interstate or foreign commerce," and if the applicant has "willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application."

*Subsection (c)*

Subsection (c) as contained in the bill replaces the provisions of existing law contained in section 3(c) of the act (15 U.S.C. 903(c)) and reflects the construction of existing law as contained in current regulations (26 CFR, pt. 177).

The requirement of existing law, concerning the posting of a bond by a licensee convicted of a violation of the act in order to continue operations pending final disposition of the case on appeal, serves no

useful purpose, and has been omitted. Further, the provisions of this subsection have been revised to simplify administration. Since the licensee is required to reapply each year for a license, the information on the application relating to his indictment and/or conviction will be adequate. Also, the license itself can, as at present, contain a warning that the licensee cannot continue operations once his conviction has become final (other than as provided in section 10 of the existing law).

As under existing law and regulations, a new license will not be issued to a person under indictment for, or who has been convicted of, an offense punishable by imprisonment for a term exceeding 1 year. However, a licensed manufacturer or licensed dealer may continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be subject to all provisions of this act, and operations pursuant to such license shall be discontinued. If a bona fide application for relief is filed under section 10 of the act, operations may continue until such application is acted upon.

*Subsection (d)*

Subsection (d) would restate and revise section 3(d) of the Federal Firearms Act (15 U.S.C. 903(d)). References to ammunition would be removed from the existing law. The word "permanent" would be stricken from the recordkeeping requirement of the subsection, since the Secretary of Treasury is given specific authority to prescribe regulations for the implementation of this requirement. The length of time for which the records should be kept and maintained by licensees under the provisions of the act and other administrative details would be left to the discretion of the Secretary. Thus, the word "permanent" becomes meaningless. It is anticipated that any regulations issued under that authority granted by this subsection of the bill would be reasonable and in accordance with good commercial practice and custom.

### SECTION 4

Section 4 of the bill would restate section 4 of the Federal Firearms Act (15 U.S.C. 904), strike the references to ammunition and to territories, possessions and the District of Columbia, and renumber and revise several provisions of the section for clarity.

*Subsection (a)*

Subsection 4(a) of the bill would restate portions of section 4 of the Federal Firearms Act (15 U.S.C. 904) and make several modifications thereof. Ammunition would be removed as elsewhere in the bill. The words "territory, or possession, or the District of Columbia," would be stricken consistent with their deletion in other sections of the bill. Other revisions would be made by renumbering and rephrasing provisions of the section for clarity without changing the meaning of existing law.

*Subsection (b)*

Subsection 4(b) of the bill would restate the remainder of section 4 of the Federal Firearms Act (15 U.S.C. 904) and would make certain

modifications.   All references to ammunition would be deleted.   The Secretary of "Defense or his designee" would be substituted for the Secretary of "War".   The words "receipt or" would be added to the last sentence of the section to clarify the provision contained therein and other technical revisions made for the same purpose without altering the meaning of existing law.

### SECTION 5

Section 5 of the bill would restate section 5 of the Federal Firearms Act, add an element of reasonable cause to the provision which makes it unlawful for an applicant for a license or exemption to make a false statement in connection with the application, increase the maximum penalties provided for in the act from $2,000 to $10,000 and from 2 years to 10 years, provide for parole of sentenced offenders as the board of parole shall determine, remove the reference to ammunition contained in subsection (b), and update the reference to the Internal Revenue Code.

*Subsection (a)*

Subsection (a) of section 5 of the bill would restate the existing law (15 U.S.C. 905(a)) and make several changes.   The words "or having reasonable cause to know" would be added to the provision which sets forth the unlawful act of making a false statement in connection with an application for a license or an exemption under the provisions of the Federal Firearms Act.

The maximum penalty provisions for violation of the Federal Firearms Act would be increased from $5,000 to $10,000 and 2 years to 10 years to serve as a further deterrence to potential violators of the act.   It is anticipated that this change will have the effect of increasing compliance with the act's provisions.

All sentenced violators are made eligible for parole "as the board of parole shall determine."   Thus, the opportunity will be available to keep hardened criminals away from the law-abiding community for a substantial period of time, but at the same time provide flexibility to correctional officials so that they may work with those who show significant potential for rehabilitation.

*Subsection (b)*

Subsection (b) of section 5 of the bill would restate subsection (b) of section 5 of the existing law (15 U.S.C. 905(b)) and make minor changes.   The reference to ammunition would be deleted.   The reference to the Internal Revenue Code would be changed to reflect the recodification of the code which was accomplished in 1954.

### SECTION 6

Section 6 of the bill would amend the Federal Firearms Act by adding a new section 11 which would provide that nothing contained in the act shall be construed as "modifying or affecting the requirements" of the provisions of the Mutual Security Act of 1954 which deal with "the manufacture, exportation, and importation of arms, ammunition, and implements of war."

Section 414 of that act gives authority to the President to control the export and import of arms, ammunition, implements of war, and technical data related thereto.   It also requires all persons engaging

24        FEDERAL FIREARMS AMENDMENTS OF 1966

in these transactions to register with the U.S. Government, pay registration fees, and secure import licenses for all such materials imported into this country.

### SECTION 7

Section 7 of the bill would establish the date at which time the amendments and changes made by the bill become effective. The effective date would be "the first day of the sixth month beginning after the date of enactment" of the amendments. It is felt that this period of time will be sufficient for the promulgation and dissemination of any regulations necessary to implement the amendments to the act made by the bill and would afford ample opportunity for comment of persons who would be affected by the regulations.

### SECTION 8

Section 8 of the bill would set forth a short title for the bill, "Federal Firearms Amendments of 1966."

### CHANGES IN EXISTING LAW

In compliance with subsection 4 of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### THE FEDERAL FIREARMS ACT

That as used in this Act—

(1) The term "person" includes an individual, partnership, association, or corporation.

*(2) The term "State" includes each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, the Canal Zone, and American Samoa.*

[(2)] *(3)* The term "interstate or foreign commerce" means commerce between any State [, Territory, or possession (not including the Canal Zone), or the District of Columbia,] and any place outside thereof; or between points within the same State, [, Territory, or possession (not including the Canal Zone), or the District of Columbia,] but through any place outside thereof; or within any [Territory or] possession or the District of Columbia.

[(3)] *(4)* The term "firearm", *except when the context otherwise requires,* means any weapon, *manufactured after the year 1898,* by [whatever] *whatsoever* name known, which *will, or* is designed to, *or which may be readily converted to,* expel a projectile or projectiles by the action of an explosive [and a firearm muffler or firearm silencer, or any part or parts of such weapon] *or the frame or receiver of any such weapon.*

*(5) The term "handgun" means any pistol or revolver originally designed to be fired by the use of a single hand and which is designed to fire or capable of firing fixed cartridge ammunition, or any other firearm originally designed to be fired by the use of a single hand.*

[(4)] *(6)* The term "manufacturer" means any person engaged in the [manufacture or importation of firearms, or ammunition

or cartridge cases, primers, bullets, or propellent powder❩ *business of manufacturing or importing firearms* for purposes of sale or distribution ❨; and the❩. *The* term "licensed manufacturer" means any such person licensed under the provisions of this Act.

❨(5)❩ *(7)* The term "dealer" means any person engaged in the business of selling firearms ❨or ammunition or cartridge cases, primers, bullets or propellent powder,❩ at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting ❨special❩ barrels, stocks, *or* trigger mechanisms ❨, or breech mechanisms❩ to firearms, *or any person who is a pawnbroker. The* ❨and the❩ term "licensed dealer" means any ❨such person❩ *dealer who is* licensed under the provisions of this Act.

*(8) The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the repayment of money loaned thereon.*

*(9) The term "Secretary" means the Secretary of the Treasury or his designee.*

*(10) The term "crime of violence" includes voluntary manslaughter, murder, rape, mayhem, kidnaping, robbery, burglary, housebreaking, extortion accompanied by threats of violence, assault with a dangerous weapon, assault with intent to commit any offense punishable by imprisonment for more than one year, arson punishable as a felony, or an attempt to commit any of the foregoing offenses.*

*(11) The term "indictment" includes an indictment or any information in any court of the United States or in any court of any State under which a crime of violence may be prosecuted.*

❨(6)❩ *(12)* The term "fugitive from justice" means any person who has fled from any State ❨, Territory, the District of Columbia, or possession of the United States❩ to avoid prosecution for a crime ❨punishable by imprisonment for a term exceeding one year❩ *of violence* or to avoid giving testimony in any criminal proceeding.

❨(7) The term "ammunition" shall include only pistol or revolver ammunition.  It shall not include shotgun shells, metallic ammunition suitable for use only in rifles, or any .22 caliber rimfire ammunition.❩

Sec. 2. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm ❨or ammunition❩ in interstate or foreign commerce.

(b) It shall be unlawful for any person to receive any firearm ❨or ammunition❩ transported or shipped in interstate or foreign commerce in violation of ❨subdivision❩ *subsection* (a) of this section, knowing or having reasonable cause to believe such ❨firearms❩ *firearm* ❨or ammunition❩ to have been transported or shipped in violation of ❨subdivision (a) of this section❩ *said subsection.*

(c) It shall be unlawful for any licensed manufacturer or *licensed* dealer to ❨transport or ship❩ *ship or transport, or cause to be shipped or transported,* any firearm in interstate or foreign commerce ❨to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer

by the prospective purchaser❜, *to any person in any State where the receipt by such person of such firearm would be in violation of any statute of such State unless the licensed manufacturer or licensed dealer establishes that he was unable to ascertain with reasonable effort that the shipment would be in violation of such State law.*

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm ❲or ammunition❳ to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States ❲, Territories, possessions, or the District of Columbia of a crime punishable by imprisonment for a term exceeding one year❳ *or in any court of any State of a crime of violence* or is a fugitive from justice.

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime ❲punishable by imprisonment for a term exceeding one year❳ *of violence*, or who is a fugitive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm ❲or ammunition❳.

(f) It shall be unlawful for any person who *is under indictment or who* has been convicted of a crime ❲punishable by imprisonment for a term exceeding one year❳ *of violence*, or *who* is a fugitive from justice, to receive any firearm ❲or ammunition❳ which has been shipped or transported in interstate or foreign commerce ❲, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or recieved, as the case may be, by such person in violation of this Act.❳

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm ❲or ammunition❳, knowing, or having reasonable cause to believe, ❲same❳ *such firearm* to have been stolen.

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm ❲or ammunition❳ or to pledge or accept as security for a loan any firearm ❲or ammunition❳ moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe, ❲the same❳ *such firearm* to have been stolen.

(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered ❲, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act.❳

*(j) It shall be unlawful for any manufacturer or dealer knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed manufacturers or licensed dealers, any package or other container in which there is any handgun without written notice to the carrier that such handgun is being transported or shipped.*

*(k) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce any handgun to any person with knowledge or with reasonable cause to believe that such person is under twenty-one years of age.*

**FEDERAL FIREARMS AMENDMENTS OF 1966**     **27**

(*l*)  *It shall be unlawful for any licensed manufacturer or licensed dealer to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or licensed dealer unless:*

(1) *such person has submitted to such manufacturer or dealer a sworn statement in such form and manner as the Secretary shall by regulation prescribe, containing the following information: (A) that such person is twenty-one years or more of age; (B) that he is not a person prohibited by this Act from receiving a handgun in interstate or foreign commerce; (C) that there are no provisions of law, regulations, or ordinances applicable to the locality to which the handgun will be shipped, which would be violated by such person's receipt or possession of the handgun; and (D) the title, name, and official address of the principal law enforcement officer of the locality to which the handgun will be shipped;*

(2) *such manufacturer or dealer has, prior to the shipment of such handgun, forwarded by registered or certified mail (return receipt requested) to (A) the local law enforcement officer named in the sworn statement, or (B) the official designated by the Governor of the State concerned under this subsection, a description of the handgun to be shipped (including the manufacturer, the caliber, the model and type of such handgun, but not including serial number identification), and one copy of the sworn statement, and has received a return receipt evidencing delivery of such letter, or such letter has been returned to such manufacturer or dealer due to the refusal of the named law enforcement officer or designated official to accept such letter in accordance with United States Post Office Department regulations; and*

(3) *such manufacturer or dealer has delayed shipment for a period of at least seven days following receipt of the notification of the local law enforcement officer's or designated official's acceptance or refusal of such letter.*

*A copy of the sworn statement and a copy of the notification to the local law enforcement officer or designated official along with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 3(d). For purposes of paragraph (2)(B), the Governor of any State may designate any official in his State to receive such notification for such State or any part thereof in lieu of the notification required by paragraph 2(A) and shall notify the Secretary of the name, title, and business address of such official and the Secretary shall publish in the Federal Register the name, title, and address of such official. Upon such publication, notification to the local law enforcement officers required under paragraph (2)(A) of this subsection will not be required for a period of five years from the date of such publication unless the request is withdrawn by the Governor of such State and such withdrawal is published in the Federal Register.*

(*m*)  *It shall be unlawful for any licensed manufacturer or licensed dealer to sell or deliver for sale any handgun to any person other than another licensed manufacturer or licensed dealer who is not a resident of the State in which such manufacturer's or dealer's place of business is located and in which the sale or delivery for sale is made, unless such manufacturer or dealer has, prior to sale, or delivery for sale of the handgun, complied with the provisions of subsection (1)(b) of this section.*

(*n*)  *It shall be unlawful for any person in connection with the acquisition or attempted acquisition of a firearm from a licensed manufacturer or licensed dealer to—*

     *(1) knowingly make any false or fictitious statement, written or oral; or*

     *(2) knowingly furnish or exhibit any false, fictitious, or misrepresented identification with the intention to deceive such manufacturer or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed manufacturer or licensed dealer under the provisions of this section.*

  *(o) It shall be unlawful for any person to transport or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.*

  Sec. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms [or ammunition] in interstate or foreign commerce shall [make] *file an* application [to] *for such license with* the Secretary [of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum], *in such form and containing such information as the Secretary shall by regulation prescribe.    Each such applicant shall be required to pay a fee for obtaining such license as follows:*

     *(1) If a manufacturer of firearms, a fee of $50 per annum;*

     *(2) If a dealer (other than a pawnbroker) in firearms, a fee of $10 per annum, except that for the first renewal following the effective date of the Federal Firearms Amendments of 1966 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25;*

     *(3) If a pawnbroker, a fee of $50 per annum.*

  (b) Upon *filing by a qualified applicant of a proper application and the* payment of the prescribed fee, the Secretary [of the Treasury] shall issue to such applicant [a license] *the license applied for,* which shall, *subject to the provisions of this Act,* entitle the licensee to transport, ship, *sell* and receive firearms [and ammunition] in interstate [and] *or* foreign commerce [unless and until the license is suspended or revoked in accordance with the provisions of this Act: *Provided,* That no license shall be issued to any applicant within two years after the revocation of a previous license] *during the period stated in the license.    No license shall be issued pursuant to this Act—*

     *(1) to any applicant who is under twenty-one years of age;*

     *(2) to any applicant, if the applicant (including, in the case of a corporation, partnership, or association, any individual who, directly or indirectly, has the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited by the provisions of this Act from transporting, shipping, selling or receiving firearms in interstate or foreign commerce; or*

     *(3) to any applicant who has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application.*

  [(c) Whenever any licensee is convicted of a violation of any of the provisions of this Act, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided,* That in the case of appeal from such conviction the licensee may

furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secretary of the Treasury shall suspend such license until he is notified by the clerk of the court of last appeal as to the final disposition of the case.⟧

(c) *The provisions of section 2 (d), (e), and (f) of this Act shall not apply in the case of a licensed manufacturer or licensed dealer who is under indictment for a crime of violence: Provided, That such manufacturer or dealer gives notice to the Secretary by registered or certified mail of his indictment within thirty days of the date of the indictment. A licensed manufacturer or licensed dealer who has given notice of his indictment to the Secretary, as provided in this subsection, may continue operation pursuant to his existing license during the term of such indictment, and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act, and operations pursuant to such license shall be discontinued.*

(d) ⟦Licensed dealers⟧ *Each licensed manufacturer and licensed dealer* shall maintain such ⟦permanent⟧ records of *production*, importation, *notification*, shipment, *sale* and other disposal of firearms ⟦and ammunition⟧ as the Secretary ⟦of the Treasury shall⟧ *may by regulation* prescribe.

SEC. 4. (a) The provisions of this Act shall not apply with ⟦respect⟧ *respect*—

(1) to the transportation, shipment, receipt, or importation of any ⟦firearm or ammunition,⟧ *firearms* sold or shipped to, or issued for the use ⟦of, (1)⟧ *of (A)* the United States or any department, independent establishment, or agency thereof; ⟦(2)⟧ (*B*) any State ⟦Territory, or possession, or the District of Columbia,⟧ or any department, independent establishment, agency, or any political subdivision thereof; ⟦(3)⟧ (*C*) any duly commissioned officer or agent of the United States, a State, ⟦Territory, or possession, or the District of Columbia,⟧ or any political subdivision thereof; ⟦(4) or to⟧ (*D*) any bank, ⟦public carrier, express⟧ *common or contract carrier, express company*, or armored-truck company organized and operating in good faith for the transportation of money and valuables, *which is granted an exemption by the Secretary*; or ⟦(5)⟧ (*E*) ⟦to⟧ any research laboratory designated ⟦by the Secretary of the Treasury: *Provided*, That such bank, public carriers, express, and armored-truck companies are granted exemption by the Secretary of the Treasury; nor⟧ *as such by the Secretary; or*

(2) to the transportation, shipment, or receipt of ⟦any⟧ antique or unserviceable firearms ⟦, or ammunition,⟧ possessed and held as ⟦curios or museum pieces: *Provided*, That nothing herein⟧ *a curio or museum piece.*

(b) *Nothing* contained in this ⟦section⟧ *Act* shall be construed to prevent shipments of firearms ⟦and ammunition⟧ to institutions, organizations, or persons to whom ⟦such⟧ firearms ⟦and ammunition⟧ may be lawfully delivered by the Secretary of ⟦War,⟧ *Defense or his designee*, nor to prevent the *receipt or* transportation of such firearms ⟦and ammunition so delivered⟧ by their lawful possessors while they are engaged in military training or in competitions.

SEC. 5. (a) Any person violating any of the provisions of this Act or any rules and regulations promulgated hereunder, or who makes

any statement in applying for the license or exemption provided for in this Act, knowing *or having reasonable cause to know* such statement to be false, shall, upon conviction thereof, be fined not more than ⟦$2,000⟧ *$10,000*, or imprisoned for not more than ⟦five⟧ *ten* years, or both, *and shall become eligible for parole as the Board of Parole shall determine.*

(b) Any firearm ⟦or ammunition⟧ involved in any violation of the provisions of this Act or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture, and all provisions of ⟦Title 26⟧ *the Internal Revenue Code of 1954* relating to the seizure, forfeiture, and disposition of firearms, as defined in section ⟦2733 of Title 26⟧ *5848(1) of said Code* shall, so far as applicable, extend to seizures and forfeitures incurred under the provisions of this Act.

 *  *  *  *  *  *  *

SEC. 10. A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this Act or of the National Firearms Act) may make application to the Secretary of the Treasury for relief from the disabilities under this Act incurred by reason of such conviction, and the Secretary of the Treasury may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest. A licensee conducting operations under this Act, who makes application for relief from the disabilities incurred under this Act by reason of such a conviction, shall not be barred by such conviction from further operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary of the Treasury grants relief to any person pursuant to this section, he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.

*SEC. 11. Nothing in this Act shall be construed as modifying or affecting the requirements of section 414 of the Mutual Security Act of 1954, as amended, with respect to the manufacture, exportation, and importation of arms, ammunition, and implements of war.*

## INDIVIDUAL VIEWS OF MESSRS. DODD, BAYH, KENNEDY OF MASSACHUSETTS, TYDINGS, FONG, JAVITS, SMATHERS, AND LONG OF MISSOURI

It became obvious late in the session that the controversial aspects of the firearms legislation proposed by the Juvenile Delinquency Subcommittee gave the administration bill little chance of being reported out of the full committee in this Congress. In view of that fact, even though a majority of the committee voted for S. 1592 initially, the committee finally voted to report S. 3767 favorably, and we did this with the intention of substituting S. 1592 for S. 3767 once the bill came to a vote on the Senate floor.

Eight of the sixteen members of the Judiciary Committee have signed these individual views, more than signed any other views contained in this report.

In our view, the report on S. 3767 raises serious questions.

The most important point is that this report has not been signed by a majority of the members of the Judiciary Committee.

It has not even been signed by all of the opponents of the administration's firearms control bill, S. 1592.

It should be noted that the report on S. 3767 was submitted to the members for approval shortly before it was to be printed. Thus, time did not permit much more than a brief analysis of the findings set out and the basis of those findings.

It is significant that the opponents' report does not even mention the major change contained in S. 3767, one which would weaken the present Federal Firearms Act (i.e., the return to the "crime of violence" standard as a substitute for the existing "felony" standard). Further, the record reflects no need for this change. This aspect of the bill is discussed subsequently.

There are several specific areas in the report on S. 3767 which are in direct contradiction to the facts and to the testimony presented before the Subcommittee To Investigate Juvenile Delinquency.

### COMMITTEE ACTION

The facts are as follows: In voting on the major provisions of S. 1592, i.e. the inclusion of handguns, the inclusion of rifles and shotguns, the inclusion of import controls and the inclusion of destructive device controls, the committee vote ₁was nine to five in favor of their inclusion.

