

UNITED STATES     OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 90th CONGRESS
SECOND SESSION

## VOLUME 114—PART 10

MAY 8, 1968, TO MAY 15, 1968

(PAGES 12219 TO 13564)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1968



# Congressional Record

**United States of America**

### PROCEEDINGS AND DEBATES OF THE 90th CONGRESS, SECOND SESSION

## HOUSE OF REPRESENTATIVES—*Wednesday, May 8, 1968*

The House met at 12 o'clock noon.

Rabbi Gerald Green, Adath Israel Synagogue, Trenton, N.J., offered the following prayer:

Sovereign of the universe and Father of mankind: In these soul-stirring times we earnestly pray that Thy guidance and Thy blessing will bring forth the best that is within us. We turn to Thee in deepest need seeking wisdom and inspiration for those who are charged with the awesome responsibility of directing the affairs of our Nation.

We ask not that we be relieved of our burdens but that we be given the strength to bear them, not for an end to problems, but for wisdom to understand them, not for an escape from challenges but for courage to face them.

Grant us compassion that embraces all men in the circle of its concerns and that registers upon our heart the anguish of the distressed, the pain of the denied, and the sorrow of the dejected.

Undergird our spirits that we may remain tireless in our efforts, unswerving in our loyalty, and invincible in our hope that a just and peaceful world may speedily be realized, when all citizens of our land will enjoy the freedom to nurture the promise that lies within them, that together we may surge forward to build a stronger nation and a better world in which the divine image Thou hast imprinted upon us may shine forth undimmed.

This we ask in Thy name, our Father in Heaven. Amen.

### THE JOURNAL

The Journal of the proceedings of yesterday was read and approved.

### MESSAGE FROM THE SENATE

A message from the Senate by Mr. Arrington, one of its clerks, announced that the Senate had passed with amendment in which the concurrence of the House is requested, a bill of the House of the following title:

H.R. 11308. An act to amend the National Foundation on the Arts and the Humanities Act of 1965.

The message also announced that the Vice President, pursuant to Public Law 816, 80th Congress, appointed Mr. FANNIN to be a member of the Board of Visitors to the U.S. Naval Academy in lieu of Mr. BAKER, resigned:

The message also announced that the Vice President, pursuant to Public Law 90–259, appointed Mr. MAGNUSON and

Mr. COTTON, as members on the part of the Senate, to the National Commission on Fire Prevention and Control.

### COLUMBUS DAY

Mr. BRINKLEY. Mr. Speaker, I ask unanimous consent to revise and extend my remarks and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Georgia?

There was no objection.

Mr. BRINKLEY. Mr. Speaker, the Third Congressional District of Georgia includes the growing city of Columbus which excels in friendly people, harmonious race relations, and a spirit of cooperation and cordiality with its military neighbor, Fort Benning. In tribute to the excellence of this city, I rise in favor of H.R. 15951, which, among other things, would establish Columbus Day as a national holiday.

Christopher Columbus was a great explorer who exemplified the high standards of self-reliance which has made this Nation great and it would be most fitting to establish Columbus Day as a national holiday.

Our city of Columbus, Ga., has for many years participated in the observance of Columbus Day and I know that favorable consideration of this feature would be a splendid, nationwide reminder of the qualities of a great man. It would also serve to motivate us toward new horizons with the same faith that piloted him.

### CITIZEN RESPONSIBILITY DISPLAYED IN ELECTIONS

Mr. HARVEY. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. HARVEY. Mr. Speaker, of all the election results reported from all sections of our country from yesterday's voting, I selfishly had greater interest in just one. It was conducted in the largest community of Michigan's Eighth District which I am proud to represent in Congress.

I am even more proud of the citizen responsibility that was displayed as residents of the city of Saginaw overwhelmingly approved a new city ordinance on open housing.

The unofficial vote tabulation was 11,666 "yes" votes and only 5,214 in opposition. To my knowledge, the city of Saginaw becomes the fourth community in our State of Michigan to approve, by vote an open housing ordinance pretty well patterned after the legislation included in the civil rights law of 1968 recently enacted by the Congress.

I would also point out, Mr. Speaker, that the city of Saginaw has a population of nearly 100,000, including approximately 20 percent Negro. It is an industrial city with nearly 20 major plants including a number of General Motors Corp. factories.

To illustrate citywide support of the measure, I have been informed that the open housing issue was approved in 40 of the city's 42 voting precincts. In the remaining two precincts, it lost by only one vote in one precinct and by 28 in the other.

As I mentioned earlier, there perhaps was more glamour and more attention focused on other election contests yesterday, but none shone more brightly or carried greater impact than what was accomplished by Saginaw voters yesterday.

### MAY 13 CUTOFF IN THE FEDERAL AID HIGHWAY PROGRAM BECAUSE OF FAILURE TO ACT ON $400 MILLION SUPPLEMENTAL MEANS FORCED CUT OF $1 BILLION

Mr. CRAMER. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Florida?

There was no objection.

Mr. CRAMER. Mr. Speaker, we have presently in existence another example of fiscal mismanagement of the highway trust fund. The Department of Transportation advised all States yesterday that there will be no further matching funds for highways after May 13 during this fiscal year of 1968 unless Congress acts on a supplemental appropriation of $400 million which was set up last year. When the overall supplemental appropriation bill was under consideration early this year it was withdrawn by the administration and there is no overall supplemental appropriation bill available to carry this supplemental through by May 13 and, therefore, the program is $400 million behind, in addition to the

12219

$600 million cut by Presidential fiat only a few months ago.

This is another example of the administration giving little leadership or foresight in this field and is another indication of fiscal management in our highway program relating to the highway trust fund which is still suffering from the $600 million cutback.

Mr. Speaker, I hope the Committee on Appropriations will find a way to unravel this matter despite the lack of leadership on the part of the administration.

---

## CALL OF THE HOUSE

Mr. GROSS. Mr. Speaker, I make the point of order that a quorum is not present.

The SPEAKER. Evidently a quorum is not present.

Mr. ALBERT. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The Clerk called the roll, and the following Members failed to answer to their names:

[Roll No. 121]

| | | |
|---|---|---|
| Adair | Gettys | Miller, Calif. |
| Andrews, Ala. | Gibbons | Moore |
| Ashmore | Green, Oreg. | Morse, Mass. |
| Bevill | Hagan | Nichols |
| Carter | Halleck | O'Hara, Ill. |
| Corman | Hansen, Idaho | Olsen |
| Cunningham | Hardy | Pool |
| Davis, Ga. | Hathaway | Pucinski |
| Diggs | Hawkins | Resnick |
| Dowdy | Hays | Roush |
| Edwards, Ala. | Henderson | Ruppe |
| Edwards, La. | Holland | Selden |
| Ellberg | Jacobs | Steed |
| Feighan | Kirwan | Watts |
| Flood | Landrum | Wyatt |
| Frelinghuysen | MacGregor | |

The SPEAKER. On this rollcall 384 Members have answered to their names, a quorum.

By unanimous consent, further proceedings under the call were dispensed with.

---

## A REVOLTING ACT OF DESECRATION

Mr. JOELSON. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New Jersey?

There was no objection.

Mr. JOELSON. Mr. Speaker, I was shocked to read that recently some warped person or persons took down the American flag which flies over the Marine Memorial in Arlington, and hoisted in its place the flag of the Vietcong. As my colleagues know, this monument is the famous and inspiring work which has immortalized the valor of our Marines at Iwo Jima.

In order to protect this statue against vandals in the future and also to accord it the respect and honor to which it is entitled, I have introduced a measure to have a Marine honor guard placed at the monument on a 24-hour basis.

Mr. Speaker, it is unbelievable that any American would stoop so low as to place the Vietcong flag over a monument

which marks a moment of triumph of a free nation over totalitarian forces. Those who revel in dissent and dissension would be the very first to have their voices stilled if the Communists were in control. For we see daily evidences of the fact that in a communistic society, those who criticize the establishment are clamped into prison and sentenced to grinding labor, if not summarily murdered.

For my part, I shall continue to support programs to keep America free and democratic so that those who yearn for Communist victories are protected against their own stupidity and folly. And I hope that as an indication of our belief in democracy and as a symbol of our gratitude to those who have given so much to protect freedom, the Iwo Jima monument will be guarded with respect, dignity, and honor.

---

## GEN. ROBERT E. WOOD NAMED SEARS' HONORARY CHAIRMAN

Mr. McCLORY. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

Mr. McCLORY. Mr. Speaker, today marks another great milestone in the brilliant career of my friend and constituent, Gen. Robert E. Wood—U.S. Army, retired—of Lake Forest, Ill.

General Wood has made numerous contributions to the civic military, economic, cultural, educational, social, and spiritual values of this nation. I have commented before on some of these contributions.

Today, in Chicago, Sears, Roebuck & Co. is paying tribute to General Wood in appreciation of his 44 years of active association with that company. At this ceremony, General Wood will be named as the company's first honorary chairman.

General Wood, who will attain his 89th birthday on June 13, will be present at the luncheon, where numerous civic and public leaders will join his associates at Sears in honoring him.

I am confident that his many friends in this House of Representatives will want to join me in extending to Gen. Robert E. Wood our heartfelt congratulations and deep appreciation for the many benefits which have been derived from his career of service to the Nation and to the world.

---

## PERMISSION FOR COMMITTEE ON RULES TO FILE CERTAIN PRIVILEGED REPORTS

Mr. COLMER. Mr. Speaker, I ask unanimous consent that the Committee on Rules may have until midnight tonight to file certain privileged reports.

The SPEAKER. Is there objection to the request of the gentleman from Mississippi?

There was no objection.

## INDEPENDENT OFFICES AND DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT APPROPRIATION BILL, 1969

Mr. COLMER. Mr. Speaker, I call up House Resolution 1164 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

H. RES. 1164

*Resolved,* That during the consideration of the bill (H.R. 17023) making appropriations for sundry independent executive bureaus, boards, commissions, corporations, agencies, offices, and the Department of Housing and Urban Development for the fiscal year ending June 30, 1969, and for other purposes, all points of order against the provisions contained under the heading "National Aeronautics and Space Administration" beginning on page 19, line 17, through page 21, line 8, are hereby waived.

Mr. COLMER. Mr. Speaker, I yield 30 minutes to the distinguished gentleman from California, and pending that I yield myself such time as I may consume.

Mr. Speaker, this rule is reported for the simple reason that certain provisions of the appropriation bill which will presently be under consideration have not been acted upon by the other body and, therefore, would be subject to a point of order. Otherwise, of course, a rule would not be necessary since the Committee on Appropriations has the privilege of filing its report directly.

Mr. Speaker, I shall not go into any details with reference to the bill.

I now shall be glad to yield to my distinguished friend, the gentleman from Iowa [Mr. GROSS].

Mr. GROSS. Mr. Speaker, I thank my friend for yielding. Is this the second consecutive year that we have had some difficulty with the NASA appropriation bill with respect to the NASA authorization bill?

Mr. COLMER. I will say to the gentleman from Iowa that my memory of that is very hazy. But I will accept that as a fact.

Also, I would like to add that one of the reasons for the granting of this rule by the Committee on Rules was to hasten the consideration of this bill. It is my opinion that the spirit of this House is pretty largely in favor of the fact that we should expedite bills now pending in the Congress as much as possible, particularly the money bills in order that we can get this Congress adjourned at least insofar as the House of Representatives is concerned without having to come back here after the conventions of the two major parties, the Democratic Party and the Republican Party.

Therefore, Mr. Speaker, as one Member of this House I am very happy to cooperate toward that end.

Mr. GROSS. Mr. Speaker, will the gentleman yield further?

Mr. COLMER. I will be glad to yield further to the gentleman from Iowa.

Mr. GROSS. That is one of the most optimistic statements that I have heard in a good many weeks, and even months, with respect to the conduct of the business of the House. I sincerely hope the gentleman is right; that we are going to get out of here about the first of August,

and that would have to be the time if we are going to adjourn sine die for the national conventions.

I hope the gentleman is right. I hope his optimism is sustained, but somehow or other I am a good deal more pessimistic on that score than the gentleman.

Mr. COLMER. In reply to that I would say to the distinguished gentleman from Iowa that one never knows unless one tries, and certainly unless we try we will not get out of here by the first of August.

Mr. GROSS. Of course, I want to say to my friend from Mississippi that I do not like to see rules waiving points of order on appropriation bills, any portion of any bill. It is my understanding that this is limited to the NASA appropriation provisions of the bill.

Mr. COLMER. The gentleman is correct. I might add also for the information of the gentleman—and of the Members of the House—that the Committee on Rules has recently adopted a course of procedure where these rules waiving points of order will be limited to specific items, as has been done in this instance.

Mr. GROSS. I appreciate that statement very much. I was not aware that the Committee on Rules had adopted that policy. I want to commend the Committee on Rules.

At the same time I must protest appropriation bills coming to the House floor with points of order waived under any circumstances. I just do not believe it is good procedure, and I must protest it.

I thank the gentleman for yielding.

Mr. COLMER. I might say further to my friend from Iowa that I have never liked the idea of waiving points of order, but there are occasions where I believe it is justified, and I believe in this particular instance it is justified.

While I am on that subject I would like to add that there is a very strong feeling in the Committee on Rules that that committee, somewhat controlling the flow of legislation to the floor of the House, should place a cutoff date and so notify the various chairmen of the various committees of the House that if they want their bills considered they must be in by a fixed date. That opinion is very strong in our committee, and I certainly hope that we may have the cooperation of all Members of the House, and of course of our distinguished leadership, in bringing that about. I want to add to that what I have stated previously on this floor, and that is that if this Congress does not adjourn sine die before these conventions that we will be coming back here after the conventions, possibly around Labor Day, and we will be harangued with political speeches for the rest of the year. And I do not believe that is conducive to good legislation, and I do not believe it is for the best interests of the membership of this House, all of whom, or most of whom, will have opposition in the general elections, and will have no opportunity to visit with their people, and to acquaint their people with their viewpoints and justify their position in this Congress.

I appreciate the contribution of the gentleman from Iowa.

Mr. YATES. Mr. Speaker, will the gentleman yield?

Mr. COLMER. I yield to the gentleman.

Mr. YATES. I want to join with the gentleman from Iowa in saying that I had hoped the Committee on Rules would not grant a rule waiving points of order here.

There were two agencies that appeared before the Independent Office Subcommittee whose appropriations would have been subject to a point of order because the legislation had not passed the Congress yet. One is the space agency and the other was the housing and urban development agency. A point of order would have been appropriate to be made against both of them. However, the rule was requested only with respect to the space agency, leaving for sometime in the future the appropriations for the new year for the housing agency. I think it unfortunate. In view of the gentleman's argument that he favors accelerating and expediting the business of the House, including these appropriations, and appropriation for the housing agency as well might have been made.

Mr. COLMER. I appreciate the gentleman's observation.

Mr. JONAS. Mr. Speaker, will the gentleman yield?

Mr. COLMER. I yield to the gentleman.

Mr. JONAS. In response to the comment made by the gentleman from Illinois, I think it is well to point out that there is a difference in the two cases that he cited.

The NASA authorization bill has already been approved by the House of Representatives and is pending in the other body.

The authorization to which he refers for the Department of Housing, Urban and Development has not even cleared the committee.

Mr. YATES. Mr. Speaker, will the gentleman yield?

Mr. COLMER. I yield to the gentleman.

Mr. YATES. May I say to the gentleman, I am told the other body will consider the House bill next week and it will therefore be almost in the same position that the NASA agency would be.

Mr. JONAS. If I may respond to that, it may be in "almost" the same position but it is not in the same position; and we cannot operate in the committee on the basis of the information of the gentleman from Illinois—we can only operate on the information that we have before us. We have no justification for these items.

Mr. COLMER. If I may respond to both gentlemen very briefly, I am sure they are both in accord with my observations that if we do not take some action, some positive affirmative action here to adjourn this Congress, we could well be here until after the snow flies and that would not be in the best interests of the country.

We always have to wait on those people over there. I have no desire to chastise them or to cast any aspersions upon them. But it is the fact that we do have to await their pleasure on these matters

and this might be a little incentive for them to go forward on this.

The SPEAKER. The Chair recognizes the gentleman from California [Mr. SMITH].

Mr. SMITH of California. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I would simply say that the gentleman from Mississippi has explained the situation very adequately, thoroughly, and ably. I concur in the remarks that he has made and associate myself with them, and particularly as to the statement he made relative to our desire to adjourn.

On this side of the aisle, I will say that we will cooperate in every way that we possibly can in the Committee on Rules to give everybody a chance to be heard on their bill.

I hope we can get out of here by the first of August, and not return. I urge the adoption of this resolution, Mr. Speaker.

Mr. COLMER. Mr. Speaker, I yield 5 minutes to the gentleman from Florida [Mr. ROGERS].

Mr. ROGERS of Florida. Mr. Speaker, I ask unanimous consent to speak out of the regular order.

The SPEAKER. Is there objection to the request of the gentleman from Florida?

There was no objection.

MR. PRESIDENT, STOP THE VIOLENCE

Mr. ROGERS of Florida. Mr. Speaker, there was another murder in Washington yesterday, during a store robbery, and nine new cases of arson. That was the third murder within a week of a storeworker, and arson is so frequent it is impossible to keep a count. The President should immediately intervene in the Washington crime situation, since the city government he appointed continues to refuse to meet the problem with force.

The government of the District of Columbia was reorganized by the President himself, and he appointed the Mayor and each member of the City Council. That government, and the men appointed to run it, have now proven themselves insufficient to the task of preserving law and order.

Under Mayor Washington, Mr. Murphy was appointed Public Safety Director. Mr. Murphy has restricted police action to such an extent that law and order has all but collapsed in the city. Mr. Murphy assured everyone, far and wide, that he would be prepared for any eventuality, and could insure the safety of the city, but he did not expect any trouble.

After all, as Edwin Lahey of the Knight newspapers pointed out recently, "the 200 million Americans who own the District of Columbia have been generous to the three-quarter million who reside here—on a per capita basis, the District of Columbia received about twice its share" of Federal grants.

It took 14,000 U.S. troops to restore order after Mr. Murphy had restricted the local police. There were errors in judgment. There were communications failures. There was confusion. And there was death, fire, and destruction.

Information is now coming to light, however, that the crime rate in Washington was spiraling even prior to the riot.

As early as 11 months ago, District of Columbia Bank Association President McLachlen said in a Washington speech:

It is the shame of our nation that in its capital city its citizens are afraid to open their business doors or even to take a walk. In human terms and in terms of our area's economy, this cost of crime in Washington today is too high, and it is still very much on the increase.

That was a year ago.

And we have witnessed the tragic breakdown of law and order since the riot. Now it is spilling over into the suburbs, with the criminal element from the inner city crossing over into the outlying areas, then escaping back into Washington where they feel safe.

In spite of all of the efforts of concerned citizens, merchant groups, and Members of the Congress, Mayor Washington has still made no public statement or taken a single action which would indicate an intention on his part to put a stop to this criminal activity by whatever force is necessary. And Mr. Murphy continues to draw his salary, apparently content with sending a few additional policemen into the streets with their hands tied behind their backs by his restrictions on their use of necessary force.

Mr. President, this lawlessness has gone on too long. You appointed Mr. Washington and the City Council. You reorganized the city government. You are commander of the District of Columbia National Guard. It is time you take control of this situation.

A President who takes pride in great social legislation enacted during his tenure in public office, and a President who has worked long and hard to restore peace in the Nation's Capital is destroyed by arsonists, murderers, and looters.

This city belongs to the Nation. It is the Capital of all our people. Our President is President of all the people. He has an obligation to all of them today. He has an obligation to see that the laws are enforced in the District of Columbia, and that order is restored—now.

Mr. GROSS. Mr. Speaker, will the gentleman yield?

Mr. ROGERS of Florida. I am glad to yield to the gentleman from Iowa.

Mr. GROSS. Is the so-called Safety Director Murphy the same Murphy who was fired by the city of Syracuse, N.Y., and then brought to Washington, D.C., by the so-called Mayor Washington to head up the Police Department and to make of the Chief of Police a figurehead in the Police Department of the District of Columbia? Is this the same Murphy?

Mr. ROGERS of Florida. I understand he did come from New York. But I do hope that some steps will be taken. It is an absurd situation that the citizens in this city are afraid to walk even on the streets of the Nation's Capital. The President must take some action, because we are getting action from nowhere else within the city of the District of Columbia. If the President does not, this Congress ought to take away the police powers of the District of Columbia and put the Army in here to establish law and order in this city, the Nation's Capital.

Mr. WYMAN. Mr. Speaker, I share the concern expressed by the distinguished gentleman from Florida over the urgent necessity of achieving, preserving, and maintaining law and order in the Nation's Capital. The extent of crisis proportion in the District of Columbia is reflected in the full-page, paid advertisement appearing in yesterday's Washington Post by the Washington, D.C., Retail Liquor Dealers Association, Inc.

It is shocking that such an advertisement should be felt to be necessary to try bring to the attention of those in law enforcement in the executive branch the message that they are not doing their job, and they are not. The people are aroused. They want firmness. Law-abiding citizens demand protection of their persons and their property.

They are entitled to these basic protections. If the present officials fail them, they should be removed and replaced with officials who will protect our people.

This was the advertisement to which I have referred:

BEN BROWN IS DEAD

Brown, Benjamin: On Tuesday, April 30, 1968, Benjamin Brown of 1900 Lyttonsville rd., Silver Spring, Md., beloved husband of Freda Brown; devoted father of Miss Barbara Brown of Silver Spring, Md. Also survived by two sisters, Mrs. Faye Blanken and Mrs. Mollie Cohen, both of Silver Spring, Md. Services at the C. D. Goldberg & Son Funeral Home, 4217 9th st. nw., on Thursday, May 2, at 2 p.m. Interment B'nai Israel Cemetery. In mourning at 1900 Lyttonsville rd., Silver Spring, Md., Apt. 1106. Family suggests in lieu of flowers contributions be made to the Steven Jay Brown Memorial at the Jewish Foundation for Retarded Children, 6200 2d St. nw.

IS LAW ENFORCEMENT ALSO DEAD?

Mr. Brown was shot while defending his property.

Should anarchy prevail because a small segment of the population takes the law into its own hands? Should bands of hoodlums be allowed to continue preying on law-abiding citizens, Negro and white?

When hoodlums—regardless of age, sex or color—are undeterred by the prospect of effective law-enforcement, no one is safe. If criminals can loot, burn and kill in the Inner City without fear of consequences, it is only a question of time before you, your family and your business can feel the effect. It makes no difference where you live, work or play: When law enforcement ceases, disrespect for law is encouraged.

When you walk or drive through many areas of Washington, do you feel safe—or scared? Do you encourage your friends and relatives to visit the Nation's Capital at this time?

Is the battle over? Not for the citizens whose lives are threatened. Not for the businessmen who cannot rebuild because they cannot get insurance. Not for the few who have surmounted the obstacles of arson and looting, and have reopened only to face new threats of extortion and worse. Not for the people who are out of jobs. Not for the people who were burned out of their homes.

Who is at fault? Certainly not the majority of citizens, white or Negro. Certainly not the majority of the poor, Negro or white. Certainly not the policeman on the beat, who must obey orders.

This is no revolt of youth against older generations. This is no revolt of the poor against the wealthy. This is no part of the Civil Rights movement whose real leaders know that Utopia doesn't have to be built on ashes.

It is an open attack by a few criminals against a community that lacks firm leadership and the courage to demand that its leaders exercise their authority—or resign.

We believe that law enforcement suffers when the police are handcuffed instead of the criminals. We believe that citizens are entitled to protection and safety.

Where is the safety, Mr. Murphy? Where is the protection, Mr. Murphy? Where will tragedy strike next? Today, the Inner City. Tomorrow, the residential areas, the suburbs. Today, Ben Brown. Tomorrow???

*Published because some of us have lost our lives, many of us have lost our property, and all of us want to preserve law and order for all residents of the Washington area and for the United States we love.*

WASHINGTON, D.C., RETAIL LIQUOR DEALERS ASSOCIATION, INC.

Mr. Speaker, there is another avenue of available action that should be taken. I refer to H.R. 16981 of which I am a cosponsor, reported favorably to the Rules Committee by the House Public Works Committee yesterday. It prohibits the granting of a permit for construction of shanties or structures on public property of the District of Columbia west of the Anacostia River. It prohibits this to anyone or any group, whether for the purpose of a scout jamboree or a demonstration—and rightfully so. The bill further provides that in those other circumstances where an assemblage requires a permit that it shall be granted only upon the contention that the applicant also post a reasonable bond to indemnify the Government for any damage to public property that may be involved.

This bill is before the Rules Committee at this hour. It should be reported and passed this week. This is a matter of the most vital importance to the preservation of law and order in the National Capital. It is one of the constructive steps we can take, and I urge such forehanded action now without delay.

LAW AND ORDER IN THE DISTRICT OF COLUMBIA

Mr. COLMER. Mr. Speaker, I yield 3 minutes to the gentleman from Missouri.

(By unanimous consent, Mr. RANDALL was allowed to speak out of order.)

Mr. RANDALL. Mr. Speaker, I wish to associate myself with the remarks of the gentleman from Florida.

In connection with my bill H.R. 16862 which will require persons holding demonstrations on Federal property to post a bond to cover certain costs of such demonstrations and to cover damages to public buildings and restoration of park lands, I concluded it was necessary to write to Mayor Washington, or perhaps the correct title is Commissioner Washington, also to Chief of the Metropolitan Police John B. Layton, Corporation Counsel Charles T. Duncan as well as Hon. Stewart L. Udall, Secretary of the Interior. It has been 10 days since I wrote letters to each asking of these gentlemen some of the very things the gentleman from Florida has been speaking about. Among the questions I asked were whether there were any new plans or procedures to protect the citizens in the pursuit of their business during the proposed occupancy of Washington. I in-

*May 8, 1968*                    CONGRESSIONAL RECORD — HOUSE                    **12223**

quired whether there were plans to handle the announced tactic of forming human chains to block the river bridges and the freeway tunnels.

Among other questions I asked was whether they are going to have enough police, or troops to guard the firefighters trying to control fires.

We also asked whether the policy followed during the rioting early in April when law enforcement officers ignored looters who walked away with property that did not belong to them in violation of the Criminal Statutes of the District of Columbia, was the present policy and would be adopted as the procedure to be followed during the proposed march on Washington?

These remarks may not be a significant contribution to the thoughts of the gentleman from Florida, but I wanted the Members of the House to know the content of the questions which had been asked of the principal law enforcement officers of the District of Columbia and of the fact that after the passage of 10 days no reply has been received.

Mr. COLMER. Mr. Speaker, I yield 3 minutes to the gentleman from Florida [Mr. HALEY].

(By unanimous consent, Mr. HALEY was allowed to speak out of order.)

Mr. HALEY. Mr. Speaker, I join my colleague, the gentleman from Florida [Mr. ROGERS], in the remarks he has made. This is a deplorable situation we have in the District of Columbia, as well as in some other parts of the Nation.

While I do not think the President of the United States is any more to blame than a lot of other people, I think the Attorney General of the United States has the power and the right to enforce the law, but, in my humble opinion, when it comes to finding the criminal, I do not believe he could find a white elephant on a junior league American baseball diamond.

Mr. COLMER. Mr. Speaker, I move the previous question on the resolution.

The previous question was ordered.

The resolution was agreed to.

A motion to reconsider was laid on the table.

Mr. EVINS of Tennessee. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the consideration of the bill (H.R. 17023) making appropriations for sundry independent executive bureaus, boards, commissions, corporations, agencies, offices, and the Department of Housing and Urban Development for the fiscal year ending June 30, 1969, and for other purposes; and pending that motion, Mr. Speaker, I ask unanimous consent that general debate be limited to 3 hours, the time to be equally divided and controlled by the gentleman from North Carolina [Mr. JONAS] and myself.

The SPEAKER. Is there objection to the request of the gentleman from Tennessee?

There was no objection.

The SPEAKER. The question is on the motion offered by the gentleman from Tennessee.

The motion was agreed to.

IN THE COMMITTEE OF THE WHOLE

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the consideration of the bill H.R. 17023, with Mr. O'HARA of Michigan in the chair.

The Clerk read the title of the bill.

By unanimous consent, the first reading of the bill was dispensed with.

The CHAIRMAN. Under the unanimous-consent agreement, the gentleman from Tennessee [Mr. EVINS] will be recognized for 1½ hours and the gentleman from North Carolina [Mr. JONAS] will be recognized for 1½ hours.

The Chair recognizes the gentleman from Tennessee.

Mr. EVINS of Tennessee. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, we are bringing you today a most important and significant bill—the independent offices and Housing and Urban Development appropriations bill for fiscal 1969.

This is a big bill—a significant bill—a far-reaching, forward-looking bill that touches the lives of all of our people.

I commend to you the reading of our report on this bill which is the product of more than 3 months of intensive work. Our committee held extensive hearings on every phase and facet of this bill, Mr. Chairman.

The hearings consume 3,508 pages in three volumes.

The committee heard 427 witnesses and carefully considered their testimony and recommendations.

Every member of our subcommittee and our capable and competent subcommittee staff contributed to this important measure.

At the outset I want to commend the hard work of all of our members—I refer to my colleagues, the gentleman from Massachusetts [Mr. BOLAND], the gentleman from Illinois [Mr. SHIPLEY], the gentleman from Connecticut [Mr. GIAIMO], the gentleman from Virginia [Mr. MARSH], the gentleman from Arkansas [Mr. PRYOR]; the ranking minority member of our subcommittee, the gentleman from North Carolina [Mr. JONAS], the gentleman from Ohio [Mr. MINSHALL], the gentleman from New Hampshire [Mr. WYMAN], and the gentleman from California [Mr. TALCOTT].

Certainly it was a pleasure to work with my able and distinguished colleague, the ranking minority member on our committee, the gentleman from North Carolina [Mr. JONAS].

I also want to commend Mr. Homer Skarin and Mr. Tom Kingfield, our able staff members, who contributed so much time and talent to the preparation of this bill before you today. They worked long and hard to keep the committee advised and informed—and to implement the committee's decisions with respect to the drafting of the bill.

I want to point out also, Mr. Speaker, that this bill embraces new budget concepts contained in the President's commission on Budget Concepts. In line with these concepts this bill presents the effects of the committee's recommenda-

tions in terms of new budget, obligational, authority.

GENERAL SUMMARY

Mr. Chairman, by way of summary: the committee considered budget estimates totaling $16,570,580,300 for some 20 executive agencies, commissions and offices—and the Department of Housing and Urban Development.

The committee has made substantial reductions in the budget recommendation—cuts and reductions totaling $2,-899,944,300.

This is a 17.5 percent reduction—the reduction in the history of our subcommittee insofar as we can determine.

This bill carries an appropriation totaling $13,670,636,000. This—I repeat—reflects cuts and reductions totaling $2,-899,000,000—almost $3 billion. This is $4,290,683,650 less than the amount for the current year.

The committee considered some 91 items of appropriation—and made limitation and reductions in 70 instances.

In some instances entire amounts recommended were deleted.

In other instances, the requested amounts were substantially reduced.

In a few instances the committee has approved the budgeted amount.

In no instance has the budget estimate been increased.

The cuts we have made totaling $2,-899,944,000 represent a cutback of $789,-944,000 in new appropriations requested in the budget.

These reductions also include $2,110,-000,000 in proposed new funding through the sale of participation certificates. As you know, Congress is empowered to set the limitations on the amount of participation certificates that can be marketed.

Amounts under the new budget concept are considered a part of the budget for obligational authority.

Sales of $1,570,000,000 for the Department of Housing and Urban Development and $515 million for the Veterans' Administration were proposed in budget requests.

HUD and VA both have substantial carryover balances for participation sales certificate authority. This additional authority is not required at this time.

The committee therefore is not recommending that any further authority be granted for participation sales for 1969. This will not affect or curtail programs of either the Department of Housing and Urban Development or the Veterans' Administration.

We did approve one item the budget recommended for financing through participation sales, but we made a transfer to direct appropriations funding. This was a $25 million request for housing for the elderly and handicapped. We recommend a direct appropriation of $25 million to provide this needed funding for the handicapped and elderly.

Mr. Chairman, we recognize that the Congress is confronted with a difficult budgetary situation.

We have had to make some difficult choices.

We want to provide all necessary support for our forces in Vietnam.

At the same time, we want to solve such domestic problems as the crisis of our cities.

We also recognize that we are confronted with a monetary crisis at home and abroad.

All of these factors have been weighed carefully in considering this appropriations bill.

We have done our best to achieve an equitable balance between the necessity for economy and the necessity of fulfilling our responsibilities with respect to domestic problems.

We have made substantial cuts and reductions.

We have deferred items which we felt should be deferred.

We have funded programs which we felt should be funded as necessary at this time.

We have deferred appropriations for unauthorized programs.

We are proceeding to recommend appropriations for the National Aeronautics and Space Administration on which the House has acted.

Time will not permit a detailed discussion of all the items contained in the bill, Mr. Chairman. I would hope that every Member would read our report carefully. We, of course, stand ready to give every Member any and all information needed on the bill.

I would like to highlight some of the larger items in this appropriations measure.

The regulatory agencies are funded at essentially the same level as last fiscal year.

### FOR GENERAL SERVICES ADMINISTRATION

The committee considered budget estimates totaling $509,291,300 for the General Services Administration.

The committee is recommending an appropriation of $494,813,000.

This reflects a total cut and reduction of $64,671,900 below the level of funding for the current year.

This represents a reduction of $14,-478,300 less than the budget requested.

There are no new public building construction projects funded in this appropriation.

We have approved the budget estimate of $10,995,000 for sites and planning for seven projects and increases for four others where additional funding is required. This will permit GSA to continue planning on a minimal basis—to keep the motor idling for an acceleration as conditions permit.

GSA will, of course, continue its important services to the Government. These services include the Public Buildings Service—the Federal Supply Service—the National Archives and Record Service—the Transportation and Communications Service—and the Property Management and Disposal Service, among others.

### NATIONAL SCIENCE FOUNDATION

The committee considered a budget request of $500 million for the National Science Foundation.

We recommend an appropriation of $400 million.

This represents a substantial cut of $100 million.

While this is a large reduction it certainly does not indicate any lack of interest in science and research by our committee.

National Science Foundation has a carryover balance of $46,500,000—and has an unexpended balance of some $650 million. Much of this $650 million, however, is allocated to projects and commitments extended over a period of time.

The committee recognizes the competence and dedication of the Director and members of the National Science Board and recommends that they make the necessary contractual adjustments in the institutional and fellowship grants programs to effectuate the economies proposed.

The committee recognizes the importance of the work of the National Science Foundation on a long-range basis—but we also recognize the necessity of setting immediate priorities in view of our stringent budgetary situation.

### APPALACHIAN REGIONAL DEVELOPMENT COMMISSION

The committee considered budget requests of $213,600,000 for the programs of the Appalachian Regional Development program.

The committee recommends a cut and reduction of $45 million.

We recommend $168,600,000 to finance this program for fiscal 1969.

The Appalachian Regional Development Act of 1965 embraces 13 States, 397 counties, and nearly one-tenth of the population of the United States.

The average annual income of the Appalachian area is estimated to be 24 percent below the national average.

Certainly we should provide appropriations to assist our cities in the solution of their problems of poverty and unemployment.

But we must also provide funding to assist this great Appalachian region in combating rural poverty and unemployment. We must help Appalachia develop its resources and provide opportunities for its people.

### NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

The committee considered budget estimates totaling $4,370,400,000 for the National Aeronautics and Space Administration.

We are recommending an appropriation of $4,008,223,000 for NASA for fiscal 1969.

This represents a billion-dollar slash in funding from fiscal 1967—a cut and reduction of $959,777,000 below the 1967 funding level.

We made a $580,677,000 cut below 1968. We have made a further cut of $362,-177,000 below the budget for next year.

Appropriations for these programs of space exploration and the development of this needed technology have been on a declining curve for several years. Several years ago the agency was funded at about $6 billion. Later the funding dropped to $5½ billion and then $5 billion. Last year the space budget was cut to $4½ billion. This year we are recommending continuing the space program at a $4 billion level.

Annual funding has thus dropped from

$6 billion to $4 billion in a period of the last few years.

Certainly we have made great progress in our programs of space exploration. We have dramatized our scentific leadership in many areas. We have demonstrated to the world that we can come from behind and hold our own in the scientific area.

During the space decade, we have launched more vehicles—traveled more miles—and achieved more time in space than any other nation in the world.

Our achievements in space are outstanding.

The committee commends the Administrator—our astronauts—and the great scientific and space team for their competence.

The Nation is proud of its space team.

However, because of our stringent budgetary situation we are recommending a hard-rock space budget.

The funding provided in this bill will continue the space program at a reduced level but we can achieve our objectives.

All three areas of space funding—research and development, construction, and administrative operations—are reduced and cut back.

This cut in the NASA budget reflects the current budgetary situation. NASA should have flexibility in allocating and reprograming the funds that are made available so as to best absorb the substantial cuts that are made necessary at this time.

Formerly 420,000 persons were employed in the space program in every State in the Nation.

Space employment has now dropped to 243,000—appropriations reductions have cut employment in half. Most of these employees work for NASA contractors.

There is a report that an amendment will be offered to further reduce appropriations for the space program.

We do not feel that the funding for NASA can be reduced further without compromising safety.

We do not feel that further reductions can be made without endangering or wrecking the programs.

The committee considers it important that our space team—the finest in the world—be continued and retained intact as far as possible.

We trust that no further cuts will be made—and that you will sustain the committee in the recommendations we are making in this bill.

### THE CRISIS OF OUR CITIES

Mr. Chairman, it should not be necessary to emphasize the crisis of our cities.

The fact that our cities are in a crisis is an overpowering fact of life in our Nation today.

We are all concerned—we are all disturbed—we all want to see these basic problems solved.

A year ago during our discussion of the appropriations for HUD for this fiscal year, I stood in this same spot and warned that the Nation is facing the third great crisis in its history.

Our first great crisis was the Civil War.

Our second great crisis was the Great Depression of the 1930's.

And now we face the Nation's third great crisis—the crisis of our cities.

ARCHSTONE OF OUR CIVILIZATION

Our cities are the archstone of our Nation. If the archstone is unsteady and unstable the entire structure is endangered—and our cherished American way of life is challenged and endangered.

This bill is a step in the right direction.

It will help provide a partial solution to the problems of our cities.

Aristotle said that the purpose of a city is to make man happy and safe.

Nine thousand years before Christ, man moved from the field to the city to seek safety and mutual security—but today, in modern America, many Americans have fled the city in search of safety and security. And others are leaving.

This is a sad and shocking commentary on our time and our day in history.

Civilization began when man began to feel safe and secure in his cities and turned to areas of personal achievement and fulfillment.

In the safety of the city, man's creativity and diversity and talents flourished, civilization evolved into the great metropolitan cities of today—and into the crisis that unprecedented growth has created.

Our cities once again must become stable and secure centers of growth where law and order prevails—where people can work together without fear—where people can live together and prosper together—without the specter of violence haunting their days and nights.

The torch of the rioter must be put out and the torch of progress must be held high.

We must move forward through the cooperation and good will of all Americans, within a framework of law and order.

THE NEED IS APPARENT

I want to make it clear that in recommending this appropriations bill for our cities we legislate not from fear but because of concern and commitment.

We are recommending this bill with its generous appropriations for our cities because our cities are jammed with people and crammed with problems.

Congress has responded. We have passed much legislation dealing with the problems of our cities—large and small.

We cannot do the job alone but Congress must continue to provide stimulus and leadership.

We must continue to coordinate and stimulate the combined efforts of Government at all levels—of private enterprise—and, most important, of people themselves.

There must be cooperation between our people if we are to succeed in rebuilding our cities.

The basic thrust to achieve the cooperation and our goals and objectives must come from local leadership and from the people themselves.

Congress has acted decisively and substantially to help solve the problems that plague our cities.

The problems of—
Slums and substandard housing.
Crime and violence.
Poverty and ignorance and disease.

CXIV——771—Part 10

High unemployment in certain areas and groups.

The pollution of our air and water.

The traffic congestion that threatens to congeal transportation.

The exodus of leadership and taxpayers to the suburbs.

The erosion of the community spirit—the spirit of cooperation and mutual trust—that is the foundation of the democratic way of life.

Respect for law and order is the basis upon which all of our problems must be solved.

Congress has placed on the books legislation to combat poverty—to provide employment—to build better housing—to provide good schools and instruction—to curb the pollution of our air and streams—to ease the traffic congestion—and to encourage people to work and plan together in their communities.

Congress has created the Cabinet-level Department of Housing and Urban Development which is charged with the responsibilities of planning, assisting, and helping our cities with problems of inadequate and substandard housing—and the other traditional enemies of mankind in our cities.

HUD is working hard at this job and Congress is doing its part.

The President, in his special message to the Congress on the crisis of our cities, pointed out that his recommended budget includes funds totaling more than $22 billion for assistance to our cities through more than 100 programs.

A special analysis of the budget puts Federal expenditures in this area at $37 billion—more than twice the level of 1961.

Since 1957 Congress has appropriated more than $4½ billion for urban renewal alone in the war on blight and slums.

Since 1959 appropriations for public housing to provide decent homes for poor people have totaled $1.8 billion.

The open-space land program—enacted in 1962—has channeled more than a quarter of a billion dollars into our cities to assist in the establishment of parks.

The popular water and sewer grant program—enacted in 1966—has been funded to a total of $365 million—including $150 million for the current fiscal year.

Last year Congress appropriated $1,663,000,000 for the war on poverty—and much of this is being spent in our cities and metropolitan areas where 70 percent of our people now live.

CALLS FOR MASSIVE PROGRAMS

The President in an earlier message to Congress this year on our cities recommended the construction of 26 million new homes and apartments over the next decade—including units for 1 million people next fiscal year.

The President's National Advisory Commission on Civil Disorders called for a "massive and sustained commitment"—including 600,000 housing units next year.

A Senate Subcommittee on Urban Problems—the Ribicoff committee—called for a $500 billion expenditure in our cities over a 10-year period.

Governor Rockefeller recently estimated the needs of our cities exceed $150 billion, and Mayor Lindsay of New York said it would take $50 billion in New York City alone over the next 10 years to solve that great city's problems.

Mayor Cavanaugh of Detroit recently called for a $250 billion urban development fund for cities.

There is a great clamor for massive Federal expenditures and Federal appropriations—but I would point out that the Federal Government—as important as its role is in this area—cannot resolve these problems alone.

There must be a commitment—a broad-based commitment—a commitment that includes business, industry, labor, as well as assistance from the Federal Government and from government at all levels, if these problems are to be solved.

What I am trying to emphasize, Mr. Chairman, is that the Federal Government has passed much legislation in this field.

We have provided billions in appropriations—but commitments from other sectors of our economy and our society are required and absolutely essential if we are to get the job done.

CAUGHT IN A SQUEEZE

The Nation, as we all recognize, is caught in a financial squeeze—between the agony of our cities and the ordeal in Vietnam.

Our committee has carefully considered and weighed our commitment in Vietnam—our commitments at home—and our fiscal and monetary situation.

While providing a generous appropriation for HUD—for our cities—we have also made some substantial cuts and reductions in this bill.

The problems of centuries cannot be cured overnight.

The solution of these complex problems will take time and a national commitment by all sectors of our economy.

The private sector of our economy must apply the great technology and techniques of our time to the problems of our cities—and many leaders of business and industry are moving ahead with programs of their own or in cooperation with the Federal Government.

The insurance industry, as we know, has committed a billion dollars to providing housing in slum and ghetto areas of our cities. Private foundations and other groups are helping with commitments.

I commend these captains of commerce and industry.

I commend their initiative and their leadership.

As President Johnson said in his message on cities:

The Government's concern is to stimulate private energy and local action—to provide capital where needed, to guarantee financing, to offer assistance that encourages planning and construction.

A big job belongs to the private sector—the homebuilders, the mortgage banker, the contractor, the nonprofit sponsor, the industrialist who now sees in the challenge the solution to the problems of our cities—large and small—re-

12226

CONGRESSIONAL RECORD — HOUSE

*May 8, 1968*

quires this kind of cooperation and commitment.

### IMPORTANCE OF SMALL TOWNS

In my view the growth and progress of our smaller cities is just as important to the solution of the urban problem as the rebuilding and improvement of our big cities.

The President's Advisory Commission on Civil Disorders also emphasized this point—as has Secretary Weaver of HUD.

Obviously, the strengthening and providing of jobs and opportunities in smaller cities will reduce the waves of out-migration into our already crowded and congested big cities and metropolitan areas.

And much of HUD's effort is concentrated in our smaller communities—a balanced effort to assist in the improvement of smaller cities and in the rebuilding and improvement of our large cities.

So, Mr. Chairman, we must proceed on both fronts—in the big cities and in the smaller cities—if we are to lead the way in the solution of these urban problems.

The appropriations we are providing in this bill should help immensely.

### THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

For the Department of Housing and Urban Development we are recommending an appropriation of $1,229,686,000.

We have made some reductions but the reductions made are largely in participation certificate sales authority.

After careful study and review, the committee decided not to recommend any sales of participation certificates for either HUD or the Veterans' Administration for 1969.

These sales are not needed because of substantial carryovers in such authority. They are not expected to be used in 1969.

Last year we authorized the sale of $2,385,000,000 in participation sales for HUD.

The Department has not used all of this authority.

HUD at this time has some $255 million in unused participation certificate authority.

The carryover is sufficient for the needs of these agencies for the coming fiscal year.

As pointed out in the report, there is one exception—HUD's program of housing for the elderly and handicapped.

HUD needs $25 million for this program.

We are providing this amount by direct appropriation.

### OTHER URBAN AIDS

While providing in excess of $1 billion for HUD in new money, this amount does not by any means reflect the total outlay for city programs.

Direct appropriations for urban areas are estimated in the budget at $2,740,-400,000 for fiscal 1969. This includes appropriations we are recommending in this bill plus advanced funding for urban renewal provided last year.

Total Federal assistance for urban areas for 1969 will exceed $22 billion.

This includes urban assistance from many Federal departments and agencies—the Department of Transportation, the Department of Health, Education, and Welfare, the Office of Economic Opportunity, among others.

This includes direct appropriations, loans, grants, and other commitments.

In addition to these items HUD also will, of course, continue its FHA and FNMA loan insurance and loan guarantee programs.

The total of some $37,520,000,000 is provided in the President's budget for all types of urban aids and assistance.

### SOME RESULTS

The ongoing HUD programs have provided much assistance for the cities.

Some 1,500 communities and 900,000 people have been served by HUD's public facility loan program.

Six hundred cities and 2 million 700 families have been assisted by the water and sewer grant program.

There are more than 2,100 public housing authorities in the Nation and 712,000 low-rent public housing units. Another 75,000 are scheduled for completion next year.

Low-income housing units built through HUD programs total 1,079,000 units of all types.

Urban renewal has carried the fight against blight and decay to 640 cities of all sizes. Since 1949 redevelopers have invested $5,700,000,000 in the rebuilding of blighted areas. Federal appropriations of $4 billion have been provided for urban renewal.

By the end of 1969 HUD will have assisted in the acquisition of 478 square miles of parkland in cities throughout our Nation.

More than 6,000 cities and towns have received planning assistance.

I cite these figures, Mr. Chairman, to enlighten those who are concerned that Congress has not acted in response to the problems of our cities.

Congress has acted—and acted decisively and substantially.

I repeat: Urban aids for fiscal 1969 total more than $22 billion.

With the various home loan and insurance programs of HUD through FHA and FNMA, urban aid funds are increased to $37½ billion.

Mr. Chairman, we have made some reductions in the space program—in the National Science Foundation—and in other agencies.

However, we are providing a generous appropriation for programs of the Department of Housing and Urban Development—programs for our cities throughout the Nation.

In addition to the full budgeted amount of $25,000,000 for housing for the elderly and $1,000,000 for Alaska housing, we are recommending $35 million for grants for neighborhood facilities.

We are recommending $38,838,000 for urban planning grants, the maximum authorized.

We are recommending $150 million for water and sewer grants.

We are recommending $350 million for annual contributions for low-rent public housing.

This bill also carries an appropriation of $75 million for open space park grants.

Despite progress made, there continues a pressing and evident need for low-in-come housing. In view of this, as pointed out in our committee report, we urged Secretary Weaver to concentrate much of HUD's resources on this problem.

We urged the Secretary to utilize all housing programs authorized by the Congress—all the tools available. These housing programs include the rent supplement program—the turnkey program—public housing—the leased housing program—and the rent certificate program among others.

We urged this action to help meet the need and supply the demand for low-income housing.

In this bill we believe we have presented a balanced program.

### MODEL CITIES

For the model cities program, as we know, the President recommended $1 billion.

The total presently authorized for the program is $650 million. Legislation is required for the other $350,000,000 before appropriations can be provided.

We are recommending $500 million—a half billion dollars for model cities.

Two hundred million dollars for cities announced in the initial round.

Two hundred million dollars for cities to be announced in the second round.

One hundred million dollars for urban renewal in model cities areas.

I repeat: The total appropriation we are recommending for the model cities program is a half billion dollars for 1969. This is $188 million above the funding level for fiscal 1968.

I think this is a generous appropriation for the model cities program, and we should see some results.

### RENT SUPPLEMENT PROGRAM

We considered a budget request for $65 million for the free-enterprise rent supplement program—the new look in low-rent public housing.

We are recommending $25 million for this program in fiscal 1969.

Some of the members of our committee felt the full $65 million amount should be approved.

Some members felt that no funds should be provided.

We struck a compromise and agreed on a recommendation of $25 million.

This represents a cut and reduction of $40 million below the budget request.

In view of the evident need for low-rent public housing, I urge that the compromise figures of $25 million be approved. This amount approved by our subcommittee has the support of the full Appropriations Committee.

This program offers the Congress an opportunity to give the housing program a generous injection of free enterprise.

This approach moves free enterprise into the field of public housing.

The program is an ongoing program. It is being utilized.

It is considered most attractive to private enterprise, private developers, private builders.

Of the $42 million appropriated to date $41,730,000 has been committed for rent supplement projects.

Today, there are 574 projects in 348 cities in 48 States.

These projects contain a total of almost 60,000 units of housing.

*May 8, 1968* CONGRESSIONAL RECORD — HOUSE 12227

As of this date 2,200 families are living in rent supplement units.

Nonprofit sponsors include church groups of virtually all denominations, service organizations like Kiwanis and Rotary, fraternal organizations, trade and craft unions, and veterans organizations.

For 30 years we have had public housing which is government owned, government managed, government financed.

In contrast the rent supplement program is privately built, privately financed, privately owned, and privately operated. It is moving ahead.

And, unlike public housing, these units are in buildings that will remain on the tax rolls and contribute their share of taxes to local government.

Insurance companies have announced that $1 billion will be provided for participation in the rent supplement program.

This program is based on the sound principle of the substitution of private credit for public credit and deserves support.

VETERANS' ADMINISTRATION

Let us consider briefly the appropriations for the Veterans' Administration, the largest item in the bill.

We considered a budget request of $7,013,480,000. This excludes the request for participation sales of $515 million which was denied because of a substantial carryover.

The committee has made only nominal reductions from the request.

We are recommending an appropriation of $6,974,207,000, for all programs of the Veterans' Administration.

There are approximately 26 million veterans in the United States and more than 66 million members of veterans' families and survivors.

It is estimated that veterans eligible for benefits will increase by 517,000 in 1969.

Nearly $5,300,000,000—75 percent of appropriations we are recommending—is to finance benefits programs.

Another $1,484,727,000 or 21 percent—is requested for medical programs.

Administrative expenses are only 3 percent.

Compensations and pensions—a fixed item by law—will require $4,654,336,000 in 1969, the largest item in the bill.

This Nation has the most effective and most comprehensive veterans assistance program in history.

Our veterans deserve the best—and a grateful Nation is providing these great benefit programs.

SUMMARY

In summary, Mr. Chairman, I want to repeat:

We considered budget request totaling $16,570,580,000.

We made cuts and reductions totaling $2,899,944,300.

This constitutes a 17½-percent reduction.

This, I am advised, is the largest percentage in the history of our subcommittee.

We have achieved two goals in this bill:

First, we achieved some substantial reductions needed because of our budgctary situation.

Second, we have provided generously for the programs of the Department of Housing and Urban Development for our cities.

We must get on with the unfinished business in our cities.

I want to commend this bill to you for your support.

This measure has been approved by the Committee on Appropriations, and I urge its adoption by the House.

Mr. TEAGUE of Texas. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to the gentleman from Texas.

Mr. TEAGUE of Texas. Approximately 8 years ago the Veterans' Administration, the Bureau of the Budget, and the House Veterans' Affairs Committee tried to work out some agreement on a program for rehabilitation, upkeep of our veterans' hospital system in this country, which has a value of something close to $2 billion. We finally came up with the figure of approximately $100 million a year for a 10-year period.

Almost every year the Appropriations Committee has given the Veterans' Administration a figure similar to that. This year, of course, they have not. In your report you say that you have deferred the item of $25 million for the construction of a hospital at San Antonio, Tex. The question I would like to ask is as follows: There is no limitation on any other money that has been given the VA. They can go ahead and use the money they have?

Mr. EVINS of Tennessee. I would say to my friend that there are no funds in here for Federal building construction by the GSA. There is only one new hospital recommended which would be at San Antonio for about $25 million. This item was deferred at this time, consistent with our policy of no new construction.

Mr. TEAGUE of Texas. But there is no limitation on any other money the Administrator has for the VA hospital system?

Mr. EVINS of Tennessee. As the gentleman knows, we are providing for hospital programs, and the funds can be available for repairs and improvements of systems, communications, and utilities, but no new hospital construction is provided in this bill. There are five new hospitals that are being completed at this time and will be in various stages of activation in 1969.

I would say to my friends from Texas that San Antonio is the next city on the list to have a new veterans' hospital. But since we did not provide any funds for other Federal buildings, we did not think it would be proper to fund this new hospital at this time.

Mr. BOLAND. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to my friend, the gentleman from Massachusetts.

Mr. BOLAND. What the gentleman from Tennessee, the chairman of this committee, has said, is correct. I think, in direct answer to the question of the gentleman from Texas, it ought to be indicated that there is no limitation on funds for rehabilitation, the particular item that you are specifically interested in, and one that this committee is interested in, too.

Mr. MONAGAN. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to the gentleman from Connecticut.

Mr. MONAGAN. I think the gentleman has substantially answered the question I have in mind, which has to do with the provision of funds for construction of public buildings under GSA. Am I correct in assuming that this means that, since the $63 million is eliminated, there will be no funds for contracts for new construction?

Mr. EVINS of Tennessee. There will be no contracts for new construction, but ongoing contracts will be finished. Those that have already been let will be funded and completed. However, funds are being provided in the amount of $10 million to continue to acquire sites and planning for 11 buildings that are planned for the future. So planning will be continued.

Mr. MONAGAN. I would like to ask one further question, if the gentleman will yield. We have recently had information of a general policy agreement on the part of the executive and the legislative branch relating to the reduction of expenditures, the reduction of budget requests. Does this proposed bill fit in with that policy? If so, in what respect?

Mr. EVINS of Tennessee. Yes, I understand that there may be an amendment offered to limit expenditures. We are 17.5 percent below the budget, I would say to the gentleman. I do not know what level of funding or expenditure limitation may be proposed, but certainly we have made our cuts. We have made more than our share.

I do not think another expenditure limitation proposal should be made to this bill. We have made substantial cuts already in both appropriations and expenditures.

Mr. JOELSON. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to the gentleman from New Jersey.

Mr. JOELSON. Mr. Chairman, if I understand this bill, we propose to appropriate over $4 billion for space and $1.2 billion for HUD. The distinguished chairman of the subcommittee mentioned a figure of $22 billion, which he says will be spent in the cities, but I assume that in this figure he is including health measures, welfare measures, education measures, while the fact remains that for slum clearance and for improving the horrible housing conditions in our cities we are not appropriating more than the amount of this bill.

I would like to keep this in perspective, to show our system of priorities is $4 billion for space and $1 billion for housing.

Mr. EVINS of Tennessee. Mr. Chairman, I am sorry the gentleman did not understand the message correctly. I tried to convey that the Federal Government is making financial commitments of over $22 billion in all programs for the cities. This has been pointed out by the President. I also refer the gentleman to the tables on pages 14 and 15 of volume III of our hearings showing the various expenditures in our cities. It totals $22.245 billion for 1969. This does not include the loan programs, the insurance programs, and the guaranteed financing, which is

an additional $15.281 billion, for a total of $37,526,000,000.

The gentleman did not get my message that a substantial total by the Federal Government is going to the cities. This often is not fully understood.

Mr. JOELSON. Mr. Chairman, I still do not get the message of the $22 billion.

Mr. EVINS of Tennessee. The gentleman should have heard the President's speech or read the President's message. He should read the hearings of our committee. Again I refer the gentleman to the tables on pages 14 and 15 of volume III of our hearings, which go into great detail. We asked the Secretary of HUD to give us this information.

Mr. JONAS. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to the gentleman from North Carolina.

Mr. JONAS. Mr. Chairman, this is a good place in the RECORD to disclose the fact that the Department of HUD will carry beyond fiscal year 1969 and into 1970 funds amounting to $23,720,000,000 of previously appropriated money, and only $6 billion of that has been obligated, and $17 billion is lying down there unobligated.

Mr. YATES. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. Mr. Chairman, let me say before I yield to my distinguished friend from Illinois that he is a very valuable Member of our House, an articulate and able Congressman, and a former member of our subcommittee who has rendered a great service in presenting the case for the cities. The gentleman is a great and valued Member of Congress.

Mr. YATES. Mr. Chairman, I am grateful to the gentleman for the encomiums just heaped upon me. The gentleman is a great and distinguished chairman of this subcommittee and has just proved himself worthy of the tradition so eloquently established by his predecessor, Congressman Thomas, of Texas.

The gentleman is eloquent and able. But I look at the tables to which the gentleman has referred, in volume III, pages 14 and 15 of the hearings, and the gentleman is correct in stating the totals.

As I read those tables, however, there is no indication as to what the programs are that are supposed to be beneficial to the cities. Rather, all that is set forth in these tables is list of the departments and agencies to which is ascribed the expenditure of certain funds to the cities. There is no description of what the programs are.

I think that our committee, the Appropriations Committee should detail the programs generally listed on page 15.

Members from time to time have stated the vast amount of help made available to the cities. The figures of $22 and $37 billion have been used several times. I think it would be well if the staff of this committee were to set out in detail what programs and what amounts make up the $22 billion and $37 billion in assistance that is supposed to go to the cities.

Mr. EVINS of Tennessee. I will say to

my friend, our staff has the information. It was prepared by the Department of HUD. Secretary Weaver supplied the data and information which are in the tables.

Mr. YATES. Mr. Chairman, will the gentleman yield further?

Mr. EVINS of Tennessee. I yield.

Mr. YATES. One cannot dispute it, because one does not know what makes it up. All we have is a summary of expenditures, without knowing to what programs those expenditures are attributed.

Mr. EVINS of Tennessee. I will tell the gentleman that for the Department of Health, Education, and Welfare, for all programs, it is $8.9 billion.

Mr. JOELSON. That is Housing and Urban Development, but the gentleman is talking about HEW.

Mr. EVINS of Tennessee. I am talking about Federal aids to urban areas, where 70 percent of our people live, and where we have critical problems to which this Congress is addressing itself.

We would be irresponsible if we voted huge sums without considering what the other agencies are doing concurrently.

Mr. YATES. Could the gentleman tell us what is the minimum amount of population that is defined in the word "cities" to which these expenditures are applicable? Would a city of 1,000 be included in this table? Would a city of 1,500 be included this table?

Mr. EVINS of Tennessee. We have problems in all of our cities. The great burden is in the large metropolitan areas, such as Chicago, which the gentleman represents. The lion's share is going to those areas. There are some planning and water projects in other areas.

Mr. YATES. Does the gentleman know that to be a fact?

Mr. EVINS of Tennessee. Yes. We had testimony that the great percentage of the appropriation goes into the metropolitan areas.

I say to my friend, if we are going to solve the problems of the big cities we also have to solve the problems of the smaller cities and the outmigration into the larger cities. Whatever we can do to relieve the pressure on the cities by assisting the smaller communities is another approach to a solution of the problems of the major cities.

Mr. YATES. Mr. Chairman, will the gentleman yield further?

Mr. EVINS of Tennessee. I yield.

Mr. YATES. I believe the gentleman misconstrues my attitude. The gentleman from Illinois is grateful to the gentleman for the speech he made earlier, acknowledging the great crisis which does exist in our cities.

The point I am making is that the table to which the gentleman referred is inadequate, because it does not show that 90 percent of the funds go into the cities of the size of Chicago or New York or San Francisco or Philadelphia.

I believe it would be helpful if, in addition to the information contained in these hearings, there were a statement as to where the money goes, by size of cities, and as to the programs to which the expenditures are attributable.

Mr. EVINS of Tennessee. The Office of

Economic Opportunity spends another $1.6 billion in the cities.

Mr. YATES. But that program does go to cities of 1,000 population or 2,000 population and under.

Mr. EVINS of Tennessee. Does the gentleman wish to discriminate against smaller cities and the medium-sized cities?

Mr. YATES. I have no willingness to discriminate against any city. What I am trying to do is to get the facts, and I do not believe the tables give us the facts.

Mr. EVINS of Tennessee. The tables are clear and available for the gentleman's consideration.

Mr. JOELSON. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to the gentleman from New Jersey [Mr. JOELSON], also a valued member of the Appropriations Committee.

Mr. JOELSON. I appreciate that statement.

Mr. EVINS of Tennessee. He is also a Member who is difficult to satisfy.

Mr. JOELSON. I am very unsatisfied, and I hope I stay that way until we get adequate appropriations for the cities.

I should like to ask a question. This Congress established a separate Department of Housing and Urban Development, as a separate Department of Government, yet this Appropriations Committee still does not have a separate subcommittee for that Department. We consider their appropriation along with that for NASA, CAB, and others. I should like to ask the gentleman why we cannot have a separate appropriation bill for the cities just as we do for the farmers?

Mr. EVINS of Tennessee. The gentleman is aware that many of our subcommittees have more than one Department. He serves on one that has three Departments. We have only one, the Department of Housing and Urban Development.

The gentleman is familiar with the history of the Department of Housing and Urban Development. It was formerly the Housing and Home Finance Agency. This of course was an independent agency and was in this bill. It has remained with this group and we have tried to recognize the demands of the cities. We believe they are treated very well in this bill.

Mr. JOELSON. I believe, if the gentleman will allow me to say so, that the subcommittee is overworked with too many agencies, and HUD should be under a separate subcommittee.

Mr. DADDARIO. Mr. Chairman, will the gentleman yield to me?

Mr. EVINS of Tennessee. I am glad to yield to the gentleman from Connecticut.

Mr. DADDARIO. It is my understanding, Mr. Chairman, that the Independent Offices Subcommittee has cut the budget for the National Science Foundation by $100 million, which is $95 million less than the present fiscal year. The question I have then goes to the way in which these cuts will take place. It is my understanding from your report that you believe in the competence, the skills, and the abilities of the Director of the National Science Foundation, Dr. Haworth,

Case 3:22-cv-00410-REP   Document 41-6   Filed 02/22/23   Page 13 of 145 PageID# 1319

and the members of the National Science Board headed by Dr. Handler. As a result of this trust they are given the authority to make the reductions which this cut of $100,000,000 will entail where they see fit. Is that correct?

Mr. EVINS of Tennessee. The gentleman is correct. We have great respect for Dr. Leland Haworth, the Director of the National Science Foundation, and Dr. Handler, the Chairman of the National Science Board. They are doing great work in upgrading science and in making grants to universities for scholarships all through the Nation. We have generally allowed the Foundation to make a decision on priorities as to which program has the greatest importance and the highest priority. The funds for the National Science Foundation are provided in a single appropriation. We do not want to hurt the work of the National Science Foundation. They can allot the funds as the Board determines.

Mr. DADDARIO. If the gentleman will yield further, it has been the history of the National Science Foundation that when cuts are made there is a certain amount of discretion involved in the making of them and this discretion is reposed in the Director and the members of the National Science Board. As I recall it further, in 1966, when a cut of some $50 million was made, it was directed at that time that the programs to develop centers of excellence in science and engineering not be affected. Even though the gentleman in the well has said he has faith in the National Science Board, on page 22 of the bill it is provided:

That of the foregoing amount not less than $37,600,000 shall be available for tuition, grants, and allowances in connection with a program of supplementary training for secondary school science and mathematics teachers.

So what we have here is a situation where on the one hand the gentleman in the well says that $100 million shall be cut and the economies shall be made by the Director and the members of the National Science Board, and then he puts a limitation on them in one category. If this is adhered to, the cuts must necessarily be deeper in the other NSF programs.

I would respectfully suggest to the chairman of the subcommittee that when the proper time comes it is my intention to offer an amendment so that this part I have just referred to will be struck and so that there can be a fair allotment of the cuts necessary within all programs rather than to have one program favored above the rest.

Mr. EVINS of Tennessee. We are giving them flexibility to make these allocations wherever they see fit, and the priorities can be determined by them.

A few years ago it was the thought that one of the best ways to support science was at the teaching level. A broad base was what we wanted rather than at the top scientific level. They are doing great work at the top, but we felt if the base were broadened there could be a greater growth in science. That is the reason for allocating a certain amount to the base level. I do understand the gentleman's position.

Mr. DADDARIO. If the gentleman will

yield further, it is understood, I am sure, by the gentleman in the well, the chairman of the subcommittee, that the House Committee on Science and Astronautics and its Subcommittee on Science Research and Development, which I chair, looked into the National Science Foundation in depth just a short time back.

We had a discussion about it on the floor of the House and we analyzed every program with which the National Science Foundation is involved. There is not any reason that one program be given a higher priority over the others.

Mr. BOLAND. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I am happy to yield to the gentleman from Massachusetts [Mr. BOLAND], a member of the subcommittee.

Mr. BOLAND. Mr. Chairman, I would like to amplify what the gentleman has said with reference to the training and support of the institutes programs for secondary science and mathematics teachers. Since the inception of this program many years ago, and perhaps before some of the present Members of the Congress came here to serve in this body, this committee recognized a need for Federal support in this area.

The bill provides $400 million for the Foundation for fiscal 1969. There has been a $100 million cut in the National Science Foundation. However, with reference to the strengthening of secondary science and mathematics teaching, no one who has ever served in this Congress since the National Science Foundation came into being has ever wanted to undercut it by not properly funding its requests. I say this with respect to both the Director, a very able gentleman, and those who serve on the board.

However, Mr. Chairman, there are $400 million in this bill for that agency, and the remainder we have written into this bill has been studied in every single instance and every member of the subcommittee has looked toward the goal to meet that need. However, the Congress of the United States ought to have some say as to where the money is going to be spent. This is precisely what we are saying because we were so impressed with the operations of this program that we felt that this was an area where there ought not to be severe cuts made. The reasoning behind the committee's thinking I think is very simple. We think it is a great program and is a program which is working well. And, we want to make sure that it will not be undercut.

Mr. EVINS of Tennessee. The distinguished gentleman from Massachusetts has explained the position of the committee precisely.

Mr. KYL. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I shall be happy to yield to the distinguished gentleman from Iowa.

Mr. KYL. I thank the gentleman for yielding. I want him to understand that the criticism which has been leveled at the tables which appear in the hearings, particularly on page 15, is not a unanimous criticism. I think the committee has provided a valuable service in pointing out such things as the fact that $716 million, plus, in the Department of Agri-

culture appropriations are actually spent in urban areas. The table and the information which it contains, is of invaluable assistance in trying to determine where the money is going and to avoid duplication.

Mr. EVINS of Tennessee. I thank the gentleman for his contribution. Many of these funds go for such programs as the school lunch program and the food stamp program in the various cities of the country.

Mr. YATES. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to the gentleman from Illinois.

Mr. YATES. With reference to the table to which the gentleman from Iowa just referred and the table to which the gentleman from Tennessee, the distinguished chairman of the subcommittee just referred, there is stated therein that the Department of Defense—military and public—spent almost $1 billion—$839 million in 1969 in the cities.

What would that entail? What would be the nature of those programs?

Mr. EVINS of Tennessee. There are National Guard armories, civil defense, and other installations and programs in the cities.

Mr. YATES. In the Department of Defense?

Mr. EVINS of Tennessee. Yes, I am sure the gentleman is familiar with the program of matching grants for city hall jobs and jobs connected with civil defense, for example.

Mr. BROYHILL of Virginia. Mr. Chairman, will the gentleman yield?

Mr. JONAS. I yield to the gentleman from Virginia.

Mr. BROYHILL of Virginia. Mr. Chairman, I thank the gentleman for yielding.

Mr. Chairman, at the appropriate time during the reading of the bill for amendment I intend to offer an amendment that would prohibit the use of any funds appropriated by this legislation for the payment of salaries to any employee who is convicted of being involved in any act of rioting or civil disobedience, and this amendment will contain the same language that was approved by the House as an amendment to the agricultural appropriation bill last week—last Wednesday, I believe—and to the NASA authorization bill last Thursday, and will also have similar language that was approved by the Congress in the HEW appropriation bill last year, and the Office of Economic Opportunity authorization bill.

If the gentleman will yield further, I wish to point out that I feel that it would be far more appropriate to act on this matter by general legislation, but we are confronted with an emergency. I recognize that the Committee on Post Office and Civil Service has acted on this matter in their committee. But as I stated before we are confronted with an emergency and cannot take a chance on any delay. We have already had one act of rioting and civil disobedience here involving several Federal employees. We have been warned that there would be other actions of disruption of Government activities and civil disobedience. It is, therefore, imperative that the Congress take every action possible to prevent this from happening and to punish

swiftly and severely those involved. Under no condition should we have anyone working for the Government or on the payroll who is involved in any activities that could result in the destruction of that same Government.

Mr. JONAS. Mr. Chairman, the distinguished gentleman from Tennessee [Mr. EVINS], who is the able chairman of the subcommittee which conducted the hearings and has jurisdiction over the subject matter in the bill, has made a comprehensive and detailed analysis of it for you.

In addition, the committee has filed for your information a 40-page report containing a discussion of the most significant items taken up by the subcommittee and also detailed tables showing by agency and department a comparison of the funds provided last year, the amounts of new obligational authority requested this year, and the funds recommended by the committee for fiscal year 1969. I commend this report to your consideration and believe you will find the answers there to most if not all of the questions that may occur to you to aid you in understanding what this bill contains and the reasons advanced by the committee for actions taken by it.

There are some sections in the bill, and some comments in the narrative of the report, which need emphasis. I will confine my remarks to a discussion of these items.

The subcommittee began hearings on this bill on February 5, 1968, and did not conclude them until March '28. The hearings are contained in 3,508 pages of testimony printed in three large volumes and these are available to Members. During the hearings, which usually lasted 5 hours a day from February 5 to March 28, the subcommittee heard and examined 427 witnesses.

This is one of the largest bills, moneywise, you will have for consideration this year. It provides funds to finance the operations of 20 separate independent offices, agencies, and commissions, plus the Department of Housing and Urban Development.

To fund the 1969 operations of these agencies and HUD, the budget requested appropriations of $16,570,580,300. The bill before you represents a reduction of $2,899,944,300 in the budget. It provides $13,670,636,000 in new obligational authority. Funds provided in this bill amount to $4,290,683,650 below the amounts provided for fiscal year 1968.

The committee considered 91 separate items of appropriations and limitations. Reductions are recommended in 70 instances. In a few instances the amount requested was approved. In no instance was the budget request increased. Some requests were denied outright. But in the majority of the cases, substantial reductions are recommended. Percentagewise, the reductions amount to 17.4 percent of the budget requests.

The denial of the request to "sell" $2,085,000,000—$515,000,000 by the VA and $1,570,000,000 by HUD—of participation certificates accounts for that amount of the reduction in new obligational authority as requested in the budget.

Members will remember the fight I led last year on. all appropriation bills to deny the Administration the authority to raise money for general operating expenses by the use of participation certificates. That fight was based upon the conviction that the use of participation certificates is the most expensive way for the Government to borrow money. Confirmation of this is now at hand.

On March 27, 1968, Fannie Mae raised $730 million by the use of participation certificates, and in doing so accepted a record annual net interest cost of 6.45 percent per annum as follows: $200 million due April 8, 1971, at 6.30 percent interest, $330 million due April 9, 1973, at 6.45 percent interest, and $200 million due April 8, 1988, at 6.45 percent interest.

Since the use of participation certificates is clearly the most expensive way the Government has of borrowing money, and since the agency and department that planned to use this method and which sought $2,085 million in new authority to use it, did not plan to use the proceeds to finance any of their operations—with the exception of HUD for housing for the elderly and handicapped—and the proceeds would have been used to defray general operating expenses of the Government, the committee denied the entire request. Instead, it made a direct appropriation of $25 million for housing for the elderly and handicapped fund.

On this item alone we have saved $12,052,000 in subsidy payments—excess interest to be paid over the interest derived from the mortgages pledged—in 1969. This saving will be an annual one for the outstanding life of the participation certificates. On a 5-year basis, the total saving on this item alone would be $12,052,000 times 5 or $60,260,000. On a 10-year basis, it would be $12,052,000 times 10 or $120,520,000.

## THE POWER OF REPETITION

It is generally agreed that repetitive claims constitute the most effective tool available in the advertising world. This tactic is used to sell a great variety of consumer products. This tactic is also used to sell programs and mold public opinion in the field of political activity.

In the political arena, repetition of false charges is equally effective. It is well recognized that truth seldom catches up with fiction when the latter is systematically proclaimed.

An example is easily available. For a number of years now the country has been flooded with repetitive charges that Congress is cold and indifferent to the needs of our cities and equally indifferent to the needs of our people who are in the poverty category. This is a false charge and I think it is time for Members of Congress to mount a counteroffensive against those who are misleading the people.

The Secretary of the Department of Housing and Urban Development, testifying in 1966 before a committee in the other body, stated that the U.S. Government is spending more than $25 billion a year financing programs of benefit to urban communities. In his message to the Congress on cities, President Johnson pointed out that the Federal Government is currently committing more than $22 billion a year to help solve the problems of the cities and that these funds are expended through more than 100 programs. The special analysis to the budget contains the following statement:

The Department of Housing and Urban Development estimates that the total Federal financial commitment for urban, social and community development aids could be considered to exceed $37 billion in 1969—more than twice the level in 1961.

Despite these facts, we frequently hear charges made by a mayor whose city has been torn by rioting and looting that the Congress has been sitting on its hands and failing to provide funds to combat city problems. Last year, following the summer riots, the Vice President of the United States indicted Congress in similar fashion. The facts show that Congress does not deserve critical comment, and I personally directed a communication to the Vice President expressing my own resentment over the false charges levied against the Congress. The distinguished chairman of the House Committee on Appropriations made a speech on the floor, following a similar outburst by the mayor of one of the largest cities in the land, pointing out in detail the many ways in which Congress is providing funds designed to benefit those who reside in the urban communities of the country.

In an effort to give you some ammunition to use in combating these false charges in your home districts, I am going to relate the facts with respect to just a few of the programs funded in this bill for that purpose. I would express the hope that colleagues in speeches at home before civic and other groups would take up this challenge and answer these charges because they are untrue, as the record will demonstrate.

### PUBLIC HOUSING

First, let us look at public housing. This program was inaugurated in 1935 and was sold to Congress and the country as one that would solve the need for low-rent housing for the poor. Since the program began, 712,000 public housing units have been constructed around the country. These units are administered by 2,100 housing authorities. They are financed by a commitment of the Federal Government to make up the difference, in annual contributions, between what the units cost to construct and the amount of residual receipts received through rents collected from the occupants. The construction costs are amortized over a period of 40 years so the Government is thus committed to a 40-year program with respect to each of these housing units.

.Since the program began, and through fiscal year 1969, the Government will have expended $2,777,201,455 in annual contributions to bridge the gap between residual receipts and amortization costs on public housing projects.

Not a single one of the 712,000 units has been paid for because the 40-year program has not expired. Nevertheless, HUD witnesses testified before the committee that 125,000 of the units need modernization and that it will cost $250

million to modernize them. It was stated that the annual cost to amortize this rehabilitation program will be $20 million a year for 40 years or $800 million. As time goes on, many of the remaining 587,000 units will have to be modernized also.

The amount of these annual contributions for which the Government is obligated is going up rapidly. The following table shows how this program grows in cost:

URBAN RENEWAL
*Annual subsidy*

| | Million |
|---|---|
| 1967 | $250 |
| 1968 | 275 |
| 1969 | 350 |

Let me repeat for emphasis that these contributions will continue and grow in amount for 40 years.

In the early 1950's a new program was inaugurated to attack the problems of decay and blight in metropolitan areas. This program is known as urban renewal and $4,075,000,000 in Federal funds have been expended so far on urban renewal. Several years ago the committee adopted a policy providing for advance funding for urban renewal. So while it is not reflected in the totals in the bill before you, new obligational authority in the amount of $750 million becomes available for urban renewal in 1969 under prior appropriation acts. This additional $750 million will bring the total of appropriated funds for urban renewal to $4,825,000,000.

MODEL CITIES

In 1966 another brandnew program was sold to the Congress. The program was called "demonstration cities," but that title was not glamorous enough so it was changed downtown to "model cities." Who could possibly oppose the creation of a "model city"? What resident would object to his city becoming a "model city"? This is an example of using a Madison Avenue tactic because the term "model city" is much easier to sell than "demonstration city."

However, be that as it may, late in 1966 Congress made available to the administration $11 million to be used by the Department of Housing and Urban Development to make grants to a select number of cities to finance the preparation of plans to convert areas of the selected cities into model neighborhoods. But HUD moved with very deliberate speed and did not even select the 75 cities that would be recipients of the $11 million in planning grants until the early part of November 1967. It took the Department nearly a year, after the money was made available, to select the first group of cities. No one has given a satisfactory explanation for this delay. But while the Department was delaying the announcement of the first group of cities, the administration last year requested $662 million in additional funds for the program. Twelve million of this amount was to be used for planning grants for a second group of cities later to be selected. Since testimony before the committee clearly indicated that the amount requested was far in excess of what could be required, due to the extraordinary delay in selecting the cities,

Congress appropriated $312 million last year. Of this amount, $12 million was to be used for planning grants for the second group of cities, $200 million was to be used to make supplemental grants to the first group of cities after their plans are filed and approved and $100 million was to be used for additional urban renewal projects within the model city areas.

Despite the administration's foot dragging that has characterized this program since its inception, the budget this year called for an additional $1 billion of funds for the model cities program, which was to include the second installment of supplemental grants to the first group of cities, initial grants to a second group of cities later to be selected, and additional urban renewal funds for both groups of cities.

Since none of the funds provided for supplemental grants last year will be expended until late this year after plans are filed and approved, it became obvious that all of the additional funds requested in the budget this year would not be required. So the committee in its wisdom approved and recommends an appropriation of $500 million for 1969. Of this amount $200 million is to be used as a second installment of supplemental grants to the first group of cities, $200 million for supplemental grants to the second group of cities yet to be selected, and $100 million for additional urban renewal projects within the model city areas. Twelve million was provided last year for grants to the second group of cities to finance the preparation of their plans. But the second group of cities has not even been announced. And if the pattern established last year is followed, it will be late in 1968 before this second group of cities will be announced.

RENT SUPPLEMENTS

Another brandnew program was inaugurated in 1966. This program is called rent supplements but in ordinary language this simply means the payment of cash subsidies to supplement rent payments made by tenants for the rental of housing units.

This program requires dual action by Congress. First we grant contract authority, which means that the administration is given authority to obligate the Government to pay rent supplements or subsidies for a period of 40 years, and the second part of the program is the appropriation of the actual dollars required to pay the subsidy due on a year-to-year basis.

So far the total amount of contract authority granted under this program amounts to $67,000,000, including the $25,000,000 in this year's bill. But to understand the cost of the program it is necessary to multiply that figure by 40. In doing so, it is found that the taxpayers are obligated to put up $2,680,000,000 over a 40-year period on this program alone. So far $19,100,000, including the $12,000,000 in this year's bill, has been provided to enable the administration to make the payments due on occupied units. This of course will also continue for 40 years and will increase as more units come on stream and are occupied.

This year the budget requested $65

million for new contract authority for additional rent supplement units and $15 million for subsidy payments on occupied units. It is crystal clear from the hearings that the rent supplement program is not moving forward as rapidly as its proponents claimed would be the case. It is therefore extremely doubtful if a sum even approaching $65 million can be used efficiently next year so the committee in its wisdom reduced that request to $25 million and reduced the request for payments to $12 million, a total of $37 million for this program next year.

OTHER PROGRAMS

I will not undertake to list all of the multitude of additional programs funded in this bill for assistance to cities, but will list a few of the most significant ones for the information of Members and those who read this RECORD, as follows:

| | Million |
|---|---|
| Urban renewal (made available from prior year appropriation) | $750 |
| Model cities | 500 |
| Public housing, annual contributions | 350 |
| Rent supplements, new contract authority | 25 |
| Rent supplements, annual payments | 12 |
| Basic water and sewer grants | 150 |
| Open space land grants | 75 |
| Neighborhood facilities | 35 |
| Urban planning grants | 38 |
| Housing for the elderly and handicapped | 25 |

It is interesting to note that the administrative and nonadministrative expenses for the Department of Housing and Urban Development funds as provided in this bill amount to $190,439,000.

It is also interesting to note that the Department of Housing and Urban Development will have on hand at the beginning of fiscal year 1969; a total of $21,709,540,000 in unspent funds; $51,512,556,000 of this money is unobligated and $10,186,013,000 is unreserved.

Despite this record of colossal appropriations made by Congress in the field of housing and urban development, there are those who continue to say that Congress is doing nothing and continues to be indifferent about the needs and problems of urban communities. It is time for the Members of Congress to meet this charge head-on and unless we do that, and explain to the people what has been done in this field, many of them will continue to be misled by the repetition of these charges. I urge my colleagues to join me in a special effort to see that the people are made aware of the facts.

Mr. JOELSON. Mr. Chairman, will the gentleman yield?

Mr. JONAS. I yield to the gentleman from New Jersey.

Mr. JOELSON. I think the gentleman is making a very persuasive—really persuasive argument. But on the question of authorization, we have in this bill a NASA appropriation when the other body has not even authorized any money.

Mr. JONAS. I do not want to go into that because we discussed that under the rule. I really do not think it is pertinent. I do not like closed rules any more than anybody else. But we do not want to have to go through this a second time. We had already marked up the bill. We changed

it after the House approved the authorization bill and we did not bring this bill to the floor until after the funds for NASA were authorized by one House of the Congress.

Mr. YATES. ·Mr. Chairman, will the gentleman yield?

Mr. JONAS. I yield to the gentleman from Illinois.

Mr. YATES. I want to say that I am in agreement with the gentleman about foot dragging. And, yet, as one reads the hearings, one finds these are very complicated programs: second, they are programs in which the cooperation of the cities and the initiative of the cities is essential. Would not the gentleman agree that the cities, too, have been guilty of foot dragging and that they have not cooperated fully with the Federal agencies in making their proposals and plans available promptly so that the test of feasibility under the statute could be applied to them?

Mr. JONAS. I will just say it is not my purpose today to point a finger at anyone. What I am trying to do is defend the Congress against unjustified criticisms that we are indifferent to the problems of the cities and we have been delaying action. Not only is that charge made here on the floor but elsewhere.

Mr. KYL. Mr. Chairman, will the gentleman yield briefly?

Mr. JONAS. I yield to the gentleman from Iowa.

Mr. KYL. In view of the discussion regarding appropriations for other departments which go into the cities, I wanted the gentleman to assure the House that the funds he is talking about which were appropriated, but which have not been spent, are pure HUD funds appropriated to that Department to be spent by that Department.

Mr. JONAS. I have not gone down and checked the books. I am just taking HUD's word for it. They put the table in the record. We asked them for the table. The table lists carryovers and expenditures. It shows the figures that I have already related. It shows, and the gentleman can see it if he will consult page 629 of the hearings, that $10 billion is down there unreserved. The following table shows the amount of these unspent, unobligated and unreasoned funds:

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT—CARRYOVERS AND EXPENDITURES—FISCAL YEAR 1969 OUTLAYS AND BALANCES

[In thousands of dollars]

See footnotes at end of table.

May 8, 1968      CONGRESSIONAL RECORD — HOUSE      12233

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT—CARRYOVERS AND EXPENDITURES—FISCAL YEAR 1969 OUTLAYS AND BALANCES—Continued

[In thousands of dollars]

| Appropriation or fund | 1969 appropriation request | Carryover into 1969 | | | | Estimated 1969 outlay | | | Carryover (out of 1969) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Unobligated balance [1] | | | Obligated balance | From prior year funds | From 1969 funds | Total | Unobligated balance | | | Obligated balance |
| | | Reserved | Unreserved | Total | | | | | Reserved | Unreserved | Total | |
| **MORTGAGE CREDIT** | | | | | | | | | | | | |
| *Federal Housing Administration* | | | | | | | | | | | | |
| Rent supplement program | 16,600 | | | | 589 | 589 | 15,511 | 16,100 | | | | 1,089 |
| Community disposal operations fund | | | 1,293 | [1] 1,293 | 197 | -8,142 | | -8,142 | | | 935 | 935 | 197 |
| Federal Housing Administration fund | | [11] 1,100,783 | | 1,100,783 | -24,839 | 26,122 | | 26,122 | [14] 1,074,357 | | | 1,074,357 | -24,535 |
| *Federal National Mortgage Association* | | | | | | | | | | | | |
| Loans to secondary market operations fund | | | 2,406,000 | 2,406,000 | | 28,000 | | 28,000 | | 2,378,000 | 2,378,000 | |
| Special assistance functions | (12) | 1,404,283 | 1,175,379 | [2] 2,579,662 | 787,811 | 430,600 | | 430,600 | 1,534,283 | 1,906,539 | 3,440,822 | 630,251 |
| Management and liquidating functions | (13) | | | (3) | | 25,630 | | 25,630 | | | | 31,365 |
| Participation sales fund | [7] 576,909 | | | 576,909 | 85,909 | -206,190 | | -206,190 | [17] 903,112 | | 903,112 | 112,927 |
| Secondary market operations (trust fund) | | | 2,181,081 | 2,181,081 | 337,683 | 590,000 | | 590,000 | | 1,830,981 | 1,830,981 | 228,783 |
| **DEPARTMENTAL MANAGEMENT** | | | | | | | | | | | | |
| General administration | 8,000 | | | | | | | 8,000 | 8,000 | | | | |
| Regional management and services | 8,925 | | | | | | | 8,925 | 8,925 | | | | |
| Administrative operations fund | | | | | 200 | 200 | | -3,245 | -3,045 | | | | 3,245 |
| Working capital fund | 2,000 | | 881 | 881 | 369 | -87 | | 287 | 200 | | 2,509 | 2,509 | 541 |
| **LEGISLATIVE PROGRAM** | | | | | | | | | | | | |
| Areawide development grants | 10,000 | | | | | 3,000 | | 3,000 | | | | | 7,000 |
| HUD legislation | 30,000 | | | | | 14,000 | | 14,000 | | | | | 16,000 |
| Subtotal, Department of Housing and Urban Development | 2,859,422 | 5,326,543 | 10,186,013 | 15,512,556 | 6,196,984 | 2,829,320 | 393,320 | 3,222,640 | 6,108,821 | 10,996,554 | 17,105,375 | 6,614,708 |
| Adjustment for interfund transaction and applicable receipts from the public | | | | | | | | -6,738 | | | | |
| Total, department of housing and urban development | 2,859,422 | 5,326,543 | 10,186,013 | 15,512,556 | 6,196,984 | 2,829,320 | 393,320 | 3,215,902 | 6,108,821 | 10,996,554 | 17,105,375 | 6,614,708 |
| Advance appropriations for fiscal year 1970 | (1,630,000) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |

[1] Excludes unused balances of 1968 participation sales authorizations.
[2] Represents balances of contract authorization, not all of which has been appropriated for.
[3] Not applicable.
[4] Loan fund balances are dependent on proposed legislation pending in HUD Act of 1968.
[5] Portion of unobligated balance to be transferred to other accounts.
[6] No appropriation is being requested. However, a participation sales authorization of $25,000,000 is being requested. This amount is needed to provide the funds necessary for the program level.
[7] $300,000,000 borrowing authority becoming available. In addition, a participation sales authorization of $285,000,000 is being requested.
[8] Includes $12,661,000 from permanent indefinite appropriation for 1967 sales and $51,230,000 proposed in 1969 for 1968 and 1969 sales.

[9] Excludes unappropriated portion of contract authorization.
[10] A participation sales authorization of $80,000,000 is being requested.
[11] Includes $1,305,000 from permanent indefinite appropriation for 1967 sales and $3,125,000 proposed in 1969 for 1968 and 1969 sales.
[12] Appropriation and balances included within urban renewal programs.
[13] Reflects unused contract authorization.
[14] Represents primarily FHA insurance reserves for future expenses and loans.
[15] Participation sales authorization of $655,000,000 is being requested. In addition $525,000,000 borrowing authorization becoming available.
[16] Participation sales authorization of $550,000,000 is being requested.
[17] Reserves for retirement of participation certificates.

Mr. MINSHALL. Mr. Chairman, as a member of the Subcommittee on Independent Offices and the Department of Housing and Urban Development Appropriations Subcommittee, I am encouraged both by the wisdom of the savings we have achieved in certain areas of this bill and by the allocation of funds we have made specifically in the area of housing and urban development.

As a Representative from the greater Cleveland, Ohio, area, I am very mindful of the important partnership which must exist between our cities and the Federal Government in getting our communities on their feet again. For years Cleveland has been bogged down in one of the sorriest urban plights in the Nation. Just over a year ago, when the plight was truly desperate and no funds at all were being allocated to Cleveland, I tried to get the situation off dead center by calling a meeting of Cleveland city officials and the Secretary of Housing and Urban Development, Dr. Weaver. I am pleased that this year the situation has changed, that the funds Cleveland has so urgently needed are beginning to be returned to the taxpayers in the form of construction and action.

As our subcommittee report states, the cuts made in the HUD budget are almost entirely composed of deferral of sale of $1.6 billion in participation certificates,

since the new obligational authority to be provided from such sales is not considered necessary for funding HUD programs in 1969.

Our appropriation provides for programs to attack urban blight, inadequate housing, and related social problems which have been a major factor in creating the misery and rebellion which have scarred our cities in the past few years. Housing for the elderly and handicapped, college housing loans, grants for neighborhood facilities, public housing, urban planning grants, open space land programs, water and sewage facilities, model cities, urban mass transportation, and rent supplements are included in the HUD funds before us today.

It is important to point out that the $1.2 billion for which we ask the House's approval is only a fraction of the massive attack we have mounted: HUD has substantial programs in terms of budget obligations and expenditures, financed in corporate and trust fund accounts. The Department of Housing and Urban Development is quoted in the special analysis to the budget as estimating "that the total Federal financial commitment for urban, social, and community development aids could be considered to exceed $37 billion in 1969."

Much remains to be done and this requires time as well as funds. But I

hope that our action today will provide another stride forward toward an America where urban blight and slum housing will be relics of the past.

As one who has always been deeply concerned about economy in government, I would like to emphasize that our subcommittee has made sizable overall reductions in the Independent Office budget, without sacrificing any essential services or programs in any of the 23 agencies and departments involved.

Mr. EVINS of Tennessee. Mr. Chairman, I yield 5 minutes to the distinguished gentleman from Connecticut [Mr. DADDARIO].

Mr. DADDARIO. Mr. Chairman, it has not been my intention here to cast any reflection on the Appropriations Committee and its handling of the National Science Foundation budget. It is my intention to see if we can allow the cuts which this bill imposes to be made equally in all NSF programs.

It is somewhat of a surprise to me that the committee would find itself so sensitive to the admonishments which may come from members of other committees who have had some familiarity with the programs over which the Independent Offices Subcommittee finds itself in budgetary control.

The fact that the section to which I referred, on page 22, has always been in

the bill cuts no ice with me at all, Mr. Chairman. The fact is that this was in at a time when the National Science Foundation was in its infancy. I would not believe that we stand here with our feet in concrete and do not realize that from time to time things in fact must change.

When the subcommittee of which I am chairman, the Subcommittee on Science Research and Development, looked at the National Science Foundation, one of the determinations it made was that certainly this program was an important one. It listed a whole series of others which were equally important.

The one place where I believe we struck a sensitive nerve, and which the Congress responded to, was that there would be support in the science areas for institutional development activities which would hit into those areas of the country where there was little activity going on insofar as science was concerned and that this geographical situation should be looked at and something in fact should be done about it. I think we can take pride in the leadership the Director and members of the National Science Board have taken in this regard. All you have to do is look at the grants and the contracts made in these areas. Take a look at the institutional support in such colleges as Grinnell in Iowa, St. Andrews Presbyterian College in North Carolina, and Hampton-Sydney and a whole multitude of schools throughout these 50 States. The fact is that as we help those universities with the highest quality we must in fact build up the areas in the country where science and research activities have floundered. It is because of that, and with no aspersions cast on this particular teachers program to which I direct my remarks.

Let us assign the necessary priorities to the programs and repose confidence, as the report indicates it is the intension so to do, in the Director and the National Science Board. I am sure that the 35,000-some teachers who participate in this program to which we are presently referring are not going to be cut off. This is a solid, integrated program. It need not stand on a pedestal such as this which is included in the bill. It has deserved support, and it is my understanding that the National Science Foundation recognizes that this is the case. If you do not give the flexibility to the Director and to the members of the Board, what you are in fact going to do is to put the emphasis of the cuts on newer programs.

The CHAIRMAN. The time of the gentleman has expired.

Mr. EVINS of Tennessee. Mr. Chairman, I yield the gentleman 3 additional minutes.

Mr. JONAS. Mr. Chairman, will the gentleman yield?

Mr. DADDARIO. I yield to the gentleman from North Carolina.

Mr. JONAS. Mr. Chairman, in view of the fact that the time which has been yielded to him by the chairman of the subcommittee is about to expire, I shall be happy to yield to the gentleman 5 minutes.

The CHAIRMAN. The gentleman will be recognized for an additional 5 minutes

in addition to the time already yielded to him by the gentleman from Tennessee.

Mr. DADDARIO. Mr. Chairman, this Foundation has worked for 15 years to foster basic research in science education. Now it is time to make the Foundation into a broader instrument for forging and shaping, in company with the Federal mission-oriented agencies, the national policies to foster the national resources for science and to focus and direct them toward the attainment of great national goals. Full employment, a clean world to live in, a population imbalance with resources, swift and ready transportation and communication, pure water to drink, education of the citizenry, discovery of new resources—all of these and other needs of the Nation must depend in part upon thorough, deliberate and positive efforts to learn more about our physical world, its creatures and its peoples and their relations with one another; and to apply this knowledge skillfully and with judgment, and to have ready for application the requisite science resources.

This applies to the National Science Foundation as a whole and its place in our society. If we look back a few years, we can see that scientific activities of the country have generated the need for additional resources in science and the NSF is a developing resource structured to fill this need.

Dr. Hornig, in talking about the National Science Foundation, said its goal was to strengthen American science per se; that the National Science Foundation is, of course, the only agency that has a fundamental responsibility to help all basic American science.

Mr. EVINS of Tennessee. Mr. Chairman, will the gentleman yield?

Mr. DADDARIO. I yield to the gentleman from Tennessee.

Mr. EVINS of Tennessee. Mr. Chairman, I want to commend my distinguished colleague for his excellent statement. The committee is in full accord with what the National Science Foundation is doing. It is a great agency, and it is upgrading science in this Nation in all areas. It has done a great work. We respect the National Science Foundation.

However, there is $400 million in this bill for the National Science Foundation.

Mr. Chairman, during my years of service on the committee we have seen this budget grow in amount. We know the great contributions that the National Science Foundation has made, but we know that we must make some reductions. We must set priorities because of our stringent budgetary situation. We felt that we could defer some of their activities at this time.

The gentleman from Connecticut [Mr. DADDARIO] is the chairman of the Subcommittee on Science and Aeronautics. He is a great Congressman and a great gentleman. He is to be commended for his dedication to the cause of science.

Mr. DADDARIO. Mr. Chairman, I thank the gentleman, but I would like to say that I cast no stone toward the subcommittee. The gentleman mentions that there is an unobligated carryover of $46.5 million. The fact remains that this is not because the National Science

Foundation has not been doing its work. It is because it has lived up to Public Law 218, which has in fact compelled it to put this money aside.

The CHAIRMAN. The time of the gentleman has again expired.

Mr. JONAS. Mr. Chairman, I yield an additional 2 minutes to the gentleman from Connecticut.

Mr. DADDARIO. I thank the gentleman for yielding the additional time.

The fact that these funds have not been expended, would indicate that they have not been doing their work properly. They have followed the admonishments of Public Law 218, and that is all there is to it.

But, Mr. Chairman, in the final analysis it is not my purpose here to do anything but to give an indication of my concern about the situation, and to hope that in this particular regard the subcommittee would in fact look at the agency as an agency which has a multitude of responsibilities and that no one part of it is superior to another.

And if, in fact, you do this, I believe that this would be going a long step toward recognizing the importance of the National Science Foundation, and recognizing also at this time that, cuts being in order, that the people who administer NSF ought to be given the flexibility and the authority to put things in their proper perspective. And whatever they do in this regard they will have to answer to the Congress. So I believe they ought to be given this opportunity.

Mr. Chairman, I yield back the balance of my time.

Mr. COHELAN. Mr. Chairman, will the gentleman yield?

Mr. DADDARIO. I yield to the gentleman from California.

Mr. COHELAN. Mr. Chairman, I rise to express my deep concern with several of the massive appropriations reductions made in this appropriation for the Department of Housing and Urban Development and the Independent Offices.

I am not unaware of the current fiscal situation, the demands for reductions in Federal spending and the hardships of serious inflation. But neither am I unaware of the major social responsibilities of the Members of this body with regard to the poor, the disadvantaged, and the discriminated against in this country.

We have issued a promise that the resources and energies of this country will be devoted to meeting the challenges of poverty and race. Year by year we have become increasingly aware of the tragic extent and disgrace of poverty in this country. We have had for several weeks now the report of the President's Commission on Civil Disorders. This and other reports make all too clear, in documentary form, the problems we face. To cut back in our efforts to meet these problems which have put fear and uncertainty and distrust into the hearts of tens of millions of Americans is to ignore the realities and responsibilities of citizenship. We have a commitment to the people of this country to make our cities habitable, our streets safe, our lives worthy of living—and this means for all people, black and white, poor and rich.

The model cities program is a small part of this promise and this commitment. To renege on even a part of it, as this bill does, is to avoid our responsibility.

Mr. Chairman, I would support appropriations for the full $1 billion model cities request made in the budget. I do not support the cuts made by this bill. Model cities like the city of Oakland, which I represent, sorely need the assistance provided by this bill. However, $500 million will keep the program going and I will vote for the bill.

This appropriations bill also reduces the money available for rent supplements by $40 million to only $25 million. For the life of me I cannot understand the reluctance of support for this program. Rent supplements are grants to renters in the amount above 25 percent of their income which they spend for rent. When their income increases their subsidy decreases until it ceases when rental costs fall below 25 percent of income. Recipients of rent supplements are those who would normally be eligible for public housing. Instead they receive subsidies allowing them to avoid the ghetto-like conditions of some public housing projects, and at the same time to have decent housing with adequate income left over. This program is also a boon to the construction industry which can expect to build housing for persons who otherwise could not afford it. The token levels on which funding for this program have been asked and granted are not sufficient. And certainly the $40 million reduction made by this bill is not prudent.

Mr. Chairman, to this point I have concerned myself with the urban oriented program reductions. This bill makes one other wholesale reduction which I strongly regret. The bill reduces the appropriation for the National Science Foundation by $100 million. This is a reduction of $1 in $5 from the amounts requested in the budget. These are dollars which almost entirely would go for the support of academic science.

Basic scientific research and experimentation as well as support of academic institutions of science and their students is of substantial importance to this country.

There is in this country a strong spirit of independent academic inquiry. This inquiry is not a luxury to be indulged in in fat years and avoided in lean ones. This is inquiry into the very problems of man—how we live, how our environment behaves, and how to improve our lives and our environment. There is no reason why we should not support the scientific inquiries which may enable us to meet our problems of pollution, transportation, housing, learning, and the like. To reduce this support by one-fifth is to reduce the inquiry and training of academic science by a large amount. I do not support this reduction.

Mr. Chairman, in opposing these reductions I do not do so without having in mind other areas which might yield substantial expenditure savings.

In particular, Mr. Chairman, I suggest that the members of this body take a hard, close look at the Defense budget.

In military procurement, support and construction we spend tens of billions of dollars each year. Certainly there are millions if not billions of dollars of expense here which could be pared or postponed without impairing our defense posture. Mr. Chairman, I suggest that the House look to this budget in making its reductions.

Mr. JONAS. Mr. Chairman, I have no further requests at this moment for time.

Mr. EVINS of Tennessee. Mr. Chairman, I yield 2 minutes to my good friend, the distinguished gentleman from Texas [Mr. FISHER].

Mr. FISHER. Mr. Chairman, I call the attention of the chairman of the committee to a sentence on page 14 of the committee report which reads as follows:

> The Committee has deferred funding the request for an appropriation of $25,412,000 for the construction of a new 760 bed VA hospital at San Antonio, Texas, at this time.

That project is somewhat familiar to me, being located in the part of San Antonio which I have the honor to represent.

As I understand it, there has already been expended about $1½ million on preliminary plans, architectural, and engineering work, which is now in the process of being completed, which is necessary before contracting can be done for construction.

My purpose in seeking this time is to ask the chairman of the committee to clarify the position of the committee with respect to the language which I have quoted.

Mr. EVINS of Tennessee. I will say to my distinguished colleague that there are no funds in this bill for Federal building construction. Under these circumstances, we did not feel that we should put money in the bill for the hospital construction program at this time.

There are three new VA hospitals that are being fully activated in 1969. Two others are being completed and will be staffed for part of the year after they are completed. The San Antonio hospital is in an advanced stage of planning and it is the next in order of priority for construction by the Veterans' Administration. It has merely been deferred because of the budgetary situation.

Mr. FISHER. As I understand it then, the gentleman and the committee are quite aware of the importance of this project and the justification for it?

Mr. EVINS of Tennessee. The gentleman has spoken to me about it. I assure him that the hospital will be built—it has just been deferred.

Mr. FISHER. I appreciate the gentleman's clarification.

The CHAIRMAN. The time of the gentleman has expired.

Mr. EVINS of Tennessee. Mr. Chairman, I yield 1 minute to the gentleman from Texas [Mr. GONZALEZ].

Mr. GONZALEZ. Mr. Chairman, I wish to thank the distinguished chairman of the subcommittee and I wish to add my voice to that of my colleague, the gentleman from Texas, from the 21st District.

This hospital originally was in my district, but by reapportionment it is now in the 21st District.

Mr. Chairman, this is a vitally needed hospital. San Antonio already has some 23.5 percent of the veteran population of the State of Texas. I am glad to hear that this does have priority and at the first available opportunity it will receive the money grant.

Mr. JONAS. Mr. Chairman, I yield 5 minutes to the gentleman from Iowa [Mr. GROSS].

Mr. GROSS. Mr. Chairman, I take this time to ask the chairman of the subcommittee, or some member of the committee, a question or two concerning this bill.

Only last week the House passed the authorization bill for NASA. What was the figure that was approved in that bill—which I voted against—but what was the figure that was approved?

Mr. EVINS of Tennessee. The House authorized $4,031,423,000 total as I recall, I will say to my friend at this time The gentleman will recall that there were two amendments adopted on the floor—one to cut research and another amendment to cut administrative operations.

Similar amendments were offered in the Committee on Appropriations and they were adopted to bring it in line with the reduction made.

Mr. GROSS. So the figure we have in this bill is the same as the authorization bill?

Mr. EVINS of Tennessee. No. It is $23.2 million less, I will say to the gentleman. We made further reductions. The space program had expenditures of nearly $6 billion a few years ago. This has been reduced, and last year it was $4.5 billion. We cut a half billion dollars out of the space program last year and this year we made further reductions below what the House authorizing committee made.

So I will say to my friend who is an excellent Member of this House and always the watchdog of the House for economy that we are on a hard rock-bottom budget for NASA at this time.

Mr. GROSS. I thank the gentleman for his remarks. Then this bill is what—$23.2 million above or below the authorization?

Mr. EVINS of Tennessee. It is $23.2 million below the authorization, I will say to my friend. We have made reductions in construction.

The only thing in this bill for construction is to repair and improve some launch pads and communications.

Mr. GROSS. It is still a $4 billion expenditure on the National Aeronautics and Space Administration with approximately $2 billion for a program to put a man on the moon in the dim and uncertain future. Is that correct?

Mr. EVINS of Tennessee. The gentleman is correct with regard to the money amounts, but he is not correct with respect to the 243,000 people employed in the program throughout the Nation and in all the States.

Mr. GROSS. I do not know that I said anything about employment.

Mr. EVINS of Tennessee. Oh, yes; I discussed employment. The number of employees in the NASA program used to be 420,000. Now it has gone down to about 243,000. They are laying off about 4,000 a month under these cuts.

Mr. GROSS. I had hoped that the committee would have cut it some more.

Mr. WYMAN. Mr. Chairman, will the gentleman yield?

Mr. GROSS. I yield to the gentleman from New Hampshire.

Mr. WYMAN. As the gentleman remembers, some years ago I tried to take several hundred million dollars off the part of the Apollo program to which the gentleman has made reference and to increase the funds available to the Air Force to help in the military control of space. But we are now in a situation in committee where they tell us that if we do not go ahead with the $2 billion for Apollo, the $20 or $22 billion that has already been put into it will have gone down the drain. So we are just stuck with it.

Mr. GROSS. I do not say this with any disrespect to the gentleman, but that down the drain argument is one of the most shopworn arguments that we hear. The program should have been cut back when the gentleman tried to do so some years ago.

Had that been done we would not now be confronted with the statement that we must continue to spend billions because we have spent billions in the past.

Mr. WYMAN. Mr. Chairman, will the gentleman yield further?

Mr. GROSS. I yield to the gentleman from New Hampshire.

Mr. WYMAN. They claim it is not just going down the drain. The problem of our dilemma relates to the long-range policy of this country to put a man on the moon before someone else does, meaning specifically the Soviets. There are a lot of people employed in this program. Many prominent citizens think it is important to the United States, and I think now we have gone so far that it should be carried through at the level to which it has been projected throughout these years to which we have committed so many millions of dollars at this time.

Mr. GROSS. I will say to my friend from New Hampshire that it is far more important to me, as one individual Member of the Congress of the United States, to know what is floating around in space; whether those vehicles carry nuclear warheads and, if so, whether we have devices for the detonation of those vehicles in space. Yes, as far as I am concerned, it is far more important to know what is happening in connection with those satellites than it is to put a man on the moon and get a handful of moon dust to take to that brandnew $14 million laboratory in Houston, Tex., for analysis.

Of course, as I have said time after time, if we ever do get a man on the moon and there is a living soul on that planet, we will be up there with a multi-million-dollar foreign aid program.

Mr. WYMAN. Mr. Chairman, will the gentleman yield?

Mr. GROSS. I yield to the gentleman from New Hampshire.

Mr. WYMAN. I would like to make the observation that, as the gentleman knows, I have been trying for years to get an increased emphasis on space policy and programing on the intercept capability between here and the moon in our space program. This is squarely a military capability for our own na-

tional survival. I would like to say, too, if the gentleman would read the hearings, he would find that no less a person than Mr. Webb has admitted that once a man has gone to the moon, emphasis on the American space program in terms of manned space flight thereafter, will have to come back closer to earth. This is extremely significant because there is no place beyond the moon in terms of reality that we can ever fly human beings to and bring them back to earth in the foreseeable future. It takes too long. They are too far away. And I might add, and not facetiously, that we have vastly greater immediate concerns here on earth and near to earth.

Mr. JONAS. Mr. Chairman, will the gentleman yield?

Mr. GROSS. I yield to the gentleman from North Carolina.

Mr. JONAS. Before we get too far in the record from the comment last made by the distinguished gentleman from Tennessee, I am sure he meant to say that several hundred thousand employees are not in-house employees of NASA. They are contract employees. I just wanted the record to show that.

Mr. GROSS. Quite a demonstration is made of cutting a few thousand employees out of NASA. Unless we cut the dollar appropriations to NASA with respect to personnel, they simply go out and hire consultants and other contract employees.

Mr. JONAS. Mr. Chairman, will the gentleman yield further?

Mr. GROSS. Yes; I yield to the gentleman from North Carolina.

Mr. JONAS. Mr. Chairman, I am really surprised that the gentleman from Iowa did not compliment the gentleman on the cutting of the budget by $362 million in this one program. That is a pretty good slice.

Mr. GROSS. Does the gentleman mean in NASA?

Mr. JONAS. Yes.

Mr. GROSS. It could stand a much deeper cut.

Mr. JONAS. Does not the gentleman really think this is a pretty good job?

Mr. GROSS. This bill ought to have been sliced 24 percent in accordance with the cut in the Agriculture appropriations bill. This bill, we are told, has been cut 17 percent. Let us get another 7 percent out of this bill. I ask that of the chairman of the subcommittee: How about another 7-percent cut?

Mr. EVINS of Tennessee. I will say, we have cut this $2,899,000,000, almost $3 billion just out of this bill, which is a 17.5-percent cut, the highest cut ever made in the history of this subcommittee as far as we have been able to determine.

I wonder how far our good friend would like us to go? To what levels would we have to go to satisfy his desire to use the meat ax?

Mr. GROSS. I suggested we go down to the level established in the precedent set by the Agriculture bill, a 24-percent cut. Our farmers are not doing well at all, yet spending on agriculture was cut 24 percent.

Mr. EVINS of Tennessee. I am one who agrees with my friend on the necessity for our farmers to be prosperous.

Mr. GROSS. How much did the gen-

tleman say the bill provides for rent supplements?

Mr. EVINS of Tennessee. The committee authorized $25 million.

Mr. GROSS. How much is provided in this bill?

Mr. EVINS of Tennessee. Twenty-five million dollars.

Mr. GROSS. Twenty-five million dollars?

Mr. EVINS of Tennessee. One hundred and fifty million dollars is authorized. We cut it $40 million this year, and there is a need for 60,000 houses per year for 10 years. There is a great need for low-income housing in this Nation.

Mr. GROSS. Our farmers need more than 22 cents a dozen for their eggs, too, and they are not getting it.

Let me advise the House here and now that I will try to reduce this spending still further by offering an amendment to cut the rent supplement out altogether. This program never should have been started. Why should the taxpayers subsidize the paying of rent for anybody in this country?

Mr. EVINS of Tennessee. We subsidize our farmers on some programs, and I support that.

Mr. GROSS. And we cut their appropriation 24 percent a few days ago. Let us get this down by 24 percent.

Mr. EVINS of Tennessee. 24 percent.

Mr. Chairman, I yield 5 minutes to the distinguished gentleman from Chicago.

Mr. YATES. Mr. Chairman, I think the gentleman should say he yields to the gentleman from Illinois.

Mr. EVINS of Tennessee. Mr. Chairman, I yield 5 minutes to the distinguished gentleman from Chicago, Ill.

Mr. YATES. Mr. Chairman, it is still the gentleman from Illinois.

The CHAIRMAN. The gentleman from Illinois is recognized.

Mr. YATES. Mr. Chairman, I thank the gentleman for yielding to me and for recognizing the fact that Chicago is in Illinois.

Mr. Chairman, I am an alumnus of this subcommittee, many of my happiest hours were spent in hearings with those who are now members and with the chairman of the committee. They are my friends and they are among the most able Members of the House. I question their judgment with trepidation. By and large, they have done a very good job on most of the bill.

I have honest differences with the committee on the housing portions of the bill and this is not unexpected nor unusual for each of us has his own ideas. But all of us who come from the large and great cities of the country know the validity of the statements made by President Johnson in his message to the Congress on the crisis in the cities when he said:

> For several decades, now, the tide has run against the growth, strength and vitality of our cities. Today, America's cities are in crisis. This clear and urgent warning rises from the decay of decades—and is amplified by the harsh realities of the present.
>
> We see the results dramatically in the great urban centers where millions live amid decaying buildings—with streets clogged with traffic; with air and water polluted by the soot and waste of industry which finds it much less expensive to move outside the city

*May 8, 1968*  CONGRESSIONAL RECORD — HOUSE  **12237**

than to modernize within it; with crime rates rising so rapidly each year that more and more miles of city streets become unsafe after dark; with increasingly inadequate public services and a smaller and smaller tax base from which to raise the funds to improve them.

If the promise of the American city is to be recaptured—if our cities are to be saved from the blight of obsolescence and despair—we must now firmly set the course that America will travel. There is no time to lose.

There is no time to lose.

The gentleman from North Carolina speaks of the great amounts of money which are still unobligated and unused by the Department of Housing and Urban Development. I believe his figure was $21 billion. This is a large sum, but still it is far from adequate for the purposes of the programs it relates to.

The gentleman from Massachusetts [Mr. BOLAND] made this point very cogently on page 16 of the hearings, where he questioned Secretary Weaver. He said:

The figure of $37 billion includes everything, all types of programs?

Secretary WEAVER. Yes.

Mr. BOLAND. That is, the total to assist individuals and communities. But this really isn't too significant a figure when we start to attack some of the problems of the cities themselves that we are trying to solve now; is that so?

I repeat, there is no time to lose, Mr. Chairman.

That is a great deal of money, I will agree with the gentleman from North Carolina, but it is still only a drop in the bucket to what must be expended if the promise of the cities is to be recaptured.

How much is it worth to build decent, slum-free neighborhoods in which to raise our children and decent housing? How much is it worth to us to provide schools in which all our children may receive quality education? How much is it worth to us to have safe streets to walk, to have air and water free from pollution, to have streets unclogged by hordes of traffic vehicles?

In short, how do we stop the flight of our young married people from the cities to the suburbs? How do we keep them in the cities?

We are moving much too slowly. We are moving too slowly in respect to appropriations, too, I would say to the gentleman.

Yes, the war in Vietnam and the whole Military Establishment have limited the funds available for civilian purposes, but our goals for the cities are still worthy and necessary goals. The life, the culture, the vitality of America's great cities must be saved and must be fostered.

How much is this going to cost? Certainly it will cost a great deal more money than the $21 billion which the gentleman from North Carolina says now is in HUD. Certainly it will cost a great deal more money than is contained in the tables which are found on page 15 of the hearings of this committee.

But funds or lack of funds is only a part of this picture. Of equal importance is the fact that these programs are bound down by enormous redtape and by the complex mechanics of achieving our goals.

The gentleman from North Carolina referred to the footdragging of the Department. I believe that in some measure this is true, but I have found the leaders of the Department of Housing and Urban Development to have been cooperative and are sincere in their efforts to try to achieve the goals of the legislation.

The CHAIRMAN. The time of the gentleman from Illinois has expired.

Mr. YATES. Mr. Chairman, will the gentleman yield me another minute?

Mr. EVINS of Tennessee. Mr. Chairman, I yield the gentleman 3 additional minutes.

Mr. YATES. I thank the gentleman.

Thus, I believe it is the cities as well that have been dragging their feet. The cities have to develop the primary thrust to implement these programs. Unless they move quickly, unless they move strongly to implement the programs they must fail, because the Federal Government cannot do it by itself.

But the cities, too, are prisoners of procedure. They are prisoners of compulsory legal processes, of laying out plans, of local consultations in neighborhoods, of eminent domain proceedings, of consultations with engineers and city planners and architects, of having to resolve disputes and arguments in order to come to some plan.

But the fact remains that we must move, and quickly, because time is running out. Procedures must be speeded up.

And funds are still needed. The funds which are available, to which the gentleman from North Carolina referred, are still inadequate to deal with the problems of the cities in the fields in which housing and urban development are concerned.

I would not, speaking for myself, have cut the model cities appropriation, as did this subcommittee, by almost 25 percent. I would not have cut the rent supplements program by approximately 40 percent. I think these programs are desperately needed by the cities today, and I think they should be corrected.

Mr. ANNUNZIO. Mr. Chairman, will the gentleman yield?

Mr. YATES. I am glad to yield to the gentleman from Illinois.

Mr. ANNUNZIO. Mr. Chairman, I thank my colleague for yielding and associate myself with his remarks.

Mr. Chairman, we are considering H.R. 17023, an appropriation bill of vital importance—a bill which can bring decent housing and a healthy environment for hundreds of thousands of families in slums and blighted areas. It is a bill which will permit scores of large and small communities to rebuild slums or blighted neighborhoods into healthy neighborhoods where people can live meaningful lives.

I, and many of us, would have been pleased if the Appropriations Committee, however, we are aware of the requested for the Department. At the same time, however, we are aware of the responsibilities they faced this year. I do not question the action of the subcommittee or that of the full committee. They have acted in the best interests of the Nation.

I urge you to support the funds voted for the model cities program and the rent supplements program. The model cities program is the first Federal program for treating the whole range of physical, economic and human problems of slums and blighted neighborhoods.

The model cities program permits the use of existing Federal programs, including a wide range of housing programs, in a frontal attack on these areas and remake them into social and economic assets. It permits the use of Federal, State, local, and private resources to attack human and physical blight. Seventy-five cities are now developing their first year action plans of their 5-year overall plans. Seventy more cities will be selected this summer to start the model cities process.

I urge you to support the committee's recommendation of $500 million for the model cities program.

This bill also provides funds for the rent supplement program which enables poor families to live in decently privately-owned housing. This is a program which serves families whose incomes are low enough to qualify for public housing and this is the program which was endorsed by the National Association of Real Estate Boards and the National Association of Home Builders.

The rent supplement program utilizes the resources of private enterprise to build, own, and manage new or rehabilitated housing. The low-income families or individuals pay 25 percent of their income toward the required rent. The difference between the amount paid and the rental as approved by the FHA is paid monthly as a supplement to the project owner. For next year, the committee has recommended $25 million in new contract authority, substantially less than the original request.

Both the rent supplement program and the model cities program are what I consider "must" items, if we are sincere in our efforts to upgrade the quality of living for millions of our fellow Americans.

Mr. JOELSON. Mr. Chairman, will the distinguished gentleman yield to me?

Mr. YATES. I yield to the gentleman from New Jersey.

Mr. JOELSON. I certainly agree with the gentleman on the desirability of funding the full amount of the budget request, but I did not get the opportunity before, because I was called out, to acknowledge that the gentleman from North Carolina [Mr. JONAS] has a very valid point about all of the money lying around unused. In the city of Paterson, N.J., which I represent, there has been money available for urban renewal and because of a very unfortunate local situation, there has been inaction. Although we need a lot of money, what is equally important is that we need dedicated people who will be willing to cut through the redtape and do the job needed. I think the gentleman from North Carolina is doing a service in pointing this out.

Mr. YATES. I thank the gentleman. The cities must appreciate and assume responsibility to speed up their own programs so that, together with the Federal

Government, they may accomplish the goals set forth by the Congress in this legislation.

Mr. BOLAND. Mr. Chairman, will the gentleman yield?

Mr. YATES. I yield to the gentleman from Massachusetts.

Mr. BOLAND. I thank the gentleman for yielding.

Mr. Chairman, I want to associate myself with the remarks of the gentleman in the well.

In the time that I have served in the Congress he has always been an eloquent spokesman for the cities. The gentleman understands the problems of the cities and he has understood them over the years. As a matter of fact, 14 years ago, when I first joined the Subcommittee on Independent Offices of the Committee on Appropriations, which was then chaired by the very great and distinguished and beloved chairman, the gentleman from Texas, Mr. Thomas, I recall so well so many of the fights that the gentleman from Chicago waged in regard to public housing. At that time it was a terribly significant part and one of the most important programs that faced this subcommittee.

The CHAIRMAN. The time of the gentleman from Illinois has expired.

Mr. EVINS of Tennessee. Mr. Chairman, I yield 5 minutes to the gentleman from Massachusetts [Mr. BOLAND].

Mr. BOLAND. The gentleman from Illinois states the case for the cities well. He is able and articulate and eloquent in stating his deep interest and concern for the cities and their problems.

There have been some figures given with respect to public housing, and they are used in this report and appear somewhere in the hearings, indicating that we have built or will build by the end of this fiscal year some 787,000 low-income public housing units. That is a very impressive figure—if you say it fast and do not relate it to the need. The fact, of course, is that there are some 6 million substandard houses in the United States. The Federal Government got into the matter of public housing back in 1937, with the passage of the Housing Act. In that year the program was first authorized after the Federal Government expressed a willingness to do something about substandard housing and to provide adequate new housing for low-income families. Now, if you divide the number of units by the number of years, it just comes to some 2,500 units per year. I submit that this is a dismal record in low-income housing.

I could not agree more with the gentleman from Illinois that we have to make a start in this program. There is a crying need to meet the problems now confronting the cities. Indeed, we must meet these problems. If you are going to accomplish anything significant at all, we have to implement the recommendations of the Kerner report.

I note that a few weeks ago the Senate Committee on Banking and Currency did report out a housing bill which starts to strike out in the direction of solving some of the housing problems in the ghettos. There is no question about the fact that we are not going to get rid of the prob-

lems of the ghetto unless we start to solve the problems of housing, of unemployment, of education, of welfare. These are the four areas of greatest concern.

This committee, because of the sense of responsibility shown by both its majority and minority members, is beginning to unravel these four knotty problems. I hope we can continue this progress. We have the model cities program, but we have not provided the full amount in this particular legislation because there was a judgment made by this committee that the model cities program cannot develop that rapidly. The $300 million that Congress appropriated last year is still available to HUD for allocation to the communities for the model cities program, but cannot be distributed to them until they have completed their planning requirements. The community planning phase, it is estimated by HUD, will take from 6 months to 1 year, and the first round of 75 model cities participants were announced by Secretary Weaver only last November. Therefore, HUD has not only the $300 million appropriated by Congress last year, but will have an additional $500 million recommended by this committee, for a total of $800,000,000 when this bill clears Congress. The members of the Appropriations Committee well know of my concern for the success of the model cities program, I want it to succeed.

Mr. YATES. Mr. Chairman, will the gentleman yield?

Mr. BOLAND. Yes; I yield to the gentleman from Illinois.

Mr. YATES. Mr. Chairman, the gentleman from Massachusetts has been one of the great champions of the programs pertaining to our cities over the years and I am delighted that he is a member of this subcommittee. In addition, the gentleman from Massachusetts has had the opportunity to see some of these programs implemented.

Mr. BOLAND. I appreciate the kind remarks of the gentleman from Illinois [Mr. YATES]. Let me say to the gentleman from New Jersey [Mr. JOELSON] that he has also been a champion in the Congress in this area. However, there have been problems and delays. A lot of this does not rest alone with the Federal Government. There are many reasons for delays.

Mr. Chairman, I suppose we are better off by going slowly, because, by doing so, the people involved in the program may not be unduly upset, and in the end we may accomplish a better job.

Mr. Chairman, the Secretary of the Department of Housing and Urban Development, Secretary Weaver, has done an outstanding job in pulling his Department together. He has been ably assisted by Under Secretary Robert C. Wood.

They have brought into the Department some of the most able men they could find, with experience in their particular field; namely, Philip N. Brownstein, Assistant Secretary for Mortgage Credit and Federal Housing Commissioner; Raymond H. Lapin, President of the Federal National Mortgage Association; Don Hummel, Assistant Secretary for Renewal and Housing Assistance; Charles M. Harr, Assistant Secretary of

Metropolitan Development; H. Ralph Taylor, Assistant Secretary for Demonstrations and Intergovernmental relations; Dwight A. Ink, Assistant Secretary for Administration; Thomas C. McGrath, Jr., General Counsel, and formerly our colleague here in the House of Representatives from New Jersey; Ashley A. Foard, Deputy General Counsel; William B. Rose, Deputy Under Secretary for Policy Analysis and Program Evaluations; Thomas F. Rogers, Director, Office of Urban Technology and Research; L. Edward Lashman, Assistant to the Secretary for Congressional Services and Andrew Hickey of Congressional Services; John M. Frantz, departmental budget officer and Nathaniel J. Eiseman, deputy departmental budget officer.

Mr. Chairman, I am going to insert in the RECORD at this point two excellent editorials published by the New York Times and the Washington Post today, urging no further cuts beyond Appropriations Committee recommendations for rent supplements and the model cities programs.

[From the New York Times, May 8, 1968]

A VOTE FOR THE CITIES

The House of Representatives is scheduled today to consider the bill to provide money for several agencies, including the Department of Housing and Urban Development.

In deference to demands to restrain spending until the Federal deficit can be brought down to a tolerable size, the House Appropriations Committee has made substantial reductions in the sums requested by President Johnson. But in assessing the housing programs, the committee has also shown a commendable effort to recognize the severity of the crisis in the nation's slums.

The result is a defensible compromise. The sum of $25 million recommended for the rent supplement program and of $500 million for model cities is in each instance one-half or less of the sum proposed by the President. If the Vietnam war were over, we would urge a much bigger expenditure for these programs. But at least the committee has funded them at higher levels than last year and thus would make possible useful experimentation and gradual expansion until the time comes when it will be possible to move ahead on urban social problems on the scale that their magnitude actually requires.

The danger now is that a conservative coalition in the House will seek to cut these appropriations still further either through an across-the-board reduction by some arbitrary percentage or by knocking out the rent supplement money entirely. The animus in Congress against the latter program is difficult to understand and impossible to justify.

The program is a promising attempt to involve private enterprise in the rehousing of the poor. It is also an effort to get away from the stark, institutional quality of public housing projects. Those who benefit from the program are the very poor who cannot pay an economic rent and whom society will have to subsidize in one form or another if they are ever to have decent homes.

Fiscal responsibility does not require further cuts in these programs, and social responsibility demands that they be continued and strengthened.

[From the Washington Post, May 8, 1968]

ESSENTIAL URBAN BILLS

There are no panaceas for urban problems. But surely the House of Representatives can contribute significantly to the quest for solutions by passing the Model Cities and Rent Supplement appropriation bills when they come up for a vote today.

The appropriation for rent supplements, only $25 million as against a request of $65 million, is important because it would provide more housing for each dollar spent than in other programs designed to aid the poor. Last year Congress prevented the rent supplement program from going forward by killing a $10 million appropriation. Surely it would be shortsighted to reject again a program which promises to enhance efficiency.

The Model Cities program concentrates assistance to more than 3 million people who live in the most blighted areas of about 70 cities. President Johnson asked for $1 billion, and the Appropriations Committee recommended $600 million. No further cuts should be made in programs which promise to improve life in the restive urban slums.

Mr. BARRETT. Mr. Speaker, will the gentleman yield?

Mr. BOLAND. I am glad to yield to the gentleman from Pennsylvania.

Mr. BARRETT. Mr. Chairman, I wish to associate myself with the remarks relative to the gentleman in the well. They were very much deserved and I concur in everything which the gentleman has said about the need for harmony and the question of providing decent and sanitary housing to all homes for everyone in America.

Mr. WYMAN. Mr. Chairman, will the gentleman yield to me?

Mr. BOLAND. I yield to the gentleman from New Hampshire.

Mr. WYMAN. I would like to ask the gentleman from Illinois one question. The gentleman says we are moving too slowly with respect to appropriations for the conditions which exist in our cities.

Mr. YATES. I do not know whether I said that. If I did, I think we can still use more money in the appropriations for our cities.

Mr. WYMAN. If the gentleman will yield further, that is not my question.

Mr. YATES. I think the programs for the cities are going too slowly because——

Mr. WYMAN. Where would the gentleman get the additional money?

Mr. YATES. You could get $165 million from the model cities program, for instance, and perhaps money from other sources.

Mr. WYMAN. In terms of priorities, would the gentleman just let the other matters go, or would he take the $165 million out of the Treasury despite the fact that we now have this huge deficit?

The CHAIRMAN. The time of the gentleman from Massachusetts has expired.

Mr. JONAS. Mr. Chairman, I yield such time as he may consume to the gentleman from New Hampshire [Mr. WYMAN].

Mr. WYMAN. If the gentleman from Illinois will remain in the well for just one moment, I would like to pursue a question. What would the gentleman, in terms of priorities, say is least important, that can be cut out, so we could find this $165 million which he says is needed for this purpose. Would he take it out of the model cities program or would he just add it on to the national debt?

Mr. YATES. For one thing, I would vote for a tax increase. For another thing, I would phase over a longer period of time programs such as the highway programs that are chargeable to appropriations. I would phase out over a longer

period of time the development of the SST. I would think the defense appropriation for civil functions could stand a significant cut. And, further, I would say that some of the agricultural programs could very well be reduced.

Mr. WYMAN. The gentleman knows that the highway program is carried on under a trust fund operation.

Mr. YATES. I referred to that portion which depends on appropriations.

Mr. WYMAN. What the gentleman is saying then is that in establishing his order of priority he would accord to our cities and the needs of our cities a higher priority than he would to these other items?

Mr. YATES. I would say that there is no higher priority in our country today than the need for our cities and the people who live in them. Does that answer the question asked by the gentleman?

Mr. WYMAN. I understand that is the position of the gentleman but, continuing for just one moment, there has been much to do in the last few days about reducing Federal expenditures by $4 billion, or $5 billion or $6 billion, and reducing appropriations for fiscal year 1969, which are now before us, by $10 billion; and there are some who would like to reduce it by $14 billion.

Mr. JOELSON. Mr. Chairman, would the gentleman yield?

Mr. YATES. I did not hear the question asked by the gentleman.

Mr. WYMAN. I would like to finish, and then I will yield to the gentleman.

In meeting this challenge—which directly involves the national solvency, is it the position of the gentleman that for the city programs there should be no reduction whatsoever, although in the Department of Housing and Urban Development there is more than $20 billion backed up and unspent?

Mr. YATES. According to the gentleman from North Carolina, it is $21 billion. Did the gentleman say $37 billion?

Mr. WYMAN. The gentleman did not say $37 billion in HUD.

Mr. YATES. All right; the $37 billion appears in the table, I believe. If $21 billion is backed up in HUD then the answer to that is that many of these programs were initiated within the last 2 or 3 years, they are just getting underway. They are undergoing the preliminary requirements to get the programs moving.

Second, the very complex procedure established by Congress in this legislation that must be applied at that local level. It is enormously time consuming. I would say that within a few years the $21 billion backlog will be used up, and we will need much more money.

Mr. WYMAN. At that time it would be in order for us to make additional appropriations if justified. What I am trying to get across to the gentleman as a member of the Subcommittee on the Department of Housing and Urban Development, I can observe to the gentleman that they just did not make a case for anything more than $500 million in the model cities program.

Mr. YATES. I read all of the committee testimony, and may I say that I had the honor to serve on this subcommittee for 14 years, and I have some knowledge

of the programs. The point I am making is that the problems in our cities do comprise the paramount problem of our country today. Sufficient funds, even a surplus quantity of funds, must be made available to the cities in order to deal with these problems.

Mr. EVINS of Tennessee. Mr. Chairman, will the gentleman yield?

Mr. WYMAN. I yield to the gentleman from Tennessee.

Mr. EVINS of Tennessee. I want to commend the distinguished gentleman from Illinois, and to say that I agree with him that the problems of our cities— the crisis of our cities—constitute the No. 1 problem of our country today. I emphasized this in my opening remarks but I did not say it as eloquently as the gentleman has done.

Mr. WYMAN. I thank the gentleman.

Mr. EVINS of Tennessee. I commend the gentleman for his statement.

Mr. JOELSON. Mr. Chairman, would the gentleman yield?

Mr. WYMAN. I yield to the gentleman from New Jersey.

Mr. JOELSON. Mr. Chairman, if the gentleman would like to know where we could get an extra $150 million, we can get it today from the space program, because I believe, rather than guided missiles, we have to have guided values in this country. I would also forgo rockets to prevent rickets, and I would forgo sophisticated missiles for educated people. And I say we do need priority, but we are spending almost $80 billion for the military, and nobody can convince me there is not fat and waste there. I do not want to see urban renewal by molotov cocktails. I want to see this House exercise responsibility.

Mr. WYMAN. I want to assure the gentleman that I do not want to see urban renewal by molotov cocktails either, but I hope the gentleman will call his schedule of appropriations to the attention of his administration through which all priority requests come to Congress. Apparently this has not been done.

Mr. YATES. The administration requested $1 billion for model cities. Only $650 million was authorized. I will say to the gentleman that—I respect the judgment of the committee, but in my opinion at least $600 million should have been made available.

Mr. WYMAN. The administration also requested certain such sums as $4.5 billion for the space program, the same one to which the gentleman from New Jersey just referred.

Mr. YATES. I will say to the gentleman that I agree with the action of the committee in reducing funds made available for that program.

Mr. JONAS. Mr. Chairman, I yield myself 1 minute.

Mr. Chairman, I did not get into the colloquy that has just ended, but I would very respectfully say to my friend from Illinois—and he is my friend—we have not agreed on all subjects, but we have agreed on many, when we served together on the subcommittee, that I believe the danger today would be that this $500 million will be reduced instead of increased.

The gentleman has not forgotten the trouble this program has had in the past

and the difficulty we have had in getting a compromise figure through this body.

That is why I am surprised when the gentleman keeps talking about this being a small appropriation. I think it is the most you can hope to get through this branch of the Congress.

Mr. YATES. Mr. Chairman, will the gentleman yield?

Mr. JONAS. I yield to the gentleman.

Mr. YATES. I thank the gentleman for his remarks. Apparently then a reduction was made because they thought that in this way they could get the whole program through the House rather than on the basis of what is considered necessary for the program.

Mr. JONAS. No; I must correct the gentleman on that. The committee recommends all it believes can be programed efficiently next year.

Mr. BOLAND. Mr. Chairman, will the gentleman yield?

Mr. JONAS. I yield to the gentleman.

Mr. BOLAND. Did my distinguished friend, the gentleman from North Carolina, at the time he was talking about the $21,500,000 carryover, insert that table in the RECORD?

Mr. JONAS. I referred to the table and at the appropriate time, after the Committee rises, I will ask permission to include it in the RECORD.

Mr. BOLAND. I thank the gentleman. I think it is an important table.

Mr. JONAS. Mr. Chairman, I yield 5 minutes to the gentleman from Missouri [Mr. HUNGATE].

Mr. HUNGATE. I should like to make crystal clear, Mr. Chairman, where I stand on this problem.

I do not think the No. 1 problem in America is cities. I think the No. 1 problem in America is people. While many live in our cities, remember, some of these people live in the country. It was developed in debate the other day that only 47 of the congressional districts now are more than 20 percent rural.

But those people, I submit, are just as important as any other people.

I speak as one who has voted for agricultural appropriations along with my friend, the gentleman from Iowa [Mr. GROSS].

I speak as one who has supported appropriations for rent supplements along with my friend, the gentleman from Illinois [Mr. YATES].

Mr. Chairman, I congratulate this committee on the fine job I think it has done in getting down to the business of the country. They have cut billions from this bill. The amounts requested are what is necessary for these programs, and yet they eliminate many things that might be desirable but which perhaps we cannot at this time afford.

I think it has been asked, How are we going to halt the flight of people from our cities to the suburbs? I suggest that the answer is not by starving those people on the farms.

I hope that we can understand both of these problems. When people do not make a living on the farms, you know where they go—they go to the cities and to the suburbs and add to the overcrowding there and the housing problem and

the overcrowded schools. They will need jobs, they will need more job training.

I think we must all try to understand both of these problems, urban and rural. I have looked at the press reports and the recent reports on the needs of the cities and industrial States and what they are doing for themselves. I just happen to read that in conjunction with how the support went on the agricultural appropriation.

I see that in many of our urban areas and industrial States they do not have an income tax to help themselves to fight these appropriation problems. This includes States such as Connecticut, New Jersey, Illinois, Maine, Ohio, Pennsylvania, Rhode Island, Texas, and Washington. Some 16 Members from those States opposed agricultural appropriations. I predict many of them will support this Federal aid. I would suggest in our financial crisis, we must help people wherever they are and we cannot keep talking about the best way to do it, while postponing action.

I urge everyone to vote for this bill today in the form that the committee has reported it out after careful study, hearings, and deliberations.

I think in the future, I would suggest to all our friends, that it is not only the farmers who should pull in their belts. Some of these urban and industrial States or cities that now get by without any income tax may be expected by some of the rest of us to pass a State or local income tax devised at the local level to help meet these urban problems.

Mr. JONAS. Mr. Chairman, I yield such time as he may consume to the gentleman from Alaska [Mr. POLLOCK].

Mr. POLLOCK. Mr. Chairman, the small appropriation for Alaska native housing contained in the bill appropriating funds for the Department of Housing and Urban Development will begin an important and vitally necessary program for the poorest and most neglected of our fellow Americans.

Two years ago the Congress authorized a housing assistance program specifically designed to meet the needs of the Alaska native. The reason for such a program is twofold—the need because of extreme poverty and the complete inability of existing programs to satisfy this need.

The Federal Government many years ago declared that it had a special responsibility for American's aboriginal people. Despite this responsibility, the conditions existing in Alaska's native villages can be described only by comparing them with villages in undeveloped foreign nations. There is nothing like it anywhere else in this country. The President's recent message on the American Indian in general stated that "most Indian housing is far worse than the housing in many slums of our large cities." Alaska's native housing is even worse than that of Indians in general and the problems is made worse by the harsh climate.

A study has been made recently of housing in the Yukon-Kuskokwim Delta region of southwestern Alaska. Median family income in this area, according to the last census, was a little over $1,400. Nine hundred households with about

5,200 members in 28 villages were surveyed. Two-thirds of the houses had only one room, and one half had less than 300 cubic feet of living space per person. Another study relating to the spread of tuberculosis considers a volume of less than 600 cubic feet per person to be very crowded and dangerous. Most houses are of frame or log construction and are without ventilation or normal sanitary facilities. A 1966 report by the Bureau of Indian Affairs stated that 97 percent of the Indian, Eskimo, and Aleut housing in Alaska is substandard. In the Bureau's opinion, the housing of the Alaska native is the worst of any group of people in the United States.

The effects of this situation on the people can readily be imagined. The health problem alone is gigantic. Today the average age of all Americans at death is about 70 years. By contrast, the average age at death of the Alaska native is 35, exactly half that of his fellow citizens. Infant mortality is astronomical. One-quarter of all native deaths are infants, and those who survive their first year risk serious disease or crippling illnesses. The rate of mental defects is high, and more than one-half of these deficiencies come from infectious diseases incurred during the first year of life.

Millions of dollars are spent annually by Federal and State authorities to improve native health. Success, however, cannot be achieved until the home environment is improved. Many natives are successfully treated for ailments in Public Health Service hospitals, only to be sent back to the same living conditions that caused the trouble in the first place. Decent housing is essential to improved health.

The program before you today is desperately needed to achieve the goals of a better life for Alaska's natives. Present programs are not suited to the job. This was pointed out in the committee report on section 1004, Senate Report No. 1455 of 1966. The cash income of most native people is far too low and erratic to enable them to take advantage of existing finance programs. Moreover, existing programs require minimum construction standards suitable to the rest of the country, but absolutely unattainable in rural Alaska. This program is designed to fit the specific remote Alaska situation, a situation so poor and deplorable that it cannot even reach up to the minimal standards of the normal programs for the poor.

The State of Alaska will operate this program and bear all administrative costs. Every penny of Federal money will go toward home construction. Self-help on the part of the homeowner will be an important part of the program. While grants are allowed, State authorities will make outright grants only where necessary. Loans will be made whenever the recipient can pay. The community must have some economics viability and each village to be eligible for this housing must have a community improvement plan.

Mr. Chairman, this appropriation is only $1 million. To the Alaska native, however, there is nothing that is more important. It is a matter of keeping faith with those for whom we have declared a special responsibility. I urge that our

promise, long neglected, not be broken now. I urge an affirmative vote on this bill.

Mr. EVINS of Tennessee. Mr. Chairman, I yield 3 minutes to the distinguished gentleman from West Virginia [Mr. HECHLER].

Mr. HECHLER of West Virginia. Mr. Chairman, I would like to commend the chairman of the subcommittee for the approach taken during the hearings in considering the budget and appropriations for the Interstate Commerce Commission. The gentleman from Tennessee has been a longtime friend of public passenger rail service in this Nation and revealed by his very penetrating questions during the hearings his appreciation of the issues involved.

However, Mr. Chairman, I was shocked by the answers that the Chairman of the Interstate Commerce Commission, the Honorable Paul J. Tierney, gave to some of the questions. For example, on page 521 of the hearings, when the subcommittee chairman commented on the need for setting certain minimum standards of passenger service, as discussed by ICC Examiner John S. Messer in the Southern Pacific case, Mr. Tierney responded:

There is a serious question as to whether or not the Commission has the power to require a certain type of service.

I think when the Chairman of an independent regulatory commission like the Interstate Commerce Commission prejudices a case as he has, he should disqualify himself from consideration of and passing on the recommendation made by Examiner Messer.

I invite this committee's attention to other examples revealed in the printed record of the hearings, indicating that Chairman Tierney appears to have a closed mind on the issue of passenger rail service. At page 513, in his prepared general statement to the subcommittee, Chairman Tierney boldly predicts:

Since September 1, 1967, 45 train-off notices have been filed. We anticipate increasing filings in this area during 1968.

Chairman EVINS expressed concern in the hearings that new mergers might result in abandonment of service to the public, and Chairman Tierney's best response was:

I would expect that as time goes on and as they study their situation, we could anticipate perhaps some requests for abandonment.

Again, when Chairman EVINS asked "Can't the Commission make some firm provisions in their orders that these points will be served," Chairman Tierney was evasive and negative in his response:

I think it would be difficult, Mr. Chairman, because conceivably some time in the future a very good case under the law could be made for an abandonment of a particular segment of the line. There may be no public need for it. So I don't think that we could say at the time the merger was being consummated that we would require the service thereafter at all points involved.

I submit, therefore, that the Chairman of the Interstate Commerce Commission appears to have fallen down on his job as a guardian of the public interest.

Such a lackadaisical attitude toward the protection of the public interest does not represent what we would expect from the chairman of a body established to protect the public interest.

Mr. PELLY. Mr. Chairman, will the gentleman from West Virginia yield?

Mr. HECHLER of West Virginia. I yield to the gentleman from Washington. He has taken an active interest in the preservation of good railroad passenger service.

Mr. PELLY. Mr. Chairman, I appreciate the gentleman from West Virginia yielding so that I can associate my own views with his with regard to the responsibilities of the Interstate Commerce Commission.

I was highly gratified to read in the Report of the Committee on Appropriations on this bill that this great committee of the House is pleased that the Interstate Commerce Commission is becoming more responsive to the needs of the general public in directing improvements in service in rail and other transportation. I, too, am pleased.

I hope the Commission will uphold a recent examiner's report which takes the position that the railroads should be required to maintain adequate passenger rail service, including both short- and long-haul trains with food and sleeper facilities.

The country must have fast, frequent and low-cost public transportation. We have excellent passenger trains that serve the Pacific Northwest, such as the Empire Builder, the North Coast Limited and the City of Portland. Other areas should have similar service and ours should be continued.

Mr. HECHLER of West Virginia. I appreciate the comment of the gentleman from Washington. Although the committee report does say—

The committee is pleased to note the Commission is becoming more responsive to the needs of the general public in directing improvements in service.

The report also significantly adds:

The Commission is commended and encouraged to take further action in this direction.

I would like to ask the chairman of the subcommittee what he feels the role of the Interstate Commerce Commission should be.

Mr. EVINS of Tennessee. Mr. Chairman, will the gentleman yield?

Mr. HECHLER of West Virginia. I yield to the gentleman from Tennessee.

Mr. EVINS of Tennessee. I do not feel that the role of the members of the Interstate Commerce Commission should be negative, or merely to say, "You can't do this," or "You may abandon this." I think they have an affirmative role to demand mandatory action by the railroads in many of these cases. I, like the gentleman from West Virginia, was pleased with the examiner's report. I have urged the Commission, if necessary, to appeal the question to the courts, to have a test case, so to speak. I think the Commission has affirmative duties as well as negative duties.

Mr. HECHLER of West Virginia. I very much appreciate that comment of the gentleman from Tennessee, because it is

unfortunately true that all too often the Interstate Commerce Commission has been weak kneed in its efforts to protect the public interest. Certainly the Chairman of the Commission should speak out and act more aggressively on behalf of the public interest.

Mr. EVINS of Tennessee. Mr. Chairman, I yield one minute to the gentleman from Virginia [Mr. DOWNING].

Mr. DOWNING. I thank the Chairman.

Mr. Chairman, I note the committee deleted the sum of $500,000 for the construction of a sea wall at Wallops Island. Wallops Island is the smallest and the most economical and the most efficient facility in the entire NASA setup. In fact, it has been said that this little station produces for the taxpayer, more "bang for the buck" than any in the NASA stable of facilities.

Wallops Station is located on an island which is on the ocean side of Virginia and Maryland. It is subject to serious erosion, an erosion which threatens to cut the facility in two. In all honesty, I cannot tell you it will happen this year or next, but if we get a severe storm, there is a distinct possibility that the island could be cut in two. For that reason they asked for $500,000 for the sea wall.

I am not going to offer an amendment to restore this amount, but I would ask the committee between now and the time you go to conference with the other body that you would investigate this and see if what I have said is true. If it is true, perhaps at that time you will consider reinstating this sum of money. In my opinion, the sea wall is necessary to preserve this facility.

Mr. EVINS of Tennessee. Mr. Chairman, I yield 2 minutes to the distinguished gentleman from New York [Mr. RYAN].

Mr. RYAN. Mr. Chairman, I should like briefly to comment on two issues raised by the independent offices appropriation bill. One is the question of the appropriation for NASA, and on that I should like to commend the chairman and the committee for their very thorough analysis of the program.

The bill appropriates $4,008,225,000 for the National Aeronautics and Space Administration. This is $21.8 million less than the authorization figure adopted by the House on May 2.

Although I must confess some surprise that the Appropriations Committee has not cut deeper into this program as was widely expected, I think their approach is reasonable under the circumstances.

I want to call attention once again to the Nerva nuclear-rocket engine program. This is an extremely important issue, not merely because of the funds requested this year, but precisely for the long-range implications of the program which are so often cited in arguing for its presumed importance. The administration had requested $60 million for NASA's portion of the joint NASA/AEC program, and the House refused to authorize any more than $11.7 million of the request. For this reason no amount of the appropriation in excess of $11.7 million may be utilized for Nerva.

However, it is believed that strong pressure will be exerted by the Senate to restore the authorization close or up to the amount originally requested. I want to call this to the attention of the conferees and point out the importance of this issue. Beyond the fact that there is no mission requirement for this hardware program and that long-range plans for its use are highly debatable, the technical aspects and the matter of feasibility are still in question. There is a general tendency throughout the technical industry to cut hardware too soon, and I think this is one of the contributing factors to the severe cost escalations, which have come unfortunately to be taken for granted, and the high rate of technical failures which are tolerated too easily considering their enormous cost to the taxpayers.

As for the second issue, there is nothing more urgent, there is no higher priority than the conditions facing us in our major cities. At last I think Congress is beginning to recognize this. I regret the fact that the bill before us does not include full appropriations to the extent of the authorizations for the model cities program, the rent supplement program, the low-rent public housing program, neighborhood facilities grants, and other critical areas.

The model cities program offers an opportunity to bring to bear various techniques and methods in a coordinated attack on the very substantial problems of our cities, not only housing, but the sociological problems as well, the underlying conditions which have led to the disorders which have marked so many of our cities.

If our decaying cities are to be saved, then our affluent society must devote sufficient resources to the task.

The President's Commission on Civil Disorders recommended construction of 600,000 units of low- and moderate-income housing a year. That is not an extravagant amount. That is a reasonable amount. The jobs in housing bill—H.R. 16266—which I have cosponsored, would build 3 million low- and moderate-income units over a 4-year period.

The appropriation process should not be used to starve programs already authorized. This has been the sad history of the public housing program which in 1949 authorized construction of some 810,000 units which have yet to be completed.

The Housing and Urban Development Act of 1965 provided additional authorizations of $47 million in each fiscal year 1966 through 1969 for low-rent public housing, making possible new public housing construction of an additional 60,000 units each of the 4 years. The proposed Housing and Urban Development Act of 1968 would increase the authorization by an additional $100 million on the date of enactment and by an additional $150 million on July 1, 1969, and July 1, 1970, to increase the possible rate of new construction to 155,000 units annually. If such an accelerated public housing program is to begin, it is crucial that existing authorization be fully funded.

The new rent supplement program is suffering from the same underfunding that has plagued public housing.

There are currently 2,734 completed rent supplement units, another 16,108 units are under construction, and some 23,500 are in planning. That is a total of 42,342 units in one stage or another. The Housing and Urban Development Act of 1965 originally provided for a total of $150 million in rent supplement contributions over a 4-year period—$30 million, fiscal year 1966; $35 million, fiscal year 1967; $40 million, fiscal year 1968; and $45 million, fiscal year 1969. However, in fact, only $42 million of this authorization has been utilized thus far. The history of this program is sadly typical of the fate of urgently needed domestic legislation. The administration request was for $65 million; this was further reduced in committee to $25 million; $108 million is available. In terms of housing units, this cutback reduces the rent supplement program by some 90,000 badly needed low-income units, which could be easily absorbed by New York City alone.

Similarly, the model cities program is starved for funds. This program, if adequately funded, could begin to regenerate entire areas of our cities. If we fail to provide the funds, the model cities program will become just another half-measure, which falsely raises the hopes of urban residents.

Last year, the administration's request was for $667 million. This was more than cut in half, and the Congress finally allotted $310 million. As the mayor of New York City remarked, "this entire amount is needed to regenerate one slum area in New York City alone."

The present available authorization for model cities is $650 million. The administration has proposed that the authorization be increased in fiscal year 1969 and fiscal year 1970 by $1 billion each year. It is, therefore, critical that the existing authorization be fully funded, so that the program may move forward. The Appropriations Committee, unfortunately, is recommending only $500 million an amount equal to what is expended in Vietnam in a single week.

Why is it that expenditures for critical human needs are so often seen by a majority of this House as the most expendable?

The Committee on Appropriations has seen fit to reduce the budgetary request for the Department of Housing and Urban Development by more than 50 percent—from $3.015 billion to $1.229 billion. The two most critical new programs, rent supplements and model cities, have also been reduced in committee at least 50 percent.

I certainly hope that this bill will not be cut further. Let us begin to recognize the responsibilities of a great nation to save its cities.

Mr. BARRETT. Mr. Chairman, I wish the bill before us provided the maximum authorization for the housing and urban development programs so vitally needed in our urban areas. It is heartening to see that the Appropriations Committee has at least voted some funds for such programs as the model cities program and the rent supplement program. These two programs have an almost limitless potential in helping us toward our twin goals of rehabilitating our cities and

providing the decent housing which our low-income families can afford and which they so desperately need.

On the other hand, Mr. Chairman, it is disheartening that the bill before us does not appropriate the maximum funds which could be made available under existing legislation and under the President's requests. For example, the committee has authorized only $25 million for the rent supplement program when the President requested $65 million. Similarly, the model cities program authorization falls substantially short of what could be authorized under existing law. Mr. Chairman, all of us in this body believe in economy and believe in the prudent use of our resources. Neither party nor any single Member has a monopoly on our common objective to use our Federal resources efficiently and for the best possible effect.

The thing that concerns me, Mr. Chairman, is that too often when people speak of economizing, unfortunately they seem to want to do so too often at the expense of our low-income families. In my judgment, this is the worst possible area in which to economize. Our urban crisis is now a stark reality before the Nation. Our urban problems and the problems of our urban poor cry out for solution and relief. The model cities program and the rent supplement program, which we fought so hard to create, provide the tools to make our urban environment better places in which to live and to provide the community facilities and the low-cost housing which our people need.

Mr. Chairman, I urge the full funding of these vitally needed programs and if it cannot be done on the House floor here today, I deeply hope that the ultimate conference report following joint Senate and House action will contain the maximum funds possible under existing law for these urgently needed housing and urban development programs.

Mr. RONAN. Mr. Chairman, the Appropriations Committee has submitted for our approval today an enormously important bill which includes appropriations for the more than 100 Federal programs that deal with the problems of urban America.

The programs of the Department of Housing and Urban Development and the legislation before us are concerned not just with clearing the slums and housing the poor, we are dealing with funds that help colleges build dormitories to house their burgeoning populations; construct water and sewer facilities in small towns; aid in urban planning; and promote open space and stimulate research into the problems of tomorrow.

The committee has reviewed the President's requests and acted prudently in reducing or deferring programs where possible. I believe we owe the committee our appreciation, and their diligence and expertise warrants our consideration.

According to some newspaper reports, an effort will be made in this House to cut back the $500 million which the Appropriations Committee has recommended for the model cities program.

I hope my colleagues will join with me in resisting any attempt to undercut a program that has been aptly described

*May 8, 1968*                    CONGRESSIONAL RECORD — HOUSE                    12243

as the most promising of all the activities now underway to rehabilitate our cities. It is an imaginative program. It is a resourceful program. It gives the cities the opportunity to try new approaches and demonstrate new techniques in building better housing and supplying community facilities that are so sorely needed.

In a sense, it may be the incubator for a brand new concept in seeking workable solutions to the problem of urban blight and all communities will profit from the lessons learned in these demonstration projects.

We cannot afford to ignore the promise of this program. Let us join with our colleagues on the Appropriations Committee in supporting adequate funds for the model cities program.

Mr. FRASER. Mr. Chairman, I want to add my support to the full $500 million appropriation for model neighborhoods. The Appropriations Committee has already reduced the President's request for model neighborhoods and any further cuts would seriously cripple this key urban program.

Under the committee's recommendation, the 75 cities with model neighborhood planning grants will be able to move from planning to act. The recommended appropriation will also aid the 65 to 75 new cities that are about to qualify for planning grants.

As a representative of an urban area, I am well aware of this program's potential. My district, Minneapolis, Minn., is currently developing a model neighborhood proposal with a $255,000 planning grant. Minneapolis is requiring the widest possible citizen involvement in the development of the model neighborhood plan.

Just recently, 99 members of the Minneapolis Model Neighborhood Policy and Planning Committee were selected in a general election open to all residents of the project area. A stipulation was made that 80 percent of the members of this committee would have to be residents of the model neighborhood area. Out of this 80 percent, at least half would have to be low income and/or minority. The remaining 20 percent of the committee would be composed of model neighborhood area business and institutional representatives who need not be residents of the area. The formation of this committee will be completed when eight teenage members are chosen by youth groups in the area.

This committee will have more than an advisory function. The official Minneapolis model neighborhood agency, the Minneapolis City Council, has stated all programs related to model neighborhood will be forwarded to the council solely through the policy and planning committee. This means that in addition to developing its own proposals, the committee will have a veto power over any proposals offered by city department heads or city planners. I feel it is extremely important for local residents to have this direct role in developing programs that affect them. Too often in the past, citizen groups have felt that these programs were imposed on them by agencies that did not have a full understanding of community needs.

By involving community residents directly in development of a wide range of coordinated, concentrated urban programs, model neighborhoods represents the best hope for the solution to the problems of our cities. The future of hundreds of American cities are at stake today. We must fulfill our responsibilities to these communities by approving this appropriation.

Mr. HOLIFIELD. Mr. Chairman, I am deeply disturbed to learn that the Appropriations Committee has recommended a cut of 24 percent in the $77 million requested by the President for civil defense. The appropriation which continues the shelter program was actually cut even deeper, 54 percent, from $21.6 million requested by the President to the $10 million recommended by the Appropriations Committee. If these cuts are allowed to stand, the civil defense appropriation for fiscal year 1969 will be far less than the minimum required to continue the program at the lowest possible sustaining rate.

With Russia's nuclear strength increasing both absolutely and relative to ours, and China developing a nuclear capability at an alarming rate, this is not the time to cut back our strategic defenses.

For a number of years, the Department of Defense has studied the subject of nuclear attack and defense. As a result of intensive inquiries into this subject, both the present civilian and military authorities of our Defense Establishment, and their predecessors, reached agreement on the importance of a fallout shelter program to our strategic defense, and the protection of our military manpower and civilian population.

This country is now going ahead with the installation of an anti-ballistic-missile system which, together with fallout shelters, would save tens of millions of lives. The cost of the shelter program is relatively small, yet this is where the cuts in the appropriation have been the most severe.

The Federal civil defense program and the cooperating State and local civil defense organizations have already proven their worth in the many natural and man-caused disasters that have affected almost every State in the Union during the past few years.

If the cut in civil defense funds is allowed to remain, the Federal, State, and local civil defense organizations will be seriously weakened, and our people will suffer.

Mr. Chairman, I strongly urge the restoration of the full amount requested for civil defense.

Mr. LEGGETT. Mr. Chairman, I would like to ask support today for appropriations for the U.S. Department of Housing and Urban Development as reported to us by the Appropriations Committee. In view of the heavy demands on our budget this year, the committee was obliged to make reductions in the amounts requested. I ask you to accept its judgment and pass this bill which so vitally affects the well-being of our urban areas. I would call to your attention two items which I consider of crucial importance in our effort to meet the needs of our cities—both large and small—the request for the promising model cities program, and the request for rent supplements.

The model cities program has brought a new ray of hope into the lives of slum dwellers and into the lives of city administrators who are trying to meet their needs. This program offers the opportunity for a city to pull together and coordinate the full range of urban aids to upgrade large blighted areas. Emphasis on coordination and local flexibility will cut out the waste caused by fragmentation and insure a greater return on the Federal dollar. We cannot afford to snuff out the hope and enthusiasm alive in the 75 cities now planning for the program and the 70 other cities that will be named this year. I ask you to vote for the $400 million requested for program grants and the $100 million asked for urban renewal projects in model cities.

Also vital to the model cities and to other urban areas is the rent supplement appropriation. Our appropriations for this program last year were painfully inadequate. At a time when 20 million Americans are living in substandard housing, this program offers us an opportunity to combine Federal subsidy with the efforts of the private sector to meet the housing needs of low-income families. Thirteen thousand units have already been built under this program; private and nonprofit sponsors are lined up waiting to build more. Give them that chance, vote for the full $25 million rent supplement appropriation.

Mr. MACHEN. Mr. Chairman, we are considering today appropriations for Housing and Urban Development for the coming fiscal year. The Appropriations Committee has already done the most difficult job of trimming the original requests and given us a lean, but solid bill that would enable us to meet the most urgent needs in urban areas. I would particularly call your attention to the provisions for two of the most promising urban aid programs in recent years—the model cities program and rent supplements.

Both of these programs represent innovative approaches to the hard core problems of inner city areas and provide maximum opportunity for using the talents of the private sector.

Seventy-five cities of various sizes across the country are now drawing up a 1-year action program and a 5-year plan for a concentrated attack on the physical, social, and economic problems of blighted neighborhoods. Another 70 cities will receive model cities planning grants this year. The key to the model cities program—the element that makes it so useful is not just the possibility of extra Federal funds, for actually model cities funds are only a small percentage of Federal money already available. The key is that the cities themselves will have the chance to produce a program to meet their individual needs, and to try new ideas.

At the same time the model cities approach eliminates the fragmentation and overlapping that has too long dissipated urban efforts. The result will be a more effective local effort and a better use of the Federal urban aid dollar. The $400

12244 CONGRESSIONAL RECORD — HOUSE *May 8, 1968*

million in model cities supplemental funds and the $100 million for urban renewal projects in model neighborhoods proposed in this bill are sound investments in the future of urban America.

Rent supplements is a unique means for involving the private sector in providing the huge amount of low-income housing needed in this country. It is flexible because it supplements income until the family can afford to pay the market rate for decent housing on its own. Despite our shabby treatment of this program in the past, it has already provided decent housing for 13,000 low-income families. I would point out to you that the appropriations figure for rent supplements now before Congress, calls for a 60-percent reduction over the original request. At a time when 10 percent of our population are living in substandard homes, I ask you to vote the full $25 million for this program.

Mr. VANIK. Mr. Chairman, I am very much in support of H.R. 17023, the Independent Offices and Housing and Urban Development appropriations bill of 1969, as reported out by the House Appropriations Committee. Although this appropriation does not include the expansion in the housing program set forth in this year's authorization bill, it is a critical program and must be supported.

The city of Cleveland is moving forward on a "Cleveland Now" program which depends very much on the outcome of the Housing and Urban Development appropriation.

This legislation appropriates $1½ billion for the model cities program of which $200 million will go to the 70 cities already in the program.

The hopes of our community hinge on the $200 million reserve for additional cities. The remaining $100 million in the bill is allocated to complete urban renewal programs around the Nation.

The proposal provides $25 million for additional rent supplement programs, $15 million above last year's program. While this annual outlay appears modest, it does provide for an annual commitment for the 30- or 40-year life of a rent supplement guarantee. Thus, a $25 million commitment over a 40-year period could become a total commitment of a billion dollars in the life of the program.

The revitalization of Cleveland depends critically on the adoption of the recent supplement program which appears to be the best way of involving the leadership and partnership of private enterprise in the rebuilding of our cities.

Although the city of Cleveland is a prime beneficiary of this appropriation, almost every municipality in the metropolitan area is involved and vitally affected by the outcome of this legislation which provides help to most of the communities in the metropolitan area. We must resist the attack of those who are indifferent to urban problems which threaten every metropolitan area.

Mr. BUTTON. Mr. Chairman, I rise in support of the HUD appropriations, fiscal year 1969, now before us. I submit that it is especially vital for this House to support full funding for the model cities and rent supplements programs. Any

further cuts in these two programs, I believe, would seriously hamper constructive efforts being made at the local level in attacking the desperate problems of the slums. Anything but full funding would also be contrary to, and fly in the face of, the findings of the Commission on Civil Disorders.

The results of the uniquely devised model cities program have yet to be felt, simply because the program has not had time to be implemented. But I am convinced this highly promising plan for our cities, large and small, can make real headway given a chance.

The Model Cities Act was one of the first pieces of legislation to call for maximum participation of private enterprise in the effort to rebuild our cities. The skills and resources of our greatest national asset—private enterprise—have been enlisted in the model cities program, and should be given our support.

The mustering of talent, all the leadership that a community can command, was a strong factor, I believe, in the decision by HUD to award a model cities planning grant to the city of Cohoes in my district.

I recently received, Mr. Chairman, a letter from Paul G. Van Buskirk, director of the model cities agency for the city of Cohoes.

The letter from Mr. Van Buskirk emphasized that—

An important concept of the Model Cities Program is involving the people being served, in the development and execution of the program.

And, he says:

We have realized that one of the basic reasons why past programs have not had the effect they should is that we did not fully understand the needs and effects on the area the program was to serve.

The former Secretary of Health, Education, and Welfare and now chairman of the Urban Coalition, said it another way in an article appearing in the May 6 issue of the New York Times, asserting that stability in American cities would not be established "until we bring into the same conversation all significant leadership elements that hold power or veto power in the life of the community."

Mr. Chairman, the model cities program embraces this concept fully. In fact, it is weighted heavily as a criterion in approval of a planning grant application.

Mr. Van Buskirk makes an impressively detailed case, Mr. Chairman. He described the historical and unfortunate lack of attention given to our growing cities over the past 60 years, and the need for concentrated effort now to avoid greater cost in the future. He points to the model cities requirement of coordinating presently fragmented programs to produce better results. He calls for our Nation to accept a strong position of world leadership in solving domestic problems. And in urging that the full appropriation for model cities be approved, he states that—

Many public and private agencies have participated in programs in the past, but have become frustrated when they were not fully funded or when the appropriation was in-

sufficient to make any impact in solving problems.

Because Mr. Van Buskirk's letter makes such good sense, and because it raises questions critical to the direction our country is taking in facing up to our domestic problems, I am inserting it in the RECORD at this point and commend it to the close attention of all Members of this House:

CITY OF COHOES, N.Y.,
*May 3, 1968.*
Hon. DANIEL E. BUTTON,
*House of Representatives
Washington, D.C.*

DEAR CONGRESSMAN BUTTON: I have recently read that the House of Representatives will consider the appropriation for the Model Cities Program on May 8, 1968. I wish to take this opportunity to inform you of the effect I believe this important appropriation will have on the City of Cohoes, a recipient of a Model City Planning Grant, and all other cities throughout the nation, as well as the nation itself.

The problems that face our cities today are the result of a lack of foresight, and the lack of concern of society and our political subdivisions over the past 40 to 60 years. While our cities were growing and being maintained, we failed to take action in the fields of air pollution, water pollution, water resources, city planning, zoning, housing and building codes, education, job training, health, social and physical rehabilitation, housing, civil rights, equal opportunities and several others. Over the years these problems grew, and became so interrelated, that it has even become difficult to analyze them. Today, the only means of solving them is the complete mobilization of all public and private resources, each sharing in the responsibility not only to correct these problems, but to maintain the machinery to see that they do not reoccur. Unfortunately, these difficult problems emerge today as national problems that affect the entire nation. The cost of a solution today is many times what it would have been 40 or 60 years ago. I believe this nation is honest enough to admit its shortcomings and make a concentrated effort today to eliminate some of its ills, so that future generations will not be burdened with a cost that will be much greater than that which we face at the present.

Prior to the Model Cities Program, our federal government did with foresight, and a strong sense of awareness, provide programs to solve some of our national problems. Some of these programs are social security, urban renewal, housing, water pollution control, health, education and several others. In most cases these programs were fragmented while our problems are interrelated. One of the concepts of the Model Cities Program is to coordinate the present fragmented programs economically, physically and socially, so that they will produce more effective and efficient results in solving our national problems. I believe we will find that coordinating the present programs under the Model Cities Program will increase their productivity immeasurably.

In the City of Cohoes many of these programs are presently being developed but have not been executed. These programs are: Urban Renewal, Code Enforcement, Demolition, Housing, Neighborhood Facilities, Water Pollution Control.

We now have the opportunity under the Model Cities Program to show that the programs can be effectively and efficiently implemented under Model Cities and will have a greater impact on social and physical rehabilitation, business and industry, employment, physical environment as well as the sound development of our city.

The Model Cities concept also realizes that

Case 3:22-cv-00410-REP   Document 41-6   Filed 02/22/23   Page 29 of 145 PageID# 1335

every community has different problems or different approaches to solving similar problems. This gives communities the opportunity to develop programs that do not exist and may only apply to the needs of their particular community.

Another important concept of the Model Cities Program is involving the people being served, in the development and execution of the program. We have realized that one of the basic reasons why past programs have not had the effect they should is that we did not fully understand the needs and effects on the area the program was to serve. In implementing the Model Cities Program, our country will demonstrate its ability to mobilize all resources and all segments of society will accept their responsibilities in solving our national problems.

We must also consider the fact that our nation has accepted its position as a world leader and we must be able to set an example to the rest of the world in our leadership and capability in openly solving our domestic problems. At this time, we should close ranks to demonstrate this important example.

We only have to read the recommendation of the report of the President's Commission on Civil Disorders to understand the immediate importance of implementing these recommendations and of extending our energies in solving these difficult problems.

Many public and private agencies have participated in programs in the past, but have become frustrated when they were not fully funded or when the appropriation was insufficient to make any impact in solving problems. It is essential, in order for the Model Cities Program to be successful, that the full appropriation before the House be approved.

Out of the greatest concern for our nation and our community, I am requesting on behalf of the people of Cohoes, that you, as our Congressman, use all of your influence, energies and efforts to obtain approval for the full appropriation for the Model Cities Program.

Yours truly,
PAUL G. VANBUSKIRK,
*Director.*

Mr. DONOHUE. Mr. Chairman, this bill before us, H.R. 17023, is both of unusual scope and complexity, covering, as it does, recommended appropriations for some 20 independent executive agencies and offices and the vitally important Department of Housing and Urban Development.

The distinguished chairman and the esteemed Appropriation Committee members truly deserve the full gratitude of this body for their dedication and diligence in preparing this bill, and the able managers of both sides merit our unanimous appreciation for their studied and painstaking efforts to clearly explain the meaning and effect of the provisions in this bill.

I know the measure, in its entirety, will be given careful examination by the Members, but I would like to urge that the most concentrated attention and sympathetic consideration be particularly granted to the appropriations suggested for the Department of Housing and Urban Development because I very deeply believe it is of imperative urgency for us to ensure the Department's wholesome program for model cities, urban planning, urban renewal and their related activities be adequately funded for full operation. The committee, I think, made what they felt was a fair compromise recommendation, but it is my

conscientious conviction that a recommendation should have been made and this House should approve, today, the maximum unfunded authorization for the model cities program—$650 million.

Over the past several weeks our appropriation action today in the model cities area and associated programs has become increasingly significant to the unity of this country and our people since it does reflect the true measure of our response toward curing a disease that is threatening the very foundation of our society.

Whatever varying thoughts we may have about the unhappy violence and destruction that recently occurred in so many cities around the country, I think it is universally and unmistakably clear that this Congress has the grave duty of doing everything in our power to correct, as soon as possible, the underlying causes of this great American tragedy.

The vehicle through which this cure and correction can be most effectively carried out is approval of the full appropriation of urban program assistance to our cities which, without our adequate Federal aid, will be left, like the poor feel themselves to be now, without any hope of help in a vital task, of National interest, that is obviously beyond their individual capacities.

May I further say that inadequate funding action might well become one of the greatest imprudences of modern history since it would undoubtedly generate new and higher despair and frustration among great numbers of our people throughout this Nation.

Let me please remind you that when this Congress passed the original model cities bill, it was making practically an inherently binding promise not just to a comparatively few cities that might come to be afflicted with riots and property destruction, but to all those numerous cities qualified for assistance on the basic grounds of low-income population, adequate housing shortages, and associated standards.

At the present time, hundreds of such cities all over the country have invested much time and overtime of community officials and expert volunteers, together with community money, to apply and be approved for this assistance, and this includes my own home city of Worcester, Mass., which has a nationally recognized reputation for community cooperation, and dedication, and for efficient accomplishment in planning, and fulfillment of development programs. If this House withholds endorsement of full funding for the basically qualified and approved city applicants, it will be tantamount to a contradiction and betrayal of the words and promises that were enacted into law less than a year ago.

Mr. Chairman, I again most earnestly exhort my colleagues here to resoundingly register their approval of the administration's full appropriation request for the model cities program to enable my community, and all other qualified communities, to participate in a humane projection wisely designed to grant all of our citizens of whatever race or color or circumstance the opportunity to rightfully share in our National heritage and

to enable this country to truly fulfill, in domestic tranquillity, its destiny of leadership in a world at peace.

Mr. GALLAGHER. Mr. Chairman, I rise today in support of the Appropriations Committee recommendations for Independent Offices and the Department of Housing and Urban Development. I am particularly concerned with funds recommended for the model cities program and the rent supplement program.

As the President recently said:

America's cities are in crisis. This clear and urgent warning arises from the decay of decades—and is amplified by the harsh realities of the present.

Model cities and rent supplements can act to bring this urban decay to a standstill and to provide the setting for transforming our cities into places of beauty and hospitality.

But this job cannot be done by the Federal Government alone. The decay of our central cities cannot be cured by simply injecting massive doses of Federal money into the heart. Success can only come through a deep involvement and commitment by the private sector in the rehabilitation and redevelopment of our urban cores. Private industry, labor, business, and people must look at America's cities as not only a challenge, but, equally, as a new opportunity.

Mr. Chairman, the committee has recommended a total appropriation for model cities of $500,000,000—$400 million in supplemental grants and $100 million for urban renewal connected with the programs. This figure is a cut of $150 million from authorized funds. However, in the face of a serious budget deficit and other problems with the economy, I feel that this is a realistic and responsible figure. Hopefully, the President's full request can be filled by a supplemental appropriation. The funds recommended by the committee are above last year's level.

The model cities program is designed to show how a city, regardless of size, can be transformed and improved to give its citizens a chance for a better life. It calls for a comprehensive attack on social, economic, and physical problems in selected blighted and slum areas. In New Jersey, three cities have already been approved for planning grants and I am confident that other cities in New Jersey will be named for planning grants in the second generation of the program. Model cities is certainly in the vanguard of the new approach to urban problems.

The rent supplement program stands as a key element of the landmark 1965 Housing and Urban Development Act. It helps to provide decent housing for low-income families without the traditional resort to public housing projects. The program utilizes nonprofit, limited dividend or cooperative associations as housing sponsors. Basically, the rent supplement program provides rental payments to private landlords to supplement the potential rent payable by a low-income family, thereby allowing the low-income family to live in housing which otherwise would be too expensive.

Mr. Chairman, it is estimated that by the year 2000, 40 million more people will be living in our already overcrowded

cities. The facilities of these cities are already overextended and strained to the point of breaking. We must begin now to rejuvenate our cities if we are to not be overtaken by the rush of time and people. I ask my colleagues to vote favorably on these recommended levels of funding.

Mr. BOW. Mr. Chairman, we have heard a great deal today about the problems of many thousands of Americans who have inadequate housing and the need for prompt action to improve the situation.

The Housing and Urban Development Department is said to be searching for new methods of constructing low-cost homes for the poorly housed, even to the extent of spending some $10 million in research and technical development.

One solution to the problem has already been researched thoroughly by Joel S. Stahl, of Youngstown, Ohio, and has been demonstrated to the satisfaction of all concerned in various other parts of the world. Mr. Stahl's proposal should receive much more serious attention than has yet been given it by HUD officials.

I include for general information an article on this subject which appeared in the Youngstown Vindicator, April 28:

ONE THOUSAND TWO HUNDRED FIFTY DOLLAR HOUSE—LOW-INCOME HOUSING'S SOLUTION?: JOEL STAHL SAYS PLASTIC KEEPS PRICE SO LOW

(By Glenn Morris)

Homes for low-income families, building for the poor, housing for the needy—whatever the label, it has been called the most pressing problem facing the American society.

Joel S. Stahl, a plastics engineer and technical consultant who is international in scope and based in Youngstown, has an idea he thinks can help solve the gigantic task, and he's trying to interest Washington in it.

By combining plastics and other common building materials, Stahl says, it is possible to build a basic one-room house of 200 square feet with all essential equipment and meeting building codes for $1,250, or a three-bedroom model of 800 square feet for $3,500, both excluding lot.

This would put home ownership within reach of just about everyone wanting it, he says.

None of the materials nor the system are new. What is new is his idea of using them in concert, he says. Also new is the country's concern to replace slum housing under the leadership of the federal government, with private business' help, and aiming at six million units in the next decade.

SEEKS FEDERAL HELP

Stahl is trying to get his idea aboard the vehicle of federal experimental housing programs. Congressman Frank T. Bow last week was officially miffed because officials of the Department of Housing and Urban Development didn't adopt Stahl's ideas immediately when he presented them in January. Stahl is still trying.

Basic to Stahl's concept is a house consisting of 4-by-8-foot sandwich panels, forming the walls and joined into modules that, like human body cells, can be clustered to create houses of almost any size.

While many materials will suit, Stahl's demonstration panel consists of two sheets of asbestos cement board one-eighth of an inch thick, separated by insulating plastic foam. The edges are wrapped in aluminum extrusions linked by H-shaped channels. The exterior side is coated with small chipped stones that easily withstand weather and create an attractive, varied appearance. The interior side is printed to resemble wood wall

paneling. The wall is about three inches thick. Stahl's firm, Stahl Industries Inc., has a patent pending on the process for making the sandwich panels.

In the process, electric lines, plumbing, heating and other utility systems are installed in the panels at a factory, where everything is assembled on an automated line, like cars at General Motors' Lordstown plant.

Then the houses are shipped as kits to the site. If the cement slab is ready, four unskilled men can erect the basic house in a day, half the time with some instruction, and occupants can move in the same day.

NOT MUCH INTEREST

Development of the house was taken abroad several years ago by Stahl because Americans weren't much interested in low-cost housing then. "People who needed low-cost housing didn't have the money and those who did weren't interested."

Stahl plunged into the remote, primitive jungle villages of South America to test how the products in his type of house could compete with government housing there. Against the government's structures of cement block and corrugated metal roofs, Stahl found his concept was competitive in price and superior in quality.

In March, Stahl and Ball Bros. Research Corp. demonstrated the ease and swiftness of erecting the house before the minister of housing in Jamaica. The official says the system may help solve his country's critical housing problem.

Today the attitude in the United States toward the need for low-income housing has changed dramatically and the drive to erradicate the slums intensified, Stahl notes. And Stahl says his house, because of its type of construction, will fit needs here as well as in hotter climates of South America and Jamaica, and carry similar prices.

So far, he notes, because of the relatively high cost of so-called "low-cost housing," few of these units will ever help the truly poor. And in conventional houses nowadays $15,000 buys only the minimum essential, and few are being built.

A few turnkey and rent-supplement projects are geared to eventual ownership he says, but the problem remains, how can home ownership be put within the reach of the truly poor? Stahl argues that his house is the answer.

NO SKILLED HELP

The low price on his type of house is the equivalent of a used car, he points out. For $1,250 the buyer can have a "starter set" that can be enlarged room by room as he can afford. The simple assembly makes the house a "do-it-yourself kit," he says; no skilled help is required on the site, to erect it.

Builders could hire unskilled people to work on home erection, thus easing the unemployment problem, Stahl says. Skilled tradesmen would work in plants making the housing kits, using their skills as they do now at conventional sites. But in the plant efficiency would rise and working time would be divorced from the weather, which is a major factor in outdoor production now. Buyers would gain the pride of home ownership that can change many attitudes.

Stahl says his answer to low-income housing would take the full apparatus of the housing industry-government, private developers, builders, cities, unions, etc. He envisions a public-private enterprise corporation, such as Comsat for space communications.

"So far," Stahl says, "housing programs have only brought a baffling welter of funds, agencies, bureaus, offices . . . but little housing. Why not a simple 'do it yourself' house package? Why not provide the necessary housing components to insure that a house can be built, if a man really wants one? Instead of trying to train inexperienced men in skills that may be beyond them (why not)

provide them with something simple enough that they can handle?

"This way, adequate housing could be produced in large numbers at controlled cost. A man could build his house shell with parts provided. He could complete the house to his taste at his leisure. Labor, private enterprise and government would be cooperating in a common task.

"In many places, this would restore the dignity of man of the house. He would then have a better chance to properly influence the minds of his young and train them to be responsible citizens. This is everybody's problem, everywhere, and time will not wait forever for the solution."

Plastics' use in housing has been Stahl's major concern since his firm began making mouldings here in 1950. He was born here, had attended South and Wilson high schools before graduating from Warren's Warren G. Harding High in 1935. He took a chemistry degree at Ohio State University in 1939, then joined Ashland Oil. In 1959 when Wasco Chemical Corp. bought his firm's plant, the company turned to specializing in technical marketing studies and production consulting. It has a staff of 15 with offices at 1200 Realty Building on Central Square and an international operation. Stahl, who is president, has been on two trade missions for the U.S. Department of Commerce, to Belgium in 1963 and the South Caribbean in 1966.

Among his clients have been Owens-Corning Fiberglas Corp., Stauffer Chemical, Johns-Mansville, Koppers Co. and Mitsubishi International of Japan.

Stahl has a film available on erection of his type of housing in the Jamaica demonstration. He will explain the system to the Society of Plastics Engineers May 8 in New York.

Mr. FRIEDEL. Mr. Chairman, the dual forces of blight and decay, nurtured by decades of apathy and disregard, have been the greatest contributors to what we now call the crisis of our cities. To overcome this crisis our efforts must be directed not only toward removing physical deterioration but also human deprivation.

As President Johnson has so correctly noted:

The cry of the city, reduced to its essentials, is the cry of a man for his sense of place and purpose.

So the task ahead is not as simple as constructing new buildings. It is good education, it is employment, it is decent housing. But let us not use the immensity of the task as an excuse for inaction.

We have made a significant beginning on reversing the trends of human and physical blight—the model cities program.

Today, over 70 communities throughout the Nation are making plans with model cities grants to rebuild decaying neighborhoods. Another 164 have applied for planning grants so they too can offer a better future for their citizens.

Unless we in Congress are willing to provide adequate funding for the model cities program, many communities—those with planning efforts now underway and those with applications pending—will be disappointed.

The struggle of these cities to reclaim blighted neighborhoods will have reached a barrier. We cannot let their efforts go unfulfilled. We cannot tell them that this Congress is unconcerned with their problems. We cannot turn away from the consequences of years of disinterest and disregard. Time has forged ahead

*May 8, 1968*     CONGRESSIONAL RECORD — HOUSE     12247

too rapidly while the pace of action has moved too slowly.

I urge my colleagues to join with me today in support of adequate funds for the model cities program. It is in the best interest of every community, every State, and of this Nation.

SUMMARY OF BUDGET AUTHORITY AND EXPENDITURE REDUCTIONS

Mr. MAHON. Mr. Chairman, this is the third regular appropriation bill of the session. The bill as reported from committee carries total new budget obligational authority—appropriations, essentially—of about $13.7 billion and represents a reduction of $2.9 billion below the budget requests.

The other two regular appropriation bills which the House has passed at this session—Treasury-Post Office and Agriculture—were also reduced below the budget requests. I will place in the RECORD at this point a table showing that the reductions to date on the three bills, including the one before us today, total $4.482 billion in new budget authority. The estimated impact on budget expenditures for 1969 would be a reduction of about $900 million, more or less, depending to some degree on just how the budget programs for the many items affected by the obligational reductions are precisely adjusted to comply.

The summary table follows:

NEW BUDGET (OBLIGATIONAL) AUTHORITY AND ESTIMATED EXPENDITURE REDUCTIONS IN FISCAL YEAR 1969 APPROPRIATION BILLS

[In millions of dollars]

| Fiscal year 1969 bill | New budget authority | | Reductions | | Budget expenditures estimated reductions [1] | |
|---|---|---|---|---|---|---|
| | Amount | Cumulative | Amount | Cumulative | Amount | Cumulative |
| Treasury-Post Office | 1,959.5 | 1,959.5 | −181.7 | −181.7 | −132.2 | −132.2 |
| Agriculture | 6,924.0 | 8,883.5 | −1,400.3 | −1,582.0 | −414.1 | −546.3 |
| Independent offices-HUD (committee bill) | 16,570.6 | 25,454.1 | −2,900.0 | −4,482.0 | −360.0 | −906.3 |

[1] Tentative calculation; subject to same refinement.

In the budget authority reductions of $4.482 billion made to date, $2.535 billion is represented by a reduction in participation certificate sales authority which, in the new budget, serves to augment the available budget authority. This new obligational authority did not increase budget expenditures for fiscal 1969, and its deletion from the budget will not reduce budget expenditures. But the reduction does reduce new budget—obligational authority—and does have a direct impact on the carryover into future years. It reduces what is commonly called the "pipeline" of unused, carryover obligational authority.

Aside from the participation certificates reduction, the reductions in the bill today are $790 million.

On the three bills, aside from the participation certificates reductions of $2.535 billion, the reductions total $1.947 billion in new budget—obligation—authority.

Mr. Chairman, on last Wednesday, the House Committee on Appropriations recommended a package looking to a total reduction by Congress below the budget requests for new budget authority for fiscal 1969, of not less than $10 billion, and a total reduction in budgeted 1969 expenditures of not less than $4 billion. These reductions would be from the 1969 Budget as submitted by the President to Congress last January. Certain limited exceptions were noted. The package also recommended a study looking to rescissions from unused carryover authority of not less than $8 billion.

THE PROBLEM OF ECONOMY AND RESTRAINT

It is easy, and there is a tendency, for Members of Congress and members of the press generally to talk somewhat glibly about vast reductions in appropriations and in expenditures. It is easy to do this if the figures are picked out of the air, so to speak, and are not related to specific items of appropriations for

projects and programs included in the budget.

Making the targets of $10 billion reduction in new budget authority and the $4 billion reduction in expenditures is not going to be easy. It will require much effort and some sacrifices, some foregoing of items desired by many Members. It may even be impossible to achieve the agreement of a majority of the Members of Congress on both sides of the Capitol to make these reductions. We will hope not.

We must bear in mind that House action is not the only factor to be considered. Action by the other body is also required. Very often, specific reductions made in the House are restored in the other body and very often the House, in the conference meetings, is compelled to acquiesce in part to the demands of the other body.

In discussing reductions in appropriations and expenditures, we must be careful not to talk about overall figures grabbed from the air, so to speak, without also thinking about the realities of legislation and keep in mind that reductions must come to rest against specific items, specific projects and programs, when the knife is applied. There is no such thing as economy in the abstract, but only in the specific.

FISCAL RESPONSIBILITIES OF THE CONGRESS

Another thing to which I think I should make reference is this: There are some Members who freely concede that Congress itself would not reduce fiscal 1969 appropriations, shall we say, by $14 billion, and fiscal 1969 expenditures by $6 billion, but who are inclined to say that the reductions can more or less easily be made by the executive branch of the Government. This is a great oversimplification. Since when has the executive branch come upon some magic, easy, painless way to economize that has

escaped the legislative branch? No; it has not. It is likewise difficult for the executive branch to make meaningful reductions. There is no painless, royal road to sharp reductions in spending.

We could all freely admit that a Member from an agricultural district might say that the Congress can, with relative ease, make reductions in expenditures and appropriations at the level of the highest figure suggested by eliminating or drastically curtailing programs which do not relate to a rural district. Likewise, a Member from a highly urbanized district might favor a program of reductions that would eliminate or drastically curtail programs which apply to nonurban areas. Approaching our fiscal decisions on any such basis would be sheer nonsense. Some balance, some compromise course is the only practical procedure.

Manifestly, reductions can only be accomplished by a majority of those voting in the House and in the other body. Reductions firmly supported by the Democratic leadership would have a better chance of acceptance than those not so supported. By the same token, reductions supported by the leadership of the minority party would have a better chance of adoption than if minority party support is unavailable.

For example, in the bill before us today, if the minority party, speaking reasonably for the minority position, wishes to submit amendments for reductions in the pending bill below reductions already made by the Committee on Appropriations, it is, of course, entirely in order to submit such amendments, and today is the day to offer any such amendments and test the sentiment of both the minority and majority on the issues involved. Of course, all Members are free to offer amendments.

Personally, I do not advocate amendments to increase or decrease the pending bill. I think the Committee on Appropriations, in the light of all the circumstances, has done a good job in working out a reasonably acceptable compromise and I would hope that majority and minority Members would support the compromise which this bill represents.

My only object in undertaking to clarify the situation is to make clear what I believe to be the most appropriate way to reduce appropriations and expenditures to the extent that the Congress as a whole may desire. It is the traditional way of putting the imprint of the Congress on the spending policies of the Government. It is our duty to decide how much shall be appropriated, and for what it shall be appropriated.

Mr. Chairman, I do not think it will be possible to secure the approval of Congress for a $6 billion reduction in expenditures and a $14 billion reduction in new appropriations, as has been variously discussed. As I have said, in my judgment making the $10 billion goal and the $4 billion goal will not be easy.

Of course, Mr. Chairman, I have voted against the authorization of many of the expensive and escalating programs which are now on the statute books, including several funded in the present bill. I am one who speaks from a position of re-

straint and economy in Government. But I cannot blind myself to the facts and realities of the situation. I know I cannot write the fiscal ticket altogether to suit my own views. No one Member can do that. But my plea is for fiscal sanity and commonsense and prudence in dealing with the issues before us.

We are in a very serious inflationary period. The dollar is under challenge at home and abroad. The budget is badly in the red—well in excess of $20 billion this year and perhaps as much as $25 billion next year without a tax bill. In these circumstances, the duty of economy and restraint is just not debatable.

THE BUDGET TOTALS IN PERSPECTIVE

Mr. Chairman, when we consider reductions of billions of dollars in appropriations and expenditures we must, for good perspective, also consider the general dollar dimensions of the areas from which those reductions must principally come.

NEW BUDGET AUTHORITY

As to new—obligational—authority, the January budget request is $201.7 billion, and only a 5-percent reduction—not a large percentage—would yield the $10 billion reduction goal recently recommended by the Committee on Appropriations. In that sense, $10 billion does not look to be a drastic reduction. But actually, the reduction of $10 billion would have to come from areas involving considerably less than $201.7 billion. I will insert a summary table that puts the $201.7 billion amount in some better focus in this respect, but perhaps the first thing to be said is that only about $141.5 billion of the $201.7 billion proposed for 1969 is required to be acted upon in bills at this session of Congress. Amounts for interest on the debt, social security, Federal retirement, and various other items will become available in fiscal 1969 on the basis of permanent appropriation provisions enacted in earlier years. Those exceed $60 billions of dollars.

Furthermore, as a very hard, practical matter, large areas of the $201.7 billion new—obligational—authority total involve objects and purposes very much fixed by provisions of various basic laws and thus are subject to very little discretionary control in the annual appropriation bills. Of course, Congress could change the basic laws and, for examples, drastically reduce social security, or public assistance grants, or various other programs. But there seems to be no likelihood that existing basic statutes will be repealed or revised downward to a meaningful degree if at all.

Let me be more specific.

Social security, medicare, and other so-called social insurance trust funds—funds held in trust—account for $46.1 billion of the $201.7 billion new budget—obligational—authority request.

Interest on the debt accounts for $14.4 billion.

Veterans' pensions, compensations, and benefits amount to $5.4 billion.

Public assistance matching grants under formulas set out in the basic laws are listed at $5.8 billion.

Farm price supports are basically determined under agricultural legislation,

and they show up at $3.4 billion. The basic laws under certain conditions require price supports on certain farm production.

The July 1968 pay increase installment provided for military and civilian employees in the pay act last fall is in the budget for 1969 at $1.6 billion.

Just the few items cited, Mr. Chairman, add to more than $75 billion.

Then, for national defense as classified in the budget, the January figure for new budget authority is $82.3 billion. Some reductions can be made, but drastic cuts are not in the realm of reality under present conditions.

It can easily be seen, then, that a good deal of the $10 billion reduction goal must come from a relatively narrow, or much smaller, slice of the $201.7 billion total.

Under leave to extend, I will include further statistics on this aspect:

NEW BUDGET AUTHORITY, FISCAL 1969

[From January budget, in billions of dollars]

| | Amount |
|---|---|
| 1. National defense | $82.3 |
| 2. Relatively uncontrollable civilian programs (that is, relatively uncontrollable through the annual budget and appropriations process without changes in the applicable basic laws), open-ended programs and fixed costs: | |
| Social security, medicare, and other social insurance trust funds | 46.1 |
| Interest | 14.4 |
| Civilian and military pay increase | 1.6 |
| Veterans pensions, compensation, and benefits | 5.4 |
| Public assistance grants | 5.8 |
| Farm price supports (Commodity Credit Corporation) | 3.4 |
| Postal operations | .3 |
| Legislative and judiciary | .4 |
| Other | 3.5 |
| Subtotal, defense and relatively uncontrollable civilian programs | 163.2 |
| 3. Relatively controllable civilian programs | 43.6 |
| 4. Undistributed intragovernmental payments (−) | −5.0 |
| Total, new budget authority proposed, 1969 [1] | 201.7 |

[1] Of which $141,500,000,000 of this normally requires action by Congress at this session. (See table 5 of budget for 1969.) The remainder would become available under provisions of various laws previously enacted (i.e., permanent appropriations for interest on debt, social security, and other trust funds, etc.).

Mr. Chairman, the $201.7 billion total of new budget—obligational—authority

proposed in the January budget represents an increase of about $15.2 billion over the total projected for the current fiscal year 1968, of which about $2.1 billion relates to funds that would become available without current action by Congress. The remaining $13.1 billion increase is in areas requiring action this session. I include a summary that puts some focus to the significance of the $10 billion reduction goal in relation to the current year base amounts:

NEW BUDGET (OBLIGATING) AUTHORITY PROPOSED IN THIS BUDGET FOR FISCAL YEAR 1969 OVER FISCAL YEAR 1968 (ROUNDED AMOUNTS USED)

| Item | Fiscal year 1969 compared to fiscal year 1968 |
|---|---|
| Available through current action by the Congress: | |
| Department of Defense and military assistance program (excludes defense share of the $1,600,000,000 pay increment effective July 1, 1968, listed below) | +$6,200,000,000 |
| Public assistance and payments to the medicare trust fund | +586,000,000 |
| Foreign economic assistance | +597,000,000 |
| Federal manpower activities (civilian agencies) | +442,000,000 |
| Office of Economic Opportunity (excluding manpower activities) | +163,000,000 |
| Atomic Energy Commission (largely new antiballistic missiles system) | +245,000,000 |
| Model cities program (full funding) | +688,000,000 |
| Military and civilian pay raises (July 1, 1968 increment under last year's pay bill) | +1,600,000,000 |
| Later transmittal (pending enactment of proposed legislation, including $445,000,000 for investments in certain international financial institutions) | +700,000,000 |
| Contingencies | +400,000,000 |
| All other (consisting of many increases and decreases) | +1,475,000,000 |
| Total increase through current action by the Congress | +13,096,000,000 |
| Available without current action by the Congress: | |
| Trust funds (principally social security) | +3,900,000,000 |
| Interest on the public debt | +900,000,000 |
| Other | −1,659,000,000 |
| Deduct interfund and intragovernmental transactions and applicable receipts from the public | −1,013,000,000 |
| Total, increase without current action by the Congress | [1] +2,128,000,000 |
| Total, budget authority increase | [1] +15,224,000,000 |

[1] Based on January budget totals.

BUDGET AUTHORITY REQUIRING CURRENT ACTION BY CONGRESS

[In millions of dollars]

| Description | 1967 enacted | 1968 estimate | | | 1969 estimate | | |
|---|---|---|---|---|---|---|---|
| | | Enacted | Supplemental needed | Total | Transmitted herein | Later transmittal | Total |
| Legislative Branch | 271 | 277 | 4 | 282 | 306 | | 306 |
| The Judiciary | 90 | 94 | 1 | 95 | 101 | 1 | 102 |
| Executive Office of the President | 29 | 31 | (*) | 31 | 33 | | 33 |
| Funds appropriated to the President | 5,112 | 4,718 | 10 | 4,728 | 5,763 | 566 | 6,329 |
| Department of Agriculture | 7,734 | 6,411 | 52 | 6,463 | 7,300 | 7 | 7,307 |
| Department of Commerce | 873 | 763 | 8 | 771 | 825 | | 825 |
| Department of Defense—Military | 71,943 | 72,112 | 800 | 72,912 | 79,182 | 75 | 79,257 |
| Department of Defense—Civil | 1,391 | 1,383 | 11 | 1,394 | 1,345 | | 1,345 |
| Department of Health, Education, and Welfare | 12,617 | 12,858 | 1,604 | 14,463 | 15,305 | 83 | 15,388 |
| Department of Housing and Urban Development | 6,402 | 3,330 | 25 | 3,356 | 3,387 | 40 | 3,427 |
| Department of the Interior | 1,586 | 1,592 | 29 | 1,621 | 1,724 | | 1,724 |
| Department of Justice | 408 | 417 | 47 | 465 | 465 | 80 | 545 |
| Department of Labor | 638 | 625 | 29 | 654 | 730 | 11 | 742 |
| Post Office Department | 1,215 | 962 | 212 | 1,174 | 920 | | 920 |
| Department of State | 395 | 389 | 1 | 390 | 418 | | 418 |
| Department of Transportation | 6,204 | 1,511 | 221 | 1,732 | 2,736 | 85 | 2,821 |
| Treasury Department | 931 | 921 | 13 | 934 | 1,016 | | 1,016 |
| Atomic Energy Commission | 2,199 | 2,509 | | 2,509 | 2,755 | | 2,755 |
| General Services Administration | 656 | 570 | 4 | 574 | 509 | | 509 |
| National Aeronautics and Space Administration | 4,968 | 4,589 | | 4,589 | 4,370 | | 4,370 |
| Veterans' Administration | 6,598 | 7,499 | 76 | 7,575 | 7,528 | 9 | 7,537 |

See footnote at end of table.

*May 8, 1968*        CONGRESSIONAL RECORD — HOUSE       12249

BUDGET AUTHORITY REQUIRING CURRENT ACTION BY CONGRESS—Continued

[In millions of dollars]

| Description | 1967 enacted | 1968 estimate | | | 1969 estimate | | |
|---|---|---|---|---|---|---|---|
| | | Enacted | Supple-mental needed | Total | Trans-mitted herein | Later trans-mittal | Total |
| Other independent agencies....... | 3,174 | 1,510 | 28 | 1,538 | 1,642 | 30 | 1,672 |
| Allowances for: | | | | | | | |
| Civilian and military pay increase................... | | | | | | 1,600 | 1,600 |
| Contingencies................ | | | 150 | 150 | ............. | 550 | 550 |
| Total, budget authority requiring current action by Congress.............. | 135,432 | 125,073 | 3,327 | 128,400 | 138,359 | 3,136 | 141,496 |

\*Less than $500,000.

Source: Table 5, budget for 1969.

### BUDGET OUTLAYS (EXPENDITURES AND NET LENDING)

Mr. Chairman, to many who are not familiar with the size and character of the many items making up the January budget spending total of $186.1 billion, it would seem that the $4 billion expenditure reduction goal recently recommended by the Committee on Appropriations is too low. It is equivalent to only slightly more than 2 percent. But because expenditures—disbursements—are the inevitable consequence of obligations incurred, and as I have indicated, great portions of the obligational authority budget are insulated from effective control at the appropriations stage, it follows, as night follows day, that much of the spending total of $186.1 billion for 1969 is beyond practical reach of effective reduction in the annual appropriations process.

To begin with, some $55 billion is estimated to flow from authority granted for prior years. Moreover, much of the total is more or less rigidly fixed and ordained by provisions of basic legislation, and unless those laws are repealed or revised, there is little discretionary control that can be exercised in the annual appropriation bills. Thus, as a hard, practical matter, the $4 billion must fall against areas of drastically less dollar magnitude than $186.1 billion.

Let me be more specific:

Social security, medicare, and other so-called social insurance trust funds—funds held in trust—account for $38.5 billion of the $186.1 billion January budget expenditure estimate.

Interest on the debt accounts for $14.4 billion.

Veterans pensions, compensations, and benefits amount to $5.2 billion.

Public assistance matching grants under formulas set out in the basic laws are listed at $5.7 billion.

Farm price supports are basically determined under agricultural legislation, and they show up at $2.9 billion.

The July 1968 pay increase installment provided for military and civilian employees in the pay act last fall is in the budget for 1969 at $1.6 billion.

Just these few items, Mr. Chairman, total some $68 billion.

Then, for national defense as classified in the January budget, the total is about $80 billion. We can work on that to some extent, and effect some savings, but not drastic reductions. But even that

total, according to the President's statement on March 31, will be revised upward by some $2.5 billion.

Thus, Mr. Chairman, the $4 billion expenditure reduction would of necessity fall principally, though not entirely, against programs and projects for which expenditures are estimated at approximately $40 billion in 1969.

Another way to measure the depth of a $4 billion expenditure reduction is to compare it against the $10.4 billion increase in estimated expenditures, 1969 over 1968, shown in the January budget. Let me list some summary figures:

*Estimated expenditure increase, 1969 over 1968 (January budget)*

                           *Billion*

Trust funds, net (social security, etc.) ----------------------- +$2.6

Vietnam war costs (does not reflect comparison of March 31 updatings) --------------------- +1.3

July, 1968 pay increase under previous legislation --------------------- +1.6

Interest on debt and public assistance grants ----------------------- +1.4

       Subtotal --------------------- +6.9

All other items, both defense and civilian (consisting of many pluses and minuses) -------------------- [1] +3.5

       Total ------------------- +10.4

[1] Thus, in great measure, a $4 billion expenditure reduction would fall against projects and programs involved in this net total—and thus, in the aggregate, would mean a slight net reduction below the fiscal 1968 total.

I include a table on this matter from the budget for 1969:

BUDGET OUTLAYS (EXPENDITURES AND NET LENDING)

[Fiscal years, in billions]

| Type of controllability | 1967 actual | 1968 estimate | 1969 estimate | Change, 1968 to 1969 |
|---|---|---|---|---|
| National defense.................................................... | $70.1 | $76.5 | $79.8 | +$3.3 |
| Relatively uncontrollable civilian programs (that is, through the appropriations process): | | | | |
| Open-ended programs and fixed costs: | | | | |
| Social security, Medicare, and other social insurance trust funds.... | 30.3 | 34.3 | 38.5 | +4.2 |
| Interest.......................................................... | 12.5 | 13.5 | 14.4 | +.9 |
| Civilian and military pay increase.................... | ............. | ............. | 1.6 | +1.6 |
| Veterans pensions, compensation, and insurance.................... | 4.9 | 5.1 | 5.2 | +.1 |
| Public assistance grants.......................................... | 4.2 | 5.2 | 5.7 | +.5 |
| Farm price supports (Commodity Credit Corporation)............... | 1.7 | 2.8 | 2.9 | +.1 |
| Postal operations................................................. | .8 | .7 | .3 | -.4 |
| Legislative and judiciary........................................ | .3 | .4 | .4 | (¹) |
| Other............................................................. | 2.4 | 2.7 | 2.8 | +.1 |
|      Subtotal, relatively uncontrollable civilian programs............... | 57.1 | 64.7 | 71.8 | +7.1 |
| Relatively controllable civilian programs, including outlays from prior year contracts and obligations........................................ | 35.2 | 39.0 | 39.5 | +.5 |
| Undistributed intragovernmental payments (–)....................... | –4.0 | –4.6 | –5.0 | –.5 |
|      Total budget outlays............................................. | 158.4 | 175.6 | 186.1 | +10.4 |

¹ Less than $50,000,000.

### APPROPRIATION BILLS YET TO BE REPORTED

Mr. Chairman, I think I can say to the House that in the remaining appropriation bills this year, the Committee on Appropriations, consistent with the announced goals, will bend every effort to make reductions wherever reasonably possible.

We have yet to consider the Labor-HEW bill, involving estimates of new budget authority of $18.1 billion.

The public works bill carries a request of $4.9 billion, including $2.8 billion for atomic energy. I should point out with respect to the public works bill that if we abandoned all new project starts the savings in appropriation for 1969 would only be about $27 million with consequent savings in spending for 1969 of some $15 million. It does not seem to me very wise for Congress or the executive branch to stop public works projects already well underway and incur the waste and the charge of mismanagement which would undoubtedly

ensue. It is not realistic to talk glibly about cutting public works, the so-called pork barrel bill, by hundreds of millions of dollars in the light of the facts which confront us. I do think, however, that we can make significant reductions in that bill.

The foreign aid bill is yet to be considered. Last year's appropriations for foreign assistance was $2.3 billion, the lowest ever. The House has not, of course, yet acted on the reauthorization bill. The appropriation request for 1969 is $2.9 billion. There is no doubt that the committee will recommend and the House will approve very sharp cuts in foreign aid.

The Interior appropriation bill is the next bill scheduled to be reported. It involves about $1.4 billion of requests. Manifestly, this bill cannot be reduced by hundreds of millions of dollars, but many reductions will be made.

The bill for State, Justice, Commerce, and the judiciary involves requests of

Case 3:22-cv-00410-REP   Document 41-6   Filed 02/22/23   Page 34 of 145 PageID# 1340

some $2.2 billion. Some savings can be made.

Other bills which will later come before us include the Transportation bill, the legislative bill, the District of Columbia bill, and the military construction bill.

The major bill this session, appropriationwise, is, of course, the annual Department of Defense appropriation bill. The January budget authority request for Defense, including the war, is $77.1 billion. There is no doubt but that a supplemental involving several billions of dollars will be before the Congress. The regular bill is scheduled for consideration by the House in late June. It is not feasible at the moment to project with any assurance what decreases or increases the Congress may decide to make in military spending before the session concludes.

Last year, in the regular Defense appropriation bill for 1968, the Congress made reductions in the total sum of $1.6 billion. I would hope that very substantial reductions can be made this year, but it is not possible to now pinpoint what may develop.

Mr. Chairman, my purpose in making these remarks is to lend some focus to the nature of the fiscal problem confronting us and to express a word of caution with respect to what Congress may be able to do in the way of appropriation and expenditure reductions during the current session. I earnestly hope that the goals which the Committee on Appropriations set on May 1 may be achieved. I would hope that we can do better, but we have a monumental task before us and we need to stay close to reality so that the chances for success in our efforts to promote economy may be enhanced.

Mr. NIX. Mr. Chairman, in his message to the Congress on housing and the cities President Johnson said:

The slum is not solely a wasteland of brick and mortar. It is also a place where hope dies quickly, and human failure starts early and lingers long.

It was to attack the multifaceted problems of the slum—poor housing, inadequate job and educational opportunities, and insufficient health care—that the model cities program was devised.

It offers cities the unique opportunity to declare wholesale war on the physical, social, and economic problems of a given neighborhood.

Response to the program has been enormous. One hundred and ninety-three cities applied for the 75 grants now in effect and 164 cities are vying for the second group of 70 to 75 grants that will be announced soon.

To these cities and to other urban areas which are looking to the model cities program for new solutions to problems, the cuts which this Congress imposed on the program last year were a bitter disappointment. We must demonstrate our concern for the problems of the cities and our intention to come to grips with them.

This year the President's budget called for $500 million in program grants and $500 million in urban renewal projects to finance the model cities effort.

Our Appropriations Committee has recommended $400 million in program grants and $100 million of the $150 million presently authorized for urban renewal in these areas. We must approve this recommendation. We cannot do less. We must not foreclose hope in the rehabilitation of our cities.

The House Appropriations Committee deserves the commendation of this body for recommending $25 million in new contract authority for the rent subsidy program.

While this falls short of the $65 million recommended by the President in his budget, it is nevertheless, a substantial increase over the $10 million approved last year. And it will allow the Department to sign long-term contracts to subsidize the rent of needy tenants at an annual rate of $25 million.

As you know, the contracts may be signed with nonprofit or limited-profit organizations operating housing projects for low- and moderate-income families.

In its first 2 years the rent supplement program has made available about 40,000 housing units. If we go along with the Appropriation Committee's proposal, the program next year may achieve a goal of about 28,000 units. It is a worthy objective. I cannot see how the Members of this House fail to support it.

Mr. PRICE of Illinois. Mr. Chairman, I commend the House Appropriations Committee for bringing to the House the Department of Housing and Urban Development appropriations bill containing $500 million for the model city program.

As one who has strongly supported the model city program since its inception, I am heartened by this positive response which the Appropriations Committee has made for insuring the continuation of the program at a sufficiently funded level.

For too long urban America has been the stepchild, overlooked, misunderstood and little cared for. Until recently, congressional support for urban-oriented programs was limited. Today, congressional thinking is being restructured by the tragic course of events of recent history, which has occurred in many of our cities.

There is obvious danger in the present state of things. Congress may overreach in two directions, by appropriating too little money or by allocating sufficient money with too much Federal control.

The model city program is a rational, logical alternative. It combines the resources of the Federal Government with the talents and energies of the local citizenry. Each input complements the other, and the arrangement assures that the local residents will have control of their own destinies.

Because it is at the same time a moderate approach and a sound solution, the model city program deserves our full support. These are not ordinary times, and they demand of us the most innovative and effective proposals we can utilize for meeting the urban crisis.

I am very proud that one of the cities in my congressional district was selected in the initial round of model city designations. Since that time East St. Louis, Ill., has been taking a hard look at itself

and its problems, coming to the realization that it does not have to be relegated to the graveyard as a dead city.

The model city program has breathed life into it. Its eventual recovery will be attributable in great part to its model city program—a program that will be funded because of the favorable action the Appropriations Committee has taken and because of the favorable vote we have cast.

Mr. EVINS of Tennessee. Mr. Chairman, we have no further requests for time.

Mr. JONAS. Mr. Chairman, we have no further requests for time.

The CHAIRMAN. There being no further requests for time, the Clerk will read.

The Clerk read as follows:

CIVIL AERONAUTICS BOARD

SALARIES AND EXPENSES

For necessary expenses of the Civil Aeronautics Board, including hire of aircraft; hire of passenger motor vehicles; services as authorized by 5 U.S.C. 3109; uniforms, or allowances therefor, as authorized by law (5 U.S.C. 5901–5902);

Mr. GROSS. Mr. Chairman, I move to strike the necessary number of words.

Mr. Chairman, I am intrigued by the representation allowances in this bill. The Civil Aeronautics Board, for instance, gets $1,000 but the Federal Communications Commission gets $500, and the Federal Power Commission gets $500. Then we turn over to NASA, and there is $35,000 for extraordinary expenses of some kind or another. Then we drop down to the National Science Foundation, and there is $2,500 for representation allowance.

My question is: Do they eat better food and drink better booze in the scientific organizations, or what is the story as to this wide disparity in entertainment funds?

Mr. EVINS of Tennessee. Mr. Chairman, if the gentleman will yield, I will say to my friend, the National Science Foundation has international conferences. This is not for entertainment, as the gentleman inferred.

This is for conferences. Also, the Administrator must have some flexibility in making contracts for scientists and specialists in special fields. The National Science Foundation fund does not relate to what the gentleman referred.

The Civil Aeronautics Board has conferences with respect to schedules of air lines of other countries, rates, and with respect to flights for our carriers. It is necessary for these agencies to have some funds to meet our friends from other countries, with which we have agreements.

Mr. GROSS. I do not travel in foreign countries, but I am told by those who do that liquor is a good deal cheaper over there. I still do not understand why there should be this wide difference in funds for entertainment.

Mr. EVINS of Tennessee. These representation allowances are kept to a very minimum, I say to my friend.

Mr. GROSS. In view of the austerity which is being talked about so much, I thought perhaps we might get a bill with

this sort of thing eliminated altogether, but apparently that is a vain hope.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

FEDERAL COMMUNICATIONS COMMISSION

SALARIES AND EXPENSES

For necessary expenses in performing the duties of the Commission as authorized by law, including uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902); not to exceed $41,000 for land and structures; not to exceed $11,000 for improvement and care of grounds and repairs to buildings; not to exceed $500 for official reception and representation expenses; special counsel fees; services as authorized by 5 U.S.C. 3109; and purchase of one passenger motor vehicle for replacement only, $19,750,000.

Mr. GIAIMO. Mr. Chairman, I move to strike the last word.

Mr. Chairman, for several years we have been carrying on a discussion, in respect to the preparation of the budget for the Federal Communications Commission, relative to spectrum reallocation. We find ourselves in a position where there has not been a reallocation of the spectrum for more than 20 years.

We find, in the field of land mobile radio usage, in the area where more and more businesses, hospitals, police, and other agencies need spectrum space, that in this area there is very little spectrum space allocated to them and that most of the spectrum is taken up by the Government and by broadcasters.

This is of concern not only to our subcommittee but also to the gentleman from Michigan [Mr. DINGELL] who serves on the Select Committee on Small Business, which is under the chairmanship of our distinguished chairman, the gentleman from Tennessee [Mr. EVINS].

I know they are looking into this. They have prodded the Federal Communications Commission to come forward with suggestions as to how they are going to reallocate usage of the spectrum.

Many of us in Congress feel they have been very slow in doing this. We have been after them for some years to come up with concrete suggestions as to how they are going to reallocate the spectrum. They have come forth with certain partial solutions, which, quite frankly, we do not believe to be adequate and do not believe will do the job—solutions such as channel splitting, and the squeezing together of usage on the channels. This does not really begin to solve the problem.

This problem is critical in our country. We are talking about an industry which needs space on the spectrum, which contributes well over $20 billion to the gross national product of this Nation. We are talking about a problem which is not going to be resolved until the Federal Communications Commission comes up with suggestions for manners and methods in which they are going to reallocate portions of the spectrum.

I take this time only to stress this problem and to bring it to the attention of the House, because we intend to push the Federal Communications Commission on this.

We want action from the FCC. They have assured us and told us year after year that they are studying the problem and that they will have suggested remedies, but the fact is that time passes and all we keep hearing is they are still studying the problem. We think it is high time we get some word from them as to reallocations of the spectrum.

Mr. Chairman, I yield back my time.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

EXPENSES, PRESIDENTIAL TRANSITION

For expenses necessary to carry out the provisions of the Presidential Transition Act of 1963 (3 U.S.C. 102, note), $900,000, to remain available until June 30, 1970.

Mr. GROSS. Mr. Chairman, I move to strike the necessary number of words.

Mr. Chairman, with reference to presidential transition, what is this? Is this $900,000 for an inaugural, or what is it?

Mr. EVINS of Tennessee. Mr. Chairman, will the gentleman yield?

Mr. GROSS. I yield to the gentleman from Tennessee.

Mr. EVINS of Tennessee. I will say to my friend an act of Congress provides that every 4 years we must provide a certain sum of money to the General Services Administration for the presidential transition, whether it is needed or not. I do not think it will be needed, and so it will revert to the Treasury. We only put the money in because the law makes it mandatory for this in the fourth year to provide funds for presidential transition.

Mr. GROSS. So presidential transition means the installation of a President? Is that what it means?

Mr. EVINS of Tennessee. I think the gentleman has the right interpretation, but I do not think there will be a change. Therefore, the money will not be expended and it will revert to the Treasury.

Mr. GROSS. The gentleman hopes for the best and fears the worst.

Mr. JONAS. Mr. Chairman, will the gentleman yield?

Mr. GROSS. I yield to the gentleman from North Carolina.

Mr. JONAS. I was going to say to my friend, I hope that he will not try to knock this out, because there will certainly be a transition next year, and we will have to have some money to pay for it.

Mr. EVINS of Tennessee. This has been done in the past, I will say to my friend. We only put the money in because it is mandatory under the law, and we state in the report that if not used it will be returned to the Treasury.

Mr. GROSS. Is the gentleman saying that President Johnson did not mean what he said when he announced he was not going to be a candidate for the Presidency?

Mr. EVINS of Tennessee. The gentleman will have to address himself to the President for that answer. He made his statement.

Mr. GROSS. But the gentleman says he does not expect the money to be spent. Evidently he means that the same President is going to be a candidate for reelection and will be reelected. Of course, I differ on the reelection.

Mr. EVINS of Tennessee. I will say to my friend that, if the Republicans do not find a good candidate, we may have to draft the President yet to be reelected. We only did this because the law makes it mandatory, and it directed that the Congress place this money in the fund. I do not think it will be used, and I say again it will revert to the Treasury and there will be some savings.

Mr. GROSS. Yes. There will be quite a substantial savings when the next Republican President comes up for the inaugural. I am sure it will be an austere affair and one that will be appreciated by the taxpayers by returning most of this money to the Treasury.

Mr. EVINS of Tennessee. I recall a few years ago when Mr. Dewey was running and our Republican friends had a large amount in the bill at that time. As Mr. Dewey was not elected, they did not get to enjoy using the funds.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

NATIONAL SCIENCE FOUNDATION

SALARIES AND EXPENSES

For expenses necessary to carry out the purposes of the National Science Foundation Act of 1950, as amended (42 U.S.C. 1861–1875) Title IX of the National Defense Education Act of 1958 (42 U.S.C. 1876–1879), the National Sea Grant Colleges and Program Act of 1966 (80 Stat. 998), and the Act to establish a National Medal of Science (42 U.S.C. 1880–1881), including award of graduate fellowships; services as authorized by 5 U.S.C. 3109; maintenance and operation of three aircraft and purchase of flight services for research support; hire of passenger motor vehicles; not to exceed $2,500 for official reception and representation expenses; uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902); rental of conference rooms in the District of Columbia; and reimbursement of the General Services Administration for security guard services; $400,000,000, to remain available until expended: *Provided,* That of the foregoing amount not less than $37,600,000 shall be available for tuition, grants, and allowances in connection with a program of supplementary training for secondary school science and mathematics teachers: *Provided further,* That receipts for scientific support services and materials furnished by the National Research Centers may be credited to this appropriation.

AMENDMENT OFFERED BY MR. DADDARIO

Mr. DADDARIO. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The Clerk will report the amendment.

The Clerk read as follows:

Amendment offered by Mr. DADDARIO: On page 22 strike out "that" in line 2, and all that follows down through the end of line 6.

Mr. DADDARIO. Mr. Chairman, this was one of the objectives to which I referred during the course of my remarks during the general debate on this bill. To those who' were not able to be on the floor at that time I shall very quickly reiterate what was said then so that the Members will understand what my intentions are.

Mr. Chairman, the chairman of the subcommittee, the gentleman from Tennessee [Mr. EVINS], had referred in the report to the fact that the committee recognized the competence of the Director and members of the National Science Board and recommended that they make the necessary contractual adjustments in the institutional and fellowship grant

programs to effectuate the economies proposed.

Mr. Chairman, that confidence which the committee has in the Director and the National Science Board is one which I applaud. I believe those gentlemen are men of the highest capability.

Mr. Chairman, my concern is that the subcommittee having recommended a cut in the National Science Foundation of $100 million in a budget request of $500 million or $95 million less than in the present fiscal year would allow the National Science Foundation Director and the National Science Board to use their skill and to have the full discretion in deciding how much each of their programs ought to be cut. The $37.6 million which is earmarked in the bill would simply mean that this program is given a favored place among all programs.

Mr. Chairman, I would hope that this amendment would be supported so that in the cutting of programs in the National Space Foundation there will be a fair understanding of what needs to be done and that the moneys provided will be distributed equally with the hope that new programs will not be adversely affected.

Mr. Chairman, I urgently ask that this amendment be supported.

Mr. EVINS of Tennessee. Mr. Chairman, I move to strike the last word, and I rise in opposition to the amendment.

Mr. Chairman, I regret to rise in opposition to the amendment offered by the distinguished gentleman from Connecticut. The gentleman is the chairman of the Subcommittee on Science, Research, and Development, but let me state that there is $400 million in this bill for the National Science Foundation. The only restriction with respect to the $400 million is that not less than $37.6 million shall be available for grants and allowances in programs for training of secondary school science and mathematics teachers. This is to encourage a broad base for the teaching of science and mathematics. If we are going to have future scientists we need to have capable teachers at the secondary level. Out of the $400 million we only ask that $37.6 million be used at the secondary level. This provision has been included by our committee for some time.

Out of the funds provided, the Foundation has complete authority and flexibility to place $362.4 million wherever it wishes. Only a small amount is earmarked for the secondary schools of the Nation.

Mr. Chairman, as I say, I regret having to oppose this amendment, but I feel it should be defeated.

Mr. JONAS. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to the gentleman from North Carolina.

Mr. JONAS. Mr. Chairman, I too regret having to oppose the amendment but I join the gentleman from Tennessee in his opposition to the amendment for the reasons stated by him.

Mr. DADDARIO. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to the gentleman from Connecticut.

Mr. DADDARIO. Mr. Chairman, I would like to have it understood that I support this program also. It is my feeling, however, that it ought not to be given a position of predominance over and above other programs.

I would say further that it should not be our responsibility here today to take one program and give it special emphasis. If we do that we will be forgetting that other important programs have come along over the years and that these should not be placed in a secondary role. Some of these programs have gone into every State in the Union, some help smaller colleges, and some support research in areas of extreme importance to our society. It logically follows that the way this legislation now reads would cause all these other programs to be more harshly treated because one program must be fully funded.

Mr. BOLAND. Mr. Chairman, will the gentleman yield?

Mr. EVINS of Tennessee. I yield to my friend from Massachusetts.

Mr. BOLAND. Mr. Chairman, I too regret having to rise in opposition to the amendment offered by my distinguished and very close friend from Connecticut, Mr. DADDARIO. The gentleman does perform a very fine service as chairman of a special subcommittee of the Science and Astronautics Committee. No one understands the programs, I believe, of the National Science Foundation, nor all the vast areas of science, more than he does. But I submit that regarding his particular amendment the recommendation of the committee in limiting these funds was proper. We have done so for the past—dozen years or so, I believe—and one of the reasons we have done so is because this committee, and the Members of Congress, have been impressed by this program. This program is a program in support of science and science education.

It provides $21 million or there is a request for $21 million for summer institutes.

For academic year institutes: $9 million.

Inservice institutes: $3 million.

On the college level summer institutes: $3 million.

Academic: $900,000.

Short course seminars: $600,000.

The CHAIRMAN. The time of the gentleman from Tennessee [Mr. EVINS] has expired.

Mr. BOLAND. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, the request of the National Science Foundation for this item was around $40 million. We cut it back to $37 million and we earmarked the funds that must be spent in this area. This committee over the years, and the Congress have followed this procedure.

I repeat again, we have carried this limitation annually in this bill. I do not think there is any question that if this particular prohibition is knocked out—if this limitation is eliminated—this is one area in which the National Science Foundation will make its largest cut.

Five hundred million dollars is requested by this Foundation in the fiscal year 1969. The committee recommended $400 million.

Most of the money goes toward basic research—and for good reason. I think over the years this committee and the Congress, I am sure the gentleman from Connecticut will agree, have supported the National Science Foundation.

It is the judgment of the committee that there ought to be a prohibition against cutting these programs about which we speak.

Mr. JONAS. Mr. Chairman, will the gentleman yield?

Mr. BOLAND. I yield to the gentleman.

Mr. JONAS. Is it not true that the National Science Foundation was slow, well a little slow, in getting into this field?

Mr. BOLAND. That is exactly right.

Mr. JONAS. And at the insistence of our subcommittee—we have been insisting that more emphasis be given to this aspect of the science problem and we do not want to see it turned back.

Mr. BOLAND. And would not the gentleman from North Carolina agree that in the years that we have been sitting in this committee and funding these programs it was the Subcommittee on Independent Offices that fully funded the request—not only fully funded but actually added more to the budget for this particular activity?

Mr. JONAS. Because this field has been neglected more than some of the others.

Mr. DADDARIO. Mr. Chairman, will the gentleman yield?

Mr. BOLAND. I am delighted to yield to my friend, the gentleman from Connecticut.

Mr. DADDARIO. Mr. Chairman, could the gentleman from Massachusetts indicate to me where the National Science Foundation has in any way shown that if my amendment would pass that this program will in fact be the one most deeply cut?

Mr. BOLAND. No.

Mr. DADDARIO. It is my understanding from making an investigation of this program that it is one which the National Science Foundation feels is important for it does, after all, support some 35,000 teachers. It should be understood, however, that, as the National Science Foundation has grown, other activities have developed within it which are of equal importance to science and science educators. All I am advising is that we recognize this and strike language which is limiting by its very nature.

Mr. BOLAND. May I say to the gentleman from Connecticut, I have no knowledge that this particular activity will be cut by the National Science Foundation.

But I have been around this Chamber long enough and on this committee long enough to know that some of the programs that are really close to the hearts of the Congress are the programs that are cut if you give flexibility to the departments down the street.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Connecticut [Mr. DADDARIO].

The amendment was rejected.

AMENDMENT OFFERED BY MR. WYMAN

Mr. WYMAN. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WYMAN: On page 22, line 9; after the word "appropriation", strike out the period and insert in

place thereof a colon, and insert thereafter the following: "and, *provided further,* That no part of this appropriation shall be available for or paid out to the benefit of any individual who at any time after the effective date of this Act, wilfully refuses to obey a lawful regulation of the university or college which he is attending or at which he is employed."

Mr. WYMAN. Mr. Chairman, my amendment is a very simple one.

In recent months we have witnessed much usurpation of the proper function of the academic administration in the country by student bodies. We pay hundreds of millions of tax dollars in scholarships to students and to graduate fellows. To the extent that any of them are wilfully involved in this type of action, the purpose of this amendment is to provide, if they are involved, after the effective date of this bill, that they then lose their scholarship.

The extension of criminal trespass, the resistance to arrest, the willful disobedience, the invasion of the rights of property have extended even to the denial to universities of their physical facilities with which they operate the university, by physical occupation by students of administration buildings, who have then refused to obey the lawful orders of the university to quit the premises.

The New York Times on May 5, 1968, reports that at Columbia they took papers out of the office of President Grayson Kirk, photographed them, and then peddled them around afterward. Not only is this theft, but any student engaged in this type of activity ought not to receive a Federal tax scholarship.

Students should know in advance—to the extent that any such are or may be involved—that if they do, after the effective date of this act, engage in such type of conduct, they will lose their scholarship or their fellowship or their graduate help, or whatever the aid may be.

No part of this amendment limits or otherwise restricts the grant of funds to the institution itself. It applies solely to individuals. This year, there are more than 14,000 fellowships. In the language of the justifications of the NSF in my Appropriations Subcommittee, more specifically the direct statement of the Director of the National Science Foundation, the Honorable Leland J. Haworth, on February 20, 1968:

Although exact numbers cannot be determined at this time, we estimate that the programs as proposed will advance the research and educational endeavors of more than 85,000 individuals. These funds will support the research of about 6,000 faculty members working in all the basic fields and will promote the advanced education of about 18,000 university and college students in science and engineering through fellowships, traineeships, and employment as research associates or assistants. An estimated 50,000 teachers of science, engineering and mathematics at the undergraduate, secondary and elementary school levels will participate in projects to improve their capabilities as educators and about 11,000 secondary and undergraduate students will participate in special research and educational projects.

Mr. Chairman, this simple amendment reflects the concern of Members of Congress to do something to help restore a greater measure of order and responsibility on the troubled campuses of Amer-

ica. One of the ways we can do this is to make it clear that engaging in this type of offensive activity cuts off your scholarship or fellowship help if you are receiving any. I sincerely urge the support of this amendment.

Mr. EVINS of Tennessee. Mr. Chairman, will the gentleman yield?

Mr. WYMAN. I yield to the gentleman from Tennessee.

Mr. EVINS of Tennessee. I would be opposed to a general prohibition against grants to colleges but I would like to inquire if the gentleman's amendment is directed to fellowships granted to individuals.

Mr. WYMAN. In response to the gentleman's question, it deals only with individuals. It does not apply to institutions. It would not in any way restrict the institution itself. It is intended as a help to the institutions in controlling their own internal affairs. It is intended as a warning to those who may be on a fellowship, paid for by the taxpayers of the United States, that if they engage in this kind of activity, they lose their fellowship or their scholarship as the case may be.

Mr. EVINS of Tennessee. I will say to my friend that we will accept the amendment and consider it in conference if we can perfect it.

Mr. YATES. Mr. Chairman, will the gentleman yield for a question?

Mr. WYMAN. I yield to the gentleman from Illinois.

Mr. YATES. Is this amendment intended to cover minor infractions of rules? For example, suppose the recipient of a scholarship violates a schedule of attending classes or lectures. Suppose he cuts a class, or for some important personal reason, does something that results in a minor breach of discipline. This example does not relate to the type of chaotic situation the gentleman has described, but I think we ought to know how far his amendment goes.

Mr. WYMAN. I appreciate the gentleman's concern. I would like to be candid with the gentleman. The intention, of course, is that the infraction shall relate to a disruption of the university or college administration. It is not so worded to require that, because, if it were so worded, the Parliamentarian has advised me, it would be subject to a point of order.

In my extension of my remarks I intended to offer such clarification. I was going to make that clear. There is no intention to penalize anyone by cutting off a scholarship for a minor infraction. The situation that this is directed to is the sort of thing that offends all of us: The usurpation of the administrative function and responsibilities of our educational institutions by willful disobedience and willful infraction of the law, sometimes extending to criminal conduct on the part of individual students who may be receiving a scholarship under this particular segment of this appropriation.

Mr. EVINS of Tennessee. Mr. Chairman, we will take the matter to conference and will accept the amendment.

Mr. WYMAN. I thank the gentleman.

The CHAIRMAN. The question is on

amendment offered by the gentleman from New Hampshire.

The amendment was agreed to.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

MEDICAL AND PROSTHETIC RESEARCH

For expenses necessary for carrying out programs of medical and prosthetic research and development, as authorized by law, to remain available until expended, $45,850,000.

BOMBING PAUSE IN VIETNAM IS STRENGTHENING THE ENEMY

Mr. RIVERS. Mr. Chairman, I move to strike out the requisite number of words.

The CHAIRMAN. The gentleman from South Carolina is recognized.

(By unanimous consent, Mr. RIVERS was allowed to speak out of order.)

Mr. RIVERS. Mr. Chairman, on March 31, President Johnson announced the beginning of a bombing pause over portions of North Vietnam in an effort to encourage the North Vietnamese to meet us at the conference table. Since the date of that announcement, we have refrained from attacking military targets above the 19th parallel.

Now, let us look at the actions taken by the North Vietnamese in response to our indication of good faith.

The enemy has done the expected thing. They have taken full advantage of the situation to move men and supplies and to repair damaged installations and lines of communication.

What are some of the specific steps they have taken? The most significant step has been to start a feverish round-the-clock movement of land and water vehicles north of the 20th parallel. Prior to the March 31 announcement, our bombing had forced the North Vietnamese to disperse and camouflage their vehicles and to move them mostly at night. With the cessation of bombing, these vehicles are now moving freely around the clock, transporting military supplies and equipment southward. The April daily volume of truck traffic is considerably higher than the March volume, and daytime water traffic has increased nearly five times over March. Coastal craft used to support the North Vietnamese logistic effort have been sighted in numbers later than seen at any other time in the past 3 years.

The bombing pause has also allowed the North Vietnamese to string out large quantities of supplies in open storage along highways, rail lines and waterways.

There has been increased activity in the port of Haiphong, especially in repairing the port's facilities and in dredging to clear the silt that has impeded the use of the shipping channel for the past year. Additionally, the bombing pause has allowed the North Vietnamese to accelerate repairs on their road, rail, and waterway network. Many bridges have been repaired or replaced, and new bypasses have been built. This has enabled the North Vietnamese to increase the speed and volume of supplies southward, and it has allowed them to bypass and restore damaged arteries. These repair efforts are currently underway throughout northern North Vietnam. April has seen a 2,000-ton increase in

**12254**

CONGRESSIONAL RECORD — HOUSE

*May 8, 1968*

shipments of material to support NVA logistic operations.

Further, the North Vietnamese have used the pause to strengthen their surface-to-air missile defenses in the southern panhandle. One-third of the surface-to-air units now in this area entered after April 1, and additional units are expected to be shifted there if the bombing pause continues.

Are these activities indicative of a country interested in negotiating for peace?

And their activities have not even been confined to North Vietnam.

In South Vietnam, attacks on most major cities have been resumed at a cost of many lives, civilian as well as military.

Further, the enemy has begun heavy infiltration of South Vietnam. During the first 4 months of 1968, an estimated 80,000 to 100,000 North Vietnamese troops were seen moving south. About 75 percent of this movement occurred in March and April. The April infiltration total, the highest to date, exceeds the March record by some 7,000 men. This infiltration is especially significant for two reasons:

First, it will accelerate the present trend that is shifting the balance of enemy forces from VC to NVA. In 1965, only 4 percent of enemy troops in South Vietnam were NVA. Now, 75 percent of combat support groups and 33 percent of in-country strength is NVA. And this percent will increase as infiltration continues.

The infiltration is significant for a second reason because these infiltrating troops are intended as replacements for combat losses. At the present rate of infiltration, the enemy will be able to rebuild his units, thus enhancing his position for renewed attacks during the current offensive. This will be the first time in 18 months that the enemy has been able to sustain a personnel input adequate to cover its losses.

In addition to infiltration of troops, the North Vietnamese are sending in materiel arms and supplies, at a rate higher than the first 3 months of this year.

In conclusion, we can say that the enemy is taking full advantage of the bombing cessation:

To repair and construct roads and bridges;

To restore critical industries;

To increase surface-to-air missile defenses in the panhandle;

To employ additional military units southward; and, in general,

To increase their warmaking capabilities.

Most of all, we can say that the enemy is not deescalating, but rather is accelerating and strengthening its offensive and defensive capabilities. And we can say that the bombing pause has contributed significantly to the effectiveness of this effort, and the loss of the U.S. servicemen's lives.

The CHAIRMAN. The time of the gentleman from South Carolina has expired.

(On request of Mr. STRATTON, and by unanimous consent, Mr. RIVERS was allowed to proceed for 3 additional minutes.)

Mr. STRATTON. Mr. Chairman, will the gentleman yield?

Mr. RIVERS. I am delighted to yield to my distinguished friend and valued member of my committee, who is doing such a magnificent job, particularly on the antisubmarine warfare. I want to make this known now.

Mr. STRATTON. I appreciate my chairman's comments.

I wish to commend the gentleman from South Carolina for his remarks.

In view of the fact that more than 37 days have passed since President Johnson placed a limited halt on the bombing of North Vietnam, and in view of the fact that the evidence is, as the gentleman has just indicated, that they have not deescalated in return for our action but have, in fact, escalated their part of the conflict, would not the gentleman agree with me that there ought to be a decision in the near future that we resume the bombing so as to protect the lives of our men, if the enemy is, in fact, not going to deescalate?

Mr. RIVERS. I believe we should set some kind of a time limit whether we make it public or not.

We should not kid ourselves. These people are smart. They are trained. They are resourceful. They have up-to-date arms. They have as good arms as we have. They have terrifically sophisticated surface-to-air missiles and antiaircraft power.

These people are wise. They are intent upon driving a hard bargain. And believe me when I say they are preparing for any outcome. They do not frighten easily. Death to them is as simple as the sun rising every morning.

The American public had better get this in mind. These people are not fools and we cannot handle this crowd with kid gloves.

Thank you very much for letting me speak out of order.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

DEMONSTRATIONS AND INTERGOVERNMENTAL RELATIONS

MODEL CITIES PROGRAMS

For financial assistance and administrative expenses in connection with planning and carrying out comprehensive city demonstration programs, as authorized by title I of the Demonstration Cities and Metropolitan Development Act of 1966 (80 Stat. 1255–1261), including $100,000,000 for grants for urban renewal projects within approved city demonstration programs, to be transferred to and merged with the appropriation "Urban renewal programs" for the fiscal year 1969 in accordance with and subject to the provisions of section 113 of said Act, $500,000,000: Provided, That the amount appropriated herein for other than urban renewal programs shall remain available until June 30, 1970.

AMENDMENT OFFERED BY MR. FINO

Mr. FINO. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. FINO: On page 33, line 4, strike out "$500,000,000" and insert "$312,000,000".

The CHAIRMAN. The gentleman from New York is recognized for 5 minutes in support of his amendment.

Mr. FINO. Mr. Chairman, the sole purpose of this amendment is to reduce the model cities appropriations from the $500

million in this bill to $312 million, which is the amount that was appropriated by this House or by this Congress last year.

The first thing I would like to point out is that any sum we vote in this House—and make no mistake about it—any sum we vote in this House will be increased in conference because the Senate, as usual, is bound to vote for more money. In order to keep these expenditures at a reasonable level, I urge the Members of this House to support this amendment, which will restore the amount to last year's appropriation.

Public opinion supports these cuts. Every congressional poll shows that the people oppose this program or want it cut. I have not seen one congressional district questionnaire which shows a majority of the people favoring an increase in this program.

The reasons are easy to set forth. This program, in my opinion—and I stated this time and time again last year and the year before—this program is a gimmick. It does not build housing. It does not take people off welfare. It pursues much trickier goals. Some of you will remember 2 years ago I said on the floor of this House that this program would be used for school racial-balance schemes. Needless to say, my friends on the other side said I was wrong and that the model cities program had nothing to do with school busing to achieve integration.

I do not intend to discuss this at length. It is not necessary to do that. Just let me read you a list of the model cities education programs listed in the Education News of February 5, 1968. I have picked out the school racial-balance programs. In Oakland, Calif., an educational park; in Hartford, Conn., suburban-inner city school busing; East St. Louis, school busing; Baltimore, Md., school busing; Boston, Mass., suburban-inner city school busing; Newark, N.J., educational park; Buffalo, N.Y., educational park; Rochester, N.Y., school busing; Charlotte, N.C., educational park; Pittsburgh, Pa., racial balance in elementary schools.

I remember back in 1966 when the gentleman from New York, my friend who represents the quiet, peaceful campus of Columbia, said that this Congress should not apologize for supporting school busing and similar efforts. I am sure that this gentleman, the same gentleman, would be happy to take the same position today. I hope that the rest of this House is less anxious to vote Federal dollars for school busing. I know there will be some who will say that we must vote this money to appease the so-called Poor People's March; that we must vote this money or Dr. Abernathy's riot commando will burn down the rest of central Washington. This brings to mind an incident of 150 years ago when the pirates of Tripoli were forcing this Nation to pay tribute. Somebody coined a new slogan of "millions for defense but not one cent for tribute." The Navy cleaned out the pirates, and that was the end of the blackmail. I think the American people are waiting for an end to blackmail today.

If these programs are not blackmail, what are they? Certainly they do not work. Each year we have increased urban

*May 8, 1968*                CONGRESSIONAL RECORD — HOUSE                12255

spending and each year we have more riots. As the programs have increased so have the riots. Nobody has pointed out the ineffectiveness of this spending better than the distinguished chairman of the Committee on Appropriations. Time and time again he has shown how the increased expenditures in these programs have achieved nothing. Of course, I must admit that these programs have had one big effect.

All this spending has produced massive inflation and a massive Government financial mess. This we know. So I suggest that, in the name of sound economics and realistic sociology, we call this spending binge to a halt. Believe me when I say that the city voter is not for these programs—I have campaigned hard against them and won 2-to-1 reelection in the heart of New York City and I say to those of you who come from big cities you need to have no fear of that, because I am a good example of those conditions which you will face.

Mr. Chairman, I urge support of the amendment.

Mr. EVINS of Tennessee. Mr. Chairman, I rise in opposition to the amendment.

I would call to the attention of the distinguished gentleman from New York that the HUD appropriation for fiscal year 1968 was $312 million for the model cities program. For 1969 the President asked for $1 billion for model cities. We were only able to consider funding to the extent of $650 million in this bill. This is all that has been authorized. We have recommended $500 million—a half-billion dollars—for the model cities program.

Mr. Chairman, the amendment, if adopted, would cut off at least half of the $200 million provided for the initial model cities. It would also have the effect of reducing the amount to be provided for some 75 additional model cities to be announced soon. There are great needs to be met in our cities. In other words, if the gentleman's amendment is adopted it would take $188 million out of the model cities program, and it would retard the effort to solve the complex problems of the cities.

Mr. Chairman, I hope the amendment will be defeated.

Mr. MICHEL. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I rise in support of the amendment.

Mr. Chairman, members of the Committee, last year, during the consideration of this bill, I offered an amendment similar in nature, designed to wipe out all the model cities money except that for planning. The basis of my remarks at that time was the fact that not one cent of the planning money previously appropriated had been used. My amendment lost by only eight votes on tellers and a switch of 10 votes would have made the difference on my motion to recommit.

Mr. Chairman, I also made reference last year to my own home community of Peoria, Ill., by saying:

Mr. Chairman, I cannot help but be reminded that on this very day my hometown of Peoria, Ill., population 130,000, is formally receiving from the National Municipal League and Look magazine our second "All-America

City Award." Peoria's award this year as one of the 11 cities so designated throughout the country is due to a combination of factors, not the least of which is the better than $50 million downtown development program without one thin dime of Federal money. We have demonstrated and will continue to prove that we can be a model city on our own.

This $50 million development program for Peoria is significant to this discussion today, for it is mere peanuts when you are talking about the really big metropolitan cities in this country. In other words, if you took the $2.9 billion of original authorization for this program and divided it up equally among the initial 70 cities they have been talking about, you come up with less than what we are doing on our own in a community of merely 130,000 people.

In addition, Mr. Chairman, since last year we have embarked upon a program of urban renewal on our own without turning to the Federal Government for a dime. And how is it going to be accomplished? The city council passed a new 5-percent utility tax to fund the begining of the program. Inasmuch as we are not designated as one of the cities to get any Federal money from this appropriation, I don't know why I should support it for others. Possibly if other cities around the country would do what we have done on our own we wouldn't have this crisis of the cities. The money comes from the same place—the people—and, I submit, we get a better dollars worth when we raise the money and spend it locally, rather than turning always to the Federal Establishment as some sort of bottomless pot at the end of the rainbow. I couldn't let the opportunity slip by without "tooting my horn" for my very progressive hometown of Peoria.

Mr. BOLAND. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I rise in opposition to the amendment. The gentleman from New York has been in opposition to these programs from the start. He is being consistent. If the gentleman's amendment is adopted we will, in effect, kill the model cities program.

The very core and the very heart of the model cities program is the supplementary grant program carried in this bill. With the $500 million we have provided for the model cities, there is an amount of $200 million provided for supplementary grants for the first group of model cities that were selected last year, some 74 cities. There is an additional $200 million reserved for cities which will be selected within the next few weeks, and there is a $100 million item for urban renewal in the model cities area.

I submit, Mr. Chairman, that the failure to provide sufficient money for supplementary grants will really damage this program because supplementary grants go to the core of this innovative program. It actually permits the local communities to start some programs on their own, funded by the Federal Government, but programs which are attuned to ongoing Federal programs. The ability of the Department of Housing and Urban Development to grant extra money to the cities so that they can take these grants and use it in specific programs they wish, such as education, garbage collection, transportation—almost any single item or any single activity which assists in giving a better life for

the people in the ghettos—that is precisely what the model cities program is attuned to do.

So, Mr. Chairman, I submit that this drastic cut—and it is a drastic cut—this $188 million cut—will come out of the supplementary grants program, and I submit that that is a dangerous procedure. I believe it would damage beyond repair the model cities program, and I would hope that this amendment would not be adopted.

Mr. YATES. Mr. Chairman, will the gentleman yield?

Mr. BOLAND. I yield to the gentleman.

Mr. YATES. The subcommittee has already drastically cut this program; has it not? The cut was almost 25 percent.

Mr. BOLAND. The subcommittee has already cut this program by almost 25 percent; that is correct.

Mr. WYMAN. Mr. Chairman, I rise in opposition to the amendment.

We have considered this matter in this subcommittee very carefully. The mayors of the cities came before our committee and said "We need $32 billion."

We asked them where we were going to get that amount of money, and they did not have the answer. But in any event they would and did strongly favor the second increment in the model cities program.

The $100 million here is for urban renewal, being bricks and mortar, and on this I am sure everyone can be in agreement; $200 million is for a reservation for the next group of model cities—about 70 cities that are going to be included by the Department, and that do have problems. The other $200 million is for the second increment to the already designated first group of model cities.

I believe that this appropriation is warranted and needed in the atmosphere that prevails in this country today. It is not tribute, as the gentleman from New York has suggested. It is not appeasement. The cities are in a crisis, and we in this Congress should take steps to bring them out of it and help the residents in those cities that have problems.

These steps called the model city program may not be perfect, but these steps are a start in the right direction. In a very real sense this is a commitment to the challenge of our times, and it is a commitment that we should honor in this House at this time.

Mr. HARVEY. Mr. Chairman, will the gentleman yield?

Mr. WYMAN. I yield to the gentleman from Michigan.

Mr. HARVEY. Mr. Chairman, I thank the gentleman for yielding. I agree with the remarks of the gentleman, and I wish to associate myself with his views.

I have voted on this side of the aisle, I think, for just about all of the Bow amendments—and in fact, I added them up the other day and I believe that last year I voted for $14 billion in cuts in voting for the Bow amendments to appropriation bills, but this is one amendment to cut the model cities program that I cannot go along with. I will oppose it with all my heart.

I believe that our cities today face very serious problems, and if we in this Congress do not realize that, then surely

12256            CONGRESSIONAL RECORD — HOUSE            *May 8, 1968*

something must be wrong with us. I believe that the committee has cut this appropriation enough at this particular time as far as I am concerned, and I will vote to oppose this particular amendment.

Mr. WYMAN. I thank the gentleman for his remarks.

We do not know whether this program is going to work out the way it is claimed it will work out, or whether all the claims that have been made for it will be proved to be correct in application, but it is a start in the right direction, and it should, as the gentleman from Massachusetts has said, be given a chance.

Mr. BOLAND. Mr. Chairman, will the gentleman yield?

Mr. WYMAN. I yield to the gentleman from Massachusetts.

Mr. BOLAND. I just want to take the time to compliment the distinguished gentleman from Michigan. He was sitting on the Committee on Banking and Currency when some of these programs were authorized. He has taken the floor in support of some of the great programs through which we hope to meet some of the problems that the cities are now confronted with.

As a member of the Committee on Banking and Currency, he supported the rent supplement program, the model cities program, the urban renewal program, and many others. This is the kind of leadership that the other side of the aisle ought to follow.

The gentleman has been a very fine Member of the Congress in this area of urban matters.

May I say that that also applies to the gentleman from New Hampshire. I served with him on this particular subcommittee and I recognize his knowledge and ability and appreciate the time he has put in on the problems that affect our cities.

Mr. WYMAN. I thank the gentleman.

Mr. McCORMACK. Mr. Chairman, will the gentleman yield?

Mr. WYMAN. I yield to the distinguished Speaker of the House, the gentleman from Massachusetts.

Mr. McCORMACK. In line with what our friend, the gentleman from New Hampshire, has said, I am sure that we all recognize the serious problems that confront the cities of our country.

I think one of the greatest challenges that confronts us is the challenge to municipal government with the problems involved in the population move, and the transition that has taken place in that respect, requiring great increases in services and new services as well. Then we must consider the limited field for taxation in the cities to meet these problems. This is the overall situation that we all must look at. It is certainly a basic problem and it applies to all the cities of our country, whether the chief executive who is elected is a Democrat or a Republican or an Independent, or nonpartisan.

These are the problems confronting the cities and certainly we should keep this amount in the bill. As a matter of fact, they need more. Certainly, we should keep the amount in that has been recommended by the committee.

Mr. WYMAN. I thank the distinguished Speaker.

Mr. REID of New York. Mr. Chairman, will the gentleman yield?

Mr. WYMAN. I yield to the gentleman from New York.

Mr. REID of New York. I would just add, Mr. Chairman, that I think model cities is a vital program.

What is involved here is substantially less than the recommendation of the President's Riot Commission report. I hope that we will stand behind the action of the committee as a bare minimum, as an imperative commitment of faith to the cities, and vote down the amendment which would drastically curtail and weaken the program.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York [Mr. FINO].

The amendment was rejected.

The CHAIRMAN. The Clerk will read.

The Clerk read as follows:

MORTGAGE CREDIT

RENT SUPPLEMENT PROGRAM

For rent supplement payments authorized by section 101 of the Housing and Urban Development Act of 1965, $12,000,000: *Provided,* That the limitation otherwise applicable to the maximum payments that may be required in any fiscal year by all contracts entered into under such section is increased by $25,000,000: *Provided further,* That no part of the foregoing appropriation or contract authority shall be used for incurring any obligation in connection with any dwelling unit or project which is not either part of a workable program for community improvement meeting the requirements of section 101(c) of the Housing Act of 1949, as amended (42 U.S.C. 1451(c)), or which is without local official approval for participation in this program.

AMENDMENT OFFERED BY MR. FINO

Mr. FINO. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. FINO: On page 34, line 25, strike out "$25,000,000" and insert "$10,000,000".

The CHAIRMAN. The Chair recognizes the gentleman from New York [Mr. FINO] in support of his amendment.

Mr. FINO. Mr. Chairman, the only purpose of this amendment is to reduce the rent subsidy appropriation from $25 million to $10 million, for the fiscal year 1969, and here again, to the same amount that we appropriated last year.

I want to make several quick points.

First of all, in my good judgment this program is very wasteful.

The average monthly subsidy per family under this program is $75, almost twice the cost of public housing.

Private housing is used in this program so that economic integration can be achieved in places that public housing cannot go.

I do not believe this type of social objective is realistic or worth spending twice the cost of public housing.

Second, it has been a flop and has built practically no new housing.

The number of actual new units constructed under this program is negligible.

Five times as many persons have been helped under the rent certificate program which is cheaper and more effective, and that is the program that is in the statute books and which was sponsored by my colleague, the ranking member of the Committee on Banking and Currency, the gentleman from New Jersey [Mr. WIDNALL].

Third, the spending that you authorize today, and this is very important and I hope the Members of the House will pay attention to it—the spending that you authorize today means 40-year contracts.

Every time you appropriate $1 under this program you obligate yourself for 40 years, so that the $25 million absorbed by this bill actually means $1 billion.

Moreover, it is safe to say that if you vote the full $25 million, as sure as God made little apples the House-Senate conference will raise that figure. To keep this wasteful program at a realistic level and a sensible level, I think it is necessary to cut the appropriation to the $10 million that we appropriated last year. Last year when we appropriated $10 million, we obligated ourselves to $400 million.

Lastly, I would like to refer to public opinion of this program. Nowhere in the Nation does the majority of the electorate support this kind of program. Last year I put a group of congressional district polls in the RECORD. Support of the program ranged from 5 percent in suburban Indianapolis to 29 percent in Berkeley, Calif.

This program is, in my judgment, obnoxious to the American people and all but meaningless to the poor. As a matter of fact, it was originally designed by the administration to exclude the poor.

If we want to help the poor, we should increase appropriations for the rent certificate program.

I cannot possibly believe that this Congress would expand a program like this in a year when we want to make—and need to make—at least $6 billion worth of budget cuts. The rent subsidy scheme is a good example of the type of misguided ways which should be cut back in view of our grave economic crisis.

I urge you Members of Congress to remember that very shortly you will be asked to vote for a 10-percent increase in taxes. I hope you have good explanations for your people back home when you vote for a program such as this.

I urge the Members of this House to support my amendment.

Mr. EVINS of Tennessee. Mr. Chairman, I rise in opposition to the amendment.

The gentleman from New York, I believe, suggested an alternative. He suggested that they might use the rent certificate program or some other program.

I would call the gentleman's attention to the report in which we said that in view of the evident need for substantial low-income housing, the Secretary is urged to utilize all the tools, the several approaches authorized by Congress, including the rent supplement program, the rent certificate program, which the gentleman has suggested, the public housing program, the leasing program, and others, to provide the low-rent housing that is needed throughout the Nation.

The testimony is to the effect that we need 60,000 low-rent housing units per year. In 10 years that is 600,000 units. We

*May 8, 1968*          CONGRESSIONAL RECORD — HOUSE          12257

have had the public housing program for 30 years. The rent supplement program is a private enterprise approach, allowing private homebuilders to contract and build these units. The rent supplement units remain on the local tax rolls. There is an incentive for the tenant to own the property. Rent supplement projects are privately owned, privately managed, privately financed. The rent supplement program is quite different from public housing projects, which are Government owned, Government managed, and Government controlled.

The amendment of the gentleman from New York would cut $15 million out of the modest $25 million we have included. The request is for $65 million. The overall authorization is $150 million. The authorization is for $150 million, and the committee agreed on $25 million. My friend would slash that amount still further.

This program is needed. It is being utilized. It has broad support. It is under local control. There is language in the bill which states that there will be no rent supplement program unless it is voted and approved by the local officials.

Who is eligible in the program? The needy, the elderly, the physically handicapped, those occupying low, substandard housing—those displaced by Government action or by a natural disaster. It applies only to those who meet the income requirements for public housing.

So, Mr. Chairman, we have gone up the hill and down the hill on this program. This issue has been debated before. It is an ongoing program, privately operated and privately maintained. The insurance companies have committed $1 billion, so the Government can come forward with this commitment. I urge defeat of the amendment.

Mr. REID of New York. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, I believe that rent supplements are basically a free enterprise program that it is beginning to be successful, and that the figures as well as the principles sustain this contention.

It is my understanding that at the present time there are some 41,000 rent supplemented units either completed, under construction, or in process. This has generated $450 million in new mortgage funds. The $25 million appropriation before us here would finance 27,000 units and approximately $313 million in new mortgage money.

Further, the administrative processing time has been reduced, I am apprised, from some 18 months to 6 months.

I do not think rent supplements have been a "flop." Indeed, I think it is starting to hold out some of the first genuine hope that progress can be made in the ghettoes under free enterprise, through the participation of limited dividend corporations and nonprofit organizations, such as church groups, pension funds, fraternal and teachers' associations.

To sum up, I believe this holds the promise of encouraging a vital, new, free-enterprise housing program. It clearly taps the resources of private enterprise. It keeps the property on the tax rolls. It encourages individual initiative, rather than forcing the tenant out of an apart-

ment when his income reaches a certain level. It fosters private ownership.

I think it is much more effective and much more humane than the stark, pedestrian public housing we have today. I think it meets the test of both fiscal responsibility and social imperative that is required by our national crisis in housing and in the cities.

The Riot Commission has recommended that we provide 6 million new housing units in the next 5 years, and the rent supplement program is at the heart of their recommendations. The Commission urges that it be revised in order to provide broader coverage and expanded in order to reach more needy families. Secretary Weaver has stressed the importance of rent supplements to the housing needs of this Nation. In a letter to me this morning, the Secretary said:

> As you know, the President has set as a goal the construction of 6 million new housing units for low- and moderate-income families in the next 10 years. If we are to meet this objective, there must be a deep commitment on the part of government, Federal, State and local, as well as the wholehearted support of private industry. . . . I cannot overestimate the importance of the rent supplement program, and the importance of its adequate funding during fiscal 1969. Of all our programs it is the one that has the solid support of almost every facet of industry, including, of course, the private sector.

I hope the Congress and the Nation will meet their responsibilities and turn down this amendment.

Mr. EVINS of Tennessee. Mr. Chairman, will the gentleman yield?

Mr. REID of New York. I yield to the gentleman from Tennessee.

Mr. EVINS of Tennessee. Mr. Chairman, there will be many Members on both sides of the aisle who would like to debate this. The issue has been debated many times before and there are generally known, so I hope we can proceed to vote on the amendment.

SUBSTITUTE AMENDMENT OFFERED BY MR. GROSS

Mr. GROSS. Mr. Chairman, I offer an amendment as a substitute for the amendment offered by the gentleman from New York [Mr. FINO].

The Clerk read as follows:

> Amendment offered by Mr. GROSS as a substitute for the amendment offered by Mr. FINO: On page 34, line 25, strike out "$25 million".

Mr. GROSS. Mr. Chairman, this rent control program, as the gentleman from New York [Mr. FINO] says, is projected 40 years into the future. I guess it is 37 years, to be exact, because I believe this is the third fiscal year. It obligates the taxpayers to the spending of a billion dollars, and we have been hearing lately much talk about how the obligational authority should be reduced.

This is a program that never should have been started, and it seems to me there is no better time than now, here, today, to put an end to this business of rent supplements.

There is in this bill approximately $72 million as a token payment—a token payment only—toward the retirement fund of Federal employees. The Federal employees' retirement fund is more than $51 billion in the red. The day is coming

and coming soon when Congress will have to face up to that to the tune of $1 or $2 billion a year to make the Federal employees' retirement fund operative.

When are we going to start cutting down on these bills and prepare to meet the obligations that we have undertaken?

I witnessed the spectacle last Friday when President Johnson appeared on television. I saw the fist shaking and heard the charge that Congress was trying to blackmail him. In other words, some of us are blackmailers, because we insist on deep spending cuts to accompany a tax increase. He asserted that if Congress cuts more than $4 billion off the spending program for fiscal year 1969, we will have indulged in a phony paper cut.

In other words, if we cut more than $4 billion off the spending program of the Federal Government in fiscal year 1969 we are a bunch of "phonies."

This is an awfully good time, and I know of no better place to save $25 million than right here and now on this direct subsidy of rents. I know of no better time to begin to pare this budget more than $4 billion. I, for one, am willing to accept the challenge. I want to prove to the President, if it is possible to do it, that I am not a wooden soldier of the status quo. Perhaps some of the rest of you covet this role. Perhaps you like to be called "phonies." I do not.

I believe this is an excellent place to start. We should have adopted the other Fino amendment and cut $188 million off the euphoniously labeled model cities program.

Model cities? Congress could spend $50 billion and there still would be no model cities.

I agree with the gentleman from New York [Mr. FINO]. It is time the municipalities of this country measured up to their responsibilities and took care of their problems rather than passing them on to all the taxpayers.

I urge adoption of this amendment. I know of no better place to save $25 million for the taxpayers of this country and accept the challenge of the occupant of the White House who appears on television to shake his fist and condemn Congress. Let us accept his challenge.

Mr. YATES. Mr. Chairman, I rise in opposition to the substitute amendment offered by the gentleman from Iowa and in opposition to the amendment offered by the gentleman from New York. The views of both gentlemen are well known and I would think that it would be futile to remind them that of all the virtues, the greatest is charity. Certainly, their harsh amendments reject this truth.

For over 30 years this Government has recognized and acknowledged the responsibility of the Federal Government to help the poor and underprivileged in our country in their housing needs. In 1936 the public housing program was initiated and over the years numbers of units have been added under its provisions. Although the program serves a useful purpose, in many instances it is found to be inadequate both in respect to the numbers of units made available and in the type of housing provided. Certainly, the program was never sufficient

to take care of the numbers of people who qualify for the housing it offers.

Thus, that program was augmented by the rent certificate program under which rent certificates were given to those who qualify in order to pay a portion of their rent. Unfortunately, in so many instances this program resulted in subsidizing substandard and slum buildings. But in view of the shortage of available dealings for those of low incomes there was no alternative. Although the program filled a gap, it did not stimulate construction of new housing.

It was for this purpose that the idea of using rent supplements was conceived. It differs from recent certificates because it fosters the construction of new housing for the underprivileged. It is a reasonable addition to the measures made available for housing the underprivileged. It provides housing that is not Government owned or operated. It invites limited dividend and not-for-profit groups such as church or labor organizations to undertake and build structures to house those who qualify. These are very limited classes.

The taxpayers pay a portion of the rent in all three classes of assistance. They subsidize a portion of the rental in public housing projects; they subsidize a portion of the rental through rent certificates and they do the same through the rent supplement program. The only difference is that recipients of the subsidy under the rent certificates program are not required to live in buildings identified as public housing projects.

The rent supplement program is a very useful tool to rebuild deteriorated and blighted areas. The need is desperate for the numbers of those who cannot find housing at prices they can afford to pay continues to grow. The rent supplement is a constructive instrument to meet their needs. I urge that both amendments be voted down.

Mr. SCOTT. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I rise in support of the amendment to the amendment.

Mr. Chairman, it is my recollection that last year we had the same matter before the House and did originally eliminate the entire appropriation for rent subsidies. Then it went over to the other body and they put the money back in. The House backed down from its original position. Certainly, I hope that the House this time will strike out the entire appropriation for rent subsidy and will stick by its guns regardless of what is done in the other body.

In my opinion, Mr. Chairman, this is not the manner in which to meet the needs of the poor for housing. It discourages young people in this country from trying to obtain the ownership of their own homes. It takes away the incentive to attempt to acquire home ownership when a Government subsidy is provided for rental property. The young people of the country often try to obtain home ownership, which tends to bind the family together. They make sacrifices to that end so that they can own a home of their own. Rent subsidy rewards the indolent and penalizes the ambitious. In my opinion it is a bad law

and an excellent place to cut Government spending to help balance the budget.

I hope the amendment to the amendment will be adopted and this program will be eliminated.

Mr. FARBSTEIN. Mr. Chairman, I move to strike the necessary number of words.

Mr. Chairman, I oppose both amendments. I wonder how many sitting here realize that in the large cities the cost of renovating old buildings is so high that even to occupy renovated old buildings, the impoverished, still need rent supplements. It is not only a question of their living in newly built homes or newly built houses. The cost of building is so high today that old, ramshackle structures that are being repaired must still be supplemented. Assistance must be rendered by government to the impoverished who seek to rent these apartments. I do not think that those of you who live in small communities and who live in small towns have any conception or realization of what rents are in the large cities, because if you had you would certainly never oppose rent supplements as has been offered here. If anything, you would go along with the sum originally requested of $65 million. As far as I am concerned, I sincerely hope that the Senate increases this from $25 million to $65 million.

Mr. Chairman, certainly this is no place to seek to economize. If you can vote for $410 million as a subsidy for farmers, if you can subsidize commercial farmers and factory farmers to the tune of $410 million, then what is wrong in helping these poor people to have a halfway decent place—not a decent place but merely a half-way decent place—in which to live?

Mr. Chairman, we are trying to keep the cities cool this summer. The best way to heat them up is to pass these amendments. We are in trouble enough in the cities. You folks who come from small communities may not realize this. Appropriations are being cut down generally so that there is little money for jobs for those kids who walk the streets. Kids will be hanging around looking for trouble this summer unless something is done to increase the poverty appropriations.

Mr. Chairman, if we are going to continue to force poor people to live in broken down homes, with broken floors, with broken pipelines, we are going to have trouble in the cities. In other words, if we are going to continue to insist that the poor occupy homes that are shameful to live in there is bound to be a day of reckoning.

Mr. Chairman, I am certainly amazed that the gentleman from New York has offered an amendment to cut this appropriation down from $25 million to $10 million.

Mr. Chairman, the gentleman from New York enjoys the good fortune of living at the edge of the city where there are many adequate homes available. But for the gentleman to disregard the occupants of the tenements, the ghettos, and the other unsuitable housing areas is unbelievable.

I beg of the members of the committee

to defeat this amendment—both of these amendments.

Mr. EVINS of Tennessee. Mr. Chairman, I ask unanimous consent that all debate on this amendment and all amendments thereto close in 5 minutes.

The CHAIRMAN. Is there objection to the request of the gentleman from Tennessee?

There was no objection.

Mr. BARRETT. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state his parliamentary inquiry.

Mr. BARRETT. It is my understanding that the 5 minutes is given, first, to the gentleman from Georgia [Mr. STEPHENS].

The CHAIRMAN. That was not the way the Chair understood the request. The manner in which the unanimous-consent request was put to the Chair was that all debate on this amendment and all amendments thereto close in 5 minutes.

Mr. BARRETT. Mr. Chairman, I ask unanimous consent to extend my remarks at this point in the RECORD.

The CHAIRMAN. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. BARRETT. Mr. Chairman, I rise in the strongest possible opposition to the amendment. I was deeply sorry to see the Appropriations Committee cut the rent supplement authorization from the $65 million requested by the President under existing law to only $25 million. To cut the $25 million even further would be, I would think, a completely irresponsible act in my judgment. The rent supplement program, for which we fought so hard, is a most promising supplement to our great public housing program. It offers a way for private enterprise and private mortgage capital to provide decent housing for the very poor who cannot pay an economic rent. At a time when our urban problems cry out for solution and at a time when decent housing is in critically short supply for low-income families, it is unthinkable that we would authorize a further cut in the rent supplement program. Mr. Chairman, I urge my colleagues on both sides of the aisle to reject this shortsighted, ill-advised amendment overwhelmingly.

(By unanimous consent, Mr. EVINS of Tennessee yielded his time to Mr. STEPHENS.)

The CHAIRMAN. The Chair recognizes the gentleman from Alaska [Mr. POLLOCK].

Mr. POLLOCK. Mr. Chairman, I rise in support of the committee's recommendations with respect to the rent supplement program.

I do so for three reasons.

First, it seems to me that the rent supplement program complements the highly successful rent certificate program, sponsored by the distinguished gentleman from New Jersey [Mr. WIDNALL]. Both programs involve the private ownership of the rental units in question. Both programs retain the property on the local tax rolls. Both programs involve a rental subsidy to families of low income.

The only difference is that the rent

certificate utilizes existing housing whereas the rent supplement program involves either the substantial rehabilitation of existing housing or new construction.

Also it seems to me that the rent supplement program is quite comparable to the program sponsored by Mr. WIDNALL involving homeownership. In principle, it seems to me that both programs have much in common.

Second, I support the rent supplement program because it is endorsed by a very responsible number of professionals in the field of housing. For example, the rent supplement program is supported by the National Association of Home Builders, the National Association of Real Estate Boards, the Mortgage Bankers Association, the President's Committee on Urban Housing, and Urban America. I could also add a very substantial number of other groups to this list. All of these groups are oriented toward private enterprise.

Third, I support the rent supplement program because it offers a viable alternative to the conventional public housing program and at this point and time it seems to me that the rent supplement program is certainly no more costly than the public housing and in fact it may be somewhat cheaper, certainly on the short-term basis it is cheaper. Finally the rent supplement program is on the books; it is operative and perhaps it is time that we concentrate our efforts on doing something to relieve the pressures in the cities for decent, safe, and sanitary housing.

The CHAIRMAN. The Chair recognizes the gentleman from New York [Mr. RYAN].

Mr. RYAN. Mr. Chairman, I oppose both the amendment to the amendment offered by the gentleman from Iowa [Mr. GROSS] and the amendment offered by the gentleman from New York [Mr. FINO]. Both are designed to gut the rent supplement program. I can understand, although I thoroughly disagree with, the attitude of the gentleman from Iowa. He has probably never been exposed to the squalor and degredation of the slums. But I am baffled by the attitude of the gentleman from New York who must know the depth of the housing crisis in New York City.

According to the 1960 census, there were then 550,000 units of delapidated and substandard housing in New York City. There are 135,000 families on the waiting list for public housing in New York City. And New York City's government has been able to build only an annual average of 2,500 units of low cost public housing in the past 2 years despite the fact that the Department of Housing and Urban Development had the funds to approve 7,500 units per year.

The gentleman from New York [Mr. FINO] said the rent supplement program was a "flop." The real failure is the failure of the New York City administration to use available Federal funds for a variety of housing programs.

Under the Fino amendment $10 million would yield about 11,000 units for the entire Nation. Because of the 15 percent limitation for any single State, this would mean about 1,200 units for New York City—which would barely make a dent in the problem.

I also deplore the not so subtle appeal to the prejudices of those who continue to resist open housing in the suggestion of the gentleman from New York [Mr. FINO] that the purpose of the rent supplement program is to promote integrated housing. Assuming arguendo that it is, open housing is a proper objective. The program should be used to open the suburbs and to bring about integrated communities. Otherwise, the crisis of the cities will not be resolved.

Rather than debating amendments to gut the rent supplement program, we should be increasing the appropriation, which provides for only $25 million. Neither that amount nor the administration's request of $65 million is sufficient. The total 4-year authorization through fiscal year 1969 is $150 million, and only $42 million has been appropriated. Instead of $25 million, it would take $108 million to keep faith with the commitment made when the rent supplement program was originally authorized.

The authorization of $150 million would have produced some 175,000 units. However, Congress has obstructed the program by low funding to the point where only 2,734 units are occupied, 16,108 units are under construction, and 23,500 units are in planning for an overall total of 42,342 units. If we continue at this pace, one-fifth of our Nation will remain ill housed for years to come. And the frustration and despair of the slums will intensify. An affluent society has an obligation to all of its citizens which must not be ignored.

The amendment to the amendment, and the amendment, should be defeated.

(By unanimous consent, Mr. RYAN yielded the remainder of his time to Mr. STEPHENS.)

The CHAIRMAN. The Chair recognizes the gentleman from New York [Mr. FINO].

Mr. FINO. Mr. Chairman, I listened to my colleague from New York, and I cannot quite understand all of his excitement. I want to make my position crystal clear.

I am not opposed to housing, but I am opposed to what we call expensive housing, and that is exactly what this rent supplement program is all about—expensive housing. We can provide plenty of sufficient housing for our so-called poor people if we concentrate on the programs that we have on the statute books.

The CHAIRMAN. The Chair recognizes the gentleman from New York [Mr. GILBERT].

Mr. GILBERT. Mr. Chairman, may I say I heard my distinguished colleague from my county, the gentleman from New York [Mr. FINO], just make some reference to this amendment. May I say that, living in the Bronx and living in the city of New York, I know the importance of the rent supplement program.

I truly join my colleague, the gentleman from New York [Mr. FARBSTEIN], in saying that I am truly dismayed and shocked that Mr. FINO does not quite understand the nature of the problem that we have in our city. I believe that we here can make this little gesture for the people who live in these ghetto areas, and in the district that I represent. I know the people want this and need it.

The CHAIRMAN. The Chair recognizes the gentleman from Michigan [Mr. HARVEY].

Mr. HARVEY. Mr. Chairman, I used to serve on the Subcommittee on Housing of the Committee on Banking and Currency, and when this program first came up I opposed it. I did so because I thought the regulations were poorly drawn and because the money was not going to the needy people who truly needed it, but these regulations have now been changed. If the Members do not believe so, then they should look at the regulations such as those I have here in my hand and study them. Do not just arbitrarily reject this program.

This is a program that is designed to help the poor, for that reason I have supported the program since the regulations were revised and I support the program today. I ask my colleagues on this side of the aisle to scrutinize it carefully. There are only two ways of helping the poor with housing. We can give them public housing or supplement their rents in rental housing. Mr. Chairman, this program deserves a chance to prove its worth. I hope both amendments will be defeated.

The CHAIRMAN. The Chair recognizes the gentleman from Georgia [Mr. STEPHENS] to close the debate.

Mr. HECHLER of West Virginia. Mr. Chairman, will the gentleman yield?

Mr. STEPHENS. I yield to the gentleman from West Virginia.

Mr. HECHLER of West Virginia. Mr. Chairman, I appreciate the fact that the gentleman from Georgia has yielded to me so that I may add my strong support to the rent supplement program. This program has already more than proven its value in West Virginia through the projects which have just recently been authorized, and for which groundbreakings have already been held. I might also mention that when we had a test vote on this issue last fall, I voted for $40 million in funds for rent supplements, even though we lost that vote in 1967.

I would like to speak briefly regarding the importance of the appropriations for the rent supplement program in the bill before us. This program is an integral part of the effort to provide decent housing for lower income families, for the elderly, the handicapped and for those who now occupy substandard housing.

Under this program, housing owners, who must be private nonprofit, limited-distribution, or cooperative mortgagors, enter into contracts with the Secretary of Housing and Urban Development to receive Federal rent supplement payments. They are thus able to provide privately built, owned, and financed housing to worthy tenants who might not otherwise be able to afford the rent. Complementing the low-rent public housing program, rent supplements help to increase the available supply of shelter for those most in need.

Since its inception, this program has been underfunded, with only $10 million in contract authorization provided for this fiscal year. I would urge that the committee recommendation for an appropriation of $25 million be granted in

full. This would be an important step toward providing decent shelter for the many Americans who cannot now afford it. In broader perspective, it would be an impressive step toward meeting the President's commendable goal of ridding the Nation of its substandard housing in the next 10 years.

There is a great need for decent housing in this country. There are nearly 6 million occupied substandard homes sheltering nearly 20 million people in this country at the present time—a time of unequaled prosperity for the majority of Americans. One way of helping to meet the housing needs of this country is through the rent supplements program and I would hope that every Member of this body would vote to provide the funds which that program requires for effective implementation.

The rent supplement program depends in large measure on the private sector, which is building the needed housing in our towns, villages, and cities. Full funding of the program will maximize the number of families of low income who will be afforded an opportunity to live in decent shelter for the first time.

Tenants assisted through the rent supplement program will pay 25 percent of their income and Federal financial assistance, which will be paid to the owners of the housing, will make up the difference between the tenants' payments and the full market rent.

This program, which has gotten off to a good start—even though the funding was not what it should have been, is an important tool in our efforts to help the American city. As President Johnson has described it, the rent supplement program is "the most crucial new instrument in our effort to improve the American city." I certainly hope that the pending amendments designed to get the program are soundly defeated.

Mr. STEPHENS. Mr. Chairman, I rise in opposition to both amendments. We enacted the rent supplement program in 1965 but made no funds available to get it underway until mid-1966. Throughout its short history, it has been continually underfunded. I want to bring up to date the status of this program.

The rent supplement program is popular. It has the support of business, labor, and welfare groups. Limited dividend corporations and nonprofit groups have flocked to file applications to help in providing decent homes for low-income Americans. The funds available have never matched the number of worthy applications. At the present time, there are 132 applications, representing 12,260 units of supplemented housing, awaiting new funds for the program.

Progress under the rent supplement program has been noticeable. By the end of fiscal year 1969, there will be 384 rent supplemental projects, located throughout the country, and providing nearly 27,000 units of supplemented housing.

In his budget for this year President Johnson asked for $65 million in funds for this program. That amount would have provided about 72,000 units of supplemented housing. The Appropriations Committee has recommended $25 million for the program in the next fiscal year. This is a $40 million reduction. This will provide about 28,000 units of supplemented housing.

The program has many advantages. To repeat some of my prior arguments: The housing provided under it is privately owned, built, and managed. It remains on the tax rolls, helping a city and county to meet its financial needs. The principle in this is the same as rent certificates; same, in fact, as flood insurance.

No program does more to use Federal funds efficiently, for as a tenant's income rises, the amount of supplement paid is reduced. In addition, the tenant is not penalized if his income rises. He does not have to move from his home, but simply pays more of the actual rent.

The rent supplement program has gained the support of homebuilders, realtors, and the mortgage banking industry. All of these groups realize the advantages of involving private industry in the attempt to provide decent low-cost housing.

I believe the rent supplement program is demonstrating its worth. Let us recognize its value by accepting the committee's full recommendation of $25 million.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Iowa [Mr. GROSS] as a substitute for the amendment offered by the gentleman from New York [Mr. FINO].

The question was taken; and on a division (demanded by Mr. GROSS), there were—ayes 48, noes 85.

So the substitute amendment was rejected.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York [Mr. FINO].

The question was taken; and on a division (demanded by Mr. FINO), there were—ayes 51, noes 92.

So the amendment was rejected.

The CHAIRMAN. The Clerk will read.

The Clerk proceeded to read the bill.

Mr. EVINS of Tennessee (during the reading). Mr. Chairman, I ask unanimous consent that the bill be considered as read in full and that the bill be open for amendment at any point.

The CHAIRMAN. Is there objection to the request of the gentleman from Tennessee?

There was no objection.

AMENDMENT OFFERED BY MR. BROYHILL OF VIRGINIA

Mr. BROYHILL of Virginia. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. BROYHILL of Virginia: On page 46, immediately after line 3, insert the following:

"SEC. 308. No part of the funds appropriated by this Act shall be used to pay the salary of any Federal employee who is convicted in any Federal, State, or local court of competent jurisdiction, of inciting, promoting, or carrying on a riot, or any group activity resulting in material damage to property or injury to persons, found to be in violation of Federal, State, or local laws designed to protect persons or property in the community concerned."

The CHAIRMAN. The gentleman from Virginia is recognized in support of the amendment.

Mr. BROYHILL of Virginia. Mr. Chairman, three times before I have proposed to this House that we take action to deny payment of salaries to any Federal employee who is convicted of inciting, promoting, or carrying on a riot, or of any group activity resulting in material damage to property or injury to persons. Three times the Members of this House have agreed with me that Federal money should be denied those who participate in such activities.

As I said last week during debate on the Agriculture appropriations bill, this restriction contained in appropriations measures for other agencies has enabled the employing agencies to warn their employees against participation in illegal acts. I sincerely regret that the restriction was not in effect in all of our Federal agencies during the recent Washington riots.

The amendment I offer today, like the previous three, provides that no funds appropriated under this act shall be used to pay salaries of any Federal employee who is convicted in any Federal, State, or local court of competent jurisdiction, of inciting, promoting, or carrying on a riot, or any group activity resulting in material damage to property or injury to persons, found to be in violation of Federal, State, or local laws designed to protect persons or property in the community concerned.

Unlike two previous amendments, the amendment I offer today does not extend to recipients of services or grants from any of the agencies funded under this act, so that there can be no question here of the denial of charitable services to innocent family members of recipients.

It does, however, prevent those agencies funded under this act from being forced, through lack of restrictive legislation, to continue to finance any of its employees who are intent on destroying law and order by providing them with funds from the very Government they are bent on destroying.

Again I say as I did last week during debate on the Agriculture appropriations bill, there are more than enough good citizens, black and white, seeking employment with this Government. We do not have to pay salaries to those whose chief pastime is to kick America around, while basking in the bonfires they set in our cities.

I did not know of any Agriculture employees involved in the looting when I offered this amendment last week. I have since learned there were two. I do not know of any employees affected by this amendment today. However, I again say that I sincerely believe every loyal Federal employee will agree with me that neither they nor any of their loyal fellow employees want those seeking to destroy their Government working side by side with them and being paid by that Government.

Mr. EVINS of Tennessee. Mr. Chairman, will the gentleman yield?

Mr. BROYHILL of Virginia. I yield to the gentleman from Tennessee.

Mr. EVINS of Tennessee. Mr. Chairman, the gentleman has discussed the amendment with me. It has been adopted before. Without objection, we will accept the amendment and take it to conference. We hope if we have some violators

Case 3:22-cv-00410-REP   Document 41-6   Filed 02/22/23   Page 45 of 145 PageID# 1351

that we can get some convictions and some action.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Virginia [Mr. BROYHILL].

The amendment was agreed to.

Mr. BOW. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I shall be brief. I shall offer a motion to recommit which embodies the same amendment that was accepted by the chairman of the Treasury-Post Office Appropriation Subcommittee last April 9. And, it is the same amendment that was adopted by the Committee of the Whole last Wednesday when we debated the Agriculture appropriation bill.

Simply stated, the amendment would set a ceiling on the expenditure of Federal funds in fiscal 1969 by the agencies provided for in the bill in the total amount of $15,518,483,000, or $732,808,-000 less than the $16,251,291,000 which these agencies proposed in the January budget to spend next year. I want to point out that this represents a cut of only 4.5 percent in their planned spending and certainly is proper in light of the fact that we may soon be voting on an overall package to reduce expenditures and obligational authority and to increase taxes on almost everyone. Last week this House approved a cut in Agriculture Department spending of 6 percent.

I want to reiterate what has been said earlier in the debate today. The Independent Offices Appropriations Subcommittee has reduced the obligational authority requests in this bill by almost $2.9 billion, including the elimination of $2.1 billion of participation sales authorizations which do not, however, affect current plans for program activities proposed by the agencies. The subcommittee has estimated that its actions in reducing the obligational authority requests by the $2.9 billion will result in actual cutbacks totaling $360 million in 1969 proposed spending by these agencies. I commend the gentleman from Tennessee [Mr. EVINS] and the gentleman from North Carolina [Mr. JONAS] and other members of the subcommittee for accomplishing these reductions, some of which will have a real impact on the spending programs of these agencies in 1969. I do want to point out, however, that their actions would result in a cutback of only 2.2 percent in the spending plans of these agencies next year. And, I think we are all agreed that greater cutbacks must be made if we are to accomplish the goal that the Appropriations Committee set for itself last week when it endorsed a resolution proposing a cutback of $4 billion in planned 1969 spending. Of course, that resolution made certain exceptions for special Vietnam costs, interest on the public debt, payments from trust funds and other relatively uncontrollable expenditures.

Thus, the agencies provided for in this bill, as well as others which are not in the relatively uncontrollable category, will have to share to a greater extent in the cutbacks than they would if the overall cutback were applied on a straight, across-the-board basis.

The amendment in the motion to recommit takes the approach that spending in fiscal 1969 should be held at the 1968 or 1969 level, whichever is lower, plus certain mandatory increases over which the agencies have no control. These mandatory increases include such items as the annualization of salaries, postage rate increases, the Pay Act increase of last October, and increases resulting from contractual obligations previously made. The lower of 1968 or 1969 expenditures by these agencies totals $14,686,205,000 to which we have added $832,278,000 of mandatory increases, making a total expenditure ceiling of $15,518,483,000 which I mentioned earlier.

These mandatory increases include $285,975,000 for the Department of Housing and Urban Development, $362,500,-000 for the Veterans' Administration and $183,803,000 for the other agencies provided for in the bill. The details of these mandatory increases were supplied to the Independent Offices Subcommittee by the agencies involved and, as submitted, they totaled $1,186 million. Analysis of these increases revealed, however, that the Department of Housing and Urban Development had included in their mandatory increases a number of items that were purely administrative determinations and reservations and were not mandatory in any sense of the word. But, I do want to make absolutely clear to everyone that their estimates of mandatory increases for the model cities program, the rent supplement program, the low rent public housing program, and housing for the elderly and handicapped were accepted by us at face value and have been included in the mandatory increases allowed by the amendment.

Mr. Chairman, this is a good amendment and worthy of an affirmative vote by the House. Although it would reduce spending in 1969 by $732 million, or $372 million more than the Appropriations Committee was able to cut, it will not curtail any of the essential services performed by these agencies. Moreover, it will help us reach the expenditure reduction goal which was approved by the Appropriations Committee last week and I urge its adoption.

Mr. GONZALEZ. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I have been trying to overcome the general lack of appreciation of the Renegotiation Board in 2 years of speeches in behalf of strengthening the Board. Despite its general obscurity, the Board is the foremost restraint against profiteering on defense and space contracts. It is the only independent agency whose entire efforts are dedicated to determining and recovering excessive profits on Government contracts.

Since its inception in 1953, the Board has saved the American taxpayer $2 billion, either by directing contractors to return excessive profits to the Treasury, or by its activities which lead contractors to voluntarily make price reductions or refunds to the Government agencies. In addition, the very presence of the Board acts as a deterrent to profiteering, just as the policeman on the beat cuts down on temptation.

In comparison with the $2 billion re-

covered by the Board in excessive profits, the Board's expenses have totaled $50 million since its inception. Discounting tax adjustments and credits, I estimate a savings-cost ratio of 18 to 1. This means that the Board saves for the American taxpayer $18 for every $1 spent to maintain it. In the case of the appropriations for the Renegotiation Board, then, we are talking of spending in order to get the means to recover much more in excessive profits.

I would have liked an increase of $600,-000 in fiscal 1969 over the Board's appropriation for last year. This would provide the Renegotiation Board with 44 or 45 additional positions to enable it to cope with the increased workload generated by the Vietnam conflict. Because the Board reviews the completed contracts of the larger prime and subcontractors on a fiscal year basis, its review runs 2 or 3 years behind the awarding of the contracts. Therefore, the Board is only now feeling the effects of the Vietnam procurement buildup.

The administration figure was an austerity request for an agency already pared down to the bone. It was based on a conservatively estimated increase in workload generated by Vietnam.

In my statements in behalf of a strong Renegotiation Board, I have cited example after example, trend after trend, indicating that excessive profitmaking is considerably more rampant than the Defense Department officials ever acknowledge. I think it very likely that the manhours the Board will need to ferret out this increased profiteering was estimated too low. But in any event, with a likely budget deficit of $20 billion, how can we be justified in withholding full funds from an agency which adds—not subtracts—to the Treasury, in proportion to the funds spent to operate it?

In fiscal 1967, prime military contract awards for Vietnam exceeded the high mark of $43.6 billion reached during the Korean conflict, and they are continuing at about the $45 billion level this year. Yet at the height of the Korean period, the Renegotiation Board had 742 employees and a budget of $5,093,000, as compared to a present budget of $2,-600,000 and 174 employees.

Actually, one of the reasons for the relative weakness of the Board today has been a series of amendments greatly limiting the Board's jurisdiction. However, I have a bill presently under consideration by the Ways and Means Committee which would restore the Board to its Korean capabilities.

But the simple truth is that the Renegotiation Board's fight against war profiteering was fully supported during the Korean war, in terms of basic statute, in terms of manpower and in terms of budget. The Board responded in kind, with determinations of excessive profits exceeding $150,000,000 for 3 of those years.

Today there are many examples of war profiteering. Today there are ample indications of increased profitmaking on defense contracts. But the simple truth is that this Congress and this Nation is largely unconcerned about the inequality of sacrifice relative to Vietnam. Few seem to care that American soldiers are

dying in Vietnam in a very hot war, while a few unscrupulous or negligent profiteers are allowed to make a killing on defense contracts in stateside comfort.

The Renegotiation Board needs a significant increase in personnel to give the taxpayer a fair chance at recovering exorbitant profits made on Vietnam procurement. There is every reason to believe that the Board would continue to save $18 for every $1 expended. Thank you.

Mr. YATES. Mr. Chairman, will the gentleman yield?

Mr. GONZALEZ. I yield to the gentleman from Illinois.

Mr. YATES. I commend the gentleman for bringing this matter to the attention of the House. I read an item in the New York Times a few days ago to the effect that appearing before the House Committee on Banking and Currency Admiral Rickover made the assertion that on many defense contracts profits of as much as 25 percent were being made by defense contractors. This should not be tolerated. Certainly there is a job for the Renegotiation Board to do here, and I hope it accepts its responsibility fully.

Mr. GONZALEZ. I thank the gentleman.

Mr. BOLAND. Mr. Chairman, will the gentleman yield?

Mr. GONZALEZ. I yield to the gentleman from Massachusetts.

Mr. BOLAND. I want to join the gentleman from Illinois in commending the gentleman from Texas on his presentation here. There is no question about the fact that the Renegotiation Board has done a good job with the budget and authority it has had.

As the gentleman knows, we have provided some $400,000 more for fiscal year 1969 than for 1968.

I know that the gentleman does have a bill, H.R. 6792, which would strengthen the Renegotiation Board. I hope that the Ways and Means Committee will act on this measure very soon and bring it to the floor of the House for passage.

I believe the points that the gentleman makes need attention.

Mr. Chairman, since the Renegotiation Board's inception, the determinations of excessive profits have totaled $952,436,-037 before adjustment for Federal taxes. Voluntary refunds and voluntary price reductions have totaled $1,300,121,259.

Because of the normal timelag between the award of a contract and the reporting of receipts and accruals thereunder for renegotiation, as well as the time required for the processing of a renegotiation case, the effect of accelerated Vietnam procurement is not reflected in the determinations I have just mentioned.

The Renegotiation Board has authority under the Renegotiation Act of 1951, as amended, to determine and eliminate excessive profits realized by contractors and subcontractors in the defense and space programs. So, the Renegotiation Board is charged by law to look into these contracts.

Renegotiation is conducted not with respect to individual contracts, but with respect to the receipts or accruals of a contractor under all renegotiable contracts and subcontracts in a fiscal year of the contractor.

In 1967, the Renegotiation Board made 18 determinations of excessive profits totaling $15,980,214. Also, in the same period, contractors reported voluntary refunds and voluntary price reductions in the amount of $30,318,586.

Mr. GONZALEZ. I thank the gentleman from Massachusetts. It is very heartening to hear the remarks made by the gentleman from Massachusetts and by the gentleman from Illinois—and, above all, those of the chairman of the subcommittee who supported this general movement in his remarks made in the hearings on the appropriation bill.

Mr. EVINS of Tennessee. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, the distinguished gentleman from Ohio announced he is going to offer a motion to recommit. I will offer an amendment to the motion.

I would say to my friend that I share his desire for economy and cutting expenditures. I think we have done this to a very substantial degree in this bill. You will be given an opportunity in voting for this bill to vote for cuts of $2,899,944,300 or almost $3 billion in new obligational authority and $360 million in expenditures this year.

My distinguished colleague, the gentleman from Ohio, would propose reducing expenditures by $372 million more. This would bring about an additional spending cut of half a billion dollars out of only a portion of the bill.

Gentlemen, we think this goes too far. We are all familiar with the Bow amendment. I share the view of the gentleman from Ohio with regard to economy, but I think this is going absolutely too deep. We have already cut this bill 17.5 percent. This is $2.9 billion below the budget request. To limit expenditures as the gentleman from Ohio suggests means that the Government may have to defer payments to contractors. He says that payments to veterans may not be affected, but I am not sure of this. This amendment might cause some delay in payment of hospital benefits. Also the payments for local air carriers might be impaired. I would say that his amendment increases the redtape. It increases the cost to the Government and others concerned across the board.

The Bow amendment merely says that the Government must not pay its bills when they are due. Frankly, I was hopeful that I could accept the amendment offered by my friend, the gentleman from Ohio, and I hoped he would make it along the lines that we recommended, in a reasonable amount. However, I feel that the amount he recommends goes too far and too deep. We have made substantial cuts in appropriations. We estimate that the expenditures in this bill bring about reductions of $1.1 billion less than 1968 after adjusting for certain mandatory increases. The expenditure reductions made by the committee will be $360 million from the budget. The gentleman from Ohio wants to more than double the expenditure reductions. This, my friends, is unwise and unsound.

I point out further that if this amendment were adopted some 20,000 to 25,000 Government contractors throughout the Nation might have to wait for the payment of bills after they perform their work. The gentleman's amendment does not limit the obligations. The gentleman's amendment merely says that bills cannot be paid when due. Mr. Chairman, we do not want it said that contractors, after they have performed their work, cannot receive their payments on time.

I believe this amendment is unsound. I believe it goes too far, and I believe you should vote down the Bow expenditure ceiling and vote for the large and substantial reductions which have already been made in this bill. You will be given an opportunity to vote for about a $3 billion cut in this bill. I hope that the recommittal motion will not be adopted.

Mr. EVINS of Tennessee. Mr. Chairman, I move that the Committee do now rise and report the bill back to the House with sundry amendments, with the recommendation that the amendments be agreed to and that the bill as amended do pass.

The motion was agreed to.

Accordingly the Committee rose; and the Speaker having resumed the chair, Mr. O'HARA of Michigan, Chairman of the Committee of the Whole House on the State of the Union, reported that that Committee, having had under consideration the bill (H.R. 17023), making appropriations for sundry independent executive bureaus, boards, commissions, corporations, agencies, offices, and the Department of Housing and Urban Development for the fiscal year ending June 30, 1969, and for other purposes, had directed him to report the bill back to the House with sundry amendments, with the recommendation that the amendments be agreed to and that the bill as amended do pass.

Mr. EVINS of Tennessee. Mr. Speaker, I move the previous question on the bill and all amendments thereto to final passage.

The previous question was ordered.

The SPEAKER. The question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed, and read a third time, and was read the third time.

Mr. BOW. Mr. Speaker, I offer a motion to recommit.

The SPEAKER. Is the gentleman opposed to the bill?

Mr. BOW. I am, Mr. Speaker.

The SPEAKER. The gentleman qualifies. The Clerk will report the motion to recommit.

The Clerk read as follows:

Mr. Bow moves to recommit the bill to the Committee on Appropriations with instructions to that committee to report it back forthwith with the following amendment: On page 46 after line 3, insert a new section as follows:

"SEC. 308. Money appropriated in this Act shall be available for expenditure in the fiscal year ending June 30, 1969, only to the extent that expenditure thereof shall not result in the net aggregate expenditure of Federal funds by all agencies provided for

*May 8, 1968*     CONGRESSIONAL RECORD — HOUSE     12263

herein (including the Office of Civil Defense) beyond $15,518,483,000, except by those Veterans' Administration and Federal Home Loan Bank Board expenditures required by law which may exceed budget estimates therefor and except by those reimbursements made by departments and agencies to the General Services Administration for services rendered."

The SPEAKER. The gentleman from Tennessee is recognized.

Mr. EVINS of Tennessee. Mr. Speaker, I have an amendment to the motion to recommit.

Mr. BOW. Mr. Speaker, a parliamentary inquiry.

The SPEAKER. The gentleman will state his parliamentary inquiry.

Mr. BOW. The motion to recommit being the prerogative of the minority, and the minority having exercised that prerogative, my parliamentary inquiry is as a matter of fact whether or not an amendment is in order, and if it is in order, whether the gentleman making it must indicate that he too is against the bill in its present form?

The SPEAKER. In response to the inquiry of the gentleman from Ohio, the Chair will state to the gentleman that the motion to recommit is one with instructions. Since the previous question has not been ordered, it is open for amendment.

Mr. BOW. Mr. Speaker, I move the previous question on my motion to recommit.

The SPEAKER. The Chair will state that the Chair had already recognized the gentleman from Tennessee.

Mr. BOW. Mr. Speaker, a further parliamentary inquiry.

The SPEAKER. The gentleman will state his parliamentary inquiry.

Mr. BOW. Again, Mr. Speaker, I request the Chair to rule on whether or not if the gentleman from Tennessee offers an amendment to the motion to recommit which has been offered by the gentleman from Ohio, whether he would then have to state if he is opposed to the bill in its present form?

Mr. EVINS of Tennessee. Mr. Speaker, I ask that my amendment be reported and I would say to my friend that under my amendment I attempt to bring it up to $360 million and this is the foundation for my support.

The SPEAKER. The Chair will state in response to the second inquiry of the gentleman from Ohio that the gentleman from Tennessee would also have to qualify.

Does the gentleman from Tennessee press his amendment?

Mr. BOW. Mr. Speaker, I again move the previous question on the motion to recommit.

Mr. EVINS of Tennessee. Mr. Speaker, my amendment would provide for $360 million.

Mr. GROSS. Mr. Speaker, regular order.

The SPEAKER. The Chair will state that the gentleman from Tennessee would also have to qualify that he is opposed to the bill, or opposed to the bill in its present form.

Mr. BOW. Mr. Speaker, I move the previous question on my motion to recommit.

The SPEAKER. Does the gentleman

from Tennessee still press his amendment?

Mr. EVINS of Tennessee. Mr. Speaker, I ask the withdrawal of my amendment.

The SPEAKER. The amendment of the gentleman from Tennessee had not been reported by the Clerk and he withdraws his amendment.

Without objection, the previous question is ordered on the motion to recommit.

There was no objection..

The SPEAKER. The question is on the motion to recommit.

Mr. BOW. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The question was taken; and there were—yeas 173, nays 217, answered "present" 2, not voting 41, as follows:

[Roll No. 122]

YEAS—173

| | | |
|---|---|---|
| Abbitt | Fountain | Pelly |
| Abernethy | Gardner | Pettis |
| Andrews, | Gathings | Poff |
| N. Dak. | Goodell | Pollock |
| Arends | Gooding | Price, Tex. |
| Ashbrook | Griffin | Quie |
| Bates | Gross | Quillen |
| Battin | Grover | Randall |
| Belcher | Gubser | Rarick |
| Bennett | Gurney | Reid, Ill. |
| Berry | Haley | Reifel |
| Betts | Hall | Reinecke |
| Biester | Hammer- | Robison |
| Blackburn | schmidt | Rogers, Fla. |
| Bolton | Harsha | Roth |
| Bow | Heckler, Mass. | Roudebush |
| Bray | Henderson | Rumsfeld |
| Brinkley | Hosmer | Sandman |
| Brock | Hull | Satterfield |
| Brotzman | Hunt | Saylor |
| Brown, Mich. | Hutchinson | Schadeberg |
| Brown, Ohio | Ichord | Scherle |
| Broyhill, N.C. | Jarman | Schneebeli |
| Broyhill, Va. | Johnson, Pa. | Schwengel |
| Buchanan | Jonas | Scott |
| Burke, Fla. | Jones, N.C. | Shriver |
| Burton, Utah | Keith | Skubitz |
| Bush | King, N.Y. | Smith, Calif. |
| Byrnes, Wis. | Kleppe | Smith, N.Y. |
| Cahill | Kuykendall | Smith, Okla. |
| Cederberg | Kyl | Snyder |
| Chamberlain | Laird | Springer |
| Clancy | Langen | Stelger, Ariz. |
| Clausen, | Latta | Stelger, Wis. |
| Don H. | Lennon | Stuckey |
| Clawson, Del | Lipscomb | Taft |
| Cleveland | Lloyd | Talcott |
| Collier | Lukens | Taylor |
| Colmer | McClory | Teague, Calif. |
| Conable | McCloskey | Thompson, Ga. |
| Cowger | McClure | Thomson, Wis. |
| Cramer | McEwen | Tuck |
| Curtis | Mailliard | Utt |
| Davis, Ga. | Marsh | Wampler |
| Davis, Wis. | Martin | Watkins |
| Dellenback | Mathias, Calif. | Watson |
| Denney | May | Whalley |
| Derwinski | Mayne | Whitener |
| Devine | Meskill | Whitten |
| Dickinson | Michel | Wiggins |
| Dole | Miller, Ohio | Williams, Pa. |
| Downing | Mills | Wilson, Bob |
| Duncan | Mize | Winn |
| Erlenborn | Montgomery | Wydler |
| Eshleman | Morton | Wylie |
| Findley | Myers | Wyman |
| Flno | Nelsen | Zion |
| Flynt | O'Neal, Ga. | Zwach |
| Ford, Gerald R. | Ottinger | |

NAYS—217

| | | |
|---|---|---|
| Adams | Blatnik | Cabell |
| Addabbo | Boggs | Carey |
| Albert | Boland | Casey |
| Anderson, | Bolling | Celler |
| Tenn. | Brademas | Clark |
| Annunzio | Brasco | Cohelan |
| Ashley | Brooks | Conte |
| Aspinall | Broomfield | Conyers |
| Ayres | Brown, Calif. | Corbett |
| Baring | Burke, Mass. | Culver |
| Barrett | Burleson | Daddario |
| Bell | Burton, Calif. | Daniels |
| Bingham | Button | Dawson |
| Blanton | Byrne, Pa. | de la Garza |

| | | |
|---|---|---|
| Delaney | Jones, Mo. | Rees |
| Dent | Karth | Reid, N.Y. |
| Diggs | Kastenmeler | Resnick |
| Dingell | Kazen | Reuss |
| Donohue | Kee | Rhodes, Pa. |
| Dow | Kelly | Riegle |
| Dulski | King, Calif. | Rivers |
| Dwyer | Kluczynski | Roberts |
| Eckhardt | Kornegay | Rodino |
| Edmondson | Kupferman | Rogers, Colo. |
| Edwards, Calif. | Kyros | Ronan |
| Edwards, La. | Leggett | Rooney, N.Y. |
| Esch | Long, La. | Rooney, Pa. |
| Evans, Colo. | Long, Md. | Rosenthal |
| Everett | McCarthy | Rostenkowski |
| Evins, Tenn. | McCulloch | Roush |
| Fallon | McDade | Roybal |
| Farbstein | McDonald, | Ruppe |
| Fascell | Mich. | Ryan |
| Feighan | McFall | St Germain |
| Fisher | McMillan | St. Onge |
| Flood | Macdonald, | Scheuer |
| Foley | Mass. | Schweiker |
| Ford, | Machen | Shipley |
| William D. | Madden | Sikes |
| Fraser | Mahon | Sisk |
| Friedel | Matsunaga | Slack |
| Fulton, Pa. | Meeds | Smith, Iowa |
| Fulton, Tenn. | Miniish | Stafford |
| Fuqua | Mink | Staggers |
| Galifianakis | Minshall | Stanton |
| Gallagher | Monagan | Steed |
| Garmatz | Moorhead | Stephens |
| Giaimo | Morgan | Stratton |
| Gilbert | Morris, N. Mex. | Stubblefield |
| Gonzalez | Mosher | Sullivan |
| Gray | Moss | Teague, Tex. |
| Green, Pa. | Murphy, Ill. | Tenzer |
| Griffiths | Murphy, N.Y. | Thompson, N.J. |
| Gude | Natcher | Tiernan |
| Halpern | Nedzi | Tunney |
| Hamilton | Nix | Udall |
| Hanley | O'Hara, Mich. | Ullman |
| Hansen, Wash. | O'Konski | Van Deerlin |
| Harvey | O'Neill, Mass. | Vander Jagt |
| Hathaway | Passman | Vanik |
| Hawkins | Patman | Vigorito |
| Hébert | Patten | Waggonner |
| Hechler, W. Va. | Pepper | Waldie |
| Helstoski | Perkins | Walker |
| Hicks | Philbin | Whalen |
| Holifield | Pickle | White |
| Horton | Pike | Willis |
| Howard | Pirnie | Wilson, |
| Hungate | Poage | Charles H. |
| Irwin | Podell | Wolff |
| Jacobs | Pool | Wright |
| Joelson | Price, Ill. | Yates |
| Johnson, Calif. | Pryor | Young |
| Jones, Ala. | Railsback | Zablocki |

ANSWERED "PRESENT"—2

Anderson, Ill.    Dorn

NOT VOTING—41

| | | |
|---|---|---|
| Adair | Hagan | Miller, Calif. |
| Andrews, Ala. | Halleck | Moore |
| Ashmore | Hanna | Morse, Mass. |
| Bevill | Hansen, Idaho | Nichols |
| Carter | Hardy | O'Hara, Ill. |
| Corman | Harrison | Olsen |
| Cunningham | Hays | Pucinski |
| Dowdy | Herlong | Purcell |
| Edwards, Ala. | Holland | Rhodes, Ariz. |
| Eilberg | Karsten | Selden |
| Frelinghuysen | Kirwan | Watts |
| Gettys | Landrum | Widnall |
| Gibbons | MacGregor | Wyatt |
| Green, Oreg. | Mathias, Md. | |

So the motion to recommit was rejected.

The Clerk announced the following pairs:

On this vote:

Mr. Dorn for, with Mr. Kirwan against.
Mr. Anderson of Illinois for, with Mr. Morse of Massachusetts against.

Until further notice:

Mr. Bevill with Mr. MacGregor.
Mr. Miller of California with Mr. Adair.
Mr. Corman with Mr. Rhodes of Arizona.
Mr. Eilberg with Mr. Harrison.
Mr. Pucinski with Mr. Carter.
Mrs. Green of Oregon with Mr. Halleck.
Mr. Hanna with Mr. Cunningham.
Mr. Hays with Mr. Widnall.
Mr. O'Hara of Illinois with Mr. Frelinghuysen.

Mr. Nichols with Mr. Moore.
Mr. Selden with Mr. Mathias of Maryland.
Mr. Gettys with Mr. Wyatt.
Mr. Ashmore with Mr. Edwards of Alabama.
Mr. Andrews of Alabama with Mr. Hansen of Idaho.
Mr. Dowdy with Mr. Olsen.
Mr. Karsten with Mr. Landrum.
Mr. Holland with Mr. Hardy.
Mr. Gibbons with Mr. Hagan.
Mr. Purcell with Mr. Watts.

Mr. DICKINSON and Mrs. HECKLER of Massachusetts changed their votes from "nay" to "yea."

Mr. BELL and Mr. McCULLOCH changed their votes from "yea" to "nay."

Mr. DORN. Mr. Speaker, I have a live pair with the gentleman from Ohio [Mr. KIRWAN]. If he had been present, he would have voted "nay." I voted "yea." I withdraw my vote and vote "present."

Mr. ANDERSON of Illinois. Mr. Speaker, I have a live pair with the gentleman from Massachusetts [Mr. MORSE]. If he had been present, he would have voted "nay." I voted "yea." I withdraw my vote and vote "present."

The result of the vote was announced as above recorded.

The SPEAKER. The question is on the passage of the bill.

Mr. EVINS of Tennessee. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The question was taken; and there were—yeas 353, nays 37, answered "present" 2, not voting 41, as follows:

[Roll No. 123]

YEAS—353

| | | |
|---|---|---|
| Abbitt | Cederberg | Fraser |
| Abernethy | Celler | Friedel |
| Adams | Chamberlain | Fulton, Pa. |
| Addabbo | Clark | Fulton, Tenn. |
| Albert | Clausen, | Fuqua |
| Anderson, Ill. | Don H. | Galifianakis |
| Anderson, | Cleveland | Gallagher |
| Tenn. | Cohelan | Gardner |
| Andrews, | Collier | Giaimo |
| N. Dak. | Colmer | Gilbert |
| Annunzio | Conable | Gonzalez |
| Arends | Conte | Gray |
| Ashley | Conyers | Green, Pa. |
| Aspinall | Corbett | Griffin |
| Ayres | Cowger | Griffiths |
| Baring | Cramer | Gubser |
| Barrett | Culver | Gude |
| Bates | Daddario | Gurney |
| Battin | Daniels | Haley |
| Belcher | Dawson | Hall |
| Bell | de la Garza | Halpern |
| Berry | Delaney | Hamilton |
| Betts | Dellenback | Hammer- |
| Biester | Denney | schmidt |
| Bingham | Dent | Hanley |
| Blackburn | Diggs | Hanna |
| Blanton | Dingell | Hansen, Wash. |
| Blatnik | Dole | Harsha |
| Boggs | Donohue | Harvey |
| Boland | Dorn | Hathaway |
| Bolling | Dow | Hawkins |
| Bolton | Downing | Hébert |
| Brademas | Dulski | Hechler, W. Va. |
| Brasco | Duncan | Heckler, Mass. |
| Bray | Dwyer | Helstoski |
| Brooks | Eckhardt | Henderson |
| Broomfield | Edmondson | Hicks |
| Brown, Calif. | Edwards, Calif. | Hollifield |
| Brown, Mich. | Edwards, La. | Horton |
| Brown, Ohio | Brierhorn | Hosmer |
| Broyhill, N.C. | Esch | Howard |
| Broyhill, Va. | Evans, Colo. | Hull |
| Burke, Fla. | Everett | Hungate |
| Burke, Mass. | Evins, Tenn. | Hunt |
| Burleson | Fallon | Hutchinson |
| Burton, Calif. | Farbstein | Ichord |
| Burton, Utah | Fascell | Irwin |
| Bush | Feighan | Jacobs |
| Button | Fisher | Jarman |
| Byrne, Pa. | Flood | Johnson, Calif. |
| Byrnes, Wis. | Foley | Johnson, Pa. |
| Cabell | Ford, Gerald R. | Jonas |
| Cahill | Ford, | Jones, Ala. |
| Carey | William D. | Jones, N.C. |
| Casey | Fountain | Karth |

| | | |
|---|---|---|
| Kastenmeier | Ottinger | Slack |
| Kazen | Passman | Smith, Calif. |
| Kee | Patman | Smith, Iowa |
| Keith | Patten | Smith, N.Y. |
| Kelly | Pelly | Smith, Okla. |
| King, Calif. | Pepper | Snyder |
| King, N.Y. | Perkins | Springer |
| Kleppe | Pettis | Stafford |
| Kluczynski | Philbin | Staggers |
| Kornegay | Pickle | Stanton |
| Kupferman | Pike | Steed |
| Kuykendall | Pirnie | Steiger, Wis. |
| Kyl | Poage | Stephens |
| Kyros | Podell | Stratton |
| Laird | Poff | Stubblefield |
| Langen | Pollock | Stuckey |
| Leggett | Pool | Sullivan |
| Lloyd | Price, Ill. | Taft |
| Long, La. | Price, Tex. | Talcott |
| Long, Md. | Pryor | Taylor |
| McCarthy | Quie | Teague, Calif. |
| McClory | Quillen | Teague, Tex. |
| McCloskey | Railsback | Tenzer |
| McClure | Randall | Thompson, Ga. |
| McCulloch | Rees | Thompson, N.J. |
| McDade | Reid, Ill. | Thomson, Wis. |
| McDonald, | Reid, N.Y. | Tiernan |
| Mich. | Reifel | Tuck |
| McEwen | Reinecke | Tunney |
| McFall | Resnick | Udall |
| McMillan | Reuss | Ullman |
| Macdonald, | Rhodes, Pa. | Van Deerlin |
| Mass. | Riegle | Vander Jagt |
| Machen | Rivers | Vanik |
| Madden | Roberts | Vigorito |
| Mahon | Robison | Waggonner |
| Mailliard | Rodino | Waldie |
| Marsh | Rogers, Colo. | Walker |
| Mathias, Calif. | Rogers, Fla. | Wampler |
| Mathias, Md. | Ronan | Watkins |
| Matsunaga | Rooney, N.Y. | Watson |
| May | Rooney, Pa. | Whalen |
| Meeds | Rosenthal | Whalley |
| Meskill | Rostenkowski | White |
| Miller, Ohio | Roth | Whitener |
| Mills | Roudebush | Whitten |
| Minish | Roush | Widnall |
| Mink | Roybal | Wiggins |
| Minshall | Rumsfeld | Williams, Pa. |
| Mize | Ruppe | Willis |
| Monagan | Ryan | Wilson, Bob |
| Moorhead | St Germain | Wilson, |
| Morgan | St. Onge | Charles H. |
| Morris, N. Mex. | Sandman | Winn |
| Mosher | Satterfield | Wolff |
| Moss | Schadeberg | Wright |
| Murphy, Ill. | Scherle | Wydler |
| Murphy, N.Y. | Scheuer | Wylie |
| Myers | Schweiker | Wyman |
| Natcher | Schwengel | Yates |
| Nedzi | Scott | Young |
| Nelsen | Shipley | Zablocki |
| Nix | Shriver | Zion |
| O'Hara, Mich. | Sikes | Zwach |
| O'Konski | Sisk | |
| O'Neill, Mass. | Skubitz | |

NAYS—37

| | | |
|---|---|---|
| Ashbrook | Dickinson | Lukens |
| Bennett | Eshleman | Martin |
| Bow | Findley | Mayne |
| Brinkley | Fino | Montgomery |
| Brock | Gathings | Morton |
| Buchanan | Goodell | O'Neal, Ga. |
| Clancy | Gooding | Rarick |
| Clawson, Del | Gross | Saylor |
| Curtis | Grover | Schneebeli |
| Davis, Ga. | Jones, Mo. | Steiger, Ariz. |
| Davis, Wis. | Latta | Utt |
| Derwinski | Lennon | |
| Devine | Lipscomb | |

ANSWERED "PRESENT"—2

| | |
|---|---|
| Joelson | Michel |

NOT VOTING—41

| | | |
|---|---|---|
| Adair | Gettys | MacGregor |
| Andrews, Ala. | Gibbons | Miller, Calif. |
| Ashmore | Green, Oreg. | Moore |
| Bevill | Hagan | Morse, Mass. |
| Brotzman | Halleck | Nichols |
| Carter | Hansen, Idaho | O'Hara, Ill. |
| Corman | Hardy | Olsen |
| Cunningham | Harrison | Pucinski |
| Dowdy | Hays | Purcell |
| Edwards, Ala. | Herlong | Rhodes, Ariz. |
| Ellberg | Holland | Selden |
| Flynt | Karsten | Watts |
| Frelinghuysen | Kirwan | Wyatt |
| Garmatz | Landrum | |

So the bill was passed.

The Clerk announced the following pairs:

On this vote:
Mr. Moore for, with Mr. Michel against.

Until further notice:
Mr. Kirwan with Mr. Adair.
Mr. Miller of California with Mr. Morse.
Mrs. Green of Oregon with Mr. Rhodes of Arizona.
Mr. Corman with Mr. Cunningham.
Mr. Selden with Mr. Halleck.
Mr. Ellberg with Mr. Carter.
Mr. Bevill with Mr. Edwards of Alabama.
Mr. Holland with Mr. Wyatt.
Mr. Pucinski with Mr. MacGregor.
Mr. Flynt with Mr. Harrison.
Mr. Gettys with Mr. Brotzman.
Mr. Hays with Mr. Frelinghuysen.
Mr. Olsen with Mr. Hansen of Idaho.
Mr. O'Hara of Illinois with Mr. Dowdy.
Mr. Nichols with Mr. Landrum.
Mr. Purcell with Mr. Karsten.
Mr. Hagan with Mr. Ashmore.
Mr. Hardy with Mr. Andrews of Alabama.
Mr. Watts with Mr. Gibbons.

Mr. COLLIER changed his vote from "nay" to "yea."

Mr. MICHEL. Mr. Speaker, I have a live pair with the gentleman from West Virginia [Mr. MOORE]. If he had been present, he would have voted "yea." I voted "nay." I withdraw my vote and vote "present."

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

GENERAL LEAVE TO EXTEND

Mr. EVINS of Tennessee. Mr. Speaker, I ask unanimous consent that all Members have 5 legislative days in which to extend their remarks on the bill just passed.

The SPEAKER. Is there objection to the request of the gentleman from Tennessee?

There was no objection.

YOUR NEW SOCIAL SECURITY

Mr. ROONEY of New York. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. ROONEY of New York. Mr. Speaker, under the Social Security Amendments of 1967 now effective, approximately 24 million persons became eligible to receive more money. Through much publicity, the Social Security Administration has attempted to make these amendments understood by those entitled to the benefits; however, millions of Americans still do not understand them.

Many who could receive the new benefits will lose them, as many who are eligible for coverage under the old provisions continue to lose them, because they do not fully comprehend their rights to collect these benefits.

To many, the mentioning of social security brings to mind retirement and age 65. The largest group of recipients are the so-called old folks, but about 5½ million others are also affected by the new amendments.

If the parent of a child was under

*May 8, 1968*  CONGRESSIONAL RECORD — HOUSE  12265

social security and is retired, dead, or disabled, that child is entitled to receive benefits while attending college and other schools up to his or her 22d birthday. Also, with the changes that have been made in the law, benefits can now be paid to persons disabled in childhood, before 18, who continue to be disabled. The benefits are payable when one of their parents receives social security retirement or disability benefits or when an insured parent dies.

Other groups under age 65 who are entitled to benefits are widows and children who get monthly survivors' insurance payments, and disabled workers and their families on disability insurance. Under survivors' insurance, monthly benefits can be paid to the widow and children of a worker under social security even though it was for only as little as a year and a half out of the 3 years before his death. One of the least known benefits included in survivors benefits is that every person covered by social security is entitled, after death, to a lump sum of from $160 to $255 to take care of funeral expenses.

One of the changes in disability insurance is particularly important to young families. It now makes benefits available to some workers before they reach 31, who could not have been eligible under the old law because they had not worked long enough under social security. As a result of this change, many young families became eligible for benefits in February of 1968.

The new law provides reduced benefits at age 50 for disabled widows, certain divorced wives, and disabled dependent widowers. They would have been eligible under the old law when they reached 60 or 62.

The amendments of 1967 provide an increase in benefit payments of 13 percent for beneficiaries on the social security rolls. The average monthly benefit paid to a retired worker with an eligible wife now on the rolls is increased from $145 to $165. The minimum benefit for a worker retiring at age 65 is increased from $44 to $55 a month. The special payments made to individuals at age 72 and over, who did not work long enough under social security to qualify for regular benefits, are increased from $35 to $40 a month for a single person and from $52.50 to $60 a month for a couple. The increased benefits are first payable for the month of February 1968 and should have been reflected in the checks received early in March.

If you retire at age 65 you get full benefits, but you can get reduced benefits, 80 percent, if you are 62 and out of work or retire early for any reason. Also, you can be age 62 if you are the wife of a retired worker covered by social security and received reduced benefits. If you are the widow of someone insured under social security you can get reduced benefits at age 60 and full benefits at age 62, which in the case of a widow is 82¼ percent of the amount that would have been paid to her husband if he were alive and retired under social security.

About 175,000 children are now eligible for benefits under the new law. These children are dependents of women who were not previously eligible for benefits

because their mother was not working at the time she died. The new amendments provide that a child will be considered dependent on the mother under the same conditions that he was considered dependent on the father.

The amendments provide for an increase from $1,500 to $1,680 in the amount of annual earnings a beneficiary under age 72 can have without having any benefits withheld. Provision is made for an increase from $125 to $140 in the amount of monthly earnings a person can have and still get a benefit for the month. The law provides that now $1 in benefits be withheld for each $2 of earnings between $1,680 and $2,880 and $1 in benefits for each $1 in earnings above $2,880.

The new law also makes it easier for one to collect benefits under medicare. Payment of a physician may now be made upon presentation of either a receipted or unpaid itemized bill.

Another change in the law gives better protection to Armed Forces families. Under the old law only the base pay was counted toward social security, but the new law provides that in the future the pay of a person in the armed services would be deemed to be $100 a month more than his basic pay.

I have attempted to point out some of the highlights of the new additional benefits now awaiting those who are eligible to receive them. As you can see, these new benefits affect practically every family in the United States. However, many will lose these benefits because they do not apply for them or did not apply early enough to receive all that they could have collected. The Social Security Administration can only pay back benefits for up to 12 months and no more.

I once again take this means of advising my constituents of the 14th Congressional District of Brooklyn, N.Y., where I was born and have lived all my life, that I am at their service if they have any questions or problems about social security benefits, or any problem with any agency or department of the Federal Government. If you do, please do not hesitate to communicate with me in writing to my office, 2268 Rayburn House Office Building, Washington, D.C. 20515, and I shall be glad to do everything I possibly can in your behalf.

## RENEWAL OF THE AUTHORITY OF RENEGOTIATION BOARD

Mr. MINSHALL. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Ohio?

There was no objection.

Mr. MINSHALL. Mr. Speaker, the House will have under consideration soon a renewal of the authority of the Renegotiation Board, which has recovered nearly $1 billion in excessive profits on defense and space contracts since the Board was established during the Korean war.

I have introduced H.R. 14999, not only to extend the life of the Board which expires June 30 unless Congress acts, but

also restores all the bite this Government watchdog had during the Korean conflict. In the ensuing years the Board has had some of its teeth pulled through amendments to the Renegotiation Act of 1951. Despite our entry into the Vietnam war we have not restored its original powers and, as a result, much profiteering on war contracts is going unchallenged.

As a member of the Subcommittee on Independent Offices Appropriations, I review the work and the budget of this extraordinary Government agency, one of the few Federal agencies which more than pays its own way. Our hearings this year were held on February 5 and I had occasion then to question the distinguished Chairman of the Renegotiations Board, Mr. Lawrence Hartwig.

At that time I asked him whether excessive salaries had figured in recent findings by the Board. Mr. Hartwig supplied the subcommittee with data which appears on page 498 of our published hearings.

This information prompted me to ask the Chairman for additional facts and he very promptly and courteously has elaborated further on the cases he mentioned in the hearings.

Mr. Hartwig cited four cases where persons tried unjustifiably to get rich on defense or space contracts only to have their plans foiled by the Renegotiation Board. Concerned as we all are about our ever-increasing defense expenditures, I can think of no better reason for seeing to it that this Board be maintained by us in a strong, healthy condition. How many more cases could Mr. Hartwig cite if the Board today had all the powers it possessed during the Korean conflict?

Because of the confidential nature of the proceedings before the Board, I cannot name the persons or companies involved in the four instances Mr. Hartwig presents, but I think the entire House will be interested in the particulars of each case.

Case No. 1 is that involving four officers of a corporation who received total compensation of $184,000 for the year ending December 31, 1965. Two of these individuals, brothers, owned controlling shares of capital stock. Their total compensation for the year was $94,000. This sum was completely disallowed because the two brothers devoted full time to another company which was under common control. Of this total disallowance of $94,000, $36,000 applied to renegotiable business. The contractor agreed to a determination of excessive profits in the amount of $60,000 before income taxes.

The second example given by Mr. Hartwig concerned the president-treasurer of a corporation who received a total salary of $187,000 for the year ending April 30, 1965. He owned controlling shares of capital stock. A disallowance of $102,000 was made on the basis that the total sum paid was unreasonable. All of the disallowance applied to renegotiable business. The contractor agreed to a determination of excessive profits in the amount of $300,000 before income taxes.

In the third case, the president, who owned all of the shares of capital stock in a corporation, received total compensation of $104,000, for the year ending

June 30, 1966. Of this sum, $29,000 was disallowed leaving $75,000 deemed to be reasonable. All of this disallowance related to renegotiable business. A determination of excessive profits in the amount of $250,000 before income taxes was not agreed to by the contractor.

Example four involves five officers of a corporation who received total compensation of $320,600 for the year ended June 30, 1964. The sum of $86,600 was disallowed on the ground that the amounts paid were unreasonable. Majority shares of capital stock were held by two of the officers. A third officer was related to one of these individuals. All of this disallowance related to renegotiable business. A determination of excessive profits in the amount of $100,000 before income taxes was agreed to by the contractor.

These are but a few examples of what the board has been able to accomplish even under present strictures. Chairman Hartwig and his colleagues are doing a magnificent job, although present law permits them to merely scratch the surface.

We must give the Renegotiation Board wider authority, as I have proposed in my bill, to help cut down on our tremendous defense expenditures and bring under closer surveillance profiteering on defense contracts which is now going unchallenged.

_____

## THE POOR SHOULD BE WELCOMED

Mr. FRASER. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from Minnesota?

There was no objection.

Mr. FRASER. Mr. Speaker, in a few days thousands of low-income Americans will arrive in Washington for the poor people's campaign. I urge every Member of Congress and every other official of the Federal Government to extend to these people the courteous welcome they deserve.

The people who are coming to Washington—including a group from my district of Minneapolis, Minn.—are American citizens. Few of their fellow citizens would deny that they have grievances, urgent grievances, that deserve a fair hearing in their National Legislature. These people are exercising their constitutional right to petition for redress of their grievances. Their presence in the Capital offers an opportunity for those in positions of leadership to show our compassion and largeness of spirit.

Some persons have gone so far as to suggest turning the marchers away from the entrances to the city, using armed force if necessary. Those who make suggestions of this kind apparently fail to recognize that our Capital belongs to these poor people, as it belongs to all citizens.

Much has been said recently, Mr. Speaker, about the threat of violence posed by the marchers. Much has been said about the need to prevent violence. The leaders of the march have em-

phasized repeatedly that the Poor People's Campaign is a campaign of nonviolence. I have no reason to doubt their word. The great majority of these marchers, I am sure, are sincere people who are tired of being ground down by the injustice of poverty in the world's wealthiest Nation. They are coming to Washington to make a lawful and, they hope, an effective plea for legislation to relieve their plight.

Too much attention has been focused, it seems to me, on a small but militant minority who would like to turn the campaign toward violence. There are some, I know, who have this attitude. But it should be remembered that they are a small minority. The best way for the citizens of Washington and the leaders of our Government to counteract the efforts of the militants is through a friendly welcome for the marchers. The best way to cause disorders is to meet the marchers with hostility or indifference.

Should there be some disturbances in connection with the campaign, I have every confidence that the city administration is prepared to cope with them. But violence would be most unfortunate, because it would undercut the peacefulness and legality which are the bases of the Poor People's Campaign.

The success or failure of the campaign will depend to a large extent on the type of climate we in Congress create for it. Let us talk less about violence and more about friendliness.

_____

## THE TAX INCREASE

Mr. GERALD R. FORD. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. GERALD R. FORD. Mr. Speaker, President Johnson has blamed the Democratic-controlled 90th Congress for home mortgage interest rates that have reached what he called "the highest point in 50 years."

I am certainly not an apologist for the Democratic majority in the Congress. If the President wants to berate the Democrats in Congress for not passing an income tax increase up to this time and say that this is the reason for high interest rates on mortgage funds, I really should not demur.

But I nevertheless feel the American people should be given the facts with regard to high interest rates on home mortgage money. So I called the Federal Housing Administration.

In signing legislation which removes the 6-percent interest rate ceiling on FHA and VA loans, President Johnson said that while the "need for homes is always there, no mortgage credit was to be found." "We could have avoided this if we could have passed a tax increase." He said that by refusing to approve a tax increase Congress has let interest rates go from "5½ percent to 7 percent and even 8 percent—the highest point in 50 years."

An FHA spokesman informed me that conventional interest rates last were 5½ percent in early 1966 and increased steadily from that time on. They have fluctuated between 6½ and 7 percent for the last 6 months to a year and are 7½ percent now, he stated. This means that conventional interest rates on home mortgage funds have been at least 6½ percent for about 12 months. The FHA spokesman said they were higher in the latter half of 1966 when the bottom dropped out."

FHA interest rates were 5½ percent from February 7, 1966, through April 11, 1966; 5¾ percent from April 12, 1966, through October 2, 1966; 6 percent from October 3, 1966, through May 7, 1968; and now 6¾ percent by administrative action taken Tuesday.

The President rejected the idea of an income tax increase in 1966, when the interest rate spiral started—nor did he at that time try to hold down Federal spending as a curb on inflation and steadily rising interest rates. He first proposed an income tax increase in his January 1967 state of the Union message—but did not send Congress a specific tax increase proposal until August 1967. By that time conventional interest rates were, in the words of the FHA spokesman, "fluctuating between 6½ and 7 percent" and the FHA and VA rates were 6 percent.

I do not like to defend the Democratic majority in the Congress, but I do wish the President would get his facts straight before he gets out his bullwhip—even to use on his own party.

_____

## LOVE OF COUNTRY

Mr. CLARK. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. CLARK. Mr. Speaker, in times like these when a vociferous but minute minority of young people are getting the headlines by burning draft cards, conducting sit-ins in our schools, and otherwise disgracing their generation, it is refreshing to view the other side of the picture.

Reflecting what I believe is the spirit of the vast majority of our young people is a letter sent to the editor of the Butler, Pa., Eagle by a young constituent of mine, Sp4c. John Chuhra, of Petrolia, Pa.

Specialist Chuhra is not a draft-card burner. He is a demonstrator of a different sort. He is in Vietnam, wearing his country's uniform and demonstrating his love of country by fighting for it.

Because of the significance of his words, I submit his letter to the Butler Eagle:

LOVE OF COUNTRY

It's hard to put into words how much I love my country. I'm in Vietnam, fighting for it, while rioters are taking advantage of it. The words "United States" to a rioter are just words, but to me they mean so much more. A place to live in peace, raise a family and be happy. How can people be truly happy with all the riots and demonstrations? Some

*May 8, 1968*      CONGRESSIONAL RECORD — HOUSE      **12267**

demonstrations are for a good purpose. Others are not.

I never really knew this love for my country until I was sent away from it. I just took it for granted, like a lot of others.

Draft-card burners should be ashamed to even walk in America, because they don't love it enough to die for it. When I return to civilian life, I'll feel more like I have a place in the society, while they don't know what to do, riot or demonstrate.

Once people learn to love their country, that will end most of the demonstrations and all the riots.

It's awfully disgusting reading the newspapers of all the riots and demonstrations . . . as the late President Kennedy once said, "Ask not what your country can do for you, ask what you can do for your country." He had the right idea. If the people back in the States could see the other countries struggling to be like ours, they'd wonder what the problem is with us.

Sp4c. JOHN CHUHRA,
*380 Trans. Detach Y-100, Vietnam.*

---

## SAFETY STANDARDS IN SUMMER CAMPS

Mr. DANIELS. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from New Jersey?

There was no objection.

Mr. DANIELS. Mr. Speaker, I have introduced a bill today to set up a program designed to set up minimum safety standards for the 6 million American children who go to summer camps each year.

Joining with me in sponsoring this important piece of legislation are the gentleman from Kentucky [Mr. PERKINS], the gentleman from Pennsylvania [Mr. DENT], the gentleman from New Jersey [Mr. THOMPSON], the gentleman from California [Mr. HAWKINS], the gentleman from New York [Mr. SCHEUER], the gentleman from New Jersey [Mr. HOWARD], and the gentleman from Pennsylvania [Mr. HOLLAND].

Mr. Speaker, it is the purpose of this bill to protect and safeguard the health and well-being of the youth of the Nation attending day camps, resident camps, and travel camps by providing for establishment of Federal standards for safe operation of youth camps, and to provide Federal assistance and leadership to the States in developing programs for implementing safety standards for youth camps, thereby providing assurance to parents and interested citizens that youth camps meet minimum standards.

The bill which I have introduced today would encourage the States to set up the machinery necessary to supervise summer camps. This end would be accomplished by the establishment of Federal safety standards by the Secretary of Health, Education, and Welfare, after consultation with State officials and representatives of organizations concerned with youth and camping.

Camps that do meet Federal standards would be encouraged to make this fact known. In this way, parents would have something to go by when they are contemplating sending children to a

summer camp. They would know, too, that the camp meets basic safety standards.

The States would be encouraged to set up programs for inspection through a system of matching grants of up to $50,000 per State to help defray the cost of the State program.

Mr. Speaker, this is a good bill. It does not provide for the establishment of any Federal bureaucracy. On the contrary, control over camps is left with the individual States. This bill is a good example of constructive federalism with the Federal Government assisting the States but not preempting the field. For this reason I hope that this bill will receive wide support on both sides of the aisle.

Mr. Speaker, this bill is supported by a wide range of organizations, including the American Camping Association, Girl Scouts, Boy Scouts, Campfire Girls, and other groups with similar purposes.

Mr. Speaker, a bill identical with the one I have introduced today has been sponsored in the other body by the very able and distinguished Senator from Connecticut, Mr. RIBICOFF, and has the support of many Members of that body, Republicans and Democrats alike. I ask unanimous consent to insert at this point two editorials in support of the Ribicoff bill. One is from the Washington Post of October 7, 1967, and the other is from the Christian Science Monitor of the same date.

The editorials follow:

[From the Washington Post, Oct. 7, 1967]

SAFETY IN YOUTH CAMPS

Every parent of the 6,000,000 children who attend resident or day camps or participate in organized tours each year doubtless has some concern for their safety. Yet it is estimated that less than half of the camps of this type functioning in the United States meet minimum safety standards. Accidents are frequent, and it is difficult for parents to determine whether the camps to which their children may go are properly managed from the viewpoint of safety.

Senator Ribicoff is attempting to do something about the problem by sponsoring a bill to set up Federal standards for youth camp safety. His measure would encourage the states to accept those standards and to provide camp inspection machinery, with the aid of Federal grants. The problem is primarily one for the states to deal with, but only a few states have adequate regulations of their own and 19 states provide no regulation whatever of youth camps.

[From the Christian Science Monitor, Oct. 7, 1967]

SAFE CAMPING

Every year American families send an estimated five million children to private camps along shores of lakes and rivers. The kids are home now, back at school. But before another vacation season opens, it is important for states to consider the matter of camp safety.

Too many states set no safety standards for this growing activity. While the American Camping Association upholds standards, it accredits only about half the summer camps in the United States. Parents need assurance about the safeguards of the large number not accredited.

Sen. Abraham Ribicoff (D) of Connecticut is working for passage of a Youth Camp Safety bill (S 1473) which would establish a joint federal-state program. It embodies the ideas of a father who has devoted himself to promoting boating safety ever since his young son was drowned two years ago in a canoe accident at camp. Mitchell Kurman

has won important support for his efforts. The American Camping Association has given its endorsement to the Ribicoff bill which Mr. Kurman has been backing. This Connecticut furniture salesman, through persistent effort, has helped six states get laws requiring small craft to carry life preservers.

In the preceding session of Congress, a camp safety bill which would have provided incentives for state action got lost in the legislative process. The current Ribicoff bill, which would offer grants to states to encourage them to set up certification facilities for summer camps, has yet to get a hearing. Its terms are such that it should only strengthen a movement which gives wholesome outdoor experience to millions of children. Mr. Kurman means to keep at his volunteer mission until Congress acts. He deserves support.

Mr. Speaker, I know that all Members of this House have a deep concern for our most precious asset—our children—and those of us who are sponsoring this bill, hope that we can take effective action to protect the 6 million children who will soon be trooping off to the summer camps. I urge all Members to join with us in support of this bill.

---

## THE HONORABLE ED FOREMAN

Mr. HALL. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include pertinent material.

The SPEAKER. Is there objection to the request of the gentleman from Missouri?

There was no objection.

Mr. HALL. Mr. Speaker, today, our good friend and former colleague, Mr. Ed Foreman, is here to see and visit his many friends on Capitol Hill. He is here on a business tour with a nonpartisan group of civic leaders, the New Mexico Amigos, the official good will ambassadors of his native State.

Those of us who served here with Ed Foreman in the 88th Congress grew to appreciate and respect him as an effective and responsible Nation's statesman, hard working legislative leader, as an eloquent and persuasive Representative for his constituency, and as an honest, sincere gentleman of basic principle and conviction.

In discussions today with a group of his congressional friends, Mr. Foreman presented some interesting and direct-to-the-point facts and proposals concerning the perplexing problems now facing our Nation. Some of the proposals he discussed are included in a recent speech that Mr. Foreman delivered before the People, Times, and Events Forum at New Mexico State University in Las Cruces, N. Mex. I believe other Members of the Congress will also appreciate reviewing the timely, thought-provoking facts and ideas expressed by our former colleague:

A TIME OF CHALLENGE AND CRISIS

(By Ed Foreman, Las Cruces, N. Mex.)

Thank you for the courtesy of your invitation to me to discuss with you *Constructive Alternatives to a Socialist America.* My reason for being here with you today is not to talk partisan politics, or to tell you, or anyone else, how you should think, speak or vote. However, I make no apology if politics of a sort does enter into my remarks. I don't mean purely partisan politics . . . I mean the politics of freedom—free enter-

prise—individual liberty—the politics of our American way of life. I am, and proudly so, a thorough-going partisan of American freedom. I am not so concerned with whether the Democrats or the Republican Party wins in November—*I'd just like to see America win for a change.*

While our cities burn and our sons die on foreign soil for the fourth time in 50 years, we find ourselves wondering and weary. Americans are growing weary of wars . . . weary of a welfare war on poverty which the poor are losing; weary of a political war on crime where the criminal is winning; weary of a costly war with inflation that the over-burdened taxpayer is losing; and weary of a vacillating war against communism where bold young Americans are given orders enough to die, but not orders and strategic support enough to win.

## VIETNAM WAR

It is unreal, unconscionable and outright un-American for our National Administration to continue increased foreign aid and trade with the Communists, when at the same time we are at war with them in Southeast Asia. There is no mood in America for a continued long drawn-out stalemate in the Vietnam war. *We should move to win . . . or get out . . . now.*

I sincerely believe that the election of a responsible Republican President will bring about an end to the Viet Nam war . . . not that I think the Republican Party has any secret special hidden weapon . . . but because past history shows us that Republican leadership has demonstrated the fortitude and intelligence to recognize and utilize informed, trained military and diplomatic leadership and counsel in time of war. To partially reply to those who ask, "How would you end end this?", I respectfully offer some practical suggestions:

(1) We should stop fighting this war on terms set forth by Hanoi . . . or the U.N. . . . or by so-called world opinion. Instead of continuing the buildup of American men in a guerrilla ground war, we should do as General Earle Wheeler, Chairman of the Joint Chiefs of Staff, has recommended . . . we should utilize our air superiority and hit the Viet Cong . . . effectively, strategically and hard in their vital supply and manufacturing centers, supply depots, transport routes, and their storage docks and logistics, support centers at Haiphong. As Air Force General Curtis LeMay and numerous other military and political leaders have wisely advised, *"We must knock out the enemy's capability to make war."*

(2) *We should stop sending aid, goods, and materials to the Communists* and the so-called free world countries who are aiding the Communist effort. The United States is now sending foreign aid supplies to some eight (8) nations that are shipping materials into the North Viet Cong Port of Haiphong . . . and the Democrat Administration controlled Congress recently passed another $2.3 billion foreign aid bill to continue this irresponsible, uncontrolled throwaway.

(3) *We should selectively destroy the North Viet Cong food crops* and important food processing centers by the simple, direct means recommended by such foreign affairs experts as Dr. Walter Judd and Congressman H. R. Gross, et al. As former President Eisenhower recently recommended, when you are in war, you should use whatever is necessary to win that war as quickly and effectively as possible to stop the senseless loss of lives and mounting expense of continuing destruction.

## FOUR-STAR POVERTY WAR

The elimination of poverty is a noble, but certainly not new, idea. Our forefathers struggled with it from the beginning and many of us have carried on the battle.

The theory that underlies the present federal programs is that poverty is a deficiency which is bound to perpetuate itself through generations unless eradicated by governmental action of the type now being initiated. If that hypothesis were true, most of America's 200 million residents would still be poor, ignorant and unemployed, as their ancestors were when they landed on these shores. *The American record suggests that the condition of poverty is not so much a cause, but a result,* and that it can be remedied—in cases where it can be remedied—by the individual.

In Detroit over $200 million was spent on the anti-poverty program. The recipients expressed their gratitude by destroying property worth approximately $500 million.

At the heart of the War on Poverty boondoggle is the Office of Economic Opportunists—the highest paid, worst managed, most incompetently staffed agency in the history of the federal government. Poverty war "General" Sargent Shriver and his 5 principal assistants are each paid more than General William C. Westmoreland, our Vietnam Commander. Yearly, Mr. Shriver gets $30,000, his Deputy Director $28,500, 3 Assistant Directors $27,000 each, and another Assistant Director $26,000. General Westmoreland's salary is $24,024 a year. One of every 42 employees of O.E.O. is paid over $20,000 a year, and nearly half receive $10,000 or more annually. It takes 2800 permanent federal employees to run the O.E.O. and another 4,772 in other federal agencies to operate programs funded through the O.E.O. Approximately 75 per cent of community action funds under the program go for administrative costs . . . almost entirely in high salaries.

You cannot help people by teaching them to depend on a welfare handout as a way of life . . . you only help them when you teach them to work to provide for themselves. *The best way to uplift poor families is to help the head of the family get a job. Spending more tax dollars, initiating new welfare programs and bureaucratic agencies is not the answer.* The way to provide new jobs is to ease the tax burdens on business and industry . . . allow more business incentives to expand, develop, and invest more in new plants and services. Labor training and related programs should be based on what business, industry and our practical, working citizens determine is wise and necessary . . . not the welfare schemes of the "society planners."

Yes, Americans do want to eliminate poverty everywhere possible, but the solution is primarily that of individual effort, not governmental "handouts." In the words of a modern slogan: "I fight poverty—I work!" Some folks don't seem to understand that if they want to make ends meet, they need to get off theirs.

## WAR ON CRIME?

In the past five years the population of the United States has risen eight per cent; and during the same time, despite all our welfare programs, the incidence of major crime in America has gone up 40 percent, or 5 times the increase in population. The number of serious offenses committed against American Citizens last year was around 2¾ million. *Last year you had one chance in 70 of being murdered, maimed or robbed; Whereas you had only one chance in 100 of dying from all causes, including accidents.* It has now been reported that bank robberies for the first 9 months of last year increased 40 per cent over the year before—in one year.

Yes, this administration has certainly given the people a choice. They can live in the city and get mugged or live on the farm and starve!

It is the theory of a majority of LBJ's society planners: That the cure for crime is more public housing . . . and a more equitable racial mix to be achieved by integrating neighborhoods and crosshauling children . . . And giant infusions of federal money into so-called depressed areas . . . and hiring only those policemen who promise to be-have like benevolent big brothers and more relief programs and more social workers.

Oh, yes, and because a number of dope addicts have robbed in order to find money to support their habit, it has been seriously suggested that the government supply the drugs free, so its users may float around the streets in narcotic euphoria, paid for by the squares who work.

Now if poverty is the root of crime, how does it happen that crime has increased most rapidly in a period in which the general per capita income has increased more rapidly?

I suggest that crime, and especially juvenile delinquency, seems to flourish more in our so-called affluent society where so many of our youngsters are not permitted to work, than it did in days of so-called poverty where they, as most of us, had to work.

If lack of social services and relief are responsible, how does it happen that crime is most out of hand in those cities filled with recent migrants from rural areas who were attracted to those cities for the plain reason that work was no longer necessary and relief was available to all?

There are deeper reasons for this national problem than can be cured by the simple outpouring of more public funds. It is time that people of good will and intelligence recognized that, unless the rewards for gross irresponsibility can be diminished, and unless the wages of sin can be cut, the overwhelming majority of law-abiding Americans of all races are going to be increasingly victimized by the unprincipled and vicious minority.

The Great Socialistic Society has actually promoted crime, riots and violence by making grandiose political promises they cannot fulfill. Crime is produced by atheism, immorality, liquor and drugs. Crime is produced by the false belief in a "something-for-nothing" welfare state.

The two best deterrents to crime are Christianity and law enforcement. I submit that it is time the Supreme Court begin to give the same consideration to the victims as it does to the vicious. I am tired of seeing criminals and communists flouting the laws of our land, while policemen are stifled by the bleeding-heart, fuzzy-thinking Court. Thugs, whether international or in your neighborhood, cannot be given a license to murder. Those who initiate violence must be stopped . . . even if they must be stopped violently.

## WAR ON THE TAXPAYER

Ever wonder why Congress is always appointing "fact finding" committees? . . . when what we really need are some "fact facing" committees?

One of the complaints of those who wrote the Declaration of Independence was that His Majesty's Government had "sent hither swarms of officers to harass our people, and to eat out their substance." King George was a "piker" compared with the number of government employees we have today.

In the first half of this century, federal employment increased ten times while the population only doubled. When we classify federal, state and local employees together, we arrive at the alarming fact that *total governmental employment jumped 46 percent over the past ten years while U.S. population grew only 18 per cent, and private employment 16 percent.* In other words, governmental employment grew three times faster than population growth.

Did you know that between 1965 and 1968, 454,955 new bureaucrats were added to the executive branch of the Federal Government alone—that's more than TWICE THE COMBINED POPULATION of Alamogordo, Carlsbad, Hobbs, Roswell, Clovis, Portales, Las Cruces, Grants, Gallup and Farmington, New Mexico! We ought to start firing these bureaucrats in Washington, and instead, provide a portion of that money for the teachers

and nurses and mailmen and our municipal employees. These people are the real public servants today and they are being short-changed.

It required 160 years—from 1789 to 1949—for federal expenditures for *civilian purposes* to reach a level of $10 billion, it took only another seventeen years, to fiscal 1966, to lift them from $10 billion to over $54 billion. On a per capita constant dollar, basis, governmental spending (federal, state, local) for domestic purposes, grew at three times the rate of personal consumption between 1954 and 1964.

If you review the budget proposal to the present Congress for 1968, you will find that government expenditures, for other than national defense and the war in Vietnam, now exceeds 100 billion dollars. When President Roosevelt came into power, the budget of our country was only $5 billion. It is now $186 billion. This represents an increase of over 100 percent per year on the 1932 base since Roosevelt was elected President.

Dr. Colin Clark, a celebrated Australian economist, has pointed out that socialism is inevitable in any country which, over a substantial period of time, takes 25 percent or more of the national income.

At the present time our total government expenditures (federal, state, local) are in excess of 40 percent of the national income. I hasten to point out that this comparison is, in the first place, a socialistic concept, for it assumes the government can take everything you have; unfortunately, in a welfare state it can.

LBJ and his "government managers" contend that we must have *another increase in taxes* to "bolster the economy." When the *income* will not match the *outgo* . . . any responsible housewife is smart enough to recognize she must cut the *outgo!* If some of our politicians had ever managed a business budget . . . even a household budget . . . we'd be a better, stronger nation today. Yes, it's a good thing that most politicians are paid annually . . . they'd starve to death on piece work!

What we need more than anything else today—to insure the value of our dollar—is to cut federal spending . . . by stopping aid to our enemies, by sharply curtailing our expensive, unrealistic, uncontrolled foreign aid giveaway programs, by reducing the federal bureaucratic payroll, by eliminating many of our politically-oriented, incentive-killing government welfare programs, by stopping money-losing federal government competition with private enterprises, etc.

Government has no money or income that it does not first take from the people. Most folks feel that they are getting more government than they need, and more government than they want. One nice little lady was very expressive in her reply to me by penciling in the margin of my 1964 Congressional questionnaire, *"Thank goodness we don't get all the government we pay for."*

LET'S LOOK AT THE RECORD

Since 1900, the Democrat Party has been in control of our federal government for 33 years, and the Republican Party has been in control for 34 years . . . counting the Republican 80th Congress as their control.

During the past 67 years, our national budget has been balanced only 25 times . . . 22 of those 25 balanced budgets were under the Republican Party, and only 3 times in this century has the Democrat Party ever lived within its income. But let's add the totals. When we subtract the balanced budgets from the deficits, we find the Republicans, in its 34 years in office, spent $13.4 billion more than we took in. The Democrats, in their 33 years, spent a grand total of $318.8 billion more than they took in . . . 96 per cent of the national debt today was created under the Democrat Party!

Since the first Federal income tax law was enacted, income taxes have been raised 15 times. Twice the Republicans increased taxes . . . and 13 times out of 15, it was the Democrats who raised taxes. On the other hand, there have been 13 tax reductions. Nine of these tax reductions were under the Republican Party . . . only four times did the Democrats reduce taxes.

The second largest single item in our national budget today is the $14 billion a year interest on our national debt. Over $13 billion of that annual interest charge is to pay the interest on the Democrat debt . . . and nearly $3 billion of it is to pay the interest on the deficit created under the Johnson administration during the past 5 years. What a record! The Democrat Party boasts of what it is doing FOR the people . . . why not talk about what it has done TO them?

WHICH WAY—FREE ENTERPRISE OR SOCIALISM?

In attempting to improve society by substituting the false God of Government for the the supreme power of individual effort, we have substituted the welfare state for our individual responsibility and God-given freedom. This is the path that has meant the end of about twenty civilizations in past history.

If you think I am too harsh in characterizing our government as a socialistic or welfare state, let me quote from LBJ's own words in 1964, stating what he intended to do if elected President. I quote him word for word:

"We are going to take all the money we think is unnecessarily being spent, and take it from the 'haves' and give it to the 'have nots'." (CONGRESSIONAL RECORD, vol. 110, pt. 2, p. 2310.)

Contrast this philosophy with the immortal words of Abraham Lincoln who said:

"Any society that takes away from those most capable and gives to those least capable will perish."

These two statements bring into sharp contrast the self-reliant political philosophy that made us a great nation and which caused us to be revered throughout the world, and the welfare state which is fast destroying our republican form of government . . . a government in which even the majority were restricted by Constitutional limitations.

If Americans do not arise to this challenge confronting us . . . our nation can go down . . . but if we ever do, it will not be because the world developed the hydrogen bomb . . . it would be because we have developed a false philosophy that says the individual is no longer *economically responsible for his own welfare*, or *morally responsible for his own conduct.*

Thomas Jefferson gave us the great political concept that a nation governs best which governs least. Oh—how far we have abandoned that philosophy today. The party which he founded ridicules his faith and makes a mockery of his name by having Jefferson Day Dinners.

The great Frenchman, Alexis de Tocqueville, who came to America in the 1830's to study what was then described as a "noble experiment" in government, summarized his findings as to the existing, and the future status, of America in the following words:

"I sought for the greatness and genius of America in her commodious harbors and her ample rivers, and it was not there; in her fertile fields and boundless prairies, and it was not there; in her rich mines and her vast world commerce, and it was not there. Not until I went to the churches of America and heard her pulpits aflame with righteousness did I understand the secret of her genius and power. *America is great because she is good,* and if America ever ceases to be good, America will cease to be great."

My prayer at this time for you, and all of America, is that through a return to faith in God, restored confidence in the supreme worth of individual effort, and a greater devotion to our Constitution, America may continue to offer the same blessings of liberty and opportunity to our posterity as it gave to our immigrant forefathers, and to ourselves. Democracy will have availed us little, if in rescuing us from the despotism of kings, it hands us over to the tyranny of a majority who are willing to accept the shackles of a welfare state.

HAPPY BIRTHDAY, MR. PRESIDENT

The SPEAKER. Under a previous order of the House, the gentleman from Missouri [Mr. RANDALL] is recognized for 60 minutes.

Mr. RANDALL. Mr. Speaker, today, May 8, is a day on which the entire world is reminded of the debt it owes to the decisive leadership of our former President, Harry S. Truman, because on this day in 1884 Mr. Truman was born in Lamar, Mo., which is in the district I am privileged to represent. He now makes his home in Independence, Mo., only a short distance from my own residence.

It is a pleasure and a privilege we enjoy annually, to take the floor of the House to say, "Happy birthday, Mr. President."

Mr. ALBERT. Mr. Speaker, will the gentleman yield?

Mr. RANDALL. I yield to the distinguished majority leader.

Mr. ALBERT. I join the distinguished gentleman from Missouri who has the honor of being the Representative in Congress of former President Harry Truman in wishing this great American a "happy birthday."

Mr. Truman has lived to see his place in history not only fixed but outstanding. He is already recognized by students of history as one of the great Presidents of all time. In both domestic and foreign policy he brought initiatives to American Government rarely equaled, and in my judgment never surpassed.

I congratulate the gentleman upon recognizing this great American on this anniversary of his birth.

Mr. RANDALL. I am grateful to our majority leader for his contribution.

Mr. McCORMACK. Mr. Speaker, will the gentleman yield?

Mr. RANDALL. I am glad to yield to our distinguished Speaker.

Mr. McCORMACK. I join with my friend from Missouri in the splendid remarks he has made in connection with the birthday anniversary of our former President, Harry S. Truman, who is one of my dear and close friends.

President Truman, as the majority leader well said, has made his place in history—not only in American history but also in world history.

He is a man of keen vision, with the capability of looking into the future and seeing history in the making. He met the problems that confronted him as President of the United States and did so in a most courageous manner.

Former President Truman will always occupy one of the foremost pages in the history of our country. He was the Chief Executive of our country in a trying period of our Nation's history when firmness and strength of leadership was necessary in addition to vision and intuition, all of which he had. He gave to our country and to the world that firm leadership

which was so essential to solve the problems of the period during which he served as President of the United States.

He is one of the most humane men that I ever have met and one with an intense love of his fellow human beings. He is a man who took advantage of the opportunities that America gives. He rose to the highest position within the gift of our people.

The life of former President Truman is an example and an inspiration for all others to follow, with particular emphasis on the youth of our country. I say this because if they have the ambition, the determination, the dedication, and the willingness to make the sacrifices necessary, any one of the youth of this country can someday become President of the United States. Among the ranks of the youth of America today are one of two who some day will become the Chief Executive of our country. I say this without regard to political affiliation. This is the greatest country in the world. We have our challenges and our problems. We have met some of them and others we still have to meet. This is the greatest form of government because unlimited opportunity exists for every individual to make progress and to overcome any obstacles or difficulties, if, as I said, they have the ambition, the determination, the willingness to make sacrifices and the courage.

If there ever was any man in the history of America who exemplifies this to the highest degree humanly possible, it is our dear friend, former President Harry S. Truman.

So, Mr. Speaker, I join with my friend from Missouri and others in extending to President Truman my hearty congratulations on his birthday anniversary and wish that God will continue to bless him and Mrs. Truman, for countless years to come.

Mr. RANDALL. Those expressions by our Speaker will, I know, be appreciated by President and Mrs. Truman, as well as all of those in the House who have known and loved him for so many years.

Just yesterday it was my opportunity to have a visit in my office with Dr. Philip Brooks, who is the director of the Harry S. Truman Library at Independence. It is my real pleasure to be able to report to you Dr. Brooks' opinion that Mr. Truman's health is much improved over what it has been at any time in the past 18 months.

Recently an incident was reported that Mrs. Truman noticed the former President was not to be found in the house or yard, and she tried to find out where he might be. She learned after awhile he had taken one of those walks for which he is famous. He had walked east to a point near the Independence Square.

So Dr. Brooks reports President Truman is much stronger and has been feeling much better than he has at any time in the past 2 years. He does not use his cane much any more. I know this improvement in his health is something that we are all overjoyed to hear about, not only those fellow citizens in the city of Independence but his friends here in the Capital and throughout this country and the entire world.

Mr. HALL. Mr. Speaker, will the distinguished gentleman yield?

Mr. RANDALL. I am always delighted to yield to my friend and colleague, the gentleman from Missouri [Mr. HALL].

Mr HALL. Mr. Speaker, I certainly want to add my best birthday wishes to the former President, President Harry S. Truman.

As a fellow Missourian, President Truman was always most vigorous in coming to that part of the State where his cousins lived. We miss those visits.

Mr. Speaker, I am delighted to hear my colleague's report with reference to the former President's health. Knowing something about the former President, having served under him in the executive branch during World War II, and since, when he would come to Missouri and visit in various parts of the State.

Mr. Speaker, I am delighted to hear the report of all the Presidential papers and memorabilia in the Truman Museum and Library.

Mr. Speaker, I certainly hope that the former President continues to improve and that he may continue to enjoy good health, as well as his wife, Bess Truman, throughout the remainder of their lives.

Mr. RANDALL. Mr. Speaker, I am most grateful to the gentleman from Missouri and I know the remarks which he made come from the heart.

Mr. WINN. Mr. Speaker, will the gentleman yield?

Mr. RANDALL. Of course I am delighted to yield to my friend, the distinguished gentleman from Kansas, our neighbor from across the State line to the west.

Mr. WINN. I thank the gentleman from Missouri for yielding and I too would like to associate myself with the remarks of the Speaker of the House and of the majority leader and our neighbor to the east. Those of us who reside in the great State of Kansas join in wishing a most happy birthday to former President Harry S. Truman. The people from my area certainly, I am sure, wish to join in an expression of continued health and happiness and many more birthdays to the former President and we salute him as one of the fine Presidents of our land, and certainly a wonderful man whom we can call a friend.

Mr. RANDALL. I appreciate the contribution of our distinguished friend, the gentleman from Kansas [Mr. WINN].

It has been my privilege to represent the Fourth District of Missouri since 1959. This district gave to the Nation and the world one of the truly great statesmen and leaders of our time. To rise before this House each year and pay tribute to the No. 1 constituent of my district is perhaps the greatest privilege the office affords.

Each year as I begin to think about Mr. Truman's birthday, I am reminded once again of the great contribution he has made to the course of history. I am also reminded of the great pleasure and knowledge I have gained from knowing this man. My deep personal affection and friendship for this great American makes it a special pleasure for me to speak my oft-repeated praises about him.

So much has been written and said to honor this man that, indeed, anything I might say by way of praise is only an echo or amplification of something which

has already been said. I feel quite sure this repetition long ago became tiresome for Mr. Truman to hear.

On this occasion, I beg his understanding that I may contribute once again words of affection—not because these words will add to his honors, but because of the privilege those of us here enjoy to pause today to meditate about this great man and his contribution to our Nation and the world.

It is not enough to praise Mr. Truman as a man or to dwell on his strengths of personal character without relating his characteristics to the tasks he faced. It is only by relation to the overwhelmingly tough jobs he filled that his very uncommon traits manifested themselves most clearly.

Of course, it was obvious from the early beginning that great abilities and strength of character were always present within this man. Even as a lad, Harry Truman was able to be among the best at various jobs around the farm. While working on the farm and doing well at it, he was also studying history and improving his mind. He was showing great ability even then—an ability which would eventually carry him to the heights of power at the most crucial time of the century and enable him to make the right decisions. His ability manifested itself when he successfully led a battery of field artillerymen in World War I as a captain. The first elective office which he held, judge of the Jackson County court, gave even greater expression to the character and ability of Harry S. Truman.

His name became synonymous with political honesty and integrity throughout the State of Missouri. This reputation led him to the Senate in 1934, where he distinguished himself even further. During his second term in the Senate he contributed greatly to the U.S. war effort as head of the Special Committee To Investigate Contracts Under the National Defense Program. As we so well recall, it was at the Democratic Convention in 1944, Mr. Truman was chosen to run for the Vice Presidency on the ticket with President Roosevelt. This choice gave recognition to the high degree of competence which Mr. Truman had exhibited in the Senate and at the same time marked him as a man who could handle the great problems which were going to confront the Nation in the years that were just ahead.

As we look back to that convention in 1944, we can be sure that the delegates were not aware of the events which were to follow. Surely they did not know that within 3 months of becoming the Vice President, Mr. Truman would succeed to the Presidency. Certainly they did not know at the convention the scope and gravity of the problems which would confront the Nation in the postwar years. Most assuredly it was not known then in 1944 that the decisions which would be made in the years which lay ahead would affect the future course of the world as profoundly as any in its history.

Even today we are still unable to conclusively and fully estimate the impact of those decisions which were made in the postwar years. We do know that they have had much more influence on the course of history than was apparent at

the time. We also know that the convention chose a man who had an uncommon gift for making decisions and making right ones. The convention delegates and President Roosevelt truly could not have made a wiser choice for the vice-presidential nominee of that convention, even if they possessed a crystal ball which would have allowed them to gaze into the future.

As we reflect upon the events that followed the election of 1944, we cannot help but be thankful, a man such as Harry Truman was available. We are forever grateful that his decisiveness, his courage, his leadership, and his ability were there to guide the Nation in these perilous times.

The way in which Harry Truman took the reins of leadership and the situation in which his rise to the Presidency occurred is a story familiar to all of us. He had held the office of the vice-presidency less than 3 months when the tragic death of President Roosevelt catapulted him suddenly into the highest office in the land and thrust upon him the leadership of the entire free world at a crucial time in history. To this high office he brought an indomitable spirit and the great abilities which he had developed over the years.

It can be said with complete accuracy that no man really knows or can be trained how to be a President. The job draws on all the capabilities of a mature and knowledgeable person. In some ways one could say that Mr. Truman was not prepared for the office when he took it. He certainly did not know the details of many of the situations he would face. He had not been briefed as extensively as he might have been if he had been coming to the office to replace an incumbent on Inauguration Day. We are even told that he was not aware of the status toward development of the atomic bomb when he took office. These factors, however, did not make him much less prepared to assume the office; they just made him have to work a little harder to act quickly and effectively. In truth it is my view that Harry Truman was perhaps better prepared to assume the Presidency than any man in the history of our country.

From his study of history, which had engaged his attention since his early years, he knew what a President had to do—and he did it. He knew that the President had to make decisions and that these could not be delegated to any other person. He was aware of the tremendous responsibility he bore. He took the load and moved surely and steadily with it. He never faltered. Those were difficult days in which to function decisively. I am sure that it must have seemed to President Truman that everyone in the country had a solution to the problems about which only the President, in the final analysis, could decide. There were many different solutions to foreign problems coming out of the State Department and the Foreign Service. The more he learned of a given problem, I am sure the more obscure the best solution seemed, on many occasions. Decisions were difficult to make, but Harry Truman is a man with a capacity for making difficult decisions, and making them right.

A lesser man than Mr. Truman would

not have been able to effectively assume the office and exercise the leadership that was needed in this time. Mr. Truman was not only able to do the job that had to be done, but he did it with a distinction which will be to his everlasting credit. As he had shown before in his career, each new office, each increase in responsibility, each new challenge, gave him an opportunity to exercise his innate abilities to an even greater extent. As is often the case with truly great men, the abilities which he possessed and had cultivated were essential to him at this time, and the job he faced gave him an increased opportunity to further develop and exhibit these abilities. It challenged him to go to the limit, and he rose to the challenge as few men in the annals of history have done. Mr. Truman's performance as a President constitutes a classic example of a case in which the greatness of the man shaped history, yet the course of history enhanced the greatness of the man. There was an interaction between the inherent capabilities of this man to rise and assume the responsibilities which he faced on the one hand, and the events which were taking place on the other. He helped shape the events, and they, in turn, made a greater man of him.

Mr. Speaker, one of the most recent as well as one of the finest tributes paid to former President Truman occurred on last Friday, May 3. That was the day President Johnson, when on a trip to the Southwest, stopped at Independence, Mo., to call upon former President Truman.

Of course President Johnson used the occasion of this stopover at Independence, Mo., to wish former President Truman a happy birthday. Since members of the press were not present, we may not ever know the content of their conversation. The belief is that President Johnson asked for the counsel and advice of Harry Truman. As everyone knows, we are about to engage in negotiations with representatives of North Vietnam in Paris. It is the opinion of observers that President Johnson asked for the benefit of the experience and advice from former President Truman, knowing he had encountered similar problems during the Korean conflict.

Mr. Speaker, I am sure it is the wish of every Member of this body that our dear friend Mr. Truman continue to enjoy happiness and good health with the personal enrichment of the full life which he has lived. We all hope in the years to come he will have many more happy birthdays.

We wish for him all the pleasantries of life which he so richly deserves, and all the blessings of life to be enjoyed with his beloved and devoted wife, Mrs. Bess Truman.

Mrs. SULLIVAN. Mr. Speaker, President Harry S. Truman is 84 today. As a Missourian, I am deeply proud of this courageous man's record during nearly eight of the most fateful years of any Presidency. As an American, I am deeply grateful for the leadership he gave this country and the free world as President of the United States.

This country, and the free world are passing through what to many is a most

puzzling era. Most of us can remember a time when poverty, despair, and denial of basic human rights were so widespread as to be almost commonplace. Bold and imaginative approaches were necessary to meet those problems head-on, and President Truman, after completing the work of his predecessor, Franklin D. Roosevelt, in the victorious conclusion of World War II, the greatest war in history, then set about to solve the many domestic problems which had been put aside during the war.

Now we have new problems which require imaginative new solutions. President Truman proved in his tenure in office that sometimes the steps which must be taken for the good of this country are not always popular ones. We all have much to learn from his political courage.

Happy birthday, President Truman. May you enjoy many more.

## GENERAL LEAVE

Mr. RANDALL. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days within which to extend their remarks on the subject of my special order, the birthday of former President Harry S. Truman.

The SPEAKER pro tempore (Mr. GRAY). Is there objection to the request of the gentleman from Missouri?

There was no objection.

## A BILL TO ESTABLISH A PRESIDENTIAL COMMISSION ON HUNGER

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from New York [Mr. GOODELL] is recognized for 30 minutes.

Mr. GOODELL. Mr. Speaker, bills are being introduced today by 34 Republicans and 36 Democrats to establish a Presidential Commission on Hunger. These bills are the product of a unique bipartisan coalition organized by the following 16 Members of this body:

The gentleman from Ohio, WILLIAM H. AYRES; the gentleman from Washington, THOMAS S. FOLEY; the gentleman from New York, CHARLES E. GOODELL; the gentlewoman from Oregon, EDITH GREEN; the gentlewoman from Washington, CATHERINE MAY; the gentleman from Illinois, ROBERT H. MICHEL; the gentleman from Maryland, ROGERS C. B. MORTON; the gentleman from Kentucky, CARL D. PERKINS; the gentleman from Texas, GRAHAM PURCELL; the gentleman from Minnesota, ALBERT H. QUIE; the gentleman from Iowa, NEAL SMITH; the gentlewoman from Missouri, LEONOR K. SULLIVAN; the gentleman from California, CHARLES M. TEAGUE; the gentleman from Arizona, MORRIS K. UDALL; the gentleman from New York, HENRY P. SMITH III; and the gentleman from California, THOMAS M. REES.

Cochairmen of the coalition to help malnourished Americans are Congressmen FOLEY and GOODELL. Our joint statement follows:

Recent studies have portrayed in general terms the shocking plight of many Americans who are permanently impaired by malnutrition. It is incredible that in our afflu-

ent society, millions of children exist today on grossly deficient diets and that many are permanently consigned to poverty and dependence by resulting physical and mental retardation.

This problem can no longer be ignored. Immediate and urgent action must be taken. Accordingly, we have announced today the formation of this bipartisan Coalition to Help Malnourished Americans.

School lunch, school milk, food stamps, commodity distribution, the emergency food and medical aid fund and other special poverty programs are all designed to carry out a noble national commitment of our bountiful resources to banish hunger from our midst. It is clear, however, that less than ⅓ of poor children who are in school benefit from these programs. Food distribution and stamp programs reach less than ⅓ of the poor. A Department of Agriculture survey indicates that more than 10 million of our people live on a diet having less than ⅔ of the minimum nutrients considered necessary for adequate health. Fragmentary medical reports indicate widespread anemia and other evidence of malnutrition among poor children, expectant mothers and individuals of all ages.

Poverty stricken areas across the nation frequently report that school children, especially in elementary grades, suffer from extreme hunger and are thus thwarted in their efforts to learn. Public hospitals report disturbing patterns of malnutrition among infants and expectant mothers. Many among the 4.3 million aged poor suffer the pain of constant hunger and resultant debilitating disease.

It is clear that many state and local governments are not carrying their share of the load to make many existing Federal programs work. Public opinion must be aroused to insist that government, at all levels, focus on this problem with the highest urgency.

We have formed this coalition of Congressmen to press impatiently and urgently on every front available to us to alleviate this problem immediately and eliminate it quickly. As first steps, we propose:

1. Public hearings immediately to determine what can be done without delay by administrative and legislative means to improve and refocus existing programs. A member of the Coalition, Congressman Carl D. Perkins of Kentucky, is the Chairman of the Committee on Education and Labor. He announced this morning that these hearings will begin the week of May 20, 1968.

2. Establishment of a Presidential Commission comparable in size, mission and urgency to the Commission on Civil Disorders. We believe that hungry Americans in the midst of plenty present a cruel paradox that demands highest priority attention and action. We are introducing today a Resolution in the House to create a Commission on Hunger of equal stature to that of the Commission on Civil Disorders. The Commission would be mandated to complete its studies on an emergency basis and report its recommendations to the nation on January 1, 1969.

It is no longer sufficient that concerned Americans adjust to their pangs of conscience by expressing frustration and indignation. Hunger hurts. We can never break the cycle of poverty in our land until we take the indispensable first step of eliminating malnutrition. Inadequate food at any time in a person's life dulls the capacity to learn and perform effectively. The problem is immediate. We pledge ourselves to do all in our power to eliminate these conditions without delay.

For the convenience of our colleagues I include the text of the bill at this point:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the ("American Hunger Commission Act").

POLICY AND FINDINGS

SEC. 2. (a) The Congress declares that it is the policy of the United States that the President, the Secretary of Health, Education, and Welfare, the Director of the Office of Economic Opportunity, and all other officials with responsibility to administer programs designed to meet the hunger needs of the American people, shall, to the fullest extent possible, use their authority under the laws of the United States, including the National School Lunch Act (42 U.S.C. 1751) and the emergency food and medical services program authorized under the Economic Opportunity Act of 1964 (20 U.S.C. 1001 (note)), to meet such needs of the Nation's poor.

(b) The Congress finds that—

(1) surveys conducted by Government agencies and responsible groups of citizens allege that, in spite of America's abundance of food resources, our Federal, State and local food programs reach only 18 per centum of the poor, and that millions of citizens lack food in adequate quality and quantity, resulting in the lifetime impairment of children, mentally and physically, and in unnecessary disease, suffering, and premature deaths among both the young and old; and

(2) the restricted use of programs authorized by Congress, failure of local and State government agencies to use Federal food programs, reversion of funds, divisions of responsibility and authority within the Congress and administrative agencies, unwise regulations, and other obstacles may be impeding and frustrating efforts to banish hunger among the desperately disadvantaged poor within our Nation.

ESTABLISHMENT OF COMMISSION

SEC. 3. There is hereby established a bipartisan commission to be known as the Commission on Hunger (hereafter referred to in this Act as the Commission).

DUTIES OF THE COMMISSION

SEC. 4. The Commission shall undertake a complete study and investigation of the unfulfilled needs of those suffering from hunger in the United States, and shall recommend such measures as it deems necessary to secure greater use of Federal food programs by State and local agencies and to establish a coordinated program to insure the fulfillment of the basic hunger needs of every American.

MEMBERSHIP

SEC. 5. (a) The Commission shall be composed of eleven members appointed by the President, except that the President may, from time to time, appoint such additional members as he may deem advisable.

(b) Members shall be appointed for the life of the Commission.

(c)(1) Except as provided in paragraph (2), members of the Commission shall each be entitled to receive $100 for each day (including travel time) during which they are engaged in the actual performance of duties vested in the Commission.

(2) Members of the Commission who are full-time officers or employees of the United States or Members of Congress shall receive no additional compensation on account of their service on the Commission.

(3) While away from their homes or regular places of business in the performance of services for the Commission, members of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as the expenses authorized by section 5703(b) of title 5, United States Code, for persons in the Government service employed intermittently.

(d) The Chairman and Vice Chairman of the Commission shall be designated by the President.

(e) The Commission shall meet at the call of the Chairman.

DIRECTOR AND STAFF OF COMMISSION

SEC. 6. (a) The Commission shall have a Director who shall be appointed by the Chairman and who shall be compensated at a rate not to exceed $25,000 per annum.

(b) The Commission may appoint and fix the compensation of such experts, consultants and organizations thereof, technicians, and clerical and stenographic assistants as it deems advisable.

(c) The Director and staff of the Commission may be appointed without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and may be paid without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates.

POWERS OF COMMISSION

SEC. 7. (a) The Commission may for the purpose of carrying out this Act hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence as the Commission may deem advisable. The Commission may administer oaths or affirmations to witnesses appearing before it.

(b)(1) The Commission shall have power to issue subpenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation by the Commission. Such attendance of witnesses and the production of such evidence may be required from any place within the United States at any designated place of hearing within the United States.

(2) If a person issued a subpena under paragraph (1) refuses to obey such subpena or is guilty of contumacy, any court of the United States within the judicial district within which the hearing is conducted or within the judicial district within which such person is found or resides or transacts business may (upon application by the Commission) order such person to appear before the Commission to produce evidence or to give testimony touching the matter under investigation. Any failure to obey such order of the court may be punished by such court as a contempt thereof.

(3) The subpenas of the Commission shall be served in the manner provided for subpenas issued by a district court under the Federal Rules of Civil Procedure for the United States district courts.

(4) All process of any court to which application may be made under this section may be served in the judicial district where-in the person required to be served resides or may be found.

(c) No person shall be excused from attending and testifying or from producing books, records, correspondence, documents, or other evidence in obedience to a subpena, on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture; but no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, except that such individual so testifying shall not be exempt from prosecution and punishment for perjury committed in so testifying.

(d) POWERS OF MEMBERS AND AGENTS.— When so authorized by the Commission, any member or agent of the Commission may take any action which the Commission is authorized to take by this section.

(e) The Commission may secure directly from any department or agency of the United States information necessary to enable it to carry out this Act. Upon request of the Chairman or Vice Chairman of the Commission such department or agency shall furnish such information to the Commission.

Case 3:22-cv-00410-REP Document 41-6 Filed 02/22/23 Page 57 of 145 PageID# 1363

REPORT

Sec. 8. The Commission shall submit a report to each House of Congress and to the President not later than January 1, 1969.

TERMINATION

Sec. 9. The Commission shall cease to exist sixty days after submitting its final report pursuant to section 8.

## CHRONOLOGY OF INVOLVEMENT IN VIETNAM

The SPEAKER pro tempore. Under a previous order of the House, the gentleman from Virginia [Mr. POFF] is recognized for 30 minutes.

Mr. POFF. Mr. Speaker, on April 2 last, before the central Virginia Asian affairs study in Lynchburg, Va., Hon. Frederick E. Nolting delivered an address of unusual significance. Indeed, it is of such significance that I want it preserved for the use of future scholars and historians who write the story of the Vietnam war.

The significance of the speech which was called to my attention by Mr. Keith Harvey, copublisher of the Bedford Bulletin-Democrat, is accented by the fact that Mr. Nolting had personal involvement in the events which the speech chronicles. He served as American Ambassador to South Vietnam during the regime of President Ngo Dinh Diem. Ambassador Nolting, speaking ex tempore, documented with intricate facts and figures the economic, social, and political progress of the era which he calls "The Miracle of Diem."

At this point, omitting several paragraphs which are prefatory or personal, I will read into the RECORD the transcript of the extemporaneous speech Ambassador Nolting delivered:

Ladies and gentlemen, I have so much on my heart and mind to say tonight that I hardly know where to begin. When a man comes back home after a long absence—back to his own country and to his own well-loved native state, he is drawn by many associations and for many reasons to share his thoughts and his experience in all frankness with those he feels close to. I want to do that this evening, I cannot do otherwise with an audience like this of my fellow Virginians. I thank you for the privilege of being here, Dr. Lippard. I have been looking forward to it a great deal. As it so happens, I come home to a changed situation—a drastically changed situation in regard to the Viet Nam problem, as Senator Spong has just mentioned, and in regard to the American political scene—a situation transformed 48 hours ago by President Johnson's dramatic announcement. One of the minor casualties of that announcement was my prepared speech. But neither you nor I, I think, cares too much about the speech—it's our country and its future that we care about. We cannot see clearly at this stage where this announcement of the President's will lead. But at least it seems to me it has given a new dimension to the problem of Viet Nam and maybe the possibility of an avenue towards its solution. Frankly, for the past four years I have been pessimistic about the success of U.S. policy in Viet Nam as it has been carried on in those years. I did not want to say this and have not said it publicly, I think, up to now, for fear of undermining what chance there was of success in that policy. But I have felt that errors committed some four years ago, in the last months of the Kennedy administration—errors which were inherited by President Johnson and, I think,

compounded during his administration—were so great as to be practically unredeemable. To show that I am not speaking entirely from hindsight, I will read you a letter. This letter is dated February 25, 1964:

"The PRESIDENT,
*The White House,*
*"Washington 25, D.C.*

"DEAR MR. PRESIDENT: I am sorry I have been unable to get an appointment to see you, for I have wanted for several months to talk with you about Viet Nam and related matters. I believe you and I have seen the issues in Viet Nam in much the same light from the time of your visit there in May 1961—at least, I have that impression from talks we have had in the past. I know, therefore, how heavily this problem must now weigh on your mind, as indeed it does on mine also; and I earnestly hope that, despite certain irrevocable errors that I think have been made, a way can yet be found to fulfill our national interests there with honor.

"I take the liberty of sending this letter, Mr. President, because I feel an obligation as well as a desire to tell you frankly and directly about my future course of action, which is likely to be interpreted in the press and elsewhere as being related to my tour on duty as ambassador in Viet Nam.

"I have today sent to the Secretary of State a request to be granted retirement from the Foreign Service, in order to accept an exceptional offer in private business. That my decision has been influenced by my strong disapproval of certain actions which were taken last fall in relation to Viet Nam, with predictable adverse consequences, I do not deny. Nor do I deny that I have been uncomfortable in my association with the Department of State since returning from Viet Nam six months ago.

"Under these circumstances, it seems sensible for me to accept a very attractive position in private business. As a private citizen, I shall continue to do my best to contribute to our country's success.

"I solicit your understanding, Mr. President, and I wish for you, as you know, personal happiness and all success in looking after the affairs of our nation.

"Sincerely and respectfully yours,
"FREDERICK E. NOLTING."

For many long years now, with deepening foreboding, I have seen, as you have, the problem of Viet Nam grow and transform itself from a relatively minor concern of the United States to the raging central affliction of our times—poisoning the spirit, the confidence, and the unity of our people. I have been sick at heart—the more so because I myself participated and shared in the long series of events that led to this "bloody impasse." I must tell you at the outset that I have no magic formulas to propose. There are none, I think. The choices before our nation are hard, painful choices—much harder than they had any need to be. Yet we must somehow find a national consensus, based on the best judgment we can bring to bear, and that right quickly before events overtake us again. Your chairman, Dr. Lippard, has asked me to speak on the origins of American involvement in Viet Nam, but he was kind enough not to limit me to that aspect of the matter. Past history helps to illuminate the future if we are wise enough to draw lessons from it, but you have had a great deal of background in this seminar and the anxious eyes of our nation are fixed on the present and the future—not on the past. I shall limit myself to a sketch of the history of United States involvement in Viet Nam—putting aside innumerable pages of material. This will be incomplete and over-simplified, it will, no doubt, omit many things of importance, but I would like to save time to discuss with you the central, immediate questions—for these questions cannot wait—not even until elections.

Where to pick up the continuous thread of

history in Indo-China is difficult to decide. I shall pick it up at the close of World War II—after the Japanese surrender and the return of the French—but with the important proviso that we do not assume that the history of the Vietnamese people began then. Actually, Vietnamese recorded history goes back some 2,000 years, and if I had to give the thrust of that history in one sentence it would be 2,000 years of struggle against Chinese domination.

America's *involvement* in Viet Nam began in the aftermath of World War II. America's *obsession* with Viet Nam began almost twenty years later—with the overthrow of the Diem government and the subsequent introduction of U.S. combat forces. Between the two there lies a long period of time and an enormous difference of policy.

In 1946–1947, as the opposition of the Vietminh to the return of French rule began to intensify, the United States in spite of its traditional anti-colonialism was sympathetic to France. There were two main reasons for this—which I cite without evaluation. France was a key factor in the recovery of Western Europe and the loss of Indo-China, it was feared, would so weaken her centrist government as to lead to a political upheaval and possibly a communist take-over in France itself. The other reason was the belief that a Vietminh victory would amount to communization of Indo-China. Ho Chi Minh was known to be a life-long agitator and revolutionary, trained in Leninist ideology and tactics in Moscow. In nearby Indonesia, Sukarno was regarded by the United States in those days as an indigenous nationalist. Ho Chi Minh definitely was not.

At the same time the United States urged France to support a non-communist nationalist counterforce to the Vietminh. By 1949, when the quasi-independent government of Bao Dai was established, another and more compelling reason was added for U.S. support of the anti-communist forces in Indo-China—of which about three-quarters were native Indo-Chinese. This was Mao Tsetung's stunning victory in China. General mobilization was decreed in Vietminh territory at that time and in February 1950 Vo Nguyen Giap stated "The covert war has ended and open warfare has begun." Moscow recognized Ho Chi Minh's government on February 1, 1950, and Communist China and Yugoslavia followed suit. Ho Chi Minh proclaimed in a broadcast, "Henceforth we definitely belong to the powerful anti-imperialist bloc of eight hundred million men." Chinese aid to the Vietminh—food, arms and ammunition, military advisors and military training both in North Viet Nam and China itself—began in March 1950. For its part, the United States decided to send material aid to France and its Vietnamese allies, beginning with the very modest sums of $15 million for military aid and $25 million for economic assistance.

On June 25, 1950, the North Koreans struck in force across the 32nd parallel and the Korean War began. For two years this limited but bloody war, involving Chinese as well as North Korean forces, served to divert American attention from Indo-China where the Vietminh forces steadily strengthened. Whether planned or not, this was an example of the kind of reciprocal action for which the Communists are past masters.

After the Korean War, U.S. aid to the French and the Associated States of Indo-China increased rapidly, until in 1954 we were paying 78% of the total cost of the war. The United States, however, had no part in the policies or conduct of the war at that stage—a fact which caused considerable friction between French and American representatives in Indo-China.

The rest of this sad chapter up to the convening of the Geneva Conference in 1954, the Vietminh victory at Dien Bien Phu, and the withdrawal of France from Indo-

China, is perhaps better known to you, for it is well-publicized now.

There are three points, however, which I think deserve special attention. The first is that after eight years of warfare the armies of France and the Associated States were never defeated in any over-all military sense. The political will of France to continue the struggle simply gave out and France, under Premier Mendes-France, got out as best she could. Actually, the provisions of the Geneva Accords of 1954 were somewhat more favorable to the non-communist side than one might have expected under the circumstances. It is interesting to note that Ho Chi Minh did not want to settle for a divided Viet Nam, even temporarily, but was persuaded to do so by Russia and China, among others.

The second fact of importance is that the United States, when faced with a decision in 1954 of whether or not to intervene with combat forces, decided against doing so, despite strong voices in the Eisenhower administration who thought that we should. I am happy to say that the Honorable Walter S. Robertson is with us tonight—and I do hope that after my remarks on this period, which he knows so well, he will straighten us out about it from firsthand experience.

The third point is that even then the United States was of two minds about this matter. There were "doves" and there were "hawks" then, and people in between. There was no strong national consensus among the American people and U.S. action, while generally in support of France and the Associated States, was in that period finally ineffectual.

The second chapter starts after the withdrawal of the French Expeditionary Corps and the partitioning of Indo-China, when all the world expected South Viet Nam to stagger and to fall quickly into the arms of Hanoi. This period begins with what has been called "the miracle of Diem." Incidentally, let me say that the pronunciation of President Diem's name is "Ziem" even though it starts with a D. I have found quite often that after a remark about this period I was accused of lisping, or people didn't understand whom I meant. I mean the former president of Viet Nam, Ngo Dinh Diem, spelled Diem. This period begins with what has been called "the miracle of Diem." It ends in 1963 with the overthrow and assassination of President Diem. The record is one of a remarkable recovery by South Viet Nam, based on a do-it-yourself philosophy and encouraged and assisted by the United States. It is, I think, a record of which both South Vietnam and America can be proud—except for the last sudden fatal months in 1963. It is a record nearly blotted out by more recent events and, I think, by deliberate intent—for reasons which will become clearer later on.

I sometimes think of the period of 1954 to the present in terms of a classic Greek drama. The first act is the story of the gradual triumph of relatively good men and good ideas over relatively bad men and bad ideas. The second act depicts the act of *hubris*, when our country setting its judgment and its power above that of the people and government it was helping, encouraged a revolution against its ally. The third and present act unfolds the dreadful consequences of that act of *hubris*. The fourth act is yet to be revealed. It will be revealed, I think, either in greater tragedy or in the regaining of America's unity. In the strengthening of her moral integrity, and in the regeneration of her leadership.

You will recall that the Geneva Accords of 1954 provided among other things for the cessation of hostilities, the independence and neutral status of Viet Nam, Cambodia and Laos, and the temporary division of Viet Nam at the 17th parallel pending a vote on unification. The armed forces of both sides were to be withdrawn to their respective territories and neither side was to be reinforced

from outside. Provision was also made for an exchange of civilians, at their choice. Neither the government of South Viet Nam nor the United States signed the Accords but the United States agreed not to violate them, and South Viet Nam, under Ngo Dinh Diem, tacitly accepted them with one exception, the provision on unification.

Both halves of Viet Nam at that time were beset by great difficulties and faced Herculean tasks of reconstruction and readjustment. To the surprise of most observers, progress towards order and economic stability was faster in the South than in the North, due in part to more abundant food supplies and despite the absorption of 900,000 refugees from the North. It is noteworthy that Hanoi did not press at that time for unification as provided in the Geneva Accords. Ho Chi Minh had his hands full in coping with internal problems, including a violent peasants revolt, and was presumably as unsure of the outcome of the referendum as was President Diem. In any event, there ensued a period of competition of a relatively peaceful sort between Hanoi and Saigon, as each strove by different means to bring some order and a measure of economic viability into their shattered countries. The miracle of Diem consisted of the fact that having formed a government under conditions of wild disorder in the South, in a country which had not known independence for four generations, he was able to inspire the respect necessary to cope with the problems confronting him. I knew this man well, after the American press had largely turned against him. To me the secret of his success was his moral integrity. I wish there were one like him in Viet Nam now.

From 1955 to 1960, South Viet Nam, with American aid of about $150 million a year, accomplished the following. Rice production rose from 2.8 million metric tons to 4.6 million metric tons, rubber production rose from 66,000 metric tons to over 79,000. Diversification of crops was encouraged, resulting in large increases in jute, kapok, copra, tea, coffee, fruit, vegetables. By 1961, 80 agriculture extension agents were working in 32 provinces, 5744–T clubs (the Vietnamese version of our own 4–H clubs) with a membership of 20,681 rural boys and girls were active in 2,330 villages. New lands were opened for re-settlement. By 1961 over 200,000 people had taken up new lands, each family receiving five hectares, about 12 acres, of which one hectare had been cleared by the government—the rest they cleared themselves. Nearly one million refugees from the North had been re-settled in one way or another and enabled to become contributing members of society. I have visited a number of these villages, often in the company of President Diem. To get out from Saigon and see this progress in the countryside was always a heartening experience.

The commercial catch of fish under government help rose from about 100,000 tons in 1955 to 250,000 tons in 1961. The government's farm credit program loaned over 3 billion piastres to over one million farm families. A national agriculture college was established with a student body of 300. 97 district farmers associations were serving 778 villages and 292 farm cooperatives were established with a membership of 110,000 and a paid-in capital of over 50 billion piastres.

I don't want to bore you with statistics. I cite them because I daresay you saw little or nothing about these accomplishments in the American press. I remember giving these facts and figures and others like them to members of the press corps in Saigon. No articles appeared on them to my knowledge. Most of the reporters there were more interested in the bloody side of the struggle, and in criticizing the government's shortcomings.

This period also marked the beginning of an industrial base in a country which had had until then almost no industry whatever. 51 manufacturing firms were established in

South Viet Nam from 1955–1961. The largest plants were in textiles which attracted 560 million piastres of investments. New factories reduced the imports of refined sugar from 25,000 metric tons in 1954 to zero in 1961. By manufacturing many of the things required and formerly imported, South Viet Nam saved $35 to $40 million annually in foreign exchange.

In transportation and communications, by 1958, the entire railroad line was operating for the first time in 12 years. Three major highways were completed and others were under construction. 14½ million cubic meters of infill was dredged from canals, restoring the water transport system in the delta area. Electric power generation doubled.

In health measures, 3,500 hamlet health stations were established; training facilities for health workers were developed; the number of doctors graduating from medical schools increased rapidly; facilities were developed to train 120 professional nurses annually; and 100 assistant nurses. By 1962, small but well equipped surgical wings were added to 25 of the 40 provincial hospitals in South Viet Nam. A malaria eradication program was established, dramatically reducing the incidence of malaria cases.

In education, the number of students, teachers, and classrooms were more than doubled in 5 years. Two new universities were established—one in Hue and one in Dalat. Four new technical vocational schools were opened. A government information program and library facilities were established in most of the 41 provinces and in all the major cities.

A native army of 350,000 men was raised, equipped, trained, deployed. A civil guard for the protection of the peasants in the provinces was similarly formed—all this with American equipment and training. Police for the cities, and rural police forces, were established, equipped and trained. These were major, difficult accomplishments. I cannot begin to do justice to those involved in these few sentences.

In 1955 South Viet Nam drew up, ratified, and put into effect a constitution and a system of free national elections. This was a brand new concept of government to the Vietnamese people. That it did not work perfectly was no surprise. The surprise was that it worked as well as it did. Their constitution, modeled on that of the United States, provided for an elected president and vice president, an elected legislature, a cabinet of responsible ministers, and a supreme court. Ngo Dinh Diem was elected president in 1955 and re-elected in 1961. Elections for the National Assembly were held regularly until October 1963. It is worth remembering that the roots of self-government in Viet Nam were planted more firmly under President Diem than ever before or since. And all this was done while the most vigorous efforts were underway to knit together a torn, confused, heterogeneous, and devastated country. This was "the miracle of Diem."

Next we come to what I term "the period of renewed aggression." This began in 1959. It is still continuing, but in a different form. The aggression started slowly, covertly, subtly. Alarmed by the progress in the South and having gotten a firm grip on the North, Ho Chi Minh decided that Viet Nam should be reunited, by force if necessary. He had a legal cover for this—the Geneva Accords of 1954. He also had ready tools—the Vietminh organizers, armed cadres, and sympathizers who were left behind in the South after the accords.

The first objective of the aggression was to undermine the government of the South, to set back or if possible to destroy what had been so painfully built up by the Diem government over the past years. The instruments were slander, propaganda, incitement of local grievances, promises, threats—working up to terror, destruction, kidnappings, and murders—reinforced at each stage by

directions, supplies and trained agents from the North.

Here I must explain several terms. What is the difference between the Vietminh and the Viet Cong? I am sure you know. Vietminh is the term Ho Chi Minh used for his independence movement starting way back in 1946. It means roughly "Vietnamese nationalists." You can see why President Diem did not want to leave President Ho Chi Minh in possession of this term. Diem, too, was a nationalist and so were his followers, and so they began to call the terrorists in the South "Viet Cong," which means Vietnamese communists. Behind this distinction in terms lies a distinction in organization and perhaps in aims, although less so now than formerly, I think. I refer to the difference between the National Liberation Front in the South and the government in Hanoi, and to the Viet Cong military organization in the South as distinct from North Viet Nam's regular army units infiltrated into the South. The National Liberation Front was publicly proclaimed in 1960 as the political spearhead of the Viet Cong organization. It seems to have had two major purposes: to consolidate and direct the Viet Cong terrorists and guerillas and to coordinate with Hanoi. The Viet Cong leaders in the South at first had some difficulties with Hanoi, and vice versa. Some southern Viet Cong did not relish the prospect of being swallowed up by Hanoi, and most did not like taking orders from Hanoi. This reflected the widespread Vietnamese factionalism and jealousy. I saw considerable evidence of these differences when I was there, but it was clear nevertheless, even seven years ago, that the Viet Cong were dependent upon Hanoi's help to keep going and couldn't have sustained their subversive activities without it. I think it is probably too late now to count on or to exploit differences of aims between the two.

President Kennedy, you remember, came into office in January, 1961. Southeast Asia was one of his graver problems. Laos and South Viet Nam were weakening under increased communist insurgency. He and his government decided on a negotiated settlement in Laos and at the same time a substantial increase in American support to the government and people of South Vietnam. This must have seemed rather strange to the strategists in Moscow, Peking, and Hanoi, who, despite their differences, tended to look upon the whole of Indo-China as one strategic area. They saw their opportunity and did not fail to take advantage of it. The treaty on Laos, negotiated by Averill Harriman, signed in Geneva in 1962 and never lived up to by the communist signatories, promptly turned the Ho Chi Minh trail into the "Harriman Memorial Highway." (I did not coin the phrase.) The treaty on Laos gave immunity to the North Vietnamese to take control of the northern provinces of Laos and to infiltrate South Vietnam while tying the hands of our side. At best the Laotian settlement can be regarded, I think, as one of the poorer alternatives in an admittedly difficult and awkward situation.

Meanwhile, the Viet Cong attempt to undermine progress in South Vietnam and to paralyze its government was making alarming headway. One of the figures I remember from my briefings for my Vietnam assignment was the figure 2,400. This was reportedly the number of South Vietnamese government officials, non-military, assassinated or kidnapped by the Viet Cong in 1960, the year before I got there—minor officials, for the most part, who were carrying on the work of the Diem government, the agriculture extension agents, road engineers, dredge foremen, district chiefs, school teachers, doctors and nurses, anti-malaria teams, and others. Twenty-four hundred of them killed or kidnapped in one year. Was this a popular uprising against an unpopular government as some would have us believe? Or was it a planned, deliberate strategy of aggression against a constitutional free government? From all the evidence I had, and it was considerable, I have no hesitation in saying it was certainly the latter.

In May 1961, Vice President Lyndon B. Johnson arrived in Saigon. He was accompanied by his wife and a group of officials from Washington, including members of the Kennedy family. President Kennedy had requested Mr. Johnson to go to Vietnam to survey the situation first-hand. The new administration in Washington was facing important decisions. I was then the new ambassador to Saigon. My wife, my family, and I arrived 48 hours before. Vice President and Mrs. Johnson were guests of President Ngo Dinh Diem. No such high American officials had been in South Vietnam since Vice President Nixon's trip in 1957. Mr. Johnson's visit consisted of four whirlwind days of conferences with President Diem and his advisers, inspection trips in and around Saigon, receptions, public appearances, handshakings, dinners, and more conferences. As a participant, I was impressed by the Vice President's drive and energy, by President Diem's calm determination and force of character, and above all by the enormous differences of approach to political leadership between the two men. The one occidental and the other oriental, the one seeking popular approval and the other seeking respect, the one democratic in our sense, the other paternalistic in his attitude towards his people, in the good Mandarin tradition. Yet there was an evident rapport between them.

At the farewell dinner, Mr. Johnson proposed a glowing toast to the Vietnamese president. "To the George Washington of Vietnam," he said, and we all drank a toast in warm champagne. This was the beginning of my tour of duty in Vietnam.

From the shambles of occupation, division, and war, a new society was being built. But now again it was under attack. Would it be capable of bearing the responsibilities of self-government, while at the same time fighting off a renewed and vicious subversive attack? Could the two countries, South Vietnam and America—so disparate in size, strength, outlook, and ways of doing things—find a formula for working more closely together in their common interest? What was the common interest? These were the central questions we pondered and discussed seven years ago.

That was in May of 1961—the mid-way point between the French withdrawal from Indo-China and today. President Kennedy, you remember, had been inaugurated in January. President Diem had been re-elected in April. Less than three years later, they were both dead.

The United States and the government of South Vietnam quickly arrived at an understanding. There were three agreed principles underlying increased U.S. aid to South Vietnam in 1961. One, the South Vietnamese, through their elected government, undertook to prosecute their struggle against the Viet Cong more intensively in all respect—economic, social and political—behind a strengthened military shield. Two, the U.S. undertook to help by increased material aid and by advice and training. The introduction of U.S. combat forces, however, was definitely ruled out. President Diem did not want them, and President Kennedy did not want to send them. Three, there would be no interference by the United States in the internal affairs of South Vietnam—no attempt to usurp the powers of the South Vietnamese government, nor to take control of the conduct of the struggle. Both parties agreed that it had to be a Vietnamese victory if it was to endure.

These principles formed the basis of a partnership of good faith directed toward a common end, the defense of the right of the South Vietnamese people to determine their own future without coercion, force or terror. They rested on a fact which is as sound today as it was then—that indigenous nationalism has to be the mainspring of resistance to the communists.

South Vietnam's appeal for more aid was answered by the United States under President Kennedy for the following main reasons. The South Vietnamese people under President Diem had shown courage, perseverance and progress for six years. As people they seemed worthy of support in their determination to remain free. They appeared to be the best bet for making a stand against the southward thrust of Asian communism. South Vietnam was more accessible than Laos and relatively well-governed. The South Vietnamese were anti-Chinese as well as anti-communist. They held the key to the rice bowl of Asia, the lower Mekong Delta. They were by treaty under the protection of SEATO.

An agreement was worked out between President Diem and myself following General Maxwell Taylor's visit to Vietnam and was promptly approved by President Kennedy. It provided vigorous new programs of action to protect the Vietnamese people and to win them solidly to the government's side—without enlarging the area of conflict, without inviting outside interference, without undercutting the essential spirit of Vietnamese nationalism, and without the use of American combat forces. To make the arrangement work in practice, it was necessary to establish a high degree of mutual confidence between the members of our mission in Saigon and the members of the Vietnamese government.

My instructions, with which I thoroughly agreed, laid heavy emphasis on building a bridge of confidence strong enough to carry the load of advice and aid which we were giving. Since, as was right and proper, we could not command, we had to rely on persuasion and mutual confidence. We had to be prepared for some disappointments and frustrations, for occasional misunderstandings, for patient negotiation, and for keeping our American influence "under a bushel," in order not to give credence to the Viet Cong propaganda that the Diem government were puppets of the Americans. We had to be prepared to recognize on occasion that American prescriptions were not always the best remedies in Vietnam. Anyone who has had the experience of trying by cable to persuade Washington that a plan approved by the National Security Council has some flaws in it will know how hard this is.

By and large this program of help and advice worked well for two years. The testimony of the enemy is more eloquent than what I can say. These are quotations from Wilfred Burchett, the Australian journalist, who spent a great deal of time with both the Hanoi government and the Viet Cong. According to Burchett, Ho Chi Minh said: "1962 was definitely Diem's year." Another quotation, according to Burchett, was from the Viet Cong: "We could not have imagined that the United States would be so stupid as to pull the rug from under Diem."

Confidence was established at all levels of our mission with their Vietnamese opposite numbers, with gratifying results. This applied to civilian as well as military activities, intelligence collection and analysis, police training, the treatment of prisoners, "the Open Arms policy," land distribution, the communications network, and last but not least, the placement of the best available men for the innumerable jobs that had to be done in the countryside.

I would like to take this occasion to express my deep admiration for the Americans I worked with, military and civilian, for their accomplishments during this period. The vast majority understood their difficult and delicate advisory roles and carried them out to the benefit of our country. It is a mark of their accomplishments that in 1963, when

I left Vietnam, the government had re-established effective control in 75% of the country as against 25% two years earlier. The cost in American lives over a period of eight years was 98 men killed.

When I went to say goodbye to my friend President Diem in August of 1963, he looked at me earnestly and asked, "Does your departure mean that the United States government has changed its policy from what you and I agreed two and one-half years ago?" I replied, "Mr. President, I have been assured on highest authority from Washington that it does not. You can rely on that"—and I showed him the telegram signed by Secretary Rusk referring to "highest authority," which meant the President. Diem thought a moment and said, "Mr. Ambassador, I believe you but I am sorry to say I do not believe the message you have received." I said, "Mr. President, you must believe it. Otherwise, all that we have accomplished will be destroyed. You and I know that confidence and mutual respect is the sole basis for successful co-operation between our two countries."

When I left Saigon on August 15, 1963, I knew I had not convinced Diem that American policy would remain the same. As it turned out, he was right. Two months and fifteen days later President Diem was overthrown and assassinated, on the first of November, 1963. This was done, not by the Viet Cong, but by a group of Vietnamese generals encouraged by the U.S. government. The thing I blame myself most for in twenty-two years of government service is my failure to persuade the State Department and President Kennedy that this would be a tragedy for Vietnam and for the United States. I had at that time been relieved as ambassador and was back in Washington on another job. But nevertheless I should have been able to make our government see what would happen.

The Vietnamese generals who overthrew President Diem still rule in Saigon. Their new constitution and civilian clothes do not hide this fact. In Washington some of those who encouraged the generals and promised them support still make policy on Vietnam.

What was the explanation of this sudden disastrous change in American policy? Why did the Kennedy administration turn on its proven ally and connive in his overthrow? President Kennedy was warned against this action. Among those who warned him was Vice President Lyndon Johnson. It is indeed ironic that President Johnson is now suffering the consequences of that act. It is even more ironic that he has been under attack by members of the Kennedy administration who favored it. And it is incredible, to me at least, that he retains among his principal advisers some of those who engineered it.

The reasons for this change in U.S. policy? First, the press. American press reporting from Saigon in 1963 and earlier was generally, in my opinion, inaccurate, prejudiced, superficial, and misleading. There were some exceptions to this, but the overwhelming weight of public information on Vietnam was prejudiced and slanted—in some cases towards the editorial line of the reporter's paper. This had a profound effect on American public opinion. It also had a profound effect on Vietnamese opinion, since American press articles were played back to South Vietnam in Vietnamese by the Voice of America.

Second, in the State Department and even in the White House staff there was a small group who had been against Diem for years. They had been squelched and silenced for awhile by President Kennedy's earlier forthright decisions but they remained basically unconvinced.

Third, with American public opinion already prejudiced against the Diem government and with certain elements in the State Department working for a change in U.S. policy, there came in mid-1963 the Buddhist crisis. A sudden series of violent events in Vietnam shocked and confused the world. Whether or not, or to what extent, Viet

Cong strategists were behind the Buddhist agitation, I do not know. While I was there we never got conclusive evidence, although the parallel between the Buddhist objectives as they developed and the tactical aims of the Viet Cong were striking. This much, however, is clear. A clever and inhumane political plot came through to the American public as a genuine revolt against religious persecution, exactly as the Buddhist agitators had intended.

I said then and repeat now that during my two and a half years of work and observation throughout South Vietnam I saw no evidence whatsoever of religious persecution on the part of the Diem government. Soon after my recall from Vietnam in August of 1963, I had a brief revealing talk with the Secretary of State, Dean Rusk. Pointing out that he himself had stated a few months before that he was encouraged by the progress made in Vietnam, I asked him why the State Department had turned so sharply against the Diem government. Mr. Rusk's reply was, "We cannot stand any more burnings." Behind this laconic statement there lay a dismal lack of understanding and judgment. This was the atmosphere, then, in which vital decisions were being made in Washington in the fall of 1963. "We cannot stand any more burnings." It is worth noting that these burnings were not the last protest suicides, either in Vietnam or in America.

In those hectic days American public opinion was understandably confused, but our policy makers in Washington are supposed to be more farsighted. For them to yield to popular misconceptions and encourage a *coup d'etat* was in my judgment unjust to an honorable ally and irresponsible to the American people.

I see, Mr. Chairman, that I am going over my time; I will try to summarize very quickly from that point on what happened in South Viet Nam. The overthrow of the government that had existed in South Vietnam for nine years left a political vacuum into which the Viet Cong came storming back. The government was paralyzed. The province chiefs, the district chiefs, the village chiefs, all of whom depended on the constitutional government, no longer knew what to do. The military junta which succeeded the Diem government quarreled among themselves and jockeyed for position and power. In the period of less than three years there were nine different governments. You remember this period—a revolving succession of generals and governments. To make matters worse, our own government embraced each new faction that came into power in Saigon. Finally, by late '64, the year after President Diem had been overthrown, the situation became so bad that President Johnson was faced with the alternative of having South Vietnam go down the drain or sending in U.S. combat forces. He decided to take the latter fateful step. These two events were the turning point, in my judgment, of the whole affair.

I must say in all frankness that the decision, whether to send in combat forces or not, was a very, very difficult one. In retrospect one can think of a lot of other things that could have been done rather than this involvement in a ground war in Asia—which was the very thing that all previous U.S. administrations since 1946 had avoided, with the exception of Korea. Yet, I am sure there is not a person in this room who does not respect the bravery, the devotion to duty, of our soldiers, sailors, air force, marines in Vietnam, not only those who are there now but those who have been there over the past years. Nothing that any of us says or does could have the intent of weakening their resolve and their outstanding devotion to duty. They saved Saigon—American forces did—in 1965, and they saved it again in 1968 at the time of the Tet offensive. But the trouble is Americans, or any other foreigners, can't

pacify the villages and the districts and the provinces of South Vietnam. This has to be done by the South Vietnamese themselves.

This concludes my summary of the historical development of U.S. involvement. I am sorry I did not have time to go more fully into the last three or four years, but I think this is well known—the political vacuum, the increase in Viet Cong control in the countryside, the inefficiencies of the governments, the introduction of U.S. combat forces, and the continued buildup of the forces on both sides and the intensity of the war.

Let me now try if I may, Mr. Chairman, very briefly to summarize my thinking on this matter, for whatever it may be worth and perhaps as an introduction to questions.

I do not believe now, nor have I ever believed, that a military victory in South Vietnam or against North Vietnam will achieve in itself the pacification, stability, or long term independence of South Vietnam nor the permanent containment of communism in the threatened East Asian countries. I do recognize that the thrust of the communist movement, however much certain communist countries may differ among themselves, is continuous and implacable, and I do not expect it to abate soon. I expect this threat to continue in Southeast Asia—under various forms—and it will be just as implacable as it has been over the last fifteen or twenty years. I see, however, little evidence of a will among the South Vietnamese people to support their present government and its policies sufficiently to achieve the *real* victory, namely, the pacification, the restoration of law and order, and the rebuilding of a stable and viable society in South Vietnam. I'm afraid the Viet Cong cancer has gone very far indeed, spread by the destruction of the war and, in a certain sense, by the very presence of one foreign soldier for every 25 South Vietnamese men, women, and children.

My hope for the success of our policy in Viet Nam since the revolution in 1963 has diminished steadily with each failure of Vietnamese leadership and each American military escalation. I have no illusions about the evils and the dangers to our country of communist aims and methods. I have no doubts about who started the war in Vietnam and who *ought* to win it. I saw it start, and I have no moral scruples about killing those who are out to kill you. I have no illusions about the shock to our friends and allies in the Far East from a change of course in Vietnam nor about the shock to our own pride. I recognize the difficulties of finding a turning place on the road of military escalation which does not risk, even more than now, the lives of Americans fighting in Vietnam.

I have no confidence in the bona fides of our enemies and their backers, and I certainly do not share the thought that the Soviet Union will lend us a willing hand to get out of our difficulties—not even to the extent that we lent them one to get out of Cuba. On the contrary, it has always seemed clear to me that the principal aim of the USSR is to catch up with America by any means, and whatever she can do to bleed us white, while bleeding herself little, contributes to the fulfilling of that aim. Neither can we expect much help from our European allies, however much they would like to see us extricate ourselves. No, we got ourselves into this predicament and it is up to us to find a way out. Opinions may—and do—differ on where we went wrong. I have given you my view—we went wrong when the Kennedy administration pulled the rug on the Diem government three months before President Kennedy died. And this comes from one who admired President Kennedy for many qualities, among them his courage to admit mistakes. But in my judgment the errors committed in Vietnam have overwhelmed the ideal—the accumulated mistakes have turned a noble effort into a near disaster. It is time, I think, to reassess, to regroup, and to recover our unity

Case 3:22-cv-00410-REP   Document 41-6   Filed 02/22/23   Page 61 of 145 PageID# 1367

and our strength for tests that are surely to come.

President Johnson's announcement 48 hours ago opened a new possibility—the possibility of a working consensus in our country on this issue. It to me was an act of real statesmanship. His renunciation of an intention to run again multiplied many times the weight of his peace offer, and put it up much more squarely to the other side. His call for national unity was to me fundamental, right, and a sine qua non to a solution in Vietnam. Holding to his basic belief that the U.S. cannot and will not allow communist aggression to go unchecked where we can effectively prevent it, he did not, I am glad to say, weaken on that fundamental principle. Recognizing the unacceptable danger of waiting in disunity and national paralysis until after elections, he gave a new dimension, it seems to me, and a new flexibility to the whole problem, and greatly enhanced his ability to deal with it. President Johnson has never blamed his predecessor for the cruel dilemma he inherited in Vietnam in November, 1963, upon succeeding to the presidency, although he was one of the few in the Kennedy administration who opposed the fatal error in Vietnam in 1963. Yet, having said that, I think that his introduction and buildup of U.S. combat forces, as it turned out, compounded that error. Nevertheless, the fact that he did not put the responsibility on anybody else, even in the face of severe political attack by the late president's brother and closest adviser, shows considerable forbearance. I am not making a political speech on anybody's behalf but this has bearing, it seems to me, on the future of Vietnam.

The de-escalation announcement leaves many question marks, of course. Will Hanoi respond? If not, what about our 550,000 troops—their safety, their morale, their ability to carry on? If Hanoi does respond, what position will we take in negotiations? This is, of course, a crucial question. Will the South Vietnamese army, government and people shoulder more of the responsibility or will they slump as the result of this development? These and many other questions remain to be answered. But surely a new possibility has been opened by the President—the chance to achieve a national working consensus so desperately needed. This seems to me to be a time for care and forbearance in political debate and public judgment. If as President Johnson evidently sincerely hopes, our nation can find a measure of unity now, we may be able at last to retrieve some of the errors of the past five years. Thank you.

## ROCKETS OR RICKETS?

Mr. JOELSON. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from New Jersey?

There was no objection.

Mr. JOELSON. Mr. Speaker, I want to discuss my vote against the NASA authorization. I think that it was an indication of the fact that I am willing to match my talk with deeds when it comes to the need for a system of priorities and fiscal responsibility.

Although I do not question the ultimate desirability of space exploration, I think that there are more pressing problems which must be faced and solved. Four billion dollars is equivalent to $4,000 million, as compared with the sum of less than $500 million which will be spent on the model cities program in the next fiscal year.

The decay and deterioration of our cities is so evident that I consider the problems on earth too urgent to allow us to spend billions of dollars on the moon. I would forgo rockets in order to eliminate rickets, and I think that sophisticated missiles are less important than educated citizens. When we give priority to guided missiles we are showing misguided values.

I reject the argument that the success of the U.S. space program is necessary in order to oppose communism throughout the world. In the long run, we will be judged by the fullness of American life, by the fairness of our society and by the happiness of our people.

## LEAVE OF ABSENCE

By unanimous consent, leave of absence was granted to:

Mr. EILBERG, for the balance of the week, on account of official business.

Mrs. BOLTON (at the request of Mr. GERALD R. FORD), for Thursday, May 9, on account of a death.

Mr. NICHOLS (at the request of Mr. ALBERT), for today and tomorrow, and the balance of the week, on account of official business.

Mr. WYATT (at the request of Mr. GERALD R. FORD), for the week of May 6, 1968, on account of being hospitalized at Walter Reed.

## SPECIAL ORDERS GRANTED

By unanimous consent, permission to address the House, following the legislative program and any special orders heretofore entered, was granted to:

Mr. RYAN, for 20 minutes, on May 9, 1968; to revise and extend his remarks and include extraneous matter.

Mr. GOODELL (at the request of Mr. WINN), for 30 minutes, today; and to revise and extend his remarks and include extraneous matter.

Mr. POFF (at the request of Mr. WINN), for 30 minutes, today; and to revise and extend his remarks and include extraneous matter.

## EXTENSIONS OF REMARKS

By unanimous consent, permission to extend remarks was granted to:

Mr. McMILLAN.

Mr. BYRNES of Wisconsin and to include extraneous material.

Mr. MINSHALL immediately following the remarks of Mr. JONAS in the Committee of the Whole today on H.R. 17023.

Mr. BOLAND to revise and extend his remarks made during the Committee of the Whole.

Mr. MAHON to revise and extend his remarks in general debate immediately prior to the beginning of the reading of the bill and to include extraneous matter and tables.

Mr. WYMAN to extend his remarks following those of Mr. ROGERS of Florida on House Resolution 1164, today, and to include extraneous matter.

Mr. BUTTON to extend his remarks on H.R. 17023, today, in the Committee of the Whole, and to include extraneous matter.

Mr. RANDALL to revise and extend his remarks just prior to the vote on the Independent Offices and Department of Housing and Urban Development appropriation bill.

(The following Members (at the request of Mr. WINN) and to include extraneous matter:)

Mr. RUPPE.

Mr. ASHBROOK in two instances.

Mr. CURTIS in two instances.

Mr. DEL CLAWSON.

Mr. ROUDEBUSH.

Mrs. BOLTON.

Mr. FINDLEY in two instances.

Mr. SCHERLE in two instances.

Mr. REINECKE.

Mr. WYDLER.

Mr. ANDERSON of Illinois.

Mr. STEIGER of Wisconsin in two instances.

Mr. BROCK in two instances.

Mr. BROYHILL of Virginia.

Mr. MATHIAS of Maryland.

Mr. QUILLEN.

Mr. DERWINSKI.

Mr. UTT.

Mr. JOHNSON of Pennsylvania.

Mr. DENNEY.

Mr. CHAMBERLAIN.

Mr. TALCOTT.

(The following Members (at the request of Mr. RANDALL) and to include extraneous matter:)

Mr. CHARLES H. WILSON.

Mr. RESNICK.

Mr. GARMATZ in two instances.

Mr. CONYERS in two instances.

Mr. STEPHENS.

Mr. RARICK in four instances.

Mr. GONZALEZ in four instances.

Mr. FRASER in two instances.

Mrs. KELLY in three instances.

Mr. PEPPER.

Mr. POOL.

Mr. HANNA.

Mr. MOORHEAD in two instances.

Mr. LONG of Maryland.

Mr. BRINKLEY.

Mrs. SULLIVAN in two instances.

Mr. HATHAWAY in two instances.

Mr. FULTON of Tennessee.

Mr. RIVERS in three instances.

Mr. SCHEUER in two instances.

Mr. DONOHUE.

Mr. CAREY.

Mr. DORN.

## SENATE ENROLLED BILLS SIGNED

The SPEAKER announced his signature to enrolled bills of the Senate of the following titles:

S. 948. An act for the relief of Seaman Eugene Markovitz, U.S. Navy;

S. 1147. An act for the relief of Mariana Mantzios;

S. 1180. An act for the relief of Ana Jacalne;

S. 1395. An act for the relief of Dr. Brandia Don (nee Praschnik);

S. 1406. An act for the relief of Dr. Jorge Mestas;

S. 1828. An act for the relief of Susan Elizabeth (Cho) Long;

S. 1829. An act for the relief of Lisa Marie (Kim) Long;

S. 1918. An act for the relief of Dr. Gabriel Gomez del Rio;

S. 1968. An act for the relief of Dr. Jose Ernesto Garcia y Tojar;

S. 2005. An act for the relief of Dr. Anacleto C. Fernandez;

S. 2022. An act for the relief of Dr. Mario Jose Remirez DeEstenoz;
S. 2023. An act for the relief of Virgilio A. Arango, M.D.;
S. 2078. An act for the relief of Dr. Alberto De Jongh;
S. 2132. An act for the relief of Dr. Robert L. Cespedes;
S. 2139. An act for the relief of Dr. Angel Trejo Padron;
S. 2149. An act for the relief of Dr. Jose J. Guijarro;
S. 2176. An act for the relief of Dr. Edgar Reinaldo Nunez Baez;
S. 2193. An act for the relief of Dr. Alfredo Jesus Gonzalez;
S. 2256. An act for the relief of Dr. Margarita Lorigados;
S. 2285. An act for the relief of Gordon Shih Gum Lee;
S. 2301. An act for the relief of Dr. Francisco Guillermo Gomez-Inguanzo;
S. 2381. An act for the relief of Dr. Jesus Adalberto Quevedo-Avila;
S. 2403. An act for the relief of Dr. Teobaldo Cuervo-Castillo;
S. 2404. An act for the relief of Dr. Heriberto Jose Hernandez-Suarez; and
S. 2489. An act for the relief of Dr. Jesus Jose Eduardo Garcia.

## ADJOURNMENT

Mr. RANDALL. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 6 o'clock and 37 minutes, p.m.) the House adjourned until tomorrow, May 9, 1968, at 12 o'clock noon.

## EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XXIV, executive communications were taken from the Speaker's table and referred as follows:

1827. A letter from the Comptroller General of the United States, transmitting a report on a review of activities of the Office of the Inspector General, Department of Agriculture; to the Committee on Government Operations.

1828. A letter from the Administrator, General Services Administration, transmitting a prospectus providing for the alteration of the General Services Administration regional office building, Washington, D.C., pursuant to the Public Buildings Act of 1959; to the Committee on Public Works.

## REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committees were delivered to the Clerk for printing and reference to the proper calendar as follows:

Mr. ANDERSON of Tennessee: Committee on Rules. House Resolution 1168. Resolution providing for the consideration of House Joint Resolution 1224, joint resolution to authorize the President to reappoint as Chairman of the Joint Chiefs of Staff, for an additional term of 1 year, the officer serving in that position on April 1, 1968 (Rept. No. 1364). Referred to the House Calendar.

Mr. O'NEILL of Massachusetts: Committee on Rules. House Resolution 1169. Resolution providing for the consideration of H.R. 16911, a bill to provide for U.S. participation in the facility based on special drawing rights in the International Monetary Fund, and for other purposes (Rept. No. 1365). Referred to the House Calendar.

Mr. THOMPSON of New Jersey: Joint Committee on the Disposition of Executive Papers. House Report No. 1366. Report on the disposition of certain papers of sundry executive departments. Ordered to be printed.

## REPORTS OF COMMITTEES ON PRIVATE BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committees were delivered to the Clerk for printing and reference to the proper calendar, as follows:

Mr. ASHMORE: Committee on the Judiciary. H.R. 16187. A bill for the relief of sundry claimants, and for other purposes; with amendment (Rept. No. 1367). Referred to the Committee of the Whole House.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 4 of rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. BELCHER:
H.R. 17118. A bill to amend title 23, United States Code, in regard to the obligation of Federal-aid highway funds apportioned to the States; to the Committee on Public Works.

By Mr. BROWN of California:
H.R. 17119. A bill to provide for the issuance of a special postage stamp to commemorate the 200th anniversary of the San Gabriel Mission; to the Committee on Post Office and Civil Service.

By Mr. COLLIER:
H.R. 17120. A bill to encourage the growth of international trade on a fair and equitable basis; to the Committee on Ways and Means.

By Mr. DERWINSKI:
H.R. 17121. A bill to provide a comprehensive national manpower policy, to improve the Manpower Development and Training Act of 1962, to authorize a community service employment program, and for other purposes; to the Committee on Ways and Means.

By Mr. JOELSON:
H.R. 17122. A bill to amend the Immigration and Nationality Act to make additional immigrant visas available for immigrants from certain foreign countries, and for other purposes; to the Committee on the Judiciary.

By Mrs. KELLY:
H.R. 17123. A bill to amend the Civil Service Retirement Act to authorize the retirement of employees after 20 years of service without reduction in annuity; to the Committee on Post Office and Civil Service.

H.R. 17124. A bill to amend the Civil Service Retirement Act to provide increased annuities; to the Committee on Post Office and Civil Service.

H.R. 17125. A bill to modernize certain provisions of the Civil Service Retirement Act, and for other purposes; to the Committee on Post Office and Civil Service.

By Mr. POAGE:
H.R. 17126. A bill to amend the Food and Agriculture Act of 1965; to the Committee on Agriculture.

By Mr. POOL:
H.R. 17127. A bill to amend the Subversive Activities Control Act of 1950 to prohibit certain acts within 2 miles of certain public buildings; to the Committee on Un-American Activities.

By Mr. ROYBAL:
H.R. 17128. A bill to provide for the issuance of a special postage stamp to commemorate the 200th anniversary of the San Gabriel Mission; to the Committee on Post Office and Civil Service.

By Mr. ASPINALL (by request):
H.R. 17129. A bill to provide for the settlement of aboriginal land claims of Alaska natives, and for other purposes; to the Committee on Interior and Insular Affairs.

By Mr. BARRETT:
H.R. 17130. A bill to increase the funds authorized for existing programs to build low- and moderate-income housing, and for other purposes; to the Committee on Banking and Currency.

By Mr. DANIELS (for himself, Mr. PERKINS, Mr. THOMPSON of New Jersey, Mr. DENT, Mr. HAWKINS, Mr. SCHEUER, Mr. HOWARD, and Mr. HOLLAND):
H.R. 17131. A bill to provide Federal leadership and grants to the State for developing and implementing State programs for youth camp safety standards; to the Committee on Education and Labor.

By Mr. DELLENBACK:
H.R. 17132. A bill to amend the U.S. fair housing law; to the Committee on the Judiciary.

By Mr. DENT:
H.R. 17133. A bill to provide additional protection for the rights of participants in private pension plans, to establish minimum standards for vesting and funding of private pension plans, to provide an insurance program guaranteeing plan termination protection, and for other purposes; to the Committee on Education and Labor.

By Mr. FALLON (for himself and Mr. KLUCZYNSKI) (by request):
H.R. 17134. A bill to authorize appropriations for fiscal years 1970 and 1971 for the construction of certain highways in accordance with title 23 of the United States Code, and for other purposes; to the Committee on Public Works.

By Mr. HARVEY:
H.R. 17135. A bill to amend the act of August 30, 1935, to permit the reimposition of tolls on a bridge across the St. Clair River between Port Huron, Mich., and Sarnia, Ontario, Canada; to the Committee on Public Works.

By Mr. KEE:
H.R. 17136. A bill to provide for orderly trade in iron ore, and steel mill products; to the Committee on Ways and Means.

By Mr. MINISH:
H.R. 17137. A bill to assist local educational agencies to carry out programs for more effective schools where there are high concentrations of children from low-income families, and for other purposes; to the Committee on Education and Labor.

H.R. 17138. A bill to amend the Immigration and Nationality Act to make additional immigrant visas available for immigrants from certain foreign countries, and for other purposes; to the Committee on the Judiciary.

By Mr. PRICE of Illinois:
H.R. 17139. A bill to provide for the issuance of a special postage stamp honoring the 100th anniversary of professional baseball; to the Committee on Post Office and Civil Service.

By Mr. SISK:
H.R. 17140. A bill to clarify the status of certain U.S. citizens performing services for the Trust Territory of the Pacific Islands; to the Committee on Post Office and Civil Service.

By Mr. STAGGERS:
H.R. 17141. A bill to encourage the growth of international trade on a fair and equitable basis; to the Committee on Ways and Means.

By Mr. TEAGUE of California:
H.R. 17142. A bill to establish a Commission on Malnutrition; to the Committee on Education and Labor.

By Mr. WAMPLER:
H.R. 17143. A bill to amend the Federal Power Act in order to provide for a national powerplant siting study and a national powerplant siting plan, and for other purposes; to the Committee on Interstate and Foreign Commerce.

By Mr. PERKINS (for himself, Mr. GOODELL, Mr. FOLEY, Mr. AYRES, Mrs. GREEN of Oregon, Mrs. MAY, Mr. MICHEL, Mr. MORTON, Mr. PURCELL, Mr. QUIE, Mr. SMITH of Iowa, Mrs. SULLIVAN, Mr. UDALL, Mr. ADAMS, Mr. ADDABBO, Mr. ANDREWS

of North Dakota, Mr. BROOMFIELD, Mr. BROWN of California, Mr. BURKE of Massachusetts, Mr. DON H. CLAUSEN, Mr. CONABLE, Mr. COWGER, Mr. DELLENBACK, and Mr. DENT):

H.R. 17144. A bill to establish a Commission on Hunger; to the Committee on Education and Labor.

By Mr. ANDERSON of Illinois (for himself, Mr. DULSKI, Mrs. DWYER, Mr. EILBERG, Mr. ESCH, Mr. FARBSTEIN, Mr. FINDLEY, Mr. FRASER, Mr. FRELINGHUYSEN, Mr. GUDE, Mr. HAWKINS, Mr. HOLLAND, Mr. HOWARD, Mr. KLUCZYNSKI, Mr. KUPFERMAN, Mr. KUYKENDALL, Mr. KYROS, Mr. LONG of Maryland, Mr. McCARTHY, Mr. McDADE, Mr. MACGREGOR, Mr. MINSHALL, Mr. MOORHEAD, Mr. O'HARA of Michigan, and Mr. OTTINGER):

H.R. 17145. A bill to establish a Commission on Hunger; to the Committee on Education and Labor.

By Mr. ROBISON (for himself, Mr. PODELL, Mr. POLLOCK, Mr. PUCINSKI, Mr. REID of New York, Mr. RIEGLE, Mr. RYAN, Mr. STANTON, Mr. STEIGER of Wisconsin, Mr. TALCOTT, Mr. TENZER, Mr. CHARLES H. WILSON, Mr. WYDLER, Mr. YATES, Mr. BRADEMAS, Mr. HAMILTON, Mr. CLEVELAND, Mr. HATHAWAY, Mr. EDWARDS of California, Mr. McCLORY, Mr. CORBETT, Mr. SMITH of New York, and Mr. REES):

H.R. 17146. A bill to establish a Commission on Hunger; to the Committee on Education and Labor.

By Mr. BELCHER:

H.J. Res. 1265. Joint resolution asking the President of the United States to designate the month of May 1968, as National Arthritis Month; to the Committee on the Judiciary.

By Mr. HARRISON:

H.J. Res. 1266. Joint resolution authorizing the President to proclaim June 30, 1968, as National Original Americans Day; to the Committee on the Judiciary.

By Mr. HATHAWAY:

H.J. Res. 1267. Joint resolution proposing an amendment to the Constitution to provide for the direct election of the President and the Vice President; to the Committee on the Judiciary.

By Mr. WOLFF:

H. Con. Res. 776. Concurrent resolution to commemorate the 200th anniversary of the first landing of Greeks in the New World; to the Committee on the Judiciary.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. BRASCO:

H.R. 17147. A bill for the relief of Bruno Burruto and Silvia Burruto; to the Committee on the Judiciary.

H.R. 17148. A bill for the relief of Mrs. Olivia Casiano and son, Jorge Manuel Correia-Simoes; to the Committee on the Judiciary.

By Mr. CELLER:

H.R. 17149. A bill for the relief of Sylvia Smith; to the Committee on the Judiciary.

By Mr. CORBETT:

H.R. 17150. A bill for the relief of Benito Mauro; to the Committee on the Judiciary.

By Mr. CORMAN:

H.R. 17151. A bill for the relief of Won Ja Yoon; to the Committee on the Judiciary.

By Mr. KUPFERMAN:

H.R. 17152. A bill for the relief of Lodovic Ancilloti; to the Committee on the Judiciary.

By Mr. McMILLAN:

H.R. 17153. A bill for the relief of Mrs. Raleigh Newton; to the Committee on the Judiciary.

By Mr. MURPHY of New York:

H.R. 17154. A bill for the relief of Juan Battista Blazzo, Margarita Blazzo, Juan Tomas Blazzo, and Carlos Antonio Blazzo; to the Committee on the Judiciary.

By Mr. O'NEILL of Massachusetts:

H.R. 17155. A bill for the relief of Clarinda Merces DaSilva; to the Committee on the Judiciary.

By Mr. PELLY:

H.R. 17156. A bill for the relief of May R. Cuchapin; to the Committee on the Judiciary.

H.R. 17157. A bill for the relief of Merly Florendo; to the Committee on the Judiciary.

H.R. 17158. A bill for the relief of Margaret D. Permo; to the Committee on the Judiciary.

By Mr. PODELL:

H.R. 17159. A bill for the relief of Emil Feuerwerker, his wife, Vera Feuerwerker, their minor son, Moshe (also known as Moses) Feuerwerker, and their daughter, Sara Feuerwerker; to the Committee on the Judiciary.

By Mr. REES:

H.R. 17160. A bill for the relief of Leslie Clive Drever; to the Committee on the Judiciary.

By Mr. ROONEY of New York:

H.R. 17161. A bill for the relief of Mr. and Mrs. Paola Pesce; to the Committee on the Judiciary.

By Mr. ROYBAL:

H.R. 17162. A bill for the relief of Rogelio Tabhan; to the Committee on the Judiciary.

By Mr. STUBBLEFIELD:

H.R. 17163. A bill for the relief of Clarence S. Lyons; to the Committee on the Judiciary.

By Mr. TEAGUE of California:

H.R. 17164. A bill for the relief of Shahzadeh Shiri; to the Committee on the Judiciary.

By Mr. TEAGUE of Texas:

H.R. 17165. A bill for the relief of Michel Mihailovic Predrag; to the Committee on the Judiciary.

By Mr. VAN DEERLIN:

H.R. 17166. A bill for the relief of Maria Lidia Hernandez Johnson; to the Committee on the Judiciary.

## PETITIONS, ETC.

Under clause 1 of rule XXII, petitions and papers were laid on the Clerk's desk and referred as follows:

307. By Mr. O'NEAL of Georgia: Petition of Peter Mulholland, Whitestone, N.Y., and others, relative to trading with the enemy; to the Committee on Foreign Affairs.

308. By the SPEAKER: Petition of James Malcolm Williams, Minneapolis, Minn., relative to action on petitions Nos. 304 and 305; to the Committee on the Judiciary.

# SENATE—*Wednesday, May 8, 1968*

The Senate met at 11 a.m., on the expiration of the recess, and was called to order by the Acting President pro tempore (Mr. METCALF).

Rev. Edward B. Lewis, D.D., pastor, Capitol Hill Methodist Church, Washington, D.C., offered the following prayer:

O God of life and peace, we are grateful this morning for the experience of personal peace. We find this peace at the place of prayer where Thy spirit bears witness with our spirit that we are the sons of God. Give us, in this moment of prayer, a sense of personal peace.

As the representatives of our President prepare to represent in seeking peace in Vietnam, we pray for Thy presence and power to be with them as they seek a lasting peace. Empower them with Thy spirit to be shared. From these efforts as well as others, bring blessing to all mankind, Dear Lord.

May pressures of this day be met with intellectual and spiritual insight. Work through the lives of the leaders and citizens of this Nation we love, with responsible and loyal actions that benefit all our fellow men. We pray in the name of the Prince of Peace. Amen.

## THE JOURNAL

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the Journal of the proceedings of Tuesday, May 7, 1968, be approved.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

## MESSAGE FROM THE HOUSE

A message from the House of Representatives by Mr. Hackney, one of its reading clerks, announced that the House had passed, without amendment, the following bills of the Senate:

S. 948. An act for the relief of Seaman Eugene Sidney Markovitz, U.S. Navy;

S. 1147. An act for the relief of Mariana Mantzios;

S. 1180. An act for the relief of Ana Jacalne;

S. 1395. An act for the relief of Dr. Brandla Don (nee Praschnik);

S. 1406. An act for the relief of Dr. Jorge Mestas;

S. 1483. An act for the relief of Dr. Pedro Lopez Garcia;

S. 1490. An act for the relief of Yang Ok Yoo (Maria Margurita);

S. 1828. An act for the relief of Susan Elizabeth (Cho) Long;

S. 1829. An act for the relief of Lisa Marie (Kim) Long;

S. 1918. An act for the relief of Dr. Gabriel Gomez del Rio;

S. 1968. An act for the relief of Dr. Jose Ernesto Garcia y Tojar;

S. 2005. An act for the relief of Dr. Anacleto C. Fernandez;

S. 2022. An act for the relief of Dr. Mario Jose Remirez DeEstenoz;

S. 2023. An act for the relief of Virgilio A. Arango, M.D.

S. 2078. An act for the relief of Dr. Albert De Jongh;

S. 2132. An act for the relief of Dr. Robert L. Cespedes;

S. 2139. An act for the relief of Dr. Angel Trejo Padron;

S. 2149. An act for the relief of Dr. Jose J. Guijarro;

S. 2176. An act for the relief of Dr. Edgar Reinaldo Nunez Baez;

S. 2193. An act for the relief of Dr. Alfredo Jesus Gonzalez;

S. 2256. An act for the relief of Dr. Margarita Loriagados;

S. 2285. An act for the relief of Gordon Shih Gum Lee;

S. 2301. An act for the relief of Dr. Francisco Guillermo Gomez-Inguanzo;

CONGRESSIONAL RECORD — SENATE *May 8, 1968*

S. 2381. An act for the relief of Dr. Jesus Adalberto Quevedo-Avila;
S. 2403. An act for the relief of Dr. Teobaldo Cuervo-Castillo;
S. 2404. An act for the relief of Dr. Heriberto Jose Hernandez-Suarez; and
S. 2489. An act for the relief of Dr. Jesus Jose Eduardo Garcia.

## ORDER OF BUSINESS

Mr. MANSFIELD. Mr. President, will the distinguished Senator from Missouri, who is to be recognized at this time under the order of yesterday, yield to me briefly?

Mr. LONG of Missouri. I yield.

Mr. MANSFIELD. I thank the distinguished Senator for his courtesy.

## THE PRESIDENT, PARIS, AND POLITICS

Mr. MANSFIELD. Mr. President, as the Senate knows, I have disagreed on aspects of the conduct of the war in Vietnam. However, there has been no question in my mind about the desire of the President to end that war. I have expressed on many occasions my full confidence that President Johnson was doing whatever he could to bring about the negotiation of a settlement in Vietnam. I reiterate that confidence today.

As majority leader, I have worked with the President since the day he assumed office, and I know something of the burdens which this war has placed on him. The rising casualty figures have hurt him deeply. He has felt for the people of Vietnam in the terrible ordeal which they are undergoing. He has deplored the financial drain of the war and the constraints which it has placed on dealing with urgent inner problems of the Nation.

President Johnson has wanted peace in Vietnam for all these reasons and simply because he is a man of peace. As a case in point which underscores his willingness to act for peace, I note on the basis of personal knowledge, which predates the selection of Paris as a peace site, that Pope Paul VI made an extraordinary offer to Washington and Hanoi. His Holiness placed at the disposal of the two governments the apostolic buildings of the Vatican, as a site for peace talks.

The offer was made, properly, in secret, and it remained a secret until several days ago, until Paris was actually chosen as a suitable site for talks. It should not go unnoticed, however, that President Johnson—at a time when he was subjected to severe criticism for failing to act on a meeting place—guarded his silence even though he had already accepted, without qualification, the Pope's invitation to meet at the Vatican. That the talks were not opened in Rome sometime ago, was not the fault of the President.

Be that as it may, I am delighted that an excellent site for these crucial talks has now been found. It is my deepest hope, a hope which I know is shared by the Senate, that the meetings which are about to begin in Paris will be fruitful.

If I may, I would like to make a plea at this time for patience during the difficult days ahead. The road is extremely precarious; the pitfalls are many. The President needs and warrants every confidence, support, and encouragement which can be given to him.

I would urge at this time, therefore, reflection, restraint, and reserve in discussion of the issues of Vietnam. That seems to me to be especially desirable, as the question may arise in the heat of the political campaign during the weeks and months ahead.

The President has gone to great lengths to precipitate the negotiations which will open on May 10 in Paris. His determination to bring about an honorable peace is underscored by a profound act of self-abnegation. In taking himself out of the campaign for the Office of President, in my judgment, President Johnson took the political content out of Vietnam. It would be my hope that the rest of us will now act to keep Vietnam out of a political context.

## PRIMARIES AND THE ELECTORAL COLLEGE

Mr. MANSFIELD. Mr. President, the outcome of the Indiana primary was a victory for KENNEDY, McCARTHY, and Nixon. KENNEDY, in winning the Democratic primary, got his campaign off the ground and running; McCARTHY, in running up his impressive total, maintained his steady momentum; and Nixon, in polling over one-half million votes, made a very impressive showing.

The tragedy of primaries is that in reality they mean very little. Very few of them are binding so far as their delegates are concerned. They cost a tremendous amount of money on the part of candidates and, therefore, in a sense, they turn into auctions on a temporary basis.

Personally, I would like to see primaries, if they are going to be maintained, conducted in all States on a day certain and under a rigid limitation of expenditures, rather than to continue the haphazard expensive procedure which is now followed. If this were done, it would mean, in my opinion, that the national conventions, at which the delegates—and not the people—make the choice, could be done away with.

In a similar fashion, the electoral college could be abolished, because in that outmoded and obsolete institution those elected to the college are sometimes free to exercise their own choice and not the choice of the people who designated them. The fact is that the electoral college is one seldom attended, with an almost invisible student body, and a nonexistent faculty.

In short, there is much in American political institutions which is in need of correction. There is much in the way of obsolescence which should be replaced.

(At this point Mr. BAKER assumed the chair.)

## OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1967

### STATEMENT IN OPPOSITION TO TITLE III

Mr. LONG of Missouri. Mr. President, I am absolutely opposed to title III, the wiretap section, of this bill. Wiretapping

and electronic snooping cannot be justified except where the security of the Nation is directly involved. Last year I introduced S. 928, the proposed Right of Privacy Act recommended by the administration. This proposal slightly amended should be substituted for the present provisions of title III, and it is my intention to offer such an amendment at a later time.

Mr. President, several of the provisions of title III are blatantly unconstitutional. If it were possible to establish degrees of unconstitutionality, many of these provisions would qualify for the highest rating. It is my intention to offer several perfecting amendments. However, even if all the perfecting amendments I offer are adopted, title III would still fall short of the demands of the fourth amendment. So, regardless of the action taken on these amendments, I would hope the Senate would adopt the substitute for title III or at a bare minimum, strike title III. Striking the title would then allow the Senate to consider the wiretap and electronic snooping issue on its own at some later date.

Mr. President, at this time, I would like to address a few general remarks to privacy and its importance.

Hardly a day goes by that I am not asked: "What difference does it make if the Government uses wiretaps and electronic bugs in fighting crime and protecting the national security? The innocent and law abiding have nothing to hide so they have nothing to fear if these techniques are used. Only the criminal and the subversive can be harmed."

The best answer I have found is another question, one posed a century ago in a treatise on English constitutional history:

> Men may be without restraint upon their liberty; they may pass to and fro at pleasure; but if their steps are tracked by spies and informers, their words noted down for crimination, their associates watched as conspirators, who shall say that they are free?

Privacy has been recognized as a fundamental human right since the dawn of western civilization. During the days of the Roman Empire, the sanctity of the home was almost absolute. No man could be dragged out of his home even to answer a summons of a magistrate.

Despite this ancient heritage, the right of privacy remains today a difficult and elusive concept to define. If it is thought of in terms of solitude, sanctity of the home and certain personal relationships such as man and wife, patient and doctor, client and attorney, its meaning can be easily seen and understood. As a result, this approach is commonly used. However, it is inadequate. In a truly free society, the right of privacy cannot be so limited.

Supreme Court Justice Louis Brandeis in 1928 explained the right in this way:

> The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings, and of his intellect. They knew that only a part of the pain, pleasure, and satisfaction of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most

comprehensive of rights and the right most valued by civilized men.

Thus, the right of privacy encompasses the freedom of the individual to share or withhold from others, according to his own selection, his thoughts, his beliefs, his emotions, his actions, and his past. It is an affirmative claim to human dignity—a claim to an inviolate personality.

Neither the Constitution nor the Bill of Rights specifically mentions the right of privacy. The fourth amendment prohibition of unreasonable searches and seizures, however, is aimed at protecting this right, and, many of the other enumerated rights would completely lack substance without the right of privacy. How real would freedom of speech be if a person's every word were recorded for future use? The individual would find himself measuring every word before he speaks it to determine how it would look to someone else on a cold record. Spontaneity, a hallmark of democracy, could not long exist. How real would freedom of association be if all gatherings were officially noted and watched? The individual would find himself wondering: Are some of the others at this meeting suspect? Would it not be safer for me to remain away? Finally, how real would freedom of official interest and how real would religion be if all services were a matter of official interest and how real would freedom of the ballot box be if all voting booths were the subject of official surveillance?

Anyone who harbors doubts as to the basic importance of the right of privacy to the individual should look back briefly at life in Nazi Germany.

A German under Hitler had but one right, the right to serve the state with his entire being. To insure that the German people did not attempt to exercise any other rights, the Gestapo systematically destroyed privacy in the Third Reich. Through the use of wiretaps, informers, predawn raids and arrests, and other techniques designed to achieve maximum fear and intimidation, they attempted to establish and maintain total state control. Under a ruling of the Reich's Supreme Court, criticism of the state was not allowed even when passed between husband and wife, or parent and child, with secrecy vowed. An exception was made for a person talking to himself or writing in his personal diary. Only the bravest, however, criticized the state even in these circumstances, because as Gestapo Chief Himmler early in the war advised:

Carping and criticism are permitted only to those who are not afraid of the concentration camp.

Dr. E. K. Bramstadt described the situation in his book, "Dictatorship and Political Police":

The general atmosphere resulting from the operation of the secret police is pregnant with uncertainty, fear, suspicion and readiness to pin the onus for all troubles on one's neighbors. This atmosphere can be summed up in the formula: "No private life permitted." As Dr. Ley once said: "There is no such thing as a private individual in National Socialist Germany. The only person who is still a private individual in Germany is somebody who is asleep."

The history of the right of privacy in Anglo-American law reveals some of the brightest and darkest hours in man's struggle for freedom. As to the origin of the concept in England, one can only surmise. U.S. Senator Henry Ashurst of Arizona told the Senate in 1931 that the English brought this and other tenets of freedom with them from the continent when they landed on the island of Thanet in A.D. 449 under the leadership of Hengist and Horsa. He said they planted deep and strong in the island of Britain these fundamentals of English liberty. A less romantic theory claims the right was borrowed from Roman law through the writings of Cicero, and Justinian's Digest of 533. Both these Roman sources made reference to the sanctity of the home and were read widely by the early English legal profession.

Ironically, the earliest reference to the right in reported English court decisions is found in the Semaynes case—1603—decided during the period of Tudor-Stuart absolutism. The decision was written by Sir Edward Coke, a great judge who refused to submit to the will of King James I and was eventually removed from the bench by James. By sheer ability, he worked himself up to chief justice of the Court of Common Pleas, and at the time of his removal, he was chief justice of the King's Bench. Sir Edward in the Semaynes case wrote:

The house of everyone is to him as his castle and fortress as well for his defense against injury and violence, as for his repose.

He did not find the house offered complete sanctuary, but under the decision, even the King could not intrude on the privacy of the home arbitrarily. Sir Edward believed that both the Parliament and the King were subordinate to the fundamental law of the land and thus the actions of both were subject to judicial review. With this concept in mind, he overruled legislative and executive actions in a number of cases. In November 1616, he was permanently removed from office.

Another court of Tudor-Stuart England was not so concerned for the fundamental law of the land. It was the Star Chamber and derived its authority not from the common law but from royal power. The Star Chamber was established by King Henry VII in 1487 and abolished by the long Parliament which convened during King Charles I reign in 1640. Star Chamber originated two writs or warrants which threatened and abused the right of privacy until the later half of the 18th century.

The first of these was the general warrant. This warrant was issued by the Star Chamber for the search of private homes and shops to discover and seize books and papers that were not properly licensed. The licensing of publications was required to control the press. After the Star Chamber was abolished, Parliament continued the licensing program and the use of general warrants in its enforcement. In 1695, the Licensing Act was allowed to expire and with it went the statutory authority to issue general warrants. Royal officials, however, continued to issue general warrants and as time passed their scope was broadened

to permit the seizure of all papers and effects of a suspect which might be used to convict him of seditious libel.

John Wilkes, a Member of Parliament, started a publication in 1762 called the North Briton. The publication attacked rather severely both King George III and Lord Bute, the Prime Minister. Because of this criticism, Wilkes was prosecuted for libel. To aid the prosecution, Lord Halifax, Secretary of State, issued a general warrant to search Wilkes' home. The warrant was executed and Wilkes brought a civil suit for trespass against Lord Halifax and the men who made the search. Wilkes obtained a verdict against the defendants and the judgment of the court written by Lord Camden in 1765 is a landmark in English liberty. Lord Camden in part wrote:

There are some crimes such for instance as murder, rape, robbery and house breaking, to say nothing of forgery and perjury, that are more atrocious than libelling. But our law has provided no paper-search in these cases to help forward the conviction. . . . It is very certain that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it would seem that search for evidence is disallowed upon the same principle. . . . The warrant to seize and carry away the party's papers in the case of a seditious libel, is illegal and void.

The next year the House of Commons joined Lord Camden's court in condemning the general warrant. It passed resolutions aimed not only at general warrants used to seize papers and effects but also those used to seize persons. These latter warrants authorized the arrest of all persons suspected of a crime.

The other privacy invading star chamber process was the writ of assistance used to help collect taxes. The writ authorized tax collectors to enter at their own discretion homes or shops to search for goods upon which taxes were owed. This writ was challenged in the courts at almost the same time as the general warrant but it was in the American colonies. Shortly after the death of King George II, in October 1760, Charles Paxton, collector of customs in Boston, filed an application with the Superior Court of Massachusetts Bay for a writ of assistance. He held a writ at the time, but since such writs were based on royal power, it was valid only during the reign of George II and for 6 months afterward. Paxton's current writ had been granted a few years earlier without public notice or public hearing.

The merchants of Boston were alert, however, to his request for a new writ and petitioned the court for a hearing. The request was granted and the hearing was set for the February term.

On a cold February day in 1761, the five judges of the superior court dressed in new fresh rich robes of scarlet English broadcloth and great judicial wigs sat around a roaring fire in the council chamber of the old Town House in Boston. At a long table sat all the barristers at law of Boston and the neighboring county of Middlesex. Each wore his black gown and tie wig. On the wall, held by splendid golden frames, were radiant

portraits, more than full length of King Charles II and King James II. Presiding over the court was Chief Justice Thomas Hutchinson, former lieutenant governor of Massachusetts Bay and an ardent supporter of the crown. Representing the merchants was James Otis, a most able member of the Boston Bar and a man personally committed against writs of assistance.

The full attention of the crowded courtroom was on Otis as he rose to address the court.

May it please your Honors . . . I take this opportunity to declare, that whether under a fee or not (for in such a cause as this I despise a fee) I will to my dying day oppose with all the powers and facilities God has given me, all such instruments of slavery on the one hand, and villany on the other, as this writ of assistance is. . . . The writ . . . being general is illegal It is a power, that places the liberty of every man in the hands of every petty officer . . . A man's house is his castle; and whilst he is quiet, he is as well guarded as a prince in his castle. This writ . . . would totally annihilate this privilege. Customhouse officers may enter our homes when they please. . . . Their menial servants may enter, may break locks, bars, and everything in their way; and whether they break through malice or revenge, no man, no court, can inquire.

To substantiate his argument Otis cited these examples:

Mr. Pew had one of these writs and when Mr. Ware succeeded him, he endorsed this writ over to Mr. Ware; . . . so your honors have no opportunity of judging the persons to whom this vast power is delegated. Another instance is this: Mr. Justice Walley had called this same Mr. Ware before him, by a constable, to answer for a breach of Sabbath-day acts, or that of profane swearing. As soon as he had finished, Mr. Ware asked him if he had done. He replied, Yes. Well then, said Mr. Ware, I will show you a little of my power. I command you to permit me to search your home for uncustomed goods. And went on to search his home from the garret to the cellar; and then served the constable in the same manner.

Otis concluded his argument by saying:

Thus reason and the constitution are both against this writ. . . . Not more than one instance can be found of it in all our law books; and that was in the zenith of arbitrary power . . . when star chamber powers were pushed to extremity by some ignorant clerk of the exchequer. But had this writ been in any book whatever, it would have been illegal. . . . An act against the constitution is void.

Thus Otis echoed the voice of Sir Edward Coke that the King and Parliament were subordinate to the fundamental law of the land.

John Adams, our second President, was present in the courtroom that day and many years later he wrote:

American independence was then and there born; the seeds of patriots and heroes were then and there sown, to defend the vigorous youth. . . . Every man of a crowded audience appeared to me to go away, as I did, ready to take arms against writs of assistance.

The court was not so moved by Otis' argument as John Adams, but it was unable to reach a decision, so it scheduled the cause for reargument during its August term. On November 18, 1761, the cause was argued all day and evening.

Then, immediately at the end of the arguments, the court ordered the issuance of the writ. During the reign of George II, only eight writs had been issued by the court, but, after its decision in the Boston case, customs officers in all major ports and most smaller ports of Massachusetts Bay obtained writs.

The story in the other American colonies was strikingly different. Records show that only one New Hampshire customs officer and possibly one New York customs officer were successful in obtaining writs of assistance. Parliament also took cognizance of writs of assistance but instead of condemning them, it specifically authorized their use in the colonies in the Townshend Revenue Acts passed in 1767. Despite this, with the above exceptions, the colony courts refused to grant the writs even though many applications for them were filed.

As a direct result of their experience with general warrants and writs of assistance, seven of the original States included provisions in their constitutions against unreasonable search and seizure and the fourth amendment was added to the U.S. Constitution as a part of the Bill of Rights. Today, all State constitutions contain similar provisions against unreasonable searches and seizures.

The fourth amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath and affirmation, and particularly describing the place to be searched and the persons or things to be seized.

Due to the nature of our governmental system and the role of the judiciary, it was 1886 before the U.S. Supreme Court decided its first landmark case involving the fourth amendment. In its decision in Boyd against United States, the Court specifically brought Lord Camden's opinion in the Wilkes case into our law and tied it to the protection of the fourth amendment. Speaking of the 1765 opinion, the Court said:

The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offense—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment.

Until recent years, our courts did not have too much difficulty in preserving a substantial area of privacy, though it fell somewhat short of the promise of the Boyd case. Specific decisions varied because of disagreement as to what constitutes probable cause, what degree of search is reasonable as an incident of arrest, and a multitude of other relevant questions, but in view of the nature of our society and the means for invading privacy, the protection provided was generally adequate.

The rapid advancement of science and technology, as well as other major changes in our society in the past 40 years, has had a tremendous impact on privacy. The courts have attempted to respond. Traditional attitudes and concepts, however, have caused serious problems.

The first example of this was the Olmstead case decided by the Supreme Court in 1928. Law enforcement wiretapping had been challenged as an unreasonable search and seizure, contrary to the fourth amendment. The Court, by a 5-to-4 decision, held that wiretapping does not come within the prohibition of the fourth amendment, because there is no physical trespass and no tangible thing seized. On the basis of this latter point, the Court distinguished between a telephone conversation and a letter in the mail, which is protected by the fourth amendment under an 1898 Court decision. Justice Louis Brandeis, one of the dissenters, warned the Court as to the dangers of its narrow view:

When the Fourth and Fifth Amendments were adopted, "the form that evil had theretofore taken," had been necessarily simple. Force and violence were then the only means known to men by which a Government could directly effect self-incrimination. . . . But "time works changes, brings into existence new conditions and purposes." Subtler and more far-reaching means of invading privacy have become available to the Government. Discovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet.

He also warned the Court as to the specific danger of wiretapping:

As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wiretapping.

Despite these warnings of Brandeis, and the passage of 14 years, the Supreme Court did not change its position in Goldman against United States. In this case, Federal agents had used a detectaphone placed on the common wall in an adjoining office to overhear the defendant's conversations. Since there was no physical trespass nor seizure of tangible things, the Court was unable to distinguish the case from Olmstead, and held, by a 5-to-3 vote, there was no violation of the fourth amendment.

The next dozen years began to bring a change in the Court's attitude. In Irvine against California, the Los Angeles police had secretly entered a suspected bookmaker's home and installed a hidden microphone in the hallway. Five days later, the police again entered secretly and moved the mike to the bedroom of the suspect and his wife, where it was left for almost a month. The Supreme Court finally was moved to say:

Science has perfected amplifying and recording devices to become frightening instruments of surveillance and invasion of privacy, whether by the policeman, the blackmailer, or the busybody. That officers of the law would break and enter a home, secrete such a device, even in a bedroom, and listen to the conversation of the occupants for a month would be almost incredible if it were not admitted. Few police measures have come to our attention that more flagrantly, deliberately, and per-

sistently violated the fundamental principles declared by the Fourth Amendment.

So the fourth amendment was finally recognized as protecting conversation against unreasonable seizure. Adhering to this position, the Court, in 1961, held the use of a spike mike violated the fourth amendment. In this case, the police from an adjoining apartment had driven a spike mike into the common wall. The Court refused to reexamine the Goldman case relying upon the penetration of the spike into the wall to provide the physical trespass required by earlier decisions.

A 1965 decision of the Court gave encouragement that the Court would meet the challenge of modern surveillance technology and also showed how elusive the right of privacy concept remains today. The case involved the Connecticut statute banning the use of birth control devices. The Court held the statute was an unconstitutional invasion of privacy, but there was a wide difference of opinion as to the reasons why. Three concurring opinions, signed by five justices, were filed, and the two dissenters each filed an opinion.

Justice Douglas for the Court wrote that the statute was unconstitutional because it intruded into a "zone of privacy created by several fundamental constitutional guarantees." Two justices found the statute contrary to due process of law, without reference to the guarantees of the Bill of Rights. Three justices, in a concurring opinion, argued "the right of privacy in the marital relation is fundamental and basic—a personal right 'retained by the people' within the meaning of the ninth amendment." Justices Black and Stewart dissented on the grounds they could find no general right of privacy guaranteed by the Constitution and Bill of Rights. The decision in the Griswold case gave a big boost to the right of privacy, but it is difficult to foresee the ultimate consequence of it.

In the last 18 months, the Supreme Court has decided three important cases involving electronic eavesdropping. The first, Osborn against United States, approved the use of a recording device concealed on the person of an undercover agent. Two Federal judges had authorized the specific use of the recorder based on an affidavit. The second case, Berger against New York, was related to the New York statute that authorized law enforcement wiretapping and electronic bugging on court orders. The Supreme Court struck down the statute because it did not require the particularity called for by the fourth amendment.

The final case was Katz against United States. The Supreme Court overruled both Olmstead and Goldman by rejecting the need for a physical trespass. It indicated that, under certain very limited conditions, court orders could be obtained for electronic snooping. However, the Court made it clear that prior approval is required.

The Katz case was a victory for privacy. It recognized the realities of modern technology. Electronic as well as physical intrusions were held subject to the protection of the fourth amendment.

Supreme Court decisions have not been limited to defining the area of privacy protected by the Constitution. The Court has also taken steps to insure that the American people enjoy this basic right. In 1914, the Court held that the Federal Government could not use evidence obtained in violation of the fourth amendment. In 1949, the Court held that the fourth amendment was applicable to State law enforcement officers as well as Federal; and then, in 1961, the Court held that State governments could not use evidence obtained in violation of the fourth amendment. As a result, the Court removed most of the temptation for law enforcement officers to make unreasonable searches and seizures. Experience has shown that this is about the only effective means the Court has to actually protect individual rights.

This review of the history of the right of privacy shows that it has been a matter of continuing importance, and that difficulties have been encountered both in defining it and protecting it.

But what about today and tomorrow? Judge Learned Hand, one of our Nation's most able jurists, once wisely observed:

Liberty lies in the hearts of men and women; when it dies there, no constitution, no law, no court can save it; no constitution, no law, no court can even do much to help it.

This observation is most relevant in assessing the right of privacy today and the outlook for tomorrow.

Our courts in the past have done much to safeguard privacy but the temperament of the whole people has also been privacy oriented. By tradition, Americans have been strong individualists. Until the last 30 years, we were a nation primarily of farmers, small businessmen, unorganized workers, professional men, and small government. It was taken for granted that the Government would leave the individual alone unless he had committed an offense, and the Government acted pretty much as it was expected to. There were exceptions such as prohibition enforcement and Attorney General Palmer's so-called Red raids, but these periods of emotionalism and overzealous Government actions were temporary, and relief was forthcoming from the courts or from other calmer Government heads.

The last 30 years, however, have witnessed a striking change in our society. The depression, World War II, and the cold war, including two major periods of armed conflict, have brought big Government, big business, big labor, and bigness in just about every other phase of our life and society. The population has mushroomed, science and technology have advanced beyond all dreams, migration has swollen urban centers, and the economy has become highly concentrated and industrialized. All of these things have placed considerable pressure on the national character. They have all tended to submerge individualism. They have all worked to level tastes, desires, ambitions, attitudes, and behavior.

They have also brought the recordkeepers. Personal data on Americans can be found in employers' and prospective employers' personnel files, credit bureaus, insurance company files, public opinion surveys, behaviorial scientists' files, and in a multitude of Government agencies, such as the Census Bureau, Social Security Administration, Veterans' Administration, Civil Service, Internal Revenue, and the Federal Bureau of Investigation. It is truly the age of the dossier, and it may be only a matter of time before there will be a Federal data center in which a great deal, if not all, of this information will be computerized for almost instantaneous retrieval.

There is no question but there exists today the institutional and technological means to establish within the United States the most severe dictatorship in history. This places a tremendous responsibility on the American people and our political institutions. Regretfully, to date, this responsibility has not been discharged too well.

In all too many instances, the increased pressures, restraints, and intrusions of progress and growth have been accepted without question or complaint. As for the future, it promises only greater pressure for conformity and regimentation.

The pressures of progress and growth do not present the only dangers to the right of privacy. National security, law enforcement, and tax collection still loom as grave threats to privacy. Each generation seems to believe that the dangers of crime, subversion, and espionage are greater in its day than ever before. As a result, there are always those who seek to justify the abandonment or limitation of some constitutional rights. The right of privacy is a frequent target. This has proved particularly true during the past 25 years. A quarter of a century of hot war and cold war has dulled the sensitivities of many Americans to individual rights. Independent research studies have indicated that several provisions of the Bill of Rights might be in serious jeopardy if put to a national referendum today. The truth, of course, is that many preceding generations have faced dangers equal to if not greater than those which currently exist. At no time in our national life has security been shakier than when our Founding Fathers were promulgating these rights. Yet they chose "the boisterous seas of liberty."

The right of privacy is in serious straits today, and the outlook for the future is bleak unless there are some changes. Recent court decisions and Presidential actions give a glimmer of encouragement, but Congress must also act. Private wiretapping and electronic eavesdropping must be prohibited to the full extent of Federal authority. Law enforcement wiretapping and electronic snooping must similarly be prohibited except where national security is directly threatened.

I know the Senate will give careful attention to the various issues that will be raised and discussed relative to title III. Many of the points I have mentioned will probably be discussed in much greater detail as debate progresses. I urge my colleagues to take the action necessary to protect the right of privacy—a right basic to our free society.

Mr. President, before concluding, I should like to comment briefly on what title III does to the right of privacy. It purports to establish a limited court order system for law enforcement snoop-

ing, but it contains the following exceptions:

First. The President or his designee would be allowed to authorize wiretaps and bugs for national security the definition of which includes "any clear and present danger to the structure or existence of the Government."

Second. Any law enforcement officer, State or Federal, could wiretap or bug for 48 hours if there were an emergency situation and there were grounds for a court order but not sufficient time to get one.

Third. The telephone company could wiretap for quality control and to protect its "rights or property."

Fourth. The Federal Communications Commission could monitor to carry out its responsibilities.

Fifth. The terms "interception" and "devices" are so defined in the bill that technically a law enforcement officer using telephone equipment, facilities, components, and so forth, for monitoring in the ordinary course of his duties would not be covered by bills prohibition.

The concept of a limited court order system is further negated by the vast number of crimes where wiretapping and bugging are authorized.

Court orders would be allowed for the following Federal crimes: Espionage; sabotage; murder; kidnaping; robbery; extortion; transmission of wagering information; influencing or injuring an officer, witness or juror; obstruction of criminal investigation; Presidential assassination, kidnaping, and assault; interference with commerce by threats of violence; and many others.

States could authorize court order snooping for murder, kidnaping, gambling, robbery, bribery, extortion, narcotics, and all other felonies that endanger life, limb, or property.

In addition to court orders, control is claimed by requiring the Attorney General or his designee or a State attorney general or a local district attorney to authorize an application to a court for an order. This control is negated, however, in the emergency 48-hour provision where any law enforcement officer can use his own discretion.

Another control is claimed through the bills requirement that notice be given to victims of taps and bugs after 90 days. This is negated, however, by authorizing the court to postpone the notice—possibly indefinitely.

All information acquired in conformity with the bill despite its many weaknesses could be used in evidence including that obtained under the Presidential authorization. The only requirement as to the latter is that the tap or bug be reasonable.

Mr. President, I urge the Senate to give this title its closest attention.

Mr. McCLELLAN. Mr. President, will the Senator yield?

Mr. LONG of Missouri. I yield.

Mr. McCLELLAN. I believe the Senator has introduced a bill (S. 928) to protect the right of privacy by prohibiting wire interception and eavesdropping, and for other purposes.

Mr. LONG of Missouri. That is correct.

Mr. McCLELLAN. Under the bill the Senator has introduced, would the President be permitted to order a wiretapping or electronic surveillance to overhear the conversation or to get information from one who might be plotting the overthrow of this Government?

Mr. LONG of Missouri. That is true.

Mr. McCLELLAN. What could the President do with the information after he had gotten it? Suppose he got definitive, positive information that half a dozen men, the heads of the Communist Party or some other revolutionary movement, were definitely plotting and actually making plans to carry out an overt act to overthrow the Government. What could the President do with that information after he had gotten it?

Mr. LONG of Missouri. He could not use it in evidence.

Mr. McCLELLAN. That is correct. The Senator would deny him the right to go to court with that evidence and convict the criminal conspirators.

Mr. LONG of Missouri. That is not unusual.

Mr. McCLELLAN. It is becoming not unusual, that is true. However, the Senator would not permit the President to use that evidence in court to prosecute the conspiring criminals.

Mr. LONG of Missouri. If the Senator would let me finish my answer, I should like to state that it is something that is not unusual to the extent that it is the position every Attorney General has taken in this country for generations.

Mr. McCLELLAN. It is also unusual for every Attorney General until this one to take the position that wiretapping is necessary in the enforcement of criminal law?

Mr. LONG of Missouri. Many of them have been against it.

Mr. McCLELLAN. I have not heard of any. According to the evidence I have, they have all indicated that they favor the use of wiretapping. Some have testified for it.

Every Attorney General since William Mitchell, in 1931, has advocated the wiretap for use by law enforcement officials. Does the Senator agree?

Mr. LONG of Missouri. I agree.

Mr. McCLELLAN. That is true since 1931.

Mr. LONG of Missouri. We have a number of amendments which will be offered at the proper time.

Mr. McCLELLAN. We are talking about the general proposition the Senator has presented in his bill: That he would permit the President to go out and undertake to detect conspirators who are planning to overthrow the Government, but would not let him take that evidence to court to convict those conspirators. The Senator's bill would not permit the President to use that evidence, but our bill would.

Mr. LONG of Missouri. The bill I have introduced would give the President authority in national security matters to make that investigation.

Mr. McCLELLAN. My bill would go further. But the Senator's bill would not let the President use that evidence to prosecute the criminals in court. They would go free.

Mr. LONG of Missouri. There has been no difficulty in prosecuting them before.

Mr. McCLELLAN. There has been—very much so.

Mr. LONG of Missouri. Many criminals have been successfully prosecuted.

Mr. McCLELLAN. Convictions are obtained now and then, even in the enforcement of our criminal laws. But how many criminals are going free? Far more who commit serious crimes in this country are going free than are being brought to justice.

Mr. LONG of Missouri. The Senator is willing to take away all of the rights of our citizens to privacy.

Mr. McCLELLAN. I am never willing to do that. My bill prohibits any invasion of privacy except in certain serious cases where the court orders it. If we cannot trust the courts and our officials to enforce and obey the laws, then there is no redemption for America. She is on the road to destruction. We have to have courts, and we have to be able to rely on courts.

Mr. LONG of Missouri. There are loopholes in the Senator's bill that one could drive a threshing machine through.

Mr. McCLELLAN. I am sure that the Senator recognizes that he is very much exaggerating in that statement. Title III of S. 917 meets all of the constitutional requirements set out in the Berger and Katz cases, and actually contains more safeguards for individual privacy than those cases would require.

Mr. LONG of Missouri. We have amendments that will be debated at the proper time.

Mr. McCLELLAN. When the Senator gets ready, we will debate the amendments. However, I am trying to find out what the Senator proposes by his bill. Nobody but the President, and only then in cases of conspiracy against the Government, would have the privilege of using this technique to obtain evidence, and then the Senator would deny him the right to have those criminals prosecuted and convicted on that evidence and penalized for their crimes.

Mr. LONG of Missouri. This bill is what the President and administration have asked for.

Mr. McCLELLAN. I do not always agree with the President. I do not think that he asks for enough sometimes.

Mr. LONG of Missouri. I do not always agree with him either, but I do in this particular case.

Mr. President, I yield the floor.

---

REPORT OF THE JUDICIAL CONFERENCE OF THE UNITED STATES REGARDING PROPOSED WIRETAP LEGISLATION

Mr. HANSEN. Mr. President, last fall I noted numerous press accounts describing a meeting of the Judicial Conference of the United States at which the Conference considered wiretapping and eavesdropping legislation pending before this Congress.

The Conference considered S. 675 which was then pending before the Senate Judiciary Committee, but unfortunately did not consider S. 2050 as introduced by the Senator from Nebraska [Mr. HRUSKA] and cosponsored by myself. As we now know, S. 2050 was redrafted and introduced in the Senate

after taking specific cognizance of the judicial standards set out in the recent Supreme Court cases on this subject.

Since I considered the findings of the Conference with respect to wiretapping legislation particularly timely to the Senate debate on this issue, I requested the report of the proceedings of the Conference at its September 22, 1967, meeting.

I have since been advised by the office of the Chief Justice of the Supreme Court of the United States that the report is in the process of being printed. I have requested that report as soon as it is available. I do hope that it is available to us before the Senate debate on this issue comes to a close.

In lieu of that report, however, I ask unanimous consent that a letter from Chief Justice Earl Warren to me be printed in the RECORD at this point. I believe that the activity of the Judicial Conference of the United States in this regard should be of interest to all Senators.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

SUPREME COURT
OF THE UNITED STATES,
*Washington, D.C., October 2, 1967.*
Hon. CLIFFORD P. HANSEN,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR HANSEN: Replying to your request of September 29, 1967, the Judicial Conference of the United States at its meeting on September 22, 1967 considered several bills pending in the Congress to prohibit wiretapping or eavesdropping, or both, including S. 675, H.R. 7093, H.R. 5386, H.R. 6710, H.R. 10037 and H.R. 10090.

The Conference agreed that the provisions of S. 675 were generally acceptable, provided that the ex parte order provisions of the bill are revised to comply with the standards set forth in *Berger v. New York,* 388 U.S. 41 (1967).

The report of the proceedings of the Conference at its last meeting has not been printed, but a copy will be sent to you by the Administrative Office of the United States Courts as soon as the report is published.

Sincerely yours,

EARL WARREN.

Mr. HANSEN. Mr. President, I ask unanimous consent to have printed in the RECORD the partial text of a letter to the Washington Post from G. Robert Blakey, professor of law, Notre Dame Law School.

There being no objection, the excerpt was ordered to be printed in the RECORD, as follows:

ELECTRONIC SURVEILLANCE AND THE COURTS

I was disappointed to see *The Washington Post* editorially conclude on Dec. 23, in reference to the Supreme Court's *Katz* decision that the "burden will outweigh the benefits" should court order electronic surveillance legislation be adopted under the Court's new guidelines, for the contrary is precisely what the two most comprehensive balanced studies to date of the problem have found. I refer, of course, to the Report of the English Privy Councillors in 1957 and the recent Report of the President's Commission on Law Enforcement and the Administration of Justice.

In June of 1957, three Privy Councillors were appointed to inquire into the interception of communications in Great Britain. The practice of the English police over a 20-year period was examined. The Councillors first found that the metropolitan police used wiretapping chiefly "to break up organized and dangerous gangs." The Board of Customs and Excise employed wiretapping primarily in the area of diamond smuggling; their experience was that the traffic was organized by a "very small, closed group" in which it was "hard to get reports from informers or by normal means of detection." Finally, the Councillors noted that in espionage the weakest link was communication and that the counter-intelligence community needed the power to break that link through the interception of communications. The Councillors then analyzed the effects of the practice on the individual citizen's privacy. They found no "conflict between the rights of the individual citizen and the exercise of the power" to wiretap. They found instead that the power under suitable limitations was an aid "to the maintenance of the true freedom of the individual." They observed that the power helped make the freedom of the individual "an effective, as distinct from a nominal, liberty." "To abandon the power," they observed, would be a concession to those who are desirous of breaking the law . . . without any advantage to the community whatever."

The issue of benefit to law enforcement was taken up at length by the President's Crime Commission. I need not set out here their findings on the nature and scope of organized crime, crime which they termed perhaps the "most sinister" in America, and crime which they noted was "dedicated to subverting not only American institutions, but the very decency and integrity that are most cherished attributes, of a free society." Some further comment is, however, required on the record of our ability to deal with organized crime without the use of electronic surveillance techniques.

Since 1961, the Federal Government has been engaged in the strongest effort yet launched against organized crime. The Department of Justice and the Department of the Treasury combined are devoting upward of $20 million a year to the drive. The services of the Nation's top investigators from the Federal Bureau of Investigation, the Intelligence Division of the Internal Revenue Service, the Bureau of Narcotics and other Federal agencies are being employed. The Department's top prosecutors are engaged in the effort. But what have been the results? Measured by the record of the past, the success of the drive has been impressive. Yet, measured by the job that needs to be done, the failure has been dismal. Prosecutions are up substantially since 1961, yet the top men in organized crime still remain largely above the law. Since 1961, for example, approximately 2000 members of La Cosa Nostra have been identified, while estimates place their probable strength at around 5000. Yet only 300 or so have been indicted and only 150 or so have been convicted. Only 3 to 8 per cent of the hard core members of organized crime, in short, have been touched by the best the Nation has to offer using conventional techniques of investigation. On this record, I suggest, it is not inappropriate that we run the risk of possible abuse that might be involved in a system of court order electronic surveillance. The alternative is a confession of impotence to enforce the law against those who would flaunt it by exploiting the weak of our society, largely among the urban poor, not out of desperation born of poverty or discrimination or a sickness of mind, but of a cold calculation of balance of advantage.

The editorial also suggests that it would be extremely difficult to square electronic surveillance with the Supreme Court's interpretation of the Fourth Amendment. To be sure, the Court struck down in *Berger v. New York* the permissive New York statute but not—note well—because it was unconstitutionally administered, but because it was susceptible to an unconstitutional interpretation. The significance of *Berger* thus lay not in the result, but in the way in which the majority reached that result. No line of reasoning which would strike down all electronic surveillance as unreasonable was followed on any point. Indeed, where it was advanced, it was either rejected or not even mentioned by the Court. If any doubt remained after *Berger, Katz* has surely dispelled it. What I am saying, in short, is that the Supreme Court has not outlawed electronic surveillance, but instead given us a constitutional blueprint which will permit us to draw up a fair, effective and comprehensive system of court order wiretapping and bugging. All that remains now is the question of legislative will. It is time we get on with the job.

G. ROBERT BLAKEY,
*Professor of Law, Notre Dame Law School.*
NOTRE DAME, IND.

Mr. HANSEN. Mr. President, I ask unanimous consent that the Senate take note of an abbreviated news clipping from the New York Times of April 21, 1968, which reports that the National Council on Crime and Delinquency recently issued a policy statement supporting the regulated use of electronic eavesdropping by the police.

I ask unanimous consent that the article be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

The National Council on Crime and Delinquency issued a policy statement yesterday supporting the regulated use of electronic eavesdropping by the police.

The statement by the council, a large nonprofit research and education group that until recently has concentrated on improving the courts and correctional agencies, is expected to help those trying to put through legislation authorizing electronic eavesdropping.

President Johnson, more than a year ago, recommended that Congress restrict rather than broaden the use of electronic surveillance devices.

Carl M. Loeb, president of the council, said in releasing the policy statement that electronic surveillance should be used only for the "prosecution of certain kinds of criminals, particularly the leaders of crime syndicates."

"The inroads of organized crime into our society threaten our way of life," he said. "The illegal billions amassed annually by these marauders are used to nullify government and infiltrate our private industry."

ORDER FOR RECESS UNTIL 11 A.M. TOMORROW

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that when the Senate concludes its business today, it stand in recess until 11 a.m. tomorrow.

The PRESIDING OFFICER. Without objection, it is so ordered.

ORDER FOR RECOGNITION OF SENATOR MORTON TOMORROW

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that, on the completion of the prayer and the disposition of the Journal tomorrow morning, the distinguished junior Senator from Kentucky [Mr. MORTON] be recognized for not to exceed 15 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

## ISSUANCE OF MEDALS TO MRS. WALT DISNEY AND CALIFORNIA INSTITUTE OF THE ARTS

Mr. BYRD of West Virginia. Mr. President, I ask the Chair to lay before the Senate a message from the House on House Joint Resolution 1234.

The PRESIDING OFFICER laid before the Senate the joint resolution (H.J. Res. 1234) to provide for the issuance of a gold medal to the widow of the late Walt Disney and for the issuance of bronze medals to the California Institute of the Arts in recognition of the distinguished public service and the outstanding contributions of Walt Disney to the United States and to the world, which was read twice by its title.

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of the joint resolution.

The PRESIDING OFFICER. Is there objection to the present consideration of the joint resolution?

There being no objection, the Senate proceeded to consider the joint resolution.

Mr. MURPHY. Mr. President, I am indeed gratified that the Senate today is approving the joint resolution authorizing the striking of a gold medal to be presented to Mrs. Walt Disney by the President of the United States as a small token of the appreciation of the American people and of the American Congress for all that Walt Disney did to make the world a little happier and a better place for all to live.

The resolution (H.J. Res. 1234) received great support from Representatives DEL CLAWSON, DOLE, and BOB WILSON.

The joint resolution is identical to Senate Joint Resolution 93, which I introduced on June 20, 1967, and which was cosponsored by 52 Senators, with the exception that under the House joint resolution the California Institute of the Arts will be required to pay the cost of the gold medal.

I am glad that the California Institute of the Arts has agreed to do that in view of the present conditions of gold in our country.

Mr. President, I ask unanimous consent that the text of the joint resolution and the remarks I made when I introduced Senate Joint Resolution 93, be printed at this point in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

### ISSUANCE OF GOLD MEDAL TO THE WIDOW OF THE LATE WALT DISNEY

Mr. MURPHY. Mr. President, it is with a great deal of pride that I introduce a joint resolution authorizing the issuance of a posthumous gold medal to the late Walt Disney in recognition of his contribution to the culture of the United States and to the world.

Walt Disney was a unique man. To the end of his days, Mr. Disney remained an idealist in a world of cynics. In an age where men live each day with the awesome knowledge that they have the nuclear power to turn this planet into radioactive dust, Disney celebrated in his every creative act the innocence, joy, and optimism of childhood.

This genius, this capacity for stirring in his fellow men the remembrance of the days of their childhood, was Mr. Disney's great gift. He used it well. All over the world, in nations of every political belief, the cartoon creations of Walt Disney are received with identical delight. If music is a universal language, Mickey Mouse is a universal reminder of the power of imagination to produce a character symbolizing the wonder of childhood.

The life of Walt Disney has been told and retold until it has reached the comfortable plateau of the familiar: how Walt was born in Chicago and lived there and in Missouri steeped in the homespun virtues of a midwesterner; how Walt emigrated to California, a State that remains a golden paradise beckoning to newcomers of imagination and courage; how Walt struggled to convince others that his cartoon mouse named Mickey could be an entertaining addition to the motion picture world; how Walt prospered yet remained true to his belief that the world of entertainment should be a place where goodness triumphed and evil invariably fell in the dust.

What remains obscure to most Americans was the Walt Disney who was a patriot, and the Walt Disney who was determined to leave a legacy of patriotic devotion to the America in which he believed.

Mr. President, I knew Mr. Disney and considered him my friend. I was not surprised to learn that 95 percent of the production of Walt Disney Studios during World War II was devoted to training films for the Armed Forces and for the war effort. These films, many of which used the famous Disney characters, are remembered by every veteran as vehicles in which peacetime Americans were taught the arts of war. They were immensely successful in accomplishing their purposes. Thousands upon thousands of Americans were taught by Mickey Mouse, Donald Duck, Pluto, and other beloved Disney characters in the operation of airplanes and warships.

Walt Disney quietly served his country in another capacity, Mr. President. As all his friends knew, Walt had a special affection for our neighbors south of the border. It was given public notice in several Walt Disney productions in which our friends in Mexico and South America were treated affectionately and with love. But it also took the form of special consultations with the Coordinator of Inter-American Affairs in the State Department, the predecessor office of the present Assistant Secretary of State for Inter-American Affairs. Walt's advice and counsel were proved invaluable on many an occasion during the days preceding, during, and immediately after World War II, and did much to create good will between the continents.

Somewhat better known, Mr. President, were Mr. Disney's contributions to the U.S. exhibits at the New York and the Brussels World's Fairs. His advice on creating exhibits capable of informing and entertaining simultaneously, knowledge that he demonstrated so ably in the delightful masterpiece that is Disneyland Park, was instrumental in giving the American exhibits at these exhibitions a grace and a beauty widely commented upon.

Perhaps the least known facet of Mr. Disney's life, Mr. President, was his consuming devotion in his last years to the California Institute of the Arts. I know that Walt looked upon this school, a college-level institution for the creative and performing arts, as his final contribution to a world that had given him riches, awards, and personal satisfaction.

My joint resolution, Mr. President, would authorize the striking of a gold medal for distinguished public service for presentation to Walt Disney's widow. The resolution also would authorize the striking of not more than 100,000 bronze medals, in successive issues of not less than 2,000, which would be ordered and paid for by the California Institute of the Arts as a means of raising funds.

I am reasonably sure, Mr. President, that Walt Disney felt that his original cartoon creations—Mickey, Donald, and all the rest—would live to bring enjoyment to succeeding generations. And his all-consuming interest, in the final act of his life, was the California Institute of the Arts. It is fitting that replicas of a gold medal awarded to Mr. Disney will benefit this school, an institution that will memorialize Walt Disney in a way that he would have preferred—by the instruction of young people. I urge the adoption of this joint resolution, Mr. President, and ask unanimous consent that the text of this joint resolution be printed in full at this point in the RECORD.

The PRESIDING OFFICER. The joint resolution will be received and appropriately referred; and, without objection, the joint resolution will be printed in the RECORD.

The joint resolution (S.J. Res. 93) to provide for the issuance of a gold medal to the widow of the late Walt Disney and for the issuance of bronze medals to the California Institute of the Arts in recognition of the distinguished public service and the outstanding contributions of Walt Disney to the United States and to the world, introduced by Mr. MURPHY, was received, read twice by its title, referred to the Committee on Banking and Currency, and ordered to be printed in the RECORD, as follows:

"S.J. RES. 93

"Whereas Walt Disney's life personified the American dream and his rags-to-riches story demonstrated that the United States of America remains the land of opportunity; and

"Whereas Walt Disney, 'the most significant figure in graphic arts since Leonardo,' pioneered motion picture cartoons, produced spectacular feature films, and created fascinating nature studies bringing joy and pleasure to children of all ages; and

"Whereas Walt Disney developed one of the wonders of the modern world, Disneyland, a fabulous park where happiness reigns and where one can relive the nation's past as well as step into the future; and

"Whereas Walt Disney was a great humanitarian, a 'teacher of human compassion and kindness,' a master entrepreneur, a great conservationist; and

"Whereas Walt Disney's masterful touch contributed so significantly to the success of exhibits of the United States, including those at the New York and Brussels Worlds Fairs; and

"Whereas Walt Disney, always an outstanding patriot, during World War II devoted ninety-five per cent of the production of his studio to the armed services; and

"Whereas Walt Disney's vision and work with the Coordinator of Inter-American Affairs did so much to create international friendship and mutual understanding with our neighbors in Latin America; and

"Whereas Walt Disney received an unprecedented number of Academy Awards, citations and honors from governments the world over, industry civic groups, and universities, which when listed total nearly a thousand; and

"Whereas Walt Disney's greatest gifts to mankind were laughter, his steadfast faith in future generations and his belief that good will ultimately triumph over evil; and

"Whereas Walt Disney's interest in young America is evidenced by his founding of the California Institute of the Arts, a college-level school of the creative and performing arts, which he regarded as his most important contribution to posterity: Now, therefore, be it

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That, in recognition of the distinguished public service and outstanding contributions to the United States and to the world, the President of the United States is authorized to present in the name

of the people of the United States and in the name of the Congress to the widow of the late Walt Disney a gold medal with suitable emblems, devices and inscriptions to be determined by Walt Disney Productions with the approval of the Secretary of the Treasury. The Secretary shall cause such a medal to be struck and furnished to the President. There is hereby authorized to be appropriated the sum of $2,500 to carry out the purposes of this section.

"SEC. 2. (a) The Secretary of the Treasury shall strike and furnish to the California Institute of the Arts not more than one hundred thousand duplicate copies of such medal in bronze. The medals shall be considered as national medals within the meaning of section 3551 of the Revised Statutes (31 U.S.C. 368).

"(b) The medals provided for in this section shall be made and delivered at such times as may be required by the California Institute of the Arts in quantities of not less than two thousand. The Secretary of the Treasury shall cause such medals to be struck and furnished at not less than the estimated cost of manufacture, including labor, materials, dies, use of machinery, and overhead expenses, and security satisfactory to the Director of the Mint shall be furnished to indemnify the United States for full payment of such costs."

Mr. MURPHY. Mr. President, I ask unanimous consent that a statement on the joint resolution, prepared by Senator Kuchel, be printed at this point in the Record.

There being no objection, the statement was ordered to be printed in the Record, as follows:

STATEMENT BY SENATOR KUCHEL

When the United States Senate today approves the joint resolution, a proposal which I am proud to cosponsor, we will add yet another honor to the memory of Walt Disney. But we will do so in a way which he would have preferred—by helping young people interested in the creative and performing arts.

This resolution will authorize not only a gold medal to be presented to Walt Disney's widow, but also will authorize the striking of bronze medals in order to raise funds for the California Institute of the Arts. This Institute, which Walt Disney was instrumental in establishing in 1961, is a place where all the performing and creative arts are are taught under one roof. Walt described the Institute as a "community of the arts". He looked upon this school as his final contribution to a world that had given him riches, awards, and personal satisfaction.

His creations and characters have been able to leap the boundaries and barriers of nations, languages, and ideologies. The world always will respond warmly to the magic that is Disney's. For this "magic", Walt Disney has received more than 950 honors and citations from all over the world including 31 Academy Awards, five Emmys, honorary degrees from many universities, and the Presidential Medal of Freedom.

Today, we honor Walt Disney again but in a manner which will help him fulfill the dream he expressed in these words: "If I can help provide a place to develop the talent of the future, I think I will have accomplished something." S.J. Res. 93 will give life to that dream and to the memory of Walt Disney.

The PRESIDING OFFICER. The question is on the third reading of the joint resolution.

The joint resolution was read the third time.

The PRESIDING OFFICER. The joint resolution having been read the third time, the question is, Shall it pass?

The joint resolution (H.J. Res. 1234) was passed.

---

## ORDER FOR RECOGNITION OF SENATOR HOLLAND TODAY

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that, notwithstanding the previous order under which the distinguished Senator from Hawaii [Mr. Fong] will be recognized for a period of not to exceed 2 hours, the distinguished Senator from Florida [Mr. Holland] may be recognized at this time for 5 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## REDS MAKING HAY OUT OF KING RIOTS

Mr. HOLLAND. Mr. President, the evidence continues to accumulate that the country is greatly ashamed of what has happened in Washington following the assassination of Dr. King, particularly the events growing out of the type of law enforcement that was adopted by the officials here.

Mr. President, I have several items from newspapers that were sent to me by Florida citizens which I should like to have printed in the Record.

The first is an article by the senior representative in the Capital of the Knight newspapers. The article, entitled "Reds Making Hay Out of King Riots" and written by Edwin A. Lahey, was published in the Miami Herald, of April 28, 1968.

I ask unanimous consent that the article be printed at this point in the Record.

There being no objection, the article was ordered to be printed in the Record, as follows:

REDS MAKING HAY OUT OF KING RIOTS

(By Edwin A. Lahey)

WASHINGTON.—The man who murdered Dr. Martin Luther King gave international communism its greatest propaganda field day.

The broadcasting stations in Peking, Moscow, and Hanoi for a month now have been getting mileage out of the civil disorders that followed the King assassination.

They have made a real thing out of the disorders in Washington. It was in this capital that Safety Director Patrick V. Murphy made the compassionate decision to surrender control of the streets to angry Negroes. About $20 million worth of arson followed. Our local officials have been trying ever since to make it seem like a "trick or treat" night.

Communist commentators are still turning out new angles on these riots.

Pravda in Moscow the other day published a letter from four Soviet citizens "of Afro-American origin," named Eslanda Hood, Robert Ross, Tito Romallo, and James Patterson. The expatriates denounced the "cruel suppression of protests by American Negroes."

In Peking the popular catch phrase is the "Afro-American struggle." The Peoples Daily in the Red Chinese capital carried more than a page of articles of the Negro disorders in the United States, including a new thought by Chairman Mao Tse-tung:

"Only by overthrowing the reactionary rule of the U.S. monopoly capitalist class and destroying the colonialist and imperialist system can the black people of the United States win complete emancipation."

In Hanoi, a daily newspaper named Nhan Dan actually described the Negro riots here as a "second front" in the war against the U.S.

"The black Americans' struggle on the second front accentuates the crisis into which U.S. imperialism is sliding deeper and deeper," this newspaper said.

The Hanoi newspaper also reminded readers that Premier Pham Van Dong of North Vietnam told Stokely Carmichael on a visit last August:

"The Vietnamese regard the black people of the U.S. as their brothers and close comrades in arms in the struggle against the common enemy, U.S. imperialism."

Some of the Communist radio commentators managed to make the Negro riots in the U.S. sound like the French Revolution.

"Fight on, heroic Afro-American brothers," said the Peoples Daily in Peking. "Victory will certainly be yours."

The paper also gloated about the rampaging Negroes in the U.S. as follows: "Defying brute force, they have attacked the reactionary troops and police and set fire to shops run by white racists."

And during the height of the riots in Washington, the domestic service of Peking Radio informed Chinese listeners that sentries had been increased at the White House, "to protect the old home of white racial oppressors."

Doesn't it really warm you, the way people all over the world love us so?

Mr. HOLLAND. Mr. President, I shall read only the first three paragraphs:

The man who murdered Dr. Martin Luther King gave international communism its greatest propaganda field day.

The broadcasting stations in Peking, Moscow, and Hanoi for a month now have been getting mileage out of the civil disorders that followed the King assassination.

They have made a real thing out of the disorders in Washington. It was in this capital that Safety Director Patrick V. Murphy made the compassionate decision to surrender control of the streets to angry Negroes. About $20 million worth of arson followed. Our local officials have been trying ever since to make it seem like a "trick or treat" night.

The rest of the article speaks for itself and shows the humiliation our whole country suffers because of what happened in Washington.

The second item is a signed editorial, by Mr. William A. Mullen and published in the Pompano Sun-Sentinel of Wednesday, May 1, entitled, "Demands for Poor Ignore Obligation to Due Process." I ask unanimous consent that it be printed at this point in the Record.

There being no objection, the editorial was ordered to be printed in the Record, as follows:

VIEWED EDITORIALLY: DEMANDS FOR POOR IGNORE OBLIGATION TO DUE PROCESS

The United States of America is a Republic and by our Constitution, Article IV, Section 4, shall be guaranteed to continue as a republican form of government.

Under our due process, amendments to the Constitution are by a two-thirds vote of both houses of the Congress or of the legislatures with the approval of three-fourths of the states.

But under way now is a new attempt to change our government from a republic to a democracy or a government of coercion. Instead of the due process of amendment, reform is sought through self-appointed delegates whose qualifications are based on the acclaim they are "poor."

These, we believe, are the fundamentals involved in the so-called "Poor People's March on Washington," which began Monday with the supposed noble cause of fulfilling the "dream of Dr. Martin Luther King."

They are the elements that are putting our tortured government to the test in the context of "Do as I says, or else . . ."

And in this context, the affairs of government will not be directed by the law of the Congress, the powers of the executive or the interpretations of the judiciary. They shall be determined by the "demands" of persons who are not duly elected representatives of the people, as decreed by our republican form of government guaranteed to the several states by the United States Constitution.

To view the latest confrontation of the invested authority of our government from any other aspect would be mortal folly, no matter how just the cause may appear, no matter how idealistic the "dream," no matter how non-violent the coercion.

No group has any right to invade our national capital, to threaten laying it under siege, or to place a shotgun of violence to the heads of our elected representatives.

But that is the manifesto of Dr. King's successor as leader of the "march" and head of the Southern Christian Leadership Conference (SCLC), Dr. Ralph Abernathy. He issued the ultimatum thusly:

"We have made up our minds that there will be no new business in this country until it takes care of the old business . . ."

There is no statutory nor constitutional authority for any individual, or any group, regardless of its numbers and physical prowess, to hamstring our governmental processes, as Dr. Abernathy proposes.

The means for change are provided through elections, through our representatives in the Congress and through our President. No other methods are lawful.

Dr. Abernathy quite obviously ignores this with his edict and his assertion that "we are not going to beg for our rights any longer, but will demand them."

These "rights" include free food programs, more anti-poverty funds, a ban on immigration until "every poor American who wishes it has gained a decent acceptable living standard and is gainfully employed," and a more direct voice of the "poor" in government affairs.

What a "decent acceptable living standard" may be, humans being what they are, is anybody's guess.

If these are granted as "rights" today, what then of tomorrow's rights? They may be free housing, free transportation, incarceration of those who impede the economic satisfaction of the "poor," or whatever may strike future fancy.

Our Government representatives have an obligation to their electorate to deal with these demands and the "poor people's march" within the framework of our Constitution.

They have a sworn oath to uphold that Constitution which guarantees a republican form of government, not a mobocracy.

This should be restated to some officials in the Department of Agriculture who joined at the end of their meeting Monday with the "crusaders" in singing We Shall Overcome.

The theme of liberty today, we submit, is "We shall persevere, or we shall perish."

WILLIAM A. MULLEN.

Mr. HOLLAND. I shall simply read one part of it to the Members of the Senate, for emphasis, so that we will never forget that this particular part of the editorial calls attention to what our duties are under the conditions.

Our Government representatives have an obligation to their electorate to deal with these demands and the "poor people's march" within the framework of our Constitution.

They have a sworn oath to uphold that Constitution which guarantees a republican form of government, not a mobocracy.

The entire editorial speaks for itself. The Pompano Sun-Sentinel of recent date published a number of letters from contributors on this subject. I ask unanimous consent that two letters, one entitled "Says Capital Disgraced," written by Mr. William Marshall, and one entitled "Negro Offers Views," signed by Willie Hayes, of Deerfield Beach, be printed at this point in the RECORD.

There being no objection, the letters were ordered to be printed in the RECORD, as follows:

SAYS CAPITAL DISGRACED

EDITOR: THE SUN-SENTINEL:
May I contribute?

What a disgrace to this World War I veteran who enlisted and served in France many months to see and read what has happened in our national capital, especially, and other large cities. Black hoodlum looters burning and looting within a few blocks of the White House and carrying away their loot with police required to stand by and let them continue. Thank God the press and TV reported it well with photos. Here is a nation with officials apparently paralyzed with fear permitting a born hoodlum element that doesn't represent one per cent of the entire good Negro population to thus degrade our country and recommend taking to the streets with guns to burn, kill and loot. Two or three preaching anarchy on the public forums. Where are the guts of our elected officials?

What a spectacle this must present to other countries, especially Russia.

WM. MARSHALL.

PHILADELPHIA, PA.

EDITOR: THE SUN-SENTINEL:
I am of the Black race and have seven children and happily married. I agree with you when you state, "We deplore the death of Dr. King, but we cannot join in mourning him." He had no right in Memphis to try to stir our folks up. Such telecasters from stations in Miami to say "A man of peace meets violent death" and for Mr. Hubert Humphrey to say "An apostle of non-violence has suffered a violent death" are statements of hypocrites.

Many of our folks are afraid to speak out against Adam Clayton Powell, Rap Brown, Stokely Carmichael and other rabble rousers who bring discredit to our race. We love our country, and the hoodlums who rape, rob and steal should be treated rough. Many politicians who want our votes to stay in office or get into office talk out of both sides of their mouths and are not sincere. It was a mistake to give Dr. King the Nobel peace prize. Anyone who listened to him trying to stir up our folks knows this to be true and his preaching "nonviolence" was a sham. Our President must stop being a politician and must tackle this firmly.

WILLIE HAYS.

DEERFIELD BEACH.

Mr. HOLLAND. Mr. President, I believe that the letter by Mr. Marshall deserves a little special consideration, so I shall quote from it:

What a disgrace to this World War I veteran who enlisted and served in France many months to see and read what has happened in our national capital, especially, and other large cities. Black hoodlum looters burning and looting within a few blocks of the White House and carrying away their loot with police required to stand by and let them continue. Thank God the press and TV reported it well with photos. Here is a nation with officials apparently paralyzed with fear permitting a born hoodlum element that doesn't represent one per cent of the entire good Negro population to thus degrade our country and recommend taking to the streets with guns to burn, kill and loot. Two or three preaching anarchy on the public forums. Where are the guts of our elected officials?

I also have an editorial from the Orlando Evening Star of Saturday, May 4. It is entitled "Can Poor March Get Results?" I ask unanimous consent that it be printed at this point in the RECORD.

There being no objection, the editorial was ordered to be printed in the RECORD, as follows:

CAN POOR MARCH GET RESULTS?

Can the Poor People's Campaign which is now on its big march to Washington force the Congress to meet demands for more jobs, a guaranteed minimum annual income, better housing and better education?

The Rev. Ralph David Abernathy believes his invasion of the nation's capital with thousands of marchers will create a crisis which will force the government to give in to the demands.

And he points to previous successes of activities by the Southern Christian Leadership Conference as evidence that this capital caper will pay off in benefits for the poor. And he makes it clear too, that his group will not let a few laws interfere with its plans to create a crisis in the capital.

SCLC's successor to Dr. Martin Luther King showed his contempt for laws by declaring quite clearly "We are prepared to break those laws which we consider to be unjust," and added "We will gladly and willingly go to jail and suffer the consequences."

To the observers who say that disruptions in the capital will harden the opposition to big government spending bills for the poor, Mr. Abernathy replies that the trouble in Birmingham in 1963 helped win the 1964 Civil Rights Act and that the trouble in Selma in 1965 helped win the Voting Rights Act.

He says that demonstrations and disturbances create the "climate" for favorable legislation, and he is relying on this tactic to get what he wants in Washington this month.

But, one thing the SCLC forgets. Demonstrations and marches or even riots and burnings won't create the hundreds of millions of dollars it would take to do all the things Mr. Abernathy wants the government to do.

Mr. HOLLAND. I read the concluding paragraph:

But, one thing the SCLC forgets. Demonstrations and marches or even riots and burnings won't create the hundreds of millions of dollars it would take to do all the things Mr. Abernathy wants the government to do.

Mr. President, we have been humiliated in the eyes of the world by what has happened, particularly what has happened in the Capital; and I want the RECORD to show that Congress knows that perfectly well, and that Congress is proposing to do its duty, but will not be swayed one iota by all of the confusion which is promised for the next few weeks.

MESSAGES FROM THE PRESIDENT—APPROVAL OF BILLS

Messages in writing from the President of the United States were communicated to the Senate by Mr. Geisler, one of his secretaries, and he announced that the President had approved and signed the following acts:

On May 3, 1968:
S. 375. An act to amend the Communications Act of 1934 with respect to obscene or harassing telephone calls in interstate or foreign commerce.

On May 4, 1968:
S. 10. An act to authorize and direct the Secretary of the Treasury to cause the vessel *Ocean Delight,* owned by Saul Zwecker,

of Port Clyde, Maine, to be documented as a vessel of the United States with coastwise privileges; and

S. 1093. An act to authorize the use of the vessel *Annie B.* in the coastwise trade.

## EXECUTIVE MESSAGES REFERRED

As in executive session,

The PRESIDING OFFICER laid before the Senate messages from the President of the United States submitting sundry nominations, which were referred to the appropriate committees.

(For nominations this day received, see the end of Senate proceedings.)

## ORDER OF BUSINESS

The PRESIDING OFFICER (Mr. HOLLINGS in the chair). Under the previous order, the Senator from Hawaii [Mr. FONG] is recognized for not to exceed 2 hours.

Mr. FONG. Mr. President, I ask unanimous consent that I may yield to the distinguished Senator from Virginia [Mr. BYRD] for 1 minute, within losing my right to the floor.

The PRESIDING OFFICER. Without objection, it is so ordered.

## COLUMNIST PRAISES SENATOR BYRD OF WEST VIRGINIA

Mr. BYRD of Virginia. Mr. President, the noted newspaper columnist Holmes Alexander wrote an article the other day dealing with the distinguished Senator from West Virginia [Mr. BYRD]. In the article he points out the esteem in which the Senator from West Virginia is held by the people of West Virginia.

I should like to say that we who have served with him and are serving with him in the Senate know of his great ability and know what a hard-working and conscientious Senator he is.

I ask unanimous consent that Mr. Alexander's article, published in the Richmond News Leader of May 1, 1968, be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

BYRD MAY BE AN ANTIDOTE FOR WALLACE

(By Holmes Alexander)

So far there isn't any stop-Wallace movement in the Democratic party, but recently there was a definite wiggle—a sign of life and motion in that direction.

On April 5, Senator Bob Byrd took the Senate floor, along with many others, to eulogize Martin Luther King, Jr. "I was shocked but I was not surprised," said the plain-spoken, up-from-poverty West Virginian. On April 8, David Lawrence approvingly ran Byrd's entire speech in the country's most widely circulated column. Byrd had spoken for 15 minutes. He drew 1,500 letters of approbation.

Then on April 20 The Beckley (W. Va.) Register and Post-Herald published its first report on a continuing 14-county poll which listed six presidential possibilities and asked for reader preference. Byrd's name wasn't on the ballot, but he drew a write-in of some significance. Of 353 votes in the incomplete sampling, Richard Nixon (92) was barely ahead of George Wallace (91), followed by Robert Kennedy (55). The Byrd write-in (35) nosed out Hubert Humphrey (34).

The poll's salient feature as viewed by

CXIV——775—Part 10

Democrats in Washington, was its outcropping of the hardline for peace at home and victory abroad. The Wallace-Byrd total of 126 easily topped Nixon, a hardliner himself, and was double the softline of Kennedy-Eugene McCarthy at 62.

There is, to repeat, no stop-Wallace movement yet under way, but you don't have to draw diagrams for the desperate Democrats. The feisty former Governor of Alabama is all but conceded five Deep South States. His campaign as the American Independent party candidate is going to collect anti-riot, anti-peacenik, anti-Administration votes all over the map. Any job-description you write for a Wallace-stopper could spell Bob Byrd.

Of course, it could also spell John Connally, Governor of Texas, but "no-body runs for Vice President" and the spell-out has to be called an academic exercise at this point. Even at that, it provides a study in Democratic party necessities. That party is going to need a counter-Wallace weapon, and there isn't anybody other than Byrd in either camp who would more certainly supply a Wallace alternative for many middle-class, and labor-class Democrats who otherwise may have nowhere else to go.

Wallace is a renegade Democrat, and Byrd is a regular. Wallace has the racist-tag, and Byrd is a rationalist. The Senator has repeatedly voted for Civil Rights bills, including the recent one on open housing. He has also repeatedly taken lonely positions against welfare-racketeering and every form of crime-in-the-streets. As chairman of the Appropriations subcommittee on the District of Columbia, he has insisted relief funds go only to the eligible. He is one of the very few men in public office who backed Mayor Daley's shoot-the-looters-and-arsonists proclamation.

"That's The Law," says Byrd.

"For hundreds of years it's been the standing order of peace-officers to shoot felons who can't be stopped in any other way at the scene of the crime. Of course, no policeman should shoot a child, or open fire in a crowded place, but that's off the question. The law must be enforced if we're to be a civilized nation.

"My heart doesn't bleed for the criminal. It bleeds for the victims of his crime. I feel much the same about our military tactics in Vietnam. My heart goes out to the American fighting man and not to the enemy. We should have bombed the dikes and cut off the enemy rice supply long ago. We should have found some way to blockade Haiphong harbor."

This is counter-Wallace language because it is Wallace-made-rational, and is Wallace-within-the party system, and Wallace-without-theatrics. There is no sign whatever, as yet, that Byrd will be considered for the national Democratic ticket. But the necessity for a Wallace-stopper is going to require some inventive ticket-making by the Democrats.

## ORDER OF BUSINESS

Mr. BYRD of West Virginia. Mr. President, will the distinguished Senator from Hawaii yield for a unanimous-consent request?

Mr. FONG. I yield.

## ESTABLISHMENT OF COMMITTEE ON VETERANS' AFFAIRS—ADDITIONAL COSPONSOR

Mr. BYRD of West Virginia. Mr. President, I am heartily in favor of a resolution which was reported today by the Committee on Rules and Administration, of which I am a member, establishing a standing Committee on Veterans' Affairs in the U.S. Senate.

The need for such a committee should

really be beyond question in this day and age.

We are currently spending some $7 billion per year for veterans' pensions, survivors' benefits, veterans' hospitals, and the many other programs which a grateful nation has provided for the men who have served in its Armed Forces.

It is hard to conceive of a more important area of our national life, an area that affects so many persons, and an area that involves the expenditure of so much money from the National Treasury. Certainly an area of this much concern is worthy of recognition by the Senate in the form of a permanent Senate committee to oversee matters concerning our veterans.

Today when more than half a million young Americans are under arms in Southeast Asia fighting for the defense of freedom and giving their lives, it is essential that we convey to them, and to all Americans, our full recognition and gratitude for the services they are performing.

The creation of a standing committee in the Senate on Veterans' Affairs is one concrete way in which we can convey this gratitude as well as end forever the fragmented process by which veterans' legislation is currently considered in the Senate.

I do not use the word "fragmented" in order to deprecate in any way the manner in which the two Senate committees' having jurisdiction over veterans' affairs—the Senate Finance Committee and the Senate Labor and Public Welfare Committee—have discharged their duties in that regard. These committees have performed a dedicated work, but they are already overly burdened with other heavy responsibilities.

Today there are nearly 26.2 million veterans living in this country. And they are all underrepresented in the U.S. Senate because, instead of the consideration of proposed legislation affecting veterans by a Veterans' committee, such legislation gets parceled out to two very large and very busy Senate committees.

Both the Senate Finance Committee and the Senate Labor and Public Welfare Committee have heavy workloads of their own in their traditional fields of jurisdiction.

The Finance Committee handles, among other legislation, bills concerning taxes and social security. Needless to say, this requires an enormous amount of senatorial and staff effort. And such legislation is by no means all that this committee must cover. The Finance Committee should not be required to expend increasing time and thought on the needs of veterans and their families.

Similarly, the Committee on Labor and Public Welfare has an ever-proliferating responsibility and should not be diverted to fulfilling yet another mission concerning veterans.

Consolidation of veterans' matters into one Senate committee would have two important and immediate benefits.

First, it would create one new committee the sole "raison d'etre" of which would be the welfare of our veterans, their families, and survivors.

Second, such a consolidation would permit the two other Senate committees—the Finance Committee and the Labor and Public Welfare Committee to concentrate their efforts entirely in other fields of expertise.

I think it should be pointed out under the resolution to which I have adluded, the jurisdiction of the proposed Senate Veterans' Affairs Committee would be the same as that of the House Committee on Veterans' Affairs.

This proposed committee would have jurisdiction over veterans' measures generally, life insurance issued by the Government in connection with service in the Armed Forces, veterans' pensions and other compensation, veterans' readjustment programs such as the GI bill, veterans' hospitals, medical care and treatment of veterans, and vocational rehabilitation and education of veterans.

The Senate should have established such a committee as this a long time ago.

But because it did not do so, over the years almost all of the legislation pertaining to veterans has originated in the House.

Yet, the Senate, our Nation's greatest deliberative body, is in a unique position, because of the greater length of a Senator's term of office, as well as the greater stability of service, to offer substantial positive contributions to our veterans laws.

We ought not let the role of initiator of legislation fall by default to the House of Representatives.

Further, the existence of a standing Committee on Veterans' Affairs in the Senate will mean that House-approved veterans bills will receive more speedy and more thorough consideration than is now possible.

This does not mean that the Senate would be rushed in its deliberations on veterans matters, but only that such important measures would be given the priority which they deserve.

The chairman and members of the Senate Veterans' Affairs Committee would be powerful spokesmen for our Nation's former soldiers in arms and would insure that their interests are never neglected.

I think that the case for the creation of a permanent Senate Committee on Veterans' Affairs is a very strong one, and I was glad, therefore, for the opportunity and privilege, earlier today, of making the motion, in the Rules Committee, to favorably report for Senate action Senate Resolution 13, the chief cosponsor of which is the distinguished junior Senator from Nevada [Mr. CANNON].

I am a cosponsor of a similar resolution. I congratulate and thank the Senator from Nevada [Mr. CANNON] for his leadership in offering and promoting this legislation, and I also thank the distinguished junior Senator from North Carolina [Mr. JORDAN] for the able manner in which he has expedited the progress of this resolution as chairman of the committee which acted favorably thereon earlier today.

Mr. President, I ask unanimous consent that, at its next printing, my name be added as a cosponsor of Senate Resolution 13, to amend rule XXV of the standing rules of the Senate.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

OMNIBUS CRIME CONTROL AND
SAFE STREETS ACT OF 1967

Mr. FONG. Mr. President, according to the FBI Uniform Crime Report for 1967, the incidence of violent crimes in the United States showed a sharp increase by more than 16 percent over the 1966 figure. Murder increased by 12 percent, armed robbery by more than 33 percent, property crimes by 16 percent, and the use of firearms in aggravated assault by 22 percent. In not a single category of crime did the FBI's crime index show a decline from the previous period surveyed.

During 1966 the police in our country were able to solve only 25 percent of the serious crimes reported—a slight decrease from the national police solution rate in 1965.

Since 1960, serious crime in this country has risen by an alarming 88 percent.

America's high crime rates are tremendously costly to the national economy. The President's Commission on Law Enforcement and the Administration of Justice estimated the following losses in various categories of crime:

Crimes against property: total $1.608 billion.
Robbery, $49.4 million.
Burglary, $312.7 million.
Larceny, $196 million.
Auto theft, $63.5 million.
Arson, $100 million.
Malicious mischief, $209.8 million.
Forgery and counterfeiting, $26.2 million.
Fraud—consumer—$18.3 million.
Fraud—bad checks, swindling—$368.8 million.
Embezzlement, $200 million.
Crimes against the person—homicide, assault, and other nonfatal crimes—total $815 million.
Other crimes: total $9.620 billion.
Gambling, $7 billion.
Driving while intoxicated, $1.8 billion.
Loan sharking, $350 million.
Narcotics and other drugs, $350 million.
Abortion, $120 million.

These figures represent a staggering total of $12.043 billion.

All of these statistics underscore the need for action by the Federal Government to help local and State authorities maintain an orderly society through the effective enforcement of our laws. Federal assistance is urgently required to achieve these ends.

Mr. President, the omnibus crime bill we are now considering, S. 917, consists of four titles dealing with substantive law: Title I, on Law Enforcement Assistance; Title II, on Confessions, Eyewitness Testimony, and Habeas Corpus; Title III, on Wiretapping and Electronic Surveillance; and Title IV, on Handgun Control.

For reasons which I will subsequently spell out in this statement, I strongly favor passage of title I, and I will urge the extension of the provisions of title IV to all types of firearms—long guns and rifles, as well as handguns.

However, I am adamantly opposed to title II and, in its present form, title III. I believe these sections of the bill to be extraordinary threats to the civil liberties of every American.

TITLES II AND III THREATS TO CONSTITUTIONAL RIGHTS

Titles II and III threaten to nullify some fundamental rights of equal justice guaranteed under the Constitution to all citizens of this Nation: the rights to privacy and against unlawful searches and seizures; the right to counsel at each and every stage of the law enforcement process; and the right to full, fair, and prompt administration of criminal justice.

I view efforts to protect these constitutional guarantees a part of the continuing battle to preserve the civil rights of all Americans.

With respect to titles II and III before us, equal justice under the law will most certainly be grievously threatened by their retention in the bill.

Risk for risk, for myself, I would rather take my chance that some criminals will escape detection than that one single innocent person shall be wrongly incarcerated or executed.

Titles II and III represent, in my opinion, radical assaults on the Constitution of the United States and would open the doors to such practices as holding suspects incommunicado for an indefinite period, out of touch with friends, family, and legal counsel; arresting persons on mere suspicion; questioning suspects with third-degree tactics without arraignment and irrespective of their right against self-incrimination.

It would invalidate the recent Supreme Court rulings on line-up identifications of accused persons.

It would narrowly constrict the power of Federal courts to grant writs of habeas corpus in connection with persons in State custody.

It would authorize, under a loosely drawn court order system, widespread eavesdropping and bugging by State and local police, as well as by Federal authorities, in connection with a vast number of suspected offenses.

The great Anglo-American tradition that a man's home is his castle—our greatly valued heritage of privacy and of freedom from arbitrary intrusion by the police—would be seriously undermined.

In short, the authoritarianism of police rule would be substituted for the authority of law and the majesty of due process.

We have to choose—

Wrote Mr. Justice Holmes, dissenting in *Olmstead* v. *U.S.*, 277 U.S. 436 (1928).

And for my part, I think it is less evil that some criminals should escape than that the Government should play an ignoble role.

TITLE I—LAW ENFORCEMENT ASSISTANCE

I wholeheartedly endorse the objectives of title I of this bill. This title represents the heart of this legislation.

Its provisions may be summarized as follows:

First. Length of programs and total au-

thorization: Authorizes a 5-year program—section 512; $100,111,000 is authorized for the first year of operation, and $300 million for the second year—section 520.

Second. Administration: Establishes a three-member Law Enforcement Assistance Administration to administer all grants. The Administration is placed in the Department of Justice, under the general authority of the Attorney General. It will consist of an Administrator of Law Enforcement Assistant—level 4, $28,750/year—and two Associate Administrators of Law Enforcement Assistance—level 5, $28,000/year—section 101.

Third. Grants to States and local governments: Authorizes planning grants and action grants to be made to States and to units of general local government or combinations of such units with a population of not less than 50,000 persons—section 202, 302(a).

Fourth. Planning grants: Authorizes Federal grants to pay up to 80 percent of the cost of preparing a comprehensive law enforcement plan—section 202, 203. Twenty-five million dollars is allocated for planning grants for the first year of operation of the act—section 520(a).

Fifth. Requirements of law enforcement plans: Plans must encompass a State, unit of general local government, or combination of such units—section 303(b)(1). The Administration is directed to encourage plans that encompass entire metropolitan areas, that coordinate with other law enforcement plans and systems, and that deal with all law enforcement agencies—police, courts, and corrections—in the area encompassed by the plans—section 303(c).

Sixth. Action grants: Authorizes grants to improve and strengthen all aspects of law enforcement. Purposes specifically mentioned are: public protection, recruitment, training, public education, construction, control of organized crime, and riot control—section 302(b). Grants for riot control and control of organized crime may be up to 75 percent of the cost of particular programs. Construction grants may be up to 50 percent of the cost of such programs. Other action grants may be up to 60 percent of the cost of the program—section 302(c). Action grants may be used only to supplement State or local funds, section 302(b)(2), and may be made only to applicants whose law-enforcement plans have been approved by the administration—section 303(b); $50,000,000 is allocated for action grants for the first year of operation of the act.

Seventh. Limit on corrections, probation, parole: Not more than $10,000,000 of the funds appropriated for action grants may be used for the purposes of corrections, probation, and parole—section 520(b)(4).

Eighth. Riot control: Action grants for riot control are included as a specific purpose of such grants—section 302(b)(6). The administration is directed to give special emphasis to such grants—section 304(a). The amount of such grants may be up to 75 percent of the total cost of a particular program—section 302(c). Up to $15,000,000 of the appropriation for action grants for riot control—section 520(b)(3). More lenient

application requirements are included for riot control grants until August 31, 1968—section 304(b).

Ninth. Organized crime: Action grants to control organized crime are included as a specific purpose of such grants—section 302(b)(5). The Administration is directed to give special emphasis to such grants—section 304(a). The amount of such grants may be up to 75 percent of the total cost of a particular program—section 302(c). Up to $15,-000,000 of the appropriation for action grants may be used for grants to control organized crime—section 520(b)(2).

Tenth. Review and comment by States: State Governors and State law enforcement agencies have 60 days to comment on application for planning grants or action grants by local units—section 521.

Eleventh. Salaries: Up to one-third of any action grant may be used for the compensation of regular law enforcement personnel. However, such assistance may be used only for salary increases, and then only on a 50-percent matching basis with State or local funds. The limitation does not apply to personnel in training programs—section 302(d).

Twelfth. Public education: Action grants may be made for crime prevention programs, education programs in schools, and programs to improve public understanding of and cooperation with law enforcement agencies—section 302(b)(3). Not more than $2,500,000 may be used for such grants—section 520 (b)(1).

Thirteenth. Research: Establishes a National Institute of Law Enforcement and Criminal Justice to encourage research and development in law enforcement. The Institute is placed in the Department of Justice under the general authority of the Administration—section 402(a). The Institute is authorized to conduct research of its own, including the establishment of a central research facility, and to make research grants to public agencies and private organizations—section 402(b). Research grants may be up to 100 percent of the cost of particular projects. Up to $20,000,000 is authorized for the Institute—section 520(c).

Fourteenth. FBI training: The FBI is authorized to expand its training programs for State and local law enforcement personnel at the Federal Bureau of Investigation National Academy at Quantico, Va. The FBI is also authorized to assist in conducting field training programs for such personnel, and to conduct research of its own—section 404. $5,111,-000 is allocated for such programs—section 520(c). ·

Fifteenth. Education: Authorizes the Administration to establish programs of loans and tuition aid to law enforcement personnel—section 406. Up to $10,000,000 is authorized for such programs—section 520(c).

Loans may be up to $1,800 per year to full-time students in undergraduate or graduate programs leading to degrees in areas directly related to law enforcement. Such loans may be cancelled at the rate of 25 percent for each year of service in a law enforcement agency. The Administration is directed to give special consideration to police and correctional of-

ficers on academic leave to earn degrees—section 406(b).

Grants for tuition and fees may be up to $200 per academic quarter or $300 per semester for law enforcement officers taking courses in areas related to law enforcement. If recipients do not complete 2 years' service with their law enforcement agency after finishing such courses, the grants must be repaid—section 406(c).

Sixteenth. Allocation to States: Not more than 12 percent of the total funds appropriated under title I may be used in any one State—section 516(b).

Seventeenth. Racial imbalance: The administration is prohibited from conditioning any grant upon the adoption by a law enforcement agency of a plan to eliminate racial imbalance—section 518 (b).

Eighteenth. LEA carryover: The administration is authorized to continue projects approved under the Law Enforcement Assistance Act of 1965 prior to the effective date of S. 917—section 405.

Nineteenth. Judicial review: Establishes a procedure of administrative hearings and judicial review for cases in which applications for grants are denied or grants are discontinued—section 509-511.

Twentieth. Definition of law enforcement: Law enforcement is defined broadly to include all activities pertaining to crime prevention or reduction and the enforcement of the criminal law—section 601(a).

FEDERAL HELP NECESSARY

There are certain national objectives which are vital to every citizen of this country, and the elimination of crime is one of the foremost among these objectives. We cannot sit back and expect the existing law enforcement agencies to solve the problem without aid from Congress and from all the citizens of the United States.

Title I clearly recognizes, as it must, that law enforcement in the United States is primarily a task for our State and local governments. The Constitution of the United States confers no general police power on the Federal Government. The denial of such power is soundly predicated on the fear that a too-powerful central government will become despotic.

Our citizens have always insisted and continue to insist that police power must be dispersed among the State and local governments of the Nation, as a guarantee that no single government can begin to accumulate enough power to submerge the democratic foundations of the Republic.

This basic principle of the responsibility of State and local governments for law enforcement in the United States is firmly maintained in title I of the bill. The law enforcement assistance programs authorized by the title will remain under the direction and control of State and local law enforcement agencies.

Title I strengthens the capacity of State and local governments to solve their problems of law enforcement, and thereby eliminates any tendency toward Federal domination.

At the same time, title I recognizes that there are many problems in law enforcement and crime prevention which State and local governments cannot solve on their own.

In accord with the recommendations of the President's Commission on Law Enforcement and Administration of Justice, title I provides substantial Federal financial assistance to these governments to improve and strengthen all aspects of their systems of law enforcement and criminal justice. It will speed funds to the areas of law enforcement where the need is greatest and most immediate. It will encourage the planning, coordination, and research in law enforcement that has been so seriously lacking in the past.

The additional resources which would be available under title I both to Federal and local authorities will facilitate better training for law enforcement personnel, acquisition of modern equipment and facilities, incorporation of innovative techniques for apprehension of the lawless, and improvements in rehabilitation processes and procedures.

The proposed legislation will not solve all of the problems. No simple or easy solution is available.

It will, however, firmly commit the Federal Government to provide a role of leadership and support. Within the framework of our established and traditional separation of responsibilities, it will let all levels of Government work together to fight the common enemy—crime and lawlessness.

I believe this proposal to be a sound, imaginative approach which will make a substantial contribution to the life of our society.

TITLE II—CONFESSIONS, EYEWITNESS TESTIMONY, AND HABEAS CORPUS

However bright the promise of title I, I deplore the action of the committee in accepting title II of the bill. Title II is a dangerous affront to the Constitution of the United States. It presents a grave threat to the fundamental principles of the Nation—to our basic concepts of separation of powers, to Federal supremacy, to judicial independence—in short, to our most cherished notions of justice and the rule of law.

The provisions of title II may be summarized as follows:

First. Confessions: Makes voluntariness the sole criterion of admissibility of a confession in evidence in a Federal court, whether or not a defendant was advised of his right to silence or to counsel—section 3501 (a), (b). Also provides that a confession shall not be inadmissible in a Federal court solely because of delay between the arrest and arraignment of the defendant—section 3501(c).

Second. Eyewitness testimony: Makes eyewitness testimony that a defendant participated in a crime non-reviewable in a Federal appellate court—section 3503.

Third. Federal court jurisdiction: Abolishes the jurisdiction of the Supreme Court and other Federal courts to review a State court determination admitting a confession in evidence as voluntarily made—section 3502.

Fourth. Habeas corpus: Abolishes the habeas corpus jurisdiction of the Federal courts over State criminal convictions. Limits Federal review of Federal claims by State prisoners to appeal or certiorari—section 2256.

Thus, title II, if enacted, would—

Require Federal courts to admit confessions and eyewitness identifications into evidence even if such evidence were obtained in violation of the specific safeguards required under the Constitution by the Supreme Court in *Miranda* v. *United States* (1966) and *United States* v. *Wade* (1967);

Abolish Supreme Court jurisdiction to review State criminal cases in which confessions or eyewitness identifications have been admitted in evidence;

Abolish Federal habeas corpus jurisdiction over State criminal conviction, in disregard of article I, section 9 of the Constitution, which provides that "the privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it";

Overrule the Supreme Court's decision in *Mallory* v. *United States* (1957) and permit Federal criminal suspects to be questioned indefinitely before they are presented to a committing magistrate. Unlike the District of Columbia Crime Act, enacted in the first session of this Congress, no time limit or other safeguards on interrogations are provided.

Each of the provisions of title II is vulnerable to serious constitutional objections. Several of the provisions are almost certainly unconstitutional on their face, because they attempt to overrule by statute clear commands of the Constitution—particularly those limiting the appellate jurisdiction of the Federal High Courts and abolishing the habeas corpus jurisdiction of all Federal courts.

I had thought it settled within our Federal system that what is mandated by the Constitution may not be dismissed by legislative fiat.

CONFESSIONS—MIRANDA CASE

Moreover, the provisions of existing law that title II seeks to overturn can hardly be declared unreasonable. Under present law, prior to any questioning, a putative defendant must be warned that, first, he has the right to remain silent; second, that anything he says could be used against him in a court of law; third, that he has the right to the presence of an attorney; fourth, if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires; fifth, opportunity to exercise these rights must be given him throughout the interrogation; and, sixth, after these warnings have been given and he has been afforded these opportunities, the individual may knowingly and intelligently waive these rights and agree to answer questions or to make a statement.

These points were spelled out in the landmark decision *Miranda* v. *Arizona*, 384 U.S. 436 (1966), where the Supreme Court held that a confession made after the suspect was taken into police custody could not be used in evidence unless the above sixfold warning had been given before questioning.

As the Supreme Court pointed out in that case, this has been a long-established practice in FBI experience. The Court said:

Over the years the Federal Bureau of Investigation has compiled an exemplary record of effective law enforcement while advising any suspect or arrested person, at the outset of an interview, that he is not required to make a statement, that any statement may be used against him in court, that the individual may obtain the services of an attorney of his own choice and, more recently, that he has a right to free counsel if he is unable to pay. . . . The present pattern of warnings and respect for the rights of the individual followed as a practice by the FBI is consistent with the procedure which we delineate today. 384 U.S., at 483–484.

The FBI routinely uses a form to advise suspects of the constitutional rights to which they are entitled—and this practice was instituted even before the Miranda decision was handed down.

Under section 3501(a) of the bill, voluntariness is made the sole criterion of the admissibility of a confession in a Federal court. The section does not affect the application of Miranda to trials in State courts.

The procedure to be followed under the bill is as follows:

First. A preliminary determination of the voluntariness of a confession is made by the trial judge, outside the presence of the jury—section 3501(a).

Second. In making his preliminary determination, the trial judge is required to consider all the circumstances surrounding the confession, including the following specified factors, none of which is to be conclusive on the issue of voluntariness—section 3501(b): First, delay between arrest and arraignment of the defendant; second, whether the defendant knew the nature of his offense; third, whether the defendant was aware or advised of his right to silence or that anything he said might be used against him; fourth, whether the defendant was advised of his right to counsel; and, fifth, whether the defendant had the assistance of counsel during his interrogation and confession.

Third. If the trial judge makes a preliminary determination that a confession was voluntary, he must admit the confession in evidence—section 3501(a).

Fourth. The jury must then hear the relevant evidence on the issue of voluntariness and determine the weight to be accorded the confession—section 3501(a).

Sections 3501 (a) and (b), then, would overrule all of the Miranda standards and render them merely as guidelines to determine the admissibility and the weight to be given a confession.

It is very apparent to me that these provisions are in direct conflict with the Supreme Court's decision in the Miranda case and would most certainly be held unconstitutional. The Court made it clear that the procedural safeguards established in Miranda are in addition to the traditional voluntariness test.

Since section 3501 dispenses with these safeguards, the section is contrary to the present requirements of the Constitution.

CONFESSIONS—MALLORY CASE

In the leading case of *Mallory* v. *U.S.*, 354 U.S. 449 (1957), the Supreme Court held that if an arrested person is not tak-

en before a magistrate or other judicial officer "without unnecessary delay," as required by rule 5(a) of the Federal Rules of Criminal Procedure, any confession obtained during the period of delay is inadmissible in evidence in a Federal court. The Mallory decision was based on the Court's supervisory power over the Federal courts, rather than on the Constitution.

Section 3501(c) of the bill specifies that a confession shall not be inadmissible in evidence in a Federal court solely because of delay between arrest and arraignment of the defendant.

The Mallory decision, excluding confessions obtained during a period of unnecessary delay between arrest and arraignment, is designed to withdraw any incentive that law enforcement officers may have to delay the arraignment of a suspect.

It encourages the police to bring arrested persons promptly before a judicial officer.

The outright repeal of Mallory by section 3501(c) would leave the "without unnecessary delay" provision of rule 5 (a) of the Federal Rules of Criminal Procedure as a rule without a remedy.

Even in the recently enacted District of Columbia Crime Act, the Congress did not see fit to repeal Mallory completely, but provided a 3-hour period for interrogation, after which a person could be released without charge and without an arrest record.

Mr. President, I strongly believe that the prompt arraignment of arrested persons is necessary in a free society which values the fair administration of criminal justice.

Prolonged incarceration and interrogation of suspects without giving them the opportunity to consult family, friends, or counsel must be discouraged.

EYEWITNESS TESTIMONY—WADE CASE

In another leading case, *United States* v. *Wade,* 388 U.S. 218 (1967), the Supreme Court held that a pretrial lineup at which a defendant is exhibited to identifying witnesses is a critical stage of a criminal prosecution. As such, the defendant is constitutionally entitled to the assistance of counsel at the line-up. The requirement applies to both State and Federal courts.

Section 3503 of the bill repeals Wade and makes eyewitness testimony that a defendant participated in a crime not reviewable in any appellate Federal court.

Here, again, there is no doubt in my mind that section 3503 is unconstitutional. As it dispenses with the procedural safeguards established in Wade for police lineups, it is therefore in conflict with the requirements of the Constitution.

FEDERAL COURT JURISDICTION

Under present law, the Supreme Court has appellate jurisdiction over all cases in the lower Federal courts. The Supreme Court also has appellate jurisdiction over cases in the State courts raising a Federal question—see U.S.C. 1251 and the following.

Section 3502 of the bill removes the jurisdiction of the Supreme Court or any other Federal court to review or disturb

a State trial court's determination that a confession was voluntary—provided the State court's determination has been upheld by the highest State court having appellate jurisdiction over the case. Thus, although State courts would be required to continue to adhere to the standards set out in the Miranda case, their applications of the Miranda standards would not be reviewable in the Federal courts.

Section 3503 of the bill removes the jurisdiction of the Supreme Court and Federal court of appeals to review or disturb any ruling of a Federal or State trial court admitting eyewitness testimony in evidence. Thus, although State courts would be required to continue to apply the Wade standards, their applications of that standard are not reviewable in the Federal courts.

Sections 3502 and 3503 would curtail drastically the jurisdiction of the Supreme Court and the lower Federal courts over State and Federal court determinations involving the voluntariness of a confession or eyewitness testimony.

These provisions are particularly serious with respect to State court determinations of these issues, since no Federal review whatsoever would be available—even though a Federal claim was obviously raised.

Any attempt by Congress to accomplish these results by statute rather than by constitutional amendment raises extremely difficult constitutional questions.

Although article III, section 2 of the Constitution provides that the appellate jurisdiction of the Supreme Court is created "with such Exceptions, and under such Regulations as the Congress shall make," the exceptions and regulations clause does not give the Congress the power to abolish Supreme Court review in every case involving a particular subject, whether that subject be confessions or any other.

To interpret that clause otherwise would give the Congress the power to destroy the essential function of the Supreme Court in our Federal system.

The Supremacy Clause in article VI of the Constitution states that the Constitution and laws of the United States "shall be the Supreme Law of the Land." The Supreme Court is the only tribunal provided by the Constitution to resolve inconsistent or conflicting interpretations of Federal law by State and Federal courts, and to maintain the supremacy of Federal law against conflicting State law.

To deny the power of ultimate resolution by the Supreme Court in any area is to nullify the principal instrument for implementing the Supremacy Clause in our constitutional system. The history of the exceptions and regulations clause is in full accord with this point.

UNWISE PUBLIC POLICY

Even if it were argued that the Congress has the constitutional power to abolish Supreme Court jurisdiction by statute, such action, in my opinion, would be extremely unwise as a matter of public policy.

Abolition of Supreme Court jurisdiction would seriously distort the delicate balance that is maintained between our

three branches of Government and would greatly reduce the historic role of the High Court in our Federal system. An attempt by the Congress to abolish the traditional power of judicial review by the Federal Courts over constitutional issues in a particular area would set an extremely bad precedent that could only have dangerous ramifications in other areas—since there would be nothing to prevent Congress from enacting similar legislation whenever the Court handed down a decision with which Congress disagreed.

Sections 3502 and 3503 are thus far more serious attacks on the Supreme Court than the ill-conceived Court-packing plan of the 1930's.

The exercise by the Congress of an ultimate power such as abolition of Supreme Court jurisdiction would precipitate a constitutional crisis of the most critical proportions.

Long experience has shown that the Federal courts, and especially the Supreme Court, perform an important and useful function in reviewing State criminal convictions in the area of confessions. A long line of confessions cases in the Supreme Court, extending back many years before the present controversy over Miranda and Wade, points up the fact that there have been numerous occasions when State courts have not effectively protected the constitutional rights of accused persons.

Moreover, by abolishing the appellate jurisdiction of the Federal courts, Congress would reduce the Constitution to a hodgepodge of inconsistent decisions by making 50 State courts and 94 Federal district courts final arbiters of the meaning of the various provisions of the Constitution.

The mere necessity of uniformity in the interpretation of the national laws decides the question—

Wrote Hamilton in the Federalist, No. 80.

Thirteen independent courts of final jurisdiction over the same causes, arising upon the same laws, is a hydra in government, from which nothing but contradiction and confusion can proceed.

HABEAS CORPUS JURISDICTION

Under existing Federal law, the Supreme Court and the Federal district courts have jurisdiction to issue writs of habeas corpus where a prisoner is in State custody in violation of the Constitution or laws of the United States—28 U.S.C. 2241. In addition, nearly all States have laws providing collateral remedies for convicted persons.

Claims of denials of Federal rights by State prisoners must be heard on the merits and resolved. If appropriate disposition is not reached in the State courts, the Federal courts are available as an alternative forum through habeas corpus, unless the prisoner has deliberately bypassed or failed to exhaust an available State remedy.

Section 2256 of the bill would remove the habeas corpus jurisdiction of both Federal and State courts with respect to State criminal convictions. The sole Federal review of Federal claims by State prisoners would be limited to appeal or petition for certiorari to the Supreme

Court from the highest State court having appellate jurisdiction over the case.

Mr. President, this provision is in square conflict with a very specific constitutional command. Article I, section 9, clause 2 authorizes suspension of the writ of habeas corpus "when in cases of rebellion or invasion the public safety may require it."

Since 1867, Congress has made the Federal writ of habeas corpus available to all persons, including State prisoners, restrained of their liberty in violation of the Constitution or laws of the United States. The constitutional provision prohibiting the suspension of the writ does not itself confer jurisdiction on any court to issue the writ. However, once Congress has granted jurisdiction to the Federal courts to issue the writ, the jurisdiction cannot be withdrawn except in cases of rebellion or invasion.

### TITLE II CANNOT STAND

Mr. President, existing law is designed to assure that confessions are voluntary, that lineups are fair, that arraignments are prompt, and that defendants receive a full and fair hearing of their Federal claims in a Federal court.

Unless we are to reject these principles, title II cannot stand.

### TITLE III—WIRETAPPING AND ELECTRONIC SURVEILLANCE

I must also respectfully interpose serious constitutional and policy objections to title III of the bill. Title III, in the form proposed by the administration as S. 928, was properly described as the Right to Privacy Act. As accepted by the committee, title III is more appropriately described as the End to Privacy Act.

No one would deny that there does exist an urgent need for Federal legislation in this area, because of the extremely confused state of existing law on wiretapping and electronic surveillance.

This may be briefly summarized in chronological order as follows:

First, 1928: The tapping of telephone wires and use of intercepted messages did not constitute an unreasonable search and seizure under the fourth amendment, because no trespass into constitutionally protected areas and no seizures of anything tangible—*Olmstead* v. *United States,* 277 U.S. 438.

Second, 1934: Section 605, Federal Communications Act:

No person, not being authorized by the sender, shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person.

Third, 1937: Wiretapped evidence obtained in violation of section 605 held inadmissible in Federal courts; ruling based not on constitutional grounds, but on Supreme Court's supervisory powers over Federal courts and officers. *Nardone* v. *United States,* 302 U.S. 379.

Fourth, 1939: In the second *Nardone* case (308 U.S. 338), held, that section 605 bars not only evidence obtained directly by wiretapping, but also evidence obtained by use of leads secured by wiretapping—the so-called "fruit of the poisonous tree" doctrine.

Fifth, 1939: Held, that section 605 prohibited the interception and divulgence of intrastate as well as interstate calls. *Weiss* v. *United States,* 308 U.S. 321.

Sixth, 1942: Held, that only a party to a tapped conversation has standing to object to the use of evidence so obtained (*Goldstein* v. *United States,* 316 U.S. 114); and section 605 not violated when police officers listened in on telephone from an extension with the permission of one party to the conversation (*Rathborn* v. *United States,* 355 U.S. 107s (1957)).

Seventh, 1941: Justice Department, interpreting section 605, ruled that a violation of section 605 required both interception and divulgence outside the Government; so that Government agents could wiretap and bug so long as the Federal Government did not divulge the information in courts.

This interpretation effectively emasculated section 605, opening the door to Federal law enforcement wiretapping and bugging. With Federal officers wiretapping and bugging, the Justice Department could not and has not prosecuted State or local officers, even when these State and local officers have publicly violated section 605 by divulging wiretapped and bugged evidence in court. This same attitude is taken with respect to the prosecution of private wiretappers—so that only a handful have been prosecuted since 1934.

Eighth, 1952: Held, that, although it was a Federal crime for State officers to divulge wiretapped evidence, section 605 did not render such evidence inadmissible in State courts (*Schwartz* v. *Texas,* 344 U.S. 199). However, such evidence obtained by State officers under sanction of State law was not admissible in Federal courts (*Benanti* v. *United States,* 355 U.S. 96 (1957)).

Ninth, 1961: In the area of bugging, the Supreme Court has held that evidence obtained by electronic devices becomes inadmissible only where there has been an unauthorized physical invasion of the defendant's premises (*Goldman* v. *United States,* 316 U.S. 129 (1942)).

Another variance of this ruling is that an informer can be wired for sound to transmit a suspect's statements to officers with a receiver (*On Lee* v. *United States,* 343 U.S. 747 (1953)); no constitutional rights violated if a Federal agent concealed a small tape recorder on his person and recorded statements of the suspect who knew the interrogator was an agent but did not know he was "bugged" (*Lopez* v. *United States,* 373 U.S. 427 (1963)).

Tenth. No uniformity on the State level. Most States have "malicious mischief" statutes to protect the property of telephone companies, but not all of these laws are broad enough to cover illegal wiretapping that does not involve physical damage to the lines of communication. Eight States have no law whatever. Forty-two have laws on lines of communication, all of them weak and ineffective. Only four States have provisions for court-issued warrants for wiretapping and electronic surveillance—also, all of them weak and ineffective.

This thumbnail sketch shows very clearly that under present law almost unlimited wiretapping and electronic surveillance and the disclosure of intercepted communications is allowed. Restrictions exist only with respect to the question of admissibility as evidence in all Federal and some State courts.

### TITLE III PROVISIONS

The provision of title III may be summarized as follows:

First, Wiretapping and eavesdropping by private persons: Prohibits the interception of wire or oral communications unless a party to the communication has consented to the interception. It prohibits the disclosure or use of illegally intercepted communications. Penalty for violation is $10,000/5 years—section 2511.

Second, Wiretapping and eavesdropping devices: Prohibits the manufacture, distribution, sale, possession, or advertising of devices whose design "renders them primarily useful for the purpose of the surreptitious interception of wire or oral communication." Prohibition is applicable to spike mike, infinity transmitter, martini olive transmitter, fountain pen microphone, and so forth, but not to legitimate electronics equipment, whether miniature or otherwise. Prohibits the advertising of any other device promoting use of the device for electronic surveillance. Penalty for violation is $10,000/5 years—section 2512.

Third, Forfeiture: Provides for forfeiture of devices used, manufactured, distributed, sold, possessed, or advertised in violation of the act—section 2513.

Fourth, Immunity: Authorizes a U.S. attorney, with the approval of the Attorney General, to grant immunity to a witness to compel testimony in any case involving a violation of the act, or involving a violation of any of the offenses for which Federal warrants for electronic surveillance may be issued—see item 5, infra—section 2514.

Fifth, Offenses for which Federal orders may be issued: The Attorney General or an Assistant Attorney General may apply for a surveillance order to investigate any of the following Federal offenses (sec. 2516(1)): espionage, sabotage, treason, murder, kidnaping, robbery, extortion, counterfeiting, bribery, sports bribery, gambling, bankruptcy fraud, narcotics, marihuana, dangerous drugs, obstruction of justice, Presidential assassination, kidnaping, and assault; labor racketeering, labor embezzlement, interstate transportation aid of racketeering, interstate transportation of stolen property, and conspiracy to commit any of the foregoing offenses.

Sixth, Offenses for which State orders may be issued: The principal prosecutor of a State or local government may, if authorized by a State statute, apply for a surveillance order to investigate murder, kidnaping, robbery, gambling, bribery, extortion, narcotics, marihuana, dangerous drugs, or other crime dangerous to life, limb, or property and punishable by imprisonment for more than 1 year. The offense must, however, be specified in a State statute authorizing such surveillance—section 2516(2).

Seventh, Requirements of Federal and State surveillance orders: The issuing judge must have probable cause for belief that, first, a particular offense has been, is being, or is about to be, committed, and second, particular communications re-

lating to the offense will be overheard. The judge must also find that normal investigative procedures have been tried and failed, are unlikely to succeed if tried, or are too dangerous—section 2518(3).

Eighth. Issuing judges: Judges of Federal district courts and Federal courts of appeals are authorized to issue surveillance orders—section 2510(9)(a). Judges of State courts of general criminal jurisdiction may issue surveillance orders, but only if they are authorized to do so by a State statute—section 2510(9)(b).

Ninth. Persons authorized to execute orders: A Federal order may be executed only by the FBI or by the Federal agency having responsibility for investigating the offense named in the order. A State order may be executed only by investigative or law-enforcement officers having responsibility for investigating the offense named in the order—section 2516 (1), (2).

Tenth. Evidence of other crimes: Evidence of crimes not named in a surveillance order may not be introduced in evidence unless judicial approval is obtained subsequent to the interception—section 2517(5).

Eleventh. Length of surveillance: An order may be issued for a period no longer than necessary to achieve its objective, and in any event no longer than 30 days—section 2518(5). The judge may require progress reports during the interception—section 2518(6).

Twelfth. Extensions of an order: Extensions of a surveillance order may be granted only upon a fresh showing of probable cause—section 2518(5).

Thirteenth. Emergency surveillance: In certain emergency situations, specially designated investigative or law-enforcement officers may intercept communications without a surveillance order. An application for a judicial order approving the interception must be filed within 48 hours—section 2518(7).

Fourteenth. Recording: Intercepted communications must be recorded if possible and sealed with the issuing judge. Applications and orders must also be sealed with the judge—section 2518(8) (a).

Fifteenth. Notice: Persons named in an order must be notified of the surveillance no later than 90 days after the termination of the interception. Notice may be postponed upon a showing of good cause before a judge—section 2518 (8)(b).

Sixteenth. Exclusionary rule: Unlawfully intercepted communications are excluded from evidence in any Federal or State court, grand jury, administrative, or legislative proceeding—section 2515.

Seventeenth. Motion to suppress: The parties to an intercepted communication or the person against whom the interception was directed may challenge the validity of a surveillance order. The Government may appeal from an order granting a motion to suppress—section 2518(10).

Eighteenth. Reports by judges: The issuing judge must file a report with the administrative office of the U.S. courts within 30 days after the expiration of a surveillance order. The report

must identify the officer or agency applying for the order, the offense named in the order, the length of the surveillance period, and the type of facilities involved in the interception—section 2519(1).

Nineteenth. Reports by prosecutors must file reports in January of each year with the administrative office of the U.S. courts. The reports must include the same information required in judges' reports, as well as information on the number of arrests, trials, and convictions resulting from the interceptions, the utility of the interceptions, the frequency of incriminating and innocent conversations overheard, and the manpower used in the interception—section 2519(2).

Twentieth. Reports by administrative office: The administrative office of the U.S. courts must file reports in April of each year with Congress summarizing and analyzing the reports filed with the office by judges and prosecutors—section 2519(3).

Twenty-first. Civil remedy: Parties to an unlawfully intercepted communication have a civil cause of action against any person who intercepts, discloses, or uses the communication. The parties may recover actual and punitive damages, a reasonable attorney's fee, and other costs of litigation. Liquidated damages are provided of not less than $100 per day during the interception or $1,000, whichever is higher. Good faith reliance on a court order or the emergency surveillance procedure is made a complete defense to a civil action—section 2520.

Twenty-second. National security. The act does not limit the constitutional power of the President to protect the Nation against hostile acts of a foreign power or any other clear and present danger to the structure or existence of the Government. Communications intercepted in exercise of the national security power may be introduced in evidence only if the interception was reasonable—section 2511(3).

Twenty-third. Section 605: Section 605 of the Communications Act of 1934 is amended to restrict its application to the unauthorized interception of radio communications. Under present law, section 605 is also applicable to wire communications, but these will be covered by S. 917.

THE RIGHT TO PRIVACY: CONSTITUTIONAL GUARANTEE

As Senators debate and thoroughly examine every aspect of these provisions, we are constantly reminded that the right of privacy, the right to be left alone, and the right against unreasonable searches and seizures—the right, that is, to be personally secure—are among the most highly valued rights of an American citizen.

As Mr. Justice Brandeis pointed out:

The makers of our Constitution . . . sought to protect Americans in their beliefs, their thoughts, their emotions, and their sensations. They conferred as against the Government the right to be let alone—the most comprehensive of the rights of man and the right most valued by civilized man.

These guarantees have been a part of Anglo-Saxon law ever since the 15th century. Nothing has been deemed more

fundamental to freedom than the concept that a man's home is his castle. William Pitt put it in these eloquent words:

The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter, the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement.

Wiretapping and electronic surveillance are enormously dangerous practices, precisely because they present an extraordinary threat to these individual liberties.

Modern electronic devices can penetrate the privacy of every home and office; without tapping any wire, without a key being turned or a window raised, transistorized instruments can be used to overhear and record the most intimate and private conversations—the exchange of confidences between husband and wife, between business partners, between employer and employees, between sweethearts.

Whether or not the protection of the Constitution applies in a particular instance does not, as the Supreme Court recently pointed out, turn on whether the site of the intrusion is a "constitutionally protected area." What a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the fourth amendment," the Court said.

Wiretapping and eavesdropping cannot, by their very natures, be limited to a particular person, place, or purpose. They are unlimited and unlimitable. Whenever a tap is placed on a telephone, for example, it monitors all conversations on that telephone, and every phone in the world which may be connected with it.

Of course, all Americans are concerned that those who violate the law are apprehended and convicted. But the question is: To what extent should wiretapping and electronic surveillance be made legal? And, to that extent, is the price we must pay in terms of the loss of personal liberty too high a price?

Mr. President, we must be very clear on one thing: what is at stake in any proposal to legalize wiretapping and eavesdropping is our very freedom embodied in those liberties inalienably guaranteed us by the Constitution.

In a democratic society privacy of communication is absolutely essential if citizens are to think and act creatively and constructively. Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas.

When we open this door of privacy to the Government—when the door is widely agape—as Alan Barth rightly points out, it is only a very short step to allowing the Government to rifle our mails and search our homes. A nation which countenances these practices soon ceases to be free.

12296 CONGRESSIONAL RECORD — SENATE *May 8, 1968*

PRESENT LEGAL STATUS INTOLERABLE

The chaotic conditions presently existing in this area, however, serve neither the interests of individual liberty nor the legitimate needs of law enforcement; they can no longer be tolerated.

Wholesale violations of existing law by individuals and law-enforcement agencies across the country must cease.

The virtual absence of any regulation of eavesdropping, in the face of its increasing prevalence and the exploding technology in the area must be remedied.

The confusing hodgepodge of standards under the State laws must be clarified.

New legislation is, therefore, an urgent necessity under which wiretapping and eavesdropping would be narrowly confined and stringently controlled, under uniform standards and precisely defined circumstances.

But, in my estimation, title III does not fill this bill.

If ever there were a case of putting out a fire by the deluge of the Pacific Ocean, title III is it. On the chance that by wiretapping and eavesdropping, the police will monitor and record the plotting of a crime, the instant bill would allow the police to put a virtual end to privacy in America.

To me, the sacrifice is altogether out of proportion to the gain.

To be sure, title III has incorporated, substantially verbatim, many of the provisions of S. 928, which I cosponsored.

I also strongly endorse the portions of title III concerned with protecting the individual from electronic invasions of his privacy by private persons.

I approve, too, of the excellent prohibitions on the manufacture, shipment, or advertising of electronic surveillance devices. If we are to make substantial progress toward protecting individual privacy, we must sharply curtail the supply of the nefarious devices that are so easily obtained in the market today.

TITLE III GOES TOO FAR

But these protections are scant compensation for the grave threat to privacy engendered by the permissive provisions in the remainder of title III. Police-conducted invasions of privacy are authorized to investigate a vast range of Federal or State crimes. Section 2516(1) offers a shopping list of crimes for which Federal warrants may be issued that is far too broad to be reconciled with any legitimate law-enforcement purpose. And the provisions of Section 2516(2) gives carte blanche to State and local police to engage in wiretapping and eavesdropping for any felony whatsoever.

So long as a willing judge is found to issue a surveillance warrant, there is no bar to massive electronic surveillance by the police at every level—Federal, State, or local. The statutory requirement of a judicial warrant is simply inadequate to protect the precious right of the individual to privacy. The ease with which some judges now rubber stamp conventional search warrants is notorious. No doubt, the vast majority of judges will take great care to make proper findings before issuing surveillance warrants. We shall inevitably find, however, that law-enforcement officers in search of surveil-

lance warrants will seek out the judges who are less exacting or less cautious in their dispensation.

There are at least three other significant loopholes in the court-order system. Tapping and bugging can be conducted for 48 hours without having to secure prior judicial authorization.

The President or his designee may authorize tapping and bugging without a court order in cases other than national security, possibly including political situations.

The definitions of the terms "intercept" and "devices" are so loosely drawn, that all law enforcement officers would appear to be exempt from the provisions requiring judicial control.

Section 2815(5) of the bill allows a Court order to be issued authorizing wiretapping and eavesdropping for as long a period "as is necessary to achieve the objective of the authorization." The only limitation the issuance of open ended surveillance orders is that if an order is issued for a period longer than 30 days, progress reports must be made to the issuing judge at 30-day intervals—section 2518(6). The bill thus contemplates surveillance periods of 60 days, 90 days, or even longer.

Equally serious, the section is likely to be read as inviting the routine issuance of surveillance orders for 30-day periods.

A most serious constitutional objection may be raised against this provision, particularly in the light of two leading cases recently handed down by the Supreme Court—*Berger* v. *New York*, 388 U.S. 41 (1967), and *Katz* v. *United States*—U.S.—(1967).

In the Berger case, the Court held invalid a New York statute authorizing the issuance of surveillance orders for 2-month periods. The opinion of Mr. Justice Clark for the Court sharply criticized the lengthy surveillance period on three separate grounds:

First, authorization of electronic surveillance for the long period is equivalent to a series of intrusions over the entire period pursuant to a single showing of probable cause.

Second, the long surveillance period effectively avoids the requirement of prompt execution of the order, a requirement applicable under existing law in the case of conventional search warrants.

Third, the conversations of any and all persons coming into the area are recorded indiscriminately during the entire surveillance period, without regard to their connection to the crime under investigation.

On the other hand, the surveillance in the Katz case was extremely precise and discriminate, involving the recording by FBI agents of the subject's conversations from a public telephone booth, averaging about 3 minutes each day over a 7-day period. So that in this case a surveillance order could have been issued pinpointing the conversations to be seized within minutes of their occurrence.

At the very least, then, Berger and Katz strongly suggest that the period of surveillance must be brief. Even under a generous reading of the Court's decisions, 15 to 30 days would, in all likelihood, represent the outer limit for a reasonably statutory period.

By authorizing monitoring of the most dragnet character and in the most indiscriminate manner for unlimited periods of time, title III flouts the Court's clear intention to limit official surveillance as a form of search to plainly specified times, places, and objectives—in the same way that a search for some physical object is limited.

Although paragraph 3 of section 2517 prohibits the disclosure of law-enforcement officers of illegally intercepted communications in criminal trials or grand jury proceedings, paragraphs 1 and 2 make clear that such communications may be disclosed or used for a host of other purposes.

Under paragraphs 1 and 2, any investigative or law-enforcement officer may disclose the contents of intercepted communications to another officer if the disclosure is in the performance of his duties; any officer having knowledge of such authorized intercepted communication may use it in the proper discharge of his official duties; and any other person who has knowledge of such interceptions may disclose its contents while testifying under oath in any Federal or State criminal or grand jury proceeding.

I do not believe that such license is either wise or desirable. Indeed, it is likely to encourage illegal electronic surveillance, especially in cases where parties to a communication are not the real objects of the surveillance.

Section 2517(2), moreover, contains very inadequate restrictions on the State offenses for which surveillance orders may be issued. Although the bill specifies a range of serious Federal offenses for which a court order may be issued, the categories of State offenses if open ended and includes any crime "punishable by not less than 1 year" in prison.

In many States, minor offenses carry a maximum penalty of 1 year's imprisonment and would thus qualify as offenses for which surveillance orders could be issued.

This provision invites eavesdropping in all manner of crime, trivial as well as serious. It would allow the cloak of judicial authorization to be thrown about the police by State judges as well as Federal. The practical effect of all this is to render official eavesdropping very nearly universal.

I oppose the enactment of any permissive electronic surveillance legislation at the present time. I especially regret the action of the committee in tying such legislation to the crucially important provisions of the law enforcement assistance program in title I of the bill.

At the same time, however, I recognize that there may be areas of law enforcement in which some police eavesdropping and wiretapping may eventually be shown to be necessary. In matters of national security, for example, electronic surveillance may be essential because the stakes involved are so high.

In matters involving organized crime, electronic surveillance may be essential because of the shroud of secrecy that organized crime can and does command to the death.

I cannot believe, however, that such surveillance is needed in the investiga-

tion of the myriad other Federal and State crimes for which warrants are authorized under the bill. If title III is to be enacted in some form, I urge Congress to limit the use of surveillance to the narrow areas of national security and hard-core organized crime, and even then to allow such surveillance to be conducted only by the Federal Bureau of Investigation.

### TO COMBAT ORGANIZED CRIME

The President's Commission on Law Enforcement and the Administration of Justice, in its report on organized crime, stated as follows:

> The great majority of law enforcement officials believe that the evidence necessary to bring criminal sanctions to bear consistently on the higher echelons of organized crime will not be obtained without the aid of electronic surveillance techniques.

The report went on to say that communication is essential to members of the underworld who operate their enterprises. For, in organized crime enterprises, the possibility of loss or seizure of an incriminating document demands a minimum of written communication.

Furthermore, because of the varied character of organized criminal enterprises, the large numbers of persons employed in them, and often the great distances separating elements of the national—or international—organization, the telephone remains the primary vehicle for communication.

I firmly believe, however, that, if authority to bug and tap hard-core organized crime is given, it must be granted only with very stringent limitations.

As I mentioned previously, it should be granted only to the FBI. As hard-core organized crime is national and even international, and as the FBI is the primary investigative agency dealing with this problem, there is no basis whatever to extend this authority to the States.

There should be a court-order system under which the order is to be obtained from the Chief Judge of the U.S. District Court or such judge as the Chief Judge shall designate, as the Chief Judge of the U.S. Courts of Appeals or such judge as the Chief Judge of the U.S. Court of Appeals shall designate. I advance this suggestion to restrict the possibility of judge shopping.

As suggested in the Berger case, applications to the court should be required to describe with particularity the conversations sought. The High Court said in that case that failure to do so "gives the officer a roving commission to seize any and all conversations. As with general warrants this leaves too much to the discretion of the officer executing the order."

There should be required in the applications also a showing that the normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried, or to be too dangerous.

The thought underlying this requirement is that wiretapping and eavesdropping should not be used unless absolutely necessary.

However, it should be specified that a mere "boiler plate recital" of the statutory language will not satisfy this re-

quirement. A description, with particulars, of efforts that have been made to obtain evidence without wiretapping and eavesdropping, and a reasoned justification of the need for using such methods, should be included in the applications.

Finally, the initial period of validity should be quite short, as required by the Berger case—perhaps a week at the most. Extensions of similar duration should be granted only upon a renewed showing of probable cause, on new motion papers.

I would further urge that papers for a renewal order should set forth some evidence beyond that contained in the original papers, particularly since the anticipated conversations to be intercepted should be described with particularity.

### NEW, UNTESTED AREA

In this very new and relatively untested area, I feel strongly that we should proceed with great caution, resolving doubts generally in favor of restriction and privacy—unless a strong case is made to the contrary.

The truth is that wiretapping and eavesdropping are law-enforcement weapons whose value and impact are as yet dimly perceived. At the present time, we can only speculate on the burdens and benefits involved. In our present state of knowledge, we simply ought not to create a blanket authorization for the wholesale use of such an ultimate weapon.

I am fearful that if these wiretapping and eavesdropping practices are allowed to continue on a widespread scale, we will soon become a nation in fear—a police state.

Further, if title III is to be enacted, I urge that its permissive provisions be limited to a life of 5 years. If wiretapping and eavesdropping prove in actual experience to be useful, and their cost is not too great, then Congress, I am sure, will not hesitate to make the legislation permanent. In light of the tremendously advanced state of technology today, with its vast potential for invasion of privacy, we owe it to each individual American citizen to require this second look at title III before it passes with finality into the statute books.

I also respectfully suggest that title III be amended to include a requirement that a national commission be appointed to study the results of electronic surveillance carried out under the bill, and to report to Congress on whether the legislation has been effective.

In this manner, the judgment of Congress on this basic issue will be as fully informed as possible. The right to privacy is deeply valued by our society. It deserves no less.

### AMENDMENT NO. 747

Mr. President, I now introduce, for myself, the distinguished senior Senator from Michigan [Mr. HART], and the distinguished Senator from Missouri [Mr. LONG], an amendment to title III of the bill covering the points I have just raised:

First. Limitation on use of electronic surveillance to organized crime cases.

Second. Elimination of wiretapping and eavesdropping by State officers.

Third. Limitation on wiretapping and eavesdropping to FBI officers.

Fourth. Limitation on judges who may

issue warrants for wiretapping and eavesdropping.

Fifth. Limitation on period of surveillance to 7 days.

Sixth. Termination of title III after 5 years.

Seventh. National commission.

I ask that the text of the amendment be printed at this point in the RECORD.

The PRESIDING OFFICER (Mr. BYRD of Virginia in the chair). The amendment will be received and printed, and will lie on the table; and, without objection, the amendment will be printed in the RECORD.

The amendment (No. 747) is as follows:

On page 62, line 5, immediately after "interception", insert "is directly related to an investigation of organized crime and".

On page 67, line 22, strike out the period and insert a semicolon and the word "and".

On page 67, between lines 22 and 23, insert the following:

"(f) the relation of the application to an investigation of organized crime."

On page 53, line 7, strike out the period and insert a semicolon and the word "and".

On page 53, between lines 7 and 8, insert the following:

"(12) 'organized crime' means the unlawful activities of the members of a highly organized, disciplined association engaged in supplying illegal goods and services, including but not limited to gambling, prostitution, loan sharking, narcotics, labor racketeering, and other unlawful activities of members of such organizations."

On page 51, beginning with line 3, strike out all through line 6.

On page 52, line 3, beginning with the first "or", strike out all through the comma on line 9.

On page 58, line 19, beginning with the second comma, strike out all through the comma on line 20.

On page 61, line 17, strike out the following: "a State, or a political subdivision thereof".

On page 63, beginning with line 17, strike out all through line 11 on page 64.

On page 70, line 20, beginning with "or", strike out all through "State" on line 22.

On page 76, line 12, beginning with "or", strike out all through the comma on line 14.

On page 62, line 3, beginning with the comma, strike out all through the comma on line 5.

On page 52, beginning with line 20, strike out all through line 25 and insert in lieu thereof the following:

"(a) the chief judge of a United States district court or such judge as he may designate, or the chief judge of a United States court of appeals or such judge as he may designate;".

On page 69, line 22, strike out "thirty" and insert "seven".

On page 70, line 4, strike out "thirty" and insert "seven".

On page 70, line 10, strike out "thirty" and insert "seven".

On page 80, between lines 14 and 15, insert the following:

"SEC. 804. (a) Except as provided in subsection (b) of this section, upon the expiration of the fifth year following the date of the enactment of this Act, section 2514 and sections 2516 through 2518 of title 18, United States Code, shall have no force or effect.

"(b) During the eighteen-month period beginning on the expiration of the fifth year following the date of the enactment of this Act—

"(1) the provisions of section 2514 of title 18, United States Code (relating to immunity of witnesses) shall apply with respect to cases or proceedings before any grand jury or court of the United States involving any violation of chapter 119 of such title (or any

conspiracy to violate such chapter) which occurred prior to the expiration of such year;

"(2) the provisions of section 2517 of title 18, United States Code (relating to authorization for disclosure and use of intercepted wire or oral communications) shall apply with respect to wire or oral communications intercepted prior to the expiration of such year; and

"(3) the provisions of paragraphs (8), (9), and (10) of section 2518 of title 18, United States Code, shall apply with respect to wire and oral communications intercepted prior to the expiration of such year.

"SEC. 805. (a) Within three years after the date of this Act, there shall be established a National Commission on Electronic Surveillance.

"(b) The Commission shall be composed of:

"(1) three Members of the Senate appointed by the President of the Senate,

"(2) three Members of the House of Representatives appointed by the Speaker of the House of Representatives,

"(3) three Members appointed by the President of the United States, one of whom shall be the Attorney General of the United States, whom he shall designate as Chairman, and

"(4) one United States circuit judge and two United States district judges appointed by the Chief Justice of the United States.

"At no time shall more than two of the members appointed under paragraph (1), paragraph (2), or paragraph (3) be persons who are members of the same political party.

"Any vacancy in the Commission shall not affect its powers but shall be filled in the same manner in which the original appointment was made, and subject to the same limitations with respect to party affiliations as the original appointment was made.

"Seven members shall constitute a quorum, but a lesser number may conduct hearings.

"(c) The Commission shall make a full and complete review and study of the operation of the provisions of this title, for the purpose of recommending to the Congress legislation for the amendment, revision, or repeal of such provisions, and such other changes as the Commission may feel will serve the interests of law enforcement, the administration of criminal justice, and the right of privacy.

"(d) (1) A member of the Commission who is a Member of Congress, in the executive branch of the Government, or a judge shall serve without additional compensation, but shall be reimbursed for travel, subsistence, and other necessary expenses incurred in the performance of duties vested in the Commission.

"(2) A member of the Commission from private life shall receive $75 per diem when engaged in the actual performance of duties vested in the Commission, plus reimbursement for travel, subsistence, and other necessary expenses incurred in the performance of such duties.

"(e) (1) The Director of the Commission shall be appointed by the Commission without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and may be paid without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates.

"(2) The Director shall serve as the Commission's reporter, and, subject to the direction of the Commission, shall supervise the activities of persons employed under the Commission, the preparation of reports, and shall perform such other duties as may be assigned him within the scope of the functions of the Commission.

"(3) Within the limits of funds appropriated for such purpose, individuals may be employed by the Commission for service with the Commission staff without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and may be paid without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates.

"(4) The Chairman of the Commission is authorized to obtain the services of experts and consultants in accordance with section 3109 of title 5, United States Code.

"(f) (1) There is hereby established a committee of fifteen members to be known as the Advisory Committee on Electronic Surveillance (hereinafter referred to as the 'Advisory Committee'), to advise and consult with the Commission. The Advisory Committee shall be appointed by the Commission and shall include lawyers, businessmen, and persons from other segments of life in the United States competent to provide advice for the Commission.

"(2) Members of the Advisory Committee shall not be deemed to be officers or employees of the United States by virtue of such service and shall receive no compensation, but shall be reimbursed for travel, subsistence, and other necessary expenses incurred by them by virtue of such service to the Commission.

"(g) The Commission is authorized to request from any department, agency, or independent instrumentality of the Federal Government or any State or local government any information and assistance it deems necessary to carry out its functions under this section and each such department, agency, and instrumentality is authorized to cooperate with the Commission and, to the extent permitted by law, to furnish such information and assistance to the Commission upon request made by the Chairman or any other member when acting as Chairman.

"(h) The Commission shall submit interim reports to the President and the Congress at such times as the Commission may deem appropriate, and in any event within five years after the date of this Act, and shall submit its final report within six years after the date of this Act. The Commission shall cease to exist sixty days after the date of the submission of its final report.

"(i) The General Services Administration shall provide administrative services for the Commission on a reimbursable basis.

"(j) There are hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts, not to exceed a total of $500,000, as may be necessary to carry out the provisions of this section."

## TITLE IV—HANDGUN CONTROL

Mr. FONG. Mr. President, all citizens of the United States are aware of the danger presented by the possession of firearms by irresponsible and criminal members of our society. We have nothing to fear from the possession of firearms by responsible citizens in the pursuit of the legitimate goals of recreation or self-protection.

However, as I have repeatedly pointed out in the past, we must prevent indiscriminate purchase of weapons and control their use, so that our citizens are protected from their unlawful and destructive use.

As approved by the committee, title IV contains the following provisions:

First. Prohibits the interstate mail order sale of handguns except between federally licensed dealers.

Second. Prohibits the over-the-counter sale of handguns to persons not residing in the State in which the dealer's place of business is located.

Third. Prohibits a Federal dealer from selling a handgun to a person under 21 years of age.

Fourth. Prohibits a Federal dealer from selling a firearm to a person who the licensee believes is prohibited by State or local law from receiving or possessing a firearm. Rifles and shotguns are included in the definition of "firearm."

Fifth. Provides higher standards for obtaining Federal firearms dealer licenses and increases the licensing fees for dealers, importers, and manufacturers.

Sixth. Regulates the importation of firearms into the United States by excluding surplus military handguns and rifles and shotguns not suitable for sporting purposes.

Seventh. Prohibits the sale of destructive devices—antitank guns, bombs, grenades—machineguns and sawed-off rifles and shotguns unless the dealer has a sworn statement from the purchaser's local law enforcement officer stating that no law would be violated by such person's possession.

Eighth. Prohibits the interstate transportation of destructive devices, machineguns, and sawed-off rifles and shotguns in interstate commerce except between licensed dealers or as authorized by the Treasury Secretary.

Ninth. Prohibits the transportation or receipt in interstate commerce of a firearm—including rifles and shotguns—knowing a felony is to be committed with it.

### TITLE IV VERY INADEQUATE

Although this title represents the first step to effective Federal gun control legislation and has my support, I strongly believe that it is entirely inadequate. By limiting its coverage only to handguns and excluding rifles and long guns, title IV falls far short of the strong and effective firearms control legislation so urgently required to control crime.

These weapons, accounting for approximately 30 percent of all homicides in this country, would still be freely available in every State of the Union.

As it now stands, title IV would prohibit primarily the interstate mail order sale of pistols, thus controlling a relatively easy method of illegal supply to buyers in States with law against unlicensed handgun ownership.

The title also would limit but not prohibit over-the-counter pistol transactions by forbidding sales to nonresidents of the States in which the purchase was made. It would make gun dealers criminally liable for sales in violation of Federal or State laws.

The bill would affect long guns in only two ways. First, it would authorize the Treasury Department to control imports of weapons not suitable for sporting purposes. Second, it would prohibit the sale of any handgun or long gun in violation of the law of the State where the sale is made, or which the seller knows will be used in a felony.

In no way does the bill inconvenience hunters and sportsmen. But it does frustrate the juvenile, the felons, and the fugitives who today can, with anonymity and impunity, buy handguns by mail and in States with lax firearms control laws, regardless of the law of their own State.

Title IV represents the least Congress can do to meet the pressing public inter-

*May 8, 1968*          CONGRESSIONAL RECORD — SENATE          **12299**

est to protect against unrestricted gun traffic in this country. If just this much firearms regulatory legislation is ultimately enacted, it will be the first time in 30 years that any such significant law has been adopted.

But it is not nearly enough.

As one who has, since 1963, urged the adoption of a strong, comprehensive gun control law, I consider the provisions contained in S. 1, to control the indiscriminate sale of all firearms—rifles as well as handguns—as being the first effective step in that direction.

S. 1 would limit the number of firearms in the possession of minors and persons with serious criminal records. It would limit the mail order sale of all firearms in interstate commerce, unless the purchaser is positively identified.

In short, title IV should be amended so as to cover not only handguns but all types of firearms.

MANDATE FOR COMPREHENSIVE LAW

Mr. President, the Congress has a very clear mandate from the people of the Nation to pass such a strong and comprehensive law.

Two public opinion polls in the last 2 years underline this fact most emphatically.

In September 1966, the Gallup poll reported 68 percent of all Americans favored legislation making a police permit a prerequisite to any firearm purchase. The Harris poll released April 23, 1968, showed that public support of such a regulation had mounted to 71 percent—nearly three out of every four Americans favoring legislation to control the sales of firearms "such as making all persons register all gun purchases no matter where they buy them."

Quite significantly, both polls indicated that most gunowners themselves support Federal firearms control, including registration. Gallup reported 56 percent of all gunowners favored such a law; Harris registered support by a better than 2-to-1 margin, 65 percent to 31 percent.

The International Association of Chiefs of Police, representing law enforcement officers from across the Nation, have voted overwhelmingly to endorse S. 1; so have the American Bar Association, the National Association of Citizens Crime Commissions, and the President's Commission on Law Enforcement and Administration of Justice.

FACTS AND FIGURES MAKE COMPELLING CASE FOR COMPREHENSIVE LAW

In this country, according to one estimate, some 20,000 laws deal with the manufacture, sale, and use of firearms. But none are effective. They stand utterly useless in any effort to control the indiscriminate sale and use of firearms in America.

In 41 States and the District of Columbia, one can buy either a rifle or a pistol without a license of any kind; in seven States the law requires a permit to buy a handgun; one State, South Carolina, prohibits the sale of handguns; and two States, Hawaii, and New Jersey, now require the registration of all guns by description, serial number, and ownership.

Even more compelling is the fact that in States which have strong gun control laws, homicides committed with guns are less common than in States with no law or which have ineffective controls. For example: In four States having strong gun control laws, the proportion of murders committed with firearms to the total number of homicides committed in the last 4 years, according to the FBI report, was well below the national average of 57 percent. In Pennsylvania, firearm murders were 43 percent of the total; in New Jersey, 39 percent; in Massachusetts, 35 percent; in New York, 32 percent. On the other hand, States with minimal controls or no such law had much higher rates: Colorado, 59 percent; Louisiana, 62 percent; Arizona, 66 percent; Montana, 68 percent; Texas, 69 percent; and Nebraska, 70 percent.

Figures for our cities told the same story.

During 1965 hearings of the Judiciary Subcommittee on Juvenile Delinquency, Attorney General Katzenbach pointed out that in Dallas, Tex., and Phoenix, Ariz., where firearms regulations are virtually nonexistent, the percentage of homicides committed by guns in 1963 was 72 percent in Dallas and 65.9 percent in Phoenix.

On the other hand, in cities having strong regulations, the figures were markedly lower: Chicago, 46.4 percent; Los Angeles, 43.5 percent; Detroit, 40 percent; Philadelphia, 36 percent; New York, 25 percent.

The only Federal laws concerning firearms—the National Firearms Act of 1934, and the Federal Firearms Act of 1938—have been aptly described by one commentator as "antiquated and impotent legal travesties."

Facts and figures overwhelmingly support the urgent need for a comprehensive law. According to surveys taken in 1966, 59 percent of all murders were committed with guns—the highest percentage ever recorded; aggravated assaults with a gun rose by 22 percent; and armed robbery, which comprises 58 percent of all robberies, rose 10 percent.

It is also known what a staggering toll guns take annually. For example, in 1966, guns were used in an estimated 6,552 murders, 10,000 suicides, and 2,600 accidental deaths—a total of about 19,000 deaths. In addition, they were used in about 43,000 serious assaults and 50,000 robberies, and they caused an estimated 100,000 nonfatal injuries.

Since 1900, three-quarters of a million people in this country have been killed by privately owned guns—one-third again as many as have been killed in all the wars in which the United States has been involved.

No one can make even a rough guess at how many guns are in private hands in this country. Estimates have ranged from a low of 50 million to a high of 200 million.

It is known, however, that each year 2 million domestically manufactured guns and 1 million imported guns are sold. In other words, in the course of each working day, about 10,000 guns reach private hands.

These are rather frightening statistics. Still other statistics add up to an extremely compelling case for extending the controls proposed by title IV to rifles and shotguns.

During the years 1960 through the first 6 months of 1965, in 107 cities having populations of more than 100,000: 805 rifles and shotguns were confiscated by law enforcement officials from juveniles; 23,130 rifles and shotguns were confiscated; 505 rifle murders were committed; 705 shotgun murders were committed; 919 rifle robberies were perpetrated; 1,989 shotgun robberies were perpetrated; 1,813 rifle assaults were committed; 2,361 rifles were seized on illegal weapons charges; 2,217 shotguns were seized on illegal weapons charges; 6,151 rifles were misused in crimes; 7,884 shotguns were misused in crimes; and 14,884 crimes were committed in which rifles or shotguns were used.

According to the FBI Uniform Crime Report for 1966, 1,747 persons were murdered in the United States with rifles and shotguns that year.

In a report dated August 11, 1967, the Director of the Alcohol and Tobacco Tax Division wrote that the strongest argument for including long guns in a firearms control law is the fact that they can be, and frequently are, converted into concealable weapons for criminal use.

We have reviewed 200 recent firearms violation case reports—

He said—

and found that there were 98 sawed-off shotguns and 14 sawed-off rifles out of a total of 207 guns involved in these cases.

It seems obvious to me that, if strict controls are imposed on handguns without imposing similar restrictions on long guns, the criminal element will continue to have ready access to concealable weapons by the simple expedient of purchasing an uncontrolled long gun and converting it into a handgun.

The controls proposed in S. 1 would reduce the easy availability of rifles and shotguns to persons with criminal records by prohibiting federally licensed dealers from making sales to felons and by making it a criminal offense for a felon to give false information to the dealer concerning his criminal record.

There is absolutely no doubt in my mind that a good, strong, Federal firearms control law is long, long overdue.

CONCLUSION

Mr. President, I recognize that the many issues I have been discussing are extremely complex—having the most profound implications for the direction American society will take in the years ahead. There are, in addition, grave constitutional questions which must be resolved.

It is my hope that all of these issues and problems will be thoroughly debated and considered during the course of discussion in the days ahead, and that Senators will take into account the points I have raised today on each of the titles of the bill.

In the final analysis, I am hopeful that we will adopt title I's aid to law enforcement and extend the application of title IV across the board to all types of firearms. But I expect that these provisions will not be purchased by the sacrifice of freedom entailed in titles II and III.

I am confident that a majority of my colleagues will scrutinize these proposals

with great care and condemn them as derogations of the principles for which our Nation was founded.

For it will be recognized that our law must not have the effect of diminishing the liberties of our citizens, but to enlarge and enhance them.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

### MESSAGE FROM THE HOUSE

A message from the House of Representatives by Mr. Bartlett, one of its reading clerks, announced that the Senate had passed the following bills and joint resolution of the Senate, severally with an amendment, in which it requested the concurrence of the Senate:

S. 68. An act for the relief of Dr. Noel O. Gonzalez;

S. 107. An act for the relief of Cita Rita Leola Ines;

S. 909. An act for the relief of Paul L. Margaret, and Josephine Kirsteatter;

S. 2248. An act for the relief of Dr. Jose Fuentes Roca; and

S.J. Res. 129. A joint resolution to authorize the Secretary of Transportation to conduct a comprehensive study and investigation of the existing compensation system for motor vehicle accident losses, and for other purposes.

The message also announced that the House had passed the bill (S. 1909) to provide for the striking of medals in commemoration of the 100th anniversary of the completion of the first transcontinental railroad, with amendments, in which it requested the concurrence of the Senate.

The message further announced that it had passed the following bills, in which it requested the concurrence of the Senate:

H.R. 3010. An act for the relief of Maria Prescilla Caramanzana;

H.R. 5783. An act to amend titles 10, 14, and 37, United States Code, to provide for confinement and treatment of offenders against the Uniform Code of Military Justice;

H.R. 8241. An act for the relief of Victorino Severo Blanco;

H.R. 10989. An act for the relief of Maria de Conceicao Botelho Pereira;

H.R. 12115. An act for the relief of Dr. Orlando L. Fernandez;

H.R. 12246. An act for the relief of Mario Santos Gomes;

H.R. 12306. An act for the relief of Ann Su Gibson;

H.R. 12502. An act for the relief of Miss Elizabeth Schofield;

H.R. 12816. An act for the relief of Christopher Sloane (Bosmos);

H.R. 14323. An act for the relief of Mrs. Elise C. Gill;

H.R. 14739. An act to amend titles 10 and 32, United States Code, to authorize additional medical and dental care and other related benefits for reservists and members of the National Guard, under certain conditions, and for other purposes;

H.R. 15345. An act to provide security measures for banks and other financial institutions; and

H.R. 15822. An act to authorize the Secretary of Agriculture to establish the Robert S. Kerr Memorial Arboretum and Nature Center in the Ouachita National Forest in Oklahoma, and for other purposes.

### HOUSE BILLS REFERRED

The following bills were severally read twice by their titles and referred, as indicated:

H.R. 5783. An act to amend titles 10, 14, and 37, United States Code, to provide for confinement and treatment of offenders against the Uniform Code of Military Justice; and

H.R. 14739. An act to amend titles 10 and 32, United States Code, to authorize additional medical and dental care and other related benefits for reservists and members of the National Guard, under certain conditions, or for other purposes; to the Committee on Armed Services.

H.R. 15345. An act to provide security measures for banks and other financial institutions; to the Committee on Banking and Currency.

H.R. 15822. An act to authorize the Secretary of Agriculture to establish the Robert S. Kerr Memorial Arboretum and Nature Center in the Ouachita National Forest in Oklahoma, and for other purposes; to the Committee on Agriculture and Forestry.

H.R. 3010. An act for the relief of Maria Prescilla Caramanzana;

H.R. 8241. An act for the relief of Victorino Severo Blanco;

H.R. 10989. An act for the relief of Maria de Conceicao Botelho Pereia;

H.R. 12115. An act for the relief of Dr. Orlando L. Fernandez;

H.R. 12246. An act for the relief of Mario Santos Gomes;

H.R. 12306. An act for the relief of Ann Su Gibson;

H.R. 12502. An act for the relief of Miss Elizabeth Schofield;

H.R. 12816. An act for the relief of Christopher Sloane (Bosmos); and

H.R. 14323. An act for the relief of Mrs. Elise C. Gill; to the Committee on the Judiciary.

### ORDER OF BUSINESS

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that, notwithstanding the previous order recognizing the distinguished senior Senator from Connecticut [Mr. DODD] at this time, the distinguished senior Senator from South Carolina [Mr. THURMOND] be recognized for not to exceed 8 minutes on a subject not germane, and that rule VIII be, therefore, waived.

The PRESIDING OFFICER. Is there objection? The Chair hears none, and it is so ordered.

The Senator from South Carolina is recognized.

### CONTINUING VIOLENCE IN THE CITY OF WASHINGTON

Mr. THURMOND. Mr. President, in 1 week in the city of Washington, three men have been killed in armed robberies.

The first was Benjamin Brown, who was shot and killed in his liquor store at 1100 Ninth Street, NW., on April 30, 1968.

The second was Emory Wade, who was shot and killed at the A. & P. store he managed at 821 Southern Avenue, Oxon Hill, on May 3, 1968.

The third occurred yesterday. Charles M. Sweitzer, an employee of the Brinsfield Rexall Drug Store at 3939 South Capitol Street, was shot and killed as he struggled with armed robbers.

In addition to these tragic murders, fires are occurring at an alarming and unprecedented rate in the District of Columbia.

On top of all of this, the leaders of the so-called Poor People's March openly speak of disrupting the city by blocking traffic on bridges and elsewhere. They speak of preventing Senators and Congressmen from entering their offices. There is substantial evidence that a group of militant leaders are dissatisfied with even this extreme approach. They plan to supplant this group with militant leaders who will incite riots and violence. This violence will include looting and burning—of which this city has already had more than its share.

Add to all this the rumors which are flooding Washington, rumors of more violence throughout the city, rumors of deliberate extension of the violence to predominantly white areas in and around the District, rumors of a planned and coordinated effort to burn down the Nation's Capital.

Fear has become a way of life in the city of Washington. Residents of the city have called my office wanting to know what is being done to prevent the impending violence. They want to know what they should do. Will they be safe if they stay in their homes? Should they make plans to leave the District? When is the violence likely to begin in earnest? On Mother's Day, as some rumors have it? When the poor people's march arrives? After the shantytown has been erected?

Mr. President, the inhabitants of this city are owed the protection of the responsible authorities in the District. Just as important, they are entitled to be reassured that this protection is forthcoming. They are entitled to know that effective steps are being taken to guarantee their safety.

Today, they are not reassured. They know that sufficient steps were not taken before. They know troops were not called in soon enough. They know orders were given to restrain and restrict the measures taken by the police and the troops in the city. They know this policy of restraint encouraged additional looting and burning.

They also know that this city has not been "normal" since the last siege of violence following Martin Luther King's death.

Mr. President, at this time I wish to read the article which appeared in this morning's Washington Post which described the death of Charles M. Sweitzer.

GUNMEN SLAY EMPLOYEE IN STORE HOLDUP

(By Alfred E. Lewis)

A Southeast Washington drug store employee was shot and killed yesterday—the third victim of armed robbers in the Washington area within a week.

The latest victim was Charles M. Sweitzer, 59, who supervised the sundries department at the Brinsfield Rexall Drug Store, 3939 South Capitol st.

Case 3:22-cv-00410-REP   Document 41-6   Filed 02/22/23   Page 85 of 145 PageID# 1391

Police said he died of an abdominal wound after he had wrestled a gun and a sack of the store's money away from one of four armed holdup men who invaded the store a few minutes before 4 p.m. Police said he was shot by an accomplice of the man he had disarmed.

Sweitzer was felled seconds after he had fired at the fleeing man he had disarmed, police said. One suspect was grabbed by an 11th Precinct policeman who also had been fired at when he tried to thwart the holdup.

Homicide Squad Lt. Patrick Burke said the policeman, Pvt. Daniel E. Keller, 23, was on duty at a polling station for the D.C. primaries in the Highland branch of the D.C. Public Library, diagonally across the street from the drug store.

Police said two children ran up to Pvt. Keller and told him some men with guns were in the drug store. Keller ran to a side entrance, but ducked around to the front when he drew a shot from one of the bandits who wore a red hood over his face.

The man with the red mask was leading the store owner, William S. Brinsfield, 63, toward the front of the store after forcing him to turn over a sack of money from the safe. As the two went by Sweitzer's counter, Sweitzer tackled the gunman, grabbing his gun and forcing him to drop the money sack, which contained between $500 and $800.

As the red-hooded man broke away and ran out the door, Sweitzer fired once at him, and a second gunman, already outside the store, fired back. Sweitzer fell in the doorway and was pronounced dead on arrival in D.C. General Hospital.

Meanwhile, as the suspect Pvt. Keller grabbed struggled to break the policeman's grasp, Keller fired three shots at the others.

They disappeared in a heavily wooded area along Oxon Run Creek and an intensive search was being conducted last night. Police sent Canine Corpsmen, a dozen foot patrolmen and a helicopter into the area for the search.

Sweitzer had worked for Brinsfield since 1960. He and his wife Mazie, made their home at 2415 St. Clair dr., Hillcrest Heights, with their son, Clarence, 21, and daughter, Margaret, 20.

Police said the suspect arrested by Pvt. Keller was 17 years old. He was sent to the Receiving Home to await Juvenile Court action on a murder charge.

It was a week ago yesterday, almost to the hour, that Benjamin Brown, 59, was shot and killed in his liquor store at 1100 9th st. nw.

On Friday, Emory Wade, 40, was shot and killed by a gunman who held up the A&P grocery branch he managed at 821 Southern ave., Oxon Hill. Police said at least one arrest has been made in all three of the fatal holdups.

Mr. President, again I call on the responsible authorities in this city—the President of the United States, the Attorney General, the Secretary of the Interior, Mayor Walter Washington, and certainly Safety Commissioner Murphy—to make known to the public that sufficient measures have been planned to protect this city. Again I urge that steps be taken to prevent this so-called poor people's march. Such actions would not only reassure the residents of the District—and the cities of all America—that the Nation's Capital is safe; it would also serve notice on those plotting violence that their actions would be stopped—by whatever force necessary—and act as a deterrent to the impending chaos in the District of Columbia.

Mr. BYRD of West Virginia. Mr. President, will the Senator from Connecticut yield to me for a unanimous-consent request?

Mr. DODD. I yield.

## STUDENT UNREST AND CRIME IN THE STREETS

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent to have printed in the RECORD the following articles published in the Washington Evening Star for today, May 8, 1968:

"War Hero Dies Trying To Foil Bandits," written by Barry Kalb.

"Bus 'Train' Ready To Roll to District of Columbia To Build Shack City," written by Charles Conconi.

"Young People Spark March," written by Haynes Johnson.

"Arsonists in District of Columbia Start Nine Fires During Night," written by Walter Gold.

"Northeast Businessmen Ask Crime Curb," written by Paul Delaney.

"Students Across Nation Press College Demands."

There being no objection, the articles were ordered to be printed in the RECORD, as follows:

### WAR HERO DIES TRYING TO FOIL BANDITS
(By Barry Kalb)

Charles (Sarge) Sweitzer was a hero again yesterday, but it cost him his life.

He was shot to death trying to rescue his boss, the hostage of a drugstore bandit.

Sweitzer was a master sergeant in the Air Force until he retired in 1960 and went to work at Brinsfield's Rexall Drug Store, 3939 South Capitol St. He was in charge of the camera counter.

Sweitzer had made it through World War II, earning the Distinguished Flying Cross; one of the Army Air Corps highest honors. But after he went to work at the drugstore, his 21-year-old son, Clarence, said yesterday, "I always wondered if something would happen." Sweitzer would have been 59 on May 31.

### FOUR GUNMEN ENTER

Yesterday at 3:35 p.m., four young men, at least one of them wearing a red mask over his face, entered the drugstore and drew guns.

According to police, two young boys in the store, seeing the guns, ran across the street to where Pvt. Daniel E. Keller of the 11th Precinct was guarding the polling place in the Washington Highlands Library.

Keller ran into the side door of the drugstore, police said, where he found three of the robbers with their guns drawn. He told them to put their hands up, but the fourth, who was in the back of the store with the owner, William S. Brinsfield, fired a shot at the 23-year-old policeman. The shot missed.

At this, the four broke for the front door, the one who had fired the shot pushing Brinsfield ahead of him and trying to carry a white sack with several hundred dollars loot at the same time.

"He grabbed me by my white coat and was pushing me out with the gun in my back," Brinsfield, 63, said later.

"As we passed the cigar counter, Charles grabbed him from behind. He took his gun away. He tried to shoot—he pulled the trigger a few times—but nothing happened."

The robber dropped the sack with the money, but one of the other bandits shot Sweitzer in the abdomen.

A customer, John R. Wheatley, said Sweitzer "staggered and fell into the doorway." Brinsfield was unharmed.

When the bandits ran out the front, police said Keller ran back out the side door and around to the front, where he seized a 17-year-old youth.

Asst. Chief of Police George Donahue said Keller fired three shots at the robbers who were running away, but it was not known if Keller hit anybody.

Two of the fleeing bandits ran into a wooded hollow surrounding Oxon Run Creek, in the area of Valley and Wayne Streets SE.

### THREE STILL AT LARGE

Additional police officers arrived quickly, and a helicopter was called in, but the three were still at large today.

The 17-year-old was charged with murder. Lt. Patrick Burke of the homicide squad identified him as Walter Howard Jr. of the 1300 block of D Street NE.

Sweitzer was pronounced dead at D.C. General Hospital.

Sweitzer lived with his wife, Mazie, his son, and his daughter, Margaret, 20, at 2514 St. Clair Drive, Hillcrest Heights.

His was the third slaying by holdup men in eight days in the metropolitan area.

Benjamin Brown, 58, of 1900 Lyttonsville Road, Silver Spring, was shot last Tuesday in his liquor store at 1100 9th St. NW. Emory E. Wade, 41, of Woodbridge, Va., the manager of the A&P on Southern Avenue in Oxon Hill, was shot as he knelt to open a safe at the demand of two armed robbers. Arrests have been made in both slayings.

### BUS "TRAIN" READY TO ROLL TO DISTRICT OF COLUMBIA TO BUILD SHACK CITY
(By Charles Conconi)

MARKS, MISS.—Some 500 demonstrators are to leave here today and be the first wave of the Poor People's Campaign to reach Washington and build a shack city.

Twelve buses were chartered to carry the demonstrators on a four-day trip across the country with a stop for a rally tonight in Nashville, Tenn. Attempts to arrange special trains have been abandoned.

The caravan will arrive in the Washington area on Sunday and will move into the city the following day to confront the government by attempting to build "the New City of Hope" somewhere on parkland.

Although Congress has been reacting angrily to the prospect of such an encampment, it is known that Southern Christian Leadership Conference organizers are still considering the use of parkland on or near The Mall.

It wasn't until late yesterday afternoon that SCLC organizers here learned they would be unable to take the demonstrators to the capital by train.

### STOPS FOR RALLIES

SCLC plans require night stops for rallies and for sleeping in the homes of people in the communities along the route. Rail plans proved to be too complicated and expensive, especially with the Mother's Day weekend making heavy demand on passenger service.

Other stops scheduled for this bus-caravan are Knoxville, Tenn., and Danville, Va. It has been reported that the demonstrators will spend Sunday in Northern Virginia and march across a bridge to Washington on Monday morning.

SCLC president, the Rev. Ralph David Abernathy, has said he will lead his followers to a campsite of his choosing and drive the first nail to build the shack city.

The first contingent of demonstrators hopes to have the shack city completed for the more than 3,000 demonstrators expected in Washington by May 19.

The mule-drawn wagon caravan, scheduled to leave here today, has been delayed until tomorrow, as march organizers awaited the arrival of more mules and tried to settle the problem of how to deal with them.

Initial plans were for mules to carry 100 demonstrators on the more than 1,000-mile trip to Washington over a period of 25 days.

### TWENTY-THREE MULES ARRIVE

The first 23 mules purchased arrived here yesterday. The farm wagons they are to pull still have not arrived.

The Reverend Andrew Young, SCLC's executive vice president, spent much of yesterday worrying about how to care for the animals on the long trip and the problems of fitting them out with special rubber shoes for walking on concrete and asphalt highways.

Throughout most of the day, the mostly teen-age group here that is going to the Nation's Capital was kept busy.

"You fight hatred with love," Young argued with a group of some 75 teen-agers in one of the large circus-type tents set up at the campsite here. "One of the ways to get them (policemen) to respect us is to respect him," he said.

Young advised the youths to be friendly with police, and asked if anyone knew why policemen "act bad and mean."

"They scared, that's why," he declared. "They scared of us because we look so big and strong, and because if you don't know us, we can look pretty mean and strong. We gotta show them we ain't mean or bad, but I don't mean being (Uncle) Toms—We is still men."

The articulate Young, who easily slips into "poor folk" talk when he feels he needs to, told the youths from Memphis and this Mississippi Delta county that they are going to have to deal with "the brothers from Harlem and Philadelphia (in Washington) who know they bad."

He said about 100 or so of the more militant Negroes could get together and "begin to think they can tear up" the police department. It will be up to the youths here, he said, to talk them out of it because "I can't be everywhere. Do you think they can tear up the police department?"

One boy, lying on a red air mattress and chewing on a weed, answered self-consciously, "They get a whole lot of folks killed."

"Who gonna get killed? Black folk or white folk," Young asked.

"A whole lot of black folks," a number of the youths answered.

"If you talk them out of violence, you save a whole lot of black folk," Young added.

### YOUNG PEOPLE SPARK MARCH

#### (By Haynes Johnson)

MONTGOMERY, ALA.—The old men still speak in the language of the fieldhand or of Uncle Remus, quaint and passive.

Ask them why they are going to Washington, and they are likely to reply, "For freedom." Their response has hardly varied for a century; they are still that close to the old simple and servile heritage.

For them, this strangest of all protest caravans to move out of the Deep South is probably their last step forward. In fact, they are going to Washington more for the ride than a hope of a real change in their lives.

That is not the case with the young people who are joining up for the Poor People's Campaign in the towns and cities of Mississippi and Alabama.

To see them, is to realize how sharply attitudes have changed in only a few years in the South. These young Negroes are articulate and motivated; they speak in tones of a militancy that would have been unthinkable—and impossible—for their parents. Many of them say they are not coming back to the South.

But there, too, the attitudes differ. Unlike the older group of Negroes, these young people are journeying North under no illusions about some elusive vision of a great freedom beyond the Mason-Dixon line. On the contrary, it is common to hear them say they would rather stay in the South—"if" the opportunities were present.

Take one group of Negro youths, from 16 to 20, interviewed at random, as representative. They are all from Selma, all now traveling with the poor people's procession as it winds through Alabama, then Georgia, and finally north to Washington.

They are moving, some 600 of them, in chartered Greyhound buses. At each locality, they follow an established procedure: they stop outside of town, are greeted by a local contingent, and then march through the town—and out of it. Then they board their buses again, and move ahead.

At each stop they also pick up more volunteers than they can afford to transport.

Charles B. Winston, Walter Ferguson, Harvey Goldsby, Steven Brakin, John Collins, Theodore Davis, Joe Oliver, Eli Johnson, Jesse King and one who insisted his name was Joseph Smitherman, the same as Selma's mayor—their names are unimportant, but their words are not.

"Martin Luther King said he would lead the Negro from economic oppression to the Capitol and set up some kind of camps on the Capitol grounds," one of them said, by way of explaining his involvement. "He said he would not ask for what he wanted—he will demand. He wanted economic prosperity, 'cause Mr. Charley has everything. All of us are out to help our race."

One of his friends cut in:

"Fix it, brother, fix it."

Here is another view:

"Like Hosea Williams (one of the march leaders) say last night, when that Negro serviceman goes to Vietnam and gets his legs shot out, they don't say, 'Look at that poor afflicted Negro,' they say 'Look at that one-legged Nigger.'"

"It's like you go to Hudson High (a Negro school in Salem) where they have this little lab the size of a sardine can, and Parrish High (white) has everything they need. I think if we go to Washington and let Congress know what we want we might profit more by going than sitting here at Hudson.

"Now, Mr. Charley's not going to give you some funds. You have to demand. And a few years from now Mr. Charley's going to be obsolete."

#### OTHER VOICES

One more voice was added:

"It's like if a Chinese citizen comes to the U.S.A., they treat him like L.B.J. But if an Afro-American goes to the Selma Del (a downtown restaurant) they tell him to eat in the pasture. We're going not only for Negroes, but for all poor people. I got to be in it as far as they will let me. I feel that's my responsibility."

Another put it this way:

"I think it's a great thing, the Poor People March, going to help the poor people at the root. It's like they say, 'We shall overcome, some day.' It's like the black horse shall ride and the white horse shall fall."

They all agreed on several main points: It was King who had got them involved (one said, "I want to make his dream a reality"); they all want to go to college, but their chances appear slim; they all come from large families and nearly half of them are fatherless.

Their aspirations are also far more realistic than similar Negro groups in the past: these young men have no illusions about whites or integration or laws, or even the old defender, the federal government.

"I don't have to eat with them (whites)," one said, "and I don't care if I live on the same block, or in the same neighborhood, with them. I just want to feel equal."

One other fact about them is worthy of note. Most of them said they first learned about the Poor People's Campaign not through their own leaders, the newspapers or at some mass meeting as in the past; they first heard about it on Johnny Carson's television show out of New York. For them at least, the medium is the message.

### ARSONISTS IN DISTRICT OF COLUMBIA START NINE FIRES DURING NIGHT

#### (By Walter Gold)

Nine cases of arson, two of them serious, were recorded in the District last night, fire officials reported. Two stores in the riot-ravaged 1100 block of 7th Street NW suffered an estimated $30,000 in damage and two 11-year-olds were arrested in connection with those blazes.

Minor damage was suffered in the other seven fires scattered across the city, and officials said juveniles were believed responsible in nearly every case.

The first fire, at 1110 7th St. NW, destroyed a boarded-up Super Music City store. The 11-year-olds, whose names were withheld because of their ages, told police and fire investigators that they and several other youngsters poured a can of kerosene over a floor in the rear of the store before setting it on fire.

It took firemen nearly an hour to bring the blaze under control. One firefighter, Pvt. Edgar Jenkins of Engine Co. 2, was treated for heat exhaustion.

Just after firemen brought that blaze under control, they noticed smoke coming from another store a few doors away at 1140 7th St. at 6:43 p.m. Two more alarms were called to bring that blaze under control.

The fire at 1140 was set by the same youngsters who used kerosene left over from the first fire, officials said. The second blaze destroyed Frank's Men's Shop, which had been looted during the rioting but not burned. The youngsters were turned over to juvenile authorities.

During the second fire, Pvt. Robert Kelly of Rescue Squad 2, was treated for a head injury. Damage to Frank's was estimated in excess of $12,000, and to Super Music in excess of $15,000.

A crowd which at times reached about 500 persons, watched firemen fight both blazes and youngsters in the crowd occasionally harassed firemen and police.

The other fires, in order of the time they started, were:

At 7:46 p.m., juveniles set fire to a burned-out novelty store at 3301 Georgia Ave. NW., causing additional minor damage.

At 9:05 p.m., youngsters threw at least two bottles of gasoline into a basement laundry at 805 Florida Ave. NW, causing a flash fire and damage estimated at $25. One of the molotov cocktails which did not explode was recovered.

At 10:25 p.m., an arsonist set a garage door on fire at 1826 6th St. NW. Juveniles are suspected, officials said.

At 10:59 p.m., the remains of an already-gutted store at 2909 14th St. NW were set afire, and another group of juveniles was believed responsible.

Four minutes later, still another group of youths set fire to a basement storage room in an apartment building at 70 Rhode Island Ave. NW.

Shortly after midnight, still another group of juveniles set a fire in another apartment house basement at 219 T St. NE. In this case, the youths kicked open a janitor's door in the basement.

### NORTHEAST BUSINESSMEN ASK CRIME CURB

#### (By Paul Delaney)

The Business and Professional Association of the Far Northeast has added its name to the growing list of complainants who are charging the District government with inadequate police protection.

The association has called for police crackdown on criminals to combat an increasing crime rate in the 14th Precinct. Or, the group demands, the city should request that troops return to protect the city.

The action of the association is indicative of the mounting pressure on the government, mostly by businessmen, to take bold steps immediately. The attitude of the group is a mixture of concern for crime and urging tax and insurance breaks for those affected in last month's rioting.

The association meets tonight to decide its next step after accusing Mayor Walter E. Washington of snubbing the group by refusing to acknowledge letters sent to him.

#### TO GO ONE STEP UP

"We've had no acknowledgement and no response from the mayor," stated association president Dr. William K. Collins. "Our next step is to contact Sen. Robert Byrd (D-W.Va.)

and the House District Committee to see what can be done."

Collins further charged Mayor Washington with overlooking "the city beyond the river completely ever since he's been in office." Collins said police coverage in the association area, bounded by Minnesota, Eastern and Southern Avenues, is inadequate and insufficient.

"The police are doing the best they can," he went on, "but the rising tide of crime is just too much for them. The number of criminals is not extremely high; it's just that a small group is being given a free hand.

"We have tried and tried to get in touch with the mayor, but we just can't get any response from him. We don't want to be ignored. We would like to meet with him and talk to him, but a letter from him would do just to show us he's interested in our situation."

### CONCERN GROWS

Members of the association have held a series of meetings since the riots. Collins said the group normally meets monthly, but lately has been meeting at least weekly.

At last Wednesday's meeting, the group drafted a statement which said citizens and businessmen of the Far Northeast "are attempting to alert the city government to the problems of civil unrest which has reached proportions that require crash programs to prevent collapse of orderly government based upon respect for law and decency." The association has been leveling most of its attacks on Safety Director Patrick V. Murphy, as have other organizations.

The group recommended a program that would:

Bring back a "stern and unyielding enforcement of laws, and the protection of human life"; control known criminals and lawbreakers who return to the community; dramatically increase the police force and/or bring back the military to the city; offer favorable tax treatment of merchants in depressed, riot-torn areas.

### COMMUNICATION ASKED

Also, offer riot risk, vandalism insurance; offer personal injury, income interruption insurance on all citizens who are victims of criminal attacks, and provide extensive community provisions for education, housing, employment and social development through massive government action.

On the other hand, businessman Ed Boorstein urged a program of communication with the people in the neighborhood. He proposed "town meetings" between residents and businesses "to talk, to air grievances, to correct false impressions and to learn from one another." He said the idea could be expanded to "town meeting telethons" to the whole city.

"Some of the burners and looters were our dissatisfied customers trying desperately to get our attention," Boorstein stated. "Judging from the response of our business community, we are still listening.

"We must be scrupulously fair and we must communicate to our public so they will understand we are fair. Our communication must be people-to-people, shirt sleeve, no big words and down-to-earth. Our communication must be talk between equals and it must start now."

Collins said his group has the support of other civic organizations in the area, including the Far East Community Services of the United Planning Organization.

### STUDENTS ACROSS NATION PRESS COLLEGE DEMANDS

Student unrest fed by racial and political issues continued at university and college campuses across the nation today.

At California's Stanford University, where arsonists burned a Navy ROTC building yesterday, students continued an administration building sit-in in opposition to suspension of seven students for demonstrating against Central Intelligence Agency recruiters last fall.

At Pennsylvania's predominantly Negro Cheyney State College, fire destroyed a 20-room building opposite the campus, where students were occupying the administration building.

Neither fire was blamed on student demonstrators, however.

A spokesman for the Cheyney protesters said they were seeking a "better curriculum, a better faculty and a better system of student finances." He said the demonstration did not involve a "black and white" problem.

At Wellesley College, a group of Negro students said it would start a hunger strike today at the exclusive Massachusetts women's school unless the group won promises of greater nonwhite participation in its academic life. The protesters also called for an alumnae drive for funds to help Negro students.

In New York, Columbia University had its calmest day yesterday since student demonstrations erupted on the campus two weeks ago. But new trouble was feared after striking students circulated copies of papers allegedly taken from the offices of President Grayson Kirk and Vice President David B. Truman during a sit-in April 23.

Kirk sent the students a telegram warning of criminal proceedings unless papers taken from his and Truman's offices were returned immediately. When the telegram was read at a meeting of student demonstrators, they chanted, "Tear it up."

At Northwestern in Evanston, Ill., where 60 Negro students had seized a business office, the administration yielded to demands for increased Negro enrollment and African-American history classes and for establishment of separate housing and meeting facilities for Negro students.

The University of Texas in Austin also announced yesterday it would offer a course on "The Negro in America" as requested by 1,300 students in a petition last fall.

At New Hampshire's Franconia College, 35 students took over the administrative offices yesterday and demanded more say in selection of the liberal art college's next president.

At Stanford, witnesses said three young men were seen setting the fire that caused an estimated $70,000 damage to the ROTC building. It was the second arson attack on the building in recent months.

A university spokesman said, however, that Stanford demonstrators had been "scrupulous about respecting property" and there was no reason to link them with the blaze.

## OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1967

The Senate resumed the consideration of the bill (S. 917) to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of Government, and for other purposes.

The PRESIDING OFFICER. Under the previous order, the Senator from Connecticut is recognized.

Mr. DODD. Mr. President, this is an historic debate in the legislative history of our country.

The fact that we are debating a Safe Streets and Crime Control Act would by itself be enough to make it historically noteworthy. But, over and above this, it is rendered noteworthy by the fact that, for the first time in 30 years, Congress is giving consideration to the need for improved gun control legislation, designed to strengthen and update the antiquated and sadly inadequate Federal Firearms Control Act.

I intend to address myself to the other titles of the Safe Streets and Crime Control Act at a later date in a subsequent statement. But today I shall confine myself to title IV, which deals with gun control, because this has been an area of primary interest for me.

That this legislation has now come to the floor is a matter for particular gratification, because the gun legislation which we are now debating represents the product of countless hearings and of 5 years of unremitting efforts against the obstructions raised by one of the most powerful lobbies in our Nation's history.

It represents a long-overdue legislative reaction to the terrible toll of life and limb exacted each year in our country by firearms. As unbelievable as it may seem, far more people have been killed by firearms in our country since the year 1900 than have died in all of our wars, from the Spanish-American War to Vietnam. Between 1900 and 1966 firearms were responsible for 280,000 murders, 270,000 suicides, and 145,000 deaths by accident—making a grand total of 795,000 since the beginning of this century. Against this figure, the total number of American war dead, from 1900 to this date in Vietnam, stands at 550,000.

In addition to those who are killed by firearms, there is a far larger number who each year are assaulted or wounded or maimed. It is estimated that the number for 1966 alone was in excess of 100,000.

These are the basic statistics, each unit of which represents a human life, which make Federal gun control legislation imperative.

Title IV, despite the fact that it is lengthy—I wish it could have been more brief—is essentially a very simple piece of legislation.

The basic purpose of title IV, reduced to its simplest terms, is to assist the States in enforcing their own firearm laws by requiring that all sales of firearms, other than rifles and shotguns, to residents of the States, be channeled through local dealers and under the control of local law.

But while it can and, I am convinced, will have a dramatic effect on law enforcement, title IV would affect the citizen who wished to purchase a handgun in only two ways:

First, if he wished to purchase a handgun from an out-of-State dealer, or a mail-order house, he would have to go through an outlet or a dealer in his own State.

Second, anyone who wishes to buy a handgun would have to identify himself to the dealer in his own State, who would get his name, his address, and his age; and, of course, he would be called upon to identify himself by social security card, automobile license, credit card, or any of the standard items that are used to establish identity.

I hope that the Senate will not be confused by the numerous auxiliary provisions of title IV, because essentially what it would do is to set up the legal mechanics necessary to prevent individuals

from exceeding or circumventing their own State laws with respect to firearms.

That is what title IV is really all about.

THE LEGISLATIVE HISTORY OF GUN CONTROL LEGISLATION

Mr. President, I think it would be helpful to the Senate to briefly recount some of the history of gun control legislation in this country.

While there has been no new gun control legislation for three decades now, it was a major issue for a long time in the thirties. It is interesting to examine the legislative history of the two firearms acts passed by Congress in the thirties, because this history is pertinent in more than one respect to the travail we have gone through in trying to enact improved gun legislation in the sixties.

In 1933, a madman armed with a pistol attempted to assassinate President Roosevelt. The assassination failed; but one of the bullets took the life of the mayor of Chicago, Anton Cermak. When the assassin was apprehended, it turned out that the pistol he had used had been purchased in a pawn shop.

In the aftermath of this attempted assassination of President Roosevelt, Attorney General Homer Cummings, one of the most distinguished public officials my State of Connecticut has ever sent to Washington, had several firearms bills introduced in the Senate and the House. One of these was H.R. 9066.

H.R. 9066 applied specifically to pistols and revolvers. In an effort to placate the hunters and shooters, Attorney General Cummings deliberately excluded rifles and shotguns from its coverage. In the form in which it was introduced, the bill required first, the licensing of all dealers; second, recordkeeping; third, registration; fourth, a transfer wax; and, fifth, the photographing and fingerprinting of new firearms owners.

At hearings in the House, Milton Reckord, then vice president of the National Rifle Association, admitted that his organization had sent mass mailings and telegrams which included statements that rifles and shotguns would be added to the new law once the law was on the books.

A 1934 National Rifle Association Newsletter read:

Within a year after the passage of H.R. 9066, every rifle and shotgun owner in the country will find himself paying a special revenue tax and having himself fingerprinted and photographed for the Federal "Rogues Gallery" every time he buys or sells a gun of any description.

The Senate began hearings on May 28, 1934, and Reckord testified at the Commerce Committee hearings. He closed his statement by asking that revolvers and pistols be removed from the Senate bill. On the day that Reckord testified, the House reported a watered-down version of the Senate bill, H.R. 9741, with pistols and revolvers—the concealable weapons—removed.

On June 26, 1934, H.R. 9741 was finally passed as the National Firearms Act. It covered only weapons habitually employed by gangsters—machineguns, sawed-off shotguns, sawed-off rifles, and gadget guns; and its major provision on this point simply required that a person pay a tax on these weapons.

On October 5, 1937, Attorney General Cummings, speaking to the International Association of Chiefs of Police, began a campaign aimed at the criminal "arsenal" of pistols, revolvers, rifles, and shotguns. He pledged a fight for the Federal registration of all firearms.

A Cummings-sponsored bill was introduced to include all firearms under the 1934 National Firearms Act.

Attorney General Cummings' legislation had the backing of the American Bar Association, the International Association of Chiefs of Police, the General Federation of Women's Clubs, and many of the Nation's top enforcement officers.

But the gun lobby, with the National Rifle Association in the vanguard, was as relentless and persistent then as it is today. The result was that by spring of 1938 Cummings had removed rifles and shotguns from his first bill as a concession to the powerful gun lobby in our country.

But even this did not satisfy the lobby. A 1937 article in the "American Rifleman" said:

The Attorney General's previous efforts to secure drastic Federal firearms laws have been killed by the active and audible objections of the sportsmen of America.

Once again, the members of the National Rifle Association will need to be represented by their officers in pointing out to Congress the hidden dangers of such a plausible legislative scheme to end crime. Once again we ask every active member to use the coupon below to say: "The right of the American citizen to bear arms shall not be infringed."

The National Rifle Association endorsed Senate bill No. 3, which had to a large degree been drafted by General Reckord, of the National Rifle Association. S. 3 passed the Senate on June 30, 1938, and was known as the Federal Firearms Act.

The key clause of S. 3, instead of requiring that gun purchasers establish their identity in a satisfactory manner to dealers and that the dealers maintain records of the identity of their customers, simply prohibited dealers from "knowingly" doing business with criminals, fugitives from justice, and persons under indictment for a felony. This was the wording that had been suggested by the National Rifle Association.

To anyone who knows anything about law enforcement, both the arrangement and the wording were so vague and clearly unsatisfactory that it should come as no surprise that the Government has never in 30 years been able to obtain a single conviction under this section of the Federal Firearms Act.

This is one of the many weaknesses of the Federal Firearms Act which title IV seeks to overcome.

At this point, I must pay an admittedly grudging tribute to the formidable lobbying abilities of the officials of the National Rifle Association. Their persistence in a bad cause is almost beyond belief. For example, not only was General Reckord able to work his will on the Federal Firearms Act of 1938, but only a few weeks ago, the doughty general, now well past his 80th birthday, played a key role in defeating State gun control legislation that had been introduced in the Maryland Legislature.

The Federal Firearms Act was inadequate even for the thirties. The soaring crime rate of the fifties and sixties, and the dangerous proliferation of arms sales to juveniles and socially irresponsible elements, has made the act totally and pathetically inadequate for the problems of today.

GUN CONTROL LEGISLATION IN THE SIXTIES

The issue of gun control legislation has been before us since 1963.

It has been suggested, and I have read it and heard it many times, that the legislation is the result of a panic reaction to the tragic slaying of President Kennedy and Dr. Martin Luther King. This is completely false. The fact is that I first drafted my bill after long study, in 1962 and I introduced it some months before the assassination of President Kennedy.

The fact is further that the Senate Judiciary Committee had completed its consideration of the pending measure prior to the assassination of Dr. Martin Luther King.

I will never forget that afternoon in the committee. We had a long, and acrimonious debate. I remember saying: "How many more people have got to be assassinated in this country?"

It was not until I got home later that night that I heard of the assassination of Dr. Martin Luther King.

So, it is untrue that the bill was introduced after the assassination of President Kennedy or that it was acted on in the committee after the assassination of Dr. Martin Luther King.

The Juvenile Delinquency Subcommittee, of which I am chairman, first embarked on a full-scale inquiry into the sale of firearms in 1961. S. 1592, the predecessor of the present measure, was introduced in the 89th Congress. During the course of 1965, it was the subject of 11 days of hearings, in which some 50 witnesses were heard. In May 1966 it was reported on favorably, with certain amendments. But I never could get the measure out of the full committee and on to the floor until very recently.

Last year, the State Firearms Control Assistance Act was the subject of another 10 days of public hearings conducted by the Juvenile Delinquency Subcommittee. In all, 47 witnesses were heard during this second round of hearings. On September 20, 1967, the subcommittee reported favorably on the proposed legislation.

I believe that the time for Senate action on gun control legislation is at hand.

WHY A GUN BILL IS IMPERATIVE

The provisions of title IV of the Safe Streets and Crime Control Act represent a forthright effort to update our presently inadequate Federal controls over the interstate traffic in firearms.

The Federal Firearms Act of 1938, which this bill seeks to update, has not been adequate to the task of regulating the interstate traffic in firearms in the United States.

The gun laws of our various States are violated wholesale, every day, almost every hour of the day. Hundreds of thousands of weapons are sold to their citizens in circumvention of their own laws, in across-the-counter transactions in neighboring States and by mail-order sales.

*May 8, 1968*      CONGRESSIONAL RECORD — SENATE      12305

At present, anyone—a criminal, a juvenile, or a lunatic—may clip an advertisement from a score of magazines, order a gun from a dealer in a distant State for a few dollars, and in a matter of weeks have the gun delivered to him with virtual anonymity.

We are the only civilized nation on this earth—or the only one that pretends to be civilized—that allows such mail-order madness. And the immediate result of this stubborn laxity is that our annual rate of murder by gunfire is astronomically larger than the rate for other civilized countries.

The last year that the Library of Congress could give me comparative statistics was 1963. In that year we showed 2.7 homicides by gunfire for every 100,-000 population. The rate for Great Britain was one fifty-fifth the American rate; the rate for Germany about one twenty-fifth the American rate; the rate for Japan one sixty-fifth the American rate; the rate for the Netherlands one ninetieth the rate in this country; and so on down the line.

Reduced to round figures instead of statistical rates, the facts are equally impressive. Thus, we find that major countries like Great Britain and Japan during the early sixties averaged approximately 30 firearm homicides per year—a figure roughly equivalent to the number murdered by guns in our country in 2 days. And we also find that for a period of 3 years in the early sixties the Netherlands did not have a single case of murder by firearms.

The surest and easiest way to kill one's self is with a firearm—especially when the firearm is immediately at hand. And when it comes to suicides by firearms, the discrepancy between the rate in this country and the rate in other civilized countries is equally astounding. In 1963—the last year for which comparative figures are available—9,600 people committed suicide by firearms in the United States, to give us a rate of 5.1 per 100,000. This rate was 15 times the rate for England; more than 6 times the rate for Germany; 50 times the rate for Japan; and about 55 times the rate for the Netherlands.

How can one account for the colossal difference in the rate of deaths by firearms in this country and in other civilized countries? The answer is distressingly simple. The fact is that every other civilized country has stringent laws governing the purchase and ownership of firearms.

The gun groups in this country have frequently sought to justify their position by holding up the example of Switzerland.

For example, the American Rifleman, in an editorial, said the following about Switzerland:

What argument do the anti-gun reformers have to offset the uncomfortable fact that Switzerland (which requires practically every able-bodied male to keep a gun in his home) has always had the lowest crime rate in Europe not excluding England?

At first reading, that is a very impressive statement.

But like virtually everything put out by the National Rifle Association, this statement was a hodgepodge of misrepresentations and distortions.

First of all, it simply is not true that Switzerland had the lowest crime rate in Europe. Her crime statistics place her somewhere in the middle of Western European countries, although her record is unquestionably far superior to our own.

Second, the loose wording of the editorial from the National Rifle Association creates the distinct impression that no one requires a permit to own a rifle or firearm in Switzerland and that all rifles are unregistered.

When Carl Bakal, the very able author of the "Right To Bear Arms," checked into this situation, this is what he found.

The Swiss maintain a militia system under which military service is obligatory for all able-bodied males between the ages of 20 and 60. It is, in fact, true that the Government requires every militiaman to keep his weapon at home, together with his uniform and 24 rounds of ammunition. On the other hand, every weapon is carefully registered, each round of ammunition must be accounted for, and the soldier has no right to use his weapon or his ammunition except for military training purposes, and even then only with specific authorization.

The Swiss people do a lot of hunting. But in order to purchase any other kind of gun in Switzerland—that is, any gun other than that issued to the militia—a person has to obtain a permit from his local police. Permits are denied not only to those who have criminal records or are under 18 years of age, but also to people who have backgrounds of drunkenness, mental illness, or emotional instability. No mail order sales are allowed in Switzerland.

And every dealer is required to verify the identity of prospective purchasers and to keep records.

Clearly, the gun legislation we are today discussing is considerably less restrictive than the gun laws in force in Switzerland. As a matter of fact, Switzerland is the last country that the National Rifle Association should have used as an example, because it has good gun laws and it enforces them strictly. But the honest sportsmen who belong to the National Rifle Association have no way of knowing the facts. And this is how this big gun lobby has built up tremendous opposition to reasonable gun legislation.

The unrestricted flow of deadly weapons is reflected every day in the growing volume of crimes of violence involving the use of guns.

We know, based on figures released by the FBI, that in 1967 murder increased 12 percent over 1966. And, in 1966, there were 6,552 gun murders committed in this country.

How high must this toll go before we do something about it, before we act decisively?

We know that armed robbery increased 30 percent in 1967 over 1966. And in 1966, there were 59,000 armed robberies by gun.

We know that aggravated assault by gun increased 22 percent in 1967 over 1966. And in 1966, there were 43,500 such assaults committed upon citizens.

For the year 1966 this adds up to more than 110,000 gun crimes of all kinds ranging from armed robbery to murder. Last year the figures jumped again. This year the trend is still upward. And so, although the great majority of gun owners in our country are responsible citizens, we can no longer ignore the fact that hundreds of thousands and conceivably millions of weapons have found their way into the hands of socially irresponsible elements—of criminals and juveniles and people with dangerous mental records.

Nor can we ignore the fact that the easy availability of guns of all kinds is in itself an important factor in our soaring crime rate.

The gun is by all odds the easiest and most suitable weapon for murder. It is also the easiest weapon with which to commit suicide or the easiest weapon with which to hold up a bank or a store or a victim on a street corner.

Mr. President, our newspapers are filled with gun stories every day. Indeed, there is not a day goes by that I do not pick up the newspaper and read about somebody being held up, or assaulted or killed with a gun.

On this point I would like to quote from an editorial description of the qualities which make guns socially dangerous, which appeared in the Washington Post on April 4, 1965:

It can be fired from a distance, thus sparing the killer any dangerous or disagreeable contact with his victim. A child can handle it, and indeed many a child does. It is not an expensive weapon. It is easily obtainable, portable, concealable, and disposable. If you take the trouble to wipe off the fingerprints, no one will be able to tell where you got it or who fired it. Even the smaller caliber pistols are marvelously effective at reasonable ranges, and one wonders why anyone wanting to slay somebody else should ever resort to any other device for doing so. . . . One also wonders why the rational members of society interested in staying alive should permit any Tom, Dick or Harry—anyone at all, from the village idiot to the upper echelons of Cosa Nostra—to obtain one of these lethal gadgets at will.

That it is easier to kill with a gun than to kill with a knife or a club, or some other weapon, has been confirmed by virtually every responsible authority in the field of criminology.

The opponents of gun legislation say, "What about knives? Will not criminals find other weapons if they do not have guns?" I have answered this by saying, "Have you ever tried to cut a loaf of bread with a pistol?" Of course, they are not the same at all. A knife may have many uses. But guns have one primary function, and that is to kill or to maim. Not merely are they infinitely more deadly than cruder weapons, but, as a University of Wisconsin study has confirmed, they make killing so fantastically simple that the mere possession of firearms serves as a psychological stimulant to murder, in the case of those who are antisocial or violence prone.

FBI Director J. Edgar Hoover has made the point in these words:

Those who claim that the availability of firearms is not a factor in murder in this country are not facing reality . . . a review of the motives for murder suggests that a readily accessible gun enables the perpetrators to kill on impulse.

Criminologists will also confirm that the juveniles and amateur criminals who are responsible for most of our armed robberies are frequently encouraged to a career of felony by the possession of firearms. It would require a particularly coldblooded type of criminal to attempt to hold up a bank or store armed only with a knife. But a holdup becomes a terrifyingly simple business whenever a gun finds its way into the hands of a rebellious juvenile or a mentally unbalanced individual or an amateur criminal.

And I want to state again for the record with all the emphasis I can that it is not the purpose of this legislation to penalize the millions of responsible citizens who are gun owners and gun collectors, but, on the contrary, to protect the legitimate gun owners and to protect the community at large by giving each State the power to place whatever restriction it may consider necessary on the sale of guns to juveniles and to socially irresponsible elements.

Mr. President, I might add that I know a great many sportsmen. I have hunted myself, and I believe that I know something about guns. Some of our best citizens belong in the group I have described as sportsmen. They are usually outstanding people. But these are not the people I am speaking about. They have been misled by the gun lobby into thinking that, if this legislation is passed all sports activities with guns would be restricted unreasonably or even stopped altogether. The fact is that there is not a line in this legislation that would do any such thing.

All honest sportsmen should be fighting for this bill because it would help them and protect them.

#### WHO IS FOR THE GUN BILL?

Responsible Americans overwhelmingly support the enactment of this legislation.

Our public opinion polls show that since 1959, from 70 to 80 percent of the people have consistently supported the enactment of stronger gun controls, including the provisions which I will soon discuss.

In the most recent poll, which was published in late April, 71 percent of the people indicated their support for stringent gun control legislation.

Gun control legislation has been endorsed editorially by the overwhelming majority of our newspapers and national magazines. A study conducted just over a year ago by the staff of the Juvenile Delinquency Subcommittee showed that our legislation had the editorial backing of papers which, between them, accounted for 93 percent of all newspaper circulation in the United States.

The language used by some of the hundreds of editorials in the files of the Juvenile Delinquency Subcommittee are anything but flattering to Congress. The Washington Post, for example, on October 22, 1965, said:

What paralysis of feeling, what hideous complacency, what failure of will and understanding, allow this kind of human sacrifice to be continued without an effort to prevent it? All of us—Congress and country alike—have sat apathetic and bemused by the perverted nonsense of the gun lobby

about the right to keep and bear arms. There has now been too much of this human slaughter. Let us stop it.

The San Francisco Examiner has charged Congress with shrinking from its responsibility in the urgent matter of firearms control. And the Boston Herald on July 24, 1967, made this comment:

For legislators to decry crime in the streets and the spiraling crime rate while allowing guns to be purchased as easily as chewing gum, is nothing short of hypocrisy.

The American Bar Association, the International Association of Chiefs of Police, and the National Association of Citizens Crime Commissions have endorsed this gun legislation and have urged Congress to act favorably upon it.

The National Council for a Responsible Firearms Policy, an organization of outstanding Americans from all walks of life, has also endorsed this bill.

Finally, the need for such legislation has been strongly endorsed by the Department of Justice, by FBI Director J. Edgar Hoover, and by the law-enforcement authorities in virtually all our major cities.

Why, then, can we not get on with the task of acting upon this reasonable proposal whose sole purpose is to aid our States in enforcing their own gun laws and in combating gun crimes within their own borders?

I know of no reason why this cannot and should not be done now.

We should no longer indulge the gun interests in their timeworn myths and their ruthless lobbying and their scare tactics, which have stalled the progress of this bill in the Senate for 5 years now.

#### WHO IS AGAINST THE GUN BILL?

Gun control legislation of any kind is violently opposed by the KKK, the American Nazi Party, the Minutemen, and other extremist organizations, both black and white.

Their propaganda is lurid, to put the matter mildly. For example, the Paul Revere Association Yeomen—it has as its acronym PRAY, of all things—has warned its members that, if they do not prepare stocks of firearms and ammunition:

Your wives and daughters will be chattels in Mongolian and African brothels.

This lunatic propaganda does not, I am certain, make any impact on the average American citizen. Every cause, I suppose, has its lunatic fringe and the fact of its existence should not disqualify the cause.

A far more formidable obstacle to the enactment of gun control legislation has been the persistent opposition of powerful and, I am sorry to say, respected organizations like the National Rifle Association and of gun magazines which enjoy large circulations among law-abiding American citizens.

According to certain press accounts, officials of the National Rifle Association have boasted—I repeat, boasted—that on 3 days' notice they can inundate congressional offices with more than half a million letters, postcards and telegrams opposing any legislation designed to regulate the sale of firearms.

The sad fact is that this is no idle

boast, because the gun lobby has over the past several years generated literally millions of communications of all kinds to Members of the Senate and the House.

From my own experience, from conversations with fellow Senators and from independent surveys that have been conducted by members of the press, I am convinced that the mail which our offices have received on this one issue far exceeds the mail generated by any other issue before the Senate.

I can understand the concern of Senators who receive thousands of letters and telegrams from the people of their State opposing this legislation, while hearing hardly at all from those who support it. But this imbalance seems to be in the nature of things in this country.

As a rule, those "agin" something have the fanaticism and technique and the facilities to inundate congressional offices. Those who are "for" something just do not seem to bother to write, wire, or get in touch with their representatives in Congress.

In a recent article in the New Yorker° magazine, an unnamed Western Senator is quoted directly in the following terms.

I'd rather be a deer in hunting season than a politician who has run afoul of the N.R.A. crowd. Most of us are scared to death of them. They range from bus drivers to bank presidents, from Minutemen to four-star generals, and from morons to geniuses, but they have one thing in common: they don't want anyone to tell them anything about what to do with their guns, and they mean it.

I ask the question: How much does the gun lobby really represent?

As I have pointed out, repeated public opinion polls since 1959 show that the overwhelming majority of the American people have consistently supported the enactment of gun control legislation, including the specific provisions of the legislation which I now propose again.

The fact is clear that the gun lobby, with all the hundreds of thousands of letters that it has been able to generate, does not speak for the American people—and history will so record.

The fact is, further, that the gun lobby does not even speak for a majority of American gun owners because, according to the most recent poll, 65 percent of all gun owners favor some form of gun control legislation.

For whom, then, does the gun lobby speak?

At the best it speaks for a very small, but terribly misguided minority, who do not really know what the gun bill is about.

Many of them are decent people. They do not understand what the gun bill is all about. They do not know what it is about because of the simple fact that they have been persistently misled by a handful of reckless and unscrupulous men who are in a position to mold public opinion in this very limited sector of the American community.

The misrepresentations and the lies about the gun bill have been repeated over and over again by the officials of the National Rifle Association and by the editors of the several most militant

*May 8, 1968*      CONGRESSIONAL RECORD — SENATE      12307

gun magazines, until they have achieved the status of dogma in the gun community.

But despite this, it is my conviction that the great majority of those Americans who have sent letters or telegrams to their legislative representatives opposing the gun bill, would support my legislation if they really understood it.

I make this statement from personal experience, because I have on some occasions in recent years been called upon to address audiences the majority of whom were critical of my bill. But their attitude changed immediately when they understood why this legislation was necessary, and what it does and what it does not do. In each case, members of the audience would come up and tell me that they really had not understood the gun bill was about and that my presentation had succeeded in changing their minds about it.

I remember one occasion in my State when I met with a sizable group of sportsmen. I presented the facts about this legislation. One fierce little man in the front stood up and said, "Now, Senator, tell us about the secret provisions of your bill."

That is the sort of thing we are up against in trying to get reasonable legislation.

And so, in appealing for the enactment of this legislation, I want to appeal in the first instance to the hundreds of thousands of decent, law-abiding, patriotic citizens who have written in to oppose the gun bill because they believed the lies and misrepresentations and distortions that have been broadcast about it.

The NRA and the other members of the gun lobby have charged repeatedly that my legislation calls for gun registration.

They keep telling that lie over and over and over again. But the word "registration" is not anywhere in the legislation, and NRA propagandists know it as well as I do.

I am not saying that it would not be wise to have it in. But I did not propose it, because it was a tough enough fight to get even this modest legislation to the floor. Still, the gun lobbyists go on lying about registration when they know it is not anywhere in the legislation.

So, again I say, the decent people, the patriotic people, sportsmen, and others, should take the time to study this bill and find out what it is all about.

The NRA has implied in its propaganda that the legislation would impose discriminatory or punitive taxes or fees on the purchase or ownership of firearms.

But again the fact is that there is no such provision in any of the legislation that has been considered in recent years.

The most that can be said for that lie is that this bill would increase the license fee from the ridiculous sum of $1 to $10, except for the first year—and it ought to be more than $1. The consequence of having the fee fixed at $1 is that every fly-by-night can call himself a licensed gun dealer, whether he has a place of business or not.

The editors of *Guns & Ammo* have sought to frighten sportsmen, gun col-

lectors, and gun merchants with this blanket description of the intent of the act:

> If you, as a collector, hunter, target shooter, gun dealer, gunsmith, or small manufacturer, wish to lose your rights to own guns, to go hunting, target shoot, deal in firearms, read no further. This bill will ultimately confiscate your guns—

Think of that: "Confiscate your guns"—

> make it impossible for you to hunt or stay in business.

But thousands and thousands of people have read this statement and, I suppose, thought it was true.

Not a word of this is true. There is not a single sentence in this legislation that could possibly be construed as imposing any restrictions on hunters or target shooters or collectors.

Some of the critics of the bill have charged that it would prevent nonresidents from bringing firearms into the State for hunting purposes. Again, there is not a shred of truth to this allegation.

Finally, some of the more reckless critics of the gun bill have charged that it is all a part of a Communist plot to disarm the American people so that the Communists can take over and impose their dictatorship. Registration, they say, leads to confiscation, and confiscation, in turn, makes a Communist takeover easier.

Not only is there not a word about "confiscation" in the legislation, but to anyone who knows anything about the history of Communist takeovers, this argument is the worst kind of nonsense.

Virtually every mountaineer in Albania had an unregistered gun before the Communists took over in their country. But that did not prevent the Communists from taking over.

On the other hand, the Swiss are a nation of sportsmen and gun lovers who for decades now have practiced the strictest kind of registration. But registration has not led to confiscation—and Switzerland remains one of the most stanchly anti-Communist countries in Europe.

I suppose it is idle to dwell on this argument about passage of reasonable gun control legislation helping the Communists, but, unfortunately, there must be people who believe it. I quote it only because it is characteristic of the irresponsible campaign of propaganda and lies against this sensible measure.

If the gun lobby were to carry this argument to its logical conclusion the first measure they would have to take would be to destroy the entire membership list of the National Rifle Association and the subscription lists of the dozen or more gun magazines. For if a Communist regime were ever to take power in this country, it could, by impounding these various lists, instantly be able to compile a nationwide master list of the names and addresses of gun owners.

To my recollection, none of my colleagues has argued, as has much of the far-out mail received in my office, that the enactment of a gun bill would pave the way to a Communist takeover in our country.

But they have argued that the pro-

scriptions contained in the measure are too severe.

Among other things, they cite the so-called inconvenience factor, arguing that a ban on the interstate mail-order sale of firearms would impose undue hardship on farmers and ranchers who may live far from any gun store and who find it more convenient to order their guns through the mail.

Even if the inconvenience factor were a reality, I would still say that the saving of thousands of human lives is far more important than any inconvenience that might be suffered by the relatively small number of farmers and ranchers who do not have ready access to gun stores in the communities in which they do their customary shopping.

But the fact is that the so-called inconvenience factor is a myth.

The fact is that under the proposed legislation isolated farmers and ranchers would still be able to order handguns, as well as rifles and shotguns, through the mails. The only difference is that they would have to order their handguns from firms operating in their respective state, and I do not believe there is a State in this Union that does not have such an outlet. If there is, I do not know about it. They can order from Sears, Roebuck; they can order from Montgomery Ward—and I do not make a point of selecting those two. There are others, I know. My point, Mr. President, is that there are outlets in every State.

I know it is going to be a little inconvenient—just a little inconvenient. But it is inconvenient to have to buy an automobile license. It is inconvenient to pay taxes. We all suffer many little inconveniences in order to achieve a better ordered society, and to save lives and curb crime.

Some of the opponents of the bill—the more reasonable and sensible ones—have also argued that it is not guns that kill people, but the criminals behind the guns. And they have further argued that, criminals being what they are, they will succeed in obtaining weapons despite any laws which we may enact.

The basic fallacy in this argument is it lumps all gun criminals together in a single criminal category.

It may be true that the hardened criminal, the so-called professional, will succeed in obtaining weapons no matter what laws we may pass. But the great majority of those involved in gun crimes are not professional criminals. They are, on the contrary, amateur criminals, some of them one-time offenders, some of them "hopped-up" juveniles involved in their first breach of the law.

In the case of these amateur criminals, it is frequently the weapon that kills rather than the criminal himself. The professional criminal—and I have known some, I have spent some part of my life in criminal work—will not attempt to hold up an old man for the paltry few dollars he may have in his pocket, and then, if he encounters any resistance, panic and fire. He does not operate that way.

But every year there are hundreds of murders perpetrated in precisely this way by amateur criminals—by kids, youngsters, and juveniles.

The professional criminal, sad to relate, is frequently a man of better than average intelligence. The amateur criminal, on the other hand, is, more frequently than not, a person of inferior intelligence and inferior initiative who would find it very difficult to obtain a gun for himself if the law placed a few obstacles in his way, instead of making it so incredibly easy to obtain weapons of all kinds, singly or in wholesale quantities.

Again I say, Mr. President, the thing that makes the gun so deadly a weapon, especially in the case of the amateur criminal, is that it is so terrifyingly easy to kill with a gun. As any psychiatrist can confirm, it requires far less psychological effort to stand back at a distance and simply pull a trigger than it does to plunge a knife into another man's body. Because of the terrible ease with which guns can be used, it is true in countless cases of murder and aggravated assault that it is not the finger that pulls the trigger, but the trigger that pulls the finger.

The opponents of the gun bill have also argued that there is no firm evidence that stricter control over the sale of firearms would effectively reduce the incidence of crimes of violence. I do not understand this argument. I simply do not understand it, because in making it, they fly full in the face of every statistic, national and international.

Surely there is an unchallengeable lesson to be derived from the fact that those countries that have tight regulations governing the sale and possession of firearms, have far lower crime rates than we have; and from the further fact that, in our own country, those States that have tight gun laws suffer from far fewer murders and other gun crimes, per 100,000 people, than those States that have no gun laws or ineffective gun laws or none at all, or practically none.

Mr. President, I want to make it perfectly clear that I do not claim that enacting a Federal gun law will curb all gun crimes overnight or, for that matter, at any time in the foreseeable future. But I do maintain that we can make substantial inroads into this problem and we can curtail it dramatically, I believe, so the future generations will not be victimized by the mail order gun murderer, or by the street robber who obtained his Saturday night special in a store just over the State line.

The facts that the Juvenile Delinquency Subcommittee have compiled over the last 6 years have convinced me of the need for the controls called for in title IV. I can only hope I will be able to convey to the Senate the terrible urgency of the need.

There are stronger voices that will be speaking on this matter later, but I would like to outline briefly for the RECORD the provisions of title IV.

Generally speaking, they are comprehensive and detailed, as they must be if they are to be effective.

I realize that some of the provisions are also controversial. But controversy is inescapable when we are charting a new course for effective Federal control.

Acknowledging this, I am convinced that the legislation now before us is

neither unreasonable nor imprudent. It would, indeed, be imprudence of the worst kind to attempt to do less.

Let me now take each major provision of my legislation and explain why it is needed, what its intent is, and what its impact will be.

1. THE PROHIBITION OF THE INTERSTATE MAIL-ORDER SALE OF HANDGUNS

First, title IV would prohibit the interstate mail order sale of all firearms other than rifles and shotguns to nonlicensed individuals.

At the present tme, as I have tried to point out, any person, no matter what his age or what his background can purchase firearms, singly or in quantity, by the simple device of filling out a coupon and sending it in to a mail-order house.

The following facts, I believe, document the need for the mail-order provisions in the bill.

Testimony before the subcommittee in 1965 proved that of 4,069 Chicago mail order gun consignees from just two dealers, 948 had prior criminal records which would have precluded them from purchasing weapons in that city. Thus, a significant number of criminals, one quarter of the total number of mail order consignees, received mail-order guns. The criminal careers of these consignees run the gamut of serious crimes, including murder.

The attorney general of New Jersey told the subcommittee, in a survey of mail-order gun recipients in his State, that 40 percent of the guns sold in this manner were sold to persons without permits, a requirement of New Jersey law that was ignored. Further, he indicated that in 44 percent of the cases where permits were not issued, the person had a prior criminal record.

Additional testimony by witnesses from Philadelphia, New York, Atlanta, St. Louis, Los Angeles, and the State of California, attested to the circumvention of their laws by the interstate traffic in mail-order guns.

In addition to the testimony of witnesses, the subcommittee obtained further documentation of this problem through independent investigations and inquiries.

We found that 25 percent of the mail-order gun recipients in the District of Columbia had criminal records prior to the time of ordering and receiving mail-order guns.

In Indiana, 10 percent of the consignees had prior criminal records.

In Connecticut, 13 percent of them had such records.

And so it goes across the Nation.

The statistics, in themselves, may be cold and undramatic.

It might help to inject a bit more meaning into them if we pause to visualize a few of the cases in this category of death by mail order—the killing of a 14-year-old boy in Virginia, the slaughter of an entire family in suburban Baltimore, a double murder of a mother and son in Massachusetts, or a slain President, all prematurely and brutally cut down with mail-order guns.

2. THE PROHIBITION OF HANDGUN SALES TO NON-STATE RESIDENTS

I now turn to the second major section of title IV which will prohibit the over-

the-counter sale of all firearms other than rifles and shotguns to nonresidents of any given State.

This is a serious area of criminal abuse of firearms. Perhaps the most thorough inquiry ever undertaken into the sources of guns used in crimes across the country concerns this very problem.

During the subcommittee's 1965 hearings on Federal gun control legislation, the commissioner of public safety of Massachusetts referred to what is undoubtedly the most completely documentation at the State level of just where and how criminals obtain firearms. He testified that over a 10-year period, the Massachusetts State Police had traced 87 percent of the 4,506 guns that had been used in the commission of crimes in his State to purchases made outside of Massachusetts. Massachuetts requires that a permit be obtained to purchase handguns. But this law was rendered useless and futile because of the ready availability of guns in neighboring States with no guns laws.

One Massachusetts criminal bought nine snub-nosed revolvers in a neighboring State, using a fictitious name each time. Subsequently two of the guns were found in the possession of George McLaughlin, one of the FBI's 10 most-wanted criminals.

Another case concerned a 16-year-old youth, who traveled to another State, which I shall not identify, and he bought three handguns and then sold them to youths who used them in crimes in the greater Boston area.

Should the laws of the States be contravened and abused in this manner? I leave the answer to Senators. Is this fair? Is this right? Is this intelligent?

Why, it makes a mockery of State control of firearms, and, for that matter, of State rights in general.

We know of a similar situation in Detroit, Mich. Just 1 week prior to the rioting which ravaged that city in July of 1967, the prosecuting attorney of Wayne County, which includes Detroit, testified before the subcommittee relative to gun control legislation.

He stated that 90 of every 100 guns confiscated by the Detroit police from lawbreakers are not registered in Detroit. This means that these firearms were not purchased in Detroit, or, for that matter, in the State of Michigan. The laws of that State require that a permit be obtained to purchase a handgun and that such sales be registered.

The prosecuting attorney said that the majority of these unregistered guns were traced to purchasers in a nearby city in a neighboring State which appears to serve as the unofficial armory for Detroit's gun-toting citizens. In this State, by the way, gun controls are nonexistent.

Subsequent to the Detroit disturbances, the subcommittee compiled the case histories of those persons who had been arrested on gun charges during the rioting. Their arrest records prove that many of them who had criminal records prior to the rioting had purchased their firearms outside of Detroit and then brought them into Detroit.

Additional witnesses at the subcommittee's hearings testified with regard to the problem of nonresident purchases of crime guns.

*May 8, 1968*          CONGRESSIONAL RECORD — SENATE          12309

Specific instances of persons traveling outside of their residence jurisdiction to buy guns which were then used in crimes of violence "back home" were cited by police officials from Washington, D.C., Los Angeles, and Philadelphia.

The attorney general of New Jersey cited a survey of nonresident purchase of handguns by residents of that State.

Twenty-seven persons using New Jersey addresses purchased 65 handguns in a nearby State. Eight of the purchasers used either fictitious names or addresses. Five used the same fictitious address, and one of them, who purchased 12 of the guns, was found to have a lengthy record for such offenses as robbery, extortion, assault, and attempted rape.

Further investigation into this aspect of the problem by the subcommittee revealed that gun dealers in the suburbs of Washington, D.C., had sold significant numbers of their weapons to residents of the District of Columbia.

One major dealer in the Washington suburbs sold 60 percent of his handguns to residents of the District, 40 percent of whom had criminal records. They were persons who could not buy guns locally because of their criminal background, and they simply took a short bus ride to another jurisdiction, with lax gun laws, and bought their guns there.

No wonder the streets of our Nation's Capital are so unsafe.

Just recently in our Nation's Capital, a convicted felon made several trips to Martinsburg, W. Va., to buy handguns. Over a 3-month period, he bought 43 of them, all of which were foreign made, imported, inexpensive belly revolvers. He illegally sold 30 of the guns to District residents before being apprehended by police, who had been alerted to his activities by authorities in West Virginia.

The testimony repeatedly proved the ease with which any criminal could purchase guns utilizing interstate sources. The examples of abuse that I have cited are typical of a nationwide situation which can only be called scandalous and shameful.

Clearly, the nonresident purchase of handguns is a serious problem facing law enforcement and one which contributes significantly to our spiraling crime rate.

The bill now before us would prohibit this illicit activity I have described.

Yet, the impact of this provision on the law-abiding and responsible citizens would be small. He would have to buy his handguns, pistols and revolvers, in his home State. And he could simply note the make and model and order it through his local dealer.

The impact on the criminal community, however, in particular on the low-grade amateurs who constitute the great majority of this community, would be considerable. If these provisions were rigidly enforced, there is every reason to hope that many of these amateur criminals, as I describe them—these doped-up kids, these first offenders who get into bad company—would be deprived of easy access to guns. And if they did not succeed in finding weapons for themselves, the chances are that they would be discouraged from further pursuing their criminal career.

Firearms controls at the State level can never be effective until this interstate source of firearms for criminal purposes is curbed.

3. THE PROHIBITION OF HANDGUN SALES TO MINORS

The third major provision of title IV would prohibit federally licensed dealers from selling firearms other than rifles and shotguns to persons under 21 years of age.

This provision it is obvious will help curtail the misuse of firearms by minors, which we know is a problem of serious proportions and one which is increasing each year.

In 1966, minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence, including murder, rape, robbery, and aggravated assault.

Twenty-one percent of our arrestees for murder in 1966 were under 21.

For robbery it was 52 percent and for aggravated assault, 28 percent.

Law enforcement authorities agree almost to a man that we can significantly reduce crimes of violence by our young people by making it more difficult for those who are crime-prone to obtain handguns.

The measure I am proposing calls for the outright prohibition of the sale of firearms other than rifles and shotguns to anyone under 21.

==How would this provision affect responsible Americans?==

==At the most, it could cause minor inconveniences to certain youngsters who are mature, law abiding, and responsible, by requiring that a parent or guardian over 21 years of age make a handgun purchase for any person under 21.==

I know that there are some youngsters under the age of 21 who are more mature than others. However, I do not know any way to legislate fairly in this area except to require that, if they are going to have a handgun, the parent or guardian must buy it for them. That is what we try to do in this bill.

But, I believe that, if a young man or woman decides to purchase a handgun, their parent or guardian should be aware of the purchase and should approve of it.

I do not believe that the requirements of this bill are unreasonable, especially in light of the continuing increase of crimes of violence by persons under 21 years of age.

4. REQUIREMENT OF IDENTIFICATION

The fourth major provision of title IV requires that all purchasers of firearms from Federal licensees be required to identify themselves by name, address and age. This does not seem to me to be very much to ask.

This is certainly not too much to ask, in view of the fact that all people are required to establish their identity, by producing a driver's license or draft card or some other document of this nature, on many occasions—for example, when they make purchases by check. He would be required to identify himself.

Title IV also provides that the licensee would have to record the identity of the purchaser and maintain this record in his files. I say that this, too, is a very

mild requirement and a very simple matter.

At present, the Federal Firearms Act does not require positive identification of the purchasers of firearms from licensees. This is a shortcoming which has been documented in the subcommittee's hearings.

The use of fictitious names, addresses, and ages has been utilized on countless occasions by juveniles and criminals who want to purchase guns anonymously.

We need look no further than the assassination of President Kennedy to show just how easy it was for Lee Harvey Oswald to obtain his mail-order rifle under fraudulent circumstances. That is the most tragic and unforgettable incident of its kind, but believe me, there have been many, many more.

Other examples come readily to mind.

There was the case involving the purchase of two Lahti antitank guns by a gang of bank robbers who used them to blast open the safe at the Brinks Co., in Syracuse, N.Y.

There was the case of the two Los Angeles police killers who bought guns under fictitious names in Nevada.

There was the case of a New York felon who purchased 12 guns in Maryland using a New Jersey address.

There was the Boston criminal who traveled through New Hampshire buying guns under fictitious names.

And so on, ad infinitum.

By providing for this elementary measure of control, this measure would not only give us an enforceable law, but a law that would be tremendously helpful to law enforcement in general, in every State in the Union.

5. THE LICENSING OF MANUFACTURERS, IMPORTERS, AND DEALERS

The fifth major provision of title IV requires that all dealers, manufacturers, and importers of firearms, destructive devices, and destructive device ammunition be licensed.

Virtually all dealers today are federally licensed, but this provision would serve to make licensing universal.

Beyond this, it establishes certain minimum standards that must be met by applicants for licenses. Under the Federal Firearms Act, the standards established for the granting of licenses are, at the best, nominal; at the worst, meaningless. For example, there is no established age requirement in the Federal Firearms Act. It does not even require that the applicant be in the firearms business. The license fee is now $1 for dealers and only $25 for manufacturers.

Under the provisions of title IV, and applicant for a Federal license would have to be 21 years of age.

He could not be a felon or a fugitive—which is also a requirement of existing law.

He would be required to have a place of business, and assurance would have to be given that he, in fact, intended to begin his business operations during the term of the license applied for. Certainly, these are reasonable things to ask.

An applicant for a dealer's license would be required to pay an initial fee of $25 to partially defray the costs of investigation, and an annual renewal fee of

$10 to cover the administrative expense of processing and issuing renewals.

A manufacturer or importer applying for a license would be required to pay an annual fee of $500. I think that is not too much for a person who is in the business of importing or manufacturing firearms.

Now, it has been insidiously inferred that I am in some kind of "cahoots" with the gun manufacturers in Connecticut, where, I believe, we have 10 out of 80 manufacturers in the country. But the fact is that not a single one of the gun manufacturers in Connecticut is for my proposal.

The gun lobby has misrepresented my bill in a hundred different ways. I am used to lies. But I particularly resent the lie being peddled around that I am out to help the Connecticut gun manufacturers when, down to the last man, they oppose my proposal.

Fees for dealers, manufacturers, and importers of destructive devices—and these, in my judgment, are the worst of all—would be set at $1,000 annually.

Fees for pawnbrokers desiring to be licensed would be set at $250 on an annual basis.

For the record, I am frank to say that this last is a somewhat arbitrary figure. I do not say that all pawnbrokers are crooked. But the best advice we could get from the law enforcement people was that the figures should be somewhere in this area. Perhaps there is a reason for setting the higher licensing rate on that kind of business. In any event, I do not make a big thing of it. If pawnbrokers are properly controlled in the area in which they exist, that is not so important.

The intent of the licensing provisions, including the establishing of standards and the setting of reasonable fees, is to insure that only legitimate businessmen, actually engaged in the firearms business or intending to engage in it, can obtain licenses.

Another reason for increasing the licensing provisions is that our subcommittee has documented countless abuses in the licensing area.

For example, it is estimated by the Treasury Department that 25 percent of presently licensed dealers are not, in fact, businessmen, but simply individuals who have secured a $1 Federal dealer's license in order to ship or receive firearms in interstate commerce at substantial discounts or savings to themselves.

Then there are the gun dealers with Federal licenses who deal from the trunk of a car or the back of a truck. We know of one case of a man who traveled around as a gun dealer peddling his wares from a truck in the State of California, after he had driven across the country from Delaware. He was able to do that, because he had a Federal license which he purchased for $1.

Problems like these place a very heavy burden upon our law enforcement officials. Clearly there is need for stronger controls upon the activities of fraudulent dealers in firearms.

My legislation would provide those controls by effectively regulating the Federal licensing of dealers, manufacturers, and importers.

These provisions would not adversely affect the legitimate businessman. They are intended to insure that it is he, and he only, who becomes licensed.

That is what we need in this country—legitimate people in the gun business, and not fly-by-nights who can get a license for $1 and peddle their wares by truckload anywhere in this country. We must get rid of the fly-by-nights, the fringe operators, whom we have come to know during our inquiries. Under the licensing provision of title IV they would be eliminated—and I think they should be.

6. PROHIBITING THE IMPORT OF MILITARY SURPLUS WEAPONS

The sixth major provision of title IV would prohibit the import of military surplus handguns, destructive devices, and other nonsporting handguns. Further, it would regulate the import into the United States of all firearms.

Although this is an area of controversy, I believe that the weight of evidence proves the need for the enactment of import controls.

The first point that must be made is that the United States no longer sells its own surplus arms to the public.

Why, then, should we allow the United States to be the dumping ground for all of the cast-off military arms of the world?

The nations providing the bulk of this surplus armament to international arms traders for import to the United States do not allow the sale of surplus weapons, foreign or domestic, in their own countries.

Second, the bulk of the surplus imports which would be banned under my bill and nonsporting weapons. They are the left-overs from World War I and World War II. Many of them were originally made in the United States and then lend-leased to allies during the wars. They are subsequently imported into this country as parts rather than as assembled firearms, in order to evade the high import duties on assembled firearms.

When imported into the United States, foreign surplus handguns are frequently rebored and rechambered, and converted into snub nose revolvers.

There is no legitimate need for the continued import into the United States of such weapons.

Included in the import ban would be the so-called destructive devices—the bazookas, antitank guns, mortars and other heavy armaments of war. There has been little opposition, I want to note parenthetically, to these control provisions.

I would like someone to tell me, if there is anyone who has that view, what reason there can be for importing a bazooka into this country today. Who would like to live next door to a fellow with a bazooka? I do not know anyone who would like to do that.

Another category of weapon that would be hit by the import ban is the so-called Saturday night special, the inexpensive, easily concealed, .22 caliber pot metal pistols and revolvers, and the blank starter guns.

There have been enough starter guns imported into the United States to equip

every high school, college, or other athletic track event for the next hundred years.

Clearly, the bulk of these guns have not been imported for sporting events. They are imported as blank guns, and then rifled barrels are fitted to the frame upon entry into the United States, to be sold eventually on the street corner for $12 or $14, or more, depending on what the traffic will bear.

Let me tell Senators that a rifled barrel starter gun will kill a person as quickly as will a pistol built for that purpose—and such guns have been used for that purpose.

Testimony from law enforcement authorities who appeared before the subcommittee bears this out.

The subcommittee's current inquiry into the background of America's murderers has established that it is the inexpensive, small caliber imported revolver that is used in over half of the murders where identification is made on the gun.

The impact on crime of the import prohibitions in this bill would be substantial. On this point, law enforcement leaders throughout the land are agreed.

The attorney general of South Carolina, the attorney general of California, and the chiefs of police in Atlanta and St. Louis have urged that the traffic in these small caliber handguns be curbed.

The files of law enforcement agencies throughout the country prove that 50 to 80 percent of America's crime guns are foreign imports.

The critics of this provision answer by asking, "If guns are not imported, would not there still be as much murder?" I do not think so, because the price at which these imported weapons can be brought in and sold is so much lower than the price at which a legitimate gun manufacturer or dealer can sell. This makes it much easier for amateurs, low-grade criminals to buy them.

If we seriously intend to curb crime in America, then we must certainly curb the import of surplus firearms, especially surplus handguns.

What impact would these import provisions in my bill have on the American sportsman?

The weapons which would be prohibited are not, by any stretch of the imagination, sporting firearms.

The voice of America's sportsman—to give the National Rifle Association some credit—the National Rifle Association does not even carry advertisements for these Saturday night specials; and, in product evaluation studies, the NRA has dismissed these weapons as inferior.

Military surplus rifles, such as the well-known Enfield and Mauser, which are used by America's hunters, could be imported.

There is certainly no intent in my mind to hinder or interfere with the lawful pursuit of hunting or recreational shooting.

7. THE CONTROL OF DESTRUCTIVE DEVICES

The seventh major provision of this measure would regulate by the most stringent controls the acquisition of the destructive devices, the large caliber armaments of war such as bazookas, antitank guns, and mortars.

*May 8, 1968*　　CONGRESSIONAL RECORD — SENATE　　12311

I do not feel there is any need to dwell on this matter. I just cannot imagine anybody being in favor of having these deadly, dangerous, useless instruments around.

Today, under present Federal law, an individual may purchase a 20-millimeter antitank gun with the same ease that he would purchase a .22 caliber plinking rifle.

Such tolerance should outrage the sensibilities of all intelligent men. It is simply insane to permit it to go on.

Mr. President, I speak of the situation because it is a specific example of the laxity of present law concerning the regulation of these weapons of mass destruction.

Such weapons, as I say, have been abused by youngsters in California, and also in New Jersey.

Such weapons have been used in robberies, including the virtual blowing up of a Brink's building in Syracuse, N.Y.

This provision is undoubtedly the least controversial in my bill. There has, in fact, been little opposition to placing stringent controls over the acquisition of these weapons. What little controversy there has been involves not the substance of the controls, but just where in the Federal law such controls are to be placed.

I maintain that the destructive devices provisions in my bill are in order, and that they should be placed under the Federal Firearms Act.

The Federal Firearms Act, which title IV amends and strengthens, has, since its enactment in 1938, been the statute of general interstate control of all kinds of firearms.

On the other hand, the National Firearms Act, with its taxing provisions—and that is about all it has—covers only machineguns, sawed-off shotguns and rifles and the so-called gadget guns.

The National Firearms Act does not proscribe the sale or shipment of these weapons to felons or fugitives, but only imposes a transfer tax upon the transfer of such weapons.

All it does is impose a tax. I say, what kind of way is that to deal with sawed-off shotguns, sawed-off rifles, and machineguns?

A tax on them? A pox on them, I say.

Anyone should be punished for having any such a firearm in his possession, and anybody who sells one ought to be punished too, except if it is being put to some legitimate use in the law-enforcement branches of our Government.

It will probably be surprising to those who take the time to read what I have said here today that there is no prohibition in the National Firearms Act against the shipment of these weapons. However, there is a prohibition on the interstate transfer of firearms to felons and fugitives in the present Federal Firearms Act.

If title IV is to become the updated Federal law covering all firearms, then its provisions should clearly include those firearms that are classified as destructive devices.

8. PENALTIES FOR VIOLATIONS

The eighth major provision of this bill calls for increased penalties for violations of its provisions.

At present, the Federal Firearms Act imposes penalties of up to 5 years imprisonment and $2,000 in fines, or both.

It is my view and that of the administration that an increase in these penalties is called for if we are to accomplish the overall goals of the legislation.

In line with this, title IV provides for penalties of up to 5 years imprisonment and $5,000 in fines, or both; and, for certain specified offenses, such as the willful shipment of firearms for felonious purposes, a term of imprisonment of up to 10 years and fines of $10,000, or both.

This concludes my discussion of the major areas of title IV.

I wish now to turn for a moment to the declarations and findings section, for, while it is nonsubstantive, and simply states the problem as determined by the Congress, it is, I recognize, controversial.

This section simply summarizes the committee's findings over the last 6 years.

There is certainly no intention on my part, nor the committee's, to critize America's sportsmen or to lump sportsmen with criminals.

The declarations and findings are a straightforward summary of facts determined to be true by the subcommittee over the last 6 years, and adopted by the full Judiciary Committee in its report.

Furthermore, the section spells out what we believe to be the rights of law-abiding citizens to purchase and own firearms for lawful purposes, and makes it clear that it is not our intention to interfere with those rights.

I believe that this is an accurate reflection of the problem and a factual assessment of the impact of the bill's provisions on law-abiding American sportsmen.

While there may be some emotional temptation to strip the bill of its declarations and findings—and I hope there will not be—I see no objective reason for doing so and urge its retention in the measure.

Mr. President, in conclusion, I believe that I have documented a serious problem of gun abuse in this country and I have tried to pinpoint those areas of abuse which the Federal Government has the responsibility to correct through the enactment of proper controls.

I now urge that we consider this legislation upon its merits.

I believe its merits are considerable and that it is preferable to any other gun proposal that the subcommittees and committees of this body have considered since December of 1963.

There is one possible misunderstanding of a procedural nature that I would like to set to rest.

It has been charged that title IV in effect repeals the Federal Firearms Act of 1938 and that, in doing so, it deprives us of the important protection of this pioneering firearms law.

Let me set the record straight on this point.

Title IV does transfer the Federal Firearms Act from one section of the United States Code to another section. But this is a far different matter from "repealing" it.

It transfers it to title 18 of the United States Code, where, I believe, it belongs. That is the criminal code. And we are

talking about the criminal misuse and abuse of guns. And if we want to have reasonable control over this traffic, it ought to be under title 18.

I repeat: I do not want to repeal the Federal Firearms Act; I want to strengthen it and put it where it really can be enforced.

Mr. METCALF. Mr. President, will the Senator yield?

Mr. DODD. I yield.

Mr. METCALF. Mr. President, the Senator is not talking about repealing the Federal Firearms Act, but is talking about transferring it to the Criminal Code. The Senator is proposing to carry all the provisions of the Federal Firearms Act over into the Criminal Code; so that nothing is actually repealed.

Mr. DODD. The Senator is exactly correct. I am glad that the Senator asked that question. It is very helpful. That is exactly what I am trying to say.

I believe that it ought to be under title 18. I believe that it ought to be strengthened. I do not want to repeal one word of it.

It was simply my wish to transfer the Federal Firearms Act, as modified by title IV, from title 15 of the United States Code to title 18 of the Code, for the simple reason that it properly belongs in the Federal Criminal Code, or title 18 as it is commonly called.

To me it makes sense that a Federal law designed to curb the flow of firearms to criminals, juveniles and other irresponsible elements, and which establishes criminal penalties for its violation, belongs in that portion of the United States Code which contains all of our criminal laws, rather than under title 15, which takes in all the Federal laws pertaining to commerce and trade. This is not basically a problem of commerce and trade. This is a problem of law enforcement and keeping guns out of the hands of criminals and lunatics and children.

Any firearms bill inevitably bears an incidental relationship to trade and commerce. But it is immeasurably more involved with Federal crime and law enforcement.

There is no doubt in my mind that the measure I am now sponsoring is sound morally, sound juridically, sound politically, and sound by every standard against which legislation can be judged.

Nor is there any doubt in my mind that its enactment would be a major victory for the cause of law enforcement, and that it would over the coming years save scores of thousands of Americans from death or maiming at the hands of trigger-nervous criminals, most of them juveniles and low-grade amateurs.

Nor is there any doubt in my mind that the enactment of this legislation would do much to redeem America's reputation in the world community.

It should be a matter of concern for every American that our best friends look with horror upon the violence that is epidemic in our country and upon the easy traffic in guns that contributes to this violence.

That situation does not exist anywhere else in the world.

On this point I would like to quote the recent words of a British journalist by the name of Henry Fairlie, who lives in

Washington and who truly loves our country. This is what he said:

> There is an element of violence in American society which the outsider has to learn to comprehend. History and character cannot be reversed and changed overnight. But this is no excuse for allowing violence such an easy access to the weapons which it not only needs, but which actually encourage it, tempt it, incite it. However much I may love and admire America, its gun laws come near to ruling it out of civilized society.

I appeal to Senators to vote for this measure on the basis of its merits.

I appeal to them not to be misled or cajoled by the scores of thousands of letters and telegrams with which a powerful and highly organized lobby is at present—as in the past—inundating Washington.

I appeal to them to weigh the facts and to weigh the statements of our law enforcement authorities, from Mr. J. Edgar Hoover down.

I appeal for their concurrence in the proposition that the sanctity of human life and the prevention of crime are infinitely more important matters than the negligible inconvenience that our hunters and sportsmen may suffer in consequence of this bill. I appeal especially to the Senators from States in which firearms are commonly used. I know that scores of thousands of decent law-abiding sportsmen have been misled by the propaganda of the gun lobby and I wish to drive this fact home. They have been misled by the National Rifle Association, with its vast membership, and its millions of dollars, and its unscrupulous methods. I wish Senators from the States in question would understand how little the gun lobby really represents and how much they have distorted the facts about this legislation. And most of them would understand it. I am disposed to believe, if they read the bill carefully.

As the Senate knows, the terms of the bill which I originally submitted also applied to rifles and shotguns. In the course of a prolonged committee debate, however, rifles and shotguns were removed from the coverage of title IV, because I could not get that bill through the Senate committee in its original form.

In my opinion, as I said at the time, this was a mistake. My conviction has been reinforced by the fact that, only hours after the committee had voted to approve the measure without long guns, the news came that Martin Luther King had been killed by an assassin armed with a rifle.

Crime statistics prove that long arms are used in more than one-third of all gun murders committed in this country. On top of this, I do not think that anyone can remain unconcerned over the growing role played, in the current epidemic of riots, by rifles in the hands of so-called urban guerrillas, many of them men with criminal records.

It is therefore my hope that title IV will be amended so that its coverage will include shotguns and rifles. This will not be easy, perhaps, because the gun lobby has been so successful in frightening so many decent hunters and sportsmen into believing that, if this title is passed, they will not be able to engage in that sport. But I am nevertheless optimistic that

they will support this measure when they know the facts.

They should be on my side. They should be up front fighting for this title, because it protects them as much as it protects the rest of our society. With such an amendment, title IV would closely parallel the gun control legislation which I introduced in 1966 on behalf of the administration.

My final appeal to Senators is that they vote for an adequate measure, that they vote for a strong measure, that they vote for title IV in its strongest possible form.

I urge them not to miss the opportunity that now presents itself, because, if the past is any guide to the future, and if we fail to enact an adequate measure in this session, it may be another several decades before Congress again gets around to dealing with this problem, so vital to the enforcement of our laws and tranquility of our society.

One of this Nation's most distinguished lawyers, Edward Bennett Williams, who is from my State, and of whom we are very proud, delivered a speech last week at Georgetown University Law School, and I quote part of what he said:

> We must at long last get Congress to stop cowering before the gun lobbies. As long as there is no effective gun control legislation in this country, violence will be so much the harder to contain.
>
> When the Congress gets the courage to stand up to the National Rifle Association, it will have taken its first significant step toward the suppression of violence in the cities.

Thus spoke one of the ablest and most experienced lawyers in our Nation, a man whom I am proud to call my friend and my neighbor.

It was a statement which, I know as a certainty, reflects the thinking of the overwhelming majority of our citizens, including our gun owners.

It was a statement which, I am equally certain, reflects the thinking of virtually all of our law-enforcement authorities.

It was a statement which would be endorsed by the hundreds of newspapers which have called editorially for stringent gun control legislation, and which, as I have pointed out, represent between them more than 90 percent of the total newspaper circulation in this country.

I now propose that, in addressing ourselves to this measure, we do our duty as the elected representatives of the American people.

Historically, every time a solid, workable proposal is made to control the sale of firearms to criminals, assassins, juveniles, and mentally disturbed individuals, the same self-styled keepers and interpreters of the Constitution drag out the same basketful of shopworn arguments which they use to befuddle the public, boggle Congress, and kill the proposed legislation.

They have succeeded admirably. Until now, for the last 30 years not a single piece of substantive firearms legislation has gotten to the floor of the Senate for debate.

And in those 30 years, the criminal, the assassin, the juvenile, the sniper, those previously known as mental patients, and certified madmen have gone on their merry way, killing and maim-

ing, oblivious to whom they owe so much for their license to buy what firearms they will to vent their rage.

They are probably not aware that a powerful lobby made up of misled sportsmen, who have been fed a steady diet of distortion and misinformation on firearms laws and the need to advance these laws beyond the cowboy and Indian, horse and buggy requirements of a generation ago, is responsible for the great firearms freedom that they enjoy.

I am periodically bombarded with letters from "sportsmen" and "sporting groups." It is clear to me that those who wrote the letters are unsure of themselves. They are scared.

Many, for example, speak of "guns for home protection" in the event law and order breakdown, not realizing that much of their argument is the result of the gunrunners exploiting fear during a time of civil unrest, and suggesting a gun in every home as a solution. When a person is scared and unsure of himself, he should not be handling a gun.

I have received thousands of such letters. And a common thread runs through them all. That thread is fear. The gunrunners discovered it long ago. And they have exploited it. This year the biggest domestic sales of arms in our history will be recorded.

That is the effect that can be had by a powerful, well-financed, well-organized lobby.

Mr. President (Mr. BURDICK in the chair), there is a tendency to forget that the gun lobby is only a relatively small group, and that it depends on terror for its success. It moves its membership to write letters to legislators, newspapers, and Congressmen by telling them falsely the law threatens to take away their firearms. Nothing could be further from the truth. It plays on their fear.

The members try to intimidate the Congressmen by threatening to vote against them at election time.

As I said earlier, I come from one of the largest gun-manufacturing States in the Union and the gun people in my State are not for me, or at least none of them that I know of. They work very hard against me.

It interested me and comforted me that one of those large gun-manufacturing companies allowed me to go through its plant when I was home the last time. I was fearful about it, and I did not know how I would be treated. The men and women at the benches were on my side. I received a heartwarming reception. I was told, "Do not be afraid of the gun lobbies. Do not let them frighten you out of what you know is right."

Yes; it is basically a system built on terror.

And remember, at all times, this small group, motivated and financed by the self-interest of the gunrunners, is the one who has succeeded in opposing laws that most of America wants, to disarm the criminal, and those similarly unqualified to go about armed to the teeth.

Well, then, who are those who want good laws, who want the wide-open sale of firearms to criminals halted, who are sick at the thought of Americans arming against Americans, laying in stockpiles of weapons and ammunition for the long hot summer?

Recent editions of the CONGRESSIONAL RECORD are replete with public opinion polls showing that more than 70 percent of the American public are in that group.

I have never seen a legitimate public opinion poll, regardless of how the question was drawn, in which the public demand for tougher firearms laws dropped below 65 percent.

Hundreds of editorials, from both newspapers and broadcasters, have been spread on this record demanding congressional action to toughen Federal laws, at least to the point where criminals and others likely to use them on the spur of the moment cannot put together arsenals with which to prey on the public.

The Subcommittee on Juvenile Delinquency has taken thousands of pages of testimony on the need for firearms laws.

And in that testimony, law-enforcement officers at every level and from every part of the country asked for the kind of a Federal law that would be workable, effective in dealing with the interstate traffic in firearms, and a law which will penalize the criminal.

Responsible law enforcement universally supports the firearms amendment I have attached to S. 917, now known, and under debate here, as title IV of the omnibus crime bill.

There is no other legislation now before the Senate that has such support from law enforcement.

It is title IV which they most favor, and if they could work their will on this Congress they would include rifles and shotguns in its provisions.

Attorney General of the United States, the Honorable Ramsey Clark, when he testified before this subcommittee last summer, favored the legislation, and said so repeatedly though he considered it minimal. Much of his testimony was based on the considerable experience of the Federal Bureau of Investigation and its Director, J. Edgar Hoover.

Mr. Hoover himself has repeatedly asked for a stronger firearm law, a law tougher and more comprehensive than the one now under consideration here.

As recently as April 23, 1968, Deputy Attorney General Warren Christopher, speaking again for the Justice Department, strongly endorsed title IV and noted that Justice would prefer a bill including rifles and shotguns. Such a law would be "of material assistance to the States in the discharge of their responsibilities."

I ask that the full text of Mr. Christopher's letter be printed at this point in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

OFFICE OF THE
DEPUTY ATTORNEY GENERAL,
*Washington, D.C., April 23, 1968.*
Hon. THOMAS J. DODD,
*Chairman, Subcommittee on Juvenile Delinquency, Committee on the Judiciary, U.S. Senate, Washington, D.C.*

DEAR SENATOR DODD: Pursuant to your request, and that of Senator Tydings, we have examined the firearms amendment offered by you and accepted by the Senate Judiciary Committee at its last meeting on S. 917.

Basically, the amendment embodies the provisions of Amendment 90 to S. 1 except with respect to long guns. Amendment 90 prohibited the interstate mail order sale of long guns; the current amendment does not. Amendment 90 prohibited the sale of long guns to persons under 18 years of age; the current amendment does not. The two versions are otherwise, with minor differences, virtually identical. Both versions specifically provide against any adverse impact on State law.

As with Amendment 90, the current amendment does not require the registration or licensing of rifles, shotguns, or other firearms, nor is it directed to the possession or lawful use of long guns.

The Department continues to believe that Amendment 90 is the legislation which should be enacted. If, however, the Congress is of the view that the proposed exemptions for long guns should be adopted, this amendment is technically sound for accomplishing that purpose. Consequently, while this amendment does not cover all categories of firearms which we believe should be covered, it is constructive legislation which should be of material assistance to the States in the discharge of their responsibilities.

The Bureau of the Budget has advised that there is no objection to the submission of this report from the standpoint of the Administration's program.

Sincerely,
WARREN CHRISTOPHER,
*Deputy Attorney General.*

Mr. DODD. Mr. President, the International Association of Chiefs of Police, without question the most renown, most respected association of police officials in the world has repeatedly sought a better Federal firearms law.

In a letter I received recently from Mr. Quinn Tamm, executive director of the association, Mr. Tamm said:

Our Association feels that there must be legislation enacted which will be effective in stemming the easy access to firearms by individuals to whom such weapons should be restricted.

This group, too, asks that rifles and shotguns be put back into this bill to make the controls on all firearms equally effective.

Mr. President, I ask that the text of the letter from Mr. Quinn Tamm, be printed in the RECORD at this point.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

INTERNATIONAL ASSOCIATION
OF CHIEFS OF POLICE, INC.,
*Washington, D.C., May 2, 1968.*
Hon. THOMAS J. DODD,
*Senate Juvenile Delinquency Subcommittee, Old Senate Office Building, Washington, D.C.*

MY DEAR SENATOR: Although I have written you on previous occasions, the most recent being February 13, 1968, expressing the support of the International Association of Chiefs of Police for your gun control legislation now being considered as Title 4 of S. 917, I wish to once again express our support.

Our Association feels that there must be legislation enacted which will be effective in stemming the easy access to firearms by individuals to whom such weapons should be restricted.

I sincerely hope the Senate will favorably consider Title 4 as a minimum requirement and hopefully will restore rifles and shotguns in the coverage of this legislation.

Sincerely yours,
QUINN TAMM,
*Executive Director.*

Mr. DODD. Mr. President, the chief law enforcement officer of the most populous State in the Union, Attorney General Lynch of California supports title IV wholeheartedly.

In a letter to me dated April 26, 1968, General Lynch said:

I shall not dwell on the recurring public tragedies which have resulted from the deranged use of weapons obtained through channels which would be closed by this proposal.

. . . The gun—both as a threat and as a means of protection—has come to embody the atmosphere of violence and fear which pervades our nation. The current federal proposal will not dispel this atmosphere nor will it remove firearms from American households. It will simply provide reasonable federal controls which have been desperately needed for many years. It is a step toward sanity.

Mr. President, I ask the letter be printed in full in the RECORD at this point.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

STATE OF CALIFORNIA, OFFICE OF
THE ATTORNEY GENERAL, DEPARTMENT OF JUSTICE,
*San Francisco, April 26, 1968.*
Hon. THOMAS J. DODD,
*U.S. Senator, Chairman, Subcommittee on Juvenile Delinquency, Old Senate Office Building, Washington, D.C.*

DEAR SENATOR DODD: As President Johnson's proposal for firearms control approaches the Senate floor, I wish to reaffirm the support for this measure which I first expressed before your Committee in 1965.

I shall not dwell on the recurring public tragedies which have resulted from the deranged use of weapons obtained through channels which would be closed by this proposal.

The gun—both as a threat and as a means of protection—has come to embody the atmosphere of violence and fear which pervades our nation. The current federal proposal will not dispel this atmosphere nor will it remove firearms from American households. It will simply provide reasonable federal controls which have been desperately needed for many years. It is a step toward sanity.

My concern in the Spring of 1968—as the chief law officer of the most populous state of the Union—centers on the current and continued acquisition of firearms by extremists, both black and white. We find that extremists persons with totally distorted views of life, persons who often are legally barred from purchasing firearms in California, continue to obtain them out of state, either personally or by mail. This is intolerable.

Due to federal inaction, California last year passed laws regulating the sale and possession of heavy military weapons—mortars, bazookas, and anti-tank guns. One of our citizens—with a highly unstable background—possessed more than *seventy tons* of such weapons. In the past few years, California law enforcement officials have encountered literally dozens of situations where quantities of heavy weapons have been found in the hands of militant extremists. While we have attempted to regulate these weapons in California, they are still freely available elsewhere in this country—in quantities sufficient to arm military forces.

We also have faced in California the problem of extremists who have obtained federal firearms dealers licenses simply for the purpose of stockpiling guns.

Daily, I deal with the law enforcement problems of America's most urban state—hundreds of miles of cities strung along our western coast. In such an environment, the

uncontrolled proliferation of firearms—due to the lack of proper federal controls—forms one of law enforcement's major problems. This unseen spread of deadly weapons presents a danger which can only be estimated from that fractional portion which we are able to detect. It is a danger which can only be properly dealt with by the Federal Government.

There are too many incidents of criminals, ex-felons, who are legally barred from purchasing hand-guns in California and who purchase them in other states to commit crimes in California and to shoot California citizens. One such case involves a man who now sits on Death Row in San Quentin Prison.

California's firearms laws are among the most enlightened of any state. They are strongly supported by the people of our state. They are—at present—much stronger than the federal laws. Yet, we can only do so much.

I assure you of my wholehearted support for the President's proposal, and again, offer any assistance which I may provide to secure passage of this measure.

Sincerely,

THOMAS C. LYNCH,
*Attorney General.*

CITIZENS' CRIME COMMISSIONS

Mr. DODD. Mr. President, at the city, State, Federal and international level, public officials and law enforcement agencies are insistent that we in Congress enact meaningful firearms control legislation which will offer to every State and its citizens the protection of interstate and foreign commerce regulation on the traffic in lethal weapons.

From the National Association of Citizens' Crime Commissions, an organization whose members represent some of the earliest efforts of the citizenry to fortify the resources of law enforcement, comes vigorous approval for stringent controls on firearms. Several of these groups are 25 or more years old.

They are in Chicago, New Orleans, Miami, Baltimore, Philadelphia, Boston, Atlanta, Burbank, Crown Point, Ind., Dallas, Fort Worth, Kansas City, Mo., St. Louis, Waukegan, Wichita, and Wilmington.

This group's message to Congress urges:

Controls provided in Title IV should embrace rifles and shotguns. But even as presently drafted, Title IV reflects almost unanimous popular sentiment.

AMERICAN BAR ASSOCIATION

Professionals who daily confront the anomoly of unfettered sale of firearms to criminals and children, the lawyers of this country, through the American Bar Association, have for years expressed their support for "strong legislation to restrict the interstate shipment of firearms."

In 1965 and again in 1966 the House of Delegates of the American Bar Association overwhelmingly voiced its support for this legislation. Their 1966 vote applies to this pending title IV, according to the president of the American Bar, Mr. Earl F. Morris. He continues:

In our view title IV does not meet the full need for legislation in this critical field. I am hopeful—

He concludes—

that the Senate will amend title IV to include rifles and shotguns.

Mr. President, I ask that the letter from the American Bar Association and

the attached resolutions be printed at this point in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

AMERICAN BAR ASSOCIATION,
*Washington, D.C., April 26, 1968.*
Senator THOMAS J. DODD,
*Old Senate Office Building,*
*Washington, D.C.*

DEAR SENATOR DODD: As you know, the American Bar Association strongly supports the Administration's firearms control legislation of which you have been a leading proponent.

After careful study of the various proposals to amend the Federal Firearms Act, the Criminal Law Section of the ABA in 1965 recommended support for S. 1592 of the 89th Congress. The House of Delegates of the ABA voted 184 to 26 to approve the recommendations of the Criminal Law Section. This vote was taken after the members of the House of Delegates heard a debate between the executive vice president of the National Rifle Association and a sponsor of the 1965 legislation.

Again in 1966, the House of Delegates overwhelmingly voiced its support for strong legislation to restrict the interstate shipment of firearms. Enclosed are copies of the two resolutions.

While Title IV of S. 917 (substitute) has the support of the Association because it would be covered by the 1965 and 1966 resolutions, in our view Title IV does not meet the full need for legislation in this critical field. I am hopeful that the Senate will amend Title IV to include rifles and shotguns.

We appreciate the efforts that you and your colleagues are making to bring about reasonable regulation of firearms.

Sincerely,

EARL F. MORRIS.

———

[Section of criminal law, August 1965]
FIREARMS ACT

Resolved, That the American Bar Association urges the Congress of the United States to enact S. 1592, 89th Congress, or similar legislation which would amend the Federal Firearms Act to prohibit the shipment of firearms in interstate commerce except between federally licensed manufacturers, dealers and importers; to prohibit sales by federally licensed dealers of shotguns and rifles to persons under 18 years of age, and of all other types of firearms to persons under 21 years of age; to prohibit felons, fugitives and persons under indictment of felonies from shipping or receiving firearms in interstate commerce, and to control commerce in large caliber weapons; to restrict the sale of handguns to residents of the state where purchased; and to limit the unrestricted volume of imported weapons.

Be it further resolved, that the Section of Criminal Law be authorized to present the views of the American Bar Association to the appropriate committees of Congress on such proposed legislation.

———

[Section of criminal law, August 1967]
LAW ENFORCEMENT AND CRIMINAL JUSTICE
ASSISTANCE ACT OF 1967

Resolved, That the American Bar Association supports in principle the enactment of S. 917 (and H.R. 5037), 90th Congress, a bill known as the Law Enforcement and Criminal Justice Assistance Act of 1967, designed to assist state and local governments in reducing the incidence of crime, to increase the effectiveness, fairness and coordination of law enforcement and criminal justice systems at all levels of Government, and for other purposes.

Be it further resolved, that the Section of Criminal Law is authorized to present the views of the American Bar Association on

such legislation to the appropriate committees of Congress.

NATIONAL COUNCIL FOR RESPONSIBLE
FIREARMS POLICY

Mr. DODD. In recent years the proliferation of firearms of all types has been a matter of extreme concern in neighborhoods large and small, in community service clubs, and in national organizations.

Prior to that hot summer day in Watts in 1965 when sniper fire and armed resistance emerged as a part of civil disorder in our generation, police across the country asked for laws that would place even moderate controls on the sale of firearms to extremists, to criminals, to the mentally ill.

But since that time, increased volume of the sales and criminal misuse of firearms brought knowledgeable people together in an effort to do something about it.

We have heard from them. Their testimony is spread on the record. It has been available to those who would listen.

Long ago, such knowledgeable and prominent men as James V. Bennett, then director of the Federal Bureau of Prisons pleaded from the base of a lifetime of experience in penology and criminology for a law to limit effectively the free access of criminals to firearms.

After his retirement, after almost 30 years of public service, a group of concerned and public-spirited citizens joined with Mr. Bennett and formed the National Council for a Responsible Firearms Policy, largely to offset the powerful national gun lobby and its blind opposition to realistic, workable firearms laws.

I received this telegram last week:

The National Council for Responsible Firearms Policy urges your active support in the public interest for Title IV of Crime Bill as minimum gun legislation. Also urge support of Floor amendment to include long guns.

That is direct enough, strong enough, and clear enough.

It is a forceful expression of the considered opinion of a number of men who qualify by experience to speak.

They are, in addition to Mr. Bennett who is president, such men as David L. Bazelon, chief judge, U.S. Court of Appeals; Dr. Karl Menninger, of the Menninger Foundation; the Honorable J. Millard Tawes, former Governor of Maryland; Dr. J. Elliott Corbett, director, Washington Study Program, the Methodist Church, and Rabbi Maurice N. Eisendrath, president, the Union of American Hebrew Congregations.

Mr. President, on April 29, 1968 members of the Senate received a statement from the executive committee of the national council. I ask that it be printed in the RECORD at this point and that the full list of the board of directors and officers be printed immediately thereafter.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

NATIONAL COUNCIL FOR A RESPONSIBLE FIREARMS POLICY,
*Washington, D.C., April 29, 1968.*

The public interest demands enactment of the Administration's proposal to control the movement of firearms in interstate commerce. The Senate Judiciary Committee has

approved only *half* of that proposal as an amendment to the anti-crime bill. The *total* public interest would be best served by the *total* proposal, involving rifles and shotguns as well as handguns. By prohibiting interstate sales, this would assign to states, localities, and local dealers full responsibility for controlling gun sales in the interests of their own areas.

How many more tragedies must the American people endure before the Congress recognizes and deals with all the dimensions of the firearms problem?

The Congress is being inundated with mail from sportsmen and other gun owners urging defeat of the Administration proposals. The National Rifle Association and the gun clubs do *not* speak for the nation's sportsmen. The appeals to Congress from these sources do *not* represent the views of the majority of the gun owners of this country, and certainly not the views of the great majority (over 70%) of the American people.

After careful study of the firearms issue, the imperatives of public order and safety in this matter, and the many polls of not only overall public opinion but also the views of the nation's gun owners (who number well in excess of 25 million), we believe the American people urgently want the kinds of controls the Administration has proposed. And so do the *majority* of American sportsmen.

We believe we speak for the great majority of Americans—but more than that. If any organization may be said to speak for the country's sportsmen on this issue, *our* credentials are much more convincing than those of the National Rifle Association and its sister organizations opposing firearms controls designed to meet the needs of modern America.

We urge enactment of the overall Administration proposal and firmly believe this is what the public at large, including the nation's legitimate gun owners, earnestly want.

NATIONAL COUNCIL FOR A RESPONSIBLE FIREARMS POLICY

BOARD OF DIRECTORS

Cleveland Amory, *author, columnist and critic.*

Judge David L. Bazelon, *Chief Judge, U.S. Court of Appeals, District of Columbia.*

Hon. James V. Bennett, *former Director, U.S. Bureau of Prisons (1937 to 1964).*

Hon. Leonard S. Blondes, *Attorney, member of Maryland General Assembly.*

Erwin D. Canham, *Editor in Chief, THE CHRISTIAN-SCIENCE MONITOR.*

Dr. J. Elliott Corbett, *Director, Washington Study Program, The Methodist Church.*

Dr. Lowell Russell Ditzen, *Director, The National Presbyterian Center.*

Rabbi Maurice N. Eisendrath, *President, The Union of American Hebrew Congregations.*

Dr. David Lanham, *Chief, Legal Psychiatric Services, District of Columbia.*

Hon. John V. Lindsay, *Mayor of New York City, former member of U.S. House of Representatives.*

Bishop John Wesley Lord, *Bishop of the Washington Area, The Methodist Church.*

Paul F. McArdle, *Attorney, former president of Washington, D.C. Bar Association.*

Dr. Karl Menninger, *Psychiatrist; Chairman, Board of Trustees, The Menninger Foundation.*

Rev. William R. Moors, *Associate Minister, Cedar Lane Unitarian Church, Bethesda, Maryland.*

Dr. James M. Nabrit, Jr., *President of Howard University, former Deputy U.S. Representative to United Nations.*

Frances Neeley, *Associate Secretary, Friends Committee on National Legislation.*

David J. Steinberg, *Secretary and Chief Economist, Committee for a National Trade Policy, Inc.*

Hon. Adlai E. Stevenson III, *Treasurer, State of Illinois.*

Hon. Charles P. Taft, *Attorney, member of Cincinnati City Council, former Mayor of Cincinnati.*

Hon. J. Millard Tawes, *former Governor of Maryland.*

OFFICERS

President, James V. Bennett.
Vice President, Leonard S. Blondes.
Secretary, J. Elliott Corbett.
Treasurer, David J. Steinberg.

AFL–CIO ENDORSES TITLE IV—WOULD ADD LONGARMS

Mr. DODD. On May 1, 1968, the American Federation of Labor and Congress of Industrial Organizations again endorsed the need for strong Federal firearms laws.

When the AFL–CIO met in convention in 1967 and considered the legislation then pending, S. 1, amendment No. 90, it adopted the following resolution:

RESOLUTION 50—AFL–CIO SEEKS STRONG FEDERAL FIREARMS LAWS

Whereas, The uncontrolled sale of firearms remains one of the principal factors in crime and accidental death and wounding, and was a factor in the assassination of our late President John F. Kennedy, and

Whereas, The number of Americans killed by firearms in the United States during the last 10 years is many times the number of American soldiers lost in Viet Nam, and

Whereas, Studies indicate that a high proportion—possibly one-fourth—of the persons who order guns from mail-order dealers have criminal records and thus could be purchasing firearms for illicit purposes, therefore, be it

Resolved, That the AFL–CIO actively supports federal legislation which—while not curbing the hunter or gun hobbyist—will bring the sale of firearms under at least partial control by banning the interstate sale of firearms through mail-order.

However, labor does not see in title IV all that it would like, or that is necessary. In its May 1, 1968, letter to me the labor organization said:

Title IV does not fully meet this presumption, but it is a step, albeit a small one, in that direction. Hence we favor its adoption. We would welcome the addition of rifles and shotguns to the coverage.

Mr. President, I believe that statement is clear enough. It speaks for itself, and for the millions of members of that organization.

The support for this legislation is both impressive and prestigious. There is no question of that.

As for myself, I can imagine no more prestigious endorsement for this firearms legislation than that given by the women of America, the mothers, those who abhor the violence they have seen in an armed community.

The General Federation of Women's Clubs, which includes over 15,000 clubs in virtually every community in this land, calls on the Congress by resolution and by letter to ban the sale of all firearms to juveniles and to enable the States to "have effective laws which will control the indiscriminate sale and possession of firearms." They ask for the restoration of rifles and shotguns to the controls of title IV. Through their president, Mrs. E. D. Pearce, the federation pleads that the Senate respond favorably to their request which is based on their "desire to have our country a safe place in which to live and to raise our children."

These last two endorsements, from the

General Federation of Women's Clubs and the AFL–CIO represent millions of mothers and fathers.

These two groups represent the most widely recognized organizations of individual citizens who have the most immediate concern for safety in their streets. They are the mothers and fathers of this Nation.

We must not fail to perform our duty to provide them and their local governments the means to control violence in their communities and to prevent the undermining of this control by unscrupulous gun merchants outside their jurisdictions.

Mr. President, I ask unanimous consent that the letter of the General Federation of Women's Clubs be printed in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

GENERAL FEDERATION OF
WOMEN'S CLUBS,
*Washington D.C., May 2, 1968.*
Hon. THOMAS J. DODD,
*Chairman, Special Subcommittee on Juvenile Delinquency, Judiciary Committee, U.S. Senate, Washington D.C.*

DEAR SENATOR DODD: The General Federation of Women's Clubs is the parent organization of some 15,000 women's clubs and, as President of GFWC, I am representing the many thousands of members of those clubs as I write this letter to you. Though this is only one letter with only one signature, the views I express here are not only mine but those of the clubwomen I represent.

Though we are, of course, concerned about the total crime crisis in which we find ourselves, the views expressed here will be confined to only that section of the Crime Bill which deals with firearms.

We want our States to be able to have effective laws which will control the indiscriminate sale and possession of firearms but without a strong Federal law which controls interstate shipment of firearms, the States cannot have effective gun control laws.

We need a Federal law which will provide strict control of the mail-order sale and shipment of firearms.

Section 901(b) of Title IV states: "that it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, etc."

With this guarantee, it is difficult to see why anyone could object to the basic purpose of this title.

There is, however, a provision in this legislation which we hope might be amended and that is the provision which exempts rifles and shotguns from the controls which would be placed on other types of firearms. We are concerned also about that provision which states: "It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or deliver any firearm to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age, if the firearm is other than a shotgun or rifle".

One of the objectives of a gun control law would be to keep firearms out of the hands of certain misdirected juveniles. According to our understanding of this provision, a juvenile could still purchase and

receive by mail rifles and shotguns without the knowledge or consent of his parents.

If this provision stands, it seems to us that any gun control law which is adopted would not be effective in an area of greatest need.

We know that your original bill included controls on rifles and shotguns and a ban on the mail order sale of firearms to juveniles. We hope you will be able to have these provisions restored in Title IV of S. 917 on the Senate floor.

On behalf of the members of the General Federation of Women's Clubs, I appreciate your giving consideration to our views which are based on our desire to have our country a safe place in which to live and to raise our children.

Sincerely,

Mrs. E. D. Pearce,
*President.*

LEADERSHIP CONFERENCE ON CIVIL RIGHTS WANTS STRINGENT GUN LAW

Mr. DODD. Mr. President, in a letter to the Senate on May 3, 1968, Roy Wilkins, chairman, Leadership Conference on Civil Rights, supported the need for tougher Federal laws on firearms.

He said that the proposed amendment, title IV of the omnibus crime bill, should apply not only to handguns, but to rifles and shotguns as well. In Mr. Wilkins' words:

As for Title IV, the gun control provision, we feel it does not go far enough. It would apply to handguns only. It is inconceivable, after the murders of President John F. Kennedy and Dr. Martin Luther King, that such a measure would not extend regulations to the weapons used against these two noble men. We urge that Title IV be broadened to cover shotguns and rifles.

Mr. President, S. 1, amendment No. 90 and title IV of the omnibus crime bill, S. 917, are the two major pieces of legislation to be considered by the 90th Congress.

Neither of those proposals is completely new. They are outgrowths of more than 7 years investigation by the Senate Juvenile Delinquency Subcommittee and many untold hours of patient deliberations by committee members as the sad unwholesome story of the mail-order gunrunner unfolded.

We traced firearms from rusting scrap heaps in post-World War II Europe to a book depository in Dallas, from Iron Curtain dumping grounds to Los Angeles and Washington; and from cellar workshops in Italy, France, and Germany to teenage murderers across the Nation.

In the 88th and the 89th Congress legislation was also proposed, and thousands of hours of work went into an effort to bring them before the Senate. In each case, however, the opposition to any stronger Federal laws prevailed.

The firearms lobby had its day. The arguments were generally the same then. There is no need to repeat them all. Some of them might be interesting, though.

We were told by the National Rifle Association and others that the defense of America, our homeland, would be jeopardized if S. 1592 were adopted in the 89th Congress.

Actually, nothing could be further from the truth. The Department of Defense spent several hundred thousand dollars studying the problem, and this is what Secretary of Defense Robert S. McNamara had to say:

THE SECRETARY OF DEFENSE,
*Washington, April 30, 1965.*
Hon. THOMAS J. DODD,
*Chairman, Subcommittee to Investigate Juvenile Delinquency, Committee on the Judiciary, U.S. Senate, Washington, D.C.*

DEAR SENATOR DODD: This refers to Mr. Carl L. Perian's letter of April 14, 1965, extending me an invitation to testify before the subcommittee on May 19, 1965, with respect to the bill, S. 1592, "To amend the Federal Firearms Act."

I have asked the Secretary of the Army, Stephen Ailes, to testify on behalf of the Department of Defense in response to your invitation, and to cover in detail the specific items which are listed in the letter of April 14, 1965.

The Department of Defense strongly recommends enactment of S. 1592. No function of the Department of Defense will be in any way impaired by the enactment of this legislation. More realistic Federal control of the distribution of firearms in the stream of commerce between the States and between the United States and foreign states is clearly in our best national interest.

Beyond the official position of the Department of Defense, I would like to add my deep, personal conviction about the desirability of this legislation.

Sincerely,

ROBERT S. McNAMARA.

During the same hearings in the 89th Congress, on S. 1592, there was again strong support from civil and religious groups. For example, after patiently listening to the arguments against a law that would disarm the criminal, Rabbi Harold P. Smith of Chicago, representing the Rabbinical Counsel of America, sent the following statement:

STATEMENT OF RABBI HAROLD P. SMITH OF CHICAGO, ILL., REPRESENTING RABBINICAL COUNCIL OF AMERICA

As national chairman of the Commission on Legislative Matters of the Rabbinical Council of America, I represent approximately 900 orthodox rabbis. As cochairman, also, of the Legislative Committee of the Chicago Board of Rabbis, I speak for 150 rabbis of Chicago—reform, conservative, and orthodox—who have authorized me to represent them here.

They have asked me to express here our strong endorsement of Senate bill 1592, proposed by the Honorable Senator Dodd, of Connecticut.

Mr. President, the list of endorsements from representatives of the public who seek, indeed demand, something be done about the dangerous domestic arms race now in full swing—and based almost wholly on fear—is overwhelming.

I have discussed many times these endorsements, actually pleas by a public concerned about public safety and the civil rights of all the people.

I will continue to call them to the attention of my colleagues until the representatives of all of the people have spoken on behalf of a sane domestic firearms law.

The most logical place for the true voice of the people to be heard is in this Chamber.

Mr. President, many Members of Congress have the impression that rural America is in the forefront of the battle to stall firearms legislation.

But that is only the impression, not the fact. Rural newspapers, many of them in small towns with small circulations, have endorsed this legislation.

The Prairie Farmer, serving the Plains States and with a circulation of about 400,000, supports this legislation. The Prairie Farmer poll, one of the best informed and most reliable and respected gauges of rural attitudes, wholeheartedly supported this legislation.

I received a letter just this week from the National Grange endorsing the provision title IV of the omnibus crime bill. The Grange said:

After a careful study of your proposal, we would conclude that it falls within the area defined by Grange Resolutions and, therefore, would support its intention and urge its passage.

Mr. President, I ask that the full text of the letter be printed in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

NATIONAL GRANGE,
*Washington, D.C., May 6, 1968.*
Hon. THOMAS J. DODD,
*Old Senate Office Building,
Washington, D.C.*

DEAR SENATOR DODD: The position of the National Grange concerning the sale and transfer of firearms is that there should be no licensing on the guns that are used for hunting purposes, nor should there be any restriction on the ownership or possession of these guns.

However, the Grange also says in its Resolutions that we would support legislation to prevent the acquisition or possession of hand guns and other weapons by minors, felons, and those with a history of mental illness. We note that this last item apparently is not covered in the language of the bill which you propose to offer as an amendment.

After a careful study of your proposal, we would conclude that it falls within the area defined by Grange Resolutions and, therefore, would support its intention and urge its passage.

Respectfully yours,

HARRY L. GRAHAM,
*Legislative Representative.*

Mr. DODD. Mr. President, through the more than 6 years that we have been endeavoring to secure more adequate Federal firearms laws, we have had strong support from religious groups and the clergy.

Indeed, it has increased with the passage of time. On May 3, 1968, I received a letter from His Excellency, the Most Reverend Phillip M. Hannan, archbishop of New Orleans, in which he shared with me his concern over the criminal misuse of firearms. Archbishop Hannan said:

I share your interest in obtaining effective legislation for the control of interstate commerce in firearms.

Accordingly, I wish to encourage you in your efforts to this end, and I certainly endorse any enactments which, while safeguarding the rights of responsible citizens, forestall the criminal misuse of any type of ordnance.

Mr. President, it is clear that His Excellency shares the common interest of so many Americans in his desire to see effective firearms legislation. He endorses legislation that would effectively "forestall the criminal misuse of any type of ordinance."

He is also concerned that the rights of responsible citizens be safeguarded, and so am I. So are all the cosponsors of this legislation over the years.

*May 8, 1968*　　　　CONGRESSIONAL RECORD — SENATE　　　　12317

It is precisely because of these common concerns that support for the legislation is so broad. It is a fact that responsible citizens will be more secure in the pursuit of wholesome hunting and recreational shooting as the misuse of firearms by criminals and others declines under a strong Federal law.

Mr. President, Attorney General Louis J. Lefkowitz of New York, who has one of the toughest law-enforcement jobs in the United States, was recently embroiled in a battle for stronger firearms legislation in his own State.

He was beset by critics, large and small, many of whom were inspired in their efforts by the national gun lobby.

His sensibilities, in addition to his long experience in law enforcement and public safety caused him to take a strong position on the need for effective gun laws at all levels of government, including the Federal.

Within the week, General Lefkowitz forwarded to me a statement of his views on the need for a strong Federal law. I ask, Mr. President, they be printed in the Record at this point.

There being no objection, the statement was ordered to be printed in the Record, as follows:

The shocking incidents involving the use of firearms by snipers who have taken the lives of policemen, firemen and private citizens during recent violence throughout the country is dramatic evidence of the need for greater control and regulation of the sale of firearms.

Obviously, legislation at whatever level it is enacted, Federal, state or local, will never completely eliminate the misuse of firearms by some individuals but something can and should be done through legislation, to provide control and regulation to reduce the promiscuous use and abuse of rifles, shotguns and other weapons.

New York State has pioneered in enacting laws to control and regulate the possession of pistols, revolvers and other concealed weapons but it now becomes apparent that further action is needed to prevent the use of rifles and shotguns by those who abuse the privilege which the law has extended.

On November 22, 1963, a sniper firing a rifle from a window shot and killed the President of the United States.

On August 1, 1966, a sniper firing a rifle from a University tower killed thirteen people.

In December of 1966, a former mental patient purchased a rifle from a mid-Manhattan store and an hour later fatally shot two persons in Bryant Park.

More recently a young girl died while sitting in a car travelling along the Belt Parkway in Brooklyn after having been shot through the head by what was possibly a stray bullet fired in innocence.

During last year, 19,000 Americans died from gunshot wounds. Countless others were wounded. Many of these were New York citizens.

I endorse federal legislation to prohibit the mail order sale of all types of guns. This is a measure which I hope will curtail the proliferating and uncontrolled retail sale of such weapons by mail order houses.

I would also urge greater control and regulation of the purchase of firearms through state legislation which would require that permits be necessary for their purchase and that such sales be registered. Such legislation should provide that before a person can possess a firearm he must show evidence of good moral character and that he has no criminal record or history of mental disease.

I will strongly support any effort by city, state or federal legislative bodies to provide greater control over the sale of all firearms.

While legislation at state or local level is essential any measure that is adopted at the local level would be of little effect if it continues to be possible for anyone simply to buy a firearm by mail from another state. It is shocking to note that last year more than a million of the two million guns sold in the United States were sold through the mail order route.

Mr. DODD. Finally, Mr. President, I have written a letter today to my fellow Senators, to which I have attached a variety of material. I ask unanimous consent that that letter, with attachments, be printed in the Record at this point.

There being no objection, the letter and attachments were ordered to be printed in the Record, as follows:

U.S. SENATE, COMMITTEE ON THE
JUDICIARY, SUBCOMMITTEE TO
INVESTIGATE JUVENILE DELIN-
QUENCY,
*Washington, D.C., May 8, 1968.*
The Honorable U.S. Senate,
*Washington, D.C.*

DEAR SENATOR: In view of the current floor debate on Title IV of S. 917, I am enclosing for your consideration additional information that supports the need for the firearms controls proposed under this title and for certain amendments that might be offered during the course of the debate.

This material which has been reproduced from the firearms hearings of the Juvenile Delinquency Subcommittee during July and August of 1967 includes:

(1) A memorandum from the Treasury Department (dated August 11, 1967) outlining some of the reasons for an amendment I introduced on May 7, 1968 which would include rifles and shotguns under the control provisions of Title IV. As the Department indicates this amendment is particularly necessary because of the easy conversion of long arms into concealable weapons for criminal use which the Alcohol and Tobacco Tax Division found in recent Federal firearms violations.

(2) A summary of firearms crimes in the United States based on the Federal Bureau of Investigation Uniform Crime Reports. These figures show the impact of firearms on this nation's serious crimes against the person. Firearms account for 60% of our wilful killings, they are used in 40% of our robberies and in 19% of our aggravated assaults.

(3) A list of the number of persons killed in the United States through the misuse of firearms since 1900. I want to emphasize that the 800,000 persons killed by guns surpass by 250,000 the total number of men lost in all our major wars since the American Revolution. The list includes those persons who committed suicide with a firearm and those killed accidentally in hunting accidents and the like.

(4) A list of reprints showing the results of eight public opinion surveys from 1959 through 1967 regarding gun control legislation. These polls consistently show at least 70% of the public would support controls much stronger than we are proposing under Title IV.

(5) A list showing that virtually every state has an ample number of Federally licensed firearms dealers. This supports my view that restriction of the mail order traffic in firearms to licensed dealers would not be an imposition on legitimate gun buyers because a dealer is within easy reach of the vast majority of the population.

(6) Excerpt from the testimony of Mr. Ephraim R. Gomberg, Executive Vice President of the Philadelphia Crime Commission. Mr. Gomberg points out that European laws are by far stricter than the gun controls such

as those proposed in Title IV and that criminal activity with the use of firearms is almost negligible on the Continent when compared to the United States.

I hope that this material will be helpful in your consideration of the firearms control provisions in the Omnibus Crime Control and Safe Streets Act of 1967.

Please feel free to call me for any additional information that could be supplied by the Juvenile Delinquency Subcommittee.

With kindest personal regards, I am
Sincerely yours,
THOMAS J. DODD, *Chairman.*

AUGUST 11, 1967.
To: Commissioner.
From: Director, Alcohol and Tobacco Tax Division.
Subject: Justification for Inclusion of "Long guns" in Proposed Controls Over Interstate and foreign Commerce in Firearms.

It is understood that Senator Dodd has asked for results of our enforcement activity under the Federal Firearms Act tending to show the need for additional controls over rifles and shotguns as proposed in S. 1 and Amendment No. 90.

Strictly on the basis of our enforcement experience, the most compelling argument for including long guns in proposed controls is the fact that they can be, and frequently are, converted into concealable weapons for criminal use. We have reviewed 200 recent firearms violation case reports and found that there were 98 sawed-off shotguns and 14 sawed-off rifles out of a total of 207 guns involved in these cases. It seems obvious that if strict controls are imposed on handguns without imposing similar restrictions on long guns the criminal element will continue to have ready access to concealable weapons by the simple expedient of purchasing an uncontrolled long gun and converting it to a handgun.

The controls proposed in S. 1 and Amendment No. 90 would reduce the easy availability of rifles and shotguns to persons with criminal records by prohibiting Federally licensed dealers from making sales to felons and by making it a criminal offense for a felon to give false information to the dealer concerning his criminal record. These controls would also afford us the opportunity, now lacking, of assisting the many states which do have some controls over purchase and possession of "long guns". A number of states do have a minimum age requirement or prohibit the purchase or possession of rifles and shotguns by aliens, drug addicts, or persons with a record of emotional instability.

Certainly, there should be some restrictions on the interstate movement of "long guns" to juveniles. S. 1 and Amendment No. 90 provide for controls in this needed area.

I would also point out that the sniper activity so prevalent in recent civil disorders throughout the country requires long guns—hand weapons simply do not have the range to be effective in such an activity. Accordingly, it is apparent that many states will consider additional controls over the purchase and possession of these weapons. Such controls cannot be effective without Federal implementation.

HAROLD A. SERR.

BRIEF SUMMARY OF FIREARMS CRIME IN THE
UNITED STATES
(Source, FBI Uniform Crime Reports, 1966)

1. Murder by gun:
(a) 6,552 gun murders in 1966 equaled 60% of the total number of murders.
(b) 5,634 gun murders in 1965 equaled 57% of the total number of murders.
(c) 5,090 gun murders in 1964 equaled 55% of the total number of murders.
2. Rifle and shotgun murders:
(a) 1,747 persons murdered with rifles and shotguns in 1966.

(b) 1,690 persons murdered with rifles and shotguns in 1965.

(c) 1,527 persons murdered with rifles and shotguns in 1964.

3. Percentage of gun murders in individual states (1962–1965). (Overall murder rate included in parentheses.)

(a) States having gun controls: Rhode Island, 24% (1.4); Massachusetts, 35% (2.4); New York, 32% (4.8); New Jersey, 39% (3.5); Pennsylvania, 43% (3.2).

(b) States having minimal or no gun control: Louisiana, 62% (9.9); Arizona, 66% (6.1); Nevada, 67% (10.6); Texas, 69% (9.1); Mississippi, 71% (9.7).

4. Police officers killed in line of duty:

(a) In 1966, 55 of 57 police officers killed in line of duty were murdered with guns.

(b) Since 1960, 96% of the 335 police officers killed in line of duty were murdered with guns.

(c) Of the 335 officers killed, 53 were killed in Eastern states, 60 in Western states, 71 in North Central states and 161 in Southern states. (Stringent gun controls generally pervade in the Northeastern states.)

5. Aggravated assault by gun:

(a) 1966, 43,500 (19% of the total).
(b) 1965, 34,700.
(c) 1964, 27,700.

(d) During the three years 1964–1966, assaults with a gun increased 36%.

(e) Regionally, 11.7% of the aggravated assaults in the Northeastern states were by gun, 18.5% in the Western states, 19.2% in the North Central states and 23.5% in the Southern states. (Effect of gun controls in the Northeastern states is apparent).

6. Armed robbery by gun:

(a) 59,300 armed robberies by gun in 1966.
(b) 52,000 armed robberies by gun in 1965.
(c) 42,600 armed robberies by gun in 1964.

7. In 1966, murder by gun was up 16% and aggravated assault and robbery by gun were up 25% and 14% respectively.

[From "The Right To Bear Arms," as revised by Carl Bakal, McGraw-Hill, 1966, copyright Carl Bakal]

APPENDIX III.—DEATHS DUE TO FIREARMS IN THE UNITED STATES, DEATH REGISTRATION AREA, 1900–65 [1]

[Total number and rate per 100,000 population]

| Year [1] | Homicide Number | Homicide Rate | Suicide Number | Suicide Rate | Accident Number | Accident Rate | Total Number | Total Rate | Year [1] | Homicide Number | Homicide Rate | Suicide Number | Suicide Rate | Accident Number | Accident Rate | Total Number | Total Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1900 | | | 835 | | 1,139 | | 1,974 | | 1935 | 6,506 | 5.1 | 6,830 | 5.4 | 2,854 | 2.2 | 16,190 | 12.7 |
| 1901 | | | 913 | | 1,082 | | 1,995 | | 1936 | 6,016 | 4.7 | 6,771 | 5.3 | 2,882 | 2.2 | 15,669 | 12.2 |
| 1902 | | | 953 | | 1,196 | | 2,149 | | 1937 | 5,701 | 4.4 | 7,073 | 5.5 | 2,696 | 2.0 | 15,403 | 11.9 |
| 1903 | | | 1,052 | | 1,151 | | 2,203 | | 1938 | 5,055 | 3.9 | 7,357 | 5.6 | 2,629 | 2.1 | 15,108 | 11.6 |
| 1904 | | | 1,185 | | 1,294 | | 2,479 | | 1939 | 4,799 | 3.7 | 6,944 | 5.3 | 2,582 | 2.0 | 14,325 | 11.0 |
| 1905 | | | 1,435 | | 823 | | 2,258 | | 1940 | 4,655 | 3.5 | 7,073 | 5.4 | 2,390 | 1.8 | 14,118 | 10.7 |
| 1906 | | | 1,714 | | 1,074 | | 2,788 | | 1941 | 4,525 | 3.4 | 6,385 | 4.8 | 2,414 | 1.8 | 13,324 | 10.0 |
| 1907 | | | 2,027 | | 897 | | 2,924 | | 1942 | 4,204 | 3.1 | 6,117 | 4.6 | 2,741 | 2.0 | 13,062 | 9.7 |
| 1908 | | | 2,468 | | 986 | | 3,454 | | 1943 | 3,444 | 2.6 | 5,076 | 3.8 | 2,318 | 1.7 | 10,838 | 8.1 |
| 1909 | | | 2,395 | | 944 | | 3,339 | | 1944 | 3,449 | 2.6 | 4,808 | 3.6 | 2,412 | 1.8 | 10,669 | 8.0 |
| 1910 | 1,852 | | 2,561 | | 1,161 | | 5,574 | | 1945 | 4,029 | 3.1 | 5,321 | 4.0 | 2,454 | 1.9 | 11,804 | 9.0 |
| 1911 | 2,347 | | 2,859 | | 1,327 | | 6,533 | | 1946 | 4,966 | 3.5 | 6,276 | 4.5 | 2,816 | 2.0 | 14,058 | 10.0 |
| 1912 | 2,449 | | 2,796 | | 1,369 | | 6,614 | | 1947 | 4,922 | 3.4 | 6,691 | 4.7 | 2,386 | 1.7 | 13,999 | 9.8 |
| 1913 | 2,821 | 4.5 | 2,930 | 4.6 | 1,572 | 2.5 | 7,323 | 11.6 | 1948 | 4,894 | 3.3 | 6,660 | 4.6 | 2,270 | 1.6 | 13,824 | 9.5 |
| 1914 | 3,077 | 4.7 | 3,286 | 5.0 | 1,579 | 2.4 | 7,942 | 12.1 | 1949 | 4,235 | 2.9 | 7,215 | 4.9 | 2,326 | 1.5 | 13,776 | 9.4 |
| 1915 | 2,885 | 4.3 | 3,608 | 5.4 | 1,501 | 2.2 | 7,994 | 11.9 | 1950 | 4,179 | 2.8 | 7,377 | 4.9 | 2,174 | 1.4 | 13,730 | 9.1 |
| 1916 | 3,241 | 4.5 | 3,386 | 4.7 | 1,613 | 2.3 | 8,240 | 11.6 | 1951 | 3,898 | 2.5 | 6,873 | 4.5 | 2,247 | 1.5 | 13,018 | 8.5 |
| 1917 | 3,793 | 5.1 | 3,269 | 4.4 | 1,730 | 2.3 | 8,792 | 11.7 | 1952 | 4,244 | 2.7 | 7,013 | 4.5 | 2,210 | 1.4 | 13,467 | 8.6 |
| 1918 | 3,727 | 4.6 | 3,350 | 4.1 | 2,013 | 2.5 | 9,090 | 11.2 | 1953 | 4,013 | 2.5 | 7,293 | 4.6 | 2,277 | 1.4 | 13,583 | 8.5 |
| 1919 | 4,567 | 5.4 | 3,302 | 3.9 | 2,350 | 2.8 | 10,219 | 12.0 | 1954 | 4,115 | 2.6 | 7,539 | 4.7 | 2,281 | 1.4 | 13,935 | 8.7 |
| 1920 | 4,477 | 5.1 | 3,169 | 3.6 | 2,262 | 2.6 | 9,848 | 11.3 | 1955 | 3,807 | 2.3 | 7,763 | 4.7 | 2,120 | 1.3 | 13,690 | 8.3 |
| 1921 | 5,509 | 6.2 | 4,122 | 4.6 | 2,346 | 2.6 | 11,977 | 13.5 | 1956 | 4,039 | 2.4 | 7,817 | 4.7 | 2,202 | 1.3 | 14,058 | 8.4 |
| 1922 | 5,714 | 6.1 | 3,912 | 4.2 | 2,514 | 2.7 | 12,140 | 13.0 | 1957 | 4,010 | 2.4 | 7,841 | 4.6 | 2,369 | 1.4 | 14,220 | 8.4 |
| 1923 | 5,648 | 5.8 | 3,900 | 4.0 | 2,578 | 2.7 | 12,126 | 12.5 | 1958 | 4,230 | 2.4 | 8,871 | 5.1 | 2,172 | 1.3 | 15,273 | 8.8 |
| 1924 | 6,028 | 6.1 | 4,280 | 4.3 | 2,571 | 2.6 | 12,879 | 13.0 | 1959 | 4,457 | 2.5 | 8,788 | 5.0 | 2,258 | 1.3 | 15,503 | 8.8 |
| 1925 | 6,216 | 6.0 | 4,333 | 4.2 | 2,570 | 2.5 | 13,119 | 12.7 | 1960 | 4,627 | 2.6 | 9,017 | 5.0 | 2,334 | 1.3 | 15,978 | 8.9 |
| 1926 | 6,377 | 6.1 | 4,616 | 4.4 | 2,593 | 2.5 | 13,586 | 12.9 | 1961 | 4,753 | 2.6 | 9,037 | 4.9 | 2,204 | 1.2 | 15,994 | 8.7 |
| 1927 | 6,310 | 5.8 | 4,989 | 4.6 | 2,714 | 2.5 | 14,040 | 13.0 | 1962 | 4,954 | 2.7 | 9,478 | 5.1 | 2,192 | 1.2 | 15,533 | 8.9 |
| 1928 | 6,857 | 6.0 | 5,437 | 4.7 | 2,839 | 2.5 | 15,133 | 13.3 | 1963 | 5,126 | 2.7 | 9,595 | 5.1 | 2,263 | 1.2 | 16,984 | 9.0 |
| 1929 | 6,540 | 5.6 | 5,660 | 4.9 | 3,015 | 2.6 | 15,215 | 13.1 | 1964 | 5,474 | 2.9 | 9,806 | 5.1 | 2,275 | 1.2 | 17,555 | 9.2 |
| 1930 | 7,190 | 6.1 | 6,833 | 5.8 | 3,120 | 2.6 | 17,143 | 14.5 | 1965 | 6,158 | 3.2 | 9,898 | 5.1 | 2,344 | 1.2 | 18,400 | 9.5 |
| 1931 | 7,532 | 6.3 | 7,543 | 6.3 | 3,041 | 2.5 | 18,116 | 15.1 | 1966 | 6,855 | 3.5 | 10,407 | 5.3 | 2,558 | 1.3 | 19,820 | 10.1 |
| 1932 | 7,458 | 6.2 | 8,075 | 6.7 | 2,928 | 2.4 | 18,451 | 15.4 | | | | | | | | | |
| 1933 | 7,863 | 6.3 | 7,798 | 6.2 | 3,026 | 2.4 | 18,687 | 14.9 | Total | 278,519 | | 369,306 | | 144,518 | | 792,343 | |
| 1934 | 7,702 | 6.1 | 7,296 | 5.8 | 3,023 | 2.4 | 18,021 | 14.3 | | | | | | | | | |

[1] There were more firearms deaths during this period than the table indicates. This is because the death registration area did not represent the whole United States until 1933. In 1900, the year the annual collection of mortality statistics began, the death registration area consisted of only 10 of our then 45 States plus the District of Columbia and a comparatively small number of cities located in nonregistration States. By 1913, the registration area had increased to the point where its population was estimated at 63,200,000, or only about ⅔ of the total population of the United States. No population estimates for the registration areas are available for the years prior to 1913; for this reason, death rates cannot be shown for those years. The rates for the years 1913–32 are based on the population estimates of Dr. Frederick Hoffman, a prominent actuarial expert for the Prudential Life Insurance Co. (who died in 1946). The rates for the years since are based on Bureau of the Census population reports. The number of deaths for the years since 1900 is from the Division of Vital Statistics of the Department of Health, Education, and Welfare.

Note: Leaders indicate data not available.

### PUBLIC WOULD SHARPLY LIMIT TEENAGERS' USE OF FIREARMS—ONE ADULT IN THREE WOULD DENY GUNS TO YOUTHS—LAW BANNING LOADED GUN IN HOME FAVORED

(By George Gallup)

PRINCETON, N.J., September 1.—In New York City last week, a 17-year-old "gang leader" fired a volley from his .22 rifle into a crowd and killed a 14-year-old girl.

A 15-year old boy shot and killed his "best pal" while demonstrating how the safety works on his new rifle. Another teen-ager killed his younger brother while practicing a "quick draw" with a revolver he "didn't know was loaded."

These are just several instances of the types of gun tragedies happening daily across the nation. An estimated 40 persons a day in the U.S. are killed by firearms.

The public today shows itself willing to adopt stricter firearm legislation which might possibly have averted the kind of incident mentioned above.

As parts of its special study of the public's attitude on curbing the use of guns and ammunition the Gallup Poll asked the public about two suggestions advanced by many authorities as ways in which the yearly toll of firearms deaths might be reduced.

An overwhelming majority of American adults would strictly regulate the use of guns by teenagers. One adult in three would go so far as to forbid completely the use of guns by persons under 18.

A majority of the public would favor making it illegal for the private citizen to keep a loaded gun in his house.

(On two other suggested restrictions as reported earlier, public support is evident. An overwhelming majority would favor law requiring a police permit before the purchase of any gun. A smaller majority would back the same procedure before buying shells or ammunition.)

This was the first question asked by Gallup Poll reporters of a cross-section of the American public:

Which of these three plans would you prefer for the use of guns by persons under the age of 18—forbid their use completely; put strict regulations on their use or continue as at present with few regulations?

Teenage use of guns

[In percent]

| | |
|---|---|
| Forbid completely | 34 |
| Regulate strictly | 51 |
| Continue at present | 12 |
| No opinion | 3 |

The very low percentage failing to express an opinion on this issue testifies to the interest on the public's part. Reporters found

this particular question sparked a great deal of interest among the people they talked to.

Support for restriction on youngsters' use of guns is significantly higher among women than it is among men. Nine out of ten women want some kind of regulation; four in ten women would forbid the use of guns by teenagers completely.

The National Rifle Association annual casualty report for 1956 showed that youngsters in the 11-to-19 age group accounted for almost half the hunting casualties (although only about a quarter of all hunters are under 25.) A fourth of all accidental gun deaths in the U.S. happen to youths under fifteen.

A second question in the series asked the following:

Do you think it should be legal or illegal for private citizens to have loaded weapons in their homes?

Loaded weapons in home?

[In percent]

| | |
|---|---|
| Illegal | 53 |
| Legal | 40 |
| No opinion | 7 |

A frequently-used argument by persons opposed to additional gun regulations has been the point that the nation's gun-owners would object to restrictions.

In the case of persons owning shotguns and rifles at present (the bulk of the coun-

try gun owners), this is not true. Among shotgun and rifle owners, the weight of opinion favors this restriction—although they are somewhat more reluctant than the public as a whole to outlaw loaded guns in the home.

Among the nation's pistol and revolver owners however, six in ten feel that it should be legal to keep a loaded weapon in the home.

In all regions of the country, except one, the public is in favor of outlawing loaded guns in the home.

The one exception is the South—a region where present restrictions on guns are almost nonexistent and where rates of death by guns are some of the highest in the nation.

The final article in the Gallup Poll's current series will report the public's attitude toward outlawing the possession of all pistols and revolvers by private individuals. The article—to be published in the (Name of Paper)—will also deal with the size and type of "arsenal" Americans have in their homes. How many citizens own a shotgun? A rifle? A pistol?

---

**PUBLIC WOULD OUTLAW ALL PISTOLS EXCEPT FOR POLICE—ONE OF MANY CONTROLS PEOPLE WILLING TO ACCEPT—ONE HOME IN EVERY TWO NOW HAS A GUN**

(By George Gallup)

PRINCETON, N.J., September 3.—Definitely of a mind to place some kind of restriction on the use of guns, the American public would go so far as to completely outlaw the possession of any pistols or revolvers by private individuals.

Such a drastic step would have an immediate effect on some 8,000,000 homes across the country where a pistol or revolver is now owned.

The current Gallup Poll series of articles has embraced several suggestions put forth by authorities as ways in which stricter control of firearms could be imposed.

The all-important findings of the series is that the public is ready to accept drastic measures in an attempt to reduce the number of firearms fatalities in the U.S. each year—an estimated 14,000 deaths a year, or approximately 40 gun fatalities a day.

Here are some of the measures the American people would be willing to accept:

1. Outlawing the possession of all pistols and revolvers except by police or other authorized persons. At present, only eight states place any restriction on the sale of handguns, chiefly requiring a permit. In the remaining states, anyone can buy a pistol without any kind of license.

As the following figures show, nearly six out of ten Americans questioned in a nationwide survey would support such legislation:

*Outlaw all handguns except for police use?*

[In percent]

Should _____ 59
Should not _____ 35
No opinion _____ 6

2. Requiring that a police permit be obtained before being able to purchase any kind of gun. Such a move is supported by three out of four adults. No license or permit is required currently anywhere in the U.S. for the purchase of shotguns or rifles.

3. A law making it illegal for private citizens to have loaded weapons in their homes. This suggestion has the backing of 53 percent of a cross-section of Americans interviewed.

4. Sharp restrictions on the use of guns by teen-agers are favored by 85 per cent in the survey. One adult in three would go so far as to completely forbid the use of any gun by a person under 18.

5. Requiring a police permit before being able to purchase ammunition or shells—supported by 54 per cent of the public. Authorities point out that if a person should be able to get a gun by illegal means, he would

then be legally free to purchase as much ammunition as he wished, provided he had the funds.

Support for such drastic curbs comes from people in a country where the sale and ownership of all kinds of guns—shotguns, rifles and pistols—is currently widespread.

About one out of every two American homes has at least one firearm of some kind.

Some 25 million adult Americans, the survey finds go hunting at some time; 16 million did some hunting during 1958.

The ownership of guns varies widely by regions of the country—from two out of three homes in the South where a gun is owned to about three out of ten homes in the Eastern states where this is the case.

Approximately four out of five farm families report that they have a firearm of some kind in the home.

**SHOTGUNS MOST POPULAR**

Shotguns are the most popular type of firearm—one out of every three homes has one. Rifles are owned by slightly more than one home in four, pistols or revolvers by one home in six.

Following are the figures on ownership of firearms. With many homes owning more than one type of weapon, the tables add to more than 100 per cent.

**DO YOU HAVE A GUN IN YOUR HOME?**

[In percent]

|  | Yes, shotgun | Yes, rifle | Yes, pistol | No guns |
|---|---|---|---|---|
| All homes | 32 | 27 | 16 | 51 |
| East | 20 | 16 | 11 | 69 |
| Midwest | 37 | 29 | 14 | 47 |
| South | 46 | 37 | 19 | 53 |
| Far West | 24 | 30 | 21 | 53 |
| Cities over 500,000 | 13 | 11 | 12 | 75 |
| 50,000 to 499,999 | 19 | 19 | 12 | 65 |
| 2,500 to 49,999 | 34 | 26 | 16 | 48 |
| Under 2,500 | 48 | 39 | 22 | 32 |
| Farms | 61 | 53 | 15 | 19 |

**EIGHT IN TEN PERSONS FAVOR LAW REQUIRING POLICE PERMIT FOR GUN—PROPORTION IN FAVOR HAS GROWN SINCE 1959 SURVEY—UNITED STATES LAGS BEHIND OTHER NATIONS IN CONTROLS**

(By George Gallup)

PRINCETON, N.J., January 11.—The assassination of President Kennedy by a man using a mail order carbine has stirred up the debate over the greater control of firearms.

When the question was put to a carefully selected sample of the American public, almost eight in ten persons said they favored a law which would require a police permit in order to buy a gun.

The following question was asked of a representative sample of the total adult civilian population of the nation:

*Would you favor or oppose a law which would require a person to obtain a public permit before he or she could buy a gun?*
The findings:

[In percent]

Favor _____ 78
Oppose _____ 17
No opinion _____ 5

*The results, by areas and groups*

[In percent]

|  | Favor | Oppose | No opinion |
|---|---|---|---|
| Men | 71 | 26 | 3 |
| Women | 85 | 10 | 5 |
| College | 80 | 17 | 3 |
| High school | 81 | 17 | 2 |
| Grade and no school | 74 | 18 | 8 |
| 21 to 29 years | 74 | 25 | 1 |
| 30 to 49 years | 80 | 16 | 3 |
| 50 and over | 78 | 15 | 7 |
| East | 90 | 8 | 2 |
| Midwest | 77 | 18 | 5 |
| South | 72 | 21 | 7 |
| West | 73 | 25 | 2 |

Four years ago, the identical question was asked of a parallel sample of the American public, including hunters and gun owners.

**OTHER MEASURES SUGGESTED**

The results showed some of the other measures the public was willing to take at that time to curb the use of firearms:

1. Outlawing the possession of all pistols and revolvers except by police or other authorized persons. Nearly six out of ten (59 percent) Americans questioned at that time said they favored such legislation.

2. A law making it illegal for private citizens to have loaded weapons in their homes. This suggestion had the backing of 53 percent of the public.

3. Sharp restrictions on the use of guns by teenagers were favored by 85 per cent in the survey. One adult in three would go so far as to forbid entirely the use of any gun by a person under 18.

4. Requiring a police permit before the purchase of ammunition or shells—supported by 54 per cent of the public.

**UNITED STATES LAGS BEHIND**

Almost all nations of the world regulate the use of firearms far more stringently than does the U.S.

In fact, in some nations, such as England, even the purchase and use of ammunition must be registered and accounted for.

Opposition to stricter laws has been fought bitterly in the U.S. by one of the country's most powerful lobby and pressure groups—the National Rifle Association.

At the time of the earlier study, it was found that nearly half of the persons included in the survey possessed guns.

**PUBLIC WOULD FAVOR POLICE PERMIT FOR GUN**

(By George Gallup)

PRINCETON, N.J.—If a nationwide referendum were held at this time on a law to require a police permit before a person could buy a gun, such a proposal would pass with flying colors.

Today 73 per cent of Americans say they favor such legislation, 23 percent are opposed, with 4 per cent expressing no opinion.

The public has been ready to accept such a law since 1959 when the Gallup Poll first measured opinion on this issue. At that time 75 per cent, or about the same proportion as today, supported the proposal to require police permits. In 1963, one month after the assassination of President Kennedy by a man with a mail order carbine, 78 per cent were in favor of this measure.

Interestingly, if the referendum were limited to just gun-owners, the proposal would still pass. Sixty per cent of this group would vote in favor of a law requiring police permits before a gun could be bought.

A person's political and educational background appear to have little bearing on where he stands on this issue, but women back the proposal to a greater extent than men.

**FIREARMS VICTIMS NUMBER 17,000**

In no other nation in the world is the sale, possession or use of firearms so free as it is in the United States. In 29 states there are no restrictions whatever on the sale of firearms and guns of every description may be bought, even by children.

With respect to fatal firearm accidents, our death rate from this cause is approximately ten times that recorded in Great Britain, for example. Victims of firearms in the U.S. now number more than 17,000 annually.

To find out the public's willingness to accept restrictions on the purchase of guns by private individuals, the Gallup Poll put this question to a representative number of persons across the nation:

*Would you favor or oppose a law which would require a person to obtain a police permit before he or she could buy a gun?*

The results:

[In percent]

| | |
|---|---|
| Yes | 73 |
| No | 23 |
| No opinion | 4 |

### THE PUBLIC'S CASE—PRO AND CON

Judging by their volunteered comments the position taken by those among the general public who favor the proposed law can be summed up this way:

Such a law would cut down the amount of crime in the nation. With no restrictions, it is easy for guns to get into the hands of teenagers, of careless and emotional persons, and criminals as well. The situation is too dangerous as it is now. A few persons in this group commented that they thought such a law was already in existence.

On the other side, the case can be stated in these terms:

Guns are needed for protection. Such a law would interfere with the interests of hunters and sportsmen. Criminals would be able to get guns even if permits were required. A law like this would be against a person's basic rights. It would be a violation of the Constitution.

What is being referred to in this last point is the right, guaranteed in the Second Amendment, "to keep and bear arms." Many experts on the Constitution, however, believe that the amendment's wording clearly means that the arms be specifically part of a nation's militia, e.g., the National Guard.

Although certain groups in this country have argued that laws restricting gun ownership would make it easier for a "communist take-over," this argument has little support among the public at large, judging by their volunteered comments.

### PERSONS UNDER 18

On the question of the use of guns by persons under the age of 18, there is little doubt as to where the public stands—gun-owners and non-owners alike.

Eighty-three per cent of all persons interviewed would either forbid their use completely or put restrictions on their use. The replies of 75 per cent of gun-owners are in this category.

Here is the question asked:

*Which of these three plans would you prefer for the use of guns by persons under the age of 18—forbid their use completely, put strict restrictions on their use, or continue as at present with few regulations?*

Here are the results for the general public and for gun-owners:

*Use of guns by person under 18?*

[In percent]

| | All persons | Gun-owners |
|---|---|---|
| Forbid completely | 28 | 17 |
| Strict restrictions on use | 55 | 58 |
| Continue as now | 14 | 23 |
| No opinion | 3 | 2 |

### GUN OWNERSHIP IN THE UNITED STATES

Support for a law to require police permits before a gun can be purchased, and for tighter restrictions on the use of guns by youths under 18, comes from people in a country where the use and ownership of all kinds of guns—shotguns, rifles, and pistols—is currently widespread.

About one out of every two American homes (48 percent) has at least one firearm of some kind.

Some 22 million adult Americans, the survey finds, are hunters.

The ownership of guns varies widely by regions of the country—from two out of three homes in the South where a gun is owned, to about three out of ten homes in the Eastern states where this is the case.

Approximately nine out of ten farm families report that they have a firearm of some kind in the home.

Following are the figures on ownership of firearms:

*Gun in home?*

[In percent]

| | |
|---|---|
| Homes with guns | 48 |
| Homes without guns | 52 |

*Kind of gun owned?*

[In percent]

| | |
|---|---|
| Shotgun | 33 |
| Rifle | 24 |
| Pistol | 16 |

(NOTE.—The percent of guns owned adds to more than the 48 percent of homes with guns, since many homes have more than one type of weapon.)

### MASS SHOOTING IN TEXAS RAISES QUESTION OF FIREARMS CONTROL

PRINCETON, N.J.—The shocking mass murder in Austin, Texas, by a student sniper this week has raised the question of restricting the sale and use of firearms.

Large majorities of the public have favored a law requiring a police permit before a person can buy a gun, in regular surveys since 1959, when opinions were first measured on the issue.

In the last survey conducted, 73 per cent of the public supported such legislation. When the results were limited to just gun-owners, a majority of 60 per cent still voted in favor.

This was the question asked:

*Would you favor or oppose a law which would require a person to obtain a police permit before he or she could buy a gun?*

The results (general public):

[In percent]

| | |
|---|---|
| Favor | 73 |
| Oppose | 23 |
| No opinion | 4 |

### USE OF GUNS BY YOUNGSTERS

If the public had its way, it would either forbid the use of guns by persons under the age of 18, or would put restrictions on their use. Eighty-three per cent of the general public, and 75 percent of gun-owners, held this view, in the last survey conducted.

### RESULTS OF A POLL CONDUCTED BY THE GALLUP ORGANIZATION FOR THE NATIONAL BROADCASTING CO., JANUARY 1967

#### NATIONAL FINDINGS

The question: "Now I'd like to ask you a few questions about guns: As you probably know there are two basic types of guns. One type consists of guns with long barrels, such as rifles and shotguns. The second type is the kind of gun you can hold in your hand, such as pistols or revolvers. First I'd like to ask you about pistols and revolvers.

Some people feel that laws covering the sale and ownership of handguns such as pistols and revolvers should be made less strict than they are now. Other people feel that the laws are all right as they are. Still others think the pistol and revolver laws should be made more strict. In general, how do you feel about the laws covering the sale and ownership of this kind of gun? Should they be made less strict, are they all right as they are, or should they be made more strict? Which of these statements do you agree with?" [1]

Laws concerning handguns should be—

| | Entire sample (percent) |
|---|---|
| More strict | 70 |
| Less strict | 2 |
| All right now | 23 |
| No opinion | 5 |
|    Total | 100 |

The question: "Now how do you feel about rifles and shotguns—in general, do you feel

that the rifle and shotgun laws should be made less strict, are all right as they are, or should be more strict? Which of these statements do you agree with?" [1]

Laws concerning rifles and shotguns should be—

| | Entire sample (percent) |
|---|---|
| More strict | 61 |
| Less strict | 2 |
| All right now | 32 |
| No opinion | 5 |
|    Total | 100 |

The question: "Are you for or against a law which would require everyone who owns a rifle or shotgun to register his gun with a state or local governmental agency?" [1]

| | Entire sample (percent) |
|---|---|
| For a law which would require registration of a rifle or shotgun | 73 |
| Against a law which would require registration of a rifle or shotgun | 22 |
| No opinion | 5 |
|    Total | 100 |

The question: "How about pistols and revolvers—are you for or against a law which would require everyone who owns a pistol or revolver to register his gun with a state or local government agency?" [1]

| | Entire sample (percent) |
|---|---|
| For a law which would require registration of a handgun | 85 |
| Against a law which would require registration of a handgun | 11 |
| No opinion | 4 |
|    Total | 100 |

The question: "Do you believe that a person should or should not be able to send away for guns through the mail?"

| | Entire sample (percent) |
|---|---|
| A person should be able to send away for a gun through the mail | 20 |
| A person should not be able to send away for a gun through the mail | 75 |
| No opinion | 5 |
|    Total | 100 |

The question: "Some people feel that anyone who wishes to purchase a gun has a right to buy one and should be permitted to buy one. Others feel that there should be restrictions on who should and who should not be allowed to buy a gun. How do you feel—should anyone who wants to be allowed to buy a gun or should there be restrictions on who is allowed to buy a gun?"

| | Entire sample (percent) |
|---|---|
| Anyone who wants to should be allowed to buy a gun | 12 |
| There should be restrictions on who is allowed to buy a gun | 84 |
| No opinion | 4 |
|    Total | 100 |

### NEGROES, WHITES AGREE ON FOUR PLANS TO DEAL WITH RACIAL PROBLEMS

(By George Gallup)

PRINCETON, N.J., August 26.—Whites and Negroes are in general agreement on four measures suggested as possible ways to deal with racial problems.

The four plans surveyed are: (1) compulsory youth training programs for youth who are out of school and out of work; (2) stricter gun laws; (3) interracial councils composed

---

[1] The order in which these two questions appeared on the questionnaire was reversed on half the sample.

of white and Negro leaders; and (4) a curfew for children under 16.

Results reported today are based on surveys of the entire adult population.

Negroes comprise approximately 9 per cent of the adult population—the proportion of Negroes included in the latest Gallup Poll survey. The sample of Negroes therefore is relatively small, but the results reveal the direction of thinking of Negro citizens.

PUBLIC VOTES ON FOUR PLANS

Here are the four plans and the vote of whites and Negroes:

1. *Compulsory youth training programs.* A large share of the blame for the recent riots has been laid to unemployed youth seeking excitement.

As a possible solution to the high unemployment among young Negroes and the steady increase in juvenile delinquency, the public approves of a youth training plan that would reach the out-of-school and out-of-work.

Present efforts call for *voluntary* attendance at Job Corps centers. The public would go further and make attendance *compulsory.* The plan would follow generally the CCC camps of the thirties, one of the most popular projects ever carried out by the nation.

This question was asked in an earlier Gallup survey:

*"Some people say that all young men between the ages of 16 and 22 who are out of school and out of work should be required to join a Youth Conservation Corps to carry on their education, learn a trade and earn a little money. Do you approve or disapprove of this plan?"*

The national findings showed 3 persons in every 4 in favor. As many as 9 Negroes in 10 backed the plan.

2. *Stricter gun controls.* The outbreak of sniping that accompanied the recent riots has rekindled the debate over gun controls. Mayor Lindsay of New York City this week called for new firearms controls for the protection and safety of citizens.

For three decades the mood of the public has favored stricter laws on the purchase of firearms. In the latest survey nearly three persons in every four (73 percent) favor a law which would require a person to obtain a police permit before he or she could buy a gun. In the previous survey on this issue (conducted one year ago), 68 percent were in favor.

The law proposed would not prohibit a person from owning a gun—either for sport or protection—but would require that a record be made of the name of the gun purchaser. The purpose of such a law would be to keep guns out of the hands of persons with a criminal record, the mentally disturbed, and others unfit to handle guns.

The latest findings show little difference between the views of Negroes and whites.

[In percent]

| | Negroes | Whites | National |
|---|---|---|---|
| Favor gun registration | 70 | 73 | 73 |
| Oppose | 21 | 24 | 23 |
| No opinion | 9 | 3 | 4 |

A further question shows that only one person in seven favors present gun laws. These laws place few regulations on the use of guns by persons under the age of 18.

3. *Curfew for all children under 16.* The recent turmoil in many areas has prompted officials of some cities to impose tight curfew regulations.

An earlier Gallup survey found 77 per cent of all persons in favor of a curfew for children under 16 for their communities. Among this group, more than 8 out of 10 would set the curfew for weekdays at 10 p.m., or earlier.

Nine Negroes in ten say they would favor such a curfew for their communities.

Many communities across the country now have a curfew law. In some communities however curfew regulations are "on the books," but are not strictly enforced.

4. *Interracial councils.* Renewed interest has been expressed in councils made up of community leaders of both races to discuss ways to deal with racial problems.

An earlier Gallup survey found widespread support for such councils; 8 in 10 among both whites and Negroes favored such councils.

---

[From the Mount Vernon (N.Y.) Argus, Sept. 18, 1967]

TWENTY-SEVEN MILLION WHITES ARM SELVES BUT LEAN TO REGISTERED GUNS

(By Louis Harris)

A national survey indicates that 27 million white Americans, representing 54 per cent of the nation's homes, own guns. A majority of gun owners say they would use their weapons to "shoot other people in case of a riot." Large numbers of white people in this country have apparently given serious thought to self-protection, and one person in every three believes that his own home or neighborhood might be affected by a riot.

It would be a mistake, however, to conclude from this evidence that most whites welcome the idea of unrestricted arms. To the contrary, by a decisive 66-to-28 per cent margin, white gun owners favor passage of a law in Congress which would require that all persons "register all gun purchases no matter where they buy them."

Gun ownership shows wide variants by regions of the country:

[In percent]

| | Own | Don't own |
|---|---|---|
| Nation | 54 | 46 |
| By region: | | |
| East | 33 | 67 |
| Midwest | 63 | 37 |
| South | 67 | 33 |
| West | 59 | 41 |

Gun ownership is concentrated more in the South and the Midwest than in other parts of the country. The East, where the fewest own guns, is also the area where gun owners would be least willing (46 per cent) to use their firearms against fellow citizens.

The cross section of white gun owners was asked:

"Would you use your gun to shoot other people in case of a riot?"

[In percent]

| | Yes | No |
|---|---|---|
| Nation | 55 | 45 |
| By region: | | |
| East | 46 | 54 |
| Midwest | 54 | 46 |
| South | 58 | 42 |
| West | 59 | 41 |

The willingness to use guns against other people seems to be related to white gun owners' attitudes toward a national firearms control law. Although a majority in the South and West favor such legislation, the percentages in favor are less than in the East and Midwest.

The cross section of white gun owners was asked:

"Do you favor or oppose federal laws which would control the sale of guns, such as making all persons register all gun purchases no matter where they buy them?"

[In percent]

| | Yes | No | Unsure |
|---|---|---|---|
| Total | 66 | 28 | 6 |
| By region: | | | |
| East | 70 | 21 | 9 |
| Midwest | 70 | 25 | 5 |
| South | 62 | 27 | 11 |
| West | 56 | 40 | 4 |

Clearly, the spate of civil disorders over the past summer has raised people's fears for their safety. This was evident in the replies of the special cross section of whites to this question:

"Do you fear that in a riot your own home or neighborhood might be affected?"

[In percent]

| | Yes | No | Unsure |
|---|---|---|---|
| Total | 34 | 58 | 2½ |
| By income: | | | |
| Under $5,000 | 41 | 49 | 10 |
| $5,000 to $9,999 | 38 | 60 | 7 |
| $10,000 and over | 32 | 62 | 6 |

Low income whites, many of whom live in fringe neighborhoods alongside Negroes, are most apprehensive.

It should be pointed out, however, that earlier Harris Surveys reported that when both Negroes and whites were asked how they feel about their personal safety on the streets, Negroes were far more anxious than whites. Fear of violence does not seem to show any color line.

*Recapitulation by States of Federal Firearms Act licenses applied for and issued during calendar year 1966*

| State: | Number of locations |
|---|---|
| Alabama | 973 |
| Alaska | 522 |
| Arizona | 1,401 |
| Arkansas | 1,340 |
| California | 6,617 |
| Colorado | 1,850 |
| Connecticut | 1,110 |
| Delaware | 174 |
| Florida | 2,531 |
| Georgia | 1,547 |
| Hawaii | 87 |
| Idaho | 894 |
| Illinois | 5,007 |
| Indiana | 2,778 |
| Iowa | 2,625 |
| Kansas | 2,315 |
| Kentucky | 2,363 |
| Louisiana | 1,280 |
| Maine | 1,131 |
| Maryland | 1,179 |
| Massachusetts | 1,068 |
| Michigan | 4,160 |
| Minnesota | 3,489 |
| Mississippi | 980 |
| Missouri | 4,677 |
| Montana | 1,417 |
| Nebraska | 1,222 |
| Nevada | 612 |
| New Hampshire | 765 |
| New Jersey | 2,164 |
| New Mexico | 1,156 |
| New York | 5,535 |
| North Carolina | 2,300 |
| North Dakota | 893 |
| Ohio | 4,844 |
| Oklahoma | 1,726 |
| Oregon | 1,709 |
| Pennsylvania | 5,606 |
| Rhode Island | 891 |
| South Carolina | 1,451 |
| South Dakota | 1,019 |
| Tennessee | 1,993 |
| Texas | 5,916 |
| Utah | 553 |

*Recapitulation by States of Federal Firearms Act licenses applied for and issued during calendar year 1966—Continued*

| State: | Number of locations |
|---|---|
| Vermont | 858 |
| Virginia | 2,287 |
| Washington | 1,399 |
| West Virginia | 1,328 |
| Wisconsin | 3,472 |
| Wyoming | 751 |
| Puerto Rico | 122 |

I have just returned from a brief visit to Amsterdam, Paris, and London. Police officials in those countries were exceedingly helpful in preparing data reflecting the nature and extent of gun control laws in Holland, France, and England.

The Philadelphia ordinance, described by the National Rifle Association as the harshest gun law in the nation, represents the most inadequate kind of control when compared to the established laws and regulations in those three countries.

In Holland I met with First Chief Inspector F. W. Perrels and Chief Inspector L. Bakker, who are responsible for administrating gun control laws in Amsterdam. While the earliest Dutch gun control law dates from 1890, the national firearms laws came in 1919 as a result of the Dutch experience during World War I. In 1919 the Dutch government forbade the manufacture, purchase, ownership, and use of all shoulder and hand guns and initiated rigid control over the importation of all such guns. Hunters and gun-club members may be licensed to use guns and may have them in their possession only to or from hunting and gun club activities. For the hunters and gun-club members, the purchase of a new gun requires the obtaining of a new and separate license. Even to sell or make a gift of a gun requires a license. A gun license is valid for one year only and must be renewed each year. If a licensee moves from one city to another, he must reapply for his license.

One of the prime arguments of those who oppose gun control legislation in the United States is that licensing and registration of guns are evil because an invading army will know precisely where to find all of the guns owned by the defending Americans. I mentioned this argument, used by the gun crowd in Philadelphia, to my Dutch police friends. Holland had experienced the plight of foreign invasion in our lifetime. They smiled and said that the possession of a gun by a Dutchman during invasion meant instant death and reprisals against hundreds of those who did not own guns. The ownership of guns, they said, does little or nothing to help resistance.

The Dutch government rigidly controls the importation of firearms. Even when guns are in transit through Holland to another country, control is exercised. Holland reports that so few crimes are committed with guns that statistical data of this nature is rarely maintained.

As of 1958, all previously owned firearms were required to be surrendered by their owners to the French government. Under the 1958 law, no one is allowed to own long barreled revolvers or rifles or to buy or sell them unless he is a police officer, a public-service officer who handles funds, or a member of the military. Ownership of weapons is not considered a right but a privilege granted at the discretion of the government, as I was informed by M. Jean Confida, Sous Prefet of the Cabinet of Police in Paris, who administers the gun control laws. There is no such thing as the mail-order purchase of firearms without a government permit. Hunters are allowed to purchase shotguns; but they must be legitimate hunters, certified as such in the communities in which they live. In all of Paris and its suburbs, with a total population of more than 5 million people,

only 700 permits were issued to purchase so-called "special purpose" defense weapons of a kind that are not totally prohibited. The French procedures for securing permits is very much like that in Philadelphia, with absolute discretion vested in the police.

As with other European nations, the French government, through its War and Home Office, maintains a total and absolute control over the manufacture, import, export, and dealing in all firearms.

It is interesting to note that in Paris there were only 76 homicides and attempted homicides involving firearms in 1966; in 1966 it was 77; in 1964 it was 76; in 1963 it was 100; and in 1962, at the time of the Algerian crisis it was 145. Offenses including robbery, illegal trading or owing firearms, and carrying firearms are equally rare offenses in France. Firearms in France are the proper subject of absolute governmental control.

In England, Scotland, and Wales, the Firearms Acts of 1937, 1962, and 1965 currently are undergoing consolidation and strengthening. All automatic and rifled guns are under strict control, and firearms certificates for their use are issued by police only for very restricted purposes. Certificates are not issued generally for protection of person or property. Smooth-bore guns, such as shotguns, are soon to be licensed, as well. The government may declare any type of weapon "especially dangerous" in order to bring it under control, and while this has not yet been done, statements in Parliament indicate that even air weapons will fall into this category.

Six times since 1933 the English government has declared an amnesty for the owners of firearms who surrendered them because they were held without permits. Three of these occurred in 1946 when 76,000 guns were surrendered to the government; in 1961 when 70,000 were given up; and in 1965 when 40,-660 guns were turned over. A future amnesty for shotgun owners undoubtedly will be announced when shotgun certificates become the law.

In England, there is an index maintained by the police of all firearms certificate holders. The index contains the serial number of all weapons. There is also an index of lost or stolen firearms. As of December 31, 1966, in all of vast London and its suburbs, there were only 15,584 certificate holders. Virtually all of them were confined to shooting-club members and sportsmen.

Firearms in England were used in only 3.1 per cent of the 9,201 robberies and offenses against the person in 1966 and but 3.4 per cent of the 7,980 similar offenses in 1965.

Along with total control over the importation of firearms in England, the very rigid certification requirements for the ownership of guns would make impossible the acquisition of foreign firearms surplus by the British population. In Holland, France, and England where I raised the question, I was told that the importation of foreign-made surplus firearms and their distribution to any category of citizens, as in the United States, would be unthinkable.

While in Paris and London, police officials supplied me with the statutes and the government regulations for the purchase, ownership, and transfer of firearms. For the convenience of this Committee and should they be of special interest to you, I shall be happy to make them available or, at least, to provide you with the citations.

If we can learn anything from the control over firearms exercised in Holland, France, and England, it is that the legislation you are considering, the Amendment to Senate 1, Senate 1853, and Senate 1854, continue to acknowledge that some segments of the American community have an absolute right to buy and use guns. The people of Philadelphia do not believe this is so. We have expressed our feelings in a modest, local ordinance that treats all firearms as dangerous

weapons, justifying the licensing of those who would buy and use them. Senate 1 Amendment, I believe, is much more realistic in its attempt to provide some controls. But even it is hardly sufficient.

E. R. GOMBERG,
*Executive Vice President, Philadelphia Crime Commission.*

VOTE TITLE IV, LIFE MAGAZINE SAYS

Mr. DODD. Mr. President, the May 10 issue of Life magazine has called once more for strong controls on the sale of firearms to individuals.

Calling for a step toward sanity, Life's most recent editorial comment reflects the concern of millions of Americans.

Their worry is the freedom with which fanatics and others can obtain rifles and shotguns as well as handguns to carry out their deranged purposes.

Life recognizes the mild nature of the legislation now included in title IV of the Omnibus Crime Control Act now before the Senate, and comments:

The gun bill before Congress is not as strong as it ought to be, but it's a start and should be voted.

The article emphasizes again the near unanimity of the real voice of this country's concern about the uncontrolled mail-order murder traffic.

To assist Senators who are now considering the bill, I ask unanimous consent that the editorial be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

[From Life magazine, May 10, 1968]

THE GUN LAW—A STEP TOWARD SANITY

When it comes to gun laws, the minority rules in America. Polls taken over the past decade consistently show that a large majority of all Americans want some kind of control over the purchase of weapons (with the latest Louis Harris poll showing 71% in favor). Each year in Congress bills are written, and committee hearings are held, but then the National Rifle Association alerts its members and friends to man the barricades against any proposals strong enough to be effective.

The barrage of letters that the NRA can call down at short notice is probably unmatched by any other lobbying group. Since the 1930s, when Congress passed two bills—one aimed at eliminating the sawed-off shotguns and machine guns favored by gangsters of that era and the other an ineffectual dealer-registration law—no bill dealing with the regulation of guns has reached the floor of Congress. The NRA's record is particularly impressive considering that it was compiled over a period and saw the assassination of one President, an attempt on the life of another and the shooting up of the House of Representatives by fanatical Puerto Rican nationalists in 1954. But after Martin Luther King was assassinated in Memphis, a gun control measure has finally been approved by a Senate committee. An amendment to the President's Safe Streets bill, the measure now before the Senate would:

Prohibit interstate mail-order sales of handguns—pistols and revolvers—to individuals.

Ban over-the-counter sales of handguns to customers from outside the state—and to anyone under 21.

Curb the imports of surplus military weapons not suitable for sporting purposes and tighten the controls on sales of anti-tank guns, bazookas, mortars, grenades and other highly destructive weapons.

None of these clauses menaces the sportsman; they might not stop an assassination either, but it is some gain to require a salesman to know the person he is selling a handgun to. Yet gun buffs have opened an intensive campaign to kill this moderate bill on the floor of the Senate. And the usual cries are heard that any control of gun sales is a direct attack on their rights, their manhood and their homes. Reasonable suggestions that there should be some way to keep a howitzer out of the possession of anybody who has the price—or a Mannlicher-Carcano out of the hands of a Lee Harvey Oswald—are countered by gun propagandists with the assertion that the citizen has a constitutional right to "bear arms." This constitutional phrase refers to state militias, not to individuals, and this is how the Supreme Court has always interpreted the right.

The gun bill before Congress is not as strong as it ought to be, but it's a start and should be voted.

### HAPPINESS IS A WARM GUN

Mr. DODD. Mr. President, Charlie Walsh is the sports editor of the Milford Citizen in my home State of Connecticut, and I might add, a sportswriter harboring some sensibilities.

One recent morning he was handed an advance bulletin—press release, in short—from the National Rifle Association designed to direct the attention of editors to what the NRA considers the principal features in the forthcoming edition of the association's monthly magazine, the American Rifleman.

I think it is safe to say that the advance bulletin startled Charlie. Here is the way he began his column in the May 2, 1968, edition of the Milford Chronicle:

The National Rifle Association has once again produced an absolute gem of unintentional irony.

In an advance bulletin for their magazine, "The American Rifleman," there appears a picture of an eight-year-old boy holding a rac of what look like dead pheasants. Under the picture appears the caption, (at this point it might be wise to grab some rung on your chair) "Happiness Is a Warm Gun." Yeah, right?

Any comment on that statement in light of the recent rash of warm guns we have been finding in this country (i.e. Memphis doorways, Texas book storage buildings) would be wholly superfluous.

Mr. President, the remainder of Mr. Walsh's views on the NRA's exploitation of happiness and youth by the presence of a warm gun would best be told in his own word. I ask unanimous consent that the entire column be printed in the RECORD at this point in the discussion of the need for legislation to disarm criminals and the mentally disabled.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

[From the Milford Citizen, May 2, 1968]

THE STEEL MYTH: IN LEFT FIELD

(By Charlie Walsh)

The National Rifle Association has once again produced an absolute gem of unintentional irony.

In an advance bulletin for their magazine, "The American Rifleman," there appears a picture of an eight-year-old boy holding a rac of what look like dead pheasants. Under the picture appears the caption, (at this point it might be wise to grab some rung on your chair) "Happiness Is a Warm Gun." Yeah, right?

Any comment on that statement in light of the recent rash of warm guns we have been finding in this country (i.e. Memphis doorways, Texas book storage buildings) would be wholly superfluous.

What might be helpful at this point would be an examination of the NRA itself, that beneficient, monolithic, semi-secret, wealthy and huge organization of gun owners, shooters, makers, collectors and lovers.

The issue, of course, is guns. Guns have one purpose and one purpose only. They were and are designed to kill living things. They were probably one of man's most efficient inventions for inflicting death. Knives, spears, clubs, bows and arrows are fine but they all have two distinct disadvantages. 1. They all require the killer to at some time, come within an unsafe distance of his victim to inflict the wound. 2. They all have a fairly wide margin of error. (If you do not strike deeply enough and accurately enough with a knife your victim will surely live.)

A gun, however, assures both safety for the user and deadliness and accuracy on the target. A gun also provides a certain freedom from the psychological problems involved with more intimate violence. How much easier it is to pull a trigger and watch a man slump one mile away than to engage in a messy eye-to-eye assault on someone.

In an old movie I saw the other night a pal of Orson Wells' made a speech about what makes one person better than another "An edge," he said, "you have got to have an edge." He went on to say that a great singer had an edge on other people in his vocal cords. And a lion's teeth give him an edge over a zebra.

The gun, he told Wells who was playing a drunk, poet, Irish sailor, was the edge most men have. He did not say over what.

The gun is man's edge over himself; his own puny body, his clawless hand, his fangless mouth and his plaguing devils.

It would, one supposes, be quite logical that men would develop an elaborate organization to develop and protect this edge. For that edge, unlike the lions teeth, is an artificial one and quite perishable.

This attempt to protect the edge was understandable when men were forced to prowl the woods for food and protect himself from the teeth of the lion and the wolf. But now the food is grown in docile herds and the lion safely in the zoo and with wolves all but extinct.

In short, the NRA is a gross anachronism. The huge amounts of energy it expends trying to convince congressmen and train young marksmen is expended over a myth—the gun.

The gun is, at this stage in history, a myth and legend. It is no more than an agonizing memory of good earthy days gone by. The place left for the gun is a locked glass case over the mantle or in a museum.

Yes, a myth, but how deadly a myth it is. It is, unlike most myths, which are made dreams and fears, made of steel and brass and black powder. It is a myth not held in the mind but in the hands. Those deadly hands.

Understand, the guns I speak of here are the guns of the hunter, the "recreational shooter." There are other guns, the guns of war and of the police that are still enmeshed in reality, although they too share at least part of the myth.

There is really only one enemy left for men to fight. It is those devils and demons which lurk in the alleys of his mind, and even all the NRA's guns can't fight them.

EDITOR SEES NRA RAVINGS AS NONSENSE

Mr. DODD. Mr. President, the Sullivan Law, New York State's firearms statute, has for generations been used by the gun lobby as a public whipping boy.

This is particularly true of the bitter abuse heaped upon it by the National Rifle Association. They see it as the ultimate in bad firearms laws, and spend considerable effort across the Nation using it as a threat to sportsmen who are not forever vigilant against the Government's insidious attempts to take their guns away.

The association's paid representatives, in thousands of forays across the country each year, give hunting and sportsmen's groups a deliberately distorted picture of the effectiveness of the Sullivan Law.

Promulgate lies about its effectiveness, if you will.

At the 1964 hearings before the Juvenile Delinquency Subcommittee, and on a number of other occasions, an NRA Director said:

New York's so-called Sullivan Law is the most restrictive gun legislation on the statute books. Yet it is a complete failure, not only in keeping guns out of the hands of the criminal element but also at reducing the crime rate.

That, of course, is not true. The NRA knows that is not true. It is the kind of deliberate distortion they peddle to legitimate sportsmen who then echo it across the land.

But this type of lobbying activity on the part of the association is being uncovered more and more each day. Thinking people do not like being fed misinformation. Newspapers are beginning to see the twisted and slanted information for what it is, and they resent it.

There is no better example of this reaction against the NRA's massive lobbying effort than an editorial which appeared in the Charleston W. Va., Sunday Gazette-Mail of April 28, 1968.

The editors point out that the murder rate by gun in New York City is 25 percent, less than half that of Phoenix and about a third that of Dallas. The editorial then observes:

If this is "complete failure" as contended by the NRA director, police departments of most U.S. metropolises would undoubtedly welcome a similar "sorry" record.

Current gun control legislation before the U.S. Senate needs to be strengthened drastically. What the nation should have is prohibition of mail order sales to the private citizen and registration of all guns, so that law enforcement authorities across the nation know who owns a gun.

It is absurd to talk about curbing crime and lowering murders rates until Congress moves against merchants of murder selling weapons of murder indiscriminately.

I say the Gazette is setting things straight. And they are getting a lot of help around the country.

I feel certain that many Senators, inundated with mail generated by the firearms lobby, have frequently read this NRA version of the effectiveness of the Sullivan Law. I should like to provide the truth about the effectiveness of that law in holding down the number of gun murders. Therefore, I ask unanimous consent that the entire editorial be printed in the RECORD.

There being no objection, the editorial was ordered to be printed in the RECORD, as follows:

[From the Charlestown (W. Va.) Gazette-Mail, Apr. 28, 1968]

SULLIVAN LAW GOOD LAW DESPITE RAVINGS OF NRA

The National Rifle Assn., which for some unaccountable reason is permitted to lobby

Congress at taxpayer expense, has long argued that gun registration laws and laws forbidding the unrestricted sale of lethal arms merely aid the criminal at the expense of the law-abiding in American society.

The facts shatter such nonsense.

In 1965, a study conducted by the Massachusetts Department of Public Safety revealed that only six weapons out of 4,506 retrieved from criminals in the state over the previous eight years had been stolen. More than 4,000 had been purchased outside the state in over-the-counter sales in Maine, New Hampshire and Vermont, none of which has on statute books the strict legislation prohibiting sales that Massachusetts has.

Surveys in Newark show that 80 per cent of the guns taken away from criminals were bought beyond New Jersey's borders.

The NRA additionally delights in castigating New York State's Sullivan Law, stiffest in the nation. This law stipulates residents can't buy or possess a handgun in the absence of a police permit, and the law is sufficiently well enforced within New York City that out of a total population of 8 million only 17,000 permits are held.

At the congressional hearings of 1964, an NRA director asserted: "New York's so-called Sullivan Law is the most restrictive gun legislation on the statute books. Yet it is a complete failure, not only in keeping guns out of the hands of the criminal element but also at reducing the crime rate."

Again the facts are quite different, and, indeed, if the nation had a Sullivan Law, New York State and City would greatly benefit, because residents wouldn't be able to acquire guns through mail orders or by traveling to areas where they are easily acquired.

The rates of murder by gun in New York City, for example, is 25 per cent, in Dallas the rate is 72 per cent and 65.9 per cent in Phoenix, two cities having virtually no law regulating firearm sales. In comparison with the nation's largest cities, New York has the fifth lowest assault rate, the third lowest murder rate, and the lowest robbery rate.

If this is "complete failure," as contended by the NRA director, police departments of most U.S. metropolises would undoubtedly welcome a similar "sorry" record.

Current gun control legislation before the U.S. Senate needs to be strengthened drastically. What the nation should have is prohibition of mail order sales to the private citizen and registration of all guns, so law enforcement authorities across the nation know who own a gun.

It is absurd to talk about curbing crime and lowering murder rates until Congress moves against merchants of murder selling weapons of murder indiscriminately.

The Sullivan Law is a good law, and despite the deliberate lies concerning the law promulgated by the NRA, it is a law that does what it was designed to do—curtailing gun ownership among criminals and the mentally unstable. The law works, and it's high time Congress adopted it for all 50 states.

POLL SHOWS RURAL AMERICA DOES NOT
BLOCK GUN CONTROLS

Mr. DODD. Mr. President, it has been the experience of congressional committees over the years that whenever, and regardless of the clear public need, firearms laws are proposed to disarm the criminal and others who regularly misuse them, the committee members are besieged by a letterwriting campaign against the proposed legislation.

And when testimony is taken, as surely as night follows day, a large number of witnesses appear and claim to speak for rural America.

They say that strict controls over the

sale of firearms would hurt the farmer, hurt the sportsmen, and be an inconvenience to the country dweller who lives some miles from a store or large commercial outlet.

Indeed, some of the arguments of these spokesmen tend to portray their constituents as more of the country bumpkin than the modern day sophisticate that much of rural America is.

That could not be more forcefully brought to the attention of the Senate than it was February 4, 1967, with the publication of two public opinion polls conducted by the Prairie Farmer, based in Chicago.

The 127-year-old publication is one of the backbones of Midwest journalism and is about as close to the Midwest farmer as any publication can get. Its circulation is around 400,000.

The Prairie Farmer polls covered the States of Indiana and Illinois, and show that even rural America is something less than enthusiastic about the rate at which American civilians are arming against one another.

The editor, James C. Thomson, in a personal letter to me, said:

My own personal opinion is that the irresponsible use of firearms has become a national scandal. Our trigger-happy image beyond our shores seems to deny our own opinion that we are a peace-loving nation.

Farmers still want firearms for hunting and the protection people living in isolation need, but farmers, like anyone else, feel that those who are mentally unbalanced or irresponsible in any way should be denied the right to own arms. The indiscriminate killings among 15- and 16-year-old boys in Chicago is incredible, and the stockpiling of arms by both blacks and whites is setting the stage for a national disaster.

I doubt very much that the gun lobby speaks for the American people. It certainly doesn't speak for the urban citizen like myself. And we offer you proof from personal interview polls that it does not speak for midwestern farmers.

Mr. President, I ask unanimous consent to have printed in the RECORD a hard-fact editorial based on those Prairie Farmers polls. It interprets the polls better than I can. I ask also that copies of both polls be printed.

There being no objection, the items were ordered to be printed in the RECORD, as follows:

[From the Prairie Farmer, Feb. 4, 1967]
FARMER SENTIMENT FOR GUNS IS A MYTH

Newspapers have suggested that rural people are the stumbling block in efforts to control indiscriminate use of firearms. The gun mystique, it is said, thrives in the open spaces.

But the overpowering sentiment in rural areas for the unrestricted ownership and use of guns is a myth. At least that is the case in Indiana and Illinois, according to a recent Prairie Farmer poll.

In personal interviews farm people were asked, "Do you feel that more stringent efforts should be made to control the possession and use of firearms by the public?" The consensus in both states was: Yes, 55 percent; No, 32 percent; and Undecided, 13 percent.

In the three years since the death of President Kennedy more than 50,000 Americans—10 times the Vietnam toll—have been gunned down by misfits, criminals, and of course, ordinary people who became careless. Too many fire a too-easily-available gun in anger and live to regret it.

In the last Congress efforts to pass gun control legislation were stalled because of the problem of reconciling the right of people to bear arms with the safety of a more crowded society.

But an angry, emotional group insists that any gun-control bill is a sinister plot and conspiracy to deprive Americans of their constitutional right to bear arms.

This is nonsense. Those of us who are concerned about the mounting death toll from shooting merely want guns kept out of reach of juveniles, drug addicts, convicted criminals, and the mentally unbalanced. There is no need to deprive hunters and those who have a legitimate reason.

But let the record show that people in rural areas are just as concerned about this problem as anyone else. They want action by Congress.

[From the Prairie Farmer, Feb. 4, 1967]
ILLINOIS FARMERS FAVOR RESTRICTIONS ON
POSSESSION, USE OF FIREARMS

Most Illinois farm people would like to see the government take steps to limit the possession and use of firearms by the public, according to a recent Prairie Farmer poll. Women had stronger feelings in limitation.

Here is how they responded when asked the following question: "Do you feel that more stringent efforts should be made to control the possession and use of firearms by the public?"

|            | Men  | Women | Both |
|------------|------|-------|------|
| Yes        | 51.6 | 62.5  | 57.0 |
| No         | 38.8 | 23.0  | 30.9 |
| Not sure   | 9.6  | 14.5  | 12.1 |

Older people were more strongly in favor of gun restrictions, but a majority of all age groups favored restriction. Here is how they voted by age groups:

|            | Under 40 | 40 to 59 | Over 59 |
|------------|----------|----------|---------|
| Yes        | 53.5     | 57.2     | 59.4    |
| No         | 34.2     | 33.1     | 23.2    |
| Not sure   | 12.3     | 9.7      | 17.4    |

Educational level didn't seem to make such difference in how farmers felt, but college-trained farmers felt strongest about restricting firearms. Here is how they voted according to educational groupings:

|            | Grade school | High school | Some college |
|------------|--------------|-------------|--------------|
| Yes        | 57.8         | 55.3        | 59.9         |
| No         | 27.4         | 33.3        | 28.3         |
| Not sure   | 14.8         | 11.4        | 11.8         |

[From the Prairie Farmer, Feb. 4, 1967]
HOOSIER FARM WOMEN WOULD LIMIT THE
POSSESSION AND USE OF FIREARMS

Indiana farm women feel strongly about limiting the possession and use of firearms by the public, according to a recent poll by Prairie Farmer. Indiana farm men were about evenly divided on the question.

Here is how they answered when asked, "Do you feel that more stringent efforts should be made to control the possession and use of firearms by the public?"

|            | Men  | Women | Both |
|------------|------|-------|------|
| Yes        | 42.8 | 63.3  | 53.3 |
| No         | 42.2 | 22.9  | 32.3 |
| Not sure   | 15.0 | 13.8  | 14.4 |

Middle-aged Hoosiers with growing children expressed stronger conviction on the need for firearms limitation. Only a bare majority of older people were in favor. Here is how they voted by age groups:

|  | Under 40 years | 40 to 59 years | 60 years and over |
|---|---|---|---|
| Yes | 51.0 | 55.6 | 50.4 |
| No | 35.6 | 30.2 | 33.8 |
| Not sure | 13.4 | 14.2 | 15.8 |

Farmers with college training felt strongest about gun restriction and licensing, but there is very little difference between this group and farmer with grade school education. Here is how they voted according to educational grouping:

|  | 8 years or less | 9 to 12 years | Some college |
|---|---|---|---|
| Yes | 60.4 | 48.8 | 61.4 |
| No | 24.2 | 37.2 | 27.6 |
| Not sure | 15.4 | 14.0 | 11.0 |

### THE NRA, THE LEGISLATOR, AND UNRESTRICTIVE LAWS

Mr. DODD. Mr. President, States popularly known as hunting States have, relatively speaking, small populations. And, generally speaking, the hunting States have lax firearms laws, though this is not universally true.

I have often suspected that among the reasons for this is that the lobbies and special interest groups find it somewhat easier to work their will when the opinions of fewer people are needed to tip the scales against one issue or another.

I read an article recently that in effect came to the same conclusion concerning the relatively unrestrictive firearms laws in the States of Maine, Vermont, and New Hampshire.

In the Portland (Maine) Express of November 7, 1967, Sandor M. Polster analyzes the firearms problems in Maine and the need for a tightening of the gun laws. The article is entitled: "Law Officials Condemn Maine's Lax Gun Laws."

Mr. Polster recounts the recent legislative history of one lawmaker who attempted to revise the firearms laws, an attorney from Belfast who introduced a gun control bill in the legislature in 1965. It met the same demise as most of the firearms legislation introduced in State and town councils across the country—it died in the legislature's judiciary committee.

Mr. Polster quotes the author on the death of his first and only effort to legislate on firearms:

I withdrew it not because of the . . . well, you just can't believe the mail I got . . . I was accused of being a Communist, of being an enemy . . . I received a deluge of this stuff. A number of my colleagues told me they had to oppose me. I was told it was too hot an issue to handle . . . I just felt there was no point in flying in the face of a stone wall.

Mr. Polster then adds:

The "stone wall" is the National Rifle Association. The effective lobby group based in Washington, has managed to keep gun laws in Maine, New Hampshire and Vermont unrestrictive. It has always frightened law enforcement officers. Many would comment off the record regarding the state's laws, but when it came to a quote, they asked to remain anonymous.

It was the year of 1965 when the Belfast, Maine, attorney received so much abuse by mail and pressure from his colleagues to withdraw his firearms proposal. According to Mr. Polster, it was the year 1965 when the last serious attempt to change the firearms laws in the State of Maine died at the hands of the NRA.

Mr. President, I quote a paragraph from the 1965 operating report of the National Rifle Association. On page 21, under "Legislative Services," the board of directors reported the following:

Information to NRA members about firearms control proposals is supplied by three principal means—(1) the regular report, "What the lawmakers are Doing," in The American rifleman; (2) NRA legislative bulletins and memoranda; and (3) direct contacts by mail or wire. During 1965, 350 bills of concern to gun owners were introduction in 47 state legislatures and the U.S. Congress. Details about the more important ones were published in 99 columns of the magazine, and 28 legislative bulletins were mailed to 300,000 members and clubs in 14 states. NRA members reacted promptly, firmly, and in force. As a result, no severe legislation was enacted on the federal or state level.

Little wonder, then, that a solitary piece of legislation that would have given the State of Maine a more effective firearms law was crushed before it had a chance.

It fell before the computerized juggernaut of the NRA lobby, as do so many other attempts in other States each year.

Mr. President, I ask unanimous consent that the entire article by Sandor M. Polster be printed in the RECORD at this point, for the information of Senators as they consider title IV of the omnibus crime bill.

Title IV is my amendment to S. 917 and is now being subjected to the same type of lobby pressure discussed in the article.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

### LAW OFFICIALS CONDEMN MAINE'S LAX GUN LAWS

#### (By Sandor M. Polster)

Since February, 45 hand guns, 41 rifles and four shotguns have been stolen from homes, cottages and businesses in Maine.

The thefts of these firearms have been reported. It is not known how many guns have been stolen and not reported for one reason or another.

In June 1965, then Massachusetts Commissioner of Public Safety Richard R. Caples told a U.S. Senate subcommittee in Washington how a 16-year-old Cambridge, Mass., youth came into Maine, purchased 16 guns and took them back to the Bay State on a bus.

Caples added then that one of the guns was later used to kill a Medford, Mass., policeman.

These facts, and others, are cited by law enforcement officials in condemning Maine's lax gun laws. The only requirement for purchase of a firearm in this state is to be 16-years or older.

To carry a concealed weapon requires a permit, issued by city police, but that is as restrictive as the law gets.

In Maine's recent legislative history, only one lawmaker has attempted to revise the gun law. Richard W. Glass, a Belfast lawyer, introduced his measure in the 1965 legislature.

Glass, Waldo County Attorney from 1954 to 1960, was a state senator in 1965.

Whereas the present law requires a permit for concealing weapons on the person, Glass' bill would have necessitated registration of any concealable weapon, which was defined as any gun up to 12 inches long.

But Glass' proposal was short-lived—it never got out of the Judiciary Committee.

"I withdrew it not because of the . . . well, you just can't believe the mail I got," he said. "I was accused of being a Communist, of being an enemy . . . I received a deluge of this stuff. A number of my colleagues told me they had to oppose me. I was told it was too hot an issue to handle."

Glass added: "After polling the committee and in light of what other people had told me, the only thing I would be getting was publicity. I just felt there was no point in flying in the face of a stone wall."

The "stone wall," in Glass' opinion, is the National Rifle Association.

The effective lobby group, based in Washington, has managed to keep gun laws in Maine, New Hampshire and Vermont unrestrictive.

It has always frightened law enforcement officers. Many would comment off the record regarding the state's laws, but when it came to a quote, they asked to remain anonymous.

On the national level, only seven states require a license or permit for possession of firearms. South Carolina is the only state completely prohibiting sale of handguns. And nine states have no minimum age limit for purchasing guns.

While Maine's laws have come under attack from out-of-state law enforcement officials and from some within the state, they are enthusiastically endorsed by Dr. Alonzo H. Garcelon, an Augusta dentist and a director of the National Rifle Association.

"I don't see that we need any change," he said. "I think we're doing pretty well. Our crime rate isn't going up as far as I can see."

Garcelon termed Glass' measure "just tricky phraseology."

"I am not against good laws," Garcelon said. "To me, a gun law is meant to put the criminal out of business. If we could design a gun law that would interfere with the criminal, then we'd be in business."

Col. Robert Marx, former chief of the Maine state police and now director of the New England State Police Staff College in Foster, R.I., said recently he wasn't satisfied with the state's gun laws.

"My feeling has always been that certain areas of the gun control law could be strengthened," he said. "Even a child can buy a gun through the mail as the law stands now."

The answer, Marx said, rests with the legislature.

"I believe our sales of weapons should be tightened up somewhat," he said.

Marx suggested that several factors ought to enter into the purchase of firearms, including mental competency, criminal record and age.

"As I understand, it's a simple matter to buy a machine gun through the mail," he said.

Several law officials said although Maine prohibits purchase of firearms by persons convicted of a felony within five years of release "from probation, prison or parole," such a law is difficult to enforce.

Gun dealers are required to record the name of the purchaser and the gun's serial number, but officials concede this is seldom done.

And besides, as one police official put it, how is a gun dealer to know if a customer is telling the truth as to his name or, for that matter, whether he is, indeed, a felon?

### COMMONWEAL POSES FIREARMS QUERY: CONSTITUTIONAL RIGHT OR LUNACY?

Mr. DODD. Mr. President, an interesting editorial statement was published in last week's issue of Commonweal, a magazine which reaches 35,000 homes each week. It comments on the pending firearms control provisions of title IV of the Omnibus Crime Control and Safe Streets Act.

John Deedy editorially takes note of the National Rifle Association's fight for their version of the second amendment and dismisses it as irrelevant. He points out that the NRA just will not countenance meaningful gun control legislation to alleviate the high rate of violence in the streets.

Of course, Mr. Deedy realizes that any appeal to the rational faculties of the NRA are futile and that, as he phrases it:

If the past offers any clue, it will go in one ear and out the other . . . thus insuring that a willful conspirator or anyone with a nutty idea in his head will still be able to drop into shops like Abercrombie & Fitch, pick out his gun, even get some coaching, and be about his business.

As we consider title IV to the crime control bill, I desire to share Commonweal's view with Senators, so I ask unanimous consent that the article published on May 3, 1968, be in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

NEWS AND VIEWS

(By John Deedy)

One would have to search far for an example of commercial contretemps to match that of Abercrombie & Fitch during the wake period of Martin Luther King. On April 8—four days after Dr. King's assassination and the day before the funeral—Abercrombie & Fitch took two columns of space in the New York *Times* to advertise its gun department and the availability of Rex Gage for private shooting lessons.

Mr. Gage, Abercrombie & Fitch gloried, is "one of the foremost instructors of England's renowned Holland & Holland shooting school. And to underscore his credentials, Abercrombie & Fitch offered a letter of recommendation from Norman T. Clarke, Holland & Holland's senior shooting instructor: "Mr. Gage . . . has had an extensive training by me. He teaches my system of how to shoot."

If all this weren't errancy enough, Clarke apologized that he wouldn't be at Abercrombie & Fitch's himself: "I am afraid I will not be able to see you in New York this spring, as I shall be visiting the West Coast and southern parts of the United States during April and part of May . . ."

Now, no one is charging there is something suspect about Mr. Gage's occupation. Abercrombie & Fitch's advertising or Mr. Clarke's itinerary. But four days after the King murder and the new evidence it provided of the American propensity for violence, there is something sick about the exaltation of guns and the shooting sports—since this is a land where anyone, balanced or not, can pop an order into the mails, or walk into Abercrombie & Fitch or any other sporting goods store, and freely purchase the guns and instruction that help make violence a way of life in America.

Admittedly, Article 2 of the Bill of Rights speaks of "the right of the people to keep and bear arms." But, as Gunnar Myrdal commented after Dr. King's murder, (a) the idea that everyone should be able to buy a gun is "silly," and (b) if the Constitution gives the people this right, "then to hell with the Constitution."

Myrdal is right, although the problem isn't in the Constitution. It's in the enactment of sensible gun control laws. Yet, strangely enough, to get such laws written is as tough a task as getting the Constitution amended, for one is in contention with the largest and perhaps most effective lobbying group in Washington, the National Rifle Association. The NRA just won't countenance broad gun control.

A week to the day after the King murder,

NRA president Harold W. Glassen of Lansing allowed that the killing was "senseless" and "cruel," but in the same breath he argued that the King murder should have no effect on gun legislation. And, indeed, it won't, if the NRA has its way, as it likely will.

Hence, even in this tragic year, the best the nation can hope for is the mildest extension of gun control—a measure to ban interstate mail-order sales of pistols and other concealable weapons, and the prohibition of over-the-counter sales of hand-guns to out-of-state residents. Pretty weak legislation, with nothing, notice, on the regulation of rifles and other "long" weapons of the type that killed Dr. King and that are common to assassinations in America. The NRA lobby protects their sale.

At the National Rifle Association's recent convention in Boston, Massachusetts Lieutenant Governor Francis Sargent urged the NRA to spearhead gun control legislation instead of "either blocking it or offering mealymouthed plans that are more pablum than reform." The metaphor is bad but the thought is good.

Unfortunately, if the past offers any clue, it will go in one ear and out the other of the National Rifle Association, thus insuring that a willful conspirator or anyone with a nutty idea in his head will still be able to drop into shops like Abercrombie & Fitch, pick out his gun, even get some coaching, and be about his business.

Purchasers defend this arrangement as a constitutional right, sellers as an inescapable merchandizing risk. History will label it lunacy.

WOMEN VOTE 2 TO 1 FOR GUN PURCHASE PERMIT

Mr. DODD. Mr. President, 1,000 members of the Good Housekeeping consumer panel, a nationwide cross section of America's women, were surveyed recently on their attitudes toward gun control.

The women were asked:

Should a permit be required to purchase a gun?

The results were published in the May issue of the magazine.

The vote was decisive, almost 2 to 1 in favor of a permit to purchase, 63.9-to-32.2 percent.

I should point out to Senators that the results of the survey are consistent with those of virtually every other public opinion poll or survey I have ever seen on the subject. They reflect a deep concern on the part of American women who feel the urgent need to pass a law that will effectively keep firearms out of the hands of criminals and the unstable.

I suggest that this is another voice in the chorus of polls, surveys, editorials, broadcasts, and expressions of deep public concern over the need for Congress to adopt a strong Federal firearms law, specifically, title IV of the omnibus crime bill now being debated.

I ask unanimous consent to have printed in the RECORD the text of the Good Housekeeping poll.

There being no objection, the item was ordered to be printed in the RECORD, as follows:

GH POLL: SHOULD A PERMIT BE REQUIRED TO PURCHASE A GUN?

According to the first nationwide survey of women's attitudes toward gun control, two out of every three American homemakers believe that no one should be able to buy a gun, pistol or rifle without a permit.

The May issue of Good Housekeeping reports the results of its findings from a poll conducted among a cross-section of over 1,000 of its readers.

Participants were asked whether they agreed with New York Mayor John V. Lindsay that a permit should be required to buy a rifle, shotgun or pistol, or with Harold W. Glassen, president of the National Rifle Association of America, who opposes such a requirement. The women's vote was very close to a decisive two to one with 63.9% in support of Mr. Lindsay and 32.2% in support of Mr. Glassen. Less than 2% were undecided.

Gun control is one of the most bitterly debated of national issues. On one side is a large body of concerned citizens who feel the urgent need to pass laws that will keep firearms out of the hands of criminals and the mentally unstable. They point to the soaring crime figures as clear evidence that guns are far too easily available. They cite the murder of John F. Kennedy as a tragedy that might have been averted if the gun laws had been stricter.

On the other side is another large body of citizens who are worried that tough gun restrictions would violate the basic freedom of law-abiding Americans. They believe that people who legitimately use guns for hunting, sports or self-protection would be penalized while criminals would easily obtain firearms by stealing and other illegal means.

The Poll revealed that the participants, while disapproving of the casual sale of firearms to all comers, were under no illusion that gun laws in themselves would turn this country into a more peaceful society. In fact, they weren't even sure that gun-control laws would reduce crime. A shade over half the respondents, 50.3% believed crime would be reduced while 42.7% foresaw no reduction.

When asked if they or a member of their family owned a gun, 57.3% said yes. Furthermore, most gun-owning households possess more than one weapon. You might logically expect that women who have a houseful of guns would be overwhelmingly opposed to gun controls. However, this is not the case. Gun owners split 50-50 between Mayor Lindsay and Mr. Glassen. Among the people who do not own guns, however, Mr. Lindsay's stand is supported seven to one.

Many readers on both sides speak out against mail-order sales of firearms, shocked by the easy access to guns offered by periodicals their children read. Many would forbid all sales to minors. One out of every ten respondents suggests mandatory training classes for gun owners. "No government would be so foolish as to issue a driver's license to someone who isn't qualified. Don't people know that a gun is dangerous?"

Mr. DODD. Mr. President, I have heard that the Senator from Wyoming [Mr. HANSEN] has been patiently waiting for me to be through, and I was anxious to get through. I have been talking about 3 hours.

Do I understand correctly that the matter of the Senator from Wyoming is to go over until tomorrow, when he will have an opportunity to fire away at me?

Mr. HANSEN. I thank the distinguished Senator from Connecticut. I note that he certainly has considered this subject in all of its ramifications, and I compliment him for his display of stamina this afternoon. I am sure it has not been easy to present all of the material he has presented.

What I should like to do, in response to the Senator's question, would be to ask some questions that the Senator from South Carolina [Mr. THURMOND] would have asked if he were here; he asked me if I would ask them for him.

Then, if it is agreeable with the Senator from Connecticut, I should like to put the questions I have in my own right tomorrow, say around 11:15.

*May 8, 1968*     CONGRESSIONAL RECORD — SENATE     **12327**

Mr. DODD. Fine.

Mr. HANSEN. Which I think the Senator from West Virginia had suggested might be an acceptable time, and agreeable with the Senator from Connecticut.

Mr. DODD. That is entirely acceptable to me.

Mr. METCALF. Mr. President, will the Senator yield?

Mr. DODD. I yield.

Mr. METCALF. I, too, have some inquiries about the effect of this bill on some of the rural areas, as to the cowboys and Indians, and so forth, which the Senator from Connecticut has talked about.

Mr. DODD. I did not mean they were there now, except on reservations.

Mr. METCALF. The Senator has reservations, and we have reservations in Montana.

I do not wish to involve the Senator in colloquy now, after his long, involved, complicated, and very eloquent and persuasive speech, but I should like to have an opportunity tomorrow to ask some questions about the impact of this bill on the people of my State.

Therefore, Mr. President, I hope it will be agreed that, after the Senator from Wyoming is through, I may have an opportunity to discuss this matter with the Senator from Connecticut.

Mr. DODD. Yes. Mr. President, if I may address my remarks to the acting majority leader, it is an open field, as far as I am concerned. I should like to have anybody ask questions who wants to.

Mr. BYRD of West Virginia. Mr. President, will the Senator from Connecticut yield for a unanimous-consent request?

Mr. DODD. I yield.

Mr. BYRD of West Virginia. Perhaps the unanimous-consent request can be worded to accommodate both the distinguished Senator from Wyoming [Mr. HANSEN] and the distinguished Senator from Montana [Mr. METCALF].

ORDER FOR RECOGNITION TOMORROW OF SENATORS DODD, ERVIN, HRUSKA, CLARK, AND CHURCH

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that tomorrow, on the completion of the statement by the distinguished Senator from Kentucky [Mr. MORTON], the Senator from Connecticut [Mr. DODD] be recognized for 1 hour.

Mr. DODD. Mr. President, I do not object. I am just fearful that others may be shut off who wish to ask questions. I do not know whether that is enough time or not.

Mr. BYRD of West Virginia. This would give the Senator from Connecticut 1 hour in which to answer questions, beginning about 11:15 or 11:20 tomorrow morning.

Mr. DODD. That is perfectly all right with me. I just do not wish anyone to think I am trying to put a limitation on the time available for the purpose of asking questions.

Mr. METCALF. Mr. President, I think that will take care of my problem, and I hope that of the Senator from Wyoming.

Mr. HANSEN. Mr. President, I should think that would be adequate.

Mr. METCALF. I have no objection.

The PRESIDING OFFICER. Is there objection to the request of the Senator from West Virginia? The Chair hears none, and it is so ordered.

Mr. BYRD of West Virginia. Mr. President, if the Senator will yield for a further unanimous-consent request, I ask unanimous consent that at the end of the hour which has already been granted to the distinguished Senator from Connecticut [Mr. DODD] tomorrow, the Chair recognize the Senator from North Carolina [Mr. ERVIN] for 2 hours; thereupon the Senator from Nebraska [Mr. HRUSKA] for 1 hour; thereupon the Senator from Pennsylvania [Mr. CLARK] for 1 hour; and thereupon the Senator from Idaho [Mr. CHURCH] for 1 hour.

The PRESIDING OFFICER. Is there objection? The Chair hears none, and it is so ordered.

Mr. METCALF. I thank the Senator from Wyoming and the Senator from Connecticut.

Mr. HANSEN. Mr. President, on behalf of the Senator from South Carolina [Mr. THURMOND], I address the following questions to the distinguished Senator from Connecticut.

As I read section 923(a), of title IV, all dealers must be federally licensed, no matter whether they sell only over the counter in their own States, or whether they sell through the mails to out-of-State residents. Is that correct?

Mr. DODD. That is correct.

Mr. HANSEN. Therefore, all firearms dealers must be federally licensed; is that not correct?

Mr. DODD. That is true.

Mr. HANSEN. As to a dealer who sells over the counter to persons in his own locality, he must comply with the provisions of section 922(b); is that not correct?

Mr. DODD. If the Senator will refresh my memory——

Mr. HANSEN. I note that the Senator from South Carolina has added a statement as to section 922(b), as follows: "922(b) says it shall be unlawful for any licensee to sell any firearm to any individual unless he has complied with the requirements of subparagraphs (1), (2), (3), (4), and (5) of section 922(b)."

Is that correct?

Mr. DODD. That is correct.

Mr. HANSEN. 922(b).

Mr. DODD. I think that is one of those sections that place requirements upon the dealer. So that would be right.

Mr. HANSEN. Is Federal criminal liability not imposed upon the dealer as well as upon the purchaser by this section?

Mr. DODD. If the dealer sold in violation of the State law, it would be a violation of the State law. That is correct.

Mr. HANSEN. Mr. President, on behalf of the Senator from South Carolina, I ask unanimous consent that the section-by-section analysis of section 922 (b), which is found on page 114 of the committee report, be printed at this point in the RECORD.

There being no objection, the analysis was ordered to be printed in the RECORD, as follows:

*Section 922(b) contains prohibitions applicable only to licensees—These prohibitions go to intrastate, as well as interstate, transactions by licensees*

*Section 922(b)(1).*—The sale by a licensee of any firearm, other than a shotgun or rifle, to anyone less than 21 years old is prohibited. The prohibition would usually be concerned with over-the-counter sales but would also be involved in intrastate mail-order sales. There is no comparable restriction in the present Federal Firearms Act.

*Section 922(b)(2).*—This paragraph was designed to implement State and local firearms controls by making it unlawful for a licensee to deliver any firearm to an unlicensed person with reasonable cause to believe the receipt or possession of the weapon would be in violation of State or local law. Again, this control measure is directed primarily toward over-the-counter sales but would also be applicable to all sales. There is no comparable provision in the present Federal Firearms Act.

*Section 922(b)(3).*—Under this paragraph, it would be unlawful for a licensee to sell a firearm, other than a rifle or shotgun, to an out-of-State unlicensed resident. Shotguns or rifles could be sold over-the-counter or mail-order to out-of-State residents. This prohibition implements the strict controls over the interstate movements of pistols and revolvers in section 922(a)(2) as contained in the title. It also is designed to prevent the avoidance of State and local laws controlling firearms other than rifles and shotguns by the simple expediency of crossing a State line to purchase one. There is no comparable provision in the present Federal Firearms Act.

*Section 922(b)(4).*—A licensee is prohibited from disposing of a destructive device or a national act weapon (gangster-type) to any unlicensed person unless that person has a statement executed by the principal law enforcement officer of the locality where the unlicensed person resides. The statement is required to be maintained as part of the records of the licensee. This prohibition is directed to over-the-counter sales and may be applied to intrastate mail-order sales. The present Federal Firearms Act has no similar provision.

*Section 922 (b)(5).*—This paragraph makes it unlawful for a licensee to dispose of a firearm without making a record showing the name, age, and residence of the purchaser. Of course, this prohibition implements each of the controls imposed by the title. There is a somewhat similar provision in the present Federal Firearms Act (15 U.S.C. 903(d)).

*Section 922(c).*—This subsection prohibits a licensee from disposing of a firearm or ammunition to a fugitive, a felon, or one under indictment. A person who has been granted relief under section 925(c) is excluded from the class of persons covered by this restriction. The prohibition here goes to all types of sales or dispositions—over-the-counter as well as mail order. The provisions of this subsection are similar to 15 U.S.C. 902(d) of the present Federal Firearms Act but go further than that subsection in that over-the-counter sales are covered. Also ammunition for destructive devices is included in the prohibition.

*Section 922(d).*—This subsection makes it unlawful for a common or contract carrier to transport or deliver any firearm in interstate or foreign commerce with knowledge that its transportation or receipt would be in violation of any provision of the title. Present law has no specific restrictions on common or contract carriers. However, 15 U.S.C. 902(d) through (1) of the present Federal Firearms Act could be applied to carriers in proper factual situations.

*Section 922(e).*—This subsection prohibits a felon, fugitive, or one under indictment from shipping a firearm or ammunition in interstate or foreign commerce. The same prohibition is contained in 15 U.S.C 902(e) of the present Federal Firearms Act except that ammunition for a destructive device is not covered.

12328 CONGRESSIONAL RECORD — SENATE *May 8, 1968*

*Section 922(f).*—This subsection makes it unlawful for a felon, fugitive, or one under indictment to receive a firearm or ammunition which has been shipped or transported in interstate or foreign commerce. The present Federal Firearms Act (15 U.S.C. 902(f)) contains a similar prohibition. However, a person under indictment is added by this subsection to the class of persons restricted from receiving firearms, the presumption in 15 U.S.C. 902(f) is not carried over into this subsection, and the restriction in the present Federal Firearms Act does not go to ammunition for destructive devices.

*Section 922(g).*—This subsection makes it a crime to transport a stolen firearm or ammunition in interstate or foreign commerce knowing either was stolen. This subsection follows 15 U.S.C. 902(g) of the present Federal Firearms Act except that it covers ammunition for destructive devices rather than pistol and revolver ammunition.

*Section 922(h).*—This subsection prohibits any person from receiving, etc., any stolen firearm or ammunition "moving as", etc., in interstate or foreign commerce. This prohibition is a modified form of the restriction in 15 U.S.C. 902(h) of the present Federal Firearms Act but the restriction would go to ammunition for destructive devices rather than pistol and revolver ammunition.

*Section 922(i).*—This subsection makes it unlawful for any person knowingly to ship or receive in interstate or foreign commerce any firearm having the serial number removed or altered. This prohibition is found in 15 U.S.C. 902(i) of the present Federal Firearms Act except that the presumption would not be carried over.

*Section 922(j).*—This subsection is related to section 925(d) as contained in the title which authorizes the importation of firearms upon meeting state conditions precedent. The subsection makes it unlawful to import a firearm in violation of section 925(d) as contained in the title or knowingly receive any firearm unlawfully imported under that section. The present Federal Firearms Act contains no comparable prohibition.

*Section 922(k).*—This subsection makes it unlawful for a licensee to falsify records, to fail to make record entries or to fail to maintain records required. The present Federal Firearms Act requires records in 15 U.S.C. 903(d). However, this prohibition, coupled with the more detailed record requirements in section 923(d) as contained in the title, goes further than requirements in the present Federal Firearms Act.

Mr. HANSEN. Mr. President, subparagraph (1) says that it is unlawful for any dealer to sell any firearms to any person under 21. If the buyer presents false identification to the dealer to the effect that he is 21 when he in fact is under age, is the dealer, if he makes the sale, criminally liable?

Mr. DODD. The dealer would have to do it knowingly. Under the language of the title, the dealer would have to know or have reasonable cause to believe.

Mr. HANSEN. He would not be criminally liable unless he did it knowing that the person was underage. Does not the language say: "Knows or has reasonable cause to believe—?"

Mr. DODD. The Senator is correct. I think the exact language reads:

It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or deliver any firearm to any individual who the licensee knows or has reasonable cause to believe is less than 21 years of age, if the firearm is other than a shot gun or rifle.

That is section 922(b)(1).

Mr. HANSEN. Mr. President, anticipating possibly that the Senator might have responded in the negative, which he did not, since he gave a qualified response to the effect that there would be no criminal responsibility unless he knew or had reasonable cause to believe that the purchaser was under 21 years of age, I am not certain how germane the next question is. However, since the question has been prepared by the Senator from South Carolina, I feel that I should ask it.

Would the fact that the person presenting false information had the appearance of a 16-year-old negate the presentation of false identification to the dealer?

Mr. DODD. I should think that would be a matter for the court to determine. The person might look less than 16 to one person and not to another.

My answer would have to be that that would be a question of fact.

Mr. HANSEN. In other words, would the youthful appearance of the purchaser constitute "reasonable cause to believe" that the person is less than 21?

Mr. DODD. Obviously, if a purchaser came in wearing rompers or in a kiddie cart, I would expect that would be reasonable cause to believe that he was under 21. However, again these are circumstances to be considered.

I am not trying to evade a direct answer.

In some cases that would be patently true. In others, it might be a pretty close question. However, the first part of the question would relate to making him criminally liable. It relates to what I have said. He should know. He should try to find out. That is all this section means.

Mr. HANSEN. How does an over-the-counter dealer comply with provisions of section 922(b)(2) if the purchaser who attempts to buy a gun over the counter is not from the same locality as the dealer?

Mr. DODD. Under the regulations promulgated by the Treasury Department, forms would be prepared and disseminated to licensees. These forms would have to be completed with respect to each gun sale. The form would include, I would presume, the name, age, and address of the purchaser and the statement that he is not a felon or fugitive or under indictment and that he is eligible under State and local law to purchase or possess a gun.

He would be required in addition, in my judgment, to establish his identification from the usual forms of identification—credit cards, automobile license, social security card, or any reasonable identification.

I know that those items can be forged and faked.

Mr. HANSEN. If the dealer is in Los Angeles and the prospective purchaser comes into the shop and says he is from San Francisco, Sacramento, or elsewhere in the State of California, is the Los Angeles dealer charged with responsibility of knowing the applicable ordinances of these other localities?

Mr. DODD. I think he is. As I understand title IV, he is responsible. He should know.

Mr. HANSEN. If, in fact, it would be a violation for a dealer in Los Angeles to sell the firearm to a purchaser from San Francisco because the sale would be in violation of the San Francisco ordinance, then the Los Angeles dealer would be criminally liable, would he not?

Mr. DODD. If he knew, that is correct. And he should know. It is incumbent upon him to learn. And if he were to go ahead and do it anyway, he would then be clearly in violation of the law. I do not see how else it could be. If he did it knowingly or had reason to believe that the sale was prohibited in San Francisco, then I would say that under the law he would be liable.

Mr. HANSEN. Mr. President, how can an over-the-counter dealer assume the risk for selling a gun to any purchaser who is not from his locality?

Mr. DODD. By making due and diligent inquiry as to his identification and the fact that he is a resident of the State.

Mr. HANSEN. What can he do to verify the essential facts of the transaction?

Mr. DODD. That he is 21, that he lives at such and such an address, that he is not a felon or a fugitive.

As I have said, the identification as to name, age, and address should not be too difficult. Most people have something they carry. He must inquire as to the status of the person with respect to being a fugitive or a felon, a convict.

Mr. HANSEN. There is no provision in title IV for the purchaser to submit a sworn statement or affidavit, is there?

Mr. DODD. There is no requirement of affidavit.

Mr. HANSEN. There is no requirement for a police check. What can the dealer do to protect himself from Federal criminal liability?

Mr. DODD. He can do just what I answered a few minutes ago. He should find out if the fellow is a fugitive or a convict by reasonable inquiry.

Mr. HANSEN. Senator THURMOND continues with his statement: "It certainly seems that it would be better to provide some type of protection for the dealer, preferably a sworn statement which could be confirmed by a local police officer."

Mr. DODD. A sworn statement and an affidavit are terms that are used almost interchangeably, and I believe they are different. At least, in my State they are. An affidavit must be notarized. Anyone can say, "I swear that this is true," but I do not believe it has the effect of a notarized affidavit. In any event, I am not adverse to requiring a notarized affidavit in addition to the other requirements. I thought it would be too burdensome on the party. But if that is what the Senator desires to do, I would not find it objectionable.

The Senator is speaking of both people residing in the same State? I believe all the questions dealt with people in the same State.

There is no other proposal before the Senate that would control this type of sale. I do not know whether that is particularly responsive to the question, but it may be helpful.

Mr. HANSEN. Senator THURMOND's statement continues: "Section 922(b)(3) of title IV prohibits over-the-counter sales of handguns to out-of-State residents, but a dealer can sell a long gun

to an out-of-State resident. There is an identical provision in Amendment No. 90—is that not true?"

Mr. DODD. I do not believe so, but I believe Senator Thurmond is making reference to Senator Hruska's bill. I do not recall the number offhand. I believe it is No. 708.

Mr. HANSEN. I am sorry I cannot be more helpful. I am only reading what is written here.

Mr. DODD. My answer is that I do not know. I am not familiar with that.

Mr. HANSEN. The next statement is this: "But the dealer who sells a long gun to out-of-State residents must meet the requirements of section 922(b)(2). Is that not correct?"

Mr. DODD. Yes. The Senator is talking about the sale of a long gun to an out-of-State resident, and what does the Senator ask?

Mr. HANSEN. The statement reads: "But the dealer who sells a long gun to out-of-State residents must meet the requirements of section 922(b)(2)." Is that not correct?

Mr. DODD. Yes, I would say so. Section (2) reads:

(2) any firearm to any person who the licensee knows or has reasonable cause to believe is not lawfully entitled to receive or possess such firearm by reason by any State or local law, regulation, or ordinance applicable at the place of sale, delivery, or other disposition of the firearm.

He would be prohibited, under this language, if he knew or had reasonable cause to believe that the possession of such firearm in the place where the buyer resided was unlawful but only in the case of the dealer shipping the firearm into the purchaser's State.

The section before that reads:

(1) any firearm to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age, if the firearm is other than a shotgun or rifle.

Mr. HANSEN. But what can the dealer do to protect himself from Federal criminal liability if in fact the prospective purchaser is in violation of a State law or local ordinance of some other jurisdiction when he attempts to buy the long gun?

Mr. DODD. I assume he would have to do the things that any reasonable man would have to do. As was said about other questions, due diligence would have to be exercised to determine whom he represented himself to be, that he lived where he said he did, that his age was what he alleged it to be, and that the laws of the place where he resided did not prohibit it.

Mr. HANSEN. Senator Thurmond then makes some statements, and I believe he would invite your comment on them. He says: "It is my strong feeling that it would be better to provide a more tangible means of protection for honest dealers. We must keep in mind that many hardened criminals will not hesitate to purchase a gun in violation of the law and that a few unscrupulous dealers will not hesitate to sell to criminals. However, I am concerned about the possible hidden dangers of this bill for the honest dealer who, under § 922(b)(2)

must now be responsible to thousands of local ordinances."

Mr. DODD. The best I can say about that—and I do not wish to be overly critical—is that if the dealer does this knowingly or with reasonable cause to believe that it is illegal, then he is liable.

Mr. HANSEN. Is it not true that the same type of burden will be placed on mail-order dealers of all firearms, whether they sell through interstate or intrastate commerce?

Mr. DODD. The same type of——

Mr. HANSEN. The same type of burden.

Mr. DODD. Well, interstate selling of handguns is altogether forbidden. So this is a different situation from the sale of the long guns, which is not forbidden, except to certain persons.

Mr. HANSEN. How can a dealer from Los Angeles check the essential facts surrounding a purchase order from an individual elsewhere in the State of California?

Mr. DODD. The same way I suppose I would if I were a dealer. I would find out. In California there is a uniform law, so that would not be difficult there. There could be States where it would pose more of a problem, but, happily, California has a uniform law.

Mr. HANSEN. Again, there is no provision for a sworn statement or a police check is there?

Mr. DODD. In the case of intrastate?

Mr. HANSEN. Intrastate.

Mr. DODD. No.

Mr. HANSEN. What if, in fact, the prospective purchaser is a convicted felon or narcotic addict or is in some other way barred by operation of Federal or State law or local ordinance from purchasing the gun? What can the dealer do to protect himself from Federal liability?

Mr. DODD. Check up on the person before he sells him the gun. He is right in his own State. But this is not an absolute requirement.

This language was written into the proposal to get at clear violations where they are easily ascertained.

Mr. HANSEN. For purposes of clarification only—and the Senator from South Carolina [Mr. Thurmond] did not ask this question but I wish to make further inquiry—would it be the Senator's judgment that there would be a responsibility and a burden upon a dealer to ascertain as best he could—without benefit of a sworn statement from the buyer or a check by the buyer's local police—that any prospective purchaser was not a convicted felon nor a narcotic addict?

Mr. DODD. Yes, and they are required to do it now under existing law, although I do not think they do. It is practically unenforced with respect to mail-order traffic. It is written in the law, but it is breached more than it is observed.

Mr. HANSEN. The final question by the Senator from South Carolina [Mr. Thurmond] is as follows: "Won't the net effect of these burdens on over-the-counter and mail-order dealers, if vigorously enforced, tend to put them in jail or drive all of them out of business?"

Mr. DODD. No, I do not think so at all. It will clean out what I call fringe operators and really not affect genuine

businessmen who sell guns. I think it would help to get people out who should not be in the business anyway.

Mr. HANSEN. I thank the Senator, and I yield the floor.

Mr. DODD. I thank the Senator for his questions.

Mr. TOWER. Mr. President, the bill under consideration was originally presented to us by the administration, but it has changed form substantially, and I do not think that it can now be accurately labeled an administration measure. In any case, the Nation's No. 1 internal problem—lawlessness—is hardly the property of any political party. It is a bipartisan issue, and the bill we have before us is a bipartisan attempt to confront such lawlessness head on and to bring it completely under control.

Members on both sides of the aisle today recognize the serious situation in which we now find ourselves—an apparent breakdown of the system of law and order which has been the basic condition for progress and prosperity in this country. Acknowledging this, I may perhaps be forgiven for recalling the, shall we say, lack of seriousness, with which the so-called crime in the streets issue was greeted by many of my friends in the other party when it was first introduced into the national election in 1964. We were told by many at that time that street crime was hardly a concern of the Federal Government.

It soon became apparent, however, that anything which causes such widespread anxiety as the crime problem cannot escape becoming a concern of the Federal Government. The anxiety stems from a perception, in many parts of the country, that matters are out of control—that they are beyond the capacities of the local law enforcement authorities. As has become seemingly inevitable when such a thing happens, the public then looks to the Federal Government for help. Although many of us may find this an unfortunate state of affairs, we should remember that in view of the enormous slice of the tax dollar appropriated by the Federal Government it is not a surprising one.

Until the 1964 election, official Washington was interested in the crime problem only in the cases of organized crime, corrupt labor and management practices, antitrust violations, and so forth, or special kinds of crimes which had been made subject to Federal jurisdiction. Since 1964, Congress has been the beneficiary of an annual presidential crime message.

I am not complaining about the administration's obvious interest in the crime problem, Mr. President. To the contrary, I find it highly gratifying. And I have no doubt whatsoever that Republican Members of Congress will fully support any administration efforts to solve this problem which are constitutional and consistent with those basic principles of government to which our party is committed.

This bill which we are considering today is without question the most important feature of the administration's overall anticrime program, which, if I recall correctly, consists this year of a number of points. The main thrust of this meas-

ure is, of course, Federal financial aid for local law enforcement agencies, a principle I heartily endorse so long as the method of channeling such aid does not create dangers which I would think we all wish to avoid.

Ideally, I would prefer that the States and local communities can handle their own law enforcement problems without financial assistance from the Federal Government. However, when we face a situation which so urgently demands attention as that confronting the police today, we must be realistic and not indulge in wishful thinking. So long as Washington takes the lion's share of the Nation's tax money, it is only reasonable that the smaller units of government be assisted in this most important matter.

Let us make no mistake about it, a crisis has indeed hit America's law enforcement agencies. They have generally been doing an excellent job, but they are simply not in a position to cope with the overwhelming increase in crime and disorder that has been developing at a staggering rate of increase since World War II, particularly in our present decade. They are, for the most part, woefully undermanned. They lack money, and they lack resources for training and technical improvements. Something has to be done now, and our Federal Government is the operation most able to assist them under present circumstances.

I therefore view the assistance program provided by this bill as necessary, though we must of course guard against possible adverse effects. This bill is necessary because there is no alternative. As for any possible adverse effects, I think that we can minimize them if we select the proper means of administration. The bill as reported out of committee most certainly does not provide the proper means.

As the House bill came over to us, grants were to be in block form to the States, which would in turn be responsible for administering the program. This approach, I believe, is a sound one—much sounder than that presented to us by the Senate Judiciary Committee—an approach which would, in effect, I fear, give the Attorney General virtually all of the discretionary grantmaking authority.

Mr. President, if there ever was an area in which a grant program should not be controlled by Washington, this is it. Surely there are few who do not instinctively recoil at the thought of a national police force. I am fearful that this bill, as approved by the Senate Judiciary Committee, may well head us down that road towards such a national police force. We have, by this time, certainly had enough experience with grant programs to know that the agency which controls the flow of money also has great power over the operations of the recipient. We all know how this process works, Mr. President. A local or State agency expands its program because of the availability of Federal funds. Staff is increased, and commitments are made. At that point, the agency is, to say the least, somewhat vulnerable to suggestions or, perhaps even demands, made by the source of the extra funds. It is very hard, if not impossible, in such a case for the local agency not

to adhere to those suggestions or demands.

Now S. 917, as it came from the administration, gave complete authority in administering these grants to the Attorney General or his designees. Certainly the Congress should never go along with such a dangerous approach, and, indeed, the other Chamber rose up and demonstrated that it was aware of the dangers in this approach. They rewrote the bill to lodge primary authority for administering the grants in the States. I know our own Criminal Laws and Procedures Subcommittee was also concerned with the prospect of an Attorney General calling the shots for the Nation's police forces, and, in the bill the subcommittee sent to the full Judiciary Committee, the subcommittee at least took a compromise approach which would have removed this power from the Attorney General. The subcommittee bill called for a three-man board with minority representation to administer the grant program—composed of "independent" members.

The bill which the full committee has sent us retains the three-man board provision, Mr. President, but completely omits the word "independent"; and so there is nothing, so far as I can see, which would prevent these board members from being taken from the Justice Department staff or at least selected by the Department. Indeed, it scarcely matters, since the board is explicitly made subject to the final authority of the Attorney General. So, if I have any understanding of the matter at all, the committee bill in this respect does not substantially differ from the bill drafted by the Justice Department and sent up to us last year.

Mr. President, we should all give careful consideration to the consequences of giving control of this grant program, a program which promises to expand with the years, to the chief Federal law enforcement officer. We have seen what has happened in the case of the medicare program, the Hill-Burton program, the education assistance program, and a great variety of other grant programs administered directly by the Federal Government. The pattern has repeated itself over and over again. We are always given assurances by administration spokesmen that aid will not lead to interference, but the inevitable guidelines always have a way of cropping up.

The lamentable part of it, Mr. President, is that in most instances these administration people who give us their solemn assurances really believe what they tell us. All they want to do, quite often, is to give out money in order that a problem can be solved. I do not accuse them of bad faith—It is simply that the process itself is, to at least some extent, inevitable. People who dole out money want to have some say-so about how it is to be spent; and of course they have their own ideas about what is right and what is wrong—ideas which may be considerably different from those prevalent in the community where the money is to be used.

I am in favor of giving aid to the country's policemen. I do not think we have any alternative. But if guidelines for using that aid are going to be set, if the conduct of police agencies is going

to be closely scrutinized by some bureau which controls a substantial amount of the operating funds on which the police agencies are counting, I say let those guidelines and that scrutiny come from a State level, a level relatively close to the communities which the agencies serve.

Mr. President, as I have noted, I have grave reservations about the Justice Department becoming the police arbiter of the Nation, most particularly under the leadership of the present Attorney General, although I wish to make clear my very high regard for the Director of the Federal Bureau of Investigation and for the splendid job which he has accomplished in building that strong and essential arm of Federal law enforcement. In any event, no matter how excellent any given official might be or how well we might feel that he himself could do the job of administering or of advising on the administration of a grant program, we have to consider that in the future there will be new and different faces in these high positions. Congress should never, in any event, legislate with an eye to the personalities in office at the time. What we write into law will be executed by many and diverse individuals in the years ahead.

There is no question that we must write a law. There is no question that this law must provide financial as well as other assistance to the Nation's police. In the last 7 years, America's population increased 10 percent, and the number of major crimes increased 88 percent. No country can stand such a state of affairs for very long. No matter what the reasons for this development—poverty, mobility, urbanization, the decline of old standards of conduct—no matter what these reasons may be, something has to be done to prevent this land from falling into a state of anarchy. If such should happen, then all of the other fine aspects of the American dream would become irrelevant.

Along with, and, in many instances, because of, the spiralling crime rate, the police departments throughout the country have been faced with an increasingly sharp recruiting problem. Unless we do everything possible to dispel that problem, we face the unthinkable possibility of a Nation without police. There can be no doubt that even the approach of such a situation would drive us straight into the arms of a dictatorship. When law and order break down, Mr. President, people will turn to the first strong man who gives promise of restoring it. It would be folly for us to pretend that it cannot happen here.

It is for all these pressing reasons that I support the principle embodied in S. 917. However, as I have noted, I believe that it would be far better to lodge authority for administering this aid in the States.

---

MEDALS IN COMMEMORATION OF THE 100TH ANNIVERSARY OF THE COMPLETION OF THE FIRST TRANSCONTINENTAL RAILROAD

Mr. MOSS. Mr. President, I ask unanimous consent that the Chair lay before the Senate a message from the House on

S. 1909. The matter has been cleared with the majority and minority leaders.

The PRESIDING OFFICER laid before the Senate the amendments of the House of Representatives to the bill (S. 1909) to provide for the striking of medals in commemoration of the 100th anniversary of the completion of the first transcontinental railroad, which were, on page 2, lines 1 and 2, strike out "National Golden Spike Society, Box Elder County, Utah," and insert "Golden Spike Centennial Celebration Commission, Washington, D.C.".

On page 2, lines 4 and 5, strike out "Utah Golden Spike Centennial Commission" and insert "Golden Spike Centennial Celebration Commission".

On page 2, line 7, strike out "National Golden Spike Society" and insert "Golden Spike Centennial Celebration Commission".

On page 3, lines 1 and 2, strike out "Utah Golden Spike Centennial Commission" and insert "Golden Spike Centennial Celebration Commission".

Mr. MOSS. Mr. President, I move that the Senate concur in the amendments of the House.

The motion was agreed to.

## STUDY OF COMPENSATION SYSTEM FOR MOTOR VEHICLE ACCIDENT LOSSES

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that the Chair lay before the Senate a message from the House on Senate Joint Resolution 129.

The PRESIDING OFFICER laid before the Senate the amendment of the House of Representatives to the joint resolution (S.J. Res. 129) to authorize the Secretary of Transportation to conduct a comprehensive study and investigation of the existing compensation system for motor vehicle accident losses, and for other purposes, which was, strike out all after the resolving clause and insert:

That (a) the Secretary of Transportation (hereinafter referred to as the "Secretary"), in cooperation with those other Federal agencies which possess relevant competencies, as provided in section 4, is authorized and directed to conduct a comprehensive study and investigation of all relevant aspects of the existing motor vehicle accident compensation system. Such study and investigation shall include consideration of the following—

(1) the inadequacies of such existing compensation system in theory and practice;

(2) the public policy objectives to be realized by such a system, including an analysis of the costs and benefits, both monetary and otherwise; and

(3) the most effective means for realizing such objectives.

(4) The oftentimes arbitrary and capricious cancellation or refusal to renew automobile insurance policies or the refusal to issue such policies without stated cause,

(5) The constant and costly increases in premiums for automobile insurance,

(6) The disparity between the amounts paid as premiums and the amounts paid out for claims,

(7) The frequent insolvencies of companies engaged in providing automobile insurance,

(8) Long delays in processing and paying claims arising out of motor vehicle accidents, and

(9) The efficiency and adequacy of present State insurance regulatory institutions.

(b) The Secretary shall submit to the President and to the Congress interim reports from time to time and a final report not later than twenty-four months after the date of enactment of this joint resolution. Such final report shall contain a detailed statement of the findings, conclusions, and recommendations of the Secretary, and may propose such legislation or other action as the Secretary considers necessary to carry out his recommendations.

### ADMINISTRATIVE POWERS

SEC. 2. In order to carry out his functions under this joint resolution, the Secretary is authorized to—

(1) appoint and fix the compensation of such employees as he deems necessary without regard to the provisions of title 5, United States Code, governing appointment in the competitive service and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates;

(2) obtain the services of experts and consultants in accordance with the provisions of section 3109 of title 5, United States Code, but at rates for individuals not to exceed $100 per diem;

(3) enter into contracts with corporations, business firms, institutions, and individuals for the conduct of research and surveys and the preparation of reports; and

(4) appoint, without regard to the provisions of title 5, United States Code, governing appointments in the competitive services, such advisory committees, representative of the divergent interests involved, as he deems appropriate for the purpose of consultation with and advice to the Secretary.

Members of advisory committees appointed under paragraph (4) of this section, other than those regularly employed by the Federal Government, while attending meetings of such committees or otherwise serving at the request of the Secretary, may be compensated at rates to be fixed by the Secretary but not exceeding $100 per day, and while away from home or regular place of business they may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of title 5, United States Code, for persons in the Government service employed intermittently. Members of such advisory committees shall, for the purposes of chapter 11, title 18, United States Code, be deemed to be special Government employees.

### COOPERATION OF FEDERAL AGENCIES

SEC. 3. (a) The Secretary is authorized to request from any department, agency, or independent instrumentality of the Government any information he deems necessary to carry out his functions under this joint resolution; and each such department, agency, or independent instrumentality is authorized and directed to cooperate with the Secretary and to furnish such information to the Department of Transportation upon request made by the Secretary.

(b) The head of any Federal department, agency, or independent instrumentality is authorized to detail, on a reimbursable basis, any personnel of such department, agency, or independent instrumentality to assist in carrying out the duties of the Secretary under this joint resolution.

### INTERAGENCY ADVISORY COMMITTEE

SEC. 4. The President shall appoint an Interagency Advisory Committee on Compensation for Motor Vehicle Accident Losses consisting of the Secretary who shall be Chairman and one representative each of the Departments of Commerce, Justice, Labor, Health, Education, and Welfare, and Housing and Urban Development, the Federal Trade Commission, the Interstate Commerce Commission, and the Securities and Exchange Commission, and such other Federal agencies as are designated by the President. Such

members shall, to the extent possible, be persons knowledgeable in the field of compensation for motor vehicle accident losses. The Advisory Committee shall advise the Secretary on the preparation for and the conduct of the study authorized by this joint resolution.

### HEARINGS AND PRODUCTION OF DOCUMENT EVIDENCE

SEC. 5. (a) For the purpose of carrying out the provisions of this joint resolution the Secretary, or on the authorization of the Secretary any officer or employee of the Department of Transportation, may hold such hearings, take such testimony, sit and act at such times and places, administer such oaths, and require, by subpena or otherwise, the attendance and testimony of such witnesses and the production of such books, papers, correspondence, memorandums, contracts, agreements, or other records as the Secretary, or such officer or employee, deems advisable.

(b) In order to carry out the provisions of this joint resolution, the Secretary or his duly authorized agent shall at all reasonable times have access to, and for the purposes of examination the right to copy, any documentary evidence of any corporation, business firm, institution, or individual having materials or information relevant to the study authorized by this joint resolution.

(c) The Secretary is authorized to require, by general or special orders, any corporation, business firm, or individual or any class of such corporation, firms, or individuals to file, in such form as the Secretary may prescribe, reports or answers in writing to specific questions relating to the study authorized by this joint resolution. Such reports and answers shall be made under oath or otherwise, and shall be filed with the Secretary within such reasonable period as the Secretary may prescribe.

(d) Any of the district courts of the United States within the jurisdiction of which an inquiry is carried on may, in case of contumacy or refusal to obey a subpena or order of the Secretary or such officer or employee issued under subsection (a) or subsection (c) of this section, issue an order requiring compliance therewith; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(e) Witnesses summoned pursuant to this section shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

(f) Any information which is reported to or otherwise obtained by the Secretary or such officer or employee under this section and which contains or relates to a trade secret or other matter referred to in section 1905 of title 18 of the United States Code, shall not be disclosed except to other officers or employees of the Federal Government for their use in carrying out this joint resolution. Nothing in the preceding sentence shall authorize the withholding of information by the Secretary (or any officer or employee under his control) from the duly authorized committees of the Congress.

### TERMINATION

SEC. 6. The authority of the Secretary under this joint resolution shall terminate ninety days after the submission of his final report under subsection (b) of the first section.

### APPROPRIATIONS AUTHORIZED

SEC. 7. There are hereby authorized to be appropriated, without fiscal year limitation, such sums, not to exceed $2,000,000, as may be necessary to carry out the provisions of this joint resolution.

Mr. BYRD of West Virginia. Mr. President, I move that the Senate concur in the amendment of the House.

The PRESIDING OFFICER. The

question is on agreeing to the motion of the Senator from West Virginia.

The motion was agreed to.

## REMOVAL OF CERTAIN LIMITATIONS ON OCEAN CRUISES

Mr. BARTLETT. Mr. President, I ask the Chair to lay before the Senate a message from the House of Representatives on H.R. 12639.

The PRESIDING OFFICER laid before the Senate a message from the House of Representatives announcing its disagreement to the amendments of the Senate to the bill (H.R. 12639) to remove certain limitations on ocean cruises, and requesting a conference with the Senate on the disagreeing votes of the two Houses thereon.

Mr. BARTLETT. I move that the Senate insist upon its amendments and agree to the request of the House for a conference, and that the Chair be authorized to appoint the conferees on the part of the Senate.

The motion was agreed to; and the Presiding Officer appointed Mr. MAGNUSON, Mr. BARTLETT, Mr. BREWSTER, Mr. COTTON, and Mr. GRIFFIN conferees on the part of the Senate.

## MODIFICATION OF ORDER RECOGNIZING CERTAIN SENATORS TOMORROW

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that the previous order recognizing the distinguished Senator from Kentucky [Mr. MORTON] immediately upon the conclusion of the prayer and disposition of the Journal tomorrow be vacated.

The PRESIDING OFFICER (Mr. PERCY in the chair). Without objection, it is so ordered.

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that the able majority leader be recognized for 15 minutes tomorrow following the prayer and the disposition of the reading of the Journal.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that the previous agreement under which the various Senators, including the Senator from Kentucky [Mr. MORTON], were to be recognized tomorrow, be reinstated following the completion of the statement by the able majority leader.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BYRD of West Virginia. Mr. President, as I understand it, tomorrow the Senate will come in at 11 o'clock following a recess today; that after the prayer and disposition of the Journal, the able majority leader will be recognized for 15 minutes; that he will be followed by the able Senator from Kentucky [Mr. MORTON] for 15 minutes; that he will be followed by the distinguished Senator from Connecticut [Mr. DODD] for 1 hour; that he will be followed by the distinguished Senator from North Carolina [Mr. ERVIN] for a period of 2 hours; that he will be followed by the Senator from Nebraska [Mr. HRUSKA] for 1 hour; that he will be followed by the distinguished Senator from Pennsylvania [Mr. CLARK] for 1 hour; and that he will be followed by the distinguished Senator from Idaho [Mr. CHURCH] for 1 hour.

Mr. President, is that understanding correct as to the previous agreement?

The PRESIDING OFFICER. The Senator is correct.

## TRANSACTION OF ROUTINE BUSINESS

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that there be a brief period for the transaction of routine business, and that statements be limited to 3 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

## EXECUTIVE COMMUNICATIONS, ETC.

The Presiding Officer laid before the Senate the following letters, which were referred as indicated:

REPORT OF TITLE I AGREEMENTS UNDER THE AGRICULTURAL TRADE DEVELOPMENT AND ASSISTANCE ACT OF 1954

A letter from the Administrator, Foreign Agricultural Service, United States Department of Agriculture, transmitting, pursuant to law, a report of agreements signed under Public Law 480 in March and April 1968 for use of foreign currencies (with an accompanying report); to the Committee on Agriculture and Forestry.

REPORT OF FEDERAL CONTRIBUTIONS PROGRAM EQUIPMENT AND FACILITIES, CIVIL DEFENSE

A letter from the Acting Director, Office of Civil Defense, Office of the Secretary of the Army, reporting, pursuant to law, on the Federal contributions program, equipment and facilities, for the quarter ended March 31, 1968; to the Committee on Armed Services.

PROPOSED FACILITIES PROJECTS FOR AIR FORCE RESERVE

A letter from the Deputy Assistant Secretary of Defense (Properties and Installations), transmitting, pursuant to law, the location, nature, and estimated cost of certain facilities projects proposed to be undertaken for the Air Force Reserve (with an accompanying paper); to the Committee on Armed Services.

REPORTS OF COMPTROLLER GENERAL

A letter from the Comptroller General of the United States, transmitting, pursuant to law, a report on the need for certain improvements in the administration of the Foreign Service Institute dated May 7, 1968 (with an accompanying report); to the Committee on Government Operations.

A letter from the Comptroller General of the United States, reporting, pursuant to law, a report of the examination of the financial statements of the Saint Lawrence Seaway Development Corporation for the calendar year 1966, Department of Transportation, dated May 6, 1969 (with an accompanying report); to the Committee on Government Operations.

PROPOSED AMENDMENT OF IMMIGRATION AND NATIONALITY ACT

A letter from the Under Secretary of State, transmitting a draft of proposed legislation to amend the Immigration and Nationality Act to facilitate the entry of certain nonimmigrants into the United States, and for other purposes (with an accompanying paper); to the Committee on the Judiciary.

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. JORDAN of North Carolina, from the Committee on Rules and Administration, without amendment:

S. Con. Res. 68. A concurrent resolution to print additional hearings on amendments to the Federal Firearms Act (Rept. No. 1108);

S. Res. 276. A resolution authorizing additional committee funds for the Committee on Labor and Public Welfare;

S. Res. 277. A resolution authorizing the printing for the use of the Committee on Government Operations of additional copies of its hearings entitled "Riots, Civil and Criminal Disorders" (Rept. No. 1110);

S. Res. 279. A resolution authorizing the printing of the report "Mineral and Water Resources of Montana" as a Senate document (Rept. No. 1104);

S. Res. 280. A resolution authorizing the printing of additional copies of the committee print entitled "Planning-Programing-Budgeting: Selected Comment" (Rept. No. 1105);

S. Res. 282. A resolution to print as a Senate document a report by Senator ELLENDER entitled "Review of United States Government Operations in South Asia" (Rept. No. 1107);

S. Res. 285. A resolution to print as a Senate document the annual report of the National Forest Reservation Commission (Rept. No. 1106); and

H. Con. Res. 770. A concurrent resolution to authorize printing of updated pocket-size United States Constitution for congressional distribution (Rept. No. 1109).

By Mr. BARTLETT, from the Committee on Commerce, without amendment:

H.R. 14681. An act to declare a portion of Boston Inner Harbor and Fort Point Channel nonnavigable; Committee on Commerce (Rept. No. 1113).

By Mr. BARTLETT, from the Committee on Commerce, with an amendment:

H.R. 15190. An act to amend sections 3 and 4 of the act approved September 22, 1964 (78 Stat. 990), providing for an investigation and study to determine a site for the construction of a sea-level canal connecting the Atlantic and Pacific Oceans (Rept. No. 1112).

## S. 3465—THE EQUAL EMPLOYMENT OPPORTUNITIES ENFORCEMENT ACT—REPORT OF A COMMITTEE— MINORITY, INDIVIDUAL, AND SUPPLEMENTAL VIEWS (S. REPT. NO. 1111)

Mr. CLARK. Mr. President, from the Committee on Labor and Public Welfare, I report favorably an original bill (S. 3465) to further promote equal employment opportunities of American workers, and I submit a report thereon. I ask unanimous consent that the report be printed, together with the minority views of the Senator from Alabama [Mr. HILL] and the Senator from Arizona [Mr. FANNIN], the individual views of the Senator from Vermont [Mr. PROUTY], and the supplemental views of the Senator from New York [Mr. JAVITS].

The PRESIDING OFFICER. The report will be received and the bill will be placed on the calendar; and, without objection, the report will be printed, as requested by the Senator from Pennsylvania.

Case 3:22-cv-00410-REP Document 41-6 Filed 02/22/23 Page 117 of 145 PageID# 1423

## REPORT ON DISPOSITION OF EXECUTIVE PAPERS

Mr. MONRONEY from the Joint Committee on the Disposition of Papers in the Executive Departments, to which was referred for examination and recommendation a list of records, transmitted to the Senate by the Acting Archivist of the United States, dated April 26, 1968, that appeared to have no permanent value or historical interest, submitted a report thereon, pursuant to law.

## BILLS INTRODUCED

Bills were introduced, read the first time, and, by unanimous consent, the second time, and referred as follows:

By Mr. BIBLE (by request):

S. 3456. A bill to provide that the prosecution of the offenses of disorderly conduct and lewd, indecent, or obscene acts shall be conducted in the name of and for the benefit of the District of Columbia; to the Committee on the District of Columbia.

By Mr. INOUYE:

S. 3457. A bill for the relief of Capt. John H. Beaumont, U.S. Air Force Reserve; to the Committee on the Judiciary.

By Mr. CLARK:

S. 3458. A bill for the relief of Natalie Tomassini; to the Committee on the Judiciary.

By Mr. HARRIS (for himself and Mr. MONRONEY):

S. 3459. A bill to name the authorized lock and dam numbered 17 on the Verdigris River in Oklahoma and the lake created thereby for Col. Auguste P. Chouteau; to the Committee on Public Works.

S. 3460. A bill to designate certain lands in the Wichita Mountains National Wildlife Refuge in Oklahoma as wilderness; to the Committee on Interior and Insular Affairs.

(See the remarks of Mr. HARRIS when he introduced the above bills, which appear under separate headings.)

By Mr. HARTKE:

S. 3461. A bill to amend the Tariff Schedules of the United States with respect to the tariff classification of invert or high-test molasses, and for other purposes; to the Committee on Finance.

S. 3462. A bill for the relief of Tommy Tung Ming Hall; and

S. 3463. A bill for the relief of Tommy Kin Ip Leung; to the Committee on the Judiciary.

(See the remarks of Mr. HARTKE when he introduced the first above bill, which appears under a separate heading.)

By Mr. LONG of Missouri:

S. 3464. A bill for the relief of Dr. Kenneth Siu; to the Committee on the Judiciary.

By Mr. CLARK:

S. 3465. A bill to further promote equal employment opportunities of American workers; placed on the calendar.

(See the remarks of Mr. CLARK when he reported the above bill, which appear under the heading "Reports of Committees.")

## S. 3459—INTRODUCTION OF BILL TO NAME THE LOCK AND DAM NO. 17 ON THE VERDIGRIS RIVER, OKLA., FOR COL. AUGUSTE P. CHOUTEAU

Mr. HARRIS. Mr. President, I introduce, for myself and Mr. MONRONEY, a bill to authorize the renaming of lock and dam No. 17 on the Verdigris River in Oklahoma and the lake created thereby for Col. Auguste P. Chouteau. Also, Mr. President, I submit for the RECORD a con-

current resolution adopted by the Oklahoma Legislature memorializing members of the Oklahoma congressional delegation to introduce legislation, which I have just offered, to rename lock and dam No. 17, the Chouteau lock and dam, and I respectfully request that the concurrent resolution by the Oklahoma State House of Representatives be printed in its entirety at this point.

The PRESIDING OFFICER. The bill will be received and appropriately referred; and, without objection, the resolution of the Oklahoma State House of Representatives will be printed in the RECORD.

The bill (S. 3459) to name the authorized lock and dam No. 17 on the Verdigris River in Oklahoma and the lake created thereby for Col. Auguste P. Chouteau, introduced by Mr. HARRIS (for himself and Mr. MONRONEY), was received, read twice by its title, and referred to the Committee on Public Works.

The concurrent resolution presented by Mr. HARRIS is as follows:

HOUSE CONCURRENT RESOLUTION 586

A Concurrent Resolution memorializing members of the Oklahoma congressional delegation to the Congress of the United States to introduce legislation which will result in an official designation of a certain lock and dam on the Verdigris River under construction near Okay, as part of the Arkansas River navigation project, as "Chouteau lock and dam"; and directing distribution

Whereas, the Arkansas River Navigation Project that is presently being constructed by the Tulsa District Corps of U.S. Engineers for the purpose of barge navigation of the Verdigris, Arkansas and Mississippi Rivers, and which operation will require the construction of a number of locks and dams; and

Whereas, it requires legislation by Congress to rename a lock and dam, and Lock and Dam No. 17, four miles northwest of Okay on the Verdigris River in Wagoner County, has not yet been so designated by Congress; and

Whereas, Col. Auguste P. Chouteau built a complete shipyard at the falls of the Verdigris River near the location of this lock and dam for the construction of large keel boats to transport hides and produce down the Verdigris, Arkansas and Mississippi Rivers to the New Orleans market that reached maximum shipment early in 1824; and

Whereas, the Corps of Engineers has written a letter stating that they have no objection to such designation by Congress and feel that in considering the known history of the area that the name "Chouteau Lock and Dam" be an appropriate name: Now, therefore, be it

*Resolved by the House of Representatives of the second session of the thirty-first Oklahoma Legislature, the Senate concurring therein:*

Section 1. That members of the Oklahoma Congressional Delegation introduce legislation in the Congress of the United States officially designating Lock and Dam No. 17, now under construction on the Verdigris River as a part of the Arkansas River Navigation project, as "Chouteau Lock and Dam" to honor the family who visioned the feasibility of navigation of these streams for commercial purposes and brought it to fruition.

Section 2. That duly authenticated copies of this Resolution, after consideration and enrollment, shall be prepared for and sent to C. B. Chouteau, Oklahoma City, Oklahoma, and other known descendants of Jean Pierre Chouteau and Col. Auguste P. Chouteau.

## S. 3460—INTRODUCTION OF BILL TO DESIGNATE CERTAIN LANDS IN THE WICHITA MOUNTAINS NATIONAL WILDLIFE REFUGE IN OKLAHOMA AS WILDERNESS

Mr. HARRIS. Mr. President, I introduce, for myself and my colleague, Mr. MONRONEY, a bill to designate certain lands in the Wichita Mountains Wildlife Refuge in Oklahoma as wilderness areas.

Mr. President, the Department of Interior last year conducted hearings in Lawton, Okla., concerning a proposal to designate certain lands within the Wichita Mountains Wildlife Refuge as wilderness in order to assure the retention of these lands in their natural state. On the basis of recommendations made at the hearings, the Department of Interior has decided to designate as wilderness areas some 8,900 acres within the boundaries of the Wichita Mountains Wildlife Refuge. These sections of the wildlife refuge afford excellent opportunities for scientific study and related educational activities, as well as for viewing this portion of our State in its natural setting. The Wichita Mountains Wildlife Refuge is an outstanding recreational facility for the people of southwestern Oklahoma and surrounding States and the establishment of a wilderness area within the refuge will certainly benefit large numbers of people who are interested in viewing the wonders of nature completely void of man-made constructions.

I would hope, Mr. President, that the bill can be enacted by the Senate with a minimum amount of delay.

The PRESIDING OFFICER. The bill will be received and appropriately referred.

The bill (S. 3460) to designate certain lands in the Wichita Mountains National Wildlife Refuge in Oklahoma as wilderness, introduced by Mr. HARRIS (for himself and Mr. MONRONEY), was received, read twice by its title, and referred to the Committee on Interior and Insular Affairs.

## S. 3461—INTRODUCTION OF BILL TO CORRECT THE TARIFF SCHEDULE FOR INVERT MOLASSES

Mr. HARTKE. Mr. President, I am today introducing a bill which would amend item 155.40 of the Tariff Schedules of the United States by adding within that classification the words "and invert or high-test molasses."

Under the Tariff Act of 1930 invert molasses was counted under this classification. But it is not, strictly speaking, molasses—it was in that spot under the doctrine of similitude. It is not imported for human consumption or for the commercial extraction of sugar.

The 1962 Tariff Classification Act did not make a special niche for this product, either. But it does carry a classification intended to be applicable to certain liquid sugars. As the tariff classification study on which the act was based makes clear, there was no intention to increase the duty on invert molasses.

However, under the similitude doctrine it was possible for the Customs Bureau to rule, and it has done so, that invert

molasses belongs in the new items 155.30 and 155.35—in short, as a liquid sugar, to be nontechnical about it. This carries a duty rate 30 times as high, or 2.9 cents per gallon, and imposes an unwarranted excessive burden on users. The bill I offer would clarify the situation by making a specific place for this product in the classification, so that interpretations of "similitude" would not be necessary.

I might add that invert molasses is not made in this country, and that it is used only commercially in industrial manufacture. Its primary source is the Dominican Republic, and its previous—and under the bill, its restored—duty rate of 0.012 cents per pound is one to which we agreed in trade negotiations in 1949 and 1956. Thus, the higher rate under the Bureau of Customs ruling puts us in the position of violating an agreement with all members of GATT, under which we received reciprocal concessions for reducing the rate from 0.03 cents per pound.

Although Treasury has contended that under the present law the action of Customs in ruling as it has is correct, it supports this legislation in the belief that the change came about as an oversight. It also supports the retroactive application of the old rather than the higher rate, and so does the Department of State and the Office of International Trade. Also included in the bill is a provision for relief on eight entries of sugars in 1967 used in producing industrial alcohol, imported in the belief that they were dutiable at the lower rate because they were "not used for human consumption or for the commercial extraction of sugar."

When tariff matters are in consideration before the Finance Committee, I hope and trust that this bill for correction of an inadvertence will be adopted.

The PRESIDING OFFICER. The bill will be received and appropriately referred.

The bill (S. 3461) to amend the Tariff Schedules of the United States with respect to the tariff classification of invert or high-test molasses, and for other purposes, introduced by Mr. HARTKE, was received, read twice by its title, and referred to the Committee on Finance.

---

ADDITIONAL COSPONSOR OF BILL

Mr. BYRD of West Virginia. Mr. President, on behalf of the Senator from North Dakota [Mr. BURDICK], I ask unanimous consent that, at its next printing, the name of the Senator from Oklahoma [Mr. HARRIS] be added as a cosponsor of the bill (S. 3410) to establish an advisory commission to make a study and report with respect to freight rates for farm products, and for other purposes.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

COMMEMORATION OF THE 100TH ANNIVERSARY OF THE ESTABLISHMENT OF YELLOWSTONE NATIONAL PARK—ADDITIONAL COSPONSORS OF JOINT RESOLUTION

Mr. BYRD of West Virginia. Mr. President, I should like to read the following

statement on behalf of the Senator from Washington [Mr. JACKSON]:

Mr. JACKSON. Mr. President, on May 1 I introduced, in behalf of the Senator from North Dakota [Mr. BURDICK], the Senators from Wyoming [Mr. HANSEN and Mr. MCGEE], and myself, S.J. Res. 164, To commemorate the one hundredth anniversary of the establishment of Yellowstone National Park by providing for the National Park Centennial, and for other purposes.

Today I ask unanimous consent that at the next printing of the joint resolution, the names of the Senators from Montana [Mr. MANSFIELD and Mr. METCALF] be added as cosponsors.

On behalf of the Senator from Washington [Mr. JACKSON], I make that request.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

SENATE RESOLUTION 287—RESOLUTION TO PAY A GRATUITY TO MARY N. BELL—REPORT OF A COMMITTEE

Mr. JORDAN of North Carolina, from the Committee on Rules and Administration, reported the following original resolution (S. Res. 287) ; which was placed on the calendar:

S. RES. 287

*Resolved,* That the Secretary of the Senate hereby is authorized and directed to pay, from the contingent fund of the Senate, to Mary N. Bell, widow of Frank Bell, an employee of the Architect of the Capitol assigned to duty in the Senate Office Buildings at the time of his death, a sum equal to six months' compensation at the rate he was receiving by law at the time of his death, said sum to be considered inclusive of funeral expenses and all other allowances.

---

OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1967—AMENDMENTS

AMENDMENT NO. 746

Mr. METCALF (for himself and Mr. MANSFIELD) submitted amendments, intended to be proposed by them, jointly, to the bill (S. 917) to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes, which were ordered to lie on the table and to be printed.

AMENDMENT NO. 747

Mr. FONG (for himself and Mr. HART) submitted amendments, intended to be proposed by them, jointly, to Senate bill 917, supra, which were ordered to lie on the table and to be printed.

(See the remarks of Mr. FONG when he submitted the above amendments, which appear under a separate heading.)

---

INTERGOVERNMENTAL COOPERATION ACT OF 1967—AMENDMENTS

AMENDMENT NO. 748

Mr. MUSKIE. Mr. President, I submit, for appropriate reference, amendments which I intend to propose to S. 698, the intergovernmental cooperation bill, now pending in the Subcommittee on Intergovernmental Relations, Committee on Government Operations.

The amendments I will offer are intended to encourage simplification and improved coordination of accounting, auditing, and financial reporting requirements of Federal assistance programs.

Every Federal agency administering Federal assistance programs to State and local governments is charged by the Congress and by the regulations of the Comptroller General with assuring proper legal use of Federal funds made available to State and local governments through such programs. As a result each administering agency and each major bureau engaged in grant-in-aid administration deploys a number of fiscal auditors throughout the States at various times to audit grant-in-aid accounts. The General Accounting Office has its own field operations with its "spot audit" program, which is geared to ascertaining the effectiveness of agency audits of Federal expenditures and which also involves audits of grant expenditures at the State and local levels.

Yet, Federal agency auditing and accounting activities have had to keep pace with the growth in the number and variety of Federal assistance programs. Moreover, State governments in recent years and many local governments have made strenuous efforts to improve the capability of their own accounting and auditing systems—thanks to the rapid growth of State and local programs and expenditures.

Federal assistance programs differ in objectives, magnitude, governments, and governmental agencies involved, and the clientele served and in many other characteristics. Such programs then can hardly be expected to yield completely to uniform accounting and auditing requirements. Nevertheless, there remains the question as to whether the existing financial reporting, accounting, and auditing requirements are reasonable in their demands. Most State and local officials feel they are not. Some Federal aid administrators feel they are not. The recent experience of the Department of Health, Education, and Welfare and the Office of Economic Opportunity in placing reliance on State and local auditing, accounting, and reporting systems suggests that a rigid adherence to the status quo is not the best way to improve intergovernmental relations in this area. To help correct this condition, the Advisory Commission on Intergovernmental Relations in its fiscal balance report adopted a three-pronged recommendation urging enactment of general legislation by the Congress applicable to Federal grants-in-aid to States whereby: first, the Comptroller General would study and review the accounting and auditing systems of the States receiving Federal grants-in-aid and ascertain their general adequacy and integrity; second, for those States certified by the Comptroller General as meeting standards of adequacy and integrity, the results of State audits of expenditures of Federal grant funds would be accepted by the administering Federal agencies in lieu of their own fiscal audits with such acceptance to cease if the Comptroller General finds that the accounting and auditing system of a particular State no longer meets prescribed standards; and, third, this

authorization would be extended at the discretion of the Comptroller General to units of local government receiving sizable grant-in-aid funds from Federal agencies.

The amendments I intend to propose are based on this recommendation. First, they would assign authority to the President to promulgate rules and regulations on a Government-wide basis for simplifying and, to the extent practicable, unifying the financial reporting requirements in Federal grant-in-aid programs. At the present time—thanks to diverse enabling legislation, appropriation acts, departmental regulations and various other factors—the procedures, format, frequency, and intensity of financial reporting requirements differ greatly from department to department and frequently from program to program within a department. The amendments are designed to provide the President with sufficient authority to achieve greater consistency, simplicity, and order in an area of grant-in-aid administration that thus far largely has also been ignored.

The amendments also provide the basis for acceptance of the accounting and auditing system in certain States and certain political subdivisions in lieu of Federal efforts in these fields. The Comptroller General, the Secretary of the Treasury, and the Director of the Bureau of the Budget are mandated to conduct a joint study of the principles, standards, and related requirements of executive agencies as they relate to the accounting and auditing of Federal grants-in-aid with a view to identify ways and means of developing Government-wide accounting and auditing procedures that foster greater interdepartmental coordination among financial management officials in the various Federal agencies administering grant programs. These provisions are designed then to reduce unnecessary duplication and excessive time required to perform these vital fiscal functions.

The Comptroller General is authorized to study and review the accounting and auditing systems of the States and their political subdivisions in order to determine the adequacy and effectiveness of their respective systems and what changes, if any, would be required in them to comply with the principles, standards, and related requirements prescribed by him in the area of grant-in-aid financial accountability. After consulting with the Secretary of the Treasury and the Director of the Bureau of the Budget and after assessing the statutory requirements and the administrative needs of executive agencies administering grants-in-aid, the Comptroller General is authorized to prescribe rules and regulations that would permit such agencies to substitute the accounting and auditing systems of States and local governments with their systems meet standards prescribed by him as they relate to the administration of Federal assistance programs.

The intent of these amendments is not to shortcut in any way the exercise of fiscal prudence and accountability at all levels of government. But they seek to develop new intergovernmental arrangements in the accounting and auditing field which would lead to a significant saving in time and energy and would provide the impetus for significant improvements in the whole area of intergovernmental fiscal management.

Mr. President, I ask unanimous consent that the text of the amendments I intend to propose to S. 698 be printed at this point in the RECORD.

The PRESIDING OFFICER. The amendments will be received, printed, and appropriately referred; and, without objection, the amendments will be printed in the RECORD.

The amendment (No. 748) was referred to the Committee on Government Operations, as follows:

AMENDMENT NO. 748

On page 2, line 4, strike out "1967" and insert in lieu thereof "1968".

On page 2, line 19, strike out "title VIII and title IX" and insert in lieu thereof "title VIII, IX, and X.".

On page 10, between lines 3 and 4, insert the following new sections:

"APPLICANT

"SEC. 122. The term 'applicant' means one or more States or local governments or other public or private agencies or organizations acting separately or together in seeking assistance with respect to a single project.

"PROJECT

"SEC. 123. The term 'project' means any undertaking, however characterized and whether of a temporary or continuing nature, which includes components proposed or approved for assistance under more than one Federal program, or one or more Federal and one or more State programs, if each of those components contributes materially to the accomplishment of a single purpose or closely related purposes.".

On page 59, after line 4, insert the following new title:

"TITLE X—ACCOUNTING, AUDITING, AND REPORTING OF FEDERAL ASSISTANCE FUNDS

"STATEMENT OF PURPOSE

"SEC. 1001. It is the purpose of this title to encourage simplification and improved coordination of accounting, auditing, and financial reporting requirements of Federal assistance programs, to survey the adequacy and effectiveness of the accounting and auditing systems of recipient jurisdictions, and to authorize the Comptroller General of the United States to prescribe rules and regulations for using State and political subdivisions accounting and auditing in meeting financial management requirements of such programs.

"MORE UNIFORM FINANCIAL REPORTING

"SEC. 1002. Notwithstanding any other provision of law, the President shall have authority to promulgate rules and regulations simplifying and, to the extent feasible, unifying financial reporting requirements of Federal assistance programs.

"ACCEPTANCE OF ACCOUNTING AND AUDITING OF STATES AND THEIR POLITICAL SUBDIVISIONS

"SEC. 1003. (a) The Comptroller General of the United States, the Secretary of the Treasury, and the Director of the Bureau of the Budget shall conduct a joint study of the principles, standards, and related requirements of executive agencies, as defined in chapter 1 of title 5, United States Code, for accounting and auditing of Federal assistance programs. Such study shall emphasize ways and means of developing governmentwide accounting and auditing procedures that foster closer cooperation and coordination among the financial management officials of the different levels of the executive agencies, avoid unnecessary duplication, and minimize the amount of time required to perform the accounting and auditing functions. Such study with recommendations shall be submitted to Congress not later than twelve months after the date of enactment of this Act.

"(b) The Comptroller General shall study and review the accounting and auditing systems of States and political subdivisions receiving Federal assistance in order to determine (1) the adequacy and effectiveness of such systems, and (2) the nature of any changes in the accounting and auditing procedures employed in such systems which would be required for compliance with the principles, standards, and related requirements prescribed by the Comptroller General for protecting the interests of the United States with regard to accounting for expenditures of Federal assistance funds by States and their political subdivisions.

"(c) The Comptroller General, after consulting the Secretary of the Treasury and the Director of the Bureau of the Budget concerning their accounting and auditing needs, and considering statutory requirements and the needs of executive agencies responsible for administering Federal assistance programs, shall prescribe rules and regulations whereby such agencies may substitute for their accounting and auditing the accounting and auditing performed by States and political subdivisions receiving Federal assistance, when such accounting and auditing meet the requirements prescribed by the Comptroller General applicable to the administration of such assistance received by such States and political subdivisions. The Comptroller General shall make a report to Congress on the operations of this subsection at the end of such fiscal year, beginning with the first full fiscal year following the date of enactment of this Act."

NOTICE OF RECEIPT OF NOMINATION BY THE COMMITTEE ON FOREIGN RELATIONS

Mr. FULBRIGHT. Mr. President, as chairman of the Committee on Foreign Relations, I desire to announce that today the Senate received the following nomination: H. Brooks James, of North Carolina, to be an Assistant Administrator of the Agency for International Development, vice Herbert J. Waters, resigned.

In accordance with the committee rule, this pending nomination may not be considered prior to the expiration of 6 days of its receipt in the Senate.

NOTICE OF HEARINGS ON SAVINGS AND LOAN RECEIVERSHIPS

Mr. PROXMIRE. Mr. President, on May 20 the Committee on Banking and Currency will conduct hearings on S. 3436, a bill to provide for the appointment of the Federal Savings and Loan Insurance Corporation as receiver, and for other purposes. The hearings will take place in room 5302, New Senate Office Building at 10 a.m. Persons desiring to testify should contact Mr. Lewis G. Odom, Jr., Staff Director and General Counsel.

TRIBUTE TO SENATOR HAYDEN—A GREAT AMERICAN

Mr. DIRKSEN. Mr. President, on behalf of the Senator from California [Mr. KUCHEL], I ask unanimous consent that a statement prepared by him in tribute

to Senator HAYDEN be printed in the body of the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

STATEMENT BY SENATOR KUCHEL

The decision of the Dean of the Senate to end an unprecedented skein of years of service to Arizona and to America evokes an almost indescribable sadness. An important page in the history of this noble body will turn. He will lay aside a public office filled for over a half-century with distinction and seldom-matched purposefulness.

Words to describe Carl Hayden and to categorize personal associations with him pour through the mind in an almost endless stream. My regard and affection best can be reflected by use of the appellation "amigo"—so reminiscent of the Old West where he was born and whose progress he influenced beyond measure.

This body will miss the challenge and presence of a member of unimpeachable integrity, who set standards which are imperishable, and whose accomplishments will inspire the best from each of us in years to come.

Though the inexorable passage of time prompts him to cease his labors in elective office, Carl Hayden will leave the Senate with more than memories and legends and he will be rich in knowledge that his beloved Arizona and the flourishing Southwest thrive because he husbanded their treasures while responding to challenges of progress. He can be content in knowledge he was a builder of an inviting and rewarding society. Though unpleasant, the breaking of ties is more easily tolerated because of his contributions toward the well-being and happiness of those who follow.

When this Congress finally adjourns an era may have ended but an ineradicable remembrance will remain as the Hayden sense of devotion motivates the membership through times ahead.

Mr. MURPHY. Mr. President, when historians of the next millennium look back with the wisdom of their hindsight to study the vibrant period in which we live, they will find ample evidence that there were among us a select few men whose vision and deeds matched the ever-expanding challenges around them.

Such a man is the senior Senator from Arizona, the distinguished CARL HAYDEN.

No State of our Union is without its share of monuments to his interest in the social prgrams and public works projects which have made possible our enormous progress during the past half century.

No State is without a plan for the future which is based to a large extent on his efforts.

More significantly, however, no State— and I respectfully request that I herewith be permitted a bit of regional pride—is now untouched by the expansive, exciting, visionary "Spirit of the West" which he so ably typified.

It has been an honor for me to call him a colleague and a friend. With the other Members of this Congress, I shall miss him.

At the same time, I sincerely hope that he will be able to find a great deal of justifiable personal satisfaction in the knowledge that the fruits of his labors will make this a better land and a better world for countless generations to come.

Mr. BIBLE. Mr. President, missing from the tribute to Senator CARL HAYDEN carried so voluminously in the CONGRES-

SIONAL RECORD yesterday were the fine remarks by Roy Elson at Tuesday's press conference after Senator HAYDEN announced his retirement. Roy, as Senator HAYDEN's administrative assistant, spoke most eloquently for himself and the Senator's staff. I ask unanimous consent that those remarks now be included in the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

SENATOR HAYDEN TRIBUTE FROM STAFF BY ROY ELSON, ADMINISTRATIVE ASSISTANT TO SENATOR CARL HAYDEN, MAY 6, 1968

For me, for my fellow staff members and for the many who have known and worked with you, Senator Hayden, let me say that it has been our honor and privilege to serve you in your service to our state and our country.

When I first came to Washington a time that was recent in the life of Carl Hayden but seems so very long ago to me, I really thought I knew some of the answers. I now realize, however, that most of what I have learned in life, I owe to Carl Hayden. For he has been my teacher, my leader, my example and, if I may say so my friend. I am certain that practically every man and woman in this room today can say essentially the same thing.

And that is about all I have to say about this great man who has, in Kipling's phrase, "walked with kings" and not "lost the common touch," the man who came from Arizona long ago to fill over 56 years of unforgiving minutes—who dared to dream dreams and lived to see their reality, not just for our time, but for all time to come.

Today we salute you, Senator Hayden, and thank you for letting us share a little in your greatness.

Mr. BROOKE. Mr. President, I shall always be profoundly grateful that I was given the privilege of serving during two sessions of the Congress with the illustrious senior Senator from Arizona and President pro tempore of the Senate, Senator CARL HAYDEN.

To those of us just beginning our service in the Senate, Senator HAYDEN's extraordinary record will ever remain a unique inspiration and example. His exemplary service to the people of his State and Nation, his unstinting courtesy, kindness, and patience with his colleagues, his devotion to the ideals and traditions of the Senate, of which he is in such a real sense a living tradition, are things for which I, as a very junior Member of this body, will retain the greatest admiration and respect.

I appreciate having the opportunity of joining my colleagues in wishing Senator HAYDEN many years of richly deserved happiness, health, together with the profound satisfaction that comes from having given of his very best to the people of Arizona, to the Senate of the United States and to his grateful and admiring fellow Americans.

THE 84TH BIRTHDAY ANNIVERSARY OF FORMER PRESIDENT HARRY S. TRUMAN

Mr. LONG of Missouri. Mr. President, today, May 8, 1968, is the 84th birthday of Harry S. Truman, one of the truly great Presidents of the United States.

It is an honor for me to be able to wish happy birthday to my good friend and

fellow Missourian. He is admired and respected by all Americans. He is the favorite son of every Missourian.

The Presidency of the United States and the leadership of the Western World were thrust upon Harry Truman both at the close of World War II and the start of the quest for an enduring peace. Few periods of history have been so crucial to this country and to the future of world peace. Few men can equal the record he established in promoting the brotherhood of man and the association of nations.

In his first 4 months of office, the United Nations was chartered, Germany surrendered, the Potsdam Conference was held, and Japan surrendered. He initiated the Marshall plan for economic assistance which was designed to help refashion all of Europe into a free community of prosperous and independent states. He fashioned a peace that imposed not harsh penalties on the defeated nations, but rather attempted to restore their vitality and enable them to rejoin the postwar community of free nations.

Although a man of peace, President Truman acted always with a courageous will to protect the independence of threatened nations. His determination to check the advance of world communism will never be forgotten by free men.

Although so noted in his foreign policy, his domestic policy was just as dedicated to furthering the cause of humanity's right to freedom. He constantly advocated national fair employment practices. He brought an end to segregation in the Armed Forces. Many of the programs envisioned by President Truman have been realized in recent years, including the extension of voting privileges to all Americans, a healthcare program for the aged, and aid to elementary and secondary schools.

President Truman gained a well deserved reputation as a man of integrity and charity, as a man who kept faith with the common man—with those men whose sturdy endurance and devotion to duty comprise the strength of America.

I know I speak for all the people in my State in wishing this world statesman, this outstanding American, this great Missourian a happy birthday.

OUR YOUNG PEOPLE ARE OUR FUTURE

Mr. BAYH. Mr. President, the future of our country depends upon the character, abilities, and development of our young people. This may be a disturbing prospect to some, but, to me, the outlook is full of promise. What brings this thought to my mind is the speech that President Johnson made at a reception this week honoring the White House fellows.

More than 6,000 of the most promising young people in the country have applied to be White House fellows in the 4 years since the program began. Of that number, only 68 have been accepted. These young people come into Government from business and universities and serve for a period of 1 year. They work at the highest levels of Government policy and program operation.

The President's remarks were very inspiring. He called upon the fellows to

*May 8, 1968*   CONGRESSIONAL RECORD — SENATE   12337

maintain an active commitment to public service all their lives. At one point he said:

No one can make democracy obsolete but the citizens of democracy who don't care.

Anyone who has doubts about the future of America would do well to read the comments President Johnson made to these young people. It seems to me that his statement is worthy of wide attention, Mr. President, so I ask unanimous consent that it be printed in full in the CONGRESSIONAL RECORD.

There being no objection, the address was ordered to be printed in the RECORD, as follows:

REMARKS OF PRESIDENT JOHNSON AT A RECEPTION FOR WHITE HOUSE FELLOWS, STATE DINING ROOM

I perhaps should have waited until you at least had time to participate in the refreshments, but I know it will be refreshing when I have gone.

Since I must go to the Senate, I think I will just start now and interrupt your meeting.

First, I want to welcome the members of the Cabinet and the President's Commission on White House Fellows, the new Fellows and the old Fellows, and all my friends.

I am happy to have this second chance to meet with the White House Fellows and their ladies. You were kind enough to invite me to come last Saturday. I was sorry I could not be there.

My own disappointment was considerable. Your invitation was most attractive to a man in my position—a short timer in Washington. It could have been my last chance to make the scene at Dupont Circle on a Saturday night.

I had another very personal reason for wanting to join you. As a man considering a new career, I think it is wise to keep up my contacts, especially with important people.

At least I think you are important people. You have been hand-picked for very high honors, and I think for very high office. You are very privileged young people.

You found room at the top for three years. Today another year begins for you.

Nineteen new White House Fellows are here as the fourth class of important and privileged young Americans.

So I am very proud and happy that I could join with Mrs. Johnson to ask you to come here, to congratulate you and to welcome you to Washington.

There are 68 of you now. That is one for each year of this Century.

I would like to think that there is some special significance to that coincidence.

I want to believe that you are the men and women who will complete the great unfinished agenda of America for this Century, so that we may launch the third Century of our continuing American adventure with even higher goals and I hope with an even greater purpose.

The next Century is crowding in on us in this room right now.

It is pressing us with a rush of change—the new challenges that are flung by science and technology; by population increases; by 40 percent of the people in the world who can't spell "dog"; 40 percent of the people in the world who can't write "cat"; by unexplored oceans and untamed weather; by poverty and injustice in our own land; by giant cities that need rebuilding; by our schools, our farms, our hospitals and our corporations that need to change to keep up with that challenge; by all the unexpected and the unknown, including the greatest of all—how to understand people and how to learn to live together in this world without war.

So that is your agenda, and that is your life. It will be your job and your privilege to work on that agenda while you are here in Washington.

I hope all of you take it as your job—your particular responsibility to repay that privilege when you leave Washington by continuing to work as private citizens on your public agenda, working in your law firms, in your executive suites, on your campuses, in your city governments, and in your own towns.

I am going to try, as one of my last orders, to see that you do that.

I am going to ask a committee of the 68 White House Fellows, who I will take great care in selecting, to work with me and some of the Members of my Cabinet, with some of those who have worked in my Administration, in the Kennedy Administration, in the Truman Administration, and the Roosevelt Administration, to make a study of the Presidency, to see how we can improve it, how we can strengthen it.

It won't be exactly another Hoover Commission on the entire Government, but it will be on the Presidency, itself, which is a rather important office.

In the years to come we need to improve it, strengthen it, and do whatever we can to make it stronger.

In addition to that, I am going to amend the Executive Order that created the selection committee, of which the most distinguished and honored Mr. Douglas Dillon is Chairman, to provide for an increase in membership.

In President Roosevelt's day that would have been known as packing the court.

I hope I can make that change without being charged with any ulterior motives.

I would like for some of you 68 Fellows who have come, who have seen, who have not forgotten, to sit around with some of these old timers who really constitute this generation gap.

I would like for you to sit with them—the Johnny Oakes of the New York Times; the John Macy's, of the Civil Service Commission; Judge Hastie.

I would like for you to talk with them as members of the board, as their equals on the board, and fellow members. Then I would like for you to go throughout the country and work with these panels so that the next group selected can even be an improvement on the group that you make up.

I look upon you as the future. You can make it or you can break it by committing yourself, or by copping out: by going home after one year at the top, or by sliding back into the comfortable routine of a cynical life, by being too busy, too timid, too awed to apply what you have learned here by staying involved, or by remaining committed.

I think you are going to learn a great deal in this town.

But it is a part of your privilege that you will come to know a basic truth. That truth is how much government can do and how much government cannot do.

If you grasp this, if you keep your eyes open and your wits sharp, you will learn the magnificent promise and the exciting truth of your own lives.

You will learn how much, very much, you can do for your own future, and particularly for the future of your country; how very much we need you, your commitment and your involvement.

And we need it now, because the future is now.

In the last century, a great English statesman looked ahead and declared, "You cannot fight against the future. Time is on our side."

Well, was Gladstone really right? Some people wonder.

Is time really on our side today, or is our century already so different, and are we already so beset and so divided by all of our problems that even time is working against us?

There are some, I think, who might answer yes, by their criticism or their cynicism.

There are others who agree by their obstruction or their silence.

There are few who surrender reason to passion and hope to frustration, who fear that they have no place in the future; or that the future, itself, is overwhelmed by the vast complexity and variety of modern life.

I understand that some of you in the White House Fellows Association have been asking yourself some of these questions.

You want to know if time is on our side, if you really have a relevant role to play; if, in fact, our problems might not have made your Association and your purposes obsolete even before you get organized and get going.

Well, I am pleased that you are concerned. That is the first evidence that we are making progress. That is the first step to commitment and, I think, to success.

I would like to try and take you just one step further in the few moments I have with you by suggesting some answers and also by suggesting some actions for you as individuals, and to your association.

Let me first make clear my own commitment.

This Nation is not going to retreat before the future. This Administration has acted for four long years now to meet the challenges of the day and to set the stage for new triumphs of tomorrow.

We have believed that time is on our side, and we have tried to work every minute to make the most of our time at the top.

I promise you here and now this afternoon, that in the time left to us we will put every last ounce of energy and strength, every last second of the day, to strong, to timely, and, I pray, to wise and to enduring purpose.

That is my personal commitment. That is my responsibility as your President.

It is the only legacy that I am concerned to leave to my successor—a Nation that has grown in achievement, a people that are richer in fulfillment, an America that is united and strong in unfearing pursuit of the greater achievement and fulfillment that the future offers us.

Now let me ask you a question: What is your responsibility? What legacy do you want to leave to your children?

I hope that you will not tell them that you gave up on your world because you couldn't roll up your sleeves, as Rex Tugwell once said, and remake it overnight.

I hope you will be able to tell them, and I hope that you will be able to show them, that you found the road of life was hard; you observed that it was steep and slow, but that you made it to the mountain top. And as you went along, you took your country with you.

You are standing on one peak of life's experience right this minute.

You are young and you are privileged Americans. You are bright. Most of you are healthy, happy, and, I hope, well off.

How do you think you got that way? How did that happen?

Some of you had to fight for the privileged position that you have this afternoon.

But all through your years, all through the life of this Nation, other Americans were fighting to raise you up. They were fighting to try to protect you. They were fighting to try to better your life; to improve your system of government; to give you new advantages and better educational opportunities; to make you what you are, because they refused to retreat before the future that has come true for you, for those of you who are very gifted and young, and I think by being both, you are very fortunate.

One of the men who fought for you, and who was fighting for you when I was a young man and first came to this town, was a close and dear friend. His name was Henry Stimson.

He was a wise man with a warm place in his heart for young people.

He left a legacy for the future: "Let them learn," he said, "from our adventures. Let them charge us with our failures. And let them do better in their turn. But let them not turn aside from what they have to do, nor think that criticism ever excuses or substitutes for inaction. Let them have hope and virtue and let them believe in mankind and its future, for there is good as well as evil. And the man who tries to work for the good, believing in its eventual victory, while he may suffer setback and sometimes even disaster, will never know defeat. The only deadly sin that I know—the only deadly sin that I know—is cynicism."

Isn't that the truth for your time, too? Isn't that the answer that you are looking for?

It is not very difficult to poor mouth. It is so comfortable and convenient sometimes to knock your own system.

It is hard to remember, sometimes, that this is really a great and a going concern, that our Nation is the envy of the world, and that there are citizens all over the world who would just give anything to trade places for it.

We can remember that without ever being satisfied with what we have or what we are.

It is difficult to put things in perspective. It is difficult to remember the giant strides that have been brought to us, despite our many problems—to the miracles of life that we have taken so much for granted, despite our plagues and our persecutions, despite our wars, despite the many calamaties that we have envisioned from time to time.

And I have endured and lived through a goodly number of them.

Man has persevered.

In the face of natural disasters, great tumults, setbacks and sins, generation after generation of Americans and our fellows on this planet have been blessed with fortune after fortune.

Through all the years, all the errors and all the dangers, reform and improvement have been the password to man's increasingly better and brighter future.

Man has been many things through all the centuries of his existence, but he has been wonderfully and mainly distinguished by one characteristic of his human nature: Man has always been, and I hope always will be, the great experimenter.

That is what you are. You are, after all, one of my first experiments.

The White House Fellows and the White House Fellows Association are really an experiment in democracy. You have succeeded beyond many of our original hopes.

I ask you now, as individuals and as an association, to commit yourself, to dedicate yourself, to organize yourself, for the greater successes that you can bring to this Nation.

You are relevant. No one can make your experiment irrelevant but yourselves.

No one can make democracy obsolete but the citizens of democracy who don't care.

Ever since we began our great experiment originally in democratic government, there have been those who wondered—sometimes in curiosity and a great many times in despair—whether this experiment would ever work.

A century ago there were many who thought we had reached a dead end. Abraham Lincoln had to remind those cynics and those skeptics that the American experiment for all its failings, was plainly still, the last best hope on earth.

Thirty-five years ago the doubters thought that we were up a blind alley. President Franklin Roosevelt had to rally a people. He had to prove the vitality of a system by urging our people not to be paralyzed by their doubts.

One of the most stirring speeches I have ever heard in this town was when he stood there on that bleak, windy March day and took the oath of office.

He said, "The only thing we have to fear is fear itself." And how true that is this moment. Just a few years ago, some of these people were saying that we had reached a deadlock of democracy, but we moved on, we moved away, and, I am proud to say, we moved up.

Again and again in the American experience, it is the pessimists who have proven to be the false prophets. It is the optimists whose courage and faith have carried us on.

That is your inheritance. That is why you are here in the White House this afternoon.

So it is your turn, now, to pick up and carry on. For every complaint about our society and about our progress, you and I can point to a new program. We can point to a new landmark act of the Congress. We can point to a new public or new private initiative; or a new partnership of business, of government, of church, of community, of university and corporation, of American with American.

That is your America.

It is a growing and going concern. It is not slack and it is not soft. But it is creative and it is challenging both to the muscle and to the mind.

It is a land of limitless opportunity and great promise for all young people. There is no more promise anywhere on this earth.

For every lament about the alienation of our young, you and I can point to millions of active, committed and involved young men and women who really deeply believe in the American experiment, who are willing to work for its improvement, who want to broaden and deepen its successes, so that every American—every single one of us—may know the full blessings of democracy.

It is a big job. It is a most difficult and hard job. But there are enough of you now in the fourth year of this program to role up your sleeves and do something about it.

Your association is new, but you can begin small. Plant an acre, put down a seed. You live and you work for all of America. You can see yourselves as the Johnny Appleseeds of a new America.

When you leave Washington, you can be the ones to go out and plant the ideas and plow the furrows that point to the future; that can awaken and unite our Americans in a new community of splendor with high, noble purposes.

You are relevant. We do care about you. You are needed.

You are a national association, and I am convinced that you have a national role to play in helping to master the human problems that concern you and concern me.

Let me suggest something to you: You might want to organize by regional committees. Our new Alliance for Businessmen has done just that, to solve a great and urgent problem, under the leadership of Mr. Henry Ford of Ford Motor Company, and Mr. Paul Austin of Coca Cola. They are out, going down the streets and the highways, finding jobs for people who can't find jobs for themselves—the hard-core unemployed.

In just a few weeks now, the businessmen have demonstrated that they are winning that battle. In less than three months since they first met here in the White House they have secured pledges for 111,000 new jobs for hard-core unemployed and disadvantaged youth.

That is quite different from what it was when I came into this town, when they had the midget on Mr. Morgan's knee, and when the President was talking to businessmen in terms of economic royalists.

Some of you are business executives. Some of you have the power and the opportunity to work as partners with this National Alliance of Businessmen, to help those who can't help themselves.

You will find many other partners who are ready and eager to cooperate with your association on a great variety of social problems—churches, law firms, universities, unions, farmers, the people of America who are working harder than ever to try to solve the problems of America.

Your regional committees could divide this nation into four quarters. You could set a target list of problems and opportunities for each region.

The first target that I had when I came to this town as a young man was to participate with a group of brain trusters, of which I did not include myself. We wrote the Report on Economic Conditions in the South. It was in the early 1930's. That report spread all across the land and people started working on the recommendations.

We haven't completed all of them yet.

One of the first ones to come out of it was the minimum wage of 25 cents an hour. Women were working in our section for 6 cents an hour.

I remember—well, I remember a lot of things about that report.

You could, I think, set a time limit for results. I think you could set that time limit with that target here today. It could be your next meeting a year from now.

Then you could come back here with a new score card. You could come back to the President and tell the President that you have worked with the National Alliance of Businessmen, that you have worked with Mr. Gardner in his Urban Coalition, that you have worked on the campuses and the city halls, in the churches, and you have many other partners.

You could come back here prepared to hold up your scorecard and say, "Mr. President, like the National Alliance of Businessmen, we have helped X number of unemployed find a job. We have helped X number of businessmen to involve themselves in the problems of the city. We have helped X number of Negroes, Puerto Ricans, Mexican-Americans, Mexican-Indians, or under privileged, get into the class room for the first time. We have gone out ourselves into X number of slums and we have worked with X number of mayors and local officials to try to get rid of those slums. We have tried to build new homes instead of burnt old ones. We have used our management and our talents to help X number of small businessmen improve their lot and get ahead. We have served as a bridge between X number of city halls and universities, between X numbers of universities and community leaders, between the campus and the street corner, between the executive suite and the ghetto store, and between the police station and the church, the factory, the supermarket, the farm, the tenement and the apartment house.

A year from now, I hope that a committee from your association will be able to come to this house, to this room, and say to your President, "Mr. President, it was a privilege to work 12 months for my country at the top."

A tour of duty in Viet Nam is just 13 months, as you know.

"We have tried to repay our country. We have remained committed and dedicated. We have done our best, singly and together, to bring all of our people closer in the work of building—building one united, one progressive—yes, one peaceful America."

You should not need any greater challenge than that. I hope you don't need any more encouragement than that.

But if you do, I am sure you will find that encouragement in association with your other White House Fellows. Some of them are so good that I have never let them leave the White House. Some of them are so good that I am taking them to Texas with me.

I am sure that if you need some more encouragement, you too, can find it in the leadership of the distinguished American

who has agreed to serve as Mr. Dillon's replacement.

I want to pay a word of tribute to Mr. Dillon. I first knew him as a lieutenant in the Navy in this town. I don't know what he did before he put on that Navy uniform several decades ago, but I know what he has done since.

He has served every day, doing the greatest good for the greatest number of people, trying to better humanity. I think this final job he has done as Chairman of the White House Fellows is not one of the minor undertakings he has had, and it is not one of the smaller contributions of the many that he and his wife have made to his country.

I want to salute and thank Mr. Dillon for his understanding.

He is more fortunate than some of us in his health, his brains and his pocketbook, but he has been willing to spend them all on trying to make this a better nation.

The man who succeeds him I know will have a lot to shoot at, but he will do his best. He is the Chairman of the President's Commission.

I am proud and happy to announce that Judge William Hastie of the Third U.S. District Court of Appeals will carry on for our former and our very able chairman.

Mrs. Johnson and I, finally, are very pleased to congratulate all of you, and to wish you good fortune, and to tell you that it has been our good fortune to know those who have come before. We hope we will have a chance to meet those of you as you come afterwards.

---

## GENERAL MOTORS ADVANCES AUTO SAFETY

Mr. RIBICOFF. Mr. President, since the Subcommittee on Executive Reorganization began hearings on traffic safety more than 3 years ago, there has been great progress in this field. Two important laws have been enacted establishing Federal regulation of this area and the Highway Safety Bureau has issued more than 20 safety standards for 1968 and 1969 cars. But most significant, the automobile companies are beginning to compete in producing safer cars.

Three years ago, the industry attitude toward safety could fairly be said to be defensive. But today the industry has taken the initiative to make safety advances available to the public as rapidly as possible. Nothing better illustrates this than General Motors' recent announcement that it will install a steel bar in the doors of certain 1969 models to guard against the hazards of side impacts.

While much has been done to protect passengers in front and rear collisions, up to now, little has been done to safeguard them in side collisions. To General Motors' great credit, it did not wait for the Safety Bureau to establish a standard for this type of hazard.

On its own, it developed a bar which is 8 inches high, 2 inches deep and, in four-door sedans, will weigh about 41 pounds. This will give added protection in side crashes and help to cut down the toll of death and injury on the highway.

General Motors' action demonstrates the effectiveness of our competitive free enterprise system. It also shows the benefits which can arise from constructive regulation in the public interest. With the increasing Federal attention to automobile safety, the industry has focused more effort on this area and there is now evident a distinct trend toward more

vigorous competition in auto safety. Each company is trying to develop new and improved safety devices and equipment to offer a better, safer product to the American people. In the end, both the industry and the public will benefit. As I stated in the subcommittee report on the Federal role in traffic safety:

> An aggressive competitive approach to safety would lighten the burden of regulation for the industry and increase public confidence in its cars.

So, Mr. President, I commend General Motors for the step it has taken in improving vehicle safety. I hope it will be the first of many it will take on its own to speed the progress of vehicle safety, and that this action will set a pattern for the entire industry.

I ask unanimous consent that a recent article explaining the device be included at this point in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

[From the New York Times, May 5, 1968]

GENERAL MOTORS TO INTRODUCE SIDE GUIDE RAILS ON MOST OF ITS 1969 CARS

(By Jerry M. Flint)

DETROIT, May 4.—The General Motors Corporation has disclosed details of a new safety feature, a "guard rail" to be built into the doors of most of its 1969 cars.

The device, a steel bar that's like a typical highway guard rail, will be inside the door panels, out of sight. Its purpose is to protect passengers in broadside collisions by keeping the other car from penetrating the passenger compartment.

The "guard rail" is regarded as one of Detroit's more significant safety advances, ranking just behind the improved windshields and collapsing steering columns that are meant to reduce deaths and serious injuries in front-end collisions.

The development underlines two new aspects of the auto safety effort: the initiative appear to have passed from Government to industry and a competitive "race" in safety appears to be beginning.

Newsmen first learned of the G.M. guard rail two months ago, but it was not until this week that General Motors was willing to disclose the details. Even that was unusual, because the big automaker traditionally does not talk about future model developments.

TWO-YEAR PROJECT

"We've been working on this for over two years," said Carl Hedeen, engineering director of G. M.'s Fisher Body Division. He said that the project, including testing, engineering, and extensive changes in production lines, had cost millions of dollars.

"Every time we made the test we ruined two cars," he said.

With 50 to 70 cars turned to junk in broadside crashes, that alone would have represented a cost of about $100,000.

The new guard rail will be on G. M.'s full-sized cars next fall and on the smaller cars in later years. The body styles of the big cars was changed for 1969 to make room for the added steel in the doors.

The guard rail consists of a heavy ribbed steel beam eight inches high.

The steel in the beam is one-third to almost twice as thick as the steel in the car's outer sheetmetal. A second, U-shaped beam, four and a half inches high, is welded along the back of the ribbed beam for added strength.

The beams, which add 41 pounds of steel to a four-door car and 35 pounds to a two-door model, are welded inside the doors about 10 inches above the door step running about parallel to an occupant's rib cage.

G.M. is also strengthening the pillar sections and hinges on which the heavier doors are hung, bringing the total added weight to 49 pounds for a four-door model and 48 pounds for a two-door car. The added steel probably adds about $4 in cost per car for the rental alone.

THREE CRASH CHANGES

There are three major changes in crash effects, Mr. Hedeen said. The intrusion of the oncoming car is "limited," the hit car tends to be pushed sideways, and the hitting car tends to deflect along the sides of the hit car, he said.

The first version G.M. built had 700 pounds of added steel, Mr. Hedeen said. Then engineers discovered that to protect the occupants the beams didn't have to keep a crashing car out completely. Instead, they had to keep the car out only until enough force was put on the doors to start the hit car skidding sideways on its own tires.

This sideways skidding, away from the incrashing car, happens on present models, too, but it happens too late, Mr. Hedeen said.

Dr. Alan Nahum and Arnold Siegel, both of the University of California at Los Angeles and both among the nation's best-known vehicle safety researchers, said last month that "the side impact collision is now the most critical problem in regard to injury prevention."

"Motorists are particularly vulnerable to injury during side-impact collisions because of the lack of structural strength in this area of the vehicle, the relative proximity of the motorists to a striking car or object, and the lethal nature of the door handles and other hardware which may be attached to the oncoming door," they told a legislative committee.

AVOIDS SPECIFIC CLAIMS

In a typical side car crash, they said, the door is pushed in on the driver, crushing his chest, pelvis and bladder and causing the collapse of one lung and a contusion to the heart.

G.M. said that because of the wide variety of broadside crashes it could not make any specific claims about the reduction in the penetration of the passenger compartment. But it does say the improvement is "significant."

The only way the company will really know, Mr. Hedeen said, is when safety researchers begin picking up wrecked cars from the Los Angeles Freeway.

But he noted that dummies were almost demolished in tests of cars without the new protection, and were relatively intact after crash-testing on models with the guard rail.

The guard rail required the redesign of the whole side of the car, Mr. Hedeen said, to make sure that there was enough room within the door for the bars without interfering with the windows.

In the past, industry critics have charged that the industry gave styling precedence over safety and design.

"You always have trouble with styling, but they are getting the message, just like everybody else." Mr. Hedeen said.

PRODUCTION LINE CHANGES

The guard rail system also requires a costly rebuilding of G.M.'s door production lines, which pop out 10 doors a minute.

Two and possibly three other safety advances are expected in 1969 automobiles.

The Ford Motor Company is developing a new frame for its big cars, which Ford says collapses at a more uniform rate than current frames. That would mean less shock passed on to the riders in a front-end collision.

The Government will require head restraints on all cars built after Jan. 1, 1969, to prevent whiplash injuries.

Both General Motors and Ford are working on anti-skid systems, and some may be available on a few 1969 models.

The Government's latest safety standards for the industry call for little that isn't already on at least some cars. The reason, some safety experts say is that most of the information on vehicle safety has been exhausted.

The latest developments, such as the guard rail and anti-skid systems, are coming from within the industry without Government prodding.

The Government's safety agency probably intends to take the developments by individual companies and make them required standards for all cars.

This adds a competitive factor because the company that develops a safety item then avoids the expense of catching up, the rush redesign and tooling required when the Government makes the item mandatory.

Talks with engineers at the various companies also indicate that the car men themselves are beginning to be competitive about safety features, taking some pride in beating the competition just as they boast about styling and performance victories.

---

TRIBUTE TO SENATOR MORTON

Mrs. SMITH. Mr. President, on April 28, 1968, the American Good Government Society presented its cherished George Washington Award to Senator THRUSTON B. MORTON.

I ask unanimous consent that the citation accompanying that award be placed in the RECORD at this point.

There being no objection, the citation was ordered to be printed in the RECORD, as follows:

RESOLUTION OF TRIBUTE AND HONOR:
THRUSTON B. MORTON

Patriot, Statesman, and Politician of rare Courage and Ability, has served our country for 25 years—four in the United States Navy where he commanded two Men-of-War, six in the House of Representatives, three as Assistant Secretary of State, and now is in his 12th year in the United States Senate.

Though a member of the Senate Minority, his Talents for the Arts of Statecraft and Politics stood high in shaping legislation, and winning elections for his Party.

Senator Morton sees through the shams of politics that must be treated reverentially to succeed. He knows that every Nation understands its own affairs better than those of its neighbors, and that to escape our present perplexities we must look to able hard-working Politicians, and not to fine principles of salvation newly discovered by theorists, fanatics and professional demagogues. Our country needs hundreds of men of Thruston Morton's courage and competence.

---

CROP INSURANCE PROGRAM IN WISCONSIN

Mr. NELSON. Mr. President, more and more Wisconsin counties have indicated their interest in participating in the programs sponsored by the Federal Crop Insurance Corporation, an agency of the U.S. Department of Agriculture established by Congress 30 years ago.

Last year, in my home State, some 11,000 farmers in 28 counties carried more than $10 million protection on five separate crops—corn, oats, peas, soybeans, and tobacco—and more than 1,500 of them were paid nearly $500,000 in FCIC crop loss payments mostly on corn losses. It was not a big loss year in Wisconsin for Federal crop insurance—but during the last 20 years FCIC has paid farmers of the State more than $8½ million. The biggest 1-year loss payment was $1½ million in 1964.

Over the last 25 years, the causes of loss on which FCIC paid Wisconsin farmers included 42 percent for drought, 24 percent for excess moisture, 17 percent for winterkill, and the remaining 17 percent for wind, flood, insects, disease, and others.

Indicative of the growth of Federal crop insurance activity in Wisconsin is the fact that 20 years ago the total annual premium paid by farmers of the State was $83,000 as compared with nearly $800,000 in 1967.

Participation in this voluntary program has more than doubled nationally in the last 6 years mainly because the cost of farming has increased so greatly and with it the farmer's financial risk. Today's American farmer invests about $4 for every $1 of potential profit from a good crop. If he loses his crop, he loses with it his expected profits for that and the succeeding years, which could spell bankruptcy for many. So it isn't surprising that more and more farmers are using Federal all-risk crop insurance to be sure they can be back in business the next year, come what may in the way of unforeseen weather disaster.

Even in the good crop years, more and more farmers are finding their Federal crop insurance policies valuable as collateral for bank loans. In the last 2 years, 29 Wisconsin banks have become eligible to write FCIC applications.

---

THE GOOD WORK OF THE FARMERS HOME ADMINISTRATION

Mr. GRUENING. Mr. President, the Farmers Home Administration has an active program in Alaska. More than 1,000 loans totaling about $9 million were serviced by the Farmers Home Administration in my State at the beginning of 1968.

The men in charge of the national farm program here in Washington, D.C., are familiar with the development needs in Alaska. Deputy Administrator Floyd Higbee has traveled throughout much of the State. Administrator Howard Bertsch, who comes from Oregon, has long understood the desirability of developing agricultural potential of the 49th State.

Exact figures show that 1,078 loans to 977 Alaskan families had been made as of January 1, 1968. These loans totaled $8,899,768. More than 25 percent, 312 amounting to $2.6 million, were made during fiscal year 1967.

In 1967, the heavy volume of work made necessary the opening of a fourth Alaska Farmers Home Administration office at Wrangell. This office serves the area stretching from Yakatat to Ketchikan.

Farmers Home Administration credit supplements rather than supplants the financing which is available through normal channels, such as the local banks. Its borrowers would have not been able to obtain loans at reasonable rates if the services of the Farmers Home Administration had not been available.

In Alaska loans for rural housing—which in many instances enabled families to move from wholly inadequate, dilapidated and sometimes unsafe quarters into new homes—totaled $6.5 million.

Another $1 million of the $8.9 million total was used by farm operators to purchase farms, make needed adjustments in operations, or recover from an emergency situation such as a crop loss brought about by natural disaster.

Some 500 native Alaskan families, located primarily in remote areas, have obtained economic opportunity loans totaling more than $700,000 from the Farmers Home Administration. These families have bought essential equipment to increase their incomes.

A milestone was established by Farmers Home Administration in Alaska last year when the first community facilities loan ever made in the State was approved for the city of Wrangell. This loan of $408,600, supplemented by a development grant of $197,200, is being used to rebuild and extend the city's water supply system. This construction is of direct benefit to 264 Wrangell families.

Even now the State director of the Farmers Home Administration for Alaska and Oregon, Robert Pierce, of Portland, is working with our State government to initiate surveys of the water and sewage disposal needs of Alaska communities with up to 5,500 population to see how they may be aided by comprehensive planning grants which are available through FHA.

It is my hope that the $25 million which has been voted by the Senate for Farmers Home Administration programs will be approved. The development of rural America is important. We must make it possible for the positive aspects of our society to reach all of its members. Much can be done through the Farmers Home Administration to realize this goal.

---

TAX-EXEMPT INDUSTRIAL BONDS

Mr. HARRIS. Mr. President, I have just received a concurrent resolution adopted by the Oklahoma State Legislature urging the continuation of the tax-exempt status of industrial revenue bonds. The resolution adopted by the Oklahoma State Legislature points out that the action proposed by the Treasury Department to discontinue tax exemption for industrial revenue bonds will adversely effect financing of industrial development in the State of Oklahoma, including the Oklahoma industrial financing authorities' second mortgage loan program—for which funds are obtained from sale of the State's obligation bond—county and city general obligation bonds, revenue bonds issued by public trust authorities, and the proposal of the Treasury Department operates to bring a virtual halt to the possibility of industrial development programs in many and especially the smaller communities in Oklahoma.

Mr. President, on March 26 of this year, I joined with the distinguished Senator from Nebraska [Mr. CURTIS], in cosponsoring an amendment to H.R. 15414, which reversed the proposed Treasury Department's action and restored the tax-exempt status of industrial revenue bonds. I cosponsored a similar amendment to the bill in the

Case 3:22-cv-00410-REP   Document 41-6   Filed 02/22/23   Page 125 of 145 PageID# 1431

Committee on Finance, and both these amendments were subsequently adopted by the committee and the Senate. Unfortunately, during the later consideration of the so-called Williams substitute for H.R. 15414, the amendments to continue the tax-exempt status of industrial revenue bonds were deleted. I stated during the debate on this topic that in Oklahoma it has been estimated that the discontinuation of the tax-exempt status for these types of revenue bonds would immediately block the employment of as many as 16,000 people. Twelve cities and 11 municipalities in Oklahoma are geared up to provide industrial plants under this type of financing, and at least $16 million of nonexpended bond funds could be frozen if the Treasury Department were to proceed with its proposal to discontinue the long-standing practice of allowing an exemption on these tax-exempt bonds.

My position on this matter is still firm in that I believe that a great deal of study and deliberation should be given to the proposal to discontinue tax exempt industrial revenue bonds, and I would hope that the proposal of the Treasury Department would not be implemented without the appropriate action by Congress authorizing Treasury to do so.

My colleague, the distinguished senior Senator from Oklahoma [Mr. MONRONEY], has also spoken out firmly in opposition to the proposed action by the Treasury Department to discontinue the tax exempt status of industrial revenue bonds. Senator MONRONEY fully realizes the importance of industrial revenue bond financing to the future industrial development and growth of our State and has fought vigorously to continue tax exempt bonds.

Mr. President, I ask unanimous consent to have printed in the RECORD, Enrolled Senate Concurrent Resolution No. 52 which expresses the position of the Oklahoma State Legislature with respect to tax exempt industrial revenue bonds and which was adopted on the 18th day of March, 1968, by the Legislature of the State of Oklahoma.

There being no objection, the resolution was ordered to be printed in the RECORD, as follows:

S. CON. RES. 52

A concurrent resolution memorializing the Congress of the United States to invoke its rightful power to determine a question of public policy and to nullify the recent rulings of the Treasury Department imposing a nonexempt status of financing for industrial development under Section 103 of the Internal Revenue Code; and directing distribution

*Whereas,* the United States Treasury Department has just struck a body blow to state industrial development financing by the issuance of Revenue Ruling 54–106, C.B. 1954–1, 28, Revenue Ruling 57–87, C.B. 1957–1, 65, and Revenue Ruling 63–20, C.B. 1963–1, 24; and

Whereas, said Treasury rulings constitute a reconsideration of the Treasury Department's position on the current tax exempt status of industrial development financing under Section 103 of the Internal Revenue Code; and

Whereas, such action adversely affects financing of industrial development in this State, including the Oklahoma Industrial Finance Authority's second mortgage loan program (for which funds are obtained from sale of this State's General Obligation Bonds), county and city general obligation bonds, revenue bonds issued by public trust authorities, and operates to bring to a virtual halt the possibility of industrial development programs in many, and especially the smaller, communities in Oklahoma; and

Whereas, the obvious result of the change in the Treasury's position will be to materially reduce reliance upon private and local capital for industrial development within this State and to force greater dependence upon Federal funds for such purpose, and is in direct opposition to the Johnson Administration's endeavor to reduce unemployment; and

Whereas, such Department ruling not only arbitrarily affects the rights and functions of the government of a free people but constitutes an arbitrary usurpation and invasion of powers by an agency which rightfully belongs to Congress as a matter of public policy.

Now, therefore, be it resolved by the Senate of the second session of the thirty-first Oklahoma Legislature, the House of Representatives concurring therein:

SECTION 1. That the Congress of the United States be, and is hereby respectfully requested to invoke its rightful power to determine a question of public policy and to nullify the recent rulings of the Treasury Department by which tax exempt status under Section 103 of the Internal Revenue Code is removed from financing of industrial development programs.

SECTION 2. That duly authenticated copies of this Resolution, after consideration and enrollment, be prepared and sent to each member of the Oklahoma Congressional Delegation and to the Chief Clerks of the Senate and the House of Representatives of each State.

Adopted by the Senate the 13th day of March, 1968.

CLEM McSPADDEN,
*President pro tempore of the Senate.*

Adopted by the House of Representatives the 18th day of March, 1968.

REX PRIVETT,
*Speaker of the House of Representatives.*

Witness my hand and the seal of my office at the State Capitol this 25th day of March, 1968.

BASIL R. WILSON,
*Secretary of the Senate.*

---

MILITARY PROCUREMENT PRACTICES

MR. DOMINICK. Mr. President, on several previous occasions I have called to the attention of the Senate certain practices in military procurement which I felt needed correction. In one of these instances, on September 19, 1967, I cited illustrations showing the need for the use of open competition in the procurement by the Army of a radio set which had the nomenclature AN/PRC-77, and its RT-841 radio transmitter.

The history of the procurement of this equipment showed that it was developed by RCA at a cost to the American taxpayer of $694,593. Under the first production contract awarded to RCA under date of June 26, 1966, for 5,737 units of the AN/PRC-77 radio set, the unit price was $1,222.34. This contract also included an amount of $54,834 for manufacturing drawings of this radio set. Supposedly, the purpose of obtaining these drawings was to permit the use of open competition on future procurements of this equipment.

However, on April 28, 1967, the Army negotiated a second noncompetitive production contract with RCA for 10,500 units of the AN/PRC-77 radio set, justified on the basis of "urgency of delivery and lack of manufacturing drawings." The price under this second noncompetitive production contract was $937.16 per unit. The total amount of this second production contract, including ancillary items, was $10,087,431.

In the exchange of correspondence which followed my remarks on the Senate floor during the months of September and October last year, Maj. Gen. William B. Latta, commander, U.S. Army Electronics Command, Fort Monmouth, N.J., informed me that future procurements of this equipment would be accomplished through the use of open competitive bidding.

Mr. President, I wish to advise the Senate that General Latta was true to his word. Invitation for bid No. DAAB-05-68-B-0218 issued by the U.S. Army Electronics Command for radio set AN/PRC-77 was opened in Philadelphia, Pa., on April 25, 1968. Twenty companies submitted bids to supply the 4,408 units the first year plus a multiyear requirement for 36,237 units of the AN/PRC-77 and 140 units the first year plus 3,286 units of the multiyear requirement of the RT-841.

As I expected, when the bids were opened, the price of this equipment dropped to almost half the unit price previously paid to RCA. Even RCA's unsuccessful bid dropped its own multiyear unit price to two-thirds the amount previously paid to RCA by the Army for this equipment. I think this case serves as an excellent example of the multimillion-dollar savings which can be accomplished in military procurement through use of open competitive bidding. General Latta should be commended for following through on this matter, and I hope that he will extend this procedure to many other procurement actions in the future. Very substantial savings to the taxpayers would result from this course of action.

Mr. President, on February 5, 1968, I brought to the attention of the Senate and the Select Committee on Small Business a failure on the part of the Naval Air Systems Command to make readily available to prospective bidders the essential technical information upon which to base their bids. Rear Adm. Joseph L. Howard, Deputy Chief of Naval Materiel—Procurement and Production—responded to my remarks by saying:

Senator Dominick is right. We do have to correct and improve our information setup insofar as keeping our bidders informed of where they can obtain proper bid packages, proper specifications, blueprints, drawings and whatnot. We have a program now in being that has just started in which the Naval Ship Systems Command, for example, places in its invitations for bids and its requests for proposals—wherever the reproduction of drawings, blueprints and plans is a highly expensive effort—we have given in our invitations lists of activities throughout the country where these may be inspected on the premises by anyone wishing to travel to these points.

Now, there are about 12 to 15 locations throughout the country where these may be seen.

We have, in addition to that, added terms in our invitations that they can write to

Washington to our Navy Publications and Printing Office and for a small price may obtain these drawings, blueprints, and whatever technical data that they require in order to make an intelligent bid.

Now, this program is just beginning. Naval Ship Systems Command has it in being. I have a sample of one of their invitations with me here. We have not installed that as yet in the Naval Air Systems Command.

Senator Dominick is correct. We should do so, and we will do so, and all the other systems commands will follow soon.

I should like to point out a further example to Admiral Howard to illustrate that following through with this procedure in other naval systems commands will produce significant savings for the taxpayer and prevent the abuses so often connected with noncompetitive sole-source procurement actions.

Among the many procurement actions which I have been following is one which involves an 8½-pound electronic device identified by the official nomenclature SB–973/SRR. This is a relatively simple piece of equipment that was designed to transfer the audio output of radio communications receivers to remote control station audio circuits. The complete assembly is housed in an aluminum cabinet 9½ inches high by 5⅛ inches wide and 7 inches deep overall. Under 10 contracts issued since 1962, this equipment has been purchased by the Navy without competition from the same manufacturer, Tabet Manufacturing Co., Inc., Norfolk, Va., at prices that ranged as high as $197 each for a quantity of 200 purchased in September 1966. The most recent price for 6,250 units, issued in March 1967, carried a unit price of $113.59.

I became interested in this procurement item when I learned that the Navy Electronics Supply Office, Great Lakes, Ill., was preparing to negotiate yet another noncompetitive sole-source contract with this manufacturer. I received a copy of a telegram which had been received by another manufacturer who sought to submit a proposal under this Navy request identified as RFP N00126–68–R–8L1003. In a single unpunctuated sentence, 205 words long, the telegram read as follows:

This telegram constitutes amendment No. 1 RFP N00126–68–R–8L1003 dated 8 Dec. 1967 and will be confirmed by formal amendment closing date is extended to 22 Jan. 1968 it has been determined that Tech Manual Navyships 94533T is not a part of the necessary specifications describing the material covered under this solicitation and would not be beneficial to any prospective offeror either in compiling an offer or in fabrication of required material further such manual is not readily available for distribution to prospective offerors by the Govt. therefore any inference to the contrary notwithstanding such manual will not be made available upon request and is not a part of the solicitation notwithstanding any representations either direct or implied as to the applicability of the clause of the solicitation entitled patent indemnity it is reaffirmed that such clause is in fact a part of this solicitation based on presently available information in the event additional facts if any are made available to the Government after the specified closing date revealing such inclusion to be inappropriate negotiation with the low offeror(s) will be undertaken for its deletion with a resultant equitable reduction in pro-

posal price US Navy Electronics Supply Office Great Lakes Ill.

A careful reading of this telegram disclosed that the Navy Electronics Supply Office intended to withhold from other prospective bidders the vital technical manual (Navyships 94537). Fortunately, this was brought to the attention of Mr. A. N. Spence, Director, Navy Publication and Printing Service, located here in Washington. Mr. Spence promptly proceeded to make this technical manual available to the entire electronics industry since this little handbook was actually carried as a stock item in the Navy Supply Depot, Philadelphia, Pa.

As a result of these actions by Admiral Howard and Mr. Spence, four valid bids were received. The price dropped to $80.10 per unit, saving the taxpayers a total of $123,080 this year over the price first quoted by the former sole-source supplier of this equipment before competitive bids were made possible in this procurement action.

I am sure there are many other equally valid examples where significant savings can be realized, and I urge Admiral Howard and the Navy to proceed at full speed with plans to expand the use of open competitive bidding in procurement transactions.

## HUMAN RIGHTS ADDRESS IN TEHRAN, IRAN, BY ROY WILKINS, U.S. DELEGATION CHAIRMAN

Mr. PROXMIRE. Mr. President, the International Conference on Human Rights at Tehran, Iran, now in its final week, recently heard Roy Wilkins, chairman of the U.S. delegation, present a scholarly report tracing this Nation's progress in the field of human rights.

Mr. Wilkins voiced hope for the continuation of the battle to obtain liberty and equality for everyone on an international scale.

Mr. President, the United States has always manifested concern for the rights of man and it is my view that we must face the responsibilities of human life, human rights, and the fundamental question of human dignity.

Mr. Wilkins' speech is most noteworthy. I urge Senators to read the remarks of this outstanding American and ask unanimous consent that it be printed in the RECORD.

There being no objection, the address was ordered to be printed in the RECORD, as follows:

ADDRESS BY ROY WILKINS, CHAIRMAN OF THE U.S. DELEGATION AT THE INTERNATIONAL CONFERENCE ON HUMAN RIGHTS, TEHRAN, IRAN, APRIL 24, 1968

In a world which is round there is no center. History, however, has central points and certainly a great many of these focus on this ancient land of Iran.

We are grateful for the opportunity to meet here and to enjoy the hospitality of a wise and progressive sovereign, to see the great material achievements of his reign, and to know first-hand of his dedication to the principles of human rights. The Shahansha's white revolution has brought new meaning to human rights in Iran, through his vast campaign for literacy, through rights for women, through social and economic development, land reform and other progressive programs.

We are certain that the President of this conference, Her Imperial Highness, Princess Ashraf, will preside with efficiency and fairness, and that under her leadership we shall do useful work.

During the darkest days of the last world war, President Franklin D. Roosevelt, whose wife became one of the principal architects of the Universal Declaration of Human Rights, met with Prime Minister Churchill and took a long look beyond the war towards peace and reconstruction. The President and the Prime Minister proclaimed the Four Freedoms: Freedom of Speech; Freedom of Religion; Freedom from Want and Freedom from Fear. Every human right enumerated since, political, civil, economic, social, including the twenty-nine articles of the Universal Declaration, are embodied within these Four Freedoms.

One may wonder why in the midst of a total war, whose outcome was then in doubt, and long before these same leaders met in this dynamic city, Roosevelt and Churchill should proclaim not a call to war but a call for human rights and fundamental freedoms. No doubt these statesmen then recognized the truth President John F. Kennedy later stated a few months before his death: "What is peace, after all, but a matter of human rights?"

It was in 1941 and it is today a fact of international life that most of the hot wars and uncertain peace are caused by deprivations, actual or threatened, of basic human rights. Warm and secure peace can only be founded on the confidence and satisfaction generated by respect for human dignity, which is the foundation of human rights.

The authors of the Four Freedoms did not engage in the sterile and useless debate over the relative merits and priorities of civil and political as compared with economic and social rights. They knew that all of these freedoms were interdependent just as all of the twenty-nine articles of the Universal Declaration are inter-related and are all priority items on mankind's agenda.

Nor were these author-statesmen naive. Surely they did not assume that a world striving to release Hitler's grip would soon be prepared for a human rights millenium. They sought as the United Nations did seven years later in the Universal Declaration to hold a goal before the world as an inspiration and a prod. In 1941 my country was apt to express an unbounded and I would say an unjustified pride in its human rights record. Measured by that of most other states, the United States did have then a fair record, but it was below the ideal. The United States possessed in 1941 the political and civil framework within which injustice, then confidently in force in a dismaying number of areas, would not permanently endure, but it was not the framework which it is now becoming and will someday be.

The deficiencies of the United States have largely been the result of a false sense of perception. The vision of the Universal Declaration and our association in the United Nations systems have been very helpful in expanding our sights.

It may be very much in point for me to outline the tortuous path by which the United States has corrected its past myopia about human rights, often by pain and once by a civil war.

We, of all people, should now know that the fabric of human rights is woven in many strands, many of which are broken in a process which is tiring and unending.

In 1787 when the United States Constitution was written, the charter was very advanced for its age but its protections were limited to civil and political rights. From most of these, one-quarter of the population was excluded as slaves and one-half as women. The fabric was certainly not complete.

In the 1860's a terrible war erupted over slavery—that supreme denial of human

rights. Following the war the Constitution was amended to abolish slavery, to guarantee equally to the freed man, and to enfranchise him. Elaborate supplementary legislation was enacted. The black man soon found that the promises of constitution and law, as in so many other countries, were illusory. Segregation, inequality, and discrimination persisted in other forms. The fabric was not complete—the American ideal remained a dream for the black man.

From 1876, the date of the last post-civil war civil rights bills, until 1947 the nation slept and the new Negro American citizen suffered. In 1947, a very short time before the UN proclaimed the Universal Declaration, President Truman's Civil Rights Commission gave the nation its report. It contained the then revolutionary sentence, "Racial segregation must be eliminated from American life." President Truman led the way by abolishing, through an executive order on July 26, 1948, racial segregation in all branches of the U.S. Armed Services. From that date on, the nation has moved from apathy to action. In 1954, our Supreme Court in a unanimous decision in a historic case, outlawed differentiation between citizens on the basis of race and thus, at last, brought black Americans under the umbrella of the U.S. Constitution. From 1957 to 1968, the Congress, overcoming opposition, filibuster, and other obstructions, has enacted five civil rights bills. After each, too many thought the fabric was completed. But many wise men knew otherwise. These acts were each forward leaps and were accomplished after the American public was outraged by what it learned from a free press, radio, and television or from arousal by public protests.

Many complain that the press and broadcast media in the United States focus excessively on the bad points in the country and not enough on its virtues. Nevertheless, the Birmingham police dogs, the murder of my co-worker Medgar Evers, and the creative protest of Dr. Martin Luther King, excoriating our society—all reported on television—have destroyed apathy, excited the American conscience, and have spelled the eventual doom of discrimination in the United States. Given freedom of speech, of press, of assembly and total access to the ballot box, any other reading of the American future is as false as it is cynical.

By 1964, when federal law opened up places of public accommodation to all Americans, many thought, "now the battle is over—the human rights fabric has been completed." It was not so. For Americans have discovered that poverty—often the end product of discrimination—cripples men. It often cripples so much that its victims cannot use newly gained economic and social rights. President Lyndon B. Johnson said it best: "Thus it is not enough just to open the gates of opportunity. All of our citizens must have the ability to walk through these gates." We Americans are merely beginning to implement a full panoply of economic and social rights which will validate the promise of American life.

There is not the slightest doubt in my mind about my country's glittering future for all Americans—black men and white, Indians, Protestants, Catholics, Jews and nonbelievers. Such a statement is justified by the confidence that the President of the nation, its courts system, and belatedly its national legislature, are fully committed towards this ideal—and the country will surely follow.

However, I confess my own myopia as I have my vision extended by the young people whose sights embrace more opportunities for self-expression and self-development than I ever dreamed for any generation. And other generations to follow will further expand the range of vision. The fabric of human rights is never completed—and may its borders never be limited by the sight of one group, one system, or one generation.

In the international field, we have proclaimed more human rights than we have implemented. The Universal Declaration is properly named. Its ideals are universally accepted but it remains a declaration and not a fact.

In part the problem is the unlimited claim of national sovereignty. I submit that under the United Nations Charter no nation is entitled to wrong its own citizens. Either the Charter provisions dealing with human rights have meaning or they are a cruel fraud. If these provisions are meaningful, they must carry their trust into the boundaries of member states. Human rights violations on this planet (except in Antarctica or outer space) occur in the territories of states.

Some contend that the UN system is incompetent to discuss human rights violations except in southern Africa or in association with hostilities. This is an artificial, contrived and unbalanced view—unsupported by the Charter or the principles of the United Nations.

The United States has benefited by criticism in the United Nations forum. Much of this has been ill-informed—some even mischievous—but no actual harm is done and much good has been accomplished. What I have said does not detract from the efforts of the United Nations to modify and hopefully to obliterate colonialism where it still exists and apartheid and other disgraces in southern Africa. Some day this discrimination by a minority against the majority must yield, even more certainly than that of a majority against a minority in my own country. I predict here the end of apartheid in South Africa—if South Africa is to survive.

However, the UN system lacks the machinery to implement its human rights standards. We have been great on production—and deficient in distribution. Admittedly in the present state of the art, the most effective implementation tool is the spotlight of international conscience and concern. However, this useful principle needs to be institutionalized in order to be focused for maximum effect. This is why we have been deeply interested in the Costa Rican proposal for a UN High Commissioner for Human Rights. We meet on the 20th anniversary of the UN Declaration of Human Rights. What will be the state of human rights around the world 20 years hence? How will the UN system contribute to this development? I have no answer but I can be forgiven a flight of imagination: a rising standard of living; a revolution in communications and technology; the escalation of expectations, material and spiritual. All these will excite populations everywhere.

No state in any system will be able to fence out ideas or fence in people. All shall learn from all and mankind will enjoy a communality now unrealized. There will be national differences, but there will be aspirations for expression and opportunity which will overleap all boundaries. States of every system must prepare to accept freedoms—with South Africa included—or accept the fate of states which cannot live with liberty and with change. Change, domestic and international, will require a commitment to action. As the President's National Advisory Commission on Civil Disorders, of which I was a member, stated: "A commitment to action—compassionate, massive and sustained—new attitudes, new understanding, and above all, new will."

We in the United States are not completely changed but the tortuous record I have reviewed shows that we have worked for change, inch after excruciating inch. This commitment and will of which I have spoken, now bright, now grim, must mark the way internationally if the world is to fulfill the promise of the unprecedented step by the United Nations in 1948.

The Universal Declaration points the way for ordered liberty. It encompasses two of the abiding principles of the great Iranian teacher, Zoroaster: "good thoughts, good words."

My country's flags are still at half-mast—mourning the assassination of my friend Martin Luther King, Jr. He used the freedoms of my land to free to free it of the dreadful heritage of slavery and its aftermath. His life had purpose and his death will have meaning if we adopt all three of Zoroaster's principles which I now leave with you: "good thoughts, good words, good deeds."

## THE BALANCE OF TRADE

Mr. PERCY. Mr. President, recent statistics show that the U.S. balance of trade has been seriously impaired and that a critical situation confronts us. The trade surplus in the first quarter of the current year was only $700 million, compared with $1.4 billion in the first quarter last year. Imports during this quarter are 15 percent higher than in the first quarter of 1967, whereas exports are only 3 percent higher. Even so, exports fell from February to March by 12 percent, resulting in an import surplus of $150 million for the month.

These are sobering statistics. There are a number of short-term, as well as fundamental, causative factors. Three of them are: The large volume of copper imports during the first months of the year, the dock strike in March, and imports resulting from steel hedging by users in this country in anticipation of a major work stoppage in the steel industry.

But there are also important fundamental economic factors at work shaping these adverse U.S. trade flows. Essentially, the continuing rate of domestic inflation creates a demand which is attracting imports, while at the same time U.S. exports are becoming more costly—and thus less competitive—in world markets.

The problems of the U.S. balance of trade are indeed serious. They underscore the urgency of necessary corrective action. A return to domestic economic stability through a tax increase and a reduction in Federal spending is very clearly in order. Such positive fundamental remedies are much preferable to regressive remedies such as border taxes, import surcharges and other barriers to trade. An excellent editorial published in the New York Times of April 26 contains a crisp analysis of the situation. I ask unanimous consent that it be printed in the RECORD following my remarks.

The PRESIDING OFFICER. Without objection, it is so ordered.

(See exhibit 1.)

Mr. PERCY. Mr. President, concern for the continuing balance-of-payments deficit of the United States is not limited to this country. It has caused wide international consternation as well. In fact, our foreign trading partners and our allies in various international organizations have strongly urged the United States to take those fundamental steps necessary to stabilize the domestic economy by reducing the deficit in Government expenditures, just as over the years we have urged them to put their fiscal houses in order. More important, while pointing to the essential remedies of the U.S. problem, these countries have

shown a sincere willingness to make important concessions on their own part to assist the United States to improve our payments position.

Particularly notable is the recent offer by the British and the other members of the European Free Trade Association, joined by Japan and other major trading countries, to speed up their application of the tariff cuts agreed to in the Kennedy round of trade negotiations, while allowing the United States to delay implementation of those same agreements. The European Community has recently indicated that it, too, would be willing to extend similar assistance to the United States, were the United States to promise to abolish by 1969 its special customs treatment for a limited number of chemical items, and to promise not to impose new trade restrictions.

Essentially, this offer was a fair one. The United States stands to gain meaningful assistance to improve its balance of trade: Accelerating European tariff cuts would give our exports a 3-year tariff advantage, while the delay in U.S. tariff cuts would tend to hold back U.S. imports. In exchange, the Community merely asked that the United States abide by commitments it has already made. In the Kennedy round we made a separate tentative agreement—which must be ratified by Congress— to abolish the special customs treatment for chemical dyes—the American selling price system or ASP—in return for meaningful European chemical tariff cuts, for a modification of the Common Market's discriminatory taxes on U.S. autos, for British cuts in tariffs on U.S. tobacco. Under the General Agreement on Tariffs and Trade, the United States and 74 other countries agree not to impose new import restrictions, particularly quotas, except under special conditions set forth in the GATT treaty.

Mr. President, the administration— particularly the Special Representative for Trade Negotiations—should take the Common Market acceleration offer very seriously. It should be treated at least as an important negotiable offer. At the same time, Europeans should understand that it would be difficult for the administration to promise to abolish the ASP system of customs valuation on dyes before the end of this year. The Europeans should consider that pressing fiscal and social legislation and the presidential election will very seriously complicate the legislative procedures that must be followed if ASP is to be removed.

Eric Wyndham-White, the astute Director-General of the General Agreement on Tariffs and Trade, has taken a leading role in proposing a solution that may be acceptable both to the United States and to the European Community. The Wyndham-White proposal is said substantially to meet the major U.S. conditions, as well as the European. If this is true, the administration should accept it, for the alternative that the administration believes itself forced to accept— a tariff surcharge on U.S. imports—would not only be an inappropriate remedy for the fundamental payments problem, but it would also seriously impair—perhaps destroy—our historically successfully re-

ciprocal trade liberalization policy. It would seriously alienate those groups in the United States which have defended and forwarded that policy. It would open the floodgate to a sweeping wave of protectionist pressure to reestablish general high level of tariff rates in the United States.

In addition to the New York Times editorial previously mentioned, I am pleased to note three additional editorials which also analyze and support a positive approach to the liberal offer of our trading partners. A Washington Post editorial of April 14 terms the Common Market's proposal a "fair tariff offer" and concludes that "there is nothing onerous about any of" the Common Market's conditions.

A Wall Street Journal editorial of April 17 calls the Common Market proposition "eminently fair." The Journal criticizes the administration's proposed tariff surcharges in these terms:

It's true that our trade surplus has lately been narrowed, partly by copper imports during the recent 8½ month strike. In addition, inflation is making U.S. exports relatively less attractive and imports relatively more so. The solution to this problem, however, is more responsible Federal financial policies—not new restrictions on imports.

An editorial published in the New York Journal of Commerce of April 23 states:

By encouraging U.S. exports to the Common Market during a period in which EEC is willing to suffer a damper on its own exports to this country, this offer very well could produce that $500 million reduction that President Johnson is seeking in our balance of payments deficit.

I ask unanimous consent that these additional editorials be printed in the RECORD.

There being no objection, the editorials were ordered to be printed in the RECORD, as follows:

EXHIBIT 1

[From the New York Times, Apr. 26, 1968]
THE TRADE DEFICIT AND COMMON MARKET'S
OFFER

The announcement that the United States imported more in March than it exported, combined with the record gold loss registered during the same period, gives fresh evidence of the toll that inflation has been taking out the economy. It is true that the deficit in trade last month was partly due to the eleven-day longshoremen's strike on the New York docks. Yet the once huge surplus that, year in and year out, the nation enjoyed in its trade with the rest of the world is now in serious jeopardy.

Comparatively little attention has been paid to the alarmingly rapid deterioration in the competitive position of the United States. The Administration has concentrated on plugging up the drains caused by private investment, tourism and aid, apparently taking it for granted that the surplus in trade would last forever. Even as late as last January the President predicted that the 1968 would see a trade surplus of over $4.5 billion which was mere wishful thinking in view of the shrinkage over the past three years.

It is easy to explain what has been happening. Demand for imports has been spurred by Washington's aggressively expansionist monetary and spending policies. At the same time, exports have suffered because American producers have been increasing prices relatively faster than their foreign competitors and they have also been hindered by insufficient export credit. In addition, the war in Vietnam

has brought much more rapid increases in military purchases than in military sales abroad. And if the war and inflationary pressure continue, it is safe to predict that the trade balance will continue to worsen.

The Administration can no longer ignore the frightening deterioration in trade. Nor will American industry. In fact, there is danger that the shrinkage in the surplus will provoke increased pressure for protectionist measures. Such a course would be economically suicidal, because it would stimulate rather than dampen domestic inflation and because it would trigger instant retaliation against American exports. In the long run, the once permanent trade surplus might become a permanent deficit.

A much more sensible way to attack the problem is, of course, through increased taxation. A rise in taxes will not halt inflation overnight. It might even lead to some further increase in prices as manufacturers seek to protect their profits. But it would slow down demand for goods, so that the accelerating increase in imports would be halted. And if military expenditures abroad could be reduced along with nonessential domestic spending, the nation would be in a position to regain its competitive stature in world trade.

The United States simply cannot afford a prolongation of complacency. The warnings have become more and more frequent, the danger closer and closer. Failure of Congress to take action in the near future is to invite a new attack on the dollar, with all the extreme danger that that implies.

Yesterday's announcement of the trade deficit emphasizes the desirability of accepting the Common Market's recent offer of temporary tariff concessions to the United States. If other large trading nations follow suit, the American trade balance should benefit by several hundred million dollars.

The Common Market offer does not go so far as had been hoped, but it probably went as far as was politically feasible. The two conditions attached to the offer, on French insistence, are unpleasant in their phrasing and time limit. But, in substance, the *quid pro quo* asked by the Common Market is minimal.

The proviso that the United States refrain from new protectionist measures or export subsidies was implicit in the Kennedy Round negotiation. The insistence that the United States repeal the protectionist "American Selling Price" system of chemical tariffs by January merely places a deadline on legislation the United States engaged itself to seek when it signed the Kennedy Round agreements.

The problem, of course, is that some import quota or other protectionist measure may pass Congress, attached to a bill that the President cannot veto. Or the Congress in this year's short session may postpone repeal of the A.S.P. system. Nevertheless, the Administration would do well not to resist the Common Market conditions, but to use them as further arguments with the Congress against protectionist action. Meanwhile, an important pitfall must be skirted.

The Common Market proposals would accelerate by one year the progressive tariff cuts the Europeans agreed to make during the Kennedy Round. They would also permit the United States to delay for one year in reducing its tariffs. It is unfortunate that this result could not be achieved simply by a faster acceleration of European tariff cuts, as Britain and West Germany proposed, rather than by a simultaneous slowdown in cutting American tariffs. Five years of negotiation went into achieving the Kennedy Round agreements, bringing near fruition three decades of American efforts in trade liberalization. A slowdown by any major country in applying the agreements, and particularly by the United States, could set a

dangerous precedent that later might undermine the whole compact.

[From the Washington (D.C.) Post, Apr. 14, 1968]

A FAIR TARIFF OFFER

Reactions to the contrary notwithstanding, the Common Market made a fair offer when they agreed to speed up their Kennedy Round tariff reductions and thereby strengthen the U.S. balance of payments. There are, to be sure, firm conditions attached to their proposal, but they come as no surprise. Economic relations among advanced nations are based on reciprocity, not generosity, and what the Common Market is asking in return from the United States falls well within the bounds of reason and sound economic policy.

The Kennedy Round tariff reductions are scheduled to be made in five annual installments from 1968 to 1972. The United States made its first reductions on Jan. 1 and the Common Market will make two reductions together on July 1, the date on which internal tariffs among the six countries are to be eliminated. What the Common Market proposes is that the United States be exempted from making any further reductions until January, 1970, while they make their third and fourth cuts in January, 1969, and July, 1970, and the fifth in January, 1972. The second and third U.S. cuts would be scheduled for January, 1970, and the fourth and fifth would be made at the beginning of 1971 and 1972. This timing would surely bolster the U.S. payments position in 1969.

In return for the tariff scheduling concession, the Common Market insists: that other advanced countries agree to accelerate their cuts; that the U.S. practice of basing tariffs on the American selling prices of certain products, rather than those of the exporting country, be abolished by 1969; and finally, that the United States take no actions that would restrict imports.

There is nothing onerous about any of those conditions. Unless other countries go along with the plan, the U.S. payments position would not be significantly strengthened. The American Selling Price tariffs are a protectionist abomination and some of the important Kennedy Round agreements—especially those that would ease the entry of U.S. autos into European markets—are already contingent on their abolition. Neither can there be any principled objection to the condition that Congress pass no protectionist legislation. No one gets a free lunch in a world dominated by national competition for trade.

[From the Wall Street Journal, Apr. 17, 1968]

A CHANCE TO KICK THE HABIT

The conditions placed by Common Market nations on their recent agreement to hasten tariff cuts are really in America's best interests. We hope Congress and the Administration will do their parts to comply.

In return for lowering tariffs next January 1, a year ahead of schedule, the Common Market asks that the U.S. revise a special duty on some chemicals and take no further protectionist measures this year. These requests, which will be a topic in talks with the U.S. and other major trading nations at Geneva today, are eminently fair. But there are serious doubts they will be met. Like other bad habits, protectionist measures remain tempting, easy to acquire, and devilishly hard to do away with once they are established.

Industrial lobbyists continue to pump up protectionist pressure in Congress. At the same time, as Richard Janssen reported in this newspaper, even some Administration "analysts" argue the U.S. may have to raise import barriers, torpedoing the Common Market agreement. They invoke this possibility in the name of our balance of payments, the very problem the Europeans

would help solve with their offer of accelerated tariff cuts.

Of course industry must be guarded from unfair, predatory foreign maneuvers, such as dumping. And limited protection may be justified for industries vital to national defense, although a tent has been spread here where an umbrella would suffice. But when protectionism is promoted and rationalized for such broad market industries as steel, chemicals and textiles as good for our payments posture, that is a bit much.

It's true that our trade surplus has lately been narrowed, partly by copper imports during the recent 8½-month strike. In addition, inflation is making U.S. exports relatively less attractive and imports relatively more so. The solution to this problem, however, is more responsible Federal financial policies—not new restrictions on imports.

It will do exports no good to protect industries whose prices have risen above world levels. Import barriers, moreover, have a way of damaging the domestic economy, as they blunt industry's incentive to compete. And price-supporting import curbs are certainly no remedy for an inflation which already strains Americans' purchasing power.

What tariffs and quotas also do, as the Common Market's confidential agreement warns us, is stimulate reciprocal barriers abroad, shrinking international trade. As a big exporter, the U.S. finds its advantage being expansionist, not protectionist.

The final folly of protectionism lies in its futility. If our current rise in imports were somehow attributable to failing American natural resources, technology or will, limitless tariffs and quotas couldn't sustain our standard of living, but would only make the inevitable decline more chaotic.

But the truth is more nearly that inflation aggravated by burgeoning demand and encountering inadequate restraint has given foreigners broader entry to our markets. At least part of the solution will be to go along with the conditions proposed by the Common Market.

Who knows? A little abstinence might help us kick the protectionist habit.

[From the Journal of Commerce Apr. 23, 1968]

DOWN TO THE WIRE

The six members of the European Economic Community have now made an offer that figuratively brings the United States right down to the wire. The conditions offered are admittedly tough, but in a world presently riddled with economic complexities they are quite simple. The EEC will accelerate its own Kennedy Round tariff cuts and permit the United States to delay its own for a year provided that this country agrees to eschew any resort to border taxes, import surcharges, quotas or other new protectionist devices in the interim. They also insist that this country abandon the so-called American Selling Price (ASP) by early 1969, as indeed, it has already promised to do.

By encouraging U.S. exports to the Common Market during a period in which EEC is willing to suffer a damper on its own exports to this country, this offer very well could produce that $500-million reduction that President Johnson is seeking in our balance of payments deficit, assuming that Canada, Japan and the EFTA nations go along, too. Perhaps not all at once. Perhaps not this year, but probably next year.

We think this an eminently fair proposition and we are encouraged by the fact that France and Italy, who have the most to lose from other tariff cuts already scheduled (theirs' being steeper than those of the other four EEC members), have endorsed it.

That it is in EEC's own self-interest to prefer this kind of agreement to a rash of American protectionist devices that may prove more or less permanent is interesting, but nowhere near as interesting as what the

American reaction is now to be. We think the facts of the matter are plain. It is probably even more in the interests of this country to accept the offer than it was in the interests of EEC to make it.

We quite understand that the policies of other countries (among them Japan and members of the European Free Trade Association) are involved. But for the moment we would like to limit consideration of the issues to the United States, on one hand, and to EEC on the other.

The facts are these: EEC buys more from the United States than this country buys from EEC. The six, in fact, buy a good deal more—about $1.3 billion more averaged over each of the last two years—than they sell in this country. This gives the United States a trading surplus with the EEC countries, regardless of its over-all balance of payments deficit. In addition to that, total U.S. direct private investments in EEC countries are put at well over $8 billion.

It is quite important that at a time when the over-all American trade surplus is shrinking, our commerce should not be further curtailed in terms of the EEC nations. As S. J. Rundt & Associates remarked last week "the 1966–67 trade surplus registered by Uncle Sam vis-a-vis the EEC would have been enough to cover better than half the official $4,929 million U.S. balance of payments deficit during that period—had we not been in the red elsewhere."

If it were up to the administration alone, we are confident this offer would be accepted, perhaps even gatefully, for it is clearly the best alternative available for everyone concerned. But Congress is being so heavily pressured to adopt piecemeal steps in the direction of protectionism that many sober people despair of an American-EEC quid pro quo. In an election year, it is said, it is futile to expect any demonstration of rationality from the Congress of the United States.

In view of the rather dreadful tax bill recently passed by the Senate (with its textile import quota rider), the cynics may not be altogether wrong. But we are not ourselves despairing at this point. It is customary in an election-year Congress to approach each new proposal within a very narrow context. Do important constituents want import quotas in steel? In chemicals? In textiles? Do they want crude oil imports further curtailed? Very well. Let's give it to them. And all too often the damage is done and acquires a degree of permanence on the U.S. statute books.

But one thing is surely different this year. With the firm offer from EEC waiting in the wings, Congress cannot nibble here and nibble there at the main-springs of our international trade policy without collapsing much of the entire structure. If it is going to indulge in its penchant for giving way to the individual claims of special interests, it is going simultaneously to reject the EEC offer, throw all manner of roadblocks in the path of U.S. exporters, and simply make our balance of payments and trading prospects worse than they are now.

The issue cannot this time be dodged, and that is why we are so hopeful that it won't be. It is true that 36 senators co-sponsored a measure to curb steel imports. It is also true—although this doesn't apply directly to the EEC countries—that 29 sponsored a measure to reduce oil import quotas.

But how many of these, and how many of the protectionist interests behind them, will persist in this course when confronted with the plain facts of the damage that will be done if they get their way? Those who do, alas, will have to accept their share of the responsibility for reducing a very promising means of lowering our balance of payments deficit to wreckage.

We accept, although reluctantly, the evidence that Congress does some very foolish things in election years. But they are usually

**12346**     CONGRESSIONAL RECORD — SENATE     *May 8, 1968*

small things. When the larger issues are properly presented, the House and Senate alike usually do the right thing, sooner or later.

If the wiser leaders of Congress and of the administration force what strike many as being minor measures into the larger context of our balance of payments deficit we think they may prevail, even though a lot of our contemporaries glumly expect the worst.

## HOW RIOTS ARE STIRRED UP

Mr. ERVIN. Mr. President, some very impressive and straight-from-the-shoulder remarks about the seriousness of riots and the need for more vigorous law enforcement in this Nation are featured in the U.S. News & World Report dated May 6, 1968. This article is an interview with the distinguished Senator from Arkansas [Mr. McCLELLAN,] who has become well known as an investigator of crime and lawlessness.

I am sure that countless millions of Americans are fully in agreement with the Senator's opinion that government officials have not been sufficiently vigorous in the enforcement of law and in prosecuting violators. The Senator makes an important point that militant groups should be made to understand that the Nation simply is not going to tolerate rioting. Rioters doubtless would change their behavior if they were impressed with the promise that as much force as is necessary would be applied to halt rioting, looting, and burning in every community where trouble threatened.

Senator McCLELLAN is correct in asserting that money alone is not going to solve the great social problem which threatens the peace and security of our Nation. He affirms the need for more jobs and better education for those who are willing to work and to learn. And he is not at all optimistic about an early end to the conditions which promote rioting and continued unrest in the Nation.

I ask unanimous consent that the interview of Senator McCLELLAN, published in U.S. News & World Report, be printed in the RECORD.

There being no objection, the interview was ordered to be printed in the RECORD, as follows:

How RIOTS ARE STIRRED UP: INTERVIEW WITH SENATOR McCLELLAN

(NOTE.—Are Government policies helping to prevent riots—or actually stirring Negroes to violence? When riots break out, is the Government moving swiftly and firmly enough to control them? Will the spending of billions of dollars in big-city slums really solve the race problem? For answers to such questions, members of the staff of "U.S. News & World Report" obtained the following exclusive interview with a veteran Senate investigator who is now studying riots.)

Q. Senator McClellan, how long have you been investigating riots?

A. The Senate Permanent Subcommittee on Investigations, of which I am chairman, began its study of riots last August.

In 17 days of public hearings we have heard witnesses on the rioting in four cities—Nashville, Houston, Detroit and Plainfield, N.J. Members of the Subcommittee staff have made preliminary investigations in several other cities, including Newark and Chicago. We have started looking into the recent riots in Washington, D.C. We will also get into other cities.

Q. What are the major conclusions that you have reached from these investigations?

A. I cannot say what may be the final conclusions of the Subcommittee. I can only express my own opinions, my conclusions up to this time. But what I say is supported and warranted, I believe, not only by testimony that the Subcommittee has heard, but also by information that the staff has gathered.

I think that a climate or condition has been created by agitators—and perhaps by an attitude of some Negroes, though certainly not a majority of them—a condition which was ready to be sparked by any incident that could be seized upon and built into a riot.

Q. Did you find any common pattern in the riots?

A. Of the four cities covered by our hearings to date, we definitely have established that militant agitators were present and had been holding meetings in three of them.

I would not say they were actually organizing a riot. They don't just decide that "we're going to have a riot in such and such a city at such and such a time."

But I would say that they were fanning the prejudices, deliberately inciting to riot, and were ready to, and did, seize upon an incident.

The three cities that I have in mind where agitators were at work are Nashville, Detroit and Houston.

Q. What do you think of the way the government has dealt with these agitators?

A. I do not think government officials have been sufficiently vigorous in the enforcement of law and in prosecuting them.

Q. What about the way the government has handled riots?

A. I don't think the government has been firm enough in its policy, in its enforcement of the laws against rioting, and in taking the necessary means and actions to prevent rioting or to stop rioting when it occurs. When I speak of "the government" here, I am speaking of government at all levels—not just the Federal Government.

Q. How do you feel about the policy of restraint that was used in the recent riots that followed the assassination of the Rev. Dr. Martin Luther King, Jr.?

A. It is hard to discuss a policy that has not been adequately defined for me clearly to understand it.

Of course, restraint should be used. The resort to force should only be done when it becomes apparent that there is the intention of rioting, with the plundering, burning and sniping that go with it. At the very inception, you can't know whether it is going to develop into a riot or remain an incident.

But when it becomes apparent that a riot is developing, I think then is the time to be firm immediately and give orders to use such force as may be necessary to stop it.

In some instances, in these recent riots, it appears that they waited too long to do this. I think they should have—and could have—been more firm and aggressive, and that they would have been more effective thereby.

Q. What is your opinion of the stand taken by Mayor Richard J. Daley of Chicago, that arsonists and looters should be shot?

A. I think if you can make rioters understand that force is going to be used, they won't riot. If a man knows he is going to be caught and convicted—or shot—he is not likely to commit a crime. We should make them understand that we are simply not going to tolerate rioting. This ought to come from the President of the United States. He should say: "We're positively not going to tolerate rioting, and we're going to use such force as may be necessary to prevent it."

If you say that and mean it, and people believe you mean it, much of this violence won't happen.

On the other hand, if you say, "Don't do anything to them," and try to placate them,

you're going to invite trouble—and more of it.

Now, that's my view. I'm not following Mayor Daley or anybody. I'm simply stating my own convictions.

Q. Have your investigations revealed instances when force was applied and did bring a quick end to violence?

A. I think when real force was applied it brought an end to some of this violence. I remember Houston particularly. It was brought to an end there. In Pine Bluff, Ark., recently the mayor said, "We're not going to tolerate it," and immediately called for the National Guard, and the minute they showed the force the rioting stopped. I think you had much the same thing in Miami.

Wherever officials take a firm position and the government stands by it with all the force it can command, so that people know what is going to be done, trouble may start but it's much less likely—and it will be ended quicker, in my judgment.

Q. Some people have suggested that if more force had been used in these recent riots the situation would have gotten out of control—turned into a revolution. Do you think we really have reached the stage in this country where we cannot enforce the law and dare not try?

A. I do not think so. The question is not whether we can. The question is: Do we have the will?

Q. Are present government policies, in your opinion, serving to reduce or to increase the danger of riots?

A. I think there are attitudes on the part of government and its leadership that tend to encourage and stimulate further dissent and resentment, instead of being calculated to discourage it.

I'm speaking primarily now of Washington. The tone is set at the top.

Just to begin with, take the "war on poverty." As it has been presented by the leadership, it gives a false hope to people. So many things are promised them. They get the impression that the Government could, if it would, lift them overnight out of their economic hardship, out of the ghetto, and put them in modern homes with good jobs and middle-class incomes and standards of living.

They are not being told the realities of life and the limits of what the Government can do for them. Then, when these promises are not fulfilled, these people become resentful and bitter.

Q. Have you found evidence of antipoverty workers, paid by the Government, contributing to the violence?

A. I don't want to go into detail about that at this time. But we have information about it.

For example, we had this case in Nashville where people were setting up and the Government was ready to finance a school that was, in my judgment, teaching racial hatred. The fellow who was to be the instructor in that school, Fred Brooks, testified under oath that he would even be willing to shoot the President's wife if that was necessary to further their cause.

I think it is tragic when the Federal Government is not sufficiently prudent or adequately concerned to prevent public funds from being distributed to or administered by people who have that kind of attitude.

Q. What other official attitudes or programs do you view as fostering violence?

A. I think there have been public utterances by Government leaders that could be interpreted as encouraging—certainly not as discouraging—violence, rioting, law violation and what is called civil disobedience.

The President of the United States, as I recall, once addressed a group on the White House lawn as "fellow revolutionaries." That certainly carried a connotation to dissident groups that he was very much in sympathy with methods used. Violence, of course, is

associated with a revolution. At a joint session of Congress, the President used the motto of civil-rights activists, "We shall overcome."

The Vice President of the United States once said in a speech at New Orleans that, if he lived under slum conditions, he could lead a mighty good revolt himself. In the same speech he also said that, unless Congress provides rent subsidies for the poor, "We will have open violence in every major city and county in America."

I dont' see how such statements can help having an impact on those who feel that they are oppressed and that the Government owes them something. If I were of the mood of these people and heard such statements, I might think that violence was at least being condoned.

Q. As a result of your studies, what do you feel is the best answer to the problem of rioting.

A. The best answer—particularly as a long-range solution—is to adopt measures and policies that will discourage further migration from the rural areas into the cities.

The Government, in my judgment, should encourage and assist industry to decentralize, and as it expands to build its plants in the open spaces, in the rural communities. There should be a housing program and other programs designed to get people out of city slums—those who are willing to work. And I'd associate with this a training program to prepare unskilled slum people for jobs.

This would give these people a better life—open up to them some of the opportunities they claim to want. It would also stop congesting the cities, help relieve the transportation and pollution problems.

If we could get people to move out of the slums to areas where there is work available, we will not have to spend as much on these ghetto areas. The slum landlords will soon wake up and begin improving their property if they want an income from it. At the least, it will keep the present conditions from worsening.

Q. What should the Government do to encourage the decentralization of industry to provide jobs in rural areas?

A. One way to encourage it would be by permitting tax-exempt bond issues by municipalities to induce industry to come in with new plants.

There are other methods that might be tried. Details, of course, remain to be worked out. But we should begin studying this problem and find ways to do it—instead of just talking about billions upon billions of spending in slum areas.

For example, last year the Committee on Government Operations reported a bill, passed by the Senate, to establish a Commission on Balanced Economic Development. The studies to be undertaken by that commission could point the way to finding some of the answers to our critical urban problems—jobs, transportation, crime, housing, pollution and lack of recreational facilities.

Q. Do you think such programs would induce many people to leave the cities?

A. I can't answer that with certainty. But I don't think that taxpayers who work and take care of themselves should be taxed to support people who prefer to a stay in a city slum and live on a dole. Of course, people have a right to live where they please. But there is no duty on the taxpayers to support them if they persist in living where there are no jobs, when suitable employment is available elsewhere.

People are always saying, "Oh, you've got to give these people more, you ought to give them more." Well, I'm in favor of educating people if they'll take an education. I'm in favor of getting them jobs if they'll work. I wouldn't oppose all expenditures designed to rehabilitate slum areas.

But I don't think the spending of billions of dollars in slum areas will solve the problem. I don't think we can spend enough money to do that job thoroughly. And I think this other approach to the problem is far less expensive and far more productive.

Why, the slum programs that people are talking about would cost billions upon billions, Governor Rockefeller of New York talks about 150 billions of dollars. Others, I believe, are talking about a program that would total some 350 billion dollars within the next 10 years.

I do not think that our Government can withstand that kind of impact on its fiscal resources. It just cannot afford it. Just printing money, if that's what we're coming to, will do greater harm to the poor than to anybody else.

Q. How do you feel about the recommendations made recently by the President's Advisory Commission on Civil Disorders?

A. Since I head a committee which also is conducting an investigation of riots, I don't think it would be appropriate for me at this time to comment unduly on that commission's report.

But there are some of its recommendations with which I do not agree. I think they have overemphasized two things in particular. They have overemphasized, and I believe erroneously so, the idea that the white race must bear the major if not the whole blame for the state of race relations today. That's an exaggerated accusation. And, second, I think the commission overemphasized the idea that the spending of money will cure all evils.

Q. The President's Commission spoke only about white racism. Have you, in your investigations, found a different kind of racism—a black racism?

A. I think that's apparent every day. You don't have to find it. It is forced upon you by statements that Negro agitators make that are carried by the news media every day.

And when you speak about white racism, I'm sure the commission didn't mean to imply that every white man is a racist. Likewise, when I speak of black racism, I certainly don't mean it to apply to every Negro. I'm talking about these militant groups, these agitators and organizations who preach violence and civil disobedience.

To preach civil disobedience is to sow the seeds of disrespect for law enforcement. For a citizen to say, "I will not obey a law because I think it is morally wrong"—well, if one citizen has a right to do that, regardless of his creed or color, then every citizen in the nation has the same right, and there could be neither law nor order nor a safe society if everyone practiced that philosophy.

Q. Would a stricter adherence to the law and a stricter enforcement of the law, generally, help to solve this problem of violence?

A. I think that is imperative if America is to survive. We've got to have better law enforcement. The increase in the crime rate and the attitudes of large segments of people toward law enforcement are endangering the internal security of our country—gravely so.

Q. Senator, to what extent have your investigations found subversive influences playing a part in these riots?

A. I can't say to what extent. I'm confident that subversive influences are present, though not in every instance.

I think the Communists are at work through every channel that is available to them to sow the seeds of discord and to exploit any dissent that they can find among our people. There isn't any question in my mind about that. I think you will find that Communists are right now planning to get into this "poor people's march" on Washington that is scheduled to begin soon.

Q. Is that march on Washington likely to produce violence?

A. I don't want to make any predictions on that at the moment. But there are many indications—from information that I get

through our Committee staff—that a large number of these radical militants will be present. What they will do, to what extent they will promote violence, I don't know. But they will be present.

Q. Do you see Congress facing growing pressure from such things as riots and the march on Washington—pressure to vote big new programs of aid? What is likely to be the congressional reaction?

A. Well, let me answer that this way:

I don't say that there is not anything that Congress should do, and that there are not some programs which would be advisable and quite proper and that maybe I would be willing to support.

But I can't see myself yielding to blackmail. Once Congress submits to intimidation of that sort, you no longer have a Government that is free to make a choice. We must not yield to threats and blackmail, or pay tribute to criminals. That's the way I feel.

Q. The way riots are growing, are we going to have to count on National Guard and Army troops instead of police to control them?

A. Oh, there's no question about that. We have to rely on the National Guard, at times, and Army troops as well. And I think they should be given special training to meet such contingencies.

Q. Is this diversion of military forces to riot duty likely to weaken the United States in its ability to act abroad?

A. Do you mean would it detract from the force that we could bring to bear in a war? Of course it could. Any weakness at home is a handicap. It could even be fatal, if it was on a large-enough scale.

Q. Are new laws going to be necessary to cope with this riot problem, or are all the laws that are needed already on the books?

A. I never say that no new laws are needed. You often find some law could be strengthened or some problem could be solved by a new statute. But the lack of laws is not our real problem. We have the laws to handle this situation much better than it has been handled. Our problem is a lack of vigorous law enforcement.

Q. You have talked of checking migration to the cities as a long-range solution. What would you suggest as a quick answer—something that would help in the long, hot summer that lies just ahead?

A. The very first thing that should be done is to announce a firm policy of not tolerating violence, and that federal forces will be made available whenever called upon. Let the mayors of cities and the Governors of States understand that the Federal Government is ready to support them and back them up in enforcing the law and preventing violence—especially mob violence.

This assurance should come from the President and the Attorney General. As I said earlier, the tone is set at the top.

Another thing: It's time to start being honest with these people. There's been so much politics played—just trying to get their votes. They're not being realistic about the situation. We've got to quit holding out false hopes and making promises that can't be fulfilled.

Q. Looking ahead, do you see any early ending to this wave of rioting that has swept the country in recent years?

A. Well, I regret to say I cannot have as much optimism about resolving this problem at an early date as I would like to have. I'm afraid it's a problem that is going to be with us for quite a long time.

You know, gentlemen, I think this country is in a very critical condition—critical with respect to our fiscal policies and with respect to law enforcement. And I don't know but what our condition is critical also with respect to our world commitments. It seems to me that we have overreacted to world conditions. The first thing I want to do is to preserve America.

## STEEL IMPORTS

Mr. HARTKE. Mr. President, the Senate Finance Committee on December 19, 1967, made public its staff study, "steel imports."

This comprehensive work was authorized following hearings by the Finance Committee in June, 1966, on my resolution calling for an investigation of the dramatic increase in steel imports which has occurred in the past decade. Testimony from various experts at that time pointed to the complexity and magnitude of the problem. The result was a conviction by the committee that such a comprehensive, expertly directed, study as that released in December was needed. The study itself warrants the conclusion that the Senate should carefully consider the merits of measures to deal with the problem, such as my bill, S. 2537, the Iron and Steel Orderly Trade Act. I have requested the distinguished chairman of the Finance Committee, Senator RUSSELL LONG, to schedule further hearings, following those held on this and related import measures last year.

Recently the Iron and Steel Institute reprinted the summary portions of the 500-page "Steel Imports" volume. Since this is the heart of the full document, and since I believe its wider dissemination will be highly useful, I ask unanimous consent that the excerpts appearing there, together with the AISI introduction, may appear in the CONGRESSIONAL RECORD.

There being no objection, the excerpts and introduction were ordered to be printed in the RECORD, as follows:

STEEL IMPORTS
(Summary of the staff study of the Committee on Finance, U.S. Senate)

BACKGROUND

For several years the American steel industry has been deeply concerned about the steadily expanding inroads of foreign steel and pig iron into domestic markets. The interest of the United States Senate was evidenced when on July 28, 1966, its Committee on Finance instructed its staff to undertake a study of the problem.

This study was completed late in 1967 and the Committee's Chief Counsel, Tom Vail, submitted the report to Chairman Russell B. Long (D., La.) on November 10, 1967. In his letter of submittal, Mr. Vail praised the work of Dr. Robert M. Weidenhammer as co-ordinator of the study. Dr. Weidenhammer is professor of economics at the Graduate School of Business, University of Pittsburgh.

Mr. Vail reported that Dr. Weidenhammer and his associates gathered data from Government agencies, American Iron and Steel Institute and other industry representatives, labor organizations, importers of foreign steel mill products, independent steel service centers, iron and steel scrap exporters, exporters of coal to foreign steel producers, iron ore exporters, U.S. and international finance agencies financing new steel industries in developing countries, and the steel industry federations of the United Kingdom, of the six member countries of the Common Market, and of Japan.

The study is published only for the information of the public and does not reflect the approval or disapproval of the Committee or any of the Committee's members.

American Iron and Steel Institute has reproduced from the report the portions designated "Introduction," "Summary of Conclusions" and "Summary of Factual Findings." We believe this is a valuable addition to the documents available on the subject of the steel import problem, a problem of concern to all Americans.

INTRODUCTION

The Nation has become accustomed to periodic bouts between major steel producers and the executive branch of the Federal Government. From President Truman's threat in 1949 to expand steel capacity by constructing Government-owned plants to President Kennedy's confrontation with the industry, forcing a price rollback in 1962, we have witnessed numerous charges and countercharges between the two parties. Tempers have been lost on both sides, and emotional statements have added fuel to the fire of the disputes.

Most often the friction has arisen over decisions by the steel industry to raise prices. The Federal Government has been and is concerned with the overall inflationary effect of an increase in the price of "our single most important industrial material." The industry, concerned with maintaining reasonable profits and its need to finance the modernization facilities in the face of rising costs, has felt justified in its decisions to increase prices.

A relatively new but related problem has arisen for the steel industry—the problem of maintaining competitiveness in the face of a growing volume of imports and substitutes, while at the same time preserving a reasonable profit level. This is the problem to which this study is addressed.

The steel import problem (as it is referred to in this study) is complex, intertwined not only with the economic and technological trends in our own industry and economy, but also with economic, managerial, and sometimes Government-directed political factors abroad. The problem is related to a determination by a host of newly emerging nations to establish steel industries of their own and to policy decisions by aid-giving governments and financial institutions to assist in their establishment. Trade and taxation policies, by other countries, aimed at subsidizing production and exports while restricting imports have also aggravated the steel import problem.

A study of so complex but highly important a subject as this requires an objective analysis of facts—facts on foreign and domestic costs, prices, trade practices, and financial conditions, none of which are easily obtainable. This difficulty was highlighted by Secretary of Commerce Alexander Trowbridge, who testified before the Senate Finance Committee on June 2, 1966, that:

"The hard core of the facts needed to judge this situation—those on foreign and domestic product costs and pricing—are not now available and probably are difficult to obtain. Without, at least, some data of this kind, however, a study would be inconclusive."

After a careful but mostly fruitless investigation of all sources of public information available, it was decided to seek information on worldwide costs and prices from all available private sources and through careful scrutiny of the balance sheets and profit and loss statements of major steel producers at home and abroad. This effort revealed sufficient "bargain basement pricing" by some foreign producers to conclude that comparable costs alone were by no means the basic issue.

World overcapacity of steelmaking facilities has caused some foreign steel industries to unload their surplus production on the U.S. market at prices at or below cost. In some countries they have been abetted by governments through the remission of taxes and through subsidies. In contrast, the U.S. steel industry has been unable to maintain its exports, in part because of a multitude of nontariff barriers encountered abroad, and of the lack of U.S. export incentives.

Unused capacity for steel also exists in this country. The steel industry management argues that such excess capacity is needed to meet cyclical and seasonal peaks of demand, and for national emergencies. It subscribes to the philosophy of adjusting output to demand rather than producing at rates in excess of demand and unloading the surplus on foreign markets.

The U.S. steel industry is concerned about the steadily expanding volume of foreign imports. If foreign steel-producing industries were run like prudent private enterprise in this country, the problem of the U.S. steel industry would be less troublesome. Unfortunately, however, foreign steel industries have thrown steel on the world market, especially the largest and least restricted by nontariff barriers, i.e., the U.S. market. As the High Authority of the European Coal and Steel Commission (ECSC) stated in its official report for 1966:

"The rapid expansion of new world steelmaking capacity and the slow scrapping of older plants caused prices to collapse."

Moreover, as stated in a recent report of the British Government (August 1967):

"Severe competition, induced by the surplus, has weakened prices to the point where much of the international trade is unprofitable and in many cases does not even cover full production costs."

In July 1967, the ECSC published its formal estimate that between 1966 and 1970 world steel capacity would expand by some 33 million tons a year (to 738 million tons by 1970), a figure which substantially exceeds foreseeable world demand. There is, therefore, reason to fear that foreign steel industries will not act prudently and adjust output and prices to levels permitting a reasonable return on sales and investment. The concern is that foreign producers, facing further deterioration of their financial status, will continue to sell increasing quantities of steel in the United States at prices which do not reflect their full direct and indirect costs, with the collaboration of their respective governments.

Forty-two percent of the world's steel capacity is government owned.[1] Moreover, cartel-like associations and subsidies are already at work and full or partial government ownership or control may lurk at the end of the road for many foreign steel industries, as a result of their recent financial difficulties.

It was not until the 1950's that the domestic steel industry faced the competition of substitutes and not until 1959 that imports became a challenge. Generally speaking, the industry, while less dynamic in reacting to shifting trends than some other industries, has been run by prudent management as is evident in its sound financial condition today. It faces no insurmountable problems except for the prospect that continually rising imports from lower cost or subsidized producers abroad could seriously weaken its market position.

A prudent businessman in a good financial position can usually outlast his competitors who sell at or below cost, because their days will be numbered. But no private enterprise industry can, in the long run, survive in competition with foreign industries that have become "instruments of government," unless its own government lends assistance against subsidized imports and against obstacles to exports.

SUMMARY OF CONCLUSIONS

If the trends indicated above persist, the Nation must be prepared to see steel imports ultimately reach such high percentages of the markets for certain steel products as to render them unprofitable for the domestic industry to make.

It would be unrealistic to expect an uninterrupted flow of imports when this country might most need them, i.e., in case of a major national emergency. Even in times of

---

[1] In the "free world," not including the United States, 28 percent of steelmaking capacity is government owned.

*May 8, 1968*      CONGRESSIONAL RECORD — SENATE      **12349**

peace, steel imports may be interrupted for any number of reasons. Japan might choose to export only to its Asiatic neighbors, and Western Europe may concentrate on supplying Eastern Europe. It means courting a possible future national ordeal if such a highly strategic industry as steel should be permitted to drift into even partial decay. After all, it is the strategic importance of steel in other countries that has brought about most of the problems that beset our steel industry today.

This study identifies the basic issue of the steel import problem by analyzing it in the framework of the world steel industry where capacity has (and continues to) outrun demand, causing a world steel surplus. In developing countries, new steel industries are being financed through foreign aid often motivated by the political rivalries between the United States and the U.S.S.R. In contrast, the traditional steel-producing countries are installing new capacity precisely because the world surplus of steel has depressed world steel prices. Therefore, the availability of radically new and cost-cutting technology promises relief from low-profit margins or losses, but it also increases still further: debt, fixed charges, and overcapacity; the latter because of a hesitation to scrap facilities still using the old techniques.

At present, the financial structure of the U.S. steel industry is sound relative to that of its major competitors, but recent trends indicate danger ahead.

Aside from the basic issue, the world surplus of steel, the study has analyzed the domestic record of the U.S. steel industry. While finances were prudently managed, the industry's unit labor costs and capital output ratios show trends that compare somewhat unfavorably with other U.S. industries, especially in the last decade. There can be no doubt that the periodical poker game atmosphere preceding wage agreement expiration dates, and the roller coaster cycle of inventory accumulation and liquidation has damaged the competitive stance of the industry. It has exposed the steel industry to invasion of its markets by imports and substitutes, and has left lasting damages to the industry's output, employment, and profits.

An important managerial problem facing the U.S. steel industry today is how to overcome the lower wage rates abroad, especially in Japan, by heavy investment in new technology. Aside from the fact that foreign producers are also modernizing their facilities, often with assistance from their governments, these investments are greatly increasing the fixed charges of the domestic industry. Unless the output of the U.S. steel industry increases by some 2 to 2½ percent a year, such fixed charges can only mean higher, rather than reduced, costs per ton of output, and, therefore, smaller rather than higher profits.[2] This would result in less funds being available from retained earnings and the capital market for investment in research and modern facilities.

Specialty steels are constantly being developed through research for national defense and space projects. Quite aside from defense, the viability of the domestic steel industry is a problem of national welfare. Steel is still the backbone of any industrialized economy. In the United States it still accounts for 95 percent of the weight of all metals and the bulk of all processed materials used in manufacturing. If in certain product-lines imports exceed, say, 60 percent of domestic consumption, domestic facilities might be scrapped, and labor shifted to other industries. Any cessation of imports at that stage, for whatever reason, would constitute a major problem to uninterrupted output of the steel-consuming civilian economy.

[2] Evidence of this was provided in the first half of 1967 when a 7-percent decline in shipments was accompanied by a 28-percent drop in profits.

It is by no means clear, however, whether such specific recommendations as a temporary levy on imports or a rollback quota would, at this time, be in the best long-term interest of the country or even of the industry. However, some responsible, short-term measure along these lines may be the prod needed to cause the steel producing nations of the world to join together in an effort to solve problems of world steel in a manner calculated to serve the best interests of all of them.

The United States singly, or in agreement with the U.S.S.R., might deemphasize the financing of steel-producing facilities in favor of financing steel-consuming industries in developing countries. This would ease the overcapacity problem which contributes to our import difficulties. In addition, a world conference of the governments of major steel-producing countries to discuss common interests in adjusting the pace of steel capacity expansion to the pace of world steel demand would be beneficial. The chances for the lasting success of this conference would be greatly enhanced if the sympathetic interest of the U.S. Government in safeguarding the industry is recognized by the countries now enjoying a market for their steel exports to this country.

A world conference may eventually restore prosperity to the world steel industry and thereby solve the problems that now concern the domestic industry. The U.S. Government should participate in such a conference with a full understanding of all the implications of the somewhat ominous trends that imperil the U.S. steel industry's future.

There is also an urgent need for fairer rules in international steel trade. Today, our steel industry must compete in the face of foreign export subsidies favoring steel imports into this country and nontariff barriers frustrating U.S. steel exports. European and Japanese steel cartels may also be contributing to unfair trade practices abroad. If fair rules of international steel trade can be achieved, the industry should be able to expand both its domestic and foreign markets. Plastics and other substitutes would still be a constant challenge to make better steels at lower costs and to clad them with aluminum or plastic, if feasible. The steel industry's great and fully intact capital resources, its highly trained engineers and labor force and its competent management and emerging research staffs should be able to preserve and develop further this important and strategic industry.

**SUMMARY OF FACTUAL FINDINGS**

(1) U.S. steel production has fallen from 61 percent of world output in 1945 to 26 percent in 1966, and will probably drop to 21 percent in 1975. Between 1947 and 1966 Japan's share of world steel output has increased tenfold, Italy's tripled, the U.S.S.R.'s doubled, and Red China produced more steel in 1966 than any country had in 1947, with the the exception of the United States and the U.S.S.R.

(2) Annual growth rates of steel production since 1900 have progressively declined in the United States and increased in the rest of the world, as shown below:

[In percent]

| Year | United States | Rest of world |
|---|---|---|
| 1900–18 | 7.4 | 4.4 |
| 1920–45 | 3.2 | 3.7 |
| 1950–66 | 1.4 | 8.3 |

(3) World steel capacity on January 1, 1966, has been estimated as 590 to 600 million tons (MT) compared to world output in 1966 of 520 MT, leaving a surplus capacity of 70–80 MT. An official estimate of the ECSC published in June 1967 projects annual increases of 33 MT in world capacity to 1970. This study estimates increases in world

demand of only 20–25 MT, indicating a progressive aggravation of the world steel surplus problem.

(4) Because the U.S. steel industry promptly adjusts output to orders and in the Communist countries output and capacity are about equal, the rest of the free world has a surplus capacity of some 45–55 MT.

(5) The Kennedy round will result in a five-stage reduction of U.S. steel tariffs, from a weighted average of 7.44 percent in 1966 to 6.5 percent in 1972. Other major countries reduced their tariffs on steel generally by more than the United States, with the result that steel tariffs are now more closely harmonized among major countries. This does not, however, take into account the very high and rising nontariff barriers, which foreign countries use to their advantage.

(6) In 1966, the balance of trade in steel was:

|  | Million tons | In billions of dollars |
|---|---|---|
| Imports | 10.8 | 1.313 |
| Exports | 1.7 | .635 |
| Net imports | 9.1 | .678 |

Imports were 12 percent of domestic shipments (90 MT) and 10.7 percent of domestic consumption (104.4 MT).

Excluding AID financed exports, the deficit was $899 million. When end-use products (machinery, trucks, etc.) are included, the deficit was reduced to $496 million. Adjusted further to include net trade in steelmaking raw materials (iron ore, coal, scrap the deficit was $499 million.

(7) Overvaluation of the dollar cannot be considered a cause of increasing steel imports. The general price level between 1957 and 1965 rose faster abroad than in this country.

(8) On the basis of research and development (R. & D.) as a percentage of sales, the steel industry ranked among the lowest of 19 major U.S. industries. The largest export industries, in relation to sales, were shown by those with the highest ratios of R. & D. to sales.

(9) Steel imports are not yet a dominating factor in the regional growth of domestic steel production. Regional population shifts and relative growth rates of steel-consuming industries are more relevant factors at present.

(10) Between 1947 and 1966, the steel industry has decreased somewhat its relative standing among major industries in sales, profits, Federal income taxes, cash dividends, total assets, total employment, and total payroll, but has increased in capital expenditure and value added.

(11) Steel demand actually declined in this country between 1957 and 1963 due to these factors:

(a) A shift in GNP from durables to services.

(b) Long-term downward trend of certain steel-consuming industries such as railroads and oil-well drilling.

(c) Stronger, lighter gage steels and a trend toward lighter functional designs.

(d) Corrosion resistant steels increase life expectancy of products made from steel.

(e) Increase of competition from substitutes (plastics, aluminum, and other light weight nonferrous metals, etc.).

(12) Steel prices rose between 1946 and 1957 by 132.5 percent compared to 60.8 percent for all industrial commodities. This was caused by managerial decisions to obtain funds internally rather than through the capital markets in order to increase capacity and to find new sources of iron ore. Unfortunately, these higher prices resulted in greater competition from imports and substitutes thus thwarting the objective for which they were imposed. From 1957 to 1966, steel prices rose by 7.7 percent while prices of all industrial commodities rose by an

average of 5.5 percent. However, steels were of improved quality by 1966 and the yield of finished steel products from raw steel had declined from 75 (1959) to 67 percent, accounting in part for the steel price increases.

(13) In 1966, the steel industry ranked in 39th place out of 41 major industries in the ratio of net profit after taxes to net worth. As a result, steel equities sold at 81 percent of book value compared to 196 percent for all industries, and at only 9.5 times earnings compared to 15.2 for all industries.

(14) For the years 1956–66, capital expenditures exceeded cash flow (depreciation, depletion, amortization, and retained earnings) by $1.2 billion. As a result, long-term debt as a percentage of net worth and debt rose from 15 to 24 percent. Interest costs as a percentage of sales rose from 0.4 to 1 percent. Working capital was still satisfactory at 225 percent of current liabilities, but the liquidity of working capital as measured by the percentage of cash and securities had fallen from 72 to 49 percent.

(15) An analysis of the financial statements of U.S. and foreign steel producers shows the following salient facts:

(a) *Current ratio.*—Standard U.S. managerial practice requires that current assets should be, at least, double current liabilities. With the exception of the British and Dutch companies, none of the West European or Japanese industries approach this standard. For Japan, current assets are only 117 percent of current liabilities, and for Italy, only 77 percent.

(b) *Profits after taxes as a percentage of total assets.*—U.S. profits ranked 39th out of 41 major U.S. industries in 1966, but they were 5.7 percent compared to 0.5 percent for Belgium, 1.5 percent for Germany, 0.3 percent for France, 1 percent for Italy, and 2 percent for Japan.

(c) *Total debt as a percentage of total assets.*—For the United States, debt as a percent of total assets was, in 1965, 34 percent as compared to 60 percent for Germany, 65 percent for France, 73 percent for Italy, and 69 percent for Japan. The German steel industry reported that for most producers long-term debt is about 180 percent of equity, which means that creditors own about two-thirds of the German steel producers.

(16) The decline in European profit margins and future profit expectations is clearly reflected in the nearly 50-percent reduction in investment between 1963 and 1965, while the United States showed almost a 50-percent increase. Data for 1966 would show a continuation of these diverse trends.

ANNUAL CAPITAL INVESTMENT PER ANNUAL TONNAGE OF RAW STEEL OUTPUT

| Year | United States | Japan | ECSC | United Kingdom |
|---|---|---|---|---|
| 1965 | $15.2 | $12.3 | $10.9 | $5.1 |
| 1964 | 13.9 | 11.6 | 15.9 | 5.9 |
| 1963 | 10.5 | 14.6 | 20.1 | 9.4 |

(17) By investing at an annual rate of $2 to $2.5 billion for the next 5 years, the industry expects to lower its cost of making carbon steel by about $5 a ton, assuming other costs remain constant. Even if we assume annual plant and equipment outlays of only $2 billion, depreciation charges alone in 5 years would be higher by $0.4 billion or by about $4 a ton. Unless output increases by at least 2 to 2.5 million tons annually and at prices fully compensating for all cost increases, the industry cannot expect to improve its stance in competition with foreign imports.

(18) The price differential for domestic buyers between domestic steel and imported steel appear to be in a range of $20 to $25.

(19) To gage the present competitive position of U.S. steel products in the home market, an attempt was made to compare domestic prices and average cost with average costs of Japanese and Western European steel producers. Because costs vary greatly between Western European countries, and in each country between companies and even individual plants of the same companies, and because they depend on accounting practices, it cannot be emphasized too strongly that the data given below are merely for benchmark purposes.

AVERAGE COST AT MILL AND DELIVERED TO U.S. CUSTOMER FOR A TON OF CARBON STEEL PRODUCTS

|  | United States | Japan | Western Europe |
|---|---|---|---|
| Average production costs at mill | $133 | $100 | $116 |
| Average cost delivered to U.S. customer | 163 | 127 | 143 |
| Differential between U.S. and foreign delivered costs | | 36 | 20 |

On the basis of the producer's average cost of carbon steel products delivered to U.S. customers and a price differential of $20 to $25, the Europeans appear to sell here at cost or below, while the Japanese steel industry would still make a profit of from $16 to $20 a ton if it sold at a differential of $20 to $25 a ton.

These profit margins still have to be qualified in two ways:

(a) While Japanese mill costs are below Western European mill costs, and while cost of entry (transport from mill to port, ocean freight, tariff, and U.S. freight from port of entry to U.S. customer) are roughly equal, the average prices f.o.b. foreign ports in 1966 actually were as follows:

| | |
|---|---|
| ECSC | $99 |
| Japan | 112 |
| United Kingdom | 114 |

The reason is found in the much higher grade product mix (cold-rolled sheet and strip) of Japanese and United Kingdom imports than of ECSC imports. Profit margins, however, would still be determined basically by costs at the mill.

(b) Indicated profit margins would exist only insofar as foreign steel mills were to sell directly to U.S. customers. If mills sell through Japanese trading companies, which may charge as high as 30 percent commission, their profit margins would be decreased in proportion. If Western European mills sell through domestic importers, their margins of profit or loss would be changed in proportion to the importers commission.

(20) Charts (and tables published in the statistical appendix) show imports of foreign steel have been stimulated by the periodical fear of steel shortages resulting from expected or actual steel strikes.

(21) For the years 1947–66 the average annual rate of increase in unit labor costs for all manufacturing industries compared with the steel industry were:

[In percent]

|  | All manufacturing industries | Steel industry |
|---|---|---|
| Output | 3.6 | 1.7 |
| Total compensation per man-hour | 5.0 | 5.7 |
| Output per man-hour | 2.9 | 1.7 |
| Unit labor cost | 2.0 | 3.9 |

(22) The capital-output ratio measures the dollar amount of capital needed to produce a dollar of value added, and thereby indicates the productivity of the invested capital. When this ratio and the unit labor cost ratio discussed above rise, profits are squeezed; when they fall profits improve. For the domestic steel industry gross (undepreciated), plant and equipment per dollar of value added had doubled between 1947 and 1966 from $1.26 to $2.52, which, compares

with a decline from $0.95 to $0.86 for all manufacturing industries (1947–55; 1966 data not yet available). This evidence is probably unexpected because of the new technology, such as the basic oxygen furnace (BOF) and continuous casting, greatly reduce investment per ton of output. Competition on a quality basis, however, has forced the domestic steel industry to invest even more in new, costlier finishing facilities than in cost-saving BOF's.

(23) Hourly steel labor costs in 1966 were $4.63 in this country compared with $1.87 in West Germany, $1.76 in Italy, $1.53 in France, and $1.10 in Japan. It is quite true that between 1960 and 1964 these hourly labor costs had increased by 61.2 percent in Italy, 41.9 percent in Japan, 40 percent in France, and 32.2 percent in West Germany as compared to only 14.1 percent in the United States. But even if one were to assume that hourly labor costs here and abroad were to rise from 1964 at the same rates as shown above for 1960–64, it would still take the following number of years for foreign wages to catch up with U.S. rates:

| | Years |
|---|---|
| Italy | 11 |
| France | 21 |
| Western Germany | 23 |
| Japan | 26 |
| United Kingdom | 39 |
| Luxembourg | 54 |

It is true that output per man-hour abroad today is still below ours, but it has been rising faster abroad. According to an official but unpublished British calculation, output per man-hour in the United States increased by 15 percent for all employees and by 20 percent for production workers between 1955 and 1965, while in Japan (for all employees) it increased 250 percent.

(24) Seven domestic steel facilities have been dismantled or idled as a result of rising imports. The impact on employment is difficult to gage, however, because during the years 1964–66 the United States experienced increased domestic production of steel despite sharply rising imports.

(25) Despite higher prices, Federal income taxes paid by steel companies in years 1958–66 average less than 70 percent of those paid in 1951 and 1955–57, due primarily to lower profits.

(26) Steel imports during the first half of 1967 approached 13 percent of domestic shipments and were over 40 percent for certain specific products.

(27) The adverse effects of a reduction in output by 7 percent on costs per ton, caused in part by heavy fixed costs (depreciation, maintenance, interest, and property taxes), were again shown in the first half of 1967 when, compared to the first half of 1966, profits declined by 28 percent. During the comparable periods, imports had risen from 4.6 million tons to 5.2 million tons.

---

CREDIBILITY GAP OR REALITY GAP?

Mr. GRUENING. Mr. President, on the eve of talks between the Governments of the United States and North Vietnam in Paris, many hope that the negotiators on both sides will negotiate on the basis of facts as they really are and have been and not on the basis of a misreading of history or a faulty understanding of current facts and potentialities.

I would hope that the negotiators on the part of North Vietnam would not underestimate the military might of the United States or the valor and proficiency of the American fighting men. As I have said, the United States has the military capacity to lay waste all of North Vietnam—although I would vigorously oppose a decision to do so.

On the other hand, I would hope that the negotiators on the part of the United States will bear in mind at all times not the official pronouncements distorting the reasons for the constantly escalating U.S. military involvement in Vietnam but rather the facts as they really are: how the United States promised not to disturb the Geneva accords, and then promptly proceeded, through a puppet government which it set up in Saigon, to subvert the provisions forbidding the re-arming of South Vietnam and the provision requiring reunifying elections to be held in July 1956; how the United States is in Vietnam. at its own invitation in violation not only of the Constitution of the United States, the Charter of the United Nations, and the SEATO Treaty; and how the United States has constantly turned an unseeing eye on the strength among the people of South Vietnam of the National Liberation Front as a very real power to be reckoned with in any negotiations to bring about a cessation of hostilities in Vietnam.

If peace is to come to Vietnam, the U.S. negotiaors will have to be realistic. Will they be?

Considerable doubt on that score is cast by Pulitzer Prize winning correspondent, David Halberstam, in an outstanding article, entitled "Bargaining With Hanoi," appearing in the May 11, 1968. issue of the New Republic.

Washington—

Mr. Halberstam writes—

suffers less from a credibility gap than a reality gap. Our leaders are not lying, not distorting so as to mislead the public (that which they distort for the public they have already subconsciously distorted for themselves). They believe what they say. They are, nevertheless, wrong and have been wrong from the start. If the war goes on for five more years they will be wrong for five more years. They understand neither the war, nor the enemy, nor their allies. We have been trapped by the felt need to justify our previous estimates of what we and they could do.

It is this self-deception concerning the origins and present state of the U.S. military involvement in Vietnam which may prove to be the biggest stumbling block to any meaningful achievement on the part of the U.S. negotiators in Paris.

The American military establishment in Saigon—

Mr. Halberstam continues—

has consistently underestimated the capacity, the intent and the psychology of the enemy, and consistently overestimated the capacity and effectiveness of the Vietnamese fighting on its own side, believing its own and its allies' reports and statistics, never questioning too closely for fear of what it might learn. In order to justify its earlier forecasts, it has systematically encouraged positive reporting.

There can be no greater danger to an individual or to a nation than self-deception. This will be especially important in the negotiations at Paris.

The road of the negotiations will "be long and hard," writes Mr. Halberstam, because "those who should be best informed on Vietnam have been least informed."

I hope that Mr. Halberstam will be proven wrong—but there is nothing in the past which leads me to believe that he will be.

I ask unanimous consent that the article by Mr. Halberstam be printed in the Record at the conclusion of my remarks.

There being no objection, the article was ordered to be printed in the Record, as follows:

BARGAINING WITH HANOI
(By David Halberstam)

It is an unreal and deceptive time; we seem to be suspended on the brink of peace, as if somehow the war were over. Just like that, done one Sunday night over television. Yet there is a special irony here, for since the Tet offensive the war in any real sense for us has been over. Washington, for the first time, I think, now recognizes the resilience of Hanoi and the Viet Cong, the fact that to a large degree we have been fighting the birth rate of that country. What I doubt is whether either Washington or the American people have recognized how tough the enemy is going to be, how Hanoi views the respective positions, how willing and able Hanoi is going to be to continue the war. We think it would be magnanimous to let the Viet Cong sit at the table; they think the war is won. No easy settlement lies ahead, no partition at the 15th parallel. We're moving from one painful period to another equally painful.

Like the French before us, we control the ground we stand on, nothing more. For many tormented years we have talked about political progress in the South, but made none, for the political problems of Indochina are insoluble to Westerners. The dynamism of the Viet Cong has not been depleted by our enormous firepower. At a high price, we created over three painful years a small and fragile pacification program. The Tet offensive destroyed it. This was no small, temporary defeat, reversible by calling up another squadron of tanks. In this very special and different war, it was a defeat of consummate magnitude, for they have extended to an extraordinary degree their control over the people in rural areas. In those tiny villages, the Viet Cong have again discouraged our Vietnamese and encouraged their own. Viet Cong defections have fallen off sharply. Losses in the Tet offensive have already been replaced. The Viet Cong continue to occupy, virtually without challenge, villages you never heard of, villages unmentioned in the American papers. Spread thin like the French before us, we are poised at Khesanh and the cities and the base camps, while the enemy has been squeezing the countryside. (We call Khesanh a victory. I believe our adversaries never intended to take it. The price was too high for too little; a prolonged attack there might have suited this divided America.) But as they squeeze the countryside, driving our Vietnamese more and more to district towns, the VC will gather more recruits: as they recruit more they will be able to risk more.

Despite the claims made in Washington and Saigon that Tet was a death rattle, the communists' Ardennes offensive, it will be easier henceforth, not harder, for them to mount another similar offensive. Their military intelligence on us will increase as they control more and more of the countryside; ours on them will decrease. We will be confined—even with a marginal troop increase—to base camps and isolated strong points, again like the French before us. The enemy will come closer to the mouths of these base camps, laying ambushes, planting mines right outside them until we become increasingly dependent on air as a means of travel, thus giving them an even firmer grip on the terrain and the people. ("The enemy," Vo Nguyen Giap wrote 16 years ago, in the first war, "will pass slowly from the offensive to the defensive. The blitzkrieg will transform itself into a war of long duration. Thus the enemy will be caught in a dilemma: he has

to drag out the war in order to win it and does not possess on the other hand, the psychological and political means to fight a long drawn out war. . . .") This has happened before: first to the French; then in late 1963, when the Viet Cong took control of the Mekong Delta without the American command in Saigon knowing it and with few shots fired. In those days there was a very knowledgeable Catholic priest who led his own private army with a good deal of success. "Yes," he said, when I asked him about the ambushes, "they have us in the caves and now they want to keep us there."

I mention this history because it bears on my judgment that peace is not likely to break out this year, and that its achievement will be far more difficult than even the most pessimistic columnists appreciate. The enemy is not only convinced that he has won the war; he has the passion, the resources, and I suspect, the desire, to continue the war until he gets exactly what he wants. He will come to peace talks remembering with bitterness what happened at Geneva 14 years ago. We may imagine that somehow we gave in to the communists there in 1954. They feel they were about to take the entire country, and were cheated out of it. They are not about to settle for very much less; and, I suspect, given their control of the population, they will be willing to keep the war going until they get what in essence is victory.

It has been one of this war's unique features that it has lent itself to so much official self-deception—not just for a couple of weeks, but for years. What the Viet Cong did to the South Vietnamese Army in 1962 and 1963 was obvious to the peasants early in the game but did not become apparent to the American generals until very late 1964.

The subtleties of a political war do not show up in statistics. For example, a VC battalion of 600 attacks a South Vietnamese outpost 20 miles from Saigon; it is a tough battle, but finally heavy American airpower is called in; the VC are driven off; 200 VC and only 30 of our Vietnamese are dead. In Saigon that night, a victory is proclaimed: *the enemy sustained very heavy losses.* But in the context of a political war, no victory has been won. What has been shown is that a battalion of Viet Cong can strike a government post close to Saigon without one single peasant warning the post; the government has been shown to have no real control over the population.

In the highly mobile desert warfare between Arabs and Israelis, if one side is stronger than the other it will be obvious within 24 hours. In the complex revolutionary war of Vietnam, if one side is on the whole stronger it may rarely show, because the weaker side (weaker politically) controls the airpower, the artillery; it can always take the turf if it makes the effort. Thus, the US mission in Saigon has spent a good deal of time pointing out that the Tet offensive was a psychological ploy. What is overlooked is that a great deal that the enemy does, and does effectively, is invisible to Western eyes. The claim that Tet was simply a propaganda maneuver minimizes what they actually did, and overrates much of what we did. For the past six years, the VC have fought to achieve precisely this—a powerful psychological effect on Vietnamese people.

Washington suffers less from a credibility gap than a reality gap. Our leaders are not lying, not distorting so as to mislead the public (that which they distort for the public they have already subconsciously distorted for themselves). They believe what they say. They are, nevertheless, wrong and have been wrong from the start. If the war goes on for five more years they will be wrong for five more years. They understand neither the war, nor the enemy, nor their allies. We have been trapped by the felt need to justify our previous estimates of what we and they could do. Some of my friends in Saigon used

to complain bitterly that what Ambassador Bunker said in his private dinners with the press was what he said in public. But if Mr. Bunker began to doubt, the doubt would not have remained private for long, not with communications as they are. Besides, once you take the first step toward doubt, the rest follows as surely as if ordained. The moment our ambassador began to believe that correspondent Peter Arnett might be right about the quality of the South Vietnamese troops (and thus Westmoreland wrong), the entire commitment might crumble. So happily for the Washington reporting system, the ambassador chose to believe Westmoreland.

Semi-hawkish reporters became semi-dovish, because of what they see; whereas the officials, often because they lack personal experience of the country and the people, start out semi-hawkish and get more hawkish as they need to justify what they have said.

There is a pattern of official behavior one can trace: X was loyal; he joined the government in 1961, worked on Vietnam programming in a time which now seems light years away, when the US had a small commitment to help South Vietnam help itself (moral for those years: if you are prepared to join in a small war you must be prepared to accept a small defeat). By 1963, X began to wonder how "limited" the war was to be and whether it was worth the cost. The more he looked, the more flaws he saw, but he stayed loyal. He simply tried to point out the flaws to his colleagues. By 1965, he had concluded the whole enterprise was hopeless. He felt totally without influence and left the government. Was his place filled? Yes, by Y, who took over the job understanding the new commitment and the uses of massive power in Vietnam, and who in accepting the new position accepted all the premises which went with it. Exit Arthur Goldberg, following McNamara, Richard Goodwin, Ted Sorensen, Bill Moyers, Roger Hilsman, James Thomson, Mike Forrestal.

The slots that have been vacated can now be filled with men who have a stake in believing the war will be won, who have said publicly it will be won, and who look for evidence that they are right. Walt W. Rostow is the classic example; he has been predicting the imminent collapse of the Viet Cong since 1965, when he told a friend of mine that it would take only six weeks. He has made similar predictions ever since. The Viet Cong have not collapsed, but neither has Rostow. If a field official wants to report to Rostow, he must get the positive news in first, because Rostow will turn off once the darker side comes on. Thus does the team insulate itself from undermining doubts, from reality. And when asked where they get their information, the team answers: General Westmoreland. And then Westmoreland goes too.

One of the most incisive analyses of the Second Indochina War I know came in a recent National Educational Television conversation among four newsmen. Peter Arnett, probably the most distinguished reporter of the war (he has won one Pulitzer and deserves a second), was asked to comment on the following statement: "Ambassador Bunker has said that he bases much of his optimism on statistics—improved statistics—such as increased number of enemy killed, increased number of VC defectors. How valid do you think these statistics are as indicators of real progress?"

Arnett replied: "Well I really feel that many in the Administration—and that's the senior military commanders, are looking at Vietnam in conventional terms. General Westmoreland in other words when he looks at the battle of Dak To at the DMZ sees it in terms of World War II. . . . So in Dak To for example when four regiments of enemy troops gathered around that mountain valley, General Westmoreland's analysis of the situation was that they were determined to overthrow

the Dak To area, control it, and use it as some kind of supply base and entry port around the border. Others look at it, I do and many officers in the field look at it, from the point of view that the NVA were in that region—the North Vietnamese were there to attract American forces up and fight them in the hills which is the best possible battle ground for them. Also they're interested in pulling American troops from the populated area—get them away from the pacification program by moving them from the people thereby letting the communist guerrillas go back to their people and begin working them again. . . If the communists indeed did have the objective that Westmoreland thought, of taking Dak To, well, they failed in their objective and they lost an estimated, a body count of 1,400 dead. That means they were decisively beaten and they were driven back into their sanctuary, Cambodia, therefore it was a great success for us. But if you look at it from the other point of view, that their main objective was to engage Americans in the worst possible terrain for the Americans, fight them, get big headlines in the United States and kill a lot and actually pay less in their own lives than they would in an open area like the Mekong Delta or the coast, and also if they intended to pull Americans out of populated areas . . . then they had quite a success."

The American military establishment in Saigon has consistently underestimated the capacity, the intent and the psychology of the enemy, and consistently overestimated the capacity and effectiveness of the Vietnamese fighting on its own side, believing its own and its allies' reports and statistics, never questioning too closely for fear of what it might learn. In order to justify its earlier forecasts, it has systematically encouraged positive reporting. The best reporters in Vietnam have spent at least two years there and have assembled a dozen or so Americans and Vietnamese whose judgment they trust, who have been proved right, and who will, if protected, speak candidly. Military reporting is very different; it is inferior officer reporting to superior officer, statistics passed up, pessimism played down, doubts filtered out, little evaluation of the source. Those officials who have tried to work independently and report independently have not found it easy. "You'll have to tone down your criticism of the South Vietnamese Army," one American was told about a year ago by a sympathetic superior, "I can't protect you any more."

Westmoreland has been a classic example. Tall, handsome, able; considered even before his appointment a likely chief of staff, he is not someone to whom you send bad news without very careful consideration. Westmoreland has been surrounded by concentric circles of generals, colonels, lieutenant-colonels, each protecting him from the negative. At briefings, Westmoreland had little interest in complicated theories about the social fabric of the war; he was quickly bored by any discussion of the faults of the South Vietnamese Army, but fascinated for more than an hour by a discussion of a new way of smoking the Viet Cong out of their tunnels. The doubters and dissenters eased off for Westmoreland, in order to get a hearing. Getting through to him was not easy. He could leave a briefing with a known dissenter thinking that *even the dissenter was optimistic*. He never understood the journalists' completely different evaluation of the war. He was finally convinced, and said so publicly, that there was a cynical element in the Saigon press crew.

On and on it goes. An excellent reporter like R. W. Apple of *The New York Times* writes a detailed story last August on how the war has been stalemated. Ambassador Bunker is annoyed, tells Westmoreland that he would like to see evidence of American progress in the last two years. So the word goes out to every corps area, and division staffs stay up most of one night grinding out evidence of

US accomplishments (which exist, though whether this means that the war is being won is another thing). Some of the evidence is flown to Saigon during the night by jet and, when Bunker walks into his office the next day it is there, stacks of it, well-organized, proving just what the mission wanted to hear.

If there was the rare South Vietnamese Army victory, Westmoreland would excitedly ask, was the press there?, was Arnett there?, was the *Times* there? More often than not, the answer would be no, because the press learned long ago that you cover as best you can the whole, not the isolated episode. But in Westmoreland's eyes, this simply confirmed the cynicism of the press.

So now we are haggling about where to meet the North Vietnamese to talk about peace. Despite the surging stock market, the polite things some presidential candidates are saying about the President, and the confident murmurs of the new Secretary of Defense, the way will be long and hard. And one reason is that those who should be best informed on Vietnam have been least informed.

---

## SCULPTURE EXHIBITION AT NORTH CAROLINA GALLERY FOR THE BLIND ATTRACTS APPRECIATIVE VISITORS

Mr. ERVIN. Mr. President, North Carolina can be rightly proud of its rich tradition for the arts and humanities. The North Carolina Museum, at Raleigh, is one of the most widely renowned cultural undertakings in America. Anyone who has visited the museum is immediately aware of the strong desire of North Carolinians to preserve beauty in many forms.

Two years ago, through the generosity of the Mary Duke Biddle Foundation, the North Carolina Museum of Art established the Mary Duke Biddle Gallery for the Blind. Because of the museum's desire to make art available to everybody, blind persons can now enjoy a great deal of the art which the museum offers.

The New York Times of Friday, May 3, 1968 published an excellent article entitled: "Sculpture Exhibition at North Carolina Gallery for the Blind Attracts Appreciative Visitors."

I ask unanimous consent that the article be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

[From the New York Times, May 3, 1968]
SCULPTURE EXHIBITION AT NORTH CAROLINA GALLERY FOR THE BLIND ATTRACTS APPRECIATIVE VISITORS

(By Milton Esterow)

RALEIGH, N.C.—Marjorie Bennett McCune, a soft-spoken, gray-haired woman, recently stood before a Berthe Morisot sculpture of which she said later:

"I enjoyed the lovely head of the beautiful little girl with a round, smiling face and pigtails hanging down her back. There was something fresh and lovely about the young face that my fingers could not miss."

Miss McCune, who is blind, had just visited the Mary Duke Biddle Gallery for the Blind at the North Carolina Museum of Art.

The gallery designed so that the blind may touch works of art, opened two years ago and is believed by its originator, Charles W. Stanford, to be the first of its kind. Mr. Stanford is its director and is also the museum's curator of education.

### PLANS IN LOS ANGELES

Several museums, including the Los Angeles County Art Museum, are now considering establishing similar galleries.

The 16-by-32 foot gallery was created with a grant from the Mary Duke Biddle Foundation of New York. Mrs. Biddle, who died in 1960, was a daughter of Benjamin N. Duke, one of the founders of Duke University.

Mary Switzer, Commissioner of Vocational Rehabilitation of the Department of Health, Education and Welfare, assisted in the gallery's planning. Last month, the gallery received a grant of $25,000 from the department that will enable it to double its size.

Since its opening, 4,000 blind persons have visited the gallery, which changes its exhibitions—mainly shows of sculpture borrowed from museums, dealers and collectors across the country—every two months.

"The gallery offers an opportunity for the blind that they've never had before," Mr. Stanford said. "I believe it has helped to develop the blind person's powers of perception, his knowledge and imagination and has given him a glimpse into a realm of civilization that before now has been unavailable to him." Mr. Stanford is 38 years old and is a graduate of Princeton University, where he majored in art history and archeology.

The gallery was built so that the blind visitor needs no help at all once he arrives at the door. Instructions in Braille on how to use the gallery are attached to the wall at the entrance. Also on the wall is a relief map of the gallery with Braille labels indicating exhibition space, library and study area.

The objects are displayed on a counter two feet wide and three feet from floor level. A guide rail, raised 2 inches above the counter, directs the blind visitor through the exhibition. On the inside of the rail are Braille labels—many of them made by blind students—describing the objects.

The items are within easy reach and the blind visitor may stop and hold them in his hand. Since the gallery's opening no object has been damaged, Mr. Stanford said.

### BOURDELLE AND NADELMAN

The current show, "Portraits in Sculpture," comprises 53 works, including busts of Lincoln, Washington, Sir Winston Churchill, Mark Twain, former President Dwight D. Eisenhower and Gov. Dan K. Moore of North Carolina and ancient Egyptian and African sculpture.

Also on view are a bronze of Beethoven by Antoine Bourdelle and works by Elie Nadelman and André Derain. Other shows have included pieces by Rodin, Daumier, Degas, Maillol, Henry Moore and Reg Butler.

The gallery has a reference library in Braille. The visitor also receives a Braille catalogue.

One recent visitor was John Lynn Brown, a 19-year-old student at the Governor Morehead School for the Blind in Raleigh.

"I've been here about 15 times," he said. "Each time I spend close to an hour here. I enjoy history and this makes it more meaningful for me. When we look at something with our hands, it's the same to us as when you look at something with your eyes. To a blind person there is no difference at all.

"The mental image you retain is what is important. I could give as realistic a description of a piece as anyone else. A blind person can appreciate art as much as a sighted person."

Miss McCune, after running her fingers over the bust of Lincoln by Daniel Chester French for several minutes, said:

"I gained a clear mental picture of the man's appearance, the heavy tousled hair, the high cheekbones and lined face, the firm mouth and pointed chin, the ample beard and sideburns—all were recognized by touch.

"The face impressed me as one that was serious but kind, one which reflected the burdens and grave responsibilities of the

President. For me the sculptor succeeded in reaching my soul."

Mr. Stanford said that no work of art had been put on display "that does not meet the same high standards as required in the museum galleries for the sighted. All objects are selected to serve an esthetic purpose as well as a teaching one."

He added: "Most museums, of course, have a policy of 'do not touch.' Well, this gallery has become so successful that many of the sighted have been coming in."

## THE GOLDEN SPIKE

Mr. MOSS. Mr. President, 99 years ago today an important national event was scheduled to take place at Promontory Summit in Utah. But 99 years ago today there was a downpour of rain which washed out the tracks in Weber Canyon. The rain continued the next day; so instead of today, May 8, Friday, May 10, will be the 99th anniversary of the driving of the Golden Spike and the joining of the transcontinental railroad.

The joining of the Central Pacific and the Union Pacific, May 10, 1869, was truly a momentous occasion. It is difficult for us today to realize just how important it was. We who are used to supersonic jets and coast-to-coast, nonstop jet flights find it difficult to comprehend the burdens of travel encountered by our forefathers.

The Mormon pioneers who settled in Utah have left diaries which describe how they would start at the break of day, travel all day long with their ox teams and wagons or hand carts, and at dusk they could turn around and still see the place from where they started the day's journey.

For our ancestors who struggled to cross this continent to settle in Utah and California, and other Western States, the joining of the railroad meant the end of such tortuous travel. Now the speed and comfort of rail travel would make their journeys and the shipment of their goods and supplies incredibly fast and easy by comparison.

The 99th anniversary will be marked in Utah, Friday, May 10, by a reenactment of the original driving of the golden spike at the original site at Promontory Summit. This reenactment has been held at the original site every year since 1952 by the Golden Spike Association.

Next year will be the centennial of this event. We have been planning for this celebration for many years, and our aim is to try to make the centennial of the event worthy of the importance of the original happening.

We now have a Golden Spike Centennial Celebration Commission, created by a joint resolution which I had the honor to introduce. Mr. Thomas M. Goodfellow, president of the Association of American Railroads, serves as chairman of the commission. He will represent the commission at the 99th celebration in Utah, Friday.

Other members of the commission include the following Senators: WALLACE F. BENNETT, my fellow Utahan; ALAN BIBLE, from Nevada; THOMAS H. KUCHEL, from California, and myself.

There are, in addition, the following Members of the House of Representa-

tives: Mr. Moss, from California; Mr. BROTZMAN, from Colorado; Mr. ROGERS, from Colorado; and Mr. BURTON, from Utah.

Industry representatives on the commission include: Robert L. Pierce, general solicitor, Southern Pacific Co.; Francis Joseph Melia, vice president, Union Pacific Railroad Co.; W. Ashley Gray, Jr., chairman, Railway Progress Institute; and R. R. Bryant, general secretary and treasurer, Brotherhood of Locomotive Enginemen and Firemen.

The commission has retained a public relations firm to prepare a plan for the celebration. That plan has been presented to the commission and is now under consideration. The commission has established its own public relations committee which has had several meetings to discuss plans to make the event of national importance.

In a related matter, the House this week passed my bill authorizing the U.S. Mint to strike a commemorative medal. Once the President signs the bill, the striking of the medals will begin.

We want the centennial to commemorate appropriately a historic event. Much has been written about the construction of the two railroads and their final meeting at Promontory.

One of the best informed persons on the subject is Mrs. Bernice Gibbs Anderson, president of the National Golden Spike Society. She has written many articles on the subject. One in particular deals with the events surrounding the final day and the driving of the final spike.

I ask unanimous consent that her article, entitled "The Last Spike," be printed in the RECORD.

There being no objection, the article was order to be printed in the RECORD, as follows:

### THE LAST SPIKE

#### (By Bernice Gibbs Anderson)

The "Last Spike" which completed the Transcontinental Railroad was driven on May 10, 1869, at Promontory Summit, Box Elder County, Utah. A good road, U-83, leaves U.S. 30-South at Corinne and leads to the Monument at Promontory Summit, 25 miles west. It is 32 miles from Brigham City, the County Seat, and can also be reached by way of Tremonton and Blue Creek Junction both on U.S. 30-South.

The monument marking the spot was placed by the Southern Pacific Company about 1915, while the original line around the north end of the Great Salt Lake was still in use. This old line was removed in 1942.

Thiokol Chemical Company's plant is about ten miles to the northeast. This is where the Minuteman and other space age vehicles were developed, in cooperation with the U.S. Air Force. The community of Promontory lies along the eastern side of the Promontory range and to the south, and a few ranches are scattered through the little valley on top of the range where the Monument is located, and to the west at Cedar Springs.

The driving of the Golden, or Last spike, is re-enacted annually on May 10th at the original site by the Golden Spike Association of Box Elder County, with the cooperation of the Box Elder County Commissioners and various other groups.

In 1869 the ceremony was set for May 8th. But rain washed out the Union Pacific tracks east of Ogden in Weber Canyon and the special train bringing Union Pacific dignitaries

from Omaha to Promontory was stalled in the downpour near Devil's Gate.

Central Pacific's delegation arrived at Promontory on May 7th, aboard the Stanford Special. Advised of the delay, they promptly wired word to the Sacramento office. Word came back that the people in California were ready to celebrate . . . and so they did, for three whole days and nights. Completion of the line meant that those who had left homes and families to come west to seek their fortunes in the gold fields and by other endeavors, could now return to the east by rail in days instead of months. Now the long dangerous trip across the plains by ox team or stage coach, or by boat to the west coast was not necessary.

On the Promontory, the rain poured down on the new tracks, the dismal railroad camps and the Stanford Special. Jack Casement of Union Pacific ordered a train to Promontory to bring Central Pacific's people in to Ogden where they were entertained and taken on a tour to Weber Canyon. On their return to Promontory, still in the rain, the Stanford Special withdrew 25 miles west to Monument Point, where the steward went hunting and brought in a mess of Sage Hens.

It was said that Union Pacific's construction crews heard a rumor on Saturday evening that the Central's workmen were planning to extend their spur, laid temporarily, into a permanent siding in order to claim Promontory as a Central terminal. Jack Casement and General Dodge of the U.P. rustled their gangs and worked through the night to complete their own siding and claim Promontory as Union Pacific terminal. Now the Central's record of ten miles of track laid in one day on April 28, did not seem so bitter to the Casement Irish. This record, made a few days previously on a stretch of line a few miles south of the monument site, established a world's record that has never been broken in railroad building.

The weather improved on Sunday afternoon, and the tent town of Promontory completed setting up its establishments along both sides of the right of way. The Hell-on-Wheels that had dogged the workers of Union Pacific nearly all the way from Omaha had made its last camp. Here were the company missionaries, the sleeping tents, the saloons and gambling dens, the eating houses and the "Soiled Doves" as Beadle called them. The Central had already sent most of its Chinese back along the line to the west. By way of comparison the Central allowed no saloons or gambling along its entire line while the road was being built.

The new tracks at Promontory Summit ran diagonally from Northeast to Southwest called "east" and "west" by the railroads, depending on which general direction the terminals of each company lay. The builders of each line had endeavored to be the first to reach the Salt Lake valley to secure this rich trade territory and also to acquire the huge land grants and the advance bonds given on each 100 miles of railroad. The terrific struggle to complete their lines as far as possible was intensified in the last months of the great race. On April 9th they agreed to join the rails at Promontory, and on April 10th Congress decreed: "That the common terminus of the Union Pacific Railroad and Central Pacific Railroad shall be at or near Ogden; and the Union Pacific Railroad Company shall build, and the Central Railroad Company shall pay for and own, the railroad from the terminus aforesaid to Promontory Summit, at which point the rails shall meet and connect and form one continuous line." In this race 225 miles of parallel grades were thrown up.

On mid-morning of May 10th, the construction trains pulled in, with track and grading gangs clinging to all available space. Next came other workers, riding the grading nags, and residents of northern Utah and southern Idaho, in wagons, buggies, surreys and other conveyances. Then came the Stanford Special, returning from Monument Point, drawn by the Jupiter-60. Engineer George Booth and Fireman R. A. Murphy. Aboard were Gov. Leland Stanford, Chief Justice Sanderson of California, collector G. T. Gage of Nevada, who took the silver spike back to that state, Gov. A. P. K. Safford of Arizona and several others.

The delayed U. P. Special pulled in about 10:30 with vice president T. C. Durrant of the U.P., Sidney Dillon, Chairman of the Board of Directors, John Diff, Boston, director, Major Gen. Grenville M. Dodge, chief engineer, Gen. S. B. Reed, Gen. Superintendent, Gen. J. S. Casement and his brother, Daniel T. Casement, track laying contractors, A. P. Russell, official photographer from New York and many others, including the Rev. Dr. John Todd of Massachusetts who gave the invocation. It was drawn by the Rogers-119, not to be confused with engine No. 117, which also seems to have been on the ground. The engineer was Sam Bradford, and firemen either David Lemon of Whitehall, Illinois, or Cyrus A. Sweet of East Douglas, Massachusetts. On this train, also, were four companies of the Twenty-first Infantry in command of Gen. Patrick A. Connor from Camp Douglas, Utah, enroute to the Presidio at San Francisco. A second U. P. Train brought the Tenth Ward Band of Salt Lake City, and many Utah dignitaries, including Governor Charles Durkee of Utah Territory, Bishop John Sharp and Col. Charles R. Savage, William Jennings, Feramore Little, R. T. Burton, C. R. Savage of Salt Lake City, and F. D. Richards, Lorin Farr, C. W. West of Ogden, and Ezra T. Benson of Cache Valley. Bishop Sharp brought the regrets of Brigham Young, absent in Southern Utah, and also represented the firm of Sharp and Young, contractors, and the last three represented the firm of Benson, Farr and West, also contractors, all of whom had charge of the grading through Utah, being sub-contractors on a $2,000,000 contract made by Brigham Young and on which he later had to accept $1,000,000 of the amount in surplus railroad equipment which was used on the Utah Central and other Utah lines.

A second Central Pacific train pulled in and that official party was increased by Treasurer Mark Hopkins, engineering chiefs Montague and Gray, Superintendent and Mrs. Strobridge, and several others.

The crowd, which numbered around 1500, was cleared from the gap left between the two lines, by the military, who lined up in double column formation on the western side of the track. Crews from each line laid the last two rails and Chinese who had been preparing the roadbed for the last tie, moved back. Superintendents Reed of the U.P. and Strobridge of the C. P. carried the laurel tie from the Stanford Special and tension mounted as the dignitaries took their places. Some speeches were made and the crowd cheered the United States, the Flag, the Pacific Railway, the financiers, the workers, and the surveyors who found the path for the rails. The bands joined the uproar. Wire led from the telegraph line to a small table holding the instruments in readiness for sending the famous message, and auger holes had been made in the tie in which to set the spikes.

Edgar Mills as EmCee of Sacramento, introduced the Rev. Todd who gave a two minute prayer while the nation spanning wires were being cleared to Promontory. J. W. Haines and F. A. Tritle each drove one of the iron spikes, W. H. Nottingham, president of the Michigan South and Lake Shore Railroad also drove one. The operator tapped out the message, "We have got done praying. The spike is about to be presented." Dr. Harkness presented the gold spikes to Dr. Durant, who slid them into their holes. Gov. Safford gave the spikes of Nevada and Arizona to Gov. Stanford, who also placed them. The silver sledge was also presented. The prepared speeches, which had already been given to the press, were appropriately rendered. The silver sledge evidently was only to be used symbolically.

Now came the momentous event! Using the regular iron sledge attached to the telegraph wires instead of the silver sledge, Stanford swung at the iron spike and missed, hitting the rail instead. The telegrapher tapped out the three dots signifying "Done"! as Durant duplicated his feat. The time was 2:47 p.m. eastern standard time at Washington D.C., actually 12:47 at Promontory by "Suntime".

The crowd went wild as the engines met over the junction, the firemen taking the throttles as engineers Bradford and Booth climbed out on the engines holding bottles of champagne which were smashed on the pilots of the opposite engines, the wine foaming over the last tie and the last rail and the last spike! Pictures were taken of everything but the actual driving, probably due to the type of slow lenses used by photographers of that period.

The epic event of ocean spanning importance thrilled the world. The magnetic ball fixed on the dome of the U.S. Capitol at Washington, D.C. fell as the wire hummed. At San Francisco the fire bell in the city hall tower pealed and 200 guns thundered a salute from Fort Point, as cannons, whistles and bells joined the uproar of thousands. At Omaha and New York 100 guns boomed, and cheering throngs paraded. The Liberty Bell spoke at Philadelphia, and a parade four miles long marched in Chicago. In Salt Lake City Mormons and Gentiles overflowed the great tabernacle, their differences momentarily forgotten. In Ogden seven thousand people thronged into the new tabernacle to listen to bands and speeches.

At Promontory several of the dignitaries were invited to lightly tap the gold and silver spikes before they were removed. Some of the military officers using their sword hilts for this purpose. The laurel tie was removed and taken back to the Stanford car, and an ordinary tie set in place. Strobridge and Reed then drove an ordinary spike into it. Stanford took the Hewes spike and gave the other one to Gen. Dodge Durant having retired to his car.

The Nevada spike was given to G. T. Gage who took it back to that state and the Arizona spike was given to Gov. Safford. Both are now in the Stanford University Museum at Palo Alto, California, as is the silver headed sledge. Some of the newspapers mentioned spikes also from Idaho and Montana. The laurel tie was destroyed in the earthquake and fire of 1906 in San Francisco.

The spikes driven by Strobridge and Reed and the redwood tie replacing the laurel tie were promptly appropriated by souvenir hunters, along with several replacements. Two rails were demolished, also, so it is probable that the Chinese and Irish workmen really joined the lines after all.

During the afternoon, traffic moved east and west as the visitors left. Promontory, having grown to some thirty tent houses straggling on each side of the tracks and many small tents dotting the sage covered valley, was left to itself. The citizens indulged in a banquet, a torchlight procession, and a grand ball with an uproar which must have startled the little prairie dogs hiding in their underground "cities".

Promontory continued to be the junction of the two lines until November 1869, when Ogden became the terminal. However, a considerable population was needed here for many years and Promontory deserves a chapter of its own.

---

## OMBUDSMAN

Mr. LONG of Missouri. Mr. President, from March 28 through March 31, 1968, the St. Louis University School of Law and the American Assembly of Columbia

University cosponsored the Mid-America meeting on "The Ombudsman."

At the conclusion of the assembly meeting, a statement representing general agreement between participants was issued. The statement deserves the attention of the Senate. Therefore, I ask unanimous consent that the report be printed in the RECORD.

There being no objection, the report was ordered to be printed in the RECORD, as follows:

### THE OMBUDSMAN

(Report of the Mid-America Assembly sponsored by St. Louis University School of Law and the American Assembly, Columbia University, Mar. 28–31, 1968)

(NOTE.—At the close of their discussions the participants in the Mid-America Assembly on *The Ombudsman* reviewed as a group the following statement. The statement represents general agreement; however, no one was asked to sign it, and it should not be assumed that every participant necessarily subscribes to every recommendation.)

### THE PROBLEM

The present-day American has ever-increasing contacts with government at all levels. The contacts are sometimes unsatisfactory, and complaints are presented with great regularity.

The doctrine that government exists to serve the people is fundamental to American political theory. It is important to the preservation of this principle that citizens have the means for protesting against governmental action or inaction which operates unfairly or prejudicially toward them.

EXISTING MEANS OF PROCESSING COMPLAINTS

#### 1. The media of mass communication

The press has had an historic role in protecting individuals who have dealings with government, and newer media have come to share this role to a degree. The media have the advantage of being independent of the governmental structure and have a tradition of mistrust of government. The threat of adverse publicity is a powerful one, for government officials pay careful attention to the complaints of newsmen.

The media, however, have their limitations. The very independence which facilitates challenge to goverment agencies also has its disadvantages. A newspaper or a broadcasting station is essentially a private enterprise which may reflect the interests and prejudices of its proprietors. Also, because of economic considerations, the press sometimes restrains itself from looking into areas that require investigation. Penetrating inquiry and follow-up are often hindered by staff limitations. The media, however, are governed by a sense of newsworthiness. They may launch inquiries, only to abandon or de-emphasize them in favor of items of more current interest.

#### 2. The courts

American courts have exercised control over legislative, executive and administrative actions to a greater extent than the judiciary in any other part of the world. Americans who try to contain governmental action within proper bounds necessarily look to the judicial system.

Yet it is apparent that judicial remedies furnish an incomplete answer to the problems of citizen grievances and complaints. A court acts only on the cases that are brought before it. Litigants seldom can proceed effectively without the services of lawyers, which many cannot afford. Even those able to pay counsel may have problems with government agencies in which the rights appear clear but which do not have dollar value sufficient to justify legal proceedings. Many courts, moreover, cannot dispose of their judicial business within a reasonable time.

A grand jury may sometimes proceed effectively against oppressive or unlawful conduct on the part of administrators. However, some factors limiting effectiveness of the grand jury are: lack of continuity and expertise, limited authority, and excessive dependence on prosecuting attorneys. It is unusual for a grand jury to initiate independent investigations.

Much can be done to improve the functioning of the judicial system in protecting individual rights. Legal aid can be provided for those who have no means of hiring their own lawyers to protect important rights. Those who are successful in challenging government agencies might be reimbursed for their own expenses (which is almost never done at the present time). Even with these measures, however, much of the solution to the problem of citizens' complaints lies outside of the judicial system.

Many complaints, for example, deal with government action which is within the letter of the law but which may still be unfeeling or unnecessarily rigid. The courts show great deference to the administrative agencies and sustain their actions which are not clearly unlawful. Citizens may need assistance with respect to the discretionary aspects of government action which courts cannot give.

#### 3. Internal Processing of Grievances

Where an agency, following investigation of a complaint, finds that its action was justified, the citizen is entitled to a prompt explanation and to advice as to the method for seeking relief. Some agencies have a reputation for courtesy, fairness and thoroughness in receiving and processing citizens' complaints, while the practices of others leave much to be desired.

The members of the public, however, may not have confidence in self-policing by agencies. If a complaint is ultimately referred to the person whose action is being protested, there can be little expectation of redress. This lack of confidence is all the more likely when the agency's work is necessarily unpleasant to many citizens, as is the case with police and tax-collecting agencies. There is also understandable fear of retaliation if the complainant has frequent dealings with the agency.

Where complaints go to the agency involved, there may be problems of politics. There may be suspicion that all citizens do not receive equal treatment at the hands of the agency, and that it is necessary to seek the intervention of one who reputedly has political influence.

#### 4. The role of the legislator

Legislators at federal, state, and local levels have traditionally concerned themselves with the problems of their constituents in dealing with the executive and administrative agencies of government. In addition to voting on bills, the legislator is expected to be the representative of his people before agencies of the government. In this respect, he affords an important humanizing function.

Legislators have often been of great assistance to their constituents in the handling of complaints. As complaints increase in number and complexity, however, legislative casework appears as only a partial solution. The legislator seldom has the time or the staff to give detailed attention to individual items. He may simply refer a complaint to the agency involved, and this will then present the self-policing situation with disadvantages as discussed above. A legislator's effectiveness may vary with his experience and prominence. Although legislators normally receive and handle complaints of all their constituents, a citizen may not have confidence in the casework of one he has consistently opposed.

Legislative handling of complaints might be improved by providing additional and more efficient staff assistance, but here there is a disadvantage of increasing the distance between the citizen and his representative. There is a danger that this may reproduce some of the very problems of bureaucracy for which legislative casework is intended to be a corrective. Furthermore, it does not seem realistic to expect the legislator to handle the ever-increasing volume of complaints.

#### 5. Other agencies

Clergymen, social and community workers, politicians, lawyers, service organizations, and others have frequently helped people with complaints. Their assistance is often valuable, but has wide variation in effectiveness.

DEMONSTRATED NEED FOR THE "OMBUDSMAN"

There was consensus that an independent office for the receiving and processing of complaints about governmental action or inaction could be of great value. The word "Ombudsman" has found its way into the English language and, although its use is not without problems, it appears to be an appropriate descriptive term for the officer performing the functions just described.

Possible advantages of an Ombudsman are as follows: (1) familiarity with government in its several aspects and skill in dealing with government officials and employees; (2) independence, both of the incumbent administration and of the general political process; (3) accessibility to the members of the public so that they may present complaints in confidence and without fear of reprisal; (4) a reputation for efficiency, integrity, and impartiality; (5) the manifestation to the public of concern with the problems of every individual, so that he receives the consideration he deserves in his business with the government; (6) the provision of a safety valve or catharsis for irremediable complaints; (7) identification of recurring patterns of complaints indicating the need for remedial action.

The Ombudsman should not be limited to the handling of the complaints which are brought to him. He should have the authority to initiate investigations where he has reason to believe that there are just grounds for public complaint. Many people are uninformed about facilities for receiving complaints, or are unable or afraid to present their own complaints. Those in disadvantaged circumstances, in particular, are often unable to present their own problems in such a way as to obtain effective assistance.

The very contemplation of the Ombudsman's office shows the need for a person of great insight and ability. Those who argue for self-policing may say that only one who is thoroughly familiar with agency work is able to deal with complaints in a way which is fair to the individual and to the general public. At times, however, an intelligent and experienced outsider versed in administrative methods may be able to make suggestions which are helpful to an agency which has become steeped in its own procedures. The office of Ombudsman could provide a valuable auxiliary to the self-policing process.

There is also the problem of size of the Ombudsman operation. The Ombudsman of tradition is a single individual. No such individual could possibly function in a government of any size without assistance. The office would serve little purpose and would quickly lose public confidence if it had so much work that complaints were not handled with reasonable dispatch. Yet, as with the legislator, if the staff becomes too large, the problems inherent in a bureaucracy may appear. There is a dilemma of size with no complete solution.

The Ombudsman's efforts should be designed to supplement the existing methods of redress of complaints, as listed above. Each of these techniques has its proper sphere for which there is no adequate substitute.

PROBLEMS IN ESTABLISHING THE OMBUDSMAN

### 1. Problems in initiating the office

The need for an Ombudsman can be sensed at all levels—federal, state and local. There was a preference for beginning with a project at the local level. In order to present a fair test, the office should not be confronted with overwhelming problems and responsibilities from its very inception. A trial at one place, however, would not necessarily preclude a trial elsewhere.

There was some interest in a federal Ombudsman project for a particular state, as an experimental matter. The State of Missouri seemed to be one of several appropriate choices.

The trial should not be for a specifically limited period, for this might weaken the effectiveness and prestige of the office. Simultaneous programs in several locations, with no definite time limits, would be highly desirable.

### 2. Appointment and qualifications

All discussion indicated that the Ombudsman would have to be a very exceptional person, both in his background and in his personal qualities. It is desirable that he be conversant with the processes of law and government, but he would not necessarily have to be a member of the legal profession.

The initial selection should be the ultimate responsibility of the legislative authority of the area. The compensation would have to be sufficient to attract a person of great ability.

The Ombudsman should have a term extending over a number of years and should have protection against capricious removal prior to the expiration of his term. The term should not end at the same time as those of the legislative and executive officials within the jurisdiction. There should be a prescribed retirement age.

### 3. Jurisdiction

There was general agreement that the jurisdiction of the Ombudsman should not include the legislative and judicial branches of government. The duties of the office should be defined by law.

### 4. Office organization and operation

The incumbent should be afforded broad discretion in establishing and organizing the office. Much experimentation will be necessary at the outset in the structuring of the office. The legislative authority must provide funds adequate to permit the office to do its work.

Experience indicates that many complaints may be expected over which the office has no jurisdiction. The complainants should not be simply turned away, but should be referred to the proper agency.

The office will normally refer people to an operating agency if that agency has not had the opportunity to deal with the matter itself. The Ombudsman should generally be available only where the citizen and the government agency have been unable to reach an understanding.

Where a proper complaint within the Ombudsman's jurisdiction is received, it should be processed quickly and thoroughly. The citizen should, if possible, have access to the Ombudsman himself. A screening process is necessary, however, so that the Ombudsman will be able to focus on complaints which should have his personal attention. But care should be taken not to develop a bureaucracy which would eliminate the humanizing factor of the office.

### 5. Powers

It is essential that the Ombudsman have access to agency files and that he have subpena power over witnesses and documents. Officers and employees who fail to cooperate with the Ombudsman should be subject to discipline or discharge.

The Ombudsman should have the power to make recommendations but not to overrule administrative decisions. He normally should proceed within the agency concerned. If the problem is not solved there, a report should be made to the superior administrative authority. In some cases, the Ombudsman may find it necessary to make a report to the prosecuting authorities.

The ultimate recourse is through publicity, by reporting to the legislature and by release of information to the news media. The authority to make public disclosure is important, but it should be exercised only after careful consideration and with due attention to the interests of all concerned.

At times there may be a difference of opinion between the administrative agency and the Ombudsman, in which each side maintains its position with sincerity. Agency personnel should not be subject to retaliation for taking a position opposed to that of the Ombudsman.

The Ombudsman should make periodic reports to the appointing authority. These reports should contain recommendations for the appropriate legislative action, the need for which has been indicated by cases he has handled.

LIMITATIONS ON THE OMBUDSMAN'S FUNCTION

As has been said earlier, the Ombudsman's office would not displace existing avenues of redress, but rather would furnish the opportunity for correction of some of their demonstrated inadequacies. The restricted scope of the Ombudsman's function should be publicized, and the public should be made aware of needs which will remain even when the Ombudsman is established.

### 1. Legal aid

The Ombudsman is not a substitute for a legal aid program. The theory behind free legal aid is that any citizen should be entitled to judicial determination of issues in which he has a legally demonstrable interest. He should be able to proceed with the assistance of his own lawyer, whose responsibility is to him alone.

### 2. "Little Hoover Commission"

It is not contemplated that the Ombudsman would be a substitute for "Little Hoover Commissions". He would have no responsibility for recommending overall reorganization of agencies.

### 3. Offices of Information and Referral

The public information function is important in modern government. This is so, at least partially, by reason of the very size and complexity of the modern governmental structure.

It may be expected that the Ombudsman's office will have to perform a public information function. Many people will not find their way to the appropriate agency simply because they lack information about where they should go. The Ombudsman will necessarily have to operate a referral system.

The Ombudsman is not a public information officer, nor is he a substitute for such a person. His duties and responsibilities are such that he should not spend an inordinate amount of time on public information work.

CONCLUSION

With all the problems of working out the specific details indicated above, there is a strong consensus that there is need for pragmatic experimentation with the Office of Ombudsman in the American context.

## REESTABLISH THE "E" AWARDS

Mr. BAYH. Mr. President, during the Second World War, our country honored thousands of businesses and industries for their contributions to the war effort. It will be remembered that "E" Awards were presented by the Armed Forces during World War II and that handsome triangular flags featured a block "E" were flown from flagstaffs from coast to coast.

The fact that the U.S. Government no longer authorizes an award symbolizing military-industrial cooperation was brought to my attention recently when I had occasion to investigate the possibility of securing suitable recognition for an Indianapolis company for its contribution to the country's war and space efforts.

The company to which I refer is Thomas & Skinner, a 65-year-old corporation which is reported to be not only the country's first but also one of the largest manufacturers of permanent magnets, upon which our sophisticated communications systems and space efforts are very dependent.

About a year ago Thomas & Skinner's research and development people perfected a new magnetic alloy which is reported to be twice as effective, pound for pound, as any known alloy. Named Columax 9, this new alloy is now being used in place of platinum cobalt which heretofore has provided the magnetic energy of many of our country's space vehicles. Besides the increased effectiveness of this new alloy, which takes considerably less space, it will save our defense effort millions of dollars. A major defense contractor, which builds magnetrons for the U.S. Government to be used in sophisticated electronic systems used for national defense, has indicated that the Columax 9 magnet would satisfactorily replace the former platinum magnet with savings up to 95 percent.

It seems to me, Mr. President, that any American business or industry which, on its own initiative and with its own research funds, makes this kind of a contribution to our defense effort, should be accorded proper recognition by governmental authorities.

The traditional ingenuity and the competitive spirit of the American free enterprise system to meet our defense needs helped make this country great and strong. The very least the Nation can do is provide some tangible public acclaim for this kind of cooperative effort. Accordingly, I am suggesting that the Department of Defense ought to seriously consider reestablishing an award similar to the "E" award. If I recall correctly, the "E" stood for excellence, but it could refer also to energy, effort, and enthusiasm, qualities for which any country has abundant need.

## INDUSTRIAL TAX-EXEMPT BONDS

Mr. CURTIS. Mr. President, I have been speaking on a number of occasions about legislation by administrative edict and particularly about the Treasury Department's ruling to eliminate the tax exemption on industrial-type revenue bonds issued by State and local units of government. I, now, have a copy of a minority report of the Municipal Industrial Finance Committee that was presented to the Board of Governors of the Investment Bankers Association of America at White Sulphur Springs, W. Va., this morning. This report goes into considerable detail about the matters I have been discussing before the Senate.

I wish to point out that this report

*May 8, 1968*          CONGRESSIONAL RECORD — SENATE                    12357

illustrates how the Treasury Department has been working with an ad hoc committee of the Investment Bankers Association, not really representative of the majority of the members of that association, and with a small group of national labor leaders, again not really representative of a majority of the members of labor unions throughout the United States, to eliminate the tax exemption on these bonds without an act of Congress.

I would further point out that this attempt by administrative decree to take legislative action in violation of the Constitution would be a severe blow to State and local governments throughout the United States, depriving them of the major source of financing to meet many of their governmental and quasi-governmental needs.

I would point out further, Mr. President, that if this type of action by the administrative branch of the Federal Government continues, without any doubt the States, counties, and municipalities of the United States will become vassals of the Federal Government.

The Curtis amendment, which would prevent the Treasury Department's action from taking effect and would preserve to the Congress the right to legislate in the all-important tax field, is still pending at the moment before a joint House-Senate Conference Committee considering the excise tax extension bill. I hereby ask permission to place the minority report of the Investment Bankers Association Municipal Industrial Finance Committee in the RECORD, and I urge the members of the Conference Committee to examine it in detail before they take final action on the industrial bond question.

There being no objection, the report was ordered to be printed in the RECORD, as follows

MINORITY REPORT OF THE MUNICIPAL INDUS-TRIAL FINANCE COMMITTEE TO THE BOARD OF GOVERNORS, INVESTMENT BANKERS ASSOCIA-TION OF AMERICA, MAY 8, 1968

This Minority Report is respectfully submitted to the Board of Governors of the Investment Bankers Association of America ("IBA") in dissent from the Majority Report presented May 8, 1968 by the Municipal Industrial Financing Committee ("the Committee") to the Board of Governors. The Minority states that said Majority Report represents a continuation of arbitrary and unilateral actions by the Committee, actions which we believe do not serve the best interests of IBA. More importantly, we submit that the Majority, in its blind determination to eliminate industrial revenue bond financing, has allied the Committee with powerful forces historically inimical to investment banking; and further, that should the tax exemption privilege be removed from industrial revenue bonds, either by Congressional or Administrative action, the Committee must bear the responsibility for the erosion and potential destruction of the tax-exempt industry—and with it, the last remnant of financial independence for all Local Government. We urge the Board of Governors, the Municipal Securities Committee and the Majority of the Municipal Industrial Financing Committee to focus their attention and energy upon the vital necessity of preserving this independence. We offer the following resume in substantiation of the above allegations:

The Board of Governors is well aware that the Committee, since its formation, has

been almost totally comprised of those unalterably opposed to industrial revenue bond financing. Thus, the Committee itself has never been an objective vehicle for an openminded, thorough examination of industrial revenue bond financing. In its negotiations with the United States Treasury Department and Members of Congress, the Committee, acting in concert with IBA officials, has purported to represent a majority viewpoint of IBA. Through various reportings in national financial journals, the Committee's activities have conveyed the impression that IBA opposes industrial revenue bond financing. We submit that the majority sentiment within IBA has never been determined.

During a meeting and forum discussion of the Municipal Securities Committee at the IBA Convention, November 29, 1967, the suggestion was offered from the floor that IBA officials begin a study to determine a meaningful and feasible approach to polling IBA member firms as to their individual positions, for or against, industrial revenue bond financing. As examples, IBA could have looked to polls taken by the Michigan Forum of New York and the Ohio Valley Group of IBA. It is significant that not only were both votes heavily in favor of continuing industrial revenue bond financing, but also that the geographic location of both groups clearly refuted the oft-repeated charge that industrial revenue bond financing is sectionally influenced. Despite the evident support for a polling of IBA membership, such action was never initiated. Minority asks that the Board of Governors again consider such a poll as an equitable approach for determining the majority sentiment of IBA on this important question.

Meanwhile, the Committee has continued its Washington activities, in several instances without informing all Committee members. The incongruous nature of such activities is best exemplified by an excerpt from the April 4, 1968, Memorandum distributed to Committee members by the Co-Chairmen. Referring to the proposed regulations dealing with industrial revenue bonds published by the United States Treasury Department on March 23, 1968, the Co-Chairmen reported:

"Your Co-Chairmen and the IBA staff at this point were given an advance copy of the Treasury regulations and were in the final stages of preparing suggestions when the Senate Finance Committee approved by a voice vote an amendment by Senator Carl Curtis to the Excise Tax Bill. This provision states that the present Internal Revenue Service rulings regarding industrial revenue bonds could only be overturned by an act of Congress.

"At this point our staff and the AFL–CIO combined forces with the Treasury Department. After a poll of the Senate, it was concluded that an effort to strike the amendment offered by Senator Curtis would be unsuccessful on the floor of the Senate. Accordingly, it was decided that the Ribicoff Amendment should be offered on the floor of the Senate as an amendment to the Excise Tax Bill. It was determined that there was significant sentiment that the Treasury had overstepped the limits of their authority but, nevertheless, the concern as to municipal industrial bonds was significant. It was believed at this time that the Curtis rider would be approved by a block vote with all the other committee amendments and, accordingly, no official vote be taken. However, strategists on the other side called for a separate vote on the Curtis Amendment and the Senate approved the Curtis Amendment 51 to 32. Two days later Senator Ribicoff, along with Senators Percy of Illinois, Murphy of California, Nelson and Proxmire of Wisconsin, Clark of Pennsylvania and Williams of New Jersey, co-sponsored the original Ribicoff Amendment which called for an August 1st cutoff date. However, on the floor of the Senate Senator Brooke of Massachusetts stated that he and Senator Kennedy

would like to vote for the Ribicoff Amendment but the state of Massachusetts needed until the end of the year to get through several large deals which were pending due to the fact their state had just passed enabling legislation. The Ribicoff Amendment passed the Senate by a vote of 50 to 32 and if passed by the House would go into effect December 31, 1968."

We submit that in allying themselves with Treasury and Organized Labor, the Committee and IBA officials have apparently chosen to ignore the cogent rebuttals, offered by leaders within their own industry, to arguments advanced by Treasury and Labor. Commenting on Treasury's "loss of revenue" thesis, the Advisory Commission on Intergovernmental Relations, (Report A–18, June 1963), said:

The government's revenue loss from the issuance of tax exempt industrial development bonds is partially offset, it should be noted, by the revenue gain resulting from the fact that the private business enterprise which receives the benefits of the tax exempt borrowing through lower rental charges is a taxable entity. To the extent that tax exempt financing (and other subsidies provided by State or local government) increases the business firm's taxable net income, its Federal tax liability is increased. In this respect the revenue effect of the industrial development bond differs from that of municipal bonds generally.

The overall increase in economic activity resulting from major capital expenditures and the parallel generation of tax revenues at the Local, State and Federal levels has consistently been disregarded by Treasury and the Committee.

Organized Labor spokesmen were quoted in the August 26, 1966 edition of *Business Week* as launching an all-out lobbying effort against industrial revenue bond financing because the availability of this financing vehicle was "pirating" industry from highly unionized areas to other sections of the nation where Organized Labor was either in the minority or non-existent. Later in this same article, however, these spokesmen admitted that "over 90%" of plants financed through the issuance of industrial revenue bonds represented expansions or new construction rather than a closing of existing facilities. We question the wisdom of the Committee's allegiance with such equivocation and illogic.

Of paramount consideration, however, is the dangerous leverage being handed to the United States Treasury Department by the proposed removal of the tax-exempt privilege on industrial revenue bonds. There is no way that the Committee or IBA officials can assure the investment banking community that Treasury's action with respect to industrial revenue bonds will be its last attack against tax-exempt financing by political subdivisions. The eventual goal of Treasury is wellknown to leaders in the tax-exempt industry, and the Committee's unswerving support of Treasury's attack upon industrial revenue bond financing can only be regarded as a naive and volatile flirtation with an even greater threat to the future of all tax-exempt financing. The historical pattern of regulatory practices by Federal agencies is one of expansion, not contraction. *The Daily Bond Buyer,* May 6, 1968, reproduced in full a letter written by William H. Cannon, Esq., Nixon Mudge Rose Guthrie Alexander & Mitchell, New York, New York. The following excerpts from the letter clearly demonstrates the danger inherent in any concession indicating to Treasury that it has the power and authority to determine which Municipal Securities shall be tax exempt:

. . . . please let me advise you of the contents of a meeting which I attended in Washington on Friday, April 19, 1968.

That meeting was attended by Mr. Stanley Surrey, Assistant Secretary of the Treasury for Tax Policy and Mr. Fred R. Becker of his

office. Numerous other people attended and represented various educational institutions as well as various public authorities which by virtue of legislation have the ability to assist both public and private institutions for higher education and, in certain states, nonprofit hospitals. The meeting was also attended by the representatives of the American Council on Education. The purpose of the meeting was to register objection and explore alternatives to the proposed Treasury regulation which, while purportedly designed to deal only with industrial aid financing actually affects all financings by public bodies involving private or non-profit schools, hospitals, electric power and gas utilities, and other similar publicly oriented purposes when the lessee or mortgagee of the financed facility is obligated to pay to the issuer moneys which are adequate to service the debt of the issuer and to pay all other expenses of operation and maintenance of the facility. Quite clearly, the proposed regulation extends into many areas beyond the industrial aid sector. At the conference, both Mr. Surrey and Mr. Becker clearly stated that such effect was specifically intended by the proposed regulation emphasizing that the proposed regulation was not to be limited solely to industrial aid problems. It was conceded that the language of the proposed regulation referring to industrial development bonds is a misnomer and that, in fact, the proper terminology should have been industrial development "type" bonds.

On the basis of Treasury's stated position (cf. above), neither the Committee nor IBA officials have any valid reason to believe that Treasury will reverse its expanding pattern of regulation and encroachment into the financing domain of the various States, their political subdivisions and agencies.

We strongly recommend that the IBA support adoption of the Curtis Amendment and the simultaneous defeat of the Ribicoff Amendment. We further recommend that the House Ways and Means Committee be requested to schedule hearings at the earliest possible date so that the entire issue of industrial revenue financing may be publicly discussed by all interested parties.

For the Minority:

PETER C. MOHR.

## THE HEARTLANDS OF THE HOME HEMISPHERE—ADDRESS BY COVEY T. OLIVER, ASSISTANT SECRETARY OF STATE

Mr. BAYH. Mr. President, Hon. Covey T. Oliver, Assistant Secretary of State for Inter-American Affairs, delivered a very significant and informative address in Indianapolis a few weeks ago in which he discussed the vast interior heartland of South America. As Secretary Oliver pointed out, in excess of 2 million miles of wilderness in this huge area "wait for the developing hand of man to add their natural wealth and productive capacity toward the well being of individuals, nations and the world."

Although in many respects the resources of the South American heartland are comparable to those which existed in this continent when our Nation was young, the neighboring countries to the south have not been able to develop those resources or to prosper at a level comparable to that of the United States. Secretary Oliver emphasized the fact that the development of the United States was largely dependent on an inflow of foreign capital; without sizable investments from abroad our agricultural, industrial, and commercial growth would have been long delayed.

In recent years, considerable help has been extended to Latin America through the Alliance for Progress, yet much of this huge region remains untapped. Secretary Oliver foresees a period in the not too distant future when the "barriers guarding the heartland of South America" will be overcome and great benefits will flow, not only to the people of Latin America, but also to those of the whole world. To facilitate this process, however, large-scale private investment, as well as public aid will be required.

One of the ways in which we have been lending our assistance has been through the people-to-people program known as the Partners of the Alliance. I am proud to note that Assistant Secretary Oliver calls attention to the role which a number of persons from Indiana have played in this important program. Under the leadership of such Hoosiers as Dr. Robert Carmin, Dr. Robert Yoho, Mr. James Nicolas, and many others, the Indiana group has provided various kinds of assistance to its counterpart organization in Rio Grande do Sul, Brazil. Included in this aid have been several college scholarships in Indiana institutions, numerous community development projects, various items of specialized equipment and funds for local educational programs.

Mr. President, I ask unanimous consent that the comments of Assistant Secretary Oliver be printed in the RECORD.

There being no objection, the address was ordered to be printed in the RECORD, as follows:

THE HEARTLANDS OF THE HOME HEMISPHERE

(Address by Covey T. Oliver, Assistant Secretary of State for Inter-American Affairs and U.S. Coordinator, Alliance for Progress to the Indiana Partners of the Alliance and Sigma Delta Chi Society, Indiana State Teachers Association Building, Indianapolis, Ind., March 11, 1968)

It is always a pleasure for me to visit with the people of this country's great heartland. It seems all too seldom that I get the opportunity to return to the commercial, industrial and agricultural complex that makes up the midwest of today.

Some "coasters" in this country, both east and west, seem to think that since I am involved in foreign affairs I should limit my visits to those areas of the country which are most directly involved and most interested in international relations. They point out that the midwest has no foreign embassies, few consulates, few foreign visitors and little direct international transportation. What these people do not seem to realize is that the people of the midwestern United States not only are seriously concerned with the course and progress of this nation's foreign affairs but that many of them are just as directly involved in these affairs as any coaster. Since I was "born and raised" on the southern fringe of this great heartland some coasters may think I am a little biased in my judgment. Bias or no, however, my opinion on this issue is certainly supported by the facts.

A recent count of Peace Corps volunteers, for instance, showed that 253 Indiana youths are scattered throughout the underdeveloped countries of the world donating two years of their lives for the progress of other people. Another 79 Hoosiers serve abroad with the Agency for International Development. Some 42 are working in our Embassies and consulates with the Foreign Service of the State Department. In all, the twenty states of the midwest contribute one-third of all Peace Corps Volunteers; 1,370 A.I.D. employees and

2,653 Foreign Service Officers, reservists, and staff personnel.

These organizations, of course, by no means exhaust the list of midwesterners who help to guide United States international relations. The International Executive Service Corps—known to its members as the paunch corps—draws 26 percent of its 3,187 qualified volunteers from the heartland of this country for the administrative and managerial talents which are in such short supply in developing countries.

Before I leave these statistics of midwestern involvement in foreign affairs I would especially like to note Indiana's participation in a vital people-to-people program known as the Partners of the Alliance. Under the capable direction of Dr. Robert Carmin and Dr. Robert Yoho and supported by the efforts of people like Mr. Gene Slaymaker, Hoosiers have assisted the development efforts of the people of Rio Grande do Sul in Brazil. To date, the Indiana Partners have contributed two motors to a Brazilian trade school, are involved in eight community development projects, and collected more than $1500 for a college and another $500 for training materials for nursing education. I understand that as a result of your good work, a Brazilian will soon have a set of artificial limbs; and that a number of women's organizations are studying ways they can best help their counterparts in Rio Grande do Sul and Paraná. For a long time there has been a little Brazil in Indiana. Now there is a little Indiana in Brazil.

I thank you good people for adding a much needed personal dimension to this nation's inter-American relations through the Partners of the Alliance Program. I look forward to hearing the results of your future efforts.

From the facts I have mentioned, it is plain there is little evidence to support the view that the heartlanders of the United States are exclusively national in their outlook and interests. You are all involved in foreign affairs, and do much more than watch the course of the new pennies of your tax dollar that go for foreign assistance.

As involved as you are, however, I believe that the greatest challenge to the people of this great heartland in the field of foreign assistance is yet to come. I believe that in the next few years the Federal Government and the governments of all member nations of the Alliance for Progress will be looking increasingly to this region for the knowledge, the experience, the skills, the energy and the tools to open the other vast American heartland, the interior of South America.

That other heartland is bounded on the north and west by the Andes, the second highest mountain chain in the world. It stretches across rivers, jungles, high plateaus and grasslands southward to the swamps of Mato Grosso in Brazil and the scrub plains of the Gran Chaco in Bolivia, Paraguay and Argentina. This largely untouched area includes practically all of the Amazon River Basin, the largest watershed in the world. More than two million square miles of wilderness still wait for the developing hand of man to add their natural wealth and productive capacity toward the well being of individuals, nations and the world.

Not very long ago as national lives are measured, the United States and the newly independent nations to the south stood at the same stage of territorial development. Like them, this nation was poor, undeveloped and holding only an insecure toehold on the edge of an unknown continent. At that time, North and South American men of vision understood that opening and developing the heartlands was the key to national security and future greatness.

In this country, Alexander Hamilton, our first Secretary of the Treasury, clearly saw that the United States could not hope to acquire and develop the North American heartland with its own human and financial resources. He knew we would require huge

foreign investments to build a nation out of the wilderness and to tie it together with roads, canals, bridges and rails. Since there was no international development bank and since no developed nation offered a concessional foreign assistance program to its less developed neighbors, the United States had to depend on the vision and courage of private financiers. Hamilton designed fiscal policies that would attract and give confidence to foreign investors, and he told the citizens of the United States to welcome such capital. In 1791, he said foreign capital "ought to be considered as a valuable auxiliary conducing to put in motion a greater quantity of productive labor, and a greater portion of useful enterprise, than could exist without it."

As a result of this welcoming and eager attitude, and no doubt attracted by the prospect of having a hand in the development of such a great area, foreign investment poured into the United States:

The cash requirement for the Louisiana Purchase, more than $11 million, was promptly supplied by European money markets.

The State of New York obtained financing for the Erie Canal almost entirely from England.

By purchasing $243 million worth of U.S. railroad securities, Europeans helped to finance the great cost of throwing transportation lines across the continent ahead of settlement.

During the time of our greatest territorial growth and development, foreign investments in the United States grew from $60 million in 1800 to more than $7 billion by 1914.

Our heartland simply could not have been opened and developed in the time it was without foreign capital and expertise. We were too poor to meet the tremendous costs involved in such a venture.

But while the United States grew in size and wealth and while the first successful foreign investments in this continent's development attracted an ever-increasing flow of capital from abroad, the countries of South America fell farther and farther behind in their efforts to tame their own interior. There are a number of reasons for this.

The greatest single factor was, perhaps, the great natural barriers and climatic extremes of the South American heartland. The towering Andes and the great central forests repelled all but a few attempts to open the interior. Weather and disease sapped the energy and the will of most men who tried. Sporadic booms such as the rubber boom in Brazil in the early 1900's kept alive the dream of taming the heartland and drew in thousands of would-be settlers. More often than not, however, new towns remained cut off from the developed areas of the coast and gradually were erased as man, no longer able to pay the human cost of staying, retreated to the fringes of the continent or lapsed into a primitive state.

Another reason for the lack of progress in opening the South American heartland was the absence of economic and political stability in the nations involved. Foreigners could never be sure that money they invested during one administration would be respected by the next. Ill-defined borders in the heartland led to devastating wars and destruction of what little development might have gone before.

Today, the vast South American heartland still stands virtually untouched—a problem, a dream and a challenge. Yet, things are changing.

As a direct result of the efforts of American nations under the Alliance for Progress, Latin America generally is enjoying an unprecedented period of economic and political stability. Nineteen of the twenty-one other member nations of the Alliance for Progress now have some form of investment guarantee agreement with the United States to protect private citizens from some of the major risks involved in investing in developing countries. Technological and scientific advances offer new solutions to natural problems once believed to be insoluble.

Businessmen, government officials, technicians, scientists and scholars are preparing coordinated plans for regional and international communications and transportation networks that will span the South American heartland and open it to pioneers and frontiersmen. Their work has been spurred by the American Presidents who met last year in Punta del Este and decided to make the dream of Latin American economic integration a reality by 1985. Inherent in the Presidents' emphasis on the need for greater investments in multinational infrastructure projects, agriculture, education, science and technology is the understanding that true integration will only come when the barriers guarding the heartland of South America have been overcome and that region made to yield its wealth to the further development of Latin America.

To give you some idea of the dramatic developments expected over the coming decades, it may be worthwhile to mention a few of the exciting projects for which detailed feasibility studies are already completed or now under consideration. Among them:

An improved continental telecommunications system, including the use of satellites, to tie together the nations of Latin America, and Latin America with the rest of the world;

The *Carretera Marginal* or Jungle Edge Highway which will open and link the backlands of Colombia, Ecuador, Peru and Bolivia;

The River Plate Basin Development scheme which centers on hydroelectric, transportation and industrial development of the watershed that includes parts of Argentina, Uruguay, Paraguay, Brazil and Bolivia.

These and many other projects will someday serve as loci of heartland development. New lands will be cleared, fertilized, irrigated and brought under cultivation to help meet Latin America's and, indeed, the world's present and future food requirements. New cities and new industries will spring up to take advantage of enhanced transportation, communications and greater power sources. New markets will open, demanding increased foreign trade.

I am sure you all can see the tremendous challenge entailed in the long term effort that will be required to open and develop South America's heartland and the innumerable opportunities this task affords midwesterners of this nation.

Alliance governments can plan, coordinate and support the work that must be done. Our government, for example, recently contributed additional funds to the Inter-American Development Bank which, together with Latin American government contributions will enable the Bank to finance a minimum of $300 million worth of multinational development projects over a three-year period. Our agricultural experts working with A.I.D. are helping their Latin American counterparts plan for increased agricultural productivity. Financial experts and economists from all over the Americas are working together to establish tax systems and ownership schemes that are fair both to the developing country as well as the foreign investor.

Governments, however, cannot do the whole job. The major effort for developing the South American heartland must come from private citizens willing to exert the backbreaking effort it always takes to develop a wilderness and willing to invest in an uncertain but promising future.

Those of you who live in the North American heartland, perhaps better than most, understand the nature and problems of frontier development. Many of you grew up listening to the stories your fathers told of the difficulties they encountered when they first came into this area. Your growing factories have had to invent and produce new tools to overcome a new environment and to take advantage of technological advances. And finally, as your Partners of the Alliance Program indicates, you understand the importance of consideration and understanding in human relations.

For these reasons, I believe that the people of this great heartland are particularly suited to help other Americans to the south develop their own heartland. I am not suggesting that you all pack up this afternoon and begin a new life on the frontiers of South America. South American development is, after all, primarily a job for South Americans.

What I am suggesting is that all of you actively search for ways you can best help Latin Americans in the tremendous job ahead. They need tractors, bulldozers and plows. They will need mutually acceptable capital investments. They need school teachers, nurses, doctors and engineers. The opportunities for expanding your present people-to-people, company-to-company, or church-to-church programs are innumerable. All it takes is imagination and a willingness to help.

For more than twenty years, this nation has dedicated considerable resources to support the development efforts of other countries. One does not have to delve too deeply into the underlying reasons for this unprecedented action to find a strong, general sense of moral rectitude—a basic charitable impulse that unifies our citizens.

Yet, if this were the only reason we have helped others before and are helping our partners in the Alliance for Progress today, we would, perhaps, be justified in curtailing the effort during periods such as this when other demands on our resources proliferate. Since we cannot curtail our efforts now, despite the cost of Viet Nam and the danger threatening our own cities, there must be other good reasons for making the sacrifice.

First of all, it is an article of faith with us that the security of our Home Hemisphere depends on total hemispheric development. We can no longer live as a tremendously wealthy nation in a neighborhood where others are abjectly poor. The violence that threatens our own cities today gives irrefutable evidence of the consequences that can be expected if social differences between neighbors are ignored and allowed to increase. A corollary of this is that at the present, relatively peaceful, time we can accomplish much with very little. The tiny percentage of our Gross National Product that we have contributed to the Alliance for Progress—it will approximate *sixteen-hundredths of one percent* this year—together with the development investments of our allies has already done a great deal. Since the Alliance began, for example, primary school enrollment has increased 50 percent and now includes 36 million children. Electric power has increased by over two-thirds and road mileage by about 18 percent.

Secondly, the sacrifice entailed in giving assistance to poorer nations is not as great as many think it is. More than 88 percent of all foreign aid funds spent by the Agency for International Development are spent in the United States for U.S. goods, products and services.

And thirdly, the United States benefits directly from the development of other free nations in the same way that Europe has benefited a thousandfold from the help it gave us during our development period. For example, I read recently that in 1966 Indiana ranked among the highest of the fifty states in export dollar volume, selling about $620 million worth of manufactured products abroad during that one year. How much of that sum, how many jobs in this area alone, would have been lost had we decided twenty years ago that our allies and former enemies must redevelop by themselves?

It does not take much imagination to see the potentially vast benefits in terms of trade alone that could result from the total development of the great heartland of South America.

If we officials who work directly in the Alliance for Progress, both here and in the other Americas, succeed in laying the groundwork for development—and I sincerely believe we will—you of the North American heartland will be called upon to contribute your energy, inventiveness, experience and understanding, especially to those who face problems similar to those you and your fathers faced in settling and developing the Midwest.

Look southward in the Home Hemisphere! The need and the opportunity for assisting them are there. With your help, both American continents will one day be able to point with pride to dynamic heartlands. Heartlands that furnish much of the power, the food, and the human and natural resources that drive the continuous development and social improvement of our New World.

---

## THE TALKS IN PARIS

Mr. McGEE. Mr. President, a critical time of testing—a testing of our national will—is about to open. I speak, of course, of the talks beginning Friday in Paris between the representatives of our Government and those of North Vietnam. We can, at this point, be pleased that our President stood firm in insisting upon a neutral site for these talks; that he did not listen to the voices of his critics and make the same error as we made in seeking, more than a decade ago, to end the fighting in Korea. Paris is a site that should be conducive to fairness all around.

The difficulties encountered in arranging for the first meeting indicate, I think, the type of difficulties that face us every step of the way. Charles Bartlett, writing in the Washington Evening Star of May 5, recalled the lessons from the Korean negotiations, including those set down for us by the late Adm. C. Turner Joy, who led the United Nations negotiating team. His conclusion might well be summed up in the paragraph from that column which says:

> A disciplined American attitude is the best hope that the settlement of the war in Vietnam will be any less protracted and gruelling than the two years of armistice talks in Korea.

Mr. President, I ask unanimous consent that Mr. Bartlett's column be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

ROAD TO VIET SETTLEMENT TORTUOUS

(By Charles Bartlett)

Hanoi's agreement to meet in Paris is valuable as a reminder that a nation which does not learn from its mistakes is doomed to repeat them.

"Come to Kaesong and we'll talk," the North Koreans said in 1951 and the first mistake in pursuit of a Korean armistice was to take them at their word. The sessions behind the enemy lines proved to be little more than a prologue carefully staged to project an impression that the Communists had won the war.

The late C. Turner Joy, the vice admiral who led the United Nations' negotiating team and wrote thoughtfully of his experiences, later observed, "Communists should not be allowed unilaterally to select the site for a conference. If one cannot successfully negotiate a site for talks, why expect to negotiate substantive issues successfully?"

President Johnson obviously erred in promising to go anywhere to talk, but one happy consequence of his withdrawal from politics is that he does not have to play out every error. He can tolerate the stings of Communist propagandists and the discomfort of hearing Hubert Humphrey say that he was wrong. This is a small price for letting the North Vietnamese know that Washington does not intend to relive the mistakes of the Korean negotiations.

Washington went wrong then on a series of critical points because it allowed its desperate eagerness to end the war to foster an illusion that it is possible to conciliate Asian Communists by giving ground to them. Experience proved exactly the reverse—when Washington gave, Peking became tougher.

In the recent site discussions, Washington stood firm and the Communists slowly receded from what was a characteristically unreasonable opening gambit. This could mean that they are anxious to end the fighting but it could also mean that they are merely anxious to get on with the business of tightening the strain of impatience upon the American nerve system in the coming months.

They may find it politically preferable to hope they can deal next January with a less obdurate American president. Johnson is more emphatic in private than in public that he does not intend to participate in a settlement that will leave South Vietnam up for grabs and it is impractical for them to rely any longer upon his personal impatience.

As both sides prepare for the Paris talks, Hanoi has gone on record that it will seek total bombing pause at the outset, while the United States, under the San Antonio formula, insists that Hanoi must pledge military restraint in return.

In actual military terms a total bombing pause may seem less important to Hanoi now than the reinforcement of the Viet Cong. American estimates that the enemy has lost 80,000 men since the Tet offensive gained credibility from the unprecedented rush of recruits, many of them raw youngsters, across the border. Their negotiating strategy is apparently being tailored to a military necessity to reinforce their depleted units.

A disciplined American attitude is the best hope that the settlement of the war in Vietnam will be any less protracted and gruelling than the two years of armistice talks in Korea. The Communists have fared well by making a shadowy and confusing exercise out of peace negotiations and they have no good reason to change their style.

Of all the mistakes which Admiral Joy ascribed to the Korean negotiations, the most critical was Washington's early acceptance of the Communists' demand for a fixed truce line. This lifted the military pressure which gave the enemy its strongest incentive to negotiate and thus prolonged the war and weakened the ultimate terms.

"Do not stop fighting," Joy warned, "until hostilities have ended; not if you want an armistice with the Communist on acceptable terms within a reasonable period of time."

Joy argued strongly against the "flexibility" advocated by Johnson's critics. The Truman administration confused its own negotiators as well as the enemy by trimming its political objectives to events as they unfolded. This vacillating kept alive the expectation that delay would produce a better deal.

The White House is aware that its critical test of firmness will come on the issue of a coalition government. The Communist interest in negotiations is hinged to their concept of a coalition that will be merely a thin veil for party control. The Johnson-Thieu olive branch will be the promise of an election in which all citizens vote for candidates of their choice.

This is a democratic compromise that will yield the Communists far less than they presently have in mind. The agreement to meet in Paris holds no promise that the road to this solution will not be slow and tortuous.

---

## SUPPORT FOR CONGRESSIONAL COUNSEL GENERAL GROWING

Mr. HARTKE. Mr. President, on March 23, 1967, I presented to the Senate a proposal for the establishment of a permanent officer of the Congress to be what might be called its "house lawyer." The bill is before the Committee on Separation of Powers and has had a preliminary consideration in its early hearings.

As I noted on several later occasions, the proposal for a Congressional Counsel General—a name which is less confusing than the original designation of "Legislative Attorney General"—has received a good deal of attention. I might add that a full-length article on it, prepared at the editor's request, will appear in the issue of the Administrative Law Review now at press.

A new popular statement of the case for this proposal has just been distributed by the North American Newspaper Alliance, written by Ernest Cuneo. It appeared earlier this week, among other places, in the Indianapolis Star, under the title "Attorney General for the Congress Held Necessary." The thoughts expressed by Mr. Cuneo are essentially those which I expressed upon introduction of the bill and in its subsequent discussion.

I ask unanimous consent that this article may appear in the CONGRESSIONAL RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

ATTORNEY GENERAL FOR THE CONGRESS HELD NECESSARY

(By Ernest Cuneo)

WASHINGTON.—For a considerable time, there has been growing concern over the relegation of the Congress to a secondary role in the nation's affairs.

This has come about in two principal ways. The Senate, once all powerful in international matters, was all but completely emasculated in foreign affairs by the famous Curtiss-Wright decision of the Supreme Court in 1936. The decision held that the President was the sole spokesman for the nation in foreign matters, that he need give the Senate only such information as he saw fit, and that his actions could not be questioned even in the courts. Added to his powers as commander-in-chief, in volatile and dangerous times, it is no wonder that Prof. Corbin remarks that the nation was back to the first institution of the Anglo-Saxon race, the elected kingship.

On the domestic side, Congress faced the dilemma of all powerful bodies, the paradox that the only way to exercise power is to delegate it. Congress created the vast governmental agencies ranging from securities and exchange to the Power and the Communications Commission. These and other agencies regulate more of American daily life than it is pleasant to think about. The power of these agencies is such that it has been remarked that national elections may become irrelevant because American life is today largely governed by agency. Far from being responsive to the people, there is considerable doubt as to whether they are responsible either to the Executive Department or to the Congress.

*May 8, 1968* EXTENSIONS OF REMARKS 12361

They have been described as revolving between them, as Mohammed's coffin revolves twixt heaven and earth.

There never was the slightest doubt that the Congress was designed to be the supreme branch of the government, nor that it must be restored to its original position if we are to continue in a government responsive to the people. It is a fair statement, therefore, that the Congress failed its duty, not only to itself, but primarily to the people by allowing its power to be eroded.

The manner of the erosion of congressional power suggests the manner in which it can be restored. Assuming that the three great branches of government are equal, that is legislative, executive and judicial, it follows that the latter, the Supreme Court, usually has final say, in case of dispute. This is not provided for in the Constitution. The Supreme Court itself simply took that power unto itself in the early case of Marbury vs. Madison.

It is somewhat astonishing, therefore, that since the inception of the republic, that Congress provided for an attorney general, who is in fact, house counsel for the executive branch, and provided for no attorney general for the Congress of the United States. Since the Constitution designedly built in frictions for the purpose of dividing power, it follows that on greatest issues the Congress is represented before the Supreme Court by an attorney general who represents only the executive. Thus, the Supreme Court and the executive branch often labor mightily to ascertain the intent of Congress, with Congress across the street and totally unconsulted. Of the finality of Supreme Court decision, Mr. Chief Justice Hughes said simply and forthrightly, "the Constitution means what the Supreme Court says it means." This is the present state of the law, but it was not designed so. Mr. Justice Holmes declared, that if the Supreme Court did not have the right to declare acts of Congress unconstitutional, the Union could continue; on the other hand if it did not have the right to declare acts and decisions of the various states unconstitutional, the Union would dissolve. The original Constitution gave no power over Congress to the Supreme Court.

The Supreme Court, as do all other courts, accepts without question the rulings of the State Department on status of foreign matters. It would seem appropriate, therefore, that the Supreme Court accept the will of Congress as stated by Congress and not decide itself what the Congress intended.

This, or course, would involve fundamental procedural changes in cases where the intent of a congressional statute is before the court. There is, of course, the implied condition that if the Congress is not satisfied with the interpretation of the court, it can change it by another law. But this is a slow and cumbersome business, and of no value in the case actually before the court.

An extremely healthy compromise would be if the Congress looked to the protection of its constitutional powers by the creation of its own law office. Thus, it could create the offices of the attorney general of the Congress, with solicitor-general of the House and of the Senate. By law, it could be easily provided that when the attorney general of the Congress deems that a fundamental constitutional right of the Congress is in issue, or when the intent of the Congress is a decisive issue, then the Congress itself shall have right to appear before the court to memorialize the court on what the Congress deems its intent or its constitutional right to be. Failing in this, that body most responsive to the people will continue to be shouldered, and alarmingly, into space more confined by the courts, the agencies, the executive branch, for the reason that it did not assert its constitutional rights.

The creation of an attorney general of the Congress with solicitors-general of the House and of the Senate would instantly restore the Congress to the pre-eminence designed for it in the original Constitution.

Mr. BYRD of West Virginia. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. BYRD of West Virginia. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

## RECESS UNTIL 11 A.M. TOMORROW

Mr. BYRD of West Virginia. Mr. President, if there be no further business to come before the Senate, I move, in accordance with the previous order, that the Senate stand in recess until 11 a.m. tomorrow.

The motion was agreed to; and (at 5 o'clock and 18 minutes p.m.) the Senate recessed until tomorrow, Thursday, May 9, 1968, at 11 a.m.

## NOMINATIONS

Executive nominations received by the Senate (legislative day of May 7, 1968) May 8, 1968:

DEPARTMENT OF TRANSPORTATION

John E. Robson, of Illinois, to be Under Secretary of Transportation.

Stanford G. Rose, of New York, to be General Counsel of the Department of Transportation.

AGENCY FOR INTERNATIONAL DEVELOPMENT

H. Brooks James, of North Carolina, to be an Assistant Administrator of the Agency for International Development, vice Herbert J. Waters, resigned.

# EXTENSIONS OF REMARKS

## THE INTERRELATION BETWEEN BUSINESS DECISIONS AND INTERNATIONAL FINANCE

### HON. THOMAS B. CURTIS
OF MISSOURI
IN THE HOUSE OF REPRESENTATIVES
*Wednesday, May 8, 1968*

Mr. CURTIS. Mr. Speaker, Mr. N. R. Danielian, president of the International Economic Policy Association, made a speech on April 18, 1968, that has several points pertaining to the current U.S. economic situation that are worth considering. In his comments, he stated that the United States must balance the budget to maintain the value of the dollar; eliminate other-than-tariff barriers in foreign countries that impede U.S. exports; and eliminate the controls on private investment and lending overseas. For these and other views expressed, I commend this speech to your attention, as follows:

THE INTERRELATION BETWEEN BUSINESS DECISIONS AND INTERNATIONAL FINANCE

(By N. R. Danielian, president, International Economic Policy Association, before the joint spring meeting of the International Economic Affairs Committee, Money/Credit/Capital Formation Committee of the National Association of Manufacturers, Chicago, Ill., April 18, 1968)

I wish to take this opportunity first to congratulate Mr. Gullander and Mr. Davis for the initiative they have taken in giving new emphasis to international economic problems as they bear upon the interests of U.S. business. This undertaking promises to be of great value.

When Mr. Davis asked me to participate in this program, I was delighted to accept because I believe in it deeply. It was because we felt that freedom in economic enterprise and political institutions would depend upon the success of our system in worldwide competition that a group of us took the initiative in 1957 to organize the International Economic Policy Association. It was obvious then that military power in the atomic age would be in a stalemate between the two major powers vying for world supremacy, and that economic and political policies would determine which way the wave of the future would take us. Events have proved this diagnosis to be correct and I am delighted that the National Association of Manufacturers is broadening its interests and activities in the international field.

Business needs a profound understanding of international financial and economic trends in making decisions concerning expansion, plant location, sourcing of materials, financing and even administrative decisions such as personnel assignment. Unfortunately, such perceptive analysis and information have not always been widely available to corporate management, mainly because economists have allowed their own hopes and desires to interfere with an objective analysis of the facts. There is a saying in Washington that the trouble with public policy is that lawyers act as if they are economists and economists behave like social workers. Information and analysis based upon such a point of view cannot serve the interests of either business or government in their decision-making process.

The best way to illustrate this thesis is by reference to some recent experiences.

THE BALANCE OF PAYMENTS AND DIRECT INVESTMENTS

You are all familiar with the ultimate indignity that has befallen direct foreign investments by the application of the Trading With the Enemy Act to those of you who want to invest more than $100,000 a year anywhere in the world. In spite of repeated warnings, economists in government tended to play down the seriousness of the balance of payments deficits, because they did not wish to face the unpleasant task of revising national objectives. Yet the handwriting was on the wall for a long time.

I remember the incredulous consternation that greeted me on the long-distance telephone on the weekend prior to New Year's Day when I informed some of my friends in the business community of what was in the offing. How did we know about it? Our information came from Europe by way of Basle where the international central banking community had read the riot act to our representatives to control the balance of payments deficits—or else.

One did not need to depend upon confidential information to anticipate what was likely to happen. Our analysis indicated that ever since 1958 the balance of payments deficits had been running between $3 and $4 billion a year and that the improvements advertised for 1965 and 1966 were statistical, rather than real. Even the last figure given for 1967, that our deficits were $3.6 billion, had the benefit of what one has called "cosmetic treatment" of the deficits. If you