# FEDERAL FIREARMS ACT

## HEARINGS

BEFORE THE

## SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY

OF THE

## COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

NINETIETH CONGRESS

FIRST SESSION

PURSUANT TO

## S. Res. 35

NINETIETH CONGRESS

ON

## S. 1

A BILL TO AMEND THE FEDERAL FIREARMS ACT

## Amendment 90 to S. 1

A BILL TO AMEND THE FEDERAL FIREARMS ACT

## S. 1853

A BILL TO AMEND THE FEDERAL FIREARMS ACT

## S. 1854

A BILL TO AMEND THE NATIONAL FIREARMS ACT

JULY 10, 11, 12, 18, 19, 20, 25, 28, AND 31; AND AUGUST 1, 1967

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1967

82–646

## COMMITTEE ON THE JUDICIARY

JAMES O. EASTLAND, Mississippi, *Chairman*

JOHN L. McCLELLAN, Arkansas
SAM J. ERVIN, JR., North Carolina
THOMAS J. DODD, Connecticut
PHILIP A. HART, Michigan
EDWARD V. LONG, Missouri
EDWARD M. KENNEDY, Massachusetts
BIRCH BAYH, Indiana
QUENTIN N. BURDICK, North Dakota
JOSEPH D. TYDINGS, Maryland
GEORGE A. SMATHERS, Florida

EVERETT McKINLEY DIRKSEN, Illinois
ROMAN L. HRUSKA, Nebraska
HIRAM L. FONG, Hawaii
HUGH SCOTT, Pennsylvania
STROM THURMOND, South Carolina

———

SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY IN THE UNITED STATES

(90TH CONGRESS)

THOMAS J. DODD, Connecticut, *Chairman*

PHILIP A. HART, Michigan
BIRCH BAYH, Indiana
QUENTIN N. BURDICK, North Dakota
JOSEPH D. TYDINGS, Maryland
EDWARD M. KENNEDY, Massachusetts

ROMAN L. HRUSKA, Nebraska
HIRAM L. FONG, Hawaii
STROM THURMOND, South Carolina

CARL L. PERIAN, *Staff Director*

II

# CONTENTS

## AGENCY COMMENTS [1]

Page

Department of Justice, on S. 1, Amendment No. 90, appearance of Ramsey Clark, Attorney General, July 28, 1967_____ 331, 918
Department of Justice, on S. 1853, dated July 18, 1967_____ 1081
Department of Justice, on S. 1854, dated July 24, 1967_____ 1082
Department of State, on S. 1, Amendment No. 90, appearance of John W. Sipes, Director, Office of Munitions Control and Robert A. Clark, Jr., Deputy Director, July 12, 1967_____ 168
Department of State, on S. 1853, dated August 4, 1967_____ 1083
Department of State, on S. 1854, dated August 3, 1967_____ 1083
Department of Treasury on S. 1, Amendment No. 90, appearance of Under Secretary of the Treasury, Joseph W. Barr and Sheldon S. Cohen, Commissioner of Internal Revenue, July 10 and 11, 1967_____ 36, 121
Department of Treasury, on S. 1853, dated July 6, 1967_____ 1084
Department of Treasury, on S. 1854, dated July 6, 1967_____ 1086
Department of Defense, on S. 1, Amendment No. 90, appearance of David E. McGiffert, Under Secretary of the Army, and Lt. Col. Joseph B. Berry, Acting Director of Civilian Marksmanship Program, National Board for the Promotion of Rifle Practice, July 25, 1967_____ 737
Department of Commerce, on S. 1854, dated November 2, 1967_____ 1090

## ALPHABETICAL LIST OF WITNESSES

Statement of—

Arrington, W. Russell, president pro tempore and majority leader, Illinois State Senate_____ 951
Barr, Joseph W., Under Secretary of the Treasury (accompanied by Sheldon S. Cohen, Commissioner of Internal Revenue)_____ 36, 121
Benenson, Mark K., New York Sporting Arms Association_____ 669
Bennett, James V., president, National Council for a Responsible Firearms Policy, and chairman, Committee on Legislation of the Criminal Law Section of the American Bar Association_____ 1065
Berry, Lt. Col. Joseph B., Acting Director of Civilian Marksmanship Program, National Board for the Promotion of Rifle Practice (accompanied David E. McGiffert, Under Secretary of the Army)__ 737
Blondes, Leonard S., vice president, National Council for a Responsible Firearms Policy (accompanied by James V. Bennett, president, Dr. J. Elliott Corbett, secretary and David Steinberg, treasurer)__ 841
Cahalan, William L., prosecuting attorney, Wayne County, Mich.____ 368
Carter, William M., Carter's Gun Works, Charlottesville, Va_____ 265
Church, Frank, U.S. Senator from Idaho_____ 415
Clark, Ramsey, Attorney General of the United States_____ 331, 918
Clark, Robert A., Jr., Deputy Director, Office of Munitions Control, Department of State (accompanied John W. Sipes, Director, Office of Munitions Control, Department of State)_____ 168
Cohen, David F., president, Pawnbrokers' Association of the City of New York (accompanied by Francis Dorn)_____ 1062
Cohen, Sheldon S., Commissioner of Internal Revenue (accompanied Joseph W. Barr, Under Secretary of the Treasury)_____ 36, 121
Corbett, Dr. J. Elliott, secretary, National Council for a Responsible Firearms Policy (accompanied Leonard S. Blondes, vice president)__ 841
Dennis, Robert T., assistant conservation director, Izaak Walton League of America_____ 584

[1] Agency comments on similar firearms legislation before this subcommittee will be found in "Hearings before the Committee on the Judiciary, U.S. Senate, 89th Congress, first sess., pursuant to S. Res. 52, May 19, 20, and 21; June 2, 3, 8, 24, and 30; July 1, 20, and 27, 1965.

IV                                        CONTENTS

Statement of—Continued

Dickinson, William D., manager, H. P. White Laboratory, Bel Air, Md__ **Page** 255

Dingell, John D., U.S. Representative, 16th District, Michigan (as presented by Senator Hruska)__ 151

Dominick, Peter H., U.S. Senator from Colorado__ 882

Dorn, Francis (accompanied David F. Cohen, president, Pawn-brokers' Association of the City of New York)__ 1062

Fillinger, Halbert E., president, Pennsylvania Antique Gun Collec-tors Association (accompanied by William F. Killeen)__ 1030

Foote, Frank (appearing on behalf of Melvin O. Steen, president International Association of Game, Fish, & Conservation Commis-sioners) __ 605

Foxworthy, Betty Ann, editor, Trap & Field magazine (accompanied Joe H. McCracken III, representing the National Skeet Shooting Association, the Amateur Trapshooting Association of the United States and the Texas Skeet Shooters Association)__ 639

Glassen, Harold W., president, National Rifle Association (accom-panied by Franklin L. Orth, executive vice president and Woodson S. Scott, vice president, National Rifle Association)__ 438, 543

Gomberg, Ephraim R., executive vice president, Crime Commission of Philadelphia__ 341

Gonzalez, Henry B., U.S. Representative, 20th District, Texas__ 285

Graham, Harry L., legislative representative, National Grange__ 828

Gutermuth, C. R., vice president, Wildlife Management Institute__ 618

Hickenlooper, Bourke B., U.S. Senator from Iowa__ 163

Hughes, Richard J., Governor of the State of New Jersey__ 997

Jackson, Leon C., representing the American Society of Arms Collec-tors, the Texas Gun Collectors Association and the Ark-La-Tex Gun Collectors Association__ 627

Jungroth, James R., president, North Dakota Wildlife Federation__ 598

Kennedy, Robert F., U.S. Senator from New York__ 158

Killeen, William F. (accompanied N. Halbert E. Fillinger, president, Pennsylvania Antique Gun Collectors Association)__ 1030

Kimball, Thomas L., executive director, National Wildlife Federation, Washington, D.C.__ 242

Knox, Neal, editor, Gun Week newspaper__ 657

Livermore, Charles P., executive director, Chicago Commission on Youth Welfare (appearing on behalf of Mayor Richard Daley of the city of Chicago)__ 408

Ludwig, Frederick J., chief assistant district attorney, Queens, Long Island, N.Y.__ 102

McCracken, Joe H., III, representing the National Skeet Shooting Association, the Amateur Trapshooting Association of the United States and the Texas Skeet Shooters Association (accompanied by Mrs. Bettey Ann Foxworthy, editor, Trap & Field magazine)__ 639

McGiffert, David E., Under Secretary of the Army (accompanied by Lt. Col. Joseph B. Berry, Acting Director of Civilian Marksman-ship, National Board for the Promotion of Rifle Practice)__ 737

Metcalf, Lee, U.S. Senator from Montana (as presented by Senator Hart)__ 148

Noble, William R., general counsel, National Retail Hardware Association__ 276

Orth, Franklin L., executive vice president, National Rifle Associa-tion (accompanied by Harold W. Glassen, president, and Woodson D. Scott, vice president, National Rifle Association)__ 438, 543

Page, Warren, president, National Shooting Sports Foundation, Inc. (accompanied by Robert C. Zimmer, counsel)__ 793

Saylor, John P., U.S. Representative, 22d District Pennsylvania__ 156

Schooley, John M., past president of the National Rifle Association__ 965, 984

Scott, Woodson D., vice president, National Rifle Association (ac-companied Franklin L. Orth, executive vice president)__ 438, 543

Shumaker, Paull L., director, Ohio Gun Collectors Association__ 648

Sikes, Robert L. F., U.S. Representative, 1st District, Florida__ 973

Sipes, John W., Director, Office of Munitions Control, Department of State (accompanied by Robert A. Clark, Jr., Deputy Director, Office of Munitions Control, Department of State)__ 168

Smith, Harold P., Rabbi, national chairman of the legislative com-mittee of the Rabbinical Council of America__ 835

CONTENTS                                          V

Statement of—Continued
    Stanczyk, Benjamin C., judge, common pleas court, city of Detroit,   **Page**
        Mich_____   591
    Steinberg, David, treasurer, National Council for a Responsible Fire-
        arms Policy (accompanied Leonard S. Blondes, vice president)____   841
    Tamm, Quinn, executive director, International Association of Chiefs
        of Police_____   1052
    Tydings, Joseph D., U.S. Senator from Maryland_____   871
    Zimmer, Robert C., counsel, National Shooting Sports Foundation,
        Inc. (accompanied Warren Page, president)_____   793

## CHRONOLOGICAL LIST OF WITNESSES

### JULY 10, 1967

Barr, Joseph W., Under Secretary of the Treasury (accompanied by
    Sheldon S. Cohen, Commissioner of Internal Revenue)_____   36
Ludwig, Frederick J., chief assistant district attorney, Queens, Long
    Island, N.Y_____   102

### JULY 11, 1967

Cohen, Sheldon S., Commissioner of Internal Revenue (accompanied by
    Joseph W. Barr, Under Secretary of the Treasury)_____   121
Metcalf, Lee, U.S. Senator from Montana (as presented by Senator Hart)_   148

Dingell, John D., U.S. Representative, 16th District, Michigan (as presen-
    ted by Senator Hruska)_____   151
Saylor, John P., U.S. Representative, 22d District, Pennsylvania_____   156
Kennedy, Robert F., U.S. Senator from New York_____   158

### JULY 12, 1967

Hickenlooper, Bourke B., U.S. Senator from Iowa_____   163
Sipes, John W., Director, Office of Munitions Control, Department of State
    (accompanied by Robert A. Clark, Jr., Deputy Director, Office of Muni-
    tions Control, Department of State)_____   168
Kimball, Thomas L., executive director, National Wildlife Federation,
    Washington, D.C._____   242
Dickinson, William D., manager, H. P. White Laboratory, Bel Air, Md__   255
Carter, William M., Carter's Gun Works, Charlottesville, Va_____   265
Noble, William R., general counsel, National Retail Hardware Association_   276

### JULY 18, 1967

Gonzalez, Henry B., U.S. Representative, 20th District, Texas_____   285
Clark, Ramsey, Attorney General of the United States (testimony con-
    cluded on July 28, 1967)_____   331
Gomberg, Ephraim R., executive vice president, Crime Commission of
    Philadelphia_____   341
Cahalan, William L., prosecuting attorney, Wayne County, Mich_____   368
Livermore, Charles P., executive director, Chicago Commission on Youth
    Welfare (appearing on behalf of Mayor Richard Daley of the city of
    Chicago)_____   408

### JULY 19, 1967

Church, Frank, U.S. Senator from Idaho_____   415
Glassen, Harold W., president, National Rifle Association (accompanied
    by Franklin L. Orth, executive vice president and Woodson S. Scott,
    vice president, National Rifle Association)_____   438

### JULY 20, 1967

Orth, Franklin L., executive vice president, National Rifle Association
    (accompanied by Harold W. Glassen, president, and Woodson D. Scott,
    vice president, National Rifle Association)_____   543
Dennis, Robert T., assistant conservation director, Izaak Walton League
    of America_____   584
Stanczyk, Benjamin C., judge, common pleas court, city of Detroit, Mich_   591
Jungroth, James R., president, North Dakota Wildlife Federation_____   598

VI                                    CONTENTS

Page

Foote, Frank (appearing on behalf of Melvin O. Steen, president, International Association of Game, Fish, and Conservation Commissioners,)_      605
Gutermuth, C. R., vice president, Wildlife Management Institute_____      618
Jackson, Leon C., representing the American Society of Arms Collectors, the Texas Gun Collectors Association, and the Ark-La-Tex Gun Collectors Association_____      627
McCracken, Joe H., III, representing the National Skeet Shooting Association, the Amateur Trapshooting Association of the United States and the Texas Skeet Shooters Association (accompanied by Mrs. Bettey Ann Foxworthy, editor, Trap & Field magazine)_____      639
Shumaker, Paull L., director, Ohio Gun Collectors Association_____      648
Knox, Neal, editor, Gun Week newspaper_____      657
Benenson, Mark K., New York Sporting Arms Association_____      669

JULY 25, 1967

McGiffert, David E., Under Secretary of the Army (accompanied by Lt. Col. Joseph B. Berry, Acting Director of Civilian Marksmanship Program, National Board for the Promotion of Rifle Practice)_____      737
Page, Warren, president, National Shooting Sports Foundation, Inc. (accompanied by Robert C. Zimmer, counsel)_____      793
Graham, Harry L., legislative representative, National Grange_____      828
Smith, Harold P., Rabbi, national chairman of the legislative committee of the Rabbinical Council of America_____      835
Blondes, Leonard S., vice president, National Council for a Responsible Firearms Policy (accompanied by James V. Bennett, president, Dr. J. Elliott Corbett, secretary and David Steinberg, treasurer)_____      841

JULY 28, 1967

Tydings, Joseph D., U.S. Senator from Maryland_____      871
Dominick, Peter H., U.S. Senator from Colorado_____      882
Clark, Ramsey, Attorney General of the United States (resumed from July 18, 1967)_____      918

JULY 31, 1967

Arrington, W. Russell, president pro tempore and majority leader, Illinois State Senate_____      951
Schooley, John M., past president of the National Rifle Association_____      965
Sikes, Robert L. F., U.S. Representative, 1st District, Florida_____      973
Schooley, John M., past president of the National Rifle Association (resumed)_____      984

AUGUST 1, 1967

Hughes, Richard J., Governor of the State of New Jersey_____      997
Fillinger, Halbert E., president, Pennsylvania Antique Gun Collectors Association (accompanied by William F. Killeen)_____     1030
Tamm, Quinn, executive director, International Association of Chiefs of Police_____     1052
Cohen, David F., president, Pawnbrokers' Association of the City of New York (accompanied by Francis Dorn)_____     1062
Bennett, James V., president, National Council for a Responsible Firearms Policy, and chairman, Committee on Legislation of the Criminal Law Section of the American Bar Association_____     1065

LIST OF EXHIBITS

1. Text of Senate Resolution 35, 90th Congress, first session, dated February 20, 1967, establishing the Juvenile Delinquency Subcommittee_____        4
2. Text of S. 1, a bill to amend the Federal Firearms Act, dated January 11, 1967_____        4
3. Text of S. 1—Amendment No. 90, the State Firearms Control Assistance Act of 1967, dated February 9, 1967_____       12
4. Text of S. 1853, a bill to amend the Federal Firearms Act, dated May 24, 1967_____       20

CONTENTS VII

Page

5. Text of S. 1854, a bill to amend the National Firearms Act and for other purposes, dated May 24, 1967 — 24
6. An address by the Honorable Edward M. Kennedy to the annual meeting of the National Rifle Association, Washington, D.C., April 2, 1967 — 27
7. Advertisement from the Shotgun News, entitled "Long Hot Summer Special," dated June 1, 1967, page 7 — 42
8. Excerpt from the report of the President's Commission on Law Enforcement and the Administration of Justice, chapter 10, entitled "Control of Firearms," Washington, February 19, 1967 — 60
9. Regulations of the Internal Revenue Service pursuant to the National Firearms Act of 1934 and the Federal Firearms Act of 1938 — 65
10. Memorandum from Harold A. Serr, Director, Alcohol and Tobacco Tax Division, Department of Treasury, on "Firearms Enforcement Activities for the Fiscal Years 1963–67," dated August 11, 1967 — 75
11. Memorandum from Harold A. Serr, Director, Alcohol and Tobacco Tax Division, Department of Treasury, on "Criminal Cases Arising From Violations of Section 2(c) of the Federal Firearms Act (15 U.S.C. 902(c))," dated August 11, 1967 — 78
12. Letter dated April 14, 1967, from Jeffrey C. Kitchen, Deputy Assistant Secretary for Politico-Military Affairs, Department of State, to the Honorable Edward M. Kennedy — 86
13. Newsletter dated June 19, 1967, from Senator Strom Thurmond, entitled "Strom Thurmond, U.S. Senator from South Carolina Reports to the People on the Right To Bear Arms" — 100
14. Comparative analysis of major innovating features of S. 1853 and S. 1—Amendment No. 90, presented by Sheldon Cohen, Commissioner, Internal Revenue Service, Department of Treasury — 124
15. Memorandum from Sheldon Cohen, Commissioner, Internal Revenue Service, Department of Treasury, entitled "Applicability of Section 10 of the Federal Firearms Act (15 U.S.C. 910)," dated August 3, 1967 — 134
16. Memorandum from Harold A. Serr, Director, Alcohol and Tobacco Tax Division, Department of Treasury, on "Justification for Inclusion of Long Guns in Proposed Controls Over Interstate and Foreign Commerce in Firearms," dated August 11, 1967 — 139
17. Letter dated July 6, 1967, from Fred B. Smith, General Counsel, Department of Treasury, to Senator James O. Eastland on S. 1854 — 1086
18. Regulations of the Department of State pursuant to section 414 of the Mutual Security Act of 1954 as amended — 169
19. Excerpt from a letter dated August 22, 1967, to the Honorable Thomas J. Dodd from Mr. John Sipes, "Import Licenses Issued for Large Caliber Firearms" — 194
20. Excerpt of letter dated August 22, 1967 (exhibit No. 19), relating to the elimination of the State Department's Munitions Control Statistical Unit — 197
21. Excerpt of letter dated August 22, 1967 (exhibit No. 19), "Countries Importing Firearms Into the United States From 1958–63" — 199
22. Chart: "Principle Countries From Which Firearms Were Imported in 1965, 1966, and 1967," from the Office of Munitions Control, Department of State — 200
23. Chart: "Firearms Imports, 1962 to Mid-1967," from the Office of Munitions Control, Department of State — 200
24. State Department form DSP–38: Application for License To Import Arms, Ammunition, and Implements of War — 205
25. State Department form DSP–9: Application for Registration for Persons or Firms Manufacturing, Exporting, or Importing Items Enumerated in the U.S. Munitions List — 210
26. Letter dated August 21, 1967, from the Honorable Roman L. Hruska to the Honorable Thomas J. Dodd — 219
27. Letter dated August 17, 1967, from John Sipes, Director, Office of Munitions Control, Department of State, to the Honorable Roman L. Hruska — 219
28. Letter dated October 3, 1967, from the Honorable Thomas J. Dodd to Mr. John Sipes — 220

VIII                                   CONTENTS

Page

29. Article from the Saturday Evening Post of March 24, 1962, by John Kobler, entitled "The Man With the Crocodile Brief Case"_____ 220
30. Article from the New York Times Magazine of September 24, 1967, by Sanche de Gramont, entitled "Arms Merchant to the World"_ 227
31. Letter dated October 24, 1967, from Robert A. Clark, Jr., Acting Director, Office of Munitions Control, Department of State, to the Honorable Thomas J. Dodd_____ 234
32. Letter dated April 26, 1966, from Douglas MacArthur II, Assistant Secretary for Congressional Relations, Department of State, to the Honorable Roman L. Hruska_____ 239
33. Ballistics report on imported firearms conducted by the H. P. White Laboratories dated March 25, 1965_____ 263
34. Advertisement from the Los Angeles Times of Seaport Traders, Inc., entitled "Submachine Gun for Father's Day"_____ 268
35. Excerpt of Minuteman publication On Target, dated March 15, 1963, entitled "Words Won't Win—Action Will"_____ 292
36. Excerpt of testimony of FBI Director, J. Edgar Hoover before the House Appropriations Committee, 1967_____ 297
37. A Study of the Activities and Missions of the National Board for the Promotion of Rifle Practice—Report to the Department of the Army, January 1966_____ 303
38. Chart: Percent Criminal Homicides by Gun to Total Homicides, 1963 through first 5 months of 1967; source: Philadelphia Police Department, August 23, 1967_____ 354
39. Chart: Guns Used in Criminal and Noncriminal Homicides 1965, 1966, and Guns Involved in Crimes 1963–66, source: Philadelphia Police Department, August 23, 1967_____ 356
40. Article from the University of Pennsylvania Law Review entitled "The Philadelphia Firearms Ordinance—A Case of Comprehensive Oversight," volume 114, No. 5, February 19, 1966, pages 550–560_____ 357
41. Statistics relevant to the control of firearms and ammunition in England, Scotland and Wales_____ 364
42. Letter dated July 17, 1967, from the Honorable Philip A. Hart to the Honorable Thomas J. Dodd_____ 367
43. Chart: Excerpt from FBI report entitled "Offenses Known to the Police, 1965 and 1966," cities over 100,000 in population (Philadelphia, Pa.)_____ 436
44. Article entitled "The Lost Amendment," from the American Bar Association Journal, by Robert A. Sprecher, June and July 1965, volume 51, Nos. 6 and 7_____ 445
45. Article entitled "To Have and Bear Arms," from the American Rifleman by Judge Bartlett Rummel, June 1964_____ 455
46. Statistics on firearms in accidents and crime: Total accidents, public accidents, home accidents, firearms, and crime, compiled by the Legislative Service, National Rifle Association of America___ 462
47. Digest of Federal and State firearms laws, prepared by the Legislative Service, National Rifle Association of America_____ 466
48. Federal and State constitutional provisions, right to keep and bear arms, compiled by the Legislative Service, National Rifle Association of America_____ 469
49. Article entitled "A Special Report—Strangulation by Law in New Jersey," from the American Rifleman by Ashley Halsey, Jr., December 1966_____ 471
50. Article from the American Rifleman by the National Rifle Association staff, entitled "A Special Report—Why Philadelphia's Wonder Law on Guns Doesn't Work," April 1967_____ 477
51. Letter dated March 20, 1961, from the Honorable John F. Kennedy to Mr. Franklin L. Orth_____ 484
52. Letter dated November 14, 1945, from the Honorable Harry S. Truman to Mr. C. B. Lister, secretary-treasurer, National Rifle Association of America, Washington, D.C._____ 484
53. Letter dated October 30, 1945, from the Honorable G. Marshall to Mr. C. B. Lister, secretary-treasurer, National Rifle Association of America_____ 485

CONTENTS                                          IX

| | | Page |
|---|---|---|
| 54. | Letter dated August 16, 1943, from the Honorable Dwight D. Eisenhower to Dr. M. J. Damlos, Mentor, Ohio | 485 |
| 55. | Editorial: "A Word to Rifle Marksmen" by General of the Army Omar M. Bradley, published in the American Rifleman, May 1951 | 485 |
| 56. | Letter dated February 14, 1967, from James H. Landers, major, U.S. Marine Corps, to Mr. Franklin L. Orth | 486 |
| 57. | Supreme Court case: *United States* v. *Miller*, 307 U.S. 174 (1939) | 500 |
| 58. | Results of a poll related to firearms legislation conducted by the Gallup Organization for the National Broadcasting Co., January 1967 | 518 |
| 59. | Gallup Poll entitled "Is the Public Ready To Accept Stricter Control of Firearms?" part I, by Dr. George Gallup, director, Institute of Public Opinion, Princeton, N.J., August 29, 1959 | 520 |
| 60. | Gallup Poll entitled "Is the Public Ready To Accept Stricter Control of Firearms?" part II, by Dr. George Gallup, director, Institute of Public Opinion, Princeton, N.J., September 1, 1959 | 521 |
| 61. | Gallup Poll entitled "Is the Public Ready To Accept Stricter Control of Firearms?" part III, by Dr. George Gallup, director, Institute of Public Opinion, Princeton, N.J., September 3, 1959 | 522 |
| 62. | Gallup Poll entitled "Eight in Ten Persons Favor Law Requiring Police Permit for Gun," by Dr. George Gallup, director, Institute of Public Opinion, Princeton, N.J., January 12, 1964 | 523 |
| 63. | Gallup Poll entitled "Public Would Favor Police Permit for Gun," by Dr. George Gallup, director, Institute of Public Opinion, Princeton, N.J., February 7, 1965 | 524 |
| 64. | Gallup Poll, press release entitled "Mass Shooting in Texas Raises Question of Firearms Control," American Institute of Public Opinion, Princeton, N.J., August 1966 | 525 |
| 65. | The Gallup report: "Negroes, Whites Agree on Four Plans To Deal With Racial Problems," by George Gallup, American Institute of Public Opinion, Princeton, N.J., August 26, 1967 | 526 |
| 66. | The Harris survey: A national survey by Louis Harris, entitled "27 Million Whites Arm Selves but Lean to Registered Guns," September 18, 1967 | 527 |
| 67. | Article from the American Rifleman entitled "NRA Disavows Connections With Groups Advocating Violence," October 1964 | 539 |
| 68. | Article from the American Rifleman entitled "The Editor's Firing Point," July 1967 | 568 |
| 69. | Editorial from the American Rifleman entitled "Who Guards America's Homes," May 1967 | 570 |
| 70. | Editorial from the American Rifleman entitled "Again, Gun Registration Aids Confiscation," June 1967 | 572 |
| 71. | Statement of the Honorable Edward M. Kennedy entitled "Effective Weapons Control Legislation" from the Congressional Record, May 19, 1967, page S7177, and three editorials entitled: "Fewer, Not More Rifles," from the Christian Science Monitor of May 10, 1967; "Community Stabilizer" from the New York Times, May 8, 1967; and the "Spirit of Lawlessness" from the New York Times, May 7, 1967 | 573 |
| 72. | Letter dated June 29, 1967, from Arlie Johnson, chairman, Idaho Fish & Game Commission to the Honorable Roman L. Hruska | 437 |
| 73. | Letter dated July 5, 1967, from John Gartner, president, Outdoor Writers Association of America, Inc., to the Honorable Roman L. Hruska | 437 |
| 74. | Article from the Washington Post, the District Line by Bill Gold, entitled "Gun Bill's Language Examined by Rees," July 18, 1967 | 581 |
| 75. | Letter dated July 18, 1967, from John C. Lynn, legislative director, American Farm Bureau Federation to the Honorable Thomas J. Dodd | 583 |
| 76. | Article from the Lincoln, Nebr., Evening Journal entitled "Soldier Charged in Assault After Richardson Man Hunt," September 1, 1965 | 608 |
| 77. | Chart: List of Montgomery Ward and Sears, Roebuck Outlets in the United States, by State | 611 |
| 78. | Chart: Recapitulation by States of Federal Firearms Act Licenses Applied for and Issued During Calendar Year 1966 | 613 |

X                                CONTENTS

|  |  | Page |
|---|---|---|
| *79. | Magazines entitled: "Trap and Field" and "Skeet Shooting Review" | 644 |
| 80. | Comments of Senator Thomas J. Dodd, chairman of the Juvenile Delinquency Subcommittee regarding the testimony of Mr. Mark K. Benenson representing the New York Sporting Arms Association, Inc. | 727 |
| 81. | Chart: Breakdown of Expenditures for the Civilian Marksmanship Program of the National Board for the Promotion of Rifle Practice for 1965 | 743 |
| 82. | Percentage of recruits in a 5-month period who had received director of civilian marksmanship training | 745 |
| 83. | Survey of director of civilian marksmanship records on the percentage of female group members in the 12- to 25-year age group | 747 |
| 84. | Army regulations covering performers in the national shooting matches at Camp Perry | 751 |
| 85. | Article from the American Rifleman entitled "Sniping in Vietnam," by Gy/Sgt. Jack Childs, U.S. Marine Corps, dated June 1966 | 754 |
| 86. | Article from the American Rifleman entitled "Snipers—Specialists in Warfare" by Frank G. McGuire, dated July 1967 | 755 |
| 87. | Article from the Washington Post by Art Buchwald in Capitol Punishment entitled "A Victory for Rats," July 25, 1967 | 761 |
| 88. | Comparison of prices charged for weapons by the Army Director of Civilian Marksmanship Program with commercially advertised prices | 763 |
| 89. | Chart: Questions Raised Concerning Applicants for Director of Civilian Marksmanship Club Membership, May through August 1967 | 765 |
| 90. | Copy of the certificate required by the Department of Civilian Marksmanship for the purchase of surplus military weapons | 766 |
| 91. | A memorandum from Robert E. Jordan III, Acting General Counsel, Department of the Army to the Under Secretary of the Army, "Constitutionality of DCM Sales Provision," October 2, 1967 | 769 |
| 92. | Department of Defense survey of National Rifle Association members given commissions during World War II | 775 |
| 93. | Chart: Breakdown of Senior and Junior Memberships in the National Rifle Association as of May 31, 1967 | 776 |
| 94. | News release issued by the Public Information Office, Department of the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio, July 19, describing the "mammoth task" performed by the military preparing Camp Perry for the matches | 781 |
| 95. | News release issued by the Public Information Office, Department of the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio, July 20, describing the "mammoth responsibility of reconditioning and maintaining" the firing ranges for the national matches | 782 |
| 96. | News release issued by the Public Information Office, Department of the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio, July 22, describing the work of 365 Air Force officers and men assigned as support personnel | 782 |
| 97. | News release issued by the Public Information Office, Department of the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio, July 26, describing the matches as the opening of the "World Series of Shooting" | 783 |
| 98. | News release issued by the Public Information Office, Department of the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio, July 26, describing the issuance of arms and ammunition and the maintenance and repair of weapons by the military for the national matches | 783 |
| 99. | News release issued by the Public Information Office, Department of the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio, July 26, describing the pay and allowances policy for the 8,000 men who support and compete in the national matches | 784 |
| 100. | News release issued by the Public Information Office, Department of the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio, July 27, concerning the "gigantic job" of the Marines in operating the ranges for the "World Series of Shooting" | 785 |

*Material has been retained in the permanent files of the subcommittee.

**CONTENTS**                                                              XI

Page
101. News release issued by the Public Information Office, Department of
     the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio,
     July 29, concerning the "billeting supply" problem of the national
     matches_____ 785
102. News release issued by the Public Information Office, Department of
     the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio,
     July 30, concerning a 140-man Marine detachment responsible for
     "running 100 targets on the enormous range" at the national
     matches_____ 786
103. News release issued by the Public Information Office, Department of
     the Army on the 1965 rifle and pistol matches, Camp Perry, Ohio,
     August 2, concerning "Certificates of Graduation" for 2,073
     marksmen at the national matches_____ 787
104. News release issued by the Public Information Office, Department
     of the Army on the 1965 rifle and pistol matches, Camp Perry,
     Ohio, August 5, concerning the proficiency and the volume of work
     performed by Air Force "gunsmiths" at the national matches_____ 787
105. News release issued by the Public Information Office, Department
     of the Army on the 1965 rifle and pistol matches, Camp Perry,
     Ohio, August 7, describing the proficiency of the "armorers" at-
     tached to the Marine Corps Pistol Team at the national matches_ 788
106. News release issued by the Public Information Office, Department
     of the Army on the 1965 rifle and pistol matches, Camp Perry,
     Ohio, August 13, announcing the arrival of 785 officers and men
     of the 5th Infantry Division to "continue support" of the national
     matches_____ 789
107. News release issued by the Public Information Office, Department
     of the Army on the 1965 rifle and pistol matches, Camp Perry,
     Ohio, August 19, describing the efficiency of Army personnel in
     operating the firing ranges at national matches_____ 789
108. Percentage of free weapons and ammunition distributed to Junior
     Clubs, junior divisions of Senior Clubs, or schools under the Di-
     rector of Civilian Marksmanship Program_____ 792
109. List of member companies of the National Shooting Sports Founda-
     tion_____ 794
110. List of member companies of the Sporting Arms & Ammunition
     Manufacturers Institute_____ 796
111. List of member companies of the National Reloading Manufac-
     turers Association_____ 796
*112. Information kit distributed by the Sporting Arms & Ammunition
     Manufacturers Institute to firearms dealers_____ 797
113. Chart: Census Bureau Figures on Firearms Manufactured for Ship-
     ment in the United States, 1963_____ 819
114. Advertisement from the Shotgun News, Columbus, Nebr., March 15,
     1967, entitled "Buy the Original Cetme, Not a Licensed Copy"__ 825
115. Advertisement from the Shotgun News, May 1, 1967, entitled
     "Genuine U.S. Government .30 Caliber Carbines"_____ 827
116. Editorial from the Washington Post of Tuesday, July 25, 1967,
     entitled "The Greatest Tragedy of All"_____ 846
117. Cartoon from the Washington Post of Tuesday, July 25, 1967, by
     Herblock, entitled "Fiddler"_____ 848
118. Brief summary of firearms crimes in the United States: Excerpts
     from the FBI uniform crime reports regarding murder rates for
     geographic areas of the country_____ 873
119. Article from the Washington Post of September 14, 1966, entitled
     "The Gallup Poll—Gun Owners Themselves Favor Curbs"_____ 880
120. Photograph: Segment of weapons and ammunition surrendered to
     the Detroit Police Department by pawnbrokers for safekeeping
     during the Detroit riot of July 23–30. (Photos of Exhibits 120–135
     taken by the subcommittee staff with the permission of the Detroit
     Police Department)_____ 885
121. Photograph: Typical foreign military surplus rifles surrendered to
     the Detroit Police Department by pawnbrokers for safekeeping
     during the Detroit riot of July 23–30. Pawnshop weapons were not
     new or for sale but were owned and pawned by residents of the riot
     area. (Identification of weapons made by the Detroit Police
     Department.)_____ 886

*Material has been retained in the permanent files of the subcommittee.

# CONTENTS

Page

122. Photograph: Segment of rifles and shotguns used in crimes (nonriot connected) seized by the Detroit Police Department in the city of Detroit from January through July 22, 1967_____ 887

123. Photograph: Sample of handguns seized from persons arrested during the first 2 days of the riot of July 23–30 in Detroit, Mich. There was a total of 267 such handguns confiscated during the entire riot period. (Identification of weapons made by the Detroit Police Department Crime Laboratory.)_____ 888

124. Photograph: Sample of handguns seized from persons arrested during the first 2 days of the riot of July 23–30 in Detroit, Mich. (Identification of weapons made by the Detroit Police Department Crime Laboratory.)_____ 889

125. Photograph: Sample of handguns seized from persons arrested during the first 2 days of the riot of July 23–30 in Detroit, Mich. (Identification of weapons made by the Detroit Police Department Crime Laboratory.)_____ 890

126. Photograph: Sample of rifles and shotguns confiscated during the first 2 days of the riot of July 23–30 in Detroit, Mich. There was a total of 280 rifles and shotguns confiscated during the riot period. This total included 120 rifles and 160 shotguns. (Identification of weapons made by the Detroit Police Department.)_____ 891

127. Photograph: Sample of rifles and shotguns confiscated during the first 2 days of the riot of July 23–30 in Detroit, Mich. (Identification of weapons made by the Detroit Police Department.)_____ 892

128. Photograph: Sample of rifles and shotguns confiscated during the first 2 days of the riot of July 23–30 in Detroit, Mich. (Identification of weapons made by the Detroit Police Department.)_____ 893

129. Photograph: Sample of rifles and shotguns confiscated during the first 2 days of the riot of July 23–30 in Detroit, Mich. (Identification of weapons made by the Detroit Police Department.)_____ 894

130. Photograph: Sample of rifles and shotguns confiscated during the first 2 days of the riot of July 23–30 in Detroit, Mich. (Identification of weapons made by the Detroit Police Department.)_____ 895

131. Photograph: Sample of rifles and shotguns confiscated during the first 2 days of the riot of July 23–30 in Detroit, Mich. (Identification of weapons made by the Detroit Police Department.)_____ 896

132. Photograph: Sample of rifles and shotguns confiscated during the first 2 days of the riot of July 23–30 in Detroit, Mich. (Identification of weapons made by the Detroit Police Department.)_____ 897

133. Photograph: 1935 A semiautomatic, model S.A.C.M. manufactured in France for military use, confiscated by the Detroit, Mich., Police Department in a homicide case during the riots. (The weapon is a recent import to the Detroit area. More than a hundred were sold with ammunition by one Detroit area dealer.)_ 898

134. Statement of Senator Thomas J. Dodd on firearms used in the Detroit riot of July 1967, including a chart entitled "Make, Serial Number, and Registration of 267 Handguns Seized in the Detroit Riot of July 23–30, 1967."_____ 898

135. Letter dated August 9, 1967, from N. A. Thompson, acting chief, legislative and legal section, office of the deputy attorney general to Mr. William C. Mooney_____ 924

136. Excerpt from the President's Commission on Law Enforcement report: "Table 2: Percent of Arrests Accounted for by Different Age Groups, 1965"_____ 941

137. Letter dated July 19, 1967, from Arthur J. Sills, attorney general, State of New Jersey, to the Honorable Edward M. Kennedy_____ 994

138. Article from the Newark Evening News entitled "Tenafly Man Shoots It Out With Police, Finally Caught," by Richard M. Ross, July 27, 1967_____ 997

139. Chart: Guns seized in connection with arrests during riots in Newark, N.J_____ 1003

CONTENTS XIII

Page

140. Legislative bulletin dated February 18, 1966, from Frank C. Daniel, secretary, National Rifle Association, to all NRA members and clubs in New Jersey___ 1012
141. Letter dated August 7, 1967, from Halbert E. Fillinger, Jr., M.D., to the Honorable Thomas J. Dodd___ 1040
142. Letter dated October 16, 1967, from the Honorable Thomas J. Dodd to Mr. Richard A. Sprague, assistant district attorney, Philadelphia, Pennsylvania___ 1043
143. Letter dated November 1, 1967, from Richard A. Sprague, 1st assistant district attorney, Philadelphia, Pennsylvania, to the Honorable Thomas J. Dodd___ 1044
144. Chart: Criminal homicides (murder) in Philadelphia—involving guns___ 1047
145. Letter dated July 24, 1967, from James M. Spicer, legislative director, Pennsylvania Pistol & Rifle Association, to the Honorable Roman L. Hruska___ 1049
146. Excerpt from the book "The Right To Bear Arms," by Carl Bakal, pages 123–4, published by the McGraw-Hill Book Co___ 1058
147. Letter dated August 9, 1967, from Fanklin L. Orth to the Honorable Thomas J. Dodd___ 1060
148. Article from the New York Times magazine entitled "The Gun and How To Control It," by James V. Bennett, September 25, 1966__ 1071

APPENDIX

Additional Statements, Resolutions, Letters and Telegrams Submitted for the Record

U.S. Senate:
Hon. Gordon Allott (Republican, Colorado)___ 1091
Hon. Wallace F. Bennett (Republican, Utah)___ 1093
Hon. Joseph S. Clark (Democrat, Pennsylvania)___ 1094
Hon. Len B. Jordan (Republican, Idaho)___ 1096
Hon. George McGovern (Democrat, South Dakota)___ 1097
Hon. Frank E. Moss (Democrat, Utah)___ 1100
House of Representatives: Hon. Abraham J. Multer (Democrat, 13th District, New York)___ 1100
Mayors: Hon. John V. Lindsay, mayor of the city of New York___ 1101
State legislatures, departments and commissions:
Nebraska State Legislature, 77th Session___ 1107
Idaho Fish and Game Commission___ 1108
Maine Department of Inland Fisheries and Game, New Hampshire Fish and Game Department, Connecticut Board of Fisheries and Game, Rhode Island Division of Conservation, Massachusetts Division of Fisheries and Game, Vermont Fish and Game Board___ 1108
Michigan Department of Conservation, statement submitted by Ralph A. MacMullan, director___ 1109
New Mexico State Game Commission___ 1111
Ohio State Wildlife Council___ 1112
South Dakota Department of Game, Fish and Parks Commission___ 1112
Wyoming Game and Fish Commission___ 1116
National Organizations and Clubs:
The American Legion, National Americanism Commission___ 1116
The Methodist Church General Board of Christian Social Concerns__ 1117
The National Police Officers Association___ 1117
State and Regional Organizations and Clubs:
Harrisburg Hunters' and Anglers' Association, Harrisburg, Pa___ 1119
Mad River Club, Pulaski, N.Y___ 1119
Maryland and District of Columbia Rifle and Pistol Association, Bowie, Md___ 1122
Methodist Church, Western Pennsylvania Conference___ 1134
Michigan Trap Shooting Association (see Williams Gun Sight Co., Inc.)___ 1154
Mineral Hill Sportsman Club, Sykesville, Md___ 1134
Orange County Federation of Sportsmen's Clubs, Inc., Goshen, N.Y. 1134
Pennsylvania Rifle and Pistol Association, Mt. Joy, Pa___ 1135
Sierra Desert Gun Club, China Lake, Calif___ 1140
Utah Wildlife Federation and Affiliated Organizations___ 1142
Wabash Valley Gun Collectors' Association, Fairmount, Ill___ 1142

CONTENTS

| | Page |
|---|---|
| Business organizations: | |
| International Armament Corp., Alexandria, Va., statement of Richard S. Winter | 1144 |
| Power Actuated Tool Manufacturers' Institute, Inc., New York, N.Y | 1151 |
| Redfield Gun Sight Co., Denver, Colo., statement of E. H. Hilliard, Jr | 1152 |
| Williams Gun Sight Co., Inc., and the Michigan Trap Shooting Association, statement of Boyd Williams | 1154 |
| Individual citizens: | |
| August, Richard J., Hazardville, Conn | 1156 |
| Bakal, Carl, New York, N.Y | 1157 |
| Barker, Elliott S., Santa Fe, N. Mex | 1170 |
| Davidson, W. R., Prescott, Ariz | 1171 |
| Gaddis, Robert L., Newport Beach, Calif | 1173 |
| Gray, Douglas L., Puyallup, Wash | 1174 |
| Hirsh, Philip R., Arlington, Va | 1174 |
| Miller, Rev. Melvin B., The Methodist Church, Anamosa, Iowa | 1175 |
| Moore, H. Gordon, Lynchburg, Va | 1176 |
| Nagy, John F., Allentown, Pa | 1176 |
| Sims, Ivan H., Bethesda, Md | 1178 |
| Sizer, Quentin W., Westfield, Mass | 1178 |
| Slot, D. C. Bruins, Flint, Mich | 1185 |
| Sorensen, Cloyd, J., Vista, Calif | 1186 |

# FEDERAL FIREARMS ACT

## MONDAY, JULY 10, 1967

U.S. SENATE,
SUBCOMMITTEE ON JUVENILE DELINQUENCY,
COMMITTEE OF THE JUDICIARY,
*Washington, D.C.*

The subcommittee (composed of Senators Dodd, Hart, Bayh, Burdick, Tydings, Kennedy of Massachusetts, Hruska, Fong, and Thurmond) met, pursuant to call, at 10 a.m., in room 318, Old Senate Office Building, Senator Thomas J. Dodd (chairman of the subcommittee) presiding.

Present: Senators Dodd, Hart, Kennedy of Massachusetts, Hruska, and Thurmond.

Also present: Carl L. Perian, staff director; Bernard Tannenbaum, special counsel; Richard W. Velde, minority counsel; William C. Mooney, chief investigator; Eugene W. Gleason, editorial director; Peter Freivalds, research director; and Richard C. Sheridan, assistant minority counsel.

Chairman DODD. The committee will come to order.

We begin these hearings squarely facing the stark reality that, in the first 3 months of this year, serious crime has increased a record 20 percent over the same period for 1966. Crimes of violence account for their share, a substantial share, of this increase. Murder is up 23 percent, robbery is up 32 percent, and aggravated assault is up 15 percent.

And we know that guns are a major player in this deadly game.

They have a role in 60 percent of our murders, two-thirds of our armed robberies, and almost one-fifth of our aggravated assaults.

This added up to 85,000 gun crimes in 1965, and over 100,000 in 1966. And the rate for the first months of 1967 proves that this figure will continue to soar.

As if our crime and racial troubles weren't substantial enough already, national firearms spokesmen have joined extremist group leaders in urging what might tragically be termed "The Guns of August."

They declaim, in the context of that overworked phrase "the long hot summer," that everybody should have guns; guns to protect themselves, guns to protect their loved ones, guns to protect their homes, and guns to protect their neighborhoods.

The "armed camp," "the posse," "the vigilante," and the "minuteman"—phrases which are throwbacks to the early days of this Nation have degenerated to become a part of the inflammatory vocabulary of our violent times.

This is the position to which we have deteriorated in the country which boasts to the world that we are a country governed by laws.

1

It is in this present national crisis that we open this hearing on legislation to control the unrestricted acquisition and use of firearms.

These hearings have been requested by the Subcommittee to Investigate Juvenile Delinquency. All the members of this subcommittee agree that the purchase of firearms by irresponsible persons needs to be stopped. Our purpose during these hearings is to find the most effective means to achieve this, our mutual goal.

We recognize that sportsmen have a legitimate interest in firearms for recreation. But we also recognize that a large proportion of the criminal population uses guns to compound their offenses to life and property. We recognize further that emotionally unstable and immature individuals use guns as an escape from problems and as a substitute for adult stature.

We seek to preserve the hunters' and marksmen's valid sport. At the same time we seek to prevent the purchase and use of firearms by those incapable of handling them responsibly.

We must put an end to the unquestioned sale of guns to the juvenile, the criminal, and the emotionally disturbed.

We must eliminate the condition in which a Federal licensee who owns a large metropolitan mail-order house can unknowingly sell firearms to a clientele, 1 out of 4 of whom have criminal records.

We must eliminate the condition in which persons who are unable to purchase guns legally in their home States travel into neighboring States to buy over the counter with no questions asked.

We must eliminate the condition in which a child under 18 years of age can order and receive a rifle or other firearms by mail without the knowledge or consent of his parents.

We must eliminate the condition in which a minor under 21 can order and obtain a handgun by mail or over the counter.

We must eliminate the condition in which any extremist, paramilitary group can acquire an arsenal of destructive devices which include bazookas, mortars, cannons, and mines.

These are conditions that exist today.

While the dealers in each of these situations do not violate the letter of the present Federal law, the fact remains that, because of glaring weaknesses in that law, this interstate traffic in firearms to criminals and children continues to flourish.

We must give States a way in which they can effectively enforce their own ordinances for the control of gun sales.

At present, they cannot do so, as just one of many striking illustrations will show.

Massachusetts investigators found that 87 percent of the guns used in crimes in that State were purchased outside Massachusetts. These guns were not stolen, in spite of claims to the contrary. Seventy percent of the gun sales in the neighboring States of Maine, Vermont, and New Hampshire were to residents of Massachusetts, with its stricter gun laws.

What I want to make clear in this opening statement is that we are going over the bills that have been submitted, that are now pending, S. 1, Amendment 90 to S. 1, the State Firearms Control Assistance Act of 1967, S. 1853, and S. 1854. We know that passage of a law will not stop all crime. What we are trying to do is get reasonable controls so that we can reduce the opportunity for undesirable people to get firearms. That is about all there is to it.

I have only briefly touched on some of the conditions we have uncovered which have convinced many Senators to support the legislation proposed by President Johnson. These conditions are the breeding ground for much of this country's serious crime.

But I want to make it clear that none of the proposed bills will stop all crime in the streets. They will not end all gun killings by children, by suicidal despondents, by deranged snipers, by outraged spouses, or by insensitive criminals.

The proposed legislation does offer the controls to severely limit the opportunities that those incapable of using guns properly will have to obtain them. And in doing so, we can significantly reduce certain types of gun crimes.

It's as simple as that.

The goal of these firearms bills is to assure the citizens of this country that their right to life and the pursuit of happiness is not denied by guns in the hands of those who should not be permitted to possess them in the first place.

Senator Hruska has introduced S. 1853 and S. 1854 which would regulate the mail-order sale and nonresident purchase of handguns between States and would include the so-called destructive devices under the provisions of the National Firearms Act.

Both the bill introduced by me, S. 1, and Amendment 90 which I introduced as a substitute on behalf of the administration, are designed to rigidly control the interstate mail-order sale of firearms to individuals; to regulate the over-the-counter sale of all firearms; to license all dealers, importers, and manufacturers of firearms; to prohibit the importation of military surplus handguns and to regulate all other imported firearms; and to place stringent controls over the destructive devices.

I might add that I don't think there is any difference of opinion among any of us as far as destructive devices are concerned, except how to best get control of them.

The three major bills we are considering would be effective in varying degrees in cutting down the total number of gun crimes. It is my opinion that the administration bill, Amendment 90, would be the most effective because it is the most far reaching.

Some gun owners argue that it is too stringent. We are trying to find out in these hearings whether or not the responsible gun enthusiasts will be willing to sustain slight inconvenience in order to guarantee to all Americans the best possible Federal gun control law.

What we are really doing today is continuing public hearings which began in 1963 on the only major firearms legislation to come before the Congress in almost 30 years.

We are affording time to all those who are concerned with firearms, those in recreation, those in law enforcement, and those in Congress. We want to hear from all of them and give them an opportunity to express their sentiments and to offer their recommendations.

All of us are striving to reduce injuries and deaths by guns in misguided hands, to find the best method to do so.

We hope to be able to do so through this set of hearings. Without objection I will ask that copies of Senate Resolution 35, S. 1, Amendment 90, S. 1853 and S. 1854 be printed in full at this point in the record and reports received from various government agencies will be printed in the appendix.

4                              FEDERAL FIREARMS ACT

(The documents referred to were marked "Exhibits Nos. 1, 2, 3, 4, and 5" and are as follow:)

EXHIBIT No. 1

[S. Res. 35, 90th Cong., 1st sess.]

[Report No. 34]

RESOLUTION

*Resolved,* That the Committee on the Judiciary, or any duly authorized sub-committee thereof, is authorized under sections 134(a) and 136 of the Legislative Reorganization Act of 1946, as amended, and in accordance with its jurisdictions specified by rule XXV of the Standing Rules of the Senate, to examine, investigate, and make a complete study of any and all matters pertaining to juvenile delinquency in the United States, including (a) the extent and character of juvenile delinquency in the United States and its causes and contributing factors; (b) the adequacy of existing provisions of law, including chapters 402 and 403 of title 18 of the United States Code, in dealing with youthful offenders of Federal laws; (c) sentences imposed on, or other correctional action taken with respect to, youthful offenders by Federal courts, and (d) the extent to which juveniles are violating Federal laws relating to the sale or use of narcotics.

SEC. 2. For the purposes of this resolution, the committee, from February 1, 1967, to January 31, 1968, inclusive, is authorized (1) to make such expenditures as it deems advisable; (2) to employ, upon a temporary basis, technical, clerical, and other assistants and consultants: *Provided,* That the minority is authorized to select one person for appointment, and the person so selected shall be appointed and his compensation shall be so fixed that his gross rate shall not be less by more than $2,300 than the highest gross rate paid to any other employee; and (3) with the prior consent of the heads of the departments or agencies concerned, and the Committee on Rules and Administration, to utilize the reimbursable services, information, facilities, and personnel of any of the departments or agencies of the Government.

SEC. 3. The committee shall report its findings, together with its recommendations for legislation, as it deems advisable, to the Senate at the earliest practicable date, but not later than January 31, 1968.

SEC. 4. Expenses of the committee, under this resolution, which shall not exceed $225,000, shall be paid from the contingent fund of the Senate upon vouchers approved by the chairman of the committee.

———

EXHIBIT No. 2

[S. 1, 90th Cong., first sess.]

A BILL To amend the Federal Firearms Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "State Firearms Control Assistance Amendments of 1967".

FINDINGS AND DECLARATION

SEC. 2. (a) The Congress hereby finds and declares—
(1) that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power;
(2) that the ease with which any person can acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States;

(3) that only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the businesses of importing, manufacturing, or dealing in firearms, can this grave problem be properly dealt with, and effective State and local regulation of the firearms traffic be made possible;

(4) That the acquisition on a mail-order basis of firearms by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances;

(5) that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms;

(6) that there is a causal relationship between the easy availability of firearms and juvenile and youthful criminal behavior, and that firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior;

(7) that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years, has contributed greatly to lawlessness and to the Nation's law enforcement problems;

(8) that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, and so forth, and destructive devices such as explosive or incendiary grenades, bombs, missiles, and so forth) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern;

(9) that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the granting or denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.

(b) The Congress further hereby declares that the purpose of this Act is to cope with the conditions referred to in the foregoing subsection, and that it is not the purpose of this Act to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this Act is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this Act.

SEC. 3. The first section of the Federal Firearms Act (52 Stat. 1250) is amended to read as follows:

"SECTION 1. DEFINITIONS.—(a) As used in this Act—

"(1) The term 'person' includes an individual, partnership, association, or corporation.

"(2) The term 'interstate or foreign commerce' means commerce between any State or possession (not including the Canal Zone) and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), but through any place outside thereof; or within any possession or the District of Columbia. The term 'State' shall include the Commonwealth of Puerto Rico, the Virgin Island, and the District of Columbia.

"(3) The term 'firearms,' except where the context otherwise requires, means any weapon (including a starter gun), by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive: the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device.

"(4) The term 'destructive device' means any explosive or incendiary (A) bomb or (B) grenade or (C) mine or (D) rocket or (E) missile or (F) similar

6                        FEDERAL FIREARMS ACT

device; and the term shall also include any type of weapon by whatsoever name known which will, or is designed to, or which may be readily converted to expel a projectile or projectiles by the action of an explosive, the barrel or barrels of which have a bore of one-half inch or more in diameter.

"(5) The term 'short-barreled shotgun' means a shotgun having a barrel or barrels of less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(6) The term 'short-barreled rifle' means a rifle having a barrel or barrels of less than sixteen inches in length, and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon as modified has on overall length of less than twenty-six inches.

"(7) The term 'importer' means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution, and the term 'licensed importer' means any such person licensed under the provision of this Act.

"(8) The term 'manufacturer 'means any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this Act.

"(9) The term 'dealer' means (A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing such firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawn-broker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.

"(10) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.

"(11) The term 'indictment' includes an indictment or an information in any court of the United States or of any State or possession under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

"(12) The term 'fugitive from justice' means any person who has fled from any State or possession (A) to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year, or (B) to avoid giving testimony in any criminal proceeding.

"(13) The term 'antique firearm' means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870; but not including any weapon designed for use with smokeless powder or using rimfire or conventional center-fire ammunition.

"(14) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(15) The term 'ammunition' means ammunition for a destructive device; it shall not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.

"(b) As used in this Act—

"(1) The term 'firearm' shall not include an antique firearm.

"(2) The term 'destructive device' shall not include—

    "(A) a device which is not designed or redesigned or used or intended for use as a weapon; or

    "(B) any device, although originally designed as a weapon which is redesigned for use as a signaling, line throwing, safety or similar device; or

    "(C) any shotgun (other than a short-barreled shotgun) ; or

    "(D) any nonautomatic rifle (other than a short-barreled rifle) generally recognized as particularly suitable for use for the hunting of big game; or

    "(E) surplus obsolete ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10, United States Code; or

    "(F) any other device which the Secretary finds is not likely to be used as a weapon.

"(3) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate."

SEC. 4. Section 2 of the Federal Firearms Act is amended to read as follows:
"SEC. 2. UNLAWFUL ACTS.—(a) It shall be unlawful—

"(1) for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer having a license issued under the provisions of this Act, to engage in the business of importing, manufacturing, or dealing in firearms or ammunition, or to transport, ship, or receive any firearm or ammunition, in interstate or foreign commerce; or

"(2) for any importer, manufacturer, or dealer licensed under the provisions of this Act to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce, any firearm to any person other than a licensed importer, licensed manufacturer, or licensed dealer, except that—

"(A) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm to the sender (including a replacement firearm of the same kind, make, and type);

"(B) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from shipping, or causing to be shipped, for conveyance in the mails, a firearm to any officer, employee, agent, or watchman eligible under the provisions of section 1715 of title 18 of the United States Code to receive through the mails, for use in connection with their official duty, pistols, revolvers, and other firearms capable of being concealed on the person;

"(C) this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or a short-barreled rifle) of a type and quality generally recognized as particularly suitable for lawful sporting purposes, and not a surplus military firearm, which is shipped, transported, or caused to be shipped or transported, in interstate or foreign commerce by an importer, manufacturer, or dealer licensed under the provisions of this Act to any person who has submitted to such importer, manufacturer, or dealer a sworn statement, in duplicate, in such form and manner as the Secretary shall by regulations prescribe, attested to by a notary public, to the effect that (1) such person is eighteen years or more of age, (2) he is not a person prohibited by this Act from receiving a shotgun or rifle in interstate or foreign commerce, (3) there are no provisions of law, regulations, or ordinances applicable to the locality to which the shotgun or rifle will be shipped which would be violated by such person's receipt or possession of a shotgun or rifle, and (4) that (Title _____, Name _____, and Official Address _____) (blanks to be filled in with the title, true name, and address) are the true name and address of the principal law enforcement officer of the locality to which the shotgun or rifle will be shipped. It shall be unlawful for an importer, manufacturer, or dealer, licensed under the provisions of this Act, to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce any such shotgun or rifle unless such importer, manufacturer, or dealer has, prior to the shipment of such shotgun or rifle forwarded by United States registered mail (return receipt requested) to the local law enforcement officer named in the sworn statement, the description (including (1) manufacturer thereof, (2) the caliber or gauge, (3) the model and type of shotgun or rifle but not including serial number identification) of the shotgun or rifle to be shipped, and one copy of the sworn statement, and has received a return receipt evidencing delivery of the registered letter or such registered letter has been returned to the importer, manufacturer, or dealer due to the rfusal of the named law enforcement officer to accept such letter as evidenced in accordance with United States Post Office Department regulations, and has delayed shipment for a period of at least seven days following receipt of the notification of the local law enforcement officer's acceptance or refusal of the registered letter. A copy of the sworn statement and a copy of the notification to the local law enforcement officer along with evidence of receipt or rejection of that notification, all as prescribed by this subparagraph, shall be retained by the licensee as a part of the records required to be kept under section 3(g): *Provided*, That (i) the Governor of any State may designate any official in his State to receive the notification to local law enforcement officers required in this subparagraph. The Secretary shall be notified of the name and title of the

official so designated and his business address and shall publish the title, name, and address of that official in the Federal Register. Upon such publication, notification of local law enforcement officers required in this subparagraph shall be made to the official designated; and (ii) the Governor of any State may request the Secretary to discontinue in his State or any part thereof the notification to local law enforcement officers required in this subparagraph. Upon publication of the request in the Federal Register, the notification to the law enforcement officers in the area described in the request will not be required for a period of five years unless the request is withdrawn by the Governor and the withdrawal is published in the Federal Register; and

"(D) nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were a State of the United States; or

"(3) for any person in connection with the acquisition or attempted acquisition of a firearm from a licensed importer, licensed manufacturer, or licensed dealer to—

"(A) knowingly make any false or fictitious statement, written or oral, or

"(B) knowingly furnish or exhibit any false, fictitious, or misrepresented identification;

intended or calculated to deceive such importer, manufacturer, or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed importer, licensed manufacturer, or licensed dealer under the provisions of subsections (b) and (c), or

"(4) for any person to transport into or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

"(b) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm to any person—

"(1) without ascertaining through reliable means of identification customarily used in good commercial practice (which shall be noted in the licensee's records) the identity, date of birth (in the case of an individual), and place of residence (or place of business in the case of a corporation or other business entity) of such person; or

"(2) who (in the case of an individual) he knows or has reasonable cause to believe is under twenty-one years of age (except for a shotgun or rifle), and under eighteen years of age in the case of a shotgun or rifle; or

"(3) who he knows or has reasonable cause to believe does not reside in (or in the case of a corporation or other business entity, who does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located; except that this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or short-barreled rifle); or

"(4) who by reason of any State or local law, regulation, or ordinance applicable at the place of sale or other disposition may not lawfully receive or possess such firearm.

This subsection shall not apply in the case of transactions between licensed importers, licensed manufacturers, and licensed dealers, nor in the case of transactions involving rifles or shotguns which are subject to the provisions of subparagraph (C) of section 2(a) (2).

"(c) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee) knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States or of any State or possession of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice.

"(d) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to ship, transport, or cause to be shipped or transported, any firearm or ammunition in interstate or foreign commerce.

"(e) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term

FEDERAL FIREARMS ACT 9

exceeding one year, or is a fugitive from justice, to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

"(f) It shall be unlawful for any person knowingly to deposit, or cause to be deposited for mailing or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice that a firearm is being transported or shipped.

"(g) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce, any firearm to any person who does not exhibit or produce evidence of a license obtained under section 3 of this Act—

"(1) knowing or having reasonable cause to believe that such person is under twenty-one years of age (except for a rifle or shotgun) and under eighteen years of age in the case of a rifle or shotgun; or

"(2) with knowledge or with reasonable cause to believe that the receipt or possession of the firearm by the person to whom it is delivered would be in violation of the laws or ordinances of the State (or political subdivision thereof) in which the delivery is made; and

No firearm will be delivered in the United States mails under such circumstances as would be unlawful if done by a common or contract carrier.

"(h) It shall be unlawful for any person to transport or ship, or cause to be transported or shipped, in interstate or foreign commerce, any stolen firearm, or stolen ammunition knowing, or having reasonable cause to believe, same to have been stolen.

"(i) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition or pledge or accept as security for a loan any stolen firearm or stolen ammunition, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing, or having reasonable cause to believe, the same to have been stolen.

"(j) It shall be unlawful for any person to transport, ship, or knowingly receive, in interstate or foreign commerce, any firearm from which the importer's or manufacturer's serial number, as the case may be, has been removed, obliterated, or altered.

"(k) It shall be unlawful for any person to import or bring into the United States or any possession thereof any firearm in violation of the provisions of this Act, or to import or bring into the United States or any possession thereof any ammunition.

"(l) It shall be unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this Act."

SEC. 5. Section 3 of the Federal Firearms Act is amended to read as follows:

"SEC. 3. GENERAL REQUIREMENTS.— (a) No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulations prescribe. Each applicant shall be required to pay a fee for obtaining such license (of each place of business) as follows:

"(1) If a manufacturer—

"(A) of destructive devices, a fee of $1,000 per annum;

"(B) of firearms (other than destructive devices), a fee of $500 per annum.

"(2) If an importer—

"(A) of destructive devices, a fee of $1,000 per annum;

"(B) of firearms (other than destructive devices), a fee of $500 per annum.

"(3) If a dealer—

"(A) in destructive devices, a fee of $1,000 per annum;

"(B) who is a pawnbroker (dealing in firearms other than destructive devices), a fee of $250 per annum;

"(C) who is not a dealer in destructive devices or a pawnbroker, a fee of $10 per annum; except that for the first renewal following the effective date of the State Firearms Control Assistance Amendments of 1967 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25.

The fee for an importer or manufacturer of, or a dealer in, ammunition for a destructive device shall be the same as for an importer or manufacturer of, or a dealer in, destructive devices. However, a person who has obtained a license

covering destructive devices shall not be required to obtain an additional license with respect to ammunition for destructive devices.

"(b) Upon filing by an applicant of the prescribed application and payment of the prescribed fee, the Secretary shall (except as provided in subsection (c)), issue to such applicant the license applied for, which shall, subject to the provisions of this Act and other applicable provisions of law, entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.

"(c) Any application submitted under subsections (a) and (b) of this section shall be disapproved and the license denied if the Secretary, after notice and opportunity for hearing, finds that—

"(1) the applicant is under twenty-one years of age; or

(2) the applicant (including in the case of a corporation, partnership, or association, any individual possessing directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of subsection (d) or (e) of section 2 of this Act; or is, by reason of his business experience, financial standing, or trade connections, not likely to commence business operations during the term of the annual license applied for or to maintain operations in compliance with this Act; or

"(3) the applicant has willfully violated any of the provisions of this Act or the regulations issued thereunder; or

"(4) the applicant has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application; or

"(5) the applicant does not have, or does not intend to have or to maintain, in a State or possession, business premises for the conduct of the business.

"(d) The provisions of sections 2 (d) and (e) of this Act shall not apply in the case of a licensed importer, licensed manufacturer, or licensed dealer who is indicted for a crime punishable by imprisonment for a term exceeding one year. A licensed importer, licensed manufacturer, or licensed dealer may continue operations, pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act and operations pursuant to such license shall be discontinued (unless an application for relief has been filed under section 11).

"(e) No person shall import or bring any firearm into the United States or any possession thereof, except that the Secretary may authorize a firearm to be imported or brought in if the person importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—

"(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or

"(2) is an unserviceable firearm (not readily restorable to firing condition), imported or brought in as a curio or museum piece; or

"(3) is—

"(A) of a type and quality that meets recognized safety standards,

"(B) generally recognized as particularly suitable for, or readily adaptable to, sporting purposes,

"(C) in the case of surplus military firearms, a rifle or shotgun, and

"(D) of a type that does not fall within the definition of a firearm as defined in section 5848(1) of the Internal Revenue Code of 1954; or

"(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm: *Provided*, That the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm will be allowed under this subsection.

"(f) No licensed importer, licensed manufacturer, or licensed dealer shall sell or otherwise dispose of a destructive device, a machinegun (as defined in section 5848 of the Internal Revenue Code of 1954), a short-barreled shotgun, or a short-barreled rifle, to a nonlicensee unless he has in his possession a sworn statement executed by the principal law enforcement officer of the locality wherein the purchaser or person to whom it is otherwise disposed of resides,

attesting that there is no provision of law, regulation, or ordinance which would be violated by such person's receipt or possession thereof and that he is satisfied that it is intended by such person for lawful purposes. Such sworn statement shall be retained by the licensee as a part of the records required to be kept under subsection (g).

"(g) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, and sale or other disposition, of firearms and ammunition at such place, for such period and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary or his delegate may enter during business hours the premises (including places of storage) of any firearms or ammunition importer, manufacturer, or dealer for the purpose of inspection or examining any records or documents required to be kept by such importer or manufacturer or dealer under the provisions of this Act or regulations issued pursuant thereto, and any firearms or ammunition kept or stored by such importer, manufacturer, or dealer at such premises. Upon the request of any State or possession or political subdivision thereof, the Secretary of the Treasury may make available to such State, or possession, or any political subdivision thereof, any information which he may possess or which he may obtain by reason of the provisions of this Act with respect to the identification of persons within such State, or possession, or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of the firearms or ammunition so purchased or received.

"(h) Licenses issued under the provisions of subsection (c) of this section shall be kept posted and kept available for inspection on the business premises covered by the license.

"(i) Licensed importers and licensed manufacturers shall identify (or cause to be identified), in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."

SEC. 6. Section 4 of the Federal Firearms Act is amended to read as follows:

"SEC. 4. EXCEPTIONS TO APPLICABILITY OF THE ACT.—The provisions of this Act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearms or ammunition imported for, or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof; or (2) any State, or possession, or any department, independent establishment, agency, or any political subdivision thereof."

SEC. 7. Section 5 of the Federal Firearms Act is amended by striking out subsection (b) and inserting in lieu thereof new subsections (b) and (c) reading as follows:

"(b) Any person who—
    "(1) with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year; or
    "(2) with knowledge or with reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is intended to be committed therewith;
ships, transports, or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense.

"(c) Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of this Act, or any rules or regulations promulgated thereunder, or any violation of the provisions of title 18, United States Code, chapter 84, or sections 111, 112, 372, 871, or 1114, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5848(1) of said Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this Act."

SEC. 8. The Federal Firearms Act is amended by renumbering sections 6, 7, 8, 9, and 10 as sections 7, 8, 9, 10, and 11, respectively, and inserting after section 5 the following new section:

"SEC. 6. APPLICABILITY OF OTHER LAWS.—

"(a) Nothing in this Act shall be construed as modifying or affecting any provision of—
    "(1) the National Firearms Act (chapter 53 of Internal Revenue Code of 1954) ; or

"(2) section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control)); or

"(3) section 1715 of title 18 of the United States Code (relating to nonmailable firearms).

"(b) Nothing in this Act shall confer any right or privilege to conduct any business contrary to the law of any State, or be construed as relieving any person from compliance with the law of any State."

"SEC. 9. Section 8 of the Federal Firearms Act (relating to rules and regulations) is amended to read as follows:

"SEC. 8. RULES AND REGULATIONS.—The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this Act. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such regulations."

SEC. 10. The amendments made by this Act shall become effective on the first day of the third month beginning not less than ten days after the date of enactment of this Act; except that the amendments made by section 5 of this Act to section 3(a) of the Federal Firearms Act shall not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act on the effective date of this Act until the expiration of the license held by such importer, manufacturer, or dealer on such date.

---

EXHIBIT No. 3

[S. 1, 90th Cong., first sess.]

AMENDMENT No. 90 Intended to be proposed by Mr. DODD (for himself, Mr. CLARK, and Mr. SMATHERS) to S. 1, a bill to amend the Federal Firearms Act, viz: Strike all after the enacting clause and insert in lieu thereof the following:

That this Act may be cited as the "State Firearms Control Assistance Act of 1967".

FINDINGS AND DECLARATION

SEC. 2. (a) The Congress hereby finds and declares—

(1) that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power;

(2) that the ease with which any person can acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States;

(3) that only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the businesses of importing, manufacturing, or dealing in firearms, can this grave problem be properly dealt with, and effective State and local regulation of the firearms traffic be made possible;

(4) that the acquisition on a mail-order basis of firearms by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances;

(5) that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms;

(6) that there is a casual relationship between the easy availability of firearms and juvenile and youthful criminal behavior, and that firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior;

(7) that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years, has contributed greatly to lawlessness and to the Nation's law enforcement problems;

(8) that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, and so forth, and destructive devices such as explosive or incendiary grenades, bombs, missiles, and so forth) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern;

(9) that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the granting or denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.

(b) The Congress further hereby declares that the purpose of this Act is to cope with the conditions referred to in the foregoing subsection, and that it is not the purpose of this Act to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that this Act is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this Act.

SEC. 3. Title 18, United States Code, is amended by inserting after section 917 thereof the following new chapter:

## "Chapter 44.—FIREARMS

"Sec.
"921. Definitions.
"922. Unlawful acts.
"923. Licensing.
"924. Penalties.
"925. Exceptions: Relief from disabilities.
"926. Rules and regulations.
"927. Effect on State law.
"928. Separability clause.

### "§ 921. Definitions

"(a) As used in this chapter—

"(1) The term 'person' and the term 'whoever' includes any individual, corporation, company, association, firm, partnership, society, or joint stock company.

"(2) The term 'interstate or foreign commerce' includes commerce between any State or possession (not including the Canal Zone) and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), but through any place outside thereof; or within any possession or the District of Columbia. The term 'State' shall include the Commonwealth of Puerto Rico, the Virgin Islands, and the District of Columbia.

"(3) The term 'firearm' means any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device.

"(4) The term 'destructive device' means any explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type of weapon which will or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter.

"(5) The term 'shotgun' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

"(6) The term 'short-barreled shotgun' means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun

(whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(7) The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

"(8) The term 'short-barreled rifle' means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(9) The term 'importer' means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term 'licensed importer' means any such person licensed under the provisions of this chapter.

"(10) The term 'manufacturer' means any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this chapter.

"(11) The term 'dealer' means (A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing such firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms or (C) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this chapter.

"(12) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.

"(13) The term 'indictment' includes an indictment or an information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

"(14) The term 'fugitive from justice' means any person who has fled from any State or possession to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year or to avoid giving testimony in any criminal proceeding.

"(15) The term 'antique firearms' means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870; but not including any weapon designed for use with smokeless powder or using rim fire or conventional center-fire ignition with fixed ammunition.

"(16) The term 'ammunition' means ammunition for a destructive device; it shall not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.

"(17) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(b) As used in this chapter—

"(1) The term 'firearm' shall not include an antique firearm.

"(2) The term 'destructive device' shall not include—

"(A) a device which is not designed or redesigned or used or intended for use as a weapon; or

"(B) any device, although originally designed as a weapon, which is redesigned so that it may be used solely as a signaling, linethrowing, safety or similar device; or

"(C) any shotgun other than a short-barreled shotgun; or

"(D) any nonautomatic rifle (other than a short-barreled rifle) generally recognized or particularly suitable for use for the hunting of big game; or

"(E) surplus obsolete ordinance sold, loaned, or given by the Secretary of the Arm pursuant to the provisions of sections 4684(2), 4685, or 4686 of title 10, United States Code; or

"(F) any other device which the Secretary finds is not likely to be used as a weapon.

"(3) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate.

"**§ 922. Unlawful acts**

"(a) It shall be unlawful—

"(1) for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or ammunition, or in the course of such business to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce.

"(2) for any importer, manufacturer, or dealer licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce, any firearm or ammunition to any person other than a licensed importer, licensed manufacturer, or licensed dealer, except that—

"(A) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received;

"(B) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of title 18 of the United States Code, is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duty;

"(C) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from shipping a rifle or shotgun to an individual who in person upon the licensee's business premises purchased such rifle or shotgun: *Provided*, That such sale or shipment is not otherwise prohibited by the provisions of this chapter.

"(D) nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were in fact a State of the United States.

"(3) for any person other than a licensed importer, licensed manufacturer, or licensed dealer to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, in which he maintains a place of business)—

"(A) any firearm, other than a shotgun or rifle, purchased or otherwise obtained by him outside that State;

"(B) any firearm, purchased or otherwise obtained by him outside that State, which it would be unlawful for him to purchase or possess in the State or political subdivision thereof wherein he resides (or if the person is a corporation or other business entity, in which he maintains a place of business).

"(4) for any person, other than a licensed importer, licensed manufacturer, or licensed dealer, to transport in interstate or foreign commerce any destructive device, machine gun (as defined in section 5848 of the Internal Revenue Code of 1954), short-barreled shotgun, or shot-barreled rifle, except as specifically authorized by the Secretary.

"(5) for any person to transfer, sell, trade, give, transport, or deliver to any person (other than a licensed importer, licensed manufacturer, or licensed dealer) who resides in any State other than that in which the transferor resides (or in which his place of business is located if the transferor is a corporation or other business entity)—

"(A) any firearm, other than a shotgun or rifle;

"(B) any firearm which the transferee could not lawfully purchase or possess in accord with applicable laws, regulations or ordinances of the State or political subdivision thereof in which the transferee resides (or in which his place of business is located if the transferee is a corporation or other business entity).

This paragraph shall not apply to transactions between licensed importers, licensed manufacturers, and licensed dealers.

"(5) for any person in connection with the acquisition or attempted acquisition of any firearm from a licensed importer, licensed manufacturer, or licensed dealer, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false or fictitious or misrepresented identification, intended or likely to deceive such importer, manufacturer, or

16          FEDERAL FIREARMS ACT

dealer with respect to any fact material to the lawfulness of the sale or other disposition of such firearm under the provisions of this chapter.

"(b) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or deliver—

"(1) any firearm to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age, if the firearm is other than a shotgun or rifle; or to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, if the firearm is a shotgun or rifle.

"(2) any firearm to any person who the licensee knows or has reasonable cause to believe is not lawfully entitled to receive or possess such firearm by reason of any State or local law, regulation, or ordinance applicable at the place of sale, delivery, or other disposition of the firearm.

"(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located; except that this paragraph shall not apply in the case of a shotgun or rifle.

"(4) to any person any destructive device, machinegun (as defined in section 5848 of the Internal Revenue Code of 1954), short-barreled shotgun, or short-barreled rifle, unless he has in his possession a sworn statement executed by the principal law enforcement officer of the locality wherein the purchaser or person to whom it is otherwise disposed of resides, attesting that there is no provision of law, regulation, or ordinance which would be violated by such person's receipt or possession thereof, and that he is satisfied that it is intended by such person for lawful purposes; and such sworn statement shall be retained by the licensee as a part of the records required to be kept under the provisions of this chapter.

"(5) any firearm to any person unless the licensee notes in his records required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

Paragraphs (1), (2), (3) and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, and licensed dealers.

"(c) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person, knowing or having reasonable cause to believe that such person is a fugitive from justice or is under indictment or has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year. This subsection shall not apply with respect to sale or disposition of a firearm to a licensed importer, licensed manufacturer, or licensed dealer who pursuant to subsection (b) of section 925 of this chapter is not precluded from dealing in firearms, or to a person who has been granted relief from disabilities pursuant to subsection (c) of section 925 of this chapter.

"(d) It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

"(e) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to ship or transport any firearm or ammunition in interstate or foreign commerce.

"(f) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or is a fugitive from justice, to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

"(g) It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe the same to have been stolen.

"(h) it shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, moving as or which is a part of or which constitutes interstate or foreign commerce, knowing or having reasonable cause to believe the same to have been stolen.

"(i) It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm the importer's or manufacturer's serial number of which has been removed, obliterated, or altered.

"(j) It shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition, except as provided in subsection (d) of section 925 of this chapter; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

"(k) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer knowingly to make any false entry in, or to fail to make appropriate entry in or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

## "§ 923. Licensing

"(a) No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulation prescribe. Each applicant shall be required to pay a fee for obtaining such a license, a separate fee being required for each place in which the applicant is to do business, as follows:

"(1) If a manufacturer—
    "(A) of destructive devices and/or ammunition a fee of $1,000 per year;
    "(B) of firearms other than destructive devices a fee of $500 per year.
"(2) If an importer—
    "(A) of destructive devices and/or ammunition a fee of $1,000 per year;
    "(B) of firearms other than destructive devices a fee of $500 per year.
"(3) If a dealer—
    "(A) in destructive devices and/or ammunition a fee of $1,000 per year;
    "(B) who is a pawnbroker dealing in firearms other than destructive devices a fee of $250 per year;
    "(C) who is not a dealer in destructive devices or a pawnbroker, a fee of $10 per year; except that for the first renewal following the effective date of the State Firearms Control Assistance Act of 1967 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25.

"(b) Upon the filing of a proper application and payment of the prescribed fee, the Secretary may issue to the applicant the appropriate license which, subject to the provisions of this chapter and other applicable provisions of law, shall entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.

"(c) Any application submitted under subsections (a) and (b) of this section shall be disapproved and the license denied and the fee returned to the applicant if the Secretary, after notice and opportunity for hearing, finds that—

    "(1) the applicant is under twenty-one years of age; or
    "(2) the applicant (including in the case of a corporation, partnership, or association, any individual possessing directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of this chapter; or is, by reason of his business experience, financial standing, or trade connections, not likely to commence business operations during the term of the annual license applied for or to maintain operations in compliance with this chapter; or
    "(3) the applicant has willfully violated any of the provisions of this chapter or regulations issued thereunder; or
    "(4) the applicant has willfully failed to disclose any material information required, or has made any false statement as to any material fact, in connection with his application; or
    "(5) the applicant does not have, or does not intend to have or to maintain, in a State or possession, business premises for the conduct of the business.

"(d) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, and sale or other disposition, of firearms and ammunition at such place, for such

18                    FEDERAL FIREARMS ACT

period and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary or his delegate may enter during business hours the premises (including places of storage) of any fire-arms or ammunition importer, manufacturer, or dealer for the purpose of inspecting or examining any records or documents required to be kept by such importer or manufacturer or dealer under the provisions of this chapter or regu-lations issued pursuant there to, and any firearms or ammunition kept or stored by such importer, manufacturer, or dealer at such premises. Upon the request of any State, or possession, or any political subdivision thereof, the Secretary of the Treasury may make available to such State, or possession, or any political subdivision thereof, any information which he may obtain by reason of the provisions of this chapter with respect to the identification of persons within such State, or possession, or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of such firearms or ammunition.

"(e) Licenses issued under the provisions of subsection (b) of this section shall be kept posted and kept available for inspection on the business premises covered by the license.

"(f) Licensed importers and licensed manufacturers shall identify, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer.

**"§ 924. Penalties**

"(a) Whoever violates any provision of this chapter or any rule or regulation promulgated thereunder, or knowingly makes any false statement or representa-tion with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or in applying for any license or exemption or relief from disability under the provisions of this chapter, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

"(b) Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports, or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or im-prisoned not more than ten years, or both.

"(c) Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of this chapter, or a rule or regulation prom-ulgated thereunder, or violation of any other criminal law of the United States, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of fire-arms, as defined in section 5848(1) of said Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter.

**"§ 925. Exceptions: relief from disabilities**

"(a) The provisions of this chapter shall not apply with respect to the trans-portation, shipment, receipt, or importation of any firearm or ammunition im-ported for, or sold or shipped to, or issued for the use of the United States or any department, or agency thereof ; or any State or possession, or any department, agency, or political subdivision thereof.

"(b) A licensed importer, licensed manufacturer, or licensed dealer who is indicted for a crime punishable by imprisonment for a term exceeding one year, may, notwithstanding any other provisions of this chapter, continue operations pursuant to his existing license (provided that prior to the expira-tion of the term of the existing license timely application is made for a new license) during the term of such indictment and until any conviction pursuant to the indictment becomes final.

"(c) A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this chapter or of the National Firearms Act) may make application to the Secretary for relief from the disabilities under this chapter incurred by reason of such conviction, and the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant

will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest. A licensee conducting operations under this chapter, who makes application for relief from the disabilities incurred under this chapter by reason of such a conviction, shall not be barred by such conviction from further operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary grants relief to any person pursuant to this section, he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.

"(d) The Secretary may authorize a firearm to be imported or brought into the United States or any possession thereof if the person importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—

"(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or

"(2) is an unserviceable firearm, other than a machine gun as defined by 5848(2) of the Internal Revenue Code of 1954 (not readily restorable to firing condition), imported or brought in as a curio or museum piece; or

"(3) is of a type that does not fall within the definition of a firearm as defined in section 5848(1) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, and in the case of surplus military firearms is a rifle or shotgun; or

"(4) was previously taken out of the United States or a prossession by the person who is bringing in the firearm.

*Provided,* That the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm will be allowed under this subsection.

## "§ 926. Rules and regulations

"The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this chapter. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.

## "§ 927. Effect on State law

"No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State or possession on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State or possession so that the two cannot be reconciled or consistently stand together.

## "§ 928. Separability

"If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby."

SEC. 4. The administration and enforcement of this Act shall be vested in the Secretary of the Treasury.

SEC. 5. Nothing in this Act shall be construed as modifying or affecting any provision of—

(a) the National Firearms Act (chapter 53 of the Internal Revenue Code of 1954) ; or

(b) section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), as amended, relating to munitions control; or

(c) section 1715 of title 18, United States Code, relating to nonmailable firearms.

SEC. 6. The table of contents to "PART I.—CRIMES" of title 18, United States Code, is amended by inserting after

"43. False personation_____ 911"

a new chapter reference as follows:

"44. Firearms_____ 921"

SEC. 7. The Federal Firearms Act (52 Stat. 1250; 15 U.S.C. 901–910), as amended, is repealed.

SEC. 8. The amendments made by this Act shall become effective one hundred and eighty days after the date of its enactment; except that repeal of the Federal Firearms Act shall not in itself terminate any valid license issued pursuant to that Act and any such license shall be deemed valid until it shall expire according to its terms unless it be sooner revoked or terminated pursuant to applicable provisions of law.

EXHIBIT No. 4

[S. 1853, 90th Cong., first sess.]

A BILL To amend the Federal Firearms Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the first section of the Federal Firearms Act (52 Stat. 1250) is amended to read:

"That as used in this Act—

"(1) The term 'person' includes an individual, partnership, association, or corporation.

"(2) The term 'State' includes each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, the Canal Zone, and American Samoa.

"(3) The term 'interstate or foreign commerce' means commerce between any State and any place outside thereof; or between points within the same State, but through any place outside thereof; or within any possession of the District of Columbia.

"(4) The term 'firearm', except when the context otherwise requires, means any weapon, manufactured after the year 1898, by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive or the frame or receiver of any such weapon.

"(5) The term 'handgun' means any pistol or revolver originally designed to be fired by the use of a single hand and which is designed to fire or capable of firing fixed cartridge ammunition, or any other firearm originally designed to be fired by the use of a single hand.

"(6) The term 'manufacturer' means any person engaged in the business of manufacturing or importing firearms for purposes of sale or distribution. The term 'licensed manufacturer' means any such person licensed under the provisions of this Act.

"(7) The term 'dealer' means any person engaged in the business of selling firearms at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting barrels, stocks, or trigger mechanisms to firearms, or any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.

"(8) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the repayment of money loaned thereon.

"(9) The term 'Secretary' means the Secretary of the Treasury or his designee.

"(10) The term 'crime of violence' includes voluntary manslaughter, murder, rape, mayhem, kidnaping, robbery, burglary, housebreaking, extortion accompanied by threats of violence, assault with a dangerous weapon, assault with intent to commit any offense punishable by imprisonment for more than one year, arson punishable as a felony, or an attempt to commit any of the foregoing offenses.

"(1) The term 'indictment' includes an indictment or any information in any court of the United States or in any court of any State under which a crime of violence may be prosecuted.

"(12) The term 'fugitive from justice' means any person who has fled from any State to avoid prosecution for a crime of violence or to avoid giving testimony in any criminal proceeding."

SEC. 2. Section 2 of the Federal Firearms Act is amended to read:

"(a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm in interstate or foreign commerce.

"(b) It shall be unlawful for any person to receive any firearm transported or shipped in interstate or foreign commerce in violation of subsection (a) of this section, knowing or having reasonable cause to believe such firearms to have been transported or shipped in violation of said subsection.

"(c) It shall be unlawful for any licensed manufacturer or licensed dealer to ship or transport, or cause to be shipped or transported, any firearm in interstate or foreign commerce, to any person in any State where the receipt or possession by such person of such firearm would be in violation of any statute of such State unless the licensed manufacturer or licensed dealer establishes that he was unable to ascertain with reasonable effort that such receipt or possession would be in violation of such State law.

"(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm to any person knowing or having reasonable cause to believe that such person is under indictment for or has been convicted in any court of the United States or in any court of any State of a crime of violence or is a fugitive from justice.

"(e) It shall be unlawful for any person who is under indictment for or who has been convicted of a crime of violence, or who is a fugitive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm.

"(f) It shall be unlawful for any person who is under indictment for or who has been convicted of a crime of violence, or who is a fugitive from justice, to receive any firearm which has been shipped or transported in interstate or foreign commerce.

"(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm, knowing, or having reasonable cause to believe, such firearm to have been stolen.

"(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or to pledge or accept as security for a loan any firearm moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe, such firearm to have been stolen.

"(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered.

"(j) It shall be unlawful for any manufacturer or dealer knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed manufacturers or licensed dealers, any package or other container in which there is any handgun without written notice to the carrier that such handgun is being transported or shipped.

"(k) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce any handgun to any person with knowledge or with reasonable cause to believe that such person is under twenty-one years of age.

"(l) It shall be unlawful for any licensed manufacturer or licensed dealer to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or licensed dealer unless:

"(1) such person has submitted to such manufacturer or dealer a sworn statement in the following form: 'Subject to penalties provided by law, I swear that I am 21 years or more of age; that I am not prohibited by the Federal Firearms Act from receiving a handgun in interstate or foreign commerce; and that my receipt of this handgun will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside. Further, the true title, name, and address of the principal law enforcement officer of the locality to which the handgun will be shipped are _____
Signature _____ Date_____',
and containing a blank space for the attachment of a true copy of any permit required pursuant to such statute or published ordinance.

"(2) such manufacturer or dealer has, prior to the shipment of such handgun, forwarded by registered or certified mail (return receipt requested) to (A) the local law enforcement officer named in the sworn statement, or (B) the official designated by the Governor of the State concerned under this subsection, a description of the handgun to be shipped (including the manufacturer, the caliber, the model, and type of such handgun, but not including

serial number identification), and one copy of the sworn statement, and has received a return receipt evidencing delivery of such letter, or such letter has been returned to such manufacturer or dealer due to the refusal of the named law enforcement officer or designated official to accept such letter in accordance with United States Post Office Department regulations; and

"(3) such manufacturer or dealer has delayed shipment for a period of at least seven days following receipt of the notification of the local law enforcement officer's or designated official's acceptance or refusal of such letter.

A copy of the sworn statement and a copy of the notification to the local law enforcement officer or designated official along with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 3(d). For purposes of paragraph (2)(B), the Governor of any State may designate any official in his State to receive such notification for such State or any part thereof in lieu of the notification required by paragraph 2(A) and shall notify the Secretary of the name, title, and business address of such official and the Secretary shall publish in the Federal Register the name, title, and address of such official. Upon such publication, notification to the local law enforcement officers required under paragraph (2)(A) of this subsection will not be required for a period of five years from the date of such publication unless the request is withdrawn by the Governor of such State and such withdrawal is published in the Federal Register.

"(m) It shall be unlawful for any licensed manufacturer or licensed dealer to sell or deliver for sale any handgun to any person other than another licensed manufacturer or licensed dealer who is not a resident of the State in which such manufacturer's or dealer's place of business is located and in which the sale or delivery for sale is made, unless such manufacturer or dealer has, prior to sale, or delivery for sale of the handgun, complied with the provisions of subsection (1) of this section.

"(n) It shall be unlawful for any person in connection with the acquisition or attempted acquisition of a firearm from a licensed manufacturer or licensed dealer to—

"(1) knowingly make any false or fictitious statement, written or oral; or

"(2) knowingly furnish or exhibit any false, fictitious, or misrepresented identification with the intention to deceive such manufacturer or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed manufacturer or licensed dealer under the provisions of this section.

"(o) It shall be unlawful for any person to transport or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides."

Sec. 3. Section 3 of the Federal Firearms Act is amended to read:

"Sec. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms in interstate or foreign commerce shall file an application for such license with the Secretary, in such form and containing such information as the Secretary shall by regulation prescribe. Each such applicant shall be required to pay a fee for obtaining such license as follows:

"(1) If a manufacturer of firearms, a fee of $50 per annum;

"(2) If a dealer (other than a pawnbroker) in firearms, a fee of $10 per annum, except that for the first renewal following the effective date of the Federal Firearms Amendments of 1967 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25;

"(3) If a pawnbroker, a fee of $50 per annum.

"(b) Upon filing by a qualified applicant of a proper application and the payment of the prescribed fee, the Secretary shall issue to such applicant the license applied for, which shall, subject to the provisions of this Act, entitle the licensee to transport, ship, sell, and receive firearms in interstate or foreign commerce during the period stated in the license. No license shall be issued pursuant to this Act—

"(1) to any applicant who is under twenty-one years of age;

"(2) to any applicant, if the applicant (including in the case of a corporation, partnership, or association, any individual who, directly or indirectly, has the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited by the provisions

of this Act from transporting, shipping, selling, or receiving firearms in interstate or foreign commerce; or

"(3) to any applicant who has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application.

"(c) The provisions of section 2 (d), (e), and (f) of this Act shall not apply in the case of a licensed manufacturer or licensed dealer who is under indictment for a crime of violence: *Provided*, That such manufacturer or dealer gives notice to the Secretary by registered or certified mail of his indictment within thirty days of the date of the indictment. A licensed manufacturer or licensed dealer who has given notice of his indictment to the Secretary, as provided in this subsection, may continue operation pursuant to his existing license during the term of such indictment, and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act, and operations pursuant to such license shall be discontinued.

"(d) Each licensed manufacturer and licensed dealer shall maintain such records of production, importation, notification, shipment, sale, and other disposal of firearms as the Secretary may by regulation prescribe."

SEC. 4. Section 4 of the Federal Firearms Act is amended to read:

"SEC. 4. (a) The provisions of this Act shall not apply with respect—

"(1) to the transportation, shipment, receipt, or importation of any firearms sold or shipped to, or issued for the use of (A) the United States or any department, independent establishment, or agency thereof; (B) any State or any department, independent establishment, agency, or any political subdivision thereof; (C) any duly commissioned officer or agent of the United States, a State or any political subdivision thereof; (D) any bank, common or contract carrier, express company, or armored-truck company organized and operating in good faith for the transportation of money and valuables, which is granted an exemption by the Secretary; or (E) any research laboratory designated as such by the Secretary; or

"(2) to the transportation, shipment, or receipt of antique or unservicable firearms possesed and held as a curio or museum piece.

"(b) Nothing contained in this Act shall be construed to prevent shipments of firearms to institutions, organizations, or persons to whom firearms may be lawfully delivered by the Secretary of Defense or his designee, nor to prevent the receipt or transportation of such firearms by their lawful possessors while they are engaged in military training or in competitions.' '

SEC. 5. Section 5 of the Federal Firearms Act is amended to read:

"SEC. 5. (a) Any person violating any of the provisions of this Act or any rules and regulations promulgated hereunder, or who makes any statement in applying for the license or exemption provided for in this Act, knowing or having reasonable cause to know such statement to be false, shall, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine.

"(b) Any firearm involved in any violation of the provisions of this Act or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5848(1) of said Code shall, so far as applicable, extend to seizures and forfeitures incurred under the provisions of this Act."

SEC. 6. The Federal Firearms Act is amended by adding at the end thereof the following new section:

"SEC. 11. Nothing in this Act shall be construed as modifying or affecting any provision of—

"(1) the National Firearms Act (chapter 53 of Internal Revenue Code of 1954); or

"(2) section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control)); or

"(3) section 1715 of title 18 of the United States Code (relating to nonmailable firearms)."

SEC. 7. The amendments made by this Act shall become effective on the first day of the sixth month beginning after the date of enactment of this Act.

SEC. 8. This Act may be cited as the "Federal Firearms Amendments of 1967".

24                        FEDERAL FIREARMS ACT

EXHIBIT No. 5

[S. 1854, 90th Cong., first sess.]

A BILL To amend the National Firearms Act, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) paragraph (1) of section 5848 of the Internal Revenue Code of 1954 is amended by inserting after "or a machinegun," the words "or a destructive device,".

(b) Paragraph (2) of section 5848 of the Internal Revenue Code of 1954 is amended by inserting after the words "or is designed to shoot," the words "or which can readily be restored to shoot," and by striking out the period at the end thereof and inserting after the word "trigger" the words ", and shall include (A) the frame or receiver of any such weapon, and (B) any combination of parts designed and intended for use in converting a weapon, other than a machinegun, into a machinegun".

(c) Section 5848 of the Internal Revenue Code of 1954 is amended by renumbering paragraphs (3), (4), (5), (6), (7), (8), (9), (10), and (11), as paragraphs (4), (5), (6), (7), (8), (9), (10), (11), and (12), respectively, and by inserting after paragraph (2) a new paragraph (3) as follows:

"(3) The term 'destructive device' means (A) any explosive or incendiary (i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile, (v) mine, or (vi) similar device; (B) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive, the barrel or barrels of which have a bore of more than 0.78 inches in diameter; or (C) any combination of parts designed and intended for use in converting any device into a destructive device. The term 'destructive device' shall not include (i) any device which is not designed or redesigned or used or intended for use as a weapon, (ii) any device, although originally designed as a weapon, which is redesigned for use or is used as a signaling, pyrotechnic, line throwing, safety, or similar device, (iii) any shotgun or rifle, (vi) any firearm designed for use with black powder, regardless of when manufactured, (v) surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10 of the United States Code, (vi) any device which the Secretary finds is used exclusively by the United States or any department or agency thereof, or (vii) any other device which the Secretary finds is not likely to be used as a weapon."

(d) Paragraph (4) of section 5848 of the Internal Revenue Code of 1954 (as renumbered) is amended by striking out the period at the end thereof and inserting the words ", and shall include the frame or receiver of any such weapon, and any such weapon which can readily be restored to firing condition."

(e) Paragraph (5) of section 5848 of the Internal Revenue Code of 1954 (as renumbered) is amended by striking out the period at the end thereof and inserting the words ", and shall include the frame or receiver of any such weapon, and any such weapon which can readily be restored to firing condition."

SEC. 2. Section 5803 of the Internal Revenue Code of 1954 is amended to read as follows:

## "SEC. 5803. EXEMPTIONS.

"The tax imposed by section 5801 shall not apply to any importer, manufacturer, or dealer all of whose business as an importer, manufacturer, or dealer is conducted with, or on behalf of, the United States or any department, independent establishment, or agency thereof. The Secretary or his delegate may relieve any such importer, manufacturer, or dealer from compliance with any provision of this chapter with respect to the conducting of such business."

SEC. 3. (a) Section 5814 of the Internal Revenue Code of 1954 is amended by—

(1) striking out the word "duplicate" in the first sentence of subsection (a) and inserting in lieu thereof "triplicate":

(2) inserting before the period in the second sentence of subsection (a) thereof the following: "and the age of such applicant": and

(3) striking out "a copy" in the first sentence of subsection (b), inserting in lieu thereof "one copy", and adding before the period in such sentence the following: "and one copy to the principal law enforcement officer of the locality wherein he resides".

(b) Subsection (e) of section 5821 of the Internal Revenue Code of 1954 is amended by—

   (1) inserting before the period in the last sentence thereof the following: "and the age of such applicant"; and

   (2) adding at the end thereof the following new sentence: "At the same time that the person making the declaration forwards the declaration to the Secretary or his delegate, he shall forward a copy thereof to the principal law enforcement officer of the locality wherein he resides."

(c) Section 5843 of the Internal Revenue Code of 1954 is amended by inserting at the end thereof the following sentence: "If a firearm (possessed by a person other than an importer or manufacturer) does not bear the identification required under this section, the possessor thereof shall identify the firearm with such number and other identification marks as may be designated by the Secretary or his delegate, in a manner approved by the Secretary or his delegate."

Sec. 4. The second sentence of section 5841 of the Internal Revenue Code is hereby repealed.

Sec. 5. (a) Subchapter B of chapter 53 of the Internal Revenue Code of 1954 is amended by adding at the end thereof a new section 5850 as follows:

## "SEC. 5850. APPLICABILITY OF OTHER LAWS.

"Nothing in this title shall be construed as modifying or affecting any provision of—

   "(1) the Federal Firearms Act, as amended (15 U.S.C. 901–909); or

   "(2) section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control)); or

   "(3) section 1715 of title 18 of the United States Code (relating to nonmailable firearms).

(b) The table of sections in subchapter B of chapter 53 of the Internal Revenue Code of 1954 is amended by adding at the end thereof:

    "Sec. 5850. Applicability of other laws."

Sec. 6. (a) Subchapter C of chapter 53 of the Internal Revenue Code of 1954 is amended by adding at the end thereof the following new sections:

## "SEC. 5856. UNLAWFUL POSSESSION IN VIOLATION OF STATE LAW.

   "It shall be unlawful for any person to possess in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

## "SEC. 5857. UNLAWFUL POSSESSION BY A PERSON UNDER 21 YEARS OF AGE.

"It shall be unlawful for any person who is not 21 years or more of age to possess a firearm."

(b) The table of sections in subchapter C of chapter 53 of the Internal Revenue Code of 1954 is amended by adding at the end thereof:

    "Sec. 5856. Unlawful possession in violation of State law.
    "Sec. 5857. Unlawful possession by a person under 21 years of age."

Sec. 7. Section 5861 of the Internal Revenue Code is amended to read as follows:

## "SEC. 5861. PENALTIES.

"Any person who violates or fails to comply with any of the requirements of this chapter shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine.".

Sec. 8. (a) The proviso in paragraph (3) of subsection (a) of section 5801 of the Internal Revenue Code of 1954 is amended by striking out the words "under section 5848(5)" and inserting in lieu thereof the words "under section 5848(6)".

(b) The proviso in subsection (a) of section 5811 of the Internal Revenue Code of 1954 is amended by striking out the words "under section 5848(5)" and inserting in lieu thereof the words "under section 5848(6)".

(c) Subsection (d) of section 5685 of the Internal Revenue Code is amended to read as follows:

"(d) Definition of Machine Gun.—As used in this section the term 'machine gun' has the same meaning assigned to it in section 5848(2)."

**26**          FEDERAL  FIREARMS  ACT

SEC. 9. (a) This Act shall take effect on the first day of the sixth month following the month in which it is enacted.

(b) Notwithstanding the provisions of subsection (a), any person required to register a firearm under the provisions of section 5841 of the Internal Revenue Code of 1954 by reason of the amendments to section 5848 of such Code contained in the first section of this Act, shall have ninety days from the effective date of this Act to register such firearm, and no liability (criminal or otherwise) shall be incurred in respect to failure to so register under such section prior to the expiration of such ninety days.

Chairman DODD. Senator Hruska, do you have a statement you would like to make?

Senator HRUSKA. Yes, I have. However, Mr. Chairman, may Senator Kennedy proceed at this time?

Chairman DODD. Certainly.

Senator KENNEDY. Thank you very much, Mr. Chairman. Let me just say, Mr. Chairman, it is a pleasure to be here, but I regret having to repeat the process that we have already been through, to repeat the consideration of issues that are fundamental and basic and clear.

Extensive hearings have already been held in the House, and in the Senate this committee held 5 days of public hearings in 1963 with 14 witnesses, 3 days of public hearings in 1964 with three witnesses, and in the 89th Congress we held 11 days of public hearings at which we heard 50 witnesses, for a total of 19 days and 67 witnesses.

In addition, the Senate Commerce Committee held 6 days of hearings with 37 witnesses. During the same period the House committee held extensive hearings. Committee members' positions have been well considered and made known in numerous votes in the subcommittee and in the full committee. The arguments and the positions on both sides of the question of providing some kind of reasonable legislation to curtail the widespread use of firearms have been fully aired.

Most of the witnesses whom we will hear have already been heard before, and we can expect to hear little that is new this next month; so it certainly is with mixed emotions that I will have the chance to participate with the distinguished chairman of these hearings.

There is one new and important factor, a factor which will enable, if not require, us to enact more effective legislation than we ever thought possible. This important change is a growing and resounding recognition by the public that the public's interest demands an end to the wide and unfettered flow of arms around the Nation. This recognition has been expressed in letters, in hundreds of unsolicited letters from individual citizens with no special interest except the interest of society in less violence, less bloodshed, and less crime.

This recognition has been expressed firmly in national opinion polls. One poll this year found that a vast majority of the public wants gun legislation going far beyond any proposal being considered by this subcommittee; 73 percent of those polled favored a law which would require registration of a rifle or a shotgun; 85 percent favored a law requiring registration of pistols; 75 percent favored doing away with all mail-order buying of guns altogether; and 84 percent felt there should be restrictions on who was allowed to buy a gun.

The public opinion is also the opinion of almost every respected law enforcement official and organization from the Attorney General to hundreds of individual chiefs of police, as well as the National Crime Commission and the American Bar Association.

Against this massive array of reasonable and responsible opinion, what do we find? We find a small group of self-interested people who rely on emotion, exaggeration, and misrepresentation to support their position. They claim that their constitutional rights would be violated by gun legislation, when the well-known fact is that this is not the case. They claim that legitimate interests of sportsmen and hobbyists would be interfered with, but even the most reputable members of their own organizations tell them that this is not true.

They say that they would support some reasonable type of legislation, when in fact they resist and obstruct the very reasonable and limited measures which, I believe, are supported by the majority of Americans and of this subcommittee. It is my firm opinion, however, that the delay and obstruction which they have fomented is now going to backfire on them.

For with every passing week and month the force of public opinion, expert opinion, and congressional opinion behind effective weapons control legislation increases. And with this increase in support, I believe that we will be able to get stronger and more effective legislation enacted in the 90th Congress than could have been enacted in any previous Congress.

Once again, as I did last April, I invite and welcome the officers and the members of the National Rifle Association and other firearms groups to join with us in a cooperative effort to remove the menace of an unrestricted flow of weapons from the face of American life. We will need their help in educating gun users as to the operation of this legislation when it is passed. We will need their help in implementing it.

The States and localities will need help in designing their own legal framework for weapons control, whatever that may be, controls which for the first time they will be able to institute without fear of avoidance and of evasion by interestate weapons trade.

Mr. Chairman, I believe that after we complete these hearings we can proceed rapidly to report a bill out of subcommittee, hopefully by the end of this month, and to report a bill out of committee by the end of August. I believe we can do this because it is now incumbent on the members of the Judiciary Committee once and for all to let the Members of the entire Senate express their will on this vital matter.

My position is well known. I expressed it most recently before the National Rifle Association and I ask that my statement be placed in the record of these hearings.

Chairman Dodd. Thank you, Senator Kennedy.

Without objection that will be done.

(The statement referred to was marked "Exhibit No. 6" and is as follows:)

EXHIBIT No. 6

ADDRESS BY SENATOR EDWARD M. KENNEDY TO THE ANNUAL MEETING OF THE NATIONAL RIFLE ASSOCIATION, WASHINGTON, D.C., APRIL 2, 1967

I welcome this opportunity to meet with you today to discuss the kind of legislation I consider absolutely essential to control the sale and movement of guns in our nation. I had looked forward to the chance to meet with your membership at a general session on legislation. Since that was not possible, I shall attempt to bring my thoughts to you, in the hope that what is said here will eventually be communicated to your membership, and to the public.

I asked to meet with you to discuss the clear and compelling need to legislate against the uncontrolled sale and shipment of guns. This need is now well-understood by the general public—weapons are available in this country to the demented, the criminal, the child, the addict, and all others who would abuse these instruments of death. Your organization has stated that the person, not the gun, creates this national problem. I agree that the gun cannot cause harm without the person, and the intent of the legislation I support is to see to it that those persons bent on violence and crime be deprived of the weapons that in their hands horrify the public.

The National Rifle Association is fully aware of the tragic statistics:

In this century the number of Americans killed within our borders by bullets exceeds the number of N.R.A. members.

In this decade the number of Americans killed by firearms at home is many times the number of boys we have lost in Vietnam.

In 1965 alone, 5,600 murders, 34,700 assaults, and most of the 68,400 armed robberies were committed with guns.

In a recent three year period, of the 4000 people who ordered guns from only two of the mail order dealers in the city of Chicago, one fourth—or 1,000—of them had criminal records.

These figures tell only a part of the unbelievable story of gun abuse, but they should be enough to cause concern among men of reason in 1967.

Let us look at the response of our nation's leadership to this growing national emergency. The President of the United States, and the President who preceded him, both called for strong legislation to curb the flow of weapons to those in our society who should not have them. This call has been supported by their Attorneys General, by the Director of the Federal Bureau of Investigation Mr. J. Edgar Hoover, by the International Association of Chiefs of Police, by the American Bar Association, by the National Crime Commission, by the country's best police chiefs and prosecutors, and, I believe, by the vast majority of our citizens.

And let us examine the response of some of those who disagree—citizens who are supposedly intelligent, patriotic and upstanding members of their communities. They have said, "Register Communists, not firearms;" "Move to Russia if you want to live under gun control legislation;" or, "Register your firearms, those who want a police state will appreciate it."

And what has been the response of the National Rifle Association? Your stated policy has been that . . . "Firearms legislation is of insufficient value in the prevention of crime to justify the inevitable restrictions which such legislation places upon law-abiding citizens." That statement does not differentiate between various kinds of legislation. It does not admit that there are any merits to the arguments of law enforcement officials, public officials, the general public or the President of the United States. That statement represents to me a negative response in the face of a majority opinion that something must be done, some step must be taken, to reduce the chance of death and injury by guns in the hands of the young, the unstable or the lawless.

As the result of your efforts, we in Congress have been flooded by mail, wires, and telephone calls. All too often these communications are abusive and irrational. We have been labeled un-American, Socialistic, and unconcerned with the true causes of crime. We have been described as opposed to the legitimate use of guns for sport and hobby. At worst these charges are ridiculous and cruel; at best they are simply wrong. And in almost every case, it is apparent that nothing is being done by opponents of gun legislation to foster understanding, intelligent debate, and compromise.

But regardless of the efforts of the opponents of gun legislation, we in Congress have our responsibilities to the people. We intend to meet them. And the choice is yours whether we will meet these responsibilities with the assistance of your members, or in spite of them.

Let me state the case for this year's legislation, legislation which I believe will pass. The State Firearms Control Assistance Act of 1967 has neither the purpose nor the effect of restricting the hunting pleasures of any members of this Association. It will not make it impossible, or even difficult, to purchase, carry, or use a gun for sporting purposes. This law, S. 1., will not prevent a firearms competitor from state to state to a match of shooting skill, and it will not preclude the legitimate gun user from buying a rifle or a shotgun while he is away from home.

It is certainly not the intention of any member of Congress to deprive, or even interfere with, the American sportsman or his right to take to the field to hunt

or match his skills against others. The true sportsman, the hunter, or the collector of weapons is well-represented in the Congress and the government. His love of the outdoors and his competitive spirit are shared and admired by all.

The State Firearms Control Assistance Act of 1967 was constructed with full recognition of the diversities among states, their geography, their histories, and their experiences with crime and guns. It seeks, after laying down basic Federal standards, to allow each state to decide for itself how to prevent the misuse of firearms.

No state can now make such decisions and make them stick. My state of Massachusetts, for example, has fairly stringent gun laws. Hunters and competitors and collectors have no difficulty in complying with them and do so willingly. Yet under present conditions these laws constitute only a minor nuisance to the criminal, the addict, the juvenile, or the incompetent who wants to avoid the Massachusetts regulations. Those who my state says cannot buy weapons can order them by mail from out of state. Those whom the laws of Massachusetts seek to keep away from guns can go to Maine or New Hampshire or Vermont, which have few restrictions, and buy their weapons. In fact a survey by the Massachusetts State Police showed that 87 percent of the guns used in crimes in the Commonwealth were purchased over-the-counter in these neighboring three States.

Is this fair to the citizens of Massachusetts, who, after weighing the costs of strict gun controls against the benefits, have decided in favor of controls? Is this fair to the law-abiding gun owners of Massachusetts who see others evading the state's laws?

It is the essence of our Federal system that the states be given as much authority as possible in determining their own legal environment. This principle is especially appropriate in the case of firearms use, which varies so greatly from region to region, from state to state. Yet where firearms are concerned, diversities cannot be protected unless the states have Federal assistance to prevent their laws from being circumvented. This is the essence, the basic thrust, of the legislation before Congress. Under this legislation:

*There will be no Federal restrictions on purchasing a gun in one's own state* for a person who complies with State and local law, is of the proper age (18 for long guns, 21 for others), and is not a convicted felon, or currently under indictment, or a fugitive from justice. Purchase of rifles and shotguns can be made by nonresidents in person from dealers in other states, and the arms can be shipped home, if the transaction and the delivery comply with the laws of both places. Other purchases of rifles and shotguns, and all purchases of hand guns originating out of state, can be made from or through dealers in one's own state, just as a local purchase is made.

This in sum is the bill. It sets only two national, and unobjectionable, standards for the *purchase* of guns. It sets no standards for the *use* of guns. The standards of this bill prevent criminals and juveniles from buying guns from licensed dealers. The rest is up to the states. They can, for example, make their own rules on the use of guns by juveniles. They can make whatever other rules they want regarding the purchase of weapons and they can promulgate these rules secure in the knowledge that their laws cannot be eroded by less stringent laws in neighboring states.

What is the harm in this? It is true that the ads in *The American Rifleman* will have to add the words "Order through your local dealer," and the out-of-state dealer will have to yield some of his profit to the local dealer, who relieves him of the state and Federal compliance obligations. If you want a handgun, you will have to buy it in your own state. If you want a rifle, you will have to buy it from a dealer in your own state, or buy it in person in another state. I venture to say that the bulk of *your* purchases already comply with those rules.

So the question before us is a simple one. Are the possible minor inconveniences too great for the sportsman to bear if they can prevent children, convicted felons, and the mentally ill from mailing away for guns whenever the spirit moves them? Are they too high a price to pay to keep surrounding states from depriving Massachusetts of the benefit of her own gun laws? Is it not worth these minor inconveniences if we can avoid one murder, one suicide, one accident, or ten, or a hundred, or a thousand?

The American public does not feel that gun control laws are too great an inconvenience, or that they will exact too high a price in restrictions for the law-abiding citizen to pay. The American public feels that whatever minor disrup-

tions gun users will experience should not override the benefits that gun control legislation will bring to the people as a whole.

In a poll conducted by the Gallup Organization this past January, we can find some measure of the public view:

73 percent of those polled favored a law which would require the registration of a rifle or a shotgun.

85 percent favored a law requiring registration of pistols.

75 percent favored doing away with all mail order buying of guns.

84 percent felt there should be restrictions on who is allowed to buy a gun.

Only 12 percent, less than one-eighth of those polled, believed that anyone who wants a gun should be allowed to buy one with no questions asked.

In the face of this expression of public opinion, an opinion that clearly states that the American people want even more protection than we find in the current proposal before Congress, we must act, and we will act.

And I believe that your organization, confronted with the case, the statistics, and the public outcry, must also act—but act positively. The National Rifle Association has a history of opposition to gun control legislation. But there have been occasions when you have shown a recognition that there can be forthright and constructive proposals for weapons control.

In a statement of policy in the September 1966 issue of *The American Rifleman*, you said, "The NRA strongly supports ownership controls directed at those individuals who, as a class, should not possess firearms—convicted felons, drug addicts, habitual drunkards, mental incompetents, and unsupervised juveniles." I could not have stated my goal, and the ultimate goal of S. 1, more distinctly. Moreover, as shown by the Association's testimony before the Juvenile Delinquency Subcommittee in the 89th Congress, you agree that, "Controls on the interstate shipment of firearms are definitely needed."

And I am pleased to remind the Association that in 1963 the Board of Directors of the NRA supported that year's firearms control legislation, and an NRA official testified in favor of it. I might add that that proposal, numbered S. 1975, might in certain respects be considered more onerous and more inconvenient for the purchasers of weapons than this year's bill. The 1963 bill called for the filing of a sworn and notarized affidavit for every interstate mail order purchase. It required a copy of that affidavit to go to the police chief in the buyer's home town, regardless of whether that jurisdiction required registration.

I think that this year's proposal is more effective, more efficient, and in some ways less burdensome for the legitimate sportsman or collector. Yet, despite your support of the 1963 bill, and despite the existence of a reasonable proposal today, the NRA has called instead for a three-point legislative program taking an entirely different approach from the one developed by experts from the executive and legislative branches after years of painstaking efforts. I must say that I wonder whether you think your proposals would meet the goal you yourselves have put forth, the goal of keeping guns away from those who should not have them. I am sure that you have heard from many who are experts, about the problems with your proposals, so I will deal with them very briefly.

The first NRA proposal would make most local crimes of violence involving firearms into Federal crimes with mandatory minimum sentences. Would this measure keep a weapon out of the hands of any criminal, any child, any alcoholic, addict, or incompetent? Of course not. Would it deter a criminal who is not deterred by the severe state penalties for murder, for assault with a deadly weapon, or for armed robbery? Of course not. What it would do would be to make vast numbers of local offenses into Federal offenses. It would require a national police force if it were to be enforced. And it would intrude the Federal Government into the proper police function of the states, cities, and local communities.

Your second proposal is for a statute which would merely prohibit shipment of a firearm to anyone who could not legally receive it in his own state. Even putting aside a serious problem of wording, this measure could not possibly be effective, for it does not provide machinery, such as that in the 1963 bill, for the shipper to determine whether the buyer is in fact eligible to receive a firearm. Nor does it prevent an ineligible purchaser from merely going across a border into the next state to buy a gun which he could not buy in his own state. Thus the proposal would be nearly impossible to enforce and ineffective even if enforceable.

Your third proposal, dealing with "destructive devices," differs only on technical points with the related provisions of the Administration proposal, and I believe that the prior differences have been compromised very much in your

favor. It is fine as far as it goes, and should be part of any Federal legislation. But this measure does not even attempt to address the central problems of weapons transactions dealt with both by S. 1 and the 1963 bill.

If you had come up with an effective alternative to the approach of S. 1, we would now be considering it. But I don't believe you have. And the American people, and their representatives in Congress, are, therefore, considering S. 1.

The bill before us is not a panacea. It will not prevent all crime, all suicides, or all gun accidents. But after many years of study it is the best measure anyone has devised. There has been too much delay already. The American people do not want to wait any longer, and neither does Congress.

Yet it is not too late for you to assume a new role of cooperation, a role consistent with the public-spirited attitudes which marked the founding of your organization. Throughout the nation's history, there have been other times when groups striving for what they considered to be right, strongly opposed legislation later enacted. But it is also true in our history that the forces that unite us have been stronger than those which divide us. And from this strength has come some of our most important legislation. The labor laws, Social Security laws, civil rights laws, and medicare were vehemently opposed by some people, yet they were passed, implemented, and now benefit millions upon millions of Americans.

Now it is up to you. Millions of Americans want the benefits of S. 1. If it is passed, you are the ones who will have to bear some slight inconvenience to pursue your hobbies. Is this not a reasonable burden to bear in the public interest? Is this not the true meaning of patriotism and love of country? You are riflemen and pistol shooters and collectors and competitors and hunters, of course. *But you are citizens first*, and if your fellow citizens ask you to make these minor concessions, *can you really refuse?*

I do not think you can. I do not think you want to. I believe that no one has a greater interest in the reduction of illegitimate and harmful uses of firearms than you who seek protection of legitimate and safe uses. Our mutual interests and our common purposes should enable us to work together to enact appropriate firearms legislation.

I am hopeful that perhaps even in the few days remaining of this annual meeting you will have an opportunity to consider ways you can foster a new spirit of constructive cooperation, in the name of progress and the national welfare.

Chairman DODD. Senator Hruska.

Senator HRUSKA. Mr. Chairman, in due time I shall submit a more lengthy and a more detailed statement bearing upon the merits of my bill, the bill (S. 1853) which was introduced some time ago, bearing on this subject.

I might say to begin with that almost everyone is agreed that some Federal legislation is necessary to update the Federal Firearms Act and the National Firearms Act.

Both are old. One is over 30 years old, and the other is some 35 years old, or thereabouts, and they both need updating.

It was with some gratification that I read General Counsel's opinion on the bill which I introduced to amend the National Firearms Act. With the exception of some minor amendments which he proposed, he bought the idea, which is that destructive devices should not be included in the Federal Firearms Act. These devices should be included in the chapter and in the law which has to do with control of destructive devices—that is where they belong.

I shall comment on another matter and frankly I am going to elaborate on this statement because of Senator Kennedy's expressed regret here that we are repeating a process which has already been gone through painfully in the House, in the Commerce Committee, and in this committee.

I should like to call attention to the fact that, at this very hour, another subcommittee of this Judiciary Committee is meeting. I

happen to be ranking minority member of the Committee on Criminal Laws and Procedures. I am the author of five bills pending before that committee, all of them bearing upon the attack on organized crime.

Senator McClellan and other Members of the Senate likewise have bills. I have to make a choice where I will go.

Tomorrow morning there will be four subcommittees of the Judiciary Committee meeting simultaneously; the Committee on Improvements of Judicial Machinery, Antitrust and Monopoly Committee, this subcommittee, and the Committee on Criminal Laws and Procedures, and that is pretty much the situation all this week and all next week.

Chairman DODD. We don't have a meeting tomorrow morning.

Senator HRUSKA. Very well, we don't have one, but we do have one of the full committee instead of this one. The chairman has set this one over until 2 o'clock tomorrow afternoon.

Senator KENNEDY. Would the Senator yield?

Senator HRUSKA. Yes, go ahead.

Senator KENNEDY. And I also understand that the Senator from Nebraska is on the Appropriations Committee.

Senator HRUSKA. I am.

Senator KENNEDY. And there are numerous subcommittees of the Appropriations Committee that meet.

Senator HRUSKA. We have a rule in the Judiciary Committee that in the assignment of these cases the chief clerk of the committee is to be consulted. I know that the chairman of this subcommittee is a hard-working man; he is conscientious; and he has tried so hard in this field, as well as in other fields. I hold no criticism in my heart against him. He wants to get ahead with his work, as do the other chairmen of the other subcommittees. This committee system is going to break down, in fact it has broken down, because when I am in this committee, my State is deprived of representation on other subcommittees; and at 2 o'clock tomorrow afternoon when I come here my State will not be represented on the floor of the Senate.

I suggest most respectfully to all the chairmen of the subcommittees that the committee system is breaking down when Senators are unable to attend committee meetings.

I was unable to attend many hearings last summer and the summer before because of my duties on the Appropriations Committee, which is authorized to sit all day and also because of the many subcommittee meetings. So when regret is expressed that this is a repeat process, I say that large parts of the record that has accumulated up until now have been pretty much ex parte—with no one to engage in cross-examination or in request for further explanation of certain things.

Mr. Chairman, I want to assure you again this is without any reflection on your qualities of leadership. We do have a rule in the Judiciary Committee that the chief clerk is to be consulted, and that is for the purpose of trying to coordinate these meetings so that we are faced with as many as four subcommittee meetings at one time.

Now, then, getting back to the bill itself. I look forward to these hearings. I hope I can attend many of them. I can't do it all the time. Tomorrow we have to hear evidence on the confirmation of a Justice of the Supreme Court. This Senator is taking under advisement the necessity of asking that we not meet tomorrow afternoon, and I will consult with the chairman in that regard later in the day.

In analyzing the evidence to be adduced we must search for two things; one is for relevance and the other is for balance. You can cite statistics until you are blue in the face, but you have to make that additional showing, of what relevance have statistics got to the legislation at hand and the impact which it will have upon America and its citizens, so that New York, with the Sullivan law has a lesser crime rate than Houston, sure—and that is a fact and it is a figure. One of the witnesses has it in his statement, and therefore says, "My goodness, if we can just abolish firearms, or at least pass this bill, then we are going to have a happy day."

A member of the Cabinet says, "Unless we pass this bill we are going to have riots and continued riots"—implying that if we pass this bill there will be no riots. If the record of the Watts situation 2 years ago is carefully considered, we find that 2,000 rifles were seized, and there is no showing that they would not have been seized had this law been in full force and effect.

Returning to the statistic on Houston and New York City; let's consider in the alternative, the figures on New York City compared with Dallas, which is in the same State as Houston. Dallas has a very spectacularly lower crime rate than Houston. So, where is the relevance? That is going to be one of our searching inquiries during the course of this hearing.

We are going to have a battle over other things besides statistics. We will have a battle in these hearings for some balance. Everyone knows how serious the crime picture is. If there is some way of alleviating; if there is some way of lightening the burden of America insofar as crime is concerned, by modifying or amending present legislation on the Federal statute books, that will be fine, as long as it is kept within certain confines.

Such legislation must be kept within certain confines. It must be workable to begin with. We have some legislation on the books now, and we are going to have a little inquiry as to how these laws have been enforced and what efforts have been made to enforce them, and how long these efforts have been prevailing.

The law that we pass must also be acceptable, for unless it is acceptable, it is not going to be enforceable. Oh, you can crack down on scores and hundreds of people but if it is not acceptable, it will not be enforceable. The 18th amendment was not acceptable. We prohibited certain things there, even as this bill seeks to prohibit things; to prohibit and not to regulate them; to prohibit in large categories; and we found that that prohibition amendment was not enforceable—it broke down.

There are laws against stealing and there are laws right now against possessing stolen firearms or transporting them, and yet we know that almost with impunity that is being done; and one of the reasons, of course, is that by the time the guy who steals the gun is caught with it, he has committed so many more crimes and more serious crimes for which he gets locked up in the pokey that the possession of that gun doesn't make any difference. So we have to have something that will be acceptable.

Then we have to face this undeniable fact, in the United States the place and the role of privately used firearms are still beneficial, necessary, and wholesome in a large degree and in a large way.

Anything that will ride roughshod over those rights of those tens of millions of people, who legally and properly own and use guns, for the purpose of dealing with the relatively small segment, and even then on a questionable basis, will be questionable legislation, and will not receive that support which will enable it to become law.

Now if we want to engage in a sort of forensic proposition here and talk about ideal situations, that is one thing. If we expect to enact some legislation that will be workable and acceptable and that will achieve some balance between trying to get at a criminal element and still protect the tens of millions of citizens who use firearms properly and wholesomely and legally and sometimes necessarily, then we have a dish of another color and another shape.

Legislation should be amended in those areas and activities of criminal, unlawful, and improper use of firearms in a discriminative and selective way. To try to swat a fly on a plaster wall with a 12-pound hammer doesn't do any good. Don't hit the fly and you destroy the wall. Here we have a vast industry involving hundreds of millions of dollars of legitimate traffic in mail-order sales, and we are going to outlaw that. Mail-order sales ought to be explored very, very carefully before it is outlawed, item 1, because of the acceptability of this; item 2, because of the workability, and enforceability of proposed legislation.

In 1965, the FBI reports show 86,000 crimes committed with firearms—crimes of violence committed with firearms, 86,000 as opposed to some 20 to 30 million lawful owners and users of guns.

Now we have to find a ground which will allow each of those concepts to be dealt with properly, and if we do, the bill will have no more stanch or no more avid a proponent and advocate for passage and enactment into law than the Senator who is now speaking; however, lacking that balance and lacking these attributes to which I refer, I shall continue to resist those things which I believe will be harmful to this country and harmful to the citizens of this country.

Some suggestion has been made about the constitutionality of the proposed legislation. I am not going to go into the bulk of the arguments on amendment 2, but I will raise constitutionality on these two propositions, where it is sought to deprive a man of the right to apply for and own a gun on the basis that he is under indictment, it is in violation of rights which he possesses under the Constitution. A man is innocent and he is presumed to be innocent until he has been convicted, and until that conviction is in final form.

The presumption of innocence is one of the most elementary of all rules, and this rule is recognized in the Federal licensing of dealers and manufacturers. It is recognized there, because a holder of a license by the Administration bill can continue to hold that license, even if he is under indictment, until he is convicted and until that conviction becomes final, under certain conditions. Amendment 90 does not extend that to the ordinary citizen. What is there about a man being accused of crime that, in and of itself, will deprive him of rights which stem from the Constitution? That is one constitutional consideration.

Another constitutional consideration is that Amendment 90 would deprive a citizen who has been convicted of a crime punishable by imprisonment for a term exceeding 1 year, of certain rights and certain things; of the right to own a gun or the right to get a permit to own a gun or be the receiver of guns through the mail or over the counter.

Well, suppose a man is convicted of forgery. What relevance has the improper use of a gun in a criminal way by a fellow who has the itching finger and exercises that itchiness by trying to imitate signatures of other people? Or if he makes false and fraudulent entries in a bank record, what is there about that, even if he is sentenced for more than a year and day, that bears of his ability to get a shotgun to go out and shoot pheasants or a pistol to go out and engage in pistol target contests?

Sometimes we get a little enthusiastic and get carried away with our enthusiasm, and as the chairman very properly said, we must make an effort to try to avoid emotionalism and to see things for what they are, and to try to get something that will be possessed of those attributes to which I have already made reference.

Thank you very much, Mr. Chairman, for your characteristic patience.

Chairman DODD. Thank you, Senator Hruska.

I only observe that the conflict in committee meetings is with us all the time. I have another one this morning that I want to be at myself. I think we all have that problem every day.

Senator KENNEDY. Mr. Chairman, just on the question about when these hearings were set, it is my understanding that the times were established for July, at least 5 or 6 weeks ago at a previous meeting of the subcommittee itself. Is that the understanding of the chairman?

Chairman DODD. That is right.

Senator HRUSKA. Yes.

Senator KENNEDY. So, though we are all heavily pressed with regard to our obligations here, I think that it is probably important for the record to show at least that we had been notified that these hearings were going to take place. There were some dates which were established and made available by the counsel and staff of this committee, so that we could try to the best of our abilities to make our own adjustments and accommodations as best we could.

Senator HRUSKA. My only comment to that is I didn't set these other subcommittee hearings, and I don't blame the chairman of this subcommittee, I have said that—but here is a stark fact which is leading fast to the destruction of the committee system, and we have a rule to deal with it.

Since such a point was made about the regretability of having to go through this all over again, I just thought I would let the record have the benefit of some of my heretofore pent-up thoughts on the subject.

Chairman DODD. Possibly the best result would be if the Senator from Nebraska could find some way to clear up these conflicts with committee meetings.

Senator HRUSKA. Give me a chairmanship of two or three of these subcommittees and I will fix it up.

Senator KENNEDY. I think it probably isn't inappropriate to point out at this time that the bill, in substance the same bill that the Senator from Nebraska introduced, was reported out by the full Judiciary Committee last year. At that time, I moved that we move that legislation out so at least the Senate itself would have an opportunity to act in its own good judgment on the legislation, be able to introduce substitute measures, and make any modifications of it, but it was reported out. It was not liberated on the floor of the Senate.

Now we are back into a situation where we are considering not only that measure but S. 1 and other measures, on which as I mentioned earlier, we have had considerable testimony.

I might mention, if it isn't a violation of our meeting rules, that already this year I moved the Senator from Nebraska's bill out at a previous full Judiciary Committee meeting, and I was reminded at that time that this was an improper motion, that this subcommittee ought to have a chance to consider the legislation. Also I was reminded by the Senator from Nebraska that he hadn't placed his new bill in this year.

But I am always ready to move if need be the Senator from Nebraska's bill at any time. Hopefully we will be able, as I have mentioned previously, to report out S. 1, Amendment 90 which I strongly support, but as a last resort, the full committee might have to report the measure of the Senator from Nebraska so at least the Senate itself will have a chance to consider it.

Senator HRUSKA. So the record here will be complete, the Senator from Massachusetts well knows, and I know he would recite the fact if it occurred to him, the reason for my not introducing a bill sooner. Hearings were in progress in the House. Some of the gentlemen sitting here were testifying. Other witnesses were testifying.

It was thought well to allow those hearings to continue to a point where we could ascertain whether there would be any further need for modifying the bill in any way that I ultimately introduced. So it was not a dilatory tactic. It didn't hold us up one bit, and that I recite by way of having a full and complete record here so that there would not be any ground for suggesting maybe the Senator from Nebraska was dilatory.

Chairman DODD. Well, do you think that we can get on with the hearing?

Senator Hart, you might wish to say something.

Senator HART. Yes; I was tempted to. I think our problem is over these many months some of us have dug ourselves into positions. Politicians aren't supposed to admit that ever happens but it does. I take it that these hearings may provide an opportunity for all of us to test our own conception of these things.

Chairman DODD. Thank you very much.

Our first witness this morning is the Honorable Joseph W. Barr, accompanied by the Honorable Sheldon S. Cohen. Mr. Barr is the Under Secretary of the Treasury. Mr. Cohen is the U.S. Commissioner of Internal Revenue.

I take it that you both want to appear together.

## STATEMENT OF JOSEPH W. BARR, UNDER SECRETARY OF THE TREASURY, ACCOMPANIED BY SHELDON S. COHEN, COMMISSIONER OF INTERNAL REVENUE

Mr. BARR. Yes, sir, Mr. Chairman.

Chairman DODD. I don't think either of these gentlemen need any introduction to the subcommittee. Mr. Barr was a former Member of Congress, Assistant to the Secretary of the Treasury, Chairman of the Federal Deposit Insurance Corporation, and has been Under Secretary of the Treasury since 1965.

Mr. Cohen is a distinguished lawyer, has practiced extensively in the District of Columbia, and before all of the courts, including the Supreme Court. He has been Commissioner of Internal Revenue since 1964.

Will you proceed with your presentation?

Mr. BARR. Thank you, Mr. Chairman.

Mr. Chairman, I might say in opening my remarks that I have listened with great interest to the colloquy which has taken place in this committee. I hope that the area of agreement that it seems to me is apparent will shine through and result in substantive action in this session of the Congress.

Mr. Chairman, I welcome the opportunity to appear before this subcommittee in support of the enactment of legislation placing additional Federal controls over the movement of firearms in interstate and foreign commerce.

Mr. Sheldon S. Cohen, the Commissioner of Internal Revenue is here with me. He will discuss in more detail the inadequacies of present interstate controls and how S. 1, Amendment No. 90, will overcome those inadequacies. He will also discuss the other bills being considered by this subcommittee. I shall cover the administration's proposal, S. 1, Amendment No. 90, in a general way.

Let me begin, if I may, Mr. Chairman, with a brief summary.

First, the main objective of this bill is to give the Federal Government control over firearms in the areas of interstate and foreign commerce where State governments have no powers. The bill is to be cited as the "State Firearms Control Assistance Act of 1967".

Second, we view this legislation as part of a joint Federal-State effort to bring about a needed improvement in the Nation's system of firearms regulation.

Third, the legislation we are proposing is in the spirit of creative federalism that pervades President Johnson's March 17 message to Congress on "The Quality of American Government," in which the President said:

> Today the Federal system rests on an interlocking network of new relationships and new partnerships among all levels of government.
> Administration of programs which are the joint responsibility of Federal, state, and local governments should be strengthened.

It is against that background, Mr. Chairman, that I offer the following observations:

The bill before you would repeal the Federal Firearms Act now codified as chapter 18 of title 15, United States Code, and would substitute a new and improved system of Federal regulation of interstate and foreign commerce in firearms under title 18, United States Code. The Treasury Department would retain the responsibility of administering these regulatory controls.

S. 1, Amendment No. 90, implements legislative recommendations which the President set forth in his message to the Congress of February 6, 1967. It would put substantially into effect the legislative program for Federal regulation of traffic in firearms strongly urged by the President's Commission on Law Enforcement and Administration of Justice in its February 1967 report titled "The Challenge of Crime in a Free Society."

This distinguished group of citizens, headed by Under Secretary of State Nicholas Katzenbach, our former Attorney General, included

among its members nationally recognized leaders in the judiciary and in the fields of law, law enforcement, penology, and local government.

The Commission's study found agreement among police administrators of major cities that easy accessibility of firearms is a serious law enforcement problem. The Commission found that State and local laws intended to control traffic in firearms tend to be nullified by the fact that firearms are too often available in neighboring jurisdictions under less restrictive legislation, or free from any regulation.

Accordingly, the Commission favored both the enactment by the States of laws prohibiting acquisition and possession of firearms by certain classes of persons who might be inclined to use them for criminal purposes, and the enactment of Federal legislation that would complement State and local laws and assist State and local governments in achieving their goals.

The administration's proposal before you for consideration is designed to reflect the Commission's recommendations. I should like now to state briefly my understanding of what it would do and, in order to eliminate misconceptions, what it would not do.

Among other things, S. 1, Amendment No. 90, would:

(1) Channel interstate and foreign commerce in firearms through federally licensed importers, manufacturers, and dealers—thereby prohibiting the commercial mail-order traffic in firearms—although licensees could ship interstate to nonlicensed persons rifles and shotguns lawfully purchased in person at the licensee's place of business and which the consignee could lawfully receive and possess at his place of residence;

(2) Prohibit sales of firearms by Federal licensees to persons under 21 years of age, except that sales of sporting rifles and shotguns could continue to be made to persons of at least 18 years of age;

(3) Permit a Federal licensee to sell a firearm—other than a rifle or shotgun—only to persons who are residents of the State where the licensee is doing business;

(4) Curb the flow into the United States of surplus military weapons and other firearms not suitable for sporting purposes;

(5) Bring under effective Federal control the importation and interstate shipment of large caliber weapons such as bazookas and antitank guns, and other destructive devices;

(6) Provide for a licensing system with meaningful standards and annual fees somewhat higher than those now applicable under the Federal Firearms Act, so as to assure that licenses will be issued only to responsible persons actually engaging in business as importers, manufacturers, and dealers. The dealer's first year annual fee, set at a figure higher than the standard fee, would be available to help defray the cost of applicant investigations;

(7) Prohibit a nonlicensee from transporting into or receiving in his State of residence a firearm—other than a shotgun or rifle—purchased outside that State, or a rifle or shotgun which it would be unlawful for him to purchase or possess in that State or political subdivision thereof;

(8) Provide for adequate recordkeeping by licensees—to include data identifying purchasers—and for authority to furnish record information to State and local law enforcement authorities; and

(9) Retain the penalties now provided in the Federal Firearms Act for interstate transportation of firearms to or by felons and the inter-

state transportation of firearms which have been stolen or had their identifying number removed; and in addition would punish interstate transportation of a firearm with intent to commit a felony therewith.

S. 1, Amendment No. 90, is not in any sense "antigun" legislation:

(1) The bill would not outlaw possession or use of firearms by law-abiding citizens.

(2) No requirement of this bill would be violative of the second amendment to the Constitution. Those opposed to firearms controls have created a misconception of this constitutional provision by referring only to the phrase that "the right of the people to keep and bear arms shall not be infringed."

However, the complete amendment must be considered to determine the right granted to whom. This amendment was not adopted with individual rights in mind but rather was considered a protection to the militia of the various States. The Attorney General submitted a memorandum on this point at hearings before Subcommittee No. 5 of the House Judiciary Committee on the anticrime program. H.R. 538, a bill identical to S. 1, Amendment No. 90, is a part of the program. He also submitted a memorandum on the point to this subcommittee on May 19, 1965, at your hearing on firearms legislation.

(3) The bill would not prohibit the acquisition of firearms for sporting purposes, or for any other legitimate use. Sportsmen will continue to be able to obtain firearms although under the bill they would need to procure them from local licensed dealers and manufacturers and thus be subject to the requirements of their respective State and local laws.

Indeed, they can travel to another State and purchase a rifle or shotgun from a licensed dealer there and bring it home with them without interference if the purchaser's State and local law does not forbid the purchase and possession of such a firearm.

Only two minor restraints are laid upon the sportsmen of this country. They will not be able to travel to another State and purchase a pistol or concealable weapon, and they will not be able to obtain a mail-order shipment from another State of a rifle or shotgun, unless they made the purchase in person and the purchase and possession is legal in their home State and locality.

Such minor inconveniences cannot be avoided if the legislation is to make it possible for the States to regulate effectively the acquisition and possession of firearms. Obviously, State authorities cannot control acquisition and possession of firearms if they have no way of knowing or ascertaining what firearms are coming into their States through the mails or, in the case of concealed weapons, by personally being carried across State lines.

(4) The bill would not interfere with interstate transportation of firearms by the ordinary citizen hunter, marksman, or householder. Neither would it preclude the interstate shipment of a gun to a licensee for adjustment or repairs, nor the return or replacement of such a gun by the licensee.

(5) The bill would not prohibit possession or use of firearms by those too young to purchase them. It is recognized that some parents may wish their minor children, who are sufficiently mature to be entrusted with them, to enjoy the use of firearms for recreational purposes.

(6) The restriction on imports would not preclude the importation of all surplus military rifles. Some of these weapons are suitable for or readily adaptable to use in hunting and could be brought in for that purpose.

(7) The bill would not interfere with activities of collectors of antique firearms. "Antique firearms," as defined in the bill, are not subject to the bill's controls since they are specifically excluded from the definition of "firearm."

As I have already indicated, the major purpose of the bill is to institute Federal controls in areas where the Federal Government can and should operate, and where the State governments cannot, the areas of interstate and foreign commerce. Under our Federal constitutional system, the responsibility for maintaining public health and safety is left to the State governments under their police powers.

Basically, it is the province of the State governments to determine the conditions under which their citizens may acquire and use firearms. I would emphasize that it is one of the important objectives of this legislation to strengthen and make more effective the exercise of the powers of the State—and local—governments to regulate the sale of firearms in the public interest.

I expect this Federal legislation to inspire more adequate State and local legislation—and to make that more adequate non-Federal regulation enforceable where it is now all too easy to evade and will always be easy to evade in the absence of such Federal regulatory controls as S. 1, Amendment No. 90, sets up.

The bill would correct serious weaknesses of the existing Federal Firearms Act concerned with licensing and recordkeeping. Under existing law, anyone other than a felon can, upon the mere allegation that he is a dealer, and open payment of a fee of $1, obtain a license. Some 104,000 dealer licenses were outstanding as of January 1, 1967. Approximately 25 percent of these were held by people not actually engaged in business.

The reason is that licenses put these people in a position to obtain personal guns at wholesale or to avoid laws that prohibit mail shipment of concealable weapons and prohibit shipment into States that require purchase permits. This is a wide open situation in which licenses can be obtained by irresponsible elements, thus facilitating the acquisition of weapons by criminals and other undesirables.

The bill before you, by increasing license fees and imposing standards for obtaining licenses, will go a long way toward rectifying this situation. Commissioner Cohen, whose organization is responsible for the administration of the Federal Firearms Act, will discuss this aspect in more detail. He will also supply facts and figures illustrating the problems encountered in enforcing existing law because of incomplete or inaccurate licensee records, and the need for more effective recordkeeping requirements.

This bill cannot, of itself, eliminate crime. However, let us not lose sight of the fact, stated by the President in his February 6 message to the Congress, that—

Any effective crime control program requires the enactment of firearms legislation . . . This legislation is no panacea for the danger of human irrationality and violence in our society. But it will help to keep lethal weapons out of the wrong hands.

Today, the people of the United States are living under the most nearly ideal conditions ever achieved by any society. Yet, their peace of mind and security is threatened by the spreading cancer of crime and juvenile delinquency. It is absolutely essential that steps such as those proposed in this bill be taken to bring under control one of the main elements in the spread of this cancer, the indiscriminate acquisition of the weapons most frequently utilized in crimes of violence.

Right now, any person can acquire firearms with ease. This includes criminals, juveniles without the knowledge or consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest. This situation is clearly intolerable.

Mr. Chairman, I don't know if it has been brought to your attention, but here is one mail-order gun advertisement from the *Shotgun News*. The title says, "Long Hot Summer," and I would call to your attention that the first item listed is "available only from Agramonte, a .45-caliber, 30-shot, semiautomatic, completely legal gun."

Here it is. If that is for sporting purposes, this is not the sporting gun that I grew up with in southern Indiana as a farm boy, Mr. Chairman.

Senator KENNEDY. I ask that that be made part of the record.

Chairman DODD. Yes, without objection, that will be done.

(The document referred to was marked "Exhibit No. 7," and is as follows:)



Exhibit No. 7

Mr. BARR. The Treasury Department's experience with the Federal Firearms Act has resulted in a feeling of frustration since the controls provided by it are so inadequate. The drafters of S. 1, Amendment No. 90, had in mind these inadequacies and have, I believe, designed a bill which, when enacted, will provide effective regulation while presenting a minimum of inconvenience to the law-abiding citizen in the acquisition, ownership, and use of firearms for legitimate purposes. These light restraints are surely a small price to be borne by sportsmen gun owners when weighed against the potential benefits to the citizenry generally.

There are indications that those opposed to additional firearms regulation will assert that the present Federal statutes controlling firearms are adequate, but that these statutes are not adequately enforced. Thus, it will be inferred that any present deficiencies in firearms controls result not from lack of statutory authority, but from lack of proper enforcement.

Let me remind you that the Attorney General has stated that existing Federal firearms laws are largely ineffective and inadequate. Within these recognized limitations, I can assure you that the Treasury Department has vigorously enforced the provisions of the present National Firearms Act and Federal Firearms Act. Commissioner Cohen will offer statistics covering some aspects of the firearms enforcement program.

This subcommittee also has under consideration another bill, S. 1853, introduced by Senator Hruska, which would amend the Federal Firearms Act. In addition, S. 1854, a bill to amend the National Firearms Act, is being considered. The Treasury Department expressed its views on S. 1853 and S. 1854 in letters to this committee from the General Counsel. Briefly, the Department expressed itself as favoring S. 1, Amendment No. 90. I again urge the enacement of that bill.

As the President so aptly stated:

To pass strict firearms control laws at every level of government is an act of simple prudence and a measure of a civilized society. Further delay is unconscionable.

I would like to echo those phrases, Mr. Chairman, and my final statement is to repeat the hope that I expressed at the beginning of my testimony, that this committee will see fit to bring to the floor of the Senate legislation embodying at least some of these principles.

Chairman DODD. Thank you. We all thank you very much, Mr. Barr, for a very, very informative statement. I suggest that we hear Commissioner Sheldon Cohen now, and we can question Mr. Barr after Mr. Cohen's statement.

Mr. COHEN. Thank you, Mr. Chairman. I am likewise grateful for this opportunity to express my views on the four gun control bills your subcommittee has under consideration. I have a direct interest in these proposals since the Internal Revenue Service administers the National Firearms Act and the Federal Firearms Act, both of which would be affected by the bills being considered by this subcommittee.

One of the bills, S. 1854, which I will discuss later, would amend the National Firearms Act. That act, now found in the Internal Revenue Code, was enacted in 1934 to provide strict controls over what were

known then as gangster-type weapons. Based on the Federal taxing power, that act imposes taxes on certain occupations and transactions involving these weapons.

In addition, it requires Federal registration of all weapons, such as machineguns and sawed-off shotguns, coming within the purview of the act. The principal effect of S. 1854 would be to bring large caliber military-type weapons and grenades, bombs, et cetera, under the coverage of the National Firearms Act.

The other bills before you are intended to effect improvements in existing controls over interstate and foreign commerce in firearms—another area where the need for additional legislation is generally recognized. These control measures are now found in the Federal Firearms Act which was originally enacted in 1938 and which is codified in title 15, United States Code.

S. 1 and S. 1853 would strengthen the Federal Firearms Act by amendment. S. 1—Amendment No. 90 would repeal the act and replace it with improved controls, over interstate and foreign commerce in firearms, in title 18, United States Code.

Mr. Chairman, I know that you and the members of your subcommittee are deeply concerned over the serious crime problem which confronts the Nation, particularly as it relates to young people. I am also sure you will agree that the easy availability of firearms to juvenile offenders, professional criminals, and to others who would use them unlawfully, is a significant factor in our increasing crime rate and that more effective controls over firearm transactions would help to check that alarming increase.

Even those who strongly oppose, as too restrictive, certain of the measures before you today admit that firearm controls more effective than those presently in force are desirable if not imperative. Indeed, I feel that it is generally recognized by all who have considered this problem, that additional Federal firearms control will strike a telling blow at one of the roots of crime.

There is disagreement only as to the extent to which controls should go and at what level of Government they should be imposed. Some say they favor controls which would reduce criminal use of firearms, but strongly oppose any restraint whatever which would be applicable to the law-abiding citizen. Such controls, I feel, are punitive rather preventive and, thus, would strike the branches of the criminal problem rather than the roots.

Some maintain that no additional Federal controls are necessary and that only State and local controls, as suitable to the indigenous population, should be employed.

Others recognize that any operable controls, to effectively reduce availability of firearms to persons inclined to misuse them, must inevitably result in occasional relatively minor inconvenience to responsible citizens acquiring guns for lawful purposes and consider this a small price to pay for the public benefit derived. They also realize that State and local controls cannot be fully effective in the absence of supplemental Federal controls.

The primary responsibility for gun controls rests with State and local governments in the exercise of their police powers. In general, they should determine, as suitable to their own jurisdictions, who is entitled to possess firearms, under what circumstances firearms may

be carried, where and for what purpose they may be used. Every one of the 50 States and the District of Columbia have laws imposing controls, in some degree, over firearms.

However, the wide disparity in controls adopted by the States is in itself a major problem of law enforcement in particular States. Strict controls over acquisition or possession adopted by one jurisdiction may be nullified if its citizens can frustrate control laws by purchase of firearms through the mail or by crossing State lines. Even the States with the most lenient controls are unable to enforce laws which would prevent criminals, minors, or mental defectives from obtaining guns, since these laws are without effect beyond their borders and since mail-order and out-of-State purchase sources are available to all.

Uniform State laws would go far toward solving these problems. I would heartily endorse a move in this direction. However, if there is one thing I have learned about firearms, it is that any legislation to control them will be resisted. We cannot wait for the millennium and agreement by 50 States on laws regulating firearms. It is a fact of life that crimes of violence involving firearms are increasing. It is also a fact that under existing laws, State and Federal, it is a simple matter for criminals, or others who might misuse them, to acquire firearms through ordinary retail sources.

It is my firm conviction that the support of the Federal Government should be available to all States and political subdivisions in the enforcement of their laws pertaining to firearms. This applies to the State or locality which has a minimum of control, as well as to the State or locality with strict controls, such as those requiring a license to possess a pistol or a revolver.

The Federal Government, and only the Federal Government, with its constitutional power to regulate interstate and foreign commerce, has the capability of filling in serious gaps which thwart the effectiveness of various State and local controls.

Since firearm controls imposed by State and local governments are relatively ineffective because they cannot reach interstate transactions and since, under the Constitution, only the Federal Government has jurisdiction over interstate and foreign commerce, the Federal Government is obligated to exercise its authority in this area to give adequate support to the State and local governments in their efforts to regulate traffic in firearms within their borders.

On the basis of past experience, we, in the Internal Revenue Service, do not believe that this can be done under existing law. At the time the Federal Firearms Act was enacted in 1938, it was designed primarily to curb traffic in firearms to and by the criminal element. There was no significant attempt made to directly assist State and local governments in enforcing their gun controls. The only provision directed toward this end is found at section 2(c).

Section 2(c) of the Federal Firearms Act makes it unlawful for a person licensed under the act to ship firearms in interstate commerce to a person, other than a licensee, in a State, the laws of which require a permit to purchase a firearm, unless such permit is exhibited to the selling licensee. This law has some benefit for those eight States which require permits to purchase certain types of firearms. It is of no aid whatever to local jurisdictions requiring a permit or to other States which may impose other restrictions on the purchase and possession of

firearms within their jurisdictional boundaries. Furthermore, it is of no effect with respect to purchases made over the counter in a neighboring State in contravention of the purchaser's home State laws.

Other control provisions of the Federal Firearms Act are based solely on interstate transportation and impose no duty with respect to the sales transactions. There is a general impression among some persons, who suggest that the present Federal Firearms Act supplies all needed statutory controls, that dealers licensed under the act are prohibited from selling firearms to convicted criminals.

This is not the case, as there is nothing in the act which definitely precludes a dealer in, say, Maryland, from selling a pistol to a convicted felon from New Jersey, who could then transport the weapon back to his home State.

It is true that the New Jersey felon would have violated the provision under section 2(e) which makes it unlawful for any person who has been convicted of a crime punishable by imprisonment for a term exceeding 1 year to transport a firearm in interstate commerce. However, unless the felon is apprehended in the act of so transporting or is subsequently found in New Jersey with the weapon in his possession, proof of the offense is extremely difficult even though the dealer's records show the Maryland sale to a New Jersey resident.

In this regard, I would call to your attention the fact that a provision in section 2(f) of the act which might have been helpful in proving transportation is no longer valid.

Section 2(f) of the Federal Firearms Act makes it unlawful for a convicted felon or a fugitive from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce. The law also provides that the possession of a firearm or ammunition by such a person shall be presumptive evidence that such firearm or ammunition was so shipped, transported, or received by such person.

The Supreme Court declared this presumption unconstitutional in a 1943 case, *Tot* v. *United States*, 319 U.S. 463. Consequently, in order to establish a violation of this statute, it is necessary to prove that a convicted felon found in possession of a firearm actually received it in the course of an interstate shipment.

The problem which has most thwarted the effectiveness of State and local controls is the interstate movement of firearms through mail-order purchase and over-the-counter purchase by out-of-State residents. The pivotal problem with regard to mail-order traffic as it exists today is that neither the State nor city into which the firearm is shipped has any practical way of exercising any effective control over the importer, manufacturer, or dealer who sells the firearm and ships it in from another State.

Further, in transactions of this nature, the record of disposition to the purchaser is not maintained in the State where the purchaser resides; but in the files at the seller's premises, which may be thousands of miles away. Thus, it is of very little value for State and local law enforcement purposes. In addition, such sales are accomplished with no effective determination of the identity of the unseen purchaser.

The other major loophole in State enforcement of firearms laws involves purchase across State lines. It is well known among law en-

forcement officers that the crossing of State lines to avoid State law in the acquisition of firearms is common practice.

During the first 9 months of the fiscal year 1967, our Alcohol and Tobacco Tax Division made 24,944 inspections of firearms dealers. From the records of these licensees, 21,137 sales to out-of-State purchasers, primarily of handguns, were selected for criminal record search. Criminal record checks were actually made on only 18,670 of these names, after eliminating those obviously unidentifiable on the basis of information available.

Of this number, it was positively established that 676 had criminal records. No doubt many others making out-of-State purchasers were also felons, who did not identify themselves, or who gave fictitious names or addresses, as did a known 474 of those checked. The records do not show how many of these purchasers may have been juveniles, aliens, or mental incompetents who traveled to another jurisdiction to purchase, or were purchasers seeking to circumvent waiting periods and local police notification requirements.

It has been found by investigators that many Federal Firearms Act dealers, while apparently technically complying with existing requirements, record fictitious or incomplete names and addresses. Such misleading information is supplied by purchasers desirous of concealing a criminal record or a status making them ineligible under their own State or local law to buy a gun.

Special surveys undertaken by the Alcohol and Tobacco Tax Division clearly reveal the frustration of strict State gun laws by out-of-State purchase. The State of Massachusetts requires a permit to purchase a handgun. It was determined from police records in Massachusetts that over 86 percent of weapons used in murders and holdups had been purchased in the States of Maine and New Hampshire, and particularly in those counties that are a short driving distance from Massachusetts. Maine and New Hampshire have no permit requirement.

Missouri State law also requires a permit to purchase a concealable weapon. It was found that during the period February 1966 to February 1967 approximately 5,000 persons who gave a residence address in the city or county of St. Louis, Mo., purchased firearms—primarily handguns—in the neighboring State of Illinois which has no permit requirement. Approximately 200 of these purchasers were determined to have records of felony convictions.

During the year ending with February 1967, residents of New York, which has stringent gun controls, received 1,110 firearms from out of State. In the Reno, Nev., area, where controls are lax, it was found that 760 firearms were purchased there by residents from other States during the 6 months ended December 31, 1966. Of the purchasers, 46 resided in California; 35 of the 46 had felony records.

Detroit, Mich., also has a serious problem enforcing its rather strict firearms laws. Dealers in nearby Toledo, Ohio, brazenly advertise "No Permit Required" to buy guns and some estimate that 90 percent of their customers are from Michigan, principally Detroit.

An Ohio-Michigan Gun Committee, established by border counties most concerned with this gun traffic, is attempting to take corrective steps. They have expressed an urgent need for more complete and accurate information with respect to these interstate purchasers. Pro-

visions, such as those in S. 1 and S. 1, Amendment No. 90, which contemplate that licensees will identify purchasers and accurately record pertinent information, would provide the type of assistance sought.

Even though our Alcohol and Tobacco Tax Division applies a significant portion of its manpower to inspect Federal Firearms Act licensees and investigate alleged offenses under the two Firearms Acts, little can be done to curb transactions which may involve infractions of State and local firearms laws.

By laborious checking of dealer records and referral to criminal identification files, information indicating possible violations of the act may be found. We do refer cases to the U.S. attorney for prosecution where there is sufficient evidence to prove all elements of an offense under the act and we do provide information to State and local law-enforcement authorities on offenses of interest to them—some 10,000 last year, I might say. However, without Federal laws which are especially designed to stop firearms traffic which circumvents State and local law, we can do little of a preventive nature in their support.

The truth of the matter is that the present Federal Firearms Act is not designed to support State and local controls. While it may be helpful in some limited areas, it could never supply effective support regardless of the manpower devoted to its enforcement. For this reason, we do not favor the piecemeal approach of S. 1853, which offers some improving changes to the Federal Firearms Act but which retains its major faults—such faults as failure to provide licensing standards, inadequate provision for records to be kept by licensees, lack of import controls, and failure to include controls over essentially military-type weapons.

The most significant breakthrough offered by S. 1853, which would provide some assistance in State and local enforcement of gun laws, is its proposal to institute an affidavit and notice procedure with respect to sale, to nonresidents of the seller's State, of handguns either by mail order or over the counter.

This provision, intended to curb irresponsible sale of handguns to juveniles and persons ineligible to buy or possess such guns in their home State, is commendable in purpose. It is somewhat cumbersome, however, imposing burdens on both buyer and seller.

Furthermore, since it is applicable only to handguns, it is of no help to States and cities which may prohibit possession of machineguns by ordinary citizens or sale of rifles or shotguns to or possession of such guns by mental incompetents, drunkards, young people, or aliens. Such laws also deserve Federal implementation.

In contrast to the relatively ineffective device of the Federal Firearms Act and S. 1853, basing controls directly on shipment or transportation, S. 1 and S. 1, Amendment No. 90, adopts a new approach for their major controls. Since the persons being federally licensed in the firearms business are engaging in interstate and foreign commerce, their firearms business activities may be federally regulated.

By imposing requirements on firearms dealers with respect to the retail sale of firearms, preventive effects are achieved more directly and effectively.

These bills would provide that licensees may not sell guns to persons who are of immature years, to persons precluded by State and local

law from receiving or possession of firearms, and to convicted felons or fugitives from justice. In addition, these licensees may not sell to persons who are not residents of the seller's State—except that special provision is made for sale of rifles or shotguns to nonresidents.

S. 1, Amendment No. 90, by prohibiting interstate commercial transportation of firearms, other than between licensees, also effectively curbs retail mail-order traffic in firearms. S. 1 adopts the same approach with respect to all but long guns and provides an affidavit and notice procedure with respect to these. These provisions would not prevent private individuals from transporting their personal weapons and an exception is made in S. 1, Amendment No. 90, with respect to the interstate shipment by licensees to nonlicensees of rifles or shotguns where the consignee is not precluded by his State or local laws from receiving or possessing a rifle or shotgun.

These S. 1 and S. 1, Amendment No. 90 controls achievement all of the intended effect of the affidavit and notice procedure of S. 1853 plus much more. They support State and local law by curbing interstate mail-order traffic and by restricting sales to out-of-State residents.

**These controls, we feel, could be effectively administered, without significant increase in personnel allocated to firearms law enforcement. Such controls would give the State and local authorities assurance that felons, mental defectives, juveniles, and others disqualified from purchasing or possessing firearms at home may not obtain such weapons by mail order or by crossing State lines to purchase.**

**In order to assure the effectiveness of** the dealer requirements on out-of-State sales, S. 1, Amendment No. 90, also imposes restrictions **with respect to interstate private** sales or purchases. These requirements **prohibit** the sale by a nonlicensee of a firearm—other than a shotgun or rifle—outside the seller's State of residence. They also prohibit **a purchaser from** transporting into or receiving in his State of residence a firearm—other than a shotgun or rifle—purchased outside **that State, or a rifle or a shotgun** which it would be unlawful for him **to purchase or possess in his home State, county, or city.**

**These restrictions are necessary** in order to give full support to the **State and local** authorities in the implementation of their own control **measures. Any minor inconvenience** to private individuals would be **more than offset by the benefits** to their communities. It should also be **pointed out that the private** transactions described could be consummated **through licensed dealers,** subject only to the standard requirements **with respect to dealer** transactions. There is much to be said **for the channeling of all** interstate transactions through Federal licensees **in order to provide maximum** assistance for State and local enforcement of firearms laws.

As previously suggested, S. 1953 would preserve a major fault of existing law by failing to prescribe standards for issuing required licenses. Dealers licensed under the Federal Firearms Act pay an annual fee of only $1 and, because of the failure of the law to set any meaningful standards, many persons not actually engaged in business obtain dealer licenses. The lack of such standards would be a particularly significant problem if S. 1853 were enacted since, under the bill, some of its major controls provide exemptions for licensees—for example, the affidavit requirement.

The law now provides that upon payment of the prescribed fee, the Secretary shall issue a license to the applicant which shall entitle the licensee to transport, ship, or receive firearms or ammunition in interstate or foreign commerce. There are no stated conditions to the issuing of the license, except the provisions for the payment of the prescribed fee, and no discretion to withhold issuance is granted under the language of the law. All the applicant need do is to allege that he is engaged, or intends to engage, in the firearms business and pay the prescribed fee.

On the basis of dealer inspections made, we estimate that 25 percent of the 104,087 Federal Firearms Act licenses issued during 1966 went to persons not actually engaging in the licensed activity. Some misrepresented themselves to buy personal guns at dealer prices. Others sought to avoid the prohibition, in section 2(c) of the act, against interstate shipment to a buyer not exhibiting a purchase permit where one is required by State law, or to circumvent the provision in section 1715 of title 18, United States Code, which prohibits the mailing of concealable firearms.

In this regard, our investigators have discovered that some mail-orders return prospective purchase orders for hand-guns with the suggestion that the purchaser obtain a Federal Firearms Act license. They point out that if the buyer qualifies as a dealer, at a cost of $1, the gun can be forwarded more conveniently, and economically, by mail.

Any additional controls over the interstate movement of firearms would make a license even more attractive if the licensee is exempt from such controls.

We have, under existing law, refused to issue licenses to felons, persons under indictment for a felony, and fugitives from justice. We have done this on the ground that the issuance of a license to such persons would serve no purpose, since by reason of section 2 of the act it would be unlawful for them to ship or receive firearms in interstate commerce. Ordinarily, there is no other basis for denying a license even though it may seem obvious that the applicant is not a proper person to be dealing in firearms.

The customary practice is to provide standards for the issuance of licenses or permits or at least to grant some discretion to the person who has the responsibility for acting on the application. A proper and reasonable standard for the issuance of a license is the standard as to whether the applicant would be likely to conduct his operations in compliance with law. This standard, which has been adopted in S. 1 and S. 1, Amendment No. 90, has been successfully used in connection with permits issued in the liquor and tobacco tax area.

I strongly recommend that you impose meaningful conditions which applicants must comply with so that this Federal licensing system will afford realistic controls. As further encouragement to limit licensing to persons actually engaging in the firearms business and to provide funds for administration of the program, I also urge increase in license fees as proposed in S. 1853, S. 1 and S. 1, Amendment No. 90.

At this point, I would like to observe that S. 1 and S. 1, Amendment No. 90 would adequately protect applicants from any arbitrary or unreasonable denials. A specific provision would afford applicants the right to a hearing in the event adverse action was contemplated.

Another problem area which existing law and S. 1853 ignore, is that concerned with the mass importation of firearms from foreign countries. This problem can be met only at the Federal level.

It is not true, as some people suggest, that adequate control over firearms imports can be effected under the Mutual Security Act of 1954. That law is concerned with importation and exportation of firearms from the viewpoint of international relations. As the National Crime Commission stated in its February 1967 report:

The limited statutory framework within which the State Department must operate prevents any effective control over the importation of firearms. If the import in question does not involve machine guns, sawed-off shotguns, or the other weapons covered by the 1934 National Firearms Act, each transaction is approved routinely, as long as the dealer is a bona fide businessman engaged in a bona fide business transaction.

S. 1 and S. 1, Amendment No. 90 are designed to curb this importation of military surplus weapons and other firearms not particularly suitable for target shooting, hunting, or any other lawful purpose. These bills would not, however, preclude the importation of military surplus rifles or shotguns which were suitable or adaptable to use for sporting purposes.

We are particularly concerned with the influx of relatively inexpensive .22-caliber pistols and revolvers which have plagued the law enforcement officers of our metropolitan areas. Many of these imports are of poor quality and are as dangerous to the user as they may be to the person who is often threatened or assaulted with them. This view is shared by officials of the National Rifle Association, as indicated by remarks of Mr. Orth, executive vice president of that association, in his statement before your subcommittee on May 21, 1965.

I would like to make it clear that the provisions of S. 1 and S. 1 Amendment No. 90, relating to the importation of firearms, are intended to exclude surplus military firearms—other than rifles or shotguns—and other firearms which are not suitable for lawful sporting purposes. The bills would not, and I emphasize "would not," preclude the importation of good quality sporting-type firearms or of military surplus rifles or shotguns particularly suitable for or adaptable to sporting use.

Another major problem in firearms control concerns the interstate shipment and disposition of highly destructive, large-caliber weapons, such as bazookas and antitank guns, and destructive devices such as grenades, bombs, missiles, and rockets. The lack of controls over the traffic in these highly destructive weapons is a matter of great concern to law enforcement officers.

I would also like to observe that the National Rifle Association has recognized the need for action in this area and that in their April 3, 1965, statement at the annual meeting, the National Rifle Association declared:

That it would support properly drawn legislation to outlaw dangerous devices such as bazookas, bombs, antitank guns, and other military-type weapons that have found their way into trade channels across America.

The administration's bill would place strict controls over the importation, interstate shipment, and disposition of these highly destructive weapons and of ammunition for use in destructive devices.

The sponsors of S. 1853 have suggested that these "destructive devices," being inherently dangerous and serving no valid civilian pur-

pose, should not be classed with guns commonly used in recreational activities. They would place these "devices" under the strict controls of the National Firearms Act—now applicable to machineguns and sawed-off shotguns—but relieve them from the interstate and foreign commerce controls of the Federal Firearms Act.

This attitude seems to reflect a misunderstanding as to the purpose and operating effect of these two major Federal fiearms control measures. It is true that the national act is designed to provide strict controls over the more vicious types of firearms, generally unsuitable for lawful civilian use. These controls are not exclusive, however, and any weapon—including national act weapons—coming within the definition of "firearm" as provided in the Federal Firearms Act is also subject to all pertinent controls of that act.

We can see no reason why a "social stigma" dividing line should be drawn and would strongly oppose any attempt to relieve National Firearms Act weapons from the operation of controls based on interstate and foreign commerce. The National Firearms Act relies on the power of the Federal Government to tax. Without the present Federal Firearms Act or similar controls, a racketeer who paid the $200 transfer tax could acquire a machinegun or sawed-off shotgun and could receive and transport it interstate without violating Federal law. We need the controls of both acts over these present national act weapons and over the "destructive devices" which S. 1854 would bring under that act's control.

Illustrative of this point is the case of a west coast resident and his wife who were arrested in April 1967 on warrants charging violations of both the National Firearms Act and the Federal Firearms Act. Various seizures made at that time and in connection with subsequent arrests of the wife have included some 45 National Firearms Act weapons, of which 29 were machineguns—19 in working condition—and five or six were silencers.

The 50 other weapons seized included nine cannons. In addition, approximately 40 tons of ammunition were found at their home and at other locations of temporary storage. The husband refers to himself as a collector. He does have a criminal record, however, and the machineguns he possessed without benefit of registration under the National Firearms Act had been received or shipped by him in interstate commerce in violation of section 2 (e) and (f) of the Federal Firearms Act.

Another factor which has contributed to the ineffectiveness of the Federal Firearms Act, and which S. 1853 fails to correct is the lack of adequate recordkeeping standards applicable to licensees. Accurate dealer records are absolutely essential if full potential benefit to the States is to be realized. They are also needed to assure compliance with the law itself. If a name is to be checked through criminal files or if there is a question of possible interstate transportation, it is imperative that the purchaser be identified and that his correct name, age, and address be recorded.

S. 1 and S. 1, Amendment No. 90 recognize the importance of accurately identifying information on purchasers and make dealers directly responsible for obtaining and recording such information. These bills would also specifically authorize the Secretary of the Treasury to make information on purchasers and on firearms purchased available

to State and local governments. These proposals could be of particular significance as a factor in aiding those who must deal with the current unrest that exists in many cities where there is a potential for outbursts of violence.

As we all know, the use of firearms in civil disturbances is becoming more common. Law enforcement officials in major cities tell our alcohol and tobacco tax investigators that there is a directly related and significant increase in firearms sales by dealers in the vicinity whenever tension develops in these metropolitan areas. They feel that adequate identification of purchasers and proper recording of sales would do much to discourage the purchase of firearms by individuals who use them in times of civil disorder to harass public safety officials in the performance of their duties.

I have discussed in some detail various weaknesses of the present Federal Firearms Act and have indicated that S. 1853 would do nothing to correct many of them. You should not infer from this, however, that I am unfavorably disposed toward S. 1853 in its entirety. I recognize that the proposed affidavit and notice procedure with respect to transactions in handguns represents a significant advance in Federal firearms control.

I also favor most of the other additional controls which S. 1853 would include in the act. I do feel, however, that all of the benefits to be derived from S. 1853, and more, are incorporated in S. 1 and S.1, Amendment No. 90. In addition, the latter bills correct significant faults in the present controls over interstate and foreign commerce in firearms.

I would now call to your attention one feature of S. 1853 which the Treasury Department regards as objectionable. I refer to the reversion to the crime-of-violence standard with respect to controls over transactions involving convicted criminals and persons under indictment. Since 1961, these controls under the Federal Firearms Act have been applied on the basis of "crimes punishable by imprisonment for a term exceeding 1 year."

This proposed change would seriously reduce the effectiveness of the pertinent controls and would put the Government in the questionable position of having to place confidence, through required licensing, in certain convicted felons, including those convicted of violations of this proposed act or of the National Firearms Act and persons convicted of racketeer-type crimes, such as those related to narcotics and gambling.

These controls would revert to their status prior to the 1961 amendments of the Federal Firearms Act made by Public Law 87–342, although prior to 1961 there were provisions in that act placing restrictions on the issuance of licenses to convicted violators of the act. Even this limited restriction would not be applicable should S. 1853 be enacted in its present form.

In my comments to this point, I have generally named S. 1 and S. 1, Amendment No. 90, together as though they were substantially the same. The bills differ significantly and, as you know, S. 1, Amendment No. 90, represents the administration's proposal for revision of laws designed to regulate interstate and foreign commerce in firearms. S. 1 is a good bill and, in the 89th Congress as S. 1592, was favored by the Department. However, we prefer the somewhat stricter

approach taken in S. 1, Amendment No. 90 with respect to controls over private transactions in firearms and with respect to controls over long guns.

I have previously commented only incidentally on S. 1854, which would amend the National Firearms Act. The principal feature of that bill is the provision making certain highly destructive devices subject to the act's controls. There is a generally recognized need to bring these essentially military weapons under strict control so far as civilian transactions are concerned.

S. 1854 was discussed in detail in a recent letter from our general counsel to the chairman of the Judiciary Committee expressing the views of the Treasury Department on the proposed legislation. As was indicated in that letter, the Department finds the major objectives of the bill acceptable.

Several amendments to the bill were suggested and it was indicated that, as so amended, the Department would not object to enactment of S. 1854. However, since S. 1854 overlooks provisions of the act which also need amendment, including those prescribing the amount of tax to be paid with respect to the taxed transactions and occupations, it was stated that the Department would favor a more comprehensive modernization revision of the National Firearms Act than that proposed in S. 1854.

Summarizing my views with respect to the other three bills before you, I am convinced that the Federal Firearms Act, as now written, does not provide the statutory controls needed to regulate interstate and foreign commerce in firearms in meaningful support of State and local efforts to control gun traffic within their jurisdictions. I base this conclusion on the experience of the Internal Revenue Service in administering the provisions of the act and on the day-to-day relations of our investigators with State and local law enforcement officers.

I do not believe that S. 1853 goes far enough toward correcting the deficiencies of the Federal Firearms Act. S. 1 offers a better revision of the act. However, S. 1, Amendment No. 90, in my judgment, provides controls over interstate and foreign commerce in firearms best suited to the enhancing of State and local controls and most susceptible of efficient administration.

I favor enactment of S. 1, Amendment No. 90, and urge that it be reported to the Senate at an early date.

Thank you, Mr. Chairman.

Chairman DODD. Thank you very much, Commissioner Cohen, for a thorough, well prepared and very informative statement, in my judgment. I only have a few questions. I assume members of the committee have more.

There have been many criticisms made of S. 1, Amendment 90, and S. 1 itself. For example, it has been said that additional controls, such as contained in S. 1, Amendment 90 would be similar to requiring the registration of firearms. Sometimes it is put another way by the critics who say it would be just another step toward the elimination of private ownership of such weapons in the United States.

Perhaps you are aware of these criticisms, but we have heard them now over a period of about 4 years. I would like to know for the record what your view is.

Mr. Cohen. There is no attempt by these proposed measures to in any way license or register firearms at our Federal level. The people who have made these charges have said "Well, if there were ever an invasion of the United States, it would provide a list of weapons which the invader could seize." I would suggest that the best list of weapons, and those who possess them, available today, would be the membership rolls of the National Rifle Association, which are easily available, with names, addresses, and other pertinent data.

The attempt here is merely to provide, if need be, for local officials, proper identification of those people purchasing guns. There is no local registration, there is no local licensing involved here.

We are just asking the dealer to record the proper name and the proper address of the purchaser to take reasonable safeguards to insure that he has satisfied himself they are correct. No more than he would ask if he were cashing a check for the purchaser, to see a driver's license or some other valid type of identification.

Chairman Dodd. Thank you very much. I think that answer is correct, but I wanted to get it on the record.

Senator Hruska. Mr. Chairman, if you are going to leave that point, could we ask Mr. Barr his thoughts on that same subject?

Chairman Dodd. Yes, Mr. Barr, do you have anything to say on that?

Mr. Barr. Senator Hruska, the objective of this bill, I think, is plain. I emphasized it probably more specifically in my testimony than Commissioner Cohen.

The objective of this bill is to enable the State and local governments, who, under our system of government, have the responsibility for maintaining peace, welfare, and the safety of the citizen. It is to enable them to do their job better. There is nothing in this bill that I know would imply a Federal intent to restrict the lawful use of firearms in the United States.

Senator Hruska. Nor to lead to the registration of firearms?

Mr. Barr. No, sir.

Senator Hruska. By Federal law.

Mr. Barr. No, sir.

Senator Hruska. Let me ask then, the significance of your statement at page 3 when you say, Amendment No. 90—

Would put substantially into effect the legislative program for Federal regulation of the traffic in firearms strongly urged by the President's Commission on Law Enforcement and Administration of Justice in its February, 1967 report titled "Challenge of Crime in a Free Society."

Is it not true that one of the recommendations of that Commission calls for the registration of all firearms, shotguns, pistols and rifles in the country? The Commission also recommends that where States have not enacted a firearms registration law within 5 years the Federal Government shall do so. And further, is there not a bill now pending pertaining to the District of Columbia embodying these principles?

Now, considering your statement that the thrust of this bill is to accomplish the program of the President's Crime Commission, which includes registration, would you like to comment as to whether there is any inconsistency in your two statements?

Mr. Barr. I would be delighted to, Senator. This legislation, essentially this same legislation was proposed by the administration at

least 2 years before the Crime Commission ever reported. At that time, Senator, we made our objectives clear and we have never deviated. What we are trying to do is to enable the States to act, to give the States information which they today cannot obtain because of the constitutionl separation of powers.

Unless we act in this narrow area, which we are recommending to you today, Senator Hruska, I don't know how the States can discharge their obligations. Now, if the States or the local governments want to move ahead to the registration of firearms, that is another subject. That is another subject indeed.

We are not here recommending that today. We are recommending only one thing, that the State and local governments who are charged with protection and the safety of the people of this country be given the information that they need to carry out the responsibility. I am not willing to leave State and local jurisdictions helpless to protect the people of the United States.

Senator HRUSKA. Neither am I, but I come back to your language.

Mr. BARR. Yes, sir.

Senator HRUSKA. "It would put substantially into effect the legislative program for Federal regulation of traffic in firearms, strongly urged by the President's Commission," and among those things which are urged by the Commission, Mr. Barr, are registration of all firearms, including shotguns, rifles, and pistol. The Commission also urges that States not legislating a firearms registration law within 5 years, there will be a Federal law. Is that included in the thrust of the bill?

Mr. BARR. That is not, sir.

Senator HRUSKA. You support the Commission in your statement, or do you want to modify that part of the statement?

Mr. BARR. I see no reason to modify my statement, sir.

Senator HRUSKA. Very well.

Mr. BARR. The Crime Commission report was submitted to the President. All its recommendations were not accepted nor are they embodied in legislation before this committee.

The Crime Commission formed a basis for a series of recommendations that the Congress will consider. I would like to repeat, Senator Hruska, however, that before they ever reported, we addressed ourselves to this narrow question of enabling the States to take care of themselves, the States and local governments. That is what we are here to do today.

Senator HRUSKA. Be that as it may the record with your statement and the recommendations of the Commission will facilitate our own individual judgments and appraisals of that language notwithstanding your disavowal. You see no reason to modify that portion of your statement?

Mr. BARR. No, sir.

Senator HRUSKA. And that is all right with me, but the words do stand and they also stand in the recommendations of the President's Crime Commission.

Chairman DODD. Do any other members of the committee wish to address any questions on that point? I am trying to limit it to just that question which I asked Mr. Cohen and Mr. Barr.

Senator KENNEDY. Nothing on that.

Chairman DODD. I only have two or three more questions. It has been argued here and elsewhere that the reason we have a firearms problem

is that the Federal laws are not adequately enforced or sufficiently enforced, and that if they were, there wouldn't be any need for new legislation. Do you have anything to say to that?

Mr. COHEN. Well, sir, I would say that we are enforcing the present law as it was intended to be enforced. There are many things, as I commented in my statement, which were not intended to be covered by the present law, which in the light of today's circumstances we certainly would recommend should be covered by Federal legislation.

The present law was not designed to be a law that would enhance the controls that State and local governments put in. It was designed to be sufficient unto itself in a very narrow area really of the racketeer-type weapons.

The greatest growth of crime today is in the area of young people, juveniles and young adults. The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly, and all responsible law-enforcement officials, and indeed the very esteemed Director of the Federal Bureau of Investigation has recommended that legislation of this character be enacted.

I cited statistics before, showing the great numbers of investigations that our people have run, to trace down weapons. We have had last year about, I think it was 9,700 or 9,800 violations—possible violations of law reported to State and local officials, so that they might follow up.

Senator HRUSKA. What was that number, please?

Mr. COHEN. 9,700 or 9,800, sir, almost 10,000. These things show that our officers are doing the best job manageable under present circumstances.

We have about a thousand frontline investigators in the area who spend a substantial portion of their time, they are engaged in both alcohol-tobacco tax and the gun law enforcement, and they spend a substantial amount of their time as need be in their given locale.

We have a number of our investigators working with municipal law enforcement officials in the juvenile gang area, to try to bring some sense and semblance of order into the area, and working with State and local officials. The cooperation with local law enforcement officers is generally in this country very good. We have found very good cooperation both ways. They are referring cases to us which come within our area, and we have been referring cases to them, which are in their area.

Chairman DODD. It has frequently been argued that there is too much discretionary power placed in the Treasury Department under S. 1, Amendment 90. I think we have heard that in almost every hearing in one form or another. What is your answer to that?

Mr. COHEN. I have found, in reviewing the act, very little in the way of discretionary authority. It does present a rather anomalous situation, where a Federal official, myself acting for the Secretary, must license people to perform acts which are very responsible acts, selling of a deadly weapon, and I cannot even inquire as to their character.

There is very little I can do, and particularly one might say when one is flooded, for the price of $1 you receive a flood of applications that such a low fee would bring in, again it inhibits the proper use of manpower.

If we can restrict the kinds of people who would apply to those who are engaged in the business, and who appear to be the type of people who will lawfully engage in the business, the restrictions do not appear to be onerous, and the checking could be as thorough as needed by the individual circumstances.

The discretion is not very broad, and I am sure that the chairman recognizes that the courts of the United States have never allowed an administrator's discretion to go unfettered. This bill provides for adequate hearing, should the discretion call for the declination of the license, and in the event that the hearing is adverse in any respect, there is an appeal to the courts, which has always proved adequate in every other area that we administer.

Mr. BARR. Mr. Chairman, may I add in that regard, sir, that in addition to the courts, there is always the Congress of the United States. I have noticed that when we make a mistake or step a little bit too far in a regulation, that somebody gets to it in the Congress, and rather quickly.

I will cite you our experience with the expense accounts. I remember in 1962 we had expense accounts tightened up to the place where I thought we were going to eliminate expense account living. At that point I guess maybe we went a little bit too far, because there was recourse to the Congress, not to the courts, and the regulation was changed, and changed promptly. I would just like to reinforce what I am sure all you Senators know, that where there is a public hearing in an area that is closely watched, no administrator has an inordinate amount of discretion.

Senator HRUSKA. Did you say public hearings?

Mr. BARR. Yes, sir.

Senator HRUSKA. If the Senator will yield, public hearings provided for license applications?

Mr. COHEN. Not in the matter of application.

Mr. BARR. Any area of regulation.

Senator HRUSKA. So they are the powers that are virtually——

Mr. COHEN. No, sir; in that case if there were a declination there would be an administrative hearing by an independent hearing officer as provided by the Administrative Procedure Act.

Senator HRUSKA. Where is that provided?

Mr. COHEN. That is subject to judicial review in that case, sir.

Senator HRUSKA. But no other appeal besides that?

Mr. COHEN. This is the normal—he has a right to go to a judicial hearing.

Senator HRUSKA. If there is any evidence that would support the finding of the Treasury Department that the license should not be granted, regardless of what the preponderance of the evidence might be, your position is sustained, isn't that the size of it?

Mr. COHEN. I wouldn't like to put it that way.

Senator HRUSKA. Under the Administrative Procedures Act, isn't that the essence of the appeal?

Mr. COHEN. No; the appeal is whether we have made a proper determination.

Senator HRUSKA. And it is improper if there is no evidence whatsoever.

Mr. Cohen. No, sir; I don't believe——
Senator Hruska. To sustain your ruling.
Mr. Cohen. No, sir. I believe we would have the normal procedure. The potential licensee would have the burden of proving that he is entitled to the license. Should he establish prima facie that he is, we would have then the burden of overcoming that. This is the normal rule in a court proceeding.
Senator Hruska. Very well.
Chairman Dodd. I am trying to get on the record the criticisms that were made of this legislation, Mr. Commissioner, and Secretary Barr. It has been commonly said the trouble with S. 1, amendment No. 90 is that it doesn't punish the criminal use of the firearm, but rather places unjustified restrictions on the law-abiding citizen.
Mr. Cohen. That is a common statement. I have discussed this with people with long experience in penology, criminology. Severe punishment is not enough to deter crime. We must take preventive action, and the preventive action that we are trying to take here is the preventing of firearms, of these very destructive devices, falling into the hands of people that the local jurisdictions decide are not capable of handling them.
A juvenile, a 16-year-old, doesn't worry about a potential 5-year or 10-year criminal sentence. He really doesn't have the wherewithal to take that all into account. He should not have the weapon in the first place. We won't have to worry about whether we sentence him to 5 or 10 years.
Chairman Dodd. It has been said over and over again, too, that the cost of administering and enforcing this law, if it is adopted with its additional controls, would be exorbitant. I think that the critics have even said that it would be prohibitive.
Mr. Cohen. I have consulted very carefully with the Director of our Alcohol and Tobacco Tax Division, Mr. Serr, and he says that the administration of the present Act is so inefficient because of the cumbersomeness of the act that he believes that he could enforce the Act, S. 1, Amendment No. 90, with about the same manpower he has today.
He certainly said at least for the first year he would like to try, without any increase in manpower, except that we would temporarily assign several of his people who are now assigned to other duties in the original licensing, since the original licensing would be a one-time operation, rather than go out and hire temporary people.
We would make a temporary reassignment of some of our other investigative people to that function, but that the ongoing function, once the original investigation process is over, would require about the same number of men, about a thousand frontline investigators, putting about the same number of hours into this activity.
Chairman Dodd. Perhaps the most frequent criticism, certainly within the last 2 years, was that this bill, if it is adopted into law, would be a violation of the second amendment to the Constitution. I know that was touched on here in Secretary Barr's testimony. This is the last question I have, and I would like to get both of you, Mr. Commissioner, and the Secretary to speak on this.
Mr. Cohen. The Secretary has covered that.
Chairman Dodd. It is important to get this on the record. I get a lot of mail on this.

Mr. Cohen. The former Attorney General, Mr. Katzenbach, submitted a memorandum, I understand, from the present Attorney General, Mr. Clark, that he will submit a similar memorandum to the committee, and I think that they both think that the argument is rather preposterous.

Chairman Dodd. Very well. There are a lot of other questions. I don't want to take up any more time.

Senator Hruska, do you have any questions?

Senator Hruska. Yes; I have some. Mr. Chairman, reference was made to that portion of the President's Crime Commission report recommending State gun registration legislation and by way of other legislation by the Federal Government, if the States did not enact such laws. I ask unanimous consent that that portion with those recommendations be set forth at that point in the record so we we have them available for consideration.

Also, Mr. Cohen, inasmuch as we are dealing with enforcement of this act, I presume a lot of this enforcement has for its basis, rules and regulations of your Department?

Is that correct?

Mr. Cohen. Yes, sir.

Senator Hruska. Is that correct?

Mr. Cohen. Yes, sir.

Senator Hruska. I ask unanimous consent that copies of these regulations, both for the National Act and the Federal Act be incorporated in the record at this point.

Chairman Dodd. Without objection.

(The documents referred to were marked "Exhibits Nos. 8 and 9" and are as follow :)

EXHIBIT No. 8

THE PRESIDENT'S COMMISSION ON LAW ENFORCEMENT
AND ADMINISTRATION OF JUSTICE,
EXECUTIVE OFFICE OF THE PRESIDENT.
*Washington, February 19, 1967.*

I am enclosing a copy of "The Challenge of Crime in a Free Society," a report to President Johnson and the Nation by his Commission on Law Enforcement and Administration of Justice.

Because of his concern about crime, the President appointed the Commission eighteen months ago, as part of his program to develop a National Strategy against crime. The broad new legislative program which the President proposed to Congress earlier this month should help put this strategy into action.

The Commission's mandate was to examine all aspects of crime and to recommend ways in which America might meet its challenge. This report makes more than 200 specific recommendations for preventing crime, for improving the operations of the police, the courts and the correctional agencies and for mobilizing government and private support for these tasks.

The report embodies the findings of a Commission composed of distinguished men and women from many professional backgrounds and many parts of the country. It reflects the work of an outstanding staff and hundreds of expert consultants from all relevant fields. I hope you will give it your close attention.

Sincerely yours,

NICHOLAS DEB. KATZENBACH. *Chairman.*

THE PRESIDENT'S COMMISSION ON LAW ENFORCEMENT AND ADMINISTRATION OF
JUSTICE

Nicholas DeB. Katzenbach, Chairman; Washingon, D.C.; Under Secretary of State; Attorney General of the United States 1965–1966

Genevieve Blatt, Harrisburg, Pa.; Assistant Director, Office of Economic Opportunity

Charles D. Breitel, New York, N.Y.; Associate Judge, Court of Appeals of the
State of New York
Kingman Brewster, Jr., New Haven, Conn.; President, Yale University
Garrett H. Byrne, Boston, Mass.; attorney
Thomas J. Cahill, San Francisco, Calif.; Chief of Police, San Francisco
Otis Chandler, San Marino, Calif.; Publisher, Los Angeles Times
Leon Jaworski, Houston, Texas; attorney, senior partner, Fulbright, Crooker,
Freeman, Bates & Jaworski
Thomas C. Lynch, San Francisco, Calif.; Attorney General, State of California
Ross L. Malone, Roswell, New Mexico; attorney, partner, Atwood & Malone
James Benton Parsons, Chicago, Ill.; Judge, U.S. District Court, Northern
District of Illinois
Lewis Franklin Powell, Jr., Richmond, Va.; attorney, partner, Hunton, Williams,
Gay, Powell & Gibson
William Pierce Rogers, Bethesda, Md.; attorney, partner, Roynall, Koegel, Rogers
& Wells (New York and Washington)
Robert Gerald Storey, Dallas, Texas; attorney, partner, Storey, Armstrong &
Steger
Julia Davis Stuart, Spokane, Wash.; President, League of Women Voters of the
United States
Robert F. Wagner, New York, N.Y.; Mayor, New York City, 1954–1966
Herbert Wechsler, New York, N.Y.; Harlan Fisk Stone Professor of Constitu-
tional Law, Columbia Law School
Whitney Moore Young, Jr., New Rochelle, N.Y.; Executive Director, National
Urban League
Luther W. Youngdahl, Washington, D.C.; Senior Judge, U.S. District Court,
District of Columbia

---

## CHAPTER 10*—CONTROL OF FIREARMS

The assassination of President John F. Kennedy with a mail-order rifle offered
a grim and tragic illustration of what can result when firearms are easily avail-
able to anyone in the United States. The Commission strongly believes that the
increasing violence in every section of the Nation compels an effort to control
possession and sale of the many kinds of firearms that contribute to that violence.

During 1963, 4,760 persons were murdered by firearms. During 1965, 5,600
murders, 34,700 aggravated assaults and the vast majority of the 68,400 armed
robberies were committed by means of firearms. All but 10 of the 278 law en-
forcement officers murdered during the period 1960–65 were killed with fire-
arms. And statistics, of course, cannot even indicate the personal tragedy each
of these offenses caused.

The issue of firearms control has been debated heatedly throughout the
country in the past few years. Many millions of the estimated 50 million privately
owned guns in the United States belong to hunters, gun collectors, and other
sportsmen. Their representative organizations resist controls over the present
easy accessibility of rifles and shotguns. Many other millions of firearms—
pistols, revolvers, rifles, and shotguns—are owned by citizens determined to
protect their families from criminal attack and their property from loss to
burglars. In a nationwide sampling conducted for the Commission by the Na-
tional Opinion Research Center, 37 percent of the persons interviewed said that
they kept firearms in the household to protect themselves. Some citizens who fear
assault and robbery in the streets of our cities carry firearms about for self-
protection. Many of these firearms owners contend that control over the pur-
chase and possession of firearms conflicts with the need and right to defend
themselves, their families, and their property.

Although the Commission believes that controls at all levels of government
must be strengthened in order to reduce the probability that potential criminal
offenders will acquire firearms, it agrees that the interests of persons desiring
such weapons for legitimate purposes must be preserved as much as possible. No
system of control, of course, can guarantee that society will be safe from the mis-
use of firearms, but the Commission is convinced that a strengthened system can
make an important contribution to reducing the danger of crime in the United
States.

---

*From *The Challenge of Crime in a Free Society,* a report by the President's Commission
on Law Enforcement and Administration of Justice.

## EXISTING FIREARMS CONTROL LAWS

Regulation of firearms in the United States is based upon three Federal laws, various kinds of State legislation, and a large number of local ordinances.

The first of the Federal laws, the National Firearms Act of 1934, applies to machine guns, short-barreled and sawed-off rifles and shotguns, mufflers and silencers and concealable firearms—not including pistols. The 1934 act requires that possessors register all of these weapons and devices with the Treasury Department, and it imposes annual taxes on firearms manufacturers, importers, and dealers. Taxes ranging from $5 to $200 are also imposed on the transfer of registered weapons and other equipment.

The Federal Firearms Act of 1938 requires the licensing of all manufacturers and dealers who use the facilities of interstate or foreign commerce. It prohibits the knowing transportation of firearms in interstate commerce to, or receipt by, any person who has been convicted of a felony, or who is a fugitive from justice. The law requires that most kinds of firearms imported into or manufactured in the United States bear serial numbers, and it prohibits the interstate transportation of stolen firearms, or those with mutilated serial numbers. The 1938 law also prohibits the licensed manufacturers and dealers from transporting firearms into States in violation of State laws requiring a permit to purchase firearms.

The third Federal law regulating firearms is the Mutual Security Act of 1954, which authorizes the President to regulate the export and import of firearms. Administration of the act has been delegated to the Department of State.

The Department of Defense, which formerly disposed of its surplus firearms through commercial and other private channels, suspended all such sales several months ago. It is now considering the advisability of destroying surplus or obsolete weapons in the future.

There is a wide diversity in the purpose and scope of State gun control laws:

Twenty-five States require a license to sell handguns at retail, 8 require a permit (or the equivalent) to purchase a handgun, 11 require a waiting period between purchase and delivery of a handgun, 1 requires a license to possess a handgun, 29 require a license to carry a handgun, 19 prohibit the carrying of a concealed handgun, 18 require a license to carry a handgun in a vehicle, 22 prohibit the carrying of a loaded firearm in a vehicle, and 4 States require the registration of firearms.

New York State's Sullivan law is the most stringent firearms control regulation in the United States. The laws of several States require that anyone carrying concealable firearms have a license, but the Sullivan law prohibits anyone from keeping a pistol or revolver in his home or place of business without a license. Further, no one may even purchase a pistol or revolver until he has obtained either a license to possess or a license to carry such a weapon. The New York law does not require a license to possess or carry rifles and shotguns, but does state that they cannot be carried in an automobile or a public place when loaded.

In addition to the State laws, there are many county, city, town, and village ordinances that require licenses for the possession or purchase of firearms.

## LIMITED EFFECTIVENESS OF PRESENT LAWS

At first glance, the combined regulatory machinery established by these firearms laws may appear to provide sufficient control. This appearance is misleading. A 1966 Federal Bureau of Investigation survey of the chief administrators of police departments in 10 large cities discloses that all but one believe that the easy accessibility of firearms is a serious law enforcement problem.

On the Federal level, the statutes do little to control the retail and mail-order sale of handguns, rifles, and shotguns. The provision of the Federal Firearms Act of 1938 prohibiting Federal licensees from transporting firearms into States in violation of State laws requiring a permit to purchase firearms has an extremely limited effect. Only eight States have enacted permit laws. If there are local ordinances within a State, but no State law, the Federal provision does not apply. The prohibition against transport of firearms to, or receipt by, felons or fugitives applies only to direct interstate shipment and does not prevent such persons from buying firearms locally after they have been transported from another State. Despite the Federal laws, therefore, practically anyone—the convicted criminal, the mental incompetent, or the habitual drunkard—can purchase firearms simply by ordering them in those States that have few controls.

Strict controls by one State or city are nullified when a potential criminal can secure a firearm merely by going into a neighboring jurisdiction with lax con-

trols, or none at all. While information is sparse, there are strong indications that mail-order houses and other out-of-State sources provide a substantial number of guns to those who commit crimes. One study by the Massachusetts State Police showed that 87 percent of concealable firearms used during the commission of crimes in Massachusetts in a recent year were obtained from sources outside the State.

In order to prevent criminal use of firearms, the police must have some way of following weapons into the hands of the ultimate consumer. But only in four States do police agencies have a method of determining who owns firearms and where they are located. The requirement that each person register firearms— a tool available to law enforcement in almost every industrial nation in the world—has been compared with the State control of automobiles and drivers. At a time when there were very few automobiles, registration was not thought necessary. When automobiles became so numerous that they posed a serious physical threat to society, comprehensive registration was felt to be essential.

A final failing in the present system of control is the ease with which extremely low-priced, and therefore widely available, surplus weapons are brought into the United States from foreign countries. At the present time it is estimated that at least 1 million such weapons are reaching the civilian market each year. During the recent hearings of the Senate Subcommittee on Juvenile Delinquency, law enforcement officials testified that foreign imports accounted for a significant percentage of the total number of firearms coming into their possession as a result of having been used in the commission of crimes. The figures ranged from a low of 18 percent in Washington, D.C., to a high of 80 percent in Atlanta, Ga.

The limited statutory framework within which the State Department must operate prevents any effective control over the importation of firearms. If the import in question does not involve machineguns, sawed-off shotguns, or the other weapons covered by the 1934 National Firearms Act, each transaction is approved routinely, as long as the dealer is a bona fide businessman engaged in a bona fide business transaction.

#### PUBLIC OPINION ABOUT FIREARMS CONTROL

Public opinion on the subject of firearms control has been sampled several times in the last few years by the Gallup Poll. According to the 1966 poll, a substantial majority of persons interviewed—67 percent—said they favored "a law which would require a person to obtain a police permit before he or she could buy a gun." Even when the same question was put to firearms owners, a majority—56 percent—indicated that they favored police permits to purchase guns.

A second question asked by the Gallup Poll was directed to the problem of guns and juveniles. "Which of these three plans would you prefer for the use of guns by persons under the age of 18—forbid their use completely; put strict regulations on their use; or continue as at present with few regulations?" In response, 27 percent of those questioned and 17 percent of firearms owners said they favored completely forbidding the use of guns by persons under 18; 55 percent of all persons and 59 percent of gun owners said they favored strict regulation; and 15 percent of all persons and 22 percent of the gun owners wanted to continue as at present.

On the question of outlawing all handguns except for police use (a question last asked in 1959) 59 percent of the sample were in favor and 35 percent were opposed.

#### THE CONTROVERSY ABOUT FIREARMS CONTROL

While the majority of the public favors reasonable firearms control, the National Rifle Association and other citizen groups have provided an effective legislative lobby to represent those hunters, gun collectors, and other persons who oppose additional regulation. Many arguments are offered by this opposition.

The most emotional position—one this Commission must reject outright—is that licensing and registration provisions for handguns, rifles, and shotguns would disarm the public and thus render it easy prey for violent criminals, or an invading or subversive enemy. In fact, all proposals for regulation would permit householders and shopkeepers to continue to possess firearms. Licensing and registration for the legitimate firearms owner would merely add a small measure of inconvenience to the presently largely unregulated mail-order and over-the-counter sales of firearms. It is this inconvenience that appears to be the underlying reason for the opposition to more firearms control. Opponents suggest that laws calling for registration would penalize the law-abiding citizen, who would

comply—while not touching criminals who would not comply. They thus conclude that such laws do not address themselves to the real problem of firearms misuse.

Those supporting stricter control of firearms agree that many potential criminal offenders will obtain firearms even with additional laws. But they point to the conclusion of the Senate Subcommittee on Juvenile Delinquency, which found that criminals, for the most part, purchase their firearms through the mails or in retail stores, rather than stealing them. One police chief from a large western city told an FBI survey that, after permissive State legislation had preempted local controls, there were "several instances of homicide committed within 30 minutes of the time a short firearm was purchased by a person who would not have been granted a permit to purchase one under the former legislation."

During the first year's operation of a Philadelphia ordinance requiring a permit to obtain a firearm, 73 convicted persons were prohibited from purchasing firearms in the city. Federal Bureau of Investigation statistics demonstrate that a higher proportion of homicides are committed with firearms in those areas where firearms regulations are lax, than in those areas where there are more stringent controls. In Dallas, Tex., and Phoenix, Ariz., firearms regulations are fairly weak. In Dallas in 1963, 72 percent of homicides were committed with firearms; in Phoenix 65.9 percent were committed with firearms. In Chicago, where regulations are more strict, 46.4 percent of the homicides were committed with firearms. In New York City, with the most stringent gun controls of any major city in the United States, only about 25 percent of the homicides are committed with firearms.

Opponents of additional controls contend that firearms are dangerous only if misused and that the appropriate legal remedy is to punish illegal use of firearms—not to hamper ownership. Supporters of control argue that it is not enough to rely on the deterrent effect of punishing the wrongdoer after the act to prevent others from misusing guns. They maintain that firearms should be kept out of the hands of those who intend to use them wrongfully.

Opponents of firearms control legislation also rely upon the Second Amendment's guarantee of "the right to bear arms." The Second Amendment, in its entirety, states:

*"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."*

The U.S. Supreme Court and lower Federal courts have consistently interpreted this Amendment only as a prohibition against Federal interference with State militia and not as a guarantee of an individual's right to keep or carry firearms. The argument that the Second Amendment prohibits State or Federal regulation of citizen ownership of firearms has no validity whatsoever.

### COMMISSION RECOMMENDATIONS

Since laws, as they now stand, do not accomplish the purposes of firearms control, the Commission believes that all States and the Federal Government should act to strengthen them. Any legislative scheme should maximize the possibility of keeping firearms out of the hands of potential criminal offenders, while at the same time affording citizens ample opportunity to purchase such weapons for legitimate purposes.

It is appropriate to ban absolutely the sale of those weapons no citizen has a justifiable reason for owning.

*The Commission recommends:* Federal and State Governments should enact legislation outlawing transportation and private possession of military-type firearms such as bazookas, machine guns, mortars, and antitank guns.

In addition, dangerous or potentially dangerous persons should be prohibited from purchasing firearms.

*The Commission recommends:* States should enact laws prohibiting certain categories of persons, such as habitual drunkards, drug addicts, mental incompetents, persons with a history of mental disturbance, and persons convicted of certain offenses, from buying, owning, or possessing firearms.

Prevention of crime and apprehension of criminals would be enhanced if each firearm were registered with a governmental jurisdiction. A record of ownership would aid the police in tracing and locating those who have committed or who threaten to commit violent crime. Law enforcement officers should know where each gun is and who owns it.

*The Commission recommends:* Each State should require the registration of all handguns, rifles, and shotguns. If, after 5 years, some States still have not enacted

such laws, Congress should pass a Federal firearms registration act applicable to those States.

Government regulation to prevent those with criminal purposes from purchasing firearms cannot be effective as long as mail-order sales and retail sales to persons living outside the seller's State are not controlled. It is essential, also, to reduce and to regulate the importation into the United States of large numbers of cheap firearms. Since sporting weapons such as rifles and shotguns apparently present less danger of criminal use than do handguns, control over the latter should be more stringent. A truly effective system of regulation requires a meshing of State and Federal action.

*The Commission recommends:* Each State should require a person to obtain a permit before he can either possess or carry a handgun. Through licensing provisions, Federal law should prohibit mail-order and other interstate sales of handguns and should regulate such sales of rifles and shotguns.

Federal legislation to implement these goals should prohibit the interstate shipment of handguns except between federally licensed importers, manufacturers, and dealers. A Federal licensee should also be prohibited from selling handguns to an individual not living in the State of the seller. The interstate shipment of shotguns and rifles should be delayed a sufficient time for law enforcement authorities in the buyer's hometown to examine his sworn statement concerning age and other factors affecting his eligibility to purchase such a weapon, and the consent of these authorities should be required before the weapon may be shipped. Antique dealers could continue to operate under reasonable regulations. States may also want to prohibit firearms sales to persons under a certain age, such as 18 or 21, or require parental approval for firearms registration in a minor's name.

---

### Exhibit No. 9

#### [Publication No. 364 (Rev. 3–64)]

### National Firearms Act and Federal Firearms Act

#### (U.S. TREASURY DEPARTMENT, Internal Revenue Service)

INTERNAL REVENUE SERVICE,
ALCOHOL AND TOBACCO TAX DIVISION, ENFORCEMENT BRANCH.

The National Firearms Act and the Federal Firearms Act are administered by the Enforcement Branch of this operational division of your Internal Revenue Service. Uniform enforcement of these laws is in the best public interest, contributing to the suppression of crime by the process of regulating traffic in firearms and ammunition and providing the basis for prosecution of willful violators. The laws which govern the scope of the firearms program are reprinted herein for distribution as a public service.

Your cooperation and support in our effort to effectively administer the firearms program are solicited in the interest of better law enforcement.

DWIGHT E. AVIS, *Director.*

### NATIONAL FIREARMS ACT

Law: United States Code, Title 26, Chapter 53.
Regulations: Part 179 of Title 26 (1954), Code of Federal Regulations.
Weapons coming within the purview of the National Firearms Act may be legally acquired and lawfully possessed subject to regulatory requirements. However, any such weapon is contraband unless properly registered, and unlawful possession thereof is subject to statutory penalties.

#### SPECIAL (OCCUPATIONAL) TAXES

Section 5801. Tax. (a) *Rate.*—On first engaging in business, and thereafter on or before the first day of July of each year, every importer, manufacturer, and dealer in firearms shall pay a special tax at the following rates:

　　(1) *Importers or manufacturers.*—Importers or manufacturers, $500 a year or fraction thereof;

　　(2) *Dealers other than pawnbrokers.*—Dealers, other than pawnbrokers, $200 a year or fraction thereof;

　　(3) *Pawnbrokers.*—Pawnbrokers, $300 a year or fraction thereof:

66                    FEDERAL FIREARMS ACT

*Provided,* That manufacturers and dealers in guns with combination shotgun and rifle barrels, 12 inches or more but less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and manufacturers and dealers in guns classified as "any other weapon" under section 5848(5), shall pay the following taxes: Manufacturers, $25 a year or fraction thereof; dealers, $10 a year or fraction thereof.

(b) *Cross Reference.*—For license to transport, ship, or receive firearms or ammunition under the Federal Firearms Act, see section 3 of the Act of June 30, 1938 (52 Stat. 1251; 15 U.S.C. 903).

Section 5802. Registration. *Importers, Manufacturers, and Dealers.*—On first engaging in business, and thereafter on or before the first day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the Secretary or his delegate in each internal revenue district in which such business is to be carried on his name or style, principal place of business, and places of business in such district.

Section 5803. Exemptions. For provisions exempting certain transfers, see section 5812.

### TRANSFER TAX

Section 5811. Tax. (a) *Rate.*—There shall be levied, collected, and paid on firearms transferred in the United States a tax at the rate of $200 for each firearm: *Provided,* That the transfer tax on any gun with combination shotgun and rifle barrels, 12 inches or more but less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and on any gun classified as "any other weapon" under section 5848(5), shall be at the rate of $5. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

(b) *By Whom Paid.*—Such tax shall be paid by the transfer: *Provided,* That if a firearm is transferred without payment of such tax the transferor and transferee shall become jointly and severally liable for such tax.

(c) *How Paid.*—
(1) *Stamps.*—Payment of the tax herein provided shall be represented by appropriate stamps to be provided by the Secretary or his delegate.

(d) *Cross Reference.*—
(1) For assessment in case of omitted taxes payable by stamps, see sections 6155(a), 6201(a)(2)(A), 6601(c)(4), and 6201(a).
(2) For requirements as to registration and special tax, see sections 5801 and 5802.
(3) For excise tax on pistols, revolvers, and firearms, see section 4181.

Section 5812. Exemptions. (a) *Transfers Exempt.*—This chapter shall not apply to the transfer of firearms—
(1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia;
(2) to any peace officer or any Federal officer designated by regulations of the Secretary or his delegate;
(3) to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament.

(b) *Notice of Exemption.*—If the transfer of a firearm is exempted as provided in subsection (a), the person transferring such firearm shall notify the Secretary or his delegate of the name and address of the transferor, the number or other mark identifying such firearm, and the date of its transfer, and shall file with the Secretary or his delegate such documents in proof thereof as the Secretary or his delegate may by regulations prescribe.

(c) *Exemption From Other Taxes.*—For exemption from excise tax on pistols, revolvers, and firearms, see section 4182(a).

Section 5813. Stamps. (a) *Affixing.*—The stamps provided for in section 5811 (c)(1) shall be affixed to the order for such firearm, provided for in section 5814.

(b) *Other Laws Applicable.*—For provisions relating to the engraving, issuance, sale, accountability, cancellation, and distribution of taxpaid stamps, see section 5846.

Section 5814. Order Forms. (a) *General Requirements.*—It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate for that purpose by the Secretary or his delegate. Such order shall identify the applicant by such means of identification as may be prescribed by

regulations under this chapter: *Provided*, That, if the applicant is an individual such identification shall include fingerprints and a photograph thereof.

(b) *Contents of Order Form.*—Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Secretary or his delegate. The original thereof, with stamp affixed, shall be returned to the applicant.

(c) *Exemption in Case of Registered Importers, Manufacturers, and Dealers.*—Importers, manufacturers, and dealers who have registered and paid the tax as provided for in this chapter shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers or manufacturers if such dealers or manufacturers have registered and have paid such tax, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this chapter.

(d) *Supply.*—The Secretary or his delegate shall cause suitable forms to be prepared for the purposes of subsection (a), and shall cause the same to be distributed to officers designated by him.

TAX ON MAKING FIREARMS

Section 5821. Rate. Exceptions, etc. (a) *Rate.*—There shall be levied, collected, and paid upon the making in the United States of any firearm (whether by manufacture, putting together, alteration, any combination thereof, or otherwise) a tax at the rate of $200 for each firearm so made.

(b) *Exceptions.*—The tax imposed by subsection (a) shall not apply to the making of a firearm—

(1) by any person who is engaged within the United States in the business of manufacturing firearms;

(2) from another firearm with respect to which a tax has been paid, prior to such making, under subsection (a) of this section; or

(3) for the use of—

(A) the United States Government, any State, Territory, or possession of the United States, any political subdivision thereof, or the District of Columbia, or

(B) any peace officer or any Federal officer designated by regulations of the Secretary or his delegate.

Any person who makes a firearm in respect of which the tax imposed by subsection (a) does not apply by reason of the preceding sentence shall make such report in respect thereof as the Secretary or his delegate may by regulations prescribe.

(c) *By Whom Paid; When Paid.*—The tax imposed by subsection (a) shall be paid by the person making the firearm. Such tax shall be paid in advance of the making of the firearm.

(d) *How Paid.*—Payment of the tax imposed by subsection (a) shall be represented by appropriate stamps to be provided by the Secretary or his delegate.

(e) *Declaration.*—It shall be unlawful for any person subject to the tax imposed by subsection (a) to make a firearm unless, prior to such making, he has declared in writing his intention to make a firearm, has affixed the stamp described in subsection (d) to the original of such declaration, and has filed such original and a copy thereof. The declaration required by the preceding sentence shall be filed at such place, and shall be in such form and contain such information, as the Secretary or his delegate may by regulations prescribe. The original of the declaration, with the stamp affixed, shall be returned to the person making the declaration. If the person making the declaration is an individual, there shall be included as part of the declaration the fingerprints and a photograph of such individual.

OTHER TAXES

Section 5831. *Cross Reference.*—For excise tax on pistols, revolvers, and firearms, see section 4181.

GENERAL PROVISIONS

Section 5841. Registration of Persons in General. Every person possessing a firearm shall register, with the Secretary or his delegate, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof. No person shall be required to register under this section with respect to a

68                    FEDERAL FIREARMS ACT

firearm which such person acquired by transfer or importation or which such person made, if provisions of this chapter applied to such transfer, importation, or making, as the case may be, and if the provisions which applied thereto were complied with.

Section 5842. Books, Records and Returns. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this chapter as the Secretary or his delegate may by regulations require.

Section 5843. Identification of Firearms. Each manufacturer and importer of a firearm shall identify it with a number and other identification marks approved by the Secretary or his delegate, such number and marks to be stamped or otherwise placed thereon in a manner approved by the Secretary or his delegate.

Section 5844. Exportation. Under such regulations as the Secretary or his delegate may prescribe, and upon proof of the exportation of any firearm to any foreign country (whether exported as part of another article or not) with respect to which the transfer tax under section 5811 has been paid by the manufacturer, the Secretary or his delegate shall refund to the manufacturer the amount of the tax so paid, or, if the manufacturer waives all claim for the amount to be refunded, the refund shall be made to the exporter.

Section 5845. Importation. No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction, except that, under regulations prescribed by the Secretary or his delegate, any firearm may be so imported or brought in when—

(1) the purpose thereof is shown to be lawful and

(2) such firearm is unique or of a type which cannot be obtained within the United States or such territory.

Section 5846. Other Laws Applicable. All provisions of law (including those relating to special taxes, to the assessment, collection, remission, and refund of internal revenue taxes, to the engraving, issuance, sale, accountability, cancellation, and distribution of taxpaid stamps provided for in the internal revenue laws, and to penalties) applicable with respect to the taxes imposed by sections 4701 and 4721, and all other provisions of the internal revenue laws shall, insofar as not inconsistent with the provisions of this chapter, be applicable with respect to the taxes imposed by sections 5811(a), 5821(a) and 5801.

Section 5847. Regulations. The Secretary or his delegate shall prescribe such regulations as may be necessary for carrying the provisions of this chapter into effect.

Section 5848. Definitions. For purposes of this chapter—

(1) *Firearm.*—The term "firearm" means a shotgun having a barrel or barrels of less than 18 inches in length, or a rifle having a barrel or barrels of less than 16 inches in length, or any weapon made from a rifle or shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than 26 inches, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

(2) *Machine gun.*—The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

(3) *Rifle.*—The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(4) *Shotgun.*—The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(5) *Any other weapon.*—The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, but such term shall not include pistols or revolvers or weapons designed, made or intended to be fired from the shoulder and not capable of being fired with fixed ammunition.

(6) *Importer.*—The term "importer" means any person who imports or brings firearms into the United States for sale.

(7) *Manufacturer.*—The term "manufacturer" means any person who is engaged within the United States in the business of manufacturing firearms, or who otherwise produces therein any firearm for sale or disposition.

(8) *Dealer.*—The term "dealer" means any person not a manufacturer or importer, engaged within the United States in the business of selling firearms. The term "dealer" shall include wholesalers, pawnbrokers, and dealers in used firearms.

(9) *Interstate commerce.*—The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States, to any other State or to the District of Columbia.

(10) *To transfer or transferred.*—The term "to transfer" or "transferred" shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of.

(11) *Person.*—The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

Section 5849. Citation of Chapter. This chapter may be cited as the "National Firearms Act" and any reference in any other provision of law to the "National Firearms Act" shall be held to refer to the provisions of this chapter.

### UNLAWFUL ACTS

Section 5851. Possessing Firearms Illegally. It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of sections 5811, 5812(b), 5813, 5814, 5844, or 5846, or which has at any time been made in violation of section 5821, or to possess any firearm which has not been registered as required by section 5841. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

Section 5852. Removing or Changing Identification Marks. It shall be unlawful for anyone to obliterate, remove, change, or alter the number or other identification mark required by section 5843. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of any firearm upon which such number or mark shall have been obliterated, removed, changed, or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

Section 5853. Importing Firearms Illegally. It shall be unlawful—

(1) fraudulently or knowingly to import or bring any firearm into the United States or any territory under its control or jurisdiction, in violation of the provisions of this chapter ; or

(2) knowingly to assist in so doing ; or

(3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in knowing the same to have been imported or brought in contrary to law.

Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

Section 5854. Failure To Register and Pay Special Tax. It shall be unlawful for any person required to register under the provisions of section 5802 to import, manufacture, or deal in firearms without having registered and paid the tax imposed by section 5801.

Section 5855. Unlawful Transportation in Interstate Commerce. It shall be unlawful for any person who is required to register as provided in section 5841 and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 5814 or a stamp-affixed declaration as provided in section 5821, to ship, carry, or deliver any firearm in interstate commerce.

### PENALTIES AND FORFEITURES

Section 5861. Penalties. Any person who violates or fails to comply with any of the requirements of this chapter shall, upon conviction, be fined not more than $2,000, or be imprisoned for not more than 5 years, or both, in the discretion of the court.

Section 5862. Forfeitures. (a) *Laws Applicable.*—Any firearm involved in any violation of the provisions of this chapter or any regulation promulgated

70                      FEDERAL FIREARMS ACT

thereunder shall be subject to seizure and forfeiture, and (except as provided in subsection (b) all the provisions of internal revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this chapter, and the persons to whom this chapter applies.

(b) *Disposal.*—In the case of the forfeiture of any firearm by reason of a violation of this chapter: No notice of public sale shall be required; no such firearm shall be sold at public sale; if such firearm is forfeited for a violation of this chapter and there is no remission or mitigation of forfeiture thereof, it shall be delivered by the Secretary or his delegate to the Administrator of General Services, General Services Administration, who may order such firearm destroyed or may sell it to any State, Territory, or possession, or political subdivision thereof, or the District of Columbia, or at the request of the Secretary or his delegate may authorize its retention for official use of the Treasury Department, or may transfer it without charge to any executive department or independent establishment of the Government for use by it.

### FEDERAL FIREARMS ACT

Law: United States Code, Title 15, Chapter 18.

Regulations: Part 177 of Title 26 (1954), Code of Federal Regulations.

All firearms (including parts thereof), silencers, and pistol or revolver ammunition come within the purview of this Act, and commercial (interstate) traffic therein is subject to licensing requirements. This Act is designed primarily to deny the criminal lawful access to such items, but violations of the law arise from the operations of the licensee and/or the criminal status of the person involved rather than the mere possession of a weapon.

Section 901. Definitions. As used in this chapter:

(1) The term "person" includes an individual, partnership, association, or corporation.

(2) The term "interstate or foreign commerce" means commerce between any State, Territory or possession (not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession (not including the Canal Zone), or the District of Columbia but through any place outside thereof; or within any Territory or possession or the District of Columbia.

(3) The term "firearm" means any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon.

(4) The term "manufacturer" means any person engaged in the manufacture or importation of firearms, or ammunition or cartridge cases, primers, bullets, or propellant powder for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter.

(5) The term "dealer" means any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellant powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, trigger mechanisms, or breech mechanisms to firearms, and the term "licensed dealer" means any such person licensed under the provisions of this chapter.

(6) The term "fugitive from justice" means any person who has fled from any State, Territory, the District of Columbia, or possession of the United States to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year or to avoid giving testimony in any criminal proceeding.

(7) The term "ammunition" shall include only pistol or revolver ammuntion. It shall not include shotgun shells, metallic ammunition suitable for use only in rifles, or any .22 caliber rimfire ammunition.

Section 902. Transporting, Shipping, or Receiving Firearms or Ammunition in Interstate or Foreign Commerce Acts Prohibited. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this chapter, to transport, ship, or receive any firearm or ammunition in interstate or foreign commerce.

(b) It shall be unlawful for any person to receive any firearm or ammunition transported or shipped in interstate or foreign commerce in violation of

subdivision (a) of this section, knowing or having reasonable cause to believe such firearms or ammunition to have been transported or shipped in violation of subdivision (a) of this section.

(c) It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearm in interstate or foreign commerce to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer by the prospective purchaser.

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States, the several States, Territories, possessions or the District of Columbia of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice.

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime punishable by imprisonment for a term exceeding one year or who is a fugitive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition.

(f) It shall be unlawful for any person who has been convicted of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be by such person in violation of this chapter.

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm or ammunition, knowing, or having reasonable cause to believe, same to have been stolen.

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or ammunition or to pledge or accept as security for a loan any firearm or ammunition moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe the same to have been stolen.

(i) It shall be unlawful for any person to transport, ship, or knowing receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possesor in violation of this chapter.

Section 903. License To Transport, Ship, or Receive Firearms or Ammunition. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce shall make application to the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum.

(b) Upon payment of the prescribed fee, the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of this chapter: *Provided*, That no license shall be issued to any applicant within two years after the revocation of a previous license.

(c) Whenever any licensee is convicted of a violation of any of the provisions of this chapter, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided*, That in the case of appeal from such conviction the licensee may furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secretary of the Treasury shall suspend such license until he is notified by the clerk of the court of last appeal as to the final disposition of the case.

(d) Licensed dealers shall maintain such permanent records of importation, shipment, and other disposal of firearms and ammunition as the Secretary of the Treasury shall prescribe.

Section 904. Excepted Persons. The provisions of this chapter shall not apply with respect to the transportation, shipment, receipt, or importation of any, firearm, or ammunition, sold or shipped to, or issued for the use of, (1) the United States or any department, independent establishment, or agency thereof; (2) any State, Territory, or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof; (3) any duly commissioned officer or agent of the United States, a State, Territory, or possession, or the District of Columbia, or any political subdivision thereof; (4) or to any bank, public carrier, express, or armored-truck company organized and operating in good faith for the transportation of money and valuables; (5) or to any research laboratory designated by the Secretary of the Treasury: *Provided*, That such bank, public carriers, express, and armored-truck companies are granted exemption by the Secretary of the Treasury; nor to the transportation, shipment, or receipt of any antique or unserviceable firearms. or ammunition, possessed and held as curios or museum pieces: *Provided*, That nothing contained in this section shall be construed to prevent shipments of firearms and ammunition to institutions, organizations, or persons to whom such firearms and ammunition may be lawfully delivered by the Secretary of War, nor to prevent the transportation of such firearms and ammunition so delivered by their lawful possessors while they are engaged in military training or in competitions.

Section 905. Penalties. (a) Any person violating any of the provisions of this chapter or any rules and regulations promulgated hereunder, or who makes any statement in applying for the license or exemption provided for in this chapter, knowing such statement to be false, shall, upon conviction thereof, be fined not more than $2,000, or imprisoned for not more than five years. or both.

(b) Any firearm or ammunition involved in any violation of the provisions of this chapter or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture, and all provisions of Title 26 relating to the seizure, forfeiture, and disposition of firearms as defined in section 2733 [1] of Title 26 shall, so far as applicable, extend to seizures and forfeitures incurred under the provisions of this chapter.

Section 906. Effective Date of Chapter. This chapter shall take effect thirty days after June 30, 1938.

Section 907. Rules and Regulations. The Secretary of the Treasury may prescribe such rules and regulations as he deems necessary to carry out the provisions of this chapter.

Section 908. Separability Clause. Should any section or subsection of this chapter be declared unconstitutional, the remaining portion of the chapter shall remain in full force and effect.

Section 909. Short Title. This chapter may be cited as the Federal Firearms Act.

Information regarding the firearms laws may be obtained at any regional or branch office of the Alcohol and Tobacco Tax. For the exact location of the office in your vicinity, it is suggested you consult the Government listings in your local telephone directory.

U.S. TREASURY DEPARTMENT, INTERNAL REVENUE SERVICE

ASSISTANT REGIONAL COMMISSIONER—ALCOHOL AND TOBACCO TAX

Located at: *Address and Telephone*

Atlanta, Georgia___(522–4121), 275 Peachtree Street NE., Atlanta, Ga., 30303.
Boston, Massachusetts__(523–8600), 55 Tremont Street, Boston, Mass., 02108.
Chicago, Illinois____(222–8468), 35 East Wacker Drive, Chicago, Ill., 60601.
Cincinnati, Ohio___(381–2200), 5th and Main Streets, Cincinnati, Ohio, 45201.
Dallas, Texas_____(748–5611), Santa Fe Building, 1114 Commerce Street. Dallas, Tex., 75202.
New York, New York___(732–9100), 90 Church Street, New York, N.Y., 10007.
Philadelphia, Pennsylvania___(923–2400), Third Floor, 2 Penn Center Plaza, Philadelphia, Pa., 19102
San Francisco, California____(986–3500), Flood Building, 870 Market Street. San Francisco, Calif., 94102.

---

[1] Sec. 5848, Internal Revenue Code of 1954.

Senator HRUSKA. Mr. Cohen, you mentioned that there are a thousand men in your department engaged in frontline efforts. Does that cover all of the enforcement requirements of your particular Alcohol and Tobacco Unit?

Mr. COHEN. Yes, sir; these are the frontline criminal investigative officers. They are not the entire Alcohol and Tobacco Tax Unit. They are the criminal law enforcement element of the Alcohol and Tobacco Tax Unit.

Senator HRUSKA. How many of those are engaged in enforcing gun legislation?

Mr. COHEN. They all are to some extent. What we do is we assign our manpower on the basis of the demands of the locale, and we have, let's say, in a given city, five officers. Now, they may spend a portion of their time on enforcement in the alcohol area, and they may spend a portion of their time as the demands of the locale are concerned in the enforcement of the gun laws, so that all of those field operating officers are engaged in enforcement of the gun laws.

Now, someone misquoted me one time as saying we had only seven full-time people engaged in the enforcement of gun laws, and that was true insofar as it was seven in the national office who managed the enforcement on a nationwide basis; but the frontline investigator out in New York City or in Chicago or in Memphis, Tenn., or in Omaha, Nebr., who is an alcohol and tobacco tax investigator has been trained in not only the alcohol work but in the firearms work; and if the firearms need is there, he spends his time on firearms.

Senator HRUSKA. Of course all of us are subject to misquotation. We usually don't misquote ourselves, however, do we? In 1965 you indicated, in testimony before the House Ways and Means Committee, that there were the equivalent of 52 man-years devoted to enforcement of the National and Federal Firearms Act. Now this year you indicated that there were or would be 113 man-years devoted to that purpose. Are those figures correct?

Mr. COHEN. That is about right.

Senator HRUSKA. Are they identifiable in your mind?

Mr. COHEN. Yes, sir.

Senator HRUSKA. Why this increase all of a sudden?

Mr. COHEN. I think we have been having more problems with firearms over the last few years than we have ever had before.

I think we have had more violence in the streets, we have had more riots, we have had more para-military activity. I feel, and so does my Director of my Alcohol and Tobacco Tax Division, as I indicated to you, sir, the investigators spend the time in enforcing the laws where the violations are occurring. Now, we don't create violations and we don't create the need for our manpower. When we find it, we apply it.

Senator HRUSKA. What are the results of this stepped up activity? You have recited 9,700 violations of State and Federal laws. How many of those were Federal violations?

Mr. COHEN. Those were 9,700 referrals to local officials.

Senator HRUSKA. How many Federal violations did you uncover?

Mr. COHEN. It will take me a few minutes to find that for you sir.

My Alcohol and Tobacco Tax Division conducts a program under which the records of some of the manufacturers and dealers are checked. The program is designated as the firearms record inspection

program. Under the program, monthly reports are made. Among the information obtained and reported as a result of these record checks, is the number of sales—primarily of handguns—the licensees make to out-of-State purchasers. Through March of last fiscal year, it was determined that some 21,000 people went outside of their State of residence to purchase a firearm. Under the program, criminal record checks are made on many of the out-of-State purchasers. Through March of last fiscal year, some 18,000 criminal record checks were made on these purchases. As a result of those criminal checks, we found that 676 of the out-of-State purchasers had criminal records. This does not mean that we could establish that each of these 676 persons transported, shipped, or received a firearm in interstate or foreign commerce. Under the program, 640 criminal investigations were initiated through March of 1967. During that period 92 cases arising from the program were referred for criminal prosecution.

Senator HRUSKA. Ninety-two out of how many?

Mr. COHEN. Ninety-two cases arising from the firearms record inspection program through March of the last fiscal year. In addition, 405 other cases under the National and Federal acts arising from other sources were referred to the Department of Justice during that period. Thus, 497 cases were referred to the Department of Justice during the first 9 months of the last fiscal year. During that same period, there were 9,700 other cases arising under the firearms record inspection program referred to local officials. These cases did not involve Federal violations and were referred to local authorities for whatever action they deemed appropriate.

We don't keep statistics on convictions in cases referred to the Department of Justice. However, the Attorney General has stated that his Department for fiscal 1966 has statistics showing that 244 cases were filed for violations of both the Federal act and the National act—183 defendants guilty; 117 defendants not guilty.

Senator HRUSKA. What is the significance of this 18,670 names with criminal records that were disclosed in the first 9 months of the fiscal year inspection of firearm dealers?

Mr. COHEN. No; I said criminal record checks were made of that many names. That doesn't mean we found that many violations.

Senator HRUSKA. 676 had criminal records.

Mr. COHEN. Yes, sir.

Senator HRUSKA. I see.

Mr. COHEN. Of which we investigated some 600 cases.

Senator HRUSKA. And you keep records of the activities of your enforcement agents, do you?

Mr. COHEN. Yes.

Senator HRUSKA. Which reflect these figures.

Mr. COHEN. Yes, sir.

Senator HRUSKA. What would the figures have been for the year 1965?

Mr. COHEN. I would have to get those for you, sir.

Senator HRUSKA. Would you please?

Mr. COHEN. Certainly.

Senator HRUSKA. Would you get them for the last 5 years?

Mr. COHEN. Yes, sir.

Senator HRUSKA. An estimate of the man-years that were devoted, the equivalent man-years that were devoted in each of these years.

Mr. COHEN. Yes, sir.

Senator HRUSKA. On this subject.

Mr. COHEN. As I indicated to you, we acknowledge that we put an increased effort here, but even with our increased effort, and we are putting as much effort as we can, we can't get results under the present law which just doesn't have the tools.

(The document referred to was marked "Exhibit No. 10" and is as follows:)

EXHIBIT No. 10

[U.S. Government memorandum, Aug. 11, 1967]

To: Commissioner.

From: Director, Alcohol and Tobacco Tax Division.

Subject: Request of Senator Hruska for information on firearms enforcement activities for past 5 years.

The following information from our records is furnished for inclusion with your July 10 testimony before the Juvenile Delinquency Subcommittee of the Senate Judiciary Committee:

UTILIZATION OF INVESTIGATIVE PERSONNEL ON FIREARMS ENFORCEMENT AND CASES PREPARED FOR PROSECUTION

| Fiscal year | Average employment investigators | Man-years on firearms enforcement | Criminal cases prepared | | | |
|---|---|---|---|---|---|---|
| | | | National Firearms Act | Federal Firearms Act | Combination (both acts) | Total |
| 1963 | 1,003 | 35 | 293 | 55 | 10 | 358 |
| 1964 | 983 | 52 | 306 | 53 | 14 | 373 |
| 1965 | 943 | 57 | 321 | 60 | 17 | 398 |
| 1966 | 937 | 101 | 346 | 100 | 19 | 465 |
| 1967 | 964 | 189 | 515 | 184 | 21 | 720 |

All of the investigators are trained in firearms work and spend the amount of time required in that area. The man-year calculation shown above is arrived at by applying the cumulative amount of time spent by each investigator on matters relating to the firearm enforcement activity.

Prior to October 1965, no statistics were maintained with respect to inspection of the premises of persons licensed under the Federal Firearms Act. The following figures reflect results of that portion of our firearms enforcement activity devoted to licensee inspections from October 1965 to June 30, 1967:

LICENSEE INSPECTIONS AS PART OF FIREARMS ENFORCEMENT

| Period | Inspections | Out-of-State purchases found | Criminal cases prepared |
|---|---|---|---|
| October 1965 to June 30, 1966 | 13,783 | 21,202 | 40 |
| July 1, 1966, to June 30, 1967 | 36,050 | 27,162 | 130 |

HAROLD A. SERR.

Senator HRUSKA. I think that would be a fair statement, providing it could show some substitute or something in S. 1-Amendment 90 that would enable you to better enforce the law under the new bill rather than the laws we have now.

Let me call your attention to a section that is very familiar to you, section 902 of the Federal Firearms Act which reads:

It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearms in interstate or foreign commerce to any person other than

a licensed manufacturer or dealer in any state the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer by the prospective purchaser.

Now, have you had any prosecutions under section 902(c) which I just read?

Mr. COHEN. That section applies to only eight States, sir. I don't recall whether we have had any specific prosecutions under that law or not. I would have to check it.

Senator HRUSKA. My question is how many prosecutions have you had under that section of the law?

Mr. COHEN. We can supply that information.

Senator HRUSKA. You have referred in your statement to——

Mr. COHEN. We have two prosecutions pending now, Mr. Shaw informs me.

Senator HRUSKA. On page 11, for example:

It was found during the period February, 1966 to 1967 approximately 5,000 persons who gave a residence address in the city or county of St. Louis, Missouri, purchased firearms, primarily handguns, in the neighboring state of Illinois, which has no permit requirement.

Presumably there have been shipments.

Mr. COHEN. No, sir. As I indicated to you, because of the *Tot* case, we cannot presume that they crossed the line with that gun, and, therefore, the mere purchase of that gun in Illinois is not a violation. We have to prove that the felon bought the gun in Illinois and carried it across that line.

Senator HRUSKA. Well, to prosecute successfully under 902(c) that involves shipment. That doesn't involve personal carriage, does it?

Mr. COHEN. 2(c) does not apply to personal carriage.

Senator HRUSKA. It applies to shipment. My question was in the light of that and this great volume of personal violence, it is to be presumed, is it not, that there were a great many shipments into Missouri by licensed dealers.

Mr. COHEN. No, sir. They are going over the counter to purchasers.

Senator HRUSKA. Well, these 5,000 were. Do you want to say to us that it is your opinion that there were no shipments made into Missouri from other——

Mr. COHEN. Well, we get the same thing, Senator, in Senator Kennedy's home State. The people up in the Boston area who want a firearm don't write to ask for the shipment; they go to Maine or they go to New Hampshire.

Senator HRUSKA. I understand, but that is not my question. I understand that and I so said, I hope you act by differentiating between personal purchases of guns and those which are shipped.

My question is: To your knowledge or from or in your records, is there anything to show that there are shipments from States like Illinois into a State having a gun law like Missouri?

Mr. COHEN. As I indicated, we have at least two cases pending at the moment. I don't know what our statistics might be for a longer period.

Senator HRUSKA. In the 1965 hearings before this subcommittee, Chief Brostron of St. Louis testified that numerous citizens of his city had obtained firearms through the mail from out-of-State dealers.

Now, in order to avoid violation of the section 902(c), those dealers should be able to prove that they had exhibited to them the Missouri license which such purchaser had before he would be qualified to buy the gun; is that not true?

Chairman Dodd. Will the Senator yield?

Senator Hruska. Surely.

Chairman Dodd. Just to clarify the record, is the Senator referring to mail order purchases?

Senator Hruska. I am referring to mail order; yes. Mail order would result in shipment.

Mr. Cohen. That is correct.

Senator Hruska. And it is shipment which is proscribed by 902(c).

Mr. Cohen. That is correct.

Senator Hruska. And that is what Chief Brostron is talking about. He said "numerous." Now, you have only two cases that you know of that have violated——

Mr. Cohen. They are pending at the moment. I don't know how many others there might be, sir.

Senator Hruska. Have you or any of you, your front line agents or your back line agents, gone in there and gone through the books and asked that licensed dealer for proof of exhibition to him of a required Missouri license?

Mr. Cohen. I would have to get that for you, sir. I don't know.

Senator Hruska. I would think that would be quite important. I would like to have the time to check it, because that is pretty important. The same provision will carry forward into this new bill, whether it is S. 1 or Amendment 90 or S. 1853, will it not?

Mr. Cohen. No, sir. The handgun situation, there would be no shipment at all.

Senator Hruska. But shipment of longarms would be allowed under S. 1853. Before shipment could be made, there would have to be a compliance with the law and an exhibition of either a State permit or license; isn't that true?

Mr. Cohen. It is true. It is the same requirement, the exhibition of license.

Senator Hruska. The same requirement. One of the witnesses before the House Ways and Means Committee, was a man, the attorney general, I believe, from New Jersey.

Mr. Cohen. I have just been handed a copy of the criminal records check. When we do check those files of the shipments, they are checked out as to the method of delivery and the description of the firearm and whether the name was properly recorded and whether there was proper authorization for receipt of the firearm.

Senator Hruska. Does that include some record of the number of the license that the buyer had given him the legal right to purchase that gun?

Mr. Cohen. If it was in the State that required it: yes, sir.

Senator Hruska. Talk about Missouri or New Jersey. They both have such laws, and so does New York, and so does Massachusetts. Is that included in the routine check that you make?

Mr. Cohen. Yes, sir.

Senator Hruska. And were any violations found?

Mr. Cohen. I don't have the statistics.

Senator HRUSKA. You don't have the statistics. You do have them on file, don't you?

Mr. COHEN. Yes, sir.

Senator HRUSKA. You keep such statistics?

Mr. COHEN. Yes, sir.

Senator HRUSKA. May I request that you furnish these statistics for the record of figures extending over the last 5 years or so and covering violations under section 902(c)?

Mr. COHEN. We will get you what we can; yes, sir.

(The information supplied for the record by Mr. Cohen was marked "Exhibit No. 11" and is as follows:)

EXHIBIT No. 11

[U.S. Government memorandum, Aug. 11, 1967]

To: Commissioner.

From: Director, Alcohol and Tobacco Tax Division.

Subject: Criminal cases arising from violations of section 2(c) of Federal Firearms Act (15 U.S.C. 902(c)).

It is understood that you have been asked to furnish information relative to section 2(c) violations for inclusion with your July 10 testimony before the Juvenile Delinquency Subcommittee of the Senate Judiciary Committee.

This Division does not categorize firearms cases by statutory sections in compiling violation statistics. Consequently, it is not possible to furnish data on the number of Federal Firearms Act Cases involving violations of section 2(c) which were prepared during the last five years.

It has been our experience that section 2(c) does not readily lend itself to the development of successful criminal cases. There are two basic reasons why this is true. In the first place, it has a very limited application. The prohibition on dealer shipment of guns to out-of-state buyers without state permits is applicable only if the buyer's state law requires a permit to purchase a gun. Only nine of the fifty states have such laws and only one of these nine requires permits for the purchase of rifles or shotguns.

Even as to the nine states where permits are required, our experience has demonstrated that section 2(c) is not likely to be violated. There are two ways by which its provisions may be easily avoided.

First, section 2(c) is most commonly circumvented by the simple expedient of going into another state, purchasing the weapon, and taking it home with you. There is no provision in the present law which precludes such a practice. The section 2(c) requirement imposes sanctions with respect to *shipment*, but does not preclude sale and delivery *over-the-counter* to a purchaser who will take the gun back with him into his home state, even though he could not buy it there without a permit.

Secondly, as you know, persons who hold Federal Fireams Act licenses are exempt from the state purchase-permit requirement of section 2(c). Many mail-order dealers seeking to avoid the section 2(c) provisions advertise that they sell handguns only to holders of Federal Fireams Act licenses. Others request customers to furnish their dealer license number. Influenced by these practices, many buyers obtain the $1.00 license in order to have guns shipped to them even though they are not actually engaged in the firearms business.

HAROLD A. SERR.

Senator KENNEDY. May I ask a question on that point?

Senator HRUSKA. Surely. I will be happy to yield.

Senator KENNEDY. Wouldn't it be very difficult to ascertain really how many violations there had really been of 902(c), because it is very difficult as I understand it, even under the present law, for the dealers to know who is sending in the various requests or applications for mail orders?

Mr. COHEN. That is correct, sir, and of course many of the dealers even suggest that the purchaser acquire a license so they avoid the whole requirement of the statute that the Senator quoted.

Senator KENNEDY. So even under the kind of survey that might be done, or even under effective enforcement procedures, unless you really, unless there was some means of arresting these people, perhaps for some other crime, you would have a very difficult time in ascertaining really if there has been such a violation?

Mr. COHEN. That is correct. For $1 a person can avoid, obviate the whole problem that Senator Hruska has raised here. If I have a license which I can get for $1 almost automatically, I can receive a gun through the mail without regard to the permit requirement.

Senator KENNEDY (continuing). That go through that procedure.

Mr. COHEN. It is obviated, sir.

Senator KENNEDY (continuing). That go through that procedure.

Mr. COHEN. Well, we figure that there are at least 25,000 people in the United States who have those licenses solely for the purpose of their own convenience.

Senator KENNEDY. But the point that I was reaching is even under the most effective kind of enforcement by your people, that it would seem to me extremely difficult for them, unless there was going to be some kind of at least arrest for some other crime, to really make a determination, an accurate determination of how much abuse there is, particularly under the respect given it of even the eight States——

Mr. COHEN. As you recognize, it is a most laborious process to try and determine crime this way, to go at it from this voluminous file, this tremendous record, to try to sift through 25,000, 50,000, whatever number of transactions there might be for the few criminal transactions that are within them. A law enforcement officer has got to have infinite patience to be able to go through this kind of thing.

Senator KENNEDY. As I understand it, you feel that with the consideration of the other, of someone, with modifications of the other amendments, that procedure would be vastly simplified?

Mr. COHEN. That would. Now, it is true that S. 1853 procedure here is better, is much better than we presently have. There is a clear identification, and there is a clear notification to local authorities that Mr. Doakes is the fellow who is buying this gun from out of State, and there is some method of identifying Mr. Doakes, and whether he is the type of person who is qualified, of age and so forth, in this State, so that any one of these bills, in this regard, is superior to present law.

Senator KENNEDY. I thank the Senator.

Chairman DODD. May I ask one question?

Senator HRUSKA. Surely.

Chairman DODD. Senator Kennedy has pointed out the difficulties are very great in this area, but in the area where an individual goes across the State line and buys a weapon in a neighboring State and then carries it back to his own State, there is almost no way of knowing, unless a crime is committed or something takes place.

Mr. COHEN. Likewise, Senator, the point is well taken in that there is no requirement today that when he goes across that State line, that

he identify himself in any particular way. When the seller asks him "your name" I could say my name is Joseph W. Barr, and the seller need not ask me for anything further. If I say it in a convincing fashion, that is good enough under today's law.

Senator HRUSKA. Under the pending bill, would that be sufficient to say that he had no reasonable cause to believe that you are not Joe Barr or Joe Doakes or anybody else?

Mr. COHEN. We would contemplate that under the pending bill that at least he would undergo those items that I mentioned before, that he would go through if he were cashing a check for Joseph W. Barr. He would want to see a driver's license or some other type; if he were a military person, a military I.D. card, some valid type of identification.

Senator HRUSKA. Of course there is a little diversional tactic in asking about the conviction of crime. My line of questioning had to do with a very simple easily detectable offense. Missouri requires a permit. There are dealer records which under present law the dealer has to keep, and if he doesn't he should get hauled into the courts and disciplined for that. You could segregate the orders that were shipped into Missouri. You could ask the dealer where are the permit numbers. It is a very simple thing. You couldn't find anything more simple than section 902(c) of the present Act, even the very highly meritorious Hruska act. I don't think you could find anything more simple. That is what I am asking about, not this nebulous thing of whether he had a conviction or whether he is a hoodlum or not. This is what I had in mind. You suggested it would be a very voluminous and laborious thing. That would hamper enforcement, wouldn't it?

Mr. COHEN. There is no requirement under present law that the dealer keep records as to how he ships guns. We don't know necessarily whether Mr. Joseph W. Barr or Mr. Joe Doakes got the weapon by mail, necessarily, unless the dealer happens to keep those records. The law does not require it.

Senator HRUSKA. There is no requirement for the keeping of any records?

Mr. COHEN. Not for the keeping of that specific record.

Senator HRUSKA. Is there anything to stop you in your regulations from asking for it? Do you ask for it in your regulations?

Mr. COHEN. I don't believe we do now, Senator.

Senator HRUSKA. Why not? Why not? It is so simple. He should have evidence that he complied with the law, and you could ask for it.

Mr. COHEN. A number of years ago I understand a regulations project of that nature was gotten up, and there was a great hue and cry from a number of people that this was leading to all of the horrors that many people say these bills will lead to.

Chairman DODD. Will the Senator yield?

Senator HRUSKA. Surely.

Chairman DODD. I missed the first part of your statement. Didn't your department ask for such a regulation in 1958?

Mr. COHEN. A number of years ago it was proposed. It was long before I arrived on the scene, sir.

Chairman DODD. And the people who are opposing Amendment 90 objected then and said this would be a terrible thing to do?

Mr. COHEN. That is right, sir.

Chairman DODD. And I think that is why you didn't get it.

Mr. COHEN. This is why we are asking for statutory confirmation of our authority to do these things.

Chairman DODD. I think that is the record, Senator Hruska.

Senator HRUSKA. It may be. Maybe they didn't protest enough.

Chairman DODD. Perhaps the others protested too much.

Senator HRUSKA. Maybe the other side protested too much, Mr. Chairman. Presumably, then, in the future we will have compounded many items like this. Because in either of the bills that are before us, there will be many more requirements for the dealer to comply with and to prove to your department that he has complied. If there is complaint now about the volume of this work in connection with this simple thing, how much will your complaint be, if you have many, many, many more requirements for the dealer to follow?

Mr. COHEN. Senator, we now require that a physician who prescribes narcotic drugs must keep valid records. He keeps them both for us and for the Department of Health, Education, and Welfare. We have little problem with physicians keeping those records. We have little problem with the disposition of the drugs insofar as the physician is concerned. This is not an unusual or an unnecessarily burdensome task. We are merely trying to provide for proper controls over potentially dangerous devices.

Every automobile in the United States is subject to some kind of licensing, a form of recordkeeping requirement, so we are not asking for anything that is inordinate or unusual. We are asking only the reasonable amount of controls that we think are necessary.

Now, you have every right, of course, to believe that we are asking for stringent controls that are beyond that which are necessary, and as I indicated, your bill is better than present law. My personal view is that the administration bill, as introduced by the chairman, is somewhat better, but I think we need something more definitive, where the rules are more spelled out than under a law enacted in 1938 which was not designed to cover society as it exists today.

Senator HRUSKA. Let's compare the two then. Comparisons are odious but maybe we can get into them. We almost have to. The Administration bill prohibits, makes it unlawful, let us say, for any dealer, to sell any firearm to an individual whom the dealer knows or has reasonable cause to believe does not have certain qualifications, either age or residence or the matter of whether or not he is a felon, and so on.

Now, tell us what is the dealer's way of showing under Amendment 90, that he has no reasonable cause to believe that the prospective buyer is not disqualified under that statute.

Mr. COHEN. He would fill out the prescribed information that would be required, and he would have identified the individual.

Senator HRUSKA. That would satisfy the Department?

Mr. COHEN. If he is a reputable dealer, and we will only have reputable dealers under the proper standards, then that is sufficient. Now, he is going to make a mistake.

Senator HRUSKA. I do not question the dealers and after you get through inspecting them and making them toe the mark and weed out those that are not dealers, I think they will be even better dealers than they have been heretofore, but not all of their buyers are reputable people, are they?

Mr. COHEN. No. It will be an offense for the purchaser to misrepresent to the dealer.

Senator HRUSKA. Oh, of course it will, and that will be great stuff, won't it. A man comes into Omaha from Alliance, Nebr.; he says he is from Alliance, Nebr., which is as far away from Omaha as Chicago is from Omaha. He will fill out the required forms and say "I am over 21; I live in Alliance, I am not a felon; I am a good guy and therefore I want to buy a gun."

Now, if this law applies to intrastate sales, and the dealer behind the counter would say "I believe you, mister."

Mr. COHEN. And he sees his driver's license and other identification?

Senator HRUSKA. Even so, he may be deceived. We cannot help it. We live in a world where we cannot design absolute controls, or foolproof systems.

Contrasted with that, we have a bill which says that the purchaser must file an application. He must fill in all these details, and he must send that application to the seller, who must send a copy of that application to the chief of police in the locality in which the prospective buyer lives. Now, then, I am a little mystified about your statement in the course of your testimony that this is a piecemeal thing.

Mr. COHEN. No, sir.

Senator HRUSKA. Whereas Amendment 90 is a much more complete and thorough thing.

Mr. COHEN. Excuse me. I applaud that aspect of your bill, sir. I think that is a fine——

Senator HRUSKA. Of course, you praised it faintly and then you damned it most viciously by saying it is piecemeal.

Mr. COHEN. No, sir. If you will permit me, I said that this aspect of it was affirmative and good. The part that disturbs me is that there are many provisions in your bill otherwise that are not——

Senator HRUSKA. I see.

Mr. COHEN. But on this provision, fine. I think that that system might be unduly burdensome on some people, but I am willing, I think it is a perfectly fine way to control this thing. It may be as good, it may be better. This is a question of judgment. That aspect of your bill I have no quarrel with at all, sir.

Senator KENNEDY. Could I ask, Senator Hruska, of course as I understand if it is an intrastate transaction, the Hruska provisions would not apply.

Senator HRUSKA. No.

Senator KENNEDY. Isn't that correct?

Senator HRUSKA. For the purpose of this question it was an interstate proposition. I will come to the intrastate after a while.

Mr. COHEN. It does apply to the extent that, under the Hruska provision, an Omaha dealer selling a handgun should satisfy himself that the buyer lives in Nebraska or he should get the required affidavit.

Senator HRUSKA. I think there is a little inconsistency on the part of these witnesses, at least a conflict.

Chairman DODD. Would it be satisfactory to the Senator from Nebraska if he wishes to go to another subject that the Senator from Massachusetts ask questions?

Senator HRUSKA. By all means. I haven't quite finished with that. The suggestion was made that this procedure of filing an affidavit in S. 1853 is burdensome. On whom is it burdensome?

Mr. COHEN. It is not burdensome on us, sir. We have no quarrel with it.

Senator HRUSKA. On whom would it be burdensome.

Mr. COHEN. The dealers or purchasers may find it somewhat more burdensome.

Senator HRUSKA. And the chief of police maybe.

Mr. COHEN. I have no idea whether——

Senator HRUSKA. He would have to enforce the law, wouldn't he? He would have to get out of his office and search the records or call up somebody that knows the buyer and say, "Do you know this guy and is he actually the guy?" He would have to enforce the law. He would be given a chance to apply and enforce the law that is either in a city ordinance or a State law, wouldn't he?

Mr. COHEN. As I say, we have no problem with that aspect of this bill at all.

Senator HRUSKA. I was hoping you would go just a little further and say this is superior to the proposition of pulling out a wornout driver's license and saying "I am all right, please sell me a gun." But I won't ask you that question.

Chairman DODD. Senator Kennedy?

Senator KENNEDY. Mr. Cohen, I first of all want to commend you and Mr. Barr on your statements. During the course of the time that I have been involved in the deliberations on this legislation, there have been a number of difficult questions that have been raised repeatedly. I think that your testimony, and certainly your responses to date, have been effective, and have been thoughtful, and have been extremely pertinent to the areas which I think there has been a good deal of confusion about, and I want to say how much I appreciate the responses which you have given, and the way that you have approached this problem, and the fact that your testimony has really directed itself to the principal areas of confusion. It has done a great deal, I believe, to eliminate some confusion.

I would like to just ask you a few questions in one area, because I know Senator Hruska has further questions, and then I would like to come back to some additional areas. The one area that I am concerned about now is on the question of importation of weapons and firearms and other devices.

I understand that you have a relationship, sort of a joint responsibility, with the Department of State, in that an importer makes application to the State Department, and the import license is granted to the applicant by State. Then after the weapons are introduced into this country, the Treasury assumes the responsibility.

I am just wondering whether, in the course of these events, the Treasury reviews the considerations for the importation of weapons?

Mr. COHEN. The licensing operation of the State Department is one which involves only our foreign affairs. They are not concerned with the domestic situation, so that their concern is merely what are our relationships in the foreign field with the country of import or export.

Senator KENNEDY. At some time do they not register this application with the Treasury?

Mr. COHEN. We may get a copy I believe, sir, if the importation is also subject to National Firearms Act controls.

Senator KENNEDY. You get a copy.

Mr. COHEN. All of the National Act weapons you see, such as a machinegun, a sawed-off shotgun, any of the sort of exotic types require Treasury permission to import, and we would coordinate with the Department of State on the importation.

Senator KENNEDY. Since the State Department is not charged with the responsibility as far as the internal workings or considerations in this country, what standards if any do you establish?

Mr. COHEN. On the importation?

Senator KENNEDY. On the importation.

Mr. COHEN. There are no standards set up in the Federal Firearms Act, and therefore, we can apply none, and as I indicated in my testimony, other than the National Act firearms of course, but if you are talking about these cheap little starter pistols that I mentioned that may be just as dangerous to the user as the victim, we have no way of restricting the influx of weapons of that nature.

Senator KENNEDY. Do you have any control over the person who is going to receive them in this country?

Mr. COHEN. He will usually be a licensee.

Senator KENNEDY. He will be a licensee. And does the Treasury investigate the background of the licensee?

Mr. COHEN. Yes, sir, to a very limited extent.

Senator KENNEDY. You do?

Mr. COHEN. To the extent the law justifies it. As I indicated, the 104,000 Federal Act licenses are issued pretty much on request, but our regulations provide that the District Director may make inquiry to establish the bona fides of the application. No formal investigation is made.

Senator KENNEDY. Once they come into the United States, they are out of the control of the State Department, is that correct?

Mr. COHEN. That is correct, sir.

Senator KENNEDY. And then you assume the prime responsibility, is that right, while these weapons are in this country?

Mr. COHEN. That is correct to the extent that the Federal Firearms Act is applicable.

Senator KENNEDY. To the extent that you do have a mandate. Now, these licensees have to indicate, as I understand it, on their application that the weapons are going to be used for particular purposes. They outline the kinds of purposes for which these imported weapons will be used, is that your understanding?

Mr. COHEN. Yes, sir. That is, I believe the importer indicates if the guns are for personal use or for resale in commercial channels.

Senator KENNEDY. Now, I would like to know whether you follow up to find out whether the weapons that are imported are actually used for those purposes?

Mr. COHEN. Well, we follow the same procedures we would follow on a weapon manufactured in the United States, that is we periodically

make inspections of the licensed importers as well as the manufacturers to make sure they are keeping the proper types of records. Their general assertion would be that these are sporting or target-type weapons, and that is the purposes generally for which they advertise them, so there is no violation inherent in that kind of activity.

Senator KENNEDY. I wrote the Secretary of State and asked him about these importations of weapons. I received a letter back on April 14 from Mr. Kitchen, and he gave me some information, comprehensive information. We have, for example, the International Armament Corp., of Alexandria, Va., which received a license in 1965. The purpose was the wholesale and retail distribution on the American civilian commercial market. In this order which was license No. 9231, they imported 150,000 long and short rifles with bayonets, and that is caliber 7.92—they imported 175,000 long and short rifles with bayonets, caliber 7. They imported 35,000 bayonets. They imported 98,000 steel helmets and 12,000 sabres.

I am just wondering—there are a good many other things they imported under that particular license. They say that the purpose is for the wholesale and retail distribution on the American civilian commercial market. What sort of investigative procedures do you follow to make a determination whether those and the 45,000 pistols that they imported are actually being used in these civilian markets and where these weapons are going?

Mr. COHEN. During our firearms inspection of those importers, they would determine that they are selling these, and this is the general practice that I am sure this company as well as many others by orders or shipment to other mail-order houses, this is the general disposition of that kind of weapon. They are of course sold to local dealers for local distribution, but most of those surplus military-type weapons are inexpensive and are disposed of in the mail-order trade.

As much as we might find it objectionable to our taste or to our feeling of what the law ought to be, there is nothing that we can do as long as they are directing it in the wholesale and retail trade in the United States.

Senator KENNEDY. This is only a part of the total rifles that have been imported between 1962 and 1966. The figures that were given me was 1,638,552 rifles, 600,000 pistols imported during that period of time, and 513,000 revolvers. I am just wondering from your own experience how effective, under the present legislation, how effective can the policing of these weapons be? Do we know where they go, how they are distributed in this country, whether they are actually used for sporting use or others? Can it be determined under the present legislation, and what you feel would be the effect under the legislation S. 1.

Mr. COHEN. Under the present legislation of course, there is virtually no control over this kind of weapon. Whether it ought to be imported is a question that is completely beyond the scope, whether it is of sufficient quality or character to even be used for sporting purposes is now completely beyond the scope of any inquiry that we can make.

Under the bills as proposed, the surplus military handgun would be prohibited. There is little or no use for these kinds of weapons in normal civilian purposes. The sporting kind of gun, the sporting gun

that is adaptable, that is designed or adaptable to sporting purposes is permissible and would be treated as if it were any other kind of gun manufactured in the United States subject to the same kind of restrictions and controls as S. 1 or S. 1, Amendment No. 90 which might have for domestically manufactured arms. Essentially the long guns would be distributable with a minimum of restrictions.

Senator KENNEDY. I suppose that the case is made that these weapons are used for targeting practice. I am not sure how familiar you are with these weapons. This is another license, No. 8361 assigned to the St. Hubert Co., in Waseca, Minn. They imported 1,700, 3.57 caliber revolvers, 1,600, 6.01 caliber, 1,700, 44 caliber revolvers. I understand that the missile that comes out is almost a half inch across.

Mr. COHEN. Those will blow a hole. Those are really not target shooting kinds of weapons, not unless you want to tear the target apart.

Senator KENNEDY. I am not going to trespass on the time of the committee. I would like to introduce copies of the various licenses that I have here, Mr. Chairman, and a copy of the letter from Mr. Kitchen at this point in the record.

Chairman DODD. Yes. I think that will be very helpful.

(The material referred to by Senator Kennedy was marked "Exhibit No. 12" and is as follows:)

EXHIBIT No. 12

DEPARTMENT OF STATE,
*Washington, April 14, 1967.*

Hon. EDWARD M. KENNEDY,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR KENNEDY: In response to your request for information during our meeting on April 12, I am forwarding herewith as enclosure 1 certain statistical data concerning numbers of pistols, revolvers, and rifles imported into the United States during the years 1962 through 1966.

Enclosure 2 outlines firearms import license data on the five largest import transactions for each of the calendar years 1963 through 1966.

We have telegraphically asked our Embassies at Brussels, Bonn, Madrid, London, Rome, and Rio de Janeiro to provide information on the import regulations obtaining in their countries. We are also examining the question of whether under Section 414 of the Mutual Security Act the Department of State could exercise stricter controls over firearms imports. We will provide information on these two matters as soon as possible.

Sincerely yours,

JEFFREY C. KITCHEN,
*Deputy Assistant Secretary for Politico-Military Affairs.*

Enclosures: (1) Statistical Data (1963–1966). (2) Import License Data (1963–1966).

[Enclosure 1]

APRIL 14, 1967.

RIFLES, PISTOLS, AND REVOLVERS IMPORTED TO THE UNITED STATES (1962–66)

The data compiled on the attached pages was collected from original import licenses returned to the Department of State by the Collectors of Customs. Such returns are made when the licenses expire or importation is completed, whichever occurs first. (A license is valid for a period of six months.) The back of each license is endorsed by the Collector of Customs to reflect importations made against the license.

The information reported for 1966 is subject to the qualification that there are some licenses issued in 1966 whose period of validity has not yet expired. Thus shipments could still be made against these licenses.

Rifles imported during 1962_____ 183,636
Pistols imported during 1962_____ 202,770
Revolvers imported during 1962_____ 35,158

Rifles imported during 1963_____ 424,085
Pistols imported during 1963_____ 142,159
Revolvers imported during 1963_____ 74,452

Rifles imported during 1964_____ 191,187
Pistols imported during 1964_____ 128,660
Revolvers imported during 1964_____ 45,981

Rifles imported during 1965_____ 729,392
Pistols imported during 1965_____ 258,876
Revolvers imported during 1965_____ 103,057

Rifles imported during 1966_____ 110,252
Pistols imported during 1966_____ 168,239
Revolvers imported during 1966_____ 254,938

Total rifles imported 1962–66_____ 1,638,552
Total pistols imported 1962–66_____ 900,704
Total revolvers imported 1962–66_____ 513,586

[Enclosure 2]

DEPARTMENT OF STATE,
*Washington, D.C.*

Subject: Major individual arms importations, 1963 licenses.

1. *Origin.*—Ministry of Defense, Rome, Italy.
*Consignee.*—Adam Consolidated Industries Inc., New York, N.Y.
License #6261 for:

Rifles Models 91 and 33—Cal. 6.6_____ 149,409
Rifles Model 41—Cal. 6.5_____ 69,478
Rifles Model 33—Cal. 7.33_____ 18,090
Muskets Model 33—Cal. 7.35_____ 12,415
Muskets Model 33—Cal. 6.5_____ 7,000

*Purpose.*—For resale as sporting rifles.
2. *Origin.*—Interarmco Industries, S. A., Geneva, Switzerland and Panama, R. P.
*Consignee.*—International Armament Corporation, Alexandria, Va.
License #6052 for:

German Walther P–38 Pistols, Cal. 9 mm_____ 1,000
German Mauser Pistols, Cal. 7.65 mm (.32)_____ 1,000
American rifles, M1903, Cal. 7.62 mm (.30)_____ 30,000
American rifles, M1917, Cal. 7.62 mm (.30)_____ 87,000

*Purpose.*—For resale to approved commercial and individual buyers.
3. *Origin.*—Oy Sako Ab, Riihimaki, Finland & Fabrique Nationale d'Armes de Guerre, Herstal-lex-Liege, Belgium.
*Consignee.*—Browning Industries, Inc., St. Louis, Missouri.
License #6757 for:

.222 Cal. Bolt Action Rifle_____ 1,100
.222 Cal. Bolt Action Rifle_____ 500
.22/250 Cal. Bolt Action Rifle_____ 250
.243 Cal. Bolt Action Rifle_____ 1,400
308 Cal. Bolt Action Rifle_____ 650

88                         FEDERAL FIREARMS ACT

*Purpose.*—For sale to retail sporting goods dealers.
4. *Origin.*—J. P. Sauer & Sohn, Echernforde, Germany.
*Consignee.*—Magnum Import Company, South Gate, California.
License #5639 for 2,500 Weatherby Mark V Rifles.
5. *Origin.*—Oy Sako Ab, Riihimarki, Finland.
*Consignee.*—Firearms International Corporation, Washington, D.C.
License #6041 for:

| | |
|---|---:|
| Sako Cal. 243 Rifles | 430 |
| Sako Cal. 222 Mag. Rifles | 55 |
| Sako Cal. 308 Rifles | 52 |
| Sako Cal. 338 Rifles | 36 |
| Sako Cal. 30/06 Rifles | 160 |
| Sako Cal. 300 Rifles | 16 |
| Sako Cal. 264 Rifles | 23 |
| Sako Cal. 222 Rifles | 120 |

*Purpose.*—For resale to Sporting Goods Dealers.

———

Subject: Major individual arms importations, 1964 licenses.
1. *Origin.*—Fabrique National d'Armes de Guerre, Herstal-lex-Liege, Belgium.
*Consignee.*—Browning Industries, Inc., St. Louis, Missouri.
License #7649 for:

| | |
|---|---:|
| .243 cal. Mausers | 91 |
| .308 cal. Mausers | 78 |
| .270 cal. Mausers | 455 |
| .30–06 cal. Mausers | 1,375 |
| .264 cal. Mausers | 905 |
| 7mm cal. Mausers | 1,021 |
| .300 H & H cal. Mausers | 140 |
| .338 cal. Mausers | 245 |
| .375 cal. Mausers | 58 |
| .458 cal. Mausers | 65 |
| .300 W. Mag. cal. Mausers | 548 |
| .308 Norma cal. Mausers | 56 |

*Purpose.*—For sale through Browning Arms Company to retail sporting goods dealers located throughout the US.
2. *Origin.*—Transalpina, S.A., Madrid, Spain.
*Consignee.*—International Armament Corp., Alexandria, Va.
License #8658 for 100,000 7.92mm cal. Mausers.
*Purpose.*—For sale within the U.S.
3. *Origin.*—Parker-Hale Limited, Bisley Works, Golden Hillock Road, Sparkbrook, Birmingham 11, England.
*Consignee.*—Pasadena Firearms Company, Inc., Pasadena, Calif.
License #7279 for 35,000 English SMLE No. 4 and No. 1 MK III Rifles, Caliber .303 British.
*Purpose.*—For sale to dealers and gunsmiths and for conversion to sporting rifles and subsequent sale to dealers.
4. *Origin.*—Interarmco Industries, S.A., Geneva, Switzerland, and Panama, R. P.
*Consignee.*—International Armament Corp., Alexandria, Va.
License #8185 for:

| | |
|---|---:|
| American rifles, M1903, cal. 7.62mm (.30) | 4,918 |
| American rifles, M1917, cal. 7.62mm (.30) | 5,036 |

*Purpose.*—For resale within the US.
5. *Origin.*—J. P. Sauer & Sohn Gegrundet 1751 In Suml, Koln-Niehi, Nesselrodestrabe 20, Western Germany.
*Consignee.*—Saint Hubert Company, Waseca, Minnesota.
License #8361 for:

| | |
|---|---:|
| .357 cal. revolvers | 1,700 |
| .401 cal. revolvers | 1,600 |
| .44 cal revolvers | 1,700 |

*Purpose.* - For resale to sporting goods stores and dealers.

FEDERAL FIREARMS ACT                    89

Subject: Major individual arms importations, 1965 licenses.

1. *Origin.*—Spanish Army, Madrid, Spain.
*Consignee.*—International Armament Corporation, Alexandria, Va.
License #9231 for:

| | |
|---|---:|
| Long & Short Rifles w/bayonets, cal. 7.92mm | 150,000 |
| Long & Short Rifles w/bayonets, cal. 7mm | 175,000 |
| Pistols | 45,331 |
| Long & Short Rifles & Carbines, cal. 6.5mm | 100,418 |
| Bayonets | 35,000 |
| Steel Helmets | 98,030 |
| Sabres | 12,694 |
| Cartridges, cal. 7mm | 23,391,000 |
| Cartridges, cal. 6.5mm | 1,750,000 |
| Cartridges, cal. 9mm | 40,000,000 |

*Purpose.*—Wholesale and retail distribution on the American Civilian commercial market.

2. *Origin.*—Fabrique Nationale d'Armes de Guerre, Herstal-lex-Liege, Belgium.
*Consignee.*—Browning Industries, Inc., St. Louis, Missouri.
License #00708 for:

| | |
|---|---:|
| .25 cal. Automatic Pistol (6.35mm) | 15,000 |
| .380 cal. Automate Pistol (9mm short) | 5,000 |
| 9mm cal. Automatic Pistol (9mm Parabellum) | 5,000 |
| .243 cal. Bolt Action Mauser | 50 |
| .308 cal. Bolt Action Mauser | 20 |
| .308 Norma cal. Bolt Action Mauser | 100 |

*Purpose.*—For resale to sporting goods dealers.

3. *Origin.*—Interarmco Industries, S.A. Panama City, Republic of Panama.
*Consignee.*—Interntaional Armament Corporation, Alexandria, Virginia.
License #01865 for:

| | |
|---|---:|
| Mauser type rifles, cal. 7.92mm | 50,000 |
| Rifles/carbines, cal. 6.5mm & 7.35mm | 10,000 |
| Mannlicher type rifles/carbines, cal. 8mm | 10,000 |
| Pistols of various types & calibers | 200 |
| Rounds of small arms ammunition, various calibers | 5,000,000 |

*Purpose.*—For sale on the American commercial market.

4. *Origin.*—Pietro Beretta, Gardone, Val Trompia, Italy.
Consignee.—Berben Corporation, New York, New York.
License #01722 for:

| | |
|---|---:|
| 25 cal. Jetfire automatic pistols | 2,000 |
| 22 cal. Minx M2 automatic pistols | 1,000 |
| 22 cal. Minx M4 automatic pistols | 400 |
| 22 LR cal. Jaguar 3½'' automatic pistols | 300 |
| 22 LR cal. Jaguar 6'' automatic pistols | 200 |
| 32 Cal. Puma automatic pistols | 600 |
| 380 cal. Cougar automatic pistols | 1,000 |
| 9MM cal. Brigadier automatic pistols | 50 |

*Purpose.*—Distribution to sporting goods dealers.

5. *Origin.*—Roehm Gmbh, Sontheim/Brenz, Germany.
*Consignee.*—Eig Cutlery, Inc., Miami, Florida.
License # 01655 for:

| | *Pieces* |
|---|---:|
| RG 10 Revolver Frame, Cal. .22 Short | 25,000 |
| RG 10 Cylinders, Cal. .22 Short | 25,000 |
| RG 10 Hammer | 25,000 |
| RG 10 Hammer Screw | 25,000 |

*Purpose.*—Resale to Federal Licensed Dealers.

90                    FEDERAL FIREARMS ACT

Subject: Major individual arms importations, 1966 licenses.
1. *Origin:* Fabrique Nationale d'Armes de Guerre, Herstal-lex-Liege, Belgium.
*Consignee:* Browning Arms Company, St. Louis, Missouri.
License #05360 for:

| | |
|---|---:|
| .243 cal. Mausers | 100 |
| .308 cal. Mausers | 150 |
| .22 cal. rifles | 53,000 |
| .25 cal. automatic pistols | 30,000 |
| .380 cal. automatic pistols | 6,000 |
| 9mm cal. automatic pistols | 9,000 |
| .32 cal. automatic pistols | 300 |
| .22 cal. automatic pistols | 15,000 |

*Purpose.*—For sale through Browning Arms Company to retail sporting goods dealers located throughout the U.S.
2. *Origin.*—Ministerio de la Defensa, Caracas, Venezuela.
*Consignee.*—Century Arms Company, St. Albans, Vermont.
License #03275 for:

| | |
|---|---:|
| 7mm cal. rifles, semiautomatic | 7,074 |
| 7mm cal. rifles | 30,614 |
| 7mm cal. carbine | 12,455 |
| 11.05mm cal. Mausers | 2,070 |
| 6 million plus rounds of ammunition—7, 9 & 11.05mm. | |

*Purpose.*—For hunting and sporting purposes.
3. *Origin.*—Star, Sonifacio Echeverria, Eibar, Spain.
*Consignee.*—Firearms International Corp., Washington, D.C.
License #03416 for:

| | |
|---|---:|
| .22 cal. pistols | 10,000 |
| .32 cal. pistols | 1,000 |
| .380 cal. pistols | 1,000 |
| 9mm cal. pistols | 500 |
| .45 cal. pistols | 700 |
| .380 cal. pistols (Starfire) | 2,000 |
| .25 cal. pistols | 1,000 |
| .22 cal. pistols (Lancer) | 1,000 |

*Purpose.*—For resale to sporting goods dealers.
4. *Origin.*—Luthy, Neuchatel, Switzerland.
*Consignee.*—International Armament Corp., Alexandria, Va.
License #05146 for:

| | |
|---|---:|
| 7.5mm Swiss Army rifles | 35,000 |
| 7.5mm Swiss Army carbines | 80,000 |
| Bayonets | 35,000 |

*Purpose.*—Sporting and collecting resale within the U.S.
5. *Origin.*—Gabilondo Y Cia., Vitoria. Spain.
*Consignee.*—Stoeger Arms Corp., South Hackensack, New Jersey.
License #05169 for:

| | |
|---|---:|
| .38 cal. revolvers | 60 |
| .22 cal. automatic pistols | 4,500 |
| .380 cal. automatic pistols | 1,000 |
| .32 cal. revolvers | 125 |
| .380 cal. pistols C III A | 345 |
| .380 cal. pistols CE III A | 175 |

*Purpose.*—For resale in the U.S.

Senator HRUSKA. Would the Senator yield on the point which he is now concerned with?

Senator KENNEDY. Yes.

Senator HRUSKA. You indicated, Mr. Cohen, that the destination or the actual use of these imports is unknown, and you have no way of tracking them?

Mr. COHEN. No, I didn't mean to imply that sir. I said that once they entered the United States, they are treated as if they were domestic manufacture, and the same kinds of records would be kept for these weapons as would be kept for domestically manufactured weapons.

Senator HRUSKA. Of course, we can get the guns of larger caliber out of the way right away, can't we?

Mr. COHEN. Yes.

Senator HRUSKA. No license for destructive devices has been granted for at least 2 years and maybe more they are not imported and that was accomplished under the authority of the Mutual Security Act. Doesn't the President have the power, if he feels that these or other guns should not be imported, to say they shall not be imported, period; isn't that true?

Mr. COHEN. I am not an expert on that act, but I have been informed——

Senator HRUSKA. Well, I understand that.

Mr. COHEN. I have been informed by the Attorney General that he feels there is not sufficient authority under that act to forbid all that should be forbidden.

Senator KENNEDY. Could I just on that point—would you support such a recommendation yourself?

Mr. COHEN. The restriction?

Senator KENNEDY. Yes, on these kinds of weapons that could not be clearly used for sporting weapons.

Mr. COHEN. Oh, we feel——

Chairman DODD. Bazookas.

Mr. COHEN. I personally feel very strongly when once we get beyond bazookas we get to the surplus military weapon, really, that is a travesty. People are trying to pass off junk on American citizens that is dangerous to user and potential victim, and it is just unconscionable.

Chairman DODD. Let me make an observation.

Mr. COHEN. I am talking about pistols now, not the long guns, some of which are adaptable to proper use.

Chairman DODD. We do have a witness from the Office of Munitions Control of the State Department who will probably be more helpful than we would expect you to be on this particular subject.

Senator HRUSKA. On the matter of being able to trace them and determine what is being done with them, there is no difference in that regard between pistols, revolvers, rifles and shotguns of domestic manufacture.

Mr. COHEN. No, I didn't indicate——

Senator HRUSKA. So the attribute of being an imported article in and of itself is another factor?

Mr. COHEN. Except for the quality.

Senator HRUSKA. Except for the quality?

Mr. COHEN. That is right.

Senator HRUSKA. Of course, some of these starter pistols are bad, but suppose a starter pistol was made in this country and was bad, would you go after them?

Mr. COHEN. I would hope that we would have some kind of authority. We have not had, to date we have not had that kind of experience.

Senator HRUSKA. A strange thing you know, on June 1, the *Shotgun News*, published in my native State, at Columbus, Nebr., we find advertisements for starter revolvers. Here is one that sells for $21.93, and here is another one which sells for $12.95 in blue, and if you want chrome it is $13.95. The second one which is cheaper is described as "Not an import. Built in Texas." Now I imagine that if we are going to get so awfully angry at imports because the are bad, we ought to get mad at domestic manufacturers because they are bad.

Mr. COHEN. Well, not all of the starter pistols, in fact most of the pistols and these go to fairly inexpensive ones manufactured in the United States are of sufficient expense, that they are usually of reasonably decent quality. I won't say they are first-rate quality always, but they are usually much better than these $2.94 or $3.95 things that are being imported, or $4.95.

Senator HRUSKA. Here is an import selling for $21.95 and this domestic job $12.95. Now, which is junk?

Mr. COHEN. I am not saying every one is of equal character. I am not an excellent judge of weapons. I turn you over to Mr. Barr who is my expert.

Chairman DODD. Have you finished on the question of imports?

Senator KENNEDY. Yes.

Chairman DODD. It has just been called to my attention that in 1965 I received a memorandum from the Department of Justice concerning the import provisions of what was then S. 1592. The memorandum says "The authority and responsibility to control the importation of implements of war under the Mutual Security Act which the President has delegated to the Secretary of State is dependent upon the furtherance of world peace and the security and foreign policies of the United States." It does not extend to the broad protection of the general welfare. However, the import provisions in S. 1592 are the same as in S. 1, Amendment 90, and do extend this broad protection. Thus they are necessary and do not represent a duplication of authority or responsibility as conferred by the Mutual Security Act.

I think that is important.

Mr. COHEN. That answers the Senator's question. Thank you very much, sir.

Chairman DODD. The President couldn't stop these imports as has been suggested under the Mutual Security Act, and unless we get this language into the new legislation, he still won't be able to do so; am I right about that?

Mr. COHEN. That is right, sir. That is my recollection.

Senator HRUSKA. Mr. Cohen, in your statement you have said among other things that "since the persons being federally licensed in the firearms business are engaging in interstate and foreign commerce, their firearms business activities may be federally registered."

I don't think too many people would quarrel with that. Now, what about the intrastate sales by these Federal licensees. Are they contemplated for coverage under Amendment 90, the administration bill?

Mr. COHEN. The licensee is bound by the Federal requirements. I believe there is a memorandum on file with the House committee from the General Counsel which indicates that once the Congress has determined that the control of interstate commerce in weapons is essential to the welfare of the citizens of the United States, then it follows that the Congress has the right to—it was filed also with this committee——

Senator HRUSKA. I am not talking about the right of Congress but whether this bill is intended to, and does provide for the controlling, and regulation of intrastate sales. For instance, a sale by Sears, Roebuck in Chicago, going to Alton, Ill. Is that controlled? Is that within the purview of that act?

Mr. COHEN. Yes, sir. There are differences. However, for example, Sears Roebuck, in Chicago, Ill., can receive an order from a resident of Springfield, Ill., for a weapon and can mail it to him. That is intrastate. There is no problem in mailing that weapon, or a resident of your State can write to a large commercial establishment in Omaha and receive the weapon by mail. It cannot cross State lines but it can within the jurisdiction.

Senator HRUSKA. Have you any difference or opinion with that, Mr. Barr?

Mr. COHEN. No, sir, Senator.

Senator HRUSKA. It is a pretty big loophole, isn't it?

Mr. BARR. No, sir.

Mr. COHEN. No, sir.

Mr. BARR. If you stop to consider the objective that we have here, and I keep getting back to it, we are not trying to clean up this whole area, sir, because as I have said, I think this is the third time, our objective is quite simple. It is to enable the States to perform the responsibility which has been given to them by the Constitution to protect their citizens. I don't think that is a loophole, sir. The States can take care of that themselves.

Senator HRUSKA. I see. Why can't they take care of these other aspects themselves?

Mr. BARR. Because the other aspects, sir, that we are addressing ourselves to are the interstate operations, where they cannot control them.

Senator HRUSKA. Precisely, precisely.

Mr. BARR. Yes.

Senator HRUSKA. Under S. 1853 we have a presale notification procedure, this is sent to the dealer in advance, and he must send a copy to the chief of police. You have praised that concept highly in the matter of the National Firearms Act and said it might be burdensome, "but this is where the responsibility clearly lies." I am reading from page 550 of your testimony in the House.

It is not a Federal responsibility but a local responsibility. It is rightly or wrongly we in this country have determined that police powers and the protection of the citizen in the main reside with state and local officers. That is the clear thrust of this bill. It might be burdensome on the local officer, but if a determination is to be made, it should be made on the local level.

Now, what I cannot get into my head is why is this good as a concept and philosophy in the case of the National Firearms Act, but no good for the purpose of controlling interstate sales by mail of handguns?

Mr. BARR. Senator, this administration would not object, and I think Mr. Cohen has made this clear, to the philosophy and the concept that you have expressed in the case of handguns. We believe that our concept is preferable, but Mr. Cohen has said, and I echo the statement, that your concept is a vast step forward and the administration would not object if the Congress saw fit to adopt it.

Senator HRUSKA. Well, getting back again to "reasonable cause," it is unlawful for a person who is under indictment or who has been convicted in any court of a felony, to buy a gun?

Mr. BARR. Yes, sir.

Senator HRUSKA. Now, how in the world can a purchaser satisfy the seller, over the counter, that he is free and clear from any felony conviction simply by showing his driver's license?

Mr. BARR. In that respect your proposal, in its limited area of applicability, may have some advantages over the administration's proposal. There is no question about it.

Senator HRUSKA. Would the seller under those circumstances have no reasonable cause, just the display of a driver's license, would he have then no reasonable cause to believe that the applicant was not a felon?

Mr. BARR. No, sir.

Senator HRUSKA. If that is all he did, and he later turned out to be a felon, could the dealer be prosecuted under S. 1, Amendment 90 if enacted into law?

Mr. BARR. Are you speaking now, sir, of the seller, the licensee?

Senator HRUSKA. Yes.

Mr. COHEN. If he took reasonable steps.

Mr. BARR. If he took reasonable steps.

Senator HRUSKA. Then it would be a reasonable and satisfactory step for a seller, in order to determine whether or not the applicant, the prospective buyer, is a felon or not, to ask to see his driver's license and that is all?

Mr. COHEN. He should take reasonable measures to keep informed.

Senator HRUSKA. All right. Now, what else can a dealer do?

Chairman DODD. Will the Senator yield?

Senator HRUSKA. Let me pursue this just a minute because they stop now with a driver's license. Do you want to add something more?

Mr. COHEN. No. I think that anyone in this business is in a position to keep informed on the local crime situation within his jurisdiction, and if he has, he will be aware of some of the people in this area.

Senator HRUSKA. Oh, Mr. Cohen, California is a thousand miles up and down. Redwood or Shasta is about a thousand miles from San Diego. How is he going to keep abreast of the crime situation under those circumstances? What else should he do?

Mr. COHEN. The local police likewise have access in their jurisdiction to the statement that he has made, and they can look at it and they can check out these people the same as they would if they had the affidavit.

Senator HRUSKA. Then you are adding something, aren't you, information from the police station?

Mr. COHEN. Well, the police, that is right. No, I didn't say he had to do that. I said that this is the job of the local police.

Senator HRUSKA. How would the local police in Shasta, Calif., a thousand miles from San Diego, handle this? Here we have a man in San Diego trying to buy a gun. He says, "I am a resident of Redlands. Here is my driver's license." Previously you said that is all the seller would be required to prove good faith and establish reasonable cause to believe he is qualified.

Mr. COHEN. That is what I said.

Senator HRUSKA. Now, what else?

Mr. COHEN. That is all. The rest is up to the local officials to coordinate the information which local police will get from observing the records of these——

Senator HRUSKA. How would the local officials know about him?

Mr. COHEN. If your purchase is being made in Redlands, the local police officers or the State police in Redlands have easy access to the records of Mr. Brown, the local gunsmith, and they can look at them and report to the other places in the State.

Senator HRUSKA. I know, they do, but here is a man buying a gun. Now, how does the local police learn about him? Is there an obligation by the storekeeper, in order to show that there is no reasonable cause for him to believe that the man is a felon. Is there a duty on the part of the storekeeper to call up the local police and say, "Will you get a hold of the chief of police in San Diego and tell me whether Joe Doakes is really living here and that he is really not a felon and that he is not a fugitive from justice," and so on? Does that duty rest upon him?

Mr. COHEN. Only if the potential purchaser was acting in such a way that it could cause a reasonable man to make that inquiry.

Senator HRUSKA. You mean with a furtive look in his eye maybe? How would he judge? One storekeeper might have great suspicion of me. Another might have great suspicion of you just because Mother Nature probably wasn't very kind at least to me in physiognomy, but how would he know. The furtive look in his eye, by his shiftiness, and then the guy who was the best actor, he would escape free?

Mr. COHEN. Senator, you are not going to get me to quarrel with you. I like your provision as far as it goes. I would like it better if it were applicable also to long guns, not just handguns?

Senator HRUSKA. You are advocating the administration bill and I want to know what it means. What does it take for a storekeeper to get away from the stigma, the burden of having reasonable cause in his determination that the purchaser is not a felon so that he can discharge the attaching responsibility? This is something you are advocating. Tell me how does it work?

Mr. BARR. Senator, may I ask a question at this juncture, sir?

Senator HRUSKA. Surely.

Mr. BARR. As I understand it, your bill does not go to sales within a State; is that correct, sir?

Senator HRUSKA. That is true.

Mr. BARR. That is true?

Senator HRUSKA. That is true.

Mr. BARR. Your bill goes only to interstate sales?

Senator HRUSKA. That is right.

Mr. BARR. So the issue between us here is which is the preferable method of approaching the problem of interstate sales. It is not the

issue—I have been a bit confused in this colloquy here—as to a sale in Redlands, Calif., to a resident of San Diego, Calif. That is not the issue; is it? Am I correct, sir?

Senator HRUSKA. I use that example. We could say Las Vegas to Redlands, Calif. Then it is in focus, isn't it?

Mr. BARR. Then it is in focus. I was confused by the intra and inter-state.

Chairman DODD. That was the point I wished to make.

Senator KENNEDY. Of course, it is of interest in California you don't do it anyway because there is a 72-hour waiting period.

Mr. BARR. Right. Right. I was not aware of that.

Senator HRUSKA. Well, that is fine. And what do they do during that waiting period, just sit around and stare at the application or what do they do?

Mr. COHEN. I am not familiar with California law, sir. I happen to be a District of Columbia lawyer.

Senator HRUSKA. That would be up to the proponents of this bill to tell us what a seller must do under these circumstances.

Mr. COHEN. In most States where there is a waiting period there is a State requirement, either a daily requirement for inspection or a daily requirement for reports.

Senator HRUSKA. Texas has no waiting period?

Mr. COHEN. That is right, sir.

Senator HRUSKA. Most States do not have waiting periods.

Senator KENNEDY. Can I ask just on this point here?

Senator HRUSKA. I haven't quite finished but go ahead. The Senator always sheds a lot of light by his questions and I know he will do it now.

Senator KENNEDY. As I understand it both from what you have mentioned here and what Mr. Barr has said, this area has been left particularly open so that you invite the States to establish what regulations they want to establish, and what procedures will be followed by the local personnel. Isn't that one of the reasons? And rather than to set firm procedures or standards by Federal legislation, it is my understanding that you are encouraging the States to make the kinds of requirements they want whether there be a time period to wait or procedures that will be met on the particular licensees?

Mr. COHEN. That is correct.

Senator KENNEDY. You are inviting them to work in partnership with this Federal legislation here, and you would expect under the provisions mentioned here that they would pursue a reasonable standard and a reasonable course of conduct, and as I am constantly reminded, reasonableness appears, I think, 1,032 times in Federal statutes and has been readily interpreted in the various courts?

Senator HRUSKA. Let me remind my good colleague that in criminal statutes a reasonable criteria and standard is not enough. A citizen is entitled to know what specific things he can do. What specific things he is barred from doing. And it is in this that the efficiency of any criminal law, in fact the constitutional requirements lie. That is the essence of it. If you are going to say well, under certain circumstances you have no reasonable cause to believe that this shifty character here a felon since he showed you this driver's license. He might have been a dope addict. He might have just been paroled from some prison. I am

surprised at the laxness with which S. 1—Amendment 90 this bill, Administration bill, is drawn in this connection. No effort to look up what Mr. Barr has referred to as being the real public policy in this country; namely, that the local authorities should be the one to enforce their laws. Under this procedure in the Administration bill, they get no chance at it. They have no notice that a gun is being sold to the prospective buyer. None. None, isn't that true?

Mr. COHEN. They have, as Mr. Barr pointed out—and I think Senator Kennedy ably pointed out—they have whatever requirements they wish to impose on their own residents. Likewise the Federal statute is primarily concerned with the transaction which crosses a State line.

Now, in the situation that you gave before, we can have that today with no possibility of convicting anyone today under the statute at least. We would have a clear violation of S. 1 or Amendment No. 90 by the purchaser in misrepresenting to the——

Senator HRUSKA. Yes; but in the meantime the gun is sold and the crime rate goes up again. According to the record almost every buyer that we talk about here seems to be one who goes out and shoots somebody. I hope that is not the idea in most people's minds because that is not true. But we still have this question. What does it take for a seller to escape the criminal penalty of $5,000 and a year or more in jail by selling a shotgun to a guy who comes to his shop. He must put himself in a position where he has no reasonable cause to believe that that man is a felon; and that he has reasonable cause to believe that he is a resident; that he is over 21, and all the other qualifications that that act requires of a gun buyer and they are tough ones.

Mr. COHEN. I think this is a standard that they are probably all living by, by their local requirements right now, sir.

Senator KENNEDY. Would it be possible to establish regulations under this legislation that would outline so that the license——

Mr. COHEN. I think we would have to outline these steps we would expect everyone to take.

Senator KENNEDY. You could actually do this, outline in regulations the course of conduct that would be expected.

Mr. COHEN. That is right. These dealers, do not deal in an isolated area. They deal every day with the police and they keep informed of local crime situations.

Senator KENNEDY. And we would expect you to do so; is that correct?

Senator HRUSKA. Is it being suggested that we would have Federal regulations with criminal sanctions for their violation? One of the greatest parts that Congress plays, any legislature, the legislature describes what a crime is and does not delegate that part to an executive or administrative agency. Almost anybody, any lawyer has access to a set of statutes. Not every lawyer has the current regulations of the numerous public bodies that range over the width and breadth of this land.

Mr. COHEN. You introduced yourself earlier in the day, sir, the copies of the regulations presently enforced.

Senator HRUSKA. Yes.

Mr. COHEN. Under the National and Federal acts.

Senator HRUSKA. Yes.

Mr. COHEN. There would be similar regulations which would spell out and define all of the terms in accordance with the intent of the Congress as expressed in either reports and legislative history. If the Congress chooses to define their terms very carefully, so much the better, and the administrator has that many fewer terms to worry about defining. But this is done every day in every kind of legislation imaginable.

Senator HRUSKA. It might be, but if I were a storekeeper and were selling guns, I would clamp down severely on sales. If I do, and if that is done by tens of thousands of dealers, all over America, and particularly in the sparsely settled places, people won't be able to buy shotguns and rifles the way they should be able to buy them. This goes beyond the realm of inconvenience or hardship. It would totally disqualify them and make it impossible for them to deal with that facility that the present conditions in America call for regarding the ownership and use of guns.

Mr. BARR. Senator, here again aren't we going to the interstate operations of business?

Senator HRUSKA. Interstate operations, yes.

Mr. BARR. That is correct. It would not affect the local hardware dealer who was selling to the farmer down the road.

Mr. COHEN. He knows the farmer down the road anyway, knows him very well.

Mr. BARR. That is correct, so as I say, I want to make it very clear that the difference between us here is which is the more efficacious. We are not going to debate that your proposal does not have merit, because it certainly does. The point I am making here is that we are dealing on an interstate issue, and I do not think we should exaggerate the importance of this issue in the local sale of shotguns and rifles.

Senator HRUSKA. Very well.

Mr. BARR. If I may be a bit personal, sir, I have hunted in your State, the State of the Senator from South Carolina, the State of the gentleman from Michigan who has just left. I have never bought a gun mail order in my life. I usually like to go down and look at them and pick them up and feel them. I hope to hunt and——

Senator HRUSKA. May I say that that comment simply says Mr. Barr is denying a great big undeniable American fact of life that has existed for 100 years. The mail order business extends all the way from mattresses to shingles and back again and goes into the millions of dollars worth of business. Now Mr. Barr has his own inclinations and preferences, but at the same time the mail order business is a big business, and firearms are legitimate articles of use.

Mr. BARR. We agree it is legitimate business.

Senator HRUSKA. One's personal preference doesn't apply here. Besides you do not live in Sundance, Wyo., or in Nebraska. There is some difference.

Mr. BARR. I have herded cattle in Newcastle, Wyo., sir, where the nearest store was 70 miles and I can remember riding in and buying a gun.

Senator HRUSKA. On horseback, perhaps?

Mr. BARR. No, sir, a pickup truck.

Chairman Dodd. With respect to those who have been convicted of certain crimes this is nothing new. I believe this has been in the law since 1938.

Mr. Barr. That is right, sir.

Mr. Cohen. The nature of the crime was changed in 1961.

Senator Hruska. We want to improve on the law. The witness previously stated the law is indefinite and vague and hard to enforce. We want to improve on it. Amendment 90 has one way to improve on it it is said and I don't think it has any.

Chairman Dodd. You have made a good point. Let me ask the witnesses what has been the experience with this provision since 1938? Do you know of any injustices that have been worked? Have there been any complaints?

Mr. Cohen. We have had no real problems that way, sir. The good gun dealer knows his customers. He knows the kind of people he is dealing with.

Senator Hruska. Mr. Cohen, you just got through telling us of the thousands of guns that are sold to nonresidents, and it makes all kinds of troubles for Massachusetts and Missouri and New Jersey and so on. Let me refer you to your statement. You just got through saying it is a big problem. Do you want to change that part of your statement?

Mr. Cohen. No, sir. Under present law such sales are not proscribed. I am talking about if we had the restrictions on the out-of-State purchase this should not be any problem of consequence.

Senator Hruska. The chairman asked whether you have had any trouble under present law?

Mr. Cohen. I said the good gun dealers, sir. We have some good and some bad in this country today.

Senator Hruska. Didn't you just get through testifying as to the thousands of guns just from Illinois alone?

Mr. Cohen. Yes, sir; and I also testified that there were no licensing standards under which we could control who the gun dealers were, whether they were people of ethical standards or not.

Senator Hruska. What did you do with those 479 instances mentioned on page 10 of your statement? You gave many other examples.

Mr. Cohen. There were no findings that the gun dealer had violated anything that he was required under the present statute to do, sir, in most of those cases. There were a few there that were.

Senator Hruska. In that regard is there any difference between present law and Amendment 90, the administration bill?

Mr. Cohen. In what regard, sir?

Senator Hruska. In the regard of determining whether the dealer has exercised good faith in trying to find out if a guy had a felony record?

Mr. Cohen. There is an additional requirement of his recordkeeping. He must be more complete in his recordkeeping, which was not the case under the old law, sir, which would give us a better indication of whether he was in good faith or not.

Senator Hruska. You had no trouble identifying 18,670 such instances.

100　　　　　　　　FEDERAL FIREARMS ACT

Mr. COHEN. There were many of those, thousands of those that were discarded because it was obvious that we could not follow them up, from our own knowledge.

Chairman DODD. Does the Senator from Nebraska have other questions?

Senator HRUSKA. I have many more.

Chairman DODD. We have a witness from out of State.

Senator THURMOND. Mr. Chairman, could I have just about 2 minutes?

Chairman DODD. Yes; of course.

Senator THURMOND. Mr. Chairman, I ask unanimous consent to put in the record a newsletter written by me on June 19, 1967, entitled "The Right To Bear Arms."

Chairman DODD. Yes; without objection that will be included.

(The document referred to was marked "Exhibit No. 13" and is as follows:)

EXHIBIT No. 13

[Vol. XIII, No. 23, June 19, 1967]

STROM THURMOND, U.S. SENATOR FROM SOUTH CAROLINA REPORTS TO THE PEOPLE ON THE RIGHT TO BEAR ARMS

The tempo of the demands for some type of gun legislation has been increasing this year. Rising crime rates have led to more heated argument about the need for gun control by the authorities, State or Federal. The debate today is whether the Federal Government should provide assistance for State laws on the subject, or set up substantive legislation of its own.

I believe, as I have indicated many times in the past, that Congress has no authority to prevent people from buying and owning firearms. The Second Amendment to the Constitution provides that "the right of the people to keep and bear Arms, shall not be infringed." These prohibitions are directed against the National Government, but not against the States. The people of each State, therefore, can regulate the sale of firearms without running afoul of the Constitution.

Most of the States have laws designed to prevent firearms from being sold to juveniles, insane persons and people with criminal records. The State laws vary in strictness and enforcement, according to the needs of each State. The New York law, for instance, requires that a person apply for and be granted a permit from the State as a prerequisite to purchasing or possessing a hand gun. In most States, however, control over gun sales is exercised by licensing the merchants who sell firearms, and by requiring the sellers to adhere to the law in order to keep their licenses.

In recent years, State laws governing the sale of firearms have been increasingly circumvented by mail order sales of weapons. Dealers in weapons located outside State boundaries often do not comply with State laws restricting sales. Guns have been sold through the mail to children, persons of unsound mind, and people with long criminal records. Some irresponsible mail order merchants sell with impunity to anyone who has the price, since they do not have to obtain a license in the State where the purchaser lives, and are beyond the reach of criminal laws of the State to which the gun is shipped.

The problem is easily solved without overstepping the safeguards of the Second Amendment. Congress has the power to regulate interstate commerce. Therefore, Congress can make it unlawful to ship firearms in interstate commerce unless the sale is consistent with the law of the State to which the weapon is shipped.

Congress should require the gun seller to obtain from the would-be purchaser a sworn statement that the buyer is not prevented by the law of his home State from purchasing the weapon. This should be coupled with a requirement that the seller, prior to shipping the weapon, send a copy of the sworn statement by registered mail to the chief law enforcement officer of the area in which the would-be purchaser lives. Failure to comply would be a Federal criminal offense.

Legislation of this type would protect the rights of the States and the rights of the people, without working an undue hardship on seller or buyer. In most States, the people feel strongly that law-abiding, sane adults should be permitted to own firearms. If the National Government prohibited the sale of firearms, law-abiding citizens would not obtain firearms, but lawbreakers would. Criminals do not hesitate to obtain firearms illegally. Moreover, they would know that a gun would provide them with a bigger advantage over a citizenry disarmed by law.

Congress should enact legislation to support the laws which the people of each State have passed according to their varying requirements. It is just as important, however, for Congress to obey the Constitutional mandate that protects the right of the people to keep and bear arms.

Sincerely,

STROM THURMOND.

Senator THURMOND. There are just two or three statements from this that I would like to emphasize at this time. The first is that Congress has no authority to prevent people from buying and owning firearms.

Next, that the people of each State can regulate the sale of firearms without running afoul of the Constitution.

The next is that the Congress has he power to regulate interstate commerce. Therefore Congress can make it unlawful to ship firearms in interstate comerce unless the sale is consistent with the law of the State in which the weapon is shipped. Therefore I suggest that Congress would require the gun seller to obtain from the would-be purchased the sworn statement that the buyer is not prevented by the law of his home State from purchasing the weapon.

This would be coupled with a requirement that the seller prior to shipping the weapon send a copy of the sworn statement by registered mail to the chief law enforcement officer of the area in which the would-be purchaser lives. Failure to comply would be a Federal criminal offense.

Now, legislation of this type would protect the rights of the states and the rights of the people, without working an undue hardship on the seller or the buyer. I am convinced that if the National Government prohibited the sale of firearms, the law-abiding citizens would not obtain firearms but the lawbreakers would. Criminals do not hesitate to obtain firearms illegally.

Moreover, they would know that a gun would provide them with a big advantage over a citizenry disarmed by law. It is my opinion that Congress should enact legislation to support the laws which the people of each State have passed according to their varying requirements, and I think it is important, just as important, for Congress to obey the constitutional mandate that protects the right of the people to keep and bear arms.

I just wanted to make those statements for the record to set out my position. I wish to thank you gentlemen for your statements here, and I feel that we could enact some legislation along the line indicated, that it would be helpful, but I feel that what has been advocated by the administration goes beyond the jurisdiction of the National Government, if we are going to observe the Constitution.

Thank you, Mr. Chairman.

Chairman DODD. Would it be acceptable to you, Mr. Commissioner and Mr. Secretary, if we interrupted your testimony? We have an official from out of State to whom I made a commitment that we

would get him away today. We may not be able to do that. By the way, as I understand it, the Judiciary Committee meeting for tomorrow morning has been canceled.

Senator HRUSKA. I am so told, because we have a meeting of the full committee.

Chairman DODD. Can we possibly meet here tomorrow morning?

Senator HRUSKA. Sure, as far as I am concerned.

Chairman DODD. Senator Thurmond, is it acceptable to you that we meet tomorrow morning?

Senator THURMOND. Yes.

Chairman DODD. Would that be acceptable to you?

Mr. BARR. Yes, sir.

Chairman DODD. Very well. Without objection then we will excuse you now and ask you to return tomorrow morning. We will now call Mr. Ludwig.

I thank you very much.

Mr. COHEN. Thank you, Senator.

Mr. BARR. Thank you.

Chairman DODD. Mr. Frederick J. Ludwig is the chief assistant district attorney of Queens County, N.Y. He is a lawyer, a graduate from the City College of New York Law School and Columbia University School of Law. He was a professor of law for several years. He was formerly a member of the New York Police Force. He is now retired from the New York City Police Force. As I said, he is the chief assistant district attorney for Queens County.

We are very interested and pleased that you were able to come, Mr. Ludwig.

## STATEMENT OF FREDERICK J. LUDWIG, CHIEF ASSISTANT DISTRICT ATTORNEY, QUEENS, LONG ISLAND, N.Y.

Mr. LUDWIG. Thank you, Mr. Chairman. I appear here on behalf of the Queens district attorney, Thomas J. Mackell, who is now in Europe with the New York State Attorneys Association, so I am now the acting district attorney of Queens and I am anxious to get back.

Chairman DODD. I know that.

Mr. LUDWIG. Because Queens has maybe twice as many people as some of the States that are represented at the table. May I begin, Mr. Chairman?

Chairman DODD. Oh, yes, go right ahead.

Mr. LUDWIG. Very briefly, I have submitted, as the committee rules require, an advance statement which I will cover.

Senator KENNEDY. Can I ask, will you talk about the Jamaica Rifle Club?

Mr. LUDWIG. I will talk about it as far as *Shepherd* v. *Maxwell*, the decision of the Supreme Court a year ago will permit me to. I am not allowed to discuss evidence, but within the ranges of the constitutional strictures of that decision I certainly will, Senator. Thank you.

One of the things the Federal Government could do is to refrain from aiding and abetting and supplying with arms persons who are engaged in criminal conspiracy. On two occasions out of three major investigations during the few months we have been in office since the first of the year, we have found that the Office of Civilian Marks-

manship of the U.S. Army has supplied on two occasions in three investigations their usual quota of rifles, eight all told, four .30-caliber, four .22-caliber. In the first investigation, the colonel in charge of that office actually came to our office to get the rifles back after they were seized, pursuant to search warrant, from one of the conspirators. In the second conspiracy, we find he has reissued the same quantity of rifles again.

Now, if the Federal Government does not wish to assist local State law enforcement by adopting stringent regulations on the interstate shipment of arms, the Government, whether it be executive or legislation policy, ought at least to refrain from supplying dangerous criminals with rifles and ammunition.

When I say dangerous, I am allowed to discuss what the charges in the most recent conspiracy, the one to which the Senator from Massachusetts refers, are. These charges involve 17 persons who are accused by a grand jury, in a unanimously found indictment in the county of Queens with conspiring to assassinate two named individuals. The indictment contains six overt acts which are spelled out, indicating that it wasn't just a general discussion to assassinate these persons, and one of those persons involved in that indictment was the donee and recipient of the munificence of the Office of Civilian Marksmanship.

Other charges are conspiracy to commit arson, advocacy of criminary anarchy, conspiracy to advocate criminal anarchy, permitting premises to be used for the advocacy of criminal anarchy, and possession of dangerous weapons under our New York Sullivan law in violation of that law, both as a felony and as a misdemeanor, 17 defendants involved. I cannot give you the evidence, but if the committee will retire into executive session, I shall be happy to exhibit to the committee members the documents which support these statements, knowing that none of these committee members will ever be jurors at the trial in Queens County.

The relationship, as stated in the prepared statement, between the incidence of violent crime and the easy availability of weapons actually used in its commission is so direct and so startling that I assume that the Federal Government will continue to ignore it. This year alone in a rather unprecedented move the President of the United States made three statements, three reports as a guide to the States, in combating what he considered to be the Nation's No. 1 domestic problem, the rise of violent crime in the United States. No other country in the world permits the easy availability of firearms as the United States does.

I myself went to the trouble of examining the Home Office statistics for England and Wales and compared them to the United States for the year 1962. What do those statistics show? They show that the rate per 100,000 population for homicide is eight times greater in the United States than it is in England, that the rate for robbery in the United States, using a weapon, is 10 times greater than it is in England, and that the rate for aggravated assault involving the use of a weapon is 17 times as great than in England.

Of course, you will say but they have crimes in England involving weapons, for example, that tremendous robbery where $2½ million

in currency was taken in August of 1963. That happened outside of London. Some 15 to 40 armed and masked individuals held up a train.

Also we heard recently all over the world about three policemen being shot down in London. But note that when three policemen were killed in England, it made worldwide headlines. At least 100 policemen are killed annually in the United States with little or no notice in the press.

The comparison of statistics between the major cities in the United States for the first 9 months clearly show that there is a positive correlation between the existence of stringent regulation on firearms, and the commission of violent crimes. By violent crimes I mean murder, nonnegligent manslaughter, aggravated assault, and robbery. We could add forcible rape, but just limiting it to those, the correlation is so direct and so positive not only between Houston and New York City for the first 9 months of 1966, the latest statistics for 1966 available, the full year's report should be out in a few days from the Federal Bureau of Investigation. Not only is the rate one-third lower in New York City, which has the so-called notorious Sullivan law than it is in Houston, which has virtually no restriction whatsoever on a State-wide source or even from local ordinance on possession of firearms, but in comparison with every other city in the United States of major proportion.

Now, just as a matter of orientation and not statistics, because in any statistical showdown, this correlation is bound to come out, not only comparing England and the United States and one city with another in the United States, but on any basis that you want to put it, it will always show, and it stands to reason, because the latest uniform crime report of the FBI shows that 57 percent of the criminal homicides in the United States are committed with firearms. When the FBI 3 years ago in these uniform crime reports first used that figure, it was only 54.5 percent. It has gone up, and it is natural that it would, because a firearm is a logical weapon to dispose of a human being with. It does the job well and conveniently.

Now, of course, the responsibility for criminal law and criminal law enforcement rests with the States under our Constitution. The Federal Government is one of delegated power. But it has power in three areas, two of them major ones. It has the power to tax and it has the power to regulate interstate and foreign commerce. The most formidable of those two powers is the power to tax. When the Federal Government decided finally to do something about crime after the roaring twenties, in 1934 it enacted the National Firearms Act, under pressure from the National Rifle Association the most commonly used weapon in organized crime; namely, the pistol, revolver, and automatic, were deleted in a subsequent draft of the National Firearms Act. The National Firearms Act is a taxing measure. It seeks to control firearms the same way the Harrison Act seeks to control narcotics, the same way your bookmaker tax and gambling tax seeks to control gambling activity in the United States, by placing a steep annual tax.

The advantage of the use of that taxing power by Congress is that we need not concern ourselves with State boundaries. Many variations of that taxing power have enabled the Federal Government to take leadership. For example, in the field of social security, which is a matter of State concern, in the field of agriculture, which really is

not interstate commerce, the Federal Government has been able, and the Supreme Court has sustained those carefully drafted efforts, whereby they have said that they will remit a tax to the State, or unless the State adopts such and such a proposal, then a Federal tax must be paid.

Now, in two sentences one statute could be enacted which would require the payment of that Federal tax, unless the State registered all dangerous weapons, a very simple proposal. I might point out here, however, and this concerns one of the bills that is being considered by this committee, that constitutionally under article 1 that bill would have to originate in the House of Representatives. I believe one of the bills, one of the three bills under consideration here this afternoon deals with the National Firearms Act and taxation, and I think is, on its face, unconstitutional.

Now, when the Federal Government moved in, they limited themselves under this broad taxing power just to the sensational weapon of organized warfare, the silencer, the sawed-off shotgun carried in a violin case, and the machinegun. They left out the most commonly used pistols and revolvers and rifles and shotguns.

In 1938, with the Federal Firearms Act, the Federal Government adopted a realistic definition of what a firearm is. It included even ammunition under its definition of a firearm.

Now one of the advantages of the present S. 1 Amendment 90 is that it incorporates one of the powers exercised, and often little noticed power of Congress, exercised back in 1927 under the postal power. That is title 18, section 1715 of the Federal statute, and under that statute, mailing of pistols and revolvers is flatly prohibited with certain exceptions—the military, certain peace officers, and so on.

It seems to me that this Amendment 90, insofar as it deals with handguns, is only perpetuating the spirit of title 18, section 1715. In other words, it prohibits the order by mail of guns that back in 1927 the Congress of the United States said could not be shipped. Today under present law it is possible to order by mail and have shipped by express those handguns and revolvers.

Not to take too much of the committee's time, I just want to comment on one or two points which I am sure this committee has listened to many times before. First, the tired argument about constitutionality and the right to bear arms.

I have never heard anyone who advocated that it is unconstitutional to take away a person's right to bear arms or require him to register the weapon or require him to be licensed, who did not omit the first 12 words of the second amendment of the Constitution of the United States; namely, the existence of a well-regulated militia being necessary to a free state. Those 12 words, "* * * the right of the people to keep and bear arms, shall not be infringed" or taken away, to keep and bear arms.

Always they eliminate those first 12 words before the paragraph and naturally our judiciary has said that the right to keep and bear arms is a collective right to be exercised under well regulated military supervision.

Besides, the second amendment has never been held by the Supreme Court to have any application whatsoever to State regulations. It is a limitation on the power of Congress alone. But as a limitation, bear in mind the first 12 qualifying words of that amendment.

The point I would like to close with, and then you may ask me whatever questions you wish. Show me a man who is unwilling to have his gun registered and I will show you a man who should not have a gun. It may be inconvenient to get a permit to have a gun. I am proud of the fact I have a pistol permit in New York City. This, at least, certifies with my photograph on it, and it must be renewed each year and I must pay $20 for it when it is first issued, it shows first that I have never been convicted of a felony nor have I ever been convicted anywhere of any of the misdemeanors or offenses listed in a certain statute in New York State which indicate habitual criminality, like possession of narcotics, possession of burglar tools, and the like, and I am glad to exhibit it. It is a more important indication of my standing vis-a-vis law enforcement than the possession of a driver's license or a certificate of ownership of an automobile.

I will answer any questions you wish to ask.

(The prepared statement of Mr. Ludwig follows:)

PREPARED STATEMENT OF FREDERICK J. LUDWIG ON BEHALF OF QUEENS DISTRICT ATTORNEY THOMAS J. MACKELL

The relationship between the incidence of violent crime and the easy availability of weapons actually used in its commission is so direct and so startling that I assume that Congress and most of our State legislatures will continue to ignore it. A principal factor in this legislative obliviousness, of course, is the National Rifle Association.

Consider crime statistics for our ten largest cities for the first nine months of 1966, the most up to date comparative data available. The homicide rate per 100,000 in New York City (5.9) is just about one-third the rate in Houston (16.7). The New York City rate is less than one-half that of Washington, D.C. (14.3) and Baltimore (14.3). Cleveland (11.0), Chicago (10.3), Detroit (9.2), and the average rate for nine such cities, other than New York, is (11.0).

Why these enormous variations among cities of the same country, each characterized by mass urbanization of millions of Americans? One important reason is the enormous variation in laws governing weapons.

Under the weapons laws of Texas, possession of a rifle or shotgun is denied to no one, regardless of his background. Possession of pistols and revolvers is not licensed. Under general prohibitory statutes, any one, regardless of his background, may lawfully possess a pistol or revolver in his home. Away from his home, any one may openly carry a pistol or revolver regardless of his background. To violate the weapons laws of Texas, the defendant must (i) carry concealed (ii) away from his home (iii) a pistol or revolver; (iv) have been convicted of a felony (v) involving a crime of violence, and (vi) the particular act of violence must have been committed, not with *any* weapon, but a firearm. Small wonder that Texas provided the locale for the assassination of President Kennedy in November 1963, and the sniper who slew fifteen persons from the campus tower in Austin, Texas on August 1, 1966.

On the other hand, New York, with one-third the homicide rate of the largest city in Texas, has the so-called Sullivan Law, which requires a license to possess a hand gun in one's home or place of business. Only one other State has such realistic regulation of hand guns (Hawaii) and its homicide rate per 100,000 inhabitants (1.7) is one of the lowest anywhere. Actually that rate for Hawaii is almost four times less than the rate for Alaska (6.5), our other new State. Like Texas, Alaska has no laws governing possession of weapons. The much maligned Sullivan Law of New York, which was revised to eliminate contradictions and absurdities in 1963 by me as Legislative Counsel was held up as a model to be emulated by other States by President Johnson in his special message to Congress on Crime February 6, 1967. Legislation controlling firearms, said President Johnson, "will gain added strength as states pass firearms legislation and licensing laws similar to the Sullivan Law."

No large civilized nation in the world presents our macabre picture of violence wreaked with weapons. One study by me compared the incidence of violent crime in England and Wales which have strict regulation of weapons with the United States. In 1962, the homicide rate per 100,000 inhabitants in the United States

(4.5) was more than eight times that of England (0.56), the rate for robbery in the United States (51.3) more than ten times that of England (5.0), and the rate for aggravated assault in the United States (75.1) more than seventeen times that of England (4.3). On the other hand, for non-violent crime, the difference in rate between the two countries is not only not as great, but also shows greater incidence in England. For example, larceny, other than petty larceny and that involving motor vehicles, actually occurs almost three times less frequently in the United States (290.5) than in England (848.8).

To prevent crimes of violence before they can occur means that almost ten thousand slain in 1965—not in Vietnam, but in the United States—might well be with us today; that almost 150,000 seriously maimed Americans—again in our streets, homes and shops—would have no wounds from last year to heal; and that more than a hundred thousand Americans deprived of their possessions at weapon-point in 1965, would not be dispossessed today. Turning the clock back only to 1900, the beginning of the illusion of progress of our Twentieth Century, the death rate of Americans just from a single weapon alone—firearms—exceeds 750,000. In all of our wars, from the first shot of the American Revolution to the latest casualty toll in Vietnam, only 530,000 American servicemen have been killed in the line of duty.

The Almighty God, Giver of life, did not make man a killer. Jaws, claws and venom have never been provided him by Divine Providence. Compared with lions, tigers, wolves and snakes, man is a puny creature endowed only with his opposable thumb and frequently inaccurate means of communication with his fellow creature. The invention of weapons by man himself—first useful only to make his survival assured against competing carnivores—has made man the world's greatest killer of his own biological genus and species. Incidentally, man alone—with the opprobrious exception of the rat—annihilates his brethren; somehow Divine Providence prevents other mammalians from devouring their own despite His endowment of jaws, claws and venom.

No one seriously interested in the advancement of the common good can ignore the distinction between the measures taken by the British Parliament and those by the Congress of the United States with respect to firearms and weapons. Weapons statutes in England date from 1328 when the Statute of Northumberland (2 Edw. III c. 3) was enacted. Under this statute, which is still in force, anyone appearing before the King's justices or ministers, with force and arms, or going armed by night or day in any fair, market or elsewhere in such manner as to terrify the king's subjects, or bringing force "in affray of the peace" is guilty of a misdemeanor. Exempted are the king's servants, ministers and those assisting them in the execution of their duties. Since the Gun License Act of 1870, possession of firearms has been controlled by licensing. Under its most recent revision, the Firearms Act of 1937 (1 Edw. VIII & Geo. VI, c. 12), "no person shall purchase, acquire or have in his possession any firearm or ammunition to which this Part of the Act applies unless he holds a firearms certificate in force at the time" (*id.* Pt. I. § (1)). "The certificate shall be granted by the chief officer of police if he is satisfied that the applicant has a good reason for purchasing, acquiring, or having in his possession the firearm or ammunition in respect of which the application is made, and can be permitted to have in his possession that firearm or ammunition without danger to the public safety or to the peace" (*id.* § 2(2)). The certificate may be revoked if "the chief officer is satisfied that the holder is prohibited by this Act from possessing a firearm to which this Part of the Act applies, or is of intemperate habits or unsound mind or is otherwise unfitted to be entrusted with such a firearm" (*id.*, § 1(7)(a)).

Unlike the British Parliament and the States of the United States which have residual and inherent power, the capability of Congress to act in domestic affairs is limited to powers delegated by the Constitution. So far as control of weapons is concerned, two of these powers are important: the power to regulate interstate and foreign commerce and the power to tax. The most formidable of these powers is the power to tax. Consideration of State boundaries does not effect its exercise; it may be used to operate on purely local and intrastate situations in the control of crime. The fact that the effect of a given tax, *e.g.*, on narcotics, or on bookmakers and wagers, is primarily regulatory and only incidentally productive of revenue, does not invalidate it. Moreover, by the power to tax Congress can coerce minimal uniform State legislation in intrastate situations, *e.g.*, social security and agriculture. By its power to tax, Congress could accomplish overnight in the weapons field what uniform State legis-

lation—at the present rate of acceptance—cannot dream of achieving until the third millenium.

When at long last in 1934, the roaring twenties roused Congress to the reality of gangster warfare and organized crime, the taxing power was invoked in the National Firearms Act (26 U.S.C. §§ 2720–2733, 3260–3266). Pistols and revolvers—included in the original draft of the bill—were deleted from its final version. Only the most sensational weapons of gang warfare—machine guns, firearm silencers and sawed-off shotguns—were included. For such "firearms"— excluding pistols, revolvers, automatics, rifles and shotguns above a minimal barrel length—a steep annual tax on manufacturers ($500), pawnbrokers ($300), dealers and anyone transferring such guns ($200) was imposed (26 U.S.C. § 2720, 3260). Yet in 1927, when Congress exercised the more limited postal power, pistols and revolvers were declared non-mailable (18 U.S.C. § 1715). When Congress resorted to the commerce power in 1938 (Federal Firearms Act, 15 U.S.C. § 901–909), the term "firearm" was broadly defined to include "any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon" (15 U.S.C. § 901(3)), as well as pistol and revolver ammunition (15 U.S.C. § 901(7)). This act, however, does no more than require a license—annually issued for one dollar with blind automaticity— to manufacturers and dealers, and generally prohibits with no implementation shipment to convicts, fugitives and persons under indictment.

The utter impotency of the Federal Firearms Act is best demonstrated by the fact that in almost thirty-years of its existence, *not a single conviction has ever been obtained under Sec 2(c) of the act.* Principally, this is because of the requirement of proof of knowledge on the part of the defendant that the purchaser of a weapon in interstate commerce is a convicted or indicted felon.

Recent developments on the American scene raise serious questions about Federal legislative policy with respect to weapons. The District Attorney of Queens County in New York, second largest in population in the State and about sixth largest in the nation, in just the past few months, has unearthed these startling facts about Federal policy on weapons:

> (1) Far from a position of neutrality under toothless statutes, the Federal Government has been an active supplier of weapons to persons who require their use to execute conspiracies made felonious under State law.
> (2) The weapons and ammunition gratuitously supplied are to conspirators involved in criminal activity that challenges the sovereignty of government itself.

The supply of these weapons and ammunition has been freely made by the office of the Director of Civilian Marksmanship of the Department of the Army. The recipients—affiliated for this purpose with some gun or rifle club approved by the National Rifle Association—have been indicted by State grand juries for such crimes as conspiracy to commit murder, arson, the advocacy of criminal anarchy, as well as substantive crimes under State law, such as the possession of rifles with intent to use them unlawfully.

Is it too much for State law enforcement to ask that the Federal Government in whatever branch—Executive or Legislative—at least refrain from the direct donation of weapons and ammunition to persons engaged in felonious conspiracies that threaten life, property and even the idea of government itself?

Chairman DODD. I have read your statement and I am sure other members of the committee have. It is certainly a very interesting one. You have had a unique experience, and you have certainly had a chance to observe the situation not only in your own State but across the country.

I don't want to delay other members of the committee, but we have heard a great deal about the Sullivan law.

Mr. LUDWIG. I happen to be, Senator, the author of the Sullivan law in its present form. I was chief counsel to the Joint Legislative Committee of the State Legislature in New York.

Chairman DODD. I know that.

Mr. LUDWIG. From 1961 to 1964, under Republican auspices I may say.

Chairman Dodd. We won't hold that against you.

Mr. Ludwig. We recodified the diverse provisions of the Sullivan law that had been scattered all through the penal law. One of the first problems we came up against is the point that was made by Senator Hruska earlier in questioning the witnesses. Some of the people said that it was good to have the law confused and vague because then it would be unenforceable; and since they wanted no law regulating weapons, they wanted the present condition of the New York law, which had been amended 670 times since 1911, and which nobody quite knew what it meant because there were contradictory provisions, overlapping provisions, inconsistent provisions, and so forth. We were able finally to get it done. We had to sit down with the NRA, but they were not able to cause us to weaken the strength of the Sullivan law.

Now the strength of the Sullivan law lies in this—that possession of a handgun, possession of a handgun, regardless of whether you are ever going to carry it or not, regardless of whether you are going to keep it in your home or in your place of business or in your own property requires a permit from the authorities, judicial or police, depending on what county you are in in New York.

Only one other State in the United States has a similar provision, and that is the State of Hawaii, our new State; and by the way, Hawaii has a very low homicide rate compared with Alaska, and both were admitted at practically the same time to the United States. Alaska, incidentally, has no weapons laws whatsoever.

Chairman Dodd. I think Hawaii has one of the best records.

Mr. Ludwig. Hawaii has a low homicide rate. If you are interested, I happen to have it here.

Chairman Dodd. I take it that it is unnecessary to say that you think the Sullivan law is effective as a deterrent to the commission of crimes with guns?

Mr. Ludwig. Unquestionably we could not maintain government in the city of New York for 1 week if there weren't a Sullivan law.

Chairman Dodd. Are you able to tell us, are there substantial numbers of crimes committed with guns that were obtained outside of the State of New York?

Mr. Ludwig. We have on our calendar many such cases that have not been tried, and I will ask your indulgence, Senator, to permit me to refer to a case where I acted as defense counsel, and which has since been disposed of. I was acting on the other side just one year ago.

This was a woman who shot and killed her husband while he was lying in bed watching television one afternoon. There was a long history of family discord, and no doubt the woman had over this long period been provoked. But the gun she used to kill her husband was in a shopping bag right by the bed, and in the course of a heated argument, she reached into the bag, pulled the gun out, and fired and shot him right through the heart, while he was lying in bed watching television. It is hard to make out a case of self-defense or anything else.

Where did that gun come from? That gun was brought by her husband, who was a taxi driver in New York City, from Georgia, where he bought it with no questions asked, along with three or four

110                     FEDERAL FIREARMS ACT

others, and brought it back and kept it loaded in his household, in violation of the New York weapons law.

Now you say, well you don't enforce the New York weapons law. We can't get a warrant to break into somebody's house without probable cause to search it for weapons, and we have no probable cause to look for it. So in that case, had that gun not been there, undoubtedly these quarrels would have continued. Possibly physical harm of one kind or another would have been inflicted on husband or wife. But the presence and ready availability of that gun, coupled with the inclination of this woman, this long-simmering inclination to do something about the maltreatment her husband was giving her undoubtedly was the cause, the effective cause of this crime. The indictment was for murder in the first degree.

Chairman DODD. This is a very interesting case and I am sure it is typical. However, have you or have you not found that many crimes committed with guns in your State are guns obtained outside your State?

Mr. LUDWIG. Yes, that had been my experience when I commanded the citywide juvenile aid bureau for three and a half years.

Chairman DODD. All right. What information do you have with regard to the misuse of rifles and shotguns? In New York you have a strong law with respect to concealable weapons. Do you have any information about the abuse or misuse of long guns?

Mr. LUDWIG. Rifles and shotguns are frequently used in the commission of homicides, because of the general awareness in New York State of the unlawfulness of the possession of a hand gun without a permit, which is not easily obtained. A large number of homicides are committed.

Chairman DODD. I want to be sure I understand you. Are they committed in the course of crime, that is as distinguished from the crime of passion? A fellow has a shotgun in his hand and he is angry at his wife or somebody else, and just picks it up and fires away. That would be one set of circumstances which I think we all understand.

But is it true or is it not true that because of the strict law on handguns, you have any substantial increase in the misuse of long guns in the commission of crime?

Mr. LUDWIG. I have no statistics on any change between past use and present use, but I would imagine that that inference can easily be made. Just to illustrate the point——

Chairman DODD. I don't wish to draw any inference. Do you think there would be any way we could find out?

Mr. LUDWIG. It is quite difficult, and maybe this one case I will give you will show how difficult it is. I just finished arguing in the highest court of the State the case called *People* v. *Mosley*. That was the man who killed a girl named Kitty Genovese while 38 people looked on and failed to call the police. It gained a little bit of attention in the newspapers. The court of appeals confirmed his conviction but took off the death penalty.

This defendant in the course of his trial took the witness stand and readily admitted killing this woman. He also testified and told the police that he killed another woman whose body was known to the police, and who was buried in South Carolina.

The medical examiner in New York, who performed an autopsy on this victim that died 13 days before the one for which he was convicted, reported that she died of stab wounds, but the defendant insisted that he shot her six times in the stomach with a .22 rifle. He insisted so vehemently that finally an order was obtained to exhume the ody in South Carolina where it was buried, where it was X-rayed, and another autopsy performed, and those six rifle bullets taken from the body.

So sometimes it is difficult to say what the cause of death is except that is was caused permanently. But the use of rifles is a very common thing by criminals, other than in crimes of passion—I mean persons that go out deliberately to commit a crime, and that has been my experience.

Chairman Dodd. Do you know whether there has ever been any attempt made in New York State to get some better control over long guns?

Mr. Ludwig. Yes. The very day that President Kennedy was assasinated—and I will never forget it, November 22, 1963—our committee, our joint legislative committee, was holding a meeting at 270 Broadway. In fact, the press were there at the time, and we immediately suspended the meeting. We wanted to announce what we proposed to do in the coming legislature.

We had already recodified our Sullivan law. Now there was a great deal of pressure to do something about rifles and shotguns. These four things are all that New York did, and they adopted a few placebos.

Chairman Dodd. What?

Mr. Ludwig. Toothless placebos, Senator, toothless placebos. We prohibit the possession of a rifle or shotgun to a youngster under 16, by law. We prohibit it to an alien. Now the toothless placebo that we adopted was to prohibit the possession of a shotgun or weapon to anyone convicted of a felony or a misdemeanor under section 552 of our Code of Criminal Procedure, those misdemeanors and offenses that indicate habitual criminality—possessss burglar tools, possession of narcotics, misdemeanors, and so forth. We also said a person who has been judged mentally incompetent, judicially, if the police come and demand his rifle or shotgun from him then it is a misdemeanor if he fails to surrender it.

I say these are toothless placebos because without registration of rifles and shotguns, how do we know that a person adjudicated a mental incompetent can or cannot, does or does not possess a rifle or shotgun?

The same is true, how do we know whether a person convicted of a felony or one of those serious misdemeanors or offenses does or does not possess a rifle or shotgun? How do we know whether an alien possesses a rifle or shotgun, and finally, how do we know whether a 16-year-old or a 15-year-old boy possesses a rifle or shotgun?

Without registration there is no hope of any enforcement. Bear in mind we have no right to stop any citizen and search him without a warrant, and we have no right to obtain a warrant, unless we have probable cause, based upon a sworn affidavit. That is the fourth amendment of our Constitution, and it applies directly to the States.

Chairman Dodd. Senator Hart, do you have any questions?

Senator Hart. No.

Chairman Dodd. Senator Kennedy.

112            FEDERAL FIREARMS ACT

Senator KENNEDY. It has been suggested that the Sullivan law has been effective in the State, and yet there hasn't been a reduction of crime in New York State, and some have suggested that, therefore, the fact that you do have a State law doesn't achieve the aims which you have outlined here this morning, that is, a greater restraint on the utilization of handguns in the commission of crime. Would you comment on that.

Mr. LUDWIG. Yes, I would say so far from there being no decrease in crime, there has actually been an increase in crime in New York.

Senator KENNEDY. That is right.

Mr. LUDWIG. But it is the same argument, it would be the same argument as if you wanted to abolish all penalties for committing murder. You would say despite the threat of the penalty, despite the threat of death of life imprisonment or long periods of imprisonment people go on committing murders, year in and year out, in fact they committed more this year than they did last year, so let's repeal the homicide law.

No State and no sane government anywhere would be willing to undertake that experiment, because I think, Senator, the answer to your question is how much more crime would we have in New York, but for the Sullivan law.

The Sullivan law—the Boston police strike in your State well illustrates what happens when there is a suspension of laws. The idea behind the Sullivan law is to prevent crime, violent crime before it can occur. The traditional criminal law operates on a post facto basis. After the homicide is committed an arrest is made, an indictment obtained, a trial held, a conviction gotten, and a sentence to imprisonment. But that does not wipe out the tragedy of a dead human being, the victim of that crime.

We have very few tools available to us in the traditional criminal law sense. We have only these few inchoate crimes, conspiracy which requires multiple defendants to participate in an attempt. Now in attempt we do not have very good tools because our courts, in New York at any rate, tell us before you can convict a fellow of attempt where the damage is not done but he tries to do it, you have to go so far in the stage of preparation and in the stage of commencement of consummation that you must commit the last act or the next to the last act necessary to complete the crime.

I will give you just one illustration of what we would hope to accomplish if we had effective weapons laws. On March 25, 1911, there was a building still standing opposite New York University down at Greenwich Village. The ninth floor of that building was occupied by the Triangle Shirtwaist Factory.

There were 600 people employed there, mostly women. It was customary occasionally for one of them to steal a shirtwaist, and in order to prevent them from leaving that building, one of the operators of that factory locked one of the exit doors at the time work was done on March 11 and stationed himself at the other to supervise the egress of these female employees. And where he saw a telltale bulge, without any search warrant he just hauled her back in.

A fire broke out just at quitting time. Many people rushed to the other locked door and were unable to get out. The result: within 10 minutes, the fire was over and it didn't destroy the building, but it killed 145 of those employees.

Now the two operators of that factory were placed on trial for manslaughter in the first and manslaughter in the second degree and they were lucky enough to obtain Max David Stoyer as their lawyer. In fact, that case made his reputation. One of the fortunate things was that these two operators were acquitted because there was insufficient proof that they knew that the locked door was locked. I say it was fortunate because Governor Dix of New York in 1911 appointed a factory committee of the legislature.

Nobody proposed redefining manslaughter. Nobody proposed in the legislature the abolition of factories. What they did propose was sensible licensing, regulation, inspection of factories to make such holocausts as the Triangle Shirtwaist an impossibility in the future and that is what we are trying to do by regulating weapons.

Senator KENNEDY. As I understand it, you feel that New York, therefore, has adopted State legislation which is best equipped to meet the needs of the people in that State.

Mr. LUDWIG. Yes; I do.

Senator KENNEDY. And you support, as I would understand from your testimony, this kind of initiative, that States ought to have a right within a certain framework to make this kind of determination.

Mr. LUDWIG. No; I had hoped that the Federal Government would supply initiative for two reasons, Senator. In the last 10 years we have become a more urbanized population; whereas 10 years ago half of our people lived in the cities and metropolitan areas, today two-thirds of them live there.

The second reason that we need more consideration and perhaps guidance is that there has been a lag on the part of State legislatures in connection with weapons legislation.

I pointed out that only Hawaii and New York have anything realistic on handguns, and one reason for that lag has been the recent Supreme Court decisions against gerrymandering, one man, one vote, or as they say one tree, one vote, I suppose in the prairie States one cow, one vote, we are attempting to get away from.

Senator HRUSKA. Maybe one gun, one vote.

Mr. LUDWIG. I think you are going to lose on the basis of recent polls, Senator. But as you will get less rural domination of State legislatures, which is inevitable, State legislatures will come up with sensible laws and you will see shotguns and rifles and handguns registered.

I don't mean sportsmen will be deprived of their chance to hunt, but they will have to come up, stand up and be counted and say they have got the gun.

Senator KENNEDY. Because there are no Federal standards at the present time, or at least Federal standards that are currently in effect have not been effective in meeting the needs which you have outlined here today, is New York's law less effective?

Mr. LUDWIG. Yes; it is, because it is possible—Senator Hruska, that used to be my State for 2 years, when I was a professor at the University of Nebraska. I have a great affection for the State of Nebraska, but if from Columbus, Nebr., we were to get that target pistol with blueing or chrome in New York, we have a provision in our Sullivan law which requires notification to the local police chief if he is shipping a handgun into the State.

But let's suppose that the Columbus manufacturer or distributor shipped it into New York City without giving notification to the New

114                    FEDERAL FIREARMS ACT

York City Police Commissioner in accordance with section 1900, sub-division 8 of our penal law. If that happened, what chance have we got to prosecute that distributor in Columbus?

We run up first of all against a constitutional problem under the 14th amendment, the due process clause, because that man in Columbus, Nebr., has never been inside the borders, never been east of the Hudson River, never set foot in New York State. The active shipping took place in the State of Nebraska, a very serious question as to whether the State of New York has any jurisdiction to punish him for the misdemeanor of violating our State laws exists, even though we have the law that says you are guilty. The Constitution of the United States prohibits the extraterritorial application of a State law, so we can't make the law of New York effective in Columbus.

Senator HRUSKA. Would the witness yield at that point?

Mr. LUDWIG. Yes, sir.

Senator HRUSKA. Is that the reason you want a Federal law? A law which would render punishment in Columbus, Nebr., a dealer who would ship into New York?

Mr. LUDWIG. We already have a law like that.

Senator HRUSKA. Yes; section 902c, if you want the number of the law.

Mr. LUDWIG. That is right. No; I said that I am not completely satisfied with the proposed Amendment 90, but it does go quite a bit of the way, and I hope, I would have hoped that possibly the Congress would follow the initiative of the President and provide leadership for the States in adopting model statutes.

I do think Amendment 90 goes part of the way, but if we are to come to grips realistically with this problem of violent crime in America, which is more serious in this country than in any other major industrial nation in the world, and which is so out of proportion to our population in comparison with European countries, which have strict control of weapons, traditionally have had, England and many other countries on the continent, we are going to require at least temporarily, until this one man, one vote can take effect among our State legislatures, a little Federal guidance and an expanded Federal role.

Senator HRUSKA. Will the Senator yield?

Senator KENNEDY. Yes; I will.

Senator HRUSKA. How many illegal guns are seized in New York every year?

Mr. LUDWIG. I haven't got the statistics, but I will mail it to you, Senator.

Senator HRUSKA. Between 9,000 and 10,000 a year, would you say?

Mr. LUDWIG. I don't know how many.

Senator HRUSKA. Would you supply that for the record?

Mr. LUDWIG. I will. We have been somewhat handicapped in the seizure of guns since *Mapp* v. *Ohio* came down from the Supreme Court of the United States.

Senator HRUSKA. The figures given us last year and the year before ran into thousands.

Mr. LUDWIG. Yes.

Senator HRUSKA. Which sort of indicates maybe some people still disregard the law in spite of this very severe penalty.

Mr. LUDWIG. That is true.

Senator HRUSKA. Now then, you cite Houston and New York as examples. Texas as an example of a State that had no legislation at all or scarcely any, and New York had a fine law, the Sullivan law. Houston has a much larger murder rate than New York. However, are you aware that New York on a per capita basis had a total of 244.2 offenses per 100,000 people, and Dallas had 203.1, and that is in the same State as Houston. Would there be any difference in that?

Mr. LUDWIG. Senator, we must be very, very careful about statistics, but the first thing we must be careful about is the actual figures we give. You want to compare Dallas with New York? Here is the uniform crime reports, the last volume.

Senator HRUSKA. Is is from that report that these figures were taken.

Mr. LUDWIG. 1965, yes, and my figures come from page 74 for Dallas, which includes more than Dallas, several counties outside, page 74, and page 82 for New York.

Senator HRUSKA. That would be the metropolitan reporting area, wouldn't it?

Mr. LUDWIG. Yes, it covers three counties outside.

Senator HRUSKA. From that same source we have statistics of 183 standard metropolitan statistical areas surveyed by the FBI. 131 had an overall homicide rate lower than New York, and that comes from the FBI Crime Report.

Mr. LUDWIG. Just let's look at these statistics. Now you mentioned Dallas for the second time.

Senator HRUSKA. Yes, sir.

Mr. LUDWIG. Now let's be fair. On page 74 of the F.B.I Uniform Crime Reports for 1965, the rate per 100,000 in Dallas for homicides is 10.3. That is for the calendar year 1965, 10.3. The same book reports for the Metropolitan New York area a rate of 6.1. Now that is not one-third less but it is substantially less.

Moreover in comparing these figures, let us be very careful. If you come, let's say, from East Jesus, Ill., where there are 100,000 people and you have had one murder during the year, your rate per 100,000 is 1. If you come from a community of 5 million and you have 50 homicides per year, your rate is still 1 per 100,000. But that is not to say that the rate of criminal homicides in those two areas is comparable, because there is a geometric progression when you go from 100,000 to a community of 5 million.

Senator HRUSKA. Well now, after all, rates are rates. We can editorialize on that all we want to, but these are facts. The figures I have given were drawn from that report.

Mr. LUDWIG. Senator, I hand up the book. I offer it.

Chairman DODD. I think we have a copy of it here.

Senator HRUSKA. Yes, we have a copy. The absolute number of homicides with weapons has actually decreased from 1940 to 1963. These are FBI figures. In 1940 the rate was 3.5 per 100,000 population, and now in 1963 it was 2.2, and yet we have all this hullabaloo about increase in per capita, and so on, and it is a little difficult to sort of reconcile those.

Have you any comment, any brief comment on that, because we are all getting hungry?

Mr. LUDWIG. Right, two sentences, Senator. I will make it brief. One, I have examined all the Uniform Crime Reports since 1933 when they first came out, and they never bothered to make any reference to

the use of firearms or weapons in the commission of these homicides until 3 years ago, so I don't know where you got those figures of 3.5 in 1940.

Senator HRUSKA. This is the rate of homicides with firearms.

Mr. LUDWIG. Yes. Second, for the last 3 years the Uniform Crime Reports report an increase in the use of firearms in committing criminal homicides from 54.5 to 57 percent for 1965. Now what they will be in 1966 we will all learn in about a week. I expect they will easily be 57 and possibly higher.

Senator KENNEDY. Could we just on this point ask, isn't it also possible that gunshot victims today are getting cured somewhat more easily than they might have before.

Mr. LUDWIG. I think one of the things while it is a disgrace, Senator, to this country, that we have such a high rate of violent crime, I think we are entitled to some self-congratulations that the membership in the NRA is limited to 800,000, which is less than a half of 1 percent of our population of 200 million, because that is a nice sign that there are just that many people whom we call enthusiasts, but who in many instances I think are still boys that never grew up.

Senator KENNEDY. They are good letterwriters too.

Mr. LUDWIG. Very vociferous.

Chairman DODD. I think what Senator Kennedy was asking you is a very pertinent question as I understood it. Let me state it the way I understood it. Isn't it a fact that we have better medical facilities and better hospital facilities and better ways of taking care of persons who are shot? Senator Hruska referred to the fact that in 1940 there was a higher homicide rate, but I think the important fact is that there have been more shootings every year. With our improved ways of taking care of people who have been shot, you don't have as many deaths.

Mr. LUDWIG. I don't agree, Senator, on that point.

While you have had the famous Valentine massacre of seven people in Chicago in 1929, last summer in July you had eight nurses killed by a man who had a gun, even though he stabbed them. He got access to them. And August 1 from the Texas tower we had 15 people plus one unborn baby killed and 33 others wounded.

These multiple killing by armed persons I think, which gained notoriety in the press, when more than one is killed by a sniper, from my account have increased. Even in the State of Nebraska, where I have found very little criminality and a very excellent police force and good law enforcement officers—good legislators, too—you had the stark figure of 11 persons killed by Charles Starkwell back in 1958, three of them women in one family.

Senator HRUSKA. If this law or three laws like it had been in force at that time it wouldn't have stopped it, would it?

Mr. LUDWIG. It would have if they had had a Sullivan law in Nebraska.

Senator HRUSKA. It would not because the rifle had been in the family for years and years and he picked up the rifle and went on a shooting spree..

Unless you want to abolish guns and destroy them, things cannot be cited like that with any relevance at all. Part of the purpose of this hearing is to try and establish some relevance between the law and the impact it will make and——

Chairman Dodd. Mr. Ludwig, let me see if I can extricate myself from the difficulty. I understood you to say that you didn't agree with me.

Mr. Ludwig. I didn't agree that multiple homicides caused by users of guns, whether rifles or handguns, are on the decline, and usually they are——

Chairman Dodd. You misunderstood me. I didn't say that.

Mr. Ludwig. I'm sorry, Senator. I will pay more careful attention.

Chairman Dodd. I asked you if it was not true there were more shootings every year, with fewer deaths than there were years ago.

Mr. Ludwig. Oh, yes; I agree. I am sorry. I missed that point. Certainly.

Senator Hruska. Just one more observation, Mr. Chairman. Milwaukee has a criminal rate, and a death rate from firearms vastly lower than New York City. California and Wisconsin have no so-called strict gun laws. California, with no such legislation, has a smaller incidence of criminal misuse of firearms and a lower rate than does New York City. The Wisconsin Legislative Reference Library at the insistance of the Wisconsin Legislature plumbed the depths of the connection between restrictive firearms legislation and the incidence of crime. They found that they were not able to prove any such connection. They proved it to such an extent that the Wisconsin Legislature said "We will not legislate on this," and they haven't. Milwaukee has a much lower rate of homicide and firearm crimes than New York City, and many other cities.

Chairman Dodd. Senator, let me keep the record straight. New York does have a gun permit ordinance, a very strict one.

Senator Hruska. But Wisconsin doesn't.

Chairman Dodd. I don't know about the whole State but I recall that the chief of police of Milwaukee has indicated that his city does have a local ordinance.

Senator Hruska. We are talking about State legislation.

Mr. Ludwig. Just in complete relevancy and materiality to the statement of Senator Hruska, just one sentence. There are a half dozen of our States that have populations in excess of 10 million people, just six. Here are the homicide rates per 100,000 people in those six States, and this is the way they rank.

New York has the lowest homicide rate statewide; the second lowest, California; third lowest, Pennsylvania; fourth lowest, Texas; fifth lower, Illinois; and sixth lowest, Ohio.

Senator Hruska. Is that homicide rates?

Mr. Ludwig. Homicide rates per 100,000, sir.

Senator Hruska. Of all sources, firearms and clubs and daggers and everything.

Mr. Ludwig. Correct; yes, sir; that is correct. And I could give you the exact decimal points, but the point is that in that same descending order, you have the same variation in stringencies of weapon control law. These are six State with 10 million or more people.

We are not comparing Rhode Island with New York or Alaska, which has a density of population of 0.58 to a square mile compared with New York which has a density of population of 350 per square mile. We are comparing well-populated States.

Senator Hruska. Of course, the statement that America is now an urbanized nation doesn't get very far, does it, when you really

118                    FEDERAL FIREARMS ACT

look at it? There are more great, vast expanses of territory in America today that have fewer population than 50 years ago. You see I come from the Middle West, where you taught school, so very notably and laudably, and the thing that they can't get into their heads is why a metropolitan State like New York would say we are so good at this with our Sullivan law we want a Sullivan law for every State.

Conditions in New York are different from conditions in Nebraska or the Dakotas or Kansas or Colorado or Wyoming, and that is the thing we can't get in our heads. In many areas there are less population than there were before, and the necessity not only for sporting purposes, but for just plain survival, sometimes against beasts, both two- and four-legged varieties, depends upon the ownership of guns. You proposed a law outlawing guns—we don't like that.

Mr. LUDWIG. Senator, I am happy that we can end on a note of agreement. I am in favor of a Federal and not a central or national government. We have a neighbor State next to New York, Vermont, which has no gun regulation.

Senator HRUSKA. One percent rate of murder by firearms.

Mr. LUDWIG. A wonderful situation crimewise. We do not seek to impose a Sullivan law on Vermont, but we would like Vermont to tell us when they are selling New York residents handguns and bringing them in, and they have voluntarily done it in some cases.

Senator HRUSKA. And, of course, my bill does that, Mr. Ludwig.

Chairman DODD. Any further questions? Senator Thurmond?

Senator THURMOND. Mr. Chairman, I might just ask the witness if he heard the statement I made a few moments ago? I think it is in line with just what you said. The positions are different in each State, and therefore each State should determine the kind of gun law it needs and I believe that is your position.

You are not trying to impose a Sullivan law upon all the States. New York State has it and likes it and some other State might have a different situation, but what you object to is the shipping of guns from one State to another that causes a lot of trouble, and as I stated a few moments ago when I made a statement on this matter, it is my feeling that Congress should require the gun seller to obtain from the would-be purchaser a sworn statement that the buyer is not prevented by the law of his home State from purchasing the gun. This should be coupled with a requirement from the seller prior to shipping the weapon, sending a copy of the sworn statement by registered mail to the chief law-enforcement officer of the area in which the would-be purchaser lives, and failure to comply with this would be a Federal criminal offense. In essence, as I understand it, that is about what you recommend.

Mr. LUDWIG. No, it is not, Senator; not in the case of handguns. I most certainly would not. I would prefer section 1715 of title 18 to be extended as it is in Amendment 90 to shipment by other than mail of handguns into a State.

Senator THURMOND. Aren't you willing for each State to have the kind of law it wants?

Mr. LUDWIG. Yes; I believe in a Federal system. Certainly I do. That is one of the greatnesses of America.

Senator THURMOND. Then it is a question of what you would favor in guns going from one State to the other. If you feel each State should

FEDERAL FIREARMS ACT                    **119**

have its own law, the only question would be the kind of interstate law you feel is needed and that is the only kind of a law in which the Congress would have the power to act under the interstate commerce clause.

Mr. LUDWIG. That is correct.

Senator THURMOND. That is all, Mr. Chairman.

Chairman DODD. Thank you.

We will recess these hearings until 10 o'clock tomorrow morning.

(Whereupon, at 2:05 p.m., the subcommittee adjourned until Tuesday, July 11, 1967, at 2 p.m.)