# FEDERAL FIREARMS ACT

## HEARINGS

BEFORE THE

### SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY

OF THE

### COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

EIGHTY-NINTH CONGRESS

FIRST SESSION

PURSUANT TO

### S. Res. 52

EIGHTY-NINTH CONGRESS

ON

### S. 1592

A BILL TO AMEND THE FEDERAL FIREARMS ACT

### S. 14

A BILL TO AMEND THE FEDERAL FIREARMS ACT

### S. 1180

A BILL TO AMEND THE FEDERAL FIREARMS ACT TO PROHIBIT
THE IMPORTATION OF A FIREARM INTO THE
UNITED STATES WITHOUT A LICENSE

### S. 1965

A BILL TO AMEND THE FEDERAL FIREARMS ACT

MAY 19, 20, AND 21; JUNE 2, 3, 8, 24, AND 30; JULY 1, 20, 27, 1965

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1965

49-588

## COMMITTEE ON THE JUDICIARY

JAMES O. EASTLAND, Mississippi, *Chairman*

| | |
|---|---|
| JOHN L. McCLELLAN, Arkansas | EVERETT McKINLEY DIRKSEN, Illinois |
| SAM J. ERVIN, Jr., North Carolina | ROMAN L. HRUSKA, Nebraska |
| THOMAS J. DODD, Connecticut | HIRAM L. FONG, Hawaii |
| PHILIP A. HART, Michigan | HUGH SCOTT, Pennsylvania |
| EDWARD V. LONG, Missouri | JACOB K. JAVITS, New York |
| EDWARD M. KENNEDY, Massachusetts | |
| BIRCH BAYH, Indiana | |
| QUENTIN N. BURDICK, North Dakota | |
| JOSEPH D. TYDINGS, Maryland | |
| GEORGE A. SMATHERS, Florida | |

SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY IN THE UNITED STATES

(89th Congress)

THOMAS J. DODD, Connecticut, *Chairman*

| | |
|---|---|
| PHILIP A. HART, Michigan | ROMAN L. HRUSKA, Nebraska |
| BIRCH BAYH, Indiana | HIRAM L. FONG, Hawaii |
| QUENTIN N. BURDICK, North Dakota | JACOB K. JAVITS, New York |
| JOSEPH D. TYDINGS, Maryland | |

CARL L. PERIAN, *Staff Director*

II

# CONTENTS

## AGENCY COMMENTS

| | Page |
|---|---|
| Department of State, on S. 1592, dated May 28, 1965 | 723 |
| Department of Commerce, on S. 1592, dated June 28, 1965 | 723 |
| Department of Treasury, on S. 1592, appearance of Secretary of the Treasury Henry H. Fowler, May 19, 1965, and appearance of Sheldon S. Cohen, Commissioner of Internal Revenue, May 19, 1965 | 29, 65 |
| Department of Justice, on S. 1592, appearance of Nicholas deB. Katzenbach, May 19, 1965 | 33 |
| Department of the Army, on S. 1592, appearance of Stephen Ailes, Secretary of the Army, May 19, 1965 | 57 |
| Federal Maritime Commission, on S. 1180, dated February 26, 1965 | 724 |
| Comptroller General of the United States, on S. 1180, dated March 4, 1965 | 724 |
| General Services Administration, on S. 1180, dated June 30, 1965 | 725 |
| Department of Treasury, on S. 14 and S. 1180, dated July 2, 1965 | 725 |
| General Services Administration, on S. 14, dated July 7, 1965 | 725 |
| Federal Aviation Agency, on S. 14, S. 1180, and S. 1965, dated July 26, 1965 | 726 |
| Department of the Army, on S. 1965, dated July 30, 1965 | 726 |
| Post Office Department, on S. 14, dated August 12, 1965 | 727 |

## ALPHABETICAL LIST OF WITNESSES

Statement of—

| | |
|---|---|
| Ailes, Stephen, Secretary of the Army | 57 |
| Allott, Gordon, U.S. Senator from Colorado | 247 |
| Barnard, Robert C., counsel for Sporting Arms and Ammunition (accompanied E. C. Hadley, president) | 407 |
| Bennett, James V., consultant and former Director, Federal Bureau of Prisons | 495 |
| Blondes, Leonard S., assemblyman, Annapolis, Md | 424 |
| Brostron, Curtis, chief of police, St. Louis, Mo | 580 |
| Caples, Richard R., commissioner, department of public safety, Boston, Mass. (accompanied by Lt. John E. Collins, firearms identification bureau and Sgt. Edward Higgins, firearms records Bureau, Massachusetts State Police) | 343 |
| Carter, Harlon B., president of the National Rifle Association (accompanied Franklin Orth, executive vice president) | 195 |
| Carter, Howard, Jr., attorney and director of the National Shooting Sports Foundation, Inc., Riverside, Conn. (accompanied by Charles Dickey, director, National Shooting Sports Foundation) | 314 |
| Champion, Hale, director of finance, State land division, Sacramento, Calif | 648 |
| Cohen, Sheldon S., Commissioner, Internal Revenue Service | 65 |
| Collins, Lt. John E., firearms identification bureau, Massachusetts State Police (accompanied Commissioner Caples) | 343 |
| Comstock, Hilliard, chairman, legislative committee and past president of the National Rifle Association | 459 |
| Cummings, Samuel, president, International Armament Corp | 689 |
| Dennis, Robert T., assistant conservation director, Izaak Walton League of America | 639 |
| Dickey, Charles, director, National Shooting Sports Foundation, Inc., Riverside, Conn. | 314 |
| Dingell, John D., U.S. Representative, 16th District, Michigan | 374 |
| Dowdy, John, U.S. Representative, Seventh District, Texas | 667 |

III

IV                                              CONTENTS

Statement of—Continued                                                        **Page**

Fannin, Paul J., U.S. Senator from Arizona_____ 241
Foote, Frank, section chief, Division of State Parks, Nebraska Game,
    Forestation, and Parks Commission, State Capitol, Lincoln, Nebr__ 548
Fowler, Henry H., Secretary of the Treasury_____ 29
Fox, Harry G., chief inspector, Philadelphia Police Department
    (accompanied Commissioner Leary) _____ 449
Gonzalez, Jess C., sergeant, robbery division, Department of Police,
    Los Angeles, Calif_____ 160
Gutermuth C. R., vice president, Wildlife Management Institute,
    Washington, D.C. (accompanied by Daniel A. Poole, secretary,
    Wildlife Management Institute)_____ 291
Hease, Walter, detective, New York City Police Department (accom-
    panied Commissioner Reisman)_____ 602
Hadley, Dr. E. C., president, Sporting Arms and Ammunition Manu-
    facturers' Institute, New York City (accompanied by Robert C.
    Barnard, counsel)_____ 407
Hellstrom, Douglas R., executive vice president, Smith & Wesson,
    Inc., Springfield, Mass_____ 530
Higgins, Sgt. Edward, firearms records bureau, Massachusetts State
    Police (accompanied Commissioner Richard R. Caples)_____ 343
Hilliard, E. H., Jr., managing partner, Redfield Gun Sight Corp.,
    Denver, Colo_____ 335, 373
Howe, Merton W., commander, robbery division, Department of
    Police, Los Angeles, Calif_____ 133
Jacobsmeyer, Adolph C., commander, special operation command,
    Police Department, St. Louis, Mo_____ 586
Jenkins, Herbert T., chief of police, Atlanta, Ga_____ 503
Katzenbach, Nicholas deB., Attorney General of the United States__ 33
Kennedy, Robert F., U.S. Senator from New York_____ 87
Kimball, Thomas L., executive director, National Wildlife Federation,
    Washington, D.C._____ 254
Layton, John B., chief of police, Metropolitan Police Department,
    Washington, D.C._____ 281
Leary, Howard R., commissioner, Police Department, Philadelphia, Pa.
    (accompanied by Chief Inspector Harry G. Fox)_____ 449
Leary, Lt. Patrick F., New York City Police Department (accom-
    panied by Commissioner Leonard Reisman)_____ 602
Leonard, Dr. Harmon C., president, American Society of Arms Col-
    lectors, Cheshire, Conn_____ 269
Lynch, Thomas C., attorney general, State of California, Sacramento,
    Calif_____ 89
McLeod, Daniel R., attorney general, State of South Carolina, Colum-
    bia, S.C. (accompanied by Chief J. Preston Strom, South Carolina
    Law Enforcement Division)_____ 655
Margraves, Robert N., Director, Office of Munitions Control, Depart-
    ment of State, Washington, D.C._____ 126
Mashaw, William G., executive vice president, National Retail Hard-
    ware Association, Indianapolis, Ind. (Accompanied by Hardy Rick-
    beil) _____ 633
Maxwell, Samuel L., secretary, Washington State Sportsmen's Council,
    Inc., Edmunds, Wash_____ 682
Miller, Carl K., director, records and communications division, Police
    Department, Chicago, Ill_____ 274
Nolan, Edward P., sales manager, Sturm, Ruger & Co., Inc., South-
    port, Conn_____ 521
Orth, Franklin L., executive vice president, National Rifle Association,
    Washington, D.C. (accompanied by Harlon Carter, president)____ 195
Palmisano, Angelo F., assemblyman, Annapolis, Md_____ 443
Pasch, Capt. Frank J., supervisor, bureau of identification, New
    Jersey State Police, Trenton, N.J. (accompanied Attorney General
    Arthur J. Sills)_____ 394
Piccinini, Joseph, detective, New York City Police Department (ac-
    companied by Commissioner Leonard Reisman)_____ 602
Poole, Daniel A., secretary, Wildlife Management Institute, Washing-
    ton, D.C. (accompanied C. R. Gutermuth, vice president)_____ 291

Statement of—Continued

Reisman, Leonard E., deputy commissioner, New York City Police
Department (accompanied by Detectives Joseph Piccinini and
Walter Haase, and Lt. Partick Leary)_____  **Page** 602
Rickbeil, Hardy, member of the board of directors, National Retail
Hardware Association, Worthington, Minn. (accompanied by
William G. Mashaw, executive vice president)_____ 633
Saylor, John P., U.S. Representative, 22d District, Pennsylvania____ 390
Siatos, Thomas J., editor and publisher, Guns & Ammo magazine,
Los Angeles, Calif_____ 615
Sikes, Robert L. F., U.S. Representative, First District, Florida____ 669
Sills, Arthur J., attorney general, Department of Law and Public
Safety, State House, Trenton, N.J. (accompanied by Capt. Frank
J. Pasch, New Jersey State Police)_____ 394
Strom, J. Preston, chief, South Carolina Law Enforcement Division,
Columbia, S.C. (accompanied by Attorney General Daniel R.
McLeod)_____ 655
Tydings, Joseph D., U.S. Senator from Maryland_____ 421
Waldman, William J., vice president, Klein's Sporting Goods, Chicago,
Ill_____ 671
Woodward, Harry R., director, Colorado Game, Fish, and Parks De-
partment, Denver, Colo_____ 185

## CHRONOLOGICAL LIST OF WITNESSES

### MAY 19, 1965

Fowler, Henry H., Secretary of the Treasury_____ 29
Katzenbach, Nicholas deB., Attorney General of the United States_____ 33
Ailes, Stephen, Secretary of the Army_____ 57
Cohen, Sheldon S., Commissioner, Internal Revenue Service_____ 65

### MAY 20, 1965

Kennedy, Robert F., U.S. Senator from New York_____ 87
Lynch, Thomas C., attorney general, State of California_____ 89
Margrave, Robert N., Director, Office of Munitions Control, Department
of State_____ 126
Howe, Merton W., commander of the robbery division, Los Angeles
Police Department_____ 133
Gonzalez, Jess C., sergeant, Los Angeles Police Department_____ 160
Woodward, Harry R., director, Colorado Game, Fish, and Parks Com-
mission_____ 185

### MAY 21, 1965

Orth, Franklin L., executive vice president, National Rifle Association
(accompanied by Harlon Carter, president)_____ 195
Fannin, Paul J., U.S. Senator from Arizona_____ 241
Allott, Gordon, U.S. Senator from Colorado_____ 247
Kimball, Thomas L., executive director, National Wildlife Federation____ 254
Leonard, Dr. Harmon, president, American Society of Arms Collectors___ 269

### JUNE 2, 1965

Miller, Carl K., director, records and communications division, Chicago
Police Department_____ 274
Layton, John B., Chief of Police, Metropolitan Police Department, Wash-
ington, D.C._____ 281
Gutermuth, C. R., vice president, Wildlife Management Institute (ac-
companied by Daniel A. Poole, secretary, Wildlife Management
Institute)_____ 291
Carter, Howard, Jr., attorney and director of the National Shooting
Sports Foundation, Inc., Riverside, Conn. (accompanied by Charles
Dickey, director, National Shooting Sports Foundation)_____ 314
Hilliard, E. H. Jr., managing partner, Redfield Gun Sight Co., Denver,
Colo_____ 335, 373

### JUNE 3, 1965

|  | Page |
|---|---|
| Caples, Richard R., commissioner, Department of Public Safety, Boston, Mass. (accompanied by Lt. John E. Collins and Sgt. Edward Higgins, Massachusetts State Police) | 343 |
| Dingell, John D., U.S. Representative, 16th District, Michigan | 374 |
| Saylor, John P., U.S. Representative, 22d District, Pennsylvania | 390 |
| Sills, Arthur J., attorney general, Department of Law and Public Safety, State House, Trenton, N.J. (accompanied by Capt. Frank J. Pasch, New Jersey State Police) | 394 |
| Hadley, Dr. E.C., president, Sporting Arms & Ammunition Manufacturers' Institute (accompanied by Robert C. Barnard, counsel) | 407 |

### JUNE 8, 1965

| Tydings, Joseph D., U.S. Senator from Maryland | 421 |
|---|---|
| Blondes, Leonard S., assemblyman, Annapolis, Md | 424 |
| Palmisano, Angelo F., assemblyman, Annapolis, Md | 443 |
| Leary, Howard R., commissioner, Philadelphia Police Department (accompanied by Harry J. Fox, chief inspector) | 449 |
| Comstock, Hilliard, chairman, legislative committee and past president of the National Rifle Association, Washington, D.C. | 459 |

### JUNE 24, 1965

| Bennett, James V., consultant, former Director, Bureau of Prisons | 495 |
|---|---|
| Jenkins, Herbert T., chief of police, Atlanta, Ga | 503 |
| Nolan, Edward P., sales manager, Sturm, Ruger & Co., Southport, Conn | 521 |
| Hellstrom, Douglas R., executive vice president, Smith & Wesson, Inc., Springfield, Mass | 530 |

### JUNE 30, 1965

| Foote, Frank, section chief, Nebraska Game, Forestation, and Parks Commission | 548 |
|---|---|
| Brostron, Curtis, chief of police, St. Louis, Mo | 580 |
| Jacobsmeyer, Maj. Adolph C., St. Louis Police Department | 586 |

### JULY 1, 1965

| Reisman, Leonard E., deputy commissioner, New York City Police Department (accompanied by detectives Joseph Piccinini and Walter Hease, and Lt. Patrick Leary) | 602 |
|---|---|
| Siatos, Thomas J., publisher and editorial director, "Guns & Ammo" magazine | 615 |
| Rickbeil, Hardy, member of board of directors, National Retail Hardware Association (accompanied by William G. Mashaw, executive vice president, National Retail Hardware Association) | 633 |
| Dennis, Robert T., assistant conservation director of the Izaak Walton League of America | 639 |

### JULY 20, 1965

| Champion, Hale, director of finance, State of California | 648 |
|---|---|
| McLeod, Daniel R., attorney general, State of South Carolina (accompanied by J. Preston Strom, chief, South Carolina Law Enforcement Division) | 655 |
| Dowdy, John, U.S. Representative, Seventh District, Texas | 667 |
| Sikes, Robert L. F., U.S. Representative, First District, Florida | 669 |
| Waldman, William J., vice president, Klein's Sporting Goods | 671 |
| Maxwell, Samuel L., Washington State Sportsmen's Council | 682 |

### JULY 27, 1965

| Cummings, Samuel, president, International Armament Corp | 689 |
|---|---|

CONTENTS                                          VII

EXHIBITS

|  |  | Page |
|---|---|---|
| 1. | Text of S. 1592, dated March 22, 1965 | 7 |
| 2. | Text of S. 14, dated January 6, 1965 | 12 |
| 3. | Text of S. 1180, dated February 18, 1965 | 15 |
| 4. | Text of S. 1965, dated May 13, 1965 | 16 |
| 5. | Charts showing an analysis of types of firearms shipped into New York City and New York State from one mail-order house during 1961, 1962, and 1963 | 20 |
| 6. | Advertisements from a photostat copy of the Shotgun News, pages 1 and 4 of the May 15, 1965, issue | 34 |
| 7. | Memorandum by the General Counsel of the Treasury Department re "Federal Firearms Control and the Second Amendment" | 41 |
| 8. | Memorandum by the Acting General Counsel of the Treasury Department on the "Constitutional Basis for Federal Firearms Legislation" | 48 |
| 9. | Statistics from Uniform Crime Reports, 1963, on States, homicides, and gun laws | 55 |
| 10. | Letter from Secretary of Defense Robert S. McNamara recommending enactment of S. 1592, dated April 30, 1965 | 64 |
| *11. | Insert of Herblock cartoon which appeared in the Washington Post on December 29, 1964, by Mr. Cohen | 70 |
| 12. | Appendix to Mr. Cohen's statement, an analysis of bill S. 1592 by Douglas C. Dillon, former Secretary of the Treasury | 75 |
| 13. | Hy Hunter Catalog and Training Manual No. 3 | 93 |
| 14. | Excerpts from catalog of Service Armament Co., 689 Bergen Boulevard, Ridgefield, N.J | 108 |
| 15. | Photograph of a .37-mm. German-made cannon left on the courthouse lawn in Santa Barbara, Calif | 117 |
| 16. | Photograph of Jerry's, a gunshop in Oceanside, Calif | 118 |
| 17. | Photograph of weapons for sale in Jerry's Gun Shop, Oceanside, Calif | 119 |
| 18. | Photograph of weapons for sale in Jerry's Gun Shop, Oceanside, Calif | 120 |
| 19. | Photograph of advertisement of Universal Firearms Corp., Hialeah, Fla., for "The Enforcer" | 122 |
| 20. | Photograph showing comparison of M-1 carbine versus "The Enforcer" | 123 |
| 21. | Police report on gun and explosives—evidence against Robert Romero, 5030 Stern Avenue, Van Nuys, Calif., October 15, 1964 | 134 |
| 22. | The Romero Arsenal | 142 |
| 23. | Machinegun barrels and parts (Romero case) | 143 |
| 24. | Captain Howe holding 9-mm. Browning parabellum automatic with shoulder stock attached (Romero case) | 144 |
| 25. | Arsenal which includes full automatic machineguns (Romero case) | 145 |
| 26. | 9-mm German MP-40 machine pistol (submachinegun) developed by the Schmeisser factory in Germany.  Full automatic only (Romero case) | 146 |
| 27. | .223 caliber Colt AR-15 rifle model SP-1.  Semiautomatic, 21¼-inch barrel including a prong-type flash suppressor which can be used as a grenade launcher | 146 |
| 28. | M-1 Caliber U.S. carbine model M1 A1.  Manufactured by Inland Manufacturing Division, General Motors 1-44.  Semiautomatic. Designed for use by paratroopers (Romero case) | 147 |
| 29. | 7.92 caliber (German service cartridge) German MG 34 light machinegun.  Manufactured by CRA 1941 (barrel plugged).  Full-or semi-automatic (Romero case) | 147 |
| 30. | Full automatic Bren MK 3—1945 machinegun, series No. LB 19791 (Romero case) | 148 |
| 31. | Inventory of Robert A. Smith, Francis A. Owens | 150 |
| 32. | 5-ton trucks used by Robert A. Smith and his traveling gun salesman operation | 151 |
| 33. | Interior of van truck depicting ammunition boxes and a wooden crate containing a Lahti 20-mm. antitank cannon (Smith case) | 151 |
| 34. | View of machineguns and aerial bomb (Smith case) | 152 |
| 35. | An assortment of rifles found in the van truck (Smith case) | 153 |

# CONTENTS

| | Page |
|---|---|
| 36. Closeup of mortar in wooden crate (*Smith* case) | 154 |
| 37. Closeup of one of the mortars found in the van truck (*Smith* case) | 155 |
| 38. Chart: Weapons destroyed by the Los Angeles Police Department as provided in section 12028 California Penal Code | 156 |
| 39. Chart: Robberies reported to the Los Angeles Police Department, 1956 through 1964 | 157 |
| 40. Chart: Robberies with guns used, reported to the Los Angeles Police Department, 1956 through 1964 | 157 |
| 41. Chart: Aggravated assaults reported to the Los Angeles Police Department, 1956 through 1964 | 157 |
| 42. Chart: Homicides reported to the Los Angeles Police Department, 1956 through 1964 | 158 |
| 43. Chart illustrating the rise of bank robberies in the city of Los Angeles | 159 |
| *44. Advertisement of the Mellinger Corp., a correspondence school located at 1554 South Sepulveda Boulevard, Los Angeles, Calif., from Master Detective magazine concerning a sales training course in the importing and mail order merchandising of guns | 161 |
| *45. Advertisement from True magazine by the Mellinger Corp. concerning mail-order merchandising of guns | 161 |
| *46. Literature offering courses in mail-order merchandising of guns by the Mellinger Corp | 161 |
| 47. Advertisement from Shotgun News, October 15, 1963, concerning sale of German Lugers by Mr. Roger A. Dier | 163 |
| 48. Property report of Los Angeles Police Department concerning seizure of goods at the residence of Mr. Roger A. Dier in Los Angeles | 164 |
| 49. Sheriff of Ventura County's report on Harold A. Schlapia, dated June 28, 1964 | 168 |
| 50. Harold A. Schlapia—Camouflage gear, backpacks, books on chemical warfare, how to handle explosives, mine laying, survival, and other similar information | 171 |
| 51. Harold A. Schlapia—Ammunition, rifles, and other equipment of the type used in military maneuvers | 172 |
| 52. Harold A. Schlapia—Arsenal seized with arrest of above mentioned subject which included gas mask kits, gas decontamination kits, 40 quad maps of the Sequoia National Park area | 173 |
| 53. News clip from the Los Angeles Times, Thursday, February 21, 1963, concerning seizure of 1,660 pistols and revolvers by Los Angeles customs agents. The shipment was destined for the Crown International Firearms, Inc., a firm owned by Hy Hunter, 8255 Sunset Boulevard, Los Angeles, Calif | 175 |
| 54. Property report of Sgt. Jess C. Gonzalez, Los Angeles Police Department on seizure of goods from Haywood "Hy" Hunter | 176 |
| 55. Series of photographs of conversion of a Hy Hunter firearm from a blank revolver to a .45 caliber firearm | 177 |
| 56. See exhibit No. 55 | 178 |
| 57. See exhibit No. 55 | 179 |
| 58. See exhibit No. 55 | 180 |
| 59. Advertisement from Shotgun News, June 1, 1964, for Hy Hunter Weapons | 181 |
| 60. Advertisement from Shotgun News, May 1, 1965, concerning imported firearms | 183 |
| 61. Legislative Bulletin of the National Rifle Association sent to all members and clubs in Prince Georges County, Md., on bill No. 13 an ordinance to amend the existing weapons law of that county | 216 |
| 62. Letter dated April 9, 1965, from the National Rifle Association of America (Franklin L. Orth, executive vice president) to NRA membership | 218 |
| 63. Treasury Department analysis of the National Rifle Association letter to the NRA members dated April 9, 1965, concerning S. 1592 | 219 |
| 64. Letter dated August 5, 1965, from Franklin L. Orth, executive vice president, National Rifle Association, to the Honorable Thomas J. Dodd, U.S. Senate | 223 |
| 65. Article from the American Bar Association Journal, June and July 1965 (vol. 61, No. 6 and 7) entitled "The Lost Amendment," by Robert A. Sprecher | 223 |

**CONTENTS**                                                                IX

Page

66. Article from the American Rifleman entitled "To Have and Bear Arms," by Judge Bartlett Rummel_____ 234
67. Senate Memorial No. 1 of the 27th Arizona Legislature adopted and approved by the Governor on May 14, 1965, urging Congress to oppose S. 1592_____ 243
68. Statement submitted by the Honorable Paul J. Fannin, Senator from Arizona on behalf of the Arizona State Rifle and Pistol Association in opposition to S. 1592_____ 244
69. Supplemental statement of Thomas L. Kimball, executive director, National Wildlife Federation, dated June 7, 1965_____ 258
*70. Photographs of antique firearms submitted by Dr. Harmon Leonard, president, American Society of Arms Collectors_____ 271
71. Photograph of 81-mm. Russian mortar (exhibits 71 through 75 contain weapons purchased by subcommittee consultant who was a provisional member of "The Minutemen") _____ 275
72. Photograph of 50-mm. Finnish mortar_____ 275
73. Photograph of 2.36-inch bazooka (top)_____ 276
74. Photograph of M-1 rifle with grenade launcher and grenades_____ 276
75. Photograph of hand grenades, bazooka rockets, rockets, and 81-mm. mortar shell_____ 277
76. Chart: Tabulation of weapons used in homicides, aggravated assaults, and robbery during fiscal year 1964 in the District of Columbia___ 284
77. Cases of criminal offenses being committed in Washington, D.C., with weapons which were purchased in nearby jurisdictions_____ 288
78. Photograph: Firearms used in crimes in the District of Columbia which were purchased in nearby counties_____ 292
79. Photograph: Sample, mail-order-type guns confiscated in 1962 in 2d precinct, District of Columbia_____ 292
80. Photograph: Sample, mail-order-type guns confiscated in 1962, District of Columbia_____ 293
81. Supplemental statement "Questions on S. 1592" submitted by C. R. Gutermuth, vice president of the Wildlife Management Institute, dated June 2, 1965_____ 313
82. Membership list of the National Shooting Sports Foundation, Inc., Riverside, Conn_____ 319
83. Treasury Department analysis of a newsletter of the National Shooting Sports Foundation on S. 1592, dated April 19, 1965_____ 326
84. Chart: Percent of guns used in crimes purchased outside of Massachusetts_____ 346
85. Chart: Number of guns used in Massachusetts crimes identified as stolen by Massachusetts State Police_____ 347
86. Chart: Guns purchased outside of Massachusetts used in crimes____ 349
87. Summary of cases involving firearms from the Massachusetts State Police_____ 366
88. Chart: Purchases of firearms outside of Massachusetts by Massachusetts residents_____ 352
*89. Report submitted by Massachusetts State Police of confiscated firearms sold in Massachusetts_____ 356
90. Article from Boston Sunday Globe, May 9, 1965, entitled "87 percent of Massachusetts Crime Guns Bought Elsewhere" by Ray Richard_ 358
91. Copy of a study of firearms licensing conducted by the Wisconsin Legislative Reference Library for the State legislature_____ 377
92. Photograph: 20-mm. Lahti antitank rifle confiscated by State Police from three youths in Sussex County, N.J_____ 402
93. Photograph: Sample of ammunition confiscated by State Police from three youths in Sussex County, N.J_____ 403
94. Copy of an article entitled "Nostalgia Helps Gun Lobby Torpedo Controls" by David Acheson, which appeared in the Washington Post on January 10, 1965_____ 416
95. National Rifle Association Legislative Bulletin dated March 21, 1963, addressed to all NRA members and clubs in Maryland opposing firearms legislation introduced by Leonard S. Blondes_____ 429
96. Letter dated July 19, 1965, from Leonard S. Blondes to Carl L. Perian, staff director, Senate Subcommittee To Investigate Juvenile Delinquency_____ 431
97. Letter dated June 22, 1965, from Franklin L. Orth, executive vice president, National Rifle Association to the Honorable Thomas J. Dodd_____ 431

X

## CONTENTS

| | | Page |
|---|---|---|
| 98. | Letter dated June 30, 1965, from Senator Joseph D. Tydings to Subcommittee Chairman Thomas J. Dodd | 441 |
| 99. | Letter dated August 19, 1965, from Assemblyman Leonard S. Blondes to Subcommittee Chairman Thomas J. Dodd | 443 |
| 100. | Legislative Bulletin of the National Rifle Association dated January 23, 1963, addressed to all NRA members and clubs in Maryland concerning Mr. Angelo F. Palmisano's firearms bill | 444 |
| 101. | List of citizens in Philadelphia who opposed gun legislation in that city | 456 |
| 102. | Letter to Mr. William Mooney dated July 7, 1965, from Police Commissioner Howard R. Leary, concerning the number of long guns used in reported crimes in Philadelphia in 1964 | 458 |
| 103. | Telegram from chief deputy attorney general, Charles A. O'Brien, of California, to Carl Perian, dated June 8, 1965, concerning the effectiveness of gun regulations in California | 473 |
| 104. | Memorandum from the Library of Congress dated June 7, 1965, entitled "Scope of Congressional Practice of Delegating Discretion to Executive Officers To Issue Regulations Implementing Enforcement of Statutes" | 480 |
| 105. | Application form for Federal firearms license submitted by James V. Bennett, former Director, U.S. Bureau of Prisons | 498 |
| 106. | Police report of Chief Leo Blackwell, of Griffin, Ga. | 505 |
| 107. | Photograph of weapons seized by police department of Griffin, Ga., from 5 alleged members of the Ku Klux Klan | 505 |
| 108. | Photographs of weapons seized by the Atlanta, Ga., Police Department (handguns) | 506 |
| 109. | Photographs of weapons seized by the Atlanta, Ga., Police Department (handguns) | 507 |
| 110. | Photographs of weapons seized by the Atlanta, Ga., Police Department (handguns) | 508 |
| 111. | Photographs of weapons seized by the Atlanta, Ga., Police Department (handguns, rifles, and shotguns) | 509 |
| 112. | Photographs of weapons seized by the Atlanta, Ga., Police Department (handguns) | 510 |
| 113. | Photographs of weapons seized by the Atlanta, Ga., Police Department (handguns) | 511 |
| 114. | Photographs of weapons seized by the Atlanta, Ga., Police Department (handguns, rifles, and shotguns) | 512 |
| 115. | Photographs of weapons seized by the Atlanta, Ga., Police Department (rifles and sawed-off shotguns) | 513 |
| 116. | Photographs of weapons seized by the Atlanta, Ga., Police Department (rifles, shotguns and sawed-off rifles and shotguns) | 514 |
| *117. | Homicide reports submitted by chief of police, Herbert Jenkins, Atlanta, Ga. | 515 |
| 118. | Page 13 of the 1964 annual report of the Atlanta Police Department, "Homicide" | 516 |
| 119. | Page 16 of the 1964 annual report of the Atlanta Police Department, "Murder" | 517 |
| 120. | Report of the Atlanta Police Department comparing 1964–65 crime figures for the period January through May | 518 |
| 121. | Analysis of sections of bill S. 1592 submitted by Douglas R. Hellstrom, executive vice president, Smith & Wesson, Inc. | 531 |
| 122. | Resolution of the Game, Forestation and Parks Commission, State of Nebraska | 548 |
| 123. | Statement by Mr. Dudley Osborn of the Nebraska Game, Forestation and Parks Commission | 550 |
| 124. | Legislative Resolution 50 of the Nebraska Unicameral Legislature, 75th session | 551 |
| 125. | Editorial entitled "Guns by Mail" from the Boston Herald, May 22, 1965 | 552 |
| 126. | Article entitled "Controversy and Confusion Swirl Around Gun Bill," from the Christian Science Monitor by Josephine Ripley, May 26, 1965 | 554 |
| 127. | Article entitled "The Gun Law That Didn't Go Off," from the Reporter magazine, October 8, 1964, by Elizabeth Brenner Drew | 555 |
| 128. | Article entitled "Massacre Canyon Cap Snappers," from Nebraskaland, October 1964 | 561 |

# CONTENTS

**Page**

129. Report of the Metropolitan Police Department of the City of St. Louis dated June 25, 1965, "Survey of Guns Used in Crimes in St. Louis"____ 588
130. Report of the Metropolitan Police Department of the City of St. Louis dated June 23, 1965, "Research on Juveniles Involved in Possession of Firearms"____ 594
131. Chart: Persons charged with certain offenses by age and sex, January 1, 1962, to December 31, 1962, annual report for 1962, St. Louis Police Department____ 596
132. Chart: Persons charged with certain offenses by age and sex, January 1, 1963, to December 31, 1963, annual report for 1963, St. Louis Police Department____ 597
133. Chart: Persons charged with certain offenses by age and sex, January 1, 1964, to December 31, 1964, annual report for 1964, St. Louis Police Department____ 598
134. Telegram dated June 1, 1965, from Mayor Robert F. Wagner, New York City to the Honorable Thomas J. Dodd____ 601
135. Article entitled "The Real Facts Behind S. 1592" from the July 1965 issue of Guns and Ammo____ 623
136. Editorial by Mr. Thomas J. Siatos from the April 1965 issue of Guns and Ammo____ 626
137. Excerpt from the CBS News telecast by Walter Cronkite on December 21, 1964____ 631
138. Sign displayed in hardware store in Worthington, Minn____ 633
139. Consent slip required for anyone under 18 years of age prior to purchase of guns or ammuniion in hardware store in Worthington, Minn____ 634
140. Statement dated July 14, 1965, containing changes made in California State firearms laws submitted by Mr. Hale Champion, director of of finance for the State of California____ 652
141. Photograph of J. P. Strom, director of South Carolina law enforcement division with .50 caliber machinegun and ammunition seized at Fort Motte Airstrip, Calhoun County, S.C.____ 660
142. Photograph of boxes of .50 caliber ammunition seized at Fort Motte Airstrip, Calhoun County, S.C.____ 661
143. Photograph of weapons purchased in South Carolina by four members of the Black Muslim group from New York City____ 662
144. Chronology of events regarding request of Mr. Samuel L. Maxwell to testify at hearings on S. 1592____ 686
145. Letter from Mr. Samuel L. Maxwell addressed to Mr. Carl L. Perian dated May 14, 1965____ 687
146. Letter from Senator Thomas J. Dodd, chairman, to Mr. Samuel L. Maxwell, dated May 17, 1965____ 687
147. Letter from Mr. Samuel L. Maxwell to Senator Warren G. Magnuson, with copies to Washington congressional delegation, referred to the Juvenile Delinquency Subcommittee by Senator Henry M. Jackson____ 687
148. Map: "Countries of Origin of Imported Firearms," total imported 1962–64____ 691
149. Photograph: Winchester, model 70, cal. .30–06____ 692
150. Photograph: M98 Mauser Deluxe Sporter, cal. .30–06____ 693
151. Photograph: German 98 Mauser military rifle, cal. 8 mm____ 693
152. Photograph: U.S. Springfield model 1903A3 surplus rifle, cal. .30–06__ 693
153. Article from the Washington Evening Star, October 2, 1964, concerning weapons seized by the FBI in McComb, Miss____ 706
154. United Press International Photograph of cache of weapons seized outside Buffalo, N.Y. in 1961 from Bobby Wilcoxon and Albert Nussbaum____ 712
155. Statement of Samuel Cummings, "Origin of Military Surplus"____ 715
156. Statement of Samuel Cummings, "Firearms Import Statistics"____ 716
157. Statement of Samuel Cummings, "SAAMI"____ 717
158. Statement of Samuel Cummings, "Outline of Moves to Obtain Embargo on Military Rifle Imports"____ 717
159. Statement of Samuel Cummings, "Small Business Market"____ 719

*Material has been retained in the permanent files of the subcommittee.

