UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION


```
* * * * * * * * * * * * * * *
JOHN COREY FRASER, ET AL.,   * CIVIL ACTION 3:22-CV-00410
                             * FEBRUARY 8, 2023   10:12 A.M.
             Plaintiffs,     * MOTION HEARING
                             * VOLUME I OF I
vs.                          *
                             *
BUREAU OF ALCOHOL, TOBACCO,  *
FIREARMS AND EXPLOSIVES,     *
ET AL.,                      * Before:
                             * HONORABLE ROBERT E. PAYNE
             Defendants.     * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * * EASTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiffs:        ELLIOTT M. HARDING, ESQUIRE
                           Harding Counsel, PLLC
                           608 Elizabeth Avenue
                           Charlottesville, VA 22901




For the Defendants:        JONATHAN H. HAMBRICK, ESQUIRE
                           United States Attorney's Office
                           SunTrust Building
                           919 East Main Street
                           Suite 1900
                           Richmond, VA 23219




Court Reporter:            Melissa H. Custis, RPR
                           701 East Broad Street
                           Richmond, Virginia 23219
                           (804)916-2278

          Proceedings recorded by mechanical stenography.
Transcript produced by computer.

Fraser v. Bureau of ATF - 02/08/2023

```
 1   APPEARANCES (continued):

 2   For the Defendants:        MICHAEL P. CLENDENEN, ESQUIRE
                                Department of Justice-Civil
 3                              Civil Division, Federal Programs
                                Branch
 4                              1100 L Street NW
                                Suite 12028
 5                              Washington, DC 20005

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Fraser v. Bureau of ATF - 02/08/2023

```
 1          (Court convened at 10:12 a.m.)

 2          THE CLERK:  Case Number 3:22-CV-410, John Corey

 3   Fraser, et al. versus Bureau of Alcohol, Tobacco, Firearms and

 4   Explosives, et al.

 5          The plaintiffs are represented by Elliott Harding.

 6          The defendants are represented by Jonathan Hambrick

 7   and Michael Clendenen.

 8          Are counsel ready to proceed?

 9          MR. HARDING:  Yes.

10          MR. CLENDENEN:  Yes.

11          MR. HAMBRICK:  Yes.

12          THE COURT:  All right.  Well, we have a question

13   first.  The motion to dismiss under 12(b)(1) and 12(b)(6) --

14   the 12(b)(1) motion is based on standing; is that right?

15          MR. CLENDENEN:  That's correct, Your Honor, yes.

16          THE COURT:  There's also a motion for summary

17   judgment by the plaintiff.  Let's assume the matters survive

18   12(b)(6), is it really ripe for summary judgment?  Is it

19   something that can be decided on the basis of what's been done

20   so far?  Is there need for discovery, or what?

21          MR. HARDING:  Your Honor, it's the plaintiffs'

22   position that --

23          THE COURT:  Come to the lectern, please.

24          MR. HARDING:  I apologize.

25          THE COURT:  The court reporter can hear you better
```

Fraser v. Bureau of ATF - 02/08/2023

1   and so can I.

2           MR. HARDING:  Insofar as the parties came together in

3   a pretrial conference with the Court, and recognize that we

4   don't believe that there are material issues of fact and that

5   this is something --

6           THE COURT:  Are there any issues of fact that need to

7   be dealt with, developed, or put in the record at all?

8           MR. HARDING:  Outside of the pleadings, the

9   plaintiffs do not believe so, Your Honor.

10          THE COURT:  Do you share that view?

11          MR. CLENDENEN:  Yes, Your Honor.

12          THE COURT:  All right.  So the resolution of the

13  basic issues resolves both the summary judgment motion and the

14  motion to dismiss.

15          All right.  The motion to dismiss is filed first, so

16  I'll hear that.

17          MR. CLENDENEN:  Good morning.  May it please the

18  Court.  Michael Clendenen from the Department of Justice on

19  behalf of the defendants.

20          Plaintiffs in this action bring a facial

21  constitutional challenge to a public safety law that has been

22  on the books for over 50 years.  The Court should dismiss

23  plaintiffs' claims and enter a judgment on behalf of the

24  defendants.

25          First, plaintiffs have not met their burden of

Fraser v. Bureau of ATF - 02/08/2023

1  establishing they have standing because none of the plaintiffs

2  have said that their parents have refused to purchase a

3  handgun for them.

4      THE COURT:  What does that -- is that the dispositive

5  question on standing, is the failure of the complaint to

6  allege that their parents have not -- that they've not asked

7  their parents to buy a gun for them?  Is that where we are?

8  Is that right?

9      MR. CLENDENEN:  Your Honor, it is plaintiffs' burden

10 to prove they have standing, so the failure for them to plead,

11 you know, certain facts in the complaint would be dispositive.

12     THE COURT:  Well, I know that.  I'm asking you is the

13 issue that your standing position turns on is the absence of

14 an allegation in the complaint that they did not, none of the

15 plaintiffs, ask their parents to buy a gun for them from a

16 federally firearms licensed dealer?  Is that your position?

17     MR. CLENDENEN:  Your Honor --

18     THE COURT:  Yes or no?  Get your tongue around one of

19 those two words, and then you can tell me later what your

20 views are.  But I would like to hear what your answer is.

21     MR. CLENDENEN:  Yes, Your Honor.  I would say yes.

22 Really, it turns on what the Court considers is plaintiffs'

23 alleged injury here.  Our reading of the complaint is, really,

24 that the plaintiffs are complaining about not being able to

25 acquire or to possess a handgun.

1      THE COURT:  No, they're not talking about possession.

2  They're talking about purchasing it, as I understand the

3  complaint.  Where does it say "possession"?  Have I missed it?

4      MR. CLENDENEN:  Your Honor, they might not have used

5  the word "possession," but --

6      THE COURT:  Of course, the constitutional language is

7  keep and bear.  So keep connotes possession, I suppose.

8      MR. CLENDENEN:  Yes, Your Honor.

9      THE COURT:  But isn't the complaint against the

10  statute that prohibits the purchase, not a statute that

11  prohibits possession?

12      MR. CLENDENEN:  Well, even to the extent that the

13  plaintiffs allege --

14      THE COURT:  Is the answer to that yes or no?

15      MR. CLENDENEN:  I'm sorry, Your Honor.  What was

16  the --

17      THE COURT:  What is the yes or no answer to that?

18      MR. CLENDENEN:  To what question, Your Honor?

19      THE COURT:  Go right ahead.

20      MR. CLENDENEN:  I apologize.

21      THE COURT:  I really ask you, when I ask a question,

22  answer the question yes or no, and then -- or say it's not --

23  it's a question that's not answerable yes or no, and then if

24  you need to explain it, I'll be glad to hear your explanation.

25  But then I understand the framework on which we're working.

Fraser v. Bureau of ATF - 02/08/2023

1          MR. CLENDENEN:  Understood, Your Honor.

2          THE COURT:  All right.

3          MR. CLENDENEN:  Even to the extent that the

4   plaintiffs' alleged injury is an inability to purchase a

5   firearm, they still, under federal law, have the option to

6   have a parent purchase a firearm for them.  And they can even

7   use their own money, or they could purchase a secondhand

8   firearm -- a secondhand handgun from anyone who's not a

9   federally licensed firearm dealing, such as a dealer at a gun

10  show.

11         THE COURT:  Somebody on the street?

12         MR. CLENDENEN:  Somebody on the street, Your Honor?

13         THE COURT:  Is it among their faults here, as

14  respects injury in fact, is that they didn't allege that they

15  didn't try to go out on the street and buy it?

16         MR. CLENDENEN:  I'm sorry, I did not hear that, Your

17  Honor.  That they didn't allege what?

18         THE COURT:  Is it that they don't allege -- is among

19  their faults the failure to allege that they didn't go out on

20  the street and buy a gun from somebody on the street, or they

21  didn't try to do that?

22         MR. CLENDENEN:  In a way, yes, Your Honor.  I would

23  say that they didn't try to --

24         THE COURT:  So as I understand it now, it is the

25  position of the United States of America and the ATF that your

Fraser v. Bureau of ATF - 02/08/2023

```
 1   standing turns on your ability to allege, in part, that you

 2   haven't violated the federal law?

 3             MR. CLENDENEN:  No, Your Honor.

 4             THE COURT:  Are you encouraging people to go around

 5   Robin Hood's barn and say, "Well, I'm a parent, but I'm not

 6   going to tell you I'm giving this to my child.  I'm going to

 7   buy this and give it to my child"?  Is that your -- they can

 8   do that, and that keeps them from having injury according to

 9   the government; is that right?

10             MR. CLENDENEN:  Yes, Your Honor.  If a parent

11   purchased it from a federally licensed firearm dealer and

12   didn't tell the dealer that they were going to give it to

13   their child and then gave it to someone -- assuming that the

14   child is between the ages of 18 and 20, that would be allowed.

15             As far as purchasing something on the street, that

16   might violate some other provisions of federal law.  It

17   wouldn't violate the laws at issue here.

18             THE COURT:  Well, I know.  But you're saying -- your

19   real argument is that the -- the government's position is that

20   they didn't allege injury in fact, because there are other

21   alternatives to getting possession of guns that this class of

22   people has.  One of those options is to have it gifted to them

23   by the parent who buys it.  Another of those options is to buy

24   it at a gun show from a nonlicensed dealer.  Another is to buy

25   it on the street.  And they don't allege that they asked for a
```

Fraser v. Bureau of ATF - 02/08/2023

1  gift, they don't allege that they tried to buy it from a

2  dealer, and they don't allege they bought it from -- tried to

3  buy it on the street.  And the failure to make those

4  allegations deprives them of standing, as I understand it.  Is

5  that your position?

6       MR. CLENDENEN:  For the first two, yes, Your Honor.

7  We wouldn't say that they need to allege that they tried to

8  purchase it on the street, because I think that probably would

9  violate some law.  I'm not sure exactly --

10      THE COURT:  What would it violate?  What law would it

11 violate?

12      I have a shotgun and a friend is interested in a

13 12-gauge shotgun.  Can I sell that to him without -- I don't

14 have a license, and I'm not a dealer.  It's just going to be a

15 private sale.  I can do that, can't I?

16      MR. CLENDENEN:  Yes, Your Honor.

17      THE COURT:  I have a Glock 9-millimeter, and a Smith

18 & Wesson .45, and a Colt long barrel that came to me through

19 inheritance.  Can I sell those on the street to Mr. Hambrick,

20 or you, if you want to buy them?

21      MR. CLENDENEN:  You could as long as both parties are

22 residents of the same state, Your Honor, yes.

23      THE COURT:  Okay.  Well, I guess I couldn't if you

24 were felons either.

25      MR. CLENDENEN:  Correct, Your Honor.

Fraser v. Bureau of ATF - 02/08/2023

1        THE COURT:  Does that law apply in a private sale?

2  Am I obligated to find out if you're a felon before I sell it

3  to you?

4        MR. CLENDENEN:  Your Honor, it would be unlawful for

5  the felon to acquire the firearm.

6        THE COURT:  Right.

7        MR. CLENDENEN:  I confess I'm not really sure if a

8  seller has to go through any sort of hoops to verify that the

9  person they're selling to, if it's just a, you know,

10  one-to-one transaction like that, if the purchasee is a felon.

11        THE COURT:  Well, let's get back to -- where does the

12  theory come from that it's okay -- that a parent can buy a gun

13  from a dealer, federal firearms dealer and give it to the

14  child, and that's okay?  And they then -- that's the way that

15  people 18 to 20 ought to be getting guns, because of parental

16  consent, where does that come from?

17        MR. CLENDENEN:  Your Honor, there's several places in

18  the legislative history where that's made explicit.  And then

19  also the ATF opinion letter that we attached as Exhibit A to

20  our motions specifies that that is allowed.

21        THE COURT:  Well, where in the legislative history?

22        MR. CLENDENEN:  I'm sorry, Your Honor, did you want

23  me to cite exactly where?

24        THE COURT:  Where are we talking about and what does

25  it say?

1          MR. CLENDENEN:  In the legislative history?

2          THE COURT:  What legislative history are you talking

3    about, and what does that legislative history say?

4          MR. CLENDENEN:  So, for example, a statement of

5    Senator Dodd at 114 Congressional Record 12309 says that, "A

6    minor or juvenile would not be restricted from owning" --

7          THE REPORTER:  I'm sorry.

8          THE COURT:  You need to, A, slow down and be clear.

9    When you're reading, you tend to go fast; all of us do.

10         MR. CLENDENEN:  Yes, Your Honor.

11         "A minor or juvenile would not be restricted from

12   owning or learning the proper usage of a firearm, since any

13   firearm which his parent or guardian desired him to have could

14   be obtained for the minor or juvenile by the parent or

15   guardian.  At the most, the provision could cause minor

16   inconveniences to certain youngsters who are mature,

17   law-abiding, and responsible by requiring that a parent or

18   guardian over 21 years of age make a handgun purchase for any

19   person under 21."

20         THE COURT:  Now, is it against the law for a federal

21   firearms dealer to sell to a person having reason to believe

22   the person is 21 -- I mean under 21?

23         MR. CLENDENEN:  Yes, Your Honor.

24         THE COURT:  That federal firearms dealer can be

25   prosecuted for doing that?  I'm a dealer, and I know that

Fraser v. Bureau of ATF - 02/08/2023

1  you're buying a gun, and I know that you're under 21, or have
2  reason to believe.  If I sell it to you anyway, that's a
3  criminal offense, isn't it?
4          MR. CLENDENEN:  It would be a criminal offense, Your
5  Honor.  And, also, the dealers have to -- or, I'm sorry, I'm
6  thinking of something else.  But if it's a sale not in person,
7  if it's over the mail or anything like that, then the seller
8  has to get, basically, an affidavit saying that the purchaser
9  is over the age of 21, so yes.
10         THE COURT:  So my 18-year-old who can vote, be
11 drafted, do a lot of other things, comes to me and says, "Dad,
12 here's $800.  Go over there and get me that handgun."  I go
13 over and get the handgun, and I don't tell the person -- the
14 person looks at me and says, "Well, there's no way you're
15 under 21," which would be an easy look, and he doesn't ask.
16 So I give him my $800, I get the gun, I walk out the door, and
17 I give it to my son or my daughter.  That's okay, right?
18         MR. CLENDENEN:  That is okay, Your Honor.  And that's
19 the exact --
20         THE COURT:  In what world is that okay?  Why is
21 that -- why isn't that an offense against the fundamental
22 principle that one cannot do indirectly what you cannot do
23 directly?  You are telling me that the position of the ATF is
24 that people are to engage in subterfuge to get these young --
25 these 18-year-olds guns.  That's what you're saying.

1      MR. CLENDENEN:  Your Honor, it's not subterfuge in

2  that situation.  In fact, if the father wanted to just tell

3  the purchaser, "Hey, I'm buying this, and I'm going to give it

4  to my 19-year-old son," that would still be fine.

5      The whole point of this statute --

6      THE COURT:  He doesn't.

7      MR. CLENDENEN:  It doesn't matter if the father tells

8  the firearm dealer that it's for the 20-year-old or

9  19-year-old.

10      THE COURT:  Where did Senator Dodd get this idea?  Is

11  there anything in the record that tells us what put that in

12  his mind?

13      MR. CLENDENEN:  The legislative history is very clear

14  that the whole point of the statute is to prevent the

15  clandestine purchase of firearms by minors under the age of

16  21.

17      THE COURT:  What's more clandestine than the

18  situation I just related to you?  That's a clandestine

19  purchase if ever one there was.

20      MR. CLENDENEN:  Well, essentially --

21      THE COURT:  I have gone to that firearms dealer with

22  my son's money in hand, my daughter's money in hand, I am

23  buying it, I don't tell him what I'm doing with it, and I walk

24  out the door and put it in the hands of my 18-year-old who's

25  sitting in my car.

Fraser v. Bureau of ATF - 02/08/2023

1          MR. CLENDENEN:  Your Honor --

2          THE COURT:  Is there anything more clandestine than

3    that that occurs?

4          MR. CLENDENEN:  Your Honor, the real concern is

5    someone buying it without their parents' permission,

6    basically.

7          THE COURT:  What's their parents' permission got to

8    do with it at all, and where does that notion come from?

9    18-year-olds -- when was this statute passed?

10         MR. CLENDENEN:  In 1968, Your Honor.

11         THE COURT:  And in 1968, what was the law respecting

12   the voting age for 18-year-olds?

13         MR. CLENDENEN:  I believe in 1968 it was still 21 in

14   most states, if not every state.

15         THE COURT:  What about serving in the armed forces?

16         MR. CLENDENEN:  I believe -- well, either 18 or 17.

17   I think the rules might be 17-year-olds can join with

18   permission of their parents.

19         THE COURT:  At 18, you can join on your own, right?

20         MR. CLENDENEN:  Yes, Your Honor.

21         THE COURT:  Yeah?  Right?  Okay.  You need to say

22   something because she's taking it down.

23         MR. CLENDENEN:  Sorry.  Yes, Your Honor.

24         THE COURT:  So that's a -- so where did -- does the

25   legislative history show where Senator Dodd came up with this

1   statement that you rely on?

2          MR. CLENDENEN:  Your Honor, as far as that specific

3   portion, I think it -- it goes to, basically, the purpose of

4   the statute, which is to reduce this, at the time, spike in

5   crime amongst young people under the age of 21.

6          THE COURT:  How does that do that if this -- if the

7   person can go to a licensed firearm dealer in a gun show and

8   get the gun?  My daughter is 18 and she wants a Glock.  She

9   goes to the firearms show.  She doesn't have to have my

10  permission to go.  She doesn't have to have my permission to

11  buy.  She has her own money and she buys it.  How is that

12  purpose of the statute aided by allowing that kind of

13  transaction?

14         MR. CLENDENEN:  So, Your Honor, there was a great

15  deal of studies put into the legislative record that showed

16  that there was a large amount of crime being committed by

17  people between the age of 18 and 20 who had obtained a firearm

18  from federally licensed firearm dealers without their parents'

19  permission.  And the statute was designed to eliminate that

20  possibility by at least requiring the parent to understand

21  what was going on and make the determination if their child

22  was mature enough to have a firearm.

