IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| JOHN COREY FRASER, et al., on behalf of themselves and all others similarly situated as a Class, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22CV00410 |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**BRIEF IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND..............................................................................................................2

I.     Statutory Background ...........................................................................................2

II.    Regulatory Background .......................................................................................5

III.   *Hirschfeld* Litigation...........................................................................................6

IV.   Procedural Background........................................................................................7

ARGUMENT ...................................................................................................................7

I.     The Court should dismiss for lack of subject matter jurisdiction because Plaintiffs lack Article III standing. .......................................................................................7

II.    The Second Amendment allows the government to regulate the commercial sale of handguns to people under the age of 21. ..........................................................9

       A.    The text of the Second Amendment does not cover the purchase of handguns by individuals under the age of 21. .....................................11

       B.    Historical traditions supports the legislative selection of 21 as the minimum age for commercial sales of handguns. ................................14

           1.   Pre-1776 .........................................................................................16

           2.   Revolution and Articles of Confederation (1776 to 1789)...................17

           3.   Early Republic (1789 to 1815) ...........................................................18

           4.   Antebellum (1815 to 1861) ................................................................18

           5.   Civil War and Reconstruction (1861 to 1877)....................................18

           6.   Post-reconstruction .........................................................................19

       C.    Militia laws do not suggest that individual under twenty-one have the right to directly purchase handguns from licensed delears............................22

III.   Plaintiffs' Due Process claim fails because age is not a suspect classification under the Equal Protection Clause. .......................................................................26

CONCLUSION................................................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Williams*,
  104 N.E. 659 (Ill. 1914).................................................................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .........................................................................................................1

*Biffer v. City of Chicago*,
  116 N.E. 182 (Ill. 1917)................................................................................................20

*Blackard v. Blackard*,
  426 S.W.2d 471 (Ky. Ct. App. 1968)..........................................................................19

*Bullock v. Sprowls*,
  54 S.W. 657 (Tex. Civ. App. 1899) .............................................................................19

*Burgett v. Barrick*,
  25 Kan. 526 (Kan. 1881) ..............................................................................................19

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786, 837 (2011) .............................................................................................12

*Castner v. Walrod*,
  83 Ill. 171 (Ill. 1876) ....................................................................................................19

*City of Dallas v. Stanglin*,
  490 U.S. 19 (1989)........................................................................................................28

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ...................................................................................................7, 8

*Coleman v. State*,
  32 Ala. 581 (1858) ........................................................................................................18

*Crouch v. Crouch*,
  187 S.E.2d 348 (N.C. Ct. App. 1972) ..........................................................................19

*Def. Distributed v. Bonta*,
  No. 2:22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ...........................14

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................................................*passim*

*Doe v. Archdiocese of Milwaukee*,
  700 N.W.2d 180 (Wis. 2005)........................................................................................19

*Edgar v. Haines,*
2 F.4th 298 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022)............................................10

*FCC v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) .......................................................................................................28, 29

*Fitz-Gerald v. Bailey,*
58 Miss. 658 (Miss. 1881) .....................................................................................................19

*FW/PBS, Inc. v. City of Dallas,*
493 U.S. 215 (1990) ...............................................................................................................7

*Gabree v. King,*
614 F.2d 1 (1st Cir. 1980)......................................................................................................25

*Heller v. Doe ex rel. Doe,*
509 U.S. 312, 321 (1993) ...............................................................................................28, 29

*Hirschfeld v. ATF,*
417 F. Supp. 3d 747 (W.D. Va. 2019).....................................................................................6

*Hirschfeld v. ATF,*
5 F.4th 407 (4th Cir. 2021), *as amended* (July 15, 2021) .........................................................6

*Hirschfeld v. ATF,*
14 F.4th 322 (4th Cir. 2021),
*cert. denied sub nom. Marshall v. ATF*, 142 S. Ct. 1447 (2022)................................................7

*Horsley v. Trame,*
808 F.3d 1126 (7th Cir. 2015) ..............................................................................................22

*Johnson v. U.S. Off. of Pers. Mgmt.,*
783 F.3d 655 (7th Cir. 2015) ............................................................................................9, 10

*Jones v. Wells,*
2 Houst. 209 (Del. Super. Ct. 1860)......................................................................................19

*Kennedy v. Bremerton School District,*
142 S. Ct. 2407 (2022) .........................................................................................................11

*Kimel v. Fla. Bd. of Regents,*
528 U.S. 62 (2000) .........................................................................................................27, 29

*Lehnhausen v. Lake Shore Auto Parts Co.,*
410 U.S. 356 (1973) ..............................................................................................................28

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ................................................................................................................8

*Mass. Bd. of Ret. v. Murgia*,
  427 U.S. 307 (1976) ..................................................................................................26

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ........................................................................................... 10, 18

*National Rifle Ass'n of America v. ATF* (*NRA*),
  700 F.3d 185 (5th Cir. 2012) ................................................................................*passim*

*National Rifle Ass'n of America v. ATF*,
  714 F.3d 334 (5th Cir. 2013) ....................................................................................17

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*,
  470 U.S. 451 (1985) ..................................................................................................26

*Nat'l Rifle Ass'n v. Brady*,
  914 F.2d 475 (4th Cir. 1990) ......................................................................................5

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022) ...................................................................... 10, 11, 14, 15

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ........................................................................................... 10, 23

*Medina v. Whitaker*,
  58 S.W. 115, 117 (Tenn. 1899)..................................................................................18

*Memphis Tr. Co. v. Blessing*,
  913 F.3d 152 (D.C. Cir. 2019) ..................................................................................18

*Parman v. Lemmon*,
  244 P. 227 (Kan. 1925)..............................................................................................20

*Peters v. Jones*,
  35 Iowa 512 (Iowa 1872)............................................................................................19

*Ramos v. Louisiana*,
  140 S. Ct. 1390 (2020) ..............................................................................................15

*Range v. Attorney General*,
  53 F.4th 262 (3d Cir. 2022),
  *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023) ....................13

*Reisse v. Clarenbach*,
  61 Mo. 310 (Mo. 1875) ..............................................................................................19

*Republican Party of Minn. v. White*,
  536 U.S. 765 (2002)....................................................................................................15

*State v. Callicutt,*
    69 Tenn. 714 (Tenn. 1878) ...................................................................................20

*Trulock v. Freeh,*
    275 F.3d 391 (4th Cir. 2001) ...................................................................................1

*United States v. Alvarez,*
    567 U.S. 709 (2012) ...............................................................................................15

*United States v. Emerson,*
    270 F.3d 203 (5th Cir. 2001) ...........................................................................*passim*

*United States v. Hays,*
    515 U.S. 737 (1995) .................................................................................................7

*United States v. King,*
    No. 5:22-cr-00215-001, 2022 WL 17668454 (E.D. Pa. Dec. 14, 2022) ..................14

*United States v. Miselis,*
    972 F.3d 518 (4th Cir. 2020) ...................................................................................9

*United States v. Moore,*
    84 F.3d 1567 (9th Cir. 1996) ...................................................................................9

*United States v. Munsingwear, Inc.,*
    340 U.S. 36 (1950) ...................................................................................................7

*United States v. Olson,*
    473 F.2d 686 (8th Cir. 1973) .................................................................................25

*United States v. Porter,*
    No. 3:22-00055, 2023 WL 113739 (S.D.W. Va. Jan. 5, 2023) ..............................14

*United States v. Rahimi,*
    59 F.4th 163 (5th Cir. 2023) ..................................................................................11

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) ...........................................................................16, 17

*United States v. Tilotta,*
    No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ..........................14

*Walker v. Walker,*
    17 Ala. 396 (Ala. 1850) ..........................................................................................18

*Whitt v. Whitt,*
    490 S.W.2d 159 (Tenn. 1973) ................................................................................18

*Womack v. Greenwood*,
  6 Ga. 299 (Ga. 1849) ..................................................................................................18

**CONSTITUTIONS**

Ala. Const. art. I, § 26 (1819) ..........................................................................................16

U.S. Const. amend. XXVI, § 1 .........................................................................................10

**STATUTES**

18 U.S.C. § 921 ....................................................................................................................4

18 U.S.C. § 922 ........................................................................................................ 1, 4, 5, 6

18 U.S.C. § 926 ....................................................................................................................5

Gun Control Act of 1968,
  Pub. L. No. 90-618, 82 Stat. 1213 .................................................................................4

