**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **JOHN COREY FRASER, et al,** | ) | |
| *Plaintiffs*, | ) | **Case No. 3:22-cv-00410** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BUREAU OF ALCOHOL,** | ) | |
| **TOBACCO, FIREARMS** | ) | **CLASS ACTION** |
| **AND EXPLOSIVES, et al.** | | |
| *Defendants* | | |

**PLAINTIFFS' REPLACEMENT BRIEF IN RESPONSE TO THE DEFENDANTS'**
**MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**SUMMARY JUDGMENT**

COME NOW the Plaintiffs, Mr. John "Corey" Fraser, Mr. Joshua McCoy, Mr. Tyler

McGrath, and Mr. Ian Shackley, (collectively, "Plaintiffs"), by and through counsel, and on behalf

of themselves and a pending Class of those similarly situated, and as ordered by this Court, *see*

ECF Doc. 38, do hereby provide this Replacement Brief In Response To The Defendants' Motion

to Dismiss and In Support of Plaintiffs' Motion for Summary Judgment. In furtherance of this

Motion, the Plaintiffs state the following:

**Procedural Posture**

The Plaintiffs filed their Amended Complaint on November 16, 2022, seeking an injunction

and declaratory judgment that 18 U.S.C. §§ 922(b)(1) and (c), and all derivative regulations,

including 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b), violate the right to keep and bear

arms as secured by the Second Amendment of the United States Constitution as well as the right

to equal protection of the laws and due process as secured by the Fifth Amendment. The Parties

had a pre-trial conference on November 16, 2022 and stipulated that there is no issue of material

fact in dispute and this case is ripe for review on the merits. The Defendants filed a Motion to

Dismiss and the Plaintiffs filed a cross-motion for Summary Judgment. The Parties appeared

before this Court on February 8, 2023 for oral argument on the pending motions. Following such hearing, the Court ordered supplemental briefing to take place so that the Parties could clarify and summarize the arguments presented. *See* ECF Doc. 38. In furtherance of the Court's Order for such briefing, the Plaintiffs state the following:

## I.     The Laws At Issue Proscribe Conduct Protected By The Plain Text of The Second Amendment.

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects the conduct. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111, 2126 (2022). To justify regulation of such conduct, the Government must demonstrate the regulation is consistent with the Nation's historical tradition of firearm regulation. *Id*. Only if a regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id*. (citing *Konigsberg v. State Bar of Cal.*, 366 U. S. 36, 50, n. 10 (1961)). It is the Government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127.

The Court's first inquiry must be whether the *conduct* is covered by the plain text, not whether the plaintiffs' *status* falls within the plain text.  *See Bruen* , 142 S. Ct. 2117 (emphasis added); *United States v. Rowson*, __ F.Supp.3d __, 2023 U.S. Dist. LEXIS 13832, 2023 WL 431037, at *15 (S.D.N.Y. Jan 26, 2023) (noting *Bruen* focused on the "conduct" the statute proscribed, not on disqualifying status characteristics of the individuals challenging the statute); *United States v. Quiroz*, __ F.Supp. 3d __, 2022 U.S. Dist. LEXIS 168329, WL 4352482, at *3 (W.D. Tex. Sept. 19, 2022) (noting an individual's conduct, rather than their status, is what needs to be analyzed to

determine if it is protected by the plain text of the Second Amendment); *United States v. Bartucci*, __ F.Supp.3d __, 2023 U.S. Dist. LEXIS 30680, at *13–14, 2023 WL 2189530 (E.D. Cal. Feb. 23, 2023) (same); *United States v. Kays*, __ F.Supp.3d __, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at *2  (W.D. Okl. Aug. 29, 2022) (same); *United States v. Hicks*, __ F.Supp.3d __, 2023 U.S. Dist. LEXIS 35485, 2023 WL 164170, at* 4 (W.D. Tex. Jan. 9, 2023) (analyzing conduct proscribed by statute and finding that receiving a firearm is encompassed by "to keep and bear arms" text of the Second Amendment); *United States v. Holden*, __ F.Supp.3d __, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *3 (N.D. Ind. Oct. 31, 2022) (same).

The Plaintiffs and the pending Class fall within the core definition of "the People" protected by the Second Amendment. Additionally, the purchase of handguns is conduct which falls within the Second Amendment's protection of the right to "keep and bear arms." Courts have refused to analyze an individual's status in the first prong of *Bruen*'s analysis. *See, e.g.*, *Bartucci*, 2023 U.S. Dist. LEXIS 30680, at *13–14;  *Kays*, 2022 WL 3718519, at *2, n.4 ("[T]he Court reiterates that an individual's Second Amendment rights are not predicated on their classification, but rather their conduct"); *Quiroz*, 2022  WL 4352482, at *3 (noting that prohibited conduct under Section 922(n) is "receipt" of a firearm and nothing more);  *Rowson*, 2023 WL 431037, at *19 (noting *Bruen*'s focus was on conduct rather than status when joining other post-*Bruen* courts that have decided the same). Per this Court's order, the Plaintiffs first address that their status falls within "the People" protected by the Second Amendment and then address whether the purchase of a handgun is protected conduct.

## A. Eighteen-to-Twenty-Year-Old Law-Abiding Citizens Are Within The Definition of "The People" Protected By The Second Amendment.

Courts must start "with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *District of Columbia v. Heller*, 554 U.S. 570, 580

(2008). The "first salient feature" of the Second Amendment's operative clause is that it codifies a "right of the people." *Id*. at 579. The Bill of Rights uses the phrase "right of the people" two other times—in the First Amendment's Assembly-and-Petition Clause and in the Fourth Amendment's Search-and-Seizure Clause. *Id*. ("The Ninth Amendment uses very similar terminology, 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'"). All three instances "unambiguously refer to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body." *Id*. In the six other provisions of the Constitution that mention "the people," the term refers to all members of the recognized political community, not an unspecified subset. *Id*. at 580 ("This contrasts markedly with the phrase 'the militia' in the prefatory clause."). Law abiding citizens who are eighteen and older fall within the "the people" due to their unqualified presence as law-abiding adults within the body-politic and political community.

