IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| JOHN COREY FRASER, et al., on behalf of themselves and all others similarly situated as a Class, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22CV00410 |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, et al., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' REPLACEMENT BRIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................3

I.      Plaintiffs Fail to Demonstrate that They Cannot Legally Acquire a Handgun Under the Current Regulations...........................................................................3

II.     Plaintiffs Have Not Established that the Plain Text of the Second Amendment Covers Their Conduct. ..................................................................................4

III.    The Challenged Laws Are Consistent with the Nation's Historical Tradition of Firearm Regulation, as the Eleventh Circuit Recently Held. .......................7

IV.    Plaintiffs' Reliance upon Found-Era Militia Statutes Is Misplaced and Proves Too Much. ...................................................................................................8

       a.     At the Time of the Framing of the Second Amendment, the Minimum Age for Militia Service Fluctuated from 16 Years Old to 21 Years Old. ...........9

       b.     During the Founding Era, Congress and the States Recognized that Militia Service Did Not Emancipate Minors from the Care and Authority of Their Parents or Legal Guardians. ...........................................................11

V.     Fundamental Rights Are Subject to Reasonable Age Restrictions Set by the Legislature. ..............................................................................................13

VI.    Youth Is Not a Suspect Class with Immutable Characteristics. .............................15

CONCLUSION .................................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Allam v. State*,
   830 P.2d 435 (Alaska Ct. App. 1992) ................................................................................. 14

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ......................................................................................... 1, 5, 6

*FCC v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) ............................................................................................. 17

*General Dynamics Land Sys., Inc. v. Cline*,
   540 U.S. 581 (2004) ............................................................................................ 16

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ............................................................................................. 15

*Jones v. Jones*,
   72 F.2d 829 (D.C. Cir. 1934) ............................................................................... 14

*Kimel v. Fla. Bd. of Regents*,
   528 U.S. 62 (2000) ............................................................................................... 15

*Lehnhausen v. Lake Shore Auto Parts Co.*,
   410 U.S. 356 (1973) ............................................................................................. 17

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................... 4

*Mass. Bd. of Ret. v. Murgia*,
   427 U.S. 307 (1976) ............................................................................................. 16

*Nat'l Rifle Ass'n v. Bondi*,
   No. 21-12314, 2023 WL 2484818 (11th Cir. Mar. 9, 2023) .......................................... *passim*

*Nat'l Rifle Ass'n, Inc. v. ATF*,
   714 F.3d 334 (5th Cir. 2013) ............................................................................... 11

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ..................................................................................... 4, 5, 7

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) ............................................................................................. 14

*Reese v. ATF*,
   No. 6:20cv01438, 2022 WL 17859138, at *10 (W.D. La. Dec. 21, 2022) ............................. 7

*State v. Callicutt,*
    69 Tenn. 714 (1878)...................................................................................11

*Rourke v. U.S. Fid. & Guar. Co.,*
    1 S.E. 2d 728 (Ga. 1939) ...........................................................................14

*Tashjian v. Republican Party of Conn.,*
    479 U.S. 208 (1986) ...................................................................................14

*Vance v. Bradley,*
    440 U.S. 93 (1979) .....................................................................................16

**Constitutional Provisions**

U.S. Const. amend. XIV, § 2 ...........................................................................14

U.S. Const. art. I, § 2, cl. 2 .............................................................................13

**Statutes**

10 U.S.C. § 246 (2016) ...................................................................................10

2019 Virginia Laws Ch. 90 (H.B. 2748) ........................................................14

Va. Code Ann. § 4.1-304(West 2019) .............................................................14

Va. Code Ann. § 44-1 (West 2015) .................................................................10

Va. Code § 18.2-371.2 ....................................................................................14

**Rules**

E.D. Va. Civ. R. 56 ...........................................................................................4

Federal Rule of Civil Procedure 4 ....................................................................1

Federal Rule of Civil Procedure 12 ...................................................................1

**Other Authorities**

42 Am. Jur. 2d *Infants* § 6 (2019) .................................................................14

2 The Debates and Proceedings in The Congress of The United States (1834)...........................13

3 Jared Sparks, ed., *The Works of Benjamin Franklin* (1836) ......................................12

90 Cong. Rec. 12279 (1968).............................................................................3

I. Thomas & E.T. Andrews, The Perpetual Laws of The Commonwealth of Massachusetts from the Establishment of Its Constitution in the Year 1780 to the End of the Year 1800 (1801) ..10