It was the extended opposition of several members of the committee which led the supporters of S. 1592 to propose reporting S. 3767 from the committee as a means of getting some kind of gun bill to the Senate floor. They did this with the full intention of offering S. 1592 as a substitute for S. 3767.

31

*Rifles and shotguns*

The opponents' report claims that upon review of the testimony before the Juvenile Delinquency Subcommittee there is no justification for restrictions on rifles and shotguns. It ignores the testimony of Commander Leary of the Philadelphia Police Department, Deputy Comdr. Leonard Reisman of the New York Police Department, and Attorney General Sills of New Jersey. (Their testimony is referred to in the individual views of Senator Dodd.)

It ignores the fact that 1,690 persons were murdered and many thousands wounded with rifles and shotguns last year and that this figure represents a steady increase over the last 3 years.

*Imported firearms*

Under the title "What S. 3767 Would Not Do," the opponents' report completely ignores the testimony of law enforcement witnesses who enthusiastically supported S. 1592's ban on imported military surplus handguns and other foreign-made firearms, not suitable for lawful use. Completely overlooked is the evidence presented by Chief Herbert Jenkins, of Atlanta, Ga., Chief Curtis Brostron, of St. Louis, Mo., Attorney General Thomas Lynch, of California, Attorney General McLeod, of South Carolina, that great numbers of firearms used in crimes in their jurisdiction were in this category. (The individual views go into detail on this point.)

The report indicates that the same restrictions should be applied to imported firearms as are applied to domestic firearms and using this "equality" argument it denounces any embargo on imported firearms. This argument completely overlooks the existing Federal law, implemented by regulations, which prohibits the sale of domestic military surplus firearms to the public. (They *may* be obtained under limited and special circumstances under the civilian marksmanship program of the Department of Defense.) The report denounces embargoes on the one hand, yet later, as a partial rationale for excluding destructive devices from his bill, it indicates that the State Department, under the authority granted by the Mutual Security Act of 1954, as amended, can in fact embargo the importation of destructive devices.

The opponents' report further alleges that the Federal Firearms Act primarily governs interstate and foreign commerce in firearms used for sporting purposes. This is an unusual interpretation. The Federal Firearms Act covers all firearms, by definition, and to say otherwise represents a consummate failure to appreciate the legislative history of this law. The report states further that the National Firearms Act has effectively controlled firearms covered by that act.

This area is covered later in the individual views and, summarily the national act does not proscribe shipment and receipt by and to felons or fugitives. It merely imposes a transfer tax on transactions, and compliance with those provisions results in a lawful transfer. A felon could lawfully acquire a national act weapon under the language of that specific act. A prime example of the application of the national act concerns the recent case in Washington State, where a mental incompetent acquired, lawfully, a fully operable German machinegun, by paying the $200 transfer tax.

*Civilian marksmanship program*

The opponents' report cites a report of the Arthur D. Little Co. on the Office of the Director of Civilian Marksmanship (DCM) program which operates under the auspices of the National Board for the Promotion of Rifle Practice.

Based on this study, the opponents' report concludes:

> The plain fact that preinduction firearms training produces more capable and effective soldiers was recently made clear by a Department of Defense study.

Again this statement is not in keeping with the facts. First, the study did not show that such preinduction training produced more capable or effective soldiers. In fact, it stated that only 3 percent (385 men) of the 12,800 basic trainees surveyed at 4 basic training centers had previous DCM-affiliated club firearms training.

This is a rather insignificant number of the total number of trainees surveyed to make such a sweeping statement. More important, one of the crucial questions left unanswered by this study is the performance of both groups under combat conditions.

We *can* say that the study strongly suggests that the program is not doing what it is supposed to do, i.e., train significant numbers of young men in rifle proficiency before entering military service, so that they will be better marksmen in combat.

This statement is in direct contradiction to the testimony of the Department of Defense on S. 1592. In addition, we must point out that DCM-trained men are apparently not entering military service (3 percent of the trainees in a sampling of 12,800). One of the reasons for this is that a significant 42 percent of the members of the DCM clubs are over 25, an age after which the likelihood of being drafted drastically diminishes.

## COMPARISON OF S. 1592 AND S. 3767

S. 1592, the administration firearms control bill, was carefully studied by the Juvenile Delinquency Subcommittee during 11 days of hearings during May, June, and July of 1965 and then reported, as amended, to the full committee on May 19 of 1966.

It has been endorsed by the administration, by the American Bar Association, and by the International Association of Chiefs of Police. The bill has been supported editorially by virtually every leading newspaper in the country. Fully 70 percent of the people, according to a recent Gallup poll, favor enactment of legislation that would be much more restrictive than S. 1592 in controlling firearms in this country.

We believe that the need for the amendments to the Federal Firearms Act embodied in S. 1592, as amended by the subcommittee, has more than adequately been documented through testimony and other factual information coming to the attention of the subcommittee.

We do not consider that S. 3767 is a substitute for S. 1592. Its scope is much too narrow and limited. Its claimed effectiveness is very questionable. S. 3767 does not provide the controls that our hearings have demonstrated are necessary, if we are to effectively regulate the acquisition of firearms as a means of arresting the rising

crime rate. S. 3767 falls far short of the positive controls that the enactment of S. 1592 would bring about.

For example, S. 3767 does not propose any control at all over the indiscriminate sale of rifles and shotguns yet there were 1,690 murders committed in 1965 with these firearms. The hearing record on S. 1592 indicates that rifles and shotguns are misused, especially in those areas where there are stringent controls on the acquisition and the use of pistols and revolvers.

*Mail-order controls*

S. 3767 does not prohibit the mail-order sale of handguns to individuals as does S. 1592. The method of regulation envisioned in S. 3767 is a requirement that an affadavit be filed. This approach was rejected by the subcommittee because the provisions of S. 1592 would be much more effective. By cutting out these mail-order sales, we would assist the States materially in controlling handgun sales within their own borders.

S. 3767 retains the controls now in the Federal Firearms Act over the interstate movement of shotguns and rifles, but they are only a record-keeping requirement and a proscription on shipment and receipt by and to felons. In addition, the bill would eliminate many of the present controls over the interstate movement of mufflers and silencers. And S. 3767 does not include destructive devices, which has long been considered a serious omission in the act. S. 1592 would correct this omission.

The hearings clearly establish the need for additional controls over mail-order sales of all firearms and certain other devices. There is nothing in the hearing record to justify the elimination of mufflers and silencers, articles which have no legitimate use, and there is a need to control destructive devices as is proposed in S. 1592.

S. 1952 would authorize the mail-order shipment of rifles and shotguns subject to affidavit controls.

It would retain mufflers and silencers within the control of the Federal Firearms Act and it would extend these controls to destructive devices.

More significantly, the interstate movement of handguns, destructive devices, and ammunition for such devices, would be limited to licensees by S. 1592. Nonlicensed persons would be prohibited from making mail-order purchases of such weapons.

*Importations*

S. 3767 would not affect imported weapons, in spite of a wealth of testimony reflecting the need for the controls provided for in S. 1592. The record compiled on S. 1592 contains more than adequate documentation of the problems and dangers inherent in the unlimited importation of firearms.

S. 1592 is concerned with the importation of destructive devices, ammunition for such devices and surplus military weapons. It would prohibit the importation of destructive devices and ammunition therefor, and would place only reasonable restrictions on the importation of surplus military weapons.

*Licensing*

S. 3767 provides for the licensing of manufacturers and dealers receiving or shipping firearms in interstate or foreign commerce, as does the present statute. The criteria used for the issuance of a

license under the bill are that the applicant (1) must be at least 21 years of age, (2) is not prohibited by the act from shipping or receiving firearms in interstate or foreign commerce, and (3) has not willfully failed to disclose a material fact or made a false statement in his application.   An example readily illustrates the weakness in these proposed licensing features of the bill.   Assuming that requirement Nos. (1) and (3) are met, S. 3767 would not prevent the issuance of a license to one convicted of a violation of this very act, the National Firearms Act, the Narcotics Act, or many other felonies. Moreover, the privilege granted by a license could be suspended only in the event the licensee were finally convicted of a crime of violence. Thus the Government might be placed in the embarrassing position of having to authorize firearms operations by a person convicted of prior violations of the Federal firearms laws.

The licensing problem is treated in detail in S. 1592.   That bill would require anyone engaged in the business of manufacturing, importing or dealing in firearms to obtain a license.   That requirement is substantially broader than merely requiring a dealer or manufacturer shipping or receiving firearms in interstate or foreign commerce to obtain a license as does S. 3767.   The criteria for issuing a license under S. 1592 are keyed to the age of the applicant, whether the applicant will actually engage in the firearms business, whether he may lawfully ship or receive firearms in interstate or foreign commerce under the act, and whether, in view of the past record and reputation of the applicant, he is likely to conduct his business lawfully. In short, S. 1592, contemplates that the privilege of engaging in the firearms business should be extended only to those legitimately entitled to the confidence of society.   Moreover, the licensing provisions of S. 1592 recognize the right of one who has been denied a license to obtain a hearing as well as judicial review of the administrative decision depriving him of a license.   It should also be noted that under S. 1592, certain business-type felony convictions will not result in the "felony" sanctions.   Finally, if a person convicted of certain other felonies is, in fact, entitled to the confidence of society, under section 10 of the act, he could be granted relief at the discretion of the Secretary of the Treasury.

*Substituting "crime of violence" criteria for so-called "felony" criteria used in the present act and in S. 1592*

As just outlined, S. 3767 does not contain the licensing standards set forth in S. 1592.   Thus, under that bill it would be possible for a convicted gambler or racketeer to become licensed under the Federal Firearms Act.   There is another major flaw in S. 3767 which would allow an evasion of the major intent of the act.   In reverting to the pre-1961 preclusionary term "crime of violence" rather than retaining the term "crime punishable by imprisonment for a term exceeding 1 year", S. 3767 would not preclude a person who had violated a provision of the National or Federal Firearms Act from being licensed under the Federal act as a dealer, manufacturer or importer of firearms. This clearly is outside of the intent of the present act.

Under S. 3767, the Treasury Department would have to issue a license to a person who had violated the National Firearms Act or the Federal Firearms Act.   It is this type of violator that the present act has tried to get at and since passage of the 1961 amendment (changing crime of violence to crime punishable by a term of imprisonment

36        FEDERAL FIREARMS AMENDMENTS OF 1966

exceeding 1 year), there have been many denials of licenses to persons who have, in the past, violated one or both acts.

In view of the importance of this proposed change, we feel it is necessary to review the history of this part of the Federal Firearms Act. The "crime of violence" criteria appeared in the original Federal Firearms Act. However, the criteria of "crime punishable by imprisonment for a term exceeding 1 year"—the felony criteria—was substituted by Public Law 87–342.  Both Senate Report 364 (87th Cong., 1st sess.) and House Report 1202 (87th Cong., 1st sess.) on S. 1750, which became Public Law 87–342, stated:

> Over the past few years the infiltration of racketeering into our society and the exploding crime rate have increasingly become a cause for national concern.  New laws are needed to give the Federal Bureau of Investigation additional jurisdiction to assist local authorities in the common assault against crime.  S. 1750, introduced at the request of the Attorney General as an integral part of an anticrime legislative program, would be such a law.
>
> Additionally, it would make it more difficult for the criminal elements of our society to obtain firearms.
>
> The Attorney General's letter proposing the enactment of this legislation, a letter from the Comptroller General, as well as a letter from the executive vice president of the National Rifle Association of America urging such an enactment, are printed below.

In considering H.R. 9570 (89th Cong., 1st sess.), which later became Public Law 89–184, the Congress again looked at the crime of violence criteria in relation to the felony criteria.  That public law added section 10 (15 U.S.C. 910) to the Federal Firearms Act and through the provisions of that section, the Secretary is authorized to grant relief to felons (other than those who used a firearm or other weapon to commit a felony or were convicted of violating the Federal or National Firearms Act) under certain circumstances. Both Senate Report 666 (89th Cong., 1st sess.) and House Report 708 (89th Cong., 1st sess.) stated:

> Prior to 1961 the Federal Firearms Act prohibited such interstate traffic in firearms and ammunition only in the case of a person indicted for, or convicted of, a "crime of violence." The 1961 legislation changed this to the language indicated above; that is, substantially to any crime meeting the definition of a felony under Federal law (18 U.S.C. 1(1)).
>
> * * * However, your committee has concluded from an examination of this case that, under certain circumstances, it would be desirable to authorize the Secretary of the Treasury to grant relief from the disabilities imposed under the Federal Firearms Act in the case of felony convictions. Relief from the disabilities is provided, however, only where it is established to the Secretary's satisfaction that the circumstances regarding the conviction and the applicant's record and reputation are such that he will not be likely to conduct his operations in an unlawful manner and that the granting of the relief will not be contrary to the public interest.  Among the factors which would be given primary

consideration in the case of a corporation is the absence of culpability of any person, at the time the application is filed, having the power to direct or control the management of the corporation.

The Secretary of the Treasury is not given permission to grant such relief if the crime involves the use of a firearm or other weapon or a violation of the Federal Firearms Act or the National Firearms Act.

The record of hearings on S. 1592 shows no need to return to the crime of violence criteria. Yet, S. 3767 proposes such action. Moreover, the manner in which this criteria would be incorporated in the act by S. 3767 would create inconsistencies. Under the licensing provisions, as amended, a person convicted of a violation of the act, the National Firearms Act, a narcotics violation, or many other felonies would be entitled not only to continue a firearms business under an outstanding license but also to obtain a new license under the act in that the act would not prohibit foreign or interstate shipments or receipts by such persons. In addition, the provisions of section 10 of the act (15 U.S.C. 910) would, for all practical purposes, become meaningless.

S. 1592 retains the "felony" criteria. It is used in relation to unlawful acts. The licensing provisions incorporate this criteria and expand on it. Moreover, it should be noted that in those instances where this criteria may prove to be unjust the person affected may obtain relief pursuant to section 10 of the act under stated circumstances.

*Implementation of State firearms laws*

Section 902(c) of S. 3767 is written so as to be largely ineffective as a means of regulating the interstate movement of firearms.

It reads:

> It shall be unlawful for any licensed manufacturer or licensed dealer to ship or transport, or cause to be shipped or transported, any firearm in interstate or foreign commerce, to any person in any State where the receipt by such person of such firearm would be in violation of any statute of such State unless the licensed manufacturer or licensed dealer establishes that he was unable to ascertain with reasonable effort that the shipment would be in violation of such State law.

This provision would be of doubtful value in assisting the States to enforce their own gun laws for the following reasons: (1) It applies only to interstate shipment and would not prevent a felon or fugitive from buying a gun from a dealer, over the counter, in his own State; (2) it would punish shipment by licensees to purchasers in States where it would be unlawful for the buyer to receive a firearm; whereas most prohibitive State gun laws proscribe purchase, ownership, possession, transportation, and so forth, by criminals or other specified classes. They do not prohibit receipt. Most States would have to enact special legislation penalizing receipt of firearms in order to benefit from the proposed control; and (3) the "unless" clause would make it very difficult to establish an offense under this provision. This is the very problem now faced by the Treasury Department under the present act.

The language of the "unless" clause is faulty in that it relieves the dealer of criminal liability because the substantive offense is based on receipt in violation of State law rather than possession.

In the opinion of the Treasury Department this subsection would be as ineffective as is the present subsection 902(c) of the Federal Firearms Act, under which not a single conviction has been obtained since enactment of the act in 1938.

A further consideration is the fact that many political subdivisions of a State have enacted local laws or ordinances controlling the sale, transfer, or possession of firearms in their respective jurisdictional areas. This subsection would not assist authorities in such local areas in the enforcement of control provisions.

On the other hand, S. 1592 offers assistance to State and local authorities in controlling the movement of firearms into a State or political subdivision of a State. This, in fact, is one of the acute problems which the bill is designed to correct. In the case of handguns, and certain other types of weapons, this would be effected by limiting interstate shipments to those between licensees and prohibiting such weapons from being shipped interstate to nonlicensed persons. Moreover, S. 1592 would prohibit over-the-counter sales of handguns and certain other types of weapons to out-of-State residents. It specifically proscribes the sale of any firearm where the receipt or possession of the weapon would be in violation of any State or local law, regulation, or ordinance, and further, prohibits any one from bringing a firearm into his State of residence from another State if it would be unlawful for him to purchase or possess the firearm in the State of his residence or political subdivision thereof where he resides. It includes no proviso similar to that in S. 3767 which would render these prohibitions unenforceable.

*Destructive devices*

S. 3767 does not define nor provide special regulations over the acquisition of "destructive devices," weapons which are basically armaments of war. Thus, under S. 3767 any teenager could acquire through the mail order route an antitank gun in the same manner that he would acquire a .22 caliber rifle. We believe that destructive devices should be regulated in accordance with the provisions of S. 1592, which provides for strict controls over their acquisition.

The apparent rationale for failure to include "destructive devices" in S. 3767 is that such weapons should be covered only by the National Firearms Act rather than by the Federal Firearms Act, which S. 3767 would amend.

We do not concur with that rationale.

The National Firearms Act (1934) is intended to regulate and control the possession of automatic weapons under the taxing power. It is similar to the intent of the Marihuana Tax Act, that is to control, through taxing measures, certain commodities. The commodities controlled under the National Firearms Act are the gangster's weapons of the thirties, machineguns, sawed-off shotguns, etc.

The act requires the payment of a transfer tax of $200 on automatic weapons and of $5 on the other weapons covered in the act, which tax is paid by the transferor. If the taxing provisions of the act are complied with then the covered weapons may be lawfully obtained. Thus, a felon who complied with the transfer tax provision could lawfully purchase a machinegun, under the act.

FEDERAL FIREARMS AMENDMENTS OF 1966          39

The act does not proscribe sale to a felon or acquisition by a felon through movement in interstate commerce. However, the Federal Firearms Act (1938), which covers all firearms, does proscribe the interstate shipment and receipt of all firearms, including the National Act weapons, by and to felons and fugitives. Thus there is no rationale for including "destructive devices" in the National Act only. It is obvious that such weapons should be included in the Federal Firearms Act, if we are to control their interstate movement and acquisition adequately and effectively.

In summary, S. 3767 is quite limited and would not be as positive a crime deterrent as S. 1592. Further, in urging enactment of his bill, Senator Hruska has never made clear the inconveniences or extreme burdens of law-abiding sportsmen that S. 1592 would effect. All of our 50 States now have a substantial number of federally licensed dealers, thus any responsible person could purchase the firearm of his choice through such dealers with minor inconvenience of identifying himself, filling out a form and complying with the laws of his State.

If we hope to enact effective firearms legislation, then we cannot accept Senator Hruska's ineffective compromise. This is borne out through a perusal of the legislative history of the National and Federal Firearms Acts, both of which were watered down versions of the original proposals, and which have led to the tragic situation in this country today where any juvenile, criminal, or demented person can buy a gun with unbelievable ease.

A comparative analysis of S. 1592 and S. 3767 follows:

| S. 1592 | S. 3767 |
|---|---|
| Definition section: | |
| Defines firearms to include destructive devices, mufflers, and silencers. | No similar provision. |
| Defines specifically destructive devices (to provide for special regulation). | No similar provision. |
| Defines short barreled shotgun (to provide for special regulation). | No similar provision. |
| Defines short barreled rifle (to provide for special regulation). | No similar provision. |
| Defines importer specifically. | No similar provision. |
| Defines crime punishable by imprisonment for a term exceeding 1 year to exclude antitrust and similar violations. (The Federal Firearms Act was amended in 1961 to provide the felony criteria rather than more limited "crime of violence" which was in the original act, passed in 1938.) | Defines "crime of violence" in lieu of definition cited in column 1. (This is a reversion to the pre-1961 definition and is inconsistent with the Attorney General's amendment of that year defining "crime punishable by imprisonment for a term exceeding one year." Thus under Senator Hruska's bill a convicted racketeer or gambler could be licensed to ship or receive firearms in interstate commerce.) |

| S. 1592 | S. 3767 |
|---|---|
| Unlawful acts (Federal licensees, importers, manufacturers, and dealers): | |
| Prohibits the interstate mail-order sale of handguns. | Regulates mail-order sale of handguns through affidavit provisions. (Not as effective as provision in S. 1592.) |
| Regulates through affidavit provision interstate mail-order sale of rifles and shotguns. | No similar provision. |
| Prohibits the sale of handguns to nonresidents of the licensee's place of business (State). | Regulates through affidavit provision this type of sale. (Not as effective as S. 1592.) |
| Prohibits the sale of handguns to persons under 21 and of rifles and shotguns to persons under 18 in over-the-counter transactions. | No similar provision. |
| Prohibits the over-the-counter sale of firearms by licensees without identifying purchasers. | No similar provision. |
| Prohibits the sale of firearms over the counter in violation of State and local law. | No similar provision. |
| Prohibits delivery of handguns to persons under 21 and rifles and shotguns to persons under 18 by common or contract carriers and Post Office Department. (This does not apply to licensees only.) | No similar provision with regard to rifles and shotguns on the carriers or Post Office Department. |
| Licensing: | |
| Licenses all manufacturers, importers, and dealers in firearms engaged in business. (Power to license is consistent with the commerce clause of Constitution.) | No similar provision. Retains present Federal Firearms Act terminology for licensing, transportation, or receipt in interstate or foreign commerce. |
| Sets forth licensing standards to insure bona fide status of licensees and compliance with the act. | No similar provision. |
| Importation of firearms: | |
| Prohibits importation of military surplus and other foreign-made nonsporting handguns as well as destructive devices and National Firearms Act weapons. (Allows importation of new foreign-made quality firearms suitable for sporting purposes and military surplus rifles and shotguns in the same category.) | No similar provision. |
| Regulation of destructive devices and National Firearms Act | |

| S. 1592 | S. 3767 |
|---|---|
| weapons, short barreled rifles and shotguns, machineguns, etc.: | |
| Provides for stringent controls over sale of these firearms. | No similar provision. |
| Recordkeeping provisions: | |
| Provides for adequate recordkeeping and periodic examination of these records to insure compliance with the act. Provides for making available to State and local officials pertinent record information for use in law enforcement. | Retains wording of present Federal Firearms Act. |

In urging enactment of the stronger and more effective S. 1592, we recognize the fact that stringent firearms laws are a deterrent to firearms misuse. All one need do is examine the figures compiled by the Federal Bureau of Investigation relative to gun murders in the several States to conclude that strong gun laws do work.