XII                          CONTENTS

APPENDIX

STATEMENTS SUBMITTED FOR THE RECORD

U.S. Senate:                                                              Page
        Hon. John Sherman Cooper_____     728
        Hon. Paul J. Fannin_____     732
        Hon. Roman L. Hruska_____     725
        Hon. Gale McGee_____     733
        Hon. Lee Metcalf_____     735
        Hon. Frank E. Moss_____     736
House of Representatives: John V. Lindsay_____     737
State commissions and departments:
        Louisiana Wild Life and Fisheries Commission_____     740
        Montana Department of Fish and Game_____     741
        Wyoming Game and Fish Commission_____     742
        Michigan Department of Conservation and International Association
           of Fish, Game & Conservation Commissioners_____     742
State legislatures:
        Louisiana Senate_____     749
        Nebraska State Legislature_____     750
        Washington State Legislature_____     751
Gun collectors associations:
        Fort Lee Arms Collectors Club of New Jersey, Inc_____     751
        Massachusetts Arms Collectors_____     752
        Memphis Gun Collectors' Association_____     753
        Wabash Valley Gun Collectors' Association_____     754
        Washington Arms Collectors, Inc_____     755
        Hudson-Mohawk Arms Collectors Association, Inc_____     758
State associations: New Mexico Wildlife & Conservation Association, Inc__     758
Veterans' associations:
        Paul E. Bolding Post No. 7_____     759
        Wayne A. Larson Post 7356, Klamath, Calif_____     760
        American Veterans Committee, Washington, D.C_____     762
Sportsmen's clubs and magazines:
        Auburn Sportsman's Club, Inc., Auburn, Mass_____     762
        Alaska Sportsmen's Council, Juneau, Alaska_____     762
        The Wayne County Sportsman's Club, River Rouge, Mich_____     763
        League of Ohio Sportsmen_____     765
        College Area Rifle & Revolver Association, State College, Pa_____     765
        Illinois State Rifle Association, Chicago, Ill_____     766
        Sportsmen's Council, Marine District of New York State_____     775
        New Jersey Sporting Goods Dealers & Manufacturers, Inc., Milltown,
           N.J_____     777
        The Camp Fire Club of America, New York_____     778
        Guns magazine, Skokie, Ill_____     780
        Warren Page, Field & Stream_____     783
        Vaughn K. Goodwin, National Muzzle Loading Rifle Association____     786
        Sportsmen & Firearms Counsel and the Ohio Rifle & Pistol Associa-
           tion, Cleveland, Ohio_____     788
        Boone & Crockett Club, Robert S. Waters, president, Johnstown, Pa__     788
        Joe H. McCracken, III, Dallas, Tex., representing the National Skeet
           Shooting Association, Amateur Trapshooting Association, Texas
           Shooters Association, California Skeet Association, and Dallas Gun
           Club_____     790
        North-South Skirmish Association, John C. Carroll, chairman, legisla-
           tive committee_____     794

CONTENTS      XIII

### , LETTERS AND TELEGRAMS SUBMITTED FOR THE RECORD

Page

Harris, Raymond I., coroner, St. Louis County, Mo., to Senator Dodd, dated July 1, 1965_____ 796

Richardson I. D., 5305 Green Tree Road, Houston, Tex., to Senator Dodd, dated August 6, 1965_____ 796

Strauss, Harvey E., president, Shur-X-Bullet Co., Inc., Rochester, N.Y., dated July 12, 1965_____ 797

Van Arskale, Bertram C., Louisville, Ky., dated April 29, 1965, to Congressman Charles P. Farnsley_____ 797

### STATEMENTS SUBMITTED FOR THE RECORD

Citizens Committee on Natural Resources, 1346 Connecticut Avenue, NW., Washington, D.C., by Spencer M. Smith, Jr., secretary_____ 799

Federal Cartridge Corp., 2700 Foshay Tower, Minneapolis, Minn., by Charles L. Horn, president_____ 800

Hornady Manufacturing Co., Grand Island, Nebr., by Joyce W. Hornady_ 803

Krug, Alan S., natural resources economist, University Park, Pa_____ 805

Liberty Lobby, 300 Independence Avenue, SE., Washington, D.C., by K. J. Cullinane, research director_____ 807

Rorschach, Harold E., 321 South Boston, Tulsa, Okla_____ 811

Shutt, G. Marvin, on behalf of the National Sporting Goods Association___ 814

Smith, Rabbi Harold P., Chicago, Ill., representing Rabbinical Council of American (headquarters: 84 Fifth Avenue, New York, N.Y.) and the Chicago Board of Rabbis (headquarters: 72 East 11th Street, Chicago, Ill.)_____ 815

Steinberg, David J., 7216 Stafford Road, Alexandria, Va_____ 817

Sargent, Raymond, L., chairman, Legislative Committee, Texas State Rifle Association_____ 818

Schooley, John M., Denver, Colo._____ 822

Scott, Woodson D., 25 Broadway, New York City_____ 824

Sensible Firearms Legislation Committee of Duchess County, by Mr. Raymond Tompkins, chairman, Post Office Box 251, Hortontown Road, Hopewell Junction, N.Y., to the Committee on the Judiciary_____ 831

Thompson, H. L., Jr., president, National Wholesale Hardware Association_____ 820

Walker, Robert Craighead, 7 Bay Street, Berlin, Md_____ 833

White, Ernest P., Jr., 14852 Union Avenue, San Jose, Calif_____ 833

Whittington, George R., 505 Amarillo Building, Amarillo, Tex_____ 834

Williams Gun Sight Co., Davison, Mich., by Boyd R. Williams, Secretary-Treasurer_____ 837

### ARTICLES SUBMITTED FOR THE RECORD

"Proposed Federal Legislation to Control the Interstate Sale of Firearms" which appears on page 58 of the Association of the Bar of the City of New York, July 1964, submitted by Mr. Fred N. Fishman, chairman, Committee on Federal Legislation, the Association of the Bar of the City of New York_____ 840

"The Truth About Guns" by Robert M. Price, 115 East Moltke, Daly City, Calif., constituent of J. Arthur Younger, 11th District, California, referred to Senator Thomas J. Dodd on May 15, 1965_____ 843

### AFFIDAVITS SUBMITTED FOR THE RECORD

Raines, Paul H., Mercantile National Bank, Dallas, Tex_____ 847

### RESOLUTIONS SUBMITTED FOR THE RECORD

Resolution adopted by the House of Delegates of the ABA in convention assembled. supporting the enactment of S. 1592, August 10, 1965, Miami, Fla_____ 849

# FEDERAL FIREARMS ACT

---

## WEDNESDAY, MAY 19, 1965

U.S. SENATE,
SUBCOMMITTEE ON JUVENILE DELINQUENCY
OF THE COMMITTEE ON THE JUDICIARY,
*Washington, D.C.*

The subcommittee (composed of Senators Dodd, Hart, Bayh, Burdick, Tydings, Hruska, Fong, and Javits) met, pursuant to call, at 10:10 a.m., in room 318, Old Senate Office Building, Senator Thomas J. Dodd presiding.

Present: Senators Dodd, Burdick, Fong and Javits.

Also present: Carl L. Perian, staff director; Gene Gleason, editorial director; William C. Mooney, chief investigator; Peter W. Velde, assistant to Senator Hruska, and Gerry H. Manges, assistant to Senator Javits.

Senator DODD. I will call this hearing to order. It is a resumption, really, of previous hearings held on this subject.

Today we will take testimony on the merits of Senate bill 1592, a proposal by President Lyndon Johnson to regulate the sale of firearms in interstate commerce. This bill is a major part of the President's legislative package to Congress designed to bring under control the explosive crime problem in this country.

The bill was proposed by President Johnson after analyzing the abuses of the Federal gun statutes which became law more than a generation ago. It appears those abuses have resulted in a runaway gun problem in this country today

S. 1592 was introduced by me on March 22, at the request of the President, and was cosponsored by Senator Tydings of this subcommittee, and Senators Douglas, Hartke, and Kennedy of New York.

During these hearings, the committee intends to determine the total scope of the firearms problem in this country including the mail-order, over-the-counter, and interstate aspects. We will further determine if the legislation before us will best solve the problem.

We intend to document in this record the contribution made by the proliferation of firearms to our burgeoning crime picture.

We also intend to hear all reasonable and objective views with regard to the effects that this amendment would have on this Nation's firearms industry, our legitimate mail-order houses, and the millions of hunters and sportsmen.

If, during these hearings, we develop information which indicates any provision of this legislation would place overly burdensome or undue hardships on responsible citizens. then these aspects will be given the most serious consideration.

1

2                    FEDERAL FIREARMS ACT

There are those who would have us believe that there is no firearms problem in this country, in spite of overwhelming evidence that such a problem does exist and that it is growing.

During 4 years of investigation, this subcommittee established a record which conclusively outlined, even to the most avid gun owners and enthusiasts, a serious mail-order problem in handguns.

The information published by the Federal Bureau of Investigation in its annual Uniform Crime Reports gives further evidence of an ever-increasing firearms problem in these United States. It also outlines the role played by rifles and shotguns in our homicide rate.

From the Bureau's annual report for 1963, we find that:

> Of the 8,500 homicides that year, 56 percent were perpetrated by persons armed with firearms. Of this 56 percent, 10 percent were by rifle, 20 percent by shotgun, and 70 percent by handgun.

From these figures, it is evident that the concealable firearm predominates as the weapon used in gun murders. However, I believe that we cannot overlook the fact that 30 percent of the firearms murders, or some 1,400 deaths, resulted from the criminal use of rifles and shotguns.

Preliminary figures for the year 1964, which are to be released in July, indicate another increase in firearms homicides.

The Federal Bureau of Investigation statistics prove that we are dealing not only with a problem of handgun misuse, but one which includes all firearms. I do not believe that we can exclude any type of firearm in the consideration of legislation. Therefore, I maintain that rifles and shotguns must be regulated if we hope to make inroads into this problem.

In this regard, I would like to cite recent cases from our files covering just the last 6 weeks, in which rifles were used in the wanton taking of human lives, or the shooting of innocent persons by hidden snipers.

In four of the cases, an immature youth was the assailant. In the fifth and sixth, the assailant has not been apprehended.

On April 12, a 17-year-old youth, armed with a high-powered rifle, shot and killed three Texas fishermen near Corpus Christi, Tex. When apprehended by the police, he was armed with a .38 revolver and a tear-gas gun. His 16-year-old accomplice was also charged in the slaying.

On April 17, an 8-year-old boy, who had just returned to his home in the Washington area with his parents, was shot in the shoulder by an unknown assailant who sped past the home and fired into it.

On April 19, a high school youth was killed and another wounded at a crowded drive-in restaurant near San Francisco. The shots were fired from a speeding car by youths armed with a shotgun.

On April 25, a 16-year-old boy sitting on a bluff overlooking a coastal highway in California, shot and killed three persons, including a 5-year-old boy, and wounded six others before taking his own life with a high-powered Swedish rifle to which a sniperscope was affixed.

On April 29, in Georgia, a 16-year-old student, apparently upset by poor grades, set up a sniper's nest high in a football stadium and fired 15 rounds from a high-powered rifle at 200 girls who were doing gymnastics on the field below. Miraculously no one was injured.

On May 4, a 17-year-old youth was shot at by a sniper from a rooftop and critically wounded in Brooklyn, N.Y.   It was the second time in less than 7 months that the youth had been wounded by a sniper.

While the firearms which were misused in these cases were not mail order, the fact is that the vast and unregulated proliferation of all types of firearms misused by immature youths and irresponsible adults is part of the problem with which we are faced.

When we consider the added attraction to the juvenile, the criminal, and the emotionally disturbed, of the secrecy of mail order, the problem becomes even more frightening.

From the subpenaed files of Klein's Sporting Goods in Chicago, the subcommittee, in cooperation with local police in several jurisdictions, has determined that mail-order rifles and shotguns have been sent to persons with criminal records in Chicago, Ill., in Dallas, Tex., in Philadelphia, Pa., in Los Angeles, Calif., in the State of New Jersey, and in the State of New York.

The crimes of these mail-order purchasers of rifles and shotguns range in seriousness from misdemeanors to felonies and include assault, assault and battery, assault with a deadly weapon, assault by battery on a police officer, larceny, sex offenses, and narcotics and dangerous drug offenses.

The information to which I have just referred proves—to me, anyway—the need for some measure of control over the interstate traffic in rifles and shotguns.

And let no one forget, Lee Oswald used a mail-order rifle to assassinate President John F. Kennedy on November 22, 1963.   We have that same model displayed on the board in the rear of the room today.

Let me also say that this study did not start or begin or commence as a consequence of that tragedy.   The original bill had already been introduced by me in the Senate 3 to 4 months prior to the assassination of President Kennedy.   There are critics who have said that this is a historical consequent of that assassination.   This is completely untrue.

The cases in our files illustrating the wanton and senseless taking of human life, evidence the fact that the rifle, or long arm, though primarily a sporting arm, is a lethal tool when misused.

To exclude such firearms from regulation in the consideration of legislation would be the height of folly.

How can any prudent and reasonable man maintain that we should not consider such firearms in our determinaton of a course of action?

An important provision in the legislation before us today would prohibit a federally licensed dealer from selling firearms to a person from another State.   That is an interesting point, and it is one concerning which gun enthusiasts have spread a lot of propaganda in the country.

We had suspected for quite some time that persons who were unable to purchase guns legally in the District of Columbia would travel into neighboring counties to buy a gun over the counter with no questions asked.   In order to see if this constituted a real problem, I asked the Treasury Department to examine the firearms records of selected dealers in nearby Maryland and Virginia to determine, first, the per-

centage of District of Columbia residents who had purchased firearms outside the District, and second, what percentage of that total had records of arrest with the Metropolitan Police Department.

The results are most certainly alarming. It was determined that two of the five dealers whose records were examined sold to a significant number of District residents. Those two dealers are located in Maryland, where regulations controlling over-the-counter sales are minimal.

The records of Apple Hardware, Inc., in Chillum, Md., show that 58 percent of their handgun sales during 1964 and early 1965 were to residents of the District of Columbia. Subsequent criminal records checks on these purchasers reveal that 40 percent of them have criminal records in the District's police files.

The records of the Suitland Trading Post in Suitland, Md., show that 40 percent of their firearms sales during 1964 and early 1965, were to residents of the District of Columbia. Subsequent criminal records checks here reveal that 23 percent of the purchasers have records in the District of Columbia.

While the dealers in question have not violated the letter of the Federal law, the fact remains that because of an apparent weakness in the law, this interstate traffic in firearms to criminals continues to flourish.

The arrest records of these purchasers which I have here in my hand—I have them all here—are quite revealing. Every citizen of the District of Columbia should be appalled after examining these records at the ease with which a felon or habitual misdemeanant can take a short bus ride and purchase a deadly weapon.

One purchaser of a gun has an arrest record which includes housebreaking, assault, petit larceny, unauthorized use of an auto, and robbery. He bought his gun in late 1964, and in February of 1965 was charged with a holdup by the Metropolitan Police Department of Washington.

Another purchaser bought his gun in late 1964, and in March of 1965 he was arrested for armed robbery.

A third purchaser, who bought his gun in 1965, has an arrest record which dates back to 1956 and includes petit larceny, assault, housebreaking, and robbery. He was convicted on a robbery charge in 1958, and was sentenced to prison. He was later paroled and subsequently arrested on another robbery charge.

A further analysis of the home addresses of these criminals and the location of the nearest District gun store was of even greater significance. Some of the gun enthusiasts argued that if it is made illegal to sell to an out-of-State resident, this will be a great burden. It is interesting to find that people who have gone into Maryland to buy these guns were within easy range of places where they could buy guns right in the District of Columbia. The majority of these persons lived within a dozen blocks of a store which sells weapons over the counter in the District of Columbia. The District operates under the Uniform Firearms Act, however, which requires the seller to wait 48 hours before delivering a handgun to a purchaser in addition to notification of the Police Department.

It is not too difficult to understand why these people prefer traveling in most cases 4 to 6 miles in order to purchase weapons where they are subject to virtually no control.

Our most flagrant case concerned a person with a record of 71 misdemeanor arrests who lived in the 1200 block of Massachusetts Avenue within 5 blocks of the nearest gun store. This gentleman traveled 8 miles in order to guarantee his anonymity.

In contrast to Maryland, a check of the Virginia stores which operate under local laws requiring a waiting period similar to that of the District of Columbia and notification of the local police prior to delivery, failed to show any significant sales to District residents with criminal records. They do not go to places where there is some effort to maintain control over the sale of these weapons.

The situation I have just described clearly illustrates the case with which virtually anyone, including convicted criminals, may purchase firearms outside the jurisdiction of their residence and make a mockery of the laws of their own community.

I might add that this situation is not peculiar to the Metropolitan Washington area. Information furnished us by the New Jersey State Police indicates that the laws of that State are circumvented by persons traveling into nearby Maryland, purchasing firearms and then returning to New Jersey.

In cooperation with Maryland authorities, the New Jersey State Police determined that 27 New Jersey residents purchased handguns in just 1 Maryland jurisdiction.

Five of the purchasers used the same fictitious address in Plainfield, N.J., and two others used fictitious addresses in Newark and in Elizabeth. One of the purchasers who used the fictitious address in Plainfield purchased 13 .22-caliber revolvers and one .25-caliber automatic. Subsequent investigation revealed that this man is actually a resident of New York City and has a lengthy police record there and a record with the FBI.

We could go on, but I think the point is obvious. We must take steps to control this traffic. The only reasonable and enforceable method of controlling it is through the provision of S. 1592 which prevents a dealer from selling to residents of other States. That is the reason for it.

We will hear from officials of the State of New Jersey at a later date and further information of the type I have just described will be presented.

Another area with which S. 1592 is concerned is the importation of foreign-made and military surplus firearms, which are sold both through retail outlets and by mail order in the United States.

During 1963 and 1964, available records show that some 2,167,629 firearms were imported into this country. When this figure is broken down, we find that 847,633 pistols and revolvers and 1,319,996 rifles and shotguns were imported.

Included among the various types, models, and makes of firearms which poured into this country is the .20 millimeter Lahti antitank gun, which we have on display here today. This is a rather heavy and cumbersome implement of war. However, the following cases show the various uses to which this gun has been put to use in this country.

During 1960, 1961, and 1962, two notorious bank robbers, one a killer, embarked on a spree of terror, armed robbery, and death which resulted in their being the subject of one of the most extensive manhunts in the history of the FBI.

They were apprehended and convicted. The cache of firearms which Federal agents seized from them included two of these .20-millimeter Lahti antitank guns and four cases of live ammunition.

Another case involving this same antitank gun occurred in the State of New Jersey, when three young men were apprehended by the New Jersey State police and game wardens near a rifle range in Sussex County. Included among their arsenal was a .20-millimeter Lahti, One of the youths admitted that while on a camping trip in December of 1962 he had fired the gun at a building which housed a tractor. The shells found their mark and did considerable damage. These youths had purchased this weapon from the same gunrunner who sold heavy weapons including the antitank guns to the two bank robbers described previously.

It is rather distressing to read some of the advertisements for these guns. I want to read one for the record. This is an ad in one of these gunrunners' catalogs, and I will quote it. There is a picture of a gun, and underneath it it says:

This is the ultimate in autoloading rifles. Fires a gigantic rimless, belted cartridge with a 2-ounce steel armor piercing bullet. Ideal for long-range shots at deer and bear or at cars and trucks and even a tank if you happen to see one.

We offer this fabulous tool at the price of only $99.50. Ammunition is $1 each or $80 for a case of 100.

In talking to the Post Office people, I asked, "What do you do about a company that puts this kind of advertisement in a magazine which is widely disseminated in the country and seen by thousands of youngsters, suggesting that it could be used to fire at cars and trucks?"

This is not the only gunrunner that has advertised this weapon. There have been other ads of a similar character. As you can see from our display it can be purchased from an Oklahoma mail-order firm for a premium price of $119.95 to the low, low price of $79.50 from a North Carolina mail-order firm.

This type of foolishness is to be deplored by intelligent men.

The mere thought of the sale of such violent tools of war to criminals and juveniles is inconceivable yet it is happening in America.

The situations I have described in this statement have resulted in these hearings today.

Twentieth century Americans are demanding a solution and we hope we have the beginnings of that solution in the bill before us today. I have no doubt that the people of this country by a substantial majority want this legislation passed. I am well aware of the large lobby and large amount of money being spent to defeat it, but I think they are going to have a lot of fun trying.

I believe that the design and intent of the bill is sound. If enacted, it would:

(1) Prohibit mail-order sales of firearms to individuals by limiting firearms shipments in interstate and foreign commerce to shipments between importers, manufacturers, and dealers.

(2) Prohibit sales by federally licensed importers, manufacturers, and dealers of all types of firearms to persons under 21 years of age, except that sales of sporting rifles and shotguns could continue to be made to persons over 18 years of age.

(3) Prohibit a Federal licensee from selling a firearm, other than a rifle or shotgun, to any person who is not a resident or businessman of the State in which the licensee's place of business is located.

(4) Curb the flow into the United States of surplus military weapons and other firearms not suitable for sporting purposes.   No one seems to know exactly how many of these surplus military weapons there are, but there must be millions of them in this country.

(5) Bring under Federal control interstate shipment and disposition of large caliber weapons such as bazookas and antitank guns, and destructive devices such as grenades, bombs, missiles, and rockets.

(6) Increase license fees under the Federal Firearms Act.

(7) Provide other Federal controls designed to make it feasible for States to control more effectively traffic in firearms within their borders under their police powers.

Now I ask that, unless there is objection, a copy of the bill, S. 1592, be printed in full at this point in the record, and that reports received from the various Government agencies be printed in the appendix.

(The document referred to was marked "Exhibit No. 1" and is as follows:)

EXHIBIT No. 1

[S. 1592, 89th Cong., 1st sess.]

A BILL To amend the Federal Firearms Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the first section of the Federal Firearms Act (52 Stat. 1250) is amended to read as follows:

"SEC. 1. DEFINITIONS.—As used in this Act—

"(1) The term 'person' includes an individual partnership, association, or corporation.

"(2) The term 'interstate or foreign commerce' means commerce between any State or possession (not including the Canal Zone) and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), but through any place outside thereof; or within any possession or the District of Columbia.  The term 'State' shall include the Commonwealth of Puerto Rico, the Virgin Islands, and the District of Columbia.

"(3) The term 'firearm' means any weapon, by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device.

"(4) The term 'destructive device' means any explosive or incendiary (a) bomb or (b) grenade or (c) rocket or (d) missile or (e) similar device, or launching device therefor (except a device which is not designed or redesigned or used or intended for use as a weapon or part thereof); and the term shall also include any type of weapon by whatsoever name known (other than a shotgun having a barrel or barrels of eighteen or more inches in length), which will, or which is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive, the barrel or barrels of which have a bore of one-half inch or more in diameter: *Provided,* That the Secretary may exclude from this definition any device which he finds is not likely to be used as a weapon.

"(5) The term 'short-barreled shotgun' means a shotgun having a barrel or barrels of less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(6) The term 'short-barreled rifle' means a rifle having a barrel or barrels of less than sixteen inches in length, and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(7) The term 'importer' means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term 'licensed importer' means any such person licensed under the provisions of this Act.

8                          FEDERAL FIREARMS ACT

"(8) The term 'manufacturer' means any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this Act.

"(9) The term 'dealer' means (a) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (b) any person engaged in the business of repairing such firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (c) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.

"(10) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.

"(11) The term 'indictment' includes an indictment or an information in any court of the United States or of any State or possession under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

"(12) The term 'fugitive from justice' means any person who has fled from any State or possession (a) to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year, or (b) to avoid giving testimony in any criminal proceeding.

"(13) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate.

"(14) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(15) The term 'ammunition' means pistol or revolver ammunition, ammunition for a destructive device, and ammunition for a machinegun or rifle."

SEC. 2. Section 2 of the Federal Firearms Act is amended to read as follows:

"SEC. 2. UNLAWFUL ACTS.—(a) It shall be unlawful for any person (except an importer, manufacturer, or dealer, licensed under the provisions of this Act) to transport, ship, or receive any firearm in interstate or foreign commerce, except—

"(1) that in the case of a shotgun or rifle (other than a short-barreled shotgun or short-barreled rifle) nothing in this subsection shall be held to preclude an individual traveling in interstate or foreign commerce from transporting such shotgun or rifle (or having such shotgun or rifle transported for him under such conditions as the Secretary shall by regulations prescribe), if such transportation is for a lawful purpose;

"(2) that in the case of a pistol or revolver, nothing in this subsection shall be held to preclude an individual traveling in interstate or foreign commerce from transporting a pistol or revolver, possessed and carried in conformity with the law of each particular State into (or through) which the pistol or revolver is transported (or having the pistol or revolver transported for him under such conditions as the Secretary or his delegate shall by regulations prescribe), if (A) the transportation is for a lawful purpose not including sale or other disposition thereof, and (B) such individual did not acquire the pistol or revolver in the course of such traveling in interstate or foreign commerce;

"(3) that in the case of a shotgun or rifle (other than a short-barreled shotgun or short-barreled rifle) or a pistol or revolver, nothing in this subsection shall be held to preclude a person from shipping such a firearm to a licensed importer, licensed manufacturer, or licensed dealer for authorized service and the return of such firearm to the sender under such conditions as the Secretary shall by regulations prescribe;

"(4) that nothing in this subsection shall be construed as making unlawful the shipping or transporting of a firearm in interstate or foreign commerce, by a common or contract carrier in the operation of his business or by United States mail, to a licensed importer, licensed manufacturer, or licensed dealer (or such transportation as is otherwise authorized under this Act);

"(5) that nothing in this subsection shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if

the District of Columbia, the Commonwealth of Puerto Rico, or the possession were a State of the United States.

"(b) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm to any person—

"(1) without following the required procedures for ascertaining (in such a manner as the Secretary shall by regulations prescribe) the identity and place of residence (or business in the case of a corporation or other business entity) of such person; or

"(2) who (in the case of an individual) is under twenty-one years of age (except for a shotgun or rifle), and under eighteen years of age in the case of a shotgun or rifle; or

"(3) who he knows or has reasonable cause to believe is not a resident of (or in the case of a corporation or other business entity, who does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located; except that this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or short-barreled rifle); or

"(4) who by reason of any State or local law, regulation, or ordinance applicable at the place of sale or other disposition may not lawfully receive or possess such firearm.

"This subsection shall not apply in the case of transactions between licensed importers, licensed manufacturers, and licensed dealers.

"(c) It shall be unlawful for any licensed imported, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee) knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States or of any State or possession of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice; or to ship or transport any firearm in interstate or foreign commerce to any person who may not lawfully receive such firearm under subsection (a).

"(d) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to ship, transport, or cause to be shipped or transported, any firearm or ammunition in interstate or foreign commerce.

"(e) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or is a fugitive from justice, to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

"(f) It shall be unlawful for any person knowingly to deposit, or cause to be deposited for mailing or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice to the Postmaster General or his delegate or to the carrier (as the case may be) that a firearm is being transported or shipped.

"(g) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce, any firearm to any person who does not exhibit or produce evidence of a license obtained under section 3 of this Act or who is not exempted by section 4 from the provisions of this Act (except a firearm transported under regulations prescribed under section 2(a) (1), (2), or (3) of this Act).

"(h) It shall be unlawful for any person to transport or ship, or cause to be transported or shipped, in interstate or foreign commerce, any stolen firearm, or stolen ammunition knowing, or having reasonable cause to believe, same to have been stolen.

"(i) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition or pledge or accept as security for a loan any stolen firearm or stolen ammunition, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing, or having reasonable cause to believe, the same to have been stolen.

"(j) It shall be unlawful for any person to transport, ship, or knowingly receive, in interstate or foreign commerce, any firearm from which the importer's or manufacturer's serial number, as the case may be, has been removed, obliterated, or altered.

"(k) It shall be unlawful for any person to import or bring into the United States or any possession thereof any firearm in violation of the provisions of this Act, or to import or bring into the United States or any possession thereof any ammunition for a destructive device.

"(1) It shall be unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this Act."

SEC. 3. Section 3 of the Federal Firearms Act is amended to read as follows:

"SEC. 3. (a) No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from the Secretary.  The application shall be in such form and contain such information as the Secretary shall by regulations prescribe.  Each applicant shall be required to pay a fee for obtaining such license (for each place of business) as follows:

"(1) If a manufacturer—
"(A) of destructive devices, a fee of $1,000 per annum;
"(B) of firearms (other than destructive devices), a fee of $500 per annum.
"(2) If an importer—
"(A) of destructive devices, a fee of $1,000 per annum;
"(B) of firearms (other than destructive devices), a fee of $500 per annum;
"(3) If a dealer—
"(A) in destructive devices, a fee of $1,000 per annum;
"(B) who is a pawnbroker (dealing in firearms other than destructive devices), a fee of $250 per annum;
"(C) in firearms (other than as prescribed in subparagraphs (A) or (B)), a fee of $100 per annum.

The fee for an importer or manufacturer of, or a dealer in, ammunition for a destructive device shall be the same as for an importer or manufacturer of, or a dealer in destructive devices, and the fee for an importer or manufacturer of, or a dealer in other firearms ammunition shall be the same as for an importer or manufacturer of or a dealer in such firearms.  However, a person who has obtained a license covering firearms shall not be required to obtain an additional license with respect to ammunition.

"(b) Upon filing by an applicant of the prescribed application and payment of the prescribed fee, the Secretary shall (except as provided in subsection (c)), issue to such applicant the license applied for, which shall, subject to the provisions of this Act and other applicable provisions of law, entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.

"(c) Any application submitted under subsections (a) and (b) of this section shall be disapproved and the license denied if the Secretary, after notice and opportunity for hearing, finds that—

"(1) the applicant is under twenty-one years of age; or
"(2) the applicant (including in the case of a corporation, partnership, or association, any individual possessing directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of subsection (d) or (e) of section 2 of this Act; or is, by reason of his business experience, financial standing, or trade connections, not likely to maintain operations in compliance with this Act; or
"(3) the applicant has willfully violated any of the provisions of this Act or the regulations issued thereunder; or
"(4) the applicant has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application; or
"(5) the applicant does not have, or does not intend to have or to maintain, in a State or possession, business premises for the conduct of the business.

"(d) The provisions of sections 2 (d) and (e) of this Act shall not apply in the case of a licensed importer, licensed manufacturer, or licensed dealer who is indicted for a crime punishable by imprisonment for a term exceed-

ing one year. A licensed importer, licensed manufacturer, or licensed dealer may continue operations, pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act and operations pursuant to such license shall be discontinued (unless an application for relief has been filed under section 6).

"(e) No person shall import or bring any firearms into the United States or any possession thereof, except that the Secretary may authorize a firearm to be imported or brought in if the person importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—

"(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or

"(2) is (A) an antique, or (B) an unserviceable firearm (not readily restorable to firing condition), imported or brought in as a curio or museum piece; or

"(3) is of a type and quality generally recognized as particularly suitable for lawful sporting purposes and is not a surplus military weapon and that the importation or bringing in of the firearm would not be contrary to the public interest; or

"(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm.

*Provided*, That the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm will be allowed under this subsection.

"(f) No licensed importer, licensed manufacturer, or licensed dealer shall sell or otherwise dispose of a destructive device, a machine gun (as defined in section 5848 of the Internal Revenue Code of 1954), a short-barreled shotgun, or a short-barreled rifle, to a nonlicensee unless he has in his possession a sworn statement executed by the principal law enforcement officer of the locality wherein the purchaser or person to whom it is otherwise disposed of resides, attesting that there is no provision of law, regulation, or ordinance which would be violated by such person's receipt or possession thereof and that he is satisfied that it is intended by such person for lawful purposes. Such sworn statement shall be retained by the licensee as a part of the records required to be kept under subsection (g).

"(g) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, and sale and other disposition, of firearms and ammunition at such place, for such period and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary or his delegate may enter during business hours the premises (including places of storage) of any firearms or ammunition importer, manufacturer, or dealer for the purpose of inspecting or examining any records or documents required to be kept by such importer or manufacturer or dealer under the provisions of this Act or regulations issued pursuant thereto, and any firearms or ammunition kept or stored by such importer, manufacturer, or dealer at such premises. Upon the request of any State or possession or political subdivision thereof, the Secretary of the Treasury may make available to such State, or possession, or any political subdivision thereof, any information which he may possess or which he may obtain by reason of the provisions of this Act with respect to the identification of persons within such State, or possession, or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of the firearms or ammunition so purchased or received.

"(h) Licenses issued under the provisions of subsection (c) of this section shall be kept posted and kept available for inspection on the business premises covered by the license.

"(i) Licensed importers and licensed manufacturers shall identify (or cause to be identified), in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."

SEC. 4. Section 4 of the Federal Firearms Act is amended to read as follows:

"SEC. 4. EXCEPTIONS TO APPLICABILITY OF THE ACT.—The provisions of this Act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearms or ammunition imported for, or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof; or (2) any State, or possession, or any department, independent establishment, agency, or any political subdivision thereof."

SEC. 5. Subsection (b) of section 5 of the Federal Firearms Act is amended to read as follows:

"(b) Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of this Act, or any rules or regulations promulgated thereunder, or any violation of the provisions of title 18, United States Code, sections 111, 112, 372, 871, or 1114, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5848(1) of said Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this Act."

SEC. 6. The Federal Firearms Act is amended by renumbering sections 6, 7, 8, and 9 as section 8, 9, 10, and 11, respectively, and inserting after section 5 the following new sections:

"SEC. 6. RELIEF OF CONVICTED PERSONS UNDER CERTAIN CONDITIONS.—A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this Act or of the National Firearms Act) may make application to the Secretary for relief from the disabilities under the Act incurred by reason of such conviction, and the Secretary may grant such relief if it is established to his satisfaciton that the circumstances regarding the conviction, and the applicant's record and reputation are such that the applicant will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest. A licensee conducting operations under the Act, who makes application for relief from the disabilities incurred under the Act by reason of such a conviction, shall not be barred by such conviction from further operations under this license pending final action on an application for relief filed pursuant to this section.

"SEC. 7. APPLICABILITY OF OTHER LAWS.—

"(a) Nothing in this Act shall be construed as modifying or affecting any provision of—

"(1) the National Firearms Act (chapter 53 of Internal Revenue Code of 1954) ; or

"(2) section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control) ) ; or

"(3) section 1715 of title 18 of the United States Code (relating to nonmailable firearms).

"(b) Nothing in this Act shall confer any right or privilege to conduct any business contrary to the law of any State, or be construed as relieving any person from compliance with the law of any State."

SEC. 7. The amendments made by this Act shall become effective on the date of the enactment of this Act; except that the amendments made by section 3 of this Act to section 3(a) of the Federal Firearms Act shall not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act on the date of the enactment of this Act until the expiration of the license held by such importer, manufacturer, or dealer on such date.

EXHIBIT No. 2

[S. 14, 89th Cong., 1st sess.]

A BILL To amend the Federal Firearms Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the first section of the Federal Firearms Act (52 Stat. 1250) is amended to read as follows:

"That, as used in this Act—

"(1) The term 'person' includes an individual, partnership, association, or corporation.

"(2) The term 'interstate or foreign commerce' means commerce between any State or possession (not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State or possesssion (not including the Canal Zone), or the District of Columbia, but through any place outside thereof; or within any possession or the District of Columbia. The term 'State' shall be held to include the Commonwealth of Puerto Rico and the District of Columbia.

"(3) The term 'firearm' means any weapon, by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive, the frame or receiver of any such weapon, or any firearm muffler or firearm silencer.

"(4) The term 'manufacturer' means any person engaged in the manufacture or importation of firearms for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this Act.

"(5) The term 'dealer' means (a) any person engaged in the business of selling firearms at wholesale or retail; (b) any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, or trigger mechanisms to firearms, or (c) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.

"(6) The term 'fugitive from justice' means any person who has fled from any State, the District of Columbia, or possession of the United States, (a) to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year; or (b) to avoid giving testimony in any criminal proceeding.

"(7) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the repayment of money loaned thereon.

"(8) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(9) The term 'indictment' includes an indictment or an information in any court of the United States, the several States, possessions, or the District of Columbia under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

"(10) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate."

SEC. 2. (a) Subsections (a), (b), (d), (e), (g), and (h) of section 2 of the Federal Firearms Act are amended by striking out the word "or ammunition" wherever they appear.

(b) Subsection (d) of section 2 of said Act is amended by striking out the word "Territories".

(c) Subsection (f) of section 2 of said Act is amended to read as follows:

"(f) It shall be unlawful for any person who is under indictment or who has been convicted by any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to receive any firearm which has been shipped or transported in interstate or foreign commerce."

(d) Subsection (i) of section 2 of said Act is amended by striking out the words, "and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act."