23         THE COURT:  So where are those studies referred to,

24  that the crime was being committed by people who bought guns

25  from federally licensed firearm dealers?  I didn't see a lot

Fraser v. Bureau of ATF - 02/08/2023

1   of reference to the fact that you just cited, that is, that

2   the violent crime and use of guns had been traced to people

3   who had bought from federally firearms dealers.  But you help

4   me out; I would like to read that again, read that section.

5              MR. CLENDENEN:  Your Honor, I'm not sure exactly

6   where --

7              THE DEFENDANT:  What study is it or what studies?

8              MR. CLENDENEN:  Your Honor, I'm not sure exactly

9   where it ties it to federally licensed firearm dealers.

10             THE COURT:  But you did.  You said that was the

11  purpose of the statute.  There's a lot of discussion about

12  young people committing crime and young people being arrested,

13  but there's precious little about where the guns came from,

14  that I found.  And you just said, well, this is -- it was the

15  fact that these crimes were being committed by people who had

16  bought from federally licensed firearm dealers.  And if you

17  don't know that, then I want you to find it and give me the

18  precise citation of the study, or studies, that say that, if

19  you would do that.

20             Mr. Hambrick, if you have something to help him, give

21  it to him.  It's all right.

22             MR. HAMBRICK:  Thank you, Your Honor.

23             MR. CLENDENEN:  So part of the Public Law Number --

24             THE COURT:  Where are you?  Is it something you cited

25  to me?

1          MR. CLENDENEN:  It is one we cited, yes, Your Honor.

2          THE COURT:  What document is it in?

3          MR. CLENDENEN:  From our memo in support of the

4  motion to dismiss.

5          THE COURT:  ECF-22.  What page?

6          MR. CLENDENEN:  Bottom of page 3, top of page 4.

7          THE COURT:  3 and 4.

8          MR. CLENDENEN:  We quoted from the Public Law Number

9  90-351.

10          THE COURT:  That's a conclusion.  But I asked you,

11  you said there were studies showing that, and that's what I

12  want to know, is where those studies are.  They don't cite any

13  studies there.

14          MR. CLENDENEN:  So the citation right before that,

15  the subcommittee hearing statement of Sheldon S. Cohen, it

16  says, "Almost all of these firearms are put into the hands of

17  juveniles by importers, manufacturers, and dealers who operate

18  under licenses issued by the federal government."

19          THE COURT:  And what are "these firearms"?

20          MR. CLENDENEN:  Handguns, Your Honor.

21          THE COURT:  It says that, huh?  It doesn't say that.

22  I mean, okay.  All right.  I think I understand your point.

23  Go ahead.

24          MR. CLENDENEN:  So, Your Honor, on the merits

25  plaintiffs' claim also fails for a number of reasons.  Under

1   *Heller*, any condition or qualification on the commercial sale

2   of firearms is considered presumptively valid.  Also, as a

3   historical matter, at the time the Second Amendment was

4   ratified, the law of every state treated individuals under the

5   age of 21 as a minor, and that was true up through the 1970s.

6   And the majority of states throughout this Nation's history

7   have enacted restrictions on the purchase or possession of

8   firearms by minors.

9           THE COURT:  What's that?  Throughout what history?

10          MR. CLENDENEN:  So we included, I believe, Exhibit B,

11  a chart of all the state laws, basically throughout the

12  history of the United States that --

13          THE COURT:  You're asking me to consider laws enacted

14  in the early 1900s and the late 1800s and the middle 1900s,

15  all of those, right?

16          MR. CLENDENEN:  That is correct, Your Honor.

17          THE COURT:  How can that be done under *Bruen*?

18          MR. CLENDENEN:  So under both *Bruen* and *Heller*, the

19  Supreme Court did look not only to the laws as they were in

20  1790 but also to 19th century law.  In *Heller*, I believe the

21  Court said that --

22          THE COURT:  Even if you looked to the 19th century

23  law, you couldn't consider anything that happened in the

24  1900s.

25          MR. CLENDENEN:  It does become attenuated as the

Fraser v. Bureau of ATF - 02/08/2023

1  relevance goes on, yes, Your Honor.

2        THE COURT:  Aren't they so far removed they're

3  utterly attenuated and of no value?

4        MR. CLENDENEN:  Your Honor, I wouldn't say of no

5  value, but it is certainly less value as time goes on.

6        THE COURT:  How about the Supreme Court?  What do you

7  think that opinion said about how valuable current things in

8  the 1900s were?

9        MR. CLENDENEN:  In *Heller*, Your Honor, the court said

10 that 19th century cases --

11       THE COURT:  19th century is the 1800s.

12       MR. CLENDENEN:  Oh, I'm sorry.  1900s case law.  It

13 is definitely less relevant, Your Honor.

14       THE COURT:  Okay.  Well, even -- but *Bruen* is the

15 case that gives us the exact formula we're to follow, and it's

16 very clear what we are to do; whether you agree with it or I

17 agree with it is immaterial.  We are to look at the time at

18 the founding, and, basically, they're telling you you can go a

19 few years before and a few years after and that's where you

20 look.  And if you are considering a state law analysis so that

21 you have to look at when the Fourteenth Amendment made the

22 first ten amendments applicable to the states, then you can go

23 into the history that is pertinent up to and a little after

24 the enactment of the Fourteenth Amendment.

25       So we're not dealing with a state law.  We're dealing

Fraser v. Bureau of ATF - 02/08/2023

1  with a federal law.  And as I understand it, our -- the time

2  period that we are to look at as driving the decision is a

3  time before the Second Amendment was enacted and a reasonable

4  time after that.  Do you agree that that's what *Bruen* tells us

5  to look at first and foremost?

6         MR. CLENDENEN:  Yes, Your Honor, in that the relevant

7  time period -- the relevant question is, what was the

8  historical understanding when the Second Amendment was

9  ratified?  However --

10        THE COURT:  Which was when?

11        MR. CLENDENEN:  1791, Your Honor.  However, as the

12 Supreme Court said in *Heller*, subsequent state laws and case

13 law into the 19th century, at least, is a critical tool of

14 understanding what the understanding was in 1791, because the

15 original understanding of what the Second Amendment meant

16 isn't quickly forgotten, basically.

17        So if states were passing this sort of regulation in

18 the 19th century, it's presumed that they weren't doing so

19 in violation of the Second Amendment, certainly not when you

20 have as many states passing this kind of restriction as we

21 have here, as opposed to just one one-off regulation here and

22 there.

23        But to the point that I think Your Honor is getting

24 at is that there were no laws exactly on point in 1791, where

25 a state, you know, set 21 as the minimum age for purchase or

Fraser v. Bureau of ATF - 02/08/2023

1    possession of a firearm.

2            THE COURT:  Or before or after.

3            MR. CLENDENEN:  So two points --

4            THE COURT:  Over what period of time?

5            MR. CLENDENEN:  Yes, Your Honor.

6            THE COURT:  There were none before 1791.

7            MR. CLENDENEN:  None that said --

8            THE COURT:  When did they come in after 1791?  What's

9    the first --

10           MR. CLENDENEN:  I believe the mid-1800s.

11           THE COURT:  So that would be 50 to 60 years after the

12   amendment was adopted, right?

13           MR. CLENDENEN:  Correct, Your Honor.  But I should

14   also note that it's true there were no laws that set 21 as the

15   minimum age in 1971.  But there were also no laws up to, at

16   least, 1850 or so that set 18 as the minimum age or that set

17   any minimum age.

18           THE COURT:  Set what now?

19           MR. CLENDENEN:  There were no state laws that set a

20   minimum age for purchase or possession of a firearm at any

21   number up until the 1850s or so.  So if we take this -- this

22   understanding to its logical extreme, then it would mean that

23   anyone, regardless of age, has a Second Amendment right to

24   purchase or possess handguns, even a six-year-old, because

25   there were no laws in 1791 that set 18 as the minimum age or

1  set 16 as a minimum age.  So it must be that there's some sort

2  of minimum age because, otherwise, it would be an absurd

3  result.

4       So because the age of majority in 1791 was 21 for

5  general purposes, it should be assumed that states and the

6  federal government can set any number, at least up to 21, as

7  the minimum age.  That's consistent with what the historical

8  understanding of the Constitution would have been at that

9  time.

10       THE COURT:  All right.  What were the -- as I

11  understand it, in 1791, the places -- the states had the

12  requirement if you were 18, you had to be in the militia.

13       MR. CLENDENEN:  A couple things, Your Honor.

14       THE COURT:  And also that you had to provide your own

15  armaments if you were going to be in the militia.  So what's

16  the import of that -- your paper doesn't even dispute that now

17  that you've submitted that state law is applicable.

18       MR. CLENDENEN:  So, Your Honor, actually, in 1789,

19  when the Constitution was ratified, and in 1791, when the

20  Second Amendment was ratified, a majority of states, I believe

21  11 out of 14, actually set 16 as the age for militia service,

22  not 18.

23       THE COURT:  But the 16 was set during the war.  16

24  was set -- a year age limit was set because they didn't have

25  enough people to fight the British.  That's what happened.

Fraser v. Bureau of ATF - 02/08/2023

1  And even the import of Hessians wasn't sufficient, so they

2  went down and they dropped the age.  Before then, it had been

3  18.

4         MR. CLENDENEN:  The age before --

5         THE COURT:  Right?

6         MR. CLENDENEN:  Your Honor, the age limit before

7  between 1791 varied a bit.  So some states had 16 as the

8  minimum age all along; some states had 18 and then went down

9  to 16, or back and forth.  It was later, mostly in the 1790s,

10 that states moved to 18 as the minimum age for militia

11 service.

12        THE COURT:  What year?

13        MR. CLENDENEN:  Later in the 1790s, after the Second

14 Amendment was ratified.  But when the Second Amendment was

15 ratified, 16 was --

16        THE COURT:  What did they need back then?  What was

17 going on back then?  What did they need?

18        MR. CLENDENEN:  I'm sorry, Your Honor, I don't --

19        THE COURT:  They needed to raise the standing militia

20 because the previous militias had been kind of eradicated in

21 the war, or decimated.  They needed to get some new blood in,

22 didn't they?  So that's why they were focusing on it.  And

23 they all said, "Hey, 18 is the age in which you have to serve

24 in the militia, and, by the way, you have to buy your own arms

25 or have them provided to you.  We're not arming you.  We don't

Fraser v. Bureau of ATF - 02/08/2023

1   have the money to do that."

2           MR. CLENDENEN:  So a number of states, Your Honor,

3   specifically had statutes that said that the person's parents,

4   if they were under the age of 21, had to furnish --

5           THE COURT:  Provide.

6           MR. CLENDENEN:  -- a firearm, which we think is

7   totally consistent with the challenged law at issue here,

8   which is that there is parental supervision for anyone under

9   the age of 21, even if they're serving in the militia.

10          But the bigger point that I want to make here is that

11  this question of militia service is really not relevant to the

12  challenge here.  Under *Heller*, the Supreme Court said that

13  there's an individual right to keep and bear arms primarily

14  for self-defense, and that that's wholly separate and apart

15  from the collective right to bear arms as part of a militia.

16          The plaintiffs here don't claim that they're part of

17  a militia or that they want to be.  So, presumably, they're

18  seeking this declaration of a Second Amendment right pursuant

19  to their individual right to --

20          THE COURT:  No, but you look -- they're suggesting,

21  as I understand it, that you look at the requirement for the

22  age of entry into the militia and the requirement to bear arms

23  as informing the purchase, the purchase, not that they're

24  saying that the right arises from.

25          MR. CLENDENEN:  Your Honor, that is plaintiffs'

1   argument.  That is plaintiffs' argument.  And the point we're

2   making is that it's really confusing two different things.

3   The status of militia laws has to do with service in the

4   militia and the collective right as part of a militia, and if

5   what they're asking for is part of their individual right,

6   then the more appropriate historical inquiry is just to see

7   what the state laws have done with regards to an individual

8   purchase of a firearm, not as part of a militia service.

9           THE COURT:  There were none.  State laws did not

10  prohibit anything in the way of purchasing in the, say, 10

11  years before 1791 or the 10 years after, right?

12          MR. CLENDENEN:  It is true, Your Honor, that in 1791,

13  and thereabouts, there were no state laws specifically that

14  set a minimum age for purchasing a firearm.

15          THE COURT:  The first ones came, you said a minute

16  ago, 50 to 60 years after the amendment was ratified, right?

17          MR. CLENDENEN:  That is correct, Your Honor.  But,

18  again, that would -- the plaintiffs' argument is, basically,

19  that that fact alone, you know, sets what the standard for the

20  Second Amendment is.  That would mean that it's not possible

21  for any state to ever set a minimum age, even 18 or a lower

22  number, for purchasing a firearm.  So, you know, a

23  six-year-old would have an unrestricted Second Amendment right

24  to go into a firearms store and purchase a handgun under that

25  theory, basically.  There's no principled way to set the line

Fraser v. Bureau of ATF - 02/08/2023

1 | at 18 as opposed to 21 or some lower number.

2 | As I understand plaintiffs' argument, they're

3 | basically saying that the age of majority now is 18 in most

4 | states, and that that, therefore, shifts where the Second

5 | Amendment right needs to go, which is exactly the opposite of

6 | what *Heller* and *Bruen* say to do.  As far as this originalist

7 | analysis goes, the Court is supposed to look at what the laws

8 | of 1791 were, so it's irrelevant that states after the 1970s

9 | have lowered the age of majority from 21 to 18.

10 | THE COURT:  Why do we look at the age of majority?

11 | Why do we even look at that?

12 | MR. CLENDENEN:  So, Your Honor, the age of majority

13 | basically sets where most rights begin.  In 1791, age of

14 | majority is 21, so you had to be 21 to vote.  In most places,

15 | I believe, you know, entering a contract you had to be 21.

16 | All these various civic rights were established at 21.

17 | So, essentially, where the Constitution sets a right

18 | and doesn't say that it vests at a certain age, it should be

19 | assumed that the age of majority is where that right vests, at

20 | least as far as this originalist analysis goes, which is what

21 | the Supreme Court has said to do with regards to the Second

22 | Amendment.

23 | THE COURT:  All right.  And your case for that

24 | proposition is what?  I didn't find anything that actually

25 | said that.  Do you have something, or that I missed?

1          MR. CLENDENEN:  As far as a case that encapsulates

2    all of that, Your Honor --

3          THE COURT:  What's that?

4          MR. CLENDENEN:  As far as a case that encapsulates

5    all of that, Your Honor --

6          THE COURT:  Just say there isn't any or give me the

7    name of it, one or the other.

8          MR. CLENDENEN:  The closest thing I would say, Your

9    Honor, is the Fifth Circuit's decision in the *NRA* case --

10         THE REPORTER:  I'm sorry, the what?

11         MR. CLENDENEN:  *NRA*, *National Rifle Association* case.

12         THE COURT:  The pre*Bruen* case.

13         MR. CLENDENEN:  It is a pre*Bruen* case, Your Honor,

14   but it does the same historical analysis that *Bruen* says to

15   do.

16         THE COURT:  Did it, really?  It didn't quite -- to my

17   knowledge, the *Bruen* formulation, at least insofar as an

18   instruction about how to proceed, is the first of its kind.

19   It first appeared in *Bruen*, not that the different points had

20   not appeared in various and sundry discussions about how to

21   proceed.  Is that correct, that *Bruen* gives us an entirely new

22   framework?

23         MR. CLENDENEN:  Your Honor, an entirely new

24   framework, under *Heller*, the Supreme Court did say to do a

25   historical analysis.  In the time period between *Heller* and

Fraser v. Bureau of ATF - 02/08/2023

1  *Bruen*, what most circuits did was they set up this two-step

2  analysis where step one was a historical analysis, and then

3  step two was if, basically, the regulation was something that

4  would have been covered by the Second Amendment at the

5  founding, then they did some sort of means-end scrutiny, other

6  intermediate scrutiny, or strict scrutiny to see who would,

7  nonetheless, pass.

8          What the Fifth Circuit did -- sorry, *Bruen* says just

9  opposite of step one.  If it falls within the scope of things

10 that were protected under the Second Amendment at the

11 founding, then it's invalid; and if it falls outside of that,

12 then the government can regulate it.

13         What the Fifth Circuit did in *NRA* was they did the

14 step one analysis, they went through the whole historical

15 understanding, everything that I've said here as far as age of

16 majority goes --

17         THE COURT:  Right.  But they didn't look at the

18 militia laws much, did they?

19         MR. CLENDENEN:  They didn't note about the militia

20 laws, Your Honor, but they --

21         THE COURT:  They didn't know about them?

22         MR. CLENDENEN:  They did, Your Honor; they said a few

23 things.  First, they said that, you know, basically, all the

24 points I'm making, which is that it's not really relevant with

25 regards to this nonmilitia right; also, the fact that the

Fraser v. Bureau of ATF - 02/08/2023

1   militia laws at 1791 set 16 as the minimum age in most states

2   proved too much; that it would basically mean that 16 should

3   be the cutoff and not 18, even though the plaintiffs in that

4   case and in this case have said they're only challenging laws

5   that, you know, set a number higher than 18 as the minimum.

6          But the *NRA* decision in the Fifth Circuit, it did go

7   through all the historical analysis.  It did, then, go on to

8   step two and say, you know, even if it weren't -- even it were

9   historically not allowed, it would still -- you know, the

10  government would still win under the step --

11         THE COURT:  You're saying you're relying on the

12  historical analysis as performed in the *NRA* case by the Fifth

13  Circuit?

14         MR. CLENDENEN:  Yes, Your Honor.

15         THE COURT:  All right.

16         MR. CLENDENEN:  And just to note also --

17         THE COURT:  What about the people argument that

18  you-all make?  What's that all about?  Do you want to help me

19  with that a little bit?  Who are "the people"?

20         MR. CLENDENEN:  So, Your Honor, we didn't include any

21  argument about the texts, specifically the phrasing of "the

22  people," ourselves.

23         THE COURT:  You're not pushing that point?

24         MR. CLENDENEN:  We're not pushing it, Your Honor.  I

25  believe one of the amicus --

Fraser v. Bureau of ATF - 02/08/2023

1          THE COURT:  You believe the plaintiffs are within

2   "the people"?

3          MR. CLENDENEN:  Your Honor --

4          THE COURT:  Well, you didn't make the argument.  Some

5   of the other cases that you cite did.  But you're not pushing

6   it.  You're not even making the argument.  So I'm assuming

7   that you are taking the view that "the people" in the

8   Second -- as used in the Second Amendment includes the

9   plaintiffs, would include the plaintiffs, yes or no?