Omnibus Crime Control and Safe Streets Act of 1968,
  Pub. L. No. 90-351, 82 Stat. 197 .............................................................................2, 3, 4

Violent Crime Control and Law Enforcement Act of 1994,
  Pub. L. No. 103-322, 108 Stat. 1796 .............................................................................5

**FEDERAL RULES**

Federal Rule of Civil Procedure 4 ......................................................................................1

Federal Rule of Civil Procedure 12.....................................................................................1

**REGULATIONS**

27 C.F.R. § 478.96 .........................................................................................................1, 5

27 C.F.R. § 478.99 ......................................................................................................1, 5, 6

27 C.F.R. § 478.124 ....................................................................................................1, 5, 6

**OTHER AUTHORITIES**

114 Cong. Rec. 12279 (1968)........................................................................................3, 5

4 Statutes at Large of Pennsylvania 153 (J. Mitchell & H. Flanders eds. 1897)..........................12

Act of Jan. 29, 1795, 1 Stat. 415 .....................................................................................12

Act of Mar. 26, 1790, 1 Stat. 104.....................................................................................12

Akhil Reed Amar, *The Bill of Rights* (1998) ............................................................12

*An Act for the Better Ordering and Regulating Such as Are Willing and Desirous to Be
United for Military Purposes Within This Province*, (Nov. 25, 1755),
in 3 Jared Sparks, ed., *The Works of Benjamin Franklin* 78 (1836) ........................25

Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun
Control*, 73 Fordham L. Rev. 487, 505 n.122 (2004) ............................................17

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency
of the Sen. Comm. on the Judiciary*,
89th Cong. 67 (1965)..............................................................................................3

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency
of the Sen. Comm. on the Judiciary*,
90th Cong. 57 (1967)..............................................................................................3

*Infant*, Black's Law Dictionary (11th ed. 2019) ......................................................16

*James Madison's Notes of the Constitutional Convention, August 7, 1787,* Yale Law School
Avalon Project, https://avalon.law.yale.edu/18th_century/debates_807.asp ..........................12

*Letter from John Adams to James Sullivan, 26 May 1776*, National Archives,
https://founders.archives.gov/documents/Adams/06-04-02-0091 ...........................................12

Op. of Ky. Att'y Gen. 94-14 (March 3, 1994)...........................................................16

Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*,
71 U. Cin. L. Rev. 1345, 1345, 1358-59 (2003) ....................................................13

Patrick J. Charles*, The 1792 National Militia Act, the Second Amendment, and Individual
Militia Rights: A Legal and Historical Perspective*,
9 Geo. J.L. & Pub. Pol'y 323 (2011)........................................................................24

Saul Cornell*, "Infants" and Arms Bearing in the Era of the Second Amendment: Making
Sense of the Historical Record*,
40 Yale L. & Pol'y Rev. Inter Alia 1 (2021) ........................................................... 11, 12, 16

S. Rep. No. 88-1340 (1964)......................................................................................2

S. Rep. No. 89-1866 (1966)......................................................................................3

S. Rep. No. 90-1097 (1968)..............................................................................*passim*

T.E. James, *The Age of Majority*,
4 Am. J. Legal Hist. 22 (1960).................................................................................16

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) ..............................19

U.S. Dep't of Def., *DOD Directive 5210.56: Arming and the Use of Force* (Nov. 18, 2016),
     https://fas.org/irp/doddir/dod/d5210_56.pdf.............................................................................22

Vivian E. Hamilton, *Adulthood in Law and Culture*,
     91 Tul. L. Rev. 55 (2016) ............................................................................................... 12, 16

William Blackstone, 1 Commentaries On The Laws Of England (1st ed. 1765).........................16

**INTRODUCTION**

The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); Steven Dettelbach, in his official capacity as the Director of ATF; and Merrick Garland, in his official capacity as Attorney General of the United States (hereinafter Defendants)[1] submit this memorandum in support of their motion to dismiss the First Amended Complaint and in opposition to Plaintiffs' motion for summary judgment in this matter.

Plaintiffs John Fraser, Joshua McCoy, Tyler McGrath, and Ian Shackley, all of whom are currently under the age of 21 and claim to represent a putative class of similarly situated individuals, challenge the constitutionality of federal criminal statutes making it unlawful for federal firearms licensees (FFLs) to sell handguns and handgun ammunition to persons under 21 years of age, 18 U.S.C. § 922(b)(1), (c), and federal regulations implementing those statutory provisions, 27 C.F.R. §§ 478.99(b)(1), 478.124(a), 478.96(b).  Plaintiffs claim that these statutes and regulations are inconsistent with their Second Amendment right to keep and bear arms and

---

[1] The First Amended Complaint also appears to raise claims against Director Dettelbach and Attorney General Garland in their individual capacities. The undersigned counsel represents only the agencies of the United States and federal officers sued in their official capacities. The undersigned counsel does not represent officers sued in their individual capacities, and this memorandum is submitted only on behalf of ATF and federal officers sued in their official capacities. For simplicity, this memorandum uses the term "Defendants" to refer to this group of defendants, excluding Defendants Dettelbach and Garland in their individual capacities. To undersigned counsel's knowledge, Plaintiffs have not served Director Dettelbach and Attorney General Garland in their individual capacities in accordance with Federal Rule of Civil Procedure 4(i)(3); those individuals would have sixty days after the completion of service in which to file a response to the First Amended Complaint under Federal Rule of Civil Procedure 12(a)(3). In any event, many of the arguments advanced in this motion would also be applicable to those defendants and support dismissal of the First Amended Complaint in its entirety. Moreover, because the First Amended Complaint fails to identify any decisions or actions personally taken by Attorney General Garland or Director Dettelbach, Plaintiffs' *Bivens* claims are facially defective. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (there is no *respondeat superior* liability in a *Bivens* suit).

with their Fifth Amendment right to equal protection of the law. Plaintiffs' claims fail as a matter of law and should be dismissed.

This Court should dismiss Plaintiffs' claims for several reasons. First, Plaintiffs lack standing to sue; they may not manufacture injury by forgoing the option of obtaining a handgun as a bona fide gift from their parents or guardians following direct purchase from a licensed dealer. Second, Plaintiffs' Second Amendment claims fail under the plain text of the Constitution and as a matter of history and tradition. Persons under the age of 21 fall outside "the people" within the meaning of the Second Amendment, and the purchase of a handgun falls outside the scope of "keep and bear" arms. As a historical matter, the government has traditionally enjoyed the power to prohibit the commercial sale of firearms to people under the age of 21. Indeed, when the Second Amendment was adopted, the law considered such persons to be infants and minors. Thus, as the Fifth Circuit held in *National Rifle Ass'n of America v. ATF* (*NRA*), 700 F.3d 185 (5th Cir. 2012), restrictions on the commercial sale of handguns to those under the age of 21 do not violate the Second Amendment. Finally, Plaintiffs' Fifth Amendment claim fails because age is not a suspect class for equal protection analysis in this context and because the statute survives rational-basis review.

## BACKGROUND

### I.     Statutory Background

Following a multi-year inquiry into violent crime that included "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964), Congress found "that the ease with which" handguns could be acquired by "juveniles without the knowledge or consent of their parents or guardians . . . and others whose possession of such weapons is similarly contrary to the public interest[,] is a significant factor in the prevalence of lawlessness and violent crime in the United States," Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 901(a)(2), 82 Stat. 197, 225. The legislative record established that "juveniles account for some 49 percent of the arrests for serious crimes in the United States and minors account for 64 percent of

2

the total arrests in this category."[2] S. Rep. No. 90-1097, at 77 (1968). "[M]inors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault," and 21 percent of the arrests for murder. 114 Cong. Rec. 12279, 12309 (1968) (Sen. Dodd).

Based on its investigations, Congress found "a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior." Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 225-26. Federal law enforcement officials testified that "[t]he greatest growth of crime today is in the area of young people, juveniles and young adults" and that "[t]he easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 90th Cong. 57 (1967) (statement of Sheldon S. Cohen).  Law enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with "statistics documenting the misuse of firearms by juveniles and minors," which "take on added significance when one considers the fact that in each of the jurisdictions referred to the lawful acquisition of concealable firearms by these persons was prohibited by statute." S. Rep. No. 89-1866, at 59 (1966); *see also id.* at 58, 60.