1. **If The Age of Majority Is The Determinative Factor For Whether An Individual Falls Within "The People" As Protected By The Second Amendment, The Plaintiffs Are Protected Because They Are Adults.**

The Government suggests that the Second Amendment allows Congress to enact the age discrimination in the laws at issue because the common law age of majority was twenty-one at the time of the Founding. *See* Motion to Dismiss at 12 (citing William Blackstone, 1 Commentaries on the Laws of England 463 (1st ed. 1765); Black's Law Dictionary 847 (9th ed. 2009)). This is not only extreme, it goes well beyond the case. The laws at issue do not prohibit handgun possession by those under twenty-one altogether, yet the Government asks this Court to adopt an interpretation of the Second Amendment that would authorize a ban of all firearms for those younger than twenty-one because, as it argues, they do not fall within the scope of Constitutional protection. Second, the Government presupposes that the legal threshold of adulthood is the

determinative factor for whether the Second Amendment applies. Assuming this is true, *arguendo*, the determination must rely on the generally-recognized age of majority as established by the State at the time of the Court's inquiry rather than be forever-fixed at the age of twenty-one from the Founding-era.

When upholding firearms restrictions, Courts must be able to conclude modern and historical regulations impose a "comparable burden" that is "comparably justified." *Id.* The Government cites the Congressional intent from 1968 that underlies the laws at issue, stating that the statutory provisions were designed to address "[t]he clandestine acquisition of firearms by juveniles and minors," S. Rep. No. 90-1097, at 79. When Congress enacted these laws in 1968, the age of majority was twenty-one. It is now eighteen in at least forty-seven states, with Alabama (19), Mississippi (21), and Nebraska (19) being the only three with higher limits per statute. Additionally, the federal government defines a "minor" as one younger than eighteen in every context which includes a specified age. Three years after the passage of the Omnibus Crime Control and Safe Streets Act of 1968, eighteen-year-olds received the universal right to vote via the Twenty-Sixth Amendment. *See also Horsley v. Trame*, 808 F.3d 1126, 1130 (7th Cir. 2015) ("The age of majority was 21 until the 1970s."). Eighteen-year-old males have been required to register for Selective Service for over a century and eighteen-year-olds are treated as adults for criminal trials, jury service, and their emancipation from parental oversight. At eighteen, one can enter a binding contract, work without restriction, vote, and be held responsible for their own taxes. Nothing distinguishes an eighteen-year-old from other contributing members of civic society and they are within the term "the People." For these and other reasons, the age of majority is eighteen for all purposes, including the Second Amendment. If the Government's argument is correct—that the Founders considered the age of majority to govern the Second Amendment—the protection

applies to those who are eighteen. The Government seeks to sever Constitutional guarantees from law-abiding adults because they would have been minors in 1791. No fundamental liberty has ever been held inapplicable to a class of law-abiding adult citizens in such a fashion and the Supreme Court has consistently ruled that the Constitution's protections generally apply to minors and adults alike. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (recognizing First Amendment protections for minors in high school); *Goss v. Lopez*, 419 U.S. 565 (1975) (due process in civil proceedings); *Roper v. Simmons*, 543 U.S. 551 (2005) (Eighth Amendment applies to minors); *Brown v. Bd. of Educ.*, 347 U.S. 483 (recognizing Fourteenth Amendment protections for minors); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (Fourth Amendment right to privacy for purposes of search and seizure). If the Government's position were tenable, every liberty could be subject to the age established in the Founding-era rather than the ages determined by the States or contemporary common-law. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of maturity." *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74 (1976). The age of majority at the time of the Court's inquiry is, at maximum, the delineation between whether civil liberties fully vest or whether such liberties remain subject to age-related interference.

2. **If Nominal Age Is The Determinative Factor For Whether An Individual Falls Within "The People" Protected By The Second Amendment, The Plaintiffs Are Protected Because Those Who Were Eighteen Routinely Purchased, Possessed, And Used Analogous Firearms And There Were No Founding-Era Age Restrictions.**

Courts must apply the "text, history, and tradition analysis" used by the Supreme Court in *Bruen*. 142 S. Ct. at 2126; *Heller*, 554 U.S. at 576 (stating that the Court is "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning" and that "[n]ormal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings

that would not have been known to ordinary citizens in the founding generation"). Considering the unique role that eighteen-year-olds played at the time of the Revolutionary War and our Nation's Founding, together with the text, history, and tradition of the Second Amendment, this Court must find that the laws at issue are invalid.

An exhaustive list of historical firearm regulations shows that there were no state laws governing the possession or purchase of firearms by minors prior to 1791 and only two states adopted them between the Constitution's ratification and 1867. *See* Robert J. Spitzer, *The Second Generation of Second Amendment Law & Policy: Gun Law History In The United States And Second Amendment Rights*, 80 LAW & CONTEMP. PROB. 55, 58–59 (2017). As for licensure, regulation, or prohibition on the commercial sale of firearms, it was not until the early Twentieth-century that such laws were enacted in certain states and there were effectively no federal requirements until the National Firearms Act in 1934. *Id.* at 75 (Georgia (1902), North Carolina (1905), New York (1911), New Hampshire (1917), West Virginia (1925), New Jersey (1927), and Florida (1927)).