*Immutable*, Merriam-Webster's Collegiate Dictionary (10th ed. 1998) ...................................... 16

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1 (2021) ................................. 12

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ........................................................................... 11

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) ................................. 8

William Blackstone, 1 *Commentaries On The Laws Of England* (1st ed. 1765) .......................... 9

## INTRODUCTION

Defendants the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); Steven Dettelbach, in his official capacity as the Director of ATF; and Merrick Garland, in his official capacity as Attorney General of the United States (hereinafter Defendants)[1] submit this response to Plaintiffs' Replacement Brief, ECF No. 44, in accordance with this Court's order, ECF No. 38. The Court should grant Defendants' motion to dismiss and deny Plaintiffs' motion for summary judgment for the reasons stated in the Brief in Support of Defendants' Motion to Dismiss, ECF No. 43, and for the reasons given below.

Plaintiffs would have this Court make new law by recognizing an unrestricted right by 18- to 20-year-olds to purchase handguns without parental knowledge from federal firearms licensees (FFLs).  To support this alleged right, Plaintiffs primarily rely upon the 1792 Militia Act and historical research that shows that, during the founding era, 18-year-olds were sometimes permitted to serve in some state militias.  According to Plaintiffs, this is enough to demonstrate that all rights secured by the Second Amendment necessarily reach 18-year-olds. *But see District*

---

[1] The First Amended Complaint also appears to raise claims against Director Dettelbach and Attorney General Garland in their individual capacities. The undersigned counsel represents only the agencies of the United States and federal officers sued in their official capacities. The undersigned counsel does not represent officers sued in their individual capacities, and this brief is submitted only on behalf of ATF and federal officers sued in their official capacities. For simplicity, this brief uses the term "Defendants" to refer to this group of defendants, excluding Defendants Dettelbach and Garland in their individual capacities. To undersigned counsel's knowledge, Plaintiffs have not served Director Dettelbach and Attorney General Garland in their individual capacities in accordance with Federal Rule of Civil Procedure 4(i)(3); those individuals would have sixty days after the completion of service in which to file a response to the First Amended Complaint under Federal Rule of Civil Procedure 12(a)(3). In any event, Plaintiffs' brief does not address the purported individual-capacity claims against Defendants Dettelbach and Garland.

1

*of Columbia v. Heller*, 554 U.S. 570, 611 (2008) (identifying "an individual right [to bear arms] unconnected to militia service").

There are multiple, fatal problems with Plaintiffs' argument.  First and foremost, at the time the Second Amendment was adopted, it was well understood that the age of majority was 21, not 18.  This original understanding of the Second Amendment prevails today.  Second, Plaintiffs' historical research is flawed, as the minimum age of militia service fluctuated dramatically, ranging from 21 years old down to 16 years old.  History thus suggests that Congress has some latitude to set age requirements for the commercial sale of handguns from FFLs, not that the Constitution itself fixes the age limit at 18.  Third, Plaintiffs' historical research ignores the fact that, while those under 21 years old were frequently allowed to serve in colonial militias, such minors were still unemancipated children, subject to the care and control of their parents or legal guardians.  Thus, mere service in the militia by minors did not yield the rights that traditionally attached upon the age of majority.

Plaintiffs' remaining arguments fare no better.  Plaintiffs fail to demonstrate that the current statutory and regulatory regime prevents them from lawfully acquiring a handgun, most readily through their parents or legal guardians.  Additionally, Plaintiffs' attempt to create more new law—by arguing that youth is a suspect or quasi-suspect class for Equal Protection analysis—runs headlong into contradictory Supreme Court precedent.

The current regulatory framework is designed to discourage the *clandestine* acquisition of handguns by 18- to 20-year-olds outside of the knowledge and supervision of their parents or legal guardians.  Significantly, the regulatory framework does not prohibit the *possession* of handguns by 18- to 20-year-olds.  Parents are still able to act as gatekeepers, purchasing and providing handguns to their 18- to 20-year-old children as they deem appropriate, which is a traditional role

with historical roots running back to the founding era.  Thus, minors between the ages of 18 and 20 do not enjoy an unvarnished right to acquire handguns from FFLs, and the challenged restrictions do not infringe on the Second Amendment as historically understood. Indeed, the Eleventh Circuit recently upheld a similar state law, holding that such regulations are consistent with the Nation's historical tradition of firearm regulation. *See Nat'l Rifle Ass'n v. Bondi*, No. 21-12314, 2023 WL 2484818, at *3 (11th Cir. Mar. 9, 2023).