First, in those geographic areas of the country with strong gun laws, the percentages of gun murders are low when compared with areas with either minimal or no gun controls. In the Northeast with generally strong gun controls, 38 percent of the murders were committed with guns in 1965. Nationally the average was 57 percent. In the Western, North Central and Southern States where gun controls are minimal the percentages of gun murders were 60, 61, and 66 percent respectively.

Second, in specific States with effective firearms regulation the disparity is even more pronounced when comparing strong gun control States with the minimal gun control States.

Below are percentages of gun murders in individual States for the 4-year period 1962–65.

| States with stringent gun laws: | States with weak gun laws: |
|---|---|
| New York, 32 percent. | Colorado, 59 percent. |
| Massachusetts, 35 percent. | Louisiana, 62 percent. |
| New Jersey, 39 percent. | New Mexico, 64 percent. |
| Pennsylvania, 43 percent. | Arizona, 66 percent. |
| | Montana, 68 percent. |
| | Texas, 69 percent. |
| | Nebraska, 70 percent. |

We acknowledge the fact that there are many and varied contributing causes to crime, all of which must be considered in any evaluation of the problem. Thus, the above figures are made more meaningful when it is realized that the densely populated States have low percentages when compared with the less densly populated States, because a major factor affecting the incidence of crime is population density.

While S. 1592 would be a much more effective means of regulation, as compared with S. 3767, it would not interfere with the purchase of firearms by law-abiding, responsible adult Americans. When one weighs the ultimate saving of human life, which we believe is the hallmark of S. 1592, with the slight inconvenience that the bill would

42        FEDERAL FIREARMS AMENDMENTS OF 1966

impose upon sportsmen and other responsible Americans in purchasing firearms, then we believe that the enactment of S. 1592 is the only responsible course to follow.

There follows the text of the amended S. 1592 along with a statement of purpose, the extent of the program with which the bill deals, its scope of coverage with rationale based on testimony before the subcommittee and a section-by-section analysis of S. 1592.

## S. 1592

### A BILL To amend the Federal Firearms Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "State Firearms Control Assistance Amendments of 1966".*

#### FINDINGS AND DECLARATION

SEC. 2. (a) *The Congress hereby finds and declares—*

*(1) that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power;*

*(2) that the ease with which any person can acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States;*

*(3) that only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the businesses of importing, manufacturing, or dealing in firearms, can this grave problem be properly dealt with, and effective State and local regulation of the firearms traffic be made possible;*

*(4) that the acquisition on a mail-order basis of firearms by non-licensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances;*

*(5) that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms;*

*(6) that there is a causal relationship between the easy availability of firearms and juvenile and youthful criminal behavior, and that firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior;*

*(7) that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the*

*United States in recent years, has contributed greatly to lawlessness and to the Nation's law enforcement problems;*

*(8) that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, etc., and destructive devices such as explosive or incendiary grenades, bombs, missiles, etc.) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern;*

*(9) that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the granting or denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.*

*(b) The Congress further hereby declares that the purpose of this Act is to cope with the conditions referred to in the foregoing subsection, and that it is not the purpose of this Act to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that this Act is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this Act.*

*SEC. 3. The first section of the Federal Firearms Act (52 Stat. 1250) is amended to read as follows:*

*"SECTION 1. DEFINITIONS.—(a) As used in this Act—*

*"(1) The term 'person' includes an individual, partnership, association, or corporation.*

*"(2) The term 'interstate or foreign commerce' means commerce between any State or possession (not including the Canal Zone) and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), but through any place outside thereof; or within any possession or the District of Columbia. The term 'State' shall include the Commonwealth of Puerto Rico, the Virgin Islands, and the District of Columbia.*

*"(3) The term 'firearm', except where the context otherwise requires, means any weapon (including a starter gun), by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device.*

*"(4) The term 'destructive device' means any explosive or incendiary (A) bomb or (B) grenade or (C) mine or (D) rocket or (E) missile or (F) similar device; and the term shall also include any type of weapon by whatsoever name known which will, or is designed to, or which may be readily converted to expel a projectile or projectiles by the action of an explosive, the barrel or barrels of which have a bore of one-half inch or more in diameter.*

*"(5) The term 'short-barreled shotgun' means a shotgun having a barrel or barrels of less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.*

44          FEDERAL FIREARMS AMENDMENTS OF 1966

"(6) The term 'short-barreled rifle' means a rifle having a barrel or barrels of less than sixteen inches in length, and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(7) The term 'importer' means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term 'licensed importer' means any such person licensed under the provisions of this Act.

"(8) The term 'manufacturer' means any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this Act.

"(9) The term 'dealer' means (A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing such firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker.  The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.

"(10) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.

"(11) The term 'indictment' includes an indictment or an information in any court of the United States or of any State or possession under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

"(12) The term 'fugitive from justice' means any person who has fled from any State or possession (A) to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year, or (B) to avoid giving testimony in any criminal proceeding.

"(13) The term 'antique firearm' means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870; but not including any weapon designed for use with smokeless powder or using rim-fire or conventional center-fire ignition with fixed ammunition.

"(14) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(15) The term 'ammunition' means ammunition for a destructive device; it shall not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.

"(b) As used in this Act—

"(1) The term 'firearm' shall not include an antique firearm.

"(2) The term 'destructive device' shall not include—

    "(A) a device which is not designed or redesigned or used or intended for use as a weapon; or

    "(B) any device, although originally designed as a weapon, which is redesigned for use as a signaling, line throwing, safety or similar device; or

    "(C) any shotgun (other than a short-barreled shotgun); or

    "(D) any nonautomatic rifle (other than a short-barreled rifle)

*generally recognized as particularly suitable for use for the hunting of big game; or*

*"(E) surplus obsolete ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of 10 U.S.C. 4684(2), 4685, or 4686; or*

*"(F) any other device which the Secretary finds is not likely to be used as a weapon.*

*"(3) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate."*

SEC. 4. *Section 2 of the Federal Firearms Act is amended to read as follows:*

*"SEC. 2. UNLAWFUL ACTS.—(a) It shall be unlawful—*

*"(1) for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer having a license issued under the provisions of this Act, to engage in the business of importing, manufacturing, or dealing in firearms or ammunition, or to transport, ship, or receive any firearm or ammunition, in interstate or foreign commerce; or*

*"(2) for any importer, manufacturer, or dealer licensed under the provisions of this Act to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce, any firearm to any person other than a licensed importer, licensed manufacturer, or licensed dealer, except that—*

*"(A) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm to the sender (including a replacement firearm of the same kind, make, and type);*

*"(B) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from shipping, or causing to be shipped, for conveyance in the mails, a firearm to any officer, employee, agent, or watchman eligible under the provisions of section 1715 of title 18 of the United States Code to receive through the mails, for use in connection with their official duty, pistols, revolvers, and other firearms capable of being concealed on the person;*

*"(C) this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or a short-barreled rifle) of a type and quality generally recognized as particularly suitable for lawful sporting purposes, and not a surplus military firearm, which is shipped, transported, or caused to be shipped or transported, in interstate or foreign commerce by an importer, manufacturer, or dealer licensed under the provisions of this Act to any person who has submitted to such importer, manufacturer, or dealer a sworn statement, in duplicate, in such form and manner as the Secretary shall by regulations prescribe, attested to by a notary public, to the effect that (1) such person is eighteen years or more of age, (2) he is not a person prohibited by this Act from receiving a shotgun or rifle in interstate or foreign commerce, (3) there are no provisions of law, regulations, or ordinances applicable to the locality to which the shotgun or rifle will be shipped which would be violated by such person's receipt or possession of a*

*shotgun or rifle, and (4) that (Title _____, Name _____, and Official Address _____) (blanks to be filled in with the title, true name, and address) are the true name and address of the principal law enforcement officer of the locality to which the shotgun or rifle will be shipped. It shall be unlawful for an importer, manufacturer, or dealer, licensed under the provisions of this Act, to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce any such shotgun or rifle unless such importer, manufacturer, or dealer has, prior to the shipment of such shotgun or rifle forwarded by United States registered mail (return receipt requested) to the local law enforcement officer named in the sworn statement, the description (including (1) manufacturer thereof, (2) the caliber or gage, (3) the model and type of shotgun or rifle but not including serial number identification) of the shotgun or rifle to be shipped, and one copy of the sworn statement, and has received a return receipt evidencing deliver of the registered letter or such registered letter has been returned to the importer, manufacturer, or dealer due to the refusal of the named law enforcement officer to accept such letter as evidenced in accordance with United States Post Office Department regulations, and has delayed shipment for a period of at least seven days following receipt of the notification of the local law enforcement officer's acceptance or refusal of the registered letter. A copy of the sworn statement and a copy of the notification to the local law enforcement officer along with evidence of receipt or rejection of that notification, all as prescribed by this subparagraph, shall be retained by the licensee as a part of the records required to be kept under section 3(g): Provided, That (i) the Governor of any State may designate any official in his State to receive the notification to local law enforcement officers required in this subparagraph. The Secretary shall be notified of the name and title of the official so designated and his business address and shall publish the title, name, and address of that official in the Federal Register. Upon such publication, notification of local law enforcement officers required in this subparagraph shall be made to the official designated; and (ii) the Governor of any State may request the Secretary to discontinue in his State or any part thereof the notification to local law enforcement officers required in this subparagraph. Upon publication of the request in the Federal Register, the notification to the law enforcement officers in the area described in the request will not be required for a period of five years unless the request is withdrawn by the Governor and the withdrawal is published in the Federal Register; and*

    *"(D) nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were a State of the United States; or*

*"(3) for any person in connection with the acquisition or attempted acquisition of a firearm from a licensed importer, licensed manufacturer, or licensed dealer to—*

"*(A) knowingly make any false or fictitious statement, written or oral, or*

"*(B) knowingly furnish or exhibit any false, fictitious, or misrepresented identification;*

*intended or calculated to deceive such importer, manufacturer, or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed importer, licensed manufacturer, or licensed dealer under the provisions of subsections (b) and (c), or*

"*(4) for any person to transport into or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.*

"*(b) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm to any person—*

"*(1) without ascertaining through reliable means of identification customarily used in good commercial practice (which shall be noted in the licensee's records) the identity, date of birth (in the case of an individual), and place of residence (or place of business in the case of a corporation or other business entity) of such person; or*

"*(2) who (in the case of an individual) he knows or has reasonable cause to believe is under twenty-one years of age (except for a shotgun or rifle), and under eighteen years of age in the case of a shotgun or rifle; or*

"*(3) who he knows or has reasonable cause to believe does not reside in (or in the case of a corporation or other business entity, who does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located; except that this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or short-barreled rifle); or*

"*(4) who by reason of any State or local law, regulation, or ordinance applicable at the place of sale or other disposition may not lawfully receive or possess such firearm.*

*This subsection shall not apply in the case of transactions between licensed importers, licensed manufacturers, and licensed dealers, nor in the case of transactions involving rifles or shotguns which are subject to the provisions of subparagraph (C) of section 2(a)(2).*

"*(c) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee) knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States or of any State or possession of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice.*

"*(d) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to ship, transport, or cause to be shipped or transported, any firearm or ammunition in interstate or foreign commerce.*

"*(e) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or is a fugitive from justice, to receive*

any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

"(f) It shall be unlawful for any person knowingly to deposit, or cause to be deposited for mailing or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice that a firearm is being transported or shipped.

"(g) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce, any firearm to any person who does not exhibit or produce evidence of a license obtained under section 3 of this Act—

"(1) knowing or having reasonable cause to believe that such person is under twenty-one years of age (except for a rifle or shotgun) and under eighteen years of age in the case of a rifle or shotgun; or

"(2) with knowedge or with reasonable cause to believe that the receipt or possession of the firearm by the person to whom it is delivered would be in violation of the laws or ordinances of the State (or political subdivision thereof) in which the delivery is made; and

No firearm will be delivered in the United States mails under such circumstances as would be unlawful if done by a common or contract carrier.

"(h) It shall be unlawful for any person to transport or ship, or cause to be transported or shipped, in interstate or foreign commerce, any stolen firearm, or stolen ammunition knowing, or having reasonable cause to believe, same to have been stolen.

"(i) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition or pledge or accept as security for a loan any stolen firearm or stolen ammunition, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing, or having reasonable cause to believe, the same to have been stolen.

"(j) It shall be unlawful for any person to transport, ship, or knowingly receive, in interstate or foreign commerce, any firearm from which the importer's or manufacturer's serial number, as the case may be, has been removed, obliterated, or altered.

"(k) It shall be unlawful for any person to import or bring into the United States or any possession thereof any firearm in violation of the provisions of this Act, or to import or bring into the United States or any possession thereof any ammunition.

"(l) It shall be unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this Act."

SEC. 5. Section 3 of the Federal Firearms Act is amended to read as follows:

"SEC. 3. (a) No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulations prescribe. Each applicant shall be required to pay a fee for obtaining such license (for each place of business) as follows:

"(1) If a manufacturer—

"(A) of destructive devices, a fee of $1,000 per annum;

"(B) of firearms (other than destructive devices), a fee of $500 per annum.

"(2)  If an importer—

"(A) of destructive devices, a fee of $1,000 per annum;

"(B) of firearms (other than destructive devices), a fee of $500 per annum.

"(3)  If a dealer—

"(A)  in destructive devices, a fee of $1,000 per annum;

"(B) who is a pawnbroker (dealing in firearms other than destructive devices), a fee of $250 per annum;

"(C) who is not a dealer in destructive devices or a pawnbroker, a fee of $10 per annum; except that for the first renewal following the effective date of the State Firearms Control Assistance Amendments of 1966 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25."

The fee for an importer or manufacturer of, or a dealer in, ammunition for a destructive device shall be the same as for an importer or manufacturer of, or a dealer in, destructive devices.  However, a person who has obtained a license covering destructive devices shall not be required to obtain an additional license with respect to ammunition for destructive devices.

"(b)  Upon filing by an applicant of the prescribed application and payment of the prescribed fee, the Secretary shall (except as provided in subsection (c)), issue to such applicant the license applied for, which shall, subject to the provisions of this Act and other applicable provisions of law, entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.

"(c)  Any application submitted under subsections (a) and (b) of this section shall be disapproved and the license denied if the Secretary, after notice and opportunity for hearing, finds that—

"(1) the applicant is under twenty-one years of age; or

"(2) the applicant (including in the case of a corporation, partnership, or association, any individual possessing directly or indirectly, the power to direct or cause the direction of the mangement and policies of the corporation, partnership, or association) is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of subsection (d) or (e) of section 2 of this Act; or is, by reason of his business experience, financial standing, or trade connections, not likely to commence business operations during the term of the annual license applied for or to maintain operations in compliance with this Act; or

"(3) the applicant has willfully violated any of the provisions of this Act or the regulations issued thereunder; or

"(4) the applicant has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application; or

"(5) the applicant does not have, or does not intend to have or to maintain, in a State or possession, business premises for the conduct of the business.

"(d)  The provisions of sections 2 (d) and (e) of this Act shall not apply in the case of a licensed importer, licensed manufacturer, or licensed dealer who is indicted for a crime punishable by imprisonment for a term exceeding one year.  A licensed importer, licensed manufacturer, or

licensed dealer may continue operations, pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act and operations pursuant to such license shall be discontinued (unless an application for relief has been filed under section 11).

"(e) No person shall import or bring any firearm into the United States or any possession thereof, except that the Secretary may authorize a firearm to be imported or brought in if the person importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—

"(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or

"(2) is an unserviceable firearm (not readily restorable to firing condition), imported or brought in as a curio or museum piece; or

"(3) is—

"(A) of a type and quality that meets recognized safety standards,

"(B) generally recognized as particularly suitable for, or readily adaptable to, sporting purposes,

"(C) in the case of surplus military firearms, a rifle or shotgun, and

"(D) of a type that does not fall within the definition of a firearm as defined in section 5848(1) of the Internal Revenue Code of 1954; or

"(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm.

Provided, That the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm will be allowed under this subsection.

"(f) No licensed importer, licensed manufacturer, or licensed dealer shall sell or otherwise dispose of a destructive device, a machine gun (as defined in section 5848 of the Internal Revenue Code of 1954), a short-barreled shotgun, or a short-barreled rifle, to a nonlicensee unless he has in his possession a sworn statement executed by the principal law enforcement officer of the locality wherein the purchaser or person to whom it is otherwise disposed of resides, attesting that there is no provision of law, regulation, or ordinance which would be violated by such person's receipt or possession thereof and that he is satisfied that it is intended by such person for lawful purposes. Such sworn statement shall be retained by the licensee as a part of the records required to be kept under subsection (g).

"(g) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, and sale or other disposition, of firearms and ammunition at such place, for such period and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary or his delegate may enter during business hours the premises

*(including places of storage) of any firearms or ammunition importer, manufacturer, or dealer for the purpose of inspecting or examining any records or documents required to be kept by such importer or manufacturer or dealer under the provisions of this Act or regulations issued pursuant thereto, and any firearms or ammunition kept or stored by such importer, manufacturer, or dealer at such premises. Upon the request of any State or possession or political subdivision thereof, the Secretary of the Treasury may make available to such State, or possession, or any political subdivision thereof, any information which he may possess or which he may obtain by reason of the provisions of this Act with respect to the identification of persons within such State, or possession, or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of the firearms or ammunition so purchased or received.*

*"(h) Licenses issued under the provisions of subsection (c) of this section shall be kept posted and kept available for inspection on the business premises covered by the license.*

*"(i) Licensed importers and licensed manufacturers shall identify (or cause to be identified), in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."*

SEC. 6. *Section 4 of the Federal Firearms Act is amended to read as follows:*

*"SEC. 4. EXCEPTIONS TO APPLICABILITY OF THE ACT.—The provisions of this Act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearms or ammunition imported for, or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof; or (2) any State, or possession, or any department, independent establishment, agency, or any political subdivision thereof."*

SEC. 7. *Section 5 of the Federal Firearms Act is amended by striking out subsection (b) and inserting in lieu thereof new subsections (b) and (c) reading as follows:*

*"(b) Any person who—*

*"(1) with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year; or*

*"(2) with knowledge or with reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is intended to be committed therewith;*

*ships, transports, or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense.*

*"(c) Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of this Act, or any rules or regulations promulgated thereunder, or any violation of the provisions of title 18, United States Code, chapter 84, or sections 111, 112, 372, 871, or 1114, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5848(1) of said Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this Act."*

SEC. 8. *The Federal Firearms Act is amended by renumbering sections 6, 7, 8, 9, and 10 as sections 7, 8, 9, 10, and 11, respectively, and inserting after section 5 the following new section:*

"*Sec. 6. Applicability of Other Laws.*—

"*(a) Nothing in this Act shall be construed as modifying or affecting any provision of*—

"*(1) the National Firearms Act (chapter 53 of Internal Revenue Code of 1954); or*

"*(2) section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control)); or*

"*(3) Section 1715 of title 18 of the United States Code (relating to nonmailable firearms).*

"*(b) Nothing in this Act shall confer any right or privilege to conduct any business contrary to the law of any State, or be construed as relieving any person from compliance with the law of any State.*"

"*Sec. 9. Section 8 of the Federal Firearms Act (relating to rules and regulations) is amended to read as follows:*

"*Sec. 8. Rules and Regulations.*—*The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this Act. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such regulations.*"

*Sec. 10. The amendments made by this Act shall become effective on the first day of the third month beginning not less than ten days after the date of enactment of this Act; except that the amendments made by section 5 of this Act to section 3(a) of the Federal Firearms Act shall not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act on the effective date of this Act until the expiration of the license held by such importer, manufacturer, or dealer on such date.*

The principal purposes of this proposed bill, S. 1592, are to aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in combating the increasing prevalence of crime in the United States.

The ease with which any person can anonymously acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern.

We believe that the existing Federal controls over interstate and foreign commerce in firearms are not sufficient to enable the States to effectively cope with the firearms traffic within their own borders through the exercise of their police power. Only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business of importing, manufacturing, or dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible. S. 1592 would provide this needed control.

It would provide Federal controls over—

(1) The interstate traffic in mail-order firearms;

(2) Out-of-State purchases of concealable firearms;

(3) Acquisition of firearms by juveniles and minors;

(4) Rifles and shotguns;

(5) Importation of nonsporting and military surplus firearms;

(6) Highly destructive weapons (e.g., bazookas, mortars, antitank guns, explosives, or incendiary grenades, bombs, etc.);

(7) Licensing of importers, manufacturers, and dealers;
(8) Recordkeeping provisions;
(9) Making interstate transportation, shipment, or receipt of a firearm with intent to commit a felony therewith, a Federal offense.