(e) Section 2 of said Act is amended by adding at the end thereof the following new subsections:

"(j) It shall be unlawful for any manufacturer or dealer knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed dealers or manufacturers, any package or other container in which there is any firearm without written notice to the carrier that a firearm is being transported or shipped.

"(k) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce any firearm to any person with knowledge or with reasonable cause to believe that such person is under eighteen years of age.

**14**                  FEDERAL FIREARMS ACT

"(1) It shall be unlawful for any manufacturer or dealer to ship, or cause to be shipped, any firearm in interstate or foreign commerce to any person (other than to a licensed manufacturer or to a licensed dealer, or to a person exhibiting a State license as prescribed in subsection (c) of this section, or for exportation to a foreign country) unless the person to whom such firearm is to be shipped has submitted to such manufacturer or dealer a sworn statement, in duplicate, in such form and manner as the Secretary shall by regulations prescribe, attested to by a notary public, to the effect that (1) such person is eighteen years or more of age, (2) he is not a person prohibited by this Act from receiving a firearm in interstate or foreign commerce, (3) there are no provisions of law, regulations, or ordinances applicable to the locality to which the firearm will be shipped which would be violated by such person's receipt or possession of the firearm, and (4) that (Title _____, Name _____, and Official Address _____) (blanks to be filled in with the title, true name, and address) are the true name and address of the principal law enforcement officer of the locality to which the firearm will be shipped. It shall be unlawful unless such manufacturer or dealer has, prior to the shipment of such firearm, forwarded by United States registered mail (return receipt requested) to the local law enforcement officer named in the sworn statement, the description (including (1) manufacturer thereof, (2) the caliber or gage, (3) the model and type of firearm but not including serial number identification) of the firearm to be shipped, and one copy of the sworn statement, and has received a return receipt evidencing delivery of the registered letter or such registered letter has been returned to the manufacturer or dealer due to the refusal of the named law enforcement officer to accept such letter as evidenced in accordance with United States Post Office Department regulations. It shall be unlawful for any person to cause to be transmitted by United States mail, or to cause to be transmitted in interstate commerce, such a sworn statement which contains any false statement as to any material fact for the purpose of obtaining a firearm from a licensed manufacturer or a licensed dealer.

"This subsection shall not apply in the case of any firearm shipped to a licensed manufacturer or dealer for authorized service and which is being returned to the sender by the manufacturer or dealer and the records of the manufacturer or dealer shall properly show such infomation."

SEC. 3. Section 3 of the Federal Firearms Act is amended to read as follows:

"SEC. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms in interstate or foreign commerce shall file an application for such license with the Secretary, in such form and containing such information as the Secretary shall by regulation prescribe. Each such applicant shall be required to pay a fee for obtaining such license as follows:

"(1) If a manufacturer of firearms, a fee of $50 per annum;

"(2) If a dealer (other than a pawnbroker) in firearms, a fee of $10 per annum; or

"(3) If a pawnbroker, a fee of $50 per annum.

"(b) Upon filing by a qualified applicant of a proper application and the payment of the prescribed fee, the Secretary shall issue to such applicant the license applied for, which shall, subject to the provisions of this Act, entitle the licensee to transport, ship, and receive firearms in interstate or foreign commerce during the period stated in the license. Except that, no license shall be issued pursuant to this Act (1) to any applicant who is under twenty-one years of age; or (2) to any applicant, if the applicant (including, in the case of a corporation, partnership, or association, any individual possessing directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited by the provisions of this Act from transporting, shipping, or receiving firearms in interstate or foreign commerce.

"(c) The provisions of section 2 (d), (e), and (f) of this Act shall not apply in the case of a licensed manufacturer or licensed dealer who is under indictment for a crime punishable by imprisonment for a term exceeding one year, provided that such manufacturer or dealer gives notice to the Secretary by registered or certified mail of his indictment within thirty days of the date of the indictment. A licensed manufacturer or licensed dealer who has given notice of his indictment to the Secretary, as provided in this subsection, may continue operations pursuant to his existing license during the term of such indictment, and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act and operations pursuant to such license shall be discontinued.

"(d) Each licensed manufacturer and licensed dealer shall maintain such permanent records of production, importation, shipment, and other disposal of firearms as the Secretary may by regulation prescribe."

SEC. 4. Section 4 of the Federal Firearms Act is amended to read as follows:

"SEC. 4. (a) The provisions of this Act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearms sold or shipped to, or issued for the use of, (1) the United States or any department, independent establishment, or agency thereof; (2) any State, or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof; (3) any duly commissioned officer or agent of the United States, a State, or possession, or the District of Columbia, or any political subdivision thereof; (4) to any bank, public carrier, express, or armored truck company organized and operating in good faith for the transportation of money and valuables, which is granted an exemption by the Secretary; (5) to any research laboratory designated as such by the Secretary; or (6) to the transportation, shipment, or receipt of antique or unserviceable firearms (other than a 'firearm' as defined in section 5848(1) of the Internal Revenue Code of 1954) possessed and held as a curio or museum piece.

"(b) Nothing contained in this Act shall be construed to prevent shipments of firearms to institutions, organizations, or persons to whom firearms may be lawfully delivered by the Secretary of Defense or his delegate, nor to prevent the receipt or transportation of such firearms by their lawful possessors while they are engaged in military training or in competitions."

SEC. 5. (a) Subsection (b) of section 5 of the Federal Firearms Act is amended by striking out the words "or ammunition."

(b) Subsection (b) of section 5 of said Act is further amended by striking out the words "title 26" where they first appear and inserting in lieu thereof the words "the Internal Revenue Code of 1954", and by striking out the words "section 2733 of title 26" and inserting in lieu thereof the words "section 5848 of said Code."

SEC. 6. The amendments made by this Act shall become effective on the first day of the second month beginning after the date of enactment of this Act.

SEC. 7. The Federal Firearms Act is amended by adding at the end thereof the following new section:

"SEC. 10. Nothing in this Act shall be construed as modifying or affecting the requirements of section 414 of the Mutual Security Act of 1954, as amended, with respect to the manufacture, exportation, and importation of arms, ammunition, and implements of war."

---

EXHIBIT No. 3

[S. 1180, 89th Cong., 1st sess.]

A BILL To amend the Federal Firearms Act to prohibit the importation of a firearm into the United States without a license

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Federal Firearms Act is amended by renumbering sections 5, 6, 7, 8, and 9 of such Act as sections 6, 7, 8, 9, and 10 and by inserting immediately after section 4 the following new section:

"SEC. 5. (a) (1) It shall be unlawful for any person to import or bring into the United States or any possession thereof any firearm for which a license to import or bring into the United States is required under subsection (b) of this section unless such person has first obtained a license from the Secretary of the Treasury, as provided in such subsection to so import or bring in such firearm.

"(2) It shall be unlawful for any person to knowingly receive any firearm which has been imported or brought into the United States or any possession thereof in violation of the provisions of this section.

"(b) Any person desiring to import or bring a firearm into the United States or a possession thereof shall, in addition to complying with all other applicable provisions of law, obtain a license from the Secretary of the Treasury for the importation or bringing in of such firearm. Licenses required under this subsection shall be issued in such form or manner and subject to such conditions as the Secretary of the Treasury shall by regulation prescribe. No license shall be issued under the provisions of this subsection unless it has been established to the satisfaction of the Secretary of the Treasury that the firearm is to be imported or brought in for a lawful purpose, and is adequately identified in such manner that proper records of its importation and disposition may be maintained—

16 FEDERAL FIREARMS ACT

"(1) that such firearm is being importer or brought in for scientific or research purposes, or as a sample for a licensed manufacturer or licensed dealer, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code, or

"(2) that the firearm to be imported or brought in is particularly designed and intended for target shooting or sporting purposes and is unique or so unusual in design or workmanship that a comparable firearm cannot be obtained in the United States or a possession thereof, or

"(3) that the importation or bringing in of such firearm is in the public interest."

SEC. 2. The amendments made by this Act shall become effective on the first day of the second month beginning after the date of enactment of this Act.

---

EXHIBIT No. 4

[S. 1965, 89th Cong., 1st sess.]

A BILL To amend the Federal Firearms Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the first section of the Federal Firearms Act (52 Stat. 1250) is amended to read as follows:

"That as used in this Act—

"(1) The term 'person' includes an individual, partnership, association, or corporation.

"(2) The term 'interstate or foreign commerce' means commerce between any State or possession (not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), or the District of Columbia, but through any place outside thereof; or within any possession or the District of Columbia. The term 'State' shall be held to include the Commonwealth of Puerto Rico and the District of Columbia.

"(3) The term 'firearm' means any weapon, by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive, the frame or receiver of any such weapon, or any firearm muffler or firearm silencer.

"(4) The term 'handgun' means any pistol or revolver originally designed to be fired by the use of a single hand, and which is designed to fire or capable of firing fixed cartridge ammunitions or any other firearm originally designed to be fired by the use of a single hand or which has an overall length of less than twenty-six inches.

"(5) The term 'manufacturer' means any person engaged in the manufacture or importation of firearms for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this Act.

"(6) The term 'dealer' means (a) any person engaged in the business of selling firearms at wholesale or retail; (b) any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, or trigger mechanisms to firearms, or (c) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.

"(7) The term 'fugitive from justice' means any person who has fled from any State, the District of Columbia, or possession of the United States, (a) to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year; or (b) to avoid giving testimony in any criminal proceeding.

"(8) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the repayment of money loaned thereon.

"(9) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(10) The term 'indictment' includes an indictment or any information in any court of the United States, the several States, possessions, or the District of Columbia under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

FEDERAL FIREARMS ACT                    **17**

"(11) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restaints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate."

SEC. 2. (a) Subsections (a), (b), (d), (e), (g), and (h) of section 2 of the Federal Firearms Act are amended by striking out the words "or ammunition" wherever they appear.

(b) Subsection (d) of section 2 of said Act is amended by striking out the word "Territories".

(c) Subsection (f) of section 2 of said Act is amended to read as follows:

"(f) It shall be unlawful for any person who is under indictment or who has been convicted by any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to receive any firearm which has been shipped or transported in interstate or foreign commerce."

(d) Subsection (i) of section 2 of said Act is amended by striking out the words, "and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act."

(e) Section 2 of said Act is amended by adding at the end thereof the following new subsections:

"(j) It shall be unlawful for any manufacturer or dealer knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed dealers or manufacturers, any package or other container in which there is any handgun as defined in this Act, or any firearm as defined in section 5848(1) of the Internal Revenue Code of 1954, without written notice to the carrier that handguns or such firearms are being transported or shipped.

"(k) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce any handgun as defined in this Act, or any firearm as defined in section 5848(1) of the Internal Revenue Code of 1954 to any person with knowledge or with reasonable cause to believe that such person is under eighteen years of age.

"(l) It shall be unlawful for any manufacturer or dealer to ship any firearm as defined in section 5848(1) of the Internal Revenue Code of 1954 in interstate or foreign commerce to any person other than a licensed manufacturer or licensed dealer or person exhibiting a license as prescribed in subsection (c) of this section.

"(m) It shall be unlawful for any manufacturer or dealer to ship any handgun as defined in this Act in interstate or foreign commerce to any person other than a licensed manufacturer or licensed dealer or person exhibiting a license as prescribed in subsection (c) of this section, unless the person to whom such handgun is to be so shipped has submitted to such manufacturer or dealer a sworn statement in such form and manner as the Secretary shall by regulation prescribe, to the effect that such person (1) is eighteen years or more of age; (2) that he is not a person prohibited by this Act from receiving a handgun in interstate or foreign commerce; and (3) that there are no provisions of law, regulations, or ordinances applicable to the locality to which the handgun will be shipped, which would be violated by such person's receipt or possession of the handgun. Such sworn statement shall contain the true name and address of the principal law enforcement officer of the locality to which the handgun will be shipped. It shall be unlawful unless such manufacturer or dealer has, prior to the shipment of such handgun, forwarded by United States registered mail (return receipt requested) to the local law enforcement officer named in the sworn statement, the description (including (1) manufacturer thereof, (2) the caliber, (3) the model and type of handgun but not including serial number identification) of the handgun to be shipped, and one copy of the sworn statement, and has received a return receipt evidencing delivery of the registered letter or such registered letter has been returned to the manufacturer or dealer due to the refusal of the named law enforcement officer to accept such letter as evidenced in accordance with United States Post Office regulations. It shall be unlawful for any person to cause to be transmitted by United States mail or to cause to be transported in interstate or foreign commerce such a sworn statement which contains any false statement as to any material fact for the purpose of obtaining a handgun.

18                    FEDERAL FIREARMS ACT

SEC. 3. Section 3 of the Federal Firearms Act is amended to read as follows:
"SEC. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms in interstate or foreign commerce shall file an application for such license with the Secretary, in such form and containing such information as the Secretary shall by regulation prescribe. Each such applicant shall be required to pay a fee for obtaining such license as follows:
"(1) If a manufacturer of firearms, a fee of $50 per annum;
"(2) If a dealer (other than a pawnbroker) in firearms, a fee of $10 per annum; or
"(3) If a pawnbroker, a fee of $50 per annum.
"(b) Upon filing by a qualified applicant of a proper application and the payment of the prescribed fee, the Secretary shall issue to such applicant the license applied for, which shall, subject to the provisions of this Act, entitle the licensee to transport, ship, and receive firearms in interstate or foreign commerce during the period stated in the license. Except that, no license shall be issued pursuant to this Act (1) to any applicant who is under twenty-one years of age; or (2) to any applicant, if the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited by the provisions of this Act from transporting, shipping, or receiving firearms in interstate or foreign commerce.
"(c) The provisions of section 2 (d), (e), and (f) of this Act shall not apply in the case of a licensed manufacturer or licensed dealer who is under indictment for a crime punishable by imprisonment for a term exceeding one year, provided that such manufacturer or dealer gives notice to the Secretary by registered or certified mail of his indictment within thirty days of the date of the indictment. A licensed manufacturer or licensed dealer who has given notice of his indictment to the Secretary, as provided in this subsection, may continue operations pursuant to his existing license during the term of such indictment, and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act and operations pursuant to such license shall be discontinued.
"(d) Each licensed manufacturer and licensed dealer shall maintain such permanent records of production, importation, shipment, and other disposal of firearms as the Secretary may by regulation prescribe."
SEC. 4. Section 4 of the Federal Firearms Act is amended to read as follows:
"SEC. 904. EXEMPTIONS.—(a) The provisions of this Act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearms sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof; (2) any State or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof; (3) any duly commissioned officer or agent of the United States, a State, or possession, or the District of Columbia, or any political subdivision thereof; (4) to any bank, public carrier, express, or armored-truck company organized and operating in good faith for the transportation of money and valuables, which is granted an exemption by the Secretary; (5) to any research laboratory designated as such by the Secretary; or (6) to the transportation, shipment, or receipt of antique or unserviceable firearms (other than a 'firearm' as defined in section 5848 (1) of the Internal Revenue Code of 1954) possessed and held as a curio or museum piece.
"(b) Nothing contained in this Act shall be construed to prevent shipments of firearms to institutions, organizations, or persons to whom firearms may be lawfully delivered by the Secretary of Defense or his delegate, nor to prevent the receipt of transportation of such firearms by their lawful possessors while they are engaged in military training or in competitions."
SEC. 5. (a) Subsection (b) of section 5 of the Federal Firearms Act is amended by striking out the words "or ammunition."
(b) Subsection (b) of section 5 of said Act is further amended by striking out the words "title 26" where they first appear and inserting in lieu thereof the words "the Internal Revenue Code of 1954", and by striking out the words "section 2733 of title 26" and inserting in lieu thereof the words "section 5848 of said Code."

Sec. 6. The amendments made by this Act shall become effective on the first day of the second month beginning after the date of enactment of this Act.

Sec. 7. The Federal Firearms Act is amended by adding at the end thereof the following new section:

"Sec. 10. Nothing in this Act shall be construed as modifying or affecting the requirements of section 414 of the Mutual Security Act of 1954, as amended, with respect to the manufacture, exportation, and importation of arms, ammunition, and implements of war."

Senator DODD. Senator Javits, I believe you have a statement.

Senator JAVITS. Senator Fong does not have a statement?

Senator FONG. No; I do not have any statement, Mr. Chairman. I anticipated listening to the testimony that will be presented before the committee.

Senator JAVITS. Mr. Chairman, then, may I be recognized very briefly?

Senator DODD. Yes, Senator Javits.

Senator JAVITS. Mr. Chairman, I would like to identify myself with the deep concerns that you have, and pay my tribute to the Chair for his interest in this matter, which has been very definitely a major matter of legislative business of the chairman's.

Even in the State of New York, where we have State laws with relation to the possession of weapons, especially concealed weapons, our police officials, as reflected by the testimony of Lawrence Pierce, the deputy commissioner of police of New York City, who appeared before the subcommittee last year, believe we have a tremendous problem of juvenile arrests for felonies including the possession of weapons, with a substantial proportion of the weapons obtained from outside the State.

Mr. Chairman, I would like to include in the record reference to the facts and figures concerning shipment of weapons into New York by one company.

(The information referred to was marked "Exhibit No. 5" and is as follows:)

20 FEDERAL FIREARMS ACT

EXHIBIT No. 5

*Shipments to New York State (exclusive of New York City)*

YEAR 1961

| Type of gun | January | February | March | April | May | June | July | August | September | October | November | December | Total by make |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Air rifle | 3 | | | 1 | | 1 | 1 | | | 1 | | | 9 |
| Enfield .38 | 2 | | | 1 | | 1 | | | | 1 | | 2 | 6 |
| Colt .45 | 1 | 1 | 1 | | | | | | | | | | 2 |
| Italian | | | | 1 | | | | | | | 1 | | 1 |
| M-1 carbine | 2 | 1 | | | | | | 1 | 1 | 2 | | 1 | 7 |
| M. & M. .38 | 1 | | | | | | | | | | | | 4 |
| Machinegun | 1 | 1 | 2 | | | | | | | | 4 | 7 | 15 |
| Mexican bowie | | | | 1 | | | | | | | | | 1 |
| Mossberg | | | | | | | | | | | | | 1 |
| P-17 rifle | 6 | | 2 | | | | | | | | | | 9 |
| Roscoe blue | 1 | | 1 | | | 1 | | 1 | 1 | 1 | 1 | | 3 |
| Smith & Wesson .38 | | | | | | | 1 | | 1 | | | 1 | 3 |
| Snubbie | | | 1 | | | | | | | | | | 1 |
| Springfield | | 4 | | | | | | | | | 1 | 1 | 5 |
| Stiletto | | | | | | | | | | | | 1 | 4 |
| Savage .22 | | | 2 | | | | | | | | | | 2 |
| Webley .45 | | | | | | | | | | | | | 2 |
| Winchester | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | |
| **Total** | 16 | 7 | 11 | 4 | | 3 | 2 | 2 | 3 | 5 | 9 | 13 | |
| **Grand total** | | | | | | | | | | | | | 75 |

FEDERAL FIREARMS ACT 21

**YEAR 1962**

| | Total |
|---|---|
| Air rifle | 4 |
| Bazooka | 1 |
| Flintlock | 2 |
| Colt .45 | 1 |
| French automatic | 1 |
| Enfield | 3 |
| Frontier 6-shooter | 2 |
| Italian | 1 |
| M. & M. .38 | 3 |
| Mexican bowie | 9 |
| Roscoe blue | 4 |
| Remington | 2 |
| Smith & Wesson | 3 |
| Snubbie | 10 |
| Stiletto | 4 |
| Webley | 1 |
| Other | 1 |
| Total | 51 |
| Grand total | 51 |

Column totals (Total row): 6, 5, 4, 3, 2, 3, 1, 3, 1, 4, 7, 12 — Grand total 51

**YEAR 1963**

| | Total |
|---|---|
| Air rifle | 3 |
| Frontier 6-shooter | 6 |
| Italian | 13 |
| Madison .8-shot | 1 |
| Madison bowie | 1 |
| Roscoe blue | 1 |
| Smith & Wesson | 4 |
| Snubbie | |
| Stiletto | |
| Other | |
| Total | 29 |
| Grand total | 29 |

Column totals (Total row): 3, 2, 4, 5, 4, 3, 3, 2, 2, 2, 1, 2 — Grand total 29

22 FEDERAL FIREARMS ACT

### Shipments to New York City

#### YEAR 1961

| Type of gun | January | February | March | April | May | June | July | August | September | October | November | December | Total by make |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Air rifle | 2 | | 2 | 1 | | 1 | | | | | | | 7 |
| Ballpoint | 1 | | | | | | | | | | | | 1 |
| Italian .25 | 1 | | | | | | | | | | | | 2 |
| M. & M. .38 | | 1 | | | | | | | | | | | 1 |
| Mexican bowie | | | | | | | 1 | | | | | | 1 |
| Mossberg .22 | | | 1 | | | | | | | | | | 1 |
| High standard .22 | 1 | | | | | | | | | | | | 1 |
| Roscoe blue | | | 2 | | 1 | | | | | | | | 3 |
| Stiletto | | | | | | | 1 | | | | | | 1 |
| Other total | 6 | 1 | 5 | 1 | 1 | 2 | 2 | 2 | | | | | |
| Grand total | | | | | | | | | | | | | 18 |

#### YEAR 1962

| Type of gun | January | February | March | April | May | June | July | August | September | October | November | December | Total by make |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Air rifle | | | | 1 | 2 | 1 | | 1 | | 1 | | | 6 |
| Enfield .38 | 1 | | | 1 | | | | | | | | | 1 |
| Frontier 6-shooter | 1 | | | | | | | | | | | | 1 |
| Italian .25 | | | | | | | | | | | | | 1 |
| Mauser | | | | | | | | | | | | | 1 |
| M. & M. .38 | | | | 1 | 1 | 1 | | | | 1 | | | 3 |
| Mexican bowie | | | | | | | | | | | | | 2 |
| High standard .22 | | | | | | | 1 | | | | | | 2 |
| Remington .22 | 1 | | | | | | | | | | 2 | | 1 |
| Roscoe blue | | | | | | 1 | | | | | 1 | | 1 |
| Smith | | | | | | | | | | | | | 1 |
| Stiletto | | | | | | | | | | | | | 1 |
| Scotland Yard | | | | | | | | | | | | | |
| Other total | 2 | | | 3 | 3 | 4 | 1 | 1 | | 2 | 3 | 2 | |
| Grand total | | | | | | | | | | | | | 21 |

FEDERAL FIREARMS ACT                    23

YEAR 1963

| Item | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Air rifle | | 1 | | | | 1 | | | | | | | 1 | 3 |
| Enfield .38 | | 1 | 1 | | | | | | | | | | | 2 |
| Frontier | | 1 | | 1 | 1 | | | | | | | | | 3 |
| Italian .25 | | | 1 | | | | | | | | | | | 1 |
| Madison, 8-shot | | | 1 | | | | | | | | | | | 1 |
| Mexican bowie | | | | | 1 | | | | | | | | | 1 |
| Roscoe blue | | | | | | | | | 1 | | | 1 | | 2 |
| Smith & Wesson .38 | | | 1 | | | | | | | | | | | 1 |
| Stiletto | 2 | | | | 1 | | | | | | | | | 3 |
| Snubbie | | | | 2 | | | | | | | | | | 2 |
| Throwing knife | | | 1 | | | | | | | | | | | 1 |
| Other total | 2 | 3 | 5 | 3 | 3 | 1 | | | 1 | | | 1 | 2 | 21 |
| Grand total | 2 | 3 | 5 | 3 | 3 | 1 | | | 1 | | | 1 | 2 | 21 |

24                    FEDERAL FIREARMS ACT

Senator JAVITS. Also, Mr. Chairman, I would like actually to include in the record two, I believe, significant excerpts from the Warren report. It is absolutely true, as the Chair has said, that the basis for these hearings is not the national tragedy of President Kennedy's assassination. But certainly the assassination's effect on the country, in an unparalleled way, will affect what goes on here. The two excerpts I will read are as follows. One is from the top of page 119 of the report, and the other one is from 121 of the report:

According to its microfilm records, Klein's—

The very outfit referred to by the chairman—

received an order for a rifle on March 13, 1963, on a coupon clipped from the February 1963 issue of American Rifleman magazine. The order coupon was signed, in hand printing, "A. Hidell, post office box 2915, Dallas, Tex." It was sent in an envelope bearing the same number and return address in handwriting.

Then the report details how the rifle was shipped, and describes the weapon—as is shown there on the board—a rifle with a telescopic sight. Then the report goes on to state as follows, at page 121:

Postal Inspector Harry D. Holmes of the Dallas post office testified, however, that when a package is received for a certain box, a notice is placed in that box regardless of whether the name on the package is listed on the application as a person entitled to receive mail through that box. The person having access to the box then takes the notice to the window and is given the package. Ordinarily, Inspector Holmes testified, identification is not requested, because it is assumed that the person with the notice is entitled to that package.

Now, Mr. Chairman, with the greatest honor to the Chair for launching this kind of an inquiry, it is nevertheless true that any American reading this Warren report should have his hair stand up at this, that the assassin of the President was able to purchase the rifle with which the President was killed without ever revealing his true identity to anyone, with the most complete anonymity. It is only because this occurred to so great an American that the country was alarmed by it.

I do not think it is at all inappropriate, Mr. Chairman, to mention this incident in close relationship to the earnest consideration of appropriate legislation. I think it is our responsibility to refer to this most tragic event in the light of consideration of legislation.

Now, Mr. Chairman, there are two other points I would like to make. One is that I think there is one other thing in addition to crime which we must keep an eye on, and as to which I would invoke the attention of the Chair, if I may, because I think it is important.

We hear a lot about private armies in this country, the Minutemen and other people who are supposed to be training with weapons in orderly formations for the purpose of taking to the hills when the Communists come. Now, this can be a very subversive thing and a very dangerous thing. Apparently there are enough weapons floating around, including the heavy weapons described by the chairman, to make this possible.

Now, I have no illusions, I have been involved in law enforcement too long, myself, to assume that you can eliminate all crime and illegality. But I would hope very much, Mr. Chairman, that in our consideration of legislation we would also consider arms in the hands of extremists, who think they are some super force to protect the United States against itself, which force could be misused to launch

some new tyranny upon us.  I hope very much that the witnesses and the Chair will bear that in mind as we work on this legislation.

Finally, like other Senators—and perhaps more so, because I have 18 million constituents—I have received an enormous amount of mail, really enormous, almost unbelievable, Mr. Chairman, expressing opposition to this bill.  Some of it is from very well-intentioned people who use their firearms for sports and other recreation.

Personally, I think the chairman's original bill, S. 14, in which I joined, utilized a better approach than this one.  But I know we must do something about this situation, responsibly.  So, Mr. Chairman, I appreciate these hearings, which arise out of a desire to see if we can find some reasonable accommodation for the many—probably millions, from what I can see from my State—honest and well-intentioned people who want to use firearms for sports and other recreation. We have all taken our sons out in the backyard and shot a few tin cans, and we all understand the legitimate sports use.  But at the same time, I will join the Chair in the responsibility of doing what must be done to see that America, either by criminals or by extremists, is threatened as little as possible by what seems to be an inundating flood of weapons capable of killing, sent in interstate commerce, and over which we have almost no control.

I thank the Chair very much for allowing me to speak these few words.

Senator Dodd.  I would like to make a brief comment.  There is nothing in this bill that need worry any legitimate sportsman or gun enthusiast.  I think the reason you are flooded with mail—as I am, too—is that the gun runners and the gun lobbyists have misrepresented the bill.  We will go into that a little later in these hearings, line by line in the literature which they put out.  I do not believe they are innocent mistakes.  I think they are too well informed for that. I think the public, as well as the Members of Congress, will be greatly interested in the false information they have disseminated about this proposed legislation.

Senator Javits.  I thank the Chair.

(At the request of Senator Roman Hruska his statement appears at this point in the record.)

#### Statement of Senator Roman L. Hruska

Mr. Chairman, I appreciate the opportunity to make a brief statement.  As you know, I was not able to attend any of the sessions prior to this time because of long-standing prior commitments.  We corresponded about the setting of these hearings well in advance of the final setting of these dates, but instead the chairman decided to go ahead and hold the first rounds even though he knew that it would not be possible for me to attend.

The fact that I have not been able to attend the hearings to date has not diminished my interest in them one bit.  My mail, like that of most Members of Congress, has been extremely heavy.  In fact, I have received many more letters on this question than any other so far this year.  It has been evenly divided between residents of my own State and others from across the country.  The mail has been virtually unanimous in its opposition to S. 1592.  By actual count only 3 letters supporting the bill have been received so far out of more than 3,000.

Mr. Chairman, I have read over the transcripts of the hearings with great interest.  A solid record is being made which shows the nature of the problem we are all trying to combat—the rise of serious crime in this country, particularly among a small element of our young people.

In my view, it is essential that this subcommittee maintain a calm atmosphere in which we objectively seek the facts about the nature of the problem and then examine existing legislation to see where it might be not only strengthened, but enforced better.

### COMMENTS ON S. 1592 AND EXISTING LAW

Mr. Chairman, I would like to comment briefly on S. 1592 and the testimony relating directly to it. As I understand the bill, it has three main purposes. First, it would ban the interstate sales and resulting shipment of firearms to all individuals in an effort to curb the mail-order traffic to juveniles, felons, and mental defectives. Second, it would ban the importation into this country of surplus military weapons and destructive devices. Third, it would greatly increase dealers', importers', and manufacturers' license fees and give the Secretary of Treasury broad authority to regulate the issuance of these licenses among other regulatory powers.

No one would quarrel with the objectives that the bill seeks to achieve. It is desirable that all potential tools of crime, not just firearms, not get into the hands of juvenile delinquents, mental defectives, or convicted criminals.

It is desirable that the unrestricted flow into this country of millions of cheap low-quality nonsporting weapons and destructive devices be halted.

It is desirable that irresponsible persons be denied the ability to circumvent existing Federal, State, and local laws and regulations to sell firearms and destructive devices to persons who may misuse them, either over the counter or through the mails.

But is a bill that is so all-encompassing and sweeping as this one necessary to achieve these goals? I think not. And the record of these hearings so far gives powerful support to that view.

### CURBING UNDESIRABLE FOREIGN IMPORTS

On May 20 Mr. Robert Margrave of the State Department testified before the subcommittee. I was shocked and appalled by his testimony. Mr. Margrave indicated that section 414 of the Mutual Security Act of 1954 gives the President more than ample authority to control the importation or exportation of firearms, ammunition, and implements of war. There is authority to ban even the importation of bows and arrows, dartguns, and blunderbusses, if need be. The language of section 414 says in part:

"The President is authorized to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition, and implements of war * * *."

This is broad language—much broader than the comparable language in S. 1592, which alludes only to the public interest. No further legislation is necessary in this area. All that is required is judicious enforcement of that law. The destructive devices we have sitting back of this room were probably imported under a license approved by Mr. Margrave himself—assuming that he has any records of the transaction. He or one of his predecessors in all probability approved the shipment that contained the rifle which was used by Lee Harvey Oswald.

S. 1592 calls for the adoption of what looks like a protectionist point of view on the importation of firearms. It may well be that there are other policy considerations to be taken into consideration in foreign commerce in firearms. A blanket prohibition against all imports may do serious damage to our trade relations with friendly nations. All these factors should be taken into consideration in the granting of import licenses or the regulation of the flow of foreign imports, new or surplus.

Other language of section 414 requires registration of manufacturers and importers of firearms and ammunition and to set fees therefor. Strict penalties are set forth with up to a 2-year term and a $25,000 fine authorized.

If foreign imports are a problem, why aren't these provisions being enforced at the present time? Why were Mr. Hy Hunter and his like able to continue to get import licenses for surplus antitank weapons, bazookas, and the like? Mr. Chairman, I would like to find out the answers to these questions and more. Mr. Margrave should be recalled.

One point is very clear: There is ample legislative authority to curb, indeed stop entirely, the flow of not only surplus military weapons, but all firearms into this country by enforcing present law.

Mr. Chairman, I ask that the full text of section 414 be inserted in the hearing record at this point along with an analysis of the legislative history of the section which was prepared by the Legislative Reference Service.

### CONTROLLING THE FLOW OF MAIL-ORDER FIREARMS

Not only can the source of much of this undesirable traffic be eliminated under present law, but the flow can be halted by local authorities if they feel the need to do so. Chief Layton of the District of Columbia testified eloquently about the plan in effect in the District of Columbia since 1962 which has cut off mail-order shipment of firearms to undesirables by close cooperation with the common carrier. He cited the problem of over-the-counter sales in nearby communities to District of Columbia residents, some of whom have criminal records. However, it was also noted that Prince Georges County adopted a regulation which will help rectify this situation significantly. And Attorney General Sills, of New Jersey, cited the arrangement his people have worked out with Maryland law enforcement officials for notification when a New Jersey resident purchases a handgun in Maryland.

Perhaps section 902 of the Federal Firearms Act can be improved to allow local jurisdictions who so desire to more effectively control mail-order sales of firearms to persons within their jurisdictions. Perhaps even the approach of S. 14 or S. 1965 is necessary. But I can see no justification for a flat ban on the interstate sale and shipment of firearms to individuals at this point.

### SALES OF SURPLUS U.S. GOVERNMENT WEAPONS

Another significant step has been taken, under existing law, by the administration which can help considerably. The Department of Defense and the General Services Administration announced a new change in the existing regulations on sales of surplus weapons from U.S. Government stocks.

Henceforth, surplus weapons can be sold only as scrap after total destruction to assure that they are "rendered completely inoperative and to preclude their being made operative." This is a laudable step and one which was long overdue. It will help dry up the source of some of the troubles.

I ask unanimous consent that the regulation be placed in the record at this point.

It is this kind of action which can be and is being taken without resorting to the harsh remedies proposed in S. 1592.

### SERIOUS CRIME IS PRIMARILY A PROBLEM OF HIGHLY POPULATED AREAS

It has been repeated many times during the course of these hearings so far that the uniform crime reports for the year 1963 indicate that the incidence of gun homicides in cities was 53 percent, in suburban areas 62 percent and in rural areas, 68 percent. From this statement it was concluded that there is a need across the Nation for legislation of the type proposed in S. 1592. The statement cited above presents only a part of the story and is entirely misleading when taken by itself.

As has been stated before in these hearings, there are three types of serious crimes where firearms—along with assorted other weapons—are tools of the criminal. These are murder, aggravated assault, and robbery. First, as to murder. Page 6 of the FBI report states that the number of willful killings has remained at about the same rate since 1958 as has the murder rate. And that police cleared up about 91 percent of the murders by arrest of the offender. This in itself is a remarkable record and stands as a fine tribute to our law-enforcement agencies across the Nation. But is murder as much of a problem in all parts of our Nation? Let me quote directly from the report at page 6:

"Murder per unit of population was highest in the Southern States and large American cities. The murder rate in the cities over 250,000 population in 1963 was 7.9 victims per 100,000 population. This was over twice the rate in the rural and suburban areas."

Now this refers to the rate not absolute numbers. When the figures themselves are compared in the tables later in the report we find that there were more murders committed in Chicago, Los Angeles, New York, and Washington than were committed in 30 States, even though the population of those States is substantially higher than those cities.

Let's look at aggravated assault. On page 9 of the report is the following:
"The average serious assault rate per unit of population in the 54 cities with over 250,000 population was almost 5 times greater than recorded in the suburban and rural areas."

And what of robbery? On page 13 of the report it states:
"The rate in cities over 250,000 was 7 times greater than the rate in the suburban areas surrounding large cities and 15 times the rate in the rural sections of our country. Cities over 1 million population had a robbery rate 4 times the level of all other cities, 9 to 1 more than suburban areas and about 19 times higher than the incidence rate in rural areas."

Why should the citizens of all States be subject to the same stringent rules and regulations as the big crime centers? It seems to me that a strong case can be made for an amendment to this bill—assuming for the moment that S. 1592 represents the right approach—which would incorporate a "triggering device" so that the law would apply only to areas where the serious crime problem is the worst and beyond the control of local authorities. I feel certain that the Attorney General and his staff could easily draw up suitable language for such change because of the recent experience they have had with the voting rights bill.