10          MR. CLENDENEN:  Your Honor, we haven't taken a

11   position on it.  If we were forced to take a position, we

12   would probably make the argument that the use of the words

13   "the people" in the Second Amendment specifically refers to

14   the political community at the time, which was people who were

15   of voting age, so 21-year-olds and older.  So at least --

16          THE COURT:  You would take the position that "the

17   people" does not include women, because that wasn't in the

18   political community at the time; is that right?

19          MR. CLENDENEN:  Again, Your Honor, we haven't made

20   that argument, but if we had to, then, yes, we would say that.

21          THE COURT:  So you're taking the position that --

22   because you have to.  You have to deal with it.  I have to

23   deal with it, so you have to take a position.  You can't

24   change your -- if you're not going -- you know, you're sort of

25   are saying, "We're not making the argument," so I didn't

Fraser v. Bureau of ATF - 02/08/2023

1   consider it to be an issue.  But the cases you cite consider

2   it to be an issue.  Now you say, "Well, if we have to take a

3   position, then what we will do is say that 'the people' means

4   the political community."  And that then, in turn, means that

5   you are taking the position that no women are included in "the

6   people"; is that right?  Do you really want to say that?  If

7   you do, say it.

8          MR. CLENDENEN:  No, Your Honor, at least --

9          THE COURT:  No black citizens are included in "the

10  people," right, under that interpretation, the political

11  community at the time?

12         MR. CLENDENEN:  At the very least, Your Honor, the

13  Fourteenth Amendment would have changed that.

14         THE COURT:  No, it wouldn't.  The Fourteenth

15  Amendment doesn't tell us what "the people" was -- were at the

16  time of the founding.

17         Now, are you saying that the analysis of "the people"

18  is made at a time different than the founding?  Because

19  earlier you told me that the political community at the

20  founding was the measure of "the people."  And if that's the

21  case, then the Fourteenth Amendment would not have changed

22  anything, because the founding -- the Fourteenth Amendment

23  didn't come until well after the founding.  And at the time,

24  the political -- of the founding, the political community

25  included no women, it included no blacks.  Who else did it not

Fraser v. Bureau of ATF - 02/08/2023

1    include?

2            MR. CLENDENEN:  I'm not sure, Your Honor.

3            THE COURT:  At a bare minimum, that's a fair segment

4    of the population of the United States who are not protected

5    by the Second Amendment issue here, and they are people who I

6    believe have been accorded significant rights under our laws

7    since that time.  Really, don't I judge "the people" by what,

8    say, in *Heller*, they did?  They kind of just said, "Okay,

9    you're part of 'the people.'"

10           MR. CLENDENEN:  Your Honor, I don't think *Heller*

11   specifically says anything about whether women or persons of

12   different races --

13           THE COURT:  No, it doesn't say one way or the other.

14   It just says, "We're looking at you today as part of 'the

15   people.'"  It wasn't an issue in *Heller*, that they -- a bar in

16   *Heller*.

17           So I just need to know, does the government want me

18   to look at what "the people" meant at the founding or at some

19   other time?  If some other time, what is it?  You're telling

20   me the founding, and that has consequences, obviously.  Every

21   position or argument we make has some kind of consequence.

22           MR. CLENDENEN:  Your Honor, I'm not sure.  I would

23   say that the Fifth Amendment due process clause, as the

24   plaintiffs have made this argument, does include an equal

25   protection component the Supreme Court has found, and at the

Fraser v. Bureau of ATF - 02/08/2023

1    very least, that would apply to women and racial minorities.

2    So if a state were to -- or if the federal government were to

3    try to differentiate, you know, a firearms law today on the

4    grounds of men versus women --

5            THE COURT:  Basically, I can consider the plaintiffs

6    as among "the people," then.

7            MR. CLENDENEN:  No, Your Honor, because their issue

8    is that they're under the age of 21.  What we're saying is

9    that that doesn't fall within "the people" under the Second

10   Amendment.

11           THE COURT:  I thought you weren't saying that.  I

12   thought you were saying they were people, but they were people

13   who couldn't bear arms, purchase arms.  There's a big

14   difference between whether they're people and whether those

15   people, whoever they may be, can purchase arms.

16           MR. CLENDENEN:  Well, Your Honor, what we're saying

17   is that it's consistent with the historical understanding in

18   1791 that persons under the age of 21 would not have this

19   right to bear arms that the Second Amendment has -- that

20   *Heller* said.

21           THE COURT:  Okay.  But in your brief, you are not

22   making the argument that the plaintiffs are not people.

23           MR. CLENDENEN:  We did not make that argument in the

24   briefs, no, Your Honor.

25           THE COURT:  I don't think you can make it now.

1          All right.  Go ahead.  I interrupted you.

2          MR. CLENDENEN:  Regarding plaintiffs' equal

3  protection claim, the Supreme Court has held that age is not a

4  suspect class and, therefore, the law is valid so long as --

5  under the equal protection doctrine is valid so long as it

6  passes rational basis review, which it easily does here.  As

7  the legislative history spells out, in 1968 there was

8  significant findings that persons under the age of 21 --

9          THE COURT:  When was the decision that age is not a

10  suspect classification?

11          MR. CLENDENEN:  When was it, Your Honor?

12          THE COURT:  Uh-huh.

13          MR. CLENDENEN:  It was the *Kimel* decision, which I

14  think was around 2000.  I can get the exact year.  It's a 2000

15  case, Your Honor.

16          THE COURT:  When was the ADA [sic] passed?

17          MR. CLENDENEN:  I believe the ADA was passed in the

18  early '90s, Your Honor.  The plaintiffs aren't making an ADA

19  claim here.

20          THE COURT:  Well, I know.  Generally, your view is

21  that the federal government or anybody can discriminate

22  against people on the basis of age and it's okay, as long as

23  you can find some reasonable rational basis for doing it?

24          MR. CLENDENEN:  As far as an equal protection

25  analysis goes, Your Honor, it is okay so long as there's a

Fraser v. Bureau of ATF - 02/08/2023

1   rational basis.  There might be other laws --

2        THE COURT:  I can go to a restaurant and they can

3   say, "Old man, you can't come in, and the reason you can't

4   come in is because we are not comfortable having old people

5   who are prone to falling in our restaurant.  We don't have

6   liability insurance for that"?  That's a very rational basis,

7   isn't it?

8        MR. CLENDENEN:  So, Your Honor --

9        THE COURT:  Can they do that to me?

10       MR. CLENDENEN:  That would be a private establishment

11  and the Equal Protection Clause of the Fourteenth Amendment or

12  of the Fifth Amendment wouldn't apply.

13       THE COURT:  Okay.  Now let's take it to the cafeteria

14  in the courthouse.  Cafeteria in the courthouse -- so the

15  private restaurant can do that, right?  Now let's take it to

16  the cafeteria downstairs, when it used to serve food instead

17  of being a Horn & Hardart.  Can they say, "Look, old boy, you

18  can't come in because I notice you have a cane and, really, we

19  don't want you in here"?

20       MR. CLENDENEN:  Your Honor, it likely would violate

21  some other law, perhaps the ADA --

22       THE COURT:  No, the ADA is what?  It's the age

23  discrimination in what act?

24       MR. CLENDENEN:  Oh, the ADEA?  I'm sorry, Your Honor,

25  I thought you said the ADA.  Your Honor, I confess that I'm

Fraser v. Bureau of ATF - 02/08/2023

1   not really an expert in this area of federal law --

2          THE COURT:  It wouldn't be a Fifth Amendment

3   violation.  It would exist not because -- if there was a right

4   under the ADA or the ADEA, it would exist by virtue of

5   statute.  It wouldn't -- I wouldn't have a Fifth Amendment

6   claim as Count Two to my complaint alleging Count One as a

7   violation of one or both of those statutes.

8          MR. CLENDENEN:  That's correct, Your Honor, as long

9   as rational basis would be satisfied, which is a very low bar,

10  as the Court has surmised.

11         THE COURT:  Who has the burden of proving what here?

12         MR. CLENDENEN:  For an Equal Protection Clause

13  violation, Your Honor?

14         THE COURT:  No.  No.  Let's leave equal protection

15  behind.

16         MR. CLENDENEN:  Okay.  On the Second Amendment

17  claims, Your Honor, because *Bruen* is so new, it's a little

18  unclear.

19         THE COURT:  What's that?

20         MR. CLENDENEN:  So *Bruen* is so new, Your Honor, it's

21  a little unclear.  But in *Heller*, the Supreme Court did say

22  that a condition or qualification on the commercial sale of

23  firearms is presumptively valid.  And *Bruen* didn't

24  specifically say that it was overruling that part of *Heller*,

25  so under that -- at least under that presumption, we would say

1  that the plaintiffs have the burden of showing that this is,

2  you know, something the Second Amendment would cover.

3         As a general matter, for things that aren't

4  presumptively valid under that section of *Heller*, it would

5  ordinarily be the government's burden to show some historical

6  analogue to the restrictions at issue.

7         THE COURT:  And the historical analogue that you have

8  to show is what?

9         MR. CLENDENEN:  Your Honor, in *Bruen* and *Heller*, the

10  Court said that it doesn't have to be an exact match, just

11  analogous.

12        THE COURT:  *Bruen* holds that if the Second

13  Amendment's plain text covers an individual's conduct, then

14  you do the next look.  And if it does, then the Constitution

15  presumptively protects that conduct.  If the conduct is

16  presumptively protected, then the government must justify its

17  regulations demonstrating that it's consistent with the

18  Nation's historical tradition of firearms regulation.  Isn't

19  that where we are?

20        MR. CLENDENEN:  Yes, Your Honor.

21        THE COURT:  So they have to show that it is -- that

22  the plain text, according to *Bruen*, covers an individual's

23  conduct, right?

24        MR. CLENDENEN:  Yes, Your Honor.

25        THE COURT:  Well, they don't make the argument that

1   the plain text covers it, right?

2          MR. CLENDENEN:  Not in the briefing that I saw, no,

3   Your Honor.  I mean --

4          THE COURT:  And then so what rule applies when the

5   plain text doesn't cover the conduct as to the burden, who's

6   got what burden?  We're in a situation where I think both of

7   you agree the plain text doesn't cover the conduct.

8          MR. CLENDENEN:  Yes, Your Honor.

9          THE COURT:  So what happens then?  Who's got what

10  burden?

11         MR. CLENDENEN:  Your Honor, I'm not sure.  I don't

12  think I have that portion of *Bruen* right in front of me, but

13  it might just be that if the plain text doesn't cover it, then

14  that's the end of the matter and the government's regulation

15  is permissible.

16         THE COURT:  So is your view that you never get into

17  this historical analysis until -- unless the Second

18  Amendment's plain text covers an individual's conduct and

19  thereby protects that conduct presumptively?  And if it is

20  presumptively protected, then the government has to justify

21  the regulation by demonstrating its consistency with the

22  Nation's historical tradition of firearm regulation.  I didn't

23  see all that argument made in your paper.  I'm a little

24  confused about who you think has what burden.  Can you help

25  me?

1        MR. CLENDENEN:  I'm honestly not sure, Your Honor.

2        THE COURT:  Well, maybe you can think about it.  Is

3   there any other point you would like to make?

4        MR. CLENDENEN:  The other point that I was going to

5   make, not on that, Your Honor, is that once -- if the Court

6   does do the historical analysis -- sorry.

7        THE COURT:  *Bruen* also says the burden is on the

8   government to "affirmatively prove that its firearms

9   regulation is part of the historical tradition that delimits

10  the outer bounds of the right to keep and bear arms."  Do you

11  agree that that's correct?

12       MR. CLENDENEN:  Yes, Your Honor.  The Court also

13  said, "Even if a modern-day regulation is not a dead ringer

14  for historical precursors, it still may be analogous enough to

15  pass constitutional muster."

16       THE COURT:  So the burden here, then, is on the

17  government to affirmatively prove that the firearms

18  regulations at issue here and the statute is part of the

19  historical tradition that delimits the outer bounds of the

20  right to keep and bear arms; is that right?

21       MR. CLENDENEN:  Only if the Court --

22       THE COURT:  You said yes.

23       MR. CLENDENEN:  So, Your Honor, I will double-check.

24  If the plain text does not cover the plaintiffs' conduct, then

25  I believe that that's the end of the matter and there's no

Fraser v. Bureau of ATF - 02/08/2023

1    need to do the historical analysis.  If the Court does find

2    that the plain text covers it and then proceeds to do the

3    historical analysis, then, in most instances, the burden is on

4    the government to show some analogous historical precursor;

5    although, it doesn't have to be a dead ringer.  But in this

6    instance, because the challenged law is a condition or

7    qualification on the commercial sale of a firearm, it's still

8    presumptively valid under *Heller*.

9            THE COURT:  *Bruen*, at 366 U.S. 50, says, "We

10   reiterate that the standard for applying the Second Amendment

11   is as follows:  When the Second Amendment's plain text covers

12   an individual's conduct, the Constitution presumptively

13   protects that conduct.  The government must then justify its

14   regulation by demonstrating that it is consistent with the

15   Nation's historical tradition of firearm regulation.  Only

16   then may a court conclude that the individual's conduct falls

17   outside the Second Amendment . . ."

18            So what is your position is to whether the Second

19   Amendment's plain text covers the conduct at issue here?

20            MR. CLENDENEN:  Your Honor, since the plaintiffs

21   didn't make an argument that the plain text covers the

22   conduct, and we would agree with that, then I think the result

23   under *Bruen* is to just stop and that the --

24            THE COURT:  Where in your brief is there an argument

25   that they didn't make the argument that the Constitution's

1   plain text covers the individual's conduct here and,

2   therefore, the analysis called for by *Bruen* doesn't apply?

3          MR. CLENDENEN:  Your Honor, we didn't make that

4   argument in our brief.

5          THE COURT:  No, you didn't.  So what am I to do with

6   that?  Now you're saying, "Well, if the plain text doesn't

7   cover it, then *Bruen*'s historical analysis framework doesn't

8   even apply," right?

9          MR. CLENDENEN:  Yes, Your Honor.

10         THE COURT:  Isn't that what you just told me?

11         MR. CLENDENEN:  Yes.  If the Court would like a

12   supplemental brief on that issue, we would be happy to oblige.

13         THE COURT:  Is there anything else you want to go

14   over?

15         MR. CLENDENEN:  If the Court has any other questions,

16   I'm happy to answer.

17         THE COURT:  Not right now, but I may.

18         MR. CLENDENEN:  Thank you, Your Honor.

19         THE COURT:  Let me hear from the plaintiff.

20         Do you need a break?

21         THE REPORTER:  I'm good.

22         MR. HARDING:  Good morning, Your Honor.

23         THE COURT:  Okay.  Good morning.

24         Now, *Bruen* says, "When the Second Amendment's plain

25   text covers an individual's conduct, the Constitution

Fraser v. Bureau of ATF - 02/08/2023

1    presumptively protects that conduct."

2          I don't see anything in your paper telling me what

3    part of the plain text of the Second Amendment covers what

4    conduct.  Where is that?  In the complaint or in the papers or

5    anything else?  Y'all launch off making these big, long

6    historical arguments, but the Supreme Court circumscribed that

7    issue.  And I don't see -- did you raise it in your papers and

8    I missed it?

9          MR. HARDING:  Respectfully, Your Honor, on page 5 of

10   our --

11         THE COURT:  Yeah, help me with it.

12         MR. HARDING:  On page 5 of our response to

13   the government's --

14         THE COURT:  Just a minute.  Just a minute.  Let me

15   get there.  That's --

16         MR. HARDING:  Document 27.

17         THE COURT:  Yes, I just have to get there.  There's a

18   lot of paper here.

19         Page 5.

20         MR. HARDING:  Yes, Your Honor.

21         THE COURT:  And where?

22         MR. HARDING:  It's the second full sentence starting

23   "because."  I'll quote.  "Because the plain text of the Second

24   Amendment covers ordinary, law-abiding 18- to 20-year-olds

25   purchasing a handgun for self-defense, that conduct is

Fraser v. Bureau of ATF - 02/08/2023

1  presumptively protected by the Constitution."  And then we

2  actually reference a 2022 case that rested on that finding.

3          THE COURT:  Is that that case from Texas?

4          MR. HARDING:  Yes, Your Honor.  But -- yes, insofar

5  as the citation for that point.  But the point is we do

6  make that --

7          THE COURT:  Where is the text?  Let's get the

8  amendment out and let me see it.  Let's see that text.

9          MR. HARDING:  Insofar as the text of the Second

10 Amendment itself?

11         THE COURT:  For the first time in a long time I can't

12 lay my hands -- oh, here it is.

13         All right.  Let's find the Constitution here.

14         MR. HARDING:  Yes, Your Honor.

15         THE COURT:  Where does it say that?  I have Amendment

16 2, "A well regulated militia, being necessary to the security

17 of a free state, the right of the people to keep and bear

18 arms, shall not be infringed."  So do you want the

19 Constitution, to see if I read it right?

20         MR. HARDING:  No, Your Honor.  That is the text of

21 the Constitution.

22         THE COURT:  Well, what is text the covers the conduct

23 here?  Which part of the text?

24         MR. HARDING:  Keep.  The word "keep," Your Honor,

25 inherently requires one to be able to possess and procure.

Fraser v. Bureau of ATF - 02/08/2023

1  One cannot keep a firearm without procuring said firearm, and

2  so it's our position that the keeping of the firearm --

3       THE COURT:  You can't keep a firearm without

4  procuring it?

5       MR. HARDING:  Correct.

6       THE COURT:  Procuring it means you obtained it in one

7  of several ways.  According to the government, it means that a

8  gift, the parents' gift is sufficient.  That's procurement.

9  Where did you get your firearm?  Procure is a word for "get"

10 in that sentence, right?

11      MR. HARDING:  Correct, Your Honor.

12      THE COURT:  I got it from my parents.  I procured it

13 from my parents.  Okay.

14      MR. HARDING:  And in that respect, we're not

15 challenging any law that would bar a parent from gifting one

16 to their child.  That would be a different challenge.  But in

17 this respect, we do --

18      THE COURT:  You rely on *McCraw* for -- as the only

19 authority that you have that the text of the Second Amendment

20 covers the conduct at issue such as to bring into play the

21 statement I have read several times from *Bruen*; is that

22 correct?