Congress's investigations revealed that "almost all of these firearms[] are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary*, 89th Cong. 67 (1965) (statement of Sheldon S. Cohen). Congress thus concluded that concealable firearms (such as handguns) "have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior," Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82

---

[2] In the 1968 Act and its accompanying legislative materials, "minor" refers to a person under the age of twenty-one, and "juvenile" refers to a person under eighteen. *NRA*, 700 F.3d at 199 n.11.

Stat. 226, and "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible," *id*. § 901(a)(3), 82 Stat. at 225.

To that end, Congress included statutory provisions designed to address "[t]he clandestine acquisition of firearms by juveniles and minors," S. Rep. No. 90-1097, at 79, in both the Omnibus Crime Control Act and the Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213. These provisions include 18 U.S.C. § 922(b)(1) and (c)(1), which regulate the sale of firearms by FFLs to persons under 21 years old.[3]

While federal law sets a minimum age of 18 to purchase shotguns or rifles from FFLs, the minimum age to purchase handguns from FFLs is 21. Section 922(b)(1) provides that FFLs may sell or deliver only "a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age" but above eighteen. 18 U.S.C. § 922(b)(1). FFLs may not sell or deliver "any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age." *Id.* Section 922(c)(1) provides that an FFL may not "sell a firearm to [an unlicensed] person who does not appear in person at the licensee's business premises" unless "the transferee submits to the transferor a sworn statement" attesting "that, in the case of any firearm other than a shotgun or  a rifle, [the transferee is] twenty-one years or more of age, or that, in the case of a shotgun or a rifle, [the transferee is] eighteen years or more of age." *Id.* § 922(c)(1).

Importantly, federal law does not prohibit the *possession* of handguns by 18- to 20-year-olds. Congress recognized that, under these provisions, "a minor or juvenile would not be restricted

---

[3] A federal firearms license is required to "engage in the business of importing, manufacturing, or dealing in firearms, [or ammunition]." 18 U.S.C. § 922(a)(1). A person is "engaged in the business" of dealing firearms, *id.* § 921(a)(21), if that person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," *id.* § 921(a)(21)(C).

from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian." S. Rep. No. 90-1097, at 79. "At the most," therefore, these provisions "could cause minor inconveniences to certain youngsters who are mature, law abiding, and responsible, by requiring that a parent or guardian over 21 years of age make a handgun purchase for any person under 21." 114 Cong. Rec. at 12309 (statement of Sen. Dodd). Congress subsequently limited the circumstances under which individuals under 18 years old may possess handguns but has not placed any similar age-related limits on the possession of handguns by individuals between 18 and 20 years old. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XI, § 110201, 108 Stat. 1796, 2010 (adding 18 U.S.C. § 922(x)).

## II.     Regulatory Background

ATF is authorized to issue "such rules and regulations as are necessary to carry out" Title 18's provisions relating to firearms.  18 U.S.C. § 926(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 477 (4th Cir. 1990) ("The Secretary of the Treasury was authorized to promulgate regulations to facilitate the enforcement of the Gun Control Act" and "[t]his responsibility was delegated within the Department of the Treasury to the Bureau of Alcohol, Tobacco and Firearms.").

The implementing regulations promulgated by ATF include 27 C.F.R. § 478.99(b), which closely tracks Congress's limitations on commercial sales of firearms to persons under 21 years of age, 18 U.S.C. § 922(b)(1).[4] ATF has also provided that FFLs "shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any [transferee who is not federally licensed] unless the licensee records the transaction on a firearms transaction record, Form 4473." 27 C.F.R. § 478.124(a); *see also* 27 C.F.R. § 478.96(b) (imposing same restrictions with respect to out-of-state

---

[4] The regulation at 27 C.F.R. § 478.99(b) provides that a federal firearm licensee "shall not sell or deliver . . . any firearm or ammunition to any individual who the [licensee] knows or has reasonable cause to believe is less than 18 years of age" or any firearm "other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the [licensee] knows or has reasonable cause to believe is less than 21 years of age."

and mail order sales). The Form 4473 establishes the transferee's eligibility to possess a firearm by recording, among other things, the transferee's "date and place of birth," 27 C.F.R. § 478.124(c)(1), and the transferee's certification that if "the firearm to be transferred is a shotgun or rifle, the transferee is 18 years or more of age," and if "the firearm to be transferred is a firearm other than a shotgun or rifle, the transferee is 21 years or more of age," *id.* § 478.124(f).

ATF applies these implementing regulations consistently with Congress's understanding that "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian." S. Rep. No. 90-1097, at 79. Accordingly, ATF has explained that a dealer may lawfully sell a firearm to a parent or guardian who is purchasing it for a minor child as long as the minor is not otherwise prohibited from receiving or possessing a firearm. Opinion of the Chief Counsel of ATF, No 23362 (Dec. 5, 1983) (hereinafter the "ATF Opinion Letter," Ex. A, ECF No. 30-1).

### III. *Hirschfeld* Litigation

A lawsuit substantially similar to this one was recently litigated in the Western District of Virginia and the Fourth Circuit. In *Hirschfeld v. ATF*, two plaintiffs between the age of 18 and 20 brought claims nearly identical to those presented in this case. 417 F. Supp. 3d 747, 750 (W.D. Va. 2019). The *Hirschfeld* plaintiffs did not purport to represent a class of similarly situated individuals. *See generally id.* The district court held that the challenged laws and regulations are constitutional and granted the government's motion to dismiss. *See id.* at 759. On appeal, a divided panel of the Fourth Circuit reversed and ruled that the challenged laws violated the Second Amendment. *See Hirschfeld v. ATF*, 5 F.4th 407, 452 (4th Cir. 2021), *as amended* (July 15, 2021); *see also id.* at 457 (Wynn, J., dissenting).

On August 27, 2021, the government filed a petition for panel rehearing and motion for rehearing en banc. *See* Pet. for Reh'g, or Reh'g En Banc, *Hirschfeld v. ATF*, No. 19-2250 (4th Cir. Aug. 27, 2021). The motion asserted that the panel was wrong on the merits of the plaintiffs' claims

and that the en banc Fourth Circuit should reverse. *Id.* at 7-15. And the motion argued that the case had become moot shortly after the panel published its opinion because the younger of the two plaintiffs had turned 21 years old. *Id.* at 6-7. The panel agreed that the case had become moot and vacated the panel opinion and the district court's opinion. *Hirschfeld v. ATF*, 14 F.4th 322, 325 (4th Cir. 2021) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39-40 (1950)), *cert. denied sub nom. Marshall v. ATF*, 142 S. Ct. 1447 (2022); *see also id.* at 328-29 (Wynn, J., concurring) (noting that "vacated opinions do not even bear the label of dicta" and speculating that "this matter surely [would have] met the requirements of Rule 35 for en banc review" had the matter not become moot). As such, no opinion from the *Hirschfeld* litigation is binding in this matter.

## IV.     Procedural Background

Defendants have moved to dismiss Plaintiffs' First Amended Complaint in full. *See* ECF No. 21. Plaintiffs filed a cross-motion for summary judgment. *See* ECF No. 28. On February 8, 2023, the Court heard oral argument on both motions. Following oral argument, the Court ordered that the parties file "replacement briefs" and provided guidance on how the Court would like the arguments structured. *See* Order (Feb. 9, 2023), ECF No. 38, at 2.

## ARGUMENT

## I.     The Court should dismiss for lack of subject matter jurisdiction because Plaintiffs lack Article III standing.

"The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines." *United States v. Hays*, 515 U.S. 737, 742 (1995) (alteration in original) (internal quotation marks omitted) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990)). "[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted). To establish standing to sue, a plaintiff (1) "must have suffered an injury in fact—an invasion of a legally protected

7

interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) "it must be likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). Standing cannot be conferred by a self-inflicted injury. *Clapper*, 568 U.S. at 416 (holding that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves").

Here, the First Amended Complaint fails to plead imminent injury traceable to Defendants because Plaintiffs have not pleaded that they are unable to obtain a new handgun from an FFL through their parents or legal guardians. Federal law does not bar Plaintiffs from possessing a handgun. Although Plaintiffs allege that the challenged federal laws burden their "fundamental right to keep and bear arms," First Am. Compl. ¶ 1, ECF No. 18, they do not demonstrate that they in fact are unable to possess firearms. Plaintiffs may lawfully possess handguns and ammunition under federal law, primarily through their parents or legal guardians, as contemplated by Congress. Sections 922(b)(1) and (c)(1) regulate only commercial sales of firearms and ammunition to persons under the age of 21, and only those sales by licensed dealers, as opposed to private sales or gun shows. *See* ATF Opinion Letter, at 1-2.[5] Congress has merely restricted commercial sales of handguns to people younger than 21 years old.[6] ATF Opinion Letter. And although FFLs are

---

[5] As Congress recognized, these laws do not bar other channels of firearm acquisition by persons who are 18 to 20 years old. Nor do they prohibit such persons from possessing firearms, including handguns. *See, e.g.*, S. Rep. No. 90-1097, at 79. ATF has thus made clear that these laws "were intended to prevent juveniles from acquiring firearms without their parents' or guardian's knowledge," not to prohibit them "from possessing, owning, or learning the proper usage of firearms." ATF Opinion Letter, at 1-2.