Historical materials "couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history." *NRA v. BATFE*, 714 F.3d 334, 339 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). At the time of our nation's Declaration of Independence and the Revolutionary War, armed militias in the colonies were comprised of boys as young as sixteen, with thousands entering service while even younger. *See id.* George Washington's Continental Army consisted of thousands of young men under twenty-one and they regularly used firearms. *See id.* Young males were commonly required to possess firearms as part of their militia service. *Id.*, *see also* James Lindgren, *Counting Guns In Early America*, 43 WM. & MARY L. REV. 1777, 1782 (2002). Thought by many as the "father of

the Constitution," *cf. West Lynn Creamery Inc. v. Healy*, 512 U.S. 186, 193, n.9 (1994), due to his influence on the drafting and content, James Madison was only twenty-five on July 4, 1776 and ultimately served in George Washington's Continental Army along with others who were even younger. His contemporaries included an eighteen-year-old James Monroe and Charles Pinckney, along with a twenty-year-old Henry Lee III, John Trumbull, Aaron Burr, and John Marshall. Additionally, the French officer Marquis de Lafayette was only eighteen in 1776 yet gained the rank of Major General in the Continental Army while leading battles including the Siege of Yorktown. Eighteen-year-olds regularly used, possessed, and traded pistols, ammunition, and other firearms at this time and these firearms continue to serve as the "most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *See Heller*, 554 U.S. at 628.

Following the ratification of the Bill of Rights on December 15, 1791, eighteen-year-olds were required by the 1792 Militia Act to be available for service and militia members were required to furnish their own weapons. Eighteen-year-olds must have been allowed to "keep" firearms for personal use. *NRA*, 714 F.3d at 339 (Jones, J., dissenting from denial of rehearing en banc). Because they were within the "core" rights-holders at the founding, their rights cannot be infringed today. *Id.* The laws prior to and immediately surrounding passage of the Second Amendment illuminate contemporary understanding. Sixteen was the minimum age for colonial militias almost exclusively for 150 years before the Constitution. *Id*. at 340. For example, in 1650, it was not just the right but the duty of all persons aged sixteen and above in Connecticut to bear arms. *See* Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON FIREARMS & PUB. POL'Y 1, 3 (2004). Other colonies had similar laws, *id*. at 8, with Delaware's minimum age of seventeen as the exception. *Id*. At the time of the Second Amendment's passage and shortly thereafter, the

minimum age for militia service in every state[1] became eighteen. Nearly every state adopted the Militia Act of 1792 by reference and began using its age structure. *Id*. Historical data confirms that those eighteen and above had the right to keep and bear arms and this right was not coextensive with militia service, but it was intimately related. *Id*. Gun ownership was necessary for militia service, but militia service was not necessary for gun ownership. *Id*. Not only had the colonies employed sixteen-year-olds in the militia for more than a century prior to the Second Amendment's ratification, other gun laws in place at the time serve as indicia of the Founders'

---

[1] Alphabetically by state, these are the available minimum militia ages set around the time of ratification of the Second Amendment and the federal Militia Act of 1792: **Connecticut**: 18 /Acts and Laws, 308 (1792); **Delaware**: 18/ Ch. XXXVI, An Act for Establishing the Militia In This State, 1134 (1793) **Georgia**: 18/ An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of the Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled "An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States," as contained in Digest of the Laws of Georgia, 460 (1792); **Maryland**: 18 / Ch. LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793); **Massachusetts**: 18 / Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, "An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service," 172 (1793); **New Hampshire**: 18 / An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, 251 (1792); **New Jersey**: 18 / Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey, 825 (1792); **New York**: 18 / Ch. 45, An Act to Organize the Militia of This State. Laws of New York 440 (1793); **North Carolina**: 18 / Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina—1786, 813 (amended by An Act to Carry Into Effect an Act of Congress, Entitled, "An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States," Also to Amend an Act, Passed at Fayetteville, in he Year One Thousand Seven Hundred and Eighty Six, Entitled, "An Act for Establishing the Militia in This State," (1793)); **Pennsylvania**: 18/ Ch. MDCXCVI, An Act for Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 455 (1793); **South Carolina**: 18/ An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, 21 (1794) (enrolling citizens turning eighteen and evidencing a shift from the former militia age of sixteen as seen in: No. 1154, An Act for the Regulation of the Militia of This State, 682 (1782-91)); **Virginia**: 18/ Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, 182 & 184 (1792).

mindset. *Id.* The Government is correct that the age of majority was twenty-one during the Founding era but minors were in the militia and were expected, if not required, to own and provide their own weapons. Referring to permissible historic limitations on gun ownership, *Heller* never mentioned a minimum age for exercise of the right. On the contrary, to explain the "militia clause," the Court postively quoted the first federal Militia Act of 1792, which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years . . . shall . . . be enrolled in the militia." *Heller*, 554 U.S. at 596 (quoting Act of May 8, 1792, 1 Stat. 271). The Court explained that the right of able-bodied citizens to keep and bear arms for self-defense was constitutionally codified "to prevent elimination of the militia," which some feared the newly created Federal Government, like past tyrants, might do by taking away the citizens' arms. *Id.* at 599. Those subject to militia duty are therefore a subset of citizens entitled to be armed and the right was considered to be essential.