## ARGUMENT

### I.      Plaintiffs Fail to Demonstrate that They Cannot Legally Acquire a Handgun Under the Current Regulations.

While Plaintiffs present a thicket of constitutional arguments, this Court need not – and should not – venture into that thicket.  Rather, this case should be dismissed because Plaintiffs are in fact able to acquire and possess a handgun under the current regulations.

As the Government described previously, the current regulations do not bar Plaintiffs' *possession* of handguns.  *See* Br. in Support of Defendants' Motion to Dismiss, ECF No. 43 (Defs.' Br.), at 4-5, 8-9.  Nor do the current regulations bar Plaintiffs' parents or legal guardians from purchasing handguns for their children from FFLs.  *See id.*  Rather, the current regulations are intended to stop the *clandestine* acquisition of handguns by 18- to 20-years-olds, *i.e.* acquisition of handguns outside of the oversight of their parents or legal guardians.  *See id.*  Parents or legal guardians may purchase a handgun from an FFL for their 18- to 20-year-old minor children.  *See* Defs.' Mem., Ex. A (ATF Opinion Letter), ECF No. 30-1.  This permits parents and legal guardians to serve an important gatekeeping role, consistent with the history and tradition of the Second Amendment.  *See* 90 Cong. Rec. 12279, 12309 (1968) (Sen. Dodd)  ("At the most [the challenged regulations] could cause minor inconveniences to certain youngsters who are mature, law abiding,

and responsible, by requiring that a parent or guardian over 21 years of age make a handgun purchase for any person under 21.").

Nowhere in the Amended Complaint or in their opposition to the motion to dismiss do Plaintiffs allege that their parents or legal guardians have refused to purchase handguns for them from FFLs or that they have otherwise exhausted legal means to obtain a handgun, let alone that obtaining a handgun through such legal channels impinges their Second Amendment rights.[2] Plaintiffs therefore lack standing. *See* Defs.' Br. 8-9.  The Court should dispose of this case on that ground alone.

## II.    Plaintiffs Have Not Established that the Plain Text of the Second Amendment Covers Their Conduct.

Plaintiffs have not demonstrated that the plain text of the Second Amendment applies to the purchase of handguns from FFLs by 18- to 20-year-olds. As such, their Second Amendment claim fails as an initial matter, without regard to historical firearm regulations. *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129-30 (2022).

First, Plaintiffs have not established that the phrase "the people," as it appears in the Second Amendment, includes individuals under the age of 21. Plaintiffs argue that "status" is different from "conduct," seemingly implying that the Court need not address the meaning of the phrase "the people." Plaintiffs' Replacement Br., ECF No. 44 (Pls.' Br.), at 2. This is incorrect. If

---

[2] Plaintiffs have failed to establish that they have exhausted legal options for obtaining a handgun. No Plaintiff has alleged that they have attempted to have their parents or guardians assist in the purchase and the parents or guardians have refused; indeed, Plaintiffs have not even alleged that they do not already possess a handgun. Since Plaintiffs have the burden of proving standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), their failure to plead these facts is fatal to their claims, *see also* Defendants' Opp'n to Plaintiffs' Mot. for Summary Judgment (Defs' Opp'n), ECF No. 30, at 4 n.3 (citing E.D. Va. Civ. R. 56(B)).

Plaintiffs are outside the scope of "the people" within the meaning of the Second Amendment, then the plain text of the Second Amendment does not apply and their challenge fails. *See Bondi*, 2023 WL 2484818, at *5 (asking whether "an 18-to-20-year-old[ ]is among 'the people' whom the Second Amendment protects" (internal quotation marks omitted) and citing *Heller*, 554 U.S. at 579, for the proposition that the "first salient feature of the [Second Amendment's] operative clause is that is codifies 'a right of the people'" (alteration in original)); *id.* at *6 (assuming without deciding that the plain text of the Second Amendment covered the conduct at issue).