It is not the purpose of S. 1592 to place any undue or unnecessary restrictions or burdens on responsible law-abiding citizens with respect to the acquisition, possession, transportation, or use of firearms appropriate to the purposes of hunting, trapshooting, target shooting, personal protection, or any other lawful activity. It is not intended to discourage or eliminate the private ownership of such firearms by law-abiding citizens for lawful purposes, or to provide for the imposition, by regulations, of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of the bill.

We believe that there is a serious problem of firearms misuse in the United States based on our extensive inquiries into the problem.

For 4 years prior to the introduction of S. 1592, on March 22, 1965, the Subcommittee to Investigate Juvenile Delinquency had been conducting an investigation into the interstate traffic in mail-order firearms, especially to juveniles, youthful offenders, and adult criminals.

In January, March, and May of 1963, and in March and April of 1964, public hearings were held by the subcommittee and the testimony proved conclusively that the interstate traffic in mail-order firearms to the above persons was a serious problem to law enforcement throughout the United States. The consensus of those who testified at the hearings was that this problem could only be effectively attacked through the enactment of Federal legislation.

During the 1963 and 1964 hearings, testimony revealed the existance of the following conditions because of the mail-order gun business:

Juveniles, minors, convicted felons, and undesirable adults have increasingly availed themselves of the mail-order source of firearms.

These firearms have been used extensively in the commission of serious crimes.

The indiscriminate sale of these firearms has resulted in accidental tragedies including loss of life and serious injury.

Because of the anonymity afforded the purchaser in a mail-order transaction, these firearms appeal to juveniles, youthful offenders, and adult criminals.

The sale of mail-order firearms is accomplished with little or no concern as to the age, background and competence of a purchaser, especially by a certain group of dealers who entered the mail-order business in recent years.

Firearms sold through the mails are primarily foreign made or imported military surplus firearms, relatively inexpensive and often inferior in design and quality.

The yearly volume of importation of these firearms is approximately 1 million a year.

The $1 fee and lack of minimum standards for obtaining Federal firearms dealers' licenses has resulted in flagrant abuse of the intent of the Federal Firearms Act.

The failure of certain dealers to keep adequate records as required by the regulations (26 C.F.R. Part 177) and to cooperate with State

and local law-enforcement officials is a detriment to effective law enforcement.

The interstate traffic in mail-order firearms often circumvents State and local law, and it is virtually impossible for the States to control this traffic in the maintenance of domestic law and order.

Furthermore, during the period between the 1964 hearings and the introduction of S. 1592 on March 22, 1965, substantial evidence on the problem of increasing firearms misuse was developed by the subcommittee concerning (1) the interstate traffic in all firearms, including rifles and shotguns and certain destructive devices, (2) the importation of firearms, (3) the effectiveness of laws in certain States and locales as a deterrent to firearms misuse and their lethal capabilities.

In addition to reaffirming the existence of the problem areas referred to in the foregoing paragraphs, many witnesses testified in the 1965 hearings regarding another aspect of the interstate firearms traffic.

Not only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention. This problem is most prevalent in, but not limited to, those States where stringent firearms regulations are in effect and the purchaser is not able to purchase a firearm under the laws of his State. As a result, a would-be purchaser travels to a neighboring State with less stringent controls and purchases the firearm which, many times it was demonstrated, was misused in his State or residence. This problem was outlined by law enforcement officers throughout the country.

Firearms purchased in the above manner have been used in the commission of a substantial number of crimes. For example, the Massachusetts State Police have traced 87 percent of the concealable firearms used in crimes in Massachusetts to out-of-State purchases.

The lack of adequate Federal controls over this aspect of the interstate traffic in firearms leaves open to people a method of violating the laws of their own States similar to the mail-order sales route.

Again, as with mail order, the records show that juveniles, youthful offenders, and adult criminals have purchased firearms in this manner and subsequently used them in crimes.

It is virtually impossible for the States to cope with this aspect of the problem without additional controls by the Federal Government.

While we conceded that the more serious problem in firearms misuse concerns the pistol and revolver, the fact remains that of the total number of firearms murders each year, some 30 percent are perpetrated by persons armed with rifles and shotguns.

Furthermore, law enforcement officials have testified to the need for and supported the concept of additional regulations over the acquisition of such weapons.

The capabilities and lethal nature of the firearm are readily apparent, when one examines the figures compiled by the Federal Bureau of Investigation and included in their uniform crime reports. During 1963, 56 percent of the 8,500 murders were perpetrated by persons armed with firearms. In 1964, 55 percent of the 9,250 murders were traced to firearms misuse. In 1965, 57 percent of the 9,850 murders were committed by persons armed with guns. Furthermore, a firearm is seven times more lethal than all other weapons combined.

In gun murders involving emotional provocation, the evidence indicates that if the gun were not available at the spur of the moment, many such murders could well have resulted only in a minor assault. However, because guns are readily available and are lethal by nature, our homicide statistics have soared.

The testimony before our subcommittee has also pointed to the fact that the majority of bank robberies involved the use of a firearm and were it not for the easy availability of guns, the chances for a successful perpetration of this particular crime would be substantially reduced.

In his statement opening the 1965 hearings, the subcommittee chairman cited the volume of firearms which had been imported during the 2-year period 1963–64. In that 2-year period, 2,167,754 firearms were imported, with pistols and revolvers numbering 859,758 of the total.

Law enforcement officials testified that foreign imports account for a significant percentage of the total number of firearms seized pursuant to their use in the commission of crimes. The percentage ranged from a low of 18 percent in Washington, D.C., to a high of 80 percent in Atlanta, Ga. The .22-caliber revolver has been singled out by law enforcement generally as being a particular problem in that it is inexpensive and easily obtainable.

The extent of the problem is clear, we believe, and the need for enactment of S. 1592 is apparent.

In documenting the thoroughness of our inquiry, we feel that it is important to cite those Federal, State, and local officials who appeared before the subcommittee calling upon the Federal Government to enact remedial legislation, and specifically S. 1592.

They are—

Nicholas deB. Katzenbach, Attorney General of the United States.

Henry H. Fowler, Secretary of the Treasury.

Sheldon M. Cohen, Commissioner of Internal Revenue.

Stephen Ailes, Secretary of the Army.

James V. Bennett, consultant, Federal Bureau of Prisons, Department of Justice.

Thomas C. Lynch, attorney general, State of California.

Arthur J. Sills, attorney general, State of New Jersey.

Daniel R. McLeod, attorney general, State of South Carolina.

Richard R. Caples, commissioner of public safety, State of Massachusetts, accompanied by Lt. John Collins and Sgt. Edward Higgins, Massachusetts State Police.

John B. Layton, Chief of Police, Washington, D.C.

Herbert T. Jenkins, chief of police, Atlanta, Ga.

Curtis Brostron, chief of police, St. Louis, Mo., accompanied by Maj. Adolph Jamobsmeyer.

Howard R. Leary, commissioner of police, Philadelphia, Pa., accompanied by Chief Inspector Harry Fox.

Leonard Reisman, deputy commissioner, New York City Police Department.

Carl K. Miller, commander, Chicago Police Department.

Merton Howe, captain, Los Angeles Police Department.

Jesse Gonzales, sergeant, Los Angeles Police Department.

PRESIDENT'S STATEMENT ON FIREARMS CONTROL

President Johnson in his message to the Congress March 8, 1965, described crime as a "malignant enemy in America's midst of such extent and seriousness that the problem is now one of great national concern." He identified as a significant factor in the rise of violent crime the ease with which any person can acquire a firearm. He also stressed the need for increased Federal control over interstate shipment of firearms and the importance of curbing the importation of surplus military weapons as well as other used firearms.

The President recommended the enactment of legislation amending the Federal Firearms Act to "make it more feasible for the States to impose more effective controls over firearms within their own boundaries," and more specifically, to correct abuses in mail order sales, to provide suitable licensing standards for persons engaged in activities licensed under the act, and to restrict the sale of firearms by licensees to persons of mature age. As a complement to Federal firearms control legislation, he urged public officials to review State and local laws "in this critical field with a view to keeping lethal weapons out of the wrong hands."

S. 1592, as originally introduced, was designed to accomplish the Federal objectives outlined by the President.

The scope of S. 1592 is broad. However, we believe that the need for each of the provisions of the bill has been thoroughly documented by the testimony given before the subcommittee. There follows the scope of coverage of the bill with rationale.

*The interstate traffic in mail order firearms*

S. 1592 would have the effect of channeling interstate and foreign commerce in firearms, except for sporting-type rifles and shotguns (not to include military surplus), through federally licensed importers, manufacturers, and dealers, thereby prohibiting the commercial mail order traffic in firearms (other than rifles and shotguns) to unlicensed persons; and with respect to interstate mail order transactions in sporting-type rifles and shotguns would require a purchase affidavit, and notice to a law enforcement officer at the place where the rifle or shotgun is to be shipped. This will enable the States to more effectively control the firearms traffic within their own jurisdictions under the police power granted to them by the Constitution.

The testimony and the record reflect the concern of law enforcement officials throughout the country over the vast proliferation of mail order firearms in interstate commerce.

This traffic is a means which affords circumvention and contravention of State and local laws governing the acquisition of firearms. It is characterized by ready availability, minimal cost, and anonymity of purchase. The result has been an ever-increasing abuse of this source of firearms by juveniles, minors, and adult criminals.

In the District of Columbia, the subcommittee, with the cooperation of the Metropolitan Police Department, determined that 25 percent of the recipients of mail-order firearms had criminal records ranging in seriousness from habitual drunkenness to murder.

In testifying before the subcommittee on June 2, 1965, Commander Carl K. Miller, Chicago Police Department, referred to the results of an investigation of 4,069 consignees of mail-order firearms in Chicago, who had purchased and received their firearms from just 3 California-

based mail-order firearms dealers.  He indicated that 948 consignees had arrest records.  Of the 948 arrestees, 13 were arrested for murder, 58 for robbery, 42 for burglary, 111 for various types of assaults, 83 for carrying concealed weapons, and 426 for disorderly conduct.

In addition, 229 were arrested for various other crimes including larceny, larceny from auto, gambling, resisting arrest, causing a disturbance with a gun, narcotics investigation, and sex offenses.

In testifying on June 3, 1965, Attorney General Arthur J. Sills, of New Jersey, cited the results of a State police survey conducted to determine if purchase permits had been obtained by residents in New Jersey who had received mail-order firearms from two California mail-order firearms dealers.  In summary, Attorney General Sills testified that, of the 154 guns sold and mailed by the 2 dealers, 61 were sold and mailed without permits being issued.  Further, it was determined that 26 persons with criminal records were among those who had purchased the 61 firearms from the 2 mail-order outlets.  This subcommittee cooperated with the New Jersey authorities by furnishing the names of consignees of mail-order handguns to the New Jersey State Police.  The laws of New Jersey require a permit to purchase a handgun.

Deputy Commissioner Leonard E. Reisman, New York City Police Department, testified on July 1, 1965, that since 1950, the police department, in accord with the provisions of the Sullivan law of New York, has checked out 2,676 deliveries of concealable firearms by common carrier into New York.  While some 1,200 were proper shipments, the police department disapproved 1,439 deliveries because they were consigned to persons who would not have been authorized to receive them under the laws of the State of New York.  Thus, even where there are the most stringent State laws, attempts are being made to circumvent the law through the delivery of mail-order firearms to unauthorized persons.

Police Commissioner Howard Leary, of Philadelphia, testified on June 8, 1965, and referred to a survey of mail-order gun consignees in Philadelphia.  Again, this survey was conducted in cooperation with the subcommittee.  Commissioner Leary stated that of the 300 guns received by Philadelphians via mail order, 54 of them had police records.  Furthermore, 15 of them had been arrested previously for crimes involving the use of firearms.  He went on to indicate that, thus far, in 1965, 160 handguns were mail-ordered to Philadelphians, and 16 of them had previous arrest records.

In endorsing S. 1592, Attorney General Thomas C. Lynch, of the State of California, cited the mail-order source of firearms as a contributing and compounding factor to crime and the problem of law enforcement throughout his State.

Chief of Police Herbert T. Jenkins, Atlanta, Ga., in referring to the increasing number of firearms which come into the custody of the Atlanta Police Department each year, indicated that the traffic in illegal firearms has doubled in the last 5 years.  He blamed mail-order sources as a major contributing factor in this increase.

In addition, examples of mail-order firearms purchased and received in circumvention of the law and subsequently used in the commission of crime, were cited by the following law enforcement officials who appeared in support of S. 1592 before the subcommittee during the 1965 public hearings:

John B. Layton, chief of police, Washington, D.C.

Howard R. Leary, commissioner, police department, Philadelphia, Pa.

Curtis Brostron, chief of police, St. Louis, Mo.

Carl K. Miller, commander, Chicago Police Department.

Merton W. Howe, captain, commander of robbery division, Los Angeles Police Department.

In summary, the record is replete with testimony documenting the existence of a serious mail-order gun problem. This traffic affords easy circumvention and contravention of State and local law and leads to the frustration of law enforcement in its efforts to combat crime.

### Acquisition of firearms by juveniles and minors

S. 1592 would bar federally licensed importers, federally licensed manufacturers, and federally licensed dealers from selling or otherwise disposing of any firearms to any person who (in the case of an individual) he knows, or has reasonable cause to believe, is under 21 years of age (except for a shotgun or rifle) and under 18 years of age in the case of a shotgun or rifle. The bill would place similar restrictions on interstate carriers regarding delivery of firearms to such persons. Thus, the bill would provide a uniform and effective means throughout the United States for preventing the acquiring of the specified firearms by persons under such ages. However, under the bill, a minor or juvenile would not be restricted from owning, or learning the proper use of the firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.

The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country.

Deputy Commissioner Leonard Reisman, of the New York City Police Department, testified that in 1964, there were 2,615 arrests in that city for the illegal possession of dangerous weapons; 1,136 of the arrestees were under 21 years of age, or 43 percent of the total. The commissioner stated that by far the most popular instruments of violence among these young people are firearms of all types.

Capt. Merton W. Howe, Los Angeles Police Department, testified that in the crimes of armed robbery and aggravated assault, the increase of gun misuse by juveniles is graphically illustrated by a comparison of 1956 and 1964 figures. In 1956, there were only 26 incidents of juvenile armed robbery by gun. However, in 1964, the figure jumped to 58 incidents. In 1956, there were 31 incidents of juvenile aggravated assaults by gun, whereas in 1964, the figure jumped to 157.

Chief Curtis Brostron, St. Louis Police Department, testified that in 1964, 21 youths, ages 14 to 26 years, committed murders with firearms, and that one of these was the double shotgun slaying of his parents by a 15-year-old boy.

Comdr. Carl K. Miller, Chicago Police Department, testified that in 1964 there were 191 firearms murders in Chicago. Of this total, the perpetrator in 3 cases was a 13-year-old juvenile; in 2 cases a 14-year-old; and 7 cases a 15-year-old, and in 11 cases a 16-year-old. Thus, 23 of the 191 gun murders were committed by juveniles under 17 years of age.

Commander Miller further indicated that minors were involved as principals in 18 of the murders.   Six were 17 years of age, six were 18 years of age, five were 19, and one was age 20.

Thus, of 191 gun murders in the city of Chicago, minors under 21 years of age accounted for 41, or approximately 20 percent of the total.

Police Commissioner Howard R. Leary, Philadelphia, Pa., cited the incidence of juvenile misuse of firearms in that city during 1964. He testified that guns played an important role in Philadelphia's juvenile crime picture.   A total of 199 juveniles under 18 years of age were arrested in 1964 charged with crimes involving firearms, including homicides, robberies, assaults, carrying concealed weapons, and violation of Pennsylvania's Uniform Firearms Act.   He indicated further that 203 firearms were confiscated from teenagers by the juvenile aid division in 1964.   The results of this traffic were exemplified by the fact that four teenage gang clashes resulted in two 17-year-olds, one 18-year-old, and one 20-year-old being killed by firearms on Philadelphia's highways.

Chief Herbert T. Jenkins, Atlanta Police Department, in referring to the misuse of firearms in the crime of aggravated assault, testified that of the 404 such assaults in the last 17 months, 93 of the perpetrators were under 21 years of age.   He concluded:

> Most of these cases would have ended as a simple altercation, except for the ready availability of the gun.

Attorney General Daniel R. McLeod, South Carolina, included in his testimony the comments of law enforcement officials in South Carolina, who responded to his request for information in preparation for his appearance before the subcommittee.   The reply of the chief of police of Greenville, S.C., is relevant:

> For your information and file, during the year 1964, 42 teenage males and 3 teenage females were arrested and charged with carrying, shooting, pointing, or having in possession, firearms in the city of Greenville.
>
> During the first 6 months of 1965, we have already arrested for the same offenses as mentioned above 26 male teenagers and 2 female teenagers.

The statistics documenting the misuse of firearms by juveniles and minors in this section of the report take on added significance when one considers the fact that in each of the jurisdictions referred to the lawful acquisition of concealable firearms by these persons was prohibited by statute.

The testimony conclusively refutes the myth that criminals steal firearms rather than purchase them in illicit channels.   While it is conceded that some criminal firearms are stolen, the fact is that the record reflects illicit purchases are made either through mail order or by over-the-counter purchase in nonresident jurisdictions.

Specific cases exemplifying illicit purchases by juveniles and minors in the above manner were included in the record by several witnesses who appeared before the subcommittee.

Commissioner Richard R. Caples, of the Massachusetts Department of Public Safety, cites the out-of-State purchase of firearms by Massachusetts residents as the prime source of the criminal gun in his State.   His statement was documented by records covering the past

10 years. He also included in the record specific cases of juveniles and minors who journeyed to neighboring States, purchased concealable firearms, and subsequently used them in crimes in Massachusetts.

A case in point concerned a 16-year-old juvenile who traveled to Maine on numerous occasions, purchased 16 firearms, including 3 handguns, and subsequently sold them to Cambridge, Mass., youths who used them in crimes.

Chief John B. Layton, Metropolitan Police Department, District of Columbia, cited the recent case of a shooting in the city's sixth precinct. Juvenile investigators determined that the gun involved, a .22-caliber pistol, had been purchased by an 18-year-old on the same day in nearby Silver Spring, Md. Further investigation determined that the same dealer in Silver Spring, in a 3- or 4-month period, had sold 11 pistols and two .22-caliber blank pistols to persons under 21 years of age. All of those involved resided in the 6th and 12th precincts which border the Silver Spring area.

Minors under 21 years of age are prohibited by the laws of the District of Columbia from purchasing pistols and revolvers.

Capt. Merton W. Howe, Los Angeles Police Department, Robbery Division, cited two cases which involved juveniles and mail-order guns:

> Two of the most tragic cases that come to mind from mail-order guns involve juveniles.

One case involved the shooting by a 16-year-old boy of his best friend. He claimed that he did not know that the gun was loaded. The second concerned a 16-year-old boy, who shot himself with a mail-order gun after having been reprimanded by his father.

Deputy Commissioner Leonard Reisman, New York City Police Department, testified about the case of a do-it-yourself gunsmith who made out-of-State purchases of starter pistols and converted them to lethal firearms. These death weapons were being sold to youth gang members on street corners for $20.

The cases cited clearly show the two major sources of firearms for juveniles: Mail-order houses and over-the-counter purchases in States with weak gun laws.

We believe that these two prime sources of firearms to juveniles and minors involving interstate commerce, mail-order, and out-of-State, over-the-counter purchases should be regulated in accord with the provisions of S. 1592.

By prohibiting the mail-order traffic in concealable firearms entirely and restricting the over-the-counter purchase of concealable firearms by nonresidents, and by regulating the mail-order traffic in shotguns and rifles, the problem will be substantially alleviated. In addition, the establishing of minimum ages for (1) purchase of rifles and shotguns at 18 years, and (2) pistols and revolvers and all other firearms at 21 years, provides the machinery for the States to implement and enforce their own statutes governing the sale and acquisition of firearms.

### Out-of-State purchase of concealable firearms

S. 1592 would prohibit a federally licensed importer, federally licensed manufacturer, or federally licensed dealer from selling or otherwise disposing of a firearm (other than a shotgun or rifle) to any person whom he knows, or has reasonable cause to believe, does not reside in (or in the case of a corporation or other business entity, who

does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located.

It would also make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased outside that State in those cases where it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

The provisions of S. 1592, which prohibit a licensee from disposing of pistols and revolvers to persons who are not residents of the State in which he conducts his business is justified by the record of the subcommittee's 1965 hearings.

The record is replete with testimony documenting the fact that the purchase of firearms by persons in other than their resident State is a serious contributing factor to crime. Testimony further indicates that large numbers of criminals and juveniles have availed themselves of this source of firearms in order to circumvent the laws of their respective jurisdictions.

The subcommittee, in conjunction with the Treasury Department, surveyed the records of selected firearms dealers in the Maryland suburban area of Washington, D.C. The results are most certainly alarming. It was determined that two dealers whose records were examined sold to a significant number of District residents. Those two dealers are located in a Maryland county where regulations controlling over-the-counter sales are minimal. (A county ordinance was subsequently enacted.)

The records of Apple Hardware, Inc., in Chillum, Md., show that 58 percent of their handgun sales during 1964 and early 1965 were to residents of the District of Columbia. Subsequent criminal records checks on these purchasers reveal that 40 percent of them have criminal records in this city.

The records of the Suitland Trading Post in Suitland, Md., show that 40 percent of their firearms sales during 1964 and early 1965 were to residents of the District of Columbia. Subsequent criminal records checks have revealed that 23 percent of the purchasers have records in the District of Columbia.

The results referred to need no elaboration. Circumvention of the laws of the District of Columbia was easily effected by these purchases.