### THE QUESTION OF THE SECOND AMENDMENT

Mr. Chairman, to me there are grave doubts about the constitutionality of significant provisions of S. 1592 in its present form.

The second amendment to the Constitution reads:
"A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."

Now there are two observations I want to make about this provision of the Bill of Rights. First, is its sweeping language. "* * * the right of the people to keep and bear arms shall not be infringed." That is strong language. Nowhere in the Constitution can be found stronger wording. Second, is the fact that it is the second amendment, not the fifth or the ninth. Its placement at the top of the list is indicative that our Founding Fathers considered this right of major importance—certainly not to be treated lightly by later generations and eroded away.

The arguments presented by the Attorney General in his testimony and buttressed by the lengthy memorandum he placed in the record do not impress me that much. The reasoning offered seems to be a rationale propounded by a law-enforcement officer rather than a detached view of a constitutional scholar. I suspect that the Criminal Division, the Bureau of Prisons and Treasury had more to do with the preparation of the study than the Civil Rights Division.

The main thrust of the argument seems to be that even though this bill totally bans interstate sale of firearms to individuals, it is all right because there would still be intrastate commerce in these items. I find this to be totally without merit. It is as if one were to contend that it would not be a violation of the first amendment right of freedom of the press to bar further publication of newspapers because the people could still read magazines and watch television newscasts.

I must admit that the case law on the second amendment is not particularly helpful. There have only been four Supreme Court decisions on this question since the founding of the Republic—hardly an overwhelming body of precedent. Three of the four, the *Cruikshank, Presser,* and the first *Miller* cases held that the second amendment placed limitations only on the Federal Government and not the States. This view is hardly in favor today. The rights of the first eight amendments have been applied to the States in a series of cases. To mention only a few that come immediately to mind: The *Mapp* case in 1961 held the 4th amendment's right of privacy against search and seizure was enforceable through the 14th amendment. In the *Gideon* case in 1963 the right to counsel in all criminal cases was made obligatory on the States by the 14th amendment. In 1964 in the *Malloy* case the 5th amendment's right against compulsory self-incrimination was protected by the 14th against abridgement by the States. All of these cases overruled prior decisions.

During the recent spring term, the Supreme Court held in the *Griswold* case that a State statute that conflicted with the "right of privacy," a right not specifically mentioned in the Bill of Rights, was unconstitutional. The right of privacy was made applicable to the States by the due process clause of the 14th amendment. Certainly, if the right of privacy can be made applicable to the States, the guarantees of the second amendment could also apply.

In the second *Miller* case in 1938, the Court passed directly on the second amendment right for the first time. It upheld the National Firearms Act of 1934 as to the placing of limitations upon the use of sawed-off shotguns. The Court held that the second amendment did not guarantee the right to keep and bear such an instrument for the preservation and efficiency of a well-regulated militia. However, Mr. Justice Black recently has commended that, "Although the Supreme Court has held this amendment to include only arms necessary to a well-regulated militia, as so construed, *its prohibition is absolute*." The emphasis is mine.

The Chief Justice of the United States, writing in a recent Law Review article stated:

"Despite these safeguards, the people were still troubled by the recollection of the conditions that prompted the charge of the Declaration of Independence that the King had 'affected to render the military independent and superior to the civil power.' They were reluctant to ratify the Constitution without further assurances, and thus we find in the Bill of Rights amendments two and three, specifically authorizing a decentralized militia, guaranteeing the right of the people to keep and bear arms, and prohibiting the quartering of troops in any house in time of peace without the consent of the owner."

At least two Supreme Court Justices would seem to take a somewhat differing view from that of the Attorney General.

In my view the question of the second amendment and S. 1592 is not so settled as some would have us believe.

Perhaps the right of the people under the second amendment is outmoded in this day of the atom bomb and the large standing army. But perhaps in this day of organized and increasing crime the citizen who has a firearm and knows how to use it properly in defense of his family and property should be encouraged. To be sure, I am not suggesting for 1 minute that we return to the days of the vigilantes or suggesting that each man take the law into his own hands. But it seems to me that one reason that the armed robbery rate in cities is 19 times that in rural areas is because potential criminals probably know that most farm families have and know how to use firearms.

In conclusion, Mr. Chairman, I would again quote from the writings of the Chief Justice when he advises us:

"We may happily note that the Constitution has remarkably weathered a variety of crises. Some were as acute as those we face today. Today, as always, the people, no less than their courts, must remain vigilant to preserve the principles of our Bill of Rights, lest in our desire to be secure we lose our ability to be free."

Senator Dodd. We have with us this morning the distinguished Secretary of the Treasury, Mr. Henry H. Fowler.

Mr. Secretary, we are very pleased that you found the time to come here in spite of your busy schedule. We know you have to be at another hearing, and the Attorney General has very graciously consented that you precede him, as I understand. We will be glad to hear from you.

## STATEMENT OF HON. HENRY H. FOWLER, SECRETARY OF THE TREASURY

Secretary Fowler. Thank you, Mr. Chairman. I do regret that in order to meet a request from the House Ways and Means Committee for an appearance in connection with its executive session, concerned with the problems of excise tax reduction, it will be necessary for me to depart shortly, with the permission of the Chair. I trust the committee will forgive me for not remaining to the end of the session to hear and deal with this most pressing and crucial problem, that your opening remarks have so clearly outlined.

The Attorney General is here to discuss the bill more fully, particularly in its relationship to the President's overall program against crime. As you know, the Alcohol and Tobacco Tax Division of the

Internal Revenue Service, which Mr. Sheldon Cohen heads as Commissioner, is responsible for the administration of the Federal Firearms Act.

Mr. Cohen is here with me today to make an additional statement, in which he will develop in some detail the six main legislative thrusts of the proposed bill and and deal in some detail with some of the principal objectives. Mr. Cohen will remain throughout the session.

I am pleased to have the privilege to appear before your committee in association with my colleague, the Attorney General, and other representatives of the administration, in strong support of S. 1592 to amend the Federal Firearms Act, because we feel that enactment of this piece of legislation is of very great and grave importance to the welfare of this country and its citizens.

S. 1592 is designed to implement the recommendations which the President set forth with respect to firearms control in his message to the Congress of March 8, 1965, relating broadly to law enforcement and the administration of justice.

The President, in that message, described crime as "a malignant enemy in America's midst" of such extent and seriousness that the problem is now one "of great national concern." The President also stated—and I again quote from his message: "The time has come now, to check that growth, to contain its spread, and to reduce its toll of lives and property."

As an integral part of the war against the spread of lawlessness, the President urged the enactment of more effective firearms control legislation and cited as a significant factor in the rise of violent crime in the United States "the ease with which any person can acquire firearms," and—as your statement and that of Senator Javits dramatically illustrated—any person without regard to his competence, reputation, standing, or state of mind.

The President recognized the necessity for State and local action as well as Federal action, in this area and he urged "the Governors of our States and mayors and other local public officials to review their existing legislation in this critical field with a view to keeping lethal weapons out of the wrong hands." However, the President also clearly recognized in his message—and this is the heart of the matter—that effective State and local regulation of firearms is not feasible unless we strengthen at the Federal level controls over the importation of firearms and over the interstate shipment of firearms. The President advised that he was proposing draft legislation to accomplish these aims, and stated, and I quote, "I recommend this legislation to the Congress as a sensible use of Federal authority to assist local authorities in coping with an undeniable menace to law and order and to the lives of innocent people."

Every day the lives of decent American citizens, our greatest national asset, are being snuffed out through the misuse and abuse of firearms by persons who should not have access to them.

Mr. Chairman, before proceeding to discuss briefly the essential features of the bill before you, I want to take this occasion to congratulate you and the members of your committee for the part which you have played during the past 4 years in awakening the people of this country to the dangers to the public safety and welfare created

by the ease with which any person in the United States can obtain firearms.

I should like now briefly to state my understanding of what this bill would do and, in order to eliminate misconceptions, what it would not do.

Among other things, the bill would—

1. Prohibit the shipment of firearms in interstate commerce, except between federally licensed manufacturers, dealers, and importers;

2. Prohibit sales of firearms by Federal licensees to persons under 21 years of ago, except that sales of sporting rifles and shotguns could continue to be made to persons of 18 years of age and up;

3. Prohibit a Federal licensee from selling a firearm (other than a rifle or shotgun) to any person who is not a resident of the State where the licensee is doing business;

4. Curb the flow into the United States of surplus military weapons and other firearms not suitable for sporting purposes;

5. Bring under effective Federal control the importation and interstate shipment of large caliber weapons such as bazookas and antitank guns, and other destructive devices; and

6. Revise the licensing provisions of the Federal Firearms Act, including increases in license fees, so as to assure that licenses will be issued only to responsible persons actually engaging in business as importers, manufacturers, and dealers.

What the bill does is to institute Federal controls in areas where the Federal Government can and should operate, and where the State governments cannot; namely, in interstate and foreign commerce.

Under our Federal constitutional system, the responsibility for maintaining public health and safety is left to the State governments under their police powers. Basically, it is the province of the State governments to determine the conditions under which their citizens may acquire and use firearms.

I certainly hope that in those States where there is not now adequate regulation of the acquisition of firearms, steps will soon be taken to institute controls complementing the steps taken in this bill in order to deal effectively with this serious menace.

Since a bureau of my Department is responsible for the administration of the Federal Firearms Act, I am particularly anxious that the changes proposed in the bill with respect to the issuance of licenses to manufacture, import, and deal in firearms be adopted.[7]

Under the existing law, anyone other than a felon can, upon the mere allegation that he is a dealer and payment of a nominal fee of $1, demand and obtain a license. Some 50,000 or 60,000 people have done this, some of them merely to put themselves in a position to obtain personal guns at wholesale.

The situation is wide open for the obtaining of licenses by irresponsible elements, thus facilitating the acquisition of these weapons by criminals and other undesirables. The bill before you, by increasing licensing fees and imposing standards for obtaining licenses, will go a long way toward rectifying this situation.

Now, to come to some of the misconceptions about the bill. One misconception about this bill which has been widely publicized is that

it will make it possible for the Federal Government to institute such regulations and restrictions as will create great difficulties for law-abiding citizens in acquiring, owning, or using firearms for sporting purposes.  This is absolutely not so.  Sportsmen will continue to be able to obtain rifles and shotguns from licensed dealers and manufacturers subject only to the requirements of their respective State laws. Indeed, they can travel to another State and purchase a rifle or shotgun from a licensed dealer there and bring it home with them without interference.

Senator DODD. May I interrupt and say I am very pleased you have brought this out.  There has been a lot of literature spread around the country to the contrary, telling people that legitimate sportsmen will not be able to buy a rifle or shotgun in another State.  There is no such thing in the bill, but as an example of what is going on, this terrifically powerful lobby is misrepresenting the fact of this legislation.

I am glad, Mr. Secretary, you emphasize the point.  It is only one of the misrepresentations.

Secretary FOWLER. Yes.

Senator DODD. And I think it is a deliberate one because they have been studying this bill for a long time and a great many people have fallen for it and that is why the Congress is being flooded with this mail.  I am going into that a little later in the hearing and we will find out where this money is coming from and who has been putting these falsehoods out.

Secretary FOWLER. Only two minor inconveniences may occur for the sportsmen of this country.  They will not be able to travel to another State and purchase a pistol or concealable weapon, and they will not be able to obtain a direct shipment from another State of any type of firearm.  On this latter point, the inconvenience is more apparent than real because the large mail order houses have outlets in most of the States and the bill will permit mail order shipments to individual citizens from these outlets within the State.

These minor inconveniences have been found to be necessary in order to make it possible for the States to regulate effectively the acquisition and possession of firearms.  Obviously, State authorities cannot control the acquisition and possession of firearms if they have no way of knowing or ascertaining what firearms are coming into their States through the mails or, in the case of concealable weapons, by personally being carried across States lines.

Mr. Chairman, there are many other points as you have indicated which could be made with respect to this bill.  For example, I think it is self-evident that minors should not have access to pistols, other concealable firearms and weapons of vast destructive power, and that minors under the age of 18 should not have access to rifles or shotguns.

Today, the people of the United States are living under the most ideal conditions which have ever existed for any peoples anywhere on earth.  Yet, much of this is threatened by the spreading cancer of crime and juvenile delinquency.

It is absolutely essential that steps such as those proposed in this bill will be taken to bring under control one of the main elements in the spread of this cancer; namely, the indiscriminate acquisition of weapons of destruction.

In concluding my statement, may I say that the Department's experience with the existing Federal Firearms Act has resulted in a feeling of frustration since the controls provided by it are so obviously inadequate in the ways in which I have indicated.

In drafting S. 1592, the drafters had in mind these inadequacies and now have, we believe, a bill which, when enacted, will provide effective controls without jeopardizing or interfering with the freedom of law-abiding citizens to own firearms for legitimate purposes.

I strongly support the enactment of S. 1592.

Thank you, very much.

Senator DODD. Thank you, Mr. Secretary. It is a very excellent statement and I am sure it will help us a great deal.

Senator Fong?

Senator FONG. A very fine statement, Mr. Secretary. I only have one question to ask. You stated there are 50,000 to 60,000 people who have licenses to deal in firearms. How many of the 50,000 to 60,000 licensees are actively engaged in dealership?

Secretary FOWLER. Our best estimate, Senator Fong, is that out of the approximately, I think this is a fairly accurate figure for 1964, 99,544 licensees, it is our estimate that less than half of the licensed dealers are actually engaged in the business as dealers and that more than half are persons who are using the simple device of becoming a licensee for their own personal nonbusiness purposes.

Senator FONG. Thank you.

Senator JAVITS. I have no questions except to compliment Mr. Fowler on a fine statement.

Senator DODD. Thank you very much, Mr. Secretary.

The Attorney General is here. Attorney General Katzenbach is a very distinguished lawyer and Attorney General of the United States. I will not go into any biographical description of the Attorney General as I do not think it is necessary. I will say we are very pleased again that you took time to come here and give us the benefit of your thinking on this legislation.

## STATEMENT OF HON. NICHOLAS deB. KATZENBACH, ATTORNEY GENERAL OF THE UNITED STATES

Attorney General KATZENBACH. Thank you, Mr. Chairman.

I picked up the May 15 issue of the Shotgun News as I was coming down here and I thought the committee might be interested in this full page ad that makes a series of misstatements about this bill. I thought members of the committee might be particularly interested in the following quotation indicative of the accuracy of the ad: "Write every member of the hearing committee: Chairman Senator Thomas Dodd and Senators Philip Hard, Birch Bayh, Quentin Burdick, Joseph Tidings, Roman H. Hruska, Herman Fong," and if you have any mail for Herman Fong, you will know the source of it. They do have Jacob Javits correct.

It might be well, Senator Fong, for you to let your mail room know that mail for Herman Fong is intended for you and too, I thought the committee might be interested in seeing this ad. It is typical of the propaganda and the misstatements that are being made about this bill

and this happens to be from the American Sportsman's Foundation, Inc., of Hanover, N.J.

Senator Dodd. Without objection, I would like to have that made a part of the record.

(The document referred to was marked "Exhibit No. 6" and is as follows:)

Exhibit No. 6

# SHOTGUN NEWS

**The Trading Post for Anything That Shoots**

SHOTGUNS — RIFLES — HAND GUNS — ACCESSORIES — MODERN AND ANTIQUE

Established 1946    Published Twice a Month

Single Copy 35c     **MAY 15, 1965**     **$3.00 Per Year**

# SEE IMPORTANT NOTICE PAGE 4

FOR SALE

HUNTING Rangefinder, new, mod. 500T deluxe set with leather holster, 5X telescope eyepiece, list $29.95, $21.95. Eaman's, Turtle Creek 4, Penna.

SPECIAL Notice. Hodgdon Powder prices going up as of July 1 on ≠ 4831, H570, H870, 5010. Last chance at low prices. 100 Lb. drum, $51. prepaid. 50 Lb., $25.95; 20 Lb. $15.95. 10 - 1 lb. cans, $15.; Shipping charges collect on all shipments under 100 lbs. Price increase will be 30% or more, buy now & save. Eaman's, Turtle Creek 4, Penna. 6-2

LOWEST Scope Prices: New, latest models. Redfield 3x-9x, list $99.50. sale $67.50; 2x-7x list $34.50. sale $53.95; FCH. MCH. HCH. add $13.10 for Accu-Range style, add $6.10 for post or dot. Bausch & Lomb, list $99.50. sale $69.95; Weatherby 2x-7x, list $99.50. sale $71.50; Unertl, Bushnell, Leupold prices on request. Scopes ppd.; Esman's, Turtle Creek 4, Penna.

WANTED to Buy, Paying top Dealer $$$, all types shotguns, rifles, handguns, scopes. Fast Deals, write description & price; Esman's, Turtle Creek 4, Penna.

SHOT - Reloading: Based on current lead market prices. Chilled shot sizes ≠ 4 thru ≠ 10, packed in 25 lb. bags at $23.60 per gun, loaders, list $3.95, 100, minimum order 1000 lbs. Full freight allowed to all states except Oregon, Calif., Idaho, Nevada, Utah, Ariz., these are FOB Dallas, Texas. Esman's, Turtle Creek 4, Penna.

"MEC" reloaders. mod. 600, 600 Jr., 310, 400, 250, lowest spot, prices anywhere USA, fast shipments, prices on request. Esman's, Turtle Creek 4, Penna.

FOR SALE

SILVER Dollars, bright uncirculated rolls of 20; 1879 S, $35; 1881 S, $35; 1885 O, $35; 1902 O, $35. Any 3 rolls assorted dates, $100.; 1904 O, $44.50; 1898 O, $57.50, 2 rolls $110; Prepaid; Eaman's, Turtle Creek 4, Penna.

VALUES: Redding Hunter powder 6 bullet scale, list $14.50, sale $10.95; Redding Master powder measure, list $18.50, sale $13.95; Forester case trimmer, list $14.25, sale $10.95; (marble bullet puller, list $7.70, sale $5.50; Ohaus bullet scale, list $18.50, sale $15.50; Lyman ≠ 55 powder measure, list $16. sale $13.; Hollow ground screw drivers for gunsmiths, list $8., sale $6.50; Everything prepaid; Eaman's, Turtle Creek 4, Penna.

SHOOTER'S Glasses, metal framed, 8mm bridge with crow bar 6 case, B&L style, large amber lens, list $9., sale $4.95, 2 for $8.50 ppd; Eaman's, Turtle Creek 4, Penna.

SILVER dollars, bright uncirculated 1879 S, 1880 S, 1881 S, 1882 S, 1883 O, 1884 O, 1885, 1885 O, 1902 O, 1922, set of 10 only $19.95, set of 5 - $10.95; Roll set, $350.; Indian head pennies, asst. roll of 50, $12.95; Liberty V nickels, asst. roll of 40 - $8.95; Ppd. Free coin lists; Eaman's, Turtle Creek 4, Penna.

B&L 10X telescope, complete with case, list $10.95, sale $8.49; B&L 20X telescopes, list $24.95, sale $19.95 ppd.; Esman's, Turtle Creek 4, Penna.

LEE rifle, shotgun or hand gun, loaders, list $3.95, 100 minimum order 1000 rifle & pistol dies, list $13.50, sale $9.95 ppd.; Esman's, Turtle Creek 4, Penna.

1965 STOEGERS Bible, 1965 Gun Digest, both for $5.75; Stoegers, $2.85. Gun Digest, $3.49; Ppd.; Esman's, Turtle Creek 4, Penna.

GUN Traders Guide, latest up to date values, list $3.85, only $3.49 ppd.; A Must for every Gun Dealer; Esman's, Turtle Creek 4, Penna.

FOR SALE

BUSHNELL Scope Chief II, 3x-9x variable, list $99.50, sale $74.50; Bushnell Banner 3x-9x variable, list $49.50, sale $25.50 ppd.; Free scope 6 reloading catalog; Esman's, Turtle Creek 4, Penna.

GUNS. 1000's to choose from, New, Used, Trades made. Bargains, Esman's, Turtle Creek 4, Penna.

HIGH Std., new shotguns. Bargains. Flite King de-luxe 12 ga., rib 30" full, list $99.95, sale $77.50; Flite King trap 12 ga., 30", list $115.95, sale $89.95; Flite King Trophy 20 ga., adj. choke, 27" bbls., list $105.95, sale $85.; Flite King field, 20 ga., 26" full or mod., list $79.95, sale $64.95, Ppd; "Good Luck Dist. Co.", Box 71, Turtle Creek 25, Penna. S-2

SWIFT "Zoom" spotting scopes, 20x-50x, list $115., sale $66.; Swift spotting scope 15x-60x, 3x eye pieces, list $89.95, sale $53.95; Swift spotting scope 20x, list $45., sale $32.50; All scopes include tripods. Everything ppd.; Esman's, Turtle Creek 4, Penna.

FIREARMS International Valmet O&U shotguns. 12 ga., 30" bbl, M&F, F&F, 26" IC&M, new factory, guaranteed, list $189.95, sale $129.95 ppd.; Esman's, Turtle Creek 4, Penna.

FREE Catalog, money saving values, nationally advertised material for the shooter, fast shipments; Esman's, Turtle Creek, Penna.

RELOADING Handbooks, Lyman 43rd edition, $3.; Speer Manual ≠ 6, $2.75; Handloaders Digest, $3.49; Everything ppd.; Eaman's, Turtle Creek 4, Penna.

RCBS reloaders, spl RCBS "Jr." press complete with your choice of any $13.50 list die set, list $45., sale complete, $34.95 ppd.; Free die sets, $5.95; Esman's, Turtle Creek 4, Penna.

FOR SALE

TRIUS trap, mechanical Clary target trap, list $29.95, sale $24.95; Lee Sonic ear valves only $3.95 pd., everything ppd.; Esman's, Turtle Creek 4, Penna.

BUSHNELL Spacemaster (60mm Obj.) with 25X eyepiece, list $95., sale $75.95; Sentry 50mm spotting scope with 20X eye piece, list $54.50, sale $44.75; Ppd.; Esman's, Turtle Creek 4, Penna.

MASTRA Gun Caddy, aims to fit most guns. Free Postpaid Price list. Your gun is unfitted to protection. Esman's, Turtle Creek 4, Pa.

BOOKS for the Sportsman on Hunting, Gunsmithing, Wild Outdoors, etc., prepaid. Free list; Esman's, Turtle Creek 4, Penna.

REM. 700 New Mod. 40x rifle, ser. working order, price here VG, 8mm appears to be 100% sale $64. 100% full mint, 30" full, 20"... (illegible) working order, $35.; list $34.95, sale $25.; Eaman's, Turtle Creek 4, Penna.

CUSTOM 300 Win. mag., best offer; Robert Dethloft, 625 Willow Lane, South Milwaukee, Wis. 53172.

(illegible classified lines)

POWDER: Red Dot, $22.50 - 12 lb. keg; Win. 450LS, $21.50; Hi Skor, $19.50 - 10 lbs; Immediate shipment. 100 Lb. prepaid; Kessel, ring Gun Shop, Burlington, Wash. S-2

(illegible classified lines)

THE SHOTGUN NEWS
Box 878
Columbus, Nebraska 68601

FOR SALE

NEED Parkers 6 Fox shotguns now. Quote best price 6 give accurate NRA description. Also buy Ithaca 6 Smiths. Reliable Loan Co., Box 2745, Raleigh, No. Car. TF-2

ITHACA 12 ga. dbl., hammerless, field bbls., bores dark, solid rib, 30", list ... sale ... with Kittinger, Ohio, O. markings, about good plus, ... Collection ... round ball molds, all are old, the lot list ... B&W cal. New Dept ... bullet mold prize, 80% orig., $10.; Win. mod. 12, 8" mint, with deluxe case stock, nice, nice, $100.; Collection of 2x film strips on Ford safe-man training, 35mm, the lot $35.; Sav. mod. 99, oct. bbl., 30-30 ... screwdriver set & many useful handles, $3.35; All ppd.; B-Mfrg. Maywood Army, R. I. And Morg'n Ams. Ill.

POWDER: Hodgdon 4831, 100 lb., $51. prepaid. 50 lbs. $25.95 collect; 5M Primers, $5.95 per M prepaid with 100 lbs. powder; Immediate shipment; Kessel-ring Gun Shop, Burlington, Wash. S-2

WW II & WWI type US Army remachine bolt action rifles (illegible)

POWDER for the handloaders. MW-970, 50 lbs., $19.95; New shipment of MW-4895, 1 lb. cans, $2.50. larger quantities cheaper; This is new powder, not salvage. By lb. or ton, loading data furnished. Dealer inquiries invited. FOB Merriam, Kans. Midwest Game Supply, 5937 Merriam Dr., Merriam, Kans. HEdrick 2-7522. TF-2

U.S. Postage Paid
Columbus, Nebr.
Permit No. 165

Internal Revenue Service
Alcohol & Tobacco Div.
7359 Internal Revenue Bldg. CF1.
Washington, D.C. 20220

# Write Your Congressmen Today!

# ATTENTION

## Sportsmen – Target Shooters – Arms Collectors – Firearms Dealers

This is to alert you to the most serious anti-firearms legislation ever proposed. On March 22, 1965 Senator Dodd of Conn., introduced into the U.S. Senate another firearms control Bill (S-1592)—which has the backing of PRESIDENT JOHNSON and his administration. An identical bill (HR-6628) was introduced into the House of Representatives by Congressman Murphy of New York. A resume of these bills indicates:

1. They apply to all guns - pistols - shotguns and rifles - alike.

2. NO EXCEPTION is made for antique or other collector weapons.

3. ANY WEAPON over .50 caliber would fall into the "DESTRUCTIVE DEVISES" category and would require a Dealers License of $1000.00 a year, this would include your ANTIQUE GUNS, FLINTLOCKS, PERCUSSIONS, CIVIL WAR CARBINES. MUSKETS, etc. Private Individuals could not possess or purchase any weapon over 50 caliber.

4. They prohibit the sale or shipment in interstate commerce of any type of gun between persons.

5. RELOADERS: Those who reload .38 Special ammunition for resale and shotgun shells for their club take note: A Manufacturer's License of $1000.00 a year would be required. ANYONE who reloads ammunition for resale would be affected by this.

6. Prohibit the sale of a gun over the counter to anyone who does not live in the state where the sale is made.

7. Gives the Secretary of the Treasury broad regulatory powers which could result in total registration of arms.

### TIME IS RUNNING OUT...EVERY ONE OF US---OUR FRIENDS AND NEIGHBORS MUST WRITE --- Be courteous and brief but to the point --- WRITE NOW!

### Word has just been received that PUBLIC HEARINGS on the DODD BILL will be held MAY 19, 1965

# HERE'S WHAT YOU SHOULD DO

Write every member of the HEARING COMMITTEE: Chairman Senator Thomas Dodd and Senators Philip Hard, Birch Bayh, Quentin Burdick, Joseph Tidings, Roman H. Hruska, Herman Fong, Jacob Javits at the U. S. Senate, Washington, D. C. asking for revision of the DODD BILL to help the Sportsman, HUNTER and GUN LOVER and to impose a MANDATORY PUNISHMENT for a Crime committed with a gun.

Write Representative Wilbur D. Mills, Chairman of the Ways & Means Committee, House of Representatives, Washington, D. C. requesting PUBLIC HEARINGS on Bill HR 6628.

Write your U.S. Senators and Representatives in Washington stating your opinion of the above Bills and urging them not to support same but to support a MIS-USE OF FIREARMS BILL. Specifically ask them to vote against S1591 - S1592 - S1180 - S1148 - ask them to support the Casey Bill HR 5642 - a mis-use of firearms bill).

Write to President Johnson, The White House, Washington, D.C. a similar letter to that outlined to the Senators and Representatives.

KEEP INFORMED OF GUN LEGISLATION AT YOUR STATE AND LOCAL LEVEL OF GOVERNMENT – Remember that not all gun legislation is bad – many existing laws need modifying.

WRITE your STATE GOVERNOR, ASSEMBLYMEN AND SENATORS asking them to SUPPORT MIS-USE OF FIREARMS BILLS and ask for PUBLIC HEARINGS on SPECIFIC FIREARMS BILLS.

### Our Goal---1,000,000 Letters to Protect Our Sport and Our Hobby

### Always Be Courteous In Your Letters

## SUPPORT - The American Sportsmen's Foundation, Inc.

81 Ernston Road                                                               Parlin, New Jersey

*A National Organization for the promotion of Shooting Sports and Wholesome Gun Legislation.*

Senator Dodd. The point is, Mr. Attorney General, this is characteristic of the outrageous misrepresentations that are spread across the country about this bill.

Attorney General Katzenbach, Mr. Chairman, and members of the committee, there can be no more valid domestic concern today than the increasing growth, the increasing sweep, and the increasing vio-

49-588—65——4

lence of crime. Crime is increasing in the cities. It is increasing in rural areas. It is increasing, most rapidly of all, in the suburbs.

The national crime rate has doubled since 1940. Just since 1958, it has increased at a rate five times faster than the rate of population growth and just between 1963 and 1964, the FBI's Uniform Crime Statistics inform us, serious crimes increased by 250,000—a jump of 13 percent.

These are figures which hardly require elaboration. The physical and fiscal toll of crime is learned anew each day in every city and community. What does require elaboration, however—what requires our most urgent and responsible attention is what we—the Federal Government and the Congress of the United States—are going to do about it.

President Johnson expressed the urgency of his concern about crime in a special message to Congress 2 months ago: He asked the Congress to enact legislation to make it easier to fight organized crime.

He asked Congress to pass new antinarcotics legislation, soon to be submitted.

He asked you to give the Federal Government authority to provide assistance to experimental approaches to law enforcement.

And, calling for a "sensible use of Federal authority to assist local authorities in coping with an undeniable menace to law and order and to the lives of innocent people," the President asked Congress to establish reasonable regulations on interstate shipments of the tools with which criminals work—guns.

We received a clear illustration of the need for S. 1592, the bill we meet to consider today, in the recent report of a wager made by Mayor Francis Graves, of Paterson, N.J., to show how easy it is to buy a gun by mail.

He ordered a .22 caliber revolver from a mail-order house in Chicago. Other than his name, address, and a money order for $13.95 he sent no information.

After the weapon arrived, the mayor noted: "The company that sent me this gun had no way of knowing whether I was a convicted murderer, what my intentions were, or whether I was 5 years old or 105 years old."

He could have added, as well, that the company had no way of knowing his true identity or address. It had no way of knowing whether he was prohibited by State or local law from owning the gun he had purchased. And he could have added that even if the company knew this information, it was likely to be of little interest to it.

There can be little alarm about the responsible mayor of a large city buying a pistol by mail. But there should be the greatest alarm about the scores of weapons bought every day by mail, many of them by persons who should not, either because of age, competency, or criminal record, lawfully possess them.

The story of the Paterson mayor is only a single example. The subcommittee has received evidence disclosing that in 1963 alone, some 1 million "dangerous weapons" were sold by mail order.

It has also been disclosed that over a 3-year period in Chicago, 4,000 persons bought weapons from only two mail-order dealers and that of these, fully one-fourth had criminal records.

Almost every edition of every major newspaper carries stories reporting crimes involving guns. Most often we read of hand guns. But it remains a fact that fully 30 percent of all murders committed by firearms involve rifles and shotguns.

These are facts of which we are rapidly becoming more urgently aware. There is a gathering momentum of sorrow, outrage, and commonsense concerning the deadly uses to which firearms are put.

J. Edgar Hoover has observed forcefully:

> The spotlight of public attention should be focused on the easy accessibility of firearms and its influence on willful killings. Where local controls and regulations exist, they should be fully implemented.
> Where there are none, measures should be taken to protect the public's interest. Loss of human lives cannot be rationalized—certainly not until all possible preventive action has been exhausted.

When the chairman of this subcommittee introduced S. 1592 on March 22, he noted that:

> FBI information demonstrates that in those areas where firearms regulations are lax, the homicide rate by firearms is substantially higher than in those areas where there are more stringent controls.
> In Dallas, Tex., and Phoenix, Ariz., where firearms regulations are practically nonexistent, the percentage of homicides committed by guns in 1963 was 72 percent in Dallas and 65.9 percent in Phoenix.
> In cities where there are strong regulations we have the following figures: Chicago, 46.4 percent; Los Angeles, 43.5 percent; Detroit, 40 percent; and Philadelphia, 36 percent. And in New York City—which has been disparaged in many ways as being thought of by some as the center of crime in America—with its much maligned Sullivan law, the rate of murder by gun was 25 percent. Thus, regulation has made a strong impact on this situation even though the uncontrolled interstate traffic makes it easy to evade the law.

Senator JAVITS. Will the witness yield?

Let me say it is all too rare that we hear a good word for New York. I am grateful to the Attorney General.

Attorney General KATZENBACH. The words are from your chairman, Senator Javits.

Senator JAVITS. I appreciate the chairman's views.

Attorney General KATZENBACH. Mr. Chairman, in a country in which more than half the 9,300 murders in 1964 were committed with firearms, many of them assuredly obtained by mail, congressional action is called for now.

In a country in which half the 20,000 suicides of 1963 were committed with firearms, many of them assuredly obtained by mail, congressional action is called for now.

In a country in which 26,000 aggravated assaults and the vast majority of 64,000 armed robberies were committed last year with firearms, congressional action is called for now.

In a country in which 216 law enforcement officers have been murdered with firearms in the past 5 years, compared with only 9 by other means, congressional action is called for now.

And in a country which has lost four Presidents to assassins' bullets, including the wrenching shock of November 22, 1963, congressional action is called for now.

As long as I live, I can never forget that it was a mail-order rifle—sent to a post office box that had been rented under an assumed name by a man with an established record of defection and mental instability—that killed President Kennedy.

I might add, Mr. Chairman, that it was a mail order pistol that the same man used to commit murder upon a police officer.

It is for these compelling reasons of public interest and public safety that the administration has proposed and most vigorously supports S. 1592, to control the mail order sale of guns.

This measure is not intended to curtail the ownership of guns among those legally entitled to own them. It is not intended to deprive people of guns used either for sport or for self-protection. It is not intended to force regulation on unwilling States.

The purpose of this measure is simple: It is, merely, to help States protect themselves against the unchecked flood of mail order weapons to residents whose purposes might not be responsible, or even lawful. S. 1592 would provide such assistance to the extent that the States and the people of the States want it.

First, the central provision of this measure is one which prohibits unlicensed persons from transporting, shipping, or receiving firearms in interstate or foreign commerce. It is this provision which eliminates the unarguable evils of mail order traffic in weapons.

Sportsmen could continue to take their shotguns or rifles across State lines. Pistols could continue to be carried in conformity with present State laws. But no longer could hundreds and thousands of persons with criminal records buy weapons interstate from mail order dealers—nor could the dealers sell to them. Sales would be made by local dealers and thus be subjects of local recordkeeping.

These records would then have new meaning: they would not be rendered futile by a flow of mail order guns. I think it is safe to say that this result alone would earn the committee and the Congress the gratitude of law enforcement officers in all parts of the country.

Second, a retail gun dealer would be required to limit his sales of hand guns to persons who are residents of his State and to limit all sales of weapons to those eligible by age and State and local law to own them. The age minimum established is 21 years, except for rifles and shotguns for which the age is 18.

Third, the bill would raise the annual license fees from the present token $1 for a dealer and $25 for a manufacturer to realistic figures, calculated to discourage applications from persons not genuinely in the firearms business. This provision is designed to bring about a higher level of responsibility in the firearms trade.

Fourth, another strengthening amendment would give the Secretary of the Treasury reasonable discretion as to who should be licensed to manufacture, import or deal in the deadly weapons with which the Federal Firearms Act is concerned.

The bill before this subcommittee does not address itself to the question of permits, leaving it to the States and local communities to decide what they need and want in that regard.

While the bill does limit the sales of handguns to persons over 21 years of age and that of shotguns and rifles to persons over 18 years of age, it does not address itself to whether persons under 21 and 18, respectively, should be permitted to use guns. That question and its resolution also is left to the States and communities. By and large, the States are free to have such firearms controls as they consider desirable within their boundaries.