23      MR. HARDING:  As the only -- the court deciding the

24 only case post *Bruen*, that is the only case post *Bruen* that

25 references it pursuant to the *Bruen* analysis in this way, yes.

Fraser v. Bureau of ATF - 02/08/2023

1        THE COURT:  Now, where in that case is that to be
2  found?
3        MR. HARDING:  We cite it at page 20.
4        THE COURT:  Just a minute.  I just need to find it.
5  *McCraw* is the case you cite, and I have it here in front of
6  me.  So where does it hold that?
7        MR. HARDING:  The only citation we have is off of the
8  Lexis citation.  I'm not sure which source the Court may have,
9  but we have it here listed as page 20 of the Lexis citation.
10  Admittedly, I don't know if it's made it to publication yet.
11        THE COURT:  My citation goes to -- there isn't any
12  page 20 in my version of it.  So what paragraph does it come
13  under?  Start reading the paragraph that it comes under, and
14  then I'll find it by looking at my copy of the Federal Rule
15  service.  Oh, God, this is 20 WL.
16        MR. HARDING:  That would be the Westlaw.  That would
17  be the Westlaw citation.
18        THE COURT:  Yeah, that's Westlaw.
19        Where is it?
20        MR. HARDING:  We don't quote -- I don't have the --
21        THE COURT:  Where is it?
22        MR. HARDING:  I don't have the *McCraw* case.
23        THE COURT:  Here, would you give this to him and let
24  him find it.
25        MR. HARDING:  Sure.  Yes, Your Honor.

Fraser v. Bureau of ATF - 02/08/2023

1          THE COURT:  Would you find it and share it with us?
2    The part you're talking about would help.

3          MR. HARDING:  Thank you.

4          THE COURT:  Read the page number.

5          MR. HARDING:  Sure.  This would be on page 8 of the
6    Westlaw citation.

7          THE COURT:  And the text is what?

8          MR. HARDING:  It says, quote, "*Bruen* is clear:  When
9    the Second Amendment's plain text covers an individual's
10   conduct, the Constitution presumptively protects that conduct.
11   Because (as detailed above) the plain text covers ordinary,
12   law-abiding 18- to 20-year-olds carrying a handgun for
13   self-defense outside of the home, that conduct is
14   presumptively protected by the Constitution."

15         THE COURT:  Now, so he says "look above," show me
16   above where he demonstrates the proposition that the Second
17   Amendment text covers the law-abiding, et cetera, et cetera.
18   Where does that analysis appear in that case?

19         MR. HARDING:  Starting on page 7 of the opinion, and
20   the Court titled its subheading as, quote, "Texas cannot rebut
21   the Court's conclusion that the plain text covers the proposed
22   course of conduct."

23         THE COURT:  And goes to where?

24         MR. HARDING:  It goes to the end of page 8.

25         THE COURT:  Where you begin the next quote?

Fraser v. Bureau of ATF - 02/08/2023

```
 1              MR. HARDING:  Yes, Your Honor.

 2              THE COURT:  Thank you very much.

 3              MR. HARDING:  Now, we recognize that this McCraw case

 4   does not specifically go into the procurement aspect of a

 5   commercial purchase issue, which is what's before the Court in

 6   this case, but we do believe that the Court's finding as to

 7   the plain text --

 8              THE COURT:  What was the issue here in McCraw?

 9              MR. HARDING:  In McCraw, it was the 18- to

10   21-year-olds in Texas couldn't, I believe, get a concealed

11   carry permit.  They couldn't go out with their handguns or

12   their firearms on them out in public.

13              And the government's argument in that case was very

14   much similar to the exact same argument here today.  It's just

15   instead of it being about public carry, it was -- today it's

16   about procurement altogether in a commercial purchase setting

17   from an FFL.  We do believe that we've adequately raised the

18   fact that we do think the plain text covers this conduct.

19              THE COURT:  Where in the complaint do you raise that?

20              MR. HARDING:  In the complaint -- I don't think we

21   say the words "plain text" in the complaint, but insofar as we

22   claim that it's a facial challenge -- I mean it facially

23   violates the Second Amendment, we believe that we've satisfied

24   the pleadings standard for the purposes of making that

25   argument.  And then, of course, our responses and in our
```

 1  motion for summary judgment, we've brought that to light as

 2  well.

 3         THE COURT:  On page 5, you say, "Because the plain

 4  text of the Second Amendment covers ordinary, law-abiding 18-

 5  to 20-year-olds purchasing a handgun for self-defense, that

 6  conduct is presumptively protected by the Constitution."  The

 7  citation is *Cf. McCraw*, and you're citing *McCraw*, which is a

 8  concealed carry case, to support that proposition.  Where else

 9  in your brief do you address the issue of what the plain text

10  of the amendment provides?

11         MR. HARDING:  Your Honor, it's our position that our

12  entire argument is that it violates the plain text.  We don't

13  repeat the term "plain text" repeatedly, but that's the heart

14  of the entire case.  If it's not a Second Amendment case at

15  all, then that's why we've brought the due process claims.

16         And we'll recognize that prior to *Bruen*'s decision,

17  including the Fifth Circuit decision that the government

18  relies on, a lot of courts found that those under 21 are

19  outside the scope of Second Amendment altogether.  And mind

20  you, the government is not arguing that it's the conduct that

21  is outside of the Second Amendment and it's not the firearm

22  that's outside of the Second Amendment, it's the

23  classification of individual who falls outside of the text of

24  the Second Amendment.

25         THE COURT:  What is the conduct referred to -- what

1    conduct is referred to in the *Bruen* statement which says, "We

2    reiterate that the standard for applying the Second Amendment

3    is as follows:  When the Second Amendment's plain text covers

4    an individual's conduct"?  What conduct is *Bruen* talking about

5    there?  What's the conduct in *Bruen*, in other words?

6            MR. HARDING:  I mean, *Bruen*, it's the carrying of

7    the -- it's the -- I believe -- oh, no.  In *Bruen* it's the

8    "shall" clause versus -- or the "shall" issue versus "may"

9    issue permitting structure.  If the Court is familiar with

10   that, I think it's around 43 or more states have what they

11   call "shall" issue permitting requirements, where as long as

12   one satisfies the statutory --

13           THE COURT:  Well, I understand that, but I'm trying

14   to go more basic than that.  I'm trying to find out what the

15   court means when it says, "the conduct."

16           MR. HARDING:  In that case, it's the keeping of the

17   firearm on them in public, outside of the home.  That's

18   ultimately what the court --

19           THE COURT:  Without -- but I thought the keeping of

20   the conduct -- of the permit outside the home -- of the gun

21   outside the home without a permit which requires a showing of

22   special need.

23           MR. HARDING:  Correct, Your Honor.  But the

24   conduct --

25           THE COURT:  So the basic issue is possession of the

1    firearm.

2              MR. HARDING:  Outside of the home.

3              THE COURT:  Outside of the home.

4              MR. HARDING:  Yes, Your Honor.  That was the heart of

5    the matter in *Bruen*, as far as the conduct.

6              We suggest that both post *Bruen* and prior to *Bruen*,

7    it is -- was the law and still is the law, the commercial

8    transactions of this nature, the conduct of this case falls

9    within the scope of the Second Amendment.  And that's

10   consistent with the Fourth Circuit's opinion.

11             THE COURT:  You define the conduct as what in this

12   case?

13             MR. HARDING:  The purchase of an unowned handgun --

14             THE COURT:  Purchase of what?

15             MR. HARDING:  Of a previously unowned handgun from a

16   commercially licensed firearm dealer.  So --

17             THE COURT:  What if the firearm dealer is licensed

18   and sells a previously owned one?  What's the difference?

19             MR. HARDING:  Well, insofar as this is not the -- the

20   difference is, is that a FFL, a federally licensed firearm

21   dealer, is the only source by which someone in the plaintiffs'

22   position can purchase this type of a handgun.  We recognize

23   there are alternative methods to purchasing pre-owned

24   handguns.  We don't believe that that, you know, saves the law

25   from the Second Amendment scrutiny in this case, but we would

1   just note that the firearm -- the FFL is the only source by

2   which an unowned handgun can enter the market.

3            But even if the Court doesn't distinguish between the

4   pre-owned and the new handgun, at the end of the day, it's the

5   purchase, the commercial purchase of the quintessential

6   self-defense weapon, mind you.  That's what *Heller* refers to

7   as the handgun.

8            So this isn't a case about just all guns generally.

9   We certainly aren't making that case.  This case has nothing

10  to do with long guns or higher caliber firearms that are

11  actually still available to the clients to purchase.  They can

12  go into the same federally licensed firearm dealer and

13  purchase an AR-15 --

14            THE COURT:  Is an AK-47 and AR-15, is that something

15  they can purchase?

16            MR. HARDING:  Yes, Your Honor.

17            THE COURT:  If they're 18?

18            MR. HARDING:  Yes, Your Honor.  My clients can walk

19  in and purchase a higher caliber, a long gun, but they can't

20  go in and purchase the firearm that is considered the

21  quintessential self-defense weapon pursuant to *Heller* because

22  of its ability to defend.  The handgun is inherently more of

23  an available, hidable, transportable, carryable firearm, and

24  that is why it's considered the quintessential self-defense

25  weapon as found by *Heller*.

Fraser v. Bureau of ATF - 02/08/2023

1          And not to digress too much.  I know that the Court

2    initially asked are we pursuing this claim under the plain

3    text argument.  We believe we've adequately raised it in the

4    complaint and in --

5          THE COURT:  Other than that on page 5 of your brief,

6    ECF-27, where else do you discuss the plain text statement

7    from --

8          MR. HARDING:  We cite the exact same case, the *McCraw*

9    case, for the same reasons on page 3 of our motion for summary

10   judgment.

11         THE COURT:  And that's it?

12         MR. HARDING:  Yes, Your Honor.  And, of course, *Bruen*

13   itself is cited as to the standard here for review, but there

14   aren't any post *Bruen* decisions applying, that we know of,

15   that *Bruen* -- post *Bruen* decisions of the courts having to

16   explicitly rule for or against the idea that commercial

17   purchasing is or is not part of the plain text.  We just think

18   the term "keep" on the plain text inherently -- it includes

19   procurement, and we -- because without the ability to procure,

20   one doesn't have the ability to keep.

21         THE COURT:  Well, I can keep it if my father gives it

22   to me, if I'm 18.  And I can keep it if I buy it at a gun

23   dealer, and I can keep it if you sell it to me in a private

24   transaction.

25         MR. HARDING:  Correct, Your Honor.  We would say that

 1  those are alternative methods of procurement.  But the

 2  question is whether or not the conduct at issue is within the

 3  scope of the Second Amendment's plain text.  We believe all of

 4  those methods would also generally fall within the construct

 5  of the Second Amendment, because if it didn't, what the

 6  government's position would be, if it doesn't cover commercial

 7  purchase, then they could ban all commercial purchase.

 8          If the conduct at issue isn't within the plain text

 9  of the Second Amendment, then nothing else matters.  They

10  could ban all gun purchases, regardless of source, and then

11  that would eliminate the ability to keep arms, because no one

12  could pass them down, gift them, sell them, maybe make them.

13  But that's somewhat of a digression.

14          If you don't mind, I'm going to go back to the

15  government's original point about standing, first of all.

16          The basic requirements for a finding of standing, for

17  the plaintiffs to have standing, are that they must have

18  suffered an injury in fact, and that includes an invasion of a

19  legally protected interest which is concrete and

20  particularized and actual or imminent, not conjectural or

21  hypothetical.  That's the first requirement.

22          The second requirement is that there must be a

23  casual -- or causal, I'm sorry, causal connection between the

24  injury and the conduct complained of, and it must be likely

25  the injury will be redressed by a favorable decision.  That's

1   the *Lujan* decision from the Supreme Court.

2          It's our position that we've satisfied all those

3   three and that the crux of the government's argument is more

4   to the merits of the argument, not on the standing itself.

5   And with that, we would say --

6          THE COURT:  Well, they say you're not part of "the

7   people" in your category.  18 to 21 is not part of "the

8   people" because the age of majority was 21 back in those days.

9          MR. HARDING:  I believe that is what the government's

10  position is --

11         THE COURT:  It's what they said.

12         MR. HARDING:  -- when it comes down to it, because if

13  they were within "the people," then they're clearly within the

14  plain text and there is no analogue to the time went it comes

15  to this issue.  There are other analogues that we could assess

16  and try to distinguish or compare.

17         THE COURT:  Run that up the flagpole again.

18         MR. HARDING:  There are plenty of other restrictions

19  that existed in 1791, as the Court noted, that we could

20  compare this to, but we don't find it to be analogous.  There

21  is no age ban on the purchase.

22         THE COURT:  What restrictions existed in 1791 on the

23  purchase of guns?

24         MR. HARDING:  Those that we reference that -- or,

25  obviously, there were many that wouldn't stand scrutiny today,

Fraser v. Bureau of ATF - 02/08/2023

1    whether it be based on race or religion, for example.  There

2    were bans on Catholics owning firearms or Native Americans or

3    the black population.  I'm not actually familiar with tons of

4    them regarding women not being able to own them.  But those

5    all existed.  But there were also felons couldn't own them in

6    many regards.  Those were -- failed the loyalty tests.

7           That's actually something that we think is partially

8    relevant for the Court's consideration.  That is, after the

9    Revolutionary War, if you were considered to be a British

10   loyalist -- and there was a method by which they would

11   determine one was or was not a loyalist.  It wasn't just a

12   bill of attainder where they just wrote up people's names.

13   They went through a process and determined if you were or were

14   not a loyalist.

15          Anyone over the age of 18 -- and that's a pivotal

16   thing to consider at the time of 1791.  Anyone -- not a

17   federal law, but in many states, if you were over 18 and you

18   were considered a loyalist to the Crown, you couldn't own

19   firearms.  Now, to us, that would suggest if you were over 18

20   you could have the firearms.

21          But those are the only restrictions that we're really

22   aware of --

23          THE COURT:  Catholics, felons, blacks, people who had

24   not signed loyalty oaths if they were over 18.

25          MR. HARDING:  Native Americans as well.  I'm not

1   sure -- I can't speak with conviction on whether or not there

2   were restrictions on women.

3           THE COURT:  The only one that related to age was the

4   loyalty oath one.

5           MR. HARDING:  Yes, Your Honor.

6           THE COURT:  And why was that?

7           MR. HARDING:  Why is that the only one that relates

8   to age?

9           THE COURT:  Why did the loyalty oath provision have

10  an age provision in it?

11          MR. HARDING:  Without having explicit legislative

12  history, I don't want to speak out of hand.  But I do think

13  it's fair to assume, based on the time and the other laws at

14  issue, that it was because any able-bodied male adult over the

15  age of 18 was also part of the militias in the many states at

16  the time, or expected to be.

17          THE COURT:  So you didn't want somebody who wasn't

18  loyal serving in the militia?

19          MR. HARDING:  Correct.  It would be, essentially,

20  like an enemy combatant in today's context.

21          THE COURT:  Do you have any authority that I can cite

22  that explains that that age -- that aspect of that age -- of

23  that restriction is tied to the militia laws?

24          MR. HARDING:  The loyalty tests component -- this is

25  what we cite, Your Honor:  We cite the *NRA* case, which is

1  obviously not a firsthand source of the issue, but we cite

2  that.  And we also cite --

3          THE COURT:  Where?

4          MR. HARDING:  At page 343.

5          THE COURT:  No, where do you cite it?

6          MR. HARDING:  Oh, I apologize.  On page 17 of the

7  plaintiffs' response in opposition.

8          THE COURT:  Page 17.

9          MR. HARDING:  Of document 27.  This is where we kind

10  of get into the comparisons of what was and wasn't on the

11  books at the time.  We state --

12          THE COURT:  Okay.  "The only Founding-era regulations

13  that could compare to the laws at issue were those for

14  'Loyalists to the Crown,' in that they applied to law-abiding,

15  able-bodied adult citizens absent consideration of race,

16  ethnicity, national origin, or religion, but even the 'Loyalty

17  Test' regulations contradict the government's position in this

18  case."

19          "Loyalty oaths [sic] were applicable to persons

20  'above 18 and stated that those who did not swear allegiance

21  would be disarmed' -- 18-year-olds were considered to have

22  rights, even if they were equally subject to being restricted

23  with other suspect class members."

24          I don't see that there's anything that shows that the

25  18-year-old provision even applies in that statement.  Is

1  there some subsequent statement that mentions it?

2          MR. HARDING:  I'm not sure I am clear on the Court's

3  question about --

4          THE COURT:  All right.  Let's try again.

5          MR. HARDING:  Sure.

6          THE COURT:  You've made the argument that among the

7  restrictions were the following who could not -- were

8  restricted from owning guns: Catholics, felons, black people,

9  Native Americans, and those who would not sign loyalty oaths,

10 if they were over 18.  And I asked you, does that over the 18,

11 does the 18 age have anything to do -- where does it come

12 from?  And you said that the tie would be to militia service

13 at age 18.  Where on page 17 do you talk about that?  And you

14 said you cited some case, and I don't see any case cited

15 there.

16         MR. HARDING:  Oh, my apologies, Your Honor.  It

17 didn't get into the fact that they were or were not -- that's

18 why I was saying we can draw the conclusion.  At the beginning

19 of the Court's question, I note that we don't explicitly have

20 a case talking about why that age, and, of course, we don't

21 have the legislative history from the various states at that

22 time.

23         THE COURT:  Do you have loyalty oath restrictions?

24         MR. HARDING:  They're cited in the -- they're cited

25 within the authority we --

Fraser v. Bureau of ATF - 02/08/2023

1          THE COURT:  You mean they're cited within *NRA*?

2          MR. HARDING:  And within the *Colonial Firearm*

3     *Regulation* article that is in the middle of that second

4     paragraph.

5          THE COURT:  I see.  But you don't know what they say

6     about the age?  Where the age --

7          MR. HARDING:  Well, in Massachusetts -- I mean, in

8     some states it was actually lower than 18.

9          THE COURT:  How much lower than 18?

10         MR. HARDING:  In Massachusetts, it was 16.

11         THE COURT:  What was 16?

12         MR. HARDING:  If you were over 16 and couldn't

13    satisfy the loyalty oath, they would disarm you.  Other

14    states it was 18.