[6] ATF has explained that if "the actual purchaser, a person of legal age, is acquiring the firearm for the purpose of loaning or giving it to an underaged person[,] [n]either the *sale* nor the minor's subsequent receipt and possession of the firearm would violate Federal law, provided that the person is not otherwise disabled" from possessing a firearm. ATF Opinion Letter, at 2 (emphasis

the only entities legally allowed to sell new—as opposed to pre-owned—handguns, *see* First Am. Compl. ¶¶ 47, 57,[7] Plaintiffs can obtain a new handgun from an FFL purchased by their parent or guardian.  Plaintiffs may not manufacture injury by forgoing a legally available option to redress their sole alleged injury, nor can they "allege an injury from one of [multiple] options where they can choose another which causes them no injury." *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 667-68 (7th Cir. 2015) (first alteration in original) (citation omitted).  Plaintiffs "can avoid [their] asserted injury" because they have legally available means by which they may obtain a handgun; they have not pleaded any facts demonstrating that those alternative means are unavailable to them or explaining why pursuing these alternative means would cause them injury. *Id.* at 668. Because Plaintiffs have an available option under federal law for obtaining a handgun, they suffer no injury traceable to Defendants.[8] [9]

## II.    The Second Amendment allows the government to regulate the commercial sale of handguns to people under the age of 21.

The laws at issue here represent a narrow, commercial restriction on the sale of handguns by FFLs to individuals under the age of 21. Nothing in the Constitution prevents Congress from

---

in original). Thus, for example, a dealer may lawfully sell a firearm to a parent or guardian who is purchasing it for a minor child as long as the minor is not otherwise prohibited from receiving or possessing a firearm.  *See id.*  Indeed, as the Ninth Circuit has noted, it is not illegal for a parent to buy a gun for his or her child even if "the child's own money" is used to make the purchase. *United States v. Moore*, 84 F.3d 1567, 1571 (9th Cir. 1996).

[7] Sellers who are not FFLs may sell pre-owned handguns to 18 to 20 year olds at gun shows without violating federal law.

[8] *But see NRA*, 700 F.3d at 191-92 (rejecting a substantially similar standing argument).

[9] For the same reasons, Plaintiffs' facial challenge to the statute must fail. *See* First Am. Compl. ¶¶ 63, 67. "[F]acial challenges typically require 'a showing that no set of circumstances exists under which the [law] would be valid, *i.e.*, that the law is unconstitutional in all of its applications, or that the statute lacks any plainly legitimate sweep.'" *Edgar v. Haines*, 2 F.4th 298, 313 (4th Cir. 2021) (second alteration in original) (quoting *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020)), *cert. denied*, 142 S. Ct. 2737 (2022). Because Plaintiffs have alternative means of obtaining handguns without violating the challenged statute, the statute is not unconstitutional in all of its applications.

selecting 21 as the age minimum for the direct purchase of handguns from licensed dealers. The Constitution establishes only one right that vests at the age of 18: voting. U.S. Const. amend. XXVI, § 1. And "[n]either the Twenty-Sixth Amendment nor state law setting the age of majority at 18 compels Congress or the States to select 18 as the minimum age to purchase alcohol, lottery tickets, or handguns." *NRA*, 700 F.3d at 204 n.17.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guarantees an individual right of "law-abiding, responsible citizens" to keep and bear arms, *id.* at 635, but noted that "[l]ike most rights, the right secured by the Second Amendment is not unlimited," *id.* at 626. The Court provided a non-"exhaustive" list of "presumptively lawful regulatory measures," including "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26. The challenged restriction on the sale of handguns to persons under the age of 21 is such a condition or qualification on commercial sales of arms, and is thus presumptively lawful. Restrictions on possession of firearms by felons and regulations on the carrying of firearms in "sensitive places" likewise reflect "permissible" "exceptions" to the scope of the Second Amendment right. *Id.* at 626, 635. The Court "made it clear in *Heller* that [its] holding did not cast doubt" on such measures and "repeat[ed] those assurances" in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

The Supreme Court recently reaffirmed *Heller*'s textual and historical approach in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Under *Bruen*, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. *Bruen* also rejected the need for "means-end scrutiny" such as "strict or intermediate scrutiny" in "the Second Amendment context." *Id.* at 2127, 2129.

A.  **The text of the Second Amendment does not cover the purchase of handguns by individuals under the age of 21.**

Under *Bruen*, a court considering a Second Amendment challenge must determine whether the plain text of the Second Amendment covers the plaintiffs' conduct prior to conducting any historical analysis. *Id.* at 2129-30. In other words, if the Second Amendment does *not* cover plaintiffs' conduct, the Second Amendment challenge fails without regard to the historical tradition of firearm regulation. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).[10] The text of the Second Amendment does not cover the conduct at issue in this case for two reasons. First, individuals under the age of 21 are not included in the phrase "the people" within the meaning of the Second Amendment. Second, the phrase "keep and bear" does not include a right to purchase handguns from FFLs.

The "people" referenced in the Second Amendment's text does not include underage individuals. Under *Heller*, the "people" entitled to bear arms includes only "members of the political community." *Heller*, 554 U.S. at 580. Thus, "'the people' whom the Second Amendment protects" are "ordinary, law-abiding, *adult* citizens." *Bruen*, 142 S. Ct. at 2134 (emphasis added) (quoting U.S. Const. amend. II.). "[I]nfants," on the other hand, "may be prohibited from possessing firearms." *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001), *overruled on other grounds by United States v. Rahimi*, 59 F.4th 163, 170 (5th Cir. 2023); *see id.* at 226 & n.21; *see also NRA*, 700 F.3d at 201 (noting that "infant" was 'historically understood" to encompass all "persons under the age of 21"); Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1, 2 (2021)

---

[10] Plaintiff bears the burden on the initial, textual inquiry. *Bruen* itself makes that clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See id.* at 2126, 2141 n.11. If the burden were on the government throughout, the Court would have said that the presumption exists from the outset. This placement of burden is analogous to the burden in other constitutional issues. *Cf. Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2421 (2022) ("Under th[e] Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] . . . its actions . . . .").

(explaining that, "when framed in historically correct terms," the answer to the question whether "the Second Amendment recognize[s] a right of infants, meaning those under twenty-one, to keep and bear arms" is "simple: no"). Today and at the time of the Second Amendment's ratification, legislatures exercised significant latitude in establishing age requirements for various rights. At the Founding, legislatures set age qualifications for an array of important activities, from voting to getting married to becoming a naturalized citizen.[11] Then, as now, age qualifications reflected the view that, as John Adams warned, minors lack "[j]udgment" and are not "fit to be trusted by the [p]ublic."[12] *See also* Cornell, *supra*, at 6-7 (discussing the limited rights of minors and the patriarchal authority that parents or guardians held over minors under the age of 21).

For the Second Amendment's ratifiers, the most natural point at which to draw the line between untrustworthy minors and responsible adults was age 21. "The age of majority at common law was 21" and individuals under that age were classified as "minor[s]" or "infant[s]." *NRA*, 700 F.3d at 201-02; *see also infra* Part II.B. Following the common law approach, the "American colonies, then the United States, adopted age twenty-one as the near universal age of majority." Vivian Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016). Founding Era legislatures set a minimum age of 21 for a right they closely associated with the right to bear arms. The founders understood "arms bearing and suffrage" as "intimately linked." Akhil Reed Amar, *The Bill of Rights* 48 (1998). Indeed, the Supreme Court has described the "people" entitled to bear arms as including only "members of the political community." *Heller*, 554 U.S. at 580. And among

---

[11] *See, e.g.*, 4 Statutes at Large of Pennsylvania 153 (J. Mitchell & H. Flanders eds. 1897); Act of Mar. 26, 1790, 1 Stat. 104; Act of Jan. 29, 1795, ch. 20, 1 Stat. 415; *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 837 (2011) (Thomas, J., dissenting) (collecting examples of age qualifications at the founding).