The Founders expressly resisted the notion of a standing army in the United States and preferred a strong, decentralized system of militias which consisted of thousands of young men younger than twenty-one. "[T]he conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Id.* at 627. In Federalist No. 46, James Madison discussed the interplay between state militias and a federal army. While defending the notion of keeping a federal military small, he posited that state militias and an armed citizenry could outweigh threats of a standing military force. *See* The Federalist No. 46, p. 247–48 (Gideon, J. ed. 1818) (J. Madison). Militias consisted and relied on young people, not just adults. Militias were decentralized bands of able-bodied males comprised of adults and minors. James Lindgren, *Counting Guns In Early America*, 43 WM. & MARY L. REV. 1777, 1782 (2002). Militias were the

first and last line of domestic defense, before and after the American Revolution, and their presence was a vital consideration when the Founders formulated America's system of federalism. *See, e.g.*, The Federalist No. 46, pp. 247–48 (Gideon, J. ed. 1818) (J. Madison). To think the Founders would have permitted a federal limitation on the purchase of new, commonly used firearms by the same body that constituted the militia is fundamentally at odds with the Second Amendment. Not only does the conduct proscribed by the laws at issue fall squarely within the scope of what our Founders meant to protect, but a reading of early-American documents show that the Founders would have rejected such bans altogether. *See, e.g.*, Richard Henry Lee, Walter Bennett, ed., *Letters from the Federal Farmer to the Republican,* at 21, 22, 24 (Univ. of Alabama Press 1975) ("[T]o preserve liberty, it is essential that the whole body of the people always possess arms and be taught alike, especially when young, how to use them." (emphasis added)); *see also* Tench Coxe, "A Pennsylvanian, No. 3," Pennsylvania Gazette, Feb. 20, 1788 ("[T]he powers of the sword are in the hands of the yeomanry of America from 16 to 60 . . . . Their swords . . . are the birthright of an American.").

   **3.** **The Government's Reliance on The Founding Era's Age of Majority is Misguided Because There Is No Age Limit In The Second Amendment And The Founders Knew How To Include Such If They Wanted To Do So.**

If the Founders wanted to attach an age restriction on the Second Amendment, they knew how to do so. *See, e.g.*, U.S. Const. Art. I, § 2 (minimum age of 25 for holding office in House of Representatives), § 3 (minimum age of thirty for holding office in Senate), Art. II, § 1 (minimum age of thirty-five for holding office as President). Further, if the People want to apply an age threshold, they know how to do so. *See, e.g.*, U.S. Const. amend. XXVI (providing eighteen-year-olds with universal suffrage). The maxim *expressio unius est exclusio alterius* is applicable. *See, e.g., United States Term Limits v. Thornton*, 515 U.S. 779, 868 (1995) (Thomas, J., dissenting).

"When the Framers decided which qualifications to include in the Constitution, they also decided not to include any other qualifications in the Constitution." *Id*.

### B.   The Purchase of Handguns Is Conduct Which Falls Within The Second Amendment's Protection of the Right To Keep And Bear Arms.

Since *Bruen*, courts have found that the "receipt" of a firearm is protected by the plain text of the Second Amendment. *See United States v. Quiroz*, __ F.Supp. 3d __, 2022 U.S. Dist. LEXIS 168329, WL 4352482 (W.D. Tex. Sept. 19, 2022); *United States v. Jackson*, __ F.Supp. 3d __, 2023 U.S. Dist. LEXIS 33579 at *20, WL 2242874 (D. Md. Feb. 27, 2023) (citing *Quiroz* among other post-*Bruen* cases and finding that receipt of a firearm is conduct protected by the Second Amendment). Other courts have assumed, without deciding, that the commercial purchase of handguns is conduct protected by the plain text of the Second Amendment by incorporating pre-existing Circuit precedent as consistent with *Bruen*. *Reese v. BATFE*, __ F.Supp.3d __, 2022 U.S. Dist. LEXIS 230140, at *20, 2022 WL 17859138 (W.D. La. Dec. 21, 2022). A similar reliance on pre-*Bruen* precedent in the Fourth Circuit would find that the purchase of a handgun in such a commercial transaction is protected. *See Hirschfeld v. BATFE*, 5 F.4th 407, 416–18 (4th Cir. 2021) (vacated for mootness). The Government argues for a rigid, sterile reading of "keep and bear arms." It suggests that "to keep arms" means to "have weapons" or "possess" and to "bear arms" means to "carry." Anything that is not "having," "possessing," or "carrying" weapons is excluded and thus "receiving" or "purchasing" a firearm would fall outside the Second Amendment's right to "keep and bear arms." The plain meaning of the verbs "have" or "possess" inherently include the act of receipt. For example, "to have" means "to be in possession of . . . *something received*." Therefore, "to have weapons" would encompass the past receipt and the current possession of those weapons. And logically, excluding "receive" makes little sense. To receive something means "to take into . . . one's *possession*." How can one possess (or carry) something without first

receiving it? Receipt is the condition precedent to possession—the latter is impossible without the former. Taking the Government's argument at face value would lead to an absurd result: if receiving a firearm were illegal, but possessing or carrying one remained a constitutional right, one would first need to break the law to exercise that right. The Government cannot argue that the conduct falls outside the scope of the Second Amendment because "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). To uphold the constitutionality of a law imposing conditions on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. *Id*.

If there were categorical exceptions from the Second Amendment for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms altogether, *id.*, but such a result would be untenable. *Id*. As Thomas Jefferson said: "Our citizens have always been free to make, vend, and ex-port arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 6 Writings 252–53 (P. Ford ed. 1895).

In *Heller*, the Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626 *Heller*'s exception for "longstanding," "presumptively lawful regulatory measures" has proven to be a challenge to apply. *National Rifle Ass'n v. BATFE*, 700 F.3d 185, 196 (5th Cir. 2012). Courts have found it "difficult to discern" whether *Heller*'s reference to "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27, by "virtue of their

presumptive validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or (ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny." *National Rifle Ass'n,* 700 F.3d at 196; *Marzzarella*, 614 F.3d at 91 (recognizing that the designation—longstanding, presumptively lawful measure—is ambiguous). The Fifth Circuit determined "that a longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment . . . ." *National Rifle Ass'n*, 700 F.3d at 196. The Fourth Circuit has not provided similar guidance as to whether courts should consider "longstanding prohibitions" to be presumptively lawful because the conduct "presumptively" falls outside of the Second Amendment's scope or because the laws presumptively withstand heightened scrutiny. Nevertheless, it has considered this issue and ruled in favor of the Plaintiffs exact legal argument in *Hirschfeld* before *Bruen* was decided. 5 F.4th 407 (vacated as moot). This Court should reject the Fifth Circuit's approach and recognize that *Heller*'s examples of "longstanding prohibitions" are only "presumptively lawful" because they presumably satisfy the review of the text, history, and tradition of the Second Amendment even though they encompass conduct within the Second Amendment's scope of protection.