Plaintiffs do not challenge laws pertaining to firearm purchase or possession by individuals under the age of 18. They argue only that law-abiding 18- to 20-year-olds "are within the definition of 'the people' protected by the Second Amendment." Pls.' Br. 3. Plaintiffs thus appear not to dispute the general principle that minors fall outside the plain text of the phrase "the people" within the meaning of the Second Amendment. Instead, they argue that the Court should look at what the age of majority established in states is *today*, rather than the historical understanding of who was a minor. *See* Pls.' Br. 5. And so even though every state set the age of majority at 21 from common law through at least the 1970s, Plaintiffs argue that the change in the age of majority from 21 to 18 in most states after this period conveys upon 18- to 20-year-olds full Second Amendment rights. *See id.*

Plaintiffs' argument is flawed because it directly contradicts the originalist approach laid out in *Heller* and *Bruen*. Courts interpreting the Second Amendment are tasked with ascertaining the "original meaning" of the Amendment. *See, e.g.*, *Bruen*, 142 S. Ct. at 2137. This approach extends to the textual analysis. *See Bondi*, 2023 WL 2484818, at *3 ("First, we consider the plain text of the Amendment, *as informed by the historical tradition*." (emphasis added)). If "the people" in 1791 would have been understood to mean "people above the age of majority," and the age of

majority at that time was 21, then "the people" covers only individuals above the age of 21. And even at the time of the Fourteenth Amendment's ratification, a period the Eleventh Circuit identified as particularly "probative" in identifying the Second Amendment's scope, *see Bondi*, 2023 WL 2484818, at *3, the age of majority was still 21. By Plaintiffs' reading, the plain text of the Second Amendment means something different today from what it meant prior to the 1970s. Indeed, their argument would mean that the federal laws at issue here, which Congress enacted in 1968, would have been constitutional when passed, yet somehow are unconstitutional now based on subsequent changes to state law. *Heller* and *Bruen* foreclose such an argument.

Second, Plaintiffs have not established that the phrase "keep and bear" applies to the *purchase* of handguns from FFLs. Instead, they say only that other courts have found that "receipt" of a firearm is protected by the Second Amendment. Pls.' Br. 12. But the laws at issue here do not prevent Plaintiffs from *receiving* a handgun; Plaintiffs can receive a handgun as a bona fide gift from their parents or guardians. The challenged laws only prevent Plaintiffs from *purchasing* (without parental involvement) a handgun from a FFL. Plaintiffs cannot establish that the purchase of a handgun from a FFL is conduct that the Second Amendment protects, and they do not cite any case holding that "keep and bear" includes an implied right to purchase, let alone purchase from a particular source. Indeed, "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. Plaintiffs acknowledge that one possible interpretation of this language from *Heller* is that such regulations fall outside the protection of the Second Amendment altogether. Pls.' Br. 14. Without providing any reason, Plaintiffs urge the Court to "reject" that approach and instead rule that the challenged regulations "presumably satisfy the review of the text, history, and tradition of the Second Amendment even though they encompass conduct within the Second Amendment's scope of protection." *Id.*

Plaintiffs do not, however, provide any reason why that presumption is overcome in this case. The result in either scenario is the same: the challenged laws are valid.

### III.   The Challenged Laws Are Consistent with the Nation's Historical Tradition of Firearm Regulation, as the Eleventh Circuit Recently Held.

Even assuming the plain text of the Second Amendment covers the conduct at issue here, the challenged laws are still valid because they are consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. Historical evidence from the Founding Era through present day shows that the government may choose up to 21 as the minimum age for purchase of handguns from FFLs. *See* Defs.' Br. 14-22.

Indeed, the Eleventh Circuit upheld a substantially similar state law on these grounds last week, after the parties' initial briefs were submitted. *See Bondi*, 2023 WL 2484818, at *2; *see also Reese v. ATF*, No. 6:20-cv-01438, 2022 WL 17859138, at *10 (W.D. La. Dec. 21, 2022) (upholding the federal laws at issue here on the grounds that the laws are "consistent with the Nation's historical tradition of firearm regulation"). In *Bondi*, plaintiffs raised a Second Amendment challenge to a recent Florida law that prevented individuals under 21 from purchasing, but not possessing, firearms.[3] *Bondi*, 2023 WL 2484818, at *1. The Eleventh Circuit canvassed the historical evidence of age-related firearm regulations, particularly state laws during the Reconstruction period. *Id.* at *6-8. The court observed that "between the Fourteenth Amendment's ratification and the close of the nineteenth century," a "total of at least twenty jurisdictions" banned "sales of firearms to 18-to-20-year-olds." *Id.* at *8 (citing examples). The court also observed that newspapers from that time also reflected a recognition by the Fourteenth Amendment's ratifiers