This situation is not peculiar or confined to the Washington, D.C., area.

The most complete documentation of the State level of this aspect of the problem was included in the testimony of Commissioner Richard R. Caples, of Massachusetts. He testified that over a 10-year period, the Massachusetts State Police had traced 87 percent of the guns used in crime in that State to purchases in neighboring States. He further stated that of some 4,506 firearms which were traced, only 6 were determined to have been stolen.

He included for the record some 60 cases which concerned the purchase of firearms in neighboring States which were subsequently used in crimes in Massachusetts.

One case concerned an unknown person who purchased nine snub-nosed revolvers from several dealers in New Hampshire, using fictitious names and addresses. Subsequently, two of the revolvers were found in the possession of a Boston resident (George McLaughlin), who, at

the time of the sales, was being sought for murder and was considered by the FBI to be 1 of the 10 most wanted criminals in this country.

The remaining cases presented by Commissioner Caples are equally serious in nature.

Attorney General Sills, of New Jersey, also testified about the purchase of firearms in other States and their subsequent illegal entry into New Jersey.

He stated that of 1,815 arrests for the illegal carrying of concealed weapons (handguns) only 15 of the guns involved had been purchased legally, that is with the permit to purchase which is required in New Jersey. Only six had been registered voluntarily, after purchase outside of that State.

Attorney General Sills referred to a cooperative effort on the part of New Jersey and Maryland authorities who surveyed the purchase of handguns by 27 New Jersey residents in Maryland. The 27 persons purchased 65 handguns from 3 retail stores in Aberdeen, Md. Eight of the purchasers used fictitious names and/or addresses, and five of these used the same fictitious address. One of the five who used that fictitious address, Hector Gomez, was later found to have a lengthy police record for such offenses as extortion, robbery, assault, and attempted rape. He purchased 12 handguns in one store and 3 from another store in a period of 12 days.

Mr. Sills endorsed the provisions of S. 1592, which would prohibit the sale of handguns to nonresidents.

In addition, the following officials cited specific cases which involved out-of-State and nonresident purchases of concealable firearms contrary to the local law and which were subsequently used in the commission of crimes of violence. None of the examples referred to in this section concerned mail-order sources. These examples are separate and distinct from those cited in the section on the interstate traffic in mail-order firearms.

Chief John B. Layton, District of Columbia.

Captain Merton Howe and Sgt. Jess Gonzales, Los Angeles Police Department.

Commissioner Howard Leary, Philadelphia.

Further, Chief Curtis Brostron, of St. Louis, and Chief Herbert Jenkins, of Atlanta, Ga., referred to the easy availability of firearms from out of State as a contributing factor to firearms used in crime.

We believe that the problem outlined above is sufficient to warrant the enactment of the provisions of S. 1592 which would prohibit the sale of handguns to nonresidents of a given State.

### Rifles and shotguns

The control would be exercised through the filing of an affadavit by the purchaser of a mail-order gun. The dealer would be required to forward a copy of this affadavit to the law enforcement officials in the purchaser's area of residence. This would give police officials a chance to check and see if the purchaser is legally entitled to have a rifle or shotgun, under that jurisdiction's statutes.

But in general, rifles and shotguns are distinguished from pistols and revolvers in S. 1592, and are given favored treatment.

Testimony reflects that the inclusion of rifles and shotguns in S. 1592 is one of the most controversial aspects of the bill, and we believe it necessary therefore, to devote a section of these views to clarifying the need for including them. While the major problem

facing law enforcement is the control of concealable firearms, the fact remains that the record also shows a substantial misuse of rifles and shotguns.

It would be unwise to exclude these firearms from coverage entirely. Such an exclusion simply cannot be justified on the basis of available information. The position which we have taken with regard to rifles and shotguns is to provide moderate but effective regulation over their acquisition.

Federal Bureau of Investigation crime statistics for 1963, show that 30 percent of the firearms murders in the United States were carried out by persons armed with rifles and shotguns. This represented a loss of lives numbering some 1,400. The 1964 figures reflect that 30 percent of the 5,090 gun murders, or 1,527 deaths, were committed with rifles and shotguns. And in 1965, 1,690 persons were murdered with rifles and shotguns.

The 30 percent figure does not always hold true in large metropolitan cities on the basis of statistics on rifle and shotgun murders given to us by representatives from a number of urban areas. The percentage of rifle and shotgun murders is much higher in rural areas than in the cities, a fact which those who oppose their inclusion in S. 1592 have consistently failed to acknowledge. FBI statistics show that 52.8 percent of the rural gun murders are by rifle and shotgun.

Thus, the problem of firearms misuse is not confined to the cities. Rather it is national in scope.

Further evidence of the need for the inclusion of the long arms is a subcommittee inquiry into the mail order sales of rifles and shotguns by Klein's Sporting Goods, Chicago, Ill., a reputable and respected firm in the business of selling mail-order firearms.

From the subpenaed files of Klein's Sporting Goods, the subcommittee in cooperation with local police in several jurisdictions has determined that mail-order rifles and shotguns have been sent to persons with criminal arrest records in Chicago, Ill.; in Dallas, Tex.; in Philadelphia, Pa.; in Los Angeles, Calif.; in the State of New Jersey; and in the State of New York.

The crimes of these mail-order purchasers of rifles and shotguns range in seriousness from misdemeanors to felonies and include assault, assault and battery, assault with a deadly weapon, assault and battery on a police officer, larceny, sex offenses, and narcotics and dangerous drug offenses.

The incidence of sale of mail-order rifles and shotguns to persons with criminal records is not as frequent as is the case with regard to pistols and revolvers. However, we do find that such firearms sales to persons with criminal records ranged between 10 and 15 percent of total sales in the jurisdictions mentioned above.

In addition, the record shows the concern of law enforcement with regard to rifles and shotguns and the need for regulation.

In referring to efforts at the State level to regulate the acquisition of long arms, Deputy Commissioner Leonard Reisman, of New York, cited statistics which show that there were 490 crimes in 1963, where the weapon used was a rifle or shotgun. This figure included 37 homicides.

In supporting the inclusion of rifles and shotguns in S. 1592, Attorney General Arthur J. Sills, of New Jersey, referred to his efforts at the State level to enact controls over these firearms. In citing the

need for S. 1592, and complementary State regulation, he referred to specific instances of rifle and shotgun murders, wherein the weapons had been purchased and subsequently misused by persons who could not have done so had the proper regulation been in effect.

Further specific references to rifle and shotgun murders were cited by Commissioner Richard R. Caples, of Massachusetts; Chief Herbert T. Jenkins, of Atlanta, Ga.; and Chief Curtis Brostron, of St. Louis, Mo.

And finally, Commissioner Howard R. Leary, of Philadelphia, testified:

> We have noticed a greater tendency, as police pressure on methods of securing of handguns is stepped up, for felons to use shotguns and rifles to hold up and threaten the public. In fact, we had a wave of holdups of public transportation vehicles by a team, who used rifles to hold at bay a busload of citizens while the robbery of the driver was being completed.

The record is, we believe, quite clear. Rifles and shotguns are misused in the commission of crimes of violence in great enough frequency to warrant regulation over their acquisition.

Importation of nonsporting and military surplus firearms:

S. 1592 would curb the flow of surplus military weapons and other foreign made firearms into the United States which are not particularly suitable for target shooting, hunting, or for any other lawful purpose.

The provisions concerning the importation of firearms would not interfere with the importation of currently produced firearms, such as rifles, shotguns, pistols, or revolvers of recognized quality which are used for hunting, recreational purposes, or personal protection.

The importation of certain foreign-made and military surplus nonsporting firearms has an important bearing on the problem which S. 1592 is designed to alleviate.

During 1963 and 1964, 2,167,754 firearms were imported into the United States. This includes 859,758 pistols and revolvers, the majority of which were either inexpensive, small caliber firearms or military surplus. Of the 1,307,996 rifles and shotguns imported, the majority were military surplus.

The problem which this flow of firearms creates has become great, not because of the high import figures alone, but because of the fact that many of these weapons have gotten into the hands of juveniles and felons.

The subcommittee's inquiry has shown that at least 75 percent of the mail order guns sold in the United States are imported in one manner or another.

Law enforcement officials testified that foreign imports account for a significant percentage of the total number of firearms coming into their possession as the result of having been used in the commission of crime. The figure ranged from a low of 18 percent of the total in Washington, D.C., to a high of 80 percent in Atlanta, Ga.

Attorney General Thomas C. Lynch, of California, testified:

> Imported surplus weapons have proved especially troublesome in connection with juveniles. Thousands of firearms not suitable for lawful sporting purposes have been dumped onto the market here at prices which attract juveniles.

Attorney General Lynch then went on to cite the problem of juvenile misuse of imported .22 caliber starter pistols which are converted to fire .22 caliber ammunition. He indicated that over the past 8 years, hundreds of felonies had been committed by youngsters armed with these weapons.

Deputy Commissioner Leonard Reisman, New York City Police Department, also testified about the experiences of New York City with regard to the imported starter pistol. He cited the case of one type of pistol which was imported into New York with a plugged barrel. Separate shipments of rifled barrels followed which were used to replace the plugged barrels. Converting the blank starter pistols to lethal firearms took a matter of minutes.

This problem, however, is not limited to the convertible starter pistols.

Chief Herbert T. Jenkins, Atlanta Police Department, testified that 80 percent of the confiscated firearms now in the possession of his department are foreign-made imports, with an average value of about $10. He indicated further that the misuse of the small-caliber firearms (usually .22 caliber) pose one of the greatest problems to law enforcement in Atlanta.

Chief Curtis Brostron, St. Louis Police Department, testified that his department's crime laboratory processes each day at least one German-made .22 caliber revolver which sells for $10 to $15.

Captain Merton W. Howe, Los Angeles Police Department, testified that in 1963, 46.7 percent of the firearms which were destroyed by the department under authority conferred by the California Penal Code, were foreign made.

In 1964, the figure based on a sampling of about 25 percent of the total was 47 percent.

Attorney General McLeod, of South Carolina, testified that the inexpensive, imported .22 caliber starter revolver, designed as a starter pistol but readily converted to a lethal firearm, has been a problem of serious proportions to law enforcement officials in South Carolina. He indicated that he has reliable information that one dealer alone converted 20,000 Rohm starter pistols to lethal .22 caliber firearms.

With regard to these weapons, the Attorney General stated:

> This gun, and others of its characteristics, should not be permitted to be imported or manufactured in this country, and so far as S. 1592 meets this problem, we are in accord with it.

The incidence of foreign-made firearms coming into the possession of police departments is truly significant.

Furthermore, the following excerpt from Senate Report 1340, 88th Congress, 2d session, is particularly noteworthy.

With reference to the interstate mail-order traffic in imported firearms, the report states on page 4:

> It is of relevance that the mail-order-type firearms are .22 caliber revolvers, .25 caliber pistols, .38 caliber, and .45 caliber revolvers. The .22 caliber and the .25 caliber are usually new weapons, while the .38 and .45 caliber are usually surplus military firearms which have been discarded by foreign governments.

*Highly destructive weapons*

S. 1592 would extend the coverage of the Federal Firearms Act to include highly destructive devices, such as explosive or incendiary bombs, grenades, and mines.   And it would establish stricter controls than those presently in the act over interstate and foreign commerce in such devices as large-caliber, military-type weapons (bazookas, mortars, and antitank guns).   They are now treated the same way as rifles and shotguns, i.e., records of sales must be kept.

The stark realities of the ease with which these weapons can be and are purchased were described in a statement opening hearings on June 2, 1965, when the chairman of the Subcommittee To Investigate Juvenile Delinquency read into the Record circumstances surrounding the purchase of several mortars and bazookas by a subcommittee consultant, who at the time was a provisional member of the paramilitary organization, the Minutemen.

The concern of law enforcement officials throughout the country over this traffic in heavy armament was made clear by Attorney General Thomas C. Lynch, of California; Attorney General Arthur J. Sills, of New Jersey; Deputy Commissioner Leonard Reisman, of New York, and Capt. Merton W. Howe and Sgt. Jesse Gonzales, of the Los Angeles Police Department.

Several representatives of the sporting fraternity indicated in testimony that the definition of "destructive devices," in S. 1592 was too inclusive and would include certain antique firearms and certain large-bore sporting firearms.   Based on these objections, the subcommittee amended this definition to exclude these firearms from coverage.

*Licensing of importers, manufacturers, and dealers*

S. 1592 would prescribe meaningful licensing standards and denial hearing procedures designed to assure that licenses would be issued only to responsible, law-abiding persons actually engaged in or intending to engage in business as importers, manufacturers, or dealers in firearms.   License fees, to be increased by the bill, would provide sufficient funds to partially defray the cost of investigation of applicants and would tend to discourage license applications by persons who do not intend to engage in the business for which the license is sought.

The absence of specific standards from the present Federal Firearms Act and the minimal fees in the act have resulted in an abuse of the intent of the act.

Secretary of the Treasury Henry H. Fowler told the subcommittee:

> Since a bureau of my Department is responsible for the administration of the Federal Firearms Act, I am particularly anxious that the changes proposed in the bill with respect to the issuance of licenses to manufacture, import, and deal in firearms be adopted.

Under the existing law, anyone other than a felon can, upon the mere allegation that he is a dealer and payment of a nominal fee of $1, demand and obtain a license.

This situation invites irresponsible individuals to obtain licenses, thus facilitating the acquisition of these weapons by criminals and other undesirables.

Secretary Fowler, in answering a question posed by Senator Hiram Fong, testified that of the 99,544 outstanding licenses in 1964:

> It is our estimate that less than half of the licensed dealers are actually engaged in the business as dealers and that more than half are persons who are using the simple device of becoming a licensee for their own personal nonbusiness purpose.

Further strong support for the need for increased license fees for dealers, manufacturers, and importers and the inclusion of specific standards to obtain licenses was given by Attorney General Nicholas deB. Katzenbach; Commissioner Sheldon S. Cohen, of the Internal Revenue Service; Commissioner Richard R. Caples, of Massachusetts; Deputy Commissioner Leonard Reisman of New York City, and by Capt. Merton W. Howe, of the Los Angeles Police Department.

*Recordkeeping provisions*

S. 1592 would place more emphasis on the recordkeeping responsibilities of licensees by requiring that reliable means be used by the licensee to verify information submitted to him by the purchaser, and by specifically providing for the inspection of records required to be maintained by licensees.

It would also authorize the release of pertinent information obtained from the licensee's records, to State and local authorities, to assist them in law enforcement activities. In addition, the bill would make it possible to require, by regulations, the submission of reports concerning the operations of lisensees.

Because of the controversy which arose during the hearings concerning section 3(g) under S. 1592, relating to the recordkeeping of acquisition and disposition of firearms and destructive device ammunition by licensees, it is necessary to devote a section of this report to these provisions of the bill.

Section 3(g) requires no more recordkeeping by licensees than is presently required by section 903(d) of the Federal Firearms Act, as implemented by regulations (26 CFR pt. 177), with the exception of including destructive device ammunition.

Section 3(g) does require that such records be made available for inspection or examination by the Secretary or his delegate during normal business hours. It is further required that licensees shall submit such reports and information with respect to the records and the contents thereof as the Secretary shall by regulation prescribe.

This is a reasonable means of determining periodically the licensees' compliance with the recordkeeping provisions of the bill. It is not designed as, nor intended to be, a means of national registration of firearms.

It is further provided for in this section that the Secretary may make available to a State, possession, or political subdivision thereof, any information that he is authorized to obtain concerning the identity of purchasers of firearms and the types of firearms purchased. This provision is included as an aid to effective law enforcement.

The record on S. 1592 is quite clear that the maintenance of complete records of acquisition and disposition of firearms by licensees is an essential element contributing to effective and sound law enforcement at the Federal, State, and local levels of government.

Making interstate transportation, shipment, or receipt of a firearm, with intent to commit a felony therewith, a Federal offense.

The evidence presented at the hearings showed a need for a change in the Federal Firearms Act to provide a penalty for shipping, transporting, or receiving a firearm in interstate or foreign commerce with intent to commit a felony therewith or with knowledge or with reasonable cause to believe that a felony offense is intended to be committed therewith.

The subcommittee agreed to provide that this be a Federal offense and that it be punishable by a fine of not more than $10,000, or imprisonment of not more than 10 years, or both.

In view of the constitutional question that has been raised with regard to S. 1592, we include the following brief analysis of the intent and interpretation of the second amendment.

A number of witnesses at the hearings argued that S. 1592 is unconstitutional because it would interfere with individual rights guaranteed by the second amendment to the Constitution. The amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

It is noteworthy that enactment of the National Firearms Act of 1934, as well as the Federal Firearms Act, was opposed on the same grounds and that these statutes were attacked in the courts as being violative of the second amendment. The courts have uniformly ruled to the contrary, and their decisions make it plain that the amendment presents no obstacle to the enactment and enforcement of S. 1592.

The decisions hold that the second amendment, unlike the first, was not adopted with the individual rights in mind, but is a prohibition upon Federal action which would interfere with the organization of militia by the States of the Union.

Obviously, Federal firearms legislation does not hamper the present-day militia; that is, the National Guard, and the courts have held accordingly (see *United States* v. *Miller*, 307 U.S. 174 (1939); *Cases* v. *United States*, 131 F. 2d 916 (1st Cir. 1942), cert. denied, sub nom *Velasquez* v. *United States*, 319 U.S. 770 (1943); *United States* v. *Tot*, 131 F. 2d 261 (3d Cir. 1942, reviewed on other grounds, 319 U.S. 463 (1943); *United States* v. *Adams*, 11 F. Supp. 216 (S.D. Fla. 1935)).

It is sometimes contended that, aside from the second amendment, there is a natural right to bear arms, or a right stemming from a State constitution. However, it is well settled that there is nothing inherent in any such right that renders it absolute. The overwhelming majority of State cases hold that the legislature may prescribe regulations and limitations with regard to the carrying of weapons. It is clear, for example, that a State law prohibiting the carrying of revolvers without a license, or forbidding possession of concealed weapons, does not violate either the Federal or State constitution. And it is clear also that no body of citizens other than the organized State militia, or other military organization provided for by law, may be said to have a constitutional right to bear arms.

In summary, the decided cases, both at the Federal and State levels, reveal no constitutional barrier to the passage of S. 1592. To the contrary, they afford ample precedent for its validity.

Case 3:22-cv-00410-REP   Document 41-4   Filed 02/22/23   Page 69 of 102 PageID# 1239

It is of some importance here to point out that the American Bar Association was not impressed by the allegation that this legislation would violate the constitutional rights of citizens. Although this argument was made in the course of the proceedings, the house of delegates of the association at its 1965 annual meeting in Miami Beach, Fla., overwhelmingly (i.e., by a vote of 184 to 26) endorsed the enactment of this bill. The association reaffirmed its position on August 8, 1966, at its convention in Montreal when it adopted a resolution urging the Congress to adopt S. 1592.

THOMAS J. DODD.
BIRCH BAYH.
EDWARD M. KENNEDY.
JOSEPH D. TYDINGS.
HIRAM L. FONG.
JACOB K. JAVITS.
GEORGE A. SMATHERS.
EDWARD V. LONG.

SECTION-BY-SECTION ANALYSIS OF S. 1592, AS AMENDED

*Section 1*

This section, which was added to the bill by the subcommittee, would include an informative short title and provide that this act (which amends the Federal Firearms Act) may be cited as the State Firearms Control Assistance Amendments of 1966.

*Section 2*

This section, which was added to the bill by the subcommittee, would incorporate into the bill a statement of "findings and declaration."

In view of the misconceptions which have arisen concerning the nature and purpose of the bill, it is deemed desirable to include in the bill a definitive declaration of the bill's purpose and of the findings which justify its enactment.

*Subsection (a)*

Subsection (a) of section 2 contains findings and declarations as to the existence of the conditions with which the bill is designed to deal and of the action necessary to cope with those conditions. Each of these findings is fully supported by the evidence of record before the subcommittee.

Paragraph (1) is the basic finding and declaration that the existing Federal controls over the traffic in firearms moving in (or otherwise affecting) interstate or foreign commerce do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power.

Paragraph (2) is the basic finding and declaration that the ease with which any person can acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States.

The subcommittee through its own investigations and by the evidence presented to the subcommittee by the Nation's leading law-enforcement officers, has established this fact beyond reasonable doubt.

Paragraph (3) is the basic finding and declaration that only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the businesses of importing, manufacturing, or dealing in firearms, can the grave problem of firearms getting into the wrong hands be properly dealt with, and effective State and local regulation of the firearms traffic be made possible.

Paragraph (4) is a specific finding that the acquisition on a mail-order basis of firearms by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances.

70

This specific finding is documented by the evidence summarized in the August 7, 1964, Interim Report on Interstate Traffic in Mail Order Firearms (S. Rept. 1340, 88th Cong., 2d sess.) and by the further evidence submitted with regard to S. 1592 in the 89th Congress and summarized in the general statement regarding the bill under the discussion of the scope of coverage of the bill. (See p. 8.) The documentation of the existence of the problem of the interstate traffic in mail-order firearms is so complete that the Attorney General of the United States has described it to the committee as resulting in "unarguable evils."

Paragraph (5) is a specific finding and declaration that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms.

The evidence of record before the committee fully supports this finding and declaration. (See summary in the general discussion of the scope of coverage of the bill under the subheading "Out of State Purchase of Concealable Firearms," p. 12.) The existence of this problem has been so well established that even the principal opponents of S. 1592 who appeared before the subcommittee conceded the existence of this problem in the course of their subsequent appearances before the House Committee on Ways and Means.