A major advance under this bill would be to curb the great, unrestricted volume of imported weapons; about a million are imported each year. These include pistols, rifles, and shotguns—notably surplus military weapons—and, as the chairman noted, even the importation of bazookas and antitank guns. I think we all recall the incident in New York a few months ago when a bazooka was used to fire across the East River at the United Nations.

The bill would stringently restrict the importation of firearms. Weapons imported for science, research, or military training, or as antiques and curios, could be allowed. So could weapons particularly suitable for lawful sporting purposes if they are not surplus military weapons and their importation would not be contrary to the public interest.

There is a demonstrable need for the regulation of the interstate mail order sale of guns. This bill is a response to that need. It was carefully drafted; it is receiving detailed attention from this subcommittee.

But, nevertheless, S. 1592 now has itself become a target—for the verbal fire of the National Rifle Association and others who represent hunters and sporting shooters. These opponents feel their views most deeply, as is evident from the bitterness and volume of their opposition. It is no secret to any Member of Congress that the NRA sent out a mailing of 700,000 letters to its membership urging a barrage of mail to Senators and Congressmen.

There is no question that the views of the NRA should be heard and given full weight. There is no question that so many people with an interest in gun legislation should have every opportunity to express it. But those views also need to be evaluated. I would like now to turn to the analysis of the opposition arguments.

I might add, Mr. Chairman, that one of the things that distresses me is that so many people cannot discuss the bill on the merits. I see no need to misrepresent what this bill would do.

If there is opposition, it should be made on a fair representation of what this bill would do. I intend to state what this bill does and does not do.

Senator Dodd. I am so glad. It needs to be done. Misrepresentations are really outrageous and I am sure you can help us, this committee and Members of the Congress get set right on this bill and help the people of this country to understand it.

I say again that I am completely sure that these are deliberate misrepresentations. It is just not possible for any intelligent person to have read this bill and put out some of the mailing literature that has been put out.

Attorney General Katzenbach. I would agree with you, Mr. Chairman.

It has been suggested, for example, by Franklin Orth, the executive vice president of the NRA, that S. 1592 gives the Secretary of the Treasury "unlimited power to surround all sales of guns by dealers with arbitrary and burdensome regulations and restrictions."

I fear this is an exaggeration flowing from the heat of opposition. The Secretary's regulations must be reasonable.

I should think that the reasonableness of the regulations promulgated by the Secretary of the Treasury under the existing provisions of the Federal Firearms Act would contradict the assumption of "burdensome regulations."

Further, the Administrative Procedure Act assures all interested parties of an opportunity to be heard before the issuance of substantive rules and regulations. The NRA and other gun interests have, in the past, taken full advantage of this opportunity and clearly could do so in the future. And still further, the regulations are subject to review and reversal by the courts and by Congress should they be felt arbitrary and capricious.

It has also been suggested that S. 1592 requires anyone engaged in the manufacture of ammunition to pay $1,000 for a manufacturer's license. The bill does not do so. It does not cover shotgun ammunition at all, and the license fee for manufacturers of other types of ammunition is $500.

Senator DODD. This is a misrepresentation and I say again it is clearly outrageous. Anyone who reads the bill knows this is not true and here is this highly respected organization putting out this misinformation and mailing it to thousands of people in this country and Members of Congress. I cannot believe that was an innocent mistake.

Attorney General KATZENBACH. It is true that anyone selling rifle ammunition, even .22 caliber, would be compelled to have a $100 dealer license. Why shouldn't he? He is dealing in ammunition for a lethal weapon. The many dealers in ammunition who also sell firearms would not, however, be required to pay an additional ammunition fee. Nor is there anything in the legislation that would, as has been stated, require a club engaged in reloading for its members to obtain a manufacturer's license.

A further specific objection raised against this bill is that it would forbid a dealer to sell to a nonresident of his State. The objection is stated in a misleading way. The bill does forbid such sales of handguns, but it specifically excepts weapons like rifles and shotguns most commonly used by sportsmen and least commonly used by criminals.

A similar objection is made on the ground that the measure would prohibit all mail order sales of firearms to individuals. While this is an accurate description of the measure with respect to interstate and foreign commerce, the bill would not foreclose now allowable shipments within a State. Any control of such commerce is left to the States.

As has been pointed out, the major and responsible mail order houses do have local outlets in many States.

One last comment on the specific NRA objections, as expressed in the letter sent to its membership. The letter described this measure as one which conceivably could lead to the elimination of "the private ownership of all guns."

I am compelled to say that there is only one word which can serve in reply to such a fear, and that is preposterous.

Beyond specific objections to the legislation, opposition to it continues to be founded in the assertion that it is unconstitutional. Let me therefore now turn to discuss, as you have asked me to do, the question of the constitutionality of the Federal firearms legislation, particularly S. 1592, from the standpoint of the second amendment to the

Constitution and of the congressional authority under which the legislation could be enacted.

With respect to the second amendment, the Supreme Court of the United States long ago made it clear that the amendment did not guarantee to any individuals the right to bear arms.

I offer for the record a memorandum, which I have had prepared in consultation with representatives of the Secretary of the Treasury. It documents the opinion that the right to bear arms protected by the second amendment relates only to the maintenance of the militia.

(The document referred to was marked "Exhibit No. 7" and is as follows:)

EXHIBIT No. 7

MEMORANDUM RE FEDERAL FIREARMS CONTROL AND THE SECOND AMENDMENT

The administration has proposed legislation to strengthen the Federal Firearms Act of 1938 (15 U.S.C. 901–909). This legislation has been introduced as S. 1592. The legislation would prohibit the transport, shipment, or receipt of firearms in interstate or foreign commerce except as between licensed importers, manufacturers, or dealers, or between such licensees and persons excepted from the application of the act, such as agencies of the Federal and State Government. The bill would prohibit the interstate mail-order traffic in fire arms, and a licensed person would be barred from selling firearms to residents of States other than the State of the licensee's place of business, except in the case of sporting type firearms. Furthermore, licensees would be prohibited from selling firearms to persons convicted of a felony and to persons under 21 years of age, or under 18 years in the case of rifles and shotguns.

It is anticipated that persons opposed to further restrictions on access to firearms will attack the proposed legislation on the ground that it violates the second amendment of the U.S. Constitution. Such an argument was rejected by Congress in connection with the adoption of the National Firearms Act of 1934 (now 26 U.S.C. 5801–5862) and the Federal Firearms Act, and the courts have rejected any incompatibility between the Federal legislation and the second amendment. Nevertheless, since the proposed restrictions are more stringent than those previously enacted by Congress, this opinion has been prepared to make as clear as possible the inapplicability of the second amendment to this legislation.

The second amendment to the Constitution provides: "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed."

An examination of the relevant Federal and State cases, commentaries on constitutional law, and the legislative history of the National Firearms Act and of the Federal Firearms Act produces the following conclusions, which will be amplified and supported below:

(a) At the time of the passage of the National Firearms Act in 1934 and the consideration and passage by Congress of the Federal Firearms Act from 1935 to 1938, the second amendment was not considered to be an obstacle.

(b) Decisions applying Federal firearms legislation hold that the second amendment was not, as the first amendment was, adopted with individual rights in mind, but was a prohibition upon Federal action which would interfere with the organization by States of their militia. The Federal firearms legislation was held not to interfere with such organization.

(c) The organized militia of the several States is today the National Guard of each State (and any Naval Militia) equipped by the Federal Government and trained in accordance with the discipline established under the authority of article 1, section 8, clause 16 of the Constitution. Consequently, it appears that

the "well regulated militia" referred to in the second amendment is at the present time the organized militia of the several States. The amendments to the Federal Firearms Act would in no way interfere with the organization, functioning, or expansion of the National Guard for Naval Militia).

(*d*) The concept of the right of the people to keep and hear arms, as expressed in State constitutions as well as in the second amendment, has been held not to prevent the States from regulating the carrying of deadly weapons by individuals, or from prohibiting the formation of military organizations other than the organized militia. The concept of "bearing arms" is primarily a military concept and has been distinguished from the carrying of a weapon for personal purposes. Insofar as the right is deemed to exist in individuals, it is often identified with the right to participate in an organized milita. Moreover, several States decisions and commentators on constitutional law have concluded that the word "people" in the second amendment and like provisions in various State constitutions is used in the collective sense to mean the people organized as a body politic.

### (*a*) *Consideration of the second amendment in the passage of prior Federal firearms legislation*

In connection with the passage of the National Firearms Act in 1934 under the power of Congress to lay and collect taxes and to regulate interstate commerce, the Attorney General advised the Committee on Ways and Means that there was no constitutional objection to the legislation.[1] Members of the committee indicated agreement with this view.[2] That this was the accepted view is indicated by the fact that the second amendment was not referred to in the 1935 hearings[3] preceding the passage of the Firearms Act of 1938, regulating interstate traffic in firearms, nor was it discussed in the several committee reports on this legislation.[4]

### (*b*) *Interpretation of the second amendment in Federal firearms prosecutions*

The argument that the second amendment inhibits Federal regulation of dealings in firearms was raised by defendants charged with, or convicted of, violation of the National Firearms Act or the Federal Firearms Act. In each case the second amendment was held not to bar the Federal legislation, one of the cases being decided by the Supreme Court and two being considered by that Court; *United States* v. *Adams*, 11 F. Supp. 216 (S. D. Fla. 1935) ; *United States* v. *Miller*, 307 U.S. 174 (1939) ; *United States* v. *Tot*, 131 F. 2d 261 (3d Cir. 1942), reversed on other grounds, 319 U.S. 463 (1943), and *Cases* v. *United States*, 131 F. 2d 916 (1st Cir. 1942), cert. denied, sub nom. *Velazquez* v. *United States*, 319 U.S. 770 (1943). An analysis of these decisions, particularly those in *Tot* and *Cases*, demonstrates that the proposed amendments to the Federal Firearms Act are in no way invalidated by the second amendment.

The National Firearms Act of June 26, 1934, 48 Stat. 1236 (now 26 U.S.C. 5801–5862) levied taxes on dealers, manufacturers, and importers of defined firearms and on transfers of such firearms, and required that every person possessing any such firearm not acquired from a registered manufacturer or dealer or importer must register with the Secretary of the Treasury or his delegate the identification of the firearm and his own identification. Each transfer of such a firearm (except between registered dealers) was to be accompanied by a written order with an IRS stamp affixed.

In an early prosecution under this act, *United States* v. *Adams*, *supra*, the defendant demurred to the charge of violations of the act on several constitutional grounds including infringement by the act of the second amendment. The court disposed of this argument by holding that the second amendment had no application to the Firearms Act. It declared that the Constitution "refers to the militia, a protective force of government; to the collective body and not individual rights" (at 219), citing Supreme Court and State court cases and a constitutional commentary on "The Right To Keep and Bear Arms," by McKenna, discussed below.

In *United States* v. *Miller*, 307 U.S. 174 (1939) the Supreme Court upheld the conviction of two men who transported in interstate commerce a shotgun which came within the definition of a "firearm" under the National Firearms Act and was not registered as required by that act nor covered by a stamp-affixed order.

---

[1] Hearings on H.R. 9066, 73d Cong., 18–19 (Apr. 16, 1934).
[2] Id. at 53–54.
[3] Hearings before the Senate Committee on Commerce on S. 3, 74th Cong. (Apr. 16, 1935).
[4] See S. Rept. 997, 74th Cong., H. Rept. 2663, 75th Cong., and S. Rept. 82, 75th Cong.

The act was challenged by the defendants as unconstitutional under the second amendment. The Court found that the second amendment did not guarantee the right to keep and bear any weapon not having a "reasonable relationship to the preservation or efficiency of a well-regulated militia." The Court stated that the obvious purpose of the amendment was to assure the continuation and render possible the effectiveness of the militia subject to call and organization by Congress under article 1, section 8, clauses 15 and 16 of the Constitution and that the amendment must be interpreted and applied with that end in view (at 178).

The Supreme Court recognized that at the time the Constitution was drafted the militia was considered to be a "body of citizens enrolled for military discipline" and that "ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time" (at 179). The Court further recognized that as of 1934, most, if not all, of the States had adopted provisions regulating the right to keep and bear arms and concluded that none of these laws affected the right of the Federal Government to adopt the National Firearms Act (at 182).

Any implication in the reasoning of the Court that the more efficient a weapon might be for purposes of a well regulated militia the less subject it might be to congressional regulation was dissipated in the two circuit court holdings which the Supreme Court did not disturb. *Cases* v. *United States*, 131 F. 2d 916 (1st Cir. 1942), certiorari denied, sub nom. *Velazquez* v. *United States*, 319 U.S. 770 (1943); *United States* v. *Tot*, 131 F. 2d 261 (3d Cir. 1942), reversed on other grounds, 319 U.S. 463 (1943). These cases upheld convictions under the Federal Firearms Act enacted June 30, 1938 (15 U.S.C. 901–909). The provision of the act which had been violated in each of these cases was section 902(f) making it unlawful for any person convicted of a crime of violence to receive firearms or ammunition transported in interstate or foreign commerce. The defendants in both cases invoked the second amendment.

In the *Tot* decision the circuit court held that it was abundantly clear from the discussions of the second amendment contemporaneous with its proposal and adoption, and from the analysis of the amendment by learned writers since then, that unlike the first amendment, it "was not adopted with individual rights in mind, but as a protection for the States in the maintenance of their militia organizations against possible encroachmetns by the Federal power" (at 266). It further stated that "weapon bearing was never treated as anything like an absolute right by the common law" but was regulated by statute as far back as the statute of Northampton in 1328 and on many occasions since (at 266). The court concluded that the Federal statute providing a general regulation of interstate and foreign commerce in firearms was consistent with the history and purpose of the second amendment. The Court affirmed the lower court decision (*United States* v. *Tot*, 28 F. Supp. 900, 903 (D.N.J. 1939)) which had cited with approval the opinion in the *Adams* case that the amendment referred to a collective protective force and not to individual rights.

In the *Cases* decision the first circuit also pointed out that the right to keep and bear arms "is not a right conferred upon the people by the Federal Constitution" and that whatever rights they might have depended on local legislation (at 921). Furthermore, while the only function of the second amendment was to prevent the Federal Government from infringing that right, the limitation imposed was not absolute (at 922). The court concluded that the framers of the amendment did not intend to give private individuals a right to possess deadly weapons of any character, whether or not they were of the kind that would be useful to a well-regulated miiltia. Specifically, the possession of ammunition by the defendant in that case for purposes of his own was not a right guaranteed by the second amendment.

*(c) The present day "well-regulated militia"*

In 1792, the year following the adoption of the second amendment, Congress acted under its power in article I, section 8, clauses 15 and 16 of the Constitution to provide for calling forth the State militia as necessary to meet invasion or insurrection, with payment the same as for U.S. troops,[5] and to provide for the enrollment and organization in the State militia of able-bodied men between prescribed ages with the requirement that they provide their own arms as specified.[6]

---

[5] Act of May 2, 1792, c. 28, 1 Stat. 264.
[6] Act of May 8, 1792, c. 33, 1 Stat. 271.

However, in 1808 Congress provided that a certain number of arms should be annually supplied to the whole of the enrolled militia. An annual appropriation of $200,000 was provided for this purpose. The arms were to be distributed to the States in the proportion that each militia bore to the whole, and in accordance with State regulations, while title to the arms was to pass to the States.[7] This arrangement continued until 1897 when Congress, dissatisfied with the 1808 act, doubled the annual appropriation and required the States to create and maintain a regular, enlisted, organized, and uniformed, active militia in order to be eligible for the Federal arms. Moreover, Congress required the States to account for the property furnished and provided that it was to remain the property of the United States.[8] Soon thereafter Congress provided that the "regularly organized armed and equipped militia" (generally known as the State National Guard) could exchange its arms, either furnished by the Federal Government or purchased by the State out of its own appropriation, for an equivalent number of caliber .45 Springfield rifles.[9] Congress also provided that the States could purchase for the use of their militia other arms and supplies from the Army for cash.[10] It was recognized that the States continued to purchase arms and equipment for their militia from their own appropriations.[11]

From 1887 to the present day the Federal Government has supplied arms to the State militia under legislation prescribing the kind, quality, care, and accounting of such arms, with the provision that the arms remain the property of the United States.[12]

In 1903 Congress provided that the "regularly enlisted, organized, and uniformed active militia in the several States" should constitute the "organized militia" and be known as the National Guard (or such other name as the State might give), that all other able-bodied men between the ages of 18 and 45 should be known as the Reserve Militia, that Federal equipment could be distributed only to the organized militia, and that any State could procure from the War Department additional arms for its organized militia where that body met certain specified training requirements.[13] Since that time the organized militia of the States has been the National Guard (and the Naval Militia),[14] and the remaining eligible manpower form "the unorganized militia" which has no status until members are called into the National Guard under State or Federal law (see 10 U.S.C. 311). This distinction between the organized militia known as the National Guard (or the Naval Militia) and the unorganized reserve is followed in State laws. (For example, see New York, military law, sec. 2; Pennsylvania, 51 P.S., secs. 1–202 1–203; Virginia, sec. 44–1 ;and Texas-Vernon's Ann. Civ. St. Art. 5765.)

It appears from the foregoing that for nearly a century and a half Congress has provided for the arming of the enrolled, organized militia, the arms being similar to or identical with those provided to the defense forces, and that for at least the past half century no member of the organized militia has been required or permitted to supply his own arms.[15] Moreover, during almost all of the 20th century the only organized militia has been the National Guard, and since 1914 the Naval Militia. These may consequently be described as the "well-regulated militia" of the present day.

---

[7] Act of Apr. 23, 1808, c. 55, 2 Stat. 490; see the pertinent part of the debates in Congress on this act in 18 Annals of Congress 2176, 2181–2185, 2195–2197 (April 1808).

[8] Act of Feb. 12, 1887, c. 129, 24 Stat. 401; see. S. Rept. 41 and H. Rept. 1267, 49th Cong.

[9] Act of Feb. 24, 1897, c. 310, 29 Stat. 592.

[10] Ibid.

[11] 28 Congressional Record 2933.

[12] See acts in this century so providing: Act of Jan. 21, 1903, c. 196, sec. 13, 32 Stat. 775, 777; act of May 27, 1908, c. 204, sec. 8, 35 Stat. 399, 401–402; act of June 3, 1916, c. 134, secs. 67, 83–87, 39 Stat. 166, 199–200, 203–205; act of Aug. 10, 1956, c. 1041, 70A Stat. 615 (32 U.S.C. 710(a)).

[13] Act of Jan. 21, 1903, c. 196, sec. 1, 32 Stat. 775.

[14] The organized Naval Militia was created in 1914: see act of Feb. 16, 1914, c. 21, 38 Stat. 283; it was to be composed of State Naval Militia which had been established in some of the States approximately beginning in 1880 and thereafter; see H. Rept. 94 and S. Rept. 167, 63d Cong., and 10 U.S.C. 7851.

[15] As early as December 1807, Congress recognized that the requirement that militiamen provide their own weapons (see footnote 2) had not been adhered to in many parts of the United States (17 Ann. of Cong., 1040–1041). In 1903 this 1792 requirement that each enrolled militiaman provide his own "musket or firelock" was finally repealed (act of Jan. 21, 1903, c. 196, sec. 25, 32 Stat. 775, 780). It was then recognized that even the requirement of enrollment had been obsolete for over 100 years (H. Rept. 1094, 57th Cong., 11).

Since the "well-regulated militia" referred to in the second amendment is the subject of a compatible network of special Federal and State laws and since the proposed amendments to the Federal Firearms Act exempt from their application activities by Federal and State authorities, it is evident that the second amendment is no obstacle to the passage of the amendments. However, because the second amendment refers to "the right of the people to keep and bear arms" it is sometimes argued that this concept impedes Federal legislation even if it be conceded that the second amendment relates only to the organized militia. For this reason this memorandum provides an analysis of this concept.

### (d) The concept of the right of the people to bear arms

While the Constitution cannot be said to be the source of a right to keep and bear arms, its wording indicates that a preexisting right was recognized. A majority of court decisions, both State and Federal, assume without discussion or determination of the issue that the right to bear arms exists in the people as individuals either because it is deemed to be a natural right or because conferred by State constitutions.

However, it is well settled that there is nothing inherent in the right making it absolute. Inasmuch as "arms" is traditionally a military term and the statement of the right in the Federal and several State constitutions is connected with the necessity for a well-regulated militia, it has been concluded that, if such a right is personal in nature, it is at least restricted to members of a well regulated or, synonymously, organized State militia. "The word 'arms' in the connection we find it in the Constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense." *English v. The State*, 35 Tex. 473, 477 (1872). "[T]he provision in question [the counterpart to the second amendment in the bill of rights of Kansas] applies only to the right to bear arms as a member of the State militia, or some other military organization provided for by law." *City of Salina v. Blaksley*, 72 Kan. 230, 83 Pac. 619, 620 (1905). (Brackets supplied.)

While a few older State cases went so far as to hold that all citizens had the unabridgable right to bear arms for self-protection as well as for militia purposes and that a statute prohibiting the carrying of concealed weapons was violative of the second amendment (see *Bliss v. Commonwealth*, 2 Litt. (Ky.) 90, 13 Am. Dec. 251 (1822)), that point of view is virtually extinct. The Supreme Court stated as an axiom in 1897 that the second amendment "is not infringed by laws prohibiting the carrying of concealed weapons", *Robertson v. Baldwin*, 165 U.S. 275, 282. The overwhelming majority of State cases follow the doctrine expressed in *Commonwealth v. Murphy*, 44 N.E. 138 (Mass. 1896), that "it has been almost universally held that the legislature may regulate and limit the mode of carrying arms." Therefore, a State statute regulating, and in certain instances prohibiting, the carrying of enumerated deadly weapons is not repugnant to the second amendment or its counterpart in the State's constitution. *English v. State*, 35 Tex. 473 (1872). Likewise, an act prohibiting the carrying of revolvers without a license does not violate either the Federal or State constitution; neither does a State law forbidding possession of concealed weapons. *Strickland v. State*, 72 S.E. 260 (Ga. 1911); *Haile v. State*, 38 Ark. 564 (1882).

Moreover, no body of citizens other than the organized State militia, or other military organization provided for by law, may be said to have a constitutional right to bear arms. *City of Salina v. Blaksley*, 72 Kans. 230, 83 Pac. 619 (1905); *Presser v. Illinois*, 116 U.S. 252 (1886).

The modern tendency among judges and legal scholars is to regard the right to bear arms as existing in narrowly limited circumstances. The present state of the law concedes at the most that "the second amendment only forbids Congress so to disarm citizens as to prevent them from functioning as State militiamen." [16] If this statement accurately reflects the prevailing trend of the law, it follows that any act of Congress which does not in fact prevent an eligible citizen from functioning as a State militiaman is not proscribed by the second amendment.

The preceding discussion and conclusion are based on what many courts assume to be true, that the right to bear arms as referred to in the Constitution is personal in nature. However, respectable authority supports the view that the second amendment merely affirms the right of the States to organize and

---

[16] McKenna, "The Right To Keep and Bear Arms," Marq. L. Rev. 138, 143 (1928).

46                    FEDERAL FIREARMS ACT

maintain militia. That is, it applies to "the people" as the body politic of each State."[17] Support for this is found in English history.[18]

Several early cases suggested that the right to bear arms "is one of those rights reserved to the States."[19] In *Aymette* v. *State*, 21 Tenn. 154, 158 (1840), the court declared, "The single individual * * * is not spoken of or thought of as 'bearing arms.'" *People ex rel. Leo* v. *Hill*, 126 N.Y. 497, 27 N.E. 789, 790 (1891), contains language of similar import: "The power to control and organize the militia resided in the several States at the time of the adoption of the Constitution of the United States and was not taken away by that instrument."

The leading case of *City of Salina* v. *Blaksley*, 72 Kans. 230, 83 Pac. 619 (1905), has been interpreted as going so far as "expressly to decide that the word 'people' means only the collective body and that individual rights are not protected by the constitutional clause." McKenna, "The Right To Keep and Bear Arms," 12 Marq. L. Rev. 138, 145 (1928). Mr. McKenna proceeded to suggest that future courts might say "that the States may have their well-regulated militia even though individuals possess no weapons of their own, provided the States supply the necessary armament upon mobilization" (at 149). This they do, under Federal and State provisions, as described above.

The foregoing analysis reveals that there is nothing in the meaning, scope, or application of the second amendment to impede passage of Federal legislation limiting interstate traffic in firearms to licensed or excepted persons and prohibiting sales by licensees to juveniles and convicted felons.

APPENDIX

THE ORIGIN OF THE SECOND AMENDMENT

The original proposal of what is now the second amendment was introduced by James Madison in the House in the first session of the First Congress, and it read as follows:

"The right of the people to keep and bear arms shall not be infringed; a well armed and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms shall be compelled to render military service in person." 1 Annals of Cong. 434 (1789).

This, along with the other proposals, was referred to a select committee. As reported by the committee, it was phrased in somewhat different language:

"A well regulated militia, composed of the body of the people, being the best security of a free state, the right of the people to keep and bear arms shall not be infringed; but no person religiously scrupulous shall be compelled to bear arms." Id. at 749.

Both proposals were obviously designed in part to protect the individual conscientious objector, and in both, this concept was phrased in individual terms; i.e., "no person." In referring to the right to bear arms, however, both proposals used the collective term, "the people," and the committee proposal is even more specific, "the body of the people." The contrast in terminology supports the view that the right to bear arms was intended as a collective right while the protection of religious scruples was a personal benefit.

The Senate debates in the First Congress are not reported. The House debates were confined to the question of the retention of the conscientious-objector provision, but Elbridge Gerry of Massachusetts did comment briefly on the history of the proposal. He noted that the Crown had quartered troops in Massachusetts and had forbidden the organization of a colonial militia. He said the purpose of organizing and maintaining a militia was to prevent the establishment of standing armies—"the bane of liberty." Id. at 749–750. He expressed the view that if States were not permitted to make their own choice with respect to conscientious objectors, they might be unable to raise a militia, and the consequence of this would be the development of a standing army. Ibid. His concern was the weakening of State militias, and there was no mention of any individual "right" to bear arms.

There is no indication in the Annals as to how the final language of the second amendment was decided upon. While the religious-scruple clause was omitted,

_____
[17] See attached appendix entitled, "The Origin of the Second Amendment."
[18] Haight, "The Right To Keep and Bear Arms," 2 Bill of Rights Review 31–33 (1941). Mr. Haight was chairman of the Bill of Rights Committee of the American Bar Association when the article was published. See also Emery, "The Constitutional Right to Keep and Bear Arms," 28 Harv. L. Rev. 473 (1915).
[19] Ibid.

the final version does retain the use of the collective term "the people," and the debates which are reported support the view that the second amendment was designed to protect and preserve the State militias. No mention was made of any individual "right" to possess, carry or use arms and there is no indication of any concern with this.

In considering the scope of the second amendment, it is appropriate to review the various provisions in State constitutions and bills of rights which were in effect in 1789. By the time the Bill of Rights was ratified in December 1791, there were 14 States in the Union. Most of these had adopted constitutions or declarations of rights following the signing of the Declaration of Independence. Rhode Island alone was still operating under its Charter of 1663. That charter authorized the colony to organize and maintain a militia, but, as might be supposed, there was no mention of any "right" to bear arms.

Delaware and New Jersey had both adopted constitutions in 1776, but neither contained a bill of rights and there was no mention of a "right" to bear arms. Connecticut had a declaration of rights, adopted in 1776, but it was also silent with respect to bearing arms.

Five States had constitutions specifically providing for the organization and maintenance of a militia but making no reference to bearing arms. The Georgia constitution of 1777, article XXXIV and XXXV, was concerned with the structure and regulation of the militia. The South Carolina constitution of 1778, article XLII, merely provided that the militia should be subordinate to the civil authorities. Maryland and New Hampshire had very similar provisions relating to the necessity and purpose of the militia: "That a well-regulated militia is the proper and natural defence of a free government" (Md. Const. of 1776, Art. XXV); "A well regulated militia is the proper, natural, and sure defence of a state" (N.H. Const. of 1784, Art. XXIV). New York apparently did not contemplate a self-armed militia since the constitution of 1777, article XL, required the State to maintain a militia in both war and peace and to maintain "a proper magazine of warlike stores," at State expense, for the use of the militia.

Three States expressly recognized the "right of the people to bear arms" for the defense of the State. Article XVII of the Massachusetts constitution of 1780, began: "The people have a right to keep and to bear arms for the common defense." The remainder of that article described the militia of the State. Article XVII of the North Carolina constitution of 1776 began: "That the people have a right to bear arms, for the defence of the State * * *." The remainder of the article forbade maintenance of a standing army and insured civilian control over the militia. Both these constitutions consistently used the term "people" in referring to collective rights, such as the right of self-government. Where individual rights were guaranteed the terms "men," "individuals," "persons," "citizens," or "subjects" were used. The Virginia Bill of Rights of 1776, section 13, provided, 'That a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural and safe defence of a free State * * *.' That section further provided that there should be no standing army and that the militia should be controlled by the civil authority.

If an individual right to bear arms for private purposes was recognized in these States in 1789, it was not a right guaranteed by the State constitutions or charters. On the other hand, the right to maintain a militia for the defense of the State was apparently jealously guarded. It is certainly arguable then that it was Federal infringement of the militia that concerned these States when the First Congress assembled, rather than any individual right to bear arms.

There were two State constitutions which might be construed as recognizing an individual right to bear arms in self-defense. The Pennsylvania constitution of 1776, article XIII, provided: "That the people have a right to bear arms for the defence of themselves and the state * * *." However, the remainder of that article was concerned with the prohibition against a standing army and the guarantee of civilian control of the militia. Moreover, "people" seems to have been used in a collective sense throughout the constitution and other terms were used to indicate individual rights. It is more likely that article XIII was intended to refer only to the common defense, not to individual self-defense. The Vermont constitution of 1777, article XV, provided: "That the people have a right to bear arms for the defense of themselves and the States"; it also prohibited a standing army and required civilian control of the militia. In view of the history of this problem, it is reasonable to conclude that the phrase "defence of themselves" referred only to collective defense and did not include individual self-defense.

48 FEDERAL FIREARMS ACT

Thus, at the time of the adoption of the second amendment neither Congress nor the States indicated any direct concern with an individual "right" to own, carry or use firearms for private purposes. If such a "right" existed, it was not clearly expressed in State constitutions or declarations of rights. Both the States and the Congress were preoccupied with the distrust of standing armies and the importance of preserving State militias. It was in this context that the second amendment was written and it is in this context that it has been interpreted by the courts.

Attorney General KATZENBACH. Clause 3 of section 8 of article I of the Constitution provides that the "Congress shall have Power * * * To Regulate Commerce with Foreign Nations and among the several States, and with the Indian Tribes."

The Federal Firearms Act is based on this, the commerce clause, as is the amendment which the subcommittee is considering.

I will not now take your time to present a legal dissertation on this point, but with your permission offer for the record a memorandum prepared by the General Counsel of the Treasury Department, which makes abundantly clear that the commerce clause of the Constitution supports all that is undertaken in S. 1592. Mr. Chairman, it is incredible that anyone could doubt it.

Senator DODD. It is to me, too.

(The document referred to was marked "Exhibit No. 8" and is as follows:)

EXHIBIT No. 8

GENERAL COUNSEL,
TREASURY DEPARTMENT,
*Washington, May 17, 1965.*

Memorandum to the Secretary.
From: Fred B. Smith, Acting General Counsel.
Subject: Constitutional basis for Federal firearms control legislation.

The proposed legislation to amend the Federal Firearms Act is based on the same constitutional provision as was the act itself, clause 3 of section 8, article I,

"Section 8. The Congress shall have power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;".

Commerce regulation is one of the enumerated "great" powers of Congress which is supplemented by the "implied" power under clause 18 of section 8, article I:

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

The Supreme Court in an often quoted 1819 decision interpreted this clause and stated regarding its effect on the congressional exercise of the enumerated powers:

"We admit, as all must admit, that the powers of the Government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the National Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch v. Maryland,* 4 Wheat. 316, 420 (1819).

The Federal power to regulate interstate commerce in firearms by means of the Federal Firearms Act has been exercised since its enactment in 1938 and has been upheld by the courts. *Cases v. United States,* 131 F. 2d 916 (1st Cir. 1942), cert. denied, 319 U.S. 770, reh. denied, 324 U.S. 889. The proposed amendments to the act extend the operation of its provisions into the foreign commerce field and expand the area of interstate commerce regulation.

The power conferred on Congress by the Commerce clause is plenary. In an early Supreme Court decision, still cited as the leading case on this constitution grant of authority, Chief Justice Marshall wrote:

"We are now arrived at the inquiry—what is this power? It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. * * *" *Gibbons* v. *Ogden*, 9 Wheat. 1, 196 (1824).

Although arising from the same source, in its application and limitation the congressional power to regulate foreign commerce differs somewhat from its power to regulate interstate commerce.

### A. AS APPLIED TO FOREIGN COMMERCE

The proposed legislation would prohibit the importation of surplus military firearms and severely restrict certain other firearms importations (e.g., firearms not suitable for lawful sporting purposes). The Supreme Court has held that, under its commerce regulating power, Congress may, if it desires, completely prohibit importation of articles of commerce. In a 1915 decision concerned with regulation of opium traffic the Court took this position, and quoted from a previous decision as follows:

"'* * * Whatever difference of opinion, if any, may have existed or does exist concerning the limitations of the power, resulting from other provisions of the Constitution, so far as interstate commerce is concerned, it is not to be doubted that from the beginning Congress has exercised a plenary power in respect to the exclusion of merchandise brought from foreign countries; not alone directly by the enactment of embargo statutes, but indirectly as a necessary result of provisions contained in tariff legislation. It has also, in other than tariff legislation, exerted a police power over foreign commerce by provisions which in and of themselves amounted to the assertion of the right to exclude merchandise at discretion. This is illustrated by statutory provisions which have been in force for more than 50 years, regulating the degree of strength of drugs, medicines and chemicals entitled to admission into the United States and excluding such as did not equal the standards adopted.'" *Brolan* v. *United States*, 236 U.S. 216, 218, 219 (1915), quoting *Buttfield* v. *Stranahan*, 192 U.S. 470, 492. See also *Yee Hem* v. *United States*, 268 U.S. 178, 183.

An early exercise of this congressional power is seen in the act of March 2, 1907, entitled, "An Act to prohibit the importation of slaves into any part or place within the jurisdiction of the United States from and after the first day of January in the year of our Lord one thousand eight hundred and eight" (2 Stat. 426).

Since the field of foreign commerce is external and involves relations with foreign nations, it is in an area of exclusive Federal jurisdiction with State interference prohibited by section 10 of Article I of the Constitution. Hence, the reservation of State power over police matters and intrastate commerce arising from the 10th amendment are not limitations over the regulation of foreign commerce.

Neither is the fifth amendment a limitation on the exercise of the foreign commerce regulation power. Regarding this matter the Supreme Court has said:

"As a result of the complete power of Congress over foreign commerce, it necessarily follows that no individual has a vested right to trade with foreign nations, which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country and the terms upon which a right to import may be exercised. This being true, it results that a statute which restrains the introduction of particular goods into the United States from considerations of public policy does not violate the due process clause of the Constitution." *Buttfield* v. *Stranahan*, 192 U.S. 470, 493 (1904). See also *Oceanic Navigation Co.* v. *Stranahan*, 214 U.S. 320, 335 (1909).

### B. AS APPLIED TO INTERSTATE COMMERCE

The proposed legislation, in order to achieve effective control over interstate transactions in firearms, would impose licensing requirements on all persons engaged in activities of a commercial nature with respect to firearms, without regard to whether their activities are interstate or intrastate, and would impose restrictions and requirements on all licensees with respect to certain transactions not necessarily interstate in nature. A major objective of the proposed amendments to the Federal Firearms Act is to assist State and local authorities, in the exercise of firearms controls within their borders under their police power, through effective control of interstate and foreign traffic in firearms. A reasonable

implementation of this purpose is the requirement that licensees sell only to residents of their States, since otherwise gun ownership controls of only local application could be frustrated. Another objective is to control interstate commerce in firearms destined for minors and criminals. Here again, a restriction on sales by licensees generally was deemed essential to achieve effective interstate control.