15         THE COURT:  Is that because their militia service was

16    16 at the time of the loyalty oath statute?

17         MR. HARDING:  We believe that is the reason, Your

18    Honor.  But I don't have anything specifically to put before

19    the Court to say that's exactly why.

20         THE COURT:  You might need to be doing that, since it

21    would seem to me to be a highly relevant aspect of analysis

22    here.

23         MR. HARDING:  Well, insofar as the loyalty oath

24    component is even relevant, we don't find it to be analogous

25    to the issue before the Court.  And that's our real point, is

Fraser v. Bureau of ATF - 02/08/2023

1   there isn't an analogue from 1791 of an age-based barrier to

2   the procurement of a handgun.

3          THE COURT:  What difference does it make if there's

4   an age-based procurement issue to owning or possessing a rifle

5   or a musket because of the loyalty oath provision?  You see

6   the point is, the way you're arguing it, the way -- is that

7   the loyalty oath provision is an age-based restriction.  And I

8   asked you how you deal with that restriction.  You say, "Well,

9   it's tied to the militia."  It makes sense that that's the

10  case, even if some state had a 16-year-old threshold for the

11  loyalty oath state, if that state also had 16 years old at the

12  militia.  Because what you don't want is, you don't want

13  people bearing arms if they're going to be inside your defense

14  mechanism.  Quisling, so to speak.

15         Now you're twist -- shifting and talking about

16  another aspect of the restriction, whether it's a restriction

17  to purchase or to possess, and I don't see that that's what

18  it's being cited for.  In other words, you-all have thrown out

19  something here that you haven't run to ground.  And I need it

20  run to ground because I think it is relevant.  It may not be

21  dispositive, but it certainly looks to me like it's relevant.

22         MR. HARDING:  Your Honor, the only reason we even

23  cite the loyalty tests is because it contains a presumption

24  that those over the threshold age do have the right to

25  procure, keep, and have these firearms, regardless if they're

1   21 or not, because -- that's why we're citing it.  That's the

2   only reason we're citing it, is because when you read these

3   laws at the time, whether they're in Massachusetts or

4   Pennsylvania, it presumes that anyone over the age does have

5   the unfettered right unless they're a loyalist to the Crown.

6          So it's not that we're citing it as an age-based

7   restriction as an analogue; we're actually just citing it as a

8   restriction that was on the books at the time that counters

9   the idea that there was an analogue.  Had there been an

10  analogue, they wouldn't need the loyalty test.  They would

11  have just said, "Anyone who's not 21 can't have the firearms."

12         The conduct at issue in that loyalty test issue is

13  the loyalty to the Crown, not the age.  The age is only

14  relevant because it presumes that there's an armed class of

15  people, that being those over the threshold age, who are

16  otherwise armed.  And so we would say that it errs on what

17  *Bruen* considered, and that is the Second Amendment

18  memorializes a preexisting right.

19         THE COURT:  Has any other court ever held that the

20  *Bruen* formulation of the standard -- "We reiterate that the

21  standard for applying the Second Amendment is as follows."

22  And I have read it and read it and read it; you-all know what

23  it is.  Is there any other court that says that the conduct

24  covered by the plain text that then animates the presumption

25  of protection and the obligation of the government to explain

Fraser v. Bureau of ATF - 02/08/2023

1    consistency with the Nation's historical tradition was the

2    conduct -- was, as is referred to in *Bruen*, you say,

3    possessing a handgun outside the home?  Is there any other

4    court that defines that conduct in discussing *Bruen*?  Any law

5    review article, anybody of authority who says that the conduct

6    at issue in *Bruen*, what they're talking about, possessing a

7    handgun outside the home, and it was covered by the provision

8    of the Second Amendment that we're talking about here?

9           Nobody cites anything.  You say that *McCraw* stands

10   for that proposition, that it -- it covers the conduct here.

11   But it involved purchasing -- it involved concealed carry.  So

12   here, the conduct has to be the purchasing of previously-owned

13   firearms from a federally licensed firearm dealer, you say.

14          Is there anybody anywhere who has -- who has written

15   to give support to that version of what conduct is

16   specifically covered by the Second Amendment?  Any case, any

17   treatise, any law review article?

18          MR. HARDING:  There are -- yes, there are cases post

19   *Bruen* that are not cited here because of their relative

20   recency.  I have to qualify that.  But the idea that the

21   commercial transaction generally, commercial procurement of

22   firearms is within the plain text --

23          THE COURT:  How many cases are there that you haven't

24   cited to me, that neither one of you have cited to me?

25          MR. HARDING:  Post *Bruen*, I believe that there are at

Fraser v. Bureau of ATF - 02/08/2023

 1  least two or three.

 2         THE COURT:  Let's have the citation, and we'll look

 3  them up when I take my recess.

 4         MR. HARDING:  Yes, Your Honor.  Happy to do so.

 5         THE COURT:  I want them now, so when we take a

 6  recess, we can look them up.

 7         MR. HARDING:  Okay.

 8         THE COURT:  We're going to take a recess in a few

 9  minutes.

10         MR. HARDING:  Okay.

11         THE COURT:  You say there are two or three more

12  cases.

13         MR. HARDING:  I don't have them before us about

14  the --

15         THE COURT:  You may not have them, but do you have

16  the citations?

17         MR. HARDING:  No, Your Honor.  They're not in our

18  briefs, and it's not part of a supplemental brief.

19         THE COURT:  Do you have them available to you?

20         MR. HARDING:  I could get them during a recess, but I

21  don't have --

22         THE COURT:  Where are you going to get them?

23         MR. HARDING:  I would have to access my computer,

24  but --

25         THE COURT:  Where is that?

1        MR. HARDING:  It's just parked outside.

2        THE COURT:  Well, you know you can bring your

3   computer in, if you get permission.

4        MR. HARDING:  Yes, Your Honor.  I was made aware of

5   that.  I didn't think that --

6        THE COURT:  Isn't it on the website?  Doesn't it tell

7   you that on the website, that if you get permission, you can

8   bring your computer in?  It's different than your hand

9   phone -- handgun -- your phone.

10        MR. HARDING:  Correct.  I do believe you can move

11   to -- I know that you can do that, Your Honor.  I apologize.

12        THE COURT:  How long will it take you to get me those

13   cases?

14        MR. HARDING:  I could get it during the Court's

15   recess.

16        THE COURT:  Okay.  So you're parked not too far away?

17        MR. HARDING:  Correct, Your Honor.  I'm next to the

18   Virginia Supreme Court.

19        THE COURT:  And you're fast?

20        MR. HARDING:  I will jog my fastest.

21        THE COURT:  We're going to take a recess at this

22   time.  I want those cases; you go get them, get the citation.

23        MR. HARDING:  Yes.

24        THE COURT:  Your computer will work somewhere, I take

25   it?

1          MR. HARDING:  Yes.

2          THE COURT:  You get Ms. Maloney's e-mail, or whatever

3   she's willing to share with you, a court e-mail, and get it

4   here, the citations, so we can read it during a recess.  We're

5   going to take a lunch recess at this time, and we can get

6   started on that process.  We will resume -- that will give you

7   time to get some lunch too, so 1:00 o'clock, give you time to

8   get something to eat, will it?

9          MR. HARDING:  Yes.

10          MR. HAMBRICK:  Yes.

11          THE COURT:  Okay.

12          MR. HARDING:  Thank you, Your Honor.

13      (Recess taken from 11:47 a.m. until 1:19 p.m.)

14          THE COURT:  All right.  I was provided with a case

15   from *United States versus Quiroz*, Q-U-I-R-O-Z, out of the

16   Western District of Texas, and you've given copies to the

17   other side.  It's 2022 U.S. District, Lexis 168329 and 2022 WL

18   4352482.

19          And then the government gave me *United States versus*

20   *Porter* out of the Southern District of West Virginia,

21   January 5, 2023, 2023 WL 113739.  And another one, Reed, I

22   think it is.  Is it Reeves or --

23          MR. HAMBRICK:  *United States v. King*, Your Honor.

24          THE COURT:  *King*.  *King*.  2022 WL 17668454, Eastern

25   District of Pennsylvania.  Okay.  All right.

Fraser v. Bureau of ATF - 02/08/2023

1          MR. HARDING:  Your Honor, we just want to note that

2  we also brought the Court's attention to the --

3          THE COURT:  Can you speak up?

4          MR. HARDING:  Yes.  We also want to bring the Court's

5  attention to the *Reese* case that I believe the Court was

6  referring to; we cited that as well.  I believe you may have

7  already had that printed off and available, but just want to

8  call your attention to that.

9          THE COURT:  In what way do you want to call --

10         MR. HARDING:  So the *Reese* decision is actually the

11 most applicable decision for the Court's question about the

12 plain text issue concerning the conduct in this case.  The

13 *Reese* decision ultimately ruled on the merits in favor of the

14 government's position on the exact same statute and laws at

15 issue, but prior to making that finding, it did find that the

16 conduct at issue, the purchase of the firearm by those under

17 21 did fall within the plain text of the Second Amendment.

18 And that's cited at -- well, it's page 20 of Lexis.  But

19 insofar as it's -- that's the closest of all the four cases

20 that have been provided that specifically address the laws at

21 issue in this case.

22         I'll also note that the *Quiroz* decision that

23 plaintiffs provided --

24         THE COURT:  Well, where do they find the conduct fits

25 within the constitutional language?

Fraser v. Bureau of ATF - 02/08/2023

1          MR. HARDING:  On page -- for *Reese*, for the *Reese*
2  decision, on page --
3          THE COURT:  I have the Westlaw version up here.
4          MR. HARDING:  I can tell you what portion of the
5  case.  It's under Section IV, Subsection A.  So if you go to
6  Section IV, Subsection A, it's says, "Facial Challenge-Count
7  I."
8          THE COURT:  Wait just a minute.  Yes.
9          MR. HARDING:  And then if you go to the second
10 paragraph of that subsection --
11         THE COURT:  So he says that you have to answer
12 whether the Second Amendment's plain text protects the ability
13 of 18- to 20-year-olds to directly purchase handguns from
14 FFLs.  And then section what?
15         MR. HARDING:  It's section IV, subsection A, so --
16 section IV, subsection A of the opinion, in the second
17 paragraph --
18         THE COURT:  The paragraph begins, "With respect to
19 the first question"?
20         MR. HARDING:  Yes, Your Honor.  And the last --
21 towards the bottom of that paragraph.
22         THE COURT:  It says they do not -- "the statute and
23 regulations" -- which are the ones at issue here, right?
24         MR. HARDING:  Yes.
25         THE COURT:  -- "do not explicitly restrict the rights

1   of 18- to 20-year-olds to 'keep and bear arms,' as they do not

2   restrict this age group from owning, possessing, or carrying

3   handguns."

4           MR. HARDING:  Correct.  And we're not citing this

5   case for the outcome as much as the issue of does the plain

6   text apply to the conduct.

7           THE COURT:  Where do they hold that?

8           MR. HARDING:  At the end of the paragraph that the

9   Court just read from, there's a sentence that starts with the

10  words "Out of an abundance of caution" --

11          THE COURT:  Yes.

12          MR. HARDING:  -- "the Court will assume that the

13  statute and regulations at issue proscribe conduct covered by

14  the plain text of the Second Amendment."

15          THE COURT:  Right.  They assume that without deciding

16  it.  They don't decide it.

17          MR. HARDING:  Well, they don't -- what they've done

18  is they've taken the Fifth Circuit's pre*Bruen* precedent, and

19  then applying it post *Bruen*, you know, erring on the side of

20  caution they do proceed to review it after having found that

21  it's conduct within the plain text of the Second Amendment.

22  They wouldn't have made it to their final outcome had they

23  not.  I mean, if it's outside of the plain text --

24          THE COURT:  If I assume something for purposes of

25  litigation, I don't decide it.  I just assume that the

Fraser v. Bureau of ATF - 02/08/2023

1   position is established, and then I go on to decide the case

2   on another basis.  That looks to me like what happened here in

3   *Reese*.  It's correct if they had not made the assumption, they

4   couldn't have gone where they went.  That's true.

5          MR. HARDING:  Again, I would just point to the *Reese*

6   case because that's the closest one to the laws at issue in

7   this case.  It's the exact same conduct.

8          Now, we do believe that the *Quiroz* decision, which

9   did explicitly have a finding --

10         THE COURT:  The what decision?

11         MR. HARDING:  The *United States* against *Quiroz*.

12         THE COURT:  Oh, the one from Texas.

13         MR. HARDING:  Yes, Your Honor.

14         THE COURT:  Where does it help you?

15         MR. HARDING:  In that case, the court explicitly

16  found that the Second Amendment's plain text does cover the

17  receipt of a firearm, meaning the procurement, the receipt of

18  a firearm and the Constitution presumptively protects such

19  conduct.  So we argue that receipt encompasses commercial or

20  private procurement.

21         Now, I'll distinguish these two from the *King* and the

22  *Porter* decision that the government has supplied.  Both of

23  those cases specifically are dealing with the sale or the

24  relinquishment of a firearm in a regulated transaction versus

25  the procurement and the purchase.  We do not contest that the

Fraser v. Bureau of ATF - 02/08/2023

1  sale in this case is what is the right that -- the conduct

2  that's being targeted by our clients.  Our clients are not

3  active sellers.

4         In fact, the Fourth Circuit in the *Hirschfeld* against

5  *ATF* case that was pre*Bruen*, on pages 416 through 418,

6  explicitly goes into distinguishing how the procurement or, in

7  this case, the purchase is dispositively different than the

8  regulations on the sales, on the commercial sales.

9         So the *Porter* and *King* decision, both of them --

10        THE COURT:  How does *Hirschfeld* do that?

11        MR. HARDING:  It does that on pages 416 through 418.

12        THE COURT:  And how?

13        MR. HARDING:  Well, it's a relatively lengthy

14 analysis, but the court goes into explaining that -- on page

15 417, the court says, "Here, the substance of the challenged

16 law dictates that they are a functional prohibition on buyers,

17 not a mere condition or qualification on sellers.  They ban an

18 entire group of adult, law-abiding citizens from purchasing

19 handguns from licensed dealers, substantially burdening the

20 group's rights.  The category of conditions and qualifications

21 on commercial sales referenced in *Heller* is limited as *Hosford*

22 highlights*," Hosford* is a Fourth Circuit case, "to laws that

23 place conditions and qualifications on the seller, like

24 licensing.  It does not encompass a ban on a class of people

25 seeking to purchase handguns from a qualified seller."

1          So we just want to note that there's a distinction

2   between the sale and the purchase.  We believe that the

3   conduct here falls within the receiving that was discussed in

4   the *Quiroz* decision.  We think that the assumption that the

5   *Reese* court made was the correct assumption, and we would ask

6   the Court to adopt the same outcome.  When it comes to this

7   issue of is the conduct in the plain text, we would ask this

8   Court to similarly interpret the *Hirschfeld* decision post

9   *Bruen* and find that this conduct is within the plain text.

10         Once the conduct is deemed to be within the plain

11  text, then the issue is the analogue.

12         THE COURT:  Excuse me just a minute.  Do you agree

13  with Mr. Clendenen's position that if I find the conduct is

14  not within the plain text of the Second Amendment, then the

15  analysis is over?

16         MR. HARDING:  From a Second Amendment standpoint --

17         THE COURT:  From a Second Amendment -- from your

18  Second Amendment claim.

19         MR. HARDING:  If the conduct is outside of the plain

20  text of the Second Amendment --

21         THE COURT:  Then you never get to studying the

22  analogues and see what the history shows, right?

23         MR. HARDING:  Correct.

24         THE COURT:  Right?

25         MR. HARDING:  Correct.  At that point, we would get

Fraser v. Bureau of ATF - 02/08/2023

1    to a due process review, and without --

2        THE COURT:  You mean at that point you would be

3    depending solely on the equal protection claim, Fifth

4    Amendment claim?

5        MR. HARDING:  Well, the due process claim of the

6    Fifth Amendment, yes, Your Honor.  Well, we also argued and

7    we've raised the fact that it doesn't even satisfy a rational

8    basis.  And we're not prepared to go there yet, but -- as far

9    as the presentation to the Court, I do want to go more into

10   the Second Amendment inquiry.  But if the conduct, meaning the

11   procurement, by these individuals of this handgun, which is an

12   outright ban on the purchase of the handgun, particularly new

13   handguns, but the purchase of the handgun from a qualified

14   dealer is outside of the scope of the plain text of the Second

15   amendment, then, yes, the Second Amendment inquiry would stop.

16       THE COURT:  Okay.

17       MR. HARDING:  But moving on in the sense that the

18   conduct, we believe that the conduct is within the scope, then

19   it becomes is there an analogue to 1791 or the founding --

20       THE COURT:  And then the burden to prove consistency

21   is on the government at that point under *Bruen*; is that right?

22       MR. HARDING:  That's correct, Your Honor.  And to

23   that end, I want to note that in *United States* against

24   *Chester*, which, again, is a pre*Bruen* Fourth Circuit case, and

25   it was cited in *Hirschfeld*, the Court said in the face of

Fraser v. Bureau of ATF - 02/08/2023

1   historical silence or ambiguity, we assume conduct is

2   protected.

3           So without pointing to something to say that this

4   type of conduct was barred, we would ask for the Court to

5   follow the *Chester* decision and the *Hirschfeld* reference to

6   that decision, and point to the fact that there is nothing to

7   say that this conduct is outside of the plain text.  Again,

8   the *Quiroz*, Texas decision, finds that the receipt is

9   inherently embedded within the concept of keep.  Keep and bear

10  requires the ability to procure.  One cannot keep without

11  having.

12          But moving to the aspect of, okay, once it's

13  established that the conduct is within the plain text and the

14  burden shifting to the government to point to a historical

15  analogue, we would point that at that point it's no longer

16  just the conduct that is being regulated, but it's a

17  categorical based ban.  That's really where the analogues fall

18  apart.  It's not that they're banning the possession of a

19  handgun by the plaintiffs altogether.  It's not that they are

20  banning the purchase of firearms from FFLs altogether.  It's

21  not -- in fact, the handgun has been elevated post *Heller* as a

22  form of firearm that is -- we referenced it earlier -- but the

23  quintessential self-defense weapon, meaning it is to be

24  recognized as the most -- I don't want to say the most

25  protected firearm, but it's inherently not a more dangerous

Fraser v. Bureau of ATF - 02/08/2023

1  firearm, meaning it's not inherently risky or dangerous or has

2  a higher capability of being dangerous in its use versus its

3  legitimate functions of self-defense.  And that is the crux of

4  the Second Amendment as an individual right.