[12] *Letter from John Adams to James Sullivan, 26 May 1776*, National Archives, https://founders.archives.gov/documents/Adams/06-04-02-0091; *see also, e.g.*, *James Madison's Notes of the Constitutional Convention, August 7, 1787,* Yale Law School Avalon Project, https://avalon.law.yale.edu/18th_century/debates_807.asp (quoting Gouverneur Morris as explaining that underage individuals "want prudence" and "have no will of their own").

the ways that the founders defined that community was by limiting the right to vote to persons over the age of 21. *See* Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345, 1345, 1358-59 (2003). There is no apparent basis for concluding that the "members of the political community" vested with Second Amendment rights, *Heller*, 554 U.S. at 580, are defined without regard to the age limits recognized by legislatures and by the Constitution itself.

That limitation reflects the broader understanding that legislatures could disarm members of groups deemed irresponsible or untrustworthy. "In the view of at least some members of the founding generation, disarming select groups for the sake of public safety was compatible with the right to arms." *NRA*, 700 F.3d at 200. The Third Circuit in *Range v. Attorney General* canvassed a variety of Founding Era laws prohibiting arms-bearing by groups such as "Native Americans," "indentured servants," and those who refused to take loyalty oaths. 53 F.4th 262, 275-79 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023); *see also Medina v. Whitaker*, 913 F.3d 152, 158059 (D.C. Cir. 2019). While many of these laws are "repugnant (not to mention unconstitutional)" by today's standards, *Range*, 53 F.4th at 276 n.18, they illustrate the historical understanding that legislatures could disarm groups that are seen as presenting a heightened risk "to an orderly society and compliance with its legal norms," *id.* at *13.

Plaintiffs also cannot show that the conduct they desire to engage in—the purchase of a handgun from an FFL—is covered by the text of the Second Amendment. "[L]aws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. As noted above, the challenged laws regulate only commercial sales of firearms and ammunition to persons under the age of 21, and only by FFLs, as opposed to private sales. The laws do not prohibit Plaintiffs from possessing handguns or obtaining a handgun by other means, such as a bona fide gift from their parents. The Second Amendment protects a right to "keep and bear" arms, not a right to *purchase* arms, let alone the right to purchase a handgun from a particular source. Indeed, several courts have recently held that the phrase "keep and bear"

does not extend to commercial transactions. *See United States v. King*, No. 5:22-cr-00215-001, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (rejecting the argument that the Second Amendment protects the implicit rights of "*buying* and selling *firearms*" (emphasis in original)); *Def. Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (concluding that the Second Amendment's plain text "quite-clearly" does not include any "implicit[]" right to "acquire and manufacture firearms" or "to purchase arms" (internal quotation marks omitted)); *United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (explaining that, "textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer'"); *United States v. Porter*, No. 3:22-00055, 2023 WL 113739, at *3 (S.D.W. Va. Jan. 5, 2023) (indicating that, "at the time of its ratification, the Second Amendment was [not] understood to protect an individual's right to sell a firearm" (quoting *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011))). This conclusion is consistent with *Heller*, which held that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *see also NRA*, 700 F.3d at 206 (holding that federal laws and regulations restricting FFLs from selling to individuals under 21 "resemble 'laws imposing conditions and qualifications on the commercial sale of arms,' which *Heller* deemed 'presumptively lawful'").

Because the plain text of the Second Amendment does not cover the right of individuals under the age of 21 to purchase handguns from FFLs, Plaintiffs' Second Amendment claim fails.

**B.    Historical tradition supports the legislative selection of 21 as the minimum age for commercial sales of handguns.**

Under *Heller* and *Bruen*, a court should rely principally on history to discern the limits of the right to keep and bear arms if the conduct in question is covered by the text of the Second Amendment. *See Bruen*, 142 S. Ct. at 2126 (noting that a firearm regulation is constitutional if the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation"). *Heller* further establishes that a court's examination of history should not

end in 1791. The Court described "examination of a variety of legal and other sources to determine the public understanding of [the] legal text in the period after its enactment or ratification" as "a critical tool of constitutional interpretation." *Id.* at 605 (emphasis omitted). The Court thus examined "[p]ostratification [c]ommentary," "[p]re-Civil War [c]ase [l]aw," "[p]ost-Civil War [l]egislation," and "[p]ost-Civil War [c]ommentators" to determine the original meaning of the Second Amendment. *Id.* at 605-26. These post-ratification traditions matter because "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Republican Party of Minn.* v. *White*, 536 U.S. 765, 785 (2002) (citation omitted). The widespread adoption of a type of regulation, even after the founding, thus creates a "strong presumption" that the regulation is constitutional. *Id.* (citation omitted).

The Supreme Court has explained that, while nineteenth century materials may "not provide as much insight" as Founding Era sources, they nonetheless constitute a "critical tool of constitutional interpretation." *Bruen*, 142 S. Ct. at 2136-37 (quoting *Heller*, 554 U.S. at 605, 614). The Court's extensive review of nineteenth century evidence in both *Heller* and *Bruen* confirms that such evidence plays an important role in Second Amendment analysis. *See Heller*, 554 U.S. at 605-619 (reviewing post-ratification evidence "through the end of the 19th century"); *Bruen*, 142 S. Ct. at 2145-56 (same). The Supreme Court has similarly looked to practices from the nineteenth century onward in interpreting the historical scope of other rights. In First Amendment cases, for example, the Court has recognized "historic and traditional" exceptions "long familiar to the bar" without tracing those exceptions back to the founding. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (citation and quotation marks omitted). In Sixth Amendment cases, likewise, the Court has consulted nineteenth century evidence in identifying the scope of the right to a jury trial. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020). There is no basis for adopting a more circumscribed view of the relevant historical evidence in Second Amendment cases. As one court

15

has stated, "we do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010).

These principles are decisive here. The common law rule that individuals are considered minors until they reach the age of 21 shows that the government may permissibly draw a line up to age 21 for the direct purchase of handguns. And laws prohibiting people under the age of 21 from purchasing firearms are "longstanding." *Heller*, 554 U.S. at 626.

### 1. Pre-1776[13]

The age of majority at common law was 21 years. *See, e.g.*, WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years, which age is completed on the day preceding the anniversary of a person's birth; who till that time is an infant, and so styled in law."); *Infant*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority . . . ."). The tradition of designating 21 years of age as the "age of majority" can be traced in England as far back as the time of Magna Carta, at least for men in knight service, and that the "choice of this age evolved . . . owing to the weight of the arms and the greater skill required in warfare." *See* T.E. James, *The Age of Majority*, 4 Am. J. Legal Hist. 22, 26, 30 (1960). "Perhaps unsurprisingly, the age required for the elite status of knighthood was the age whose imprint would endure. English historical and common law traditions became law throughout the British Commonwealth. Twenty-one remained the age of majority for centuries in England, as well as throughout much of the Western world and nations that incorporated English traditions." Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016). This rule prevailed in every state until the 1970s. *See NRA*, 700 F.3d at 201.

---

[13] Defendants have organized the historical evidence in this section according to the headings provided in the Court's order. *See* ECF No. 38, at 2-3.

### 2.   Revolution and Articles of Confederation (1776 to 1789)

States continued to treat 21 as the age of majority up to and through the ratification of the Constitution. *See id.* Minors during this time period had few legal rights and were subject to the patriarchal authority of their parents or guardians. *See* Cornell, *supra*, at 6-7; *see also Bruen*, 142 S. Ct. at 2118 ("[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."); *Skoien*, 614 F.3d at 641 ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791."). Although there were no laws during this period explicitly prohibiting the sale of firearms or handguns to individuals under the age of 21, *see* Ex. B, ECF No. 30-2, there were no laws setting 18 or another age as a minimum either, *see id.* Thus, despite Plaintiffs' assertion that they are not challenging restrictions on handgun purchase or possession by individuals under the age of 18, there is no historical justification from the Founding Era to support drawing 18 as the line, as opposed to 21.