    *Heller* listed the firearm-possession bans for felons and the mentally ill to be "longstanding" and presumptively lawful, but the conduct—possession of firearms—fell within the "core" of the Second Amendment. 554 U.S. at 630. This reference to specific laws "that targeted particular groups for public safety reasons" are insufficient historical analogs to support the statutory and regulatory scheme at issue in this case. This recognition "of specific 'longstanding prohibitions' does not support a general prohibition on almost all 18-to-20-year-olds—just because of their age." *Firearms Policy Coal., Inc. v. McCraw*, 2022 U.S. Dist.

LEXIS 152834, at *25 2022 U.S. LEXIS 152834 (N.D. Tex. Aug. 25, 2022). The defining characteristics of felons or the mentally ill as a class are what materially distinguish them from those who remain free to engage in the same conduct. It is their status or classification, rather than the *conduct*, that allows for Second Amendment restrictions. *Heller* referred to class-based restrictions on firearm possession by felons and the mentally ill as "longstanding" though those bans were of mid-Twentieth century vintage. *See United States v. Booker*, 644 F.3d 12, 23–24 (1st Cir. 2011) (explaining that the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), "bears little resemblance to laws in effect at the time the Second Amendment was ratified," as it was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968); *United States v. Skoien*, 614 F.3d 638, 640–41 (7th Cir. 2010) (explaining that 18 U.S.C. § 922(g)(4), which forbids firearm possession by a person who has been adjudicated to be mentally ill, was enacted in 1968); Carlton F. W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L. J. 1371, 1376–80 (2009) (showing that a strictly originalist argument for *Heller*'s examples—including bans on firearm possession by felons and the mentally ill, and laws imposing conditions on commercial arms sales—is difficult to make).

Heller suggests that a regulation can be "longstanding" even if it cannot boast a Founding-era analogue. *See Skoien*, 614 F.3d at 640–41 ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791."). Nevertheless, *Heller* did not go so far as to say that a restriction is presumably lawful merely because it has gone unchallenged and nothing in the Second Amendment or in debates underlying our Founding limited Constitutional protections to adults at the time. *Bruen* noted that there is "ongoing scholarly debate" on whether the Fourteenth Amendment's" ratification in 1868 imbued the Second

15

Amendment with a new and different meaning to the States than it had to the Federal Government in 1791. *Bruen*, 142 S. Ct. at 2138. The Court clarified that "post-Civil war discussion of the right to bear arms, [which] 'took place 75 years after the ratification of the Second Amendment [and] do[es] not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2137–38 (quoting *Heller*, 554 U.S. at 614). *Bruen* "should not be understood to endorse freewheeling reliance on historical practice form the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring).

*Heller*'s examples of class-based restrictions on felons and the mentally ill are listed among several others in 18 U.S.C. § 922(g) that are materially different from the age-related restrictions at issue in 18 U.S.C. §§ 922(b)(1) and (c). The ban on being a felon in possession of a firearm comes only after a verdict is rendered via our justice system that must comport with due process and a series of other constitutional safeguards. The ban on the mentally ill being in possession of a firearm must generally comport with due process as well. Even if, *arguendo*, those restrictions are constitutional, they maintain a quality of individualized assessment and due process while the restrictions in this case apply universally to all adults under a particular age. *Compare* 18 U.S.C. § 922(g), *with* 18 U.S.C. §§ 922(b)(1) and (c). A similar status or class-based prohibition exists in this case, in that the law attempts to rely on the distinguishing characteristics of a group rather than the inherent risk of the conduct (commercial transactions) or any uniquely dangerous quality of the firearm (handguns). At the time of the Founding, class-based or status restrictions targeted Native Americans, African-Americans, and Catholics. *See* Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON. FIREARMS & PUB. POL'Y at 16–20 (2004). None of those would be permitted today. The only Founding-era regulations that could compare to the laws at issue were those for "Loyalists to the Crown," in that they applied to law-abiding, able-bodied adult citizens absent

consideration of race, ethnicity, national origin, or religion, but even the "Loyalty Test" regulations contradict the Government's position in this case. *NRA*, 714 F.3d at 343 (Jones, J., dissenting).

"Loyalty Tests" were applicable to persons "above eighteen and stated that those who did not swear allegiance would be disarmed"—eighteen-year-olds were considered to have rights, even if they were equally subject to being restricted with other suspect class members. *Id.* (citing Massachusetts' age cut-off of sixteen in 1775 and Pennsylvania's at eighteen). Additionally, "Loyalty Tests" were applied to individuals on a case-by-case basis and were therefore most similar to contemporary restrictions on felons and the mentally ill. In theory, restrictions on the sale of firearms and ammunition to contemporary minors is presumptively valid, *see, e.g.*, Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883)); *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009), but that is not at issue. There are no Founding-era analogues or longstanding prohibitions against the sale of items commonly used in self-defense to law-abiding, able-bodied adult citizens and the restrictions here lack the material features of those illustrated in *Heller*. The "longstanding prohibition" exception is inapplicable.