---

[3] The Florida law is in fact more restrictive than the federal law at issue here because it applies to all firearms, not just handguns, and prohibits all sales, not just those by FFLs. *See Bondi*, 2023 WL 2484818, at *2 (citing 2018 Fla. Laws 10, 18-19 (codified at Fla. Stat. § 790.065(13))).

that legislatures may restrict firearm purchase or possession by individuals under the age of 21, *id.* at *10-11, and relied on Thomas Cooley's treatise providing the same conclusion, *id.* at *11 (citing Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883). The court rejected the plaintiffs' analogy to militia laws, noting that the plaintiffs "mistake[] a legal obligation for a right." *Id.* at *12. The court concluded that the challenged law was constitutional. *Id.* at *13. This Court should follow the Eleventh Circuit's approach and uphold the federal laws at issue here as consistent with the Nation's historical tradition of firearm regulation.

## IV. Plaintiffs' Reliance upon Founding-Era Militia Statutes Is Misplaced and Proves Too Much.

Plaintiffs put great stock in the fact that 18-year-olds could serve in some militias at the time of the framing of the Second Amendment and rely principally on the Militia Act of 1792. *See* Pls.' Br. 8-11. But plaintiffs fail to account for the fact that minimum age for militia service fluctuated dramatically, ranging from 21 years old (the common law age of majority at the time) to 16 years old in some states at some points. That history alone demonstrates that Congress and state legislatures have authority to set reasonable age requirements for purchasing guns—not, as Plaintiffs suggest, that the Constitution itself fixes the minimum age at 18.

Contrary to Plaintiffs' arguments, the states and Congress recognized that those under 21 years old were unemancipated minors, subject to special regulations and the oversight of parents or legal guardians, even while serving in the militia. During the founding, both Congress and various states recognized the role that parents or legal guardians would play in overseeing their minor children enrolled in militia service, going as far as to require that parents or guardians provide firearms for their children's militia service. Thus, the mere possibility of service by 18-to 20-year-olds in the militia does not alter the contemporary background legal principle that rights

under the Second Amendment attach at the age of 21. *See, e.g.*, William Blackstone, 1 *Commentaries On The Laws Of England* 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years, which age is completed on the day preceding the anniversary of a person's birth; who till that time is an infant, and so styled in law."); Black's Law Dictionary 847 (9th ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority.").

> ### a. At the Time of the Framing of the Second Amendment, the Minimum Age for Militia Service Fluctuated from 16 Years Old to 21 Years Old.

Prior to and during the Founding Era pertinent to the Second Amendment, the minimum age to serve in militias varied dramatically. A number of States — Delaware, Georgia, Kansas, New Jersey, North Carolina, Ohio, Pennsylvania — chose at certain points to enroll only individuals over 21 in their respective militias. *See* Ex. C, ECF No. 30-3 (chart reproducing statutory provisions setting 21 as the minimum age for militia service).

In other states, the minimum age to serve varied between 16 and 21. In 1705, during Queen Anne's War (1702-1713), Virginia set the age restriction on militia duty at 16. *See* Ex. E (chart reproducing early New Jersey and Virginia militia laws). In 1723, it raised the minimum age for militia duty to 21. *See id.* The minimum age remained at 21 when Virginia passed a later militia law in 1738, and when it sought recruits for a 1754 expedition against the French. *See id.* In 1755, at the beginning of the Seven Years War, the legislature lowered the minimum age for service to 18. *See id.* At the beginning of the Revolutionary War, the legislature lowered the minimum age to 16. *See id.*

In 1784, the legislature raised the minimum age to 18. *See id.* Multiple other states set the minimum age for militia service at 16. At the time Massachusetts ratified the Constitution on

February 6, 1788, its militia laws allowed service "from sixteen to forty years of age." I. Thomas & E.T. Andrews, The Perpetual Laws of The Commonwealth of Massachusetts from the Establishment of Its Constitution in the Year 1780 to the End of the Year 1800, at 339 (1801). Similarly, in 1777, the New Jersey legislature set 16 as its minimum age for required militia service. *See* Ex. G, ECF No. 30-7 (chart of early state militia laws allowing 16-year-olds to serve). In 1778, it raised the minimum age for required service to 21, while expressly reserving the right to accept volunteers "between the Age of sixteen and twenty-one years." *See* Ex. E, ECF No. 30-5. Indeed, eleven out of the first fourteen states set 16, not 18, as the minimum age of service in the militia as of the time the Constitution and the Second Amendment were ratified. *See* ECF No. 36-1.[4]