Paragraph (6) is a specific finding and declaration that there is a causal relationship between the easy availability of firearms and juvenile and youthful criminal behavior, and that firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent, juveniles and minors prone to criminal behavior.

The subcommittee in the course of its investigation and hearing has fully established the basis for this finding and declaration. The subcommittee expressed its concern with regard to the causal relationship between the availability of firearms and juvenile and youthful criminal behavior in the interim report on August 7, 1964 (S. Rep. 1340, 88th Cong., 2d sess.), relating to the "Interstate Traffic in Mail Order Firearms."

This finding and declaration has been further supported by the evidence presented before the subcommittee in the 89th Congress during hearings on S. 1592. (See the summarization under the bill subheading on "Acquisition by Juveniles and Minors" in the general discussion of the scope of coverage of the bill.)

Paragraph (7) is a specific finding and declaration that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years have contributed greatly to lawlessness and to the Nation's law enforcement problems.

This finding and declaration is fully supported by the evidence developed by the investigation of the subcommittee and by testimony before the subcommittee by the Attorney General of the United States, the attorneys general of California, New Jersey, and South Carolina, and by the police officials of Atlanta, Chicago, Los Angeles, New

**72**          FEDERAL FIREARMS AMENDMENTS OF 1966

York City, Philadelphia, St. Louis, and the District of Columbia. (See summary under subheading "Importation of Nonsporting and Military Surplus Firearms," in general discussion of the bill relating to scope of coverage.)

Paragraph (8) is a specific declaration and finding that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, etc., and destructive devices such as explosive or incendiary grenades, bombs, missiles, etc.) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern.

This finding and declaration is fully supported by the investigations of the subcommittee and by the evidence presented at the hearings before the subcommittee.

The concern of Federal, State, and city law enforcement officers over this problem was made clear at the hearings before the subcommittee. (See summary under subheading "Highly Destructive Weapons" in general discussion of the scope of coverage of the bill.)

Paragraph (9) is a specific finding and declaration that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.

This finding and declaration is fully supported by investigations of the subcommittee and by the evidence presented by Federal, State, and city law enforcement officials at the hearings before the subcommittee. (See summary under subheading "Licensing of Importers, Manufacturers, and Dealers" in general discussion of the scope of coverage of the bill.)

*Subsection (b)*

Subsection (b) of section 2 is designed and intended to remove certain public misconceptions as to the nature of the bill and is a general declaration that the purpose of the bill is to cope with the conditions referred to in the findings in subsection (a), and that it is not the purpose of the bill to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that the bill is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by regulations of any procedures or requirements other than those reasonably necessary to implement, and effectuate the provisions of the Federal Firearms Act (as it would be amended by S. 1592).

*Section 3*

This section (which was sec. 1 of the bill as introduced) would restate and amend section 1 of the Federal Firearms Act (52 Stat. 1250) which contains the definition of the meaning of certain terms used in the act. This section, as amended by the subcommittee, would be divided into subsection (a) (containing definitions of terms) and subsection (b) (containing exclusions as to the application of certain terms as used in the act).

FEDERAL FIREARMS AMENDMENTS OF 1966          73

*Subsection (a)*

The definition of the term "person" in paragraph (1) is existing law (15 U.S.C. 901(1)).

The definition of the term "interstate or foreign commerce" is a restatement of existing law (15 U.S.C. 901(2)). "Territory" is omitted since there is no territory at the present time. The last sentence of this definition is inserted to clarify the status of the act in Puerto Rico, the Virgin Islands, and the District of Columbia.

The definition of the term "firearm" in paragraph (3) is a restatement and revision of the provisions of existing law (15 U.S.C. 901(3)). The revised definition has been extended to include any weapon (including a starter gun) by whatsoever name known "which will," or "which may be readily converted to," expel a projectile or projectiles by the action of an explosive. This represents a much-needed clarification and strengthening of existing law designed to prevent circumvention of the purposes of the act. As under existing law, the definition also includes weapons "designed to" expel a projectile or projectiles by the action of an explosive, and firearm mufflers and firearm silencers.

The present definition of the term "firearm" includes "any part or parts" of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

In addition, the definition of the term "firearm" is extended to include any "destructive device" as defined in the proposed new definition of this term contained in paragraph (4) of section 1(a). The effect of this inclusion is to make the provisions of the act applicable to all such destructive devices.

The subcommittee amended the definition of a "firearm" to specifically include any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive, in order to make it unequivocally clear that such starter pistols are firearms within the meaning of the Federal Firearms Act. Such so-called starter pistols which may be converted to fire a projectile by boring a hole through an obstruction in the barrel, substitution of a barrel which will permit the firing of a projectile, or otherwise converted to fire a projectile have been a matter of serious concern to law-enforcement officers.

The definition of the term "destructive device" contained in paragraph (4) is a new provision.

The subcommittee has restated this definition for the purpose of clarifying its application.

As amended, the term "destructive device" means any explosive or incendiary *(a)* bomb or *(b)* grenade or *(c)* mine or *(d)* rocket or *(e)* missile or *(f)* similar device; and the term also includes any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive, the barrel or barrels of which have a bore of one-half inch or more in diameter.

The restated exceptions to the application of the term "destructive device" are contained in paragraph (2) of subsection (b).

The first part of the definition of destructive device would bring under the coverage of the Federal Firearms Act certain highly destructive weapons not now covered by the act. The part of the defini-

tion including firearms which have a bore of one-half inch or more in diameter would not extend the coverage of the present act (since existing law now applies to all firearms as defined in the act), but would rather subject such military-type weapons which have no recognized use for lawful sporting purposes to the restrictive controls provided under the bill for traffic in destructive devices.

The definition of the term "short-barreled shotgun" contained in paragraph (5) is a new provision. The definition describes a shotgun of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). The purpose of the definition is to provide a convenient means of reference to weapons of this type.

The definition of the term "short-barreled rifle" contained in paragraph (6) is a new provision. The definition describes a rifle of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). The purpose of the definition is to provide a convenient reference to weapons of this type.

The definition of the term "importer" is a new provision. Under existing law (15 U.S.C. 901(4)), the term "manufacturer" includes a person engaged in importation of firearms or ammunition for purposes of sale or distribution. It appears obvious that separate classifications should be provided for importers and manufacturers in order to more appropriately effectucate the purposes of the act.

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 904(4)) except that the references to importation have been deleted.

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) with certain revisions. The definition also makes it clear that "pawnbrokers" are a type of dealer. This reflects proposed changes in other provisions of the act which would place pawnbrokers handling firearms in a special category and provide for higher license fees for procurement of licenses by pawnbroker dealers.

The definition of the term "pawnbroker" is a new provision. Pawnbroker dealers are covered under the provisions of the existing act in the same manner as other dealers. The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers. Under the provisions of the National Firearms Act (26 U.S.C. ch. 53), pawnbrokers are separately classified and charged a higher rate of special (occupational) tax than other dealers.

The definition of the term "indictment" is a new provision. Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime. This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to "Territory" omitted since there is at the present time no such "Territory."

The definition of the term "antique firearm" contained in paragraph (13) is a new definition added by the subcommittee to the bill. The purpose is to provide by this definition (and par. (1) of subsec. (b)) for the exclusion of bona fide antique firearms (and replicas thereof) from the coverage of the Federal Firearms Act. As included in the

bill, the term "antique firearm" means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870 (but not including weapons designed for use with smokeless powder or using rimfire or conventional center-fire ignition with fixed ammunition.

. Certain suggestions were made to the subcommittee to the effect that ready availability of ammunition on a commercial basis should be one of the principal criteria considered in determining whether a firearm was an antique. Under this concept, firearms using fixed ammunition and of a design developed after the year 1870, would be classed as antiques based on availability of ammunition. The subcommittee after careful study rejected this approach for two principal reasons: First, there are devices commercially available by which firearms can be adapted to fire ammunition other than that which the firearm was designed to fire. Second, there would be an inherent and undesirable uncertainty in this type of classification, dependent upon whether or not ammunition was (or was not) at any given time, readily available on a commercial basis.

The definition of the term "Secretary" or "Secretary of the Treasury" contained in paragraph (14) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

The definition of the term "ammunition" contained in paragraph (15) was amended by the subcommittee to exclude from the coverage of the Federal Firearms Act all ammunition, other than ammunition for a destructive device.

As revised, the term "ammunition" means ammunition for a destructive device. The term does not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.

Under existing law (15 U.S.C. 901(7)), the term included pistol and revolver ammunition. However, an evaluation of the evidence developed in the hearings before the subcommittee showed that it is difficult to effectively control interstate and foreign commerce in conventional firearms ammunition used for sporting, recreational, and other lawful purposes. Therefore, the subcommittee decided to limit the coverage of the act, insofar as ammunition is concerned, to ammunition for highly destructive weapons. Strict controls can be effectively exercised in this area since there is no significant normal legitimate commerce in such ammunition (other than for military purposes which are exempt from coverage under sec. 4 of the Federal Firearms Act).

*Subsection (b)*

Subsection (b) is new. It contains exceptions to the applicability of certain terms as used in the Federal Firearms Act (as it would be amended by the bill).

Paragraph (1) provides that as used in the Federal Firearms Act, the term "firearm" shall not include an antique firearm. The term "antique firearm" is defined in paragraph (13) of subsection (a). The effect this provision has is to make the Federal Firearms Act inapplicable to antique firearms.

An exception was provided in existing law for firearms held and possessed as an antique or curio but the Act contained no definition

of an "antique firearm." S. 1592, as introduced, proposed to delete this exception. The evidence presented at the hearings demonstrated the need for a properly defined and delineated exception for antique firearms. It was pointed out that in other countries which exercise strict controls over the traffic in firearms exemption from such controls is made for firearms which can properly be classified as antiques.

Paragraph (2) of subsection (b) is a new provision which contains exceptions to the applicability of the term "destructive device." The subcommittee has restated these exceptions and has specifically enumerated items not intended to be covered.

All antique firearms would be excluded by paragraph (1) since antique firearms are excluded from the application of the definition of "firearms."

As restated, this paragraph would provide that as used in the Federal Firearms Act the term "destructive device" would not include—

> (A) a device which is not designed or redesigned or used or intended for use as a weapon; or
> (B) any device, although originally designed as a weapon which is redesigned for use as a signaling, line throwing, safety or similar device; or
> (C) any shotgun (other than a short-barreled shotgun); or
> (D) any nonautomatic rifle (other than a short-barreled rifle) generally recognized or particularly suitable for use for the hunting of big game; or
> (E) surplus obsolete ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of 10 U.S.C. 4684(2), 4685, or 4686; or
> (F) any other device which the Secretary finds is not likely to be used as a weapon.

The exceptions contained in paragraph (2) are drafted in the same manner as the exceptions contained in 26 U.S.C. 5179(a) (relating to registration of stills) and section 5205(a)(2) (relating to stamps on containers of distilled spirits). Therefore, the decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780; certiorari denied, 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable. Establishment by a person that he came within the exception would be a matter of affirmative defense. Thus, an explosive device shown to be designed and intended for lawful use in construction or for other industrial purposes would be excepted. However, if the device were designed or used or intended for use, as a weapon, it would be subject to the provisions of the act.

A provision has been made in this paragraph that the Secretary may exclude from the application of the definition of "destructive device" any device which he finds is not likely to be used as a weapon. This provision makes it possible to deal with situations which may arise where there is no reasonable likelihood that the device will be used as a weapon.

Paragraph (3), which relates to the application of the term "crime punishable by imprisonment for a term exceeding one year" as used in the Federal Firearms Act, is a new provision. This provision was placed in subsection (b), rather than in subsection (a), since it merely excludes certain offenses from the application of this language as used in the Federal Firearms Act.

Prior to October 4, 1961, the Federal Firearms Act included provisions which made it unlawful for a person convicted of a crime of violence (as defined) in any court of the United States, a State or possession, to transport, ship, or receive any firearm in interstate or foreign commerce. S. 1750 (87th Cong., 1st sess.) amended the act by striking the definition of "crime of violence" and by striking that term wherever it appeared in the act and inserting in lieu thereof the term "crime punishable by imprisonment for a term exceeding one year." S. 1750 was introduced at the request of the Attorney General as an integral part of an anticrime legislative program. See House Report 1202 (87th Cong., 1st sess.). The felony criteria for prohibiting the transporting, shipping, or receiving of firearms incorporated in the act by S. 1740 has been retained to date.

However, the definition of "crime punishable by imprisonment for a term exceeding one year" proposed in the bill would modify the felony criteria by excluding antitrust-type violations. It may be noted that antitrust-type violations are not felonies under Federal law. However, a limited number of States have statutes making such offenses felonies. The definition would provide uniform treatment of such offenses, both State and Federal.

*Section 4*

Section 4 of the bill (sec. 2 of the bill as introduced) would amend section 2 of the Federal Firearms Act (15 U.S.C. 902), which relates to prohibited acts, to read as contained in the bill.

*Subsection (a)*

The subcommittee has rearranged and restated the provisions of subsection (a) of section 2 of the act as contained in the bill. This subsection is, in general, intended to aid in coping with the problems referred to in paragraphs (1) through (4) of the "Findings and Declaration" contained in subsection (a) of section 2 of the bill, including the problem of the interstate traffic in mail-order firearms.

The subsection, as amended by the subcommittee, would apply only with respect to the activities of persons engaging in the firearms business. Thus, there would be no possibility that a hunter, a person engaging in shooting competitions, a person moving his household belongings from one State to another, a person sending his firearm to another State for service, would be burdened or restricted in such activity by the provisions of this subsection.

As a related change, the subcommittee has amended section 5 of the Federal Firearms Act to provide a specific penalty for the shipment, transportation, or receipt of a firearm in interstate or foreign commerce with intent to commit therewith an offense punishable by imprisonment for a term exceeding 1 year (see sec. 7 of the bill for the detailed discussion of this new penalty provision).

Subsection (a) is derived in part from the provisions of existing law contained in subsection (a) and (b) of section 2 of the Federal Firearms Act (15 U.S.C. 902 (a) and (b)). Such provisions of existing law make it unlawful for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer licensed under the act, to transport, ship, or receive any firearm in interstate or foreign commerce, or for any person to receive any firearm transported or shipped in interstate or foreign commerce, by an unlicensed importer, manutransport, ship, or receive any firearm in interstate or foreign comfacturer, or dealer.

Subsection (a), as amended by the subcommittee, is aimed primarily at the activities of persons engaging in the business of importing, manufacturing, or dealing in firearms (or ammunition for destructive devices).

The effect of subsection (a), as amended, with respect to commercial transactions, is substantially the same as the effect of the subsection as contained in the bill as introduced. It would have the effect of channeling interstate and foreign commerce in firearms to licensed importers, licensed manufacturers, and licensed dealers, thereby prohibiting the commercial mail-order traffic in firearms (other than rifles and shotguns subject to the provisions of paragraph (2)(C)) to unlicensed persons. This will help the States to effectively control the firearms traffic within their own jurisdiction under the exercise of their police power granted to them under the Constitution.

Paragraph (1) of subsection (a) provides that it shall be unlawful for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer having a license issued under the provisions of the Federal Firearms Act to engage in the business of importing, manufacturing, or dealing in firearms (or ammunition for destructive devices) or to transport, ship, or receive any firearm (or ammunition for destructive devices) in interstate or foreign commerce.

This paragraph is essentially existing law, except for the specific prohibition against engaging in business without having first obtained a license under the provisions of the Federal Firearms Act. This new language is keyed to the provisions of the first sentence of subsection (a) of section 3 of the Federal Firearms Act as contained in the bill, and the purpose of the basic requirement is discussed in the analysis of that provision.

Paragraph (2) of subsection (a) provides, in general, that it shall be unlawful for any importer, manufacturer, or dealer licensed under the provisions of the Federal Firearms Act to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce, any firearm to any person other than a licensed importer, licensed manufacturer, or licensed dealer.

The effect of paragraph (2) is to channel the commercial traffic in firearms in interstate and foreign commerce through licensees in the various States so that the State into which a firearm is shipped will have authority to effectively control the transactions between the Federal licensees and the ultimate purchasers under the police power granted to the States by the Constitution.

The provisions of this paragraph would not, of course, be applicable in respect to transactions with the persons excepted under the provisions of section 4 of the act (15 U.S.C. 904), such as Federal or State agencies. No specific exception is made in this section for the transactions with such persons, since such transactions are covered by section 4 of the Federal Firearms Act (as contained in sec. 6 of the bill).

However, four specific exceptions have been provided in the bill to the provisions of paragraph (2).

The first exception in subparagraph (A) provides that paragraph (1) of subsection (a) shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm to the sender (including a replacement firearm of the same kind, make, and type). This provision is intended to accommodate interstate shipments of firearms for service or repair and to allow a dissatisfied

customer to have a substitute firearm of the same kind, make, and type shipped to such customer by a licensee.

The second exception in subparagraph (B) of paragraph (2) of subsection (a) provides that paragraph (1) of subsection (a) shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from shipping, or causing to be shipped, for conveyance in the mails, a firearm to any officer, employee, agent, or watchman eligible under the provisions of section 1715 of title 18 of the United States Code to receive through the mails, for use in connection with their official duty, pistols, revolvers, and other firearms capable of being concealed on the person. This will allow interstate shipments by mail of firearms by licensees to persons who are, under existing law, authorized to receive through the mails firearms capable of being concealed on the person for use in connection with their official duties.

The third exception in subparagraph (C) of paragraph (2) of section 2(a) of the act as contained in the bill exempts from the prohibition against shipment or transportation in interstate or foreign commerce of firearms by licensees to nonlicensed persons rifles and shotguns which are suitable for sporting purposes but which are not military surplus. The exemption is conditioned on the obtaining of an affidavit from the prospective consignee attesting to the legality of the shipment and receipt of the firearm. The provision also makes it unlawful for a licensee to ship or transport in interstate or foreign commerce to a nonlicensed person such rifle or shotgun without first notifying the principal law enforcement officer of the locality to which the rifle or shotgun is to be shipped. These controls are designed to assure against commercial interstate mail-order shipment to persons ineligible under Federal or applicable State law to receive a rifle or shotgun, and to advise interested local law enforcement officers of the transaction in order that they may have an opportunity to establish the prospective recipient's qualifications under State law for receipt or possession of a rifle or shotgun and to take any action deemed appropriate.

In addition, subparagraph (C) provides (1) that the Governor of any State may designate any official in his State to receive the notification to local law enforcement officials required by this subparagraph and that the Secretary shall publish such designation in the Federal Register; and (2) that the Governor of any State may request that the Secretary discontinue the required notification to local law enforcement officials in his State or any part thereof and upon publication in the Federal Register, the request shall be in effect for 5 years, unless withdrawn by the Governor and so published in the Federal Register.

The fourth exception in subparagraph (D) of paragraph (2) of subsection (a) of section 2 of the act as contained in the bill is the exception for the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States. This provides that nothing in paragraph (2) shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, or a possession, differently than it would apply if such place were a State of the United States. This provision is intended to make it clear that the prohibitions of this paragraph are not intended, by reason of the definition of the term "interstate or foreign commerce," to apply to over-the-counter sales, or transportation within such places.

The decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780, cert. den. 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable to the exceptions contained in paragraph (2) of this subsection.  Establishment by a person that he came within the exception would be a matter of affirmative defense.

Paragraph (3) of subsection (a) of section 2 of the act as contained in the bill would make it unlawful for any person, in purchasing or otherwise obtaining or attempting to purchase or otherwise obtain a firearm from a licensee licensed under this act, knowingly to supply any false or spurious information or identification intended or calculated to deceive such licensee with respect to such person's identity, age, address or criminal record (if any), or with respect to any other material fact pertinent to the lawfulness of a sale or other disposition of a firearm by a licensed importer, licensed manufacturer, or licensed dealer under the provisions of subsections (b) and (c) of section 2 of the act.

Paragraph (4) of section 2(a) of the act as contained in the bill is a new provision which would make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased outside that State if it is unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

*Subsection (b)*

Subsection (b) of section 2 of the act, as contained in the bill, is a new provision which is intended to regulate the over the counter disposition of firearms by federally licensed importers, manufacturers, and dealers, to persons other than licensees under the act.

The subcommittee has made certain amendments to this subsection to set forth more specifically the procedures intended to be followed and the exact nature of the acts which are prohibited.

In order for the records of disposition required to be kept by licensees to have significant value or validity, it is essential that the licensees be required to ascertain by reliable means of identification the age and identity of the purchaser and the address of the place where he resides.

Paragraph (1) of subsection (b), as amended by the subcommittee, would make it unlawful for any licensee under the Federal Firearms Act to sell or otherwise dispose of any firearm to any person without ascertaining through some reliable means of identification, such as a motor vehicle driver's license, or other comparable document (which is required to be noted in the licensee's records), the identity, date of birth (in the case of an individual) and place of residence (or place of business in the case of a corporation or other business entity) of such person.

It is intended that the place of residence to be established under this provision be the place where the person is actually residing, other than on a transient basis.

Under paragraph (2) of subsection (b), as amended by the subcommittee, it would be unlawful for a federally licensed importer, federally licensed manufacturer, or federally licensed dealer, to sell or otherwise dispose of any firearm to any person who (in the case of an individual) he knows or has reasonable cause to believe is under 21

years of age (except for a shotgun or rifle) and under 18 years of age in the case of a shotgun or rifle.

The subcommittee amendment to paragraph (2) inserted the words "knows or has reasonable cause to believe." This change does not relieve the licensee from the requirement of ascertaining the age of the purchaser as provided in paragraph (1) of subsection (b).