The Supreme Court has in numerous decisions since *McCulloch* v. *Maryland, supra* (4 Wheat. 316 (1819)), discussed the power of Congress to legislate in matters involving interstate commerce. It seems apparent from these many decisions that, in exercising its constitutional power to regulate, Congress may, for the common good, restrict or completely prohibit interstate commerce in specific articles, and may regulate intrastate transactions, as appropriate, to effectively achieve its purpose in regulating interstate commerce.

The power of Congress under the commerce clause has been described as plenary and supreme and subject to no limitations other than those prescribed by the Constitution itself. *Prudential Insurance Co.* v. *Benjamin* (328 U.S. 408, 423, 434 (1946)); *Carolene Products Co.* v. *United States* (304 U.S. 144, 147 (1938)); *Kentucky Whip & Collar Co.* v. *Illinois Central Railroad Co.* (299 U.S. 334 (1937)). The Supreme Court has stated that:

"The motive and purpose of a regulation of interstate commerce are matters for the legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control." *United States* v. *Darby* (312 U.S. 100, 115 (1941)), citing *McCray* v. *United States* (195 U.S. 27); and *Sonzinsky* v. *United States* (300 U.S. 506, 513).

The power to regulate means the power "to prescribe the rule by which commerce is to be governed." *Gibbons* v. *Ogden* (9 Wheat. 1, 196).

A permit or licensing system is one congressional method of regulating interstate commerce. *Hanf* v. *United States* (235 F. 2d 710, 717 (8th Cir. 1956), cert. denied 352 U.S. 880 (1956)); and *Arrow Distilleries* v. *Alexander* (109 F. 2d 397, 401, 402 (7th Cir. 1940), cert. denied 310 U.S. 646). These decisions, which upheld a permit system applicable to intrastate as well as interstate liquor traffic, cite as authority other Supreme Court cases also holding that the commerce power of Congress may, when necessary to achieve effective interstate regulation, extend to—

1. Regulation of intrastate rail rates (*Minnesota Rate Cases, Simpson* v. *Shepard* (230 U.S. 352 (1913));

2. Regulation of intrastate milk prices (*United States* v. *Wrightwood Dairy Co.* (315 U.S. 110 (1942)); and

3. Regulation of intrastate tobacco market (*Mulford* v. *Smith* (307 U.S. 38 (1938)).

The *Wrightwood Dairy* decision includes the following language:

"It follows that no form of State activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power." (315 U.S. 110 at 118, 119.)

and in *Darby, supra*, the Court said:

"The power of Congress over interstate commerce is not confined to the regulation of commerce among the States. It extends to those activities intrastate which so affect interstate commerce *or the exercise of the power of Congress over it* as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." [Italic supplied.] *United States* v. *Darby* (312 U.S. 100 (1941) at 118, 119), citing *McCulloch* v. *Maryland* (4 Wheat. 316, 421) and other Supreme Court cases.

See also *Katzenbach* v. *McClung* (379 U.S. 294 (1964)) and *Heart of Atlanta Motel* v. *United States* (379 U.S. 241 (1964)) for reaffirmation of this position.

The legislative record before Congress concerning traffic in firearms will undoubtedly amply demonstrate that the licensing of all persons engaged in the business of manufacture or dealing in firearms is an appropriate and necessary means to the attainment of the legitimate end of regulating firearms traffic across State lines; otherwise such traffic cannot be traced and effectively brought under control.

With respect to the prohibition on the interstate shipment of firearms, except between licensed persons, it is well recognized that the assistance of States in the exercise of their police power or the enforcement of their domestic policies

is a valid purpose for regulation of interstate commerce. *Kentucky Whip & Collar Co.* v. *Illinois Central Railroad Co., supra,* and cases cited (299 U.S., pp. 341, 342, 347, 351, 352). In this case, upholding as constitutional a law regulating interstate shipment of prison-made articles, the Supreme Court said:

"* * * and, while the power to regulate interstate commerce resides in the Congress, which must determine its own policy, the Congress may shape that policy in the light of the fact that the transportation in interstate commerce, if permitted, would aid in the frustration of valid State laws for the protection of persons and property." (299 U.S. 334 at 347, citing *Brooks* v. *United States,* 267 U.S. 432; *Gooch* v. *United States,* 297 U.S. 124.)

In achieving its avowed purpose, Congress may impose restrictions or requirements which are applicable in States which had not enacted legislation on the same subject matter. *Kentucky Whip, supra,* 297 U.S. at 353; and *Darby, supra,* 312 U.S. 100 at 113, 114.

Apropos the validity of utilizing the commerce power to restrain sales of firearms to minors and criminals, the following language of the Supreme Court is considered relevant:

"That the United States lacks the police power, and that this was reserved to the States by the 10th amendment, is true. But it is nonetheless true that when the United States exerts any of the powers conferred on it by the Constitution, no valid objection can be based upon the fact that such exercise may be attended by the same incidents which attend the exercise by a State of its police power, or that it may tend to accomplish the same purpose." *Hamilton* v. *Kentucky Distilleries Co.,* 251 U.S. 146 (1919) at 156, citing *Lottery Case,* 188 U.S. 321, 357; *McCray* v. *United States,* 195 U.S. 27; *Hipolite Egg Co.* v. *United States,* 220 U.S. 45, 58; *Hoke* v. *United States,* 227 U.S. 308, 323; *Seven Cases* v. *United States,* 239 U.S. 510, 515; *United States* v. *Doremus,* 249 U.S. 86, 93–94.

On the record before it Congress may reasonably find that the incidence of the use of handguns for criminal purposes among older juveniles is so great as to justify a prohibition on the sale of firearms (except for a shotgun or rifle) to all minors. In this respect Congress would follow the lead of many States which prohibit such sales, and in so doing this legislation would strengthen the enforcement of State laws.

See also *Kentucky Whip, supra,* 299 U.S. 334 at 347 and *United States* v. *Darby,* 312 U.S. 100 at 114 where it is said:

"Congress, following its own conception of public policy concerning the restrictions which may appropriately be imposed on interstate commerce, is free to exclude from the commerce articles whose use in the States for which they are destined it may conceive to be injurious to the public health, morals, or welfare, even though the State has not sought to regulate their use." (Citing cases.)

"Such regulation is not a forbidden invasion of State power merely because either its motives or its consequence is to restrict the use of articles of commerce within the States of destination; and is not prohibited unless by other constitutional provisions. It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the States." (Citing cases.)

In a case construing the statutory controls over interstate shipment of gambling devices an opinion in which three Justices joined indicated that the Court had not yet fully decided all constitutional questions relating to the power of Congress to require uniform registration, which would include registration by persons operating only intrastate, and of requiring information on strictly intrastate transactions. *United States* v. *Gambling Devices,* 346 U.S. 441. However, it seems clear from such cases as *Hanf* v. *United States* and *Arrow Distilleries* v. *Alexander, supra,* that where, in order to achieve effective regulation of interstate commerce, Congress deems it necessary or appropriate to require uniform licensing, it is within the congressional power to do so. By the same token, the cases would indicate that there would be no constitutional bar to imposing uniform requirements on persons federally licensed under laws arising from the interstate commerce power, where to except requirements as to intrastate transactions would tend to render ineffective the controls over interstate commerce. This concept would seem to be clearly within the scope of the Court's holding in *McCulloch* v. *Maryland, supra,* in its discussion of the latitude given Congress by the "implied power" clause in determining the appropriate means for achieving its purpose in regulating interstate commerce.

As the Court has repeatedly maintained, at least since Marshall's 1824 decision in *Gibbons* v. *Ogden,* 9 Wheat. 1, the only limitations on the congressional power

to regulate interstate commerce are those found in the Constitution itself.  If such limitations exist, they abide in the 5th and 10th amendments.  Previously discussed Supreme Court cases conclusively show that the reservation expressed in the 10th amendment does not constitutionally bar Congress from enacting statutes which burden intrastate commerce or which amount to the exercise of police power, so long as this action is reasonable and necessary to effectively accomplish the interstate commerce regulation undertaken.

With respect to the fifth amendment, the Supreme Court has consistently held that where the subject of commerce is one as to which the power of the State may constitutionally be exerted by restriction or prohibition in order to prevent harmful consequences, the Congress may act to restrict or prohibit interstate commerce relative to the same subject without violating the due process of law. *Kentucky Whip & Collar Co.* v. *Illinois Central Railroad Co.,* 299 U.S. 334, 351; *United States* v. *Darby,* 312 U.S. 100, 125; *Heart of Atlanta Motel* v. *United States, supra.*

It is concluded that the provisions of S. 1592, designed to amend the Federal Firearms Act, are constitutional as within the power of Congress to regulate interstate and foreign commerce and are subject to no limitation prescribed in the Constitution.  The act and the proposed amendments thereto are intended to regulate interstate and foreign commerce in firearms.  The fact hat there is also intended some incidental regulation of intrastate commerce does not invalidate the proposed legislation.  Although the regulation of firearms traffic under the proposed legislation may have some characteristics of the exercise of "police power." it is not a usurpation of a power reserved to the States by the 10th amendment; and it is not violative of the due process clause of the 5th amendment.

Attorney General KATZENBACH. Today, of course, the organized, or "well-regulated" militia is the National Guard of the individual States. Therefore, in considering the relationship of S. 1592 to the second amendment, the question is whether it would interfere with the maintenance and training of the National Guard.

The answer is "No."  The Federal Govermnent supplies arms to maintain and train the Guard and this would be unaffected by the bill.

Further, section 4 of the bill exempts State departments and agencies, and independent establishments from its restrictions just as they are exempted by section 4 of the original act.  So, S. 1592 would in no way regulate or disarm the National Gaurd.

Even beyond this, the second amendment argument fails.  Even if it were applicable, the fact remains that this measure does not infringe on the right of the people to keep and bear arms.  It may make the purchase of weapons a little more inconvenient, but it does so for a reason : So that any State which itself wishes to regulate firearms more closely may effectively do so.

More generally, I really cannot understand why the legislation we are talking about should seem a threat at all to sportsmen, hunters, farmers, and others who have a productive or necessary or enjoyable interest in the use of rifles, shotguns, or sporting handguns.  Nothing that we propose here could intelligently be construed as impairing the enjoyment they derive from shooting.

This legislation would, indeed, make some changes in the distribution of firearms.  It would, indeed, by outlawing mail-order sales of firearms between States, bring about changes in the commercial firearms world.

It would, indeed, challenge interests which have thrived on the present state of unregulated chaos.  But such a challenge is tragically **overdue.**

I have sought, Mr. Chairman, to make it plain that S. 1592 applies only to the sale and distribution of firearms; their use would remain a question for State and local law. I have sought to make it plain that our effort is, as the President said in March, to keep "lethal weapons out of the wrong hands."

These issues have been widely debated over a period of years. There have been extensive congressional hearings. There has been wide debate among the public and in the press. The pros and cons have been fully discussed. Now we approach the time of decision.

The NRA warned, in the letter to its membership, that if "the battle is lost, it will be your loss, and that of all who follow."

It is impossible for me to understand the NRA's view of what battle is being fought and what the stakes are. In my view, we are all joined in a nationwide battle—a battle against rape and robbery and muggings and murder—and the stakes are public order and safety for every citizen.

Which is more significant, the right not to be slightly inconvenienced in the purchase of a firearm, or the right not to be terrorized, robbed, wounded, or killed?

As the chief law enforcement officer of the United States, I come before you today to ask you to supply the only conceivable answer to that question. I come, with all the urgency at my command, to ask the subcommittee to report this measure favorably and to ask the Congress to enact it without delay.

Thank you, Mr. Chairman.

Senator DODD. Thank you, Mr. Attorney General. That was an excellent statement and will be helpful to us and very helpful to all the Members of Congress. I am sure it will likewise be helpful to the people of this country to get an accurate and truthful understanding of this bill.

Senator Fong?

Senator FONG. I have no questions. I want to thank you, Mr. Attorney General for this very, very excellent statement which is very concise and logical. I think this will dispel a lot of things which have been said about the bill which is not true.

Attorney General KATZENBACH. Thank you, Senator. I hope it serves the purpose.

Senator DODD. Mr. Perian?

Mr. PERIAN. Mr. Katzenbach, we have been repeatedly informed by the National Rifle Association that criminals will obtain guns no matter how many laws there are on the books. In your experience in law enforcement, do you feel this is an accurate statement?

Attorney General KATZENBACH. I believe the criminals will continue to obtain guns. I think this is going to make it more difficult and will also mean that some people will not obtain guns and will not become criminals as a result. I do not expect the enactment of this bill to eliminate all crime or all murder in the United States. I do think it is a reasonable and responsible measure and that it will help the States to help themselves in controlling the possession and use of firearms by the criminal elements.

I suppose some criminals would continue to get firearms. I would doubt that it would be possible to completely prevent that by the process of law and regulation.

Mr. PERIAN. Well, the statistics of your own Federal Bureau of Investigation reflect that gun homicides actually occur predominantly in families or between acquaintances where a gun is available.

Do you think enactment of S. 1592 would substantially reduce this type of crime?

Attorney General KATZENBACH. I think it would have an effect upon that type of crime, yes. I think the easy accessability of weapons to such persons, where they can simply order something because they see an advertisement on it and have it around the house, inflates the crime statistics. I would like to give you some statistics I have from the Director of the FBI with respect to this.

For the 3-year period, 1962 through 1964, those States with controls reported 44 percent of the murders were committed by the use of a gun; the remaining States reported 59 percent of their killings resulted from the use of a gun.

Nationally, in 1964 we had a 9-percent increase in murder, and it can be reasonably estimated even though final figures are not available, that there were almost 9,300 willful killings of which 55 percent were committed with the use of a firearm.

In addition, there were 26,500 aggravated assaults with the use of a gun which did not result in the death of the victim, and during the year 1964 there were 63,700 armed robberies, the vast majority of which were committed with the use of a gun.

I might add a field like bank robbery, for example, is increasingly becoming an amateur field. You have the 73-year-old grandmother and the 17- or 18-year-old kid. Twenty-seven percent of our bank robberies last year were committed by those amateur felons, so to speak, and these are the people who acquire a gun by mail order and then proceed to use it to hold up a bank.

Mr. PERIAN. So, in other words we are dealing with amateur criminals and ostensibly this would be an effective way to prevent them from obtaining weapons.

Attorney General KATZENBACH. We are dealing with them and young people who, because they get a gun in their possession, go out and use it. If they could not get a gun, they would not use it. They might steal a car, but we would be a lot better off if what they did was steal a car rather than go and shoot somebody. It would make it more difficult for the convicted felons to purchase guns if the States continue, as I hope they will, to enact laws which make it possible to learn who is in possession of guns, and which restricts possession by people such as felons and the mentally unstable.

Senator FONG. Mr. Attorney General, you have given us some figures on the number of homicides that were committed with firearms.

Attorney General KATZENBACH. Yes.

Senator FONG. Have you any statistics on the number of homicides in the States in relation to the population as between States that have strict firearm laws and States that do not have strict laws?

Attorney General KATZENBACH. I do not have those statistics at the tip of my fingers.

Senator FONG. Is it possible to get those?

Attorney General KATZENBACH. Yes; we could get those figures and I think they would be rather interesting.

Senator FONG. It would be very interesting. Will you supply those figures to us?

Attorney General KATZENBACH. Yes, sir; I will.

(The information was submitted, marked "Exhibit No. 9" and is as follows:)

### EXHIBIT NO. 9

According to "Uniform Crime Reports—1963," copy attached, the average State murder rate per 100,000 population was 3.9 in the seven States requiring permit or equivalent for the purchase of hand guns. The States referred to above are Hawaii, Massachusetts, Michigan, Missouri, New Jersey, New York, and North Carolina. In the remaining States the rate was 4.7 murders per 100,000 population. The national average was 4.5.

Attorney General KATZENBACH. To return to your earlier question, Mr. Perian, Mr. Hoover has reported that about 70 percent of the homicides occur in the family unit or otherwise among acquaintances. They are, for the most part, impulse killings. In 1964, a gun was used in 57 percent of the cases.

It is this type of murder to which the easy accessibility and lethal nature of a gun can contribute. I think easy accessibility is important in that context. The gun makes murder easy in that kind of context and I think that the ability to get guns by mail order, just for the heck of it, contributes even in that kind of murder situation.

Mr. PERIAN. Senator Burdick had a question.

Senator BURDICK. Mr. Chairman, I have one question before I have to leave on one phase of this, at least.

Mr. Katzenbach, I live in the wide open spaces. The population is sparse. The towns are considerable distances apart.

As I understand from your testimony, the dealer in ammunition, the dealer in .22 caliber ammunition would have to get a $100 license. Out in my State as I say, the distances are great and .22 caliber ammunition and other ammunition is dispensed through a general store or gas station, probably all they have in the town and in a great many of these towns, literally hundreds of towns in North Dakota.

Now, a fee of $100 for one of those smaller merchants will be quite a burden on him.

Attorney General KATZENBACH. I think you make a legitimate point on that, Senator. I think we would be willing to consider permitting the sale of sporting-type ammunition—shotgun shells or .22 caliber—that type of ammunition alone and without guns, as warranting an exemption from the licensing requirements.

I think we would be prepared to consider that or a very much lower fee with respect to the sale of that type of ammunition. I am not sure that I would include ammunition for that gun over here, the large one in the back.

Senator BURDICK. These are small caliber rifles and to some extent some of those people do have to rely on getting their .22 caliber rifles and their sporting goods through the mails.

Attorney General KATZENBACH. I would suppose, Senator, there are local mail order outlets within your State for the purchase of guns and other responsible dealers in guns. It seems to me those

people who have too great a distance to drive can, nonetheless, order and purchase any gun they wish from one of the dealers within the State, and it can be delivered by mail, subject to regulations which the Secretary of the Treasury would promulgate.

I would concede a minor inconvenience to a farmer who lives a long way from the city and who wishes to purchase a gun for his 18-year-old boy or something of that kind, say for Christmas. He is going to have a minor inconvenience, but he can purchase it within his State. He can purchase it from a dealer within his State. He can purchase the gun that he wants. The regulation on that would not, it seems to me, be too burdensome and it would be possible for dealers within that State to know something of the nature of the persons within that State.

Senator BURDICK. I want to make it clear that I think the interstate sales to minors and people with known criminal records, or mental defectives should be a limitation. But there are cases where some of our people out in the Badlands do use the mail order system to get guns and rifles.

Attorney General KATZENBACH. But the point is they still can get it from dealers within that State.

Senator BURDICK. That is right.

Senator DODD. Anything further?

Senator BURDICK. That is all.

Senator DODD. Counsel?

Mr. PERIAN. I think what Senator Burdick was driving at is that there has been a great deal of concern expressed over the effect this bill would have on some 400 firms in this country that depend entirely or in part on the mail order business and from your statement we can assume that these companies can still function if they operate through a new system of State dealerships.

Is that a correct assumption?

Attorney General KATZENBACH. They will have to distribute through local outlets and ship only to local outlets. I have no doubt this is going to change their system of distribution and have some impact on it. They cannot simply mail to anybody who fills out a form and sends it in to them and I suppose this is going to make it a little more difficult for them.

Mr. PERIAN. That is all.

Senator DODD. That is exactly the point as I understand the bill.

Attorney General KATZENBACH. I want to make it clear—I want to make it more difficult for them.

Senator DODD. And so do I. I think it makes sense to do so.

Mr. Attorney General, you referred to the assassination of President Kennedy and the ease with which Oswald obtained the rifle and pistol. I suppose we all know that there is a continuing possibility of further attempts on Presidents lives.

Have you any information relative to the threats on the life of the President which have come to your attention since you assumed the capacity of Attorney General?

Attorney General KATZENBACH. Well, the threats continue to be made as they have been with respect to every President. This is the responsibility of the Secret Service, to check these out. Of course,

making a threat upon the President's life is a crime and there have been instances where, through the preventive work of the Secret Service, people who had access to firearms and who were mentally unstable have been taken into custody.

Senator Dodd. Then the mail-order traffic makes the task of the law enforcement people much more difficult, does it not?

Attorney General Katzenbach. It makes it just infinitely more difficult and it discourages the efforts at the local level to have a sensible system within a State because it is so easy to evade.

What we are attempting to do is close those loopholes so that States can take reasonable measures themselves.

Senator Dodd. I am very glad you made the point in response to a question that, of course, this bill will not put an end to all homicides by gun. I do not know of any sensible person who has ever suggested it would and no law ever operates perfectly. I am sure this will not do so.

I believe you made a good point and I am sure the committee will be interested and Members of Congress, that it will help and that is all it is intended to do. It seems to me the argument that it will not put an end to all homicides is akin to the proposition that we ought to wipe off the statute books of the States the laws against homicide because murder still goes on. It is that kind of logic. This argument is being used over and over again in the propaganda put out.

Attorney General Katzenbach. I think, Mr. Chairman, the only way we will ever eliminate crime in this country too, is to repeal the criminal laws.

Senator Dodd. Well, Mr. Attorney General, I say again I am extremely grateful to you for your testimony. It has been very helpful to us. You are so well informed on this subject, better than anyone I know, and we are grateful to you.

Thank you again.

Attorney General Katzenbach. Thank you, Mr. Chairman.

Senator Dodd. We are happy to have Mr. Stephen Ailes, Secretary of the Army.

Mr. Secretary, we are glad that you would take the time to come here and give us your views on the legislation. I know you have had considerable experience in the Department of the Army and as Under Secretary and Secretary, your testimony is very valuable.

You go right ahead, sir.

## STATEMENT OF HON. STEPHEN AILES, SECRETARY OF THE ARMY

Secretary Ailes. Thank you very much, Mr. Chairman. I am happy to present to you today the views of the Department of Defense on S. 1592, the bill which amends the Federal Firearms Act to accomplish the control over firearms recommended by the President in his message to the Congress of March 8, 1965.

As you know, Mr. Chairman, the Secretary of Defense has advised you in his letter of April 30, 1965, that the Department of Defense strongly recommends enactment of S. 1592. We support the President's views concerning the need for additional controls on the importation and distribution of firearms.

No function of the Department of Defense will be impaired by enactment of this legislation. As the Secretary of Defense has stated:

More realistic Federal control of the distribution of firearms in the stream of commerce between the States and between the United States and foreign states is clearly in our best national interest.

Of the activities of the Department of Defense, the one most immediately affected by the bill is the civilian marksmanship program administered by the Department of the Army.

While enactment of the bill would require some minor changes in the program's administrative procedures, nevertheless these changes will not affect the effectiveness of the program, and the program will be carried on fully in accord with the purposes of the bill and its requirements.

To explain this point, I would like first to describe the civilian marksmanship program and then indicate how the program can be conducted in compliance with the bill.

I will conclude by stating our plans for ascertaining the true usefulness of the program to national defense.

Since 1903, the Congress has directed the Secretary of the Army to provide a civilian marksmanship training program under the direction of the National Board for the Promotion of Rifle Practice.

The Board consists of 25 members appointed by the Secretary of the Army and includes representatives of the three military services, the Coast Guard, the Armed Forces Reserve components, the Selective Service System, the National Rifle Association of America (NRA), and the country at large.

The activities of the Board are authorized and directed in sections 4307 to 4313 of title 10, United States Code, and are supported every year by a separate appropriation in the Defense Appropriation Act.

The President's budget for the coming fiscal year requests $459,000 for this purpose.

The principal functions of the Board are (1) to promote small arms practice among citizens who are not members of the Armed Forces, (2) hold small arms competitions, and (3) issue, loan, or sell small arms, ammunition, and targets necessary for this program.

The Board's programs are administered for the Board by the Office of the Director of Civilian Marksmanship in my office.

The Board's promotion of rifle and pistol practice is accomplished primarily through supporting civilian rifle and pistol clubs enrolled with the Director of Civilian Marksmanship.

On January 1 of this year, there were 5,697 clubs enrolled with the Director of Civilian Marksmanship. The total enrollment in these clubs was 413,371 persons.

The clubs are of three main types—senior clubs, composed of members 17 years of age and over; junior clubs, composed of members between 12 and 18 years of age, supervised by an adult; and clubs affiliated with colleges or with schools maintaining National Defense Cadet Corps programs.

To be eligible for enrollment with the Director of Civilian Marksmanship, the senior clubs must have 10 or more civilian members, and junior clubs must have a certified adult instructor.

All clubs must have access to adequate range facilities and must agree to conduct marksmanship training for 9 months of the year.

The clubs must be operated without regard to race or creed, and they must be affiliated with the National Rifle Association. Before accepting a club's application, the NRA institutes a check through the State adjutant general and the rifle and pistol association of the State in which the club is located to determine that the club's officials are American citizens without criminal backgrounds and not members of subversive organizations.

The actual investigation varies somewhat from State to State, depending upon facilities available and local regulations. In New York, for example, the names furnished are checked through the State Criminal Investigation and Identification Division. Prior to final approval of NRA affiliation, the club must also obtain endorsements from two community leaders.

The Board supports these clubs by distributing ammunition and issuing caliber .30 rifles, caliber .22 rifles, and caliber .45 automatic pistols on a loan basis. These are issued to clubs on a ratio of approximately 1 weapon for every 11 members. The clubs are responsible for the safety and care of the weapons. Ammunition is issued once a year on the basis of the number of members in the club who have fired approved marksmanship qualification courses during the previous year.

Currently, there are about 18,000 caliber .22 rifles, 12,500 caliber .30 rifles, and 4,300 caliber .45 pistols on loan to the clubs.

The Director of Civilian Marksmanship is accountable for all these weapons and maintains an accurate list of them by serial number.

The Board conducts the National Rifle and Pistol Matches at Camp Perry, Ohio, each year. As an integral part of these matches, Small Arms Firing Schools are conducted by the U.S. Army Infantry School under the general supervision of the National Board. These schools provide the latest information and techniques concerning marksmanship instruction.

The law which directs these activities of the Board also provides for the sale, at cost, of weapons and ammunition necessary for target practice. Such weapons and ammunition as may be sold have, of course, been determined to be no longer needed by the Government. The principal types of weapons sold under this program have been caliber .30 1903–A3 "Springfield" rifles, caliber .30 M1 carbines, and caliber .45 pistols.

Under the Army's policy, no more than one weapon of each type may be sold to any one purchaser. Under the law, sales may be made only to members of the National Rifle Association.

To be a member of the National Rifle Association, an individual must pledge that he is a citizen of the United States, not a member of an organization which seeks the violent overthrow of the U.S. Government or any State or local government, and not a person convicted of a crime of violence.

In addition to proving his NRA membership, the purchaser must also comply with all applicable State laws concerning purchase and ownership of weapons and must submit the forms and certificates required by such laws at the time of purchase.

In general, we believe that the civilian marksmanship program is being carried out properly, responsibly, and in accordance with the purposes intended by the Congress. We know of nothing to indicate

that guns lent or sold under this program have been used for any improper purpose.

It will continue to be so carried out with the passage of the legislation you are presently considering. As you know, section 2(a) of the bill would prohibit all shipments of firearms in interstate commerce except shipments between federally licensed manufacturers or dealers or, by virtue of the general exemption of section 4 of the bill, shipments between agencies of the U.S. Government or State or local governments. A sale or other distribution of a firearm to an individual, therefore, can take place only within a State and not through an interstate shipment.

This means that the present practice of the civilian marksmanship program whereby firearms are distributed to gun clubs and individual purchasers by interstate shipment must be modified.

Under the modified procedure we are contemplating, the distribution of firearms to clubs and purchasers under the program will take place only with individual States.

Upon receipt of an approved application for loan or sale, the Army would ship the requested firearms to the U.S. Property and Fiscal Officer serving with the State National Guard in the State in which the club or purchaser is located. This officer is a Federal officer whose function it is to maintain accountability for Federal property issued for the use of the National Guard in his State.

Thus, the interstate shipment would be between agencies of the U.S. Government and therefore, under section 4, free from the general prohibition on interstate shipments.

Upon receipt of the firearms from the Army, the Property and Fiscal Officer would distribute them to the clubs or to the purchasers within the State. Information concerning the distribution would be made available to the State and local authorities.

Sections 2(b) and 2(c) of the bill would place certain regulatory controls on each federally licensed manufacturer or dealer selling or otherwise disposing of firearms within a State.

For example, an individual recipient would have to be 21 years old, or 18 years old in the case of a rifle, would have to comply with all applicable State and local laws, and would have to be free of any indictment or conviction for a serious crime.

The Army would require observance of all these regulatory controls before authorizing any disposition of weapons under the civilian marksmanship training program. Proof of compliance would be required before a weapon would be sent by the Army to the Property and Fiscal Officer in the State.

The Department of the Treasury, which would have the major responsibility under the proposed bill, has confirmed to us that the bill would not interfere with the shipment of firearms or ammunition under the civilian marksmanship program in accordance with the procedures which I have just described.

The Treasury also expressed its appreciation of the procedure whereby the Army will agree to observe the same procedures and limitations which would be acpplicable with respect to dealers licensed under the act.

Parenthetically, I should say that the Army is not considered a "dealer" under the bill because it is not a "person" as defined in section 1(1) of the bill.

In summary then, the civilian markmanship program can continue to be effectively administered, consistent with the provisions of the proposed law.

For a long time, many military and civilian leaders have considered that the instruction in markmanship and the experience with firearms provided to citizens of the United States under the civilian markmanship training program have been beneficial to the national security, by creating a reservoir of personnel trained in a basic military skill, on which the Armed Forces may draw in time of need, and I might add by providing us with a fair number of new recruits who have had some previous experience with the rifle.

However, this benefit has never really been measureable, and a solid body of facts on which to base a judgment has never been gathered together. I have recently approved undertaking a study designed to cover from an independent point of view, four areas related to the basic question of the extent to which the program enhances national security.

First, the study will give us a basis for determining the benefits which actually accrue to the military from the activities of the National Board for the Promotion of Rifle Practice.

Second, the study will review the organizational structure which carried out these activities.

Third, it will evaluate the program controls.

Fourth, it will subject the program to a cost analysis.

The firm of Arthur D. Little has been chosen to carry out this study, and the contract negotiations were completed on May 13. We expect to have a draft of the study in 6 months.

Mr. Chairman, that concludes my statement.

Senator DODD. That is a very helpful and interesting statement, Mr. Secretary.

Before I ask a question I want to say to you for the record that I am not against guns. I own some myself. I have always been a little bit concerned about this program which you have described. However, I am very glad to have you say you are having studies undertaken. I think it has disturbed a number of other people, some Members of Congress, and maybe it is a very good thing. I am inclined to think it is good and should be continued. I think this study is absolutely necessary. It seems to have grown up helter-skelter. I am amazed, for example, to learn that from 1959 to 1964 the Army had given away to private gun clubs 246.9 million rounds of free ammunition costing $7 million.

Secretary AILES. That was from 1959.

Senator DODD. 1959 to 1964, a period of 5 years, $7 million. Well, that is a pretty expensive item and if it is in our interest and worthwhile, I think many people would have some serious question about it.

I also learned in the same period the Army had placed $2.3 million worth of guns on loan to gun clubs, so this raises the output of money to $9.5 million and in the same period, the National Board for the Promotion of Rifle Practice spent an additional $2.5 million so it is now $12 million in 5 years.

Well, we have an awful lot of things to do in this country. I say maybe it is all to the good. But it is a little annoying to me and some members of this committee to have an organization that participates in this program amounting to $12 million spreading false propaganda about this bill and I should think it would be your view, and I expect it is.

Secretary AILES. Mr. Chairman, as you suggest, nobody has taken a real good look for a long time at exactly the scope and size of this program and what we get in return for it.

We have some difficulty in finding out to what extent the recruit who comes into the Army, and has had this sort of training, benefits from it, when he actually engages in his marksmanship training. There is some relation, but what we are trying to find out is, what is the relation and to what extent is the expenditure of Federal funds justified?   We are directed, by statute, to do this at this time.

Senator DODD. I know.   I am glad you are doing it.   I am only trying to emphasize the importance of doing it.   I was interested in what you had to say about the civilian marksmanship program being carried out properly and responsibly and I know you said you knew of nothing to indicate that guns lent and sold under this program had been used for any improper purpose.

How do you know that?

Secretary AILES. This is a negative statement as you indicate, Mr. Chairman.   We do have some records with respect to serial numbers on the guns.   I have a feeling, while this is a negative statement, that somehow or other, we would know about it pretty fast if these guns show up in the wrong place, or are put to the wrong use.   We simply have not received any such criticism.

Senator DODD. Would it be accurate to say on the other hand since there is so little control over where the guns do go once they have been sold, or in other cases loaned to individuals, quite possibly that access to arms and ammunition could be gained by criminals and juveniles and subversive groups?

My point is this: As difficult as it is to prove that this does happen, it seems just as difficult to prove it does not happen and that is why I think the study is of great importance.   I think the fact is we do not know.

Secretary AILES. That is quite true.   That is why I went to some pains to make a statement in the negative here.

Senator DODD. Yes.

Secretary AILES. First of all, we have little control over guns that have been sold because they can be resold and they are in somebody else's hands.   The fact is that we have not run into a situation where those guns showed up in the hands of the wrong people.   I suspect we would have heard of it, but I agree with you that it certainly does not prove that it has not happened.

Senator DODD. I received a letter dated February 16, 1965, from Col. Rex Sage, Office of Chief of Legislative Liaison, Department of the Army.   I will only quote part of it because the rest is not pertinent here.   I quote:

Neither the Army nor any of its contract agencies has conducted a comprehensive study which compares the marksmanship proficiency of soldiers who had preservice marksmanship experience with the proficiency of those who had not.

Does your study undertake to do this?

Secretary AILES. Yes, sir.   As I said a moment ago, we really do not know what the relationship is.   Everybody suspects there is some relationship and we hope to find out something on that score.

The real justification for this program from the point of view of the Army, in my judgment, would lie right there.   I think past studies have shown that, in Korea, something less than 50 percent of the riflemen in combat fired at anything.   Men who have some talent as marksmen are more liable to shoot at something than men who do not.   The range of the weapon is extended in the hands of the marksman.   We have a great interest in this.   We still depend on the rifleman and his being able to shoot his rifle well.   The fact that the recruit has been shooting squirrels as a boy enables him to be a better marksman when he comes into the Army, and that is to our advantage.

If these training programs are not helping us, then there is little military justification for them, in my judgment.

Senator DODD. I think you are absolutely right.   I do not know, maybe I am unduly shocked, but there is a program that has been going on since when?

Secretary AILES. Since 1903, begun by Elihu Root.

Senator DODD. Nobody ever took the trouble to find out if it was any good.   It has cost $12 million in the last 5 years.   What do you suppose it has cost since 1903?

Secretary AILES. Ammunition was probably cheaper then, Mr. Chairman.   I think this is the sort of thing that looked as if it were a good idea right from the beginning.   I know we had considerable difficulty with various aspects of the Army back then.   Perhaps our marksmanship was pretty low.

I will say that we have made some remarkable advances in how to teach marksmanship in the Army in the last 3 to 5 years, which perhaps casts a different light on this.

Senator DODD. You are talking about in the Army?

Secretary AILES. Yes, sir.   I say that when this program was founded we did not have the train-fire range and some of these other things, and that is why it was started.

Senator DODD. Maybe we do not need it any more.

Secretary AILES. Quite conceivably, and that is what this study should answer.

Senator DODD. It has been argued that the so-called armed citizen is vital to the defense of our country in the event of a foreign power invading us.

I would like to hear your comments if you care to make any, on this view in the light of the modern concepts of warfare.   I have been charged, for example in the literature I have seen with trying to disarm our people so the Communists could more easily take us over and I wonder what you think of this.

Secretary AILES. I could just say this, Mr. Chairman, that I have not seen any contingency war plan where the citizenry was included.

As you know, we have a National Guard and the Reserve in the States that we go to great pains to train.   That program costs us over $1 billion a year.   This is something that is very important, but those are combat troops and support troops which would be called up in wartime.   But I am not familiar, myself, with any plans in

high levels of Government to call out the armed citizenry as at Bunker Hill.

Senator DODD. I know.  I want to say publicly, particularly to you, Mr. Secretary, that I have a great respect for the NRA.  I know General Orth very well.  I thing he is a fine man, an excellent man. He is greatly concerned.  I happen to know about these Minutemen and the Vigilantes, and so on.