5       So it's not the commercial purchase that's --

6       THE COURT:  What does the record show about the

7  existence *vel non* of handguns in or around 1791?

8       MR. HARDING:  As far as pistols?

9       THE COURT:  Handguns.  What other kind of handgun, is

10  there than a pistol?  A Derringer, I guess.  I think a

11  Derringer was invented much later, but I don't know.

12       MR. HARDING:  As far as historical materials

13  reference the ability for these young people, young adults

14  specifically in this case, but those over 18 to have access to

15  pistols, I believe that the -- there's no legislative record

16  about the issue from 1791.  But I think the historical

17  references in some of these citations in our brief referenced

18  the fact that they would have expected these young men to have

19  their own firearms.  Whether they be pistols or muskets is

20  relatively immaterial at this --

21       THE COURT:  Is it really?  Because back in those days

22  if you have a pistol and I have a musket, you can't get close

23  enough -- I can knock you off before you get close enough to

24  me to use the pistol.  So maybe firearms just means muskets.

25       MR. HARDING:  Well, the *Heller* decision found that

Fraser v. Bureau of ATF - 02/08/2023

1   the individual right, fundamental liberty of keeping and

2   bearing firearms, particularly as a means of self-defense, and

3   then highlighting the handgun as the quintessential

4   self-defense weapon, I think that would contradict the idea

5   that the musket is the heightened protected firearm,

6   particularly for the purpose, and that is self-defense,

7   because closer range would logically be the style of firearm

8   to be used in a self-defensive manner.

9         THE COURT:  Back in those days firearms, pistols were

10  used for what do you think?

11        MR. HARDING:  An array of things.  I mean, it could

12  be used to --

13        THE COURT:  Mostly they were used for dueling,

14  weren't they?  That's not self-defense.

15        MR. HARDING:  I think that the pistol was certainly

16  the firearm of choice in a duel, but I don't think the

17  majority of the use of the pistol was during a duel.  I think

18  pistols were probably used in the same fashion that handguns

19  are today, and that is they're kept in the home, they're kept

20  to --

21        THE COURT:  But the pistols in 1791, they used balls,

22  not bullets, didn't they?

23        MR. HARDING:  Sure.  Correct.

24        The reason I'm even focusing on the handgun component

25  versus the long guns is that the -- the laws at issue, there

1   is no analogue for and there are no other purported bans on

2   the gun being accessible by this class.  They can have the

3   gun.  They can go out and buy it from somewhere else.  So it's

4   not as if the government can rely on the fact that this

5   firearm is so inherently dangerous to these people, therefore,

6   we're going to ban it.  In fact, if you look at the stated

7   legislative purpose in 1968, that being to reduce the

8   clandestine procurement of firearms, the clandestine

9   procurement is acting outside of the law.  That's what

10  clandestine would mean in that sense, and that is you're doing

11  it unlawfully.

12          Yet, what they're doing, what the code does is it

13  inherently regulates these young men and women to a system

14  that is outside of the law, purely to the private sector where

15  there are no forms of due diligence to determine background

16  check, you know, the criminality, the mental health history,

17  any other substance abuse issues, matters that -- you know,

18  domestic violence issues, things that have historically

19  resulted in someone not being able to access the firearm.

20  None of that --

21          THE COURT:  How does all of that fit into the Second

22  Amendment analysis?  I can understand the argument that by

23  structuring a system that precludes purchase from a legitimate

24  dealer where you can get a warranty, and there's a record of

25  it, and all those salvatory purposes are met but allows you to

1   get them on the black market or as a gift makes utterly no

2   sense.  No rational -- it's not a rational basis.  It's not

3   reasonable.  I can understand that argument, but what does it

4   have to do with the Second Amendment part of it?

5              MR. HARDING:  Thank you for clarifying that.  You're

6   right.  But from a Second Amendment standpoint, at least, we

7   think it's actually relevant as well, because what we have

8   here, once the Court recognizes that the plain text applies to

9   the purchase or the procurement, we have a -- the whole

10  regulation is just a categorical ban based on age.  It's not a

11  ban based on the gun.  It's not a ban based on the source of

12  the gun.  It is a ban based on the categorical ban without any

13  individualized finding of any type of disqualifying conduct to

14  a class of law-abiding adult citizens.

15             And that's where the government's position in this

16  case is the same as the NRA's position in the -- or the

17  court's decision in the *NRA* case, and that is that these class

18  of people fall -- these class -- or the plaintiffs and their

19  class fall outside of "the people."  That's their position.

20             And their position is, well, they were minors in

21  1791, and even though adulthood or the age of majority has

22  shifted since then, these individuals should be relegated to a

23  second-class status, even though the laws recognize them as a

24  member of the people.  There are no other variables that these

25  young men and young women in the class have that would render

1   them outside of "the people."  They are universally allowed

2   suffrage through Article 26, when the Constitution was amended

3   to give them the federal right, the universal federal right to

4   vote.

5          THE COURT:  That's not back at the founding.

6          MR. HARDING:  No, Your Honor, but at the time --

7          THE COURT:  Why should we decide the meaning of one

8   word in a constitutional provision with reference to

9   historical analogues at the time of the founding and decide

10  another part of the words in the same statute with relevance

11  to today and more current law and such analogues?

12         MR. HARDING:  It's our position that the government

13  is trying to have it two different ways, and they can't have

14  it either way, and that is, in 1791, if their position is

15  these people -- only adults have the right to the Second

16  Amendment, only adults are the classification that can fall

17  within that, our position is fine, have that position.  But

18  adulthood is different.

19         Adulthood is the same, meaning if they meant adults

20  in 1791, we can look to today's standards, at today's inquiry,

21  and say who are the adults and who are not the adults, and

22  that is the same context.  And in today's inquiry, they are

23  adults.  In 1791, they were minors or infants, depending on

24  how you classified the term.

25         The government's entire case is because they had

Fraser v. Bureau of ATF - 02/08/2023

1  guardians, they were not fully emancipated adults in 1791.
2  Nothing has changed since.  But the fact of the matter is the
3  Second Amendment can keep the same meaning in 1791 and the
4  plaintiffs still succeed.  Adulthood is the same.  It's just
5  who it applies to is different.
6        In that regard, we would say that the government's
7  reliance on the age of majority in 1791 being the primary
8  factor, that's fine.  The issue is the age of majority is not
9  21.  The age of majority is 18.  And an 18-year-old today is
10 affirmatively a member of "the people" based on the same
11 factors at issue in 1791.  They can vote, they can serve, they
12 have no legal guardian, they can pay taxes, enter into
13 contract.  They're not otherwise burdened by any other -- any
14 other body.
15       The same wasn't in 1791.  In 1791, there were various
16 factors that an 18-, 19-, 20-year-old would have had to
17 consider and they weren't fully legally emancipated.  But
18 adulthood is the same.
19       Now, if the Court were to find that that doesn't
20 really matter, that adulthood isn't the shifting issue, that
21 it's really the actual age, 18, 19, 20, meaning let's strip
22 majority and minority from the review, then the government's
23 position also fails because of all the references to the
24 militia laws at issue, the lack of any age restriction-based
25 bans at that time.

1          And the government continues to cite this argument

2     that we argue for too much, that we're arguing for all minors.

3     We're not arguing for any minors to get firearms in this case.

4     These are all adults.

5          So the aspect of, well, a six-year-old could do it or

6     a ten-year-old could do it, we're not here today, and,

7     honestly, we're not trying to make that argument, and we don't

8     necessarily think it needs to be made, because insofar as the

9     state does have some role in determining when rights fully

10    vest, the age of adulthood is that threshold, and that age of

11    adulthood has changed pursuant to the will of the people, and

12    that was through Article 26, which gave them universal

13    suffrage, and through the Selective Services causes that

14    require these young men to enlist.  Whether they get

15    drafted --

16          THE COURT:  The key to adulthood is whether you're

17    among the people?

18          MR. HARDING:  No, we would argue that "the people" is

19    more expansive than "adulthood."  But insofar as your civic

20    engagement, your act of participation in body populous as a

21    citizen is fully vested at 18, insofar as the eyes of

22    the federal --

23          THE COURT:  Now?

24          MR. HARDING:  I'm sorry?

25          THE COURT:  Now?

1          MR. HARDING:  Yes.

2          THE COURT:  Well, I guess we're back to my first

3     question and, that is, intellectually, how does one justify

4     going back in time and using historical analogues to interpret

5     one part of a constitutional provision and then using today's

6     situation to interpret another part of the same constitutional

7     amendment?  How can you do that?  What authority is there to

8     do that?

9          MR. HARDING:  I guess to clarify our position on that

10    question is, the government's position is adulthood, age of

11    majority, is the threshold issue in 1791 as to when these

12    rights vest.  Our position is though the number might have

13    changed on adulthood, the state has still established adult --

14    it's the same inquiry.  It's not a different inquiry.  It's

15    just we're not couching adulthood in 1791; it's here today.  I

16    mean, adulthood can change.  Insofar as the state wants to

17    recognize a member -- someone as a fully vested, fully

18    emancipated, fully independent member of society, the state

19    has done that.

20          So having a 1791 inquiry versus a more modern review,

21    I think we can sit here and look at 1791 and say -- and this

22    is even under the government's own argument -- "Who did they

23    want to have firearms?"  And the government's position is not

24    the minors, certainly not the minors.  The minors aren't the

25    ones to have the firearms.  That's fine.  If that's the case

1   they want to present, minors aren't the ones at issue here.

2   That's what I'm trying to say.  If adulthood is the

3   distinguishing factor, we have to look at it at the time of

4   today.

5           Now, if they want to look at the nominal age itself

6   rather than the classification of minor versus adult, the

7   argument still falls because there were no bans based on age

8   at that time, no categorical bans especially, or just

9   outright, and that goes back to the loyalty test reference.

10  Those laws were presuming that 16 or 18, depending on what

11  state, would have access to these firearms, and then if they

12  failed the loyalty test, they would be disarmed, right?

13          And so looking at 1791, no age-based restrictions, no

14  categorical-based restrictions on the books.  Presuming these

15  young people, even though they were minors, presuming them to

16  be a part of the militia, they're inherently part of the

17  people at large and they're not banned.  In fact, the Court

18  referenced it earlier, there were a lot of categories that

19  were, I guess, considered outside of "the people" at that

20  time.  And things have changed since as well.

21          Finally -- well, I don't want to say "finally."  But

22  if the founders wanted to include an age-based restriction,

23  they knew how to do so.  The body of the Constitution in

24  Article 1 and Article 2 put age-based restrictions and

25  classifications on the right to run for the House of

Fraser v. Bureau of ATF - 02/08/2023

1  Representatives at 25; 30 to run for the U.S. senate; 35 to

2  run for president.  If the people or Congress wanted to add an

3  age-based restriction on the right to exercise the Second

4  Amendment, then they knew how to do so as seen by Article 26,

5  which is a reference to age for universal suffrage for voting,

6  for federal purposes, at 18.

7          The Constitution is silent when it comes to an

8  age-based restriction at all on the Second Amendment.  And

9  insofar as the people are concerned, there is not one variable

10 that the government can point to to these young men and the

11 young women in the class that would remove them from the

12 people but for the fact that they weren't adults in 1791.

13         Yet, that had nothing to do with what the Second

14 Amendment was intended for.  And because it incorporates and

15 encompasses a preexisting right -- that's what *Bruen* has

16 found; it's what the *Hirschfeld* decision found; it's what

17 *Heller* recognizes, it's an individual preexisting right -- one

18 has to take a step back and think what limitation --

19         THE COURT:  There is a preexisting right?

20         MR. HARDING:  To be able to defend oneself through

21 the keeping and bearing of arms, yes.  *Bruen* and *Heller* have

22 found as much, preexisting the Second Amendment's

23 ratification.

24         And so then we have to sit there and think, "Okay.

25 If it's preexisting, how did the founders expect it to be

Fraser v. Bureau of ATF - 02/08/2023

1  exercised prior to the ratification of the Second Amendment,"

2  meaning prior to that?  And there again, the government isn't

3  able to point to any analogue that's disarming a categorical

4  class of the exact same people who would be called to arms to

5  use the firearms to defend the country in the first place.

6          And if you look at some of the founders and the

7  drafters of the Constitution themselves, they would have

8  fallen within this age class at the time of the Revolutionary

9  War.  They're the exact members of the militia who would have

10 been called to arms.

11         THE COURT:  Do we have proof of that in the record?

12         MR. HARDING:  In the briefing, Your Honor, I believe

13 there's references to Madison having been -- I'm trying to

14 find the exact age, but they were -- I'm relatively sure

15 Madison would have fallen within that age bracket at that time

16 of the Revolutionary War.

17         THE COURT:  18 to 20?

18         MR. HARDING:  18 to 21, I believe he would have

19 fallen within that age range.

20         THE COURT:  Do we have any proof of that?  See, I

21 have to consider what's in the record.

22         MR. HARDING:  Sure.

23         THE COURT:  I have to have some authority for

24 deciding something.

25         MR. HARDING:  I'm trying to find where we referenced

Fraser v. Bureau of ATF - 02/08/2023

1   the ages of some of the founders in our briefing.  If it's

2   not in our --

3            THE COURT:  Franklin was 81 when he signed the

4   Declaration of Independence, which was considerably before

5   '91, so he wasn't in the militia.  John Hancock was an older

6   man.

7            MR. HARDING:  Yeah.  I do recall Madison was

8   relatively young at the time of the Revolutionary War, though.

9   And I think -- I don't know if he would have been 18.  He

10  might have been --

11           THE COURT:  I don't know that they were -- any of

12  them were 18.

13           MR. HARDING:  He might have been in his early 20s.

14  But the point being is they clearly were relying on thousands

15  and thousands of young men under the age of 21 when advancing

16  their militias.  They clearly considered these young men and

17  the body at large to be included because of the reason why we

18  have the Second Amendment, not just as the individual right to

19  defend oneself, but even the more collective aspect of it, of

20  calling forth a defense mechanism.  These were -- these were

21  the exact body that was relied upon at that time to get us to

22  the point of the founding.

23           So it would have been counterintuitive to think that

24  these people are outside of the scope of the Second Amendment.

25  In fact, if anything, they're the exact people, even

1    worst-case scenario.  They're the exact type of people that

2    were being protected by the Second Amendment, because this was

3    the body that was being called to arms.

4          THE COURT:  All right.

5          MR. HARDING:  Finally, again, these firearms aren't

6    unusually dangerous; therefore, we can't point to the firearms

7    being outside of the scope.  And it's not a presumptively

8    lawful, long-standing restriction.  This isn't something that

9    has been around, such as the ban on felon possession or those

10   found with maybe mental illness or those who were found to be

11   threats to the state at large.  This was brought in in 1968.

12   And, yes, it was in response to 1960s gun violence.  The

13   record -- I believe the legislative history that the

14   government provided, at least some of legislative history

15   around the passage of this, referenced the fact that we had a

16   president assassinated; his brother, the attorney general, had

17   been running for president assassinated; civil rights leaders

18   had been assassinated.  Gun violence was very much on the

19   topical mind of the country.  But because it's 50-plus years

20   old and hasn't be challenged that often doesn't mean it's

21   presumptively lawful or that it's long-standing.  It's the

22   substance of the law that has to be reviewed.  It's the how

23   and the why that the restriction is imposed.

24          And without any type of individualized assessment of

25   these young men and young women, to do a categorical ban on

1   them also does bring up the equal protection argument.  And I

2   do want to move to that.  Insofar as age-based restrictions

3   are concerned, we do concede that the Supreme Court has

4   referenced old-age-based restrictions on a few different

5   times, and has found age is not -- is not a factor for the

6   purposes of a heightened scrutiny, a suspect or a

7   quasi-suspect class.

8          We take the position that reading that statement

9   alone is overbroad, because the Court was not faced with this

10  issue before it at the time, and it has not been.  In fact,

11  the Supreme Court, when looking at minors, which, again, this

12  case does not involve, but when it does look at minors, it has

13  found that the civil rights fully do extend regardless of age.

14  Maybe it can be curtailed in some form or fashion, but age is

15  not a barrier to having said rights.  *Tinker* against *Des*

16  *Moines*, *Planned Parenthood* against *Danforth*.  It's been

17  applied to the First Amendment, the Fourth, the Fifth, the

18  Sixth, the Eighth, and the Fourteenth.

19          THE COURT:  The holding that age is not a suspect

20  class is still the rule before this Supreme Court, isn't it,

21  in the Supreme Court's decision?

22          MR. HARDING:  We believe that the judicial -- no,

23  Your Honor.  Our position is that the narrowness that the

24  supreme -- the constitutional avoidance principle would negate

25  the idea that the Supreme Court of the United States has ruled

Fraser v. Bureau of ATF - 02/08/2023

1    against us on this motion.  Just because they said age is not

2    a suspect class, we cannot rule it -- we cannot look outside

3    of the context that they were stating that.  And to extend it

4    to the bottom end of the age rung for adults would be

5    overbroad, and the court did not rule as much.

6         None of the factors that are presented in this brief,

7    in this argument, were put before the Court.  And those

8    primary factors are what aspects of a classification render

9    members of such class to be a suspect or quasi-suspect class.

10   And those factors are primarily whether or not there's been a

11   history of long-standing oppression and exploitation of the

12   members of the class.

13        And we argue on page 21 that those classified, based

14   on their youth, have suffered from a history of purposeful,

15   unequal, and oppressive treatment, whether it be prior to the

16   founding, at the time of the founding, and particularly

17   through the draft and even to today.  Then we can sit there

18   and point to the fact that -- and we go through at length

19   listing the various methods by which the youth have been

20   exploited and oppressed by the political bodies at large in

21   the state.  But then we look at the fact that it is a mutable

22   characteristic and they are an insular minority.

23        Now, I know the government argues that age is not

24   immutable, but it is immutable in the sense that the person is

25   incapable of unilaterally changing their condition.  I cannot

1  become 10 years older today.  It's immutable in the sense that

2  it is not amendable, it's not capable of any type of revision

3  of the person who is in the class.  They can't make themselves

4  older.