Although the relevance of laws concerning state militias during this period is minimal at best, *see infra* Part II.C, eleven out of fourteen states during this period set sixteen, not eighteen, as the minimum age of militia service, *see* ECF No. 36-1.[14]

---

[14] Plaintiffs have argued that "Loyalty Test" regulations applicable during this era, which they say prohibited possession of firearms by certain individuals over the age of 18 who would not swear allegiance against the crown, suggests that the right to bear arms must have vested at age 18. *See* Pls.' Opp'n to Mot. to Dismiss, ECF No. 27, at 17. But the sources on which Plaintiffs rely only provide two examples: one from Pennsylvania in which the Loyalty Test operated against individuals over 18, and one from Massachusetts that operated against individuals over 16. *See Nat'l Rifle Ass'n, Inc. v. ATF*, 714 F.3d 334, 343 n.21 (5th Cir. 2013) (Jones, J., dissenting); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 505 n.122 (2004). And these ages correspond to the age for militia service in these two states. *See* ECF No. 36-1. Thus, the age cutoff for these Loyalty Tests was likely meant to disarm members of the militia, and does not imply an individual right to keep and bear arms outside the context of militia service for those over the age of 18 or 16.

### 3. Early Republic (1789 to 1815)

From 1789 to 1815, Massachusetts, North Carolina, and Vermont enacted regulations requiring the parents to furnish firearms to the children who were serving in the state militia until the child reached the age of 21. *See* Ex. F, ECF No. 30-6. This is consistent with the authority exercised by parents at common law.

### 4. Antebellum (1815 to 1861)

Prior to 1861, two states, Alabama and Tennessee, enacted laws expressly restricting the ability of "minors" to purchase or use particular firearms while the state's age of majority was set at 21. *See* Ex. B, ECF No. 30-2; *Walker v. Walker*, 17 Ala. 396 (Ala. 1850); *Whitt v. Whitt*, 490 S.W.2d 159, 160 (Tenn. 1973); *Memphis Tr. Co. v. Blessing*, 58 S.W. 115, 117 (Tenn. 1899). Both states also had Second Amendment analogues in their respective constitutions when they enacted these qualifications. *See* Ex. B, ECF No. 30-2. Several states also enacted laws during this period requiring parental permission for service in the state militia by individuals under 21 or laws requiring parents to furnish firearms to the children who were serving in the state militia until the child reached the age of 21. *See* Ex. D, ECF No. 30-4; Ex. F, ECF No. 30-6.

Case law also demonstrates the authority of the government to restrict firearms purchases by people under the age of 21. *Heller*, 554 U.S. at 610 (considering as relevant "19th-century cases"). A conviction for violating a state law "which makes it a misdemeanor to 'sell, or give, or lend, to any male minor,' a pistol" was upheld by the Supreme Court of Alabama, *Coleman v. State*, 32 Ala. 581, 582 (1858).

### 5. Civil War and Reconstruction (1861 to 1877)

From 1861 to 1877, three more states, Kentucky, Indiana, and Georgia, enacted laws expressly restricting the ability of "minors" to purchase or use particular firearms, or restricting the ability of "minors" while the state's age of majority was set at 21. *See* Ex. B, ECF No. 30-2; *Womack v. Greenwood*, 6 Ga. 299 (Ga. 1849). These states also had Second Amendment analogues in their respective constitutions when they enacted these qualifications. *See* Ex. B, ECF No. 30-2.

18

In 1868, Oregon enacted a law setting 16 as the minimum age for possessing certain firearms. *See id.*

Nineteenth century "legal scholar[s]," *Heller*, 554 U.S. at 616, wrote that restrictions on the ability of minors to purchase firearms were permissible. "[T]he judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations," *id.*, included among the permissible exercises of State police power "[t]hat the State may prohibit the sale of arms to minors." Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883). Professor Cooley perceived no inconsistency between these age qualifications on sales and the fact that "State constitutions," like the federal constitution, "provide that the right of the people to bear arms shall not be infringed." *Id.* at 429; *see also Heller*, 554 U.S. at 616-17 (treating Cooley's interpretations of the Second Amendment as persuasive authority); *Emerson*, 270 F.3d at 235-36, 258-59 (same).

### 6. Post-reconstruction

From 1877 to 1897, 14 additional States and the District of Columbia enacted laws expressly restricting the ability of "minors" to purchase or use particular firearms, or restricting the ability of "minors" while the state's age of majority was set at 21. *See* Ex. B, ECF No. 30-2.[15]

---

[15] Missouri (1879), Mississippi (1880), Delaware and Illinois (1881), Maryland and West Virginia (1882), Kansas and Wisconsin (1883), Iowa (1884), Nevada (1885), Louisiana (1890), Wyoming (1890), District of Columbia (1892), North Carolina (1893), and Texas (1897). *See* Ex. B, ECF No. 30-2. For states that prohibited purchase or possession of firearms by "minors" and set the age of majority at 21, see *Jones v. Wells*, 2 Houst. 209 (Del. Super. Ct. 1860); *Peters v. Jones*, 35 Iowa 512 (Iowa 1872); *Burgett v. Barrick*, 25 Kan. 526 (Kan. 1881); *Blackard v. Blackard*, 426 S.W.2d 471, 472 (Ky. Ct. App. 1968); *Fitz-Gerald v. Bailey*, 58 Miss. 658 (Miss. 1881); *Crouch v. Crouch*, 187 S.E.2d 348, 349 (N.C. Ct. App. 1972); *Bullock v. Sprowls*, 54 S.W. 657, 659-60 (Tex. Civ. App. 1899); *Doe v. Archdiocese of Milwaukee*, 700 N.W.2d 180, 188 (Wis. 2005). Until the 1970s, Illinois, Missouri, and Oklahoma set the age of majority at twenty-one for men, and eighteen for women. *See Castner v. Walrod*, 83 Ill. 171 (Ill. 1876); *Anderson v. Williams*, 104 N.E. 659, 661 (Ill. 1914); *Reisse v. Clarenbach*, 61 Mo. 310 (Mo. 1875); *Bassett v. Bassett*, 521 P.2d 434, 435 n.2 (Okla. Civ. App. 1974).

Seven of these States and the District of Columbia had Second Amendment analogues in their respective constitutions when they enacted these qualifications. *See id.*[16]

Cases during this period also demonstrate the authority of the government to restrict firearms purchases by people under the age of 21. For example, the Supreme Court of Tennessee, a State that prohibited the sale of pistols to minors and set the age of majority at 21, upheld a conviction for selling a pistol to a minor against a challenge brought under the state's Second Amendment analogue, expressly rejecting the defendant's argument "that every citizen who is subject to military duty has the right 'to keep and bear arms,' and that this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him." *State v. Callicutt*, 69 Tenn. 714, 716-17 (Tenn. 1878). The court explained that the challenged restrictions "were not intended to affect, and do not in fact abridge, the constitutional right of the 'citizens of the State to keep and bear arms for their common defense,' but have been passed with a view 'to prevent crime.'" *Id.* at 716. The court stated that "we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Id.* at 716-17.[17]

By the early twentieth century, three more States restricted the purchase or use of particular firearms by individuals below 21 years of age, and two of these states had Second Amendment

---

[16] Kansas, Louisiana, Mississippi, Missouri, North Carolina, Texas, and Wyoming. *See* Ex. B, ECF No. 30-2. Because the District of Columbia is a federal enclave, it is directly constrained by the Second Amendment.

[17] *See also* Op. of Ky. Att'y Gen. 94-14 (March 3, 1994) ("Given the Commonwealth's history of restricting the access of minors to deadly weapons, it is not unreasonable to conclude that the Kentucky constitutional provision recognizing a right to bear arms has no application to minors" and that "[i]f the right to bear arms does extend to minors, it likely is a more limited right than that possessed by adults"); *Parman v. Lemmon*, 244 P. 227, 228 (Kan. 1925) (rejecting constitutional challenge to provision prohibiting sale and possession of "dangerous weapons to minors," including "any pistol, revolver or toy pistol," in an action alleging that violation of the statute was negligence per se); *Biffer v. City of Chicago*, 116 N.E. 182, 184-85 (Ill. 1917) (city ordinance denying concealable weapons permit to "all minors" did not violate the federal or state constitutional right to bear arms).

analogues in their constitutions. *See id.*[18] Thus, by 1923, a total of twenty-two States and the District of Columbia had made 21 the minimum age for purchase or use of particular firearms, and fourteen of these States (and the District of Columbia) had State constitutional analogues to the Second Amendment. *See id.* Within the same timeframe (mid-nineteenth century through early twentieth century) twenty-one other States imposed age qualifications on the purchase or use of certain firearms, setting the minimum age between twelve and twenty. *See* Ex. B, ECF No. 30-2.[19]

This tradition continues into the present day. All fifty States and the District of Columbia have minimum-age qualifications for the use or purchase of particular firearms. *See id.* And at the time that these minimum-age qualifications were enacted, thirty-five of the fifty States, plus the District of Columbia, had constitutional provisions securing the right to keep and bear arms. *See* Ex. B, ECF No. 30-2.[20] Twenty-nine of the fifty States (and the District of Columbia) only placed a minimum-age qualification on the purchase or use of handguns—usually defined as pistols, revolvers, or other concealable firearms. *Id.*[21] The federal restrictions challenged here thus stand in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *Bruen*,

---

[18] Oklahoma (law enacted in 1890, Oklahoma admitted as a State in 1907), New Hampshire (1923), and South Carolina (1923). Oklahoma and South Carolina have State constitutional provisions protecting the right to bear arms. *See* Ex. B, ECF No. 30-2.