## II.     The Regulations At Issue Are Not Consistent With This Nation's Historical Tradition of Firearms Regulation.

The lack of age-based restrictions on the sale, purchase, or possession of firearms signals that such regulations are not consistent with this Nation's historical tradition of firearms regulations. Most importantly, there has never been another example of a regulation that prohibited the commercial purchase of a handgun by a law-abiding adult citizen predicated on their age. Based on the Court's Order, the Plaintiffs' found that the earliest age-based restriction in the United States came in 1856, when Alabama made it a misdemeanor to "sell, or give, or lend to any male minor a pistol." *See Coleman v. State*, 32 Ala. 581 (1858); Act of February 2nd, 1856 (Pamphlet Acts of 1855-56, at 17). No other regulations enacted prior to 1776, prior to 1789, or prior to 1815 provided

any analogous laws to those at issue in this case, but hree years after Alabama passed the first age-based restriction, Kentucky passed its first law which imposed a fine for similar conduct. *See* 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg," § 23 ("If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars."). These are the only known age-restrictions that existed prior to our Nation's ratification of the Fourteenth Amendment and the Second Amendment would not have been applicable to the States at the time. From 1868 until 1968, state-based restrictions consisted of the following, listed in chronological order. Notably, all of the relevant laws that cited a nominal age included ages below eighteen years old, regardless of "minor" status:

In 1878, Mississippi passed "An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes. See 1878 Miss. Laws 175, §§ 2-3 ("§ 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described (pistols, various knifes etc. , or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars . . . § 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed in whole or in part, any weapon of the kind or description in the first section of this act described (pistols, knifes, etc.) shall be deemed guilty of a misdemeanor, and on conviction shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor . . . ."

In 1878, Tennessee § 4864 made it a misdemeanor to sell, give, or loan a minor a pistol. or other dangerous weapon, except a gun for hunting or weapon for defense in traveling). *See State v. Callicutt*, 69 Tenn. 714 (1878).

In 1881, Florida enacted "An Act to Prevent the Selling, Hiring, Bartering, Lending or Giving to Minors under Sixteen Years of Age, or to any person of unsound mind, certain Fire-arms or other dangerous weapons." See 1881 Fla. Laws 87,  chap. 3285, § 1-2 ("§ 1. it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any minor under *sixteen* years of age any pistol, dirk or other arm or weapon, other than an ordinary pocket-knife, or a gun or rifle used for hunting, without the permission of the parent of such minor, or the person having charge to such minor, and it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket knife. § 2. Any person or persons so offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty nor more than fifty dollars, or imprisoned in the county jail not more than three months.") (emphasis added)

In 1881, Pennsylvania passed the Act of June 10, 1881, § 1 which made any person, "who shall knowingly and willfully sell or cause to be sold, to any person under *sixteen* years of age, any cannon, revolver, pistol or other such deadly weapon, guilty of an offense." *See McMillen v. Steele*, 275 Pa. 584 (1923) (emphasis added).

In Kansas, the state passed "An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2." *See* 1883 Kan. Sess. Laws 159, § 1 ("Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of

notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars."), ("§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.").

In 1883, Michigan passed Mich. Pub. Acts 144, "An Act To Prevent The Sale And Use Of Toy Pistols, § 1: That no person shall, sell, give, or furnish to any child under the age of *thirteen* years, any cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially arranged or designated for the explosion of the same." (emhpashis added).

In Minnesota, the state passed "Ordinance # 2395 § 2" which stated "That hereafter it shall be unlawful for any person or dealer therein, at any time during thirty days next preceding the fifth day of July, in each year, to sell, expose or offer for sale, or in any manner furnish or dispose of to any resident of the city of St. Paul, or to any other person for use in said city, or to any minor person at any time, any blank cartridge, pistol or revolver, or any of the explosives, firecrackers, or fireworks, the use of which in prohibited in section one of this ordinance, and all such acts are hereby prohibited.' *See Schmidt v. Capital Candy Co.*, 166 N.W. 502 (1918).

That same year, Rhode Island passed 1883 R.I. Pub. Laws 157, "An Act In Amendment Of And in Addition To Chapter 92 Of The Public Statutes "Of Fire-arms and Fire-works. *Id.* ("Section 1: No person shall sell to any child under the age of fifteen years, without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part of any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate.").

In 1885, New Jersey passed 1885 N.J. Laws 52, "An Amendment To An Act To Prevent Vending, Using, Or Exploding Of Guns, Pistols, Toy Pistols, Or Other Fire-Arms To Or By Persons Under The Age Of Fifteen Years In This State, § 2" which stated "That it shall not be lawful to sell, hire or loan to any person under the age of *fifteen* years any gun, pistol, toy pistol, or other fire-arms; or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other fire-arms; nor for any person under the age of fifteen years to carry, fire or use any gun, pistol, toy pistol or other fire-arms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school."

In Indiana: Section 1886 R.S. 1881 banned "selling a deadly weapon to a minor." *See State v. Allen*, 94 Ind. 441 (1884). Kentucky banned the sale of deadly weapons to a minor. *See Tankersly v. Commonwealth*, 9 S.W. 702 (1888). Ohio passed 1888 Ohio Laws 222, To Prohibit The Sale Of Toy Pistols In The State Of Ohio, § 6986b: That it shall be unlawful for any firm, company or person in the state of Ohio, to sell or exhibit for sale any pistol manufactured out of any metallic or hard substance, commonly known as a toy pistol; to a minor under the age of *fourteen* years; any firm company or person violating the provisions of this act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than ten nor more than fifty dollars, or be imprisoned not less than ten days nor more than twenty days, or both and shall be liable to a civil action in damages or any person injured by such sale.

In Louisiana, the state passed 1890 La. Acts 39, An Act Making It A Misdemeanor For Any Person To Sell, Give Or Lease, To Any Minor, Any Pistol, Bowie-Knife, Dirk Or Any Weapons, intended To Be Carried Or Used As A Concealed Weapon, § 1: It shall be unlawful for any person to sell, or lease or give through himself or any other person any pistol, dirk, bowie-knife or any

other dangerous weapon which may be carried concealed to any person under the age of twenty-one years.