Plaintiffs ignore these historical facts. In their rush to rely upon the fluctuating minimum age for militia service, they run into the problem that their argument proves too much: under their theory, 16-year-olds should have an unrestricted right to purchase a handgun because they were allowed to serve in militias at points during the Founding Era. Yet Plaintiffs offer no coherent principle explaining why 18-year-olds—but not 16-year-olds—should have unrestricted rights to purchase handguns from FFLs. Plaintiffs point to the "Loyalty Test" regulations applicable during this era, which they say prohibited possession of firearms by certain individuals over the age of 18 who would not swear allegiance against the crown. *See* Pls.' Br. 17. But the sources on which

---

[4] Today, both federal law and Virginia state law continue to recognize the role that militias might play in the common defense. These modern statutes set the minimum age for service at 17 (for the federal militia) and 16 (for the Commonwealth's militia). Under federal law, the "militia of the United States consists of all able-bodied males at least 17 years of age and . . . under 45 years of age . . . and of female citizens of the United States who are members of the National Guard." 10 U.S.C. § 246(a) (2016). And under Virginia law, "[t]he militia of the Commonwealth of Virginia shall consist of all able-bodied residents of the Commonwealth . . . who are at least 16 years of age and . . . not more than 55 years of age." Va. Code Ann. § 44-1 (West 2015).

Plaintiffs rely only provide two examples: one from Pennsylvania in which the Loyalty Test operated against individuals over 18, and one from Massachusetts that operated against individuals over 16. *See Nat'l Rifle Ass'n, Inc. v. ATF*, 714 F.3d 334, 343 n.21 (5th Cir. 2013) (Jones, J., dissenting); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 505 n.122 (2004). And these ages correspond to the age for militia service in these two states, with Pennsylvania being one of the minority of states that set 18 as the minimum age of militia service prior to 1791. *See* ECF No. 36-1. Thus, the age cutoff for these Loyalty Tests was likely meant to disarm members of the militia, and does not imply an individual right to keep and bear arms outside the context of militia service for those over the age of 18 or 16. The reality is that the mere service by minor children in the militia (either in 1791 or today) does not reverse the historical understanding that legislatures may regulate firearm ownership by people under 21, which was the age of majority when the Second and Fourteenth Amendments were ratified.

### b. During the Founding Era, Congress and the States Recognized that Militia Service Did Not Emancipate Minors from the Care and Authority of Their Parents or Legal Guardians.

Plaintiffs also fail to recognize that the ability to bear arms in the highly regulated context of military service is not inconsistent with conditions on the commercial acquisition of handguns from FFLs, including age qualifications, as a matter of historical practice and common sense. *See Bondi*, 2023 WL 2484818, at *12 (holding that "the historical record shows that merely being part of the militia did not entitle 18-to-20-year-olds to enjoy the same political and civil rights as adults," and discussing a Tennessee Supreme Court case, *State v. Callicutt*, 69 Tenn. 714, 714 (1878), that rejected a similar argument).

Longstanding conditions on the acquisition and/or possession of handguns and other firearms by those under the age of 21 include—and presuppose—the active oversight by parents or legal guardians.  In the 1968 Gun Control Act, Congress expected that parents could serve as the initial gatekeepers to determine whether their minor children were mature enough to handle a handgun.  *See* Defs.' Br. 5.  And this is similar to the oversight that parents and legal guardians played over their minor children at the time of the drafting of the Second Amendment. *See* Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1, 6-7 (2021).

During the founding era, Congress and the states expressly recognized that those under 21 years old were generally unemancipated and subject to parental authority.  For example, Michigan, Missouri, and New York required parental consent for individuals under 21  to serve in their militias. *See* Ex. D (chart summarizing state laws that required parental consent for those under 21 to serve in the militia).  Colonial Pennsylvania in 1755 passed a Militia Act, drafted by Benjamin Franklin, that permitted persons under 21 to enroll in the militia but provided "that *no youth under the age of twenty-one years*, . . . shall be admitted to enroll himself, or be capable of being enrolled, in the said companies or regiments *without the consent of his or their parents or guardians*, masters or mistresses, in writing under their hands first had and obtained." An Act for the Better Ordering and Regulating Such as Are Willing and Desirous to Be United for Military Purposes Within this Province, Nov. 25, 1755, in 3 Jared Sparks, ed., *The Works of Benjamin Franklin* 78, 82-83 (1836) (emphasis added).  Other States required parents to furnish the firearms for their minor child's militia duty. *See* Ex. F (chart summarizing states that required parents to furnish firearms to their minor children enrolled in militia service).