The provisions of paragraph (2) of subsection (b) of section 2 of the act, as contained in the bill, provide uniform and effective means throughout the United States for preventing the purchasing of the specified, firearms by persons under such ages. The procuring of firearms by juveniles (often without the knowledge or consent of their parents or guardians) has become a matter of national concern. The tragic consequences of this situation have been fully brought out in the proceedings of the subcommittee.

Under this provision a minor or juvenile would not be restricted from owning or learning the proper usage of a firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.

The subcommittee amended paragraph (3) of subsection (b) of section 2 of the act, as contained in the bill, by substituting the words "does not reside in" for the words "is not a resident of" to make it clear that this provision is to be construed as referring to actual place of residence rather than the legal or voting residence. However, it is not intended that premises occupied only on a transient basis be considered the place of residence for the purpose of this subsection.

As amended by the subcommittee, the provisions of paragraph (3) prohibiting licensees under the act from selling a firearm (other than a shotgun or rifle) to an unlicensed individual who is a resident of a State, other than that in which the importer's, manufacturer's, or dealer's place of business is located, is intended to deal with the very serious problem of individuals going across State lines to procure firearms which they could not lawfully procure or possess in their own State and without the knowledge of their local authorities. The hearings before the subcommittee have fully demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms. The hearings have also shown that this is a common means by which criminal and lawless elements obtain firearms.

Paragraph (4) of the subsection would make it unlawful for any federally licensed importer, manufacturer, or dealer to sell or otherwise dispose of any firearm to any person who, by reason of State or local law, regulation, or ordinance, applicable to the place of sale or other disposition, may not lawfully receive or possess such firearm.

The conditions imposed by this subsection on the operations of persons licensed under the act are deemed to be reasonable conditions on the privilege granted to them, and necessary to effective control of interstate and foreign commerce in firearms, and to protect the public welfare.

*Subsection (c)*

Subsection (c) of section 2 of the act, as contained in the bill, is a new provision which, like subsection (b), deals with the activities of

licensed importers, licensed manufacturers, and licensed dealers. This subsection would make it unlawful for any such importer, manufacturer, or dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee) knowing, or having reasonable cause to believe, that such person is under indictment or has been convicted in any court of the United States, or of a State (as defined in par. (2) of sec. 1(a) of the act, as contained in the bill) or possession, of a crime punishable by imprisonment for a term exceeding 1 year, or who is a fugitive from justice. In other words, licensees would be prohibited from knowingly disposing of firearms or ammunition to felons, fugitives from justice, or persons under indictment for a felony. The subcommittee deleted from subsection (c) of section 2 of the act, as contained in the bill originally introduced, the final clause thereof which would have made it unlawful for a licensed importer, licensed manufacturer, or licensed dealer to ship or transport any firearm in interstate or foreign commerce to any person who could not have lawfully received such firearm under the provisions of subsection (a) of section 2 gf the act, as contained in the bill originally introduced. A provision to achieve a comparable purpose is now found in subsection (a)(2) of section 2 of the act, as contained in the amended bill.

*Subsection (d)*

Subsection (d) of section 2 of the act, as contained in the bill, is existing law (15 U.S.C. 902(e)) except that the words "in any court" have been inserted to conform the language of subsection (e).

*Subsection (e)*

Subsection (e) of section 2 of the act, as contained in the bill, is a restatement of existing law (15 U.S.C. 902(f)) revised to include persons under indictment. The omission of these persons from existing law appears to have been an inadvertent omission since such persons are, under existing law (15 U.S.C. 902(e)), prohibited from shipping or transporting firearms in interstate or foreign commerce. Also, the presumption contained in existing law has been eliminated, since it was declared unconstitutional by the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

*Subsection (f)*

Subsection (f) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person (including a licensee under the act) knowingly to deposit, or cause to be deposited for mailing, or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice to the Postmaster General or his delegate or to the carrier (as the case may be) that a firearm is being transported or shipped. This provision is correlated to the provisions of section 2(g) of the act as contained in the bill. Further, the testimony before the subcommittee disclosed the existence of a practice of surreptitiously shipping firearms, without notice or disclosure, to circumvent requirements of Federal or State law.

*Subsection (g)*

The subcommittee has amended subsection (g) of section 2 of the act as contained in the bill since the amendments made to subsection (a) require a restatement of the provisions applicable to carriers.

As amended, subsection (g) of section 2 of the act as contained in the bill contains two paragraphs.

Paragraph (1) prohibits a common or contract carrier from delivering in interstate or foreign commerce any firearm to any person knowing or having reasonable cause to believe that such person is under 21 years of age (or under 18 years of age in the case of a rifle or shotgun).

Paragraph (2) prohibits a common or contract carrier from delivering a firearm in interstate or foreign commerce to any person with knowledge or with reasonable cause to believe that the receipt or possession of the firearm by the person to whom it is delivered would be in violation of the laws or ordinances of the State (or political subdivisions thereof) in which the delivery is made.

A similar requirement is also provided with respect to delivery of firearms in the U.S. mails.

The provisions of this subsection are in furtherance of the purposes of the bill to restrict acquisition of firearms by juveniles and minors and to aid the States and their political subdivisions in achieving effective firearms controls.

*Subsection (h)*

Subsection (h) of section 2 of the act as contained in the bill is existing law (15 U.S.C. 902(g)) and relates to the transportation or shipment of stolen firearms.

*Subsection (i)*

Subsection (i) of section 2 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 902(h)). The language has been revised to correspond with other comparable provisions of Federal law pertaining to the receipt or sale of stolen property "moving as, or which is a part of, or which constitutes interstate or foreign commerce," (see 18 U.S.C. 2313 relating to sale or receipt of stolen vehicles). This change will make it clear that the provisions apply to stolen firearms or ammunition transported in interstate or foreign commerce, after having been stolen, as well as to firearms and ammunition stolen in the course of movement in interstate or foreign commerce.

*Subsection (j)*

Subsection (j) of section 2 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 902(i)) relating to firearms from which the manufacturer's serial number has been removed, obliterated, or altered. The restatement makes applicable the provisions of the subsection to an importer's serial number, as well as the manufacturer's, since importers and manufacturers are separately classified under the provisions of the bill. The restatement also deletes the words "and the possession of any such firearm shall be presumptive evidence that such firearm was being transported, shipped, or received as the case may be, by the possessor in violation of this act" since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

*Subsection (k)*

Subsection (k) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person to import or bring into the United States, or any possession thereof, any firearm in violation of the provisions of this act or to import or bring into the United States or any possession thereof any ammunition for a destructive device. This provision is correlated to the provisions relating to importation of firearms contained in section 3(e) of the act as contained in the bill.

*Subsection (l)*

Subsection (l) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States, or any possession thereof, in violation of the provisions of this act. This subsection also is correlated to the provisions of section 3(e) of the act as contained in the bill relating to importation.

*Section 5*

Section 5 of the bill (which was sec. 3 of the bill as introduced) would amend section 3 of the Federal Firearms Act (15 U.S.C. 903) which relates to licensing of importers, manufacturers, and dealers, and to recordkeeping by licensees.

*Subsection (a)*

Subsection (a) of section 3 of the act, as contained in the bill, is a restatement and revision of existing law (15 U.S.C. 903(a)).

The first sentence of subsection (a) is intended to make it clear that no person shall engage in business as an importer of firearms, or as a manufacturer of firearms, or as a dealer in firearms (or ammunition for destructive devices) until he has filed an application with, and received a license to do so from the Secretary. In order to effectively regulate interstate and foreign commerce in firearms (and ammunition for destructive devices) it is necessary that all persons engaging in these businesses be licensed. Similar provisions were upheld in *Hanf* v. *United States*, 235 F. 2d 710, cert. den. 352 U.S. 880, as reasonably necessary to effective control of interstate and foreign commerce under comparable conditions.

The legislative record before the subcommittee concerning the traffic in firearms amply demonstrates that the licensing of all persons engaged in the business of importing, manufacturing, or dealing in firearms is an appropriate and necessary means to the attainment of the legitimate end of effective control over the interstate traffic in firearms. A full discussion of the constitutional basis for this provision (and other provisions) is contained in the memorandum submitted by the Attorney General of the United States, Nicholas deB. Katzenbach, when he testified before the subcommittee on May 19, 1965. This memorandum is included in the record of the hearings following the testimony of the Attorney General.

The second sentence of subsection (a) provides that the application for a license shall be in such form and contain such information as the Secretary of the Treasury shall by regulations prescribe. It is the intent of this provision to authorize the Secretary to require the submission of information reasonably relevant to the determination as to whether the applicant is entitled to a license under the standards

prescribed in subsection (c). Since the Secretary has the responsibility for determining whether the license should be issued, he must necessarily have the authority to require the submission by the applicant of information relevant to his determination as to the applicant's eligibility. Authority to prescribe the form of the license application has been exercised by the Secretary since the Federal Firearms Act was enacted in 1938, and the evidence presented to the subcommittee demonstrated that only information relevant to the issuance of a license has been required on the prescribed application form.

The provision that applicants shall be required to pay a fee for obtaining their license "for each place of business" is merely a clarification of existing law, since existing law is now so construed (see 26 CFR 177.33). It is intended that the license cover only the specific place of business for which it is issued.

Under existing law, an importer is required to obtain a license as a manufacturer. The bill provides a separate classification for importers, and under subsection (a) an importer would be required to obtain a license as such.

Under existing law, the applicant, if a manufacturer or importer, paid a fee of $25 per annum, and, if a dealer, a fee of $1 per annum. These fees are completely unrealistic and, in the case of dealers represent only a fraction of the cost of processing an application and issuing a license. Further, the information presented at the public hearings held by the subcommittee established the fact that many persons holding licenses as dealers under the Federal Firearms Act are not bona fidely engaged in business as such, but nevertheless have due to the nominal license fees and the absence of statutory standards for the issuance of licenses, obtained licenses. This information is summarized in the general discussion of the provisions of the bill regarding the scope of coverage under the subheading "Licensing of Importers, Manufacturers, and Dealers." In order for the licensing system under the act to serve its intended purpose, it is essential that this situation be corrected.

Under the provisions of subsection (a) of section 3 of the act as contained in the bill the license fees would be increased to a figure which would make it unlikely that any person not bona fidely engaged in business as an importer, manufacturer, or dealer would attempt to obtain a Federal Firearms Act license. The increased license fees would be such as to not only cover the cost of processing an application and issuing the license, but would partially defray the cost of conducting the investigation contemplated by the provisions of section 3(c) of the act as contained in the bill to determine the qualifications of the applicant and whether or not he would be likely to conduct his operations in compliance with the act.

A separate classification and higher fees are provided in the case of a manufacturer or importer of, or a dealer in, "destructive devices" as defined in paragraph (4) of subsection (a) of section 1 of the act, as contained in the bill. Since "destructive devices" are not ordinary articles of commerce, it is anticipated that very few such licenses will be issued. The purpose of this separate classification and higher fee with respect to such devices is to make more effective the stringent controls imposed under the bill with regard thereto.

A separate license with a higher license fee is also provided for pawnbroker dealers. A "pawnbroker" is defined in section 1(a) of the bill. It may be noted that under the National Firearms Act (26 U.S.C. ch.

53) pawnbroker dealers are charged a higher rate of occupational tax than other dealers.

The bill provided a fee of $100 per annum for dealers (other than dealers in destructive devices and pawnbrokers). The evidence presented at the hearings before the subcommittee showed that the $100 dealer fee would work a hardship on small dealers, particularly dealers in sporting ammunition and dealers in sporting rifles and shotguns.

The amendment to the bill eliminating ammunition (other than ammunition for destructive devices) means that the substantial number of persons who deal only in ammunition will not be required to obtain a license under the act. Thus, ammunition reloaders and ammunition dealers will not be affected by the bill.

The subcommittee further amended the bill to provide a basic license fee of $10 per annum for dealers (other than pawnbrokers and dealers in destructive devices). This will materially reduce the burden on small dealers while retaining a fee sufficiently high to discourage filing of applications by persons not genuinely engaged in business as dealers in firearms.

It is contemplated that investigations will be conducted to determine suitability of licensees and prospective licensees under the new licensing standards discussed below in subsection (c). Because the annual license fee for dealers (other than pawnbrokers or dealers in destructive devices) is being reduced to $10 and in order to partially defray the expense of a one-time investigation of such dealers the subcommittee has provided that for the first renewal following the effective date of the amendments to the Federal Firearms Act made by this bill or for the first year he engages in business such a dealer will pay a license fee of $25.

It is deemed that the fees provided in the bill as amended by the subcommittee will be adequate for the purposes intended and will partially defray the costs of investigation of applications and of administration of the Federal Firearms Act, as amended by the bill.

*Subsection (b)*

Subsection (b) of section 3 of the act as contained in the bill is a restatement and revision of the provisions of existing law (15 U.S.C. 903(b)). Existing law provides that upon payment of the prescribed fee the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, or receive firearms and ammunition in interstate or foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of the act. It will be noted that in existing law there are no specific conditions on the issuance of a license other than the payment of the prescribed fee. However, in view of the existing proscriptions in section 2 of the act against the shipment, transportation, or receipt in interstate or foreign commerce in firearms or ammunition by a person who is a fugitive from justice, or who has been convicted of, or who is under indictment for, any offense punishable by imprisonment for a term exceeding 1 year, the act has consistently been construed as precluding the issuance of licenses to such persons since it would be illegal for them to engage in the transactions covered by the license. (See 26 CFR, pt. 177.)

The revision of section 3(b) makes it clear that the privileges granted to the licensee are not unlimited or unconditional but are subject to the provisions of this act and other applicable provisions

of law, and also that an application for a license (including a renewal application as well as an original application) may be denied under the conditions set forth in section 3(c) of the act as contained in the bill.

*Subsection (c)*

Subsection (c) of section 3 of the act as contained in the bill is basically a new provision, except to the extent that it incorporates the construction of existing law to the effect that a license will not be issued to a person who is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of section 2 of the act (i.e., a person who has been convicted of, or who is under indictment for, a felony, or who is a fugitive from justice).

The existing provisions of the Federal Firearms Act, regarding the issuance of licenses, represent an anomaly to the general practice with regard to the issuance of licenses or permits in that the act contains no standards for the issuance or denial of a license, such as are contained in other comparable acts. (See 26 U.S.C. 5271(c) and 5712, and 27 U.S.C. 204(a)(2).)

Further, the existing weak provisions of the act do not grant any discretion with regard to the issuance of licenses to importers, manufacturers, and dealers, but rather provide that upon payment of the prescribed nominal fee that the Secretary of the Treasury "shall" issue the license applied for.

Since under existing law it would be unlawful for an importer, manufacturer, or dealer to ship or receive firearms in interstate or foreign commerce without a license, it is necessary to issue licenses upon the allegation of applicants that they "intend" to engage in such business. However, under existing law there is no specific statutory basis for denying an application submitted by a person who is not yet engaged in the firearms business and who does not intend to engage in the business with respect to which he is submitting an application for a license. While there may be implied authority in existing law to deny applications under such conditions, there are significant legal and administrative problems involved in taking such action under existing law.

In view of the magnitude of this problem (e.g., Secretary Fowler estimated that possibly 50,000 licenses had been issued to persons who may not be engaged in the business covered by the license) as developed at the hearings, it is essential that there be no doubt as to the authority of the Secretary of the Treasury or his delegate to deny license applications in cases where the applicant is not engaged in the applicable business, and does not intend to engage in such business. Therefore, the subcommittee has restated the provisions of paragraph (2) of subsection (c) to make it completely clear that the Secretary of the Treasury or his delegate may deny an application for a license where the applicant is not engaged in the business and there is good cause to believe that he will not engage in the business during the term of the license applied for.

The hearing record shows that the nominal license fees and other inadequacies of existing law have resulted in an untenable situation which urgently needs correction and it is noted that Secretary of the Treasury Henry H. Fowler in his appearance before the subcommittee on May 19, 1965, stated, that as the head of the Department responsible for the administration of the Federal Firearms Act that he was

88        FEDERAL FIREARMS AMENDMENTS OF 1966

"particularly anxious that the changes proposed in the bill with respect to the issuance of licenses to manufacture, import, and deal in firearms be adopted." The Attorney General of the United States, Nicholas deB. Katzenbach, who testified before the subcommittee on the same date, stated that the changes in the licensing provisions provided in the bill were intended to "give reasonable discretion to the Secretary of the Treasury as to who should be licensed to manufacture, import, or deal in the deadly weapons with which the Federal Firearms Act is concerned," and "to bring about a higher level of responsibility in the firearms trade."

Subsection (c) of section 3 of the act as contained in the bill eliminates the anomalous situation with respect to the licensing system contained in existing law and sets forth specific standards under which an application shall be disapproved and the license denied, after notice and opportunity for hearing.

The standards provided in subsection (c) are very similar to the standards provided in 26 U.S.C. 5271(c) (relating to permits to procure, deal in, or use specially denatured distilled spirits); 26 U.S.C. 5712 (relating to permits for manufacturers of tobacco products); and to 27 U.S.C. 204 (relating to wholesale dealers in liquors, importers of liquors, etc.) under which the Treasury Department has issued over 25,000 permits. The principal standard in all three of the statutes cited is the implied standard recognized by the Supreme Court in the *Ma-King* case (*Ma-King* v. *Blair*, 271 U.S. 479).

The record and reputation of the applicant as well as relevant and significant association with persons with a criminal record or reputation would be the principal basis for finding that the applicant is not likely to maintain operations in compliance with the Federal Firearms Act. (See *Seaway Beverages, Inc.* v. *Dillon, et al.*, 319 F. 2d 722, cert. den. 375 U.S. 923; and *Pincourt* v. *Palmer*, 190 F. 2d 390, which construe the language of the standards set forth in par. (2).)

The hearing and appeal procedures provided by the Administrative Procedure Act (act of June 11, 1946, 5 U.S.C. 1001 et seq.) would, as in the case of the permits provided for in title 26, United States Code, sections 5271 and 5712, be applicable with respect to license proceedings under the Federal Firearms Act.

The provisions of paragraph (2) relating to individuals possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association, are necessary to preclude felons or other individuals who could not obtain a license as an individual from using a corporation or other business organization to conduct their operations. In the past, individuals convicted of a felony have formed corporations for the purpose of continuing their firearms operations.

The provisions of paragraph (5) would preclude the issuance of licenses to applicants who do not have, or do not intend to have or maintain, bona fide business premises for the conduct of the business. This provision will be a definite aid in limiting licensees under the Federal Firearms Act to persons bona fidely engaged in business, and assuring that there will be an appropriate place that is subject to proper inspection where the required records will be maintained.

The information developed at the public hearings held by the subcommittee disclosed a definite need for such a provision. It was shown that in some cases importers or dealers maintained no regular place of business which could be found, and conducted their operations

through post office boxes, mail drops, answering services, etc., or from a vehicle, vessel, or aircraft which moved from place to place.

It is not intended that a building also used as a dwelling be precluded from being the place of business. However, in such cases the part of the building intended as the business premises should be designated as such and the records maintained in the designated area available for inspection as provided in subsection (g).

*Subsection (d)*

Subsection (d) of section 3 of the act as contained in the bill replaces the provisions of existing law contained in section 3(c) of the act (15 U.S.C. 903(c)) and reflects the construction of existing law as contained in current regulations (26 CFR part 177).

The requirement of existing law, concerning the posting of a bond by a licensee convicted of a violation of the act in order to continue operations pending final disposition of the case on appeal, serves no useful purpose, and has been omitted. Further, the provisions of this subsection have been revised to simplify administration. Since the licensee is required to reapply each year for a license, the information on the application relating to his indictment and/or conviction will be adequate. Also, the license itself can, as at present, contain a warning that the licensee cannot continue operations once his conviction has become final (other than as provided in sec. 11).

As under existing law and regulations, a new license will not be issued to a person under indictment for, or who has been convicted of, an offense punishable by imprisonment for a term exceeding 1 year. However, a licensed importer, licensed manufacturer, or licensed dealer may continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be subject to all provisions of this act, and operations pursuant to such license shall be discontinued. If a bona fide application for relief is filed under section 11, operations may continue until such application is acted upon.

*Subsection (e)*

Subsection (e) of section 3 of the act as contained in the bill is a new provision designed to bring under control the flow of surplus military weapons and other firearms being imported or brought into the United States which are not particularly suitable for target shooting, hunting, or any other lawful purpose.

The operations of certain importers of and dealers in such firearms has reflected a flagrant disregard of the public interest.

The interim report made by the subcommittee with respect to the "Interstate Traffic in Mail-Order Firearms" (S. Rept. 1340, 88th Cong., 2d sess.) pointed out that such firearms are a principal source of supply to juvenile delinquents and other lawless elements. This report also indicated that many of these firearms were in such poor condition, or of such poor workmanship, that their use would be hazardous.

The further evidence now of record before the committee fully supports and justifies the halting of this senseless flow of imported surplus military and non-sporting-type firearms which have found their way into the hands of criminal and lawless elements across the United States. Many of the Nation's leading law enforcement officials have

testified regarding the wide usage of such firearms in the commission of crimes and of their serious and destructive effect on law enforcement. They have also testified as to the unsafe character to the user of many such firearms, particularly the converted starter pistols, the rebored weapons, and the firearms with insufficient safety features. The testimony concerning the problems created by the importation of such firearms is more fully set forth in the general discussion of the provisions of the bill relating to scope of coverage under the subheading dealing with the "Importation of Nonsporting and Military Surplus Firearms."