I noticed an article in the St. Louis Post-Dispatch last year which relates that the national leadership of the Minutemen said that many of his members are also members of the NRA.  I do not think this is true.  I know the NRA tries very hard, and I am sure it succeeds in excluding these people and I want to be fair about that and say so on the record.

My understanding is that the rules of the NRA prohibit membership in the NRA to any of the members of any of these organizations.

It is interesting to note that some of these Minutemen and Vigilantes claim they are urging their members to get into these rifle clubs so that they can get access to guns and ammunition.

I suppose your study will take a look at that.

Secretary AILES. Yes, sir, we are aware of that problem, as you are, and this is one thing that we are definitely looking at.  In other words, what are the procedures with respect to the selection of these clubs, and are they adequate?

Like you, I am well acquainted with Frank Orth and I know very well that he was vitally interested in any of that sort of activity. In fact, he was violently opposed to his organization being taken over for that purpose.

Senator DODD. I know he is, too.  He is such a good man it is a pity he has made such a mistake about this bill.

Mr. Secretary, I have a letter from the Secretary of Defense which I will put in the record and this simply states that he has asked you to come here.

Secretary AILES. Yes, sir.

(The letter referred to was marked "Exhibit No. 10" and reads as follows:)

EXHIBIT No. 10

THE SECRETARY OF DEFENSE,
*Washington, April 30, 1965.*

Hon. THOMAS J. DODD,
*Chairman, Subcommittee to Investigate Juvenile Delinquency, Committee on the Judiciary, U.S. Senate, Washington, D.C.*

DEAR SENATOR DODD: This refers to Mr. Carl L. Perian's letter of April 14, 1965, extending me an invitation to testify before the subcommittee on May 19, 1965, with respect to the bill, S. 1592, "To amend the Federal Firearms Act."

I have asked the Secretary of the Army, Stephen Ailes, to testify on behalf of the Department of Defense in response to your invitation, and to cover in detail the specific items which are listed in the letter of April 14, 1965.

The Department of Defense strongly recommends enactment of S. 1592.  No function of the Department of Defense will be in any way impaired by the enactment of this legislation.  More realistic Federal control of the distribution of firearms in the stream of commerce between the States and between the United States and foreign states is clearly in our best national interest.

Beyond the official position of the Department of Defense, I would like to add my deep, personal conviction about the desirability of this legislation.

Sincerely,

ROBERT S. MCNAMARA.

Senator Dodd. I am very grateful to you, Mr. Secretary for taking your time to come here.

Secretary Ailes. Thank you, Mr. Chairman.

Senator Dodd. We have Mr. Sheldon S. Cohen, Commissioner of the Internal Revenue Service. Mr. Cohen is also taking time out of a mighty busy day to come here. We are very grateful to you, Mr. Commissioner and as in the case of the other officials who appeared here this morning, I do not think it is necessary to read into the record your accomplishments in life which are very considerable. You are certainly an outstanding authority and we are very anxious to have the benefit of your views.

You may proceed.

## STATEMENT OF SHELDON S. COHEN, COMMISSIONER OF INTERNAL REVENUE

Mr. Cohen. Mr. Chairman, I am Sheldon Cohen, Commissioner of Internal Revenue. As Secretary Fowler reminded you, the Alcohol and Tobacco Tax Division of the Service administers the Federal Firearms Act, which S. 1592 proposes to amend. To some it may seem a little incongruous for the Internal Revenue Service to be charged with this administrative responsibility where laws relating to commerce, and not to taxation, are involved. However, there is a quite logical answer for this arrangement.

As you know, there are two congressional enactments concerned with firearms regulation. The first, enacted in 1934 and known as the National Firearms Act, provides strict controls over "gangster type" weapons, and is based on the Federal taxing power, and is now incorporated in the Internal Revenue Code. The Federal Firearms Act was enacted, in 1938, in reliance on the congressssional power to regulate interstate and foreign commerce and has been codified under title 15 of the United States Code. In the interest of good management and efficiency it was deemed desirable to leave both firearms regulatory acts to be enforced by one Federal agency. It was concluded that this task should go to the Internal Revenue Service which was already equipped and capably functioning in the field, when the second measure was enacted. The Service has continued to administer the Federal Firearms Act and has an awareness of its limitations and the areas in which it could be improved.

In my remarks on S. 1592 I will discuss its major purposes and will point out how they would be achieved, by strengthening some existing provisions of law, by a modified approach in others and by extending the scope of the regulation of interstate and foreign commerce in firearms. I will also discuss some of the allegations being made by the principal detractors of the bill.

We feel that the case has been established beyond a reasonable doubt by past testimony given before your committee, and before the Commerce Committee on S. 1975 that a serious problem exists with respect to importation of firearms and to interstate commerce in firearms, and that the present provisions of the Federal law are inadequate to meet these problems.

S. 1592 proposes a general revision of the 27-year-old Federal Firearms Act for the purpose of more effectively controlling interstate and foreign commerce in firearms in order to meet the needs of our present-day society in the light of current realities, conditions, and problems.

The bill adheres to and furthers the principle inherent in the present act that interstate and foreign commerce in firearms be controlled at the Federal level under the commerce power, in a manner which will enable the States to control more effectively the traffic within their own borders, under their own police power.

Your subcommittee's inquiry into the interstate traffic in mail-order firearms, especially as it relates to juveniles and young adult criminals, has brought to full public attention the problem which has most thwarted the effectiveness of State and local firearms controls.

I understand that the subcommittee has kept abreast of this problem for some years, and began a full-scale investigation into this matter in March of 1961.

On August 7, of last year, Mr. Chairman, you made an interim report with regard to the "Interstate Traffic in Mail-Order Firearms" (S. Rept. No. 1340, 88th Cong., 2d sess.).

Your report presents a rather shocking picture of the conditions which exist with regard to interstate traffic in mail-order firearms.

The pivotal problem with regard to this traffic as it exists today is that the State and city into which the firearm is shipped has no practical way of exercising any effective control over the importer, manufacturer, or dealer who sells the firearm and ships it in from another State.

Further, in transactions of this nature the record of disposition to the purchaser is not maintained in the State where the purchaser resides, but in the files at the seller's premises, which may be thousands of miles away. Thus it is of very little value to the State and local law enforcement purposes. In addition, as you pointed out in your interim report, it can generally be said that "such deliveries are accomplished with no effective determination of the bona fides of the purchaser."

Also, as is pointed out in your report, some of these mail-order dealers have resorted to "mail drops" and "answering services," to conceal the locations of their real places of business and often to shield themselves from complaints of dissatisfied customers. It is further stated in your report that "The advertising employed by most mail-order firearms dealers can best be described as lurid and directed at the immature or juvenile reader," as you pointed out this morning.

Mr. Chairman, it was in the light of studied consideration of the evidence presented before your committee, and before the Commerce Committee, and of the factual conditions outlined in your interim report, that the President proposed in his message on crime that the Congress amend the Federal Firearms Act to prohibit firearms shipments in interstate commerce except among importers, manufacturers, and dealers licensed by the Treasury Department, and to thus restrict the mail-order sales of firearms to individuals.

I strongly urge that you follow the recommendation of the President's message in this regard.

Another of the principal problems, and I might say one with which your committee is certainly thoroughly familiar, is the unrestricted purchase of firearms by juveniles. As you stated in your interim report of last August on the "Interstate Traffic in Mail-Order Firearms," an "area of concern to the subcommittee has been the casual relationship between the availability of firearms and juvenile and youthful criminal behavior." To anyone who has followed your hearings and read your interim report, in fact to anyone who follows in the daily press the tragic stories on the misuse of firearms by juveniles, it must be apparent that this problem has reached alarming proportions.

S. 1592 proposes to deal with this problem in a direct and forthright manner.

The vast majority, in fact almost all of these firearms, are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government. A large percentage of these transactions are on a mail-order basis and are often consummated without the knowledge or consent of parents or guardians. The way to end this dangerous practice is to stop these Federal licensees from selling firearms to juveniles and this is one of the major things that S. 1592 would do. I am sure that every concerned citizen will agree with this objective.

A third major problem area involves individuals going across State lines to procure the firearms which they could not lawfully procure or possess in their own State, or in other cases, in order to circumvent certain local waiting periods and police notification requirements.

This problem has been most acute in the area of concealable weapons, such as pistols and revolvers. For this reason, and because the States in general have under their police power imposed more controls on the acquiring, possessing, or carrying of concealed weapons than have been imposed with respect to sporting-type firearms, such as shotguns, and rifles, the restrictions in the bill regarding out-of-State purchases of firearms have not been made applicable to sporting-type firearms.

I emphasize the fact that the restriction against sale to nonresidents has not been made applicable to shotguns and rifles as indicating that we have realistically recommended such control only as to the weapons that constitute the most serious law enforcement problem.

I might say that the District of Columbia is an excellent example of why this provision is a vital condition precedent at the Federal level to the achievement of effective firearms controls in our States and cities. Any resident of the District of Columbia can, by traveling less than 10 miles, cross a State line and arrive at the premises of a federally licensed firearms dealer. Here he can purchase a pistol or revolver and, indeed, from some of the dealers even a bazooka or antitank gun, as we have in the back of the room. He then brings his pistol or revolver back into the District of Columbia, thus circumventing the District's waiting period and police notification requirements. The seriousness of this problem was clearly revealed by a recent Treasury Department study which you cited this morning, of certain federally licensed firearms dealers who operate in the vicinity of the District of Columbia, the results of which were made available to your committee. There is no doubt whatsoever that a principal source of procurement of conceal-

able weapons by the criminal element in the District of Columbia is from nearby gun dealers in Maryland and Virginia.

Of course, the District of Columbia is not the only example. Similar conditions exist in many other parts of the United States.

Many of those who argue against gun control laws cite New York's Sullivan law and claim that it is ineffective. But, as you, Senator Dodd, have so ably pointed out on many occasions, the rate of serious crimes involving the use of firearms in our cities is actually much greater in cities which exercise little or no control over firearms, than in those which have strict control. However, the biggest drawback to the effectiveness of local controls, outside of the interstate mail-order traffic, involves those who go across the State lines and purchase their pistol or revolver in another jurisdiction.

Obviously the States and municipalities cannot stop every traveler at the State line or the city line, and make a search for concealable weapons. The effective way to deal with this problem, which the States cannot deal with, is to stop these federally licensed dealers from selling the concealable weapons to residents of another State and to require persons procuring weapons which can be concealed on the person to purchase them from dealers located in the State where they reside.

I urge that you aid the law enforcement officers in metropolitan areas who are trying to cope with the crime problems by adopting these amendments to the Federal Firearms Act.

The fourth problem area, and one which can only be dealt with at the Federal level, concerns the importation of surplus military weapons and other firearms not particularly suitable for lawful sporting purposes.

The investigations of your subcommittee have established the magnitude and seriousness of the problems which have been caused by the importation of such weapons.

In your statement to the Senate on February 18 of this year, Mr. Chairman, you expressed your view that there is a serious and sometimes destructive effect on law enforcement because of the staggering flow of imported weapons of the type which would be curbed under the amendments to the Federal Firearms Act which would be made by S. 1592. You also pointed out the distressing fact that the assassination of the President of the United States was perpetrated by a man armed with a foreign-made and imported Carcano rifle, which cost the importer $1.12.

The President has recommended that the Congress enact legislation to halt this senseless flow of surplus military weapons into the United States, and the provisions contained in S. 1592 are designed to implement that recommendation.

There is widespread public support for this provision, and I note that the National Rifle Association of America in the statement issued on April 3, 1965 this year, at the conclusion of its annual meeting, declared, and I quote:

The National Rifle Association will support properly drawn legislation to curb the flood of castoff military firearms that have been dumped in America as a result of the adoption of more modern weapons by most countries since World War II.

Mr. Chairman, in addition to the surplus military weapons, we are also seriously concerned with the influx of relatively inexpensive pistols and revolvers which have plagued the law enforcement officers of our metropolitan areas. You spoke of these in your speech to the Senate on February 18 and pointed out that many of these imports are of poor quality and are dangerous to the user as they may be to the person who is often threatened or assaulted with them.

You also quoted from the statement of Mr. Franklin Orth, executive vice president of the National Rifle Association, which he made before your subcommittee on May 2, 1963. Since the quotation from Mr. Orth's statement so well illustrates the problem with regard to these inexpensive imported pistols and revolvers, I think it is important it should appear in this hearing record. It is very short, and with your permission I would like to read it into the record at this point. Mr. Orth stated, and I quote:

> For the most part, this traffic in firearms involves the relatively inexpensive imported pistols and revolvers that are advertised in many cheap pulp magazines throughout the country. As a matter of information for the commitee, the National Rifle Association has conducted product-evaluation studies of many of these handguns and has found them to be largely worthless for sporting purposes. As a matter of policy, we do not accept their advertising in the American Rifleman, the official journal of the association.

I would like to make it clear that the provisions of this bill relating to the importation of firearms is intended to exclude surplus military firearms, and firearms which are not suitable for lawful sporting purposes. The bill would not, and I emphasize would not, preclude the importation of good quality sporting-type firearms.

The amendments to the Federal Firearms Act contained in S. 1592, relating to the importation of firearms, are urgently needed, and I strongly support the President's recommendations that they be adopted.

The fifth major problem area with which the bill deals concerns the interstate shipment and disposition of large-caliber weapons, such as bazookas and antitank guns, and destructive devices such as grenades, bombs, missiles, and rockets.

The lack of controls over the traffic in these highly destructive weapons is a matter of greatest concern to me, and should be of concern to every responsible citizen of the United States. It may be of interest that the Secretary of the Army, speaking for the Department of Defense, expressed the view to the Director of the Bureau of the Budget that "because of the potential dangerous threat these weapons pose, effective controls are needed."

I would also like to note that the National Rifle Association has recognized the need for action in this area and that in their April 3, 1965, statement at the annual meeting, the National Rifle Association declared:

> That it would support properly drawn legislation to outlaw dangerous devices such as bazookas, bombs, antitank guns, and other military-type weapons that have found their way into trade channels across America.

I have here the Herblock cartoon which appeared in the Washington Post on December 29, 1964, entitled "You Don't Even Need to Limit Yourself to a Few People," which so aptly illustrates the subject which

I am discussing, and I would like the members of the subcommittee to see it, and with your permission, Mr. Chairman, I would like to have it inserted in the hearing record.

(The cartoon referred to was marked "Exhibit No. 11" and will be found in the subcommittee files.)

Mr. COHEN. S. 1592 would place strict controls over the importation, interstate shipment, and disposition by federally licensed importers, manufacturers, and dealers of these highly destructive weapons.

In addition, as you are of course aware, Mr. Chairman, S. 1591, the bill to amend the National Firearms Act, which you introduced on March 22 and which was referred to the Committee on Finance, proposes additional controls on these highly destructive weapons under the exercise of the Federal taxing power. The additional controls under the taxing power are particularly necessary in order to reach the weapons of this character already in the possession of private individuals and to control the transfer of ownership or possession of these weapons between such individuals. The same type of Federal controls would be exercised, under the National Firearms Act, over transfer and possession of these highly destructive weapons as is exercised under existing law with respect to gangster-type weapons, such as submachineguns.

Mr. Chairman, I come now to the sixth major area of amendments to the Federal Firearms Act contained in S. 1592. A major fault in the existing Federal Firearms Act which S. 1592 proposes to correct is that relating to small annual fees charged for licenses. Under the bill the license fees would be increased to a figure which would make it very unlikely that any person not actually engaged in business as an importer, manufacturer, or dealer would attempt to obtain a Federal Firearms Act license. The increased license fees would be such as to not only cover the cost of processing an application and issuing the license, but would defray the cost of conducting an appropriate check of the qualifications of the applicant to determine whether or not he would be likely to conduct his operations in compliance with the act.

An example of the problem with which we are confronted is illustrated by an advertisement which appeared in the March 1, 1965, issue of the Shotgun News, Columbus, Nebr. This advertisement stated under the heading "Public Service Information" as follows:

> For just $1 you can obtain a Federal dealers license, then you can ship or receive handguns by mail instead of the high-price express. If you buy one handgun every 3 years it will pay you to have a license. You do not have to have local license. Write to the same office that you send your income tax payment to ask for application for Federal firearms license. Remember just $1 per year.

We asked the dealer who placed this advertisement to discontinue its publication, and he has voluntarily complied, but I cite this case as an example to illustrate our problem.

Our problem is compounded by the fact that existing law provides that upon payment of the prescribed fee the Secretary shall issue a license to the applicant which shall entitle the licensee to transport, ship, or receive firearms or ammunition in interstate or foreign commerce. There are no stated conditions to the issuing of the license except the provisions for the payment of the prescribed fee, and no discretion is granted under the present language of the law.

I might say that this is at least an anomalous situation. Certainly the customary practice is to provide standards for the issuance of licenses or permits, and a proper and reasonable standard is the standard as to whether the applicant would be likely to conduct his operations in compliance with law.

This standard not only has been recognized by the courts as reasonable but in effect it is a standard suggested by the Supreme Court many years ago in a leading case on this subject (*Ma-King Co.* v. *Blair*, 271 U.S. 479 (1926)). We have, under existing law, refused to issue licenses to felons, persons under indictment for a felony, and fugitives from justice. We have done this on the ground that the issuance of a license to such persons would serve no lawful purpose, since by reason of section 2 of the act it would be unlawful for them to ship and receive in interstate commerce.

Now, as your committee pointed out in its interim report, some of these licensees operate out of "answering services" and "mail drops," some conduct the most questionable type of operations, often in disregard of the public interest. Yet these people hold licenses issued by the Federal Government.

I do not feel that the Internal Revenue Service should be placed in the position of being forced to issue licenses to such persons. I therefore strongly recommend that you impose some meaningful conditions which applicants must comply with so that this Federal licensing system will afford some realistic controls.

I feel that honest and responsible firearms importers, manufacturers, and dealers should support these provisions since the amendments contained in this bill will assure that the firearms traffic will be in the hands of responsible business people and that they will not be confronted with the unfair competition of those who cannot or will not comply with reasonable standards.

Mr. Chairman, I have reviewed six major areas with which this bill deals. As I previously stated, S. 1592 is a general revision of the 27-year-old Federal Firearms Act designed to bring the act up to date and to make it an effective instrument in the war against crime and lawlessness. Time will not permit me to discuss each and every detailed provision of the bill. However, when Secretary Dillon transmitted the bill to the Congress he also submitted a section-by-section analysis of the bill which, if it has not already been inserted in the hearing record, I would like to have inserted in the record as an appendix to my statement.

Senator DODD. It has not been, and will be inserted at the conclusion of your remarks.

Mr. COHEN. Thank you, Mr. Chairman.

(The material referred to was marked "Exhibit No. 12" and is to be found at the conclusion of Mr. Cohen's remarks, p. 75.)

Mr. COHEN. We feel that there are problems relating to the interstate and foreign traffic in firearms which must be dealt with at the Federal level, and I am sure that you share this view. However, there are, as you know, some who would not even agree that there are any serious problems in the firearms control area, there are others who have a financial interest in the firearms traffic, and, further, there are well-meaning sportsmen and law-abiding gun owners who have a fear of

personal inconvenience—in most cases greatly exaggerated—all who oppose any bill designed to realistically and effectively deal with the firearms problem.  I think you will agree that the sportsmen and law-abiding gun owners need not fear the passage of this bill.

The inadequate firearms controls which we have today demonstrate the power of their opposition to effective controls.  They are organized.  They make their own views known to elected public officials.  They write letters to the editors.  Their influence has far exceeded their proportionate number in the population.

However, I am confident that the great majority of Americans favor the enactment of more effective firearms control legislation.

One of the difficulties which has tended to hinder enactment of proposed firearms legislation is the vast amount of misinformation which the public receives concerning the nature and effect of S. 1592.  For example, in a recent article which appeared on the front page of one of the country's leading newspapers it was stated, and I quote:

> The gun bill that is the subject of so much concern is legislation proposed by Senator Thomas J. Dodd, Democrat, of Connecticut, to require the registration of firearms.

As the chairman and the members of this subcommittee know, S. 1592 would not require the "registration" of firearms.

Widespread confusion as to the purpose and effect of the bill has also arisen from statements contained in a letter sent by a national organization to its membership urging them to write to their Congressmen and Senators and to the President of the United States concerning S. 1592, and giving specific instructions on how to write the letters. This letter did not furnish the membership of the association with an objective appraisal of the provisions of the bill, nor did it point out that the bill is an integral part of the President's program to combat the increasing incidence of crime in America.  The general impression conveyed was that S. 1592, if enacted would be the death knell of private gun ownership in America as well as of all sporting activities involving firearms.

I certainly would not wish your committee, or the Congress, to premise its action on this bill on any misconception that it provides for the Federal registration of firearms throughout the United States or that it would lead to the elimination of the private ownership of all guns.  The bill was not intended to, and does not, impose any substantial additional burdens on the possession and use of firearms by law-abiding citizens for lawful purposes.

Clearly the bill would not "destroy our skeet and target clubs, hunting activities, target ranges, Olympic shooting team, the national rifle matches, et cetera" as has been asserted in correspondence received as a result of the letter to which I referred.

Some of the bill's opponents would attack it on unfounded constitutional grounds alleging either that its provisions are beyond the congressional power to regulate interstate or foreign commerce or that they violate rights expressed in the Constitution's amendments. There is currently a widespread misconception as to the meaning of the second amendment and its significance in relation to Federal firearm controls.

This is certainly due in part to the fact that during the past decade certain gun publications and gun organizations have widely dis-

seminated information concerning the second amendment which contains, as you pointed out in your speech in Boston before the Ford Hall Forum on March 28 of this year, only the "last half" of the amendment which, in its entirety reads, and I quote:

A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed.

Not only do those who assert that the second amendment confers the right on the individual to keep and bear arms quote the language of the Constitution out of context, but they also ignore the judicial decisions which have construed the second amendment. The courts have held that in applying Federal Firearms legislation that the second amendment was not adopted with individual rights in mind, but rather as a prohibition upon Federal action which would interfere with the organization by the States of their militia.

I understand that a memorandum opinion which deals with the subject of Federal firearms control and the second amendment is being offered by the Attorney General for inclusion in the record of these hearings. This opinion was prepared with the provisions of the bill in mind, and it reaches the unequivocable conclusion that there is nothing in the meaning, scope, or application of the second amendment to impede the passage of S. 1592.

I will discuss now the authority of the Congress to enact this legislation.

The amendments to the Federal Firearms Act proposed in S. 1592 would be premised on the same constitutional authority under which the Federal Firearms Act was originally enacted. That, of course, is the power of the Congress under the Constitution to regulate interstate and foreign commerce, which is expressed in clause 3 of section 8 of article I of the Constitution.

Actually the opponents of firearms legislation at the Federal level ordinarily argue the second amendment, and have not been inclined to question the scope of the power of Congress to regulate interstate and foreign commerce.

I do not think that there is any substantial question but that all of the proposed amendments are within the scope of the authority of the Congress under the Commerce power. I also understand that the Attorney General is submitting for the record a memorandum opinion supporting this view.

In conclusion, I would like to say that we believe that S. 1592 contains measures suited to the attainment of the President's expressed objectives in the field of firearms controls. It is recognized, however, that one of the purposes of these hearings is to determine what clarification of language or simplification or improvement of procedures, if any, can be effected. I assure you that members of my staff and I will be glad to assist your committee to this end, in perfecting language or in effecting procedural simplifications or improvements which do not detract from the bill's major objectives.

Senator Dodd. Thank you very much, for this good statement. We will undoubtedly be calling on you in regard to perfecting the language of this bill. I am sure it can be improved. I have never seen one that was not subject to improvement and we are very open to suggestions which will make it a better bill and less burdensome and more reasonable if that can be done.

I have been concerned because of one line of propaganda against the bill having to do with the collectors of antique firearms. I have seen advertisements asserting that this bill would prohibit any legitimate collector from collecting antique firearms.

What do you think about this?

Mr. COHEN. We do have some problems in the area of antique firearms, particularly the problem of definition. Some gun collectors would classify any gun that they would like to collect as an antique and I think that here the problem is one of definition.

Assuming a proper definition could be drafted, I think we would not object to some type of special provisions for antique guns.

Senator DODD. I quite agree with you. It is one of the areas I wish you people would take a look at.

Mr. COHEN. One of our problems there, sir, is many of these guns which are not serviceable can be easily converted by any expert gunsmith into a very serviceable gun.

Senator DODD. I know. We are going to try to write some language in. I am sure we can do better and will make it perfectly clear that the legitimate collector of antique firearms is not going to be hurt by this bill.

Mr. COHEN. We will be glad to try to help you with that.

Senator DODD. I do not think anyone wants to do that and it is possible and quite likely we do not have the right language yet, but we are going to try to get it.

Shotgun ammunition has been excluded from the bill, as you know.

Do you think other such sporting ammunition ought to be excluded or could be excluded without severely limiting the effectiveness of the bill?

Senator Burdick raised a good point this morning and I am sure you heard him, about the .22-caliber ammunition people use to kill rodents and other pests in the open areas.

I speak for myself and not the other members of the committee, but I think they ought to be reasonable about these things anywhere they can be.

What do you think?

Mr. COHEN. We thought a good deal about the ammunition problem. We think there may be some modifications and again, we would like to hear the views of the public so we can know what the problems are and try to respond to the problems that are developed.

We are strong for keeping ammunition for the types of weapons that we are talking about here—the highly destructive types of weapons, out of the hands of anyone and as long as the modifications are restricted to sporting-type ammunition, we might be able to work out some exceptions.

Senator DODD. The sportsmen should be behind this bill and I think they would be if they got a fair and honest explanation of it. I have had my own experience with a good many of them and when I have had a chance to explain it to them I found in 99 cases out of 100 they say, "I did not know that."

It is a strange thing that we have had to put up such a struggle to get the truth of the bill across and it is getting more difficult with each day

Mr. COHEN. I think there was a Gallup poll, sir, some while back that indicated the general population at large, 70 or 75 percent of the people supported it.

Senator DODD. It was 80 percent.

Mr. COHEN. Yes—for legislation such as this.

Senator DODD. I am sure that is true, but you know what a small group can do when it deliberately sets out to misrepresent this legislation. It is difficult. This committee has no funds to send out a countermeasure. One mailing I know about was in the neighborhood of $40,000.

Mr. COHEN. It is depleting some of my own funds because we are replying to many of these letters.

Senator DODD. You have more money in the Treasury than we have up here.

Anyway, I am very grateful to you and we will be in consultation with you.

Mr. COHEN. Thank you.

Senator DODD. Thank you.

(Exhibit No. 12 follows:)

### EXHIBIT No. 12

#### EXPLANATION OF BILL TO AMEND THE FEDERAL FIREARMS ACT

The bill is a general revision of the Federal Firearms Act, designed to more effectively control interstate and foreign commerce in firearms. The bill adheres to and furthers the principle inherent in the present act that interstate and foreign commerce in firearms be controlled at the Federal level under the commerce power in a manner which will enable the States to control more effectively the traffic within their own borders under their own police power.

The bill would, in general, make it illegal to transport, ship, or receive firearms in interstate or foreign commerce, except as between licensed importers, licensed manufacturers, or licensed dealers, or between such licensees and persons excepted from the application of the Federal Firearms Act by section 4 of that act (e.g., agencies of the Federal and State Governments). Thus, under the bill, the so-called interstate mail-order traffic in firearms, whereby an individual can order a gun to be shipped from a mail-order dealer in another State, would be completely terminated.

Further, all sales by federally licensed importers, federally licensed manufacturers, and federally licensed dealers of shotguns and rifles to persons under 18 years of age, and of all other types of firearms to persons under 21 years of age, would be prohibited.

The bill is also designed to eliminate the serious abuses of the Federal Firearms Act license system inherent in the nominal license fee and weak qualifying requirement provisions of existing law, and to assure that persons licensed under the act are actually engaged in the business and are of good repute.

The bill would curb the flow of imports of surplus military weapons, and certain other firearms which are not particularly suitable for lawful sporting purposes.

Further, the bill would bring under strict Federal control interstate and foreign commerce in large caliber weapons such as bazookas, mortars, antitank guns, etc., and destructive devices such as explosive or incendiary (a) grenades or (b) bombs or (c) missiles or (d) rockets or (e) similar weapons.

#### SECTION-BY-SECTION ANALYSIS

*Section 1*

This section would restate and amend section 1 of the Federal Firearms Act (52 Stat. 1250) which contains the definition of the meaning of certain terms used in the act.

The definition of the term "person" in paragraph (1) is existing law (15 U.S.C. 901(1)).

76            FEDERAL FIREARMS ACT

The definition of the term "interstate or foreign commerce" is a restatement of existing law (15 U.S.C. 901(a)). "Territory" is omitted since there is no "territory" at the present time. The last sentence of this definition is inserted to clarify the status of the act in Puerto Rico, the Virgin Islands, and the District of Columbia.

The definition of the term "firearm" in paragraph (3) is a restatement and revision of the provisions of existing law (15 U.S.C. 901(3)). The revised definition has been extended to include any weapon by whatsoever name known "which will," or " which may be readily converted to," expel a projectile or projectiles by the action of an explosive. This represents a much needed clarification and strengthening of existing law designed to prevent circumvention of the purposes of the act. As under existing law, the definition also includes weapons "designed to" expel a projectile or projectiles by the action of an explosive, and firearm mufflers and firearm silencers.

The present definition of this term includes "any part or parts" of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

In addition, the definition of the term "firearm" is extended to include any "destructive device" as defined in the proposed new definition of this term contained in paragraph (4) of section 1. The effect of this inclusion is to make the provisions of the act applicable to such destructive devices.

The definition of the term "destructive device" contained in paragraph (4) is a new provision. The purpose of this definition is twofold. First, it would bring under the terms of the act any explosive or incendiary (a) grenade or (b) bomb or (c) rocket or (d) missile or (e) similar weapon, or launching device therefor (except devices which are not designed or redesigned or used or intended for use as a weapon). Second, the definition would include large caliber weapons such as bazookas, mortars, antitank guns, etc., in order that the more stringent controls applicable with respect to the traffic in destructive devices would be applicable with respect to such weapons.

The parenthetical exception contained in this definition is drafted in the same manner as the exceptions contained in title 26, United States Code, section 5179(a) (relating to registration of stills) and section 5205(a)(2) (relating to stamps on containers of distilled spirits). Therefore, the decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780; cert. den. 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable. Establishment by a person that he came within the exception would be a matter of affirmative defense. Thus, an explosive device shown to be designed and intended for lawful use in construction or for other industrial purposes would be excepted. However, if the device were designed or used or intended for use, as a weapon, it would be subject to the provisions of the act.

A provision has been made in this definition that the Secretary may exclude from the definition any device which he finds is not likely to be used as a weapon. Examples of devices which may be excluded from this definition are devices such as a Very pistol and other signaling devices and line-throwing appliances (required for commercial vessels by U.S. Coast Guard regulations) which may have been made from converted firearms. This provision also makes it possible to deal with any other comparable situation which may arise, such as old cannon or field pieces which are primarily of historical significance and with respect to which there is no reasonable likelihood that they will be used as a weapon.

The definition of the term "short-barreled shotgun" contained in paragraph (5) is a new provision. The definition describes a shotgun of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). The purpose of the definition is to provide a convenient means of reference to weapons of this type.

The definition of the term "short-barreled rifle" contained in paragraph (6) is a new provision. The definition describes a rifle of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). The purpose of the definition is to provide a convenient reference to weapons of this type.

The definition of the term "importer" is a new provision. Under existing law (15 U.S.C. 901(4)), the term "manufacturer" includes a person engaged in importation of firearms or ammunition for purposes of sale or distribution.

It appears obvious that separate classifications should be provided for importers and manufacturers in order to more appropriately effectuate the purposes of the act.

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 904(4)) except that the references to importation have been deleted.

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) with certain revisions. The definition also makes it clear that "pawnbrokers" are a type of dealer. This reflects proposed changes in other provisions of the act which would place pawnbrokers handling firearms in a special category and provide for higher license fees for procurement of licenses by pawnbroker dealers.

The definition of the term "pawnbroker" is a new provision. Pawnbroker dealers are covered under the provisions of the existing act in the same manner as other dealers. The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers. Under the provisions of the National Firearms Act (26 U.S.C. ch. 53), pawnbrokers are separately classified and charged a higher rate of special (occupational) tax than other dealers.

The definition of the term "indictment" is a new provision. Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime. This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to "territory" omitted since there is at the present time no such "territory."

The definition of the term "crime punishable by imprisonment for a term exceeding one year" is a new provision.

Prior to October 4, 1961, the Federal Firearms Act included provisions which made it unlawful for a person convicted of a crime of violence (as defined) in any court of the United States, a State, or possession, to transport, ship, or receive any firearm in interstate or foreign commerce. S. 1750 (87th Cong., 1st sess.) amended the act by striking the definition of "crime of violence" and by striking that term wherever it appeared in the act and inserting in lieu thereof the term "crime punishable by imprisonment for a term exceeding one year." S. 1750 was introduced at the request of the Attorney General as an integral part of an anti-crime legislative program. See House Report 1202 (87th Cong., 1st sess.). The felony criteria for prohibiting the transporting, shipping, or receiving of firearms incorporated in the act by S. 1750 has been retained to date.

However, the definition of "crime punishable by imprisonment for a term exceeding one year" proposed in the bill would modify the felony criteria by excluding anti-trust-type violations. It may be noted that anti-trust-type violations are not felonies under Federal law. However, a limited number of States have statutes making such offenses felonies. The definition would provide uniform treatment of such offenses, both State and Federal.

The definition of the term "Secretary" or "Secretary of the Treasury" contained in paragraph (12) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

The definition of the term "ammunition" contained in existing law (15 U.S.C. 901(7)) has been revised to include ammunition for a destructive device and ammunition for a machinegun or rifle in addition to pistol and revolver ammunition.

*Section 2*

Section 2 of the bill would amend section 2 of the Federal Firearms Act (15 U.S.C. 902), which relates to prohibited acts.

*Subsection (a)*

Subsection (a) is derived in part from the provisions of existing law cantained in subsections (a) and (b) of section 2 of the Federal Firearms Act (15 U.S.C. 902 (a) and (b)). Such provisions of existing law make it unlawful for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer licensed under the act, to transport, ship, or receive any firearm in interstate or foreign commerce, or for any person to receive any firearm transported or shipped

in interstate or foreign commerce, by an unlicensed importer, manufacturer, or dealer.

The provisions of section 2(a) of the bill establish a general rule making it unlawful for any person, except an importer, manufacturer, or dealer licensed under the provisions of this act, to transport, ship, or receive firearms in interstate or foreign commerce. This would have the effect of channeling interstate and foreign commerce in firearms through licensed importers, licensed manufacturers, and licensed dealers, thereby prohibiting the so-called mail-order traffic in firearms to unlicensed persons. Thus, the several States could adequately deal with the sale and disposition of firearms within their own jurisdiction by the exercise of their police power granted to them under the Constitution.

The provisions of this subsection would not, of course, be applicable in respect of transactions with the persons excepted under the provisions of section 4 of the act (15 U.S.C. 904), such as Federal or State agencies. No specific exception is made in this section for the transactions with such persons, since such transactions are covered by section 4.

However, five specific exceptions are made to the general prohibitory provisions of subsection (a). These exceptions deal (1) with the transporting of certain types of firearms by individuals traveling in interstate or foreign commerce, (2) with the shipment of firearms to licensees under the act for authorized service and the return of such firearm to the sender, (3) with the transportation of firearms by carriers, and (4) with the application of the subsection in the District of Columbia, the Commonwealth of Puerto Rico, and the possessions.

Exception (1) makes it possible for a person who is traveling in interstate or foreign commerce to carry with him his shotgun or rifle (other than a short-barreled shotgun or short-barreled rifle). The exception also makes it possible for an individual traveling in interstate or foreign commerce (such as a person moving his place of residence) to have his shotgun or rifle transported for him under such conditions as the Secretary shall by regulations prescribe. However, the transportation of the firearm by or for the individual must be for a lawful purpose.