5          Now, the powers that be, meaning time, if we're

6  fortunate enough to make it later in life, that will perhaps

7  mute out the characteristic.  But that immutable has

8  historically always been about the possessor of the

9  classification themselves: race, sex, gender, national origin,

10 ethnicity.  You know, religion, ironically, isn't inherently

11 immutable; people can convert all the time.  But people are

12 protected then, arguably, under the First Amendment.

13         In this situation, it's not mutable and they are

14 insular minority in the sense that both historically and

15 presently they are such a small number of the political body

16 that they aren't capable of mobilizing against the older

17 cohorts who have been able to vote for such a long time in

18 order to establish an equal footing in the eyes of the law.

19         And we've seen that, and we detail a history of that

20 when, even prior to the draft cases, when Florida or Wisconsin

21 was able to conscript young men between the ages of 16 up into

22 their mid-twenties to go out and publicly build the roads.

23 And they could pay their way of out it, but they were,

24 effectively, drafted into public service to go build the

25 roads.

Fraser v. Bureau of ATF - 02/08/2023

1          Now, did they have a right to vote themselves in or

2     out of that situation?  Some did; some did not.

3          In this case, what we have before the Court is prior

4     to universal suffrage, in 1968, none of the members of the

5     class before the court had that universal right to vote.  So

6     their rights were stripped from them without them having a say

7     in the matter.

8          Now, the government might say, "Well, now they do

9     have universal suffrage.  They can go out and vote to give

10    them themselves the right to go purchase the firearm from an

11    FFL."  But that's not the case, because they are insular in

12    the sense that they have no -- they're new to the scene when

13    it comes to the people at large, to the civic body.

14          And so whether it be the history of exploitation and

15    oppression, the immutability of their characteristics, or the

16    insular minority status, those are the fundamental factors of

17    whether or not a class gains any form of heightened scrutiny.

18    And it stands to reason in this case, because as the Court

19    noted earlier, plenty of folks were not considered part of

20    "the people" at the time.  But none of those invidious and

21    insidious categorical bans, whether based on race, religion,

22    sex, gender, what have you, national origin, ethnicity, none

23    of those would survive today.  And even though there wasn't a

24    categorical ban on age at the time, the government is now

25    trying to say, "Well, they are a part of the people at large,

Fraser v. Bureau of ATF - 02/08/2023

1    it's just we're going to -- because they can vote and they can

2    serve and they have no other limitations, but because the

3    Supreme Court found that old-age-based restrictions have no

4    type of protection, then we're going to relegate these young

5    men and women to second-class citizens."

6         And with that, if the Court were to find that the

7    Second Amendment doesn't apply, we do believe that an equal

8    protection analysis is appropriate.  We do think this is

9    fundamentally distinguishable from the Supreme Court's prior

10   rulings on age-based class restrictions based on which end of

11   the spectrum we're talking about on age.

12        And, finally, it doesn't survive rational basis from

13   a due process challenge.  Even if the age-based restriction

14   passes equal protection muster, we think relegating these

15   young adults to the private sector, devoid of any type of

16   oversight or protections as a means of undermining clandestine

17   procurement of firearms is fundamentally irrational and can't

18   survive even under a rational basis.

19        THE COURT:  Well, in Count One and Two, you purport

20   to assert facial and as-applied challenges.  Isn't it really

21   just the facial challenge?

22        MR. HARDING:  Well, Your Honor, yes, we argue that it

23   is just a facial challenge.  But if this Court were to find

24   that the plaintiffs need to show or have yet to show if

25   there's a clash as to what needs to be shown between the

Fraser v. Bureau of ATF - 02/08/2023

1  government and the plaintiffs concerning parental approval,

2  for example, that's a fact we could establish at trial, if

3  need be, and prove that, as applied, our clients' parents

4  aren't going to buy them the firearms.  We don't think that

5  that's a pleading requirement.

6          THE COURT:  You don't allege that.

7          MR. HARDING:  No, we don't think we have to.

8          THE COURT:  Wouldn't you have to allege it to allege

9  an as-applied challenge?  In other words, you measure the

10 claim against what the allegations in the complaint are and

11 if, in fact, the issue is -- if it's as an applied challenge,

12 the issue is whether the parents will or will not buy them a

13 gun and give it to them, that has to be in the complaint as

14 the predicate for the --

15         MR. HARDING:  For the as-applied challenge.

16         THE COURT:  Or as an applied challenge, don't you

17 agree?

18         MR. HARDING:  We did not plead that the parents

19 wouldn't purchase the firearm.

20         THE COURT:  I know, but don't you agree that if

21 you're going to make an as-applied challenge, the only one you

22 have is that and you have to plead it, and you haven't pled

23 it?

24         MR. HARDING:  We have not pled that the parents

25 haven't purchased it.  We just think it's a facial -- we think

Fraser v. Bureau of ATF - 02/08/2023

1    it's a facial --

2            THE COURT:  It's a facial challenge.

3            MR. HARDING:  It is a facial challenge.  But the

4    government has raised the issue of an end-around means by

5    which one could procure the targeted firearm through a third

6    party, that being the parent.  We don't believe that we need

7    to find that.  In fact, we find that condition to be

8    unconstitutional as well.  I mean, it's a part of the overall

9    structure that we're challenging, because these individuals

10   are not actors of the state.

11           If a shall-issue state and the shall-issue permits

12   are going to be struck down due to arbitrary enforcement, a

13   parental oversight provision for emancipated adults certainly

14   is arbitrary.  It's unenforceable.  It's effectively

15   deputizing parents as a means of becoming a way for these

16   young men and women to access their Second Amendment right.

17   The state cannot bestow that requirement onto an unregulated,

18   unqualified, completely arbitrary choice of a parental

19   decision for an adult.  But if they --

20           THE COURT:  So a right to drive?

21           MR. HARDING:  One could argue you have the right to

22   travel, but we're not arguing --

23           THE COURT:  To drive.

24           MR. HARDING:  To drive, generally?  Not --

25           THE COURT:  Is there a constitutional right to drive?

Fraser v. Bureau of ATF - 02/08/2023

1           MR. HARDING:  No.  There's not a

2  fundamental constitutional -- there's not a constitutional

3  right to a lot of age-based things: alcohol, tobacco, gaming,

4  you know, renting a car at a certain age.  There's plenty of

5  privileges we enjoy in a free society, but the idea that we're

6  going to couch firearm procurement in the same level as a

7  myriad of other benefits, it's at odds with what the

8  Constitution requires.  It's at odds with *Heller* and *Bruen*.

9           THE COURT:  I think I understand.

10          MR. HARDING:  Yeah.  Now, I don't know if the --

11 right now we're still, I guess, on the motion to dismiss?

12          THE COURT:  I thought you-all told me it was the same

13 thing.

14          MR. HARDING:  It is the same thing.  I just wanted to

15 make sure from the logistical purposes of the Court.  I didn't

16 know if the Court wanted to delve into summary judgment.

17          THE COURT:  Is there something different that I need

18 to delve into?

19          MR. HARDING:  No.  The standards are in our briefs.

20          THE COURT:  All right.

21          MR. HARDING:  With that, we'll rest, Your Honor.

22          THE COURT:  Mr. Clendenen, do you have anything else?

23          MR. CLENDENEN:  Yes, Your Honor, a few things.

24          Good afternoon.  May it please the Court.  Your

25 Honor, I did want to talk a little more about the plain text

Fraser v. Bureau of ATF - 02/08/2023

1   issue.

2        THE COURT:  All right.

3        MR. CLENDENEN:  The first point -- and a lot of this

4   is covered in the amicus brief of the Every Town for Gun

5   Safety, ECF Number 26.  On page 3 of that amicus brief, the

6   amicus talks about how it's the burden of the plaintiffs to

7   show that the conduct falls within the plain text of the

8   Second Amendment, when *Bruen* says first look to whether or not

9   it's covered by the plain text, and if that is so, then the

10  government has the burden to show that there's a historical

11  analogue, which suggests that that first part, the burden

12  falls on the plaintiff.

13       So the fact that the plaintiffs haven't made any

14  argument, other than maybe one conclusory sentence in their

15  briefing, that the plain text covers their conduct, that

16  should be the end of the matter, regardless of whether or not

17  the government has rebutted it in their briefing, since the

18  burden is on the plaintiffs.

19       But on the plain text specifically, there's two

20  issues here.  One is whether "the people" includes individuals

21  who are ages 18 to 20, and the second issue is whether or not

22  the word "keep" includes a right to purchase firearms.

23       On that second point, whether or not "keep" includes

24  a right to purchase, the same amicus brief, on page 4, cites

25  two district court opinions that found that -- well, found

1   that selling, and one of those cases also says purchasing

2   firearms, does not fall within the meaning of keep.  And that

3   also the other two cases that we printed, *United States*

4   *versus* --

5          THE COURT:  How can you keep it if you don't purchase

6   it?

7          MR. CLENDENEN:  I'm sorry, what was that, Your Honor?

8          THE COURT:  How can you keep it if you don't purchase

9   it?

10         MR. CLENDENEN:  Well, Your Honor, he can procure it

11  from it his parents.  His parents can give it to him as a

12  gift.  The *United States versus Porter* decision --

13         THE COURT:  That's the only way.

14         MR. CLENDENEN:  Well, it is possible to buy a

15  secondhand handgun from --

16         THE COURT:  But you said you weren't pushing that

17  point, I thought.

18         MR. CLENDENEN:  Primarily, Your Honor, the way that

19  the --

20         THE COURT:  Judge Williams put it this way:  Fish or

21  cut bait.  I mean, are you going to argue that and want me to

22  decide it or not?  Is the ATF really saying, "Look, the

23  statute is saved because you can make a purchase from an

24  unlicensed dealer"?  That's what you're saying?

25         MR. CLENDENEN:  No, Your Honor.  Our primary argument

1  is that the plaintiffs can purchase it from their parents.

2          THE COURT:  That's your only argument now.  I told

3  you to either buy it or sell it, and you sold it.  Let's go

4  on.

5          MR. CLENDENEN:  Yes, Your Honor.  It is a standing

6  argument, so --

7          THE COURT:  Let me ask you something.

8          MR. CLENDENEN:  Yes, Your Honor.

9          THE COURT:  Why isn't the argument that you can

10 buy -- a parent could buy a gun for a child, the functional

11 equivalent of a straw purchase for a prohibited person?

12 Because here he is a prohibited person getting it the only

13 lawful way he can get it, by buying it.  So it looks to me

14 like that you're really arguing that the -- that a straw

15 purchase arrangement is okay in the context of this situation,

16 to get it into the hands of an otherwise prohibited person.

17 Help me with that.

18          MR. CLENDENEN:  Your Honor, in the context of a

19 parent, yes.  This is basically an exception to the ordinary

20 straw purchase rule, that a parent is allowed to do it in this

21 instance where the only disability is that the person is under

22 the age of 21 but over the age of 18.

23          THE COURT:  But why is the parent given that right

24 when -- if I go out and I buy it for my grandson, I'm not

25 protected.  If I go out and buy it for the neighbor's son, I'm

Fraser v. Bureau of ATF - 02/08/2023

1  not protected.  Why is the parent protected?  I mean, I would

2  go to jail as a straw purchaser, right?  If I bought one for

3  an 18-year-old who is the young man, young woman next door, I

4  like them a lot, I like -- I take them hunting with me, we go

5  shooting at the Cavalier sporting place, and I want them to

6  have a handgun because I think that they travel in rough

7  circumstances sometimes and I want them to be able to protect

8  themselves, if I buy it from a federally licensed dealer and

9  give it to them, I have effected a straw purchase to a

10  particular person, haven't I?

11          MR. CLENDENEN:  Your Honor --

12          THE COURT:  Yes or no?

13          MR. CLENDENEN:  I'm not sure, to be honest.  I think

14  what --

15          THE COURT:  Suppose this -- let's take it one step

16  further.  Suppose this person, this young person comes to me

17  and says, "Sir, we are great friends.  You know how much I am

18  careful with guns and respect them and know what I'm doing.  I

19  need a gun to protect myself because I travel through some

20  rough territories earning my living as a pizza delivery

21  driver.  Would you buy me one?  My parents won't do it.  Would

22  you do it?"

23          "Sure.  I'll do it."

24          I've just completed a straw purchase when I do that,

25  haven't I?

1           MR. CLENDENEN:  Yes, Your Honor.  That would be more

2    clearly not allowed.

3           THE COURT:  What is it that keeps the mere status of

4    parent, that keeps that very same transaction from being a

5    straw purchase, a purchase for somebody who is otherwise not

6    allowed to have a gun?

7           MR. CLENDENEN:  Your Honor, this is the balance that

8    Congress set out.  The legislative history makes it clear that

9    if a parent is involved, it's okay.  And the ATF opinion

10   letter spells that out more explicitly as well.

11          THE COURT:  Well, it just says it's okay.  It doesn't

12   explain why.  I'm looking for a rationale why -- you see, what

13   you're saying is, you're arguing a truly unusual premise -- I

14   mean the theory, and the theory is that by doing what is

15   unlawful, you can make something lawful.  It's a very

16   troublesome proposition for a court to sign on to something

17   like that.

18          MR. CLENDENEN:  Your Honor, historically, both in the

19   firearm context and many other contexts, parents have, you

20   know, supervisory rights over their children.  So ordinarily,

21   someone under 21 can't drink alcohol --

22          THE COURT:  I have supervisory rights over my

23   18-year-old, do I?  What can I do?

24          MR. CLENDENEN:  An 18-year-old child --

25          THE COURT:  Living with me.

Fraser v. Bureau of ATF - 02/08/2023

1          MR. CLENDENEN:  You could, for example, allow your

2  18-year-old child, if you're a legal guardian, to drink

3  alcohol in your presence, even though they go can't out and

4  buy it on their own.

5          Historically, in the firearm context, there is

6  precedent for this as well.  There were some states at the

7  founding that allowed 18- to 20-year-olds to be in the militia

8  only with parent's permission.  We've included a chart with

9  those state laws.

10          THE COURT:  Right.

11          MR. CLENDENEN:  And the idea in this context, or the

12  1968 law, is that a parent or legal guardian knows their child

13  and knows if that child is mature enough to own a handgun

14  without committing crimes.  So the whole point -- the whole

15  point of not wanting a clandestine purchase of a firearm as

16  used in the legislative history, it's clandestine from the

17  parents.  It's not a question about whether or not someone is

18  clandestinely purchasing it from the firearm dealer; that's

19  not the point.  It's clandestine with regard to whether or not

20  the parent knows it, because the parent is in the best

21  position to know if that child, who's under the age of 21, is

22  responsible and mature enough to own that kind of firearm and

23  isn't going to go out and commit crimes with it.

24          THE COURT:  Isn't that, really, just part of an ends

25  versus means test?  I mean, one part of it; it's not the whole

Fraser v. Bureau of ATF - 02/08/2023

1  thing.  It's sort of the central point of one.

2       MR. CLENDENEN:  Your Honor, I don't think it's

3  necessarily part of an ends versus means test necessarily.

4  And, again, *Bruen* --

5       THE COURT:  It will allow these people, who we don't

6  really want to have it because they're -- to have a handgun

7  because they're so -- the group has committed violent crimes,

8  they're in that category, and, yet, we'll let the parent

9  choose.  And for all you know when you're enacting a law, the

10 parent could be a felon, and, in fact, it's not unusual that

11 we have cases that felon parents buy guns, give them to their

12 offspring.

13       MR. CLENDENEN:  So, Your Honor, in that situation, it

14 wouldn't be allowed because the purchaser would also have a

15 disability to acquiring a firearm, if they're a convicted

16 felon.  So that wouldn't work if they had other disability,

17 like, if they --

18       THE COURT:  All right.

19       MR. CLENDENEN:  You know, if they were a habitual

20 drug user, for example, they're not allowed to purchase a

21 firearm under federal law, so the same thing would apply.

22 They wouldn't be able to purchase it and then gift it to their

23 child.  But the plaintiffs haven't alleged that their parents

24 are under any disability like that here.

25       THE COURT:  Yeah, I know.

Fraser v. Bureau of ATF - 02/08/2023

1          MR. CLENDENEN:  On the plain text point, though, so

2    one issue is whether keep includes a right to purchase.  The

3    other is whether or not "the people" includes 18- to

4    20-year-olds.  Again, the Every Town for Gun Safety amicus

5    addresses this on page 4., and they cite a law review article

6    specifically explaining that 18- to 20-year-olds fall outside

7    of "the people."  And then all the cases that plaintiffs cite,

8    there's no discussion rebutting that point.  The *McCraw* case,

9    it doesn't really go into --

10         THE COURT:  What brief are you asking me to touch on

11   down here?

12         MR. CLENDENEN:  It's ECF Number 26.  It's an amicus

13   brief --

14         THE COURT:  Yes.

15         MR. CLENDENEN:  -- by Every Town for Gun Safety.

16         THE COURT:  What page?

17         MR. CLENDENEN:  Page 4.

18         THE COURT:  And where?

19         MR. CLENDENEN:  About halfway down the first full

20   paragraph.

21         THE COURT:  Beginning with what word?

22         MR. CLENDENEN:  "Here, however, the question is a

23   different one: whether those younger" --

24         THE COURT:  ". . . than 21 are considered part of

25   'the people' covered by the Amendment's text.  As recent

Fraser v. Bureau of ATF - 02/08/2023

 1   scholarship by a leading Second Amendment historian has

 2   confirmed, they are not."  Citing Saul Cornell.

 3            MR. CLENDENEN:  Yes, Your Honor.  And none of the

 4   cases that the plaintiffs have cited really rebut that point.

 5            THE COURT:  That's just the common law age of

 6   majority question.  Isn't that what it all boils down to?

 7            MR. CLENDENEN:  It is what it boils down to, yes,

 8   Your Honor, but, specifically, in the context of the plain

 9   text inquiry.

10            THE COURT:  Anything else?

11            MR. CLENDENEN:  Just a couple of points, Your Honor.

12   For the equal protection analysis, since, as we've explained,

13   age is not a suspect class, the Court would uphold the law as

14   long as rational basis is satisfied.  And rational basis, as

15   the Supreme Court has said in a number of cases, a law can be

16   underinclusive and overinclusive and still pass rational basis

17   so long as there's any connection at all.