[19] Oregon (1868), Ohio (1880), Florida and Pennsylvania (1881), New Jersey (1882), Michigan, New York, and Rhode Island (1883), Washington (enacted 1883, admitted as a State in 1889), Massachusetts (1884), Minnesota and Virginia (1889), Vermont (1896), South Dakota (1903), Utah (1905), Montana (1907), Idaho and Maine (1909), Arizona (enacted 1883, admitted as a State in 1912), California and Connecticut (1923). *See* Ex. B, ECF No. 30-2.

[20] Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Montana, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Wyoming.

[21] Alabama, California, Colorado, Connecticut, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, North Carolina, North Dakota, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

142 S. Ct. at 2156; *see id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing the "unusual" nature and "outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban").

Other courts have found this historical evidence decisive.  For example, when the Fifth Circuit has stated that "[m]odern restrictions on the ability of persons under 21 to purchase handguns . . . seem, to us, to be firmly historically rooted."  *NRA*, 700 F.3d at 204. The Seventh Circuit reached a similar conclusion in *Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015).  This result was consistent with the case law on the subject prior to *Heller*.  *See*, *e.g.*, *Emerson*, 270 F.3d at 261("[I]t is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms.").

### C.     Militia laws do not suggest that individuals under twenty-one have the right to directly purchase handguns from licensed dealers

The First Amended Complaint relies on the fact that U.S. law designates male citizens over eighteen as eligible for service in the military. *See* First Am. Compl. ¶ 5.[22] Some colonial and founding-era laws likewise set the age for militia service below 21. *NRA*, 700 F.3d at 204 n.17. As in *NRA*, however, a "militia-based attack on the federal laws at bar is unavailing" for three key

---

[22] Eighteen-to-twenty-year-olds are eligible for military service, but such eligibility neither bestows a right to unrestricted use of firearms by such individuals, nor implies anything about the rights of civilians under twenty-one regarding the purchase of firearms from licensed dealers for personal use. Even when active military personnel are required to be armed for the performance of their official duties, they may only carry such arms on or off Department of Defense property "[w]hen authorized." U.S. Dep't of Def., *DOD Directive 5210.56: Arming and the Use of Force* (Nov. 18, 2016), §§ 1.2(a), 3, https://fas.org/irp/doddir/dod/d5210_56.pdf. Military personnel wishing to carry a privately-owned firearm on Defense Department property for personal protection purposes not related to the performance of official duties must request permission to do so, and must be twenty-one or older. *Id.* §§ 1.2(e), 4.3(b). Thus, the U.S. military's practice is to regulate firearms extensively. *See id.* § 1.2(i) ("Except as permitted in this issuance or as specifically permitted in other applicable DoD policy, the possession of a privately owned firearm on DoD property is prohibited."). In any event, as a matter of policy, it is appropriate for Congress to distinguish between the privileges and responsibilities afforded to active service personnel in the extensively regulated U.S. armed forces, and those afforded to civilians.

reasons. *Id.*

First, "the right to arms is not co-extensive with the duty to serve in the militia." *Id.* (citing *Heller*, 554 U.S. at 589-94).  The issue in *Heller* was not the constitutional scope of the right to carry arms in the context of militia service.  *See Heller*, 554 U.S. at 577 ("[Heller] argues that [the Second Amendment] protects an individual right to possess a firearm *unconnected with service in a militia*, and to use that arm for traditionally lawful purposes, such as self-defense within the home.") (emphasis added); *id.* at 579 n.5 (the right to bear arms "is still an individual right, and not one conditioned upon membership in some defined 'assembly,' as [Justice Stevens] contends the right to bear arms is conditioned upon membership in a defined militia").  Indeed, *Heller* specifically concluded that the right protected by the Second Amendment had "*nothing whatever to do with service in a militia.*"  *Id.* at 593 (emphasis added).  Instead, the Supreme Court dealt with whether possession of a handgun for self-defense in the home is a right protected by the Second Amendment.  *Id.* at 598-99, 635-36.[23]  *Heller* did examine the prefatory "well-regulated militia" language of the Second Amendment, *id.* at 595-99, but explained that this language "does not suggest that preserving the militia was the only reason Americans valued the ancient right." *Id.* at 599.

Hence, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635, which was at issue in *Heller*, should not be conflated with the duty of participating in the common defense as part of a militia.  *See also Emerson*, 270 F.3d at 241 (noting that in the proposed amendment by the Pennsylvania convention that ratified the Constitution, "'bear arms' clearly pertains to private, civilian wearing or carrying of arms and the power of the state to organize, arm and discipline the militia is in a separate section, indicating that the Anti-Federalists viewed these issues as distinct").

---

[23] Moreover, the majority's opinions in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), did not recite the "well-regulated militia" language even once, even as dicta.  *See id.* at 749-91 (plurality opinion); *id.* at 791-805 (Scalia, J., concurring); *id.* at 805-58 (Thomas, J., concurring).

Moreover, it is consistent with the historical understanding of the right to bear arms to consider individuals under twenty-one suitable for the duty to bear arms under militia leadership, training, and control, but to restrict their purchase of firearms in a non-militia setting. As explained above, *see supra* Part II.B, during the Founding Era, persons under twenty-one were considered minors or infants. And even during this era, the bearing of arms in the militia was "well regulated" and did not entail members using firearms unchecked without supervision.

While "'a well-regulated Militia' refers *not* to a special or select subset or group taken out of the militia as a whole [it did refer] to the condition of the militia as a whole, namely being well disciplined and trained." *Emerson*, 270 F.3d at 234-35; *see also Heller*, 554 U.S. at 597 ("[W]ell-regulated" implies "proper discipline and training."); Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J.L. & Pub. Pol'y 323, 326 (2011) ("The right to 'keep and bear arms' in a 'well-regulated militia' was not a license to individually train or discharge firearms.") (citing militia statutes).

In any event, the relevant issue here is not the right to use arms in a national or state militia. Plaintiffs do not allege that they have enrolled, have attempted to enroll, or have been denied access to "keep and bear arms" in a national or state militia. And because the age qualification in no way prevents them from enrolling in the federally-organized and state-trained militia or from possessing firearms provided by the militia, it has nothing to do with any duty on the part of a "well-regulated militia" to "keep and bear arms." In short, because the right recognized in *Heller* had "nothing whatever to do with service in a militia," 554 U.S. at 593, militia laws bear little to no relevance to the present case.

Second, "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need." *NRA*, 700 F.3d at 204 n.17 (citations omitted). "Such fluctuation undermines [any] militia-based claim that the right to purchase arms must fully vest precisely at age 18—not earlier or later." *Id*. It is well established that legislatures have significant discretion in raising or lowering the minimum age for individuals

24

to gain certain rights or privileges. For example, legislatures have traditionally had broad discretion to prescribe minimum age limits for the exercise of the different privileges and rights that collectively constitute adulthood, and to raise and lower those limits as long as there is a rational basis for the legislature's decisions. *See*, *e.g.*, *Gabree v. King*, 614 F.2d 1, 2 (1st Cir. 1980) (recognizing that "eighteen to twenty-one year olds have historically been denied full rights of adulthood while shouldering such burdens of citizenship as military service," and rejecting equal protection challenge to a state law raising the drinking age to twenty-one); *United States v. Olson*, 473 F.2d 686, 687-88 (8th Cir. 1973) (upholding prior version of federal law setting 21 as the age for jury service after Congress amended law to lower the minimum age for jury service to 18). One of these is the privilege of serving in a militia.  As history demonstrates, both Congress and the states retain the discretion of raising and lowering the minimum age for service in the national or state militia.  Thus, even if the duty to serve in a militia bears some relation to the right protected by the Second Amendment—which is doubtful—history and tradition demonstrate that legislatures possess significant discretion in selecting the minimum age for such service.