In Nebraska, the state passed 1895 Neb. Laws 237, Statutes Relating To The government Of The City Of Lincoln, Art.. XXVI, §§ 2, 5: § 2. No person shall sell, loan, or furnish, to any minor, any gun, fowling-piece, or other fire-arm, within the limits of the city, under penalty of a fine of fifty dollars for each offense. § 5. It shall be unlawful for any parent, guardians, or other person having the care and custody of any minor, to purchase for or give to any such minor or knowingly to permit any minor to have any toy pistol, toy guns, or other toy arms or arms or sling shot, out of which any leaden or other dangerous missiles may be discharged . . .

In Texas, the state passed 1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155: That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian os such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

In Georgia Penal Code 1234 § 340 (1910) forbid the sale of pistols to minors and made the violations of the statute a misdemeanor). *See Spires v. Goldberg*, 26 Ga. App. 530 (1921).

In Illinois, Cook County Ordinance chap. 53 of Chicago Code of 1911: § 6 stated that "It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar."

Finally, in Delaware, § 1 stated that if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten days nor more than six months, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers." *See State v. Quail*, 28 Del. 310 (1914). In sum, neither adulthood nor the age of eighteen serve as a historical threshold for the purposes of the Second Amendment's protection of the right to purchase a handgun by a law-abiding citizen.

### III.   The Plaintiffs Have Standing.

The Government argues that the Plaintiffs lack standing to bring this suit. To establish Article III standing to bring a suit before this Court, a plaintiff (1) "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) "it must be likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The Plaintiffs suffer from an

injury that is both actual and inevitable, it does not come as the result of third-party action, and such injury is capable of redress by this Court. Mr. Fraser was denied his purchase of a previously unowned handgun from an FFL due to the laws at issue. Aware of his mandated denial, the other Plaintiffs are not required to attempt a frivolous, inevitable denial or the potentially unlawful act of aiding, abetting, or conspiring with an FFL to violate the laws at issue by enticing the sale. The Government argues FFLs may sell handguns to the parents or guardians of those under twenty-one, and such parents or guardians may then gift these firearms to their children if they are not otherwise prohibited from receiving or possessing a firearm. *See* Opinion of ATF Chief Counsel, No. 23362 (Dec. 5, 1983). Nevertheless, these parents may not buy firearms for their children with money provided by their children if they are under the age of twenty-one. *See Hirschfeld v. Bureau of Alcohol, Tobacco & Explosives*, 5 F.4th 407, 413 n.4 (4th Cir. 2021) (vacated for mootness); *see also* 18 U.S.C. §§ 922(a)(6), 924(a)(1)(A); *see also Abramski v. United States*, 573 U.S. 169, 193 (2014) (finding a violation of §§ 922(a)(6) and 924(a)(1)(A) when an individual prohibited from purchasing gun used straw man to acquire it). This eliminates their ability to engage in the protected activity of commercial procurement of handguns—the "quintessential self-defense weapon." *Heller*, at 629. The Plaintiffs remain subject to injury capable of redress, therefore they maintain standing for these claims to be ruled upon on the merits. The Government argues that adults of able body and mind could theoretically use their parents to purchase the desired firearms and ammunition from an FFL, therefore they have not made the necessary showing that the laws at issue interfere with their Second Amendment rights. Not only is this unnecessary, as the Government agreed there is no issue of material fact left to be established and has not shown that these parents would purchase such firearms, but the argument is irrelevant. Free citizens do not maintain "legal guardians" or other State-sanctioned intermediaries for the purpose of exercising

fundamental liberties, for they are fully emancipated adults and the rights are natural. There is no example in the history of Constitutional jurisprudence of law-abiding, adult citizens of able mind and body having to subject their fundamental liberties to the approval or participation of his or her parent for exercise. Moreover, parental-oversight restrictions on other fundamental liberties have been routinely invalidated, even where minors are involved. *See, e.g., Planned Parenthood v. Danforth*, 428 U.S. 52, 74–75 (1976). The "parent as a third-party intermediary" doctrine does not exist. Additionally, one's access to their fundamental rights cannot be predicated on the status of their parents. *Cf. Mathews v. Lucas*, 427 U.S. 495 (1976); *Trimble v. Gordon*, 430 U.S. 762 (1976). The Government's argument is most appropriately considered as a defense on the merits to the regulatory scheme generally, not an argument against Article III standing. The Constitution's Article III standing requirement does not demand the Plaintiffs to subject fundamental liberties to the discretion of parents and no such requirement has ever been upheld. The Fourth Circuit considered the exact challenge before this Court and never held the plaintiffs lacked standing based on a failure to plead that their parents actually refused to purchase the relevant handguns. *See Hirschfeld*, 5 F.4th 407 (ruling on the merits)

## IV.    Classification Based On Youth Constitutes A Suspect or Quasi-Suspect Class, Therefore Laws Which Burden A Law-Abiding Adult Citizen's Liberties Based On Youth Must Be Subject To Heightened Scrutiny.

Insofar as this memorandum is considered a "replacement" for prior briefing rather than supplementary, the Plaintiffs and pending Class respectfully incorporate all previous arguments presented before the Court concerning claims that the laws at issue violate due process, equal protection, and rational basis scrutiny pursuant to those argumentsraised in their prior briefing and oral argument. The Fifth Amendment states that "[n]o person shall be… be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Though it does not contain the

Fourteenth Amendment's equal protection clause, the concepts of equal protection and due process are not mutually exclusive. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Fifth Amendment equal protection claims are "precisely the same" as equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."). Not only does equal protection analysis require "strict scrutiny of a legislative classification" when the classification "impermissibly interferes with the exercise of a fundamental right," it also requires strict scrutiny when it "operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Ret. v. Murgi*a, 427 U.S. 307, 312 (1976). If this Court does not find that the laws at issue impermissibly interfere with the Plaintiffs' rights to defend themselves, it should apply heightened scrutiny because the age classification at issue impacts a suspect or quasi-suspect class—young adults who are legally discriminated according to their youth. The Government argues that Supreme Court jurisprudence forecloses this argument because it once held that "[a]ge is not a suspect classification under the Equal Protection Clause." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). *Kimel* referenced a dispositive and materially different form of age-based classification, the use of a maximum age for older adults. Notably, age-based challenges have only been directly considered in that context before the Supreme Court of the United States. *Id.* (citing *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) (upholding maximum age for state judges); *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (mandatory retirement for foreign service personnel); *Murgia*, 427 U.S. 307 (mandatory retirement of police officers at fifty years old). The Supreme Court has never considered whether minimum age-based classifications, particularly those for young adults, create a suspect classification.

26

The most notable challenge on behalf of the youth in America came in *Oregon v. Mitchell*, 400 U.S. 112 (1970), just prior to the passage of the Twenty-Sixth Amendment, when the Court simultaneously upheld and struck portions of federal law attempting to universally lower the voting age from twenty-one-year-old adults to eighteen-year-old minors. *Id.* (finding that Congress could lower the age for federal but not state elections due to federalism concerns, prompting the passage of the Twenty-Sixth Amendment). A material factor that distinguishes the issue from that in *Mitchell* was that eighteen-year-olds were minors at the time. Now that they are adults, Justice Douglas's partial dissent in *Mitchell* carries even more weight in this equal protection challenge:

> Congress might well conclude that a reduction in the voting age from 21 to 18 was needed in the interest of equal protection. The Act itself brands the denial of the franchise to 18-year-olds as "a particularly unfair treatment of such citizens in view of the national defense responsibilities imposed" on them. § 301 (a)(1), Voting Rights Act, 84 Stat. 318. The fact that only males are drafted while the vote extends to females as well is not relevant, for the female component of these families or prospective families is also caught up in war and hit hard by it. Congress might well believe that men and women alike should share the fateful decision. It is said, why draw the line at 18? Why not 17? Congress can draw lines and I see no reason why it cannot conclude that 18-year-olds have that degree of maturity which entitles them to the franchise. They are "generally considered by American law to be mature enough to contract, to marry, to drive an automobile, to own a gun, and to be responsible for criminal behavior as an adult." Moreover, we are advised that under state laws, mandatory school attendance does not, as a matter of practice, extend beyond the age of 18. On any of these items the States, of course, have leeway to raise or lower the age requirements. But voting is a fundamental matter in a free and democratic society, [w]here "fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."

*Id.* at 142 (Douglas, J., dissenting in part) (internal citations omitted).

In *Gregory v. Ashcroft*, the Court considered discrimination against judges based on olde age. 501 U.S. at 472. It asserted that "a State may rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interest . . . . That age proves to be an inaccurate proxy in any individual case is irrelevant." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62,

84 (2000). The Court suggested that a rational basis might exist even if no judges affected by the mandatory retirement requirement were incompetent when removed as a result of the provision: "The Missouri mandatory retirement provision, like all legal classifications, is founded on a generalization. It is far from true that all judges suffer significant deterioration in performance at age 70. It is probably not true that most do. It may not be true at all." *Id*. This dicta suggested the Court believed that very little scrutiny was necessary but *Gregory* was consistent with intermediate scrutiny in that it considered the government's interest as "compelling" and declared the provision not merely rational but "reasonable." *Id*. For a classification to be "suspect" or "quasi-suspect" for heightened scrutiny, there must have been: a history of legally imposed discrimination based on that classification; the individuals must exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and they must constitute an insular minority or be politically powerless. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (citing *Murgia*, 427 U.S. at 313–14). A suspect or quasi-suspect class "is saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection youth and deem them unconstitutional in this case. from the majoritarian political process." *Murgia*, 427 U.S. at 313. All three of these factors exist for young adults who are discriminated according to their youth. First, young adults are politically insular minorities relegated to a position of relative powerlessness due to the overwhelming number of the population who are older and have had years, if not decades, of additional time and influence within the political system by the time these young citizens participate. Second, young adults suffer from an inherently immutable characteristic, their age. Finally, and most importantly, young adults have suffered from a lengthy and detailed history of purposeful and unequal treatment, oppression, and exploitation based on youth. For the following reasons heightened

scrutiny must apply to laws that discriminate against adults based on their youth and deem them unconstitutional in this case. If the Plaintiffs and their Class fall outside of the scope of the Second Amendment and do not warrant heightened due process protections, the laws at issue violate rational basis for the reasons cited. It is irrational to discriminate against young adults by relegating them to a market devoid of regulatory oversight, background checks, or licensure requirements in the name of deterring clandestine firearm possession.

**Conclusion**

WHEREFORE, the Plaintiffs, on behalf of themselves and a pending Class, respectfully request for this honorable Court to GRANT their Motion for a Summary Judgment; GRANT their request for a Declaratory Judgment and HOLD that the laws at issue violate their Second and, or, Fifth Amendment rights as pleaded in their Complaint; and ORDER the relief as requested in Complaint against the Defendants in their official capacity.

Respectfully submitted,

_____/s_____
Elliott M. Harding, Esq.
*Counsel for the Plaintiffs & Class*
Harding Counsel, PLLC
608 Elizabeth Ave.,
Charlottesville, VA 22901
P: 434-962-8465
E: Elliott@HardingCounsel.com

**CERTIFICATE OF SERVICE**

On March 8, 2023, I electronically submitted the foregoing document with the clerk of court for the United States District Court for the Eastern District of Virginia using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically as well.

Respectfully submitted,

_____/s_____
Elliott M. Harding, Esq.
*Counsel for the Plaintiffs & Prospective Class*
Harding Counsel, PLLC
608 Elizabeth Ave.,
Charlottesville, VA 22901
P: 434-962-8465
E: Elliott@HardingCounsel.com