The role of parents in overseeing their minor children's involvement in militia service was also recognized by Congress.  In the course of Congressional debate over the 1792 Militia Act, while Congress was considering whether the United States should furnish firearms to persons who were unable to equip themselves, Representative John Vining "asked by what means minors were to provide themselves with the requisite articles?" *See* 2 The Debates and Proceedings in The Congress of The United States 1854-55 (1834) (relevant portions attached as Exhibit H). The remedy, according to Representative Jeremiah Wadsworth, was that "as to minors, their parents or guardians would prefer furnishing them with arms themselves." *Id.* at 1855-56.

Thus, when it comes to the use of firearms by minors, it is a long-standing tradition for parents and legal guardians to provide oversight.  The regime established by the 1968 Gun Control Act allows 18- to 20-year-olds to possess handguns but prohibits such persons from directly purchasing handguns from FFLs.  The idea behind this provision is to defeat the *clandestine* acquisition of handguns by minors, and instead, to encourage parental supervision of minors when possessing or using handguns.  Such a regime does not offend the Second Amendment.

## V.      Fundamental Rights Are Subject to Reasonable Age Restrictions Set by the Legislature.

It is well established in our history that the legislature may draw categorical minimum age limits for certain activities.  *See, e.g.*, U.S. Const. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years"); *id.*, art. I, §3, cl. 3 ("No Person shall be a Senator who shall not have attained to the Age of thirty Years"); *id.*, art. II, § 1, cl. 5 (no person shall be eligible for the office of President "who shall not have attained to the Age of thirty five Years"); *id.* amend. XXVI, § 1 ("The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or

by any State on account of age."). And the legislature has the power to set different minimum ages for different activities.[5] "[S]tatutes setting different ages at which a person may engage in an activity or be treated as an adult are within the province of the legislature." 42 Am. Jur. 2d Infants § 6 (2019); *see also Jones v. Jones*, 72 F.2d 829, 830 (D.C. Cir. 1934) (observing that at common law, individuals were deemed infants until age 21, but noting that "the Legislature may regulate the age of majority for infants in all cases, or for specified purposes only."); *Allam v. State*, 830 P.2d 435, 438 (Alaska Ct. App. 1992) ("There is no legal requirement that the same age of majority apply to all activities and circumstances."); *Rourke v. U.S. Fid. & Guar. Co.*, 1 S.E. 2d 728, 731 (Ga. 1939) ("The legislature has ample power to regulate the age of minority or majority, and it may prescribe a longer period of minority for some purposes than for others.").

This same principle applies equally to fundamental rights such as the right to keep and bear arms. The right to vote is a fundamental right, *see Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986), but prior to the Twenty-Sixth Amendment, nothing *constitutionally* prevented legislatures from setting the minimum age to vote at 21. *See Oregon v. Mitchell*, 400 U.S. 112, 118 (1970) (striking down a portion of federal law lowering the voting age in state, county, and municipal elections from 21 to 18); *id*. at 294-95 ("Obviously, the power to establish an age qualification must carry with it the power to choose 21 as a reasonable voting age, as the vast majority of the States have done.") (Stewart, J., joined by Burger, C.J. and Blackmun, J., concurring in relevant part). Indeed, prior to 1971, the Constitution itself expressly recognized that voting rights attached at 21 years of age, not 18. *See* U.S. Const. amend. XIV, § 2. This was

---

[5] For example, in Virginia, a person must be 21-years-old to buy beer. Va. Code Ann. § 4.1-304(A) (West 2019). And as of July 2019, a person must be 21-years-old to buy cigarettes. *See* 2019 Virginia Laws Ch. 90 (H.B. 2748) (amending Va. Code § 18.2-371.2 to raise the minimum age from 18 to 21).

so because of the well-understood principle that rights—even fundamental rights—generally attach at age 21, the common law age of majority.

The Second Amendment was adopted against this same background principle. Unlike the right to vote, however, there has been no formal constitutional amendment to alter this original understanding. Therefore, the age at which Second Amendment rights attach remains as originally understood in 1791: 21 years old. Thus, Congress is well within its authority to set a minimum age of 21 to purchase handguns from an FFL.

## VI.   Youth Is Not a Suspect Class with Immutable Characteristics.

Plaintiffs continue to argue that this Court should make new law and hold that youth is a suspect or quasi-suspect class. *See* Pls.' Br. 25-29. This flies in the face of the Supreme Court's statement in *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000), that "[a]ge is not a suspect classification under the Equal Protection Clause." That should be the end of the matter. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) ("This Court has said repeatedly that age is not a suspect classification under the Equal Protection Clause.").

Plaintiffs persist by arguing that *Kimel* and related cases are distinguishable because they referenced "a materially different form of age-based classification, the use of a maximum age for older adults." Pls.' Br. 26. While this is true, this fact weakens, rather than strengthens Plaintiffs' argument. In *Kimel*, the plaintiffs faced mandatory retirement ages. In other words, (relative) youth vanished, never to be regained. Yet the Supreme Court approved this regime, holding that it did not violate the Equal Protection Clause.

In the current case, Plaintiffs do not even face the degree of disability that the *Kimel* plaintiffs faced. The current Plaintiffs still have their (relative) youth. In three years (or less), they will "age out" of their supposed disability, enjoying the full panoply of rights under the Second

15

Amendment.  This is an age-based classification that imposes a far lower cost than the *Kimel* plaintiffs suffered.  Moreover, "[e]ven if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required."  *Vance v. Bradley*, 440 U.S. 93, 108 (1979) (citation and internal quotation marks omitted); *see also Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976) (upholding mandatory retirement age for state police officers and recognizing that such "drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one" and that "[p]erfection in making the necessary classifications is neither possible nor necessary").

Plaintiffs also argue that youth presents "immutable" characteristics that trigger suspect classification. Pls.' Br. 28.  The problem with this analogy is apparent: youth is not "immutable." *See* Merriam-Webster's Collegiate Dictionary (10th ed. 1998) (defining "immutable" as "not capable of or susceptible to change").  Unlike race or biological sex, which are generally constant and unchanging, "youth" as a classification eventually disappears—all too quickly.

The bottom-line is that youth is not a suspect or quasi-suspect classification that triggers Equal Protection analysis.  The Plaintiffs will soon "age out" of this classification.  As such, heightened scrutiny does not apply to Plaintiffs' Equal Protection claims.[6]

---

[6] In a glancing fashion, Plaintiffs argue that "young adults are politically insular minorities relegated to a position of relative powerlessness" due to the fact that older people have had additional time and influence within the political system. *See* Pls.' Br. 28. This questionable "us-versus-them" characterization ignores the fact that every single person in young adults' supposed political opposition was, at some point, young themselves. *Cf. General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 591 (2004) "[T]he record is devoid of any evidence that younger [people] [a]re suffering at the expense of their elders . . . . Common experience is to the contrary").

16

Moreover, Plaintiffs have not established that the challenged laws fail rational-basis review. Under rational-basis review, Plaintiffs bear "the burden 'to negative every conceivable basis which might support" the statute, without regard to "whether the conceived reason for the challenged distinction actually motivated the legislature." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)); *see also* Defs.' Br. 28-29. Plaintiffs entire argument that the statute is "irrational" is contained in a single sentence, *see* Pls.' Br. 29, and does not contend with any of Congress's stated reasons for passing these laws, let alone other conceivable rationales. Plaintiffs' cursory argument cannot meet the heavy burden to show that the statute fails rational-basis review. Thus, Plaintiffs' Equal Protection claim should be dismissed.

## CONCLUSION

Because the challenged regulations do not violate the Second Amendment or the Fifth Amendment, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint with prejudice.

Dated:  March 15, 2023

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:    /s/ *Jonathan H. Hambrick*
Jonathan H. Hambrick
VSB No. 37590
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5400 (phone)
(804) 819-7417 (fax)
jay.h.hambrick@usdoj.gov

17

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

MICHAEL P. CLENDENEN
(D.C. Bar No. 1660091)
Trial Attorney
DANIEL RIESS
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-0693
Fax: (202) 616-8460
michael.p.clendenen@usdoj.gov

*Attorneys for Defendants*

18

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Elliott Harding, Esquire
Harding Counsel, PLLC
608 Elizabeth Avenue
Charlottesville, VA 22901

/s/ *Jonathan H. Hambrick*
Jonathan H. Hambrick
VSB No. 37590
Attorney for the Defendants
Office of the United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone:  (804) 819-5400
Facsimile:  (804) 771-2316
Email:  jay.h.hambrick@usdoj.gov