One particularly disturbing facet of the traffic in military surplus firearms involves the importation of antitank guns, bazookas, mortars, and similar larger caliber weapons. One importer told the subcommittee that he alone had imported over 4,000 such weapons. These firearms have not been imported for national defense purposes, but for indiscriminate sale to anyone with the purchase price, including lawless elements.

Under the provisions of subsection (e), no person could import or bring firearms into the United States or a possession thereof, except upon authorization by the Secretary. Such authorization would not be issued under the provisions of this subsection unless it was established to the satisfaction of the Secretary that certain conditions designed to protect the public interest had been met.

These provisions would not prohibit the importation of currently produced firearms which are in safe firing condition and which are particularly suitable for sporting purposes; nor would they prohibit the importation of military surplus rifles or shotguns as long as they meet adequate safety standards, are suitable for, or readily adaptable to, sporting purposes and are not "firearms" as defined in the National Firearms Act. Therefore, there would be no interference with the bringing in of rifles or shotguns, or of pistols or revolvers (not military surplus), of recognized quality which are used for hunting and other recreational purposes or for personal protection.

Also firearms could be brought in for scientific or research purposes, or for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or if they were unserviceable (not readily restorable to firing condition) and were intended as curios or museum pieces. Also any antique firearm (as defined) could be brought in since such firearms are excluded from the coverage of the Federal Firearms Act. A firearm which had previously been taken out of the United States (or a possession) could be brought back in by the person who took it out. This is to accommodate travelers, hunters, and American personnel stationed in foreign countries.

*Subsection (f)*

Subsection (f) of section 3 of the act as contained in the bill is a new provision relating to the sale or other disposition of destructive devices, machineguns, short-barreled shotguns, and short-barreled rifles by licensee to nonlicensees. This provision is imposed as a condition on the privilege granted the licensee to engage in interstate or foreign commerce with respect to such firearms. Since these are not ordinary articles of commerce, it is not expected that there will be any significant volume of transactions falling within the application of the subsection. However, it is deemed to be in the public interest to place

adequate controls over the disposition of these highly destructive weapons by licensees to nonlicensed persons.

*Subsection (g)*

Subsection (g) of section 3 of the act as contained in the bill is a restatement and revision of the recordkeeping requirements of existing law (15 U.S.C. 903(d)). Under existing law and regulations (26 CFR 177.51), licensees are required to maintain complete and adequate records reflecting the importation, production, and disposition at wholesale and retail of firearms, and the records are required to be kept available for inspection by internal revenue officers during regular business hours (26 CFR 177.54).

The restatement of the recordkeeping requirements contained in this subsection would make clear in the statute the requirement that the records be made available for inspection at all reasonable times, and the authority of the Secretary or his delegate to enter during business hours the premises of the licensee for inspection purposes.

The subsection also makes clear the authority of the Secretary, by regulations, to require the submission of reports concerning the operations of licensees.

Particularly as to manufacturing and importing operations the submission of information as to the number and types of firearms manufactured and imported might prove to be desirable and in the public interest. The hearings held regarding the bill have demonstrated the difficulty of readily obtaining reliable information in this regard. Also there may be other situations in which the submission of information could be of significant value, as for example retail sales of firearms in unusual quantities which might be destined for armed groups who would supplant lawful authority or for illicit exportation for purposes for which an export license could not be obtained.

There is no provision of S. 1592 which requires, provides for, or authorizes the Secretary or his delegate to institute a national firearms registration procedure under the Federal Firearms Act, and it is not intended that S. 1592 be used as the statutory basis for the national registration of firearms.

If it should be deemed necessary or desirable to provide for the national registration of firearms (other than as provided in the National Firearms Act; 26 U.S.C. ch. 53), it is intended that such registration be by specific congressional authorization and not pursuant to any regulatory discretion granted under the terms of this bill.

It has been existing practice to make available to State and local law enforcement officers information obtained from the required records of licensees for law enforcement purposes (e.g., tracing the ownership of a firearm found at the scene of the crime). The subsection would provide specific statutory authority for this practice.

It may be noted that the entry and inspection provisions contained in this subsection are similar to those provided in 26 U.S.C. 5146 with regard to the premises of liquor dealers. If there is to be proper enforcement of the Federal Firearms Act, it is essential that there be clear statutory authority to enter the premises where the business is carried on in order to inspect the records which are required to be maintained pursuant to the act.

*Subsection (h)*

Subsection (h) of section 3 of the act as contained in the bill is a new provision which would require licenses issued to importers, manufacturers, and dealers under the provisions of this section to be kept posted and available for inspection on the business premises covered by the license.

*Subsection (i)*

Subsection (i) of section 3 of the act as contained in the bill is a new provision. Existing law (15 U.S.C. 902(i)) makes it unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce, any firearm from which the manufacturer's serial number has been removed, obliterated, or altered. Under the statutory authority to prescribe regulations to carry out the provisions of the act (15 U.S.C. 907), the Secretary has prescribed regulations requiring the identification of firearms (26 CFR 177.50). Subsection (i) would include in the act specific statutory authority for the Secretary to require licensed importers and licensed manufacturers to identify firearms in the manner prescribed by regulations.

*Section 6*

Section 6 of the bill (which was sec. 4 of the bill as introduced) amends section 4 of the Federal Firearms Act. Section 4 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 904). However, the section as contained in the bill eliminates certain of the exceptions in existing law.

Section 4 of the act as contained in the bill contains the exception in existing law (15 U.S.C. 904) applicable in respect to transportation, shipment, receipt, or importation of firearms or ammunition imported for or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof, or (2) any State or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof. Such transactions are completely exempt from all provisions of the act.

The exemptions in existing law for certain nongovernmental activities have been omitted. Such omission does not mean that firearms or ammunition (for destructive devices) cannot be shipped to, or procured by, the omitted persons. Rather, it means that the omitted persons will be required to conduct their transactions and operations in conformity with the terms of the Federal Firearms Act. There appears to be no substantial reason why this cannot be done.

The Department of Defense has advised the subcommittee that the Department "strongly recommends the enactment of S. 1592" and that "no function of the Department of Defense will be in any way impaired by this legislation" (this includes the civilian marksmanship program conducted under the auspices of the Secretary of the Army).

*Section 7*

Section 7 of the bill (which was sec. 5 of the bill as introduced) amends section 5 of the Federal Firearms Act (15 U.S.C. 905(b)).

No change has been made in subsection (a), the existing penalty provision of the Federal Firearms Act.

The subcommittee has amended section 7 of the bill by redesignating subsection (b), which relates to forfeiture, as subsection (c) and inserting a new subsection (b) which would provide that any person who

(1) with intent to commit therewith an offense punishable by imprisonment for a term exceeding 1 year; or (2) with knowledge or with reasonable cause to believe that an offense punishable by imprisonment for a term exceeding 1 year is intended to be committed therewith; ships, transports or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than 10 years, or both, for each such offense.

The provisions of the new subsection (b) would provide a severe penalty for shipping, transporting, or receiving a firearm in interstate or foreign commerce with intent, or with knowledge or reasonable cause to believe, that a felony offense is intended to be committed therewith.

This is basically an extension of the penalty imposed under the present act regarding the shipment, transportation or receipt in interstate or foreign commerce of firearms by persons convicted of an offense punishable by imprisonment for a term exceeding 1 year.

The 10-year maximum penalty appears clearly warranted in the cases to which subsection (b) would be applicable and it is important that persons be deterred from shipping, transporting, or receiving firearms in interstate or foreign commerce under the conditions which would be covered by this subsection.  However, this provision would not have the effect of unduly burdening the agencies involved in criminal justice activities at the Federal level, as would certain other proposals relating to subsequent criminal misuse of a firearm which at any previous time had moved in interstate or foreign commerce. The effect of the "subsequent misuse" approach would be to give apparent Federal jurisdiction in the case of an inordinately large number of criminal cases involving crimes of an essentially local nature.

*Subsection (c)*

Subsection (c) of section 5 of the act as contained in the bill is a restatement and revision of existing law (15 U.S.C. 905(b)).  This subsection would extend the existing forfeiture provisions of the Federal Firearms Act, which provide for the forfeiture of firearms and ammunition involved in violations of the act to cover firearms and ammunition "involved in, or used or intended to be used in," violation of the act or of certain provisions of title 18 of the United States Code pertaining to threats to, or assaults on, law-enforcement officers, members of the judiciary, etc.

Under existing law, firearms involved in violations of the Federal Firearms Act (15 U.S.C. 901 et seq.) or the National Firearms Act (26 U.S.C., ch. 53) are subject to forfeiture.  However, these provisions are inadequate to cover many cases involving firearms used in offenses against the laws of the United States pertaining to assaults on, or threats against, law enforcement officers and public officials.

The subcommittee made one change in the redesignated subsection (c) dealing with forfeiture of firearms.  This amendment added to the enumerated provisions of title 18, United States Code, the violation of which makes a firearm subject to seizure and forfeiture, chapter 84 of title 18.  Chapter 84 of title 18 contains the recently enacted provisions concerning, in general, assassination or attempted assassination of the President of the United States and certain other persons.  The subcommittee deems the inclusion of chapter 84 necessary to avoid the possibility of future situations involving attempted

commercial exploitation of the fact that a firearm was used in an assassination or an attempted assassination. It has come to the subcommittee's attention that a deplorable and regrettable situation in this respect has already developed with regard to the rifle reported by the Warren Commission to have been used in the assassination to which that report was directed.

The procedures applicable to seizure, forfeiture, and disposition would be the same as for firearms seized for violation of the Federal Firearms Act (i.e., the provisions of the Internal Revenue Code of 1954, applicable in respect of National Firearms Act firearms, would apply).

The enactment of the provisions contained in this section of the bill is deemed to be clearly a matter in the national interest.

*Section 8*

Section 8 of the bill (sec. 6 of the bill as introduced) would renumber sections 6, 7, 8, 9, and 10 of the Federal Firearms Act as sections 7, 8, 9, 10, and 11, respectively, and insert after section 5 a new section.

The new section 6 of the act as contained in the bill relates to the applicability of other laws. This section is merely for the purpose of making it completely clear that nothing in the Federal Firearms Act shall be construed as modifying or affecting any provision of the National Firearms Act, section 414 of the Mutual Security Act of 1954, or section 1715 of title 18 of the United States Code. Also subsection (b) of section 6 makes it clear that nothing in the Federal Firearms Act is intended to confer any right or privilege to conduct any business contrary to the law of any State, or to be construed as relieving any person from compliance with the law of any State.

*Section 9*

The first sentence of section 9 of the bill is a restatement of existing law (15 U.S.C. 907) concerning the authority of the Secretary of the Treasury to prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of the Federal Firearms Act.

The subcommittee has amended this section of the existing Federal Firearms Act (relating to the issuance of regulations) by adding at the end thereof a new sentence which would specifically provide that the Secretary shall give reasonable public notice, and afford interested parties opportunity for hearing, prior to prescribing regulations to carry out the provisions of the Federal Firearms Act. This would mean that any new regulations issued to effectuate the provisions of the bill would only be issued after such public notice and opportunity for hearing. Thus, all interested parties will have full opportunity to be heard before any regulations implementing the provisions of the Federal Firearms Act, as amended by the bill, are issued.

The subcommittee deems this specific statutory requirement for a hearing desirable in view of the wide public interest in the procedural details to be prescribed by regulations to implement the provisions of the statute.

It is expected that the Treasury Department will give full consideration to the views of interested parties and to the legitimate interests of those who may be affected by the procedures to be prescribed.

The language of the notice and hearing provision included in the subcommittee amendment is identical to the language contained in

section 5 of the Federal Alcohol Administration Act (27 U.S.C. 205) under which the Treasury Department issues regulations relating to the labeling and advertising of alcoholic beverages.

*Section 10*

Section 10 of the bill contains the effective date provisions and corresponds to section 8 of the bill as introduced.

In view of the notice and hearing requirements regarding the issuance of regulations which the subcommittee has provided for in section 9 of the bill, the subcommittee has deemed it advisable to amend the effective date provisions to provide time for the issuance of implementing regulations as provided for in the bill. Under this section of the bill, as amended by the subcommittee, the amendments to the Federal Firearms Act contained in the bill would, in general, be effective as of the first day of the third month which begins not less than 10 days after the date of enactment. However, the amendments made by the bill to section 3(a) of the Federal Firearms Act (relating to the obtaining of licenses by importers, manufacturers, and dealers) would not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act as of the effective date until the expiration of the license held by such importer, manufacturer or dealer on such date.

In effect this means that a licensee will not have to obtain a new license, by reason of the amendments to the Federal Firearms Act made by this bill, until the licensee's existing annual license expires. This will permit an orderly processing of license applications over the course of the year following the effective date of amendments to the Federal Firearms Act made by this bill.

THOMAS J. DODD.
GEORGE A. SMATHERS.
EDWARD V. LONG.
BIRCH E. BAYH.
EDWARD M. KENNEDY.
JOSEPH D. TYDINGS.
HIRAM L. FONG.
JACOB K. JAVITS.

ADDITIONAL VIEWS OF MR. KENNEDY OF MASSACHUSETTS

Although I am pleased that some legislation regulating the sale of firearms has finally been reported from the Judiciary Committee, I intend to support a motion on the Senate floor to substitute Senator Dodd's bill S. 1592, for the bill reported, S. 3767. S. 3767 is a compromise measure supported by some members as the only way to get any kind of gun control legislation out of the committee. But it is not an adequate substitute for S. 1592, and in my judgment there is no justification for passing legislation weaker in impact or narrower in scope than S. 1592.

Indeed it is amazing to me that we continue to tolerate a system of laws which makes it ridiculously easy for any criminal, madman, drug addict, or child to obtain lethal firearms which can be used to rain violence and death on innocent people. I recognize that S. 1592 is not a panacea; that effective gun regulation will require State action and that gun controls will not by themselves eliminate violence. But I think we have a responsibility to do what we can to minimize the bloodshed and death resulting from firearms abuse. And S. 1592 represents a responsible first step. S. 1592 establishes a Federal framework within which State regulation of firearms can be made effective. It does this by, inter alia, banning interstate mail order traffic in handguns, restricting the over-the-counter purchase of handguns by nonresidents, regulating mail-order traffic in shotguns and rifles by an affidavit procedure, establishing minimum ages of 18 for the purchase of rifles and 21 for the purchase of pistols, and seeking to curb the flow of nonsporting and military surplus firearms which have poured into this country from abroad in recent years and been dumped on the market at low prices attractive to juveniles. It is a serious attempt to deal with the problems revealed by the testimony taken at the many hearings the Juvenile Delinquency Subcommittee held on this question.

S. 3767 on the other hand leaves out regulation of rifles altogther, and permits anyone, no matter how young, to buy a rifle by mail order or a pistol over the counter. S. 3767 would also permit the sale of handguns, by interstate mail order and to nonresidents over the counter, provided an affidavit is filled out. This is not adequate. There is no justification for replacing a ban on mail-order handgun sales by an affidavit procedure. An affidavit procedure is simply not as effective as an outright ban. Affidavits may be ignored by local law enforcement officers or the information on them may go unchecked for accuracy. Consequently, employing the affidavit procedure will not insure that handguns will not be sold to those who have no right to them.

Similarly, in the face of the evidence of substantial misuse of rifles and shotguns, particularly in areas where handguns are regulated, I can see no justification for leaving mail-order rifle and shotgun sales totally unregulated.

Furthermore, S. 3767 would do nothing to stop the torrent of cheap imports flooding our country with unsafe and military surplus weapons. In contrast, under S. 1592, imported military surplus handguns are banned, and imported military surplus rifles are permitted only if they meet recognized safety standards and are suitable for lawful sporting purposes. The purpose of this restriction is to stop the United States from being the dumping ground for weapons of death from abroad. Since the flow of cheap and unsafe guns from abroad increases the danger of gun violence to the American people, I think it altogether appropriate to legislate to slow that flow.

Opponents of S. 1592 base their opposition on what they claim to be the unnecessary burdens caused the average gun buyer by this legislation. But this legislation will not in any substantial way burden any person who has a legitimate purpose in obtaining a firearm. And I do not believe that the minor burdens this bill may impose can possibly justify any further watering down of its gun controls.

Why would it be so burdensome to have to order guns by mail within your State? Or to actually visit a weapons shop or department store to purchase firearms? Or to be restricted in buying a pistol to buying it in the State of your residence? Or to be 21 to buy a pistol from a federally licensed dealer over the counter? Why should anyone under 18 be permitted to buy a rifle by mail order or over the counter? What is so burdensome about requiring the buyer of a rifle by mail order from out of State to fill out a simple affidavit? After all, S. 3767 would impose that burden for handguns. Is it really so great a burden to put upon a rifle buyer? If imposing this slight inconvenience would result in even only a few less than the present 1,700 rifle murders a year, I think it would be worth it.

I believe we owe it to the people of this country to try and make a decent start in reducing the dangers of gun violence, and passage of S. 1592 would mark such a beginning.

EDWARD M. KENNEDY.

## ADDITIONAL VIEWS OF MR. TYDINGS

I opposed S. 3767 and I voted against it in the Judiciary Committee, because I believe it is totally inadequate to protect the American public from the nearly unlimited traffic in lethal weapons which threatens us today.

I realize that other Senators who share my opinion of this bill nonetheless voted for it in order to get some firearms bill to the floor, where it can be strengthened by amendment. I have joined those Senators in the views they express against S. 3667 in this report and I join them in rejecting the views expressed in this report in favor of S. 3767. I will vigorously support the amendments which will be offered on the Senate floor to strengthen this bill.

How much longer will the people of the United States be subjected to indiscriminate slaughter at the hands of criminals and lunatics who have nearly unlimited access to weapons of death? That is the question squarely facing the Congress.

JOSEPH D. TYDINGS.

98

### INDIVIDUAL VIEWS OF MR. HART

With others of the committee, I voted to report S. 3767 in the belief that the Senate should be put into position to act in this area of great concern.   The country does face a serious problem in the sale and distribution of firearms, and our colleague from Connecticut, Senator Dodd, long has urged the Congress to recognize the problem and act.

I believe we should prohibit the interstate sale of handguns and large, operable, military weapons.   However, I do not agree that mail-order restrictions should apply to sporting shoulder arms weapons difficult to conceal.   The criminal who felt the need for a shoulder arm would not be seriously inconvenienced by mail-order restrictions.   Even in many States that have strict regulations on handgun purchases, over-the-counter sales of shoulder arms are unrestricted.

PHILIP A. HART.

99

## INDIVIDUAL VIEWS OF MR. SCOTT

We need realistic, enforcible Federal regulation of the interstate sale of firearms. Two areas are most urgently in need of prompt action: (1) sales of handguns, which are most liable to use and abuse by criminals, and (2) mail-order purchases of all weapons because of their susceptibility to crimes, most horribly illustrated by the assassination of President Kennedy.

I cannot, however, without some reservations, support either S. 1592 or S. 3767.

S. 1592 has several desirable provisions. But I would be more favorably disposed to that bill if it were stripped of section 2, its statement of findings—which by inference lumps millions of law-abiding citizens together with criminals and the worst kind of extremists—and if its regulation of "destructive devices" would be treated separately in the National Firearms Act of 1934.

S. 3767 does not go far enough, chiefly because I believe that the interstate mail-order sale of rifles and shotguns, as well as handguns, should be regulated.

I offered, during the Judiciary Committee's executive session consideration of various firearms control bills, a measure patterned after S. 14, a bill which Senator Dodd introduced on January 6, 1965. I believe it meets the areas of major concern.

My bill would (by amendment of the Federal Firearms Act):

1. Require the manufacturer or dealer, before making shipment of a firearm, to obtain from the purchaser a sworn statement in duplicate that—

(a) Such a person is at least 18 years of age.

(b) Such person is not under indictment, has not been convicted of a crime punishable by a term exceeding 1 year, and is not a fugitive from justice.

(c) There are no provisions of local law which would be violated by his possession of the firearm.

(d) Provides the true name and address of the principal law enforcement officer of the locality to which the firearm will be shipped.

2. Require the manufacturer, prior to shipment of a firearm, to send to the local law enforcement officer by registered mail a description of the firearm (but not its serial number identification), one copy of the purchaser's statement, and obtain return receipt from such officer for the registered letter. The dealer must wait for 7 days after receiving receipt, before making delivery of the firearm.

3. Require the shipper of a firearm to deliver a written notice of the content of the shipment, to the common or contract carrier.

4. Make it unlawful for the carrier to deliver any firearm to a person with knowledge or reasonable cause to believe that such person is under 18 years of age.

5. Exempt antique firearms.

100

6. Provide that it is not the intent of Congress to—
> (a) Regulate shipments of firearms to the exclusion of State laws.
> (b) Supersede State laws, unless inconsistent with the bill.
> (c) Make lawful any act if such act is unlawful under State law.

My bill also incorporates certain technical and clarifying amendments to the act, for example (1) license fees in the case of dealers are increased from $1 to $25 for the first year and $10 for subsequent years, and in the case of manufacturers and pawnbrokers from $25 to $50; (2) deletes obsolete references to "territories"; (3) eliminates ammunition and small firearms parts from coverage of the act since Treasury has found provisions relating thereto impractical to administer; (4) makes clear that the act would not be construed so as to affect section 414 of the Mutual Security Act of 1954.

The imminent adjournment of the 89th Congress precludes further action on firearms control legislation. When Congress reconvenes in January, I shall continue my efforts to help enact effective legislation, geared to meet a serious problem.

HUGH SCOTT.

O