The second exception, which is contained in paragraph (2), relates to the transporting of a pistol or revolver by an individual traveling in interstate or foreign commerce and to having the pistol or revolver transported for such an individual. The limitations with respect to the transportation of pistols and revolvers are more restrictive than with respect to the transportation of shotguns or rifles. The reasons for the more stringent limitations are twofold. First, the States and possessions in general have, under their police power, imposed more restrictions on the acquiring, possessing, or carrying of concealable weapons than have been imposed with respect to sporting-type firearms, such as shotguns and rifles. Second, the more restrictive limitations are also correlated to the provisions of subsection (b) of section 2 as contained in the bill, which would prohibit licensed importers, manufacturers, and dealers from selling a pistol or revolver to a person who is a nonresident of the State in which the licensee's place of business is located.

The effect of the provisions of paragraph (2) of this subsection, coupled with the provisions of subsection (b) of this section, is to require a person to procure his pistol or revolver in the State in which he resides, and if he transports the pistol or revolver across a State line, to comply with the law of each State into or through which he transports such pistol or revolver. Such provisions are designed to give meaning and effect to the laws of those States which have imposed requirements for the protection of their citizens with regard to the acquiring, possessing, or carrying of such firearms. The term "State" is defined in paragraph (2) of section 1 of the act as including the District of Columbia, the Commonwealth of Puerto Rico, and the Virgin Islands.

The third exception, contained in paragraph (3) of subsection (a), provides that, subject to such conditions as the Secretary shall by regulations prescribe, a person may ship a firearm to a licensed importer, licensed manufacturer, or licensed dealer for authorized service and for the return of such firearm to the sender. However, it should be noted that this exception does not apply to any firearms which are subject to the provisions of the National Firearms Act. Such firearms can only be transported in interstate or foreign commerce between persons licensed under the act.

Paragraph (4) of this subsection provides an exception for the shipping or transporting of a firearm in interstate or foreign commerce by common or con-

tract carrier between persons licensed under the act, and to and from licensees and persons exempted by section 4 of the act.  This exception also recognizes lawful shipments by U.S. mail between persons licensed under the act.  Further, the exception recognizes transportation to or from nonlicensees pursuant to regulations prescribed under paragraphs (1), (2), and (3) of this subsection.

The provisions of paragraph (5) of subsection (2) provide that nothing in this subsection shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, or a possession, differently than it would apply if such place were a State of the United States. This provision is intended to make it clear that the prohibitions of the subsection are not intended , by reason of the definition of the term "interstate or foreign commerce," to apply to over-the-counter sales, or transportation within such places.

The decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780, cert. den. 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable to the exceptions contained in this subsection.  Establishment by a person that he came within the exception would be a matter of affirmative defense.

*Subsection (b)*

Subsection (b) of section 2 of the act, as contained in the bill, is a new provision which is intended to regulate the disposition of firearms by licensed importers, manufacturers, and dealers, to persons other than licensees under the act.

The subsection would make it unlawful for any importer, manufacturer, or dealer to sell or otherwise dispose of any firearm without following the required procedures for ascertaining (in such a manner as the Secretary shall by regulations prescribe) the identity and place of residence (or of business in the case of a corporation or other business entity) of the purchaser.

In order for the records of disposition required to be kept by licensees to have significant value or validity, it is essential that the licensees be required to satisfactorily ascertain the identity of the purchaser and his place of residence.  It should be noted in this regard that the rifle used by Lee Harvey Oswald to assassinate the late President John F. Kennedy, and the pistol used to kill the police officer, were procured by Oswald from federally licensed dealers, under a fictitious name.

Under the subsection all sales or other dispositions by federally licensed importers, federally licensed manufacturers, and federally licensed dealers of shotguns and rifles (other than short-barreled weapons) to persons under 18 years of age, and of all other types of firearms to persons under 21 years of age, would be prohibited.  This provides a uniform and effective means throughout the United States for preventing the purchasing of the specified firearms by persons under such ages.  The procuring of firearms by juveniles (often without the knowledge or consent of their parents or guardians) has become a matter of national concern.  The tragic consequences of this situation has been brought out in the proceeding of the Subcommittee to Investigate Juvenile Delinquency of the Committee on the Judiciary of the Senate.

The provisions of the subsection prohibiting licensees under the act from selling a firearm (other than a shotgun or rifle) to an unlicensed individual who is a resident of a State, other than that in which the importer's, manufacturer's, or dealer's place of business is located, is intended to deal with the very serious problem of individuals going across State lines to procure firearms which they could not lawfully procure or possess in their own State and without the knowledge of their local authorities.  The hearings before the Subcommittee To Investigate Juvenile Delinquency of the Committee on the Judiciary of the Senate demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms.

Paragraph (4) of the subsection would make it unlawful for any federally licensed importer, manufacturer, or dealer to sell or otherwise dispose of any firearm to any person who, by reason of State or local law, regulation, or ordinance, applicable to the place of sale or other disposition, may not lawfully receive or possess such fierarm.

The conditions imposed by this subsection on the operations of persons licensed under the act are deemed to be reasonable conditions on the privilege granted to

them, and necessary to effective control of interstate and foreign commerce in firearms, and to protect the public welfare.

*Subsection (c)*

Subsection (c) of section 2 of the bill is a new provision which, like subsection (b), deals with the activities of licensed importers, licensed manufacturers, and licensed dealers. This subsection would make it unlawful for any such importer, manufacturer, or dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee operating under the provisions of sec. 3(d) or sec. 6) knowing, or having reasonable cause to believe, that such person is under indictment or has been convicted in any court of the United States, or of a State (as defined in par. (2) of sec. 1) or possession, of a crime punishable by imprisonment for a term exceeding 1 year, or who is a fugitive from justice. In other words, licensees would be prohibited from knowingly disposing of firearms or ammunition to felons, fugitives from justice, or persons under indictment for a felony. This subsection would also make it unlawful for such importer, manufacturer, or dealer to ship or transport any firearm in interstate or foreign commerce to any person who may not lawfully receive such firearm under the provisions of subsection (a) of this section.

*Subsection (d)*

Subsection 2(d) of the bill is existing law (15 U.S.C. 902(e)) except that the words "in any court" have been inserted to conform the language to the language of subsection (e).

*Subsection (e)*

Subsection 2(e) of the bill is a restatement of existing law (15 U.S.C. 902(f)) revised to include persons under indictment. The omission of these persons from existing law appears to have been an inadvertent omission since such persons are, under existing law (15 U.S.C. 902(e)), prohibited from shipping or transporting firearms in interstate or foreign commerce. Also, the presumption contained in existing law has been eliminated, since it was declared unconstitutional by the Supreme Court in *Tot v. United States*, 319 U.S. 463.

*Subsection (f)*

Subsection (f) of section 2 as contained in the bill is a new provision which would make it unlawful for any person (including a licensee under the act) knowingly to deposit, or cause to be deposited for mailing, or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice to the Postmaster General or his delegate or to the carrier (as the case may be) that a firearm is being transported or shipped. This provision is correlated to the provisions of section 2(g) of the act as contained in the bill which in general prohibits carriers from delivering, or causing to be delivered, in interstate or foreign commerce, any firearm to any person who does not exhibit or produce evidence of a license obtained under section 3 of the act. Further, the testimony before the Subcommittee to Investigate Juvenile Delinquency of the Committee on the Judiciary of the Senate disclosed the existence of a practice of surreptitiously shipping firearms, without notice or disclosure, to circumvent requirements of Federal or State law.

*Subsection (g)*

Subsection 2(g) of the act as contained in the bill is a new provision which would in general make it unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce, any firearm to any person who does not exhibit or produce evidence of a license obtained under section 3 of the act. As noted in the discussion of subsection 2(f), any person who delivers, or causes to be delivered to the common or contract carrier, any package or other container in which there is a firearm, is required to give written notice to the carrier that a firearm is being transported or shipped.

This provision is also correlated to the provisions of section 2(a) of the act as contained in the bill, and is intended to aid in effectuating the provisions of that subsection which are intended to channel interstate or foreign commerce in firearms to persons licensed under the act.

*Subsection (h)*

Subsection (h) of section 2 as contained in the bill is existing law (15 U.S.C. 902(g)) and relates to the transportation or shipment of stolen firearms.

FEDERAL FIREARMS ACT                              **81**

*Subsection (i)*

Subsection 2(i) as contained in the bill is a restatement of existing law (15 U.S.C. 902(h)). The language has been revised to correspond with other comparable provisions of Federal law pertaining to the receipt or sale of stolen property "moving as, or which is a part of, or which constitutes interstate or foreign commerce" (see 18 U.S.C. 2313 relating to sale or receipt of stolen vehicles). This change will make it clear that the provisions apply to stolen firearms or ammunition transported in interstate or foreign commerce, after having been stolen, as well as to firearms and ammunition stolen in the course of movement in interstate or foreign commerce.

*Subsection (j)*

Subsection 2(j) as contained in the bill is a restatement of existing law (15 U.S.C. 902(i)) relating to firearms from which the manufacturer's serial number has been removed, obliterated, or altered. The restatement makes applicable the provisions of the subsection to an importer's serial number, as well as the manufacturer's, since importers and manufacturers are separately classified under the provisions of the bill. The restatement also deletes the words "and the possession of any such firearm shall be presumptive evidence that such firearms was being transported, shipped, or received, as the case may be, by the possessor in violation of this Act" since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

*Subsection (k)*

Subsection (k) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person to import or bring into the United States, or any possession thereof, any firearm in violation of the provisions of this act or to import or bring into the United States or any possession thereof any ammunition for a destructive device. This provision is correlated to the provisions relating to importation of firearms contained in section 3(e).

*Subsection (l)*

Subsection (l) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States, or any possession thereof, in violation of the provisions of this act. This subsection also is correlated to the provisions of sections 3(e) of the act relating to importation.

*Section 3 of the bill*

Section 3 of the bill would amend section 3 of the Federal Firearms Act (15 U.S.C. 903) which relates to licensing of importers, manufacturers, and dealers, and to recordkeeping by licensees.

*Subsection (a)*

Subsection (a) of section 3 of the act as contained in the bill is a restatement and revision of existing law (15 U.S.C. 903(a)).

Under existing law, an "importer" is required to obtain a license as a "manufacturer." The bill provides a separate classification for importers, and under subsection (a) an importer would be required to obtain a license as such.

Under existing law, the applicant, if a manufacturer or importer, paid a fee of $25 per annum, and, if a dealer, a fee of $1 per annum. These fees are completely unrealistic and, in the case of dealers, represent only a fraction of the cost of processing an application and issuing a license. Further, the information presented at the public hearings (held in 1963 by the Subcommittee To Investigate Juvenile Delinquency of the Judiciary Committee of the Senate, and by the Commerce Committee of the Senate in 1963 and 1964 on S. 1975, 88th Cong., 1st sess.) strongly indicated that many of the persons holding licenses as dealers under the Federal Firearms Act were not bona fidely engaged in business as such, but had, due to the nominal license fees, obtained the licenses for their own personal reasons (e.g., to obtain a discount on purchase of firearms, or to ship, or receive concealable weapons through the mails, or to circumvent State or local requirements).

Under the provision of subsection (a) of section 3 of the act as contained in the bill the license fees would be increased to a figure which would make it very unlikely that any person not bona fidely engaged in business as an importer, manufacturer, or dealer would attempt to obtain a Federal Firearms Act license.

The increased license fees would be such as to not only cover the cost of processing an application and issuing the license, but would defray the cost of conducting the investigation contemplated by the provisions of section 3(c) of the act as contained in the bill to determine the qualifications of the applicant to engage in the business, and whether or not he would be likely to conduct his operations in compliance with the act.

A separate classification and higher fees are provided in the case of a manufacturer or importer of, or a dealer in, "destructive devices" as defined in section 1(4) of the act as contained in the bill. Since "destructive devices" are not ordinary articles of commerce, it is anticipated that very few such licenses will be issued. The purpose of this separate classification and higher fee with respect to such devices is to make more effective the stringent controls imposed under the bill with regard thereto.

A separate license with a higher license fee is also provided for pawnbroker dealers. A "pawnbroker" is defined in section 1 of the bill. It may be noted that under the National Firearms Act (26 U.S.C. 53) pawnbroker dealers are charged a higher rate of occupational tax than other dealers.

The language of the first sentence is intended to make it clear that no person shall engage in business as an importer of firearms or ammunition, or as a manufacturer of firearms or ammunition, or as a dealer in firearms or ammunition, until he has filed an application with, and received a license to do so from, the Secretary. In order to effectively regulate interstate and foreign commerce in firearms and ammunition, it is necessary that all persons engaging in these businesses be licensed. Similar provisions were upheld in *Hanf* v. *United States*, 235 F. 2d 710, cert. den. 352 U.S. 880, as reasonably necessary to effective control of interstate and foreign commerce under comparable conditions.

The provision that applicants shall be required to pay a fee for obtaining their license "for each place of business" is merely a clarification of existing law, since existing law is now so construed (see 26 CFR pt. 177.33).

*Subsection (b)*

Subsection (b) of section 3 as contained in the bill is a restatement and revision of the provisions of existing law (15 U.S.C. 903(b)). Existing law provides that upon payment of the prescribed fee the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, or receive firearms and ammunition in interstate or foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of the act. It will be noted that there are no specific conditions on the issuance of a license other than the payment of the prescribed fee. However, in view of the proscriptions in section 2 of the act against the shipment, transportation, or receipt in interstate or foreign commerce of firearms or ammunition by a person who is a fugitive from justice, or who has been convicted of, or who is under indictment for, any offense punishable by imprisonment for a term exceeding 1 year, the act has consistently been construed as precluding the issuance of licenses to such persons since it would be illegal for them to engage in the transactions covered by the license. (See 26 CFR pt. 177). The revision of section 3(b) makes it clear that the privileges granted to the licensee are not unlimited or unconditional but are subject to the provisions of this act and other applicable provisions of law, and also that the application for the license may be denied under the conditions set forth in section 3(c) of the act as contained in the bill.

*Subsection (c)*

Subsection (c) of section 3 of the act as contained in the bill is basically a new provision, except to the extent that it sets forth the construction of existing law to the effect that a license will not be issued to a person who is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of subsection (d) or (e) of section 2 of the act (i.e., a person who has been convicted of, or who is under indictment for, a felony, or who is a fugitive from justice).

The existing provisions of the Federal Firearms Act, regarding the issuance of licenses, represent an anomaly to the general practice with regard to the issuance of licenses or permits in that the act contains no standards for the issuance or denial of a license such as are contained in other comparable acts. (See 26 U.S.C. 5271(c) and 5712, and 27 U.S.C. 204(a)(2).)

Even though the act has no specific statutory standards, the courts would have held that, there would have been an implied standard had the terms of the act provided any discretion to the Secretary with regard to the issuance

of a license. (See *Ma-King Co.* v. *Blair*, 271 U.S. 479, where the Supreme Court held that in the case of a statute which granted discretion, i.e., used the language "may issue" rather than "shall issue," that a license could be denied if there were reasonable grounds for believing that the applicant would not be likely to conduct his operations in conformity with Federal law.

Subsection (c) of section 3 of the act as contained in the bill eliminates the anomalous situation with respect to the licensing system contained in existing law and sets forth specific standards under which an application shall be disapproved and the license denied, after notice and opportunity for hearing.

The standards provided in subsection (c) are very similar to the standards provided in 26 U.S.C. section 5271(c) (relating to permits to procure, deal in, or use specially denatured distilled spirits) ; 26 U.S.C. 5712 (relating to permits for manufacturers of tobacco products) ; and to 27 U.S.C. 204 (relating to wholesale dealers in liquors, importers of liquors, etc.). It may be noted that the principal standard in all three of the statutes cited is the implied standard recognized by the Supreme Court in the *Ma-King* case (*Ma-King* v. *Blair*, 271 U.S. 479).

The hearing and appeal procedures provided by the Administrative Procedure Act (act of June 11, 1946, 5 U.S.C. 1001 et seq.) would, as in the case of the permits provided for in 26 United States Code sections 5271 and 5712, be applicable with respect to license proceedings under the Federal Firearms Act.

The provisions of paragraph (2), relating to individuals possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association, are necessary to preclude felons or other individuals who could not obtain a license as an individual from using a corporation or other business organization to conduct their operations. In the past, individuals convicted of a felony have formed corporations for the purpose of continuing their firearms operations.

The provisions of paragraph (5) would preclude the issuance of licenses to applicants who do not have, or do not intend to have or maintain, bona fide business premises for the conduct of the business. This provision will be a definite aid in limiting licensees under the Federal Firearms Act to persons actually engaged in business, and assuring that there will be an appropriate place that is subject to proper inspection where the required records will be maintained.

The information developed at the public hearings held by the Subcommittee To Investigate Juvenile Delinquency of the Judiciary Committee of the Senate disclosed a definite need for such a provision. It was shown that in some cases importers or dealers maintained no regular place of business which could be found, and conducted their operations through post office boxes, mail drops, answering services, etc.

*Subsection (d)*

Subsection (d) of section 3 of the act as contained in the bill replaces the provisions of existing law contained in section 3(c) of the act (15 U.S.C. 903(c)) and reflects the construction of existing law as contained in current regulations (26 CFR 177).

The requirement of existing law, concerning the posting of a bond by a licensee convicted of a violation of the act in order to continue operations pending final disposition of the case on appeal, serves no useful purpose, and has been omitted. Further, the provisions of this subsection have been revised to simplify administration. Since the licensee is required to reapply each year for a license, the information on the application relating to his indictment and/or conviction will be adequate. Also, the license itself can, as at present, contain a warning that the licensee cannot continue operations once his conviction has become final (other than as provided in sec. 6).

As under existing law and regulations, a new license will not be issued to a person under indictment for, or who has been convicted of, an offense punishable by imprisonment for a term exceeding 1 year. However, a licensed importer, licensed manufacturer, or licensed dealer may continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be subject to all provisions of this act and

operations pursuant to such license shall be discontinued. If a bona fide application for relief is filed under section 6, operations may continue until such application is acted upon.

### Subsection (e)

Subsection (e) of section 3 of the act as contained in the bill is a new provision designed to bring under control the flow of surplus military weapons and other firearms being imported or brought into the United States which are not particularly suitable for target shooting, hunting, or any other lawful sporting purpose. The interim report of the Committee on the Judiciary made by its Subcommittee To Investigate Juvenile Delinquency with respect to the "Interstate Traffic in Mail-Order Firearms" (S. Rept. 1340, 88th Cong., 2d sess.) made it clear that such firearms are a principal source of supply of juvenile delinquents and certain other criminal elements. This report also indicated that many of these firearms were in such poor condition, or of such poor workmanship, that their use would be hazardous.

The operations of certain importers of and dealers in such firearms has reflected a flagrant disregard of the public interest.

Under the provisions of the subsection, no person could import or bring firearms into the United States or a possession thereof, except upon authorization by the Secretary. Such authorization would not be issued under the provisions of this subsection unless it was established to the satisfaction of the Secretary that certain conditions designed to protect the public interest had been met.

These provisions would not hinder the importation of currently produced firearms of a type and quality generally recognized as particularly suitable for lawful sporting purposes, or the importation of antique or unserviceable firearms (not readily restorable to firing condition), imported or brought in as a curio or museum piece.

### Subsection (f)

Section 3(f) of the act as contained in the bill is a new provision relating to the sale or other disposition of destructive devices, machineguns, short-barreled shotguns, and short-barreled rifles by licensees to nonlicensees. This provision is imposed as a condition on the privilege granted the licensee to engage in interstate or foreign commerce with respect to such firearms. Since these are not ordinary articles of commerce, it is not expected that there will be any significant volume of transactions falling within the application of the subsection. However, it is deemed to be in the public interest to place adequate controls over the disposition of these firearms by licensees to nonlicensed persons.

### Subsection (g)

Subsection (g) of section 3 of the act as contained in the bill is a restatement and revision of the recordkeeping requirements of existing law (15 U.S.C. 903 (d)). Under existing law and regulations (26 CFR 177.51), licensees are required to maintain complete and adequate records reflecting the importation, production, and disposition at wholesale and retail, of firearms, and the records are required to be kept available for inspection by Internal Revenue officers during regular business hours (26 CFR 177.54).

The restatement of the recordkeeping requirements contained in this subsection would make clear in the statute the requirement that the records be made available for inspection at all reasonable times, and the authority of the Secretary or his delegate to enter during business hours the premises of the licensee for inspection purposes.

The subsection also makes clear the authority of the Secretary, by regulations, to require the submission of reports concerning the operations of licensees.

It has been existing practice to make available to State and local law enforcement officers information obtained from the required records of licensees for law enforcement purposes (e.g., tracing the ownership of a firearm found at the scene of the crime). The subsection would provide specific statutory authority for this practice.

It may be noted that the entry and inspection provisions contained in this subsection are similar to those provided in 26 U.S.C. 5146 with regard to the premises of liquor dealers.

### Subsection (h)

Subsection (h) of section 3 of the act as contained in the bill is a new provision which would require licenses issued to importers, manufacturers, and dealers under the provisions of this section to be kept posted and available for inspection on the business premises covered by the license.

*Subsection (i)*

Subsection (i) of the act as contained in the bill is a new provision. Existing law (15 U.S.C. 902(i)) makes it unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce, any firearm from which the manufacturer's serial number has been removed, obliterated, or altered. Under the statutory authority to prescribe regulations to carry out the povisions of the act (15 U.S.C. 907), the Secretary has prescribed regulations requiring the identification of firearms (26 CFR 177.50). Subsection (i) would include in the act specific statutory authority for the Secretary to require licensed importers and licensed manufacturers to identify firearms in the manner prescribed by regulations.

*Section 4*

Section 4 of the act as contained in the bill is a estatement of existing law (15 U.S.C. 904). However, the section as contained in the bill eliminates certain of the exceptions in existing law.

Section 4 of the act as contained in the bill contains the exception in existing law (15 U.S.C. 904) applicable in respect to transportation, shipment, receipt, or importation of firearms or ammunition imported for, or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof, or (2) any State or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof. Such transactions are completely exempt from all provisions of the act.

The exemptions in existing law for certain nongovernmental activities have been omitted. Such omission does not mean that firearms or ammunition cannot be shipped to, or procured by, the omitted persons. It merely means that the omitted persons will be required to obtain firearms and ammunition from licensees and that the proper records of transactions must be maintained.

*Section 5*

No change has been made in subsection (a) of section 5 of the act relating to penalties. However, subsection (b) of section 5 of the act as contained in the bill is a restatement and revision of existing law (15 U.S.C. 905(b)). This subsection would extend the existing forfeiture provisions of the Federal Firearms Act, which provide for the forfeiture of firearms and ammunition involved in violations of the act to cover firearms and ammunition "involved in, or used or intended to be used in," violation of the act or of certain provisions of title 18 of the United States Code pertaining to threats to, or assaults on, law enforcement officers, members of the judiciary, the President, the Vice President, etc.

Under existing law, firearms involved in violations of the Federal Firearms Act (15 U.S.C. 901 et seq.) or the National Firearms Act (26 U.S.C. ch. 53) are subject to forfeiture. However, these provisions are inadequate to cover many cases involving firearms used in offenses against the laws of the United States pertaining to assaults on, or threats against, law enforcement officers and public officials.

The procedures applicable to seizure, forfeiture, and disposition would be the same as for firearms seized for violation of the Federal Firearms Act (i.e., the provisions of the Internal Revenue Code of 1954, applicable in respect of National Firearms Act firearms, would apply).

The enactment of this provision is deemed to be clearly a matter in the national interest.

*Section 6*

Section 6 of the bill would renumber sections 6, 7, 8, and 9 of the Federal Firearms Act as sections 8, 9, 10, and 11, respectively, and insert after section 5 two new sections.

The new section 6 would provide for the relief of convicted persons under certain conditions. This section would not apply if the crime involved the use of a firearm or other weapon or a violation of the Federal Firearms Act or the National Firearms Act. Otherwise, the Secretary could grant relief from the disabilities incurred under the act by reason of a conviction if it was established to his satisfaction that the circumstances regarding the conviction and the applicant's record and reputation were such that the applicant will not be likely to conduct his operations in an unlawful manner and that the granting of the relief would not be contrary to the public interest.

The new section 7 of the act as contained in the bill relates to the applicability of other laws. This section is merely for the purpose of making it completely clear that nothing in the Federal Firearms Act shall be construed as modifying or affecting any provision of the National Firearms Act, section 414 of the Mutual Security Act of 1954, or section 1715 of title 18 of the United States Code. Also subsection (b) makes it clear that nothing in the Federal Firearms Act is intended to confer any right or privilege to conduct any business contrary to the law of any State, or to be construed as relieving any person from compliance with the law of any State.

*Section 7*

Section 7 provides that the amendments made by this act shall become effective on the date of the enactment of the act, except that the amendments made by section 3 to section 3(a) of the Federal Firearms Act would not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act on the date of the enactment of the act, until the expiration of a license held by such manufacturer, importer, or dealer on such date.

In effect, this would mean that a licensee would not have to obtain a new license until his existing license expired.

Senator DODD. We will have to recess the hearings now because we are not allowed to continue this afternoon while the Senate is in session.

Tomorrow morning we will hear from Senator Robert F. Kennedy; Robert N. Margrave, Director, Office of Munitions Control, Department of State; Thomas C. Lynch, attorney general, State of California; Capt. Merton W. Howe, commander, Robbery Division, Department of Police, Los Angeles, Calif.; Sgt. Jesse Gonzalez, Robbery Division, Department of Police, Los Angeles, Calif.

You ought to hear these people. They are good people and I do not see why we cannot get a decent piece of legislation that we can all agree on. I doubt that any serious-minded person would argue there is no need for remedial legislation.

We will recess now until tomorrow morning at 9:30.

(Thereupon, at 12:30 p.m., the subcommittee recessed, to reconvene at 9:30 a.m., Thursday, May 20, 1965.)

# FEDERAL FIREARMS ACT

**THURSDAY, MAY 20, 1965**

U.S. SENATE,
SUBCOMMITTEE ON JUVENILE DELINQUENCY
OF THE COMMITTEE ON THE JUDICIARY,
*Washington, D.C.*

The subcommittee (composed of Senators Dodd, Hart, Bayh, Burdick, Tydings, Hruska, Fong, and Javits) met, pursuant to recess, at 9:30 a.m., in room 318, Old Senate Office Building, Senator Thomas J. Dodd, presiding.

Present: Senators Dodd, Burdick, and Javits.

Also present: Carl L. Perian, staff director; and William C. Mooney, chief investigator.

Senator DODD (presiding). The committee will come to order.

We have as our first witness Senator Robert Kennedy, who knows a great deal about the firearms problem.

Senator Kennedy.

## STATEMENT OF HON. ROBERT F. KENNEDY, A U.S. SENATOR FROM THE STATE OF NEW YORK

Senator KENNEDY. Mr. Chairman and members of the subcommittee, I am grateful for the opportunity to testify today on a matter of deep national interest. Regulation of the sale of firearms is, in my judgment, essential for the safety and welfare of the American people.

Every year, thousands of Americans are murdered by firearms—5,090 in 1964 alone.

The great majority of these deaths would not have occurred if firearms had not been readily available. For the evidence is clear that the availability of firearms is itself a major factor in these deaths.

One out of every 20 assaults with a weapon in the United States in 1963 resulted in death. Where firearms were used, however, one out of every five assaults resulted in the death of the victim.

Of the 225 law-enforcement officers who have been killed by criminals in the last 4 years, 216—95 percent—have been killed by firearms. Of the weapon users responsible for these deaths, 73 percent had been convicted of crimes before acquiring the murder weapon.

This bill would meet the firearms problem in a moderate and careful fashion.

It would restrict the interstate shipment of firearms to manufacturers, dealers, and importers, thus eliminating the present flow of 1 million inexpensive mail-order weapons annually. Many of these guns go to juveniles, persons with criminal records, and emotionally unstable persons.

87

It would prohibit the retail sale of firearms to youths, or to persons not resident in the State of purchase—thus helping States to enforce their own firearms regulation.

It would sharply curtail the importation of foreign military surplus weapons, which account for the bulk of the cheap mail-order trade, and the bulk of the large-caliber weapons sold in the United States.

Basically, this bill would only subject deadly weapons to the same control we have always imposed on automobiles, liquor, or prescription drugs. The use and sale of these things are carefully regulated by Federal, State, and local governments. The same should be true of firearms.

S. 1592 would impose necessary controls. It would make State and local law enforcement more effective, and safeguard policemen in the exercise of their duties. And it would accomplish these ends without unduly curtailing the use of firearms for legitimate sport shooting or hunting, and without curtailing the lawful activity of sport gun clubs.

Nevertheless, the Nation, Congress, and sportsmen have been subjected to a massive publicity campaign against this bill. I might say, Mr. Chairman, that by far, the greatest amount of mail that I have received as a U.S. Senator has come in connection with this bill, and in opposition to this bill in an organized campaign which in my judgment, is against the best interests of the people of this country. This campaign has distorted the facts of the bill and misled thousands of our citizens. Those responsible for this campaign place their own minimal inconvenience above the lives of the many thousands of Americans who die each year as the victims of the unrestricted traffic in firearms. The campaign is doing the Nation a great disservice. I think the responsibility for that campaign and the implications of it should be taken into consideration by those who are behind it, Mr. Chairman.

Senator Dodd. I thoroughly agree with you, Senator.

Senator Kennedy. The national interest will be served by the speedly enactment of S. 1592. I support every one of its provisions.

During its deliberations, I would urge the subcommittee to consider also ways by which the private arsenals of secret groups—such as the Ku Klux Klan, the Black Muslims, and the so-called Minutemen—could be curtailed and eliminated. At a minimum, all weapons in the possession of these organizations or members of these organizations should be registered. Further, all large-caliber heavy weapons should be removed from private hands. Private citizens have no need of antitank guns, mortars, or machineguns.

And I would also urge all citizens, and all State and local authorities, to take every appropriate step to control the sale and possession of firearms in their own communities. Without that action, this bill will not be nearly as effective as it should be.

We have a responsibility to the victims of crime and violence. It is a responsibility to think not only of our own convenience but of the tragedy of sudden death. It is a responsibility to put away childish things—to make the possession and use of firearms a matter undertaken only by serious people who will use them with the restraint and maturity that their dangerous nature deserves—and in my judgment demands.

For too long, we have dealt with these deadly weapons as if they were harmless toys. Yet their very presence, the ease of their acqui-

sition and the familiarity of their appearance have led to thousands of deaths each year—and to countless other crimes of violence as well.

With the passage of this bill, we will begin to meet these responsibilities. It is a necessary bill, and I urge its immediate enactment.

It would save hundreds of lives in this country and spare thousands of families all across this land the grief and heartbreak that may come from the loss of a husband, a son, a brother, or a friend.

It is past time that we wipe this stain of violence from our land. I thank you, Mr. Chairman.

Senator Dodd. Senator Kennedy, that is a very strong statement. I feel that you have had a lot to do with this bill. I am glad to say publicly that your counsel and advice was of tremendous importance to the members of the subcommittee. With your experience as Attorney General and your knowledge of this problem, I think there is not anyone in the Senate that knows more about it.

So we are very grateful to you for appearing here this morning and making this splendid statement.

Senator Kennedy. Thank you, Mr. Chairman.

Senator Dodd. Attorney General Lynch.

Mr. Attorney General, once again, I will say that I am grateful to you for appearing as well as the other witnesses who have come.

Mr. Lynch is the attorney general of the State of California. He has had more than 30 years of experience in law enforcement work. He served on Federal, State, and local levels, and was assistant district attorney, San Francisco, and he headed a long series of prosecutions that rid that city of organized crime. He is a recognized expert in the field of law enforcement and he directs the entire law enforcement of the whole State of California.

So we want to hear your views on this bill, Mr. Attorney General.

## STATEMENT OF THOMAS C. LYNCH, ATTORNEY GENERAL, STATE OF CALIFORNIA

Mr. Lynch. Thank you, Senator, and members of this subcommittee.

I appear here as the chief law officer of our Nation's most populous State and I will say right at the outset that I heartily endorse S. 1592. From the viewpoint of California law enforcement, these are critical items of Federal legislation.

It provides a suitable framework within which each State can work out its own particular problems. As a State official, this is most important to me. It is aimed at many of the firearm hazards encountered in our State: Uncontrolled interstate and foreign commerce, easy availability of cheap foreign weapons, dangerous uncontrolled mail-order commerce between dealers and individuals, easy access to Federal dealer's licenses. Yet, most importantly, it sets up guidelines which will allow California to determine its own course in these matters.

To illustrate the problem facing California simply in terms of numbers: more than $2\frac{1}{2}$ million concealable firearms are now registered with the State department of justice; 101,000 were registered last year alone. A single mail-order firm in Los Angeles shipped 641 handguns to California residents in 1963.

We cannot even begin to estimate the number of unregistered concealable firearms acquired by California residents each year through mail-order and out-of-State purchases.

California's problems as the most populous State are somewhat unique. They undoubtedly will become more common throughout the Nation in the next 20 years. Yet, obviously, Alaska does not have the same problems that now beset my State. This bill would allow us to deal with our problems without impressing the same standard on smaller, less populous States.

It is from this vantage point that I urge this legislation. An old saw about California concerns the visitor from the East who returns to his home from California to say, "I've seen the future and I don't like it." I say, I've seen the future and we must deal with it.

For the committee's information, the California Department of Justice—which I head—is responsible for registration of all concealable firearms sold by registered dealers in California. We are also responsible for issuance of licenses for the manufacture, possession, sale, or distribution of machineguns and tear gas devices. I am therefore well acquainted with the firearms situation in California.

I wish also to stress that as a hunter and even as a former member of the National Rifle Association, I do not see that this legislation in any way will hamper the legitimate sportsman. Good quality rifles, shotguns, and pistols still will be readily available to the honest citizen, the real hunter. In fact, S. 1592 will go far to rid our Nation of the cheap foreign surplus weapons which peril both their users and fellow shooters.

I stress that this law will not peril the legitimate gun fancier because I do not think we can ignore today the atmosphere surrounding gun legislation. Since the death of President Kennedy, the national feeling against the wanton use of firearms has grown. Public opinion polls reveal that the general public overwhelmingly supports far stronger firearms regulations than any that have been proposed by any legislative body.

We must recognize that this strong and unorganized attitude favoring firearms legislation is countered by an equally strong and much better organized—though numerically much smaller—viewpoint that any firearms legislation is an encroachment on the second amendment and a threat to the asserted right of all Americans to possess weapons without legislative restriction.

You gentlemen, I am sure, are well aware of these pressures. Senator Kennedy has already testified to them. I only mention them because I wish to point out that against this background of strong feelings, events occur daily which cry out for stricter firearms regulation.

I believe we cannot deny the violence of the age in which we live. About 50 percent of the 600 murders recorded annually in California are committed with guns. Opponents of S. 1592 would point to the St. Valentine's Day massacre or even the gunfight at the OK Corral as previous examples of similar violence. This is 1965. We are living in a complex urbanized society—a society that has changed vastly just during the past 20 years.

California perhaps knows this society best—this does not necessarily mean that it knows how to deal with it—we are now developing an urban complex foreshadowing that yet to be experienced by any State or region of the country.

I am not referring to the eastern urban centers that you are familiar with here—millions of people jammed into a few square miles. I am referring to California's urban complex—megalopolis, if you wish—millions of people spread out in single-family dwellings over hundreds of square miles. No open space. No "country" in the traditional sense, just mile upon mile of houses.

In such an unfathomed urban society which requires new approaches and new laws in every field, the wanton misuse and abuse of firearms presents unique problems—problems that our Nation as a whole will face in 10 years. We cannot accept violence indefinitely as a product of this society.

This committee has criticized some gun advertising for its obvious incitement of impressionable youngsters. I have here with me a gun catalog, a 64-page mail-order advertisement for a Derringer pistol which features violence and physical combat and throws in a dash of sex for good measure. Let me quote you a sample:

> Remember that no matter how tough or big your opponent is, if you learn how to use the Hy Hunter Frontier Derringer properly you will always be the victor.

(The document referred to was marked "Exhibit No. 13" and the sections referred to are as follows:)