18            So the fact that, you know, it is true there's,

19   effectively, a loophole for someone under 21 to buy a

20   secondhand firearm at a gun show, and so for that reason, as

21   Your Honor said, the law isn't perfect, basically, in

22   preventing all persons under 21 from acquiring firearms.  But

23   that doesn't matter for a rational basis review.  That's,

24   basically, just a point to say that the law is underinclusive

25   in one regard, which is fine for a rational basis review.

Fraser v. Bureau of ATF - 02/08/2023

1          The connection (coughing) -- I'm sorry.

2          THE COURT:  Do you want to go get a glass of water?

3          MR. CLENDENEN:  I think I'll be fine.

4          The connection is that Congress found there was a

5    heightened level of criminal activity involving firearms of

6    people under the age of 21 around the time the statute was

7    passed, specifically using handguns, and so they passed a law

8    that would require -- effectively require parental permission

9    for a purchase from federally licensed firearm dealers, which

10   were the largest sellers to people in this age group.  That is

11   enough for a rational basis review.  The fact that there's

12   loopholes doesn't really come into play.

13          THE COURT:  So what you're saying is that rational

14   basis review doesn't require a rational basis.  To me, it's

15   utterly irrational to say, "Well, we're not going to allow

16   18-year-olds to buy from federal firearms dealers, where, A,

17   we know who's buying it and what their background is, et

18   cetera, but their parents can sneak around and do it and give

19   it to them."  So they could give it to anybody, whether the

20   person was balanced or not balanced, disciplined or not

21   disciplined, known or not known.  So we don't have any --

22   again, we don't know who it is because the parents are buying

23   it.

24          Or the child can go out and go to the gun shows and

25   buy from the gun show people who aren't obligated to do it.

Fraser v. Bureau of ATF - 02/08/2023

1   We have no way of tracing it.  It makes utterly no sense to do

2   that except that it provides a way for Congress to do

3   something, because it allows them to achieve an objective,

4   which is to regulate some firearm purchases, looking like

5   they're doing something on the law, in the face of a problem,

6   and doing it in a way that opens the door and invites

7   subterfuge itself.

8        And to -- in order to get the -- in other words,

9   you're inviting these young people, 18 to 20, to use means by

10  which we can't track them, by which we don't know if they've

11  got good guns, warranties and et cetera, and mostly that you

12  can't track them.  What reason or rationality is there to a

13  structure of a law like that?

14       MR. CLENDENEN:  Your Honor --

15       THE COURT:  I understand the principle you're talking

16  about, overinclusivity, underinclusivity.  I understand that,

17  but I've never seen it applied to something like this, where

18  Congress actually creates a law that invites its violation of

19  the object it's trying to accomplish and is arguing that in

20  court to defend that it's rational.  And I'm having trouble

21  with that intellectually.  Can you help me?

22       MR. CLENDENEN:  Your Honor, the purpose, the main

23  purpose of the statute is that it's supposed to encourage 18-

24  to 20-year-olds to have their parent give permission,

25  basically, before they can buy these firearms.

1              For a rational basis review, the fact that there
2    could be a better statute written that outright prohibited gun
3    shows and that sort thing that would achieve the purpose even
4    better, it doesn't matter so long as the law furthers the
5    purpose at all.
6              THE COURT:  So the theory is at least the system,
7    irrational though it may be, gives some protection to those
8    who are harmed by firearms fired -- used by people 18 to 20?
9    Is that what it boils down to?
10             MR. CLENDENEN:  With the exception of the word
11   "irrational," Your Honor, just because that's a legal term of
12   art, basically, that is the standard.
13             THE COURT:  Well, but let me ask you this:  What
14   evidence is there in the congressional record that the crime
15   that they're seeking to address is -- was committed by 18- to
16   20-year-olds?  You cited something earlier, but that doesn't
17   seem to address the ages of the people in any way that I can
18   make any sense out of it.  Do you have anything that --
19   because that does have to do with rationality, doesn't it?
20             MR. CLENDENEN:  A few things, Your Honor.  So on our
21   memorandum in support of the motion to dismiss, which is
22   ECF-22, bottom of page 2, top of page 3, we cited, "The
23   legislative record established that, quote, 'juveniles account
24   for some 49 percent of the arrests for serious crimes in the
25   United States and minors account for 64 percent of the total

1  arrests in this category.'"

2          THE COURT:  Let's take that for a minute.  What's a

3  juvenile?  What's minor?  What's the definition of all that?

4  It's not shown.  That actually suggests that maybe they really

5  are considerably younger people than 18 to 20 and, therefore,

6  wouldn't support logically a restriction on those who are 18

7  to 20.

8          MR. CLENDENEN:  Your Honor, I believe --

9          THE COURT:  Have you read that article?

10          MR. CLENDENEN:  What was that, Your Honor?

11          THE COURT:  That article you cite me about the

12  juveniles and the minors, as you just cited.

13          MR. CLENDENEN:  Oh, the Senate report?

14          THE COURT:  Yeah, the finding.  Have you read to see

15  what behind that -- what data there is behind that respecting

16  the ages of people they're talking about when they mention

17  juveniles and minors?

18          MR. CLENDENEN:  Not recently, Your Honor.  I do

19  know that -- I'm mixing this up, I think.  But I think

20  juveniles is individuals under 18, and minors is under the age

21  of 21.  I thought we had a footnote --

22          THE COURT:  So a big percentage of the arrests --

23  that's arrests.  That doesn't get you anywhere, it just shows

24  they've been arrested -- relates to people who aren't even in

25  the category of 18 to 20.  Under that theory, they're below

1  18, so they're not in the category of 18 to 20.  So nothing in

2  that finding would support the regulation of an 18- to

3  20-year-old.

4        Now the next one is -- what is the second?  What's

5  attributed to the minors?

6        MR. CLENDENEN:  ". . . 'minors account for 64 percent

7  of total arrests in this category.  Minors under the age of 21

8  years accounted for 35 percent of the arrests for the serious

9  crimes of violence including murder, rape, robbery, and

10  aggravated assault,' and 21 percent of arrests for murder."

11        THE COURT:  All right.  I see.

12        I have to go back and see what kind of validity there

13  was behind that.  Have you done that?  What kind of validity

14  is there to that conclusion?  That's a congressional

15  conclusion.

16        MR. CLENDENEN:  Yes, Your Honor.  And under rational

17  basis review --

18        THE COURT:  Written by some congressional staffer

19  somewhere on the basis of something, I assume.  So have you

20  gone back to see what the staffer wrote, whether it was

21  correct or not?

22        MR. CLENDENEN:  Your Honor --

23        THE COURT:  Have you checked the underlying authority

24  for the assertion that Congress is making there and whether

25  it's correct, because it's internally inconsistent.  You tell

1   me that juveniles are under 18, and then in the next breath,

2   they say minors account for 35 percent of those -- of what

3   juveniles do, so it can't be that juveniles excludes minors.

4   It just is typical gobbledygook from people who are trying to

5   make a point, and it doesn't stand up.  So it looks to me

6   like, in your situation, you have to go back and see what did

7   they say and do and what was really the basis for that

8   conclusion.

9           MR. CLENDENEN:  Your Honor, I think I might have --

10          THE COURT:  Is there any?

11          MR. CLENDENEN:  Your Honor, I think I might have it

12  mixed up in that either juveniles or minors specifically

13  refers to individuals 18 to 20 and one refers to anyone under

14  the age of 21.  I don't remember, honestly, Your Honor.

15          THE COURT:  Okay.

16          MR. CLENDENEN:  I thought we had a footnote that

17  spelled that out, but I can't find it right now.

18          THE COURT:  If there is, I didn't get it.

19          MR. CLENDENEN:  But for rational basis review, the

20  fact that Congress made these legislative findings is

21  sufficient.  For heightened scrutiny, the Court --

22          THE COURT:  In considering rational basis, we don't

23  consider whether there's any merit at all to the congressional

24  finding?  Suppose that you go back and look and there is

25  nothing to offer to support that, nothing, just no proof,

1   somebody wrote it out.  Are you saying we don't consider that?

2           MR. CLENDENEN:  Your Honor, I'm not sure -- rational

3   basis review is a very low bar.

4           THE COURT:  It isn't a high bar, but I'm not quite

5   sure it's as low as you think it is.

6           All right.  Anything else?

7           MR. CLENDENEN:  Your Honor, I'm happy to answer any

8   other questions, but otherwise --

9           THE COURT:  All right.

10          MR. CLENDENEN:  Thank you.  Yes, Your Honor.

11      (The Court and the law clerk confer.)

12          THE COURT:  Look, the linchpin of *Bruen* is the

13  statement:  "We reiterate that the standard for applying the

14  Second Amendment is as follows:  When the Second Amendment's

15  plain text covers an individual's conduct, the Constitution

16  presumptively protects that conduct.  The government must then

17  justify its regulation by demonstrating that it is consistent

18  with the" -- that is, the "it" in the sentence is the

19  regulation for the law -- "that it is consistent with the

20  Nation's historical tradition of firearm regulation.  Only

21  then may a court conclude that the individual's conduct falls

22  outside the Second Amendment's 'unqualified command.'"

23          In your papers, that issue is glossed over.  It's

24  given some treatment but not much, and it doesn't focus the

25  way that some of the decisions that you've cited to me that

Fraser v. Bureau of ATF - 02/08/2023

1    aren't in the brief focus on, and some of the ones that do.

2          I'm told here that the conduct that is covered by the

3    text of the Second Amendment -- or the plain text of the

4    Second Amendment in *Bruen* was possessing handgun outside the

5    home.  Here, it's purchasers of previously-owned firearms from

6    FLFA dealers.  That's federal firearms dealers.  That really

7    isn't addressed much.  None of that is addressed much in the

8    briefs.  So the construct of the analysis isn't presented

9    nearly as clearly in the briefs as we have framed it out in

10   the arguments today.

11         The other thing that the briefs sort of touch on, and

12   I think leave room for improvement is the discussion

13   assuming -- I assume in making this statement that the conduct

14   is covered by the plain text.  It then becomes the burden on

15   the government to show what is said in the quote that I just

16   gave you, and in order to do that, the court tells us exactly

17   what periods to consider and what weight to give the periods

18   of time when we're looking at the historical analysis.  And in

19   particular, the government's papers focus on cases that are

20   way out of the time zone, without recognizing what the court

21   in *Bruen* said is the validity of the usefulness of those

22   statutes and regulations.

23         So I'm generally of the view that rebriefing will

24   help make the matter clearer.  So I want you to have this

25   transcript, and I want you to refile some briefs.

Fraser v. Bureau of ATF - 02/08/2023

1          Is there any need to file anything other than --

2    you-all seem to agree that the -- that if the plaintiff

3    prevails on the motion to dismiss, the plaintiff will also

4    prevail on the motion for summary judgment, because there's no

5    fact, no nothing to do.  You're telling me this is the same

6    thing.  And if that's the case, and you haven't argued that

7    issue anyway, do you agree that if you lose on the motion to

8    dismiss, you lose on the summary judgment motion?

9          MR. HARDING:  Yes, Your Honor.  We wouldn't even

10   really make it to summary judgment if the Court finds that we

11   don't have standing or 12(b)(6) is satisfied, so we would

12   concede that point.  We would ask for leave to amend the

13   complaint, but --

14         THE COURT:  How would you amend it?

15         MR. HARDING:  For example, if we need to expressly

16   claim that the conduct -- in the complaint, if we need to

17   allege it as a fact rather than -- I mean, I think it would be

18   a legal conclusion.  But if we need to allege as a fact that

19   the conduct is within the plain text of the Second Amendment,

20   I would certainly add that.  The fact that it's not beaten

21   down as a fact in the complaint, I don't think it's necessary

22   because I think it's a legal conclusion, but we would

23   certainly add it.

24         THE COURT:  Well, you have to think about amending

25   your complaint.

Fraser v. Bureau of ATF - 02/08/2023

1    So he says if he loses the motion for summary

2    judgment -- I mean for 12(b)(6), he loses the motion for

3    summary judgment too.  Do you say otherwise, that if you lose

4    the motion to dismiss, you lose summary judgment?  I need to

5    know what goes after an adverse decision against you.  A

6    decision against you, what happens then?  You-all told me

7    there are no facts left.

8    MR. CLENDENEN:  Yes, Your Honor.  If the Court

9    concludes that both our 12(b)(1) and 12(b)(6) fail, and that

10   the 12(b)(6) fails because we've lost on the merits, then the

11   plaintiffs would be entitled to summary judgment at that

12   point, yes.

13   THE COURT:  Well, they would be entitled to summary

14   judgment then, okay.

15   All right.  Well, then just file one brief -- you

16   don't need to refile them on your motions -- and I'll treat it

17   all as subject to the agreement we just put on the record.

18   Get the transcript, and I want any citations keyed to

19   the transcript, if you need to.  I want you to see what you

20   said and see what you said in response to the questions that I

21   asked, as well as what the other side said when they were

22   boiling things down.  It may help us refine things.

23   I'm going to issue an order telling you with more

24   precision what I would like to have the brief focused on, but

25   I'm not going to restrict your ability to file the briefs.

Fraser v. Bureau of ATF - 02/08/2023

1          So now we need to determine when is the best time to

2    get your brief in quickest while it's fresh in my mind.  And

3    if you're going to need the transcript, that, in part,

4    requires us to know when the transcript can be ready.  I know

5    that the court reporter has other obligations, but you

6    well-heeled government and plaintiff can order an expedited

7    transcript.

8          What is soonest the transcript could be available,

9    standard, expedited, or whatever else?  Do you have any sense

10   of that, given what's going on in the rest of the court?

11          THE REPORTER:  The soonest I could do is seven days.

12          THE COURT:  That would be expedited.

13          THE REPORTER:  That's expedited.  And 14 days is less

14   expedited, and 30 days is regular turnaround.

15          THE COURT:  And there's a different price for the 30,

16   14, and 7.

17          I'm going to let you-all talk to the court reporter

18   about that.  I would rather have your briefs sooner rather

19   than later while it's still fresh in my mind.

20        (Counsel confers.)

21          THE COURT:  Are you so --

22          MR. HARDING:  We were just discussing the timeline,

23   Your Honor.

24          THE COURT:  Why don't you discuss the timeline and

25   then --

Fraser v. Bureau of ATF - 02/08/2023

1          MR. HARDING:  I think we're in agreement 14 days

2    would be preferred.

3          THE COURT:  All right.

4          MR. HAMBRICK:  Your Honor, Jay Hambrick.  I think we

5    would like to order the semi-expedited, which would give it 14

6    days, and then ask for 14 days to compile the brief.  Would

7    that work?

8          THE COURT:  14 days from now is the 22nd of February,

9    and 14 days from then is what?  March the 9th?  Is that

10   right?  March the 8th?  The 22nd, and then one week after

11   that is March the 1st, so it would be March 8th.

12         MR. HAMBRICK:  March the 8th, Your Honor.

13         THE COURT:  And then, in this instance, since we're

14   really treating it as a motion to dismiss, we'll let you go

15   first.

16         MR. HAMBRICK:  Did you want to do simultaneous and

17   then replies one week thereafter?  So we both file on

18   March 8th, and then we each file a reply on March 15th?

19         THE COURT:  Well, you may be required to file a reply

20   after I read them, but we can do that.  March 8th and

21   March 15th then.

22         MR. HAMBRICK:  Yes, Your Honor.

23         Your Honor, could I just correct one thing in the

24   record?

25         THE COURT:  Sure.

 1          MR. HAMBRICK:  This is just for plaintiff to confirm.

 2   I think you said -- you framed the issue as the prohibition on

 3   the sale of previously owned firearms, and I think the issue

 4   is the prohibition on the sale of nonpreviously owned

 5   firearms.  So just the "non" was omitted.

 6          THE COURT:  I think that's correct.

 7          Do you agree with that?

 8          MR. HARDING:  Yes, Your Honor.

 9          THE COURT:  Then that will be it.  I can't find my

10   note on that topic.

11          MR. HARDING:  Your Honor, I just want -- I want to

12   clarify that as well.  The Court asked --

13          THE COURT:  If you give me a minute, it was on *Bruen*,

14   and I need to -- let me look.  I wrote it down, so I'll make

15   sure that what I -- I said, "Here, the issue has been defined

16   as purchases, not sales of previously owned firearms from a

17   federally licensed firearm dealer," because that's what I

18   wrote down and I read it at the time.  So is that wrong?

19          MR. HARDING:  What you wrote down may not be wrong

20   insofar as that might be what I said.  But I want to clarify

21   it's the purchase of any handguns from a federally licensed

22   firearm dealer.  We just want to highlight that they're the

23   only source of unowned handguns and ammunition, you know,

24   nonpreviously owned, meaning new.

25          THE COURT:  It's the purchase of any handgun?

1         MR. HARDING:  Any handgun and ammunition from a

2    federally licensed firearm dealer.

3         THE COURT:  All right.

4         MR. HARDING:  That's the -- that is the conduct at

5    issue.  That's the conduct.

6         THE COURT:  Well, that's different than what you

7    said.

8         MR. HARDING:  Correct.  When I was explaining the

9    difference between what's at issue here versus the permitted

10   conduct of purchasing ones on the street or things like that,

11   I just want to distinguish this is the only source of unowned

12   handguns as FFL.

13        THE COURT:  Well, I understand that.

14        MR. HARDING:  Yes.

15        THE COURT:  Also, I asked you -- that note was

16   written to write down exactly what your response was when I

17   asked you what do you say the conduct is that is protected by

18   the plain text of the Second Amendment.

19        MR. HARDING:  Thank you.

20        THE COURT:  I'm going to try to frame up an order and

21   get it issued to give you some ideas.  It's an important

22   question and we need to make sure we're on the same

23   wavelength.  The wavelengths changed a little bit in the

24   argument, which from time to time happens.  And when that

25   happens, it's helpful to maybe get some fresh papers on it,

Fraser v. Bureau of ATF - 02/08/2023

1    and it will help you-all refine your thinking too.

2            So thank you very much.  Appreciate your argument.  I

3    look forward to your papers.

4        (Court adjourned at 2:50 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fraser v. Bureau of ATF - 02/08/2023

```
 1                          CERTIFICATE

 2    I, Melissa H. Custis, certify that the foregoing is

 3    a correct transcript from the record of proceedings

 4    in the above-entitled matter.

 5

 6    /s/  Melissa H. Custis, RPR          Date:  02/22/2023

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```