Indeed, many of the State militia laws presumed active oversight of minors by parents or legal guardians. For example, Colonial Pennsylvania's 1755 militia act, drafted by Benjamin Franklin, permitted persons under 21 to enroll in the militia but provided "that no youth under the age of twenty-one years, . . . shall be admitted to enroll himself, or be capable of being enrolled, in the said companies or regiments without the consent of his or their parents or guardians, masters or mistresses, in writing under their hands first had and obtained." *An Act for the Better Ordering and Regulating Such as Are Willing and Desirous to Be United for Military Purposes Within This Province*, Nov. 25, 1755, in 3 Jared Sparks, ed., *The Works of Benjamin Franklin, Vol. III* 78, 82-83 (1836). Thus, to the extent it is relevant, the highly regulated context of military service at the Founding is entirely consistent with the existence of age qualifications on the personal purchase of firearms.

Third, "if the right to arms and the duty to serve in the militia were linked in the manner

25

that [Plaintiffs] declare, then [their] argument proves too much." *NRA*, 700 F.3d at 204 n.17 "In some colonies, able-bodied sixteen-year-olds were obligated to serve in the militia," but Plaintiffs are "not challenging restrictions on handgun possession by or sales to persons under age 18." *Id.* (citation omitted); *see* First Am. Compl. at Counts I-II (challenging age qualification only with respect to persons between eighteen and twenty-one). The fact that a past legislature selected some particular minimum age for militia service thus does not evince an inalienable right in the incidents of militia service in persons of that age. "[A]bsent some clear indication" to the contrary, "the presumption is that a law is not intended to create . . . vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985) (citation and internal quotation marks omitted). Otherwise, the unavoidable implication of historical militia laws would be that by requiring sixteen-year-olds to serve in the militia, colonial legislatures bestowed on persons of that age an inalienable right to all the incidents of militia service.

### III.   Plaintiffs' Due Process claim fails because age is not a suspect classification under the Equal Protection Clause.

In addition to their Second Amendment claim, Plaintiffs also argue that the challenged statutes and regulations violate their "rights to equal protection guaranteed under the Due Process Clause of the Fifth Amendment to the United States Constitution." First Am. Compl. ¶ 67; *see generally id.* at Count II. As with Plaintiffs' Second Amendment claim, the Fifth Circuit has already considered and rejected a substantively identical claim brought by similar plaintiffs under 21 years old. *See NRA*, 700 F.3d at 211-12. Because age is not a suspect classification under these circumstances, the claim fails again as a matter of law.

"[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Strict scrutiny is not triggered here because Plaintiffs have not established an

impermissible interference with their Second Amendment rights, *see supra* Part II, and because "age is not a suspect classification under the Equal Protection Clause." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). "Age classifications, unlike governmental conduct based on race or gender, cannot be characterized as so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *Id.* (citation and internal quotation marks omitted). Thus, the government "may discriminate on the basis of age without offending" the constitutional guarantee of equal protection "if the age classification in question is rationally related to a legitimate state interest." *Id.*

Where age classifications are concerned, "[t]he rationality commanded by the Equal Protection Clause does not require States to match age distinctions and the legitimate interests they serve with razorlike precision." *Id.* Accordingly, although "[r]acial classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests," *id.* at 84 (alterations and citation omitted), and "gender classifications are constitutional only if they serve important governmental objectives and the discriminatory means employed are substantially related to the achievement of those objectives," *id.* (alteration, citation, and internal quotation marks omitted), the government "may rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests," *id*. "The Constitution does not preclude reliance on such generalizations," *id.,* "even if it is probably not true that those reasons are valid in the majority of cases," *id.* at 86 (internal quotation marks omitted). "That age proves to be an inaccurate proxy in any individual case is irrelevant." *Id.* at 84. Consequently, courts will not overturn age classifications unless they are "so unrelated to the achievement of any combination of legitimate purposes" that one "can only conclude that the government's actions were irrational." *Kimel*, 528 U.S. at 84 (alterations and citation omitted). And "because an age classification is presumptively rational, the individual challenging its constitutionality bears the burden of proving that the facts on which the classification is apparently based could not reasonably

27

be conceived to be true by the governmental decisionmaker." *Id.* (citation and internal quotation marks omitted).[24]

The laws at issue here easily survive rational-basis review. Rational-basis review "is a paradigm of judicial restraint," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993); it is "the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989). Under this standard, the challenged statute enjoys "a strong presumption of validity," and the challenger bears "the burden 'to negative every conceivable basis which might support it'" without regard to "whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach*, 508 U.S. at 314-15 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 321 (1993); *accord Beach*, 508 U.S. at 313-15 (a law survives rational-basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," because "a legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data."); *Heller*, 509 U.S. at 320 (recognizing that the government "has no obligation to produce evidence to sustain the rationality of a statutory classification").

The legislative record described above, *see supra* Statutory Background, demonstrates that Congress's decision to restrict handgun purchases by individuals under 21 was not irrational under this deferential standard. In 1968 when these laws were passed, Congress was concerned with the problem of violent crime committed by individuals under the age of 21. To that end, they passed a law intended to reduce the number of handguns in the possession of such individuals, and in particular to prevent the clandestine purchase of handguns without the knowledge of the 18-20-year-old's parents or guardians. Congress thus intended to create a scheme whereby parents and

---

[24] Plaintiffs have thus far made at most a cursory argument that the challenged laws fail rational-basis review. Because the burden lies with Plaintiffs, their claim fails for this reason alone.

guardians can evaluate whether or not their child is responsible enough to possess a handgun and not use it to commit crimes. This crime-prevention rationale is certainly a "conceivable basis" for Congress passing this law, and Plaintiffs cannot negate that rationale under every "reasonably conceivable state of facts." *Beach*, 508 U.S. at 313. And although the government does not need to produce any evidence supporting the law's intended goals, *see id.*; *Heller*, 509 U.S. at 320, here the legislative history is based on empirical evidence indicating that (a) minors under the age of 21 committed a disproportionate amount of armed crimes (at the time the law was enacted), and (b) FFLs were the primary source of handguns for individuals in this category. *See supra* Statutory Background. The fact that the law allows for 18-20-year-olds to acquire and possess handguns through certain means other than purchase from an FFL at most demonstrates that "there is an imperfect fit between means and ends," *i.e.*, the statute could be considered underinclusive. *Heller*, 509 U.S. at 321. Under rational-basis review, this underinclusivity is irrelevant. *Id.* Courts cannot, under rational-basis review, strike down a law as unconstitutional for not going far enough to achieve its desired goal. The fact that it is "reasonably conceivable" that the challenged law prevents *some* 18-20-year-olds from obtaining a handgun in a situation in which they may commit a violent crime with that handgun is sufficient to satisfy rationality. *Beach*, 508 U.S. at 313. Plaintiffs meet their burden of showing that the age qualifications that Congress decided to impose on commercial handgun purchases were based on facts that "could not reasonably be conceived to be true by the governmental decisionmaker." *Kimel*, 528 U.S. at 84 (citation omitted). Plaintiffs' equal protection claim therefore fails.

## CONCLUSION

Because Plaintiffs fail to state a valid claim under the Second Amendment or the Fifth Amendment, Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment and dismiss the First Amended Complaint.

Dated:  March 8, 2023

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:     /s/ *Jonathan H. Hambrick*
Jonathan H. Hambrick
VSB No. 37590
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5400 (phone)
(804) 819-7417 (fax)
jay.h.hambrick@usdoj.gov


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

MICHAEL P. CLENDENEN
(D.C. Bar No. 1660091)
Trial Attorney
DANIEL RIESS
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-0693
Fax: (202) 616-8460
michael.p.clendenen@usdoj.gov

*Attorneys for Defendants*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of March, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

>Elliott Harding, Esquire
>Harding Counsel, PLLC
>608 Elizabeth Avenue
>Charlottesville, VA 22901

>/s/ *Jonathan H. Hambrick*
>Jonathan H. Hambrick
>VSB No. 37590
>Attorney for the Defendants
>Office of the United States Attorney
>919 East Main Street, Suite 1900
>Richmond, Virginia 23219
>Telephone:  (804) 819-5400
>Facsimile:  (804) 771-2316
>Email:  jay.h.hambrick@usdoj